**"UNDER SEAL"**

FILED
CHARLOTTE, NC

MAR 1 8 2019

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 5:19-CR- 22-FDW |
| | ) | |
| vs. | ) | **BILL OF INDICTMENT** |
| | ) | |
| 1) GREG E. LINDBERG, | ) | Violations: |
| 2) JOHN D. GRAY, | ) | 18 U.S.C. § 1349 |
| 3) JOHN V. PALERMO, JR., and | ) | 18 U.S.C. § 666(a)(2) |
| 4) ROBERT CANNON HAYES. | ) | 18 U.S.C. § 1001(a)(2) |
| | ) | 18 U.S.C. § 2 |
| | ) | |

THE GRAND JURY CHARGES:

## Relevant Individuals and Entities

At all times material to this Bill of Indictment, unless otherwise stated:

1. The North Carolina Department of Insurance ("NCDOI") was a department established under the North Carolina General Statutes and charged with the execution of laws relating to insurance and other subjects. The chief officer of the NCDOI was the elected Commissioner of Insurance ("COMMISSIONER").

2. The North Carolina General Statutes provided that the COMMISSIONER was responsible for ensuring that the statutes governing insurance were faithfully executed, and further provided that "[t]he Commissioner shall appoint or employ such other deputies, actuaries, economists, financial analysts, financial examiners . . . accountants . . . and other employees that the Commissioner considers to be necessary for the proper execution of the work of the Department." As an elected official, the COMMISSIONER swore to "be faithful and bear true allegiance to the State of North Carolina" when he took office in January 2017.

a. In January 2018, the COMMISSIONER reported to federal law enforcement officials concerns about political contributions and requests made by GREG E. LINDBERG and JOHN D. GRAY. The COMMISSIONER agreed to cooperate with the then-initiated federal investigation, and did so in the ensuing months.

3. Defendant GREG E. LINDBERG was a resident of Durham, North Carolina, the founder and Chairman of Eli Global, LLC, an investment company, headquartered in Durham, North Carolina, and the owner of Global Bankers Insurance Group ("GBIG"), a managing company for several insurance and reinsurance companies, headquartered in Durham, North Carolina.

4. GBIG managed several insurance companies across the United States and was subject to regulation by the NCDOI. Beginning in or about September 2017, and continuing through in or about February 2018, GBIG was subject to an ongoing periodic examination conducted by the NCDOI pursuant to North Carolina General Statute § 58-2-131, which provides that the NCDOI shall conduct a financial examination of every domestic insurer when "prudent for the protection of the policy holders or the public," but "not less frequently than once every five years." Following the periodic investigation, GBIG was subject to a remediation agreement it signed with the NCDOI in or about May 2018.

5. Defendant JOHN D. GRAY was a resident of Chapel Hill, North Carolina, and a consultant for LINDBERG.

6. Defendant JOHN V. PALERMO, JR. was a resident of Pittsboro, North Carolina, the Vice President of Special Projects at Eli Global, and the Chairman of a Chatham County political party.

7. Defendant ROBERT "ROBIN" CANNON HAYES was a resident of Concord, North Carolina, and the Chairman of a North Carolina state political party ("North Carolina State Political Party A").

8. North Carolina election law set contribution limits for contributions to candidates ($5,200 per election in 2018). N.C. Gen. Stat. § 163A-1425(a) and (c). This limit, however, did not apply to "any national, State, district or county executive committee of any political party." N.C. Gen. Stat. § 163A-1425(g). Nor did it apply to any "independent expenditure committee." N.C. Gen. Stat. § 163A-1425(j). North Carolina law also prohibited conduit contributions or

contributions made anonymously or in the name of another. N.C. Gen. Stat. § 163A-1428(a).

### COUNT ONE
### 18 U.S.C. § 1349
### (Conspiracy to Commit Honest Services Wire Fraud)

9. Paragraphs 1 through 8 are realleged and incorporated herein by reference.

10. From in or about April 2017, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants,

**(1) GREG E. LINDBERG,**
**(2) JOHN D. GRAY,**
**(3) JOHN V. PALERMO, and**
**(4) ROBERT CANNON HAYES,**

did knowingly combine, conspire, confederate, and agree with one another, and with others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and to deprive, by means of material false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by means of wire communication in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice to defraud and deprive, that is, to deprive North Carolina and the citizens of North Carolina of their intangible right to the honest services of the COMMISSIONER, an elected State official, through bribery, in violation of 18 U.S.C. §§ 1343 and 1346.

### A. The Scheme to Defraud

11. From in or about April 2017, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants, GREG E. LINDBERG, JOHN D. GRAY, JOHN V. PALERMO, and ROBERT CANNON HAYES, devised and intended to devise a scheme and artifice to defraud and to deprive North Carolina and the citizens of North Carolina of their intangible right to the honest services of the COMMISSIONER, an elected State official, through bribery.

