```
                    UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        STATESVILLE DIVISION


UNITED STATES OF AMERICA     )    DOCKET NO. 5:19-CR-22-1
                             )
        vs.                  )
                             )
GREG E. LINDBERG,            )
                             )
              Defendant.     )
_____)



          TRANSCRIPT OF MODIFICATION OF CONDITIONS OF RELEASE
                  BEFORE THE HONORABLE DAVID S. CAYER
                     UNITED STATES MAGISTRATE JUDGE
                           AUGUST 13, 2019
```

APPEARANCES:

On Behalf of the Government:

    WILLIAM THOMAS STETZER, ESQ.
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

On Behalf of the Defendant:

    ANNE M. TOMPKINS, ESQ.
    Cadwalader, Wickersham & Taft, LLP
    227 West Trade Street
    Charlotte, North Carolina 28202



Digitally recorded proceedings transcribed by:

        Cheryl A. Nuccio, RMR-CRR
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

P R O C E E D I N G S

(Transcript of proceedings digitally recorded on August 13, 2019.)

THE COURT: United States versus Greg Lindberg.

Good morning, Ms. Tompkins.

MS. TOMPKINS: How are you?

THE COURT: I'm well.

Mr. Stetzer.

MR. STETZER: Good morning, sir.

THE COURT: Ms. Tompkins, this is your motion to modify his conditions of pretrial release so I'll hear from you.

MS. TOMPKINS: Thank you, Your Honor.

Yes, we are on for modification of Mr. Lindberg's conditions of release. There are four main points that I want to make this morning.

One is Mr. Lindberg was ordered to wear an ankle monitor on April 2nd when we came in for initial appearance. In practice, over the last four months that ankle monitor has proven to be more restrictive than necessary to ensure his appearance at trial.

In addition -- and I'll talk a little bit more about that -- I'd like to talk about Mr. Lindberg's strong incentives to appear at trial. Since the first conversation that he had with the FBI almost a year ago last August,

Mr. Lindberg has maintained his innocence. He wants to have his day in court. He's motivated to have his day in court. This has not changed during our review of discovery up to this point. We have a strong case against the allegations and Mr. Lindberg very much looks forward to clearing his name.

There have been issues with discovery, technical issues, delay, and some volume that were unanticipated when we agreed to the conditions of release four months ago. That -- those I'll talk about if the Court is interested, but those have resulted in the necessity for us to delay the trial well beyond what we would have thought four months ago when we first came in and agreed to the conditions of release.

Separately, then, from the electronic monitoring issue, Mr. Lindberg was also ordered to have random drug screening. Mr. Lindberg neither drinks or uses drugs and we would simply ask the Court to remove that as a condition of his release as being unnecessary.

So I'd like to argue the points.

So as you know, Your Honor, federal law requires that the Court use the most least -- the least restrictive means necessary to ensure Mr. Lindberg's appearance at court. In April Mr. Lindberg turned in his passport. He was ordered not to travel internationally, and has not and has no intention to travel internationally.

Mr. Lindberg has access to two private planes.

Those planes are under charter now. He doesn't use them in any way. He also has a boat that's also under charter which he also does not use.

So other than that restriction, the -- turning in the passport and international travel, Mr. Lindberg has no other restrictions on his travel in the United States. The only restriction he has is to get permission from his pretrial services officer.

He's on pretrial supervision in the Southern District of New York where he lives. He has complied. His pretrial officer has stated to us that he has been a model client. He has no trouble with Mr. Lindberg's travel in the way that he has sought permission and gotten permission to travel, and he has no objection to the ankle monitor being removed as a condition of his supervision.

He does, however -- and I have an email to that effect. If Your Honor would like to see that, I'll hand it up. He does note, however, that he -- this is not his jurisdiction and so he defers to his local pretrial services officer for her point of view. We contacted her. She also had no objection, but said she would leave it, obviously, to the Court's decision. So pretrial, we would contend to the Court, has no issue with removing the ankle monitor.

