UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
DOCKET NO. 5:19-CR-00022-MOC-DSC

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| vs. | ) |
| | ) **ORDER** |
| GREG E. LINDBERG and | ) |
| JOHN D. GRAY, | ) |
| Defendants. | ) |

     **THIS MATTER** comes before the Court on the Government's Motion for Preliminary Order of Forfeiture. See Doc. No. 201. After a three-week trial, a jury found the defendants, Greg Lindberg and John Gray, guilty of federal funds bribery and of conspiring to commit honest services wire fraud by corruptly offering millions of dollars in campaign contributions to Mike Causey, the Commissioner of the North Carolina Department of Insurance, in exchange for removing his Senior Deputy Commissioner responsible for overseeing the regulation of Lindberg's insurance companies. Now, the Government seeks the forfeiture of funds paid by Lindberg to two independent expenditure committees, asserting they are "proceeds traceable" to the offenses of conviction. The Court agrees and thus orders forfeiture of the entity funds.

**I.    BACKGROUND**

     On March 18, 2019, a grand jury in the United States District Court for the Western District of North Carolina returned an indictment, charging Greg Lindberg and John Gray ("the defendants"), as well as John Palermo and Robin Hayes, with one count of conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349, and one count of bribery concerning programs receiving federal funds and aiding and abetting the same, in violation of 18 U.S.C. §§ 666(a)(2) and 2. The indictment alleged that, from about April 2017 to August 2018: Lindberg

1

served as chairman of Eli Global, LLC, an investment company, and as owner of Global Bankers Insurance Group ("GBIG"), an insurance and reinsurance management company; Gray worked as Lindberg's consultant; Palermo was vice president of Eli Global and chairman of the Chatham County Republican Party; and Hayes chaired the North Carolina Republican Party ("NCGOP"). Doc. No. 3 ¶¶ 3–7. In those capacities, the grand jury asserted that they conspired to and "corruptly gave, offered, and promised things of value to [the Commissioner of the North Carolina Department of Insurance], including millions of dollars in campaign contributions . . ., in exchange for specific official action favorable to GBIG, including the removal of the Senior Deputy Commissioner of the [Department] responsible for overseeing the regulation, including the pending periodic examination, of GBIG." Id. ¶ 14.

The defendants and Palermo pleaded not guilty and exercised their constitutional right to a jury trial.[1] After about three weeks of trial and three days of deliberation, the jury returned a verdict, finding the defendants guilty and Palermo not guilty. The trial evidence showed that, from January to August 2018, the defendants met with Commissioner Mike Causey on several occasions, sparing no effort or expense in their attempts to have him remove Senior Deputy Commissioner Jackie Obusek as the regulator of Lindberg's companies. But, unbeknownst to them, Causey was serving as informant for the Federal Bureau of Investigation and recording their discussions. Three of those discussions are particularly noteworthy for the present motion.[2] First, on May 5, 2018, Lindberg explicitly offered Causey value in exchange for official action during

---

[1] Pursuant to a plea agreement, Hayes pleaded guilty before trial to making false statements to federal officials, in violation of 18 U.S.C. § 1001(a)(2). See Doc. Nos. 70–72.

[2] A fuller discussion of the offenses and the defendants' interactions with Causey can be found in the Court's Order denying Lindberg's and Gray's Motions for Judgment of Acquittal and New Trial. The Court expressly adopts that discussion for purposes of this motion as well.

2

their private discussion at the Statesville Regional Airport.  See Tr. 169.  Causey suggested he would receive "pushback" for "mov[ing]" Obusek and others, so he asked: "What's in it for me? What can you do to, to help me that's not gonna be . . . under the radar screen?"  Gov't Ex. 113a at 9.  Immediately, Lindberg offered to "do whatever it takes to . . . support [his] re-election."  Id. at 10.  Specifically, he would "create" an independent expenditure committee "for [Causey's] re-election" and "put in a million or two" as the "sole donor."  Id. at 11–12.

