# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### DOCKET NO. 5:19-CR-00022-MOC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **ORDER** |
| **GREG E. LINDBERG and** | ) | |
| **JOHN D. GRAY,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

   **THIS MATTER** comes before the Court on Motions for Judgment of Acquittal or for New Trial, which were filed by the defendants, Greg Lindberg, Doc. No. 213, and John Gray, Doc. No. 214. Through an indictment, a grand jury charged the defendants with conspiring to commit honest services wire fraud and with federal funds bribery by corruptly offering millions of dollars in campaign contributions to Mike Causey, the Commissioner of the North Carolina Department of Insurance, in exchange for removing his Senior Deputy Commissioner responsible for overseeing the regulation of Lindberg's insurance companies. After a three-week trial and three days of deliberation, a jury found the defendants guilty of both offenses. Now, the defendants raise a host of purported errors with that verdict, asserting that the Government presented insufficient evidence and that the Court erred in its evidentiary rulings and in instructing the jury. The defendants are incorrect. For reasons discussed below, their motions to overturn their convictions are denied.

## I.  BACKGROUND

   On March 18, 2019, a grand jury in the United States District Court for the Western District of North Carolina returned an indictment, charging the defendants, as well as John Palermo and Robin Hayes, with one count of conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349, and one count of bribery concerning programs receiving federal funds and aiding

and abetting the same, in violation of 18 U.S.C. §§ 666(a)(2) and 2. The indictment alleged that, from about April 2017 to August 2018: Lindberg served as chairman of Eli Global, LLC, an investment company, and as owner of Global Bankers Insurance Group ("GBIG"), an insurance and reinsurance management company; Gray worked as Lindberg's consultant; Palermo was vice president of Eli Global and chairman of the Chatham County Republican Party; and Hayes chaired the North Carolina Republican Party ("NCGOP"). Doc. No. 3 ¶¶ 3–7. In those capacities, the grand jury asserted that they conspired to and "corruptly gave, offered, and promised things of value to [the Commissioner of the North Carolina Department of Insurance], including millions of dollars in campaign contributions . . ., in exchange for specific official action favorable to GBIG, including the removal of the Senior Deputy Commissioner of the [Department] responsible for overseeing the regulation, including the pending periodic examination, of GBIG." Id. ¶ 14.

The defendants and Palermo pleaded not guilty and exercised their constitutional right to a jury trial,[1] which ran from February 18 to March 5, 2020. The defendants were ultimately convicted, so, for these motions, the Court summarizes the trial evidence in the light most favorable to the Government. See United States v. Burgos, 94 F.3d 849, 862–83 (4th Cir. 1996) (en banc). At trial, the bulk of the Government's evidence was introduced through Commissioner Mike Causey. His testimony—alongside the testimony of Senior Deputy Commissioner Jackie Obusek—provided the jury with a foundation to understand the Department's objectives, its relationship to Lindberg, and the circumstances leading up to the defendants' offenses. To begin, Causey testified that, as Commissioner, he is responsible for overseeing the periodic reexamination of domestic insurance companies, including GBIG, Lindberg's parent insurance company, and Eli

---

[1] Pursuant to a plea agreement, Hayes pleaded guilty before trial to making false statements to federal officials, in violation of 18 U.S.C. § 1001(a)(2). See Doc. Nos. 70–72.

Global, a GBIG affiliate. See Tr. 132–35. Those examinations were conducted by the Department's financial analyst division. Obusek examined Lindberg's companies in particular. See Tr. 137–38; see also Tr. 65–66.

Prior to Causey's 2017 election, Obusek was not the Senior Deputy Commissioner. See Tr. 138. But she had served in the Department for about twenty years. See Tr. 52. Graduating with an accounting degree from East Carolina University, Obusek started as an entry-level financial examiner and worked her way up the organizational chart. See Tr. 52–54. She excelled through her continuous "outstanding performance evaluations," at least three of which were signed by her predecessor, Ray Martinez. Tr. 54. Once Causey was elected, he chose to let Martinez go. Tr. 94. In his stead, he appointed Obusek, as he had "confidence in her abilities." Tr. 138. Martinez left to work for Lindberg. See Tr. 83.

Obusek testified that, as a financial analyst, she was tasked with ensuring that domestic insurers could pay policyholders if a claim is filed. See Tr. 57. If an insurer was at risk for insolvency, her division would supervise, rehabilitate, and possibly liquidate the companies to protect policyholders. See Tr. 58–59. She also explained that insurance companies sometimes engage in affiliate investments, whereby one company invests in another company that is under common control. Because such investments are illiquid, they can be risky for policyholders. See Tr. 59. While North Carolina did not have limits on such affiliated investments before 2019, now, even a ten percent affiliated investment is considered "a red flag amount." Tr. 59–60.

Lindberg first moved some of his insurance companies into North Carolina toward the end of 2014. See Tr. 64. From that time onward, Obusek was involved in their regulation. See Tr. 65–66. As far back as March 2015, Obusek was concerned with Lindberg's business practices. See Tr. 72. At that time, the Department allowed Lindberg's companies to engage in up to forty

3

percent affiliated investments. See Tr. 533. Obusek and other analysts took their concerns to Martinez, but he dismissed them out of hand, requiring the regulators to submit all communications with Lindberg for his approval. Tr. 109–10. Sometime after Causey took office and Martinez was released, Lindberg's companies and the Department reached a memorandum of understanding, where Lindberg's companies were limited to ten percent affiliated investments. See Tr. 533–34.

In 2017, a few months after Causey was elected, he was scheduled to meet with Eli Global's leadership. See Tr. 139–40. One week before, he received a call from his campaign treasurer, who notified him that he had received a $10,000 donation from the Lindbergs. See Tr. 139. Causey thought the contribution was "unusual," both because the election cycle had just ended and because it was "the only one [he had] received of that size at that point." Tr. 140. Thus, he decided to return the donation. Id. The defendants both attended the subsequent meeting. There, Gray asked Causey to call Michigan's insurance commissioner "to put in a positive word" to facilitate Lindberg's purchase of another insurance company. Tr. 143. Causey agreed and later phoned his Michigan counterpart. Afterward, Gray called Causey, stating he had spoken with Causey's fundraising agent to indicate that he and Lindberg wanted to host a fundraiser for Causey in December. He also told Causey that Lindberg had donated $500,000 to the NCGOP, and that $110,000 was to be transferred to Causey's campaign. See Tr. 144–46. Causey testified that the defendants' behavior troubled him, as it seemed they "wanted to reward" him for making the call. Tr. 146. Thus, he called his agent to make clear they were "not going to have a fundraiser in December" and he was "not taking [the] $110,000." Tr. 146. And he raised his concerns with the Federal Bureau of Investigation, later agreeing to cooperate as an informant. See Tr. 146–48.

While cooperating, Causey recorded several conversations with the defendants, spanning from about January to August 2018. In virtually every conversation, the defendants spared no

4

effort or expense in their attempts to remove Obusek as the regulator of Lindberg's companies. To start, on January 27, 2018, Gray again phoned Causey, generally protesting that Causey's "staff [was] trying to make it so that communication" between Lindberg's companies and the Department was "difficult." Gov't Ex. 111a at 6.[2] Gray then homed in Obusek, maintaining she was incorrect in her belief that their affiliated investment agreement was too "high risk." Id. at 6, 9. To him, the agreement was "too complicated and too sophisticated for her," so "she dug up some trash on the internet . . . to convince folks that there [was] a real problem." Id. at 12. He then mused that Lindberg had "made a contribution to [the former commissioner's] campaign" but that "there was no connection between" the donation and the favorable agreement. Id. at 6. He also noted that the former commissioner had "asked" them to support the campaign and it would be "stupid" to refuse. Id. He also intimated, "[w]hen Mike Causey runs for re-election, if he asks [Lindberg] to contribute to his campaign, [do] you think he's not going to? [T]hat'd be crazy." Id.

Because of these perceived injustices by Obusek and others, Gray asked whether Causey would be "willing to meet with" him and Lindberg. Id. at 7. Causey agreed, but insisted that the meeting needed to be "highly confidential" because he did not want Obusek, other staff members, or "the legal folks to know anything about it." Id. He also suggested that the meeting needed to be "somewhere away from Raleigh or away from Chapel Hill where . . . [they could] have privacy and nobody [would] see [them]." Id. Gray replied, "um, I don't how far you wanna go and how private you wanna be . . . I can arrange for us to meet at Bald Head Island which is nobody but us or we could meet somewhere closer than that. You, you tell me." Id. at 7.

Before confirming a location, Gray continued to air his grievances with Obusek. He told

---

[2] For ease of reference, the Court quotes from the Government's written transcripts of recorded conversations. Of course, as the Court instructed the jury, transcripts are merely an aid and it was the jury's understanding of the recordings that governed. See Tr. 154–55.

Causey that "Jackie is not [his] friend" and her work would "not withstand judicial review." Id. at 9. Gray then hinted that state employees "have rights" and "you can't . . . fire [them] easily, but you can reassign [them] and give [them] other duties." Id. at 10. Next, he suggested that Causey needed a "strong financial analyst" at the Department. Id. Luckily, he knew one: Palermo. Contrary to Obusek's assessment, Palermo had "looked at every one of [Lindberg's affiliate investments] and [found them] sound." Id. at 11. Before ending the call, Gray proposed meeting at "a little restaurant that is not open during the day . . . in Chatham County" where they could discuss "and there'd be nobody in the restaurant but [them]." Id. at 15. Causey agreed.

The defendants and Causey eventually met on February 14, 2018, but at the Concord Regional Airport instead. See Tr. 158. The substance of that conversation mostly echoed Gray's prior complaints. But, this time, Lindberg joined in, protesting that Obusek was "deliberately, and intentionally, and maliciously hurting [his] reputation with other regulators" and was "lying to [Causey] to hurt [his] name." Gov't Ex. 112a at 4–5. Like Gray, Lindberg volunteered that Causey "need[ed] a guy like John Palermo on [his] team who [could]. . . understand assets." Id. at 6. At that point, Lindberg queried, "[w]ould you consider hiring John Palermo? On your staff?" Id. After detailing Obusek's "personal vendetta against [them]," Lindberg implored: "the only chance we've got to resolve this is to get John [Palermo] over [to the Department] in some capacity . . . if not replacing [Obusek] as the Chief Financial Examiner, put him as your Senior Financial Adviser. Put him above so that—," at which point Gray interjected, "[s]o that everything that comes from them . . . has to go through him . . . for review." Id. at 14. Reiterating, Lindberg asked Causey to "put [Palermo] as a Senior Financial Adviser [and] leave [Obusek] right where she is and just have him review everything she does." Id. at 15. According to him, this would ensure that a "fair and balanced" regulator could "counteract" Obusek and other hostile staff. Id. at 14.

The defendants next met with Causey on March 5, 2018 at the Statesville Regional Airport. See Tr. 169. This time, Palermo attended. There, Causey stated he could bring Palermo "officially on board by April first." Gov't Ex. 113a at 3. Again, Gray reminded Causey that there needed to be "a relationship between [himself] and [Palermo], with nobody in between." Id. at 5. In other words, Causey needed to "set it so that, if [Obusek] stays where she is, she doesn't breathe a word outside that office or send a slip of paper outside that office that's not reviewed first by [Palermo]." Id. Causey then asked to speak privately with Lindberg. Alone, Causey equivocated, saying he was "gonna get pushback" and "a whole lot of grief" for bringing Palermo in, having him report "[d]irectly to" him, and "mov[ing] some folks." Id. at 7–8. Causey pointed out that Gray previously referenced political contributions, then asked, "what's in it for me? What can you do to, to help me that's not gonna be . . . under the radar screen?" Id. at 9. Immediately, Lindberg offered to "do whatever it takes to . . . support [his] re-election." Id. at 10. Specifically, he would "create" an independent expenditure committee "for [Causey's] re-election" and "put in a million or two" as the "sole donor." Id. at 11–12. Lindberg noted that Causey would "have no control over [the] money," but they would find someone that Causey would "have confidence in" to run the committee. Id. at 17. Later that day, Gray called to confirm Lindberg's offer, explaining if they could "get John [Palermo in the Department] so he [could] help [Causey] be . . . the most successful Insurance Commissioner in [his] lifetime, there [would] be at least a million dollars somewhere in [Causey's] re-election." Gov't Ex. 114a at 6.

The defendants, Palermo, and Causey met again on March 27, 2018 at the GBIG headquarters. See Tr. 210–11. During another private discussion, Causey dissuaded Lindberg from having him hire Palermo. As he explained, such a hiring would "end up on the front page" of the local newspapers, so they would "be better off . . . doing it a different way." Gov't Ex. 115a

7

at 3. Lindberg agreed, explaining that, "[i]n other people's eyes," Palermo's work with Lindberg could "prevent him from being an objective person there at the [D]epartment." Id. at 4. He then offered, "maybe the discussion about [Palermo] was simply that we need someone like that, but because he's already worked [at Eli Global], in a public way," it would be "better to find somebody else." Id. As Lindberg rationalized, the chosen regulator had to be "credible with the rest of the states" and, "because of his employment history," Palermo would not be. Id. at 5.

After reaching this consensus, Causey and Lindberg invited Gray and Palermo to return to the discussion. After Lindberg apprised them of Causey's hesitance, the defendants began proposing new, favorable arrangements. First, Lindberg suggested that Palermo "and [Causey could] continue to work together on [their] stuff [or] on any other stuff [Causey] want[ed] him to work on" in "kind of a personal relationship." Id. at 9. Gray offered that, when Causey hired a new regulator, he could "put somebody . . . on that interview committee" from GBIG or "privately just send something" to Palermo about candidates. Id. at 9–10. Finally, Lindberg settled on a third option: Causey could "[j]ust swap" Obusek and Debbie Walker, the head of the Department's Captive Insurance Division, because she was "very commercial," "very savvy," and "a very different person than [Obusek]." Id. at 11. As he explained, this would be an acceptable "short-term fix" just as hiring "John [Palermo] was a short-term fix." Id.

On May 16, 2018—about a month and a half later—the defendants met with Causey at Lindberg's home in Durham. See Tr. 220. There, the defendants again pushed either having "Walker in [Obusek's] job" or leaving "[Walker] where she [was], and tell[ing] her she's going to handle [their] stuff." Gov't Ex. 118a at 5. Gray underscored that, if Walker "could be the lead financial analyst, . . . the problems that [they] were experiencing [would] disappear." Id. at 6.

At the meeting, the defendants discussed the plan for effectively contributing to Causey's

campaign.  For one, they proposed donating a "million-and-a-half" to Causey through two separate avenues.  Id. at 20.  They would first "get [a] half-million into the NCGOP," which Hayes would transfer to Causey.  Id. at 9.  Second, Lindberg promised he would "put a million" into an independent expenditure committee managed by Palermo by adding "$250,000 [each] quarter for one year."  Id. at 19.  For that entity, Gray indicated there would be a chair who would "be there, but [would] be there subject, and this stays in this room, subject to direction from [Lindberg] and [himself]."  Id. at 6.  Gray also offered to "add a board position" for whomever Causey trusted.  Id. at 7.  Lindberg responded, "I don't have any problem, you just tell us who you want and we'll do it."  Id.  Causey named Judy Reynolds, a friend.  But at that point, Gray cautioned that there could not be "any coordination" or "direct linkage in communication between the entity and [Causey] the candidate."  Id.  Thus, rather than having Causey connect them with Reynolds, the defendants decided to have Palermo call her.  See id. at 8–9.  Summarizing, Lindberg stated, "the bottom line is we hear you loud and clear on Judy Reynolds, the NCGOP [donation], and, I think, the only final thing to put all this to bed [and] to get you out of the muck is to get, to get us over to [Walker,] however the easiest way to do that."  Id. at 14.  Lindberg wrote the $500,000 check to the NCGOP that day.  See Gov't Ex. 53.  Later, Gray called Causey to say he had the check "in [his] pocket" and it would "accrue to [Causey's] benefit."  Gov't Ex. 119a at 4.

On May 29, 2018, the defendants and Causey once more met at Lindberg's home.  See Tr. 251.  This time, Causey complained that "the numbers [were] changing" on the defendants' promised donations and that he was limited to receiving "ten or fifteen thousand dollars at a time" from Lindberg's NCGOP donation to not "draw attention."  Gov't Ex. 121a at 5.  Put simply, Causey protested that he had not "seen anything directly to [his] benefit."  Id. at 9.  Gray reassured, "if you're willing to have Debbie Walker handle everything for [GBIG], then, we- we'll," at which

9

point Lindberg interjected, "[w]e'll put the money in the bank." Id. Lindberg also reminded him that the "half million [was] already out of [his] pocket" and "in the hands of the [NC]GOP." Id.

The three again deliberated on how the independent expenditure committees should be structured to best benefit Causey. See id. at 10. To understand campaigning limitations, the defendants called Palermo, who organized the entities. See id. at 12. According to him, a 501(c)(4) organization allows for "forty- to forty-five percent" "direct campaigning" and a 527 organization allows for "a hundred percent direct campaign[ing]," but "the (c)(4) is not disclosed" and "the 527 is disclosed." Id. at 12–13. Earlier in the meeting, Gray made clear that their goal was to "avoid disclosure" and "stay anonymous on the source of the money." Id. at 8. Lindberg settled on putting "a half-million into the 527 and . . . a million in the (c)(4)," musing that "the (c)(4) is not disclosed. Half-a-million is going to be disclosed in the second quarter [through the 527], which is fine. No big deal. Whoop-te-do. . . . And a half-a-million will be disclosed [as] sent to [the NC]GOP second quarter, which is fine. They can do some more articles on me." Id. at 13, 20. Recognizing these expenditures totaled a firm "two million now," Lindberg told Palermo to get him the "names to those organizations," and he would "cut the checks." Id. at 13–14.

As that point, the discussion transitioned to precisely how the 501(c)(4)'s funding would be used to benefit Causey's campaign. Lindberg opined that "forty-five percent of [the $1 million would] be campaign specific" and "the rest" could be directed towards Causey's "wonderful accomplishments and building the insurance business in North Carolina." Id. at 15–16. In particular, Gray asserted that the funds should focus on "the desirability of domesticating companies in North Carolina." Id. at 16. Lindberg then opined that all advertising should "avoid policy discussions." Id. at 16, 18. At that point, everyone agreed: "the public doesn't care about the insurance business. . . . The public cares about jobs." Id. at 16.

10

Palermo left the call, but the conversation continued for a bit longer. Gray again asked Causey, "what do we do with [Walker]?" Id. at 19. Causey answered, "I'll make the switch, when we," to which Lindberg offered, "[g]et the checks cleared." Causey confirmed: "Yeah. Get all this straight, and . . . I'll make the switch." Id. at 20. Lindberg replied, "[t]hat's a homerun." Id.

After the meeting, the defendants followed through on their end of the agreement. Gray sent the contact information for Causey's treasurer to Hayes. See Tr. 1013; see also Gov't Ex. 61, 63. The NCGOP wire transferred the first $10,000 to Causey's campaign account on June 14, 2018, followed by another $10,000 on July 16, 2018. See Tr. 256–67; Gov't Ex. 104 at 3; Gov't Ex. 105 at 3. For his part, Lindberg wrote a $500,000 check to the 527 organization and a $1 million check to the 501(c)(4) organization. See Gov't Ex. 69, 70. And Palermo established the entities, opened bank accounts in their names, deposited the checks, then emailed the defendants, stating "for you[r] conversations with [Causey], the 2 entities are ready to go." Gov't Ex. 71.

But by the end of July, Causey had failed to do as he promised and remove Obusek as the regulator of Lindberg's companies. So, on July 25, 2018, the defendants and Causey met one last time to discuss a "date certain" for the transfer. Gov't Ex. 127a at 6; see Tr. 287. When asked, Causey protested that, of the $2 million promised to him, he had received very little. See Gov't Ex. 127a at 4. He also indicated he was dissatisfied with the independent expenditure committees, as he did not have "any control over" them. Id. That prompted Lindberg to ask, "how much money do you want in your campaign account [to] make you feel comfortable" and make "that staff realignment occur?" Id. After negotiating, Lindberg proposed having $250,000 of his prior NCGOP donation go "immediately into [Causey's] campaign account," then having "the balance" provided after realignment. Id. at 4, 8. Then, they would "run 250,000 [dollars] a quarter, a million a year, through [the] NCGOP . . . for the other million-and-half" so Causey would have "cash in

[his] campaign account" and would not "have to worry about" the entities' campaigning limitations. Id. at 6. Gray mused that such transfers through the NCGOP were preferable, as they would "not [be] traced back to [Lindberg]." Id. at 4. But he also warned Causey that he could not "go around telling people . . . [t]hat John Gray has gone to [the] NCGOP and told them what to do with the money." Id. at 6. Gray also reiterated that they needed Causey's "assurance and a date certain by which the Debbie Walker Staff realignment [would] occur." Id. at 8. Causey said he would do so "before the end of August" so long as "that's when the other can be done." Id.

With Lindberg and Causey still present, Gray then called Hayes to inform him of the plan. Gray told Hayes that he "need[ed] for [Causey] to get a transfer from NCGOP in the amount of 250,000 [dollars that] week." Id. at 10. Hayes responded that "it looks a little odd to have that much at one time," but that he could do it "if that's what [they wanted to] do." Id. at 11. Regarding the additional contributions, Hayes again expressed "concern" that such a "large amount [would] draw attention" and "somebody'll start asking questions," but he made clear that "whatever y'all wanna do, we'll do." Id. The defendants answered in the affirmative, and Hayes replied, "[a]lright! I'll get'r done!" Id. at 12. The next day, the NCGOP transferred $230,000 to Causey, meaning he had received a total of $250,000. See Tr. 290; Gov't Ex. 105 at 3.

On the morning of August 1, 2018, Gray texted Causey, indicating they needed to talk to "confirm [their] conf. of last week & related topics." Gov't Ex. at 90. When Causey did not respond, Gray texted him the next evening, stating they "need[ed] to talk ASAP" "[r]elative to [his] campaign account." Id. Later that night, Gray and Causey held their last notable conversation, where Gray once more pressured him to remove Obusek. See Tr. 292–93. Gray confirmed that the NCGOP wire transfer occurred, then asked, "[h]ow soon do you think that [the staffing transfer] can happen?" Gov't Ex. 128a at 2. When Causey suggested that he would

12

remove Obusek after he received "the other half of that transfer," Gray responded, "do you want the other half . . . the way we left it, you, you would make the uh . . . staff transition and soon after that we would transfer the other part. Is that satisfactory?" Id. Gray also stated, "we're committed to supporting you to the two million dollar level. I would strongly recommend we not do much more . . . this year but whatever it takes for you to be satisfied, we will do." Id. at 3. By the end of the conversation, Gray again promised, "if you get the realignment done in August, we'll get the other part in there. . . on or before the last day of August." Id. at 5. Causey once again agreed to the transfer, and Gray responded, "I'm delighted." Id.

Each of these recordings were admitted during the Government's presentation of evidence. After eliciting the testimony of Causey and Obusek—as well as other witnesses who are discussed as relevant below—the Government rested, and the defendants and Palermo moved for judgment of acquittal. See Tr. 1253–70; see also Doc. No. 192 (memorandum in support). The Court summarily denied the motion. See Tr. 1271. Next, the defendants and Palermo presented about two days' worth of witnesses. On March 3, 2020, after closing arguments, see Tr. 1680, the Court instructed the jury on the law of the case, see Tr. 1753, and the jury retired to deliberate, see Tr. 1794. After three days of deliberation, the jury returned a verdict of guilty as to the defendants on both counts, and a verdict of not guilty as to Palermo on both counts. See Doc. No. 193. The defendants later renewed their Motion for Judgment of Acquittal and filed a Motion for New Trial. Those motions are now ripe for review.

## II.    DISCUSSION

Federal Rule of Criminal Procedure 29 provides, in relevant part, that the Court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); see also Fed. R. Crim. P. 29(c)

(allowing a defendant to renew their acquittal motion after a guilty verdict). Where, as here, the defendant challenges the sufficiency of the evidence, the Court must decide "whether there is substantial evidence in the record, when viewed in the light most favorable to the Government, to support the conviction." United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010) (quoting United States v. Madrigal-Valadez, 561 F.3d 370, 374 (4th Cir. 2009)). For this inquiry, "substantial evidence" is that which "a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (quoting Burgos, 94 F.3d at 862). And, in viewing evidence in the light most favorable to the Government, the Court "must consider circumstantial as well as direct evidence, and allow the Government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Cameron, 573 F.3d 179, 183 (4th Cir. 2009) (quoting United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982)). The Court will not enter an acquittal if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Madrigal-Valadez, 561 F.3d at 374 (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Federal Rule of Criminal Procedure 33 explains that, upon a defendant's motion, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Under that rule, the Court may order a new trial based on the unfair admission of evidence or upon improper jury instructions. See, e.g., McDonnell v. United States, 136 S. Ct. 2355, 2375 (2016); United States v. Johnson, 337 F.2d 180, 204 (4th Cir. 1964), aff'd, 383 U.S. 169 (1966). Still, the Court "should exercise its discretion to grant a new trial 'sparingly'" and should do so "only when the evidence weighs heavily against the verdict." United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (citations omitted); accord United States v. Burfoot, 899 F.3d 326, 340 (4th Cir. 2018).

14

### A.    The "Official Act" Requirement

As discussed above, the defendants in this case were charged with conspiring to deprive North Carolina and its citizens of the honest services of the Commissioner through bribery.  See Skilling v. United States, 561 U.S. 358, 404 (2010) (construing the honest services statute as proscribing "fraudulent schemes to deprive another of honest services through bribes or kickbacks").  At trial, the Government proceeded on a theory that bribery should be defined with reference to the federal bribery statute, 18 U.S.C. § 201.  See McDonnell, 136 S. Ct. at 2365 (applying the same reference).  Relevant here, Subsection 201(b)(1) in particular provides that a person who "directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent . . . to influence any official act" is guilty of bribery.

In this case, while instructing the jury, the Court carefully defined the official act requirement of the federal bribery statute.  To begin, the Court explained:

> The term "official act" means any decision or action on any question or matter, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust. The question or matter must be specific and focused and involve a formal exercise of governmental power similar in nature to a lawsuit, hearing, or administrative determination. A decision or action on a qualifying step for a question or matter would qualify as an official act. An official act also includes a public official exerting pressure on another official to perform an official act, or providing advice to another official, knowing or intending that such advice will form the basis for an official act by another official.  In this case, the charge is that the question or matter is the removal and replacement of the Senior Deputy Commissioner in charge of overseeing the regulatory review of Defendant Lindberg's insurance companies.

Jury Instr. at 25.  The defendants do not contest this aspect of the instruction.[3]  But the Court went

---

[3] Neither defendant disputes that that the Court properly identified the explicit *quid pro quo* charged in the indictment.  See Doc. No. 3 ¶ 14.  By identifying the charged official act, the

on to say: "You are hereby instructed that the removal or replacement of a Senior Deputy Commissioner by the Commissioner would constitute an official act." Id.

The defendants now assert that this latter instruction created a fundamental flaw in their prosecution, such that the Court should set aside the jury's entire guilty verdict and either acquit them or grant them a new trial. Their argument principally proceeds in three steps. First, they assert that this instruction wrongly relieved the Government of its obligation to prove every element beyond a reasonable doubt. See Doc. No. 213-1 at 13–25. Second, they maintain that a properly instructed jury could not have concluded that the Government's evidence was sufficient to prove the official act requirement beyond a reasonable doubt. See id. at 25–30. Finally, they contend that the official act requirement equally applies to the federal funds bribery offense, so that conviction is likewise deficient. See id. at 30–38.

Put simply, the Court disagrees with the defendants' contentions of error. For one, the Court's instructions of law properly left it to the jury to decide whether the evidence was sufficient to conclude beyond a reasonable doubt that defendants offered a bribe with intent to influence an official act. And, even if the Court erred in crafting its official act instruction, that requirement does not apply to the offense of federal funds bribery, so that conviction would be sustained.

> i.    *The Official Act Jury Instruction*

A few foundational points are necessary to address the defendants' contentions of error. To begin, the Fifth Amendment to the United States Constitution guarantees that no one will be

_____

Court ensured the defendants were not convicted of a bribe outside the scope of the indictment. See Jury Instr. at 15 (noting "defendants are not on trial for any act or any conduct not specifically charged in the indictment"). And by identifying the explicit *quid pro quo*, the Court adhered to McCormick v. United States, 500 U.S. 257, 273 (1991), and Evans v. United States, 504 U.S. 258 (1992). See also Jury Instr. at 26 (noting "[t]he solicitation or acceptance by an elected public official of a campaign contribution" is not a crime unless the Government "prove[s] they were offered, given, or promised in exchange for a specific official act" (emphasis added)).

16

deprived of liberty without "due process of law." In turn, the Sixth Amendment ensures that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Together, "these provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." United States v. Gaudin, 515 U.S. 506, 510 (1995).

In United States v. Gaudin, the Supreme Court applied these constitutional protections to overturn a defendant's conviction for making false statements to a federal agency, in violation of 18 U.S.C. § 1001. See id. at 522–23. The error arose when the trial judge instructed the jury on the essential element of materiality. At first, the judge explained that the Government was required to prove the alleged false statements were material to the activities and decisions of the agency. See id. at 508. But the judge further instructed that "[t]he issue of materiality . . . is not submitted to you for your decision but rather is a matter for the decision of the court. You are instructed that the statements charged in the indictment are material statements." Id. (alterations in original). The Court held that this latter instruction created error. Id. at 512. In so holding, the Court reasoned that the materiality inquiry necessarily "requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" Id. Because the trial judge's materiality instruction deprived the jury of the opportunity to apply the law to these essential factual questions, the defendant was deprived of his constitutional rights. Id. at 513–15, 522–23; see United States v. Johnson, 71 F.3d 139, 142 (4th Cir. 1995) (explaining that "a trial judge commits error of constitutional magnitude 'when he instructs the jury as a matter of law that a fact essential to conviction has been established by the evidence, thus depriving the jury of the opportunity to make this finding'"); see also United States v. Lovern, 293 F.3d 695, 700 (4th Cir. 2002) (same).

While reversing the defendant's conviction, the Supreme Court continued to underscore that a trial judge "must be permitted to instruct the jury on the law and to insist that the jury follow his instructions." Gaudin, 515 U.S. at 513; see Johnson, 71 F.3d at 142; see also United States v. Ramirez-Castillo, 748 F.3d 205, 213 (4th Cir. 2014). In other words, the Constitution is not a tool for neutralizing unfavorable decisions of law. The Eleventh Circuit recognized the same in United States v. Hastie, 854 F.3d 1298 (11th Cir. 2017). There, a vehicle licensing commissioner wrongfully used the commission's email database to send locals a mayoral candidate endorsement. See id. at 1300. The commissioner was tried for violating the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721(a), 2725(3), which prohibits the disclosure of "personal information" obtained by a state department of motor vehicles and its employees. See id. at 1301. At closing, the trial judge instructed the jury: "The term 'personal information' means information that identifies an individual, including an individual's email address." Id. at 1305. The commissioner was convicted, so she appealed, asserting "the jury should have been allowed to determine whether 'personal information' includes email addresses 'as a factual question.'" Id. The Eleventh Circuit disagreed, explaining that "the definition of 'personal information' is a matter of statutory interpretation, which makes it a question of law." Id. at 1305–06. After holding that email addresses are encompassed within the statutory meaning of "personal information," the Court noted that the commissioner's disagreement with this "definition of 'personal information' does not remove the authority of the district court to instruct the jury on the law." Id.; accord United States v. Williams, 164 F.3d 627 (4th Cir. 1998) (table); United States v. Klausner, 80 F.3d 55, 60 (2d Cir. 1996) (citing United States v. Taylor, 66 F.3d 254, 255 (9th Cir. 1995)); United States v. Johnson, 718 F.2d 1317, 1321 n.13 (5th Cir. 1983) (collecting cases).

With these foundations in mind, the Court must now decide whether its official act

instruction wrongly removed facts from the jury that are essential for conviction, as in <u>Gaudin</u>, or correctly apprised the jury of the law, as in <u>Hastie</u>. Two decisions discussing the official act requirement guide the Court's analysis. In <u>McDonnell v. United States</u>, the Supreme Court clarified the legal meaning of "official act." 136 S. Ct. at 2367. Quoting the text of Section 201(a)(3), the Court first indicated that the Government must "identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." <u>Id.</u> at 2368. Then, employing traditional canons of statutory construction, the Court narrowly construed the terms "question" and "matter," explaining that they "refer to a formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." <u>Id.</u> at 2369. Based on this narrow interpretation, the Court explained that "a typical meeting, call, or event arranged by a public official . . . <u>does not</u> qualify as a 'question' or 'matter' under [Section] 201(a)(3)." <u>Id.</u> (emphasis added). On the other hand, "a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—<u>would</u> qualify as an 'official act'" because those actions are "focused and concrete, and each involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing." <u>Id.</u> at 2370 (emphasis added). This discussion makes clear that, as a matter of statutory interpretation, some actions <u>categorically</u> qualify as official acts, while other actions <u>categorically</u> do not qualify as official acts. <u>See</u> <u>United States v. Uchimura</u>, 125 F.3d 1282, 1285 (9th Cir. 1997) (recognizing that a decision of law is one which a jury must agree "in <u>all</u> circumstances," not just "in <u>most</u> circumstances" (emphases in original)).

Next, <u>United States v. Fattah</u> makes clear that the alleged action in this case—the removal and replacement of a Senior Deputy Commissioner by the Commissioner—categorically qualifies

as an official act.  See 914 F.3d 112 (3d Cir. 2019).  There, a congressman was convicted of conspiring to commit honest services fraud after hiring a political consultant's girlfriend to receive various benefits.  See id. at 137–39.  On appeal, the congressman contended that the decision to hire the girlfriend could not constitute an official act because such a routine decision "is nothing like a lawsuit, agency determination, or committee hearing."  Id. at 157.  The Court disagreed and held the congressman "engaged in an official act."  Id.  In so finding, the Court made clear that a hiring decision was "focused and concrete" and "within the specific duties of [the congressman's] position—[a] function conferred by the authority of his office."  Id. at 156 (quoting McDonnell, 136 S. Ct. at 2369).  And, although hiring decisions are "routine, . . . [o]fficial acts need not be momentous decision—or even notable ones.  Judges, for example, make 'routine' evidentiary rulings every day, and yet it is beyond question that those rulings are official acts."  Id. at 157.

As in Fattah, the decision to remove a Senior Deputy Commissioner as a regulator is plainly "within the specific duties of [the Commissioner of the North Carolina Department of Revenue]" and is "[a] function conferred by the authority of his office."  Id. at 156.  Indeed, state law makes this clear, as it empowers the Commissioner to "appoint or employ such . . . employees that the Commissioner considers to be necessary for the proper execution of the work of the Department." N.C. Gen. Stat. § 58-2-25.  Thus, removal of such a regulator constitutes an official act as a matter of law, see Fattah, 914 F.3d at 155–59, and the Court is obliged to instruct the jury of the same, see Uchimura, 125 F.3d at 1285.

Attempting to escape this straightforward conclusion of law, the defendants suggest two possible avenues by which the Court mischaracterized the official act requirement.  Most simply, they assert that the Court's instructions took "the element of an official act away from the jury." Doc. No. 213-1 at 13.  But the preceding discussion elucidates why this argument fails.  Like the

20

Supreme Court in <u>McDonnell</u> and the Eleventh Circuit in <u>Hastie</u>, this Court simply engaged in an exercise of statutory construction, determining that, as a matter of <u>law</u>, the charged offense, *i.e.*, "the removal and replacement of a Senior Deputy Commissioner by the Commissioner <u>would</u> constitute an official act." Jury Instr. at 25 (emphasis added). Importantly, this legal interpretation of the official act requirement did not deprive the jury of the opportunity to determine an essential question of fact reserved for the jury: whether the defendants actually gave or promised anything of value to a public official with intent "to influence any official act." <u>United States v. Sun-Diamond Growers of Cal.</u>, 526 U.S. 398, 404 (1999); <u>see</u> <u>McDonnell</u>, 136 S. Ct. 2371 (recognizing that, in a Section 201(b)(2) prosecution, "[i]t is up to the jury, <u>under the facts of the case</u>, to determine whether the public official <u>agreed</u> to perform an 'official act' at the time of the alleged *quid pro quo*" (emphases added)).[4]

Second, the defendants maintain that "the removal and replacement of a Senior Deputy Commissioner by the Commissioner" is not an official act as a matter of law, but a mixed question of law and fact that must be submitted to the jury. Doc. No. 213-1 at 18 n.3, 18–25; <u>see also</u> <u>Gaudin</u>, 515 U.S. at 512. In support, the defendants pinpoint one factual aspect that transforms the removal of a regulator from an official to an unofficial act: "the informality of the . . .

---

[4] Despite the defendants' suggestion otherwise, the remedy afforded in <u>McDonnell</u> does not remove from the Court its responsibility to interpret the statutory official act requirement. <u>See</u> Doc. No. 219 at 11–13. True, as the defendants note, <u>McDonnell</u> makes clear that a "properly instructed jury" must determine "under the facts of the case" whether "the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." <u>Id.</u> at 11. But the <u>McDonnell</u> jury was <u>improperly</u> provided an "overinclusive" instruction that would have allowed the jury to convict for <u>either</u> conduct that qualified or did not qualify an official act. 136 S. Ct. at 2374. The Court thus left it for the Fourth Circuit to determine whether there was sufficient evidence to convict under a proper understanding of the official act requirement; if so, the defendant's case could "be set for a new trial," but if not, the "charges against him must be dismissed." <u>Id.</u> at 2375. By contrast, here, the jury was <u>properly</u> instructed and charged to determine the essential questions of fact for this case. Thus, <u>McDonnell</u>'s remedy is neither here nor there.

reassignment process." Doc. No. 213-1 at 24. This argument principally rests on state law, which provides that the Commissioner's orders "affecting any insurer, insurance agent, insurance broker or other person or persons subject to the provisions of [the Insurance Chapter of North Carolina law], shall not be effective unless made in writing and signed by the Commissioner of by his authority." N.C. Gen. Stat. § 58-2-45. According to the defendants, because the evidence showed that a regulator could be reassigned through "a simple conversation" rather than in writing, the jury should have been instructed that an "informal (and strictly internal) [re]assignment process" is not a "'formal exercise of government power' akin to a 'lawsuit, hearing, or administrative determination.'" Doc. No. 213-1 at 26–27.

The Court will assume, for the sake of the argument, that the defendants' construction of state law is correct.[5] Still, their contorted amalgamation of that law with the phrase "formal exercise of governmental power" contravenes McDonnell in two ways. For one, the defendants' reading effectively means that an official act does not turn on the type of the action but on the means by which the action is accomplished. McDonnell rejected that construction, explaining that a "public official need not specify the means that he will use to perform his end of the bargain." 136 S. Ct. at 2371. And, regardless of what state law requires, McDonnell makes clear that an official act need not directly "affect[]" another; rather, it is sufficient for the bribe payee to take a "qualifying step" toward an action that would result in an official act. Id. at 2370 (explaining that a public official performs an official act "by using his official position" to "exert pressure on" or "provide advice to" another official, intending for such actions to form the basis of an official act).

---

[5] At first blush, the Court disagrees with their construction. While state law does authorize the Commissioner to appoint qualified Senior Deputy Commissioners, see N.C. Gen. Stat. § 58-2-25, the defendants fail to pinpoint precisely how Senior Deputy Commissioners are "subject to" the Insurance Chapter. Regardless, as explained above, the Court's analysis does not turn on this question, so the Court declines to decide this novel state law issue at this juncture.

The discussed passages from McDonnell embody the commonsense notion that Congress did not enact Section 201 to create nullity. Rather, that federal bribery statute was intended to "prohibit[] *quid pro quo* corruption." Id. at 2372. The defendants have found a way to interpret the statute so that any bribe payor can promise gifts in exchange for acts that would be otherwise official, so long as they insist (with nods and winks) that the action must be completed through informal channels. The Court will not contravene Supreme Court precedent and eviscerate Congress's federal bribery statute with this absurd interpretation—especially because other, clearer readings are available. Cf. Stone v. Instrumentation Lab. Co., 591 F.3d 239, 247 (4th Cir. 2009) (explaining that courts "must, if possible, interpret statutes to avoid absurd results" (quoting Aremu v. Dep't of Homeland Security, 450 F.3d 578, 583 (4th Cir. 2006)).[6]

### ii. The Official Act Requirement and Federal Funds Bribery

In addition to being convicted of conspiring to commit honest services fraud, the defendants were also convicted of federal funds bribery, 18 U.S.C. § 666(a)(2). Adhering to the text of the statute, the Court instructed the jury that federal funds bribery requires the Government to prove that a "defendant gave, offered, or agreed to give anything of value to any person . . . with intent to influence or reward an agent of an organization or of a state or local government or agency in connection with any business, transaction, or series of transactions of that organization,

---

[6] Relatedly, the defendants contend the evidence was legally insufficient to demonstrate an official act, suggesting it was "undisputed" that the defendants and Causey entertained the idea of reassigning Obusek's regulatory duties "through an informal conversation." Doc. No. 213-1 at 13. Whatever the defendants might believe, the evidence was not "undisputed" that they simply conspired for an "informal" task reassignment. In fact, at several points in the conspiracy, the defendants discussed the possibility of formally replacing Obusek with Palermo or swapping Obusek with Walker. See, e.g., Gov't Ex. 112a at 14; Gov't Ex. 115a at 11. Thus, there was substantial evidence by which the jury could have found that defendants conspired for a formal removal and replacement of Obusek. Regardless, as discussed above, whether or not the regulatory reassignment occurred through "informal" or "formal" channels is beside the point.

government or agency." Jury Instr. at 27. The defendants now maintain that the Court erred when it failed to instruct the jury that the official act requirement of Section 201 applies with equal force to federal funds bribery. See Doc. No. 213-1 at 30–38. As discussed below, the Court disagrees that its decision was erroneous, but regardless, any error was harmless.

Since McDonnell, several circuits have held that the official act requirement of Section 201 does not apply to federal funds bribery. See United States v. Ng Lap Seng, 934 F.3d 110, 129–34 (2d Cir. 2019); United States v. Porter, 886 F.3d 562, 565–66 (6th Cir. 2018); United States v. Maggio, 862 F.3d 642, 646 n.8 (8th Cir. 2017); see also United States v. Ferriero, 866 F.3d 107, 127–28 (3d Cir. 2017) (declining to extend the official act requirement to a state bribery statute). As those circuits have noted, bribery generally requires proof of a *quid pro quo*. See, e.g., United States v. Jefferson, 674 F.3d 332, 358 (4th Cir.), as amended (Mar. 29, 2012). But when defining specific bribery crimes, Congress can choose to "define the particular *quids* and *quos* prohibited." Ng Lap Seng, 934 F.3d at 129. For Section 201 bribery, Congress limited the *quo* to certain "official acts." See 18 U.S.C. § 201(a)(3). And the Supreme Court promoted that textual limitation through statutory interpretation in McDonnell, 136 S. Ct. at 2368. Accord Sun-Diamond, 526 U.S. at 408 (narrowing Section 201(c) based on the textual official act requirement and explaining that "when Congress . . . wanted to adopt a broadly prophylactic criminal prohibition . . . it has done so in a more precise and more administrable fashion"). But the official act limitation is nowhere to be found in the federal funds bribery statute. And this Court will not substitute its judgment for Congress's by importing a limitation that is wholly unmoored from the statute at hand.

Urging otherwise, the defendant highlights "constitutional and practical concerns" with treating the two statutes differently. Doc. No. 213-1 at 31. The defendants first protest that this reading undermines federalism. In support, they explain that the federal funds bribery statute was

"enacted to resolve a circuit split over whether [Section] 201 applied to State and local officials." Doc. No. 213-1 at 35. Thus, failing to apply the "official act" limitation to federal funds bribery would create a "nonsensical result" where "federal law would regulate <u>state</u> officials more strictly than <u>federal</u> officials." <u>Id.</u> (emphases in original). But failing to include this limitation does not create the unusual result that the defendants suggest, as other, unique restrictions apply exclusively to federal funds bribery: (1) the transaction must involve a "value of $5,000 or more," <u>see</u> 18 U.S.C. § 666(a)(2); and (2) the organization, government, or agency must receive, in any one year period, benefits in excess of $10,000 under a federal program, <u>see</u> <u>id.</u> § 666(b). By selecting these particular restrictions, Congress plainly intended to exercise its "power to keep a watchful eye on expenditures and on the reliability of those who use public money." <u>Sabri v. United States</u>, 541 U.S. 600, 608 (2004); <u>see</u> <u>Ng Lap Seng</u>, 934 F.3d at 138 (same).

Next, the defendants assert that failing to incorporate the official act requirement into the federal funds bribery statute would take an "overly broad view of the *quo* necessary to sustain a federal [funds] bribery conviction [and thereby] raise significant vagueness concerns." Doc. No. 213-1 at 32. As a point of clarification, it is true that the federal funds statute broadly targets bribes involving federal funds recipients. <u>Accord</u> <u>Salinas v. United States</u>, 522 U.S. 52, 56 (1997) (recognizing that Section 666 has "expansive, unqualified language, both as to the bribes forbidden and the entities covered"); <u>Ng Lap Seng</u>, 934 F.3d at 133; <u>United States v. McNair</u>, 605 F.3d 1152, 1191 (11th Cir. 2010) (nothing the federal funds bribery statute "sweeps more broadly" than Section 201 because it "does not say 'official act' but says 'any business, transaction, or series of transactions'"). But a <u>broad</u> statute is not necessarily an unconstitutionally <u>vague</u> statute. Rather, a statute is void for vagueness where it: (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) it encourages arbitrary and

25

discriminatory enforcement. See Skilling, 561 U.S. at 402–03. Under the federal funds bribery statute, Congress made it a crime to corruptly give, offer, or agree to give "give a person anything of value (the *quid*)" with intent to influence or reward an agent of an organization, government, or agency "in connection with any business, transaction, or series of transactions . . . involving anything of value of $5,000 or more (the *quo*)." Ng Lap Seng, 934 F.3d at 132. A person of ordinary intelligence is able to understand precisely what types of *quid pro quos* are prohibited by this statute. See id.; see also Skilling, 561 U.S. at 412 (recognizing that the honest services fraud statute is "not unconstitutionally vague" when limited to bribery and kickback schemes because it "draws content . . . from federal statutes," including the federal funds bribery statute).

For the foregoing reasons, the Court disagrees with the defendants' protestations that the official act requirement should be read into the federal funds bribery statute. But even if the Court is incorrect, any error in this case is harmless. The Supreme Court has held that the failure to instruct the jury on an essential element of an offense is harmless where "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Neder v. United States, 527 U.S. 1, 3 (1999). Furthermore, the Fourth Circuit has held that such errors are harmless where the jury made an "identical finding in its consideration of [another] count[]." United States v. Aramony, 88 F.3d 1369, 1383 (4th Cir. 1996) (emphasis in original) (summarizing United States v. Forbes, 64 F.3d 928, 934–35 (4th Cir. 1995)). In their briefing, the defendants contend that "[t]he element of 'business, transaction, or series of transactions' in [the federal funds bribery] statute must be read to have the same meaning as [the] 'official act'" requirement in Section 201. Doc. No. 213-1 at 30 (emphasis added). Because the jury properly found that the defendants bribed Causey in exchange for an official act as a part of its honest service wire fraud conviction, see infra Part II.A.i, that same finding would equally apply to the

federal funds bribery conviction.  Cf. United States v. Suhl, 885 F.3d 1106, 1114 (8th Cir.) (declining to decide whether the official act requirement applies to federal funds bribery, as "the instructions sufficiently submitted the official act issue to the jury"), cert. denied, 139 S. Ct. 172 (2018).  Thus, any error that might have occurred is harmless.[7]

*     *     *

To summarize, the Court properly instructed the jury that "the removal and replacement of the Senior Deputy Commissioner in charge of overseeing the regulatory review of Defendant Lindberg's insurance companies . . . by the Commissioner would constitute an official act."  Jury Instr. at 25.  And, the Court did not err by failing to instruct the jury that the official act requirement of Section 201 applies with equal force to federal funds bribery.  Accordingly, the Court's official act instruction provides no basis to reverse the defendants' convictions.

## B.      The "Benefits" Requirement of Federal Funds Bribery

Next, the defendants assert their federal funds bribery prosecution was infirm because the Government failed to prove that the North Carolina Department of Insurance received more than $10,000 in "benefits" under a federal program.  See Doc. No. 213-1 at 46.  By its terms, the federal funds statute requires the Government to prove the offered bribe was intended to influence or reward an agent of an "organization, government, or agency [that] receive[d], in any one year

---

[7] Without support, the defendants briefly attempt to turn this harmlessness analysis on its head, suggesting an erroneous instruction on the official act requirement during the honest services wire fraud charge would also require the Court to overturn the defendants' conviction for federal funds bribery—even if the official act requirement does not apply to federal funds bribery.  See Doc. No. 213-1 at 38.  But the Court instructed the jury that "[e]ach charge and the evidence pertaining to it should be considered separately."  Jury Instr. at 15 (emphasis added).  And the defendants have presented no basis to overturn the longstanding recognition that "juries are presumed to follow their instructions."  Richardson v. Marsh, 481 U.S. 200, 211 (1987); see Burfoot, 899 F.3d at 342 (4th Cir. 2018).  Thus, even if the Court erred in crafting its official act instruction for the honest services wire fraud offense, that error, standing alone, does not require the Court to reverse the defendants' conviction for federal funds bribery.

27

period, benefits in excess of $10,000." 18 U.S.C. § 666(b). Those "benefits" can be in the form of a "grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." Id. But "benefits" do not include "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Id. § 666(c).

While the federal funds statute does not further define the term "benefits," the Supreme Court further clarified its meaning in Fischer v. United States, 529 U.S. 667, 677 (2000). There, the Court explained that the central feature distinguishing statutory "benefits" from other payments is whether the funds are paid to the entity "for significant and substantial reasons in addition to compensation or reimbursement." Id. at 679. Entities receive "benefits" within the meaning of the statute where they are subjected to "substantial Government regulation" that helps them achieve "long-term objectives" or policy goals "beyond performance of an immediate transaction." Id. at 680. By contrast, an entity does not receive "benefits" where payments are made as "for the limited purposes of compensating providers or reimbursing them for ordinary course expenditures." Id. at 679. To determine whether a program recipient receives federal "'benefits,' an examination must be undertaken of the program's structure, operation, and purpose," examining "the conditions under which the organization receives the federal payments." Id. at 681; see also United States v. Pinson, 860 F.3d 152, 166–67 (4th Cir. 2017).

Applying this standard, the Fischer Court held that payments made under the Medicare program to an agency responsible for operating local hospitals constituted "benefits" under the statute. 529 U.S. at 669. In so holding, the Court acknowledged that funds were paid to the hospitals based on "the 'reasonable cost' of services rendered" to the elderly and disabled. Id. at 672. Still, the Court explained that the Medicare program "operates with a purpose and design above and beyond point-of-sale patient care," as hospitals receive value not just "from isolated

transactions but also [from] long-term advantages from the existence of a sound and effective health care system for the elderly and disabled." Id. at 677–78, 680. In fact, hospitals "play a vital role and maintain a high level of responsibility in carrying out [those] purposes" because "the Government does not make the payment unless the hospital complies with its intricate regulatory scheme." Id. at 677, 681. The Court thus found these benefits distinguished a hospital from "a contractor whom the Government does not regulate or assist for long-term objectives or for significant purposes beyond performance of an immediate transaction." Id. at 680; see United States v. McLean, 802 F.3d 1228, 1235 (11th Cir. 2015).

As in Fischer, the Government here produced sufficient evidence to find that its awards to the North Carolina Department of Insurance are "benefits" within the meaning of the statute. The Government primarily proved this through the testimony of Laresia Everett, the Controller of the Department. She testified that in 2017 and in 2018, the Department's Seniors Health Insurance Information Division "receive[d] grants from the United States Department of Health and Human Services . . . to help educate and provide assistance to seniors about Medicare, Medicaid Advantage Programs, the prescription drug program, and supplemental insurance." Tr. 872. These grants were intended "to benefit seniors and help them get health care . . . in North Carolina . . . if they are eligible." Id. According to her, the Department applied for and was awarded those funds for this purpose. See Tr. 887. And, while the Department may substantively define its program, there are "program aspects [that the Department has] to report" and "certain measures [it is] supposed to meet with regards to reporting the progress reports." Tr. 888.[8]

_____

[8] Everett also noted in passing that the Department also receives more than $10,000 in benefits "from FEMA . . . to train firefighters." Tr. 872:21–24. But because the Court finds that grants from the United States Department of Health and Human services are "benefits" under the federal funds bribes statute, the Court does not address whether this passing mention is sufficient to satisfy the requirements of the federal funds bribery statute.

Through Everett, the Government also introduced into evidence the Notices of Award that were provided by the Government to the North Carolina Department of Insurance.  See Gov't Ex. 109.  Those notices clarify that, as a condition of the "cooperative agreement," the North Carolina Department of Insurance has the "responsibility of participating in at least monthly meetings with [the Department of Health and Human Services Administration for Community Living] to discuss grant-related activities and programmatic and budgetary issues which is consistent with [the Administration for Community Living]'s responsibilities."  Id. at 2.

These exhibits and testimony are sufficient for a jury to find that the federal funds conferred "benefits" on the Department within the meaning of the federal funds statute.  As in Fischer, the cooperative agreement here served a purpose "above and beyond" a simple payment for services rendered; in particular, the agreement aimed to ensure "the existence of a sound and effective health care system for the elderly."  Fischer, 529 U.S. 677, 680.  This aim is illustrated by the fact that the Department is required to meet certain programmatic reporting requirements.  See Tr. 888; see Gov't Ex. 109 at 3.  Likewise, the Department must participate in at least monthly meetings to ensure its activities are consistent with those programmatic requirements.  See Gov't Ex. 109 at 2.  Viewing the evidence in the light most favorable to the Government, this evidence was sufficient for the jury to conclude that the Department received a "benefit."

Finally, while the Court concludes there was sufficient evidence for the jury to find a "benefit" within the meaning of the federal funds bribery statute, at least some jurisdictions have treated the "benefits" inquiry as a matter of statutory interpretation, i.e., "a legal question for the court."  United States v. Insaidoo, 765 F. App'x 522, 524 (2d Cir.) (citing United States v. Bahel, 662 F.3d 610, 626–29 (2d Cir. 2011)); see United States v. Peery, 977 F.2d 1230, 1233 n.2 (8th Cir. 1992), cert. denied, 140 S. Ct. 552 (2019).  But see United States v. Bravo-Fernandez, 913

F.3d 244, 250 (1st Cir. 2019); United States v. McLean, 802 F.3d 1228, 1247 (11th Cir. 2015).[9] If the issue is, in fact, a question of law, the regulatory scheme further confirms that the Department received "benefits" as required by the federal funds bribery statute. See Fischer, 529 U.S. at 671. As noted above, the Government's evidence shows that the Department was awarded grants through the State Health Insurance Assistance Program. See Gov't Ex. at 109 at 1. Those grants are awarded by the Administration for Community Living to ensure "adequate and appropriate health insurance coverage to individuals eligible to receive benefits under the Medicare program." 45 C.F.R. § 1331.1. Recipient must satisfy a number of programmatic requirements to qualify for a grant. Id. § 1331.2 (imposing the requirements of 42 U.S.C. § 1395b-4). Grants may only be used in accordance with the purpose described in the application. Id. § 1331.5. And the recipient must report on the use of grant funds. Id. § 1331.6. Thus, the pertinent regulations further illuminate the fact that grant recipients receive a benefit beyond a simple transaction, i.e., "the existence of a sound and effective health care system for the elderly." Fischer, 529 U.S. at 680.[10]

Based on the foregoing, when viewed in the light most favorable to the Government, the evidence is sufficient to find that the Department received "benefits" within the meaning of the

_____

[9] The Fourth Circuit has not clearly decided whether the "benefits" question is one for the Court or the jury, but in United States v. Pinson, the Circuit did vacate a conviction where the Government's "evidence failed to show that the federal money given" to an entity was a "benefit." 860 F.3d at 167. In any event, as discussed above, the Court need not resort to the broader regulatory scheme to conclude that the Department received a "benefit."

[10] The defendants briefly assert that the Court erred by failing to give their jury instruction on the "benefits" requirement. See Doc. No. 213-1 at 65. But their instruction mischaracterized the law, stating that the term "benefits . . . does not include certain payments made in the usual course of business, such as compensation like salaries, wages, or fees, or the reimbursement of expenses." Doc. No. 189 at 4. Fischer explained that salaries, wages, and fees are not categorically insufficient as the defendants suggested. Rather, they constitute "benefits" where they are made for reasons "above and beyond" a simple payment for services rendered. Fischer, 529 U.S. 677. The Court thus rejected the defendants' instruction, as it mischaracterized the law. See Noel v. Artson, 641 F.3d 580, 586–87 (4th Cir. 2011).

31

federal funds statute as required for a federal funds bribery prosecution.

### C. The Entrapment Defense

The defendants also assert they should be acquitted or granted a new trial because they were entrapped as a matter of law. See Doc. No. 219. There are two elements to the affirmative defense of entrapment: (1) Government inducement and (2) the defendant's lack of predisposition to commit the crime. See United States v. Squillacote, 221 F.3d 542, 564 (4th Cir. 2000). To raise an entrapment defense, the defendant must carry the initial burden of producing "more than a scintilla of evidence that the government induced him to commit the charged offense." United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993). If the defendant meets this burden, the Government must then prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. See United States v. Sligh, 142 F.3d 761, 762 (4th Cir. 1998).

The Court agrees with the defendants that there is more than a scintilla of evidence suggesting Government inducement. To begin, on January 27, 2018, Gray asked Causey during a phone call whether he would be "willing to meet with [him] and [Lindberg]" to discuss their grievances with Obusek. Gov't Ex. 111a at 7. Causey agreed to a meeting but insisted that the meeting had to be "highly confidential" because he did not want "the legal folks to know anything about it." Id. Both before and during that initial meeting, the defendants suggested that Obusek should be removed from regulating Lindberg's companies. See Gov't Ex. 111a at 10–11; Gov't Ex. 112a at 6. But at that time, neither explicitly offered Causey any value for her removal. Three weeks later, in their second meeting, Causey asked to speak privately with Lindberg. After complaining about the "grief" he would receive from removing and replacing Obusek, he transparently asked: "What's in it for me? What can you do to help that's not going to be under the radar screen?" Gov't Ex 113a at 8–9. Only at that point did Lindberg explicitly offer "a million

or two" in campaign contributions for Obusek's removal. Gov't Ex. 113a at 11–12. Causey's prior actions would provide at least some basis for a jury to find that the Government induced him to commit the offenses of conviction. See Sligh, 142 F.3d at 762–67 (holding a district court erred in failing to provide an entrapment instruction where a Government agent "persisted in her baiting of [the defendant]" and "introduced, as well, the specific idea of a bribe" through the question "What's in it for me?"). Thus, the defendants carried their initial burden and were entitled to an entrapment instruction. See United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991).

Despite being entitled to a jury instruction on entrapment, the Court disagrees that the defendants were entrapped as a matter of law. Instead, the Government presented ample evidence for the jury to find that the defendants were predisposed to commit the offenses, as they were ready and willing to offer a bribe when given an opportunity. See Jacobson v. United States, 503 U.S. 540, 550 (1992) (holding "where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition"); United States v. Jones, 976 F.2d 176, 179 (4th Cir. 1992) ("The government may meet its burden [and prove predisposition] by demonstrating the defendant's ready response to the inducement offered."); United States v. Hunt, 749 F.2d 1078, 1085 (4th Cir. 1984) (same). For example, when Causey asked what he would obtain by removing Obusek, Lindberg did not respond with lawful reasons why her removal might be a good decision, such as fair governance. Cf. Sligh, 142 F.3d at 766. Nor did he attempt to rebuff Causey's invitation to offer a bribe. See id. Rather, he immediately offered to "put a million or two" in an independent expenditure committee "for [Causey's] re-election." Gov't Ex. 113a at 11–12. And, while Gray was not present for the conversation, he called Causey afterward and wholeheartedly endorsed the arrangement. See Gov't Ex. 114a at 6 (explaining that if the

33

defendants "get [Palermo in the Department] . . . there will be at least a million dollars somewhere in [Causey's] re-election"). Based on these ready responses to the alleged inducement, a jury could—and did—conclude beyond all reasonable doubt that the defendants were predisposed to commit the offenses. See Squillacote, 221 F.3d at 565.[11]

Additional evidence also supports the jury's finding that the defendants were predisposed to commit honest services wire fraud and federal funds bribery. Specifically, viewing the evidence in the light most favorable to the Government, "both defendants previously offered campaign contributions to [Causey] to curry favor with him . . . [which shows] they were ready, willing and able to compensate him if he did what they asked in the future." Doc. No. 218 at 16–17. For example, before the defendants requested that Causey call his Michigan counterpart to facilitate their purchase of an insurance company, the Lindbergs donated $10,000 to his campaign. See Tr. 139. That contribution was unusual, as the election cycle had just ended, and it was the largest donation Causey had yet seen. See Tr. 140. Once Causey made the favorable call to the Michigan insurance commissioner, Gray in turn phoned Causey to indicate that they had earmarked $110,000 for Causey with the NCGOP—eleven times as much as the prior donation attempt—and they would host a fundraiser for Causey. See Tr. 144–46. Also, in a phone call predating the February 2018 meeting, Gray hinted to Causey—just minutes apart—that Lindberg would "contribute to his campaign" if asked, and that Obusek should be "reassign[ed]" and "give[n] other duties." Gov't Ex. 111a at 6, 10. Again, viewed in the light most favorable to the Government, the jury could

---

[11] The defendants opaquely suggest that the Court erred by failing to give their proposed jury instruction on entrapment because it offered "more guidance" than the Court's instruction. See Doc. No. 213-1 at 65–66. But this equivocal complaint does not even hint that the Court erred in stating the law of entrapment or that the error prejudiced the defendants. It is well-established that "a trial court has 'considerable discretion in choosing the specific wording of its instructions.'" United States v. Hager, 721 F.3d 167, 185 (4th Cir. 2013) (alterations omitted). The Court did not abuse its discretion in wording its instruction here. See id.

find that these unusual and aggressive campaign contributions—all of which were temporally connected to some requested action by Causey in his role as Commissioner—suggest that the defendants were predisposed to commit the offense of conviction.

Finally, the defendants complain that these campaign contributions are insufficient to establish predisposition, as they are legal and thus do not show a "predisposition to commit an illegal act." Jacobson, 503 U.S. at 550 (emphasis added). True, "by itself," evidence of an aggressive but "lawful" campaign contribution may insufficient "to show predisposition to do what is . . . illegal." Id. at 551. But these suspect contributions must also be considered alongside the defendants' ready responses to offer a bribe. Together, this evidence would allow the jury to find that the defendants were predisposed to commit the offenses. See United States v. Harvey, 991 F.2d 981, 995 (2d Cir. 1993). Accordingly, the defendants were not entrapped as a matter of law.

### D. Evidentiary Rulings

Beyond these three primary contentions of error, the defendants briefly raise a bevy of other purported errors that they maintain, cumulatively, require either a new trial or a judgment of acquittal. First, the Court addresses the alleged evidentiary errors. On appeal, the Fourth Circuit reviews this Court's application of the Federal Rules of Evidence under the deferential abuse of discretion standard and its interpretation of the rules *de novo*. See Ward v. AutoZoners, LLC, 958 F.3d 254, 273 (4th Cir. 2020). Even where the Court erred in its rulings, the Circuit will not disturb the judgment if the error was harmless. See id. In evaluating harmlessness, the Circuit will also set aside a judgment if "the errors in the aggregate . . . violated the trial's fundamental fairness." Id. As explained below, the Court's rulings were correct at the time and remain correct with the benefit of hindsight. Thus, these rulings do not support overturning the defendants' convictions.

i. *Causey's Purported Bias*

The defendants first maintain that a new trial is warranted because the Court deprived them of the opportunity to fully cross-examine Causey's bias and character for truthfulness in testifying. The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees a criminal defendant the right "to be confronted with the witnesses against him." Interpreting this clause, the Supreme Court has held that a defendant's rights are infringed where he is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (alterations in original). Still, the "Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Id. at 679 (citation omitted). Accordingly, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id.

At trial, the defendants first sought to undermine Causey's testimony by showing he was biased in favor of Government, postulating that he cooperated with the FBI in "an attempt to avoid investigation into his own activities." Doc. No. 213-1 at 53. To support this theory, the defendants pointed to Causey's deposition in an unrelated civil case. In the deposition, an attorney for Cannon Surety, LLC, accused Causey of engaging in a criminal "pay to play" scheme, accepting campaign contributions from Cannon's direct competitor in exchange for treating Cannon "unfavorably." Doc. No. 213-2 at 7–8. Causey's attorney objected, so Cannon's attorney replied:

> Well, Mr. Johnson, when the FBI asks him these questions, I'm just getting him
> ready for it . . . [b]ecause it appears, Mr. Commissioner, that you have committed

36

a federal offense, and your lawyer needs to inform you of that, that this appears to be a pattern and a practice, by you, to take campaign money to punish a competitor to campaign supporters of yours' business. That is illegal.

Id. Causey's attorney responded that the assertions were "ridiculous," to which Cannon's attorney replied, "Well, you can call it ridiculous if you want to. You let him explain that to a federal grand jury." Id. About a month later, Causey approached federal authorities about the defendants. The defendants speculate that this timing shows that Causey cooperated to avoid investigations into his own activities. See Doc. No. 213-1 at 53.

Outside the jury's presence, the Court made clear that it understood the defendants' bias theory. The Court also expressed skepticism. See Tr. 363 (recognizing "[t]he fact that some civil attorney brings up the words FBI" does not mean that "somebody is under criminal investigation"). But because bias is a question for the jury, the Court decided that the defendants should be permitted to explore this possible source of bias. See Tr. 364 (rejecting the Government's suggestion that the attorney's accusation "carries no weight at all"). Still, the Court explained that cross-examination should be limited to ensure the case at hand did not become a "mini trial" on whether Causey committed wrongdoing in the Cannon case—which was disputed and unrelated to the prosecution at hand. Tr. 358. After discussing limitations, Lindberg's counsel ultimately cross-examined Causey regarding his possible bias in favor of the Government:

> Q: Sir, I will ask you again, sir. During [the civil] deposition, did the counsel conducting that deposition question the legality of your unrelated campaign finance contributions, sir? . . .
>
> A: He questioned the legality of something that didn't actually happen. He was trying to show that I received money from competitors of Cannon Surety and [that was the] reason for me going after examining Cannon Surety, and that was not the case. He was off base with his premise and I think we showed that.
>
> The Court: Move on.
>
> Q: Is it your testimony, sir, here in front of this jury that there's no relationship

37

to the allegations made against you at that time to—

[The Government]:     Objection.

The Court:     Let me hear the question first.  I'll listen to the question first.

Q:     To the fact of you going through the assistant U.S. attorney[?]  Is it your testimony here that there was no relationship between the timing of the allegations made against you and the allegations that you made against Greg Lindberg?

A:     Yes, sir, none whatsoever.

Tr. 438–39.  Lindberg's counsel then moved to a different subject.  See Tr. 439.

Acknowledging this exchange, the defendants nevertheless assert that the Court erred in two ways.  First, according to the defendants, the Court entirely limited cross-examination on bias by instructing counsel to "move on."  Doc. No. 213-1 at 54.  Second, the Court prohibited the defendants from introducing the deposition transcript as extrinsic evidence.  See id. at 53.  Together, these alleged errors purportedly prohibited the defendants from revealing the "key fact" of bias to the jury: "that the deposing lawyer [in the Cannon case] warned Mr. Causey that he could be investigated by the FBI."  Doc. No. 213-1 at 54.

To begin, the defendants' expansive reading of the Court's "move on" comment is negated by the record as a whole.  Contrary to the defendants' assertions, the Court did not prohibit them from further inquiring about possible bias resulting from this deposition exchange.  Rather, the Court's statement to "move on" simply reminded counsel that the Court would not conduct a "mini trial" on disputed facts from the unrelated Cannon matter.  As Van Arsdall makes clear, the Court retains broad discretion to ensure litigants do not obfuscate the issues in an attempt to delay the trial at hand and distract the jury.  See 475 U.S. at 680; see also United States v. Maynes, 880 F.3d 110, 115 (4th Cir. 2018) (recognizing that "[t]he district court remains in the best position to strike a balance between the relevance of the information to the defense and the risk of creating a mini-

trial"); United States v. Johnson, 850 F.2d 690 (4th Cir. 1988) (table) (same). Examining counsel made clear that he understood the import of the Court's ruling, noting that the Court did not "want to conduct a mini trial" on the Cannon matter and thus offering not to "mention the Cannon issue at all." Tr. 359–60. And—contrary to briefing counsel's assertion—examining counsel clearly understood the Court's statement as reaffirming its ruling, as he continued to ask questions about the deposition exchange without rebuke, even after the Court instructed him to "move on."

Moreover, the record does not support the defendants' suggestion that they were prohibited from asking whether Causey was "warned . . . that he could be investigated by the FBI." Doc. No. 213-1 at 54 (emphasis added). As noted above, examining counsel ultimately chose to move away from the deposition exchange to another subject. See Tr. 439. At bottom, the defendants' contention may be rooted in a specific exchange between defense counsel and the Court. Counsel inquired whether the Court would permit asking Causey: "was there an allegation made in a deposition that your conduct regarding campaign contributions had been questioned and that it was stated that . . . this information would be presented to the FBI?" Tr. 365 (emphasis added). The Court rejected that question because the Cannon attorney "[did not] say he [was] going to present it to the FBI." Id.; see also Tr. 370 (explaining "[t]here's no statement [from the attorney that] he's going to report [wrongdoing]"). Put simply, the Court rejected the counsel's question because it mischaracterized the evidence—not because it went to the issue of bias.

Finally, the defendants complain that the Court refused to admit the deposition transcript as it "suggested that [Causey] would be investigated by federal authorities for illegal activity." Doc. No. 213-1 at 53. As discussed above, the Court's limitations were appropriate to prevent a mini-trial on an unrelated and disputed matter. Thus, the Court did not err by balancing the issues and carefully limiting cross-examination into Causey's bias.

### ii. Causey's Character for Truthfulness

In the same vein, the defendants assert the Court erred by prohibiting cross-examination into specific instances of misconduct by Causey, which allegedly demonstrate his character for untruthfulness. Rule 608(b) explains that, on cross-examination, the Court "may" allow attorneys to inquire into specific conduct where "they are probative of the character for truthfulness or untruthfulness of . . . the witness." By using the word "may," the rule firmly vests the admissibility of such evidence into this Court's discretion. See United States v. McNatt, 931 F.2d 251, 255 (4th Cir. 1991). And, again, the Court may properly exercise that discretion to avoid a "mini-trial" on unrelated "facts and charges." United States v. Birchette, 908 F.3d 50, 60 (4th Cir. 2018).

Here, the defendants wanted to cross-examine Causey about certain produce sales at a farmer's market, occurring about eleven years ago, which allegedly violated the market's rules. According to the defendants, this "would have been probative of [his] character for untruthfulness [because] . . . a person who was willing to lie about something as trivial as the growing of blueberries would embellish the truth in other instances." Doc. No. 213-1 at 55. Ultimately, the Court declined to allow inquiry into those specific incidents, again sparing the jury a mini-trial on the disputed issue of whether Causey followed the market's rules. Tr. 192–94. The Court also noted that, even if Causey did violate the rules, such a violation would have had little probative value, as it occurred over a decade before trial. Cf. United States v. Cavender, 578 F.2d 528, 530 (4th Cir. 1978) (explaining that even a criminal conviction over a decade old should be used for impeachment purposes "very rarely and only in exceptional circumstances"). Thus, the Court appropriately exercised its broad discretion to prohibit inquiry into disputed and outdated conduct.

### iii. Suggestions to Hire John Palermo

Third, the defendants maintain that the Court errantly admitted irrelevant and unfairly

prejudicial recordings into evidence. Only relevant evidence is admissible. See Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Even if evidence is relevant, the Court may nevertheless exclude it "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. "Judgments of evidentiary relevance and prejudice are fundamentally a matter of trial management," so district courts are afforded broad discretion in determining admissibility. United States v. Benkahla, 530 F.3d 300, 309 (4th Cir. 2008). As such, the decision to admit evidence under these rules "will not be overturned except under the most extraordinary circumstances, where that discretion has been plainly abused." United States v. Udeozor, 515 F.3d 260, 265 (4th Cir. 2008) (citation omitted).

Here, the defendants maintain that their recorded statements suggesting that Causey hire Palermo were both irrelevant and unfairly prejudicial because these suggestions were "not part of the 'scheme or artifice' to deprive the public of honest services, which was the object of the conspiracy charged in the indictment." Doc. No. 213-1 at 58. Rather, "[t]he official act charged in [the] indictment was the removal of Senior Deputy Commissioner" and "Palermo's suggested hiring had nothing to do with that action." Id. at 58–59. Thus, these discussions unfairly "diverted the jury's attention from the relevant official act or transaction." Id. at 60.

The defendants' parsimonious argument mischaracterizes the indictment and omits critical evidentiary context. True, the indictment charged the defendants with conspiring to promise things of value to Causey "in exchange for specific official action favorable to [Lindberg's insurance companies], including the removal of the Senior Deputy Commissioner of the [Department] responsible for overseeing the regulation, of [the companies]." Doc. No. 3 ¶ 14. But the indictment and trial evidence revealed several means by which the defendants hoped to accomplish that

objective. For example, Gray told Causey that he should hire Palermo and "set it so that, if [Obusek] stays where she is, she doesn't breathe a word outside that office or send a slip of paper outside that office that's not reviewed first by [Palermo]." Gov't Ex. 113a at 5. Later, when Causey expressed concern about the atmospherics of hiring Palermo, Lindberg suggested "swap[ping]" Obusek with Walker, musing that this change would be an acceptable "short-term fix," just as hiring "John [Palermo] was a short-term fix." Gov't Ex. 115a at 11. Context thus makes clear that Palermo's suggested hiring was not an irrelevant and unfairly prejudicial act, entirely divorced from the conspiracy to remove Obusek as Lindberg's regulator; instead, these conversations are highly probative of whether the defendants agreed to bring their unlawful conspiracy to fruition. See Burfoot, 899 F.3d at 335 (explaining that conspiracy to commit wire fraud "requires a jury to find that (1) two or more persons agreed to commit wire fraud and (2) the defendant willfully joined the conspiracy with the intent to further its unlawful purpose").[12]

Anticipating this conclusion, the defendants also complain that these discussions should not be considered "in furtherance of" the conspiracy because the wire payments for Causey were dispensed much later—well-after the defendants agreed to remove and replace Obusek with someone other than Palermo. Doc. No. 213-1 at 59. But while the means of the conspiracy may have changed, the objective did not; from its inception to its end, the defendants intended to remove Obusek and to replace her with a more favorable regulator. Like countless other courts, this Court properly admitted these discussions which occurred "in furtherance of" that unlawful criminal objective. See United States v. DiSanto, 86 F.3d 1238, 1252 (1st Cir. 1996) (explaining the

_____

[12] For the same reason, the Court rejects the defendants' complaint that the jury should have been instructed regarding multiple conspiracies. See United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994) (explaining that "[a] multiple conspiracy instruction is not required unless the proof at trial demonstrates that [defendants] were involved only in 'separate conspiracies unrelated to the overall conspiracy charged in the indictment'" (emphasis in original)).

recordings over two years removed from a conspiracy may nevertheless be probative as to "the existence of a conspiracy" and "complicity" when they are "closely intertwined with the charged offense" (citation omitted)); United States v. Elledge, 723 F.2d 864, 868 (11th Cir. 1984) (rejecting a defendant's contention that he was only involved in "preliminary discussions which did not result in any finalized criminal agreement," as a " complete detailed agreement is not necessary to convict persons of conspiracy" and he "had agreed to the undertaking in principle, and had begun to discuss the details of the scheme"); United States v. Grassi, 616 F.2d 1295, 1302 (5th Cir. 1980) (same). Therefore, the defendants' suggestions to hire Palermo were properly admitted.

### iv. Expert Witness Testimony

Finally, the defendants complain that the Court excluded their expert in campaign finance from testifying at trial. Prior to trial, the defendants submitted two filings with separate avenues warranting the admission of expert testimony at trial. In the first, they argued that campaign finance law is "extremely confusing," so an expert's testimony was necessary to ensure the jury did not "confuse the issues and convict on a legal campaign contribution." Doc. No. 122 at 1. In their subsequent filing, the defendants reframed their argument, suggesting that the jury needed to understand campaign finance law to decide "whether the defendants offered or gave anything of value to [Causey] in exchange for an official act." Doc. No. 133-1 at 2. Ultimately, the Court rejected the proffered expert testimony because it was irrelevant, unhelpful to the jury, and confused the issues, contravening Federal Rules of Evidence 401 and 403, as well as Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). The Court stands by its ruling now.

To begin, the defendants were not charged with violating intricate and opaque campaign finance laws, but with crimes of bribery, plain and simple. To dispel any notion otherwise, the jury was instructed that the "defendants [were] not on trial for any act or any conduct not

specifically charged in the indictment, including . . . other political activities." Jury. Instr. at 15. Thus, an expert's testimony on the contours of campaign finance law would have obfuscated a pertinent issue before the jury—*i.e.*, the <u>defendants'</u> mental state in relation to the <u>charged offenses</u>—by opining on matters irrelevant to the case at hand—*i.e.*, <u>an expert's</u> knowledge regarding <u>unrelated offenses</u>. The Court properly excluded this irrelevant and unfairly prejudicial testimony. <u>See</u> <u>United States v. Abdallah</u>, 911 F.3d 201, 220 (4th Cir. 2018) (explaining that witnesses' knowledge of legal ambiguities is irrelevant where there is no "connection between the witnesses' knowledge and [the] Defendant's own *mens rea*"); <u>United States v. Ali</u>, 735 F.3d 176, 192 (4th Cir. 2013) (same); <u>see also</u> <u>United States v. Wilson</u>, 133 F.3d 251, 265–66 (4th Cir. 1997) (explaining "it is the responsibility—and the duty—of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction").

Perhaps sensing this outcome, the defendants fall back on their suggestion that the campaign finance expert should have been allowed to provide testimony on whether Causey received "anything of value" in exchange for an official act. <u>See</u> Doc. No. 213-1 at 56. So the argument goes, the expert's testimony would have shown that Causey did not receive anything of "value" because the "rules" governing independent expenditure committees prohibit Causey from "controll[ing] the funds." Doc. No. 213-1 at 57; <u>see</u> Doc. No. 133-1 at 4.[13]

To start, it is nonsensical to suggest that a public official must directly control or receive funds to obtain "anything of value." <u>See</u> Doc. No. 120 at 6 n.2. Regardless of whether Causey

---

[13] The defendants' argument appears predicated upon the belief that expert opinion could have established that such funds were objectively valueless for Causey. Such an objective framework seems misguided, as courts focus "on the value which the defendant subjectively attaches to the items received." <u>United States v. Renzi</u>, 769 F.3d 731, 744 (9th Cir. 2014) (quoting <u>United States v. Gorman</u>, 807 F.2d 1299, 1305 (6th Cir. 1986)).

44

directly controlled how the funds were expended, such funds would still provide him with "value" if they were expended toward securing his reelection.  See United States v. Terry, 707 F.3d 607, 614 (6th Cir. 2013) ("A 'thing of value' could include a campaign contribution, so long as that was 'received in exchange for official acts.'"); see also Renzi, 769 F.3d at 744 (explaining that the phrase "thing of value" is "defined broadly").

Congress embodied this commonsense notion within the plain text of the relevant criminal statutes; by their terms, the relevant statutes reject the defendants' superimposed "control" requirement.  For one, Section 201(b)(1) criminalizes "offers or promises [to] any public official . . . to give anything of value to any other person or entity with intent . . . to influence any official act."  For its part, the federal funds bribery statute makes it a crime to "corruptly give[], offer[], or agree[] to give anything of value to any person, with intent to influence or reward an agent of . . . a State . . . in connection with any business, transaction, or series of transactions of such . . . government" 18 U.S.C. § 666(a)(2) (emphasis added)).  Thus, the legislative branches plainly contemplated and criminalized giving "value" to other persons beyond the official in an attempt to receive favorable action from the official.  See United States v. Menendez, 132 F. Supp. 3d 635, 640 (D.N.J. 2015) ("Even if contributions to Majority PAC had no objective value to [the public official], they unquestionably had value to Majority PAC as an entity, and [Section] 201(b)(2) criminalizes corruptly seeking anything of value, even for another person or entity, in return for being influenced in the performance of an official act."); see also Jefferson, 674 F.3d at 359 ("An absurd result would occur if we were to deem [a public official]'s illicit actions as outside the purview of the bribery statute, simply because he was rewarded by periodic payments to his family's business."); United States v. Siegelman, 640 F.3d 1159, 1169 (11th Cir. 2011) (affirming a federal funds bribery conviction predicated upon a corrupt donation to an issue advocacy

campaign supported by an official).

Notably, the defendants also failed to explain how the expert's testimony would have overcome the fact that Causey could control the funds provided to him through the NCGOP. During their July meeting, Causey complained he was dissatisfied with the independent expenditure committees because he had no direct "control over" them. Gov't Ex. 127a at 4. The defendants thus decided to provide $250,000 immediately to Causey through the NCGOP, then offered the remainder through installments. See id. at 4–8. Hayes agreed to make the transfer on behalf of the NCGOP, and Causey's campaign account received an additional $230,000 on the next day—meaning Causey had directly received $250,000. See Gov't Ex. 105 at 3.

Finally, even if the Court abused its discretion by refusing to allow expert testimony on whether Causey could lawfully control the independent expenditure committee funds, that error was harmless. In fact, the error likely benefited the defense rather than harmed it. On multiple occasions, the defendants indicated that they believed that public officials were prohibited from controlling campaign contributions. See, e.g., Gov't Ex. 114a at 6 (Gray noting "coordination is not something you would be doing" and expenditures should be "without any coordination with the candidate"); Gov't Ex. 115a at 6 (Lindberg indicating "the right thing here in North Carolina, so, just so you know, you can know about [campaign expenditures], you can't coordinate and control it" and "it's gotta be independent"); Gov't Ex. 118a at 7 (Gray opining "[t]here can't be any coordination"). Notwithstanding that belief, the defendants still allowed Causey to control those expenditures. See Gov't Ex. 120a at 5 (Gray stating "there's some discussion we've had that I probably shouldn't have with you," then discussing the structure of the committees); see generally Gov't Ex. 121a (the defendants planning with Causey both the management of the committees and how the funds would be used); Gov't Ex. 127a at 6 (Lindberg opining "the

[independent expenditure committee] is a pain in the butt . . . . [i]f you even know it exists, you could get, you know, have compliance issues"). Thus, an expert's testimony would have <u>confirmed</u> that the defendants unlawfully allowed Causey to control precisely how the funds would subsequently be used in an attempt to secure his reelection.

### E. Jury Instructions

Beyond the alleged error in the official act jury instruction, the defendants also complain about a myriad of other instructions provided by the Court. <u>See</u> Doc. No. 213-1 at 50–56. The bulk of these complaints has already been rejected for reasons stated above, but a few require a bit more discussion. Similar to evidentiary errors, the Circuit reviews this Court's "decision to give a particular instruction for abuse of discretion, and review[s] whether a jury instruction incorrectly stated the law *de novo*." <u>United States v. Miltier</u>, 882 F.3d 81, 89 (4th Cir.) (citations omitted), <u>cert. denied,</u> 139 S. Ct. 130 (2018). On review, the Court must determine "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of an objecting party." <u>Id.</u> And even where a jury was erroneously instructed, the Court "will not set aside a resulting verdict unless the erroneously instruction <u>seriously</u> prejudiced the challenging party's case." <u>Bunn v. Oldendorff Carriers GmbH & Co. KG</u>, 723 F.3d 454, 468 (4th Cir. 2013) (emphasis in original) (citation omitted). As discussed below, the Court's instructions accurately captured the law and the presented facts of this case. Therefore, the Court will not overturn the defendants' convictions on these grounds either.

#### i. *"Corrupt" Intent and Good Faith*

Most of the defendants' remaining complaints about the jury instructions assert, in some fashion or another, that the Court inadequately apprised the jury of the requisite criminal intent for

47

the charged offenses. To sustain a conviction for honest services wire fraud, the Government must prove beyond all reasonable doubt that a defendant's scheme to defraud was "undertaken with the specific intent to defraud." Harvey, 532 F.3d at 333. Likewise, to sustain a conviction for federal funds bribery, the Government must prove that the defendant "corruptly" gave, offered, or agreed to give a thing of value to "any person, with intent to influence or reward" an agent of a State government in connection with a transaction involving $5,000 or more. 18 U.S.C. § 666(a)(2). As to the latter offense, the Court explained:

> An act is done "corruptly" if it is done with the intent to engage in some specific *quid pro quo*, that is, to receive a specific benefit in return for the payment, or to induce a specific act. A payment is made with corrupt intent only if it was made or promised with the intent to corrupt the particular official. Not every payment made to influence or reward an official is intended to corrupt him. One has the intent to corrupt an official only if he makes a payment or promise with the intent to engage in a specific *quid pro quo* with that official. The defendant must have intended for the official to engage in some specific act or omission or course of action or inaction in return for the payment charged in the Bill of Indictment.

Jury Instr. at 29. The defendants concede that this instruction "fairly track[s]" the definition of "corruptly" as given by the Fourth Circuit in United States v. Jennings, 160 F.3d 1006, 1019 (4th Cir. 1998). Doc No. 213-1 at 61. Still, they marshal a host of "Supreme Court precedent and other appellate decisions on similar bribery statutes," which supposedly "undercut [this] definition." Id. Conspicuously absent from the defendants' assertions is any serious suggestion that the Circuit's definition has proven "untenable" in light of intervening Supreme Court decisions. Hoffman v. Hunt, 126 F.3d 575, 584 (4th Cir. 1997). Of course, this Court remains bound by the panel decision in Jennings "absent contrary law from an *en banc* or Supreme Court decision." Taylor v. Grubbs, 930 F.3d 611, 619 (4th Cir. 2019); see also Qingyun Li v. Holder, 666 F.3d 147, 150 (4th Cir. 2011) (noting a panel decision is binding unless "a subsequent Supreme Court decision 'specifically rejected the reasoning on which the prior decision was based'" (alterations omitted)).

48

Thus, whatever the merits of the defendants' arguments, <u>Jennings</u> remains the law in this Circuit.

Even assuming <u>Jennings</u> is not dispositive of the issue, the Court would nevertheless reject the defendants' alternative definition. The defendants asked that the jury be instructed: "If a defendant acts with the belief that his purpose was lawful, he does not act 'corruptly.'" Doc. No. 213-1 at 61. The Court gleans two possible meanings from this statement, and both are incorrect statements of law. First, the jury might understand this to mean it is a defense for a bribe payor to believe "he was bribing a public official to do something that was lawful or otherwise good." Doc. No. 218 at 30; <u>see, e.g.,</u> Gov't Ex. 112a at 14 (Lindberg opining that Obusek should be replaced with someone who is "fair and balanced" like their friend, Palermo). But in this Circuit, the bribe need not be offered in exchange for an act that is "harmful to the government or inconsistent with the official's legal obligations." <u>United States v. Quinn</u>, 359 F.3d 666, 675 (4th Cir. 2004). This is because the harm is not tied to the consequences of the bribe *per se*, but the bribe payor's actions to subvert the democratic process and impair the judgment of officials through conditional offers of payment. <u>Cf. id.</u>; <u>accord</u> <u>United States v. Jannotti</u>, 673 F.2d 578, 601 (3d Cir. 1982).

Alternatively, the jury might understand the instruction to mean that *quid pro quo* bribery is unpunishable, so long as the bribe payor was ignorant that the law prohibited such agreements. But, as usual, mistake of law is not a defense to either of the offenses at hand, lest our democratic institutions would fall to corruption under cries of ignorance. <u>Accord</u> <u>United States v. Blagojevich</u>, 794 F.3d 729, 739 (7th Cir. 2015) (citing <u>Barlow v. United States</u>, 8 L.Ed 728 (1833)); <u>United States v. Wynn</u>, 684 F.3d 473, 478 (4th Cir. 2012) (explaining the "only mens rea requirement" for wire fraud is that the "defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value"); <u>United States v. Nelson</u>, 712 F.3d 498, 508 (11th Cir. 2013); <u>United States v. Paradies</u>, 98 F.3d 1266, 1285 (11th Cir. 1996).

Relatedly, the defendants also complain that the Court erred by not providing their requested good-faith defense instruction to the jury. Portions of their instruction were rejected because they were simply an effort to make the same arguments to the jury that the Court rejected above. See Tr. 1551 (asserting that the Court should include their good-faith instruction to explain to the jury that "a person who acts on a belief or an opinion honestly held is not punishable under the statute[s] merely because the belief or opinion turns out to be inaccurate, incorrect, or wrong [and that an] honest mistake in judgment or an honest error in management does not rise to the level of criminal conduct"); see also, e.g., Blagojevich, 794 F.3d at 739 (rejecting the same).

More generally, because the defendants were charged with the specific intent crimes of honest services wire fraud and federal funds bribery, they were free to assert a good faith defense. See United States v. McDonnell, 792 F.3d 478, 513–15 (4th Cir. 2015), overruled on other grounds, 136 S. Ct. 2355 (2016). "The essence of a good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent." United States v. Brown, 478 F.3d 926, 928 (8th Cir. 2007). In other words, good faith is the "absence of an intent to defraud." S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 531 (4th Cir. 2002). Since an "intent to defraud is essentially the opposite of good faith," courts routinely recognize that a "separate instruction on good faith is not required . . . where the court adequately instructs on intent to defraud." United States v. Berroa, 856 F.3d 141, 161 (1st Cir. 2017); see United States v. Mancuso, 42 F.3d 836, 847 (4th Cir. 1994) (same); accord United States v. Shipsey, 363 F.3d 962 (9th Cir. 2004); United States v. Manges, 110 F.3d 1162, 1177 (5th Cir. 1997).

The Court provided countless instructions on the *mens rea* requirements for honest services fraud, federal funds bribery, conspiracy, and aiding and abetting liability. See Jury Instr. at 19, 22, 27–30. The Court also instructed the jury that "[u]nless the Government proves that each

50

defendant has committed each and every element of the offenses charged in the Indictment against that defendant beyond a reasonable doubt, you must find that defendant not guilty of the offense." Id. at 6. An additional instruction on good faith would have been redundant and thus unnecessary.

Importantly, the Court acknowledged to defense counsel that their lack of criminal intent (or good faith) was a "relevant defense[]." Tr. 1550. Noting that "every element" had to be proven, the Court invited counsel to "argue" to the jury that "intent" was not proven. Tr. 1562. Defense counsel took the Court up on its invitation. See Tr. 1699 ("And then in polar opposite of criminal intent, you've got Greg Lindberg saying that he wants to follow the law"); id. at 1714 ("And if John Gray had the predisposition to commit a crime, why would he always say that he intended to follow the law and he wanted to?"). The jury rejected this defense, finding that defendants acted with criminal intent. Ample evidence supported that conclusion, including the defendants' offers to (1) fund an independent expenditure committee with "a million or two" for Causey's re-election in exchange for hiring Palermo, Gov't Ex. 113a at 11–12,[14] and (2) to "put the money in the bank" if Causey would be "have Debbie Walker handle everything for [GBIG]," Gov't Ex 121a at 9.[15]

In sum, the Court's instructions of law regarding criminal intent were correct, and the jury reasonably applied those instructions to find that the defendants' actions were undertaken with the specific intent to influence an official act, "which, in turn, would indicate a specific intent to deprive the public of honest services." Harvey, 532 F.3d at 334.

---

[14] Notably this Government proved at trial this first offer of a *quid pro quo* occurred at the Statesville Regional Airport, which is within this district. See Tr. 169. Thus, there is no merit to the defendants' brief suggestion that there is insufficient evidence of proper venue. See United States v. Day, 700 F.3d 713, 727 (4th Cir. 2012) (recognizing that even "simple acts" in furtherance of a charged conspiracy "can give rise to venue in conspiracy cases"); see also Doc. No. 120 at 14.

[15] Based on these statements and others, the Court also rejects the defendants' summary contentions that there is insufficient evidence of an explicit *quid pro quo* and an intent to influence future official acts. See Doc. No. 213-1 at 67.

51

*ii.     Material Concealment of Fact*

When instructing the jury on the elements of honest services fraud, the Court explained that the scheme or artifice must involve "a material misrepresentation or material concealment of fact."  Jury Instr. at 21.  The Court explained that a "statement or representation of fact or concealment of fact is material if it would be of importance to a reasonable person in making a decision about a particular matter or transaction."  Id. at 22.  And the Court also instructed the jury that "[t]he Government may be able to prove [the misrepresentation] element if [the jury found] that the bribe was concealed from the public."  Id.  Briefly—and without support—the defendants assert that concealment from the public is insufficient to satisfy this misrepresentation element where there is no duty to disclose.  See Doc. No. 213-1 at 63.  The Court disagrees.

The defendants' argument is like that of the defendant in United States v. Colton, 231 F.3d 890 (4th Cir. 2000).  There, the defendant asserted that his bank fraud conviction under 18 U.S.C. § 1344(1) could not stand because (1) the Government failed to adduce any evidence "affirmative misrepresentations" to the financial institution, and (2) he did not have an "independent legal duty to disclose" the concealed information.  Id. at 897.  The Court rejected the defendant's "cramped construction of the bank fraud statute."  Id. at 894.  In so doing, it recognized that the phrase "scheme or artifice to defraud"—as used in the mail, wire, and bank fraud statutes—"includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to 'prevent the other party from acquiring material information.'"  Id. at 898 (alterations omitted) (quoting Restatement (Second) of Torts § 550 (1977)).  Such active concealment is sufficient even "without any misrepresentation or duty to disclose."  Id. at 899.

In reaching its decision, the Court distinguished "concealment" from "simple nondisclosure."  Id.  The Court explained that concealment requires "deceptive acts or contrivances

intended to hide information, mislead, avoid suspicion, or prevent further inquiry into a material matter." Id. By contrast, nondisclosure is simply "mere silence." Id. Put simply, while "silence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud, suppression of the truth with intent to deceive (concealment) does." Id.

The defendants fail to explain why these settled principles of law do not apply equally to honest services wire fraud. By its terms, the honest services statute expands the phrase "scheme or artifice to defraud" to "include[] a scheme or artifice to deprive another of the intangible right of honest services.'" 18 U.S.C. § 1346. And the "right of honest services" includes the right to be free from bribery and kickback schemes. See Skilling, 561 U.S. at 413. A jury could reasonably conclude that, if the "public at large" learned about the concealment of a bribe, then "that knowledge would have a tendency to influence their behavior." United States v. Foxworth, 334 F. App'x 363, 366 (2d Cir. 2009) (citing United States v. Rybicki, 354 F.3d 124, 147 (2d Cir. 2003) (en banc)); see Harvey, 532 F.3d at 334 (holding "concealment of material facts" is sufficient for an honest services wire fraud conviction); United States v. Dimora, 879 F. Supp. 2d 718, 732 (N.D. Ohio 2012), aff'd, 750 F.3d 619 (6th Cir. 2014); United States v. Terry, No. 1:10-CR-390, 2011 WL 2111127, at *8 (N.D. Ohio May 26, 2011), aff'd, 707 F.3d 607 (6th Cir. 2013).

Again, in this case, there was ample evidence for a jury to conclude that the defendants acted to conceal their bribe from the public at large. As an example, during their May 29, 2018, meeting, Causey and the defendants discussed the specifics of how to transfer the bribe to Causey for his reelection campaign. Gray made clear at that meeting that the independent expenditure committees should be used to "avoid disclosure" and "stay anonymous on the source of the money." Gov't Ex. 121a at 8. Lindberg similarly mused that putting "a half million into the 527 and . . . a million into the (c)(4)" was optimal, as "the (c)(4) is not disclosed" and the half million

to the 527 organization would be "[n]o big deal." Id. at 13, 20. Even after the defendants abandoned their plan to use independent expenditure committees, they continued to actively conceal their bribes to Causey. For example, Gray opined that transfers through the NCGOP were preferable, as they would not be "traced back" to Lindberg. Gov't Ex. 127a at 4. And Gray specifically warned Causey that he could not "go around telling people . . . [t]hat John Gray has gone to [the] NCGOP and told them what to do with the money." Id. at 6. Based on these statements and countless others, the jury could find that the defendants materially concealed their bribes so that the public at large would not learn of them.[16]

## III.  CONCLUSION

After a three-week trial and three days of deliberation, a properly instructed jury considered the relevant evidence and found the defendants guilty of conspiring to commit honest services fraud and of federal funds bribery, based on their offers to provide the Commissioner of the North Carolina Department of Insurance with millions of dollars in campaign contributions in exchange for removing and replacing his Senior Deputy Commissioner as the employee responsible for regulating the defendants' companies. Contrary to the defendants' assertions, the law and evidence supported that verdict. Thus, the Motions for Judgment of Acquittal and for New Trial are denied.

---

[16] Based on the same evidence, the Court rejects the defendants' brief assertion that there is insufficient evidence of fraudulent pretenses. See Doc. Nos. 213-1 at 67, 192 at 16–17.

54

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Motions for Judgment of Acquittal and for New Trial, which were filed by Defendant Greg Lindberg, Doc. No. 213, and Defendant John Gray, Doc. No. 214, are **DENIED**.

Signed: August 4, 2020

Max O. Cogburn Jr.
United States District Judge

55