**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Statesville Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **No. 5:19-cr-22-MOC** |
| GREG E. LINDBERG, *et al.,* | |
| *Defendants.* | |

## SENTENCING MEMORANDUM

## I.      INTRODUCTION

Greg Lindberg, through counsel, respectfully submits this memorandum in aid of the Court's decision on sentencing in this matter. Mr. Lindberg objects to the guideline calculation contained in the Presentence Report ("PSR") and requests that this Court accept the proposed guidelines calculation contained herein. In this case, a downward departure from Probation's proposed guideline range is warranted because the magnitude of the loss calculation dramatically overstates Mr. Lindberg's culpability. In addition, a further downward variance is warranted in light of Mr. Lindberg's lifelong record of upstanding citizenship and charitable acts, his significant parental duties, his low risk of recidivism, and the need to avoid an inequitable disparity with similarly situated defendants. Defense counsel respectfully request that this Court sentence Mr. Lindberg to a custodial sentence of 12 to 24 months, which, depending on whether the Court grants the Government's request to sentence Mr. Hayes to probation, will still be either 2 or 4 times greater than the maximum guidelines' range of 6 months for Mr. Hayes. A sentence of 12 to 24 months also captures the median range for bribery offenses in 2019 nationwide, which was 12 months, and the mean sentence for honest services fraud offenders, which was 24 months.

Although Mr. Lindberg's suggested sentence will promote nationwide consistency in sentencing—a goal that the Government and Mr. Lindberg both agree on, Dkt. No. 245 at 11—the Government's recommended sentence of 14 years will undermine it, *id.* at 2. A 14-year sentence is 28 times the 6-month sentence that the Government recommended for Mr. Hayes, who was charged with the same counts as Mr. Lindberg and additional counts for lying to the FBI. It is over 10 times the median sentence in the last three years for honest-services fraud and bribery defendants. It is about 7 times the mean sentence for honest-services fraud defendants in 2018 and 2019. And it is over two times the 6.5-year sentence recommended by the Government in the bribery case against Governor McDonnell—the top elected official in Virginia—and seven times the two-year sentence that Governor McDonnell received before his conviction was overturned. *United States v. McDonnell*, 792 F.3d 478, 493-94 (4th Cir. 2015), *vacated by* 136 S. Ct. 2355 (2016). To achieve consistency, the Court should reject the Government's suggestion and sentence Mr. Lindberg to between 12 and 24 months.

## II.     PROCEDURAL HISTORY

Mr. Lindberg is before this Court to be sentenced after a jury found him guilty on one count of conspiracy to commit honest-services wire fraud under 18 U.S.C. §§ 1343, 1346, and 1349 and one count of federal funds bribery under 18 U.S.C. § 666(a)(2). The jury deliberated for almost 3 days before rendering a verdict. At the outset of this case, Mr. Lindberg was indicted along with defendants John Gray, John Palermo, and Robin Hayes. The indictment contained five counts. (Dkt. 3). Messrs. Lindberg, Gray, and Palermo were indicted on two counts. Mr. Hayes alone was charged on all five counts, including three false statement counts (18 U.S.C. § 1001) in which he was the only defendant charged. At trial, Mr. Gray was also convicted of the two counts he was charged with, and Mr. Palermo was acquitted. Prior to the trial of his codefendants, Mr. Hayes entered a plea deal with the Department of Justice ("DOJ") to one false statement count and a dismissal of the other charges against him. (Dkt. 70). The DOJ has agreed the sentencing guideline calculation for Mr. Hayes generates an offense level

of 4 (0-6 months) and has requested this Court sentence him to a term of probation, which, if accepted by this Court, will result in no jail time for Mr. Hayes.

## III.    THE SENTENCING GUIDELINE ANALYSIS

### A.    Non-Sentencing Guideline Objections to the PSR

The nature of the conduct that the jury convicted Mr. Lindberg for—though serious—plainly does not warrant the guideline calculated in the PSR. Mr. Lindberg incorporates his prior factual and legal objections to the PSR by reference here (Dkt. 231) and expands upon his objections below.

### B.    Loss Amount

#### 1.    The amount of the payment for offense-level purposes should be $500,000.

Mr. Lindberg objects to the 16 level increase to the offense level that the PSR applies under USSG § 2B1.1, by way of USSG § 2C1.1(b)(2). Paragraph 107 increases the offense level by 16 levels because "the value of payment is based on the bribe, which was more than $1,500,000 but less than $3,500,000." Yet the bribe amount was not proven to be more than $500,000.00, and accordingly, using the $500,000 figure is within the Court's discretion to use for the loss calculation under § 2B1.1. Mr. Lindberg incorporates by reference his previously filed objections on this issue.

#### 2.    Aggravating Role Enhancement

The two level aggravating role enhancement under USSG § 3B1.1(c) should not apply to Mr. Lindberg. This enhancement was not present in the draft PSR and appears to have been added solely based on the conclusory suggestion by the government in its Objection to the PSR. (Dkt. 227). The final PSR includes the enhancement saying: "[b]ased on these factors, evidence indicates that Lindberg exercised decision making authority, recruited accomplices, claimed the right to a larger share of the profit and exercised authority and control over others. Therefore, a two-level role adjustment is applicable and no change to the report is recommended."

Although Mr. Lindberg had control of his insurance companies, the record lacks evidence demonstrating that Mr. Lindberg had decision-making authority or control *over his coconspirators*. The Government's recitation of relevant conduct describes Gray as a "consultant" for Mr. Lindberg and Mr. Palermo as a "political operative" — not as subordinates acting blindly at Mr. Lindberg's direction. (PSR ¶ 11). The evidence demonstrated that Mr. Lindberg hired John Palermo, the local head of the GOP, and John Gray, a professional political consultant, to advise him on political relations and the campaign finance arena. Due to Mr. Lindberg's limited knowledge of the political process—for example, he said to Mr. Causey, "whatever Robin and John can figure out . . . I don't know election law well enough," (Gov't Trial Exhibit 127A)—he paid these men a salary to handle these matters. Mr. Lindberg also followed Mr. Causey's direction and requests when asked for something other than IECs. And Mr. Lindberg relied on former U.S. Congressman and NCGOP Chairman Robin Hayes for ideas. Mr. Lindberg's reliance on others' knowledge in these areas is not an excuse for the conduct at issue. But it does negate the idea that he was the leader, organizer, or manager who directed others how to manipulate the system or who controlled their actions. In fact, with the FBI's guidance, Mr. Causey directed some of the most important conversations that led to this indictment.

A defendant's participation and potential to profit in a criminal conspiracy are not enough to warrant a leadership enhancement for that defendant. *See United States v. Singh*, 195 F. Supp. 3d 25 (D.D.C. 2016) (stating that the two-level aggravated role sentencing enhancement was not appropriate for a defendant who did not exercise any control over any co-conspirator subject to criminal liability, although he exercised managerial authority in the administration of companies that fraudulently secured contracts). Further, in this case, DOJ has acknowledged its inability to value the "benefit to be received" (PSR ¶ 107), rendering Mr. Lindberg's "right to a larger share of the profit" an inapplicable factor here. In fact, when Debbie Walker was asked under oath by Mr. McCarthy, "is there any type of guaranteed financial benefit that you know of that would come from you looking

over these files versus Jackie Obusek?", Ms. Walker replied, "Not that I'm aware of, no." *See* Tr. 1308:5-8.

The only person who clearly stood to profit was would-be coconspirator Mr. Causey but for his status as a government informant. Because the Government is unable to show this enhancement's applicability, it is unwarranted and unnecessary. The background note addressing the intent of this enhancement specifies that "this adjustment is included primarily because of concerns about relative responsibility." *See* 3B1.1, comment. But that concern, if it exists at all, can be addressed elsewhere. Simply put, there is no need for this enhancement based on the facts of this case. Accordingly, as application of the upward adjustment goes against the spirit of the enhancement, it should be denied.

Other courts in this Circuit have denied application of this enhancement in cases where the conduct did not sufficiently meet the enumerated factors. *See United States v. Kimmel*, 644 F. App'x 231, 234 (4th Cir. 2016) (non-precedential) ("These factual findings . . . certainly demonstrate that Kimmel played a significant role in the extensive fraudulent scheme. Yet these facts do not establish that Kimmel ever managed or supervised people, which is a necessary finding to support the enhancement."); *United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009) (rejecting government's argument that the enhancement was warranted given defendant's "integral role as the manufacturer of the bills effectively gave him the authority to control the flow of the bills to the other participants" because that argument "conflates the *potential* to exercise control over an operation with the *actual* exercise of control") (emphasis in original); *United States v. Slade*, 631 F.3d 185, 191 (4th Cir. 2011) ("[W]hile various co-conspirators sold drugs 'for' Slade . . . this record does not support the conclusion that Slade was exercising authority over other co-conspirators or managing the conspiracy's activities. In light of the absence of any evidence of Slade's aggravating role as a manager or supervisor, the district court erred in enhancing his offense level under USSG § 3B1.1(b)."); *United States v. Sayles*, 296 F.3d 219 (4th Cir. 2002) (holding that a two-point enhancement, pursuant to 3B1.1(c), was not

warranted where it had not been established that the defendant had functioned as an organizer, leader, manager or supervisor of criminal activity).

The government's few cited authorities to support the enhancement are distinguishable because each involved a defendant who exercised direct control over numerous activities of coconspirators and made key management decisions for them. The defendant in *United States v. Bartley* "'exercised management responsibility' by setting prices and terms of payment, handling proceeds, arranging the logistics of the deliveries, [ ] giving advice to his street dealers on how to market the product . . . . [and] repeatedly direct[ing] others to wire transfer proceeds from the drug distribution activities or to receive such transfers of funds on his behalf." 230 F.3d 667, 674 (4th Cir. 2000). The defendant in *United States v. Liebman* was deemed to be "in general charge of the workers conducting the [unlawful activity] once Lavitt," a third party who had been directing the work, "left the scene." 40 F.3d 544, 548 (2d Cir. 1994). And in *United States v. Steffen*, the defendant, a highway patrolman growing marijuana on his property, used his police vehicle on multiple occasions to escort a co-conspirator who was transporting drugs and also transferred his electric utility bill to the co-conspirator "to avoid detection." 741 F.3d 411, 416 (4th Cir. 2013) (internal quotation marks omitted). In contrast to these defendants, Mr. Lindberg did not exercise similar control over any coconspirator; in fact, he frequently deferred to the decision-making of third parties, like John Gray and Robin Hayes, who remained present throughout the conspiracy and controlled and executed essential parts of it. Even the government has acknowledged Mr. Gray's substantial role in the conspiracy. Dkt. No. 245 at 13 ("Indeed, Gray was the 'front man' for the scheme—driving it to fruition—calling Commissioner Causey more than one hundred times in just eight months."). Because Mr. Lindberg did not exercise significant control over coconspirators, this enhancement should not apply to him.

6

### C. Correct Guideline Calculation

Based on the above objections, we respectfully submit that the proper guideline analysis, before downward departures and variances are applied, should be calculated as follows:

| | | |
|---|---|---|
| i. | Base Offense Level, § 2C1.1(a)(2): | 12 |
| ii. | Specific Offense Characteristics, § 2B1.1(b): | 12 |
| iii. | Offense involved elected official, § 2C1.1(b)(3): | 4 |
| iv. | Adjustment for Role, § 3B1.1(c): | 0 |
| v. | Total Offense Level: | = 28 (78-97 months) |

## IV. THE COURT SHOULD VARY DOWNWARD TO IMPOSE A NON-GUIDELINES SENTENCE ON MR. LINDBERG

Although the sentencing guidelines "should be the starting point and the initial benchmark[,] [they] are not the only consideration." *Gall v. United States*, 552 U.S. 38, 50 (2007). In particular, the district court must consider all of the § 3553(a) factors and "may not presume that the Guidelines range is reasonable." *Id.* Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing courts to impose a sentence sufficient, *but not greater than necessary* to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added).

Here, the sentencing guidelines simply do not take into account the unique facts and circumstances of Mr. Lindberg's case. In particular, a below-guidelines sentence would be more appropriate taking into account: (1) the loss amount overstates the seriousness of the offense; (2) the case involved complex issues of federal law outside of Mr. Lindberg's area of expertise and a sting operation; (3) the history and characteristics of Mr. Lindberg, who has served a life full of helping others and commitment to family, including being a single father; (4) the deterrent effects already carried out through the severe reputational harm and stress to his businesses; and (5) similar sentences, which have uniformly fallen far below the sentencing guidelines range in this case.

As the character letters submitted on his behalf attest, Mr. Lindberg has led a life guided by: a commitment to family and the community; a strong and innovative work ethic; and a heartfelt belief in one's responsibility to engage in civic and charitable work to improve one's community. *See Letters Submitted in Support of Mr. Lindberg at Exhibits 1-32, 41*. Thus, given all of the factors under 18 U.S.C. § 3553, we submit that the appropriate sentence in this case would be a custodial term of 12-24 months. This reflects the average range of national sentences most recently imposed on honest services fraud offenders and thus reflects the appropriate baseline range to avoid unwarranted sentencing disparities.

A.   **The Court Should Exercise its Discretion to Vary Downward Because the Loss Amount Would Result in a Sentence that is "Greater than Necessary" Under § 3553.**

The Court should exercise its discretion to make a downward departure within the framework of the guidelines or vary downward. Such a downward variance is appropriate under the guidelines and federal law because the guidelines' formulaic and excessive emphasis on amount of loss would cause the offense level to substantially overstate the seriousness of the offense. *See United States v. Kalili*, 100 F. App'x 903, 906 (4th Cir. 2004) (non-precedential) (affirming 5-level downward departure because the defendant's offense level overstated the seriousness of her offense where the defendant "did not significantly profit from her daughter's ill-conceived scheme before they were caught"); *see also United States v. Cheng*, 96 F.3d 654, 656 (2d Cir. 1996) (affirming district court's downward departure because $3.5 million loss overstated the seriousness of the offense); *see, e.g., United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (remanding case with a very large intended loss amount, but "low risk that any actual loss would result," and commenting that the district court may have been overly influenced by the guidelines range in imposing lengthy sentence); *United States v. Edwards*, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence far below the guideline range as

substantively reasonable in a fraud case where the sentencing judge stated that the guideline range calculated using intended loss "overstated the circumstances" of the defendant's case).

A downward departure or variance is warranted because using the value of the payment substantially overstates the seriousness of the offense in a case such as this where: there are no identifiable victims; Mr. Lindberg did not seek or receive any pecuniary gain from the conduct at issue; and his conduct did not cause any loss or pecuniary harm to others. The Guidelines expressly provide for such a situation: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1, app. n. 21(C).

There is judicial consensus that the § 2B1.1 loss tables can produce unduly harsh sentencing ranges that go far beyond that sufficient to deter illicit conduct, as they bear little or no connection to the seriousness of the offense or the defendant's culpability.[1] Section 2C1.1(b)(2) instructs the Court to use the "value of the payment" to apply a loss enhancement corresponding to the loss tables in § 2B1.1. But New York federal courts, which handle some of the highest volumes of fraud cases in the country,[2] have repeatedly criticized the grossly disproportionate nature of the loss tables. They

---

[1] *See, e.g., United States v. Moody*, No. 13-cr-87-JLK, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug. 5, 2013) (adopting view that the loss guidelines are "fundamentally flawed"); *see also United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J., concurring); Hon. Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 941-44 (2017) ("[A]s the guidelines have become harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases"); accord notes 113-116, infra.

[2] *See* U.S. Courts, Federal Judicial Caseload Statistics, Table D-8, (2018) https://www.uscourts.gov/sites/default/files/data_tables/jb_d8_0930.2018.pdf; *and see* U.S. Courts, Federal Judicial Caseload Statistics, Table D-8 (2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_d8_0930.2019.pdf.

have called the loss tables "patently absurd"[3] and "a black stain on common sense"[4] that rely upon a "flawed methodology for tabulating white-collar sentences[.]"[5] Courts have concluded that imposing sentences corresponding to the loss tables contradicts the "statutory requirement that federal sentencing take many factors into account," because it gives too much weight to a "single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense."[6] Thus, mechanically applying loss tables "effectively guarantee[s] that many such sentences [will] be irrational on their face."[7]

As further evidence of the disproportionate nature of the loss enhancement, if the Court applies a 16-point loss enhancement, instead of the proposed 12 point enhancement, it results in an adjusted offense level of 34 for Mr. Lindberg. This enhancement would cause the sentencing range to jump 73 months—from 78-97 to 151-188 months—an increase of over 6 years based solely on the value of the payment. Under the guidelines, such an offense level would dictate a prison term greater than or equal to that recommended for attempted murder, criminal sexual abuse of a minor, arson, aggravated assault or robbery involving serious bodily injury, and transmission of biological weapons causing permanent bodily injury and resulting in substantial disruption of governmental functions.[8]

---

[3] *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (non-precedential).

[4] *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (finding that application of 18-point loss enhancement was "patently absurd" and varying downward 17 points for defendant with $2.5 million loss).

[5] *United States v. Johnson*, No. 16-cr-457-1, 2018 U.S. Dist. LEXIS 71257, at *11, *14 (E.D.N.Y. Apr. 26, 2018) (reasoning that the "loss-enhancement numbers do not result from any reasoned determination of how the punishment can bet fit the crime, nor any approximation of the moral seriousness of the crime").

[6] *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

[7] *Id.*

[8] U.S.S.G. § 2A2.1 (attempted murder, OL 33); § 2A2.2 (aggravated assault involving a firearm and permanent bodily injury to a victim who is an intimate partner, OL 29 (14 + 5 +7+3)); § 2A3.1 (criminal sexual abuse of a minor, OL 34 (30 + 4)); § 2B3.1 (robbery involving firearm, OL 25 (20 +

The notion that Mr. Lindberg—a non-violent first time offender—is as culpable as a sex offender, an arsonist, or someone who deploys biological weapons illustrates the outrageously disproportionate nature of the enhancements here. Absent proof that the value of the payment (used for "loss") corresponds closely to an increase in Mr. Lindberg's culpability, such a draconian enhancement would be fundamentally unjust.

For these reasons, the Court should depart or vary downward because the loss enhancement would result in an offense level that would substantially overstate the seriousness of the offense.

## B.    The Nature and Circumstances of This Case Call for a Below-Guideline Sentence

There are a few factual and legal characteristics of this case that make it unique. First, the conduct that led to the conviction occurred after months of a FBI sting operation, and the Court "agrees with the defendants that there is more than a scintilla of evidence suggesting Government inducement"—and enough evidence to have warranted the entrapment jury instruction. (Dkt. 240). That the jury did not accept entrapment as a complete defense does not diminish this unique characteristic of the case.  Courts have held that, even when defendants are predisposed to commit a crime and thus not entitled to an entrapment defense, they are eligible to assert "imperfect entrapment" as ground for downward departure if they were pressured unduly by the government to go forward with the offense. *See e.g.*, *United States v. McKeever*, 824 F.3d 1113 (D.C. Cir. 2016) (remanding case where district court failed to consider defendants' entrapment claim that police

---

5)); § 2B3.2 (extortion by force with the threat of death and brandishing of a firearm, OL 25 (18 + 2 + 5)); § 2K1.4 (arson knowingly creating a serious risk of death or bodily injury, OL 24); § 2M6.1 (transmitting biological weapons causing permanent bodily injury to a victim, OL 24 (22 + 4 + 2)). Even without this 4 point enhancement, Mr. Lindberg is facing a sentence comparable to those listed here.

introduced guns into conspiracy to trigger five level enhancement under § 2B3.1(b)(2)); *United States v. Bala*, 236 F.3d 87, 91 (2nd Cir. 2000) (agreeing with the Ninth, Eighth, and Fourth Circuits that "'imperfect entrapment' described as "aggressive encouragement of wrongdoing, although not amounting to a complete defense," is a proper ground for downward departure at sentencing pursuant to U.S.S.G. § 5K2.12).

Courts have applied this departure even after finding that the defendant was predisposed to commit the crime, if the government conduct increased the scale or volume at which the crime was committed beyond what the defendant was predisposed to commit. The Ninth Circuit held that a defendant convicted of six counts of distributing methamphetamine established sentencing entrapment as a matter of law, where the defendant was predisposed to distribute only half-gram quantities of methamphetamine prior to government's inducement and did not originally intend to sell a larger amount, but manipulation by government agents led the defendant eventually to agree to a larger amount. *See United States v. Vierra*, 426 F. App'x 484 (9th Cir. 2011) (citing *U.S. v. McClelland*, 72 F.3d 717 (9th Cir. 1995) (finding that the district court properly departed downward 6 levels for "imperfect entrapment" under § 5K2.12 even though it found the defendant was "predisposed to commit the crime and thus not entrapped"). Although the government contends that it "did nothing to increase the scale or volume of the criminal conduct," Dkt. No. 245 at 9, this contention is contradicted by trial evidence that demonstrated how Mr. Causey sought to encourage bribes of millions of dollars. *See* Gov't Ex. 119 at 4 ("You know they gave him another twenty-three thousand for his campaign, gave two hundred thousand to the guy running for governor. Gave Dan Forest a million and a half in one pop, and I'm thinking, you know hell I'm the insurance commissioner. I should be as high on his [Mr. Lindberg's] uh radar list as – as Dan Forest or any – or any of these other guys in other states and . . . he's putting millions of dollars out there in – in total . . . .").

Regardless of whether couched as a departure under the guidelines or a variance, the evidence of inducement in this case sets it apart. Because of this, Mr. Lindberg's offense is not the straightforward violation of the law that the guidelines speak to. The evidence of inducement or "imperfect entrapment" should be considered as mitigation for sentencing purposes.

Second, when the FBI first approached Mr. Lindberg on August 28, 2018, they informed him that he had been recorded while speaking to Mr. Causey and that his donations to the NCGOP were under investigation. Yet Mr. Lindberg sat with them and openly discussed his conduct for hours, without a lawyer, and allowed the FBI complete access to his phone. As the Court and the Government well know, that is not always the case. When approached by federal agents, many soon-to-be defendants, sensing an arrest is coming, immediately try to obfuscate and lie about the behavior at issue. But not Mr. Lindberg, who acknowledged the behavior and even apologized for the trouble that it caused the agents. This behavior speaks to his overall integrity and character.

Third, as discussed above in the loss section and below in the disparity section, the Government acknowledged that it could not prove that Mr. Lindberg stood to gain a specific monetary benefit or that Mr. Lindberg caused financial harm to others. The Government has also acknowledged that no loss to others was caused by this conduct. Although loss or harm to victims is not required for a conviction, it does distinguish this case from those where financial harm is caused to victims. For example, take the case against former Enron CEO Jeffrey Skilling. The district court in *Skilling* found that Mr. Skilling was responsible for at least $42 million worth of harm to victims and sentenced him to 14 years. *See United States v. Jeffrey Skilling*, Case 4:04-cr-00025 (S.D. Tex. 06/24/2013). Based on the Government's proposed guideline calculation, Mr. Lindberg would serve a similar sentence.

Here, the sentencing guidelines simply do not take into account the unique circumstances of this case. A straight guideline analysis does not accurately reflect the true nature of Mr. Lindberg's conduct or his blameworthiness. What is worse, a guideline sentence would result in a wholly unjust

sentence devoid of reason, proportionality, or fundamental fairness. Counsel does not raise these facts seeking to justify Mr. Lindberg's conduct, but they provide important context for the actions and should mitigate his sentence.

### C. The History and Characteristics of Mr. Lindberg Call for A Below-Guideline Sentence

*__Professional Background__*

Mr. Lindberg, now age 50 years old, is a self-made man, who in his rise to business success never lost his humility, his compassion for others, or his commitment to his family and community. Mr. Lindberg was born in a working-class family in San Mateo, California. He was the youngest of six children and became the first Lindberg to graduate from college. From a modest family with working-class occupations like plumber, auto-mechanic, and freight pilot, Mr. Lindberg learned that hard work and discipline are rewarded with success. He was also aware he came from meager beginnings, learning at a young age that his grandfather at one time made only 8 cents an hour.

Mr. Lindberg's parents modeled hard work for him, and he has followed their example. Mr. Lindberg's father recounts that Mr. Lindberg "had to learn to be independent at an early age" because his father's work as a freight pilot kept him away from home almost two weeks every month. *See Letter from Bob Lindberg at Ex. 10.* Bob Lindberg speaks to work ethic and discipline that his son showed even at a young age, describing for the Court how his son was an editor of his high school newsletter, and that he eventually got accepted to Yale, off the waitlist. *Id.* Mr. Lindberg's mother tells the Court how, as a child, Mr. Lindberg sought out cleaning jobs at the family house to earn money. *Letter from Arlene Lindberg at Ex. 32.*

In 1991, while a student at Yale, Mr. Lindberg started his first company out of his dorm room with a $5,000 loan. Even as a student, he recognized an unmet need for regulatory compliance information in the home care market and launched a home care newsletter. Mr. Lindberg's mother

recounts how at the time Mr. Lindberg purchased his first home, he was still regularly sleeping in a sleeping bag at his office. *Letter from Arlene Lindberg at Ex. 32.*

During the 1990s, he led his companies into the healthcare space and started looking at acquisitions. By 1998, Mr. Lindberg's business consisted of 12 people working out of a single room full of folding tables and computers, as he struggled to meet payroll and pay the printing bill. Mr. Lindberg's companies survived a major adversity in 1998 when changes in regulations for home care agencies led to the loss of over half of their customers in less than 6 months. This experience taught Mr. Lindberg how to maintain a strict discipline in cutting costs as revenues decline. In the early 2000s, Mr. Lindberg and his team handled various acquisitions successfully using lessons from several prior turnarounds.

In 2009, doctors discovered that Mr. Lindberg had a golf-ball sized tumor at the base of his brain stem. During the operation to remove the tumor, his left ear canal was completely removed. He was unable to walk after surgery but has since re-learned how to do so, again demonstrating his tenacity and work ethic.

Despite this health set-back, Mr. Lindberg's companies continue to grow and expand. Today, due to his work and vision, the Global Growth family encompasses dozens of companies, and has 8,000 employees worldwide. His colleagues and business partners continue to trust and value Mr. Lindberg's leadership.

Mr. Lindberg has remained civic minded as his fortune grew. Global Growth has invested in eye care surgery for underserved populations and in research for treatment of Parkinson's disease, and has been providing medical services to tens of thousands of people in developing countries since 2015. "Political donor Lindberg ponies up $1 million for HBCU scholarships" was one headline in July of 2018.

Mr. Lindberg didn't attend the press conference and declined interview requests. He was content to give $200,000 a year for years, covering scholarships of $10,000 a year for business students at historically black colleges and universities in North Carolina. The only official corporate statement came from Brandon Mitchell, a vice president of Lindberg's Global Bankers Insurance Group, who said the company planned to steer scholarship recipients into the company's internship program.

Mr. Lindberg's personal struggles have not deterred his commitment to others. In 2020, he pledged a $50,000 donation to the Special Olympics of North Carolina (SONC) as a year-round Healthy Communities partner focused on nutrition. This involvement included state-level events such as the Winter Games, Summer Games, Equestrian Tournament and Fall Tournament, promoting nutrition education among SONC athletes.

In July of 2020, his companies provided the first 100,000 meals, of its commitment to provide 1 million meals, to areas affected by the global pandemic. The meals go to nonprofits in the U.S., Europe, India, the Philippines, Costa Rica, and the Ukraine with a focus on programs that provide the most nutritious meals at a reasonable cost.

### A Compassionate and Caring Employer and Business Executive

People who know Mr. Lindberg from personal relationships or who have worked with him uniformly speak of his love for his family, his lifetime commitment to helping others, his generosity, his integrity, his work ethic, and his kindheartedness.

For over a decade Mr. Lindberg has participated in Vistage CEO leadership seminars. Vistage is an international group of CEOs of successful companies who are put together in small groups, in confidential settings, to meet regularly to discuss their particular business challenges, feedback, and advice. Several CEOs that Mr. Lindberg met through Vistage wrote complimentary letters to the Court praising Mr. Lindberg's leadership, his integrity, and his generosity.

CEO David Finch tells the Court how Mr. Lindberg was "without question, the most giving person in our group." *Letter by David Finch at Ex. 21.* Finch goes on to describe how on one occasion Mr. Lindberg took the time to meet with a friend of Finch's to help give him advice on his struggling business, even taking the time to follow-up and review this friend's financials and helped find other ways to save Finch's friend's business when "there was nothing in it for Greg...not a penny...nothing." *Id.* Similar stories of Mr. Lindberg's giving nature abound.

Jeffrey Fisher, CEO of Unique Places LLC and licensed attorney, also met Mr. Lindberg through Vistage. Mr. Fisher submitted a letter to the Court stating that "Greg was a beacon of inspiration in our group, not just to me, but to all participants," and that "Greg has the uncanny ability to see and empower a leader's potential, regardless of the venture." *Letter from Jeff Fisher at Ex. 8.* Mr. Fisher continues by noting that:

> Greg was emotionally committed to and compassionate with the men and women in our group, exhibiting genuine concern when we shared difficult family or business issues. Being a very successful businessman with high demands on his time and attention, I was surprised that he always made the time for me if I sought his counsel outside of our Vistage meetings. Of note, Greg would not always tell me what I might want to hear, but instead he would encourage me to focus on my goals, be honest with myself and others, and to follow the right path.

*Id.* Another Vistage participant and CEO, Chris Bogan, recalls that "I first met Greg when he was still running a healthcare newsletter that he founded in college and for which he would still pull all-nighters in his office to get out an edition." *Letter from Chris Bogan at Ex. 18.* Mr. Bogan recounts how Mr. Lindberg freely provides any business resources he has to help others, even those where he does not stand to gain a penny from financially: "Greg has always been exceptionally generous – of spirit, of mind and of pocket." *Id.*

Peers, including Mr. Bogan, have praised Mr. Lindberg's dedication to his employees' well-being, specifically noting that Mr. Lindberg "was extremely generous to his employees," and "he regularly invested in programs to support the growth of his employees." *Letter from Chris Bogan at Ex.*

18. Mr. Bogan added that Mr. Lindberg's commitment to his employees went far beyond those in his immediate circle of influence: "Greg invested substantially to recreate a Vistage infrastructure within all of his Eli Capital companies. The goal was to support his executives and line employees in becoming better leaders, parents and people at home, at the office and in their communities." *Id.*

Les Sufrin, an accountant who has known Mr. Lindberg for almost 20 years, writes the Court saying, "During my history with Greg, he has always been guided by the highest ethical standards." *Letter from Leslie Sufrin at Ex. 9.* Mr. Sufrin describes observing Mr. Lindberg's interactions with the accounting firm and that "in all these years, I have never heard or observed anything but the utmost in professionalism and high character." *Id.*

Retired Judge Beecher Gray describes his personal observations of Mr. Lindberg over many years of sharing neighboring farm land, saying, "Greg Lindberg over these 16 years has demonstrated honest, integrity, and reliability time after time in our dealings with him. He has shown nothing but the finest of fairness and generosity to our horse farm operation and to us personally." *Letter from Beecher Gray at Ex. 15.*

Several of Mr. Lindberg's colleagues from Global Growth have also submitted letters to the Court attesting to Mr. Lindberg's integrity, altruism, and leadership. For example, Ms. Hurley, who has worked with Mr. Lindberg for over 22 years and started with him in a single room office, writes to express the support and compassion she has always felt from him sharing that, when she decided to go part-time to adopt a special needs child, Mr. Lindberg "made sure the move didn't affect my career advancement." *Letter from Bridgett Hurley at Ex.* 16. Ms. Hurley further shares that, "[w]hen I had pregnancy complications and was the sole bread winner for my children, he set up a home/bed office so I could continue to be involved." *Id.* It is evident that Mr. Lindberg's commitment to family is not limited to only his own. Ms. Hurley also speaks of Mr. Lindberg's commitment to giving back to the community and explains her role assisting him in identifying charitable causes. *Id.* Ms. Hurley recounts

various donations Mr. Lindberg made to food banks and homelessness- related charities in the years before this indictment. *Id.*

The Chief Investment Officer at Global Growth, Chris Herwig, described Mr. Lindberg as "a whip smart entrepreneur who also has excellent leadership skills." *Letter by Chris Herwig at Ex. 7.* Herwig tells the Court of his appreciation for Mr. Lindberg's mentorship and his value to the company and that, "despite the current circumstances, I have the highest opinion of Greg and his character." *Id.*

Erin Masercola, an employee of Mr. Lindberg's for over 21 years, credits Mr. Lindberg for her career success and happiness. *Letter by Erin Masercola at Ex. 23.*. Ms. Masercola tells the Court of the discretion Mr. Lindberg exercises when it comes to hiring decisions—"he didn't want to fill his company with yes men." *Id.* Personal assistant Stefani Bullock writes, "he is hands down the most generous person I have ever met," as she recounts a time Mr. Lindberg stepped up for her when she was experiencing a personal financial hardship. *Letter by Stefani Bullock at Ex. 29.* Lauren Rinebold similarly stated, "Greg is one of the most generous and caring people by which I have ever been employed. He goes above and beyond to make sure that his employees are happy and cared for." *Letter by Lauren Rinebold at Ex. 26.*

Coty Clark, who served in the United States Navy and now works for Mr. Lindberg's private security, described his interactions with Mr. Lindberg saying, "he never ceases to impress me with his gratitude, compassion, and leadership skills…It is a privilege to work for such a successful and intelligent individual who inspires others to be successful not only in their profession but as well as their family life." *Letter by Coty Clark at Ex. 6.* Clark further notes that "in some of the most difficult times that he [Mr. Lindberg] is facing there isn't a moment that goes by that he isn't thinking of others." *Id.*

Another security team member, Korby Holcomb, former U.S. Army, recounts for the Court the character traits he's observed in Mr. Lindberg while having an unfiltered view of his personal and professional life. Mr. Holcomb applauds Mr. Lindberg's commitment to expressing gratitude and support to those who work for him: "he is very mindful of the importance of recognizing people who work hard and he takes pleasure in brightening their lives." *Letter by Korby Holcomb at Ex. 4.* Bestowing upon Mr. Lindberg the highest kind of compliment, Mr. Holcomb notes that after seeing Mr. Lindberg's character in action every day that Mr. Lindberg "is the kind of man I want to have a major influence on the lives of my kids as they get started in their professional lives." *Id.*

Employee Robert Stearns, formerly a military police investigator, tells the Court of the integrity and loyalty Mr. Lindberg shows his employees, including a recent example of how Mr. Lindberg made sure to tell them to prioritize their health and the health of their families over traveling to complete their work duties during this COVID pandemic. *Letter by Robert Stearns at Ex. 3.*

Mr. Lindberg's executive assistant describes him as an "extremely generous human being" and notes that "[h]e is a great motivator and brings out the best in people." *Letter from Brenda Lynch at Ex. 1.* A longtime member of Mr. Lindberg's household staff recounts that "upon my receiving a diagnosis of cancer, Mr. Lindberg provided full support and compensation for me and my family throughout the period of my hospitalization, treatment, and recovery." *Letter from Keith Hollis at Ex. 25.*

Longtime friend Roy Burnett details for the Court how when Hurricane Florence hit, Mr. Lindberg flew a friend of Roy's and her children to another state so they could escape the hurricane and be closer to family. *Letter from Roy Burnett at Ex. 28.* Mr. Burnett further describes an occasion where Mr. Lindberg generously paid the expenses for the sister of his friend, whom he had never met, to enter alcohol treatment. *Id.*

### *Character and Dedication to Family*

Mr. Lindberg's love for and dedication to his children is noted by all who know him well. He and his now ex-wife have three children: Lauren, age 15, Devon, age 13, and Emma, age 8. He is also the sole parent of an infant son, Erik, who is 1 year old.

Brenda Lynch, Mr. Lindberg's executive assistant, writes: "Greg is a loving, respectful, caring, and responsible father. His children's health, safety, education and wellbeing are of the utmost importance to him." *Letter from Brenda Lynch at Ex. 1.* Ms. Lynch notes that from viewing Mr. Lindberg around his children, that he "is not afraid to act or look silly around them" detailing her personal observations of him playing nerf wars and jumping on the trampoline. *Id.*

For a period of time, Mr. Lindberg's oldest children were home-schooled and had dedicated tutors. One of these tutors speaks of Mr. Lindberg's efforts to instill a work ethic and foster innovation and entrepreneurialism in his children, noting that she assisted Mr. Lindberg in helping his 9 year old get a smoothie business idea off the ground. *Letter from Ally Schmidt at Ex. 14.* As a regular in the Lindberg home for several years, Ms. Schmidt speaks from personal knowledge when she notes that "Greg is a loving father and earnest businessman. He worked diligently for long hours, and was also sure to make time for his family on trips, evenings, and family dinners." *Id.* Another tutor, and regular in Mr. Lindberg's home, describes Mr. Lindberg's weekly input in the children's lesson plans and his words of sentiment noting how proud he was of his children's achievements. *Letter from Emily Tadepalli at Ex. 22.*

Mr. Sufrin writes that he has personally seen Mr. Lindberg's interactions with his children and observed "the love which he has provided to them" and "his joy in discussing the picture book his daughter Emily wrote when she was six years old and how proud he was to discuss her approach to this creative project." *Letter from Les Sufrin at Ex. 9.* "Greg was always clear on one cornerstone point:

family comes first. He loves his children, expressed love and satisfaction in having a large family." *Letter from Chris Bogan at Ex. 18.*

His brother Gary and Gary's wife Jill write that: "Greg is devoted to his family and has consistently offered his support and guidance to many members of the family over many years. He cares deeply about the health and wellbeing of our family and has been instrumental in bringing our family together in both good and trying times." *Letter by Gary Lindberg and Jill Neilson at Ex. 2.* His mother describes multiple occasions when Mr. Lindberg has stepped in to cover health events for family members and education costs. *Letter from Arlene Lindberg at Ex. 32.* Arlene Lindberg tells the Court how much she appreciates the financial assistance her son continues to provide her. *Id.* She continues by describing the regular attention and love she has seen Mr. Lindberg show his infant son by taking him for evening walks and wearing him in a front pack to make sure the baby felt warmth and love. *Id.* Cindy Tillitz, Mr. Lindberg's sister says: "Greg is very present with his children's lives and loves them deeply. He encourages his children to think without limits to experience all that life can offer them." *Letter from Cindy Tillitz at Ex. 19.* Ms. Tillitz further describes Mr. Lindberg as a "generous, loving, kind person with integrity" that she is proud of. *Id.* She tells the Court of her gratitude for his financial assistance for her daughter undergoing in vitro fertilization "which was a gift beyond words." *Id.*

His personal assistant attests that Mr. Lindberg "believes family is the #1 most important thing in life," as she recalls observing him participate in nerf gun wars and tag in the backyard with his children. *Letter by Stefani Bullock at Ex. 29.* Ms. Bullock notes the love she has seen Mr. Lindberg show his newborn son from taking him on multiple walks a day, to feeding him, and rocking him to sleep. *Letter by Stefani Bullock at Ex. 29.* Long-term household staff member Katherine Abbott tells the Court about the consistent gratitude Mr. Lindberg expresses to her and the other staffers and how he "inspires others through strong leadership." *Letter by Katherine Abbott at Ex. 5.* Abbott further notes,

"what has always been undoubtedly apparent to me is the love and adoration he has for his children." Abbott recounts how she observed Mr. Lindberg working tirelessly to grow his companies "while always keeping his promise to be home for family dinners and quality time spent with his kids." *Letter by Katherine Abbott at Ex. 5.* Abbott joins the many employees who share personal stories of health issues or familial problems that caused financial distress where Mr. Lindberg generously stepped in and covered the problem, taking a tremendous amount of stress off of these people's shoulders. *Letter by Katherine Abbott at Ex. 5.*

Being a parent is Mr. Lindberg's greatest passion. In addition to having three children with his ex-wife, Mr. Lindberg is the sole parent for his infant son, Erik Lindberg. After his divorce, Mr. Lindberg desired to have more children and did so through an egg donor and a surrogate. The donor did not retain any maternal rights, and there is no mother listed on Erik's birth certificate. Accordingly, Erik legally does not have a mother. Mr. Lindberg is Erik's only parent and support. Erik lives with Mr. Lindberg, who cares for him daily. Mr. Lindberg's absence from Erik's life for an extended period of time during Erik's formative years would cause a critical loss in caretaking of infant Erik. This loss of an only parent exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. While Erik's physical needs would be met during Mr. Lindberg's absence, a lengthy absence from his young son's daily life would cause an irreplaceable loss in caretaking. This caretaking burden would be shifted to Mr. Lindberg's elderly parents, who are divorced and live separately.

The Sentencing Guidelines specifically denote this type of loss in caretaking as a grounds for departure in § 5H1.6 cmt. n. 1(B). And numerous courts have taken parental and familial responsibilities into consideration to grant downward variances. *See United States v. Muñoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008) (*Gall* "indicates that factors disfavored by the Sentencing Commission may be relied on by the district court in fashioning an appropriate sentence," and holding that the sentencing court's finding that the defendant's family circumstances were extraordinary—the

defendant cared for his eight-year-old son as a single parent and had elderly parents with serious medical problems—was supported by the record); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming a downward variance to probation where the district court found that a prison sentence would negatively affect the defendant's disabled young son); *United States v. King*, 201 F. Supp. 3d 167 (D.D.C. 2016) (downward departure to three years' probation with condition of evening home confinement with location monitoring was appropriate where defendant was sole caretaker of seven-year-old daughter who would otherwise become a ward of the state); *United States v. Spero*, 382 F.3d 803 (8th Cir. 2004) (a situation in which one parent is critical to a child's well-being qualifies as an exceptional circumstance justifying a downward departure); *United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) (affirming the district court's departure based on defendant's indispensable role in caring for his wife, who recently had her kidney removed due to renal cancer and who had been diagnosed as being at risk of committing suicide if she were to lose her husband to death or incarceration).

Accordingly, we ask the Court to consider the harm Erik would suffer if Mr. Lindberg were to be absent for a significant part of his childhood and recognize that such harm exceeds that ordinarily incident to incarceration for a similarly situated defendant. Mr. Lindberg is also expecting the birth another child with his partner Olivia Molina. He and Ms. Molina plan to raise the baby together, and while that child does have a mother, we would ask the court to also consider that Mr. Lindberg is about to have a newborn and the impact his absence will have on both her and the child.

### D. Need for the Sentence Imposed to Provide Just Punishment

As part of its sentencing obligations, this Court must consider the need for the sentence imposed to "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). District courts have been "charged with imposing sentences that are sufficient, but not greater than necessary to comply with the sentencing purposes set forth in § 3553(a)." *Peugh v. United States*, 133 S. Ct. 2072, 2091 (2013). Mr. Lindberg's case is one that warrants a below guidelines sentence. It is not our aim to minimize the

seriousness of the charges; however, when weighed against Mr. Lindberg's history as a whole, a guideline term of imprisonment would be far "greater than necessary to comply with the sentencing purposes set forth in § 3553(a)." *Id.*

Prison has a much greater significance for those imprisoned for the first time, and thus a reduction in sentence is appropriate for first time offenders and consistent with the goals of "just punishment" in 18 U.S.C. § 3553(a)(2)(A) and "adequate deterrence" in § 3553(a)(2)(B). "Because white collar criminals have extremely low recidivism rates, restraint through incarceration arguably provides only marginal societal benefit." J. Strader, *White Collar Crime and Punishment: Reflections on Michal, Martha and Milberg Weiss*, 15 Geo. Mason. L. Rev. 45, 102 (2007). The likelihood that Mr. Lindberg would commit future crimes is all but non-existent.

Mr. Lindberg's age and lack of criminal history provide the Court with assurance that there is no need to incarcerate him for an extended period to protect the public. *See* United States Sentencing Commission, *Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), Ex. 9 (which shows that those in the age group over 50, who fall in criminal history category I, have an especially low recidivism rate of 6.2%, as compared to those, for example, under age 21 who recidivate at a rate of 29.5%).[9]

Additional research performed by the United States Sentencing Commission also shows that people who have no arrests, like Mr. Lindberg, have an even lower rate of recidivism than those individuals in criminal history category I who have an arrest history and are *"the most empirically identifiable group of federal offenders who are least likely to offend."* *See* United States Sentencing Commission,

---

[9] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

*Recidivism and the "First Offender"* (May 2004) (emphasis added).[10] Further, the United States Sentencing Commission's research indicates that long prison sentences are unnecessary for older offenders. "Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, *regardless of the length of sentence imposed.*" *See also* United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (emphasis added).[11]

Mr. Lindberg is a man with no prior record and a lifetime of hard work and decency, demonstrating that the conduct that brings him before the Court is an anomaly, one that is both statistically and realistically unlikely to ever reoccur. This Court can rest assured that Mr. Lindberg's suffering as a result of his conduct will not stop at the conclusion of a prison sentence, but will be something he deals with every day for the rest of his life. It has already caused significant disruption to his business dealings—his positions in certain companies will forever be limited by his felony conviction. The deterrent effects already carried out through these losses of business positions, opportunities, and reputational harm will continue to plague him for many years to come.

### E. A Guidelines Sentence Would Create Significant Unwarranted Sentencing Disparities

Finally, and very importantly, to avoid a substantial and inequitable sentencing disparity, the Court should vary downward to a below-Guidelines sentence. *See* 18 U.S.C. § 3553(a)(6) (providing that in determining the appropriate sentence, courts shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). To fashion a non-disparate sentence in Mr. Lindberg's case, it is necessary to analyze the sentences received by defendants to whom Mr. Lindberg is similarly situated.

---

[10] The Report is available at:
http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_First_Offender.pdf

[11] The Report is available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

First and foremost, it is necessary to review the plea agreement entered into by codefendant Mr. Hayes, who is facing a maximum guidelines' range of 6 months' imprisonment. Although Mr. Hayes was admittedly not on as many of the recordings as the other defendants, his actions and role were indisputably integral to the conduct at issue. Further, Mr. Hayes operated from a position of trust as a former Congressman and in his then-role with the NCGOP. Without Mr. Hayes's willingness to violate campaign finance laws and direct donations into Mr. Causey's campaign account, the defendants would have been unable to facilitate the acts that brought them before this Court. We anticipate the Government will say that the defendants would have found another way, but it was FBI informant Mr. Causey who required that the donations be provided to him in a way that he "can control now." Gov't Trial Ex. 127A. Without Mr. Hayes's knowing involvement, the specific conduct in this case would not have occurred.

Significantly, Mr. Hayes alone was charged in all five counts of the Indictment, including three counts of making false statements (18 U.S.C. § 1001) in which he was the *only* defendant charged. This is significant because the other defendants also spoke to the FBI, around the same time that Mr. Hayes did, and there is no allegation that they were untruthful during those conversations. In the same surprise circumstances as Mr. Hayes, Mr. Lindberg was approached by law enforcement in August of 2018. Yet, instead of lying to the agents, Mr. Lindberg openly answered their questions and even permitted them to interview him for several hours without a lawyer present. Further, Mr. Lindberg allowed the agents to make an image copy of his phone.

Counsel understand that there are always benefits to plea agreements. But would be inequitable for Mr. Lindberg to receive a sentence significantly longer than Mr. Hayes simply because he went to trial. If that is the case, then it seems Mr. Hayes has been *rewarded* for his dishonesty to the agents, making his false statement charges a very beneficial move on his part. The facts and equities of this case, as demonstrated by a simple review of the indictment, show that Mr. Hayes engaged in the same

conspiracy as Mr. Lindberg, plus additional criminal conduct under 18 U.S.C. § 1001. If Mr. Lindberg now receives a sentence in line with the Government's request (151-188 months) it would create a massive disparity in sentences that cannot be justified by the facts given that even the lowest end of that requested range—151 months is **over 25 times** Mr. Hayes's maximum sentence. Notably, Mr. Hayes did not testify at trial and the Government's case was not aided by any post-plea debriefing with him, particularly because the Government's case was on tape. Therefore, his plea agreement cannot be distinguished from Mr. Lindberg's situation on the basis of cooperation.

It is also significant that, by lying to federal agents when questioned, Mr. Hayes was able to avoid pleading guilty to bribery charges because the false statement charges were included as lesser offenses. In his plea agreement, the Government agreed to dismiss the more serious counts and request a sentence at the low end of 6 months, acknowledging that such a sentence was "sufficient but not greater than necessary" to achieve the sentencing objectives. To sentence Mr. Lindberg to a sentence anywhere near the guidelines' range would serve to effectively reward Mr. Hayes's dishonesty and punish Mr. Lindberg for exercising his constitutional right to trial, a result that would be supremely unjust.

The sentences of similarly situated defendants also justify a downward variance. Courts have recognized that to avoid a non-disparate sentence they must analyze "national disparities between defendants with similar records . . . guilty of similar conduct." *See* USSC Departure and Variance Primer, (May 2020).[12] Accordingly, this court should also to examine sentences of defendants outside this indictment to whom Mr. Lindberg is similarly situated.

As the loss guidelines have a propensity to overstate the seriousness of the offense, courts vary below the guidelines in a significant number of cases to which a § 2B1.1 loss enhancement applies,

---

[12] Available at: https://www.ussc.gov/sites/default/files/pdf/training/primers/2020_Primer_Departure_Variance.pdf.

including offenses under § 2C1.1. For example, in 2017 and 2018, 75 percent of sentences issued to bribery offenders (including those sentenced under § 2C1.1) were below the Guideline range. *See* 2017 U.S.S.C. Sourcebook, Table 27A at Ex. 33; *and see* 2018 U.S.S.C. Sourcebook, Table 31 at Ex. 35. The same was true for bribery offenders in 2019, with only 18.5 percent of the offenders sentenced within the guidelines and with no upward variances. *See* 2019 U.S.S.C. Sourcebook, Table 31 at Ex. 39. Looking specifically at honest services offenders sentenced under § 2C1.1, of the 245 offenders sentenced in 2019, only 40 of them were sentenced within the guidelines, and the rest were granted downward departures, variances, or both. *See* 2019 U.S.S.C. Sourcebook, Table 32 at Ex. 40 (84 of these downward departures were § 5K1.1, 25 were other guideline departures, and 94 were variances). A below-Guideline sentence for honest services fraud offenders is the norm, not the exception, with average sentences issued in 2019 ranging between 12 and 24 months. *See* 2019 U.S.S.C. Sourcebook, Table 40 at Ex. 41.

The downward variances given to bribery offenders, moreover, are typically significant. The median sentences imposed for honest services fraud offenders in 2017 and 2018 were 15 months and 16 months respectively—*more than 50 percent below the low end of the guideline range*. *See* 2017 U.S.S.C. Sourcebook, Table 31C at Ex. 34; 2018 U.S.S.C. Sourcebook, Table 40 at Ex. 36. In 2019, the median sentence for bribery offenders was 12 months—again reflecting a 50 percent departure from the guidelines. *See* 2019 U.S.S.C. Sourcebook, Table 40 at Ex. 41.

In 2018 and 2019, the mean sentences for honest services fraud offenders were 22 and 24 months respectively, demonstrating similarly significant variances more than 50 percent below the low end of the guideline range. *See* 2018 U.S.S.C. Sourcebook, Table 40 at Ex. 36 (note: no statistics on the mean sentence for honest services fraud offenders in 2017 were identified); *and see* 2019 U.S.S.C. Sourcebook, Table 40 at Ex. 41.

Based on the arbitrariness of the fraud guidelines, courts routinely order sentences of 24 months or less to bribery defendants, concluding that the loss guidelines are not a reliable proxy for culpability, do not reflect just punishment for fraud offenses, and are not necessary to deter future misconduct and protect the public from non-violent fraud offenders. For example, in the landmark case of *United States v. McDonnell*, before the Supreme Court vacated Governor McDonnell's conviction, the district court had sentenced McDonnell to a 24 months' imprisonment, which represented a significant departure from what the Government and Probation requested. The Presentence Report calculated Governor McDonnell's offense level at a 32 with a sentencing range of 121-151 months. *Sentencing Position of the United States at 1, United States v. McDonnell,* 64 F. Supp. 3d 783 2014 WL 7405778 (E.D. Va. 2014). At sentencing, Judge Spencer determined the proper offense level was 28 with a corresponding sentencing range of 78-97 months. *United States v. McDonnell*, No. 3:14-cr-12, 2014 WL 7405778 (E.D. Va. 2014). However, Judge Spencer stated that it would have been "ridiculous under these facts" for him to have been required to give Governor McDonnell "seven or eight years in prison" for what he did. *United States v. McDonnell,* 64 F. Supp. 3d 783, No. 3:14-cr-12, Dkt. 604, 605 (E.D. Va. Jan. 6, 2015). The Court found the Governor McDonnell had taken between $97,000-$120,000 worth of bribes, including luxury vacations, use of a Ferrari, and a Rolex, while in office. *Id.* Although the value of the payments in *McDonnell* were smaller than the ones in this case, the notable distinction is that the defendant actually received the money. Despite the defendant lining his own pocket, the court still granted a significant variance.

In this particular case, the guideline calculation as a whole seeks to attribute Mr. Lindberg's blameworthiness by the value of the payment he made. But, as explained above, this application of the loss calculation significantly overstates the seriousness of the offense and would result in a significant sentencing disparity with those similarly situated both in this case and across the nation.

Notably, Mr. Lindberg is a first time offender with a resulting criminal history category of 1. In 2019, the mean sentence length for the 301 individuals with a criminal history category of 1, who were convicted of bribery, was 22 months. The median was 12 months. *See* 2019 U.S.S.C. Sourcebook, Table 27 at Ex. 38.

In light of the national data, a substantial downward variance from the loss guidelines is warranted to a sentence within the range of 12 to 24 months. This represents the average range of national sentences most recently imposed for honest services fraud offenders and thus reflects the appropriate baseline range to avoid unwarranted sentencing disparities, particularly in light of Mr. Hayes's sentence. Moreover, the very nature of Mr. Lindberg's offense supports an additional downward variance because the nature and circumstances of the offense are less egregious than certain other types of the honest services fraud or bribery cases. Unlike some defendants, the Government cannot prove a financial amount that Mr. Lindberg stood to gain or a financial loss to victims by his actions. In this rare instance, the ultimate harm is less substantial and thus a significant downward variance is appropriate.

### Mr. Lindberg's Health and the Current State of BOP

Additionally, due to current world events, there is a new factor for the Court to take into account when considering how Mr. Lindberg will serve his prison time. Because of the COVID-19 pandemic, Mr. Lindberg will spend his prison sentence in lockdown conditions similar to solitary confinement. Since March 13, 2020, BOP "modified its operations" to respond to the spread of COVID-19.[13]

---

[13] Fed. Bureau of Prisons, Fed. Bureau of Prisons COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII.

Individuals "in every institution" are "secured in their assigned cells/quarters to decrease the spread of the virus."[14]  Family and friends are prohibited from visiting.[15]  Programming, absent select UNICOR operations, has ceased and movement throughout BOP facilities is suspended.[16]  And while BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry[17],  in reality even these most basic activities are not always allowed, and instead, conditions amount to a "total lockdown" for "almost twenty-four hours a day."[18]

---

[14] Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII) and is still in effect. And, at some facilities, once someone tests positive for the virus, they are put in solitary confinement. See, e.g., Class Action Complaint, Torres v. Milusnic, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19; Class Action Petition for Writ of Habeas Corpus, Hallinan v. Scarantino, No. 20-hc-2088-FL (E.D.N.C. May 26, 2020), ECF No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19).

[15] Fed. Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited August 6, 2020).

[16] *Id.*

[17] *Id.*

[18] *Torres,* ECF No. 1, at 8 (Lompoc); *See also, e.g.*, Mem. From B. von Blanckensee, Acting Complex Warden FCC Lompoc, to All Staff at FCC Lompoc (Apr. 17, 2020) ("no phone or computer access"), https://bit.ly/3cdgA8H; *Hallinan*, ECF No. 1-4, at 3-4 (Declaration of Roger Duane Goodwin) ("Our unit [in FCI Butner Medium] remains locked down. . . except for about 1 hour on weekdays, when we are allowed to take a walk outside of our unit."); *Torres,* at 22-28 (describing crowded, unsanitary conditions); *Torres,* at 56 (Declaration of Joanna Perales) ("prisoners were not allowed to shower" and "once [prisoners] run out of soap, they cannot purchase any more because the commissary is closed"); *id.* at 59-60 (Declaration of Graciela Zavala-Garcia) ("my son was denied all access to telephones, email and commissary" and "my son has not been able to shower or change into clean clothes"); Class Action Complaint, *Wilson v. Ponce,* No. 20-cv-04451 (C.D. Cal. May 16, 2020), ECF No. 1, at 82-83 (Declaration of Jackeline Vazquez) (describing the crowded and unsanitary living conditions at FCI Terminal Island and declaring that "my brother was told that prisoners would not be able to use phones and computers until further notice"); Emergency Petition for Writ of Habeas Corpus, *Wilson v. Williams,* No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3-4 (Declaration of Kendal Nelson) ("[At FCI Elkton] They are not allowing us to go outside and get fresh air, and we're not allowed into the law library.").

Not only will Mr. Lindberg be on lockdown—prohibited from seeing his loved ones and unable to engage in rehabilitative or productive programming—Mr. Lindberg will also be at grave risk of contracting COVID-19. CDC guidance, such as social distancing, is simply "impossible to achieve in our federal prisons"—particularly during a lockdown.[19] Incarcerated individuals share bathrooms, sinks, showers, and telephones, and must eat together and sleep in close proximity to each other. They lack the freedom to bathe regularly and are unable to effectively disinfect their surroundings.[20] Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities—

---

[19] Letter from Dr. Sandro Galea, Dean, Boston Univ. School of Pub. Health, et al., to President Trump 1 (Mar. 27, 2020), https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions); *see also* Ctrs. for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, https://bit.ly/2M9IF6a (last visited July 16, 2020) (recognizing that correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments").

[20] *See, e.g.*, Fed. Bureau of Prisons, BOP Implementing Modified Operations,

https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 16, 2020) (allowing three showers a week); *Wilson v. Williams*, --- F.Supp.3d ---, 2020 WL 1940882, at *3 (N.D. Ohio Apr. 20, 2020) (acknowledging that soap and disinfectant "can only be so useful in an environment where the inmates are constantly in close proximity to one another. Likewise, the education about hygiene and social distancing [BOP] tout[s] is only effective if the inmates have the supplies and physical space to put such knowledge into practice."); Facility Evaluation: Metropolitan Detention Center COVID-19 Response, *Chunn v. Edge*, No. 20-cv-1590 (E.D.N.Y. Apr. 30, 2020), ECF No. 72-1, at 2 ("Detainees [at MDC Brooklyn] do not have access to adequate cleaning solutions or personal protective equipment."); Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 56 (Declaration of Joanna Perales) (plaintiffs and other individuals at Lompoc "do not have access to hand sanitizer, and are only given one bar of soap each week"); *id.* at 66 (Declaration of Nema Zayed Fears) ("Since the COVID-19 outbreak started, a single mask is the only piece of protective equipment that my father has received. He has had to re-use that mask for weeks."); Emergency Petition for Habeas Corpus, *Wilson v. Williams*, No. 20-cv-794 (N.D. Ohio Apr. 13, 2020), ECF No. 1-5, at 3 (Declaration of Kendal Nelson) (describing "unbearabl[ly]" unsanitary conditions).

33

111 inmates have died[21] over 10,000 inmates have tested positive[22], and over 70% of those tested by the BOP have the virus.[23]

For the duration of the COVID-19 pandemic, any time Mr. Lindberg spends in prison will necessarily be more severe than it ordinarily would. The Court should account for the current oppressive nature of BOP confinement by varying downward and sentencing Mr. Lindberg to a below guideline sentence.

## V.    CONCLUSION

For the foregoing reasons, Mr. Lindberg respectfully asks the Court to vary downward from the otherwise applicable Sentencing Guidelines and give him a below-guidelines sentence of 12-24 months. Such a sentence would take into account the guidelines and all of the sentencing factors of 18 U.S.C. §3553.  It would also take into account in light of his co-defendant's sentence and the unique aspects of this case.  And it reflects the median and mean sentences for bribery convictions.  Defense counsel also respectfully requests that the Court allocate an hour for Mr. Lindberg's sentencing hearing.

/s/ Rachel Riley

Brandon N. McCarthy (admitted *pro hac vice*)
Jorge A. Solis (admitted *pro hac vice*)
Rachel M. Riley (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 N. Pearl Suite 1100
Dallas, TX  75201
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

---

[21] Fed. Bureau of Prisons, BOP: COVID-19 Update, https://www.bop.gov/coronavirus/ (last visited August 12, 2020).

[22] *Id.*

[23] Michael Balsamo, Over 70% of Tested Inmates in Federal Prisons have COVID-19, AP News (Apr. 29, 2020), https://bit.ly/2AiMjrF.

Robert T. Smith (admitted *pro hac vice*)
Rajesh R. Srinivasan (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
202-625-3500
rajesh.srinivasan@katten.com


Jeffrey C. Grady (N.C. Bar. No. 32695)
KATTEN MUCHIN ROSENMAN LLP
550 S. Tryon Street, Suite 2900
Charlotte, NC 28202
704-444-2036
jeff.grady@kattenlaw.com

Aaron Zachary Tobin (N.C. Bar. No. 50019)
CONDON TOBIN SLADEK THORNTON, PLLC
8080 Park Lane, Suite 700
Dallas, TX 75231
214-265-3800
atobin@ctstlaw.com


*Counsel for Defendant Greg E. Lindberg*


## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2020, I electronically filed the foregoing memorandum with

the Clerk of Court using the CM/ECF system, which will send notification to counsel of record.

Dated: August 12, 2020                    Respectfully submitted,

/s/ Rachel Riley
Rachel M. Riley (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 N. Pearl Suite 1100
Dallas, TX 75201
214-765-3600
rachel.riley@katten.com

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| 1 | Letter from Brenda Lynch |
| 2 | Letter from Gary Lindberg & Jill Neilson |
| 3 | Letter from Robert Stearns |
| 4 | Letter from Korby Holcomb |
| 5 | Letter from Katherine Abbott |
| 6 | Letter from Coty Clark |
| 7 | Letter from Chris Herwig |
| 8 | Letter from Jeff Fisher |
| 9 | Letter from Leslie Sufrin |
| 10 | Letter from Bob Lindberg |
| 11 | Letter from Jeffrey Morris |
| 12 | Letter from Jennifer Bell |
| 13 | Letter from Alyssa Hogan |
| 14 | Letter from Ashley Schmidt |
| 15 | Letter from Beecher Gray |
| 16 | Letter from Bridgett Hurley |
| 17 | Letter from Carolyn Cuany |
| 18 | Letter from Chris Brogan |
| 19 | Letter from Cindy Tillitz |
| 20 | Letter from Daniel McMahon |
| 21 | Letter from David Finch |
| 22 | Letter from Emily Tadapelli |
| 23 | Letter from Erin Masercola |
| 24 | Letter from Irina Myasnikova |
| 25 | Letter from Keith Hollis |
| 26 | Letter from Lauren Rinebold |
| 27 | Letter from Robert Gaddy |
| 28 | Letter from Roy Brunett |
| 29 | Letter from Stefani Bullock |
| 30 | Letter from Tug Swaffer |
| 31 | Letter from Ronny Vogel |
| 32 | Letter from Arlene Lindberg |
| 33 | 2017 USCC Sourcebook Table 27A Sentences Relative to the Guideline Range |
| 34 | 2017 USCC Sourcebook Table 31C Below Guideline Range: Degree of Decrease |
| 35 | 2018 USCC Sourcebook Table 31 Sentence Imposed Relative to the Guideline Range |
| 36 | 2018 USCC Sourcebook Table 40 Extent of Downward Variances |
| 37 | 2019 USCC Sourcebook Table 13 Sentence Type |
| 38 | 2019 USCC Sourcebook Table 27 Sentence Length in Each Criminal History Category |
| 39 | 2019 USCC Sourcebook Table 31 Sentence Imposed Relative to the Guideline Range |
| 40 | 2019 USCC Sourcebook Table 32 Sentence Imposed Relative to the Guideline Range |
| 41 | 2019 USCC Sourcebook Table 40 Extent of Downward Variances |
| 42 | Letter from Aaron Tobin |