| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> *Plaintiff*, <br><br> v. <br><br> **GREG E. LINDBERG**, *et al.*, <br><br> *Defendants*. | No. 5:19-cr-22-MOC |

## DEFENDANT'S EMERGENCY MOTION TO MODIFY SENTENCE AND REQUEST FOR EXPEDITED CONSIDERATION

We have all learned this past year that Zoom—despite its many benefits—is a pale substitute for face-to-face hearings. As Sigmund Freud once said, even if "his lips are silent," a witness "chatters with his fingertips."[1] The problem with Zoom is that those fingertips may be outside the small window on our monitor.

"[V]irtual reality is rarely a substitute for actual presence and … even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it." *United States v. Lawrence*, 248 F.3d 300, 304 (4th Cir. 2001). Even where it works flawlessly, videoconferencing software, much like a written transcript, can never fully reflect "all of the subtleties of a witness, such as inflection of voice or a particular gesture that may completely change the meaning of the testimony." *Cf.* James P. Timony, *Demeanor Credibility*, 49 Cath. U. L. Rev. 903, 903 (2000); *see also Edwards v. Logan*, 38 F. Supp. 2d 463, 467 (W.D. Va. 1999) ("[T]he ability to observe demeanor . . . may be lessened in a particular case by video conferencing. This may be particularly detrimental where it is a party to the case who is

---

[1] *See* S. Freud, "Fragment of an Analysis of a Case of Hysteria" (1901), in *Collected Papers* (London: Hogarth Press, 1955), vol. 7, pp. 77–78.

participating by video conferencing, since personal impression may be a crucial factor in persuasion.").

The COVID-19 pandemic has also reinforced how life's milestones are dimmed and its tragedies heightened when shared with family only over broadband. Families who lost loved ones in isolation wards without the chance to say goodbye, high school seniors who had only virtual graduations, and grandparents who have yet to meet their grandchildren can all attest to that.

In light of these lessons, Defendant Greg Lindberg asks this Court to exercise its authority under 18 U.S.C. § 3582(c)(1)(A)(i) to permit him to spend no less than 30 days, beginning on June 10, 2021, on probation under home confinement rather than in a federal penitentiary. During that time, Mr. Lindberg and his companies face a critical civil trial in the North Carolina state courts for which he is the only person realistically able to serve as a corporate representative and testify as to key facts. And during the same period of probation, his family hopes to hold a memorial service for Mr. Lindberg's father, who passed away only a few weeks ago.

## BACKGROUND

**A.      The North Carolina Litigation**

In 2019, four insurance companies ("Insurers") ultimately owned by Mr. Lindberg sued him and two of his companies in Wake County Superior Court.[2] These Insurers made substantial long-term investments in the Global Growth family of companies, also owned by Mr. Lindberg. The North Carolina Department of Insurance approved these affiliate investments, with the caveat that the Insurers should not invest more than 40% of their assets in them. But—after a review of the affiliate investments—the Department required the Insurers to reduce their affiliate holdings to only 10% of their assets.

Ultimately, the Department placed the Insurers in an agreed rehabilitation connected with a signed Memorandum of Understanding. The gist of this Memorandum was that hundreds of Mr.

---

[2]     The Superior Court docket information is *Southland National Insurance Corporation in Rehabilitation, et al., v. Lindberg et al.*, Case No. 19-CVS-013093.

2

Lindberg's companies would be "globally restructured" to protect the best interests of the Insurers' policyholders. The core of the North Carolina case is a dispute over whether the Memorandum is a term sheet or a binding and enforceable agreement. Mr. Lindberg was the point person for the companies in negotiating and implementing the Memorandum.

The case is currently set for trial beginning on June 21, 2021, and the Superior Court judge assigned to the matter, Judge A. Graham Shirley II, has stated his preference for live, in-person participation by the parties. *See* **Exhibit A** (Order Setting Trial Date and Dispositive Deadlines). Because of his intimate knowledge of corporate operations and the high level of turnover at his companies, Mr. Lindberg will be a key witness at the trial and, as a named defendant, has an interest in being physically present as the person in the best position to help his lawyers mount a defense. He is the only person who can realistically serve as an effective corporate representative for the defendant companies.

### B.     The Memorial Service

Mr. Lindberg's father, Bob Lindberg,[3] passed away on April 29 of this year after a protracted battle with a painful and rare form of blood cancer. Besides being an accomplished military and civilian pilot, Bob was a loving father to Mr. Lindberg and his four siblings, as well as a doting grandfather to his 16 grandchildren and great grandchildren. The Lindberg family dearly hopes to gather, in person, for a memorial service to honor and celebrate Bob's life.

Now that the COVID-19 pandemic has eased enough to allow for gatherings, the family has scheduled the memorial service for June 12, 2021, in California. Mr. Lindberg would like, if at all possible, to have the chance to spend that day mourning the loss of his father with his closest living relatives.

## ARGUMENT

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a district court

---

[3]     To avoid confusion with Mr. Lindberg, this brief will call his father "Bob."

to modify a sentence for "extraordinary and compelling" reasons. Mr. Lindberg asks that the Court use this authority to reduce his sentence by at least 30 days on condition of probation subject to home confinement for a period beginning on June 10, 2021, so that he can (1) attend his father's memorial service on June 12, 2021, and (2) participate in his own defense in the North Carolina trial, which is currently scheduled to last for two weeks.

He is willing to consent, as he did pretrial, to 24-hour GPS monitoring with permission to attend only a few scheduled activities at specific locations, namely his father's memorial service and the North Carolina trial and trial preparation meetings. Mr. Lindberg understands this request is within the Court's discretion, and requests it exercise that discretion not simply for him, but more importantly for the Insureds whose interests he is seeking to protect, his employees, and his immediate family.

**A.     The First Step Act allows this Court to modify Mr. Lindberg's sentence.**

Before Congress passed the First Step Act, prisoners could not file a motion for compassionate relief on their own: The Bureau of Prisons had to file for it. *See United States v. Beck*, 425 F. Supp. 3d 573, 577–78 (M.D.N.C. 2019).

But the BOP rarely did so. "A 2013 report from the Office of the Inspector General revealed that, on average, only 24 incarcerated people per year were released on BOP motion … [and] concluded that BOP did 'not properly manage the compassionate release program.'" *United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020) (*quoting* U.S. Dep't of Just. Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* 1 (2013)).

"Against this backdrop, Congress amended [Section 3582(c)] to 'remove the Bureau of Prisons from its former role as a gatekeeper over compassionate release petitions.'" *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020) (*quoting McCoy v. United States*, No. 2:03-cr-197, 2020 WL 2738225, at *4 (E.D. Va. May 26, 2020). "[T]he current law allows an individual in federal prison to directly petition the district court for relief." *McCoy v. United States*, No. 2:03-cr-197, 2020 WL 2738225, at *4 (E.D. Va. May 26, 2020) (*citing* § 3582(c)(1)(A), *aff'd*, 981 F.3d 271 (4th

4

Cir. 2020).

A District Court may adjust a defendant's sentence where "extraordinary and compelling reasons" support modification and the court finds that modification reflects the factors laid out in 18 U.S.C. § 3553(a) and applicable policy statements issued by the U.S. Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A)(i). Because there are no such applicable policy statements, this last requirement has no bite.[4]

Because neither the statute nor any policy statement of the Sentencing Commission define what amounts to an "extraordinary and compelling circumstance" in a defendant-filed motion, *United States v. Jones*, 980 F.3d 1098, 1104 (6th Cir. 2020), this Court has the authority (and discretion) to make its own determination about whether Mr. Lindberg's request meets that standard. *See McCoy*, 981 F.3d at 288 (recognizing the "First Step Act and its amendment of § 3582(c)(1)(A) . . . gives new discretion to the courts[.]"); *United States v. Patterson*, No. 311CR258MOCWCM1, 2021 WL 96464, at *2 (W.D.N.C. Jan. 11, 2021) ("[C]ourts may make their own independent determinations as to what constitute "extraordinary and compelling reasons" to warrant a reduction of sentence under Section 3582(c)(1)(A)."). Mr. Lindberg contends that it does.

**B.   Mr. Lindberg's request presents an extraordinary and compelling basis for a sentence modification.**

When a statute does not define a term, Courts should turn first to its ordinary meaning. *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically

---

[4]   There is a policy statement in U.S.S.G. § 1B1.13 that describes "extraordinary and compelling circumstances," but it was last updated in November 2018 under the pre-First-Step-Act regime. As a result, the Fourth Circuit has held that it does not apply to "defendant-filed motions" under Section 3582(c)—like this one. *McCoy*, 981 F.3d at 282 (4th Cir. 2020). Most other circuits that have decided the question agree. *United States v. McGee*, 992 F.3d 1035, 1048–50 (10th Cir. 2021); *United States v. Aruda*, 993 F.3d 797, 801–02 (9th Cir. 2021); *United States v. Cooper*, 996 F.3d 283, 288 (5th Cir. 2021); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108–11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). *But see United States v. Brasher*, 996 F.3d 1243 (11th Cir. 2021) (reaching the opposite conclusion).

5

give the phrase its ordinary meaning." (internal quotation marks omitted)); *Peck v. U.S. Dep't. of Lab.*, 996 F.3d 224, 230 (4th Cir. 2021) ("When a statute does not define a word, we turn first to its 'ordinary meaning.'" (*quoting Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011))). Something is extraordinary where it is "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019).[5] And it is compelling if it urgently requires attention or is "drivingly forceful." *Compelling*, Am. Heritage Dictionary of the English Language (5th ed. 2018).[6] In other words, in common parlance, a reason for release is "extraordinary and compelling" if it is (1) unusual and (2) urgent or especially persuasive.

Though courts have not yet settled on definitive applications of this standard given how recently Section 3582(c) was amended, cases in which courts have granted relief are broadly consistent with the statute's common-meaning interpretation. *See, e.g., United States v. Warren*, No. 3:18-CR-136, 2021 WL 1341049 (W.D.N.C. Apr. 9, 2021) (granting defendant's motion for compassionate relief based on need to care for ailing parents and disabled children, as well as COVID-19 vulnerability); *United States v. Mann*, No. 5:02-CR-156, 2021 WL 2019187 (E.D.N.C. May 20, 2021) (granting compassionate relief where defendant's obesity put him at risk of COVID-19 complications and he would not have been a career offender if sentenced today). And courts have recognized that the First Step Act "was enacted to further increase the use of compassionate release," and should be interpreted accordingly. *See United States v. Griggs*, 462 F. Supp. 3d 610, 617 (D.S.C. 2020); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019).

---

[5] *See also Extraordinary*, Am. Heritage Dictionary of the English Language (5th ed. 2018)("beyond what is ordinary or usual"); *Extraordinary*, The Chambers Dictionary (13th ed. 2014) ("not usual or regular"); *Extraordinary*, Oxford English Dictionary (2d ed. 1994) ("outside the usual or regular course or order").

[6] *See also Compelling*, Oxford English Dictionary (2d ed. 1994) ("irresistible" or "demanding attention, respect, etc."); *Compel*, The Chambers Dictionary (13th ed. 2014) ("forcing attention or interest, irresistible; powerfully persuasive").

6

### 1. Being named as a defendant and serving as the key witness in a bet-the-company civil trial is an extraordinary and compelling circumstance.

It is "unusual"—and thus "extraordinary" in common parlance—for a federal prisoner to be named as a defendant in billion-dollar, bet-the-company civil litigation. And it is even more rare for that same prisoner to be *the* key witness in a trial in such a case.

Mr. Lindberg's need and desire to attend trial in person, rather than virtually, is also compelling.[7] Courts around the country have recognized over and over that virtual testimony or attendance at a trial or hearing is inferior to live attendance. *Lawrence*, 248 F.3d at 304 ("[V]irtual reality is rarely a substitute for actual presence and that, even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it."); *see also Thornton v. Snyder*, 428 F.3d 690, 687 (7th Cir. 2005) ("The immediacy of a living person is lost with video technology." (internal quotation marks omitted)). Even where a defendant is in prison, the decision to dismiss with in-person attendance in civil litigation cannot be taken lightly. *Id.* at 698–99 (allowing videoconference attendance where prisoner was classified as an "extremely high escape risk").

Indeed, this principle is fundamental to our court system. It is baked into the Federal Rules of Civil and Criminal Procedure, which require that in-person attendance and testimony be the rule, not the exception. *See* Fed. R. Crim. P. 43(a)(2) (requiring defendant's presence at every trial stage); Fed. R. Civ. P. 43(a) ("At trial, the witnesses' testimony must be taken in open court unless a federal statute, the Federal Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from

---

[7] If the Court refuses to allow in person attendance at the North Carolina trial or the memorial service, Mr. Lindberg asks that the Court enter an order directing BOP to allow him to attend both events virtually. Given the short time window remaining before each, he could not likely submit this request to BOP and exhaust any appellate options in time to bring the video conference issue to the Court's attention separately.

7

a different location.").[8] And it is the core of the Supreme Court's revitalized confrontation clause jurisprudence. *See, e.g., Crawford v. Washington*, 541 U.S. 36, 50 (2004).

This in-person, live-testimony-with-all-parties-present default rule is driven by three concerns. First, courts fear that witnesses will be less able to persuasively tell their story and more willing to lie if they do not confront the parties directly in the courtroom. This fear is grounded in a basic belief that "[i]n the most important affairs of life, people approach each other in person, and televi[sed appearance] is no substitute for direct personal contact," *see Stoner v. Sowders*, 997 F.2d 209, 213 (6th Cir. 1993):

> It is always more difficult to tell a lie about a person "to his face" than "behind his back." In the former context, even if the lie is told, it will often be told less convincingly. [Nothing can], of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions. Thus the right to face-to-face confrontation . . . "ensur[es] the integrity of the fact-finding process."

*Coy v. Iowa*, 487 U.S. 1012, 1019–20 (1988) (*quoting Kentucky v. Stincer*, 482 U.S. 730, 736 (1987). For witnesses (and especially party witnesses) appearing only remotely at trial is damaging—it robs compelling testimony of some of its force, earnestness, and ability to persuade. *Edwards*, 38 F. Supp. 2d at 467 ("Of course, it is not the same as actual presence, and it is to be expected that the ability to observe demeanor, central to the fact-finding process, may be lessened in a particular case by video conferencing. ***This may be particularly detrimental where it is a party to the case who is participating by video conferencing, since personal impression may be a crucial factor in persuasion.***").

Second, the fact-finder may be less able—as Dr. Freud suggests—to judge the credibility of a witness who testifies from outside the courtroom. The Advisory Committee said as much when it amended Civil Rule 43 in 1996:

> Contemporaneous transmission of testimony from a different location is permitted

---

[8] Similarly, Rule 43(a) of the North Carolina Rules of Civil Procedure directs that, "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules."

8

> only on showing good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. ***The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition.***

Fed. R. Civ. P. 43 cmt. 1996 (emphasis added).

And finally, if the parties are not present, they will have a much harder time consulting their attorneys on trial strategy as the evidence unfolds. *See Lawrence*, 248 F.3d at 304 ("The ... right of a defendant to be present at trial best ensures the right to consult with counsel and to confront adverse witnesses.").

Recognizing these concerns, the Fourth Circuit has held that "a plaintiff should be present at the trial of his action, particularly if, as will ordinarily be true, his own testimony is potentially critical." *Muhammad v. Warden*, 849 F.2d 107, 111 (4th Cir. 1988). Indeed, going farther, it declared that "[n]ot only the appearance but the reality of justice is obviously threatened by [a party's] absence" from trial. *Id.* Thus, it has directed district courts confronted with this issue "***no matter how it is presented***" to consider the following factors in determining whether to enter an order designed to secure a defendant's attendance at a civil trial:

> (1) Whether the prisoner's presence will substantially further the resolution of the case, and whether alternative ways of proceeding, such as trial on depositions, offer an acceptable alternative.
>
> (2) The expense and potential security risk entailed in transporting and holding the prisoner in custody for the duration of the trial.
>
> (3) The likelihood that a stay pending the prisoner's release will prejudice his opportunity to present his claim, or the defendant's right to a speedy resolution of the claim.

*Id.* at 113 (emphasis added).

So, in *Hawks v. Timms*, the Maryland federal District Court ordered the government not only to permit a *plaintiff* prisoner to attend his civil trial, but to pay for his transport. 35 F. Supp. 2d 464 (D. Md. 1999). The court explained that Mr. Hawks's success or failure at trial would "depend entirely on his own testimony and credibility." *Id.* at 467. More than that, the opposing

9

Case 5:19-cr-00022-MOC-DCK    Document 317    Filed 06/07/21    Page 9 of 16

parties would be present in court "to tell their story and establish eye contact and rapport with the jury"—fairness dictated that Mr. Hawks's be permitted to do the same. *Id.* On the other hand, the expense was limited, Mr. Hawks posed no real security risk, and a stay would be too long to be reasonable. *Id.* at 468.

So too here: Mr. Lindberg must testify at the civil trial to defend his own, his companies', and policyholders' interests. That effort will be undermined and the North Carolina judge's ability to sense his earnestness hindered if he can only appear remotely. Meanwhile, the opposing parties and their witnesses can appear in person without restriction. Fairness demands Mr. Lindberg be able to do the same, incarcerated or not. In fact, Mr. Lindberg's case is more compelling than Mr. Hawks's case: Mr. Hawks at least chose to file his lawsuit, risking that he would be unable to attend. Mr. Lindberg did not choose to be sued in North Carolina state court.

More than that, if he is still incarcerated, Mr. Lindberg will be stymied in his efforts to consult with counsel in real time during trial.[9] Instead, he would have to wait until the end of the day to consult with his attorneys via Corrlinks, where there is also a delay in transmissions. And in terms of preparing for trial, Mr. Lindberg does not have regular access to his attorneys while in federal prison. During his time at FPC Montgomery, Mr. Lindberg has had only two privileged meetings with counsel because of the COVID policies in place there.[10] In fact, BOP has even prohibited Mr. Lindberg from participating in third-party conference calls. *See* **Exhibit C** (Nov. 23, 2020 Letter from Sarah Allison to Aaron Tobin). Thus, the Court should find that Mr. Lindberg has extraordinary and compelling reasons to attend the North Carolina trial.

---

[9] Towards that end, Mr. Lindberg has also moved in the Wake County Superior Court for an order facilitating his trial testimony. *See* **Exhibit B** (Motion to Facilitate Trial Testimony).

[10] Mr. Lindberg is not challenging these policies or arguing that they are unreasonable given the unprecedented nature of the pandemicAll the same, they still interfere with his ability to effectively consult counsel about the civil case and so should be considered when evaluating the reasonableness of his request here.

## 2. Mr. Lindberg's desire to attend his father's memorial service is also an extraordinary and compelling circumstance.

This Court has already recognized that trying family circumstances can support a motion under Section 3582(c). *Warren*, 2021 WL 1341049. While the defendant's circumstances in *Warren* were far more dire than Mr. Lindberg's, so was the relief she was requesting.

Mr. Lindberg seeks only a short, temporary modification of his sentence (rather than a permanent release from prison) to attend his father's funeral—as well as assist in his own defense at trial as discussed above.[11] Mr. Lindberg is further willing to accede to the monitoring and home confinement conditions the Court considers appropriate to ensure that he does not exceed the limited purpose of his release. *See United States v. Isaac*, No. CR 7:17-06-KKC-1, 2020 WL 6483101, at *1 (E.D. Ky. Nov. 4, 2020) (noting that the First Step Act provides courts with "***flexibility*** to grant a motion filed by the defendant") (emphasis added).

While nearly everyone will experience the loss of a father, it is still an extraordinary (indeed, once in a lifetime) event in each of our lives. And the death of a beloved elder relative is always a traumatic time in which family hopes to be together. In short, the death of Mr. Lindberg's father is an unusual and persuasive reason for a temporary release that will not—indeed, cannot—arise again. This Court should therefore grant his motion.

## C. The sentencing factors under § 3553(a) support the temporary modification of Mr. Lindberg's sentence.

The sentencing factors in Section 3553(a) also support granting Mr. Lindberg's motion. "Those factors include the nature and circumstances of the underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." *United States v. Richer*, No. 3:18-CR-00311-MOC, 2021 WL 1553827, at *5 (W.D.N.C. Apr. 20, 2021) (internal quotation

---

[11] Mr. Lindberg will pay for his own travel, security, and costs associated with home confinement.

11

marks omitted).

Mr. Lindberg is a first-time offender, making it unlikely that he will commit further crimes if temporarily released for a short period of time. Indeed, the Sentencing Commission has found that the re-conviction recidivism rate of offenders with no earlier arrests was only 2.5 percent.[12] U.S. Sentencing Commission, *Recidivism and the "First Offender"* 5, 14 & n.28 (May 2004), available at: https://tinyurl.com/yy6slh87. Further, the underlying offense here is a non-violent, white-collar crime. While Mr. Lindberg acknowledges the seriousness of those offenses, their non-violent nature still undermines any argument that a short stint of home confinement would create any danger to the public. Indeed, the sentencing district court acknowledged that Mr. Lindberg's conviction was aberrant behavior. Statement of Reasons at 3, *United States v. Lindberg*, 5:19-cr-00022-MOC-DSC, Dkt. No. 63 (sealed).

Mr. Lindberg also complied with all conditions of his pretrial and post-trial releases. He also has not "incurred a BOP violation within the last year," or ever.

While incarcerated, Mr. Lindberg has developed an exemplary record of community service and upstanding behavior toward others. He volunteers as a teacher in the prison's Education Department, teaching classes (often to standing room only crowds) on subjects ranging from entrepreneurship to money or stress management. Thus far, he has taught more than 100 inmates. Mr. Lindberg also coaches and mentors individual inmates in maintaining a positive mental attitude and preparing for re-entry. The glowing letters of support from his fellow inmates attached to this motion testify to the impact Mr. Lindberg has had on their lives since he came to the facility. *See* **Exhibit C** (Letters of Support).[13]

---

[12] The "re-conviction" rate "limits recidivism to the first-conviction during" a "two year follow-up period." *Id.* at 13. The Sentencing Commission also calculated a "primary recidivism" rate, which includes not only convictions but also (1) re-arrests that had not led to a conviction as of the time of the report and (2) supervision revocations. *Id.* at 12–13. The primary recidivism rate for first-time offenders with no earlier arrests was 6.8 percent. *Id.* at 14.

[13] In instances where the handwriting on these letters is illegible, counsel has also included a typed copy of the inmate's letter for the Court's convenience.

Beyond these efforts, he works 160 hours a month as an orderly (cleaning the bathrooms, floors, walls, and classrooms) and painter in the Education Department, as well as an education clerk. Finally, Mr. Lindberg has enrolled in—and passed—3 of the 5 tests needed to complete a housekeeping apprenticeship program. He is, in short, a model prisoner, which should support granting his motion. *See United States v. Trotman*, 837 F. App'x 187, 188 (4th Cir. 2020) (noting that an analysis of § 3553(a) factors properly includes a defendant's post-sentencing conduct).

Mr. Lindberg proposes that his release be governed by the same home-confinement conditions ordered during his pretrial and post-trial releases—including 24-hour GPS monitoring—to reduce "recidivism [risk] and maximize public safety."[14] Mr. Lindberg has already proved that allowing him to be outside federal prison under these conditions creates no risk to the public because he abided by them without issue. In home confinement, Mr. Lindberg would live apart from and not interact with any "criminal associates" who were convicted in his case. Finally, GPS monitoring would ensure that Mr. Lindberg's only destinations outside the home would be those preapproved by this Court for the limited purposes described in this motion.

### D.     Section 3582(c)(1)(A)'s exhaustion requirement has either been met or should be waived as futile.

Section 3582 requires that a defendant exhaust his administrative remedies, including any BOP request processes and appeals, before moving for relief in the district court. Mr. Lindberg has met that requirement in this case.

On April 30, 2021, Mr. Lindberg submitted a formal request for transfer to home confinement based on COVID-19 risk factors, his father's passing, and his need to attend the trial in the North Carolina case. BOP denied that request in writing on May 3.

That same month, Mr. Lindberg also spoke to the Warden of the Alabama facility where he

---

[14] If the Court is unwilling to grant Mr. Lindberg probationary relief for the entire day while the trial is pending, Mr. Lindberg is willing—despite concern as to possible threats to his ability to communicate with counsel and participate in trial preparation after and before court hours—to reside in the Wake County Jail at night after returning from the memorial service for his father.

13

is housed about the possibility of attending the trial. The Warden declined to allow Mr. Lindberg to attend the trial and instead suggested that he would need approval from the United States Attorney General. And in early May, Mr. Lindberg was also told that it was impossible for him to receive a furlough to attend his father's memorial service in California.

Mr. Lindberg submitted another request just four days ago, this time through Corrlinks, again requesting a furlough to attend the North Carolina trial and his father's memorial service. To date, he has received no response. Unfortunately, given the short window between his application and the date of the memorial service, BOP likely will not process this last request and any subsequent appeal in time to allow Mr. Lindberg to attend that event or challenge any denial in court. The same is true of any appeal from BOP's denial of his earlier requests.

These efforts satisfy Section 3582's exhaustion requirement.

Moreover, even if Mr. Lindberg's efforts were not sufficient to meet the exhaustion requirement, it should be waived as futile. *See Totaro v. Warden Fort Dix FCI*, 742 F. App'x 596, 598 (3d Cir. 2018) ("[E]xhaustion may be excused when the purposes of exhaustion would not be served … by requiring [the prisoner] to exhaust his administrative remedies." (internal quotation marks omitted)); *United States v. Powell*, 94 Cr. 316, ECF No. 98 (D.D.C. Mar. 28, 2020) (waiving exhaustion under § 3582(c)(1)(A) when the court found that "requiring defendant to first seek relief through the [BOP] administrative process would be futile").

"[T]he fundamental premise of § 3582(c)(1)(A)'s exhaustion requirement is to give the BOP the first opportunity to consider whether release is appropriate." *United States v. Iezzi*, No. 2:17-CR-00157, 2020 WL 4726582, at *6 (W.D. Pa. Aug. 14, 2020). "By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction; however, courts have waived this requirement when enforcing it would prove futile." *United States v. Chandler*, No. CR 3:15MJ122 (DJN), 2020 WL 6139945, at *3 (E.D. Va. Oct. 19, 2020).

In examining requests for a sentence reduction under § 3582(c) "courts should be flexible in determining whether exhaustion should be excused[.]" *United States v. Perez*, 451 F. Supp. 3d

14

288, 292 (S.D.N.Y. 2020).

> 'Even where exhaustion is seemingly mandated by statute…, the requirement is not absolute.' There are three circumstances where failure to exhaust may be excused. 'First, exhaustion may be unnecessary where it would be futile, either because agency decision makers are biased or because the agency has already determined the issue.' Second, 'exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief.' Third, 'exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice.'

*Id.*, at 291–92 (quoting *Washington v. Barr*, 925 F.3 d 109, 118-19 (2d Cir. 2019).

If this Court determines Mr. Lindberg has not exhausted his administrative remedies, Mr. Lindberg's situation supports waiving this requirement as futile. The process in place for filing a written request or seeking approval from the Attorney General cannot be completed before his father's funeral or within sufficient time for Mr. Lindberg to meaningfully prepare for and participate in the upcoming civil case.

## CONCLUSION

Zoom is no substitute for in-person testimony or family events. To protect his right to defend himself and join his family in mourning the loss of his father, Mr. Lindberg therefore asks this Court to exercise its authority under Section 3582(c) to make a slight modification to his sentence.

Respectfully submitted,

/s/ Elizabeth F. Greene
Elizabeth F. Greene (N.C. Bar No. 26730)
Flannery | Georgalis LLC
212 S. Tryon Street, Suite 1410
Charlotte, NC 28281
Tel/Fax: (704) 949-2252
egreene@flannerygeorgalis.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2021, I electronically filed the motion above with the Clerk of Court using the CM/ECF system, which will send notification to counsel of record.

/s/ Elizabeth F. Greene
Elizabeth F. Greene (N.C. Bar No. 26730)