**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4470**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

GREG E. LINDBERG,

> Defendant - Appellant.

------------------------------

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

> Amicus Supporting Appellant.

**No. 20-4473**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

JOHN D. GRAY,

> Defendant - Appellant.

------------------------------

NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS,

> Amicus Supporting Appellant.

Appeals from the United States District Court for the Western District of North Carolina, at Statesville. Max O. Cogburn, Jr., District Judge. (5:19-cr-00022-MOC-DSC-1; 5:19-cr-MOC-DSC-2)

───────────────

Argued: December 8, 2021                    Decided: June 29, 2022

───────────────

Before GREGORY, Chief Judge, TRAXLER, and FLOYD, Senior Circuit Judges.

───────────────

Vacated and remanded for a new trial by published opinion. Chief Judge Gregory wrote the opinion, in which Senior Judge Traxler and Senior Judge Floyd joined. Senior Judge Traxler wrote a separate opinion concurring in the judgment.

───────────────

**ARGUED:** Howard Robert Rubin, KATTEN MUCHIN ROSENMAN LLP, Washington, D.C., for Appellants. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** David A. Brown, Sr., FLANNERY GEORGALIS LLC, Charlotte, North Carolina, for Appellant John Gray. E. Joshua Rosenkranz, Joseph R. Kolker, ORRICK HERRINGTON & SUTCLIFFE LLP, New York, New York; Robert T. Smith, Rajesh R. Srinivasan, Washington, D.C., Brandon N. McCarthy, Rachel M. Riley, KATTEN MUCHIN ROSENMAN LLP, Dallas, Texas, for Appellant Greg E. Lindberg. William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. David B. Smith, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, Washington, D.C.; Henry W. Asbill, Veena Viswanatha, Sarah N. Davis, Joshua L. Richardson, BUCKLEY LLP, Washington, D.C., for Amicus Curiae.

───────────────

2

GREGORY, Chief Judge:

Defendants Greg E. Lindberg and John D. Gray were convicted of honest services fraud and federal funds bribery in connection with a series of payments and offers of payment, in the form of campaign contributions, made to Mike Causey, the elected Insurance Commissioner for North Carolina. The jury found that these payments were made in exchange for Causey assigning a different Deputy Commissioner to oversee the affairs of Lindberg's insurance companies. Lindberg and Gray now challenge the district court's jury instructions and the sufficiency of the evidence supporting their convictions.

Because we find that the district court erred in instructing the jury on the elements of Count One, that the error is not harmless, and that the instructional error on Count One improperly infected the jury's consideration of Count Two, we vacate and remand. We find, however, that the district court did not err in declining to read the "official act" requirement of 18 U.S.C. § 201 into 18 U.S.C. § 666.

I.

Greg E. Lindberg served as chairman of Eli Global LLC, an investment company, and as owner of Global Bankers Insurance Group, an insurance management company, during the relevant period from April 2017 to August 2018. Lindberg owns several insurance businesses subject to regulation in North Carolina. John D. Gray worked as a consultant for Lindberg during the relevant period. Lindberg and Gray ("defendants") were convicted of conspiring to commit honest services wire fraud and federal funds bribery for offering millions of dollars in campaign contributions to Mike Causey, the Commissioner

3

of the North Carolina Department of Insurance, in exchange for the reassignment of a Senior Deputy Commissioner assigned to review Lindberg's insurance companies.

The North Carolina Department of Insurance oversees insurance companies doing business in North Carolina to protect consumers. One way the Department of Insurance does this is by monitoring "affiliated investments," which are investments made by one company in another company within a group of companies under common ownership. Insurance regulators monitor affiliated investments because they are seen as illiquid and, therefore, can limit the ability of an insurance company to pay policyholders. Prior to 2019, North Carolina did not statutorily limit the percent of affiliate investments of regulated companies, but the Department of Insurance had the authority to impose such limits.

In November 2016, Mike Causey was elected as North Carolina's Commissioner of Insurance. Lindberg had publicly supported Causey's opponent Wayne Goodwin in the race. When Causey took over, he promoted Jacqueline Obusek, a twenty-year veteran of the Department, as Senior Deputy Commissioner. Obusek had expressed concern with some of Lindberg's business practices as early as March 2015. Specifically, Obusek was concerned about the high percentage of affiliate investments relied on by Lindberg's companies.

Several weeks after he was elected, Causey was scheduled to meet with Lindberg and other members of Eli Global's leadership. Prior to the meeting, he received a phone call from his campaign treasurer notifying him that he had received a $10,000 donation from Lindberg. Causey testified that he thought the contribution was "unusual" both

4

because of the size and the timing, and he decided to return the donation.  J.A. 233–34.  At the meeting, Gray explained that Eli Global was in the process of purchasing another insurance company based in Michigan and asked Causey to call his counterpart in Michigan "to put in a positive word."  J.A. 237.  Causey agreed and made the phone call. Causey testified at trial that Gray then called him to state that Lindberg had donated $500,000 to the North Carolina Republican Party ("NCGOP") with $110,000 to be sent to Causey's campaign and that Gray and Lindberg wanted to host a fundraiser for Causey in December.  J.A. 238–40.  Causey testified that he called his fundraising agent to say that he was "not going to have a fundraiser in December" and he was "not taking [the] $110,000."  J.A. 240.[1]

Causey later reached out to the Federal Bureau of Investigation ("FBI") to express concerns about these offers of donations and agreed to cooperate with an FBI investigation into Lindberg and his associates.  During the course of this investigation, Causey recorded telephone conversations with Gray and John Palermo, Vice President of Special Projects at Eli Global, and recorded meetings with Lindberg, Gray, and Palermo over the course of several months from about January to August 2018.  During these meetings, Lindberg and Gray expressed their dissatisfaction with Obusek.  They urged Causey to hire Palermo and task him with overseeing Lindberg's companies.  When Causey expressed his concern about the negative public response he would receive by hiring Palermo, Lindberg instead asked that

---

[1] Defendants dispute that they donated money to the NCGOP with a portion to be sent to Causey's campaign, and there is no record of an attempted transfer.  But there is evidence of an offer to host a fundraiser.

5

Causey replace Obusek with Debbie Walker, another employee in the Department of Insurance. Over the course of several meetings, they discussed Lindberg creating an independent expenditure committee and donating substantial amounts, between $500,000 and $2,000,000 to Causey's reelection campaign. At a final meeting on July 25, 2018, Gray stated that "if we have your assurance and a date certain by which the Debbie Walker staff realignment can occur, then the entirety of that [$]500,000 will go right in your account." J.A. 2101. Causey then agreed to complete the staff change by the end of August, after which Lindberg stated, "Get that check over to Mike [Causey] now. And then by the end of August[,] we'll get you the balance. And we get Debbie Walker." J.A. 2101. The day after the meeting, Causey's campaign received $230,000 from the NCGOP. In total, Causey received $250,000 in donations funneled through the party.

Following the conclusion of the investigation, the defendants were each charged in March 2019 with one count of conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349, and one count of federal funds bribery and aiding and abetting the same, in violation of 18 U.S.C. §§ 666(a)(2) and 2. Defendants pleaded not guilty, and a jury trial was held from February 18 to March 5, 2020.

At trial, defendants and the United States both objected to the district court's proposed jury instruction defining "official act" to include the "removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner." J.A. 1648, 1678, 1881. Both parties agreed that the issue of what qualifies as an "official act" should be left for the jury. Defendants also objected to the district court's description of the elements of federal funds bribery and argued that it should include a requirement that "something of value is given

6

to a public official in exchange for an explicit promise to perform an official act."  J.A. 1683.  The district court denied both objections.  Further, the district court prevented defendants from arguing or putting on evidence to show that Obusek's reassignment was not an "official act."

After three days of deliberation, Gray and Lindberg were convicted on both counts.[2] Defendants renewed their Motions for Judgment of Acquittal and for New Trial, which were denied, and filed a timely notice of appeal.  Defendant Gray was sentenced to a term of imprisonment of thirty months, and Lindberg was sentenced to a term of imprisonment of eighty-seven months.[3]

## II.

### A.  Count One:  Honest Services Fraud

We turn first to the question of whether the district court erred when, in instructing the jury on Count One, it stated in no uncertain terms "that the removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act." J.A. 1881.  This Court reviews "whether a jury instruction incorrectly stated the law de novo."  *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018).

---

[2] A third defendant who is not part of this appeal was acquitted.

[3] Another co-defendant who pled guilty before trial received no prison time.

7

In *McDonnell v. United States*, 579 U.S. 550, 580 (2016), the Supreme Court "defined honest services fraud[4] . . . with reference to § 201 of the federal bribery statute."[5] In particular, the Court imported the "official act" requirement found in 18 U.S.C. § 201 and found that "the [g]overnment was required to show that Governor McDonnell committed (or agreed to commit) an 'official act' in exchange for the loans and gifts." *McDonnell*, 579 U.S. at 555.

Section 201(a)(3) defines the term "official act" to mean

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

---

[4] The honest services fraud statute states in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

[5] The Supreme Court did so because "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201." *McDonnell*, 579 U.S. at 562. Similarly, the *McDonnell* Court also imported the "official act" requirement into Hobbs Act extortion as agreed to by the parties. *Id.* at 562–63.

18 U.S.C. § 201(a)(3).  At issue in *McDonnell* was the disagreement between the parties as to the proper reach of this definition.  *McDonnell*, 579 U.S. at 566–67.  The *McDonnell* Court examined the term "official act" in § 201(a)(3) and found that it did not, as urged by the government, apply to almost any action taken by an official within the ambit of his office.  *Id.*  Rather, the Supreme Court narrowed the definition of the term:

> In sum, an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy."  The "question, matter, cause, suit, proceeding or controversy" must involve a *formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.*  It must also be something *specific and focused* that is "pending" or "may by law be brought" before a public official.  To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so.

*McDonnell*, 579 U.S. at 574 (emphases added).  Thus, the *McDonnell* Court avoided several constitutional concerns raised by Governor McDonnell, including vagueness and federalism concerns as well as concerns about the impact of a broad reading of the statute on the "basic compact underlying representative government."  *Id.* at 574–77.  The Supreme Court then provided examples of conduct that would qualify as an "official act."

> For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an "official act."  A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on *another* official to perform an "official act."  In addition, if a public official uses his official position to provide advice to another official, knowing and intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of § 201(a)(3).

*Id.* at 572.  And it also provided examples of conduct that does not qualify:

9

Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information, however, does not qualify as a decision or action on the pending question whether to initiate the study. Simply expressing support for the research study at a meeting, event, or call—or sending a subordinate to such a meeting, event, or call—similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an "official act." Otherwise, if every action somehow related to the research study were an "official act," the requirement that the public official make a decision or take an action on that study, or agree to do so, would be meaningless.

*Id.* at 573.

Here, although the district court properly defined the term "official act" according

to the directive of *McDonnell*,[6] it then instructed the jury in no uncertain terms "that the

---

[6] The court instructed the jury that:

The term "official act" means any decision or action on any question or matter, which at any time may be pending, or which may by law be brought before any public official in such official's official capacity, or in such official's place of trust. The question or matter must be specific and focused and involve a formal exercise of governmental power similar in nature to a lawsuit, hearing, or administrative determination.

A decision or action on a qualifying step for a question or a matter would qualify as an official act. An official act also includes a public official exerting pressure on another official to perform an official act, or providing advice to another official, knowing or intending that such advice will form the basis for an official act by another official.

. . . . [M]erely setting up a meeting, hosting an event, or talking to another official, without more, would not constitute an official act. Still, you may consider evidence that a defendant requested a meeting, hosted an event, talked to another official, expressed support, or sent a subordinate to accomplish the foregoing as evidence of acting with intent to influence an official act.

J.A. 1880–81.

10

removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act," J.A. 1881.  In doing so, we find that the district court impermissibly took an element of the crime out of the hands of the jury and violated the defendant's Fifth and Sixth Amendment rights.

Criminal convictions must "rest upon a jury determination that the defendant is guilty of *every element* of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (emphasis added); *see also id.* at 511 ("The Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged.").  The right to a jury trial is a fundamental aspect of our judicial system.  *See Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *see also Gaudin*, 515 U.S. at 510–11 ("[The right to a jury trial] was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties."  (citation omitted)).  And it extends to all the elements of a crime with which a defendant is charged, including mixed questions of law and fact. *Gaudin*, 515 U.S. at 513 (discussing the "historical and constitutionally guaranteed right of criminal defendants to demand that the jury decide guilt or innocence on every issue, which includes application of the law to the facts").  Indeed, in *Gaudin*, the Supreme Court expressly rejected the government's argument that the right to a jury trial "actually applies to *only the factual components* of the essential elements."  515 U.S. at 511–12; *see also id.* at 512 ("If [the government's position] were true, the lawbooks would be full of cases, regarding materiality and innumerable other "mixed-law-and-fact" issues, in which the criminal jury was required to come forth with "findings of fact" pertaining to each of the

11

essential elements, leaving it to the judge to apply the law to those facts and render the ultimate verdict of 'guilty' or 'not guilty.'").  Thus, while "the judge must instruct the jury on *the law applicable* to the issues raised at trial. . . .[,] the next two steps are *strictly for the jury*:  (1) determining the facts as to each element of the crime, and (2) applying the law as instructed by the judge to those facts."  *United States v. Johnson*, 71 F.3d 139, 142 (4th Cir. 1995) (emphases added), *abrogated on other grounds by United States v. Medley*, 972 F.3d 399, 412 (4th Cir. 2020) (en banc); *see also United States v. Ramirez-Castillo*, 748 F.3d 205, 213 (4th Cir. 2014).

The district court acknowledged the existence of the constitutional principles raised in *Gaudin* but rejected their application to this case because it found that the question of whether the removal and replacement of a Senior Deputy Commissioner is an official act is a "matter of law."  J.A. 85–90.  And the court found that it had properly "engaged in an exercise of statutory construction [in] determining that, as a matter of <u>law</u>, the charged offense, *i.e.*, 'the removal and replacement of a Senior Deputy Commissioner by the Commissioner <u>would</u> constitute an official act.'"  J.A. 90 (quoting J.A. 1881).

The district court erred, however, in interpreting the "official act" inquiry to be a pure question of law.  *See* J.A. 89–90.  First, the court misinterpreted *McDonnell* as supporting this conclusion.  Specifically, the court pointed to *McDonnell*'s statements that "a typical meeting, call, or event arranged by a public official . . . <u>does not</u> qualify as a

12

'question' or 'matter'"[7] and that "a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an 'official act,'" J.A. 88 (quoting *McDonnell*, 579 U.S. 569, 572), and found that "[t]his discussion makes clear that, as a matter of statutory interpretation, some actions categorically qualify as official acts, while other actions categorically do not qualify as official acts," *id.*

But the Supreme Court was clear in *McDonnell* that "[i]t is *up to the jury*, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." 579 U.S. at 572–73 (first emphasis added). And the *McDonnell* Court clearly considered it the province of the jury to determine *what constitutes an official act*. *See id.* at 577–80. In fact, *McDonnell* provides a detailed framework for jury instructions on the meaning of "official act": First, the jury instructions must "adequately explain to the jury how to identify the 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 577. Second, "the instructions [should] inform the jury that the 'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective . . . [and] must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate the research studies." *Id.* at 578–79. Third, the instructions should inform the jury that "it ha[s] to find that [the defendant] made a decision or took an action—

---

[7] Whether a "typical meeting, call, or event" qualifies as a question or matter is only the first step of the "official act" inquiry in *McDonnell*. 579 U.S. 569–70. "[T]he next step is to determine whether arranging a meeting, contacting another official, or hosting an event may qualify as a 'decision or action' *on* a different question or matter." *Id.*

13

or agreed to do so—*on* the identified 'question, matter, cause, suit, proceeding or controversy' . . . . [and] that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 579. Thus, although the *McDonnell* Court explained that some conduct cannot constitutionally constitute an "official act" and provided examples of conduct that would qualify under the facts of that case, the Court clearly envisioned that it was the role of the jury to determine whether conduct constitutes an official act.

The district court also relied on two out-of-circuit cases to support its conclusion, but both comparisons are unavailing. In *United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019), the Third Circuit considered the honest services fraud conviction of a congressman and "conclude[d]" that Fattah's decision to hire a lobbyist's girlfriend as a congressional staffer "was an official act." *Id.* at 156–57. The district court read *Fattah* as "mak[ing] clear that the alleged action in this case—the removal and replacement of a Senior Deputy Commissioner by the Commissioner—categorically qualifies as an official act. . . . as a matter of law." J.A. 88–89. But the issue presented to the Third Circuit in *Fattah* is readily distinguishable from the one we consider here. At issue in *Fattah* were instructions on the definition of "official act" given to the jury prior to the Supreme Court's decision in *McDonnell*. *Fattah*, 914 F.3d at 152. Although the district court in *Fattah* conceded that "its instructions were incomplete and erroneous" in light of *McDonnell*, it did not set aside the defendants' convictions because it found "that the erroneous jury instructions had not influenced the verdict on the bribery counts." *Id.* The Third Circuit, however, disagreed. *Id.* It found that Fattah's hiring of a lobbyist's girlfriend constituted an official act within

14

*McDonnell*'s framework, but it vacated the defendants' convictions because it found that the jury may have relied on other conduct, including the congressman's scheduling of a meeting between a lobbyist and the U.S. Trade Representative, which "*McDonnell* now makes clear were unofficial" acts. *Id.* at 154, 157, 159 ("In light of the erroneous instructions, and because only one category clearly qualifies as an 'official act,' the jury's deliberations were fraught with the potential for *McDonnell* error."). At no point did the Third Circuit contend that a district court *may instruct the jury as a matter of law* that certain conduct categorically qualifies as an official act. Rather, the question the *Fattah* court considered was whether "the [girlfriend's] hiring was the *only* category of actions *that the jury relied on* when it found that Fattah performed an official act." *Id.* at 157 (second emphasis added). Thus, although the *Fattah* court spoke in outwardly categorical terms, its "official act" analysis seems more properly classified as part of its harmless error review. *See id.* (rejecting the government's argument that "because the [girlfriend's] hiring was an official act, the effect of the erroneous jury instructions could be no more than harmless").

The district court also found support for its determination in the Eleventh Circuit case *United States v. Hastie*, 854 F.3d 1298 (11th Cir. 2017). In *Hastie*, the court considered a defendant's conviction for violating the Driver's Privacy Protection Act, 18 U.S.C. § 2721(a), which prohibits the disclosure of "personal information," as defined in 18 U.S.C. § 2725(3), obtained by a state department of motor vehicles and its employees. *Id.* at 1301. The Eleventh Circuit found that the district court had not erred in instructing the jury that "[t]he term 'personal information' means information that identifies an

15

individual, including an individual's email address" because "the definition of 'personal information' is a matter of statutory interpretation, which makes it a question of law." *Id.* at 1301, 1305–06. The *Hastie* court clarified that "the district court would have erred[, however,] if it had instructed the jury that the emails *provided by Ms. Hastie* constitute 'personal information.'" *Id.* at 1306. Rather, the Eleventh Circuit found that the district court had merely given an example of what constituted "personal information" and "provided the jury a definition at a higher level of generality." *Id.* 1306–07 (nevertheless warning against a definition "so specific that it essentially directs the verdict").[8] Here, however, the district court did not merely provide an example of conduct that would constitute an official act as part of its explanation of the law or merely speak in generic terms; it told the jury that the conduct at issue "*[i]n this case* . . . would constitute an official act."[9] J.A. 1881 (emphasis added). It thus directed the verdict on that element.

---

[8] We also note the presence of a forceful dissent in *Hastie* arguing that "[w]hether email addresses are 'personal information' may properly be characterized as a mixed question of law and fact" and, therefore, that the jury instruction at issue in that case violated the defendant's Sixth Amendment rights. *Id.* at 1307–12 (Jordan, J., dissenting). In any case, we are, of course, not bound by cases from our sister circuits.

[9] Nor did the district court misspeak. The district court repeatedly stated at trial that it planned to instruct the jury that the conduct at issue in this case categorically qualified as an official act. *E.g.*, J.A. 1444 ("I'm going to tell the jury that the movement of people and moving out a director would be an official act."); J.A. 1564 ("I'm going to tell the jury during the charge it is an official act"); *see also* J.A. 1455–56 ("An official taking $2 million in campaign contributions or in the hip pocket to do an act and remove a regulator to a regulator perceived more favorable by the person offering the money, in this Court's opinion, is clearly an official act. . . . Right now it's pretty clear to me that . . . if [the jury] find[s] these facts occurred . . . that would be, as a matter of law, an official act.").

16

Having determined that the district court improperly instructed the jury on the "official act" element, we must now determine whether the error requires vacating defendants' convictions. Defendants argue that the district court's error is structural and, therefore, that their convictions must be vacated. The government, however, argues that the proper standard is harmless-error review and that any error here is harmless. Since we find that the district court's error is not harmless, we find that defendants' convictions on Count One must be vacated regardless of the proper standard to be applied.

"A constitutional error is harmless when it appears 'beyond a reasonable doubt that the error . . . did *not* contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 2 (1999) (emphasis added) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The purpose of such harmless error review is to prevent the "setting aside [of] convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman*, 386 U.S. at 22. And, therefore, it seeks to balance "society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made." *Neder*, 527 U.S. at 18 (quoting *Connecticut v. Johnson*, 460 U.S. 73, 86 (1983)). Thus, we have found an error harmless "where a defendant did not, and apparently could not, bring forth facts contesting the omitted element." *Id.* at 19. But, if after "conduct[ing] a thorough examination of the record. . . . the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, *where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding*—it should not find the error harmless." *Id.* (emphasis added).

17

Here, we cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error. Unlike the defendant in *Neder* who "did not, and apparently could not, bring forth facts contesting the disputed element," the defendants here contested "that the removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act," J.A. 1881, and sought to present evidence on the matter, *see* J.A. 1549–50. For example, defendants were prevented from arguing to the jury that "task reassignment is not similar to 'a lawsuit, hearing, or administrative determination'" and, therefore, not an official act. Appellant's Br. 24; *see also* J.A. 1881. And the district court prevented defendants from cross-examining a former employee of the North Carolina Department of Insurance for the purpose of arguing that "this was not an official act."[10] *See* J.A. 1564.

Thus, we find that the instructional error was not harmless as to Count One and, therefore, that defendants' verdicts on Count One must be vacated.

## B.  Count Two: Federal Funds Bribery

We now turn to consideration of defendants' convictions of federal funds bribery under Count Two. Under § 666(a)(2), the jury was required to find that defendants had

> corruptly give[n], offer[ed], or agree[d] to give anything of value to any person, with the intent to influence or reward an agent of a state government, or any agency thereof, in connection with any business, transaction, or series

---

[10] After an offer of proof, the district court stated that the relevant testimony "can come into evidence in front of the jury as part of something" like "your entrapment defense or any other part of your defense." J.A. 1563. But, the district court explained, "[t]he thing I'm not going to allow is that – it's not going to do you any good to get up there and argue this was not an official act when I'm going to tell the jury during the charge it is an official act." *Id.* at 1564.

of transactions of such organization, government or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2).

### i.     Improperly Infected

The district court first instructed the jury on Count One, including providing its erroneous instruction on the official act element, before turning to the elements of Count Two.  Thus, having been instructed "that the removal or replacement of a [S]enior [D]eputy [C]ommissioner by the [C]ommissioner would constitute an official act," J.A. 1881, the jury was then instructed to consider whether such conduct was "in connection with *any business*, transaction, or series of transactions" of a government agency, J.A. 1883 (emphasis added).

After reviewing the record, we are not "confident that [the erroneous instruction on Count One] did not play any role in the jury's verdict" on Count Two.  *Cf. Connecticut*, 460 U.S. at 87 ("[I]f the erroneous instruction was given in connection with an offense for which the defendant was acquitted *and if the instruction had no bearing on the offense for which he was convicted*, it would be appropriate to find the error harmless." (emphasis added)).

The government protests that the verdict on Count Two cannot have been infected by the court's instructions on Count One because the court "separately instructed the jury on the elements of the [federal funds] bribery offense," Appellee's Resp. Br. 61, and "juries are presumed to follow the judge's instructions," *United States v. Burfoot*, 899 F.3d 326, 342 (4th Cir. 2018).  Indeed, the court did instruct the jury that:  "Each charge and the

19

evidence pertaining to it should be considered separately.  The fact that you may find a defendant guilty or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged."  J.A. 1870.  But the court's instructions on each count were not as separate as the government contends.  For example, the court provided instructions on both counts at the same time using the term "official act":

> As I have explained, *Count One and Count Two* charge that the defendants gave, offered, or promised contributions to support the [C]ommissioner's 2020 campaign for reelection in exchange for the removal and replacement of the [S]enior [D]eputy [C]ommissioner in charge of overseeing the regulatory review of Defendant Lindberg's insurance companies.
>
> The solicitation or acceptance by an elected public official of a campaign contribution, the offer of money through an Independent Expenditure Committee, and the giving or offering of a campaign contribution to an elected public official by a donor do not, in and of themselves, constitute a federal crime even though the donor has business pending before the elected public official, and even if the contribution is made shortly before or after the public official takes *official actions* favorable to the donor.  They are also not bribes if they're given with only a vague expectation of some future benefit. Instead, the government must prove they were offered, given, or promised in exchange for a specific *official act* by the [C]ommissioner.

J.A. 1881–82 (emphasis added).  And, although both counts involve bribery,[11] the court twice used the term "official act" when referring generally to "bribery":

> In order to satisfy the *elements of bribery* for this case, the public official need not actually perform an *official act*, or even intend to do so.  When the defendant is a person who is *charged with paying a bribe*, it is sufficient if the defendant intends or solicits the public official to perform an *official act* in exchange for a thing of value.

J.A. 1881 (emphases added).

---

[11] Notably, the term "bribery" makes up a part of the name of the offense charged in Count 2—federal funds *bribery*—but not of the offense charged in Count 1—honest services fraud.

20

> It is not a defense to the *crime of bribery* that the offer or promise of anything of value was made to the public official to influence an *official act* which is actually lawful, desirable, or even beneficial to the public.

J.A. 1887 (emphases added). The court's erroneous "official act" instruction may, therefore, have effortlessly bled into the jury's consideration of Count Two—federal funds bribery.

Further, even aside from these overlapping instructions, the jury's consideration of Count Two may have been infected by the erroneous "official act" instruction if the jury interpreted, as some of our sister circuits have, the "any business" requirement to be broader than the "official act" requirement. *See generally United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) ("[Section 666] is more expansive than § 201."). In other words, the jury may have found defendants guilty on Count Two because it *felt compelled* to find that the "any business, transaction, or series of transactions" element of Count Two was *necessarily met* based on the improper "official act" instruction on Count One. In *United States v. Ng Lap Seng*, 934 F.3d 110, 139 (2d Cir. 2019), the Second Circuit found that the district court had improperly instructed the jury on § 666(a)(2) by including an "official act" requirement. The *Ng Lap Seng* court, however, found that the instructional error was harmless because the jury's verdict on § 666(a)(2) was based "on instructions requiring it to find proved *more than the law requires*." *Id.* ("Th[e] error, however, was harmless beyond a reasonable doubt because the jury, having found more proved than required by law—*i.e.*, the intent to influence an "official act"—it certainly would have found Ng guilty on proper instructions omitting that inapplicable standard"). Here, by contrast, the jury was required by the district court to find that an "official act" was present

21

and, therefore, may have found that the "any business" requirement of § 666(a)(2) was also met if it interpreted the former to require more than the latter.

Thus, we cannot find that the erroneous instruction on Count One "had no bearing on" defendants' convictions under Count Two. *See Connecticut*, 460 U.S. at 87. Because we are not convinced beyond a reasonable doubt that the erroneous jury instruction on Count One "did not contribute to the verdict[s] obtained" on Count Two, we also vacate defendants' convictions under Count Two. *See Neder*, 527 U.S. at 2 (quoting *Chapman*, 366 U.S. at 24).

### ii.    "Official Act" Instruction

Defendants also argue that the district court erred because it failed to instruct the jury that an "official act," as defined by the Supreme Court, is an element of federal funds bribery. We review "whether a jury instruction incorrectly stated the law de novo." *Miltier*, 882 F.3d at 89.

The core of defendants' argument is that the holding and reasoning of *McDonnell* require that prosecutions under 18 U.S.C. § 666(a)(2) are limited to "official acts."[12] Specifically, defendants protest that the language of § 666 is "exceedingly broad" and would, therefore, "capture all sorts of commonplace interactions between the public and elected officials" absent "some limiting principle." Appellant's Opening Br. 26–27. Since the *McDonnell* Court "avoided invalidating [the honest-services fraud statute and extortion under the Hobbs Act] on constitutional grounds by reading them to embrace 18 U.S.C.

---

[12] Unlike defendants' objection to the requested instruction on Count One, the government did not join defendants in this objection. *See* J.A. 1683.

22

§ 201's definition of 'official act,'" defendants argue that the district court should have similarly limited § 666 here. *Id.* at 27. Further, defendants stress that reading in "official act" to restrict § 666(a)(2) is supported by the text, history, and purpose of the Act. *Id.* at 27–28.

As an initial matter, we note that none of our sister circuits have found occasion to read the official act requirement of 18 U.S.C. § 201 into 18 U.S.C. § 666. *United States v. Roberson*, 998 F.3d 1237, 1247 (11th Cir. 2021) ("The only Circuit Courts of Appeals to directly consider the issue in published cases post-*McDonnell*, the Second and Sixth, have not imported an "official act" requirement into section 666. . . . Consistent with the views of our sister Circuits, . . . we do not read into section 666 limitations unsupported by the language of the statute."), *cert. denied*, 142 S. Ct. 1109 (2022); *see also Ng Lap Seng*, 934 F.3d at 133; *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018).[13] For example, in *Ng Lap Seng*, the Second Circuit found that the district court erred when it improperly instructed the jury that an "official act" was required to convict the defendant under § 666. 934 F.3d at 139.

In declining to import § 201's "official act" definitional provision into § 666, our sister circuits have stressed that the text of § 666 does not include the term "official act."

---

[13] Our sister circuits have been similarly hesitant to extend *McDonnell* to corruption statutes other than § 666. *See United States v. Reed*, 908 F.3d 102, 113 (5th Cir. 2018) ("We pause to observe that our holding here is consistent with our fellow circuits' reluctance to extend *McDonnell* beyond the context of honest services fraud and the bribery statute, even where prosecutions involved local or state government officials."); *United States v. Ferriero*, 866 F.3d 107, 128 (3d Cir. 2017) (rejecting defendant's argument that the New Jersey bribery statute at issue should be limited by *McDonnell* and stating that "[a]lthough the statutes in *McDonnell* and here both involve bribery, we see no reason for transplanting the conclusions in *McDonnell* that stem solely from the Court's application of general statutory-construction principles to the particular statute at issue in that case").

*See id.* at 133 ("Nowhere does § 666 mention 'official acts.'"); *Roberson*, 998 F.3d at 1247 (noting that "[t]he phrase 'official act' is not in 18 U.S.C. § 666" and that reading "official act" into § 666 is "unsupported by the language of the statute"); *cf. Porter*, 886 F.3d at 565 ("In *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than [§ 666]."). It is axiomatic that, in statutory construction cases, "our starting point must be the language employed by Congress." *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979)). Thus, given the absence of any reference to the term "official act" in 18 U.S.C. § 666, we find no cause to depart from the consensus of our good colleagues in declining to import *McDonnell*'s interpretation of a term found in a separate statute.

Defendants maintain that the absence of the term "official act" in the text of 18 U.S.C. § 666 is irrelevant because both the Hobbs Act and the honest-services fraud statute similarly do not reference the term "official act" and yet the *McDonnell* Court "read those statutes as including an 'official act' requirement." Appellant's Opening Br. at 36.

But, first, defendants "misunderstand[] the procedural posture in *McDonnell*." *Roberson*, 998 F.3d at 1246 n.12. *McDonnell* did not hold that an "official act" was a requirement of either Hobbs Act extortion or honest services fraud. Rather, the Court interpreted the meaning of the term "official act" in the context of a conviction under those two statutes because *the parties had agreed* to define the relevant statutes with reference to the "official act" requirement found in 18 U.S.C. § 201. *See McDonnell*, 579 U.S. at 562 ("The parties agreed that they would define honest services fraud with reference to the

24

federal bribery statute, 18 U.S.C. § 201."); *id.* at 562– 63 ("The parties also agreed that . . . they would use the definition of 'official act' found in the federal bribery statute" to define Hobbs Act extortion under color of official right). In other words, *McDonnell*'s holding was not that Hobbs Act extortion and honest services fraud were limited to "official act[s]" (as defined in 18 U.S.C. § 201) but that—*assuming such a limitation*—the government's proposed definition of "official act" was too broad.

Second, the structure and text of the Hobbs Act and the honest services fraud statute differ fundamentally from federal funds bribery. The honest services fraud statute proscribes "any scheme or artifice to defraud" another of "the intangible right of honest services." 18 U.S.C. §§ 1341, 1346. Although the statute does not speak in terms of *quids* and *quos*, the Supreme Court has interpreted the statute narrowly to forbid only "fraudulent schemes to deprive another of honest services *through bribes or kickbacks*." *Skilling v. United States*, 561 U.S. 358, 404 (2010) (emphasis added). For its part, the Hobbs Act prohibits extortion that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" and this extortion can be committed by obtaining property "under color of official right." 18 U.S.C. § 1951. As with honest services fraud, the Supreme Court has held that extortion "under color of official right" requires a *quid pro quo*. *Evans v. United States*, 504 U.S. 255, 260 (noting that at common law "[e]xtortion by the public official was the rough equivalent of what we would now describe as 'taking a bribe'"); *see also United States v. Hairston*, 46 F.3d 361, 365 (4th Cir. 1995) ("[W]e have stated that the government must prove a quid pro quo when it charges extortion under color of official right."). Thus, the two statutes at issue in

25

*McDonnell* both require proof of a *quid pro quo* without textually describing the *quo* proscribed.  It was in this context that the parties in *McDonnell* mutually agreed to import the "official act" requirement, the *quo* from 18 U.S.C. § 201, into the jury instructions for the charged counts under those statutes.  *See generally Skilling*, 561 U.S. at 412 (explaining that the honest services fraud statute's "prohibition on bribes and kickbacks draws content . . . from federal statutes proscribing—and defining—similar crimes" such as § 201 and § 666).

Unlike honest services fraud and Hobbs Act extortion, however, federal funds bribery explicitly describes the proscribed *quo*.  *See generally Ng Lap Seng*, 934 F.3d at 132 ("In addressing various manifestations of bribery under the federal criminal law, Congress may, of course, define the particular *quids* and *quo*s prohibited. . . . [N]ot all federal bribery statutes identify 'official act,' much less official act as defined in § 201(a)(3), as the necessary *quo* for bribery.").  Section 666 prohibits "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person" (the quid) "with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more" (the quo).  18 U.S.C. § 666.  Thus, unlike with the statutes at issue in *McDonnell*, there is no need to look outside the text of § 666 to define the *quids* and *quos* proscribed.  Indeed, if we did so, we would frustrate the plain statutory text.

The legislative history of § 666 also does not support defendants' argument.  As we have previously explained, Congress enacted 18 U.S.C. § 666 following a circuit split over

whether the federal bribery statute, 18 U.S.C. § 201, applied to state and local officials. *United States v. Jennings*, 160 F.3d 1006, 1013–14 (4th Cir. 1998). In adopting a new bribery statute that explicitly reached state and local officials, Congress sought to "fill the regulatory gap[]" and "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." *Sabri v. United States*, 541 U.S. 600, 606 (2004) (quoting S. Rep. No. 98-225, at 369 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).

Defendants contend that, since § 666 is an "extension" of § 201, Congress must have intended both statutes to apply similar standards, including the "official act" requirement, to prosecutions against federal, state, and local officials. But "only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the statutory] language." *Salinas v. United States*, 522 U.S. 52, 57 (1997) (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)). And here, the legislative history not only fails to support—but weighs against—such a departure. Since the drafting of § 666 was motivated by a circuit split regarding the reach of § 201, Congress must have been aware of § 201's definition of "official act" when it drafted § 666—and yet it chose not to include the term in the text of the latter statute.[14] Further, the particular *quo* selected

---

[14] Congress amended 18 U.S.C. § 666 in 1986 because it found that its original enactment "came during the final weeks of the 98th Congress, and, due to demanding time constraints, [the legislative package § 666 was included in] contained a number of ambiguities and technical defects." H.R. Rep. No. 99-797, at 16 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 6138, 6139. The 1986 amendments added the word "corruptly" to the beginning of § 666(a)(2) and replaced the previous phrase "for or because of" with the
(Continued)

by Congress is consistent with the purpose of § 666: to protect the integrity of federal money. *See Sabri*, 541 U.S. at 608. Thus, unlike § 201 bribery, § 666 only proscribes *quo*s with a value of $5,000 or more and in instances where the covered entity has received federal funding exceeding $10,000 in the previous one-year period. *See* 18 U.S.C. § 666.

### iii.     Constitutional Concerns

Nevertheless, defendants argue that *McDonnell* requires this Court to limit the *quo* in § 666 to "official acts" because a broad reading of the statute raises the same "significant constitutional concerns" identified in *McDonnell*: vagueness concerns, federalism concerns, and concerns about undermining "[t]he basic compact underlying representative government[, which] assumes that public officials will hear from their constituents and act appropriately on their concerns." *McDonnell*, 579 U.S. at 574–77 (emphasis removed). And since *McDonnell* "avoided invalidating [the honest-services fraud statute and the

---

current phrase "intending to be influenced or rewarded" but still did not add the term "official act" to the statute.

Defendants respond that Congress was similarly aware of § 201's inclusion of "official act" when it enacted the honest services fraud statute in 1988 and yet the Supreme Court still read in "official act" in *McDonnell*. But in contrast to § 666 which was enacted to "supplement[] § 201," *Jennings*, 160 F.3d at 1013, Congress adopted the broad prohibition on the "intangible right of honest services," 18 U.S.C. § 1346, in response to the Supreme Court's holding in *McNally v. United States*, 483 U.S. 350, 360 (1987), that "[t]he mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government," *id.* at 356; *see also Skilling*, 561 U.S. at 404 ("Congress enacted § 1346 on the heels of *McNally* and drafted the statute using that decision's terminology."). Thus, the legislative history of § 1346 does not suggest that the elements of § 201 were front of mind to the statute's drafters as they must have been for the drafters of § 666. Further, as already discussed, this argument misconstrues *McDonnell*, which merely assumed at the behest of both parties that an "official act" was a requirement of honest services fraud and overlooks that like § 201—but unlike the honest services fraud statute—§ 666 includes a proscribed *quo*.

Hobbs Act] *on constitutional grounds* by reading them to embrace 18 U.S.C. § 201's definition of 'official act,'" defendants conclude that we must similarly read "official act" into 18 U.S.C § 666 to save the statute from unconstitutionality. Appellant's Opening Br. at 27 (emphasis added).

Defendants' argument, however, compounds their mischaracterization of *McDonnell*. As discussed above, the *McDonnell* Court *assumed* that the relevant statutes required proof of an "official act" because the parties had agreed on that point. And the constitutional issues considered by the *McDonnell* Court were raised by the government's expansive interpretation of the statutory definition of "official act"—not by the possibility that the Hobbs Act and honest services fraud statute would be applied without an "official act" requirement. Further, the Supreme Court did not hold in *McDonnell* that its interpretation of the term "official act" delineated the outer bounds of constitutionally proscribable *quo*s. Although the narrower construction of 18 U.S.C. § 201(a)(3) adopted by the *McDonnell* Court avoided potential constitutional issues, it was the Court's statutory interpretation as informed by Supreme Court precedent—not these constitutional concerns—that circumscribed the definition of "official act." *McDonnell*, 579 U.S. at 574 ("[I]n addition to being inconsistent with both text and precedent, the [g]overnment's expansive interpretation of 'official act' would raise significant constitutional concerns."). In sum, *McDonnell* does not foreclose that conduct falling outside the narrow definition of "official act" might be constitutionally proscribable, it merely holds that proscribing conduct falling *within* the definition of "official act" does not raise these constitutional concerns.

In any case, while "[s]tatutes should be construed to avoid constitutional questions, . . . this interpretative canon is not a license for the judiciary to rewrite language enacted by the legislature." *Salinas*, 522 U.S. at 59–60 (quoting *Albertini*, 472 U.S. at 680). Congress designed, drafted, and adopted the specific *quo* proscribed under 18 U.S.C. § 666 which does not include the term "official act." If we ignore its instruction, even under the guise of "judicial restraint," we "trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." *Id.* at 60 (quoting *Albertini*, 472 U.S. at 680).

Moreover, it is not clear that a plain reading of § 666 raises the same constitutional concerns as the government's proposed definition of "official act" in *McDonnell*.

As an initial matter, 18 U.S.C. § 666 does not raise the same federalism concerns as 18 U.S.C. § 201 because Congress "clearly intended" § 666 to "alter[] the existing balance of federal and state powers." *Salinas*, 522 U.S. at 59. "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States. . . . [and it] may legislate in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). *See generally Sabri*, 541 U.S. at 605–08 (holding that Congress was authorized under the Spending Clause to enact § 666 to "protect spending objects from the menace of local administrators on the take"). Since "[t]his is an extraordinary power in a federalist system," *id.*, we have found that where "a statute [is] susceptible of two plausible interpretations, one of which would have altered the existing balance of federal and state powers[,] . . . absent a clear indication of Congress' intent to change the balance, the proper course was to adopt a construction which maintains the existing balance." *Salinas*, 522 U.S. at 59 (citing *Gregory*, 501 U.S. at 460–61; *McNally*, 483 U.S. at 360

30

(referring to "the rules of statutory construction we have followed to give proper respect to the federal-state balance")).  Thus, in *McDonnell*, the Court explained that it "decline[d] to construe [18 U.S.C. § 201(a)(3)] in a manner that . . . involves the Federal Government in setting standards of good government for local and state officials" because "a more limited interpretation of 'official act' is supported by both text and precedent."  *McDonnell*, 579 U.S. at 576–77.

But, in contrast to § 201 which applies imprecisely to "public officials,"[15] Congress expressed its clear intent to reach the conduct of state and local officials (where such officials are agents of a covered entity that receives $10,000 or more annually in federal funds) in the text of § 666 and, therefore, intended to "recalibrat[e] the federalism balance." *Ng Lap Seng*, 934 F.3d at 137; *see also Salinas*, 522 U.S. at 58 (explaining that § 666 "was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds"); *Sabri*, 541 U.S. at 605, 608 ("Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity. . . . Congress [is] within its prerogative to protect spending objects from the menace of local administrators on the take.").  And as the Supreme Court reiterated in *Salinas*, "[n]o rule of construction . . . requires that a penal statute be strained and distorted

---

[15] Indeed, as discussed above, prior to 18 U.S.C. § 666, there was a circuit split regarding whether the term "public official" encompassed state and local officials. *Jennings*, 160 F.3d at 1013–14.

in order to exclude conduct clearly intended to be within its scope."[16]  522 U.S. at 59

(quoting *United States v. Raynor*, 302 U.S. 540, 552 (1938)).

Defendants are on surer footing with their concern that a broad reading of 18 U.S.C.

§ 666 "could cast a pall of potential prosecution" over legitimate interactions between

"conscientious public officials" and "citizens with legitimate concerns."[17]  *McDonnell*, 579

---

[16] Defendants also argue that failing to read in "official act" to 18 U.S.C. § 666 will lead to the "perverse result" that state officials will be subject to greater prohibitions under § 666 than federal officials under § 201.  This argument, however, ignores the differences between the two statutes, including the separate limitation imposed in § 666 that the *quo* involve something "of value of $5,000 or more."  Thus, a state official who receives envelopes of cash in exchange for an "official act" valued at less than $5,000 may violate § 201 but not § 666.  And congressional intent to reach different conduct in different contexts is hardly invalidating.  *See generally Skilling*, 561 U.S. at 413 n.45 ("Overlap with other federal statutes does not render [the honest services fraud statute] superfluous.  The principal federal bribery statute, § 201, for example, generally applies only to federal public officials, so [honest services fraud's] application to state and local corruption and to private-sector fraud reaches misconduct that might otherwise go unpunished.").

[17] To bolster this argument, defendants pointed to a litany of hypotheticals in their briefing and at oral argument, which they argue provide examples of protected conduct that could unconstitutionally be swept up by a broad reading of § 666.  In one such hypothetical, defendants state that "because § 666(a)(2) covers bribes and *gratuities*," the statute could be read to prohibit "a constituent from donating to a candidate in appreciation for assigning a respected health official to lead a pandemic taskforce."  Appellant's Opening Br. at 27.

First, it is not settled law that § 666 covers gratuities.  Indeed, there is a circuit split on the issue.  *Compare United States v. Ganim*, 510 F.3d 134, 150 (2d Cir. 2007) (holding that § 666 criminalizes gratuities); *United States v. Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007) (same); *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997) (suggesting the same), *with United States v. Fernandez*, 722 F.3d 1, 20–26 (1st Cir. 2013) (conducting a searching examination of the text and legislative history of § 666 and concluding that the statute does not criminalize gratuities).  And, while our Court has not yet had occasion to directly answer this question, we have previously been skeptical that it does.  *See Jennings*, 160 F.3d 1006.  In *Jennings*, we explained that the decisions of our sister circuits which find "that § 666 prohibits payment of both bribes and gratuities. . . . blur the long standing distinction between bribes and illegal gratuities. . . . [and that] a court (Continued)

U.S. at 575. Indeed, "[t]he basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns." *Id.* Thus, not every *quo* is constitutionally proscribable. *Id.* at 574–75.

In particular, the *McDonnell* Court was concerned that if a typical meeting, call, or event—without more—constituted a proscribable *quo*, then citizens might shy away from

---

squarely addressing the issue could reasonably conclude that § 666(a)(2) prohibits bribes, but not gratuities." *Id.* at 1016 n.4 (citations omitted).

The distinction between a bribe and a gratuity is the "intent element." *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398, 404 (1999). While a gratuity is made "for or because of" specific conduct "that the payor expected to occur in any event," a bribe must be made "corruptly" meaning with "the intent to receive a specific benefit *in return for* the payment." *Jennings*, 160 F.3d at 1013 (emphasis added). "In other words, for bribery there must be a *quid pro quo*." *Sun-Diamond*, 526 U.S. at 404. Including gratuities within the ambit of § 666(a)(2) seems, therefore, at odds with the textual requirement that one must act "corruptly" to run afoul of the statute. 18 U.S.C. § 666(a)(2); *see also Jennings*, 160 F.3d at 1018–19 ("One has the intent to corrupt an official only if he makes a payment or promise with the intent to engage in a fairly specific quid pro quo with that official."); *Fernandez*, 722 F.3d at 23 (noting that an interpretation that excludes gratuities "would help to explain the presence of the corruptly language in" the statute).

Courts that have interpreted § 666 to apply to gratuities have done so based on the statute's use of the phrase "with intent to influence *or reward*." *See, e.g.*, *Ganim*, 510 F.3d at 151. In *Jennings*, however, "we read these words to embody the established rule . . . that a bribe can be promised *before*, but paid *after*, the official's action on the payor's behalf." *Jennings*, 160 F.3d at 1016 n.3 (emphasis added). This definition, we explained, "accords with the traditional meaning of the term 'reward' as something offered to induce another to act favorably on one's behalf (for example, a bounty offered for the capture of a fugitive)." *Id.*; *see also Fernandez*, 722 F.3d at 23.

Defendants here were prosecuted under a bribery theory, and the jury was not instructed on a gratuity theory. We do not find in defendants' lone hypothetical sufficient grounds to decide this issue, which is not squarely presented here. In any case, while extension of § 666 to gratuities may raise concerns about the reach of the statute, whether or not § 666's *quo* is limited to "official acts"—the question that is raised here—would not mollify these concerns.

33

public discourse and, for example, hesitate to contact their representative about a legitimate concern if they had previously made a campaign contribution to that official. Similarly, here, defendants argue that a broad interpretation of the "any business, transaction, or series of transactions" element of § 666(a)(2) would criminalize "nearly anything a public official does." *Id.* at 575.

Taking a page from *McDonnell*, we turn first to the text of § 666 before determining whether constitutional concerns are raised.[18] Section 666(a)(2) prohibits:

> corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666.

First, a bribe under § 666 must be made "corruptly." As we have previously explained, "[n]ot every payment made to influence or reward an official is intended to corrupt him." *Jennings*, 160 F.3d at 1018 (citing *United States v. Arthur*, 544 F.2d 730, 734–35 (4th Cir. 1976)); *id.* at 1021 ("[T]he gravamen of a bribery offense is a payment made to *corruptly* influence or reward"). "One has the intent to corrupt an official only if he makes a payment or promise with the intent to engage in a *fairly specific* quid pro quo with that official." *Id.* at 1018–19 (emphasis added). Thus, in *Jennings*, we explained that

---

[18] Although we believe that a plain reading of § 666 does not sweep as broadly as defendants contend, we also note that before striking down a federal statute as unconstitutional, we must "consider whether the prescription is amenable to a limiting construction." *Skilling*, 561 U.S. at 405. Indeed, "[o]nly by taking a wrecking ball to a statute that can be salvaged through a reasonable narrowing interpretation would we act out of step with precedent." *Id.* at 409 n.43.

34

"the defendant must have intended for the official to engage in some *specific* act (or omission) or course of action (or inaction) *in return for* the charged payment" because, otherwise, we "mistakenly suggest[] that § 666 prohibits any payment made with a generalized desire to influence or reward (such as a goodwill gift), no matter how indefinite or uncertain the payor's hope of future benefit." *Id.* at 1019, 1021 (emphases added).

Turning to the proscribed *quids* and *quos*, the phrase "anything of value" "encompasses all transfers of personal property or other valuable consideration in exchange for the influence or reward." *Salinas*, 522 U.S. at 57. Thus, the *quid* proscribed by § 666 encompasses "nearly anything a[n agent] accepts—from a campaign contribution to lunch." *McDonnell*, 579 U.S. at 575.

The proscribed *quo*, however, is limited to those made "in connection with any business, transaction or series of transactions of" a covered organization, government or agency "involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). Defendants argue that the phrase "any business" reaches as broadly as the flawed definition of "official act" advanced by the government in *McDonnell* which "encompasse[d] nearly any activity by a public official. . . . from workaday functions . . . to the broadest issues the government confronts." *McDonnell*, 579 U.S. at 566, 568. But this reading glosses over the plain meaning of the term "business" and ignores the context provided by the remainder of the provision. The relevant business must be 1) business *of the covered entity* and 2) valued at $5,000 or more. *See Fernandez*, 722 F.3d at 13 ("In other words, the subject matter of the bribe must be valued at $5,000 or more; the bribe itself need only be 'anything of value.'" (quoting *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011)); *United*

35

*States v. Duval*, 846 F.2d 966, 976 (5th Cir. 1988); *cf. Salinas*, 522 U.S. at 57 (referring to "the $5,000 threshold for the business or transaction in question").

The term "business" is subject to "broader and narrower meanings," including "a person's regular occupation, profession or trade"; "the practice of making one's living by engaging in commerce"; "an activity that someone is engaged in"; and "work that has to be done or matters that have to be attended to." *Robinson*, 663 F.3d at 274 n.4 (quoting New Oxford American Dictionary 1838 (3d ed. 2010)). And in the context of "[p]arliamentary law," Black's Law Dictionary 226 (9th ed. 2009) explains that "business" means "the matters that come before a deliberative assembly for its consideration and action."

Although many of the dictionary definitions of "business" connote commercial conduct, our sister circuits have rejected efforts to limit "[§ 666's] reach to purely commercial conduct." *Fernandez*, 722 F.3d at 14 (rejecting defendants' argument that "the passing of Senate legislation cannot be considered 'business' or a 'transaction' under § 666" because "the Senate does not conduct business or financial transactions through legislating"); *United States v. Marmolejo*, 89 F.3d 1185, 1193–94 (5th Cir. 1996) (rejecting defendants argument that the provision should be restricted "to transactions involving money, goods, or services"), *aff'd on other grounds sub nom. Salinas*, 522 U.S. 52. In other words, these courts have found that "the language of the business or transaction clause in § 666(a) is broad enough to include bribes offered to influence the *intangible* business or transactions of a federally funded organization." *Robinson*, 663 F.3d at 275 (emphasis added); *cf. Salinas*, 522 U.S at 61 (reserving the question of § 666's

36

"applicability to intangible benefits . . . because that question [was] not fairly included within the questions on which we granted certiorari"). As the Seventh Circuit has explained, "[t]he 'business' of a federally funded 'organization, government, or agency' is not commonly 'business' in the commercial sense of the word" and, therefore, limiting § 666 to "business or transactions that are commercial in nature would have the effect of excluding bribes paid to influence agents of state and local governments. . . . [in] contradict[ion to] the express statutory text." *Robinson*, 663 F.3d at 274. Further, such a narrow construction would be at odds with the reasoning of the *Salinas* Court, which found that the use of "any" before "business or transaction" showed that § 666 was "not confined to a business or transaction which affects federal funds." *Salinas*, 522 U.S. at 56–57 ("The enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected."); *see also Robinson*, 663 F.3d at 273 ("'Any' and 'anything' are terms of expansion.").

That does not mean, however, that the "business or transaction" element "encompasses nearly any activity by a public official." *McDonnell*, 579 U.S. 566. Following the instructions of *McDonnell*, when "choos[ing] between . . . competing definitions, we look to the context in which the words appear." *Id.* at 568. Notably, the business at issue is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act. Thus, the relevant business will naturally vary according to the purpose and operations of the covered entity. *See Fernandez*, 722 F.3d at 14 (finding that in passing legislation, two state senators "were acting in their capacity as legislators, they were performing the precise functions that

37

members of a state legislative body perform as agents of a state government"); *see also Robinson*, 663 F.3d at 267 (finding that the term "any business" is "broad enough to cover the law-enforcement activities a police department that receives federal aid"); *Marmolejo*, 89 F.3d at 1192–93 (finding that § 666 encompassed a sheriff who provided special treatment, like conjugal visits, to federal prisoners housed in a county jail supervised by the sheriff). Further, under the interpretive canon of *noscitur a sociis*, the term "business" is informed by the immediately succeeding term "transaction," which "usually connotes a discrete act or event." *Robinson*, 663 F.3d at 273–74; *see also McDonnell*, 579 U.S. at 569. Thus, the qualifying "business" should similarly be something relatively concrete and circumscribed like an action item rather than a broad policy goal.

Further, "the $5,000 triggering provision ensures the statute reaches acts of bribery involving transactions of substantial value." *Marmolejo*, 89 F.3d at 1193–94. Thus, unlike the government's broad interpretation of "official act" in *McDonnell*, which threatened to reach prosaic interactions of nominal value between constituents and their representatives, § 666 requires more. Indeed, under this limitation, § 666 finds conduct permissible that is proscribable under *McDonnell*. For example, if a constituent gives their representative an envelope with $500 in cash in exchange for a promise to award a $4,000 government contract to that constituent, that falls below the threshold of § 666—even though a jury could find that such conduct falls within the bounds of an "official act."

Where the "business" at issue is intangible, courts have relied on a variety of valuation methods, including the value of the bribe (the "market approach"), *see, e.g.*,

38

*Fernandez*, 722 F.3d at 13, and the value of the benefit received by the "bribe-giver," *United States v. Owens*, 697 F.3d 657, 659 (7th Cir. 2012), or "third parties 'with an immediate interest in the transaction,'" *United States v. Hardin*, 874 F.3d 672, 676 (10th Cir. 2017), to determine whether the relevant "business" or "transaction" exceeds the threshold. Thus, defendants protest that the $5,000 provision does not meaningfully limit § 666 because under the "market approach" a constituent who legally donates $5,000 or more to an official's campaign could find themselves liable for *anything* that official does in exchange. But this argument oversimplifies the analytical steps underlying the "market approach." Although a jury may consider the value of a bribe *as evidence* of the value of the relevant *quo*, they must still find that the value of the *quo* itself exceeds $5,000. And a jury would, therefore, weigh whether an alleged bribe provides evidence of the value of the *quo*, including approaching a seeming mismatch with skepticism.

Additionally, this argument overlooks other limitations found in the text such that the relevant intangible "business" must be a discrete, actionable item under the purview of the covered entity. Thus, in order to trigger § 666, the *quo* could not be something as general as broad policy matters relevant to the covered entity. Further, whatever the outer bounds of "business," the term does not include the conduct the *McDonnell* court was primarily concerned with: a typical meeting, call, or event (without more).[19] *See generally*

---

[19] Indeed, the district court here recognized as much. It explained to the jury that:

The following actions performed or agreed to be performed by the government agent, without more, are not sufficient to establish a violation of Title 18, United States Code, Section 666: Setting up a meeting, hosting an

(Continued)

39

*Business Meeting*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/busin ess%20meeting (last visited May 26, 2022) (defining "business meeting" as "a meeting *at which* matters of business are discussed" (emphasis added)).

Finally, and relatedly, defendants argue that prosecutors may rely on a broad reading of § 666(a)(2) to prosecute constituents and state and local officials "without fair notice, for the most prosaic interactions." *McDonnell*, 579 U.S. at 576. Since we find that such "prosaic interactions" are not within the ambit of the statute, our textual interpretation of § 666 "avoids this 'vagueness shoal.'" *Id.* Indeed, in *Skilling*, the Supreme Court explained that once construed to include only bribes and kickbacks, the honest-services fraud statute was not unconstitutionally vague because it "draws content . . . [from] case law, [and] also from federal statutes proscribing—and defining—similar crimes," including § 666, and "[a] criminal defendant who participated in a bribery or kickback scheme . . . cannot tenably complain about prosecution . . . on vagueness grounds." *Skilling*, 561 U.S. at 412–13.

In sum, we find that the specter of the constitutional concerns referenced by the *McDonnell* Court are not raised by the text of § 666. In reaching this conclusion, we follow the guidance of *McDonnell* in first conducting a searching analysis of the statutory text before determining whether such constitutional concerns are implicated. Although there may be similarities between the limits of the "any business, transaction, or series of

---

event, talking to another official, sending a subordinate to a meeting, or simply expressing the [sic] support for a constituent.

J.A. 1884.

transactions" element of § 666 and the limits of the term "official act" as defined in *McDonnell*, the two *quos* are not coterminous as each is rooted in the specific statutory analysis of the textual provision at issue.

### III.

In conclusion, we hold that the district court erred by instructing the jury that an "official act"—an element of the crime of honest services fraud—was present as a matter of law. Further, we find that this error is not harmless and, therefore, we vacate defendants' convictions on Count One. We also vacate defendants' convictions on Count Two because we find that the verdicts were improperly infected by the instructional error on Count One. The case is, therefore, remanded for a new trial. We do not find, however, that the district court erred in failing to instruct the jury that an official act is an element of federal funds bribery.

*VACATED AND REMANDED FOR A NEW TRIAL*

TRAXLER, Senior Circuit Judge, concurring:

I fully concur in the opinion authored by Chief Judge Gregory. Under our Constitution, a criminal conviction "rest[s] upon a *jury determination* that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (emphasis added). The district court therefore unfortunately erred by preventing the jury from determining whether the action sought by the defendants—the replacement of the Senior Deputy Commissioner of the Department of Insurance—was an "official act" as defined in 18 U.S.C. § 201 and by the Supreme Court in *McDonnell v. United States*, 579 U.S. 550 (2016). The court's error cannot be considered harmless, and the erroneous jury instructions affected the jury's deliberations on the honest-services fraud charge in Count One and the federal-funds bribery charge in Count Two. Accordingly, as Chief Judge Gregory explains, the instructional error requires us to vacate and remand for a new trial on both counts.

The defendants also rely on *McDonnell* for a separate challenge to their federal-funds bribery conviction. In *McDonnell*, the Supreme Court noted that the government's proffered broad reading of § 201's "official act" requirement "would raise significant constitutional concerns." *McDonnell*, 579 U.S. at 574. The defendants here contend that prosecutions of state and local officials under 18 U.S.C. § 666 raise the same constitutional concerns identified in *McDonnell* and that we must therefore require the government to prove in § 666 cases that the bribe involved an "official act" as defined in *McDonnell*.

I agree that a very broad reading of § 666 could lead to constitutionally questionable prosecutions of state and local officials. Nevertheless, there is no need to import the

42

"official act" language of § 201 into prosecutions under § 666. As Chief Judge Gregory ably explains, the language of § 666 itself provides sufficient protection against constitutionally questionable prosecutions. Section 666 requires the putative bribe to be connected to "any business, transaction, or series of transactions" of the relevant agency "involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). Although the "any business" language seems broad at first blush, the meaning of the clause is informed and narrowed by the words that follow—transaction or series of transactions. Because a "transaction" typically involves a specific, identifiable act or event, the "business" to which the act of bribery is directed must be "something relatively concrete and circumscribed like an action item rather than a broad policy goal." Opinion at 38. The requirement that the case involve a minimum value of $5,000 also works to ensure that local officials do not risk prosecution "for the most prosaic interactions," such as setting up a routine meeting or community event. *McDonnell*, 579 U.S. at 576.

A careful analysis of the language § 666 shows that the statute is not as broad and far-reaching as the defendants fear, and I agree that the statutory guardrails identified in Judge Gregory's opinion are sufficient to quell the constitutional concerns raised by the defendants. I therefore fully concur.