# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Statesville Division

UNITED STATES OF AMERICA,

    v.

GREG E. LINDBERG, *et al.*,

        *Defendants.*

**No. 5:19-cr-22-MOC**

## REPLY IN SUPPORT OF DEFENDANT GREG LINDBERG'S MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com

James F. Wyatt, III
  (NC State Bar No. 13766)
Robert A. Blake, Jr.
  (NC State Bar No. 20858)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
704-331-0773 (fax)
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (*pro hac vice*)
Rachel M. Riley (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201-2591
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

*Counsel for Defendant Greg E. Lindberg*

# TABLE OF CONTENTS

Reply Argument .................................................................................................. 1

I.   The government does not point to evidence sufficient to sustain the
     Defendants' convictions ......................................................................... 1

     A.   The government cites no evidence the Defendants proposed a *quid
          pro quo* involving the removal of Ms. Obusek from her position,
          and the mere reassignment of tasks does not qualify as an "official
          act." ............................................................................................... 3

     B.   The internal reassignment of tasks, without more, does not
          amount to the "business" of the Department of Insurance,
          rendering the evidence insufficient on Count Two ............................... 7

     C.   The government does not dispute that, at a minimum, this Court
          must set the case for a new trial because it did not instruct the
          jury that the reassignment of tasks (without more) was not an
          actionable *quo* ................................................................................ 9

II.  The government fails to explain why a new trial is not warranted based
     on the four other instructional and evidentiary issues identified by Mr.
     Lindberg .............................................................................................. 10

     A.   The Court impermissibly lowered the requisite level of intent on
          both counts ....................................................................................... 10

          1.   The Court's failure to instruct the jury that honest-services
               wire fraud requires "corrupt" intent is inconsistent with
               *Skilling* and raises serious constitutional concerns ................... 11

          2.   The Court improperly diluted the requisite level of intent
               on both counts ............................................................................ 16

          3.   These instructional errors were not harmless ............................ 19

     B.   The Court erred in declining to admit two State statutes that
          tended to show that the Defendants did not request an "official
          act" or a decision on the "business" of the Department of
          Insurance, and that error was not harmless ...................................... 21

Case 5:19-cr-00022-MOC-DCK   Document 461   Filed 07/26/24   Page 2 of 34

C.    The Court's failure to instruct the jury on each side's preferred methodology for the $5,000-value element seriously impaired Mr. Lindberg's defense on Count Two ........................................................ 24

D.    The government offers no valid defense of this Court's decision to admit two unfairly prejudicial e-mails with little to no additional probative value ........................................................................................ 25

Conclusion ............................................................................................... 28

Certification ............................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Andersen LLP v. United States,*
   544 U.S. 696 (2005) ................................................................ 11, 14, 18

*Corley v. United States,*
   556 U.S. 303 (2009) ..................................................................... 15

*McDonnell v. United States,*
   136 S. Ct. 2355 (2016) ...................................................... 1, 4-6, 13, 21

*Skilling v. United States,*
   561 U.S. 358 (2010) ...................................................................11-12

*United States v. Ham,*
   998 F.2d 1247 (4th Cir. 1993) ............................................................ 26

*United States v. Jackson,*
   371 F. Supp. 3d 257 (E.D. Va. 2019)...................................................... 16

*United States v. Jennings,*
   160 F.3d 1006 (4th Cir. 1998) ............................................................. 5

*United States v. LeBeau,*
   949 F.3d 334 (7th Cir. 2020) ............................................................. 17

*United States v. Lindberg,*
   39 F.4th 151 (4th Cir. 2022)....................................... 5, 8-9, 18-19, 21, 23

*United States v. Ring,*
   706 F.3d 460 (D.C. Cir. 2013) .........................................................12-13

*United States v. Segal,*
   495 F.3d 826 (7th Cir. 2007) ..........................................................22-23

*United States v. Suhl,*
   885 F.3d 1106 (8th Cir. 2018) ............................................................ 16

*United States v. Sun Diamond Growers of Cal.,*
   526 U.S. 398 (1999) ..................................................................... 14

*United States v. Terry,*
   707 F.3d 607 (6th Cir. 2013) ............................................................. 12

*United States v. Titus,*
   475 F. App'x 826 (4th Cir. 2012) (unpublished) ................................................. 21

*United States v. Whitfield,*
   590 F.3d 325 (5th Cir. 2009) ...................................................................... 7, 12

**Statutes**

18 U.S.C. § 201(b) ................................................................................ 12

18 U.S.C. § 201(b)(1) ....................................................................... 13-15

18 U.S.C. § 201(b)(2) ....................................................................... 12-13

18 U.S.C. § 666(a)(1)(B) ...................................................................... 12

18 U.S.C. § 666(a)(2) ........................................................ 8, 12-13, 15, 17

41 U.S.C. § 52(2) ................................................................................. 12

N.C. Gen. Stat. § 58-2-45 ................................................................. 22-23

N.C. Gen. Stat. § 58-2-132 .................................................................... 22

**Rules**

Fed. R. Evid. 401 .................................................................................. 21

Fed. R. Evid. 403 .................................................................................. 23

**Other Authorities**

Supp. Joint App'x, *McDonnell v. United States,*
   No. 15-474 (U.S.) (filed Feb. 24, 2016) ................................................... 13

*Merriam Webster's Dictionary of Law* (1996) ............................................. 14

U.S. Br. 39, *Snyder v. United States,*
   No. 23-108 (U.S.) (filed Mar. 11, 2024) ............................................. 14, 18

# REPLY ARGUMENT

## I. The government does not point to evidence sufficient to sustain the Defendants' convictions.

This case represents an unprecedented expansion of the federal bribery statutes. In *McDonnell v. United States*, the Supreme Court clarified that a defendant commits federal bribery only if he offers something of value in exchange for a decision or action that advances the merits of something akin to a lawsuit, hearing, or administrative determination. 136 S. Ct. 2370-71 (2016). And yet, the government does not dispute that it submitted no evidence Mr. Lindberg or Mr. Gray ever made such an offer. Instead, the Defendants simply asked for the reassignment of work from one deputy commissioner to another—without any assurances that the new deputy would take any action in their favor. That is not a federal crime.

Perhaps for this reason, the government attempts to recast the prohibited *quo* based on what the "Indictment charges"—the "'removal'" of Jacqueline Obusek from her "position" as "'the Senior Deputy Commissioner.'" Gov't Opp'n 3, 5-6 (quoting Indictment ¶ 14); *see also id.* at 10. The government suggests that invoking the Commissioner's authority to "appoint and remove" senior level officials within the Department of Insurance is akin to an administrative determination. *Id.* at 6-7. But the government's arguments are premised on a fallacy.

In testing the sufficiency of the *evidence*, the grand jury's *allegations* are irrelevant. And for that reason, this Court's prior ruling on the sufficiency of the indictment's allegations has no bearing on the sufficiency of the evidence that the government submitted during this retrial.

1

And here's the kicker for the government: There was *no evidence* the Defendants offered campaign contributions in exchange for Commissioner Causey's agreement to demote, fire, or remove Ms. Obusek from her position as the Senior Deputy Commissioner. Commissioner Causey was crystal clear in this regard:

> Q.   Jackie Obusek was not getting demoted?
>
> A.   Correct. . . .
>
> Q.   Jackie Obusek was not getting fired?
>
> A.   Correct.
>
> Q.   Jackie Obusek's office wasn't even going to move?
>
> A.   Correct.
>
> Q.   Her title wasn't going to change?
>
> A.   Right.
>
> Q.   We're just moving, you know, the -- I know it's electronic. We're moving the Lindberg files from A to B; right? That's what they're asking for?
>
> A.   Right. That's what they're asking, yes, sir.

Tr. 418:11-25. That destroys the government's only defense of the convictions at issue here. The government points to zero evidence that the Defendants proposed a *quid pro quo* involving the Commissioner's authority to "appoint and remove" Ms. Obusek.

As for what the government actually proved—that the Defendants asked that the Commissioner move files from one regulator to another—the government offers no defense. It never explains how such a request satisfies the test for an "official act" under *McDonnell*. Nor does it explain how the purely *internal* movement of files qualifies as the "business" of the Department of Insurance, which involves the

*external* regulation of the insurance industry. As explained below, that dooms the government's convictions on both counts.

A.   **The government cites no evidence the Defendants proposed a *quid pro quo* involving the removal of Ms. Obusek from her position, and the mere reassignment of tasks does not qualify as an "official act."**

The government does not dispute that neither Mr. Lindberg nor Mr. Gray tied campaign contributions to a request for a different outcome on the Department of Insurance's review of Mr. Lindberg's businesses. Nor could it. The evidence was overwhelming that Mr. Lindberg simply sought a level playing field, not a predetermined outcome on the review of his businesses. *See* Post-Trial Mem. 10-11 (citing exhibits). That makes this case unlike the scores of cases the government has prosecuted in the wake of *McDonnell*.

Perhaps sensing that this case is unprecedented, the government attempts to save its conviction on Count One by claiming the Defendants' *quid pro quo* involved what amounted to a demotion; it describes the Defendants' ask as the "'removal'" of Ms. Obusek from her "position" as "'the Senior Deputy Commissioner.'" Gov't Opp'n 3, 5-6 (quoting Indictment ¶ 14).

But the government does not cite a shred of evidence the Defendants ever tied campaign contributions to such a request. *See id.* To be sure, there was evidence that Commissioner Causey had the *power* to fire, demote, or move Ms. Obusek from her position as the Senior Deputy Commissioner. *See id.* at 5-6 (citing such evidence). But that's not enough. The government needed to introduce evidence that the Defendants

proposed *a quid pro quo* involving the Commissioner's invocation of that power. It cites none. *Id.* at 3-7.

As Mr. Lindberg highlighted in his opening memorandum, Commissioner Causey was emphatic that the Defendants never tied campaign contributions to an ask that he "fire" or "demote" Ms. Obusek, or "change" her "title." Post-Trial Mem. 19 (quoting Tr. 418:16-25). And that testimony was fully aligned with the recordings. GEL Exh. 194, at 12:17-18; GEL Exh. 189, at 10:17-18; GEL Exh. 168, at 93:5-8.[1]

The government's response: It ignores the record, focusing instead on what the "Indictment charges." Gov't Opp'n 3-7. That's telling. Again, the government cannot rest on its allegations. It must point to proof.

Equally telling, the government offers no substantive defense of what it did prove: It does *not* argue that the mere reassignment of tasks from one deputy to another qualifies as a "formal exercise of governmental power." *McDonnell*, 136 S. Ct. at 2368. Nor could it.

---

[1] At most, there was evidence that, early on, the Defendants raised with Commissioner Causey the idea of moving Ms. Obusek, GEL Exh. 169, at 68-69, but there was no offer of campaign contributions tied to such a move. The Defendants merely asked if such a move was "something [the Commissioner] can do," *id.* at 94, and whether it was "feasible," GEL Exh. 185, at 7. In response, Commissioner Causey said only that he would "look into it." GEL Exh. 169, at 94; GEL Exh. 185, at 7 (same). The next time the parties met, Mr. Lindberg proposed leaving Ms. Walker where she was "and just tell[ing] her she is going to handle our stuff." GEL Exh. 189, at 10; *see also id.* at 12 (Mr. Lindberg) (stating that Ms. Walker could "stay where she is and just handle our stuff"). Based on this evidence, no reasonable jury could have concluded that the Defendants offered campaign contributions in exchange for Commissioner Causey's agreement to remove Ms. Obusek from her position, and the Commissioner was clear there was no such offer. Tr. 418:16-25.

Transferring a file from one deputy to another is not of the same stripe as a lawsuit before a court, a hearing before a committee, or an administrative determination by an agency. *Id.* at 2369. Nor does it qualify as a decision *on* a lawsuit, hearing, or administrative determination. *Id.* at 2370. As Mr. Lindberg explained, and the government nowhere disputes, a decision must advance the merits to qualify as one *on* a formal exercise of governmental power. *See* Post-Trial Mem. 9-10 (citing *McDonnell*, 136 S. Ct. at 2370-71).

Undeterred, the government suggests that it is enough that the Defendants "believed that having Ms. Walker in charge of regulation was critical to their attempt to redomicile in North Carolina an out-of-state insurance company they were trying to purchase in Nebraska." Gov't Opp'n 7. But such a belief is not enough. The federal bribery statutes do not reach a payment made by a payor with the "'hope of [some] future benefit.'" *United States v. Lindberg*, 39 F.4th 151, 172 (4th Cir. 2022) (quoting *United States v. Jennings*, 160 F.3d 1006, 1020 (4th Cir. 1998)). The Defendants needed to offer something of value tied to a request for a specific outcome on the redomiciling of the Nebraska company—something they never did.

Because the government is wrong on the evidence, it is equally wrong on the significance of *McDonnell*. There, the Supreme Court held that merely "refer[ring] a constituent to another official" capable of performing an official act is not enough. 136 S. Ct. at 2371. That is little different than the Defendants' ask here: They requested that the Commissioner "refer" the review of Mr. Lindberg's businesses "to another official"—and nothing more. *Id.*

When it comes to defending the constitutionality of this prosecution, the government goes completely silent. This prosecution checks all the boxes flagged in *McDonnell*. It raises concerns about an official's ability to respond to a constituent's concerns—in this case, about a government employee's ability to perform her duties fairly—while at the same time soliciting or receiving campaign contributions. *See* Post-Trial Mem. 12-13. It also runs aground on the vagueness shoal. The government nowhere explains why, under *McDonnell*, it is lawful to request a "refer[ral]" to "another official" capable of performing an official act, 136 S. Ct. at 2371, but it is unlawful to request that *work* be referred to another official. Without a meaningful distinction between these types of requests, it is impossible for citizens to understand how to comport their behavior to what the law requires. *See* Post-Trial Mem. 13. And the government says nothing about the federalism concerns raised by Mr. Lindberg. Federal prosecutors might wish to discourage citizens from tying campaign contributions to requests for better customer service. But a sovereign State could well take a different position—that it wants to incentivize public officials to be attentive to their constituents. *Id.* at 13.

For all these reasons, the Supreme Court has held that the federal bribery statutes are reserved for specific attempts to advance the outcome of something akin to a lawsuit, hearing, or administrative determination. *McDonnell*, 136 S. Ct. at 2370-71. The government has proved none of those things here. The Court must set aside the Defendants' convictions on Count One.

**B. The internal reassignment of tasks, without more, does not amount to the "business" of the Department of Insurance, rendering the evidence insufficient on Count Two.**

The government's effort to save its conviction on Count Two is premised on the same flaw it uses to prop up Count One. It suggests the Defendants offered campaign contributions tied to Ms. Obusek's removal from her position as the Senior Deputy Commissioner of Insurance "responsible programmatically for all financial analysis and financial examination of traditional insurance companies regulated by the state of North Carolina." Gov't Opp'n 10. But there is absolutely no evidence to this effect.

As noted above, Commissioner Causey testified that the Defendants never asked him to fire, demote, or remove Ms. Obusek from her position as Senior Deputy Commissioner. And the recordings bear out that testimony. Thus, contrary to the government's suggestion, the Defendants did not ask Commissioner Causey to take any action related to Ms. Obusek that is analogous to bribing a judge in exchange for the "'appointment of a friend or family member [to serve] as a law clerk or secretary.'" *Id.* (quoting *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009)).[2]

Instead, when it came to Ms. Obusek, the ask was that the Commissioner reassign the task of reviewing Mr. Lindberg's businesses to a different deputy commissioner, Ms. Walker. And the Defendants had no assurances that the outcome would be any different if Ms. Walker undertook that task. Post-Trial Mem. 16 (collecting record citations).

---

[2] To be sure, there was some evidence that the Defendants discussed having Commissioner Causey hire John Palermo, but the indictment did not charge this conduct, the Court did not instruct on it, and the government did not argue it to the jury. As a result, it is not a valid basis for sustaining the jury's verdicts.

That does not amount to asking to alter the substance of the Department of Insurance's "business." 18 U.S.C. § 666(a)(2). As the Fourth Circuit emphasized, "the 'business or transaction' element" does "*not*" encompass "nearly any activity by a public official." *Lindberg*, 39 F.4th at 174 (emphasis added). The focus is on "the business *of the entity* on whose behalf the agency is authorized to act," and because of that focus, "the relevant business will naturally vary according to the purpose and operations of the covered entity." *Id.*

The government nowhere analyzes this aspect of the Fourth Circuit's holding in *Lindberg*. *See* Gov't Opp'n 8-11. Instead, it proclaims that "there is no requirement regarding the degree that the 'business' must relate to the substantive work the entity perform." *Id.* at 10. That is simply incorrect.

The Fourth Circuit was adamant that the business *does* "vary according to the purpose and operations of the covered entity." *Lindberg*, 39 F.4th at 174. For that reason, the government must prove that the Defendants intended to corruptly influence an agent of the Department of Insurance in connection with how the Department metes out the "business" of the Department.

That makes sense. Otherwise, any little thing that an official does within the scope of his government employment would qualify as the "business" or a "transaction" of the Department—including arranging a meeting or hosting an event. But here again, the Fourth Circuit was clear: "whatever the outer bounds of 'business,' the term does not include the conduct the *McDonnell* court was primarily concerned with: a typical meeting, call, or event (without more)." *Id.* Each of those

are purely *internal* tasks. In contrast, the Fourth Circuit cited with approval a series of definitions of the term "business" that point to the "'work that has to be done'" by the government or agency. *Id.* at 173 (citing various authorities); *see also* Post-Trial Mem. 15 (citing the same).

As Mr. Lindberg explained, and the government nowhere disputes, the "business" of the Department of Insurance is regulating the insurance industry. Post-Trial Mem. 15-16. There is no evidence Mr. Lindberg or Mr. Gray sought to corruptly influence Commissioner Causey in how the Department regulated Mr. Lindberg's businesses. Instead, the Defendants asked the Commissioner to refer the review of Mr. Lindberg's businesses to a different deputy—with no guaranteed outcome on that review. Because the Defendants stopped short of asking for any outcome on the business of the Department of Insurance, the Court also must set aside the convictions on Count Two.

**C.    The government does not dispute that, at a minimum, this Court must set the case for a new trial because it did not instruct the jury that the reassignment of tasks (without more) was not an actionable *quo*.**

In his post-trial motion, Mr. Lindberg argued that, even if there were evidence of some kind of a *quid pro quo* involving the removal of Ms. Obusek from her position (there isn't), a new trial would still be warranted. *See* Post-Trial Mem. 18-21. That's because, even if such a personnel move could qualify as a viable *quo* under the bribery statutes at issue here, the Court declined to instruct the jury that it could not convict based solely on a reassignment of tasks. *Id.* at 20 (citing record). And as explained

9

above, the mere reassignment of tasks is not an "official act" or the "business" of the Department of Insurance.

The government offers no argument for sustaining the Defendants' convictions if the jury found that the *quo* involved only "the reassignment of tasks," and it nowhere disputes that, as instructed, the jury could have found guilt on this impermissible basis. In fact, the government does not respond at all to the Defendants' argument that, under *McDonnell*, this Court "should have instructed the jury" that it could not convict on this alternative basis. *See* Post-Trial Mem. 20-21.

Thus, at a minimum, a new trial is warranted here. An offer tied to a request to refer the review of Mr. Lindberg's business from one official to another—without more—is not actionable under the federal bribery statutes. Yet this Court declined to instruct the jury that it could not convict on this legally untenable theory, warranting a new trial on both counts.

## II. The government fails to explain why a new trial is not warranted based on the four other instructional and evidentiary issues identified by Mr. Lindberg.

The Defendants also highlighted four other instructional and evidentiary issues that warrant a new trial. *See* Post-Trial Mem. 21-47. The government fails to rehabilitate any of them.

### A. The Court impermissibly lowered the requisite level of intent on both counts.

Mr. Lindberg highlighted two independent but related problems with this Court's jury instructions on the requisite level of intent on both counts. *Id.* at 21-26. First, this Court failed to instruct the jury that honest-services wire fraud requires

10

proof of "corrupt" intent. *Id.* at 23-25. Second, the Court lowered the burden of proof on both counts when it instructed the jury that, with respect to "*both counts*, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." *Id.* at 25-26. The government fails to adequately defend either of these issues.

1. **The Court's failure to instruct the jury that honest-services wire fraud requires "corrupt" intent is inconsistent with *Skilling* and raises serious constitutional concerns.**

Honest-services wire fraud requires proof of "corrupt" intent—that the defendants knew what they were "doing is unlawful." This requirement traces its origins to *Skilling v. United States*, 561 U.S. 358 (2010), and *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). And it is needed to avoid serious constitutional issues.

The government disagrees. It claims that the only intent required is a finding that the defendant knowingly requested a *quid pro quo*, and as a result, the term corruptly "adds nothing to the requirement that the defendant solicit or pay a bribe with the intent to exchange the bribe for official action." Gov't Opp'n 12. It argues that neither *Skilling* nor cases decided after it "affirmatively ties honest services fraud" to an awareness on the defendant's part that he requested something unlawful. *Id.* at 12-13. And it argues that the examples offered by the Defendants— showing the need for a separate intent standard to avoid grave constitutional concerns—"are merely red herrings." *Id.* at 13-14. The government is incorrect in each regard.

11

In *Skilling*, the Supreme Court limited the honest-services fraud statute to "core" cases of corruption involving "bribery or kickback schemes." 561 U.S. at 407. In doing so, the Court avoided vagueness concerns by drawing "from federal statutes proscribing—and defining—similar crimes," namely, "18 U.S.C. §§ 201(b), 666(a)(2)" and "41 U.S.C. § 52(2)." *Id.* Each of these three statutes requires the government to prove more than knowing conduct. The two bribery statutes, 18 U.S.C. §§ 201(b) and 666(a)(2), require "corrupt[ ]" intent. And the anti-kickback statute requires the government to prove the defendant gave remuneration "for the purpose of *improperly* obtaining or rewarding favorable treatment in connection with [certain enumerated circumstances]." 41 U.S.C. § 52(2) (emphasis added).

For these reasons, courts have repeatedly looked to the federal bribery statutes for purposes of defining honest-services fraud. *Skilling* itself cites with approval circuit-level decisions where courts had looked to other federal bribery statutes to supply the terms for honest-services fraud, 561 U.S. at 412-13, including *United States v. Whitfield*, which focused on 18 U.S.C. § 201's requirement of a "corrupt agreement," 590 F.3d at 352-53. And following *Skilling*, courts of appeals have repeatedly looked to other federal bribery statutes to define the contours of honest-services fraud. In *United States v. Terry*, for example, Judge Sutton explained that a core "principle" of bribery was "corrupt" intent, which he imported from 18 U.S.C. §§ 201(b)(2) and 666(a)(1)(B). 707 F.3d 607, 612 (6th Cir. 2013). And the D.C. Circuit did the same in *United States v. Ring*, holding that honest-services fraud requires "an

intent to influence an official act by way of a *corrupt* quid pro quo." 706 F.3d 460, 465 (D.C. Cir. 2013) (emphasis added) (citing 18 U.S.C. § 201(b)(1)).

Indeed, following *Skilling*, the law was so well established in this regard that, as the government concedes, "the parties in *McDonnell* agreed to use Section 201's definitions." Gov't Opp'n 12. As a result, in *McDonnell*, the government had to prove the governor "demanded, sought or received [an] item of value *corruptly* in return for being influenced in the performance of [an] official act," and the parties defined "corruptly" to mean an act that "is performed knowingly and dishonestly for a wrongful purpose." Supp. Joint App'x 68, *McDonnell v. United States*, No. 15-474 (U.S.) (filed Feb. 24, 2016), *available at* 2016 WL 860558 (emphasis added); *see also McDonnell*, 136 S. Ct. at 2365 (noting that the parties had agreed to use 18 U.S.C. § 201(b)(2)'s definitions for "official act" and "corruptly"). The government now claims that it is not "affirmatively" required to use Section 201's definitions, Gov't Opp'n 12, but its approach in *McDonnell* is consistent with a contemporary understanding of what *Skilling* requires.

Thus, the government is incorrect when it argues that "there is no caselaw that affirmatively ties honest services fraud" to "the elements and instructions for Section 201 bribery." *Id.* Both before and after *Skilling*, courts have done just that, and at least until this case, the government agreed with that approach.

Next, the government mistakenly argues that the phrase "corruptly" in 18 U.S.C. §§ 201(b)(1) and 666(a)(2) adds "nothing to the requirement that the defendant solicit or pay a bribe with the intent to exchange the bribe for official action." Gov't

13

Opp'n 12. The Supreme Court rejected a near-identical argument in *Arthur Andersen*. There, the Court held that the phrase "knowingly . . . corruptly persuades" in the federal obstruction statute requires "consciousness of wrongdoing." 544 U.S. at 706. A similar outcome is compelled here. It is not enough to "give[ ]," "offer[ ]," or "promise[ ]" something of value in exchange for official action; the defendant must do so "corruptly, " 18 U.S.C. § 201(b)(1)—that is, with consciousness of wrongdoing or an awareness that his conduct is unlawful. For that reason, in a recent case before the Supreme Court, the government acknowledged that "corruptly" requires consciousness of wrongdoing even in Section 666, a statute aimed at bribery. *See* U.S. Br. 39, *Snyder v. United States*, No. 23-108 (U.S.) (filed Mar. 11, 2024) (arguing that "corruptly" as used in Section 666 "mean[s] 'having an unlawful or evil motive'" (quoting *Merriam Webster's Dictionary of Law* 109 (1996), and citing *Arthur Andersen*, 544 U.S. at 705-06).

Despite its recent position before the Supreme Court in *Snyder*, the government suggests a different understanding of "corruptly" here, claiming that in *United States v. Sun Diamond Growers of California*, 526 U.S. 398 (1999), the Supreme Court held that the intent needed to commit bribery "went no further than the intent to exchange official action for a bribe." Gov't Opp'n 13. But *Sun Diamond* did not purport to discuss the meaning of the phrase "corruptly" in the federal bribery statutes. Rather, it discussed the basic distinction between bribery and an illegal gratuity. *See Sun Diamond*, 526 U.S. at 404-05. Nothing in *Sun Diamond* suggests that, in the context of bribery, the phrase "corruptly" has no independent significance.

14

And that would be a strange outcome, because the Supreme Court has repeatedly declined to interpret statutes in a way that renders any of their terms superfluous. *E.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) (criticizing the government for proposing an interpretation that rendered statutory language "superfluous"). The fact remains that a would-be briber must do more than give, offer, or promise something of value in exchange for official action; he must do so "corruptly." 18 U.S.C. §§ 201(b)(1), 666(a)(2).

The government also ignores the basic need for the requirement of corrupt intent. As Mr. Lindberg explained, in the absence of a corrupt-intent element, a jury could find that protected political speech qualifies as honest-services fraud. Post-Trial Mem. 24-25. And he provided a series of examples to illustrate this point. *See id.* For example, warring political groups vowed to sponsor advertisements for or against Senator Collins based on her vote on then-Judge Kavanaugh's confirmation as Associate Justice. *Id.* at 24. And a satirist, John Oliver, offered Justice Thomas $1 million annually for the rest of his life if he formally resigned his position from the Supreme Court. *Id.* at 24-25. Because these are examples of offers to provide a thing of value in exchange for an official act, the only thing that saved these political actors from prosecution was a lack of corrupt intent. *See id.*

The government takes a different view. Mr. Lindberg's examples are "red herrings," it argues, because the "public officials in those hypotheticals did not agree to take any action in exchange for money," and hence, "there was no *quid pro quo*." Gov't Opp'n 13.

The government is wrong. Under, the federal bribery statutes, "[a] *payor defendant* completes the crimes of honest-services fraud and federal-funds bribery as soon as he gives or offers payment in exchange for an official act . . . ." *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (emphasis added); *accord United States v. Jackson*, 371 F. Supp. 3d 257, 267 (E.D. Va. 2019). That's exactly what happened in each hypothetical. To make a political point, various actors offered things of value to influence official action. Neither Senator Collins nor Justice Thomas had to accept those offers to expose the would-be payors to potential criminal liability. The only thing that spared them was an obvious lack of "corrupt" intent, and for that reason, the absence of such an element would raise grave constitutional concerns.

It was therefore critical for this Court to have instructed the jury that honest-services wire fraud required proof of a corrupt intent. Such a requirement is consistent with *Skilling*, *Arthur Andersen*, other bribery statutes, and the canon against superfluidity, and such a requirement is necessary to avoid serious constitutional issues. Respectfully, the Court's failure to define "corruptly" as an element of honest-services wire fraud was error.

2. **The Court improperly diluted the requisite level of intent on both counts.**

The Court also improperly diluted the requisite level of intent on both counts. To be sure, the Court correctly instructed the jury that, on Count Two, the term "corruptly" requires "knowledge that the conduct was unlawful." Tr. 1007:4-5. But the Court contradicted that charge by later instructing the jury that, with respect to

16

"both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Tr. 1016:2-4.

The government offers two responses. Neither is persuasive.

*First*, the government argues that, although it agreed at the time with the definition of "corruptly" that the Court provided to the jury on Count Two, Section 666 does "not require the jury to find the defendants acted knowing their conduct was unlawful." Gov't Opp'n 15. The government now argues that the Court was only obligated to instruct the jury that an act is done corruptly "if it is done with the intent to engage in some more or less specific *quid quo pro*." *Id.*

This argument fails here for the same reason that it fails above. Under Section 666(a)(2), it is not enough to "give[ ], offer[ ], or agree[ ] to give" something of value to any person with the intent to influence a government agent in connection with official action; a defendant must do so "corruptly." 18 U.S.C. § 666(a)(2). The government's sudden reversal here would read the word "corruptly" out of Section 666.[3]

As above, the government's new position on the word "corruptly" is also contrary to *Arthur Andersen* and the government's position before the Supreme Court in *Snyder*, and it raises serious constitutional issues. The word "corruptly" requires

---

[3] Even aside from the merits, the government is not entitled to change positions now. It agreed that "corruptly" requires "knowledge that the conduct was unlawful" in Count Two. Dkt. No. 421, at 31; *accord* Tr. 794:18-23, 795:4-5. The government has waived any argument to the contrary. *See United States v. LeBeau*, 949 F.3d 334, 341, 343 (7th Cir. 2020) (holding that because parties stipulated to an initial set of jury instructions, and then agreed to a judge's change, a subsequent challenge was waived).

"consciousness of wrongdoing," which safeguards against convicting defendants who "honestly and sincerely believed [their] conduct was lawful." *Arthur Andersen*, 544 U.S. at 706; *accord* U.S. Br. 39, *Snyder v. United States*, No. 23-108 (U.S.) (filed Mar. 11, 2024). Absent such a requirement, a political group could be prosecuted for publicly offering to run advertisements in support of legislators who vote in favor of certain legislation—even if that group is plainly exercising its rights under the First Amendment.

*Second*, the government argues that, under the Court's instructions, the jury was required to consider "the evidence and instruction on each charge separately." Gov't Opp'n 15. The government concedes that this Court instructed the jury that, with respect to "both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." *See id.* But the government emphasizes that this contradictory instruction appeared in Count One, and the Court informed the jury that it still had to find "'beyond a reasonable doubt that the defendant acted with a requisite level of intent on both counts.'" *Id.* (quoting Tr. 1016:1-2). Thus, the government appears to argue that the jury would not have understood the instruction contained within Count One to undermine the requisite intent that the jury was required to find with respect to Count Two. *See id.* at 15-16.

But this is just a rehash of the same unsuccessful argument the government made in the earlier appeal in this case. There, the government emphasized that this Court instructed the jury to consider each count separately. *Lindberg*, 39 F.4th at

164. But the Fourth Circuit held that this Court's "instructions on each count were not as separate as the government contends," pointing to several situations where this Court simultaneously instructed the jury on the substance of both counts. *Id.* at 164-65. The Fourth Circuit concluded that this Court's erroneous instruction on Count One "may, therefore, have effortlessly bled into the jury's consideration of Count Two," requiring a retrial on both counts. *Id.* at 165.

The same outcome is compelled here. The key instruction stated: "While the government must prove beyond a reasonable doubt that the defendant acted with a requisite level of intent on both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Tr. 1015:25-1016:4. The plain import of this language was that, no matter the requisite level of intent the government must prove on both counts, it did not have to prove that the defendants knew their acts were unlawful. *See id.* That instruction plainly contradicted the Court's instruction on "corrupt" intent in Count Two, and respectfully, the Court erred in doing so.

### 3. These instructional errors were not harmless.

The government does not dispute that it bears the burden of showing that the Court's instructional errors were harmless. It argues instead that it satisfies this difficult standard because the jury was instructed on a heightened level of intent on Count Two, and it returned guilty verdicts on both counts, showing that any error on Count One was harmless. Gov't Opp'n 16.

But the government's analysis is incomplete. As noted above, the Court did not instruct the jury on a heightened level of intent for Count Two. Rather, it instructed

19

the jury that it had to find that the Defendants acted with "knowledge that the conduct was unlawful," Tr. 1007:4-5, but then the Court contradicted that instruction by charging the jury that regardless of the requisite level of intent for "both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful," Tr. 1015:25-1016:4.

Thus, the Court's instructions did not function as a valid controlled experiment. The jury was not properly instructed on either count as to the requisite level of "corrupt" intent, and the jury's verdict on one count therefore cannot be used to sustain the other.

The government also implies that this Court can act with confidence that any error was harmless because the jury "returned a guilty verdict the very same afternoon on which it began deliberations." Gov't Opp'n 15. But that warrants caution, not confidence in the jury's verdict.

As the Court noted, the jury could have gone "either way." Tr. 1033:7. The fact that it returned a verdict so soon suggests that it may have been improperly influenced by the Court's erroneous instruction that, for "both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Tr. 1015:25-1016:4.

Under these circumstances, the government cannot show that the verdict was not tainted by the Court's erroneous instructions. A new trial is warranted on both counts.

**B.** **The Court erred in declining to admit two State statutes that tended to show that the Defendants did not request an "official act" or a decision on the "business" of the Department of Insurance, and that error was not harmless.**

The government does not dispute that, in some instances, State law might be relevant to an element or defense to a federal offense. To be sure, it claims that "courts *generally* do not provide juries with statutes other than those charged in the indictment." Gov't Opp'n 16 (emphasis added). But buried in a footnote, it acknowledges that the Fourth Circuit affirmed a decision that put before a jury State statutes and regulations that were relevant to a federal offense. *Id.* at 20 n.3 (discussing *United States v. Titus*, 475 F. App'x 826 (4th Cir. 2012) (unpublished)).

Thus, contrary to the government's suggestion, there is no broad prohibition on placing State statutes before a jury. The question becomes whether the State statute is "relevant" to an element or defense of a federal offense. *See, e.g.*, *Titus*, 475 F. App'x at 834. And as the government concedes, a fact is relevant if it has "'*any tendency* to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action.'" Gov't Opp'n 17 (quoting Fed. R. Evid. 401) (emphasis added).

One fact that was relevant is whether the Defendants requested what would have amounted to an "official act," *Lindberg*, 39 F.4th at 163, and State law is highly relevant to this determination. An "official act" involves a "formal exercise of governmental power" by a State official similar to a lawsuit, hearing, or administrative determination. *McDonnell*, 136 S. Ct. at 2369. And it must involve a question that is pending or that "may by law be brought" before the State official. *Id.*

21

State law is relevant to both issues; it bears on whether something involves a "formal exercise of governmental power," and it matters to determining whether an issue may by law be brought before a particular State official. Indeed, for similar reasons, courts had recognized even before *McDonnell* that "state laws are useful" in determining the scope of "honest services" fraud. *United States v. Segal*, 495 F.3d 826, 834-35 (7th Cir. 2007).

The two proffered State statutes were plainly relevant here. Those statutes required the Commissioner to issue a signed, written order and abide by other formalities if he exercised "formal governmental power" affecting the rights of any insurer. N.C. Gen. Stat. §§ 58-2-45, 58-2-132. And yet, there was no evidence that the transfer of a file from one employee to the next was *ever* viewed as requiring a signed, written order, suggesting that such a transfer did not involve a formal exercise of governmental power. *See* Post-Trial Mem. 28 (citing Tr. 413:22-414:13, 855:6-857:15).

The government does not argue otherwise. Instead, it attempts to recharacterize the official act as the removal of Ms. Obusek from her position as the Senior Deputy Commissioner, and it notes that these State statutes "do not pertain" to that issue. Gov't Opp'n 18.

But as noted above, there was no evidence that the Defendants tied campaign contributions to a request to have Ms. Obusek removed from her position as the Senior Deputy Commissioner. Rather, the evidence established that the Defendants asked Commissioner Causey to transfer the review of Mr. Lindberg's businesses from Ms. Obusek to Ms. Walker. The proffered statutes were plainly relevant to that issue,

because such a transfer could be said to involve an "approval, authorization, or permission . . . affecting an[ ] insurer." N.C. Gen. Stat. § 58-2-45. And yet, no one understood such a transfer to require a written order signed by the Commissioner. *E.g.*, Tr. 413:22-414:13, 855:6-857:15. The jury was entitled to consider this evidence.

As a fallback, the government argues that, even if the statutes were relevant, the Court appropriately held that the danger of unfair prejudice outweighed their probative value. But like the Court, the government could not engage in an appropriate balancing under Rule 403, because it does not appreciate the full probative value of the evidence. *See* Post-Trial Mem. 32 (citing authorities). Nor does the government explain why any risk of confusion could not be addressed through an appropriate limiting instruction. On this score, the Seventh Circuit rejected a claim that a court could not adequately instruct a jury on the interplay between State law and honest-services fraud. *Segal*, 495 F.3d at 834-35. As such, the Court should have admitted the statutes into evidence for the jury's full consideration.

Finally, the government has not shown that the exclusion of these statutes was harmless. The government notes that the Court permitted defense counsel to ask a few questions on the existence of these statutes. Gov't Opp'n 20. But those questions were not an adequate substitute for the statutes themselves, which were powerful evidence that no one would consider the requested transfer a formal exercise of governmental authority. *See Lindberg*, 39 F.4th at 163 (holding that the Defendants should have been permitted to present "evidence" that what they requested was "not

an official act"). As a result, the government cannot show that the exclusion of these statutes was not harmless.

### C. The Court's failure to instruct the jury on each side's preferred methodology for the $5,000-value element seriously impaired Mr. Lindberg's defense on Count Two.

Mr. Lindberg requested that the Court instruct the jury in neutral terms on the methodologies that each side favored for assessing the subject matter of the alleged bribe, which goes to the $5,000-value element of Count Two. *See* Post-Trial Mem. 34 (citing record). The government preferred a market approach, whereas the Defendants wanted the jury to adopt a cost-based approach. *Id.* Ultimately, the Court instructed the jury only on the government's preferred methodology. Tr. 1006:13-20.

The government does not dispute that Mr. Lindberg's proposed instruction was an accurate statement of the law. Because Section 666 is silent on how to value the subject matter of an alleged bribe, a cost-based approach is an acceptable method for doing so. *See* Post-Trial Mem. 35-36 (citing authorities).

Instead, the government argues that Mr. Lindberg's instruction was "'substantially covered by the charge the court actually gave to the jury.'" Gov't Opp'n 23 (citation omitted). According to the government, because the Court "informed the jury that it 'may' consider the value of the bribe," those instructions made "clear that the jury was not bound to do so." *Id.*

This argument gets the government only so far. Although the Court appropriately instructed the jury that it was not bound to accept a market approach, it provided the jury with no other instruction on how to value the subject matter of the alleged bribe. And for that reason, the Court's instruction on a market approach

24

did not "substantially cover[ ]" the Defendants' request for an instruction on a cost-based approach.

The Court's decision not to instruct the jury on a cost-based approach also seriously impaired the defense. Although the government notes that Mr. "Lindberg was free to suggest to the jury that it use some other method of valuation," Gov't Opp'n 24, only the government's preferred methodology had the Court's seal of approval. And the government does not dispute that it highlighted this fact for the jury during closing. Tr. 923:7-11.

Thus, it is disingenuous to argue that the Court's instruction "did not give the United States an improper advantage." Gov't Opp'n 24. Although both sides had proffered accurate and competing methodologies for valuing the subject matter of the alleged bribe, the Court instructed the jury only on the government's preferred methodology. That gave only the government's valuation methodology an air of legitimacy in a case where it struggled to pinpoint any evidence beyond a "belie[f]" that Ms. Walker would have been better for Mr. Lindberg's businesses than Ms. Obusek. Gov't Opp'n 7. As a result, the government cannot show that the failure to give Mr. Lindberg's proposed instruction was not harmless.

**D.** **The government offers no valid defense of this Court's decision to admit two unfairly prejudicial e-mails with little to no additional probative value.**

Finally, the government fails to adequately defend this Court's decision to admit two e-mails containing an evolving list of action items and notes that Mr. Lindberg sent to himself. These e-mails had limited to no additional probative value

and posed a substantial risk of unfair prejudice. And their admission was not harmless.

The government notes that aspects of these e-mails contained relevant information, Gov't Opp'n 26, while ignoring that, under Rule 403, the Court must weigh "the incremental probative value" of the e-mails against any remaining evidence untainted by the risk of unfair prejudice, *United States v. Ham*, 998 F.2d 1247, 1253 (4th Cir. 1993). And much of these e-mails were cumulative of other evidence. For example, it was no secret that a "major issue[ ]" Mr. Lindberg wanted addressed was assigning Ms. Walker to review Mr. Lindberg's businesses.

Nor does the government adequately explain why these e-mails had additional value to its case. It claims the e-mails show Mr. Lindberg's "intent to cover up his crimes," Gov't Opp'n 26, but it does not dispute that it has no evidence to this effect. It concedes that Mr. Lindberg produced both e-mails to the government, and it does not dispute that, because Ms. Walker was not in place by August 31, 2018, it made sense that Mr. Lindberg would have deleted that condition from a reminder on September 1, 2018, to refund the money he had provided to the independent expenditure committees. *See* Post-Trial Mem. 41-43.

The government also doesn't defend its decision to exploit the e-mails to maximize the risk of unfair prejudice. Although it now acknowledges that the e-mails were not carbon copies of each other, *see id.* at 25-26, it implied to the jury falsely that Mr. Lindberg was merely "resend[ing]" the same e-mail to himself—but only after deleting "the quo." Tr. 987:4-6. And although the government implied to the jury

that Mr. Lindberg falsely asserted privilege over portions of these documents, Tr. 708:19-709:5, it does not dispute that it never contested his counsel's invocation of privilege over some of their contents. *Compare* Post-Trial Mem. 44-45, *with* Gov't Opp'n 25-37. Similarly, the government offers no justification for its decision to appeal to "class prejudice" by highlighting Mr. Lindberg's aspirations for growing his wealth. *See* Gov't Opp'n 25-27.

The government claims that "the Court's heavy redactions ensured that the exhibits did not prejudice the defendants at all." Gov't Opp'n 25; *see also id.* at 26. But there are two fallacies in this claim.

*First*, the Court's decision to redact *other portions* of these e-mails did nothing to cure the unfairly prejudicial nature of what it permitted the jury to consider. The government, for example, offers no defense of its decision to falsely imply that Mr. Lindberg did not have a legitimate basis for his privilege claims and the government's naked appeal to Mr. Lindberg's wealth.

*Second*, the government nowhere addresses Mr. Lindberg's argument that the Court's redactions made the problem of unfair prejudice worse, not better. *See* Gov't Opp'n 25-27. As Mr. Lindberg explained (Post-Trial Mem. 46), the heavy redactions allowed the government to imply, falsely, that the documents were virtually identical, which allowed the government to suggest, incorrectly, that the only change to the second e-mail was the deletion of "the quo." Tr. 987:4-6. And the redactions removed section headers and other separators that allowed the government to imply, incorrectly, that the unredacted items were somehow linked—*e.g.*, suggesting

incorrectly that Mr. Lindberg's aspirations about his net worth in 2041 were somehow related to reassigning work from Ms. Obusek to Ms. Walker.

As for harmless error, the government offers no defense. *See* Gov't Opp'n 25-27. It effectively concedes that, given that the Defendants' principal defense went to a lack of criminal intent, the government's efforts to use these e-mails to claim that they proved "[c]onsciousness of guilt" were not harmless. Tr. 987:7.

## CONCLUSION

Mr. Lindberg respectfully requests that the Court enter a judgment of acquittal or, alternatively, order a new trial on both counts.

Dated: July 26, 2024

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com

Respectfully submitted,

/s/ James F. Wyatt, III
James F. Wyatt, III
  (NC State Bar No. 13766)
Robert A. Blake, Jr.
  (NC State Bar No. 20858)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
704-331-0773 (fax)
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (*pro hac vice*)
Rachel M. Riley (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201-2591
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

*Counsel for Defendant Greg E. Lindberg*

28

## CERTIFICATION

Pursuant to the Court's Standing Order of June 18, 2024, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 26, 2024                    /s/ James F. Wyatt, III
                                        James F. Wyatt, III
                                          (NC State Bar No. 13766)