## B. **The Purpose of the Scheme**

12.  The purpose of the scheme was for the defendants to unlawfully cause the COMMISSIONER to take official action favorable to LINDBERG's companies through bribery of the COMMISSIONER.

## C. **The Manner and Means of the Scheme**

13.  The manner and means by which the defendants carried out the scheme included, but were not limited to, the following:

14.  The defendants corruptly gave, offered, and promised things of value to the COMMISSIONER, including millions of dollars in campaign contributions and through an independent expenditure committee, in exchange for specific official action favorable to GBIG, including the removal of the Senior Deputy Commissioner of the NCDOI responsible for overseeing the regulation, including the pending periodic examination, of GBIG ("Senior Deputy Commissioner A").

15.  LINDBERG, GRAY, and PALERMO surreptitiously met with the COMMISSIONER at various locations throughout North Carolina, including the Statesville Regional Airport in Statesville, North Carolina, and LINDBERG's residence in Durham, North Carolina, to discuss LINDBERG's request for the removal of Senior Deputy Commissioner A in exchange for millions of dollars in campaign contributions to the COMMISSIONER.

16.  In order to conceal the scheme, the defendants took steps to anonymously funnel the campaign contributions to the COMMISSIONER in a manner to avoid publicly disclosing that they had come from LINDBERG.

   a.  At LINDBERG's direction, PALERMO set up two corporate entities to form an independent expenditure committee with the purpose of supporting the COMMISSIONER's campaign for re-election. LINDBERG funded the two corporate entities—as he and GRAY promised to the COMMISSIONER—with $1.5 million.

   b.  At LINDBERG and GRAY's direction—and as an installment on the $500,000 promised to the COMMISSIONER by LINDBERG and GRAY—HAYES caused the transfer of $250,000, from monies LINDBERG had previously contributed to North Carolina State

Political Party A, to the COMMISSIONER's campaign for re-election.

17. In addition, over the course of the scheme, the defendants concealed that they had provided campaign contributions to the COMMISSIONER in exchange for the favorable personnel action.

## D. Acts in Furtherance of the Scheme

18. The acts in furtherance of the scheme included, but were not limited to, the following:

<u>Initial Attempts to Contact the COMMISSIONER</u>

19. On or about April 18, 2017, LINDBERG attempted to contribute $10,000 to the COMMISSIONER's campaign for re-election, but the COMMISSIONER rejected LINDBERG's contributions.

20. In or about August 2017, GRAY requested that HAYES schedule a meeting between the COMMISSIONER and LINDBERG and GRAY. HAYES confirmed that he was attempting to do so. Indeed, in November 2017, HAYES sent a text message to the COMMISSIONER suggesting, "I think u should consider a face to face with Greg [LINDBERG]."

21. On or about November 13, 2017, HAYES sent an email to PALERMO regarding political matters stating, in part, "If u agree, I'll suggest u put the money in the party and we will put it in races at your direction."

22. On or about November 19, 2017, GRAY and PALERMO exchanged emails about the identity of Senior Deputy Commissioner A.

23. On or about November 20, 2017, LINDBERG, GRAY, and GBIG executives met with the COMMISSIONER. During the meeting, LINDBERG asked the COMMISSIONER to call several insurance commissioners from other states where LINDBERG was attempting to complete acquisitions to vouch for LINDBERG and GBIG. The COMMISSIONER agreed to make those phone calls, and GRAY later called the COMMISSIONER to explain that LINDBERG had contributed $500,000 to North Carolina State Political Party A, $110,000 of which was earmarked for the COMMISSIONER. GRAY also stated that LINDBERG wanted to host a fundraiser for the COMMISSIONER.

24. On or about November 27, 2017, GRAY sent a text message to the COMMISSIONER requesting a private meeting: "We spoke of an opportunity to speak privately after our recent meeting & I am interested in how & when this could work in your schedule."

25. On or about November 28, 2017, GRAY and PALERMO exchanged text messages about hosting a fundraiser for the COMMISSIONER, which the COMMISSIONER declined through a representative.

<u>Use of Another Public Official to Contact the COMMISSIONER</u>

26. Between on or about February 1, 2018, and on or about February 4, 2018, GRAY and PALERMO exchanged text messages explaining that LINDBERG's political contributions to an elected public official ("Public Official A") were on hold in light of recent publicity about LINDBERG's contributions. GRAY further stated, "I explained we should meet our agreement as [Public Official A] has no influence with [the COMMISSIONER]. Now I'm thinking a full explanation is warranted so [Public Official A] has the opportunity to consider conf. with [the COMMISSIONER] if he knows hin."

27. GRAY later called Public Official A and, on or about February 5, 2018, sent a text message to LINDBERG stating, "I have discussed our NCDOI matter with [Public Official A]. Please call before your trip to Greensboro today so we can discuss details. Excellent opportunity available for support here." On the same date, LINDBERG made a $150,000 contribution to a political committee supporting Public Official A.

28. On or about February 7, 2018, Public Official A called the COMMISSIONER to explain that LINDBERG was doing good things for North Carolina business.

29. On or about February 12, 2018, PALERMO sent an email to LINDBERG and GRAY stating, "Just between the 3 of us . . . . [Public Official A] has already made two calls on our behalf and is trying to help us move the ball forward. I was also told that the $150K will be going to [Public Official A]."

## Complaints About the Senior Deputy Commissioner

30. On or about February 14, 2018, LINDBERG and GRAY met with the COMMISSIONER in a private conference room at the Concord Regional Airport in Concord, North Carolina. Leading up to the meeting, GRAY explained that the meeting would be secret, and told the COMMISSIONER that GRAY and LINDBERG would enter the facility through a different door from the COMMISSIONER so that nobody would see them together.

31. During the meeting, LINDBERG complained about various issues with the NCDOI, including Senior Deputy Commissioner A. LINDBERG stated that she was "deliberately and intentionally and maliciously hurting my reputation with other regulators," and that she's "been lying to you to, to hurt my bad name."

32. LINDBERG and GRAY suggested that the COMMISSIONER hire PALERMO at the NCDOI in place of, or in a superior role to, Senior Deputy Commissioner A.

33. To facilitate this personnel action, GRAY suggested that the COMMISSIONER meet with PALERMO in private at a closed restaurant in Chapel Hill, North Carolina.

34. On or about February 26, 2018, the COMMISSIONER met PALERMO at the closed restaurant in Chapel Hill, North Carolina. During the meeting, PALERMO suggested that the COMMISSIONER hire PALERMO onto the NCDOI staff and LINDBERG would pay PALERMO a substantial exit package to make up for the difference in compensation between his salary at Eli Global and his salary at the NCDOI.

## LINDBERG Offers the Bribe

35. On or about March 5, 2018, LINDBERG, GRAY, PALERMO, and the COMMISSIONER met at the Statesville Regional Airport in Statesville, North Carolina. During the meeting, the parties discussed various pending matters between GBIG and the NCDOI.

36. When the COMMISSIONER informed LINDBERG, GRAY, and PALERMO that he might be able to hire PALERMO as early as April 1st, LINDBERG responded, "that'd be great, that's a homerun." LINDBERG also

confirmed that he would provide PALERMO with an exit package to compensate him.

37. GRAY informed the COMMISSIONER that he should have PALERMO report directly to him so nobody at the NCDOI could question what PALERMO was doing, and "if you could set it so that if, if [Senior Deputy Commissioner A] stays where she is, she doesn't breathe a word outside that office, or send a slip of paper outside that office, that is not reviewed first by John [PALERMO]."

38. The COMMISSIONER asked to speak with LINDBERG alone, and during that portion of the meeting, the COMMISSIONER asked LINDBERG, "What's in it for me? What can you do to help that's not gonna be . . . under the radar screen?" LINDBERG responded that he would create an independent expenditure committee to support the COMMISSIONER's re-election and fund it himself with $1 million to $2 million.

39. Following the meeting, GRAY called the COMMISSIONER to thank him and called the meeting a "fantastic result." During the call, GRAY stated, "Well, I'm gonna tell you somethin'. And this is not to influence you in any way, shape, or form. But if-if-if we get this-if we get this current [financial examination report] business put to bed and we get John [PALERMO] there so he can help you be that, as I say, the most successful insurance commissioner in my lifetime, there will be at least a million dollars somewhere in your re-election. I can tell you that. At least a million."

40. On or about March 13, 2018, PALERMO sent GRAY an email comparing 501(c)(4) and 527 committees (referring to designations for certain organizations that can engage in political activity under the Internal Revenue Code), which were the corporate structures for the proposed independent expenditure committee offered by LINDBERG to the COMMISSIONER. After exchanging emails with LINDBERG about the subject, GRAY informed PALERMO that non-disclosure was "a must."

### LINDBERG Offers Alternative to Hiring PALERMO

41. On or about March 27, 2018, the COMMISSIONER met with LINDBERG, GRAY, PALERMO, and others at the GBIG headquarters in Durham, North Carolina. During the meeting, the COMMISSIONER asked to speak with LINDBERG alone.

42. During that portion of the meeting, the COMMISSIONER informed LINDBERG that he did not think it would be a good idea to hire PALERMO at the NCDOI, as it would be well known that PALERMO came from LINDBERG's company and was liable to end up in the newspaper.

43. LINDBERG agreed and offered instead that "we recruit someone brand new to the Department with the same skill set." Later in the meeting, LINDBERG offered that the COMMISSIONER should instead move Senior Deputy Commissioner A to another Division of the NCDOI and move the head of the other Division ("Division Head 1") to Senior Deputy Commissioner A's position.

Further Discussions About the Independent Expenditure Committee

44. On or about May 2, 2018, LINDBERG and the COMMISSIONER spoke on the telephone about the status of the independent expenditure committee. LINDBERG stated that "we're ready" to send $200,000 through North Carolina State Political Party A as soon as the COMMISSIONER was ready to receive it, and "we'll just send that to Robin HAYES and he can do a candidate directed donation from there." He further stated that "we've got a million we're planning on putting into this independent expenditure committee," and the independent expenditure committee would be administered by two individuals related to GRAY and PALERMO.

45. After that discussion, LINDBERG stated that the "only other open item was" the swap of Division Head 1 selected by LINDBERG with Senior Deputy Commissioner A.

46. On or about May 16, 2018, LINDBERG, GRAY, and the COMMISSIONER met at LINDBERG's residence in Durham, North Carolina. During the meeting, the COMMISSIONER asked about the status of the independent expenditure committee, and LINDBERG asked about the exchange of Division Head 1 with Senior Deputy Commissioner A. LINDBERG further offered, "Leave [Division Head 1] where she is and just tell her that she's going to handle our stuff, we're good to go."

47. At the same meeting, LINDBERG and GRAY stated that they were willing to transfer $500,000 to the COMMISSIONER's campaign through North Carolina State Political Party A. GRAY then stated, "But if, if [Division

Head 1] could be the lead financial analyst, the, the problems that, that we are experiencing will disappear."

48. LINDBERG later summarized, "The bottom line is we hear you loud and clear on [the name of the person the COMMISSIONER provided to run the independent expenditure committee]; the [North Carolina State Political Party A] thing; and I think the only final thing to put all this to bed and get you out of the, the muck, is to get, to get us over to [Division Head 1]."

49. In a telephone call following the meeting, GRAY told the COMMISSIONER that he had a $500,000 check for North Carolina State Political Party A that would be for the benefit of the COMMISSIONER.

50. On or about May 16, 2018, LINDBERG wrote a $500,000 check to North Carolina State Political Party A.

## HAYES Discusses the Bribe with the COMMISSIONER

51. On or about May 21, 2018, HAYES and the COMMISSIONER spoke on the telephone. During the call, the COMMISSIONER asked, "Did John [GRAY] . . . mention anything to you about what they're doing?" HAYES confirmed, "Yeah, we are, more than happy to help, so, when all that comes through we'll be glad to figure out the best way to, do it." Later in the call, the COMMISSIONER stated, "John [GRAY] and Greg LINDBERG had pledged, to, you know, they had a half million dollars the other day when I was meeting with them and they said that, you know, 'this is what we're going to give to the Party so . . . that they can give a check to you.'" The COMMISSIONER also told HAYES about the independent expenditure committee promised by LINDBERG, and HAYES assured that "they always do what they say they're going to do."

52. During the call, HAYES then raised the personnel change requested by LINDBERG, stating, "Well, the thing that I heard that I think is important is, and I don't know enough about it to really spoke intelligently, but there were some personnel issues, that they were hoping that you would, and I don't even know the lady that was apparently really, really good, in financial analysis, that they would like to see put back into that Department to make sure that things got done that needed to get done."

## Establishment of the Independent Expenditure Committee

53. On or about May 22, 2018, PALERMO sent an email to the COMMISSIONER entitled, "Special project," in which he requested certain information necessary to establish the independent expenditure committee.

54. On or about May 25, 2018, PALERMO sent an email to LINDBERG and GRAY stating that the independent expenditure committee to support the COMMISSIONER would be ready in two weeks.

55. On or about May 29, 2018, LINDBERG, GRAY, and the COMMISSIONER met again at LINDBERG's residence in Durham, North Carolina to discuss the personnel move and the independent expenditure committee.

56. At the meeting, the COMMISSIONER complained about the changing amounts of money LINDBERG had offered, and the manner in which North Carolina State Political Party A was coordinating the $500,000 contribution to the COMMISSIONER.

57. During the meeting, GRAY stated, "If we want to put it in these terms, if you're willing to have [Division Head 1] handle everything from Global Bankers Insurance Group, then we'll . . .," and LINDBERG interjected, "We'll put the money in the bank." LINDBERG and GRAY then called PALERMO and discussed the timeline to create and fund the independent expenditure committee. During the discussion with PALERMO, LINDBERG confirmed the $1.5 million he would put into the independent expenditure committee and the $500,000 contribution that would be made through North Carolina State Political Party A, bringing the total contribution to the COMMISSONER's campaign to $2 million.

58. After the call with PALERMO, the meeting between LINDBERG, GRAY, and the COMMISSIONER continued, and GRAY asked, "What do we do with [Division Head 1]?" The COMMISSIONER responded, "I'll make the switch when we all get this . . .," and LINDBERG interjected, "Get the check cleared." When the COMMISSIONER confirmed, LINDBERG responded, "That's a homerun."

59. After the meeting, GRAY sent the contact information for the COMMISSIONER's campaign treasurer to LINDBERG, PALERMO, and

Case 5:19-cr-00022-FDW-DSC   Document 3   Filed 03/18/19   Page 11 of 23

HAYES. The next day, HAYES sent the campaign treasurer an email requesting the wire transfer information for the COMMISSIONER's campaign. The campaign treasurer responded on or about June 6, 2018, and North Carolina State Political Party A transferred $10,000 to the COMMISSIONER's campaign on or about June 15, 2018, and another $10,000 one month later, on or about July 16, 2018.

60. On or about June 7, 2018, PALERMO sent LINDBERG an email about the two corporate entities he had established to form the independent expenditure committee in support of the COMMISSIONER. On or about June 8, 2018, LINDBERG wrote a check to one of the entities for $500,000 and another check for $1.0 million to the other entity. PALERMO cashed both checks, and on or about June 11, 2018, PALERMO sent an email to LINDBERG and GRAY stating, "In essence, for you conversations with [the COMMISSIONER], the 2 entities are ready to go."

61. On or about June 19, 2018, GRAY told the COMMISSIONER that the independent expenditure committee had been funded with $1.5 million.

### LINDBERG, GRAY, and PALERMO Further Push the COMMISSIONER

62. On or about June 29, 2018, LINDBERG sent an email to various individuals, including PALERMO, stating, "We are shutting down donations until we see some improvement in the NC DOI staff." PALERMO forwarded the email to GRAY.

63. On or about July 6, 2018, PALERMO sent an email to LINDBERG that began, "For Internal Use Only." In the email, PALERMO stated that he had lunch with Public Official A and "took the opportunity to talk to him about our issue with the DOI." PALERMO went on to state, "I think [Public Official A] got the message and will reach out to [the COMMISSIONER] over the weekend. Net is . . . in [Public Official A's] words: '[The COMMISSIONER] needs to man-up and do what he agreed to.'" Later in the email, PALERMO stated:

> In this case, John Gray and I are in agreement, when we have a request, and think something has been agreed to, we need to have an end date for it to happen. Otherwise, there is no sense of urgency to get it accomplished. I also wanted you to know that the two entities

we agreed on to be set up, are, and the first board meeting is going to be held on July 18th.

PALERMO ended the email by asking to attend the next scheduled meeting with the COMMISSIONER to "listen in and participate," and recommending that GRAY call the COMMISSIONER before Public Official A. LINDBERG responded, "Good info," and invited PALERMO to attend the meeting. GRAY responded following LINDBERG's email, "Good plan here," and confirmed that he would call the COMMISSIONER.

64. On or about July 9, 2018, PALERMO sent a text message to Public Official A asking if he was able to speak with the COMMISSIONER. Later, PALERMO sent another text message to Public Official A stating that the COMMISSIONER had cancelled a meeting. Public Official A sent a text message back stating that he would call the COMMISSIONER. On the same date, Public Official A called the COMMISSIONER and stated that LINDBERG, GRAY, and PALERMO seemed anxious to find out if the COMMISSIONER had fired or moved someone at the NCDOI.

65. On or about July 9, 2018, the COMMISSIONER called GRAY to inquire about the call from Public Official A. During the call, GRAY assured the COMMISSIONER that he had personally delivered a $500,000 check to North Carolina State Political Party A, and LINDBERG had written checks for the other $1.5 million to the independent expenditure committee. GRAY then asked about moving Division Head 1 into a position to handle GBIG matters. The COMMISSIONER agreed to move forward with that once we "get all this other stuff straight."

66. On or about the same date, PALERMO sent a text message to GRAY asking, "Btw. You [s]aid [the COMMISSIONER] was committed to moving [Senior Deputy Commissioner A]. . . . Did you get a date?" GRAY confirmed that he and LINDBERG would discuss that further with the COMMISSIONER during the last week of July.

67. On or about July 17, 2018, PALERMO sent an email to LINDBERG regarding support for political candidates and the political committees. In the email he stated, "I'm sure [the COMMISSIONER] is going to make the changes he agreed to as long as we set in place a time line for it to happen. I do not think he will walk away from the opportunity in front of him. . . . I am sure [the COMMISSIONER] is going to do what should be in his best interest."

LINDBERG responded, copying GRAY, "Thanks John…will decide on this after we see some progress."

### LINDBERG and GRAY Direct HAYES to Transfer the Bribe

68.  On or about July 25, 2018, LINDBERG, GRAY, and the COMMISSIONER met again at LINDBERG's residence in Durham, North Carolina to discuss a "date certain" for the personnel move and the status of the campaign contributions.

69.  During the meeting, the COMMISSIONER stated that he was not happy with the independent expenditure committee, as it had taken too long to set up and was likely to get publicity given recent publicity about LINDBERG's campaign contributions. The COMMISSIONER requested something that he could control instead.

70.  In response, GRAY offered, "Let's do it through NC, [North Carolina State Political Party A]. That way it's not traced back to Greg [LINDBERG]." GRAY then asked when the personnel change could take place, and stated, "There's five-hundred thousand at the [North Carolina State Political Party A]. Two-hundred fifty-thousand of that can go immediately to your campaign account. And the other two-hundred fifty-thousand can go when you want it."

71.  Throughout the conversation, GRAY and LINDBERG offered to transfer $250,000 from North Carolina State Political Party A to the COMMISSIONER's campaign immediately, followed by another $250,000 after Senior Deputy Commissioner A was moved. LINDBERG then stated that he would contribute $250,000 through North Carolina State Political Party A to the COMMISSIONER each quarter to make up the remainder of the $1.5 million.

72.  GRAY summarized, "Well you're gonna have ten-thousand plus two-hundred fifty-thousand, quickly, if we have, if we have your assurance and a date certain by which the [Division Head 1] staff realignment can occur, then the entirety of that five hundred thousand will go right into your account." And, LINDBERG stated, "Ok, so resolved. You'll get on the horn with Robin [HAYES] right away. Get that check over to [the COMMISSIONER] now. And then by the end of August we'll get you the balance, and we'll get [Division Head 1]."

73. GRAY then called HAYES, while LINDBERG and the COMMISSIONER were still present, to discuss the transfer of $250,000 from North Carolina State Political Party A to the COMMISSIONER's campaign. During the call, GRAY stated, "We've come to the conclusion that it would be better for all of us . . . if we, if we put funds in the [North Carolina State Political Party A] and can, can work out . . . what goes to [the COMMISSIONER], and what I need is for [the COMMISSIONER] to get a transfer from the [North Carolina State Political Party A] in the amount of two-hundred and fifty-thousand this week." HAYES responded, "Ok, well if that's what you want to do, we can do it. It looks a little odd to have that much at one time. You know, we were talking about putting it over, you know, so much a month, so it didn't jump out, but that's what you want to do, we can do it." GRAY stated, "That's what I recommend, [the COMMISSIONER], what do you say?" The COMMISSIONER responded, "Yes." GRAY then asked, "Greg?" LINDBERG responded, "That works for me." GRAY then said, "If you could do that, we would appreciate it." HAYES responded, "Sure." And, GRAY followed up, "We'll get with you and um, understanding that this is all confidential. . . ." HAYES responded, "Yeah, oh, absolutely." GRAY continued, "We're gonna, we're gonna try to help [the COMMISSIONER] build his campaign fund, but we think doing it through the [North Carolina State Political Party A] is probably the way that creates the least amount of consternation for all of us." HAYES responded, "Yeah, well, you know, again, my concern, any large amount like that's gonna draw attention, nothing wrong with it, but they'll see it and somebody will start asking questions, and particularly, given the fact that he doesn't have to run again until what . . . 2020. . . so put a lot of money at one time in there right now, then, they gonna [say], 'well, why . . . you don't have a campaign now.'" But, HAYES confirmed, "Whatever you all want to do, we'll do." HAYES later stated, "All I'm doing is raising a couple points that are my obligation—have you thought of this—but when you say do it, that's easy, that's easy. . . . Alright, I'll get 'er done."

74. On or about July 26, 2018—the very next day—North Carolina State Political Party A transferred $230,000 to the COMMISSIONER's campaign account. When combined with the $20,000 previously transferred, the total transferred was $250,000.

75. On or about July 31, 2018, LINDBERG sent an email to PALERMO, copying GRAY, directing him not to spend any of the money LINDBERG deposited into the independent expenditure committee: "Hi John, please don't spent any of the cash in the 527 and 501c4. . . . Depending on

what happens we may refund the money to me."

## GRAY, PALERMO, and HAYES Confirm the Transfer to the COMMISSIONER

76. On or about August 2, 2018, GRAY spoke with the COMMISSIONER to confirm that the wire transfer had been made of the first $250,000 installment, and to inquire about the status of the personnel move. He asked, "The way we left it, you would, you would make the staff transition, and soon after that we would transfer the other part, is that satisfactory?" GRAY confirmed that they had agreed to transfer half of the $500,000 into the COMMISSIONER's campaign account immediately and half after the personnel change had occurred. At the end of the call, however, GRAY asked, "Do you want the other part of that money, is it necessary for it to be there before you make the realignment?" The COMMISSIONER responded, "I'd like to have [the second $250,000 installment] in there, you know, end, end of August, somewhere in that last week of August. But I'll, I'll continue working on the realignment." GRAY replied, "Well, if you get the realignment done in August, we'll get the other part in there, um, um, on or before the last day of August." The COMMISSIONER agreed and GRAY responded, "I'm delighted."

77. On or about August 3, 2018, PALERMO sent an email to GRAY confirming that the COMMISSIONER's campaign treasurer had received the recent $230,000 wire transfer from North Carolina State Political Party A. Soon thereafter, GRAY sent the COMMISSIONER a text message stating, "I must communicate with you so I can assure Greg [LINDBERG] all is appropriate with our Wed. agreement." He further sent the COMMISSIONER a screenshot confirmation of the wire transfer from North Carolina State Political Party A to the COMMISSIONER's campaign, which he, PALERMO, and HAYES received via email from a representative of North Carolina State Political Party A the night before.

78. On or about August 3, 2018, HAYES also called the COMMISSIONER to confirm receipt of the $230,000 transfer. During the call, HAYES stated, "Okay well, I want to be sure, cuz things are working nicely and they was a lot of concern."

79. On or about August 4, 2018, PALERMO sent a text message to GRAY confirming that he spoke to HAYES, and "Robin [HAYES] spoke to [the COMMISSIONER]. . . . Not sure the entire message was delivered,

however he did confirm that [the COMMISSIONER] said he is on track for the end of the month."

80. On or about August 9, 2018, GRAY forwarded PALERMO a series of communications he had with the COMMISSIONER. PALERMO responded via text message: "It's a comedy of errors that could only happen with [the COMMISSIONER] the helm. . . . Frankly, I'm pissed as a really good initiative is on hold because of a donation and a staff move that might not help."

### HAYES Lies to the Federal Bureau of Investigation

81. On or about August 28, 2018, agents from the Federal Bureau of Investigation approached GRAY to interview him in connection with this matter. Following the interview, at approximately 2:50 p.m., GRAY called HAYES. During the call, GRAY asked, "I got a call from the FBI relative to the money transfers from [North Carolina State Political Party A] to [the COMMISSIONER's] campaign account . . . do we have a problem here?" HAYES responded, "I don't think so, but they called me a minute ago and I'm in Beaufort waiting on them. I'll let you know. . . . I didn't have any idea what was on their mind, but now you've given me a clue." GRAY later stated, "Well . . . , I'm just wondering about it, because there was a phone call that I made, and we discussed [North Carolina State Political Party A] transferring some money at [the COMMISSIONER's] request, and I'm just wondering if that's a problem." HAYES responded, "Shouldn't be, but I'll let you know. . . . Stand down till you hear from me."

82. On the same date, at approximately 3:00 p.m., agents from the Federal Bureau of Investigation arrived to interview HAYES. During the interview, the agents asked HAYES about LINDBERG's $500,000 contribution to North Carolina State Political Party A. Specifically, they asked, "Have you and Mr. LINDBERG, or anybody who represents Mr. LINDBERG, had any discussions about that particular contribution . . . like what his expectations are regarding those funds?" HAYES responded, "Absolutely not." To confirm, the agents then asked HAYES, "With respect to this most recent large contribution he made, which is $500,000, he didn't direct you anywhere where that money would go?" HAYES responded again, "Absolutely not." The agents then asked HAYES, "Did anyone associated with him or his organization direct you where that money would go?" HAYES again responded, "No." Later, HAYES was asked, "Has [GRAY] ever called, even just as a friend, and asked you to do anything for Mr. LINDBERG?" HAYES responded, "Nothing like along the

lines of directing money, no." Still later, HAYES was asked, "You know very clearly that if Mr. LINDBERG put $500,000 in [North Carolina State Political Party A]'s account and then tells Robin HAYES...." HAYES interrupted, "Mr. LINDBERG did not tell me."

83. Additionally, during the interview, the agents asked HAYES about conversations he had with the COMMISSIONER. Specifically, the agents asked, "Have you talked with [the COMMISSIONER] about Mr. LINDBERG or Mr. GRAY?" HAYES responded, "No." HAYES was then asked, "Have you talked with [the COMMISSIONER] about personnel in his office?" HAYES responded, "No." HAYES was then asked, "About personnel problems he has in his office?" HAYES again responded, "No."

### E. **Execution of the Scheme**

84. On or about each of the dates set forth below, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants, GREG E. LINDBERG, JOHN D. GRAY, JOHN V. PALERMO, and ROBERT CANNON HAYES, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce the writings, signs, signals, pictures, and sounds described below:

| **Date** | **Description** |
|---|---|
| June 11, 2018 | Deposit of $500,000 from LINDBERG in North Carolina Growth and Prosperity Committee Account |
| June 11, 2018 | Deposit of $1,000,000 from LINDBERG in North Carolina Growth and Prosperity Committee Account |
| June 15, 2018 | Transfer of $10,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |
| July 16, 2018 | Transfer of $10,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |
| July 26, 2018 | Transfer of $230,000 from North Carolina State Political Party A to the COMMISSIONER's campaign account |

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### 18 U.S.C. §§ 666(a)(2) and 2
### (Bribery Concerning Programs Receiving Federal Funds and Aiding and Abetting)

85. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

86. From in or about March 2018, through in or about August 2018, in Iredell County, in the Western District of North Carolina, and elsewhere, the defendants,

**(1) GREG E. LINDBERG,**
**(2) JOHN D. GRAY,**
**(3) JOHN V. PALERMO, and**
**(4) ROBERT CANNON HAYES,**

did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward an agent of the NCDOI, a State agency that received benefits in excess of $10,000 pursuant to a Federal program involving a grant, contract, subsidy, loan guarantee, and other forms of Federal assistance in 2018, in connection with any business, transaction, or series of transactions of such State government and agency involving something of value of $5,000 or more: namely, the defendants gave, offered, and agreed to give $2 million in campaign contributions and through an independent expenditure committee to the COMMISSIONER, a public official of the State of North Carolina, intending to influence and reward the COMMISSIONER in connection with the transfer of Senior Deputy Commissioner A.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT THREE
### 18 U.S.C. § 1001(a)(2)
### (False Statements)

87. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

88.  On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

**(4) ROBERT CANNON HAYES,**

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that North Carolina State Political Party A had not accepted directed contributions.  This statement was false because, as Chairman of North Carolina State Political Party A, HAYES then and there knew that North Carolina State Political Party A had accepted directed contributions from LINDBERG.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT FOUR
## 18 U.S.C. § 1001(a)(2)
## (False Statements)

89.  Paragraphs 1 through 83 are realleged and incorporated herein by reference.

90.  On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

**(4) ROBERT CANNON HAYES,**

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that neither LINDBERG, nor anyone associated with LINDBERG, had any discussions with HAYES about LINDBERG's expectations with respect to LINDBERG's $500,000 contribution to North Carolina State Political Party A, or directed HAYES where LINDBERG's $500,000 contribution would go.  This was false because HAYES then and there knew that he had conversations with LINDBERG and GRAY during which LINDBERG and GRAY directed HAYES to transfer $250,000 to the COMMISSIONER's campaign.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT FIVE
### 18 U.S.C. § 1001(a)(2)
### (False Statements)

91. Paragraphs 1 through 83 are realleged and incorporated herein by reference.

92. On or about August 28, 2018, in the Western District of North Carolina, and elsewhere, the defendant,

### (4) ROBERT CANNON HAYES,

knowingly and willfully, made a material false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the government of the United States, to wit, a false statement to agents of the Federal Bureau of Investigation that HAYES never spoke with the COMMISSIONER about LINDBERG or GRAY, or personnel or personnel problems at the NCDOI. This statement was false because HAYES then and there knew that he had spoken with the COMMISSIONER about contributions from LINDBERG being funneled through North Carolina State Political Party A to the COMMISSIONER, and about LINDBERG's request that the COMMISSIONER move certain personnel within the NCDOI.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

93. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

    a.     All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendants to the extent of the value of the property described in (a).

94. The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

- a forfeiture money judgment in the amount of at least $2 million, such amount constituting the proceeds of the violations set forth in this Bill of Indictment;

- approximately $250,000 in proceeds voluntarily turned over by the COMMISSIONER to the United States as a result of the investigation;

- and approximately $1.5 million in proceeds deposited into two bank accounts held in the name of North Carolina Growth and Prosperity at Wells Fargo Bank, account numbers *0817 and *0809.

A TRUE BILL

_____
FOREPERSON

R. ANDREW MURRAY
UNITED STATES ATTORNEY

_____
BILL STETZER
FIRST ASSISTANT UNITED STATES ATTORNEY
DANA O. WASHINGTON
ASSISTANT UNITED STATES ATTORNEY

ANNALOU T. TIROL
ACTING CHIEF, PUBLIC INTEGRITY SECTION

_____
JAMES C. MANN
TRIAL ATTORNEY