One of the primary reasons that we think it's -- that the ankle monitor is not the least restrictive means to

ensure Mr. Lindberg's appearance at trial is you would normally see an ankle monitor used in instances where there is a geographic restriction. The ankle monitor provides the government with a level of electronic surveillance that they need. If Mr. Lindberg was ordered to house arrest, the electronic monitoring would alert if he left that area of geographic restriction.

In practice, Mr. Lindberg has no geographic restriction. Therefore, the ankle monitor doesn't engage in any way that informs the government in a manner that would, frankly, help them to know where he is or whether or not he was attempting to flee, which we would argue he is not.

Therefore, Mr. -- you know, the -- Mr. Lindberg's ankle bracelet really acts as a stalking device only. It does not act in the usual way that you would see an electronic monitor. We had that conversation when we first came in here in April with Judge Keesler about how it was going to be used; and at that time the government said, "We are not seeking a geographic limitation, but we want the ankle monitor."

That was before we had seen the indictment, we had seen any discovery. We agreed to it. And in the four months hence, we simply want to come back to the Court and say it, in practice, is impractical and it doesn't add to the protection that the government, we think, sought in April to ensure Mr. Lindberg's appearance.

1  So after four months we wanted to come back and say
2  the bracelet gives the government no additional information
3  that it is seeking.  It is not being used in the normal set of
4  circumstances.
5          Mr. Lindberg's incentive to appear is very strong.
6  Like his three co-defendants, he has pled guilty.  The case is
7  going to trial -- I mean pled not guilty.  Pled not guilty.
8  He wants his day in court and he will have his day in court.
9  As I said initially, he has maintained his innocence since the
10 first day that the case came to light and he spoke to the FBI.
11         The Court may know that these allegations involve
12 campaign contributions that Mr. Lindberg made to the North
13 Carolina Department of Insurance Commissioner.  We've now
14 reviewed some of that discovery, including audio and video
15 evidence, and we contend that it's far from an open-and-shut
16 case.  In fact, there are multiple examples on the audio and
17 video where Mr. Lindberg is in conversations with the
18 insurance commissioner where Mr. Lindberg insists on
19 compliance with the law.  Those are not the actions of a
20 person who wishes to flee.  This -- these are the -- those are
21 the words of a person who now wishes to stand and defend
22 himself and stand and fight.  Mr. Lindberg is extremely
23 motivated to be here to go to trial and to be exonerated of
24 these charges.  He has no incentive to flee.
25         The discovery in the case has turned out to be much

more voluminous than we anticipated. In fact -- in technical difficulties and delays. And at every turn, even with the audio and video, we got that about three weeks after his initial appearance, and there were -- there was weeks' worth of back and forth about making the audio and video work just because of technical difficulties.

We've gotten maybe four different groups of discovery from the government, the bulk of which has come in July and in July we received approximately 1.2 million documents. This obviously has caused us to ask the Court for a delay in the trial. We are currently on the November trial calendar. Not sure whether or not we'll make that -- that calendar for trial or whether we'll -- there will be necessity for a further delay. And I bring that to light because of the length of time that Mr. Lindberg is on a level of pretrial supervision that really exceeds the standard for ensuring his appearance in court.

So for these reasons, Your Honor, we ask for his conditions of release to be modified in those two ways: To remove the ankle bracelet and to take away the necessity for him to have random drug testing.

And I will hand up, Your Honor, email traffic from his local Pretrial Services Officer Sarah Wright and from Marlon Ovalles who is his pretrial services officer in the Southern District of New York.

1         Yes, I'll give them a copy.

2         (Document tendered to the Court.)

3         MS. TOMPKINS: Thank you, Your Honor.

4         And, Your Honor, if I just may, just to put into the
5 record, what Officer Ovalles said on page 3 of his email, he
6 says, "If this case were to be stemming from the Southern
7 District of New York, I would say that pretrial consents to
8 the removal of the location monitoring as well as the drug
9 testing condition. I would also recommend that he be allowed
10 to travel throughout the continental United States without
11 prior approval from pretrial services. However, since this
12 case stems from the Western District of North Carolina, I
13 defer to Officer Sarah Wright on their position on the
14 request. I've included Officer Wright in my response."

15         Officer Wright's response was, "No objection. We
16 would leave it up to the Court."

17         Thank you.

18         THE COURT: What does the government say?

19         MR. STETZER: The government opposes this request,
20 Your Honor. The reason he's on such -- given such latitude on
21 his travel is because of the GPS monitor. The reason the
22 government didn't seek detention in this matter is because of
23 the agreement for the GPS monitor.

24         If we go to the threshold question for Your Honor
25 about reopening this detention hearing, is first we'd have to

look at whether there were facts that were unknown to the movant at the time. And those facts were not unknown. Those facts were obvious. That this case wouldn't be resolved in under four months was certainly obvious to counsel as esteemed as Ms. Tompkins. In fact, it was so obvious that we negotiated that as part of our recommendation not to seek detention. We talked about the travel restrictions and no seeking detention in exchange for the GPS monitoring.

      Ms. Tompkins specifically -- and I say this not because I believe the Court is bound by our agreement, but because it shows how foreseeable and how known these facts were. Ms. Tompkins sent me a letter saying take a look at these conditions. It includes the conditions that we're currently under now, but also said that after a period of compliance with the GPS monitoring, we can revisit that with the Court. The government responded that was a nonstarter and the primary reason we weren't seeking detention was because of the GPS monitor. And so that's important to show that the facts -- these are not new facts or unknown.

      If we deal with changes or information that would deal with flight, well, first, I think if the Court is going to reopen detention status, the Court should also revisit the travel restrictions. If the GPS monitoring is in jeopardy, then that should be considered by the Court.

      The Court should also consider, and I would ask the

Case 5:19-cr-00022-MOC-DSC   Document 57   Filed 08/15/19   Page 9 of 16

Court to consider, if the GPS is in jeopardy, to detain this defendant until we have our trial.

The circumstances that have changed are more concerning regarding the defendant's flight. I have informed counsel from the beginning that I believe this defendant would be a flight risk and that's why we insist on the GPS monitoring.

As Ms. Tompkins mentioned, the defendant does have access to -- owns a private jet that is capable of traveling anywhere in the world. The yacht mentioned is a 214-foot ocean-going vessel that's registered in the Cayman Islands, so this defendant can actually flee by land or by sea.

He has -- as of 2016 he had 115 foreign bank accounts, including in Canada, India, Ireland, Malta, the Philippines, England, and the Cayman Islands.

When he was confronted by the FBI with these allegations, within 30 days of that is when he bought this 214-foot vessel. And shortly thereafter he listed just about all of his assets for sale, including his residences in North Carolina, Key West, and properties in Idaho, so he immediately began liquidating his assets. We had a conversation with Ms. Tompkins about that and were given some assurances. That raises the level of concern for the government given now that we want to take off the GPS monitoring.

Mr. Lindberg is also aware of an ongoing parallel

investigation involving his business structure. He is not a resident of the Western District. We capitulated in the negotiation to allow him to reside in New York in that district. He had to pick a district. But he also had at that time when we talked about it, he had significant business interests in North Carolina and elsewhere. Since then his insurance companies have been placed in rehabilitation by the Department of Insurance. The insurance commissioner says he wrote to shareholders or to policyholders. He took that action after determining that the long-term liquidity of the investment portfolios of the company had deteriorated to the point that the Department of Insurance needed to act to protect the policyholders of the company.

He's facing a guideline level of 32 with a sentence of 121 to 151 months in prison. So our contention is this defendant has the resources to flee and flee well, unlike the vast majority of defendants who appear in front of you.

In addition, if he was to flee, it would cause irreparable harm to the policyholders and the states that would have to bail out his insurance companies if he fled and took those assets with him.

Our evidence in the case involves recordings where the Department of Insurance Commissioner Mike Causey was so concerned at the behavior of Mr. Lindberg a year and a half ago that he came to the U.S. Attorney's Office and said, "I

think this guy is trying to bribe me." That's what started the investigation.

After that point, when Commissioner Causey met with Lindberg, those recordings -- those meetings were recorded. So we have the quid pro quo that we've alleged on tape by Mr. Lindberg on more than one occasion, so we believe our case is strong.

The gist of this case, as we allege, is that because Mr. Lindberg did not like the way and the level he was being regulated by the Department of Insurance, by the chief regulator on his review, essentially, he was willing to pay $2 million to have that person removed as his regulator. So our contention is if he's willing to pay $2 million not to face regulation, what would he be willing to do not to face a lengthy prison sentence?

So we would -- we would strongly oppose him being taken off the GPS monitoring. And we would ask if the Court is considering that, to also consider what -- what would be appropriate to make sure this defendant does appear for trial, and I think that would have to include adding travel restrictions and potentially detention.

THE COURT: Ms. Tompkins.

MS. TOMPKINS: Well, Your Honor, the Court is always able to review conditions of release, whether the government agrees with that or not.

As I said, when we did make that agreement with the government, we hadn't seen the indictment. We hadn't seen any discovery. It was really sort of a package that we agreed on before we knew what the facts of the case were. We obviously disagree with the characterization of the strength of the case, as apparently the other three co-defendants do. The case is set for trial.

Listen, I think, you know, the liquidating assets argument is spurious. As I said to the government early on, Mr. Lindberg lives in New York. He's put assets up, his home, for sale, as people do. It's not an indication at all of him fleeing, and I think the government was -- was assuaged by that months ago and it's unfair to bring it up today.

The idea of the insurance companies being in rehabilitation is really, I think, not a huge issue here, but I would point out to the Court that the insurance companies being in rehabilitation take those assets outside of Mr. Lindberg's control and he doesn't have access to money or assets from the insurance companies which really lessens the government's concerns about Mr. Lindberg using his wealth to flee.

And again, the -- his planes and his boat are under a -- are chartered. The government has tracked his planes and he's not on them. I mean, he doesn't use them, so these are -- these are -- and they have the ability to track his

planes.

My point here today, the main point, is that for four months Mr. Lindberg has generally been two or three places, New York where he lives, North Carolina where his businesses are. The insurance companies are not his only business interests. He has -- he has dug in in Durham as a businessman. He goes -- he has occasional business trips elsewhere in the country.

His pretrial services officer has had not a speck of trouble with him and has no concerns that he is a flight risk. I think that's compelling to this Court that the two professionals who are -- who are charged with monitoring him are comfortable with Mr. Lindberg's ability to make his way to court when required to.

So the parallel investigation has been known to Mr. Lindberg and to counsel since day one. That's not a changed circumstance. There's nothing about that that coming in today is any bigger of a risk than it was four months ago.

So I think that the practical situation here is that four months in the electronic monitoring is simply not being used in an effective way that assists the government or the Court to get Mr. Lindberg in court. It feels symbolic of control but not, in fact, helpful in making sure that Mr. Lindberg shows up for court; and, like his pretrial services officers, we ask the Court to remove that as a

```
 1  condition of his release.
 2              THE COURT:  Mr. Stetzer, anything further?
 3              MR. STETZER:  No, Your Honor.
 4              THE COURT:  All right.  The Court is going to deny
 5  the motion.
 6              (End of proceedings.)
 7                              *****
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1  UNITED STATES DISTRICT COURT
2  WESTERN DISTRICT OF NORTH CAROLINA
3  CERTIFICATE OF REPORTER
4
5
6          I, Cheryl A. Nuccio, Federal Official Realtime Court
7  Reporter, in and for the United States District Court for the
8  Western District of North Carolina, do hereby certify that
9  pursuant to Section 753, Title 28, United States Code, that
10 the foregoing is a true and correct transcript of the
11 digitally-recorded proceedings, transcribed to the best of my
12 ability, held in the above-entitled matter and that the
13 transcript page format is in conformance with the regulations
14 of the Judicial Conference of the United States.
15
16         Dated this 15th day of August 2019.
17
18                         s/Cheryl A. Nuccio
                           _____
19                         Cheryl A. Nuccio, RMR-CRR
                           Official Court Reporter
20
21
22
23
24
25
```