On May 29, 2018, the defendants and Causey met at Lindberg's home to discuss Obusek's removal and Causey's reward.  See Tr. 251.  After several rounds of "changing" numbers, the defendants finally settled on providing Causey with a firm $2 million for his campaigning.  Gov't Ex. 121a at 5, 13.  Lindberg had previously contributed $500,000 to the NCGOP for Causey's benefit, so they planned to transfer an additional $1.5 million to Causey.  While discussing how to accomplish the transfer, Gray stated that they needed to "avoid disclosure" and "stay anonymous on the source of the money."  Id. at 8.  The defendants thus decided to use independent expenditure committees as a conduit.  To understand campaigning limitations, the defendants called Palermo, who explained that a 501(c)(4) organization allows for "forty- to forty-five percent" "direct campaigning" and that a 527 organization allows for "a hundred percent direct campaign[ing]," but "the (c)(4) is not disclosed" and "the 527 is disclosed."  Id. at 12–13.  With that in mind, Lindberg settled on placing "a half-million into the 527 and . . . a million in the (c)(4)."  Id. at 13.  Lindberg directed Palermo to get him the "names to those organizations," and he would "cut the checks."  Id. at 13–14.  After the meeting, Lindberg wrote a $500,000 check to the 527 organization and a $1 million check to the 501(c)(4) organization.  See Gov't Ex. 69, 70.  Palermo established the entities, opened their bank accounts, deposited the checks, then emailed the defendants, stating "for you[r] conversations with [Causey], the 2 entities are ready to go."  Gov't Ex. 71.

By the end of July, Causey had failed to do as he promised and remove Obusek as the regulator of Lindberg's companies. So, on July 25, 2018, the defendants and Causey met again to discuss a "date certain" for the transfer. Gov't Ex. 127a at 6; see Tr. 287. When asked, Causey complained he was dissatisfied with the independent expenditure committees, as he did not have "any control over" them. Gov't Ex. 127a at 4. After negotiating, the defendants ultimately decided to provide the entire $2 million through the NCGOP. Specifically, $250,000 of Lindberg's prior NCGOP donation would go "immediately into [Causey's] campaign account," then "the balance" of that donation would be provided after realignment. Id. at 4, 8. Next, they would "run 250,000 [dollars] a quarter, a million a year, through [the] NCGOP . . . for the other million-and-half" so Causey would have "cash in [his] campaign account" and would not "have to worry about" the expenditure committee limitations. Id. at 6. Gray called Hayes, who confirmed he would transfer the funds through the NCGOP to Causey. See id. at 10–12. And Lindberg discussed "shut[ting] down [the independent expenditure committees] and [having] that money come[] back." Id. at 5.

Before Lindberg ever recalled the entity funds, the grand jury issued its indictment, which found probable cause for the forfeiture of funds "constituting the proceeds" of the charged offenses. Doc. No. 3 at 21–22. Based on that finding, the Government applied for and obtained a warrant to seize the entity funds from their bank accounts. The Government successfully seized $1,454,758.45—$979,128.63 from the 501(c)(4) organization and $475,629.82 from the 527 organization. See United States v. $979,128.63 in funds in Wells Fargo Account 0809, No. 3:19-MJ-102, Doc. Nos. 5–6 (W.D.N.C. Apr. 9, 2019). At the end of trial but before charging the jury, the defendants and Palermo waived their right to have the jury decide the issue of forfeiture. See Tr. 1624–25. After deliberating three days, the jury returned a verdict of guilty as to the defendants

4

on both counts and a verdict of not guilty as to Palermo on both counts.  See Doc. No. 193.  On May 13, 2020, the Court held a hearing to consider forfeiture.  Now, the issue is ripe for review.

**II.     DISCUSSION**

Criminal forfeiture is part of a defendant's sentence.  See United States v. Martin, 662 F.3d 301, 306 (4th Cir. 2011).  The procedure for entering a criminal forfeiture order is set forth in Federal Rule of Criminal Procedure 32.2.  Under that rule, the Court "must promptly enter a preliminary order of forfeiture" where it "finds that property is subject to forfeiture."  Fed. R. Crim. P. 32.2(b)(2)(A).  Rule 32.2 is procedural in nature, so the Court must look to other "applicable statute[s]" to "determine what property is subject to forfeiture."  Fed. R. Crim. P. 32.2(b)(1)(A); see, e.g., United States v. Poulin, 690 F. Supp. 2d 415, 421 (E.D. Va. 2010), aff'd, 461 F. App'x 272 (4th Cir. 2012).  Furthermore, where "the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense."  Fed. R. Crim. P. 32.2(b)(1)(A).

An amalgam of statutes mandates the criminal forfeiture of the proceeds traceable to federal funds bribery and conspiracy to commit honest services wire fraud.  To start, 18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of this title), or a conspiracy to commit such offense" "is subject to [civil] forfeiture to the United States."  In turn, Section 1956(c)(7) defines "specified unlawful activity" to include federal funds bribery and "any offense listed in Section 1961(1)," which includes wire fraud.  Finally, 28 U.S.C. § 2461 explains that where a "defendant is convicted of [an] offense giving rise to [civil] forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and

5

[18 U.S.C. § 3554]," and the procedures of 21 U.S.C. § 853. See United States v. Chittenden, 896 F.3d 633, 635 n.2 (4th Cir. 2018) (noting that Section 2461 "authorizes criminal forfeiture for any offense that gives rise to civil forfeiture"); United States v. Chamberlain, 868 F.3d 290, 294 n.2 (4th Cir. 2017) (noting that Section 2461 "allows criminal forfeiture wherever civil forfeiture is authorized," then applying "the criminal forfeiture procedures set out at 21 U.S.C. § 853").

Because the applicable statutes authorize forfeiture, the Court must next decide whether the Government has proven the requisite nexus between the identified funds and the offenses of conviction by a preponderance of the evidence. See Martin, 662 F.3d at 307; see also United States v. Farkas, 474 F. App'x 349, 359 (4th Cir. 2012). Here, that means that the Government must show that the independent expenditure committee funds are "proceeds traceable" to federal funds bribery or to conspiracy to commit honest services wire fraud. Section 981(a)(2) provides two relevant definitions for the term "proceeds":

> (A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.
>
> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

Some courts have attempted—without much success—to determine which definition applies in the bribery context. See United States v. Percoco, No. 16-CR-776, 2019 WL 1593882, at *4 (S.D.N.Y. Apr. 15, 2019) (noting that "case law provides no clear way to delineate these two categories of conduct" and that bribery is a "gray area" that fairly falls under both definitions). But the litigants

in this case have not. Rather, they have followed the approach of several other courts—including the Fourth Circuit in an unpublished decision—and applied a more-general "but for" test to determine whether funds constitute proceeds. See Farkas, 474 F. App'x at 360 (collecting cases). Under that test, "funds are considered proceeds and therefore deemed forfeitable if 'a person would not have the funds but for the criminal offense.'" Id. (citation and alterations omitted). Joining the Fourth Circuit and the litigants, the Court will adhere to the "but for" test in its analysis.[3]

Based on the trial evidence discussed above, the Court finds by a preponderance of the evidence that the independent expenditure committees would not have obtained or acquired the identified funds from defendant Lindberg but for the offenses of conviction. Of note, when Causey asked what he would receive in exchange for removing and replacing Obusek, Lindberg immediately offered to "create" an independent expenditure committee "for [his] re-election" and to "put in a million or two" as the "sole donor." Gov't Ex. 113a at 11–12. After discussing the tradeoffs between public disclosure and direct campaigning with Gray, Palermo, and Causey, Lindberg settled on placing $500,000 into a 527 organization and $1 million into a 501(c)(4) organization. See Gov't Ex. 121a at 10, 13–14. Palermo established these entities, Lindberg wrote the checks, then Palermo deposited them in the entities' accounts for future negotiations with Causey. See Gov't Ex. 69–71. Based on the foregoing, it is clear that the independent expenditure committees would not have obtained or acquired those funds but for the offenses of conviction.

Lindberg does not dispute the foregoing facts—nor could he reasonably based on the trial evidence. Rather, he presents three principal reasons why the Court should not conclude the entity

---

[3] Regardless, it makes no difference whether the Court applies the Fourth Circuit's general "but for" test or conducts a textually moored analysis under either Subsection (A) or Subsection (B). For all three analyses, the Court reaches the same result: the entity funds are forfeitable. And Lindberg has not identified any "direct costs" that are properly deductible under Subsection (B), so the amount of forfeiture is likewise the same across all three analyses.

funds are traceable proceeds that are forfeitable in this criminal proceeding. To begin, Lindberg asserts that the funds were not "proceeds" of a bribe, but simply a means to "facilitate" the offense. See Doc. No. 209 at 2. Next, assuming the funds are "proceeds," Lindberg maintains that such proceeds are not forfeitable in this criminal proceeding. See Doc. No. 221 at 7–11. Lastly, Lindberg asserts that the jury's acquittal of Palermo destroys this "requisite nexus" for criminal forfeiture. See Doc. No. 209 at 3–5. The Court discusses and rejects these arguments in turn.

First, without authority and without much substantiation, Lindberg asserts that the entity funds are not proceeds, as they were simply "used to facilitate a bribe." Doc. No. 209 at 2. As he notes, other statutory forfeiture provisions unrelated to the offenses here specifically allow for the forfeiture of property used to "facilitate" an offense. See, e.g., 18 U.S.C. § 981(a)(1)(B). According to him, because Section 981(a)(1)(c) does not authorize the forfeiture of property "used to facilitate bribery offenses," there is no basis for forfeiture in this case. Doc. No. 209 at 2.

Lindberg's argument rests on an implicit, yet central premise: that the words "facilitate" and "proceeds" are somehow mutually exclusive. But as the present case shows, they are not. While Lindberg does not define "facilitate," the word usually means "[t]o make the occurrence of (something) easier; to render less difficult" or "to make the commission of (a crime) easier." Facilitate, Black's Law Dictionary (11th ed. 2019); see United States v. Schifferli, 895 F.2d 987, 990 (4th Cir. 1990) (noting that "'facilitate' implies that the property need only make the prohibited conduct less difficult or more or less free from obstruction or hindrance" (internal quotation marks omitted)); In re 650 Fifth Ave. & Related Props., 777 F. Supp. 2d 529, 564 (S.D.N.Y. 2011) (same). Naturally, the entity funds made the bribery offenses "easier," because without a *quid*, there cannot be *quid pro quo* bribery. But, as explained above, the entity funds are also fairly characterized as "proceeds traceable" to the offenses, as the entities would not have obtained or acquired the funds

8

"but for" the defendants' federal funds bribery and conspiracy to commit honest services wire fraud. Accord Percoco, 2019 WL 1593882, at *4; United States v. Thirteen Thousand Five Hundred Dollars ($13,500) in U.S. Currency, No. 07-CV-2703, 2008 WL 5191209, at *4 (W.D. Tenn. Dec. 10, 2008). Put simply, the entity funds can comfortably be described as "facilitating" those offenses and as "proceeds" of those offenses, so there is no reason to treat these phrases as mutually exclusive. Accord United States v. Wyly, 193 F.3d 289, 302 (5th Cir. 1999) (explaining "criminal proceeds" can be used "to facilitate" an offense, as they "make[] the prohibited conduct less difficult or more or less free form obstruction or hindrance"); United States v. Schlesinger, 396 F. Supp. 2d 267, 272 (E.D.N.Y. 2005) (same), aff'd, 514 F.3d 277 (2d Cir. 2008).

Lindberg's first objection leads to his second: that even if the entity funds are proceeds traceable to his offense, they are not *his* proceeds, so the proper "nexus" has not been proven for a criminal forfeiture proceeding under Rule 32.2. See Doc. No. 221 at 6–11. True, the Government did not prove that the funds were Lindberg's proceeds, *i.e.,* that he acquired or obtained them while committing the offenses. But the nexus requirement of Section 981(a)(1)(C) does not require the Government to show the funds were the convicted defendant's proceeds in particular. Such a nexus would make little sense, as Section 981(a)(1)(C) is a civil forfeiture statute, which does not require any criminal defendant at all. See United States v. One Parcel of Real Estate Located at 7715 Betsy Bruce Lane Summerfield, N.C., 906 F.2d 110, 112 (4th Cir. 1990). Instead, Section 981(a)(1)(C) requires the Government to prove the property "constitutes or is derived from proceeds traceable to a violation . . . of [certain criminal statutes]," including the federal funds bribery and conspiracy to commit honest services wire fraud statutes. 18 U.S.C. § 981(a)(1)(C) (emphasis added). Rule 32.2 procedurally demands no more, as it requires the Government to "establish the requisite nexus between the property and the offense." Fed. R. Crim.

P. 32.2(b)(1)(A) (emphasis added); see Martin, 662 F.3d at 307 (explaining the Government "must establish a nexus between the property for which it is seeking forfeiture and the crime"). And, once the Government establishes the nexus between the property and the offense of conviction, the Court must order "the forfeiture of the <u>defendant's interest</u> in the property—whatever that interest may be—in the criminal case." Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption (emphasis added).

Suggesting otherwise, Lindberg principally relies on <u>United States v. Contorinis</u>, 692 F.3d 136, 145–48 (2d Cir. 2012). But his reliance is misplaced. There, the defendant was convicted of insider trading and conspiring to commit securities fraud after using insider information to purchase and sell stock on behalf of his employer. See <u>id.</u> at 139. Relying on the same "proceeds traceable" statute applicable here, the district court entered a forfeiture order that required the defendant to forfeit "the total amount of profits made, and losses avoided," by the employer as a result of the insider trading. <u>Id.</u> at 145. On appeal, the Second Circuit vacated the forfeiture order, holding that the defendant could not be ordered to "forfeit funds that were <u>never possessed or controlled</u> by himself or others acting in concert with him." <u>Id.</u> at 148 (emphasis added).

Of course, <u>Contorinis</u> might apply here if Lindberg "never possessed or controlled" the forfeitable property. Criminal forfeiture proceedings are *in personam* and designed to "to punish the wrongdoer" for his crime. <u>United States v. Blackman</u>, 746 F.3d 137, 143 (4th Cir. 2014); see <u>United States v. Bajakajian</u>, 524 U.S. 321, 332 (1998). As such, criminal forfeiture proceedings can reach "only the defendant's interest in the property [that] may be forfeited." <u>United States v. Daugerdas</u>, 892 F.3d 545, 548 (2d Cir. 2018); see <u>United States v. Rouhani</u>, 598 F. App'x 626, 633 (11th Cir. 2015); see also <u>Honeycutt v. United States</u>, 137 S. Ct. 1626, 1635 (2017). But unlike in <u>Contorinis</u>, Lindberg retains an interest in the entity funds. He specifically held and

10
Case 5:19-cr-00022-MOC-DSC   Document 239   Filed 08/04/20   Page 10 of 14

disbursed the entity funds for Causey's re-election and Obusek's removal.  See Gov't Ex. 69–71.  And, when those funds were not used, he asserted his right to recall them.  See Gov't Ex. 127a at 5 (discussing "shut[ting] down [the independent expenditure committees] and [having] that money come[] back").  Criminal forfeiture is thus appropriate to dispose of Lindberg's "interest in the property—whatever that interest may be."  Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption. [4]

Lindberg's third and final objection follows the second.  According to him, even if the facts at trial were legally sufficient to establish a nexus between the entity funds and the bribery offenses, that nexus was nevertheless destroyed when the jury found Palermo not guilty.  In other words, because Palermo principally managed the entities, his acquittal must mean that the jury did not find the "evidence regarding the [entities] to amount to evidence of a crime."  Doc. No. 209 at 3.  Lindberg reads too much into the verdict.  His argument tacitly echoes the doctrine of collateral estoppel (also known as "issue preclusion").  But collateral estoppel bars the successive litigation of issues that were "actually litigated and resolved in a valid court determination essential to the prior judgment."  Hately v. Watts, 917 F.3d 770, 777 (4th Cir. 2019).  While the jury could have agreed with the conclusion Lindberg attempts to draw, it is certainly not "essential" to the verdict, as other conclusions equally support the verdict.  For example, the jury might have decided Palermo lacked the criminal intent that Lindberg demonstrated as to the bribes.  See, e.g., Def. Ex. JVP-60a (Gray telling Causey that "Palermo does not know about the $500,000 at the NCGOP

---

[4] An individual other than the Lindberg might have an interest in the entity funds.  Palermo attempts to assert such an interest here.  See Doc. No. 208.  But Rule 32.2(b)(2)(A) makes clear that the Court must enter a preliminary order of forfeiture "without regard to any third party's interest in the property.  Determining whether a third party has such an interest must be deferred until any third party files a claim in an ancillary proceeding under Rule 32.2(c)."  Palermo's request that the Court consider his "interests in these funds, however minimal," Doc. No. 208 at 1, is thus premature, see United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009).

11
Case 5:19-cr-00022-MOC-DSC   Document 239   Filed 08/04/20   Page 11 of 14

and [that Lindberg] and [he] would prefer that remain just between [them]"); cf. United States v. Abdallah, 911 F.3d 201, 219–20 (4th Cir. 2018) (noting a defendant cannot neutralize his own criminal intent by identifying others with innocent intentions).

Also, collateral estoppel is inappropriate because the inquiries and burdens of proof driving the jury's verdict and this Court's forfeiture inquiry are distinct. After a trial, the jury found that Palermo was not guilty of the offenses beyond a reasonable doubt. See Doc. No. 193. But the question now before the Court is whether the entity funds are "proceeds traceable" to Lindberg's and Gray's offenses of conviction by a preponderance of the evidence. Martin, 662 F.3d at 307; see also Farkas, 474 F. App'x at 359. These differing questions and burdens of proof render collateral estoppel inapplicable. See United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984) (highlighting "difference[s] in the relative burdens of proof" and holding that "an acquittal of a criminal charge does not automatically bar an action to enforce sanctions by way of forfeiture of goods"); accord United States v. Holland, 722 F. App'x 919, 929 (11th Cir. 2018).

At bottom, there is simply no way to know at this stage whether the jury would have agreed with Lindberg or the Court. But Lindberg waived his right to have the jury decide the question of forfeiture at trial. See Tr. 1624–25. Now, with the benefit of Palermo's acquittal, he also attempts to preclude the Court from deciding the same question he removed from the jury. He cannot have it both ways. Lindberg decided that the Court should decide the question of forfeiture, and the Court has done so. Based on the foregoing, the Court finds that the entity funds are forfeitable.

# ORDER

**IT IS, THEREFORE, ORDERED** that the Government's Motion for Preliminary Order of Forfeiture, Doc. No. 201, is **GRANTED**, as follows:

1. Based on the trial evidence and defendants' convictions, the United States is authorized to take and maintain possession of the following property, and that property is hereby preliminarily forfeited to the United States for disposition according to law, provided that such forfeiture is subject to any third-party claims and interests, pending final adjudication:

- **Approximately $979,128.63 in funds seized from a Wells Fargo Bank Account ending in 0809, such account held in the name of North Carolina Growth and Prosperity Alliance Inc.; and**

- **Approximately $475,629.82 in funds seized from a Wells Fargo Bank Account ending in 0817, such account held in the name of North Carolina Growth and Prosperity Committee Inc.**

2. Pursuant to 21 U.S.C. § 853(n)(1) and Federal Rule of Criminal Procedure 32.2(b)(6), the Government shall publish notice of this order; notice of its intent to dispose of the property in such manner as the Attorney General may direct; and notice that any person, other than the Defendant, having or claiming a legal interest in any of the above-listed forfeited property must file a petition with the Court within thirty days of the final publication of notice or of receipt of actual notice, whichever is earlier. This notice shall state that the petition shall be for a hearing to adjudicate the validity of the petitioner's alleged interest in the property, shall be signed by the petitioner under penalty of perjury, and shall set forth the nature and extent of the petitioner's right, title or interest in the forfeited property and any additional facts supporting the petitioner's claim and the relief sought. The United States may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in property that is the subject of this Order of Forfeiture, as a substitute for published notice as to those persons so notified.

3. Upon adjudication of all third-party interests, this Court will enter a Final Order of Forfeiture. If no third party files a petition within the time provided by law, then this Order shall become final by operation of law.

4. The Court retains jurisdiction to enforce this Order, and to amend it if necessary, pursuant to Federal Rule of Criminal Procedure 32.2(e).

**SO ORDERED.**

Signed: August 4, 2020

Max O. Cogburn Jr
United States District Judge