UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GREG E. LINDBERG,<br><br>*Defendant*. | No. 5:19-CR-22-MOC<br><br>No. 3:23-CR-48-MOC |

**CONSOLIDATED POSITION OF THE UNITED STATES REGARDING RESTITUTION ISSUES REMAINING BEFORE THE COURT**

Per the Court's instruction at the hearing on August 10, 2026 ("August 10 Hearing"), the United States respectfully submits this consolidated position statement regarding the remaining restitution issues before this Court, including those raised by Defendant as well as those raised by others seeking restitution. For the reasons set forth herein, the United States requests that the Court conduct a *de novo* review of the Special Master's recommendations and related reasoning contained in his various reports and other filings, the Defendant's multiple filings regarding restitution, and the filings made by others seeking restitution, and enter a final order of restitution in a form substantially similar to that proposed by the Special Master in his Second Supplement to Report and Recommendations Regarding Restitution ("Final Report," Doc. 245).[1] To aid the Court's *de novo* review, below is a chart summarizing the restitution issues the United States

[1] At the August 10 hearing, the Court orally denied Defendant's requests in various filings to disqualify certain attorneys representing the United States in this matter and orally denied Defendant's motion to strike (Doc. 290).

believes remain open and the recommendation of the United States regarding each such issue.[2]

| **Issue[3]** | **Description** | **Effect on Restitution Amount Included in Preliminary Order of Restitution** | **Recommendation of United States** |
|---|---|---|---|
| A<br>Doc. 269<br>Doc. 278 | Threshold Issue of Constitutionality of Special Master Process | N/A | The Special Master process used here comports with the Constitution as explained below. |
| **Issues Relating to Starting Restitution Amount Owed to Victims** | | | |
| 1 | *Inclusion of Pre-Judgment Interest* | $263,000,000 | **Allow -** The Court should continue to include the conservative Time Value of Money interest rate proposed by the Special Master in the Final Restitution Order to fully compensate victims for their losses. Several courts have recognized that including an interest component in restitution is necessary to make victims whole. *See, e.g., United States v. Fike*, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). |
| 2 | Proper Starting Balance of Affiliate Investments | $141,000,000 | **Disallow –** The Court should continue to include this amount in the Final Restitution Order. The Special Master's use of the starting IALA loan balances was a starting point for efficiency. Neither the Special Master, nor the Court, is obligated to use those amounts when there is additional information that |

[2] The United States submits that Defendant has waived any (non-constitutional based) objections to the Preliminary Restitution Order other than those specifically reserved in the Order, which is an independent reason to deny most of these issues. The United States will note where an issue was ***not*** specifically reserved in the Preliminary Restitution Order by italicizing the description.

[3] For consistency, when an issue is identified by a number, that number is identical to that used by LINDBERG and the Special Master in their filings. (*See, e.g.* Doc. 132-3 & Doc. 245 at 6). When an issue is identified by a letter, it is an issue that has not been consistently identified with a standard nomenclature.

| | | | |
|---|---|---|---|
| | | | warrants deviation from those balances. The proposed Final Order of Restitution includes supported deviations that both increase and decrease the amount of restitution calculated. |
| B | Inclusion of Fraudulent Management and Other Fees Charged by SASL and SFL | TBD | **Disallow -** While, if known, these types of fees could be included in the restitution amount since these were part of his fraud (*see* PSR at ¶ 103(e) ("Moreover, the co-conspirators used SASL to extract millions of dollars from LINDBERG's insurance companies in the form of investment advisory fees paid to SASL."), the Special Master's approach to restitution in this case, with agreement from LINDBERG, focused on the affiliated loan amounts. |
| **Issues Relating to Credits Against Restitution for Items that Have Not Been Monetized and the Value of Which is Unknown** | | | |
| 3 | *Credit Against Restitution Amount for Defendant's Proposed Value of Preferred Equity of AAPC Given to ULICO* | $352,906,240 | **Disallow –** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Defendant should receive credit against his restitution obligations if and when ULICO is able to realize any value from the preferred equity, and in the actual dollar amount of value once realized, not his prospective guess of future value. |
| 7 | *Credit for Proceeds of the Clanwilliam Group Sale that Have Been Escrowed for Tax Liabilities* | $20,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Defendant should receive credit against his restitution obligations if and when any of these funds are actually paid as restitution. |

| Issues Related to Credits for Payments Made to, or Monies Received by, Victims as Part of Pre-Existing Civil Obligations Not Tied to the IALA Loan Balances<br><br>and<br><br>Issues Related to Credits for Alleged Diminution in Value of Defendant's Assets After He Proximately Caused Victims' Losses by Causing Them to Invest in Affiliated Investments Through Fraud and Deception[4] | | | |
|---|---|---|---|
| 4 | Credit for Certain Payment Made to SNIC | *$27,823,425* | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. These payments were made after the North Carolina Insurance Companies were put into rehabilitation, were not related to affiliate loan balances, and were made by Defendant for new consideration, e.g., to keep these insurance companies from being placed into liquidation. |
| 5 | Credit for Cash Payments Made on Certain Preferred Equity Investments and for Other Matters (itemized on page 22 of Defendant's initial response to the Special Master's First Report (Doc. 132 at 22)) | $79,655,289 | **Allow in part –** To the extent these payments were for loans included in the IALA balances, they should be credited against the starting restitution amount. The Special Master's proposed Final Restitution Order has reduced the amount of restitution order by $39 million to account for this. The remaining amount claimed should be **disallowed** because those amounts represent payments for non IALA loans or that were otherwise already taken into account by the Special Master. Defendant should not get credit for payments made toward non IALA loans when the outstanding balances of such loans have not been included in the restitution amount. |
| 6 | *Credit for Fee Paid to CBL for Agreement to Subordinate Debt with Respect to Beckett* | $3,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. This payment was made after the North Carolina Insurance Companies were put into rehabilitation, was not related to |

[4] Many of LINDBERG's arguments about the restitution issues focus on whether he was the "proximate cause" of the victim's losses. As set forth below, he was, but, in any event, he agreed as part of the plea agreement to pay restitution beyond losses he proximately caused. (Doc. 40 at ¶ 10(a)).

| | | | |
|---|---|---|---|
| | | | affiliate loan balances, and was made by Defendant for new consideration, e.g., to have insurance companies subordinate their debt to a third party's debt. |
| 8 | Credit for Proceeds of ULICO Sale of Real Estate | $13,596,013 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. The assets sold in these transactions were obtained by ULICO outside of those identified in the IALA in exchange for additional consideration. Because the outstanding balance of the underlying affiliated investment was not contained in the Preliminary Restitution Order, payments received related to this investment should not count as credits. |
| 9 | Credit for Proceeds of Certain Bermuda Asset Sales | $9,800,076 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. The assets sold in these transactions appear to have been obtained by the Bermuda insurance companies outside of those identified in the IALA in exchange for additional consideration. Because the outstanding balance of the underlying affiliated investment was not contained in the Preliminary Restitution Order, payments received related to this investment should not count as credits. |
| 10 | Credits for Purported Proceeds of Zero-Coupon Bonds in PPNs | $243,452,385 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Defendant has not established that such a credit relates to the IALA loan balances. |
| 11 | *Credit for Purported Value in October 2018 Value of North Carolina Insurance Companies* | $454,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Even if the claimed value of the North Carolina Insurance Companies was accurate in 2018, it has nothing to do with payments on the affiliate loan balances, was subject to claims by other creditors, and was not available to pay policyholders. |

| | | | |
|---|---|---|---|
| 13 | *Credit for Losses Suffered Related to Eye Care Lenders* | $22,288,826 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. The decision of the North Carolina Insurance Companies to purchase assets out of bankruptcy in 2024, years after LINDBERG defrauded them, is irrelevant to the amount of restitution owed by LINDBERG. This transaction is not a situation where Defendant returned money or assets to a victim. |
| 14 | *Credit for Losses Suffered Related to an Alleged Failure to Refinance UKAT in 2023* | $39,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. The decision of the North Carolina Insurance Companies to forgo a specific refinance transaction in 2023, years after LINDBERG defrauded them is irrelevant to the amount of restitution owed by LINDBERG. |
| 16 | *Credit for Purported Loss in Value Suffered as a Result of the Clanwilliam Group Sale, to which Lindberg Consented* | $474,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Even if LINDBERG's value claims are accurate, which is dubious,[5] he consented to the sale. Moreover, the sale occurred years after LINDBERG committed the fraud. |
| 17 | *Credit for Purported Losses Caused by Selling the Zero-Coupon Bonds Prior to Their 30-year Maturity* | $611,600,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. The decision of the North Carolina Insurance Companies, made after LINDBERG defrauded them, to liquidate assets rather than wait until they mature decades in the future is irrelevant to the amount of Restitution owed by LINDBERG. |

[5] In addition to the age and source of the purported valuations upon which LINDBERG relies, as noted in the PSR, artificially inflating the financial condition of companies was a central part of LINDBERG's scheme. (*See, e.g.*, Doc. 63 at ¶¶ 102 -103).

| Issues Related to Credits for Outstanding IALA Loan Balances for Which Defendant Claims Others Shared Responsibility | | | |
|---|---|---|---|
| 12 | *Credit for Losses Suffered on Investments Related to Agera* | $129,000,000 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Defendant agreed to include these loans in the IALA, and at the time of the IALA it appears that Defendant had a controlling ownership stake in Agera. Moreover, Defendant was aware of the Agera investments before he entered into an agreement with ULICO, and his false promises about fixing the issues with the Agera investments was part of his fraudulent conduct. |
| 15 | *Credit for Certain Affiliated Investments Purportedly Approved by Others at Eli Global Relating to insurance Holdco Debt* | $14,897,805 | **Disallow -** The Court should not apply this credit to the amount of restitution set forth in the Preliminary Restitution Order. Even if other LINDBERG employees were involved in these affiliated loans, given Defendant's admitted fraudulent conspiracy, the losses are properly included in restitution. |
| **Issues Related to Other Entities Claiming Restitution** | | | |
| C<br>Doc. 221<br>Doc. 238 | Whether Vista (Now Cell 1.16) is a Party Due Restitution and, if not, Should the Court Recoup the Approximately $23 Million Distribution that Vista/Cell 1.16 Received from NHC's Sale of the Clanwilliam Group | TBD | **Disallow -** Vista is not a party due restitution, but the Court cannot recoup the payment it received from the sale of the Clanwilliam Group, which the Court already approved (Doc. 68). While Vista was no doubt harmed by Defendant's conduct, it has not shown that it reasonably relied on Defendant's misrepresentations and the United States does not have sufficient evidence to prove it.[6] |
| D | Whether Conservatrix is a Party Due Restitution | €215,356,806 | **Disallow -** Conservatrix is not a party due restitution. While Conservatrix appears to |

[6] The Court heard argument on this at the August 10 hearing, so it will not be further addressed herein, except that the United States notes that the affidavit upon which Cell 1.16/Vista relies does not claim that the affiant (who had an economic interest in Cell 1.16/Vista and worked closely with LINDBERG) personally relied upon false rating reports when agreeing to invest in LINDBERG-related investments. Rather, it merely concludes that "Cell 1.16 relied on those ratings reports in its financial reporting to VT DFR" and "in concluding that the loans complied with the investment guidelines." (Doc. 113 at ¶¶ 21, 24).

| | | | |
|---|---|---|---|
| Doc. 130<br>Doc. 258 | | | have been harmed by Defendant's conduct, as the Fourth Circuit found, Conservatrix "fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct." *In re: Zetteler, et al.*, Case 26-1749, Doc. 15 at 4 (June 13, 2026). The United States does not have sufficient evidence to demonstrate that Conservatrix was harmed by investing in LINDBERG related investments.[7] |
| **Issues Related to Payment Priority Among Parties Owed Restitution** | | | |
| E<br>Doc. 275<br>Doc. 297 | Whether the Court Should Order Restitution Payments on a Pro Rata Basis or Whether the Court Should Provide a Preference to the Bermuda Insurance Companies and/or ULICO Under 18 U.S.C. §§ 3664(j)(1) & (i) | N/A | **Disallow -** While the United States understands and agrees with the sentiment that the Court should endeavor to put the losses of individual policyholders above those of entities, it nevertheless agrees with the Special Master's position that a pro rata payment structure is most practical here. First, the North Carolina Insurance Companies are not a "provider of compensation" under § 3664(j)(i).[8] Second, unlike the process that allowed the Special Master to make payments directly to certain policyholders of the North Carolina Insurance Companies, there is no practical mechanism in place, or suggested, that could produce the same result for the policyholders of ULICO (which have not yet suffered any losses because of the actions of ULICO) or the Bermuda |

[7] Indeed, Conservatrix's filings in this case make a different loss claim, "it was entirely foreseeable that the Conservatrix policies would lose value because of Defendant's undercapitalization of Conservatrix" and "The losses Conservatrix suffered as a result of the non-performance of the Commitment total € 215,356,806." (Doc. 130 at 7-8; *see also* Doc. 258 at 10). Not providing capitalization or profit as promised – even if it may be actionable in other for a -- is different from taking money through deceit and misrepresentations.

[8] This is addressed in the Response filed by the North Carolina Insurance Companies (Doc. 123 at 6-7). In short, guarantee associations paid policyholders, not the insurance companies, and the insurance companies now owe the guarantee associations for those payments. That is much different than an insurance policy issuing a check to a victim to cover it loss. It is not surprising then, that numerous Courts have ordered restitution directly to failed insurance companies. (*See* cases collected in Doc. 137 at 3-4 and n.4).

| | | | |
|---|---|---|---|
| | | | Insurance Companies. Thus, restitution payments would go through the insurance companies, which would subject them to statutory preferences and other creditors and not necessarily directly to policyholders. |
| **Miscellaneous Procedural Issues** | | | |
| F<br>Doc. 172<br>Doc. 190 | Whether the Court Should Stay Asset Sales by the Special Master | N/A | **Deny –** As the Special Master explains in responses and final reports, there are no pending or contemplated sales by the Special Master to stay prior to this Court entering a final restitution order.[9] |
| G<br>Doc. 278<br>Doc. 282<br>Doc. 290 | Whether the Court Should Treat Motions as Unopposed, Strike Motion Responses Based on Defendant's Desired Level of Detail, or Hold Special Master Filings in Abeyance | N/A | **Deny –** As the Court noted during the August 10 hearing, the United States is not required to respond to every filing, especially when the status of a defendant's counsel is unknown. |

To the extent the United States believes additional discussion is warranted of these issues, it is set forth below.

## I. Relevant Provisions of Plea Agreement, Factual Basis, PSR, and Other Orders Regarding Restitution

On November 5, 2024, Defendant signed a plea agreement in which he agreed, among other things, to pay:

> [F]ull restitution, regardless of the resulting loss amount, to all persons ***directly or indirectly*** **harmed** by the defendant's criminal conduct. This includes Defendant's crime of conviction, all 'relevant conduct," as defined by U.S.S.G. as defined by U.S.S.G. §1B1.3, and all conduct pertaining to any dismissed counts or uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Among other things, Defendant agrees to pay full

[9] The defendant also petitioned the Fourth Circuit for a stay, as well as an expedited writ of mandamus in both cases, which the Circuit has since denied. (USCA4 Appeals 26-4309, 4310).

> restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment: Southland National Insurance Company; Southland National Reinsurance Corporation; Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Universal Life Insurance Company of Puerto Rico; PB Life and Annuity Co., Ltd.; Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; PB Investment Holdings Ltd.; and Universal Life Insurance Company.

(Doc. 40 at ¶ 10(a) (emphasis added).

Defendant also signed a Factual Basis in support of his guilty plea under penalty of perjury. (Doc. 42). Among other admissions, Defendant specifically admitted that:

> To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. [And that his] conduct **caused substantial financial hardship** to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of LINDBERG's insurance companies were placed in rehabilitation and PBLA was placed into liquidation."

(*Id.* at ¶¶ 5-6) (emphasis added).

On June 17, 2025, the United States Probation Office submitted its final presentence report, which, among other things, set forth the offense conduct relating to LINDBERG's crimes. (Doc. 63 ¶¶22 - 110). At his sentencing hearing, LINDBERG agreed that the Court could use the offense conduct set forth in the presentence report for sentencing and indicated he had no objections to its contents. (Doc. 234-52 at 6-8). The offense conduct set forth in the presentence report included the following facts, among others:

- In total, the co-conspirators caused LINDBERG's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other LINDBERG companies. The vast

majority of these obligations remain unpaid. (Doc. 63 ¶ 103(f)).

- Although the exact amount of restitution owed to the victim insurance companies and victim policyholders is currently unknown, it likely exceeds $2 billion. (Doc. 63 ¶ 110).

On December 5, 2024, the parties submitted a Joint Motion for Appointment of Special Master and a proposed order. ("Joint Motion," Doc. 54). LINDBERG had agreed to do this as part of his plea agreement. (Doc. 40 ¶ 9) ("defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution….Within thirty days after filing of this Plea Agreement, the parties agree to submit a joint motion for the appointment of a special master…."). The parties began working on a draft of the Joint Motion weeks *before* LINDBERG even signed his plea agreement. Indeed, LINDBERG's counsel submitted an initial draft of the motion to the United States on October 18, 2024. (Exhibit A at 2). LINDBERG originally proposed that Scott Avila serve as the Special Master (*Id.* at 1), but the United States wanted a lawyer to serve as Special Master, preferably one with experience practicing in this District. Ultimately, the parties reached a compromise and jointly recommended that Joseph Grier of the Charlotte-based law firm Grier Wright Martinez PA serve as the Special Master, and that Scott Avila, of Paladin Management, serve as the Special Master's financial advisor. (Doc. 54. ¶ 8).

The Joint Motion represented to the Court, among other things, that:

- "[T]he amount of restitution **owed is substantial**." (Doc. 54 ¶ 5(b)) (emphasis added).

- "Some of the victims have been severely financially impacted by Defendant's conduct and need whatever restitution can be provided as

> soon as possible. Accordingly, it is imperative that the parties take steps to **maximize the amount of restitution** that is recovered and **paid**." (Doc. 54 ¶ 6) (emphasis added).

The Court granted the Joint Motion and issued an order in the form jointly proposed by the parties that incorporated both of these representations, without any objection from LINDBERG. ("Special Master Order," Doc. 56 ¶¶ 5(b), 6). The Special Master Order contemplated that the Special Master would be paid consistent with his hourly rates, which had been previously submitted for the Court's review. (*Id.* ¶ 8). Other provisions of the Special Master Order included:

- Noting LINDBERG's agreement "to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the special master … ***all of Defendant's*** … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets'" (Doc. 56 ¶ 9) (emphasis added).

- Empowering Special Master to "fashion a proposed restitution order" (Doc. 56 ¶ 3(f)); and "propose an apportionment methodology to be applied to future restitution payments received" (Doc. 56 ¶ 3(g)).

- "The Special Master shall prepare quarterly interim statements … that, among other things, reflect the fees and expenses of the Special Master, his/her financial advisors, and his/her retained counsel (if any) incurred for said period in carrying out the Special Master's duties...." and that "Upon the Court's approval of each Interim Statement, the Special Master shall pay such approved fees and expenses from the assets administered by the Special Master that the Special Master determines are reasonably available to satisfy such fees and expenses or as otherwise directed by the Court…." (Doc. 56 ¶ 14).

- "None of the authority vested in the Special Master by the Court is intended to compel or authorize the Special Master to violate any other federal or state court orders." (Doc. 56 ¶ 16).

## II. The Special Master Process Here is Constitutional

### A. Due Process does not prohibit a special master from acting as a receiver.

Title 18, United States Code, Section 3664(d)(6) expressly provides that the "Court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a *de novo* determination of the issue by the court." While Defendant claims the special master process here is "unconstitutional as applied" because the Special Master Order purportedly grants the Special Master receiver duties in addition to those "arising in connection with a proposed order of restitution" (s*ee, e.g.* Doc. 269 at 2), he fails to cite a single case holding that a special master appointed under Section 3664(d)(6) fails constitutional muster. This is not surprising given that federal courts, including this one, have routinely employed special masters to carry out similar duties to those authorized by the Special Master Order here. *See, e.g., United States v. Hitt*, Case 1:19-cr-43, Doc. 28 (E.D.V.A. Feb. 13, 2019); *United States v. Adams*, Case 3:19-cr-88, Doc. 24 (S.D. Miss. Nov. 26, 2018); *United States v. Burks*, Case 3:14-cr-208-MOC, Doc. 14 (W.D.N.C. Nov. 20, 2014); *United States v. Guastella*, 2009 WL 1619902, at n.7, Case No. 98CR1325(SAS) (S.D.N.Y. Jun. 4, 2009); *Cf. United States v. Takata Corp.*, Case 16-cr-20810, Doc. 40 (E.D. Mich. Jul. 31, 2017).

The special masters appointed in *Burks, Adams* and *Hitt* are especially instructive because in those cases the special masters were appointed specifically as both special master and receiver and had the full panoply of duties attendant to each role. *See Burks*, Doc. 14 (same individual appointed as special master under § 3664(d)(6) and as receiver

under § 1956(b)(4)); *Adams*, Doc. 24; (same individual appointed as special master under § 3664(d)(6) and receiver in related civil action brought by SEC); *Hitt*, Docs. 61 & 71 (same individual appointed as special master under § 3664(d)(6) and receiver in related civil action brought by SEC). Contrary to Defendant's claim, the mere combination of multiple roles in one person is not violative of due process. The Supreme Court has repeatedly acknowledged this. *See, e.g.*, *Richardson v. Perales*, 402 U.S. 389, 410 (1971) (due process not violated by social security examiner acting as both investigator and adjudicator); *Withrow v. Larkin*, 421 U.S. 35 (1975) (due process not violated by medical board acting as investigator, adjudicator and sentencer).

**B. In any event, the Special Master is not acting as a general receiver.**

Even if there were potential constitutional issues in combining the roles of receiver and special master, as the Special Master correctly points out, the Special Master Order here *did not* make the Special Master a general receiver over the Primary Restitution Assets in this case. (Doc. 288 at 9-10). Rather, as specifically intended by the parties and agreed to by LINDBERG, the Special Master Order carefully limited the Special Master's authority to securing control of "***all of Defendant's*** … rights and interests, whether held directly or indirectly, in … the 'Primary Restitution Assets.'" (Doc. 56 ¶ 9). With respect to New Hold Co. ("NHC") and the Specified Affiliated Companies, including Beckett, LINDBERG had already lost control over those assets through the June 27, 2019 Memorandum of Understanding ("MOU") and the orders issued by the Wake County

Superior Court in related litigation.[10] Thus, rather than acting as a general receiver over those assets, the Special Master only took control over whatever remaining interest, if any, LINDBERG had in those assets.[11]

LINDBERG's own exhibits submitted in this matter reflect that reality. For example, he admits that (i) in June 2019, he signed the MOU thus "establishing the process to transfer the … SACs;" and (ii) in October 2024, he transferred the SACs to the rehabilitator appointed in the Wake County litigation. (LINDBERG Declaration (Doc. 278-1) at 3-4). Moreover, the "Term Sheet" that was circulated ***after*** the Court entered the

---

[10] *See, e.g. Southland National Insurance Corp., et al. v. Greg E. Lindberg, et al.*, Case 19 CVS 013093, Judgement and Order entered May 17, 2022 at ¶ 47 ("The core of the [MOU] agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SAC's by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders.") and at ¶ 108 ("If SAC's are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC ….") (attached as Exhibit B).

[11] LINDBERG incorrectly claims that because he transferred his "equity interest" in NHC to the Special Master, the Special Master had the ability to control NHC and thus the sale of, among other things, Beckett. (*See, e.g.* Doc. 269 at 12, 15, 16; Doc. 292 at 4). This claim is false and belied by the record. LINDBERG could, and did, only transfer what he had. The rights attendant to his equity interest in NHC were limited by the MOU and the resulting Wake County litigation. This is addressed in the Special Master's Response to Lindberg's motion to disqualify him. (*See* Doc. 288 at 13-14) ("With respect to the SACs, Defendant had no direct interests whatsoever and certainly no rights to control a sale process or otherwise approve or veto any sales. With respect to NHC, Defendant holds an ownership interest with no control rights, other than the right to appoint two designees to NHC's seven-member board of directors."). LINDBERG later claims that the sale of Beckett required the "affirmative consent of an AAI Director [e.g., the board member appointed by the Special Master]." (Doc. 292 at 12). This claim, too, in not supported by the record. Indeed, as the MOU makes clear, this was only the case "[p]rovided there is no default under any Loan (Doc. 55-1 at 5), and here several of the loans were in default. As Judge Dever found in granting summary judgment against LINDBERG for breaching the IALA by failing to pay required interest payments on the loans, LINDBERG "materially underpaid at least one month's interest for some loans [under the IALA] and even more for the loans that defendants unilaterally asserted accrued zero interest." *Colorado Bankers Life Ins. Co., et al. v. Academy Financial Assets, LLC,* Case 5:20-cv-474, Doc. 115 at 17 (E.D.N.C. Aug. 19, 2024).

Special Master Order states that, "The Special Master has no role with respect to NHC or the SACs, because GEL [LINDBERG] has no property rights in these companies. Paragraph 16 in the Special Master Order was meant to clarify this. But even without that paragraph, the Special Master has no rights to property other than those the defendant holds….The Special Master has no role in NHC's plan to manage or sell the SACs." (Doc. 278-1 at 8, 11). If LINDBERG disagreed with this position, he never asked this Court to find otherwise. Yet, he now claims that that the Special Master Order did just that. His decision to avoid raising this issue with the Court until now speaks volumes.

**C. The Special Master's compensation arrangement does not violate Defendant's due process rights.**

Instead of citing any controlling legal support for his claim that the duties of the Special Master here are unconstitutional, LINDBERG relies on a handful of civil cases for the incorrect proposition that allowing the Special Master to be paid from the Primary Restitution Assets creates a structural conflict that violate his due process rights. (Doc. 269 at 4-5). The Court should reject this attempt by LINDBERG to avoid the very process to which he agreed to in order to (successfully) secure a more lenient sentence. Defendant only attacks this process now – not because the process violates the constitution – but because he no longer believes it is beneficial for him.

The primary civil case upon which Defendant bases his argument is *United States v. O'Connor*, 291 F.2d 520 (2d Cir. 1961), but Defendant's reliance is misplaced because *O'Connor* does not stand for the proposition that a special master appointed to assist with restitution under Section 3664(d)(6) may not be compensated from a defendant's assets.

Rather, *O'Connor*, in dicta, made the unremarkable observation that a person with a conflicting financial interest could not serve as a special master in a civil action brought under 26 U.S.C. § 7403 to enforce a tax lien. 291 F.2d at 522. Pursuant to § 7403(d), the district court in *O'Connor* appointed a receiver to enforce a federal tax lien and also appointed the same individual as special master under Rule 53(b). *Id.* at 523, 528. Ultimately, the *O'Connor* Court held that the district court should not have appointed ***any*** special master because it saw "no exceptional condition that would justify reference to a master when the Tax Court is available.[12]" 291 F.2d at 528. While the Court could have ended its analysis with the conclusion that no special master was appropriate in the matter, it continued to state in dicta that the district court should not have appointed the same person to act as both receiver and special master due to that person's financial interest in his role as receiver, e.g., in order to be paid as a receiver, he would need to determine as special master that there was a tax due and owing and thus the lien was valid. *Id.* at 526 (citing *Turney v. Ohio*, 273 U.S. 510, 522 (1927)).

Whatever the nature the receiver's financial interest in *O'Connor*, it certainly does equate to a finding that the Special Master in this case has a financial conflict, or that if he did, it would rise to a constitutional level. As the Supreme Court has repeatedly made clear in *Turney* and its progeny, it is only when a judicial officer "has a direct, personal,

[12] The version of Rule 53 in place at the time provided, among other things, that "a reference to a master shall be the exception not the rule" and required that "in an action to be tried without a jury the court ***shall accept*** the master's findings of fact unless clearly erroneous. *See* Rule 53(b) & (e)(2) (1937) (emphasis added).

substantial pecuniary interest in reaching a conclusion" that a defendant's due process rights are implicated. 273 U.S. at 523.

LINDBERG proffers no credible "direct," "personal," or "substantial" pecuniary interest that the Special Master has here that would create a conflict. Rather, he makes the unsupported claim that, "the more he administers, the larger the fund from which he is paid." (Doc. 292 at 21). But, even if this were true, it is irrelevant. As agreed to by LINDBERG, the costs and hourly fees of the Special Master (along with Defendant's defense counsel) were to be paid, upon Court approval, out of "the assets administered by the Special Master … *or as otherwise directed by the Court*." (Doc. 56 ¶ 14) (emphasis added). Those fees were not contingency fees; nor were they dependent on whether any particular asset was sold or, if so, for how much. Indeed, the Order would allow the Special Master to be compensated "as otherwise directed by the Court" even if the Special Master recommended to the Court that no restitution was owed by Defendant. Moreover, the Order allows the Court to direct that the Special Master be paid from sources other than the assets he administers. If anything, a person compensated on an hourly basis might have a financial incentive to prolong the process not to expedite it. *Cf. United States v. Konrad*, 730 F.3d 343 at n. 12 (3rd Cir. 2013) ("Defendant's contention the Master had a conflict of interest because she was compensated from the recommended reimbursement is unfounded. The Master was paid the standard hourly rate, and not a percentage of the sum she calculated."). Moreover, the Special Master received no compensation from the

Beckett sale that LINDBERG cites as purported proof of the Special Master's unconstitutional conflict, which further undercuts his claims.[13] (Doc. 288 at 16).

**D. Defendant has repeatedly waived objections to the Special Master's Compensation structure.**

Additionally, per the Special Master Order, the Special Master (as well as Defendant's defense counsel) submitted itemized fee petitions for the Court's approval. (*See, e.g.* Docs. 75, 81, 95, 97, 148, 154, 263, 264). LINDBERG never objected to any of them, even those submitted after the Beckett sale.[14] Again, his decision not to raise these issues with the Court until now speaks volumes.

## III. LINDBERG Proximately Caused the Victims' Losses

LINDBERG admitted under penalty of perjury that his criminal conduct "caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders." (Doc. 42 at ¶ 6). He further represented to the Court in the Joint Motion that "the amount of restitution owed is substantial" and that "[s]ome of the victims have been severely financially impacted by Defendant's conduct and need

---

[13] LINDBERG's claims about the Beckett sale are also based on incorrect factual assertions about the sale process and the value of Beckett, among other things. Although the Court need not reach these factual issues, attached is an affidavit from the Chief Executive Officer of NHC describing the sale. (*See* Meghji Affidavit attached as Exhibit C).

[14] In the Special Master's Third Status Report filed on December 18, 2025, the Special Master disclosed that one group of Specified Affiliated Companies known as "Beckett" was "sold by its parent portfolio group … to a third party purchaser for value in an arms'-length transaction….The purchaser of Beckett did not require or otherwise request that the Special Master approve the sale of Beckett. Because of the extensive debt encumbering Beckett and the rest of the Collectivus portfolio of companies, the sale did not yield proceeds that can be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and thus will make the future sale(s) of companies within the Collectivus portfolio more likely to yield more value to apply toward restitution. (Doc. 94 at 6-7).

whatever restitution can be provided as soon as possible. Accordingly, it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid." (Doc. 54 ¶¶ 5(b) & 6). Yet, he has since submitted several Declarations in support of his recent filings that seek to undo these admissions, and he uses these purported "facts" to support his claims that he was not the "proximate cause" of the victims' losses. (*See, e.g.* Doc. 300 at 8-9). Rather, he now claims, it was "intervening decisions" by those placed in control over the insurance companies after they were placed into rehabilitation and liquidation proceedings that caused the victims' losses. (*See, e.g. Id.* at 9). The Court should reject this attempt to rewrite history.

But even if the losses did not materialize until after LINDBERG lost control of the insurance companies, his assertions misconstrue the meaning of proximate cause. LINDBERG proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high quality, liquid investments with his opaque, illiquid affiliated investments. As set forth in the offense conduct of the PSR, to which LINDBERG did not object, LINDBERG "caused LINDBERG's insurance companies, including SNIC, CBLIC, BLIC, and PBLA, to invest more than $2 billion in loans and other securities in other LINDBERG companies. The vast majority of these obligations remain unpaid.". (*See, e.g.*, Doc. 63 ¶ 103(f)). LINDBERG wants the Court to focus on what happened after he fraudulently took the insurance companies' money, but that misconstrues the proximate cause inquiry.

In any event, LINDBERG agreed to pay restitution for losses above and beyond those he directly and proximately caused. Per the plea agreement, LINDBERG explicitly

agreed to pay "full restitution, regardless of the resulting loss amount, to all persons ***directly or indirectly* harmed** by the defendant's criminal conduct." (Doc. 40 at ¶ 10(a) (emphasis added). Indirect harm, by definition, is more expansive than proximately caused harm, and a defendant is free to obligate himself, as LINDBERG has, to pay restitution above and beyond that called for by statute. Title 18, United State Codes, Section 3663A(a)(3) provides the "court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." Importantly, "victim" is a defined term in § 3663A that means "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. §3663A(a)(2). Thus, a defendant can agree in the plea agreement to pay restitution to persons other than those "directly and proximately" harmed by his conduct. That is exactly what LINDBERG agreed to here in exchange for concessions by the United States and as a basis for his successful petition for leniency. The Court should not countenance his attempts to renege on that agreement.

## IV. Conclusion

Defendant's remaining pending motions should be denied.[15] There is sufficient factual evidence in the record submitted by the parties supporting the requested

---

[15] Defendant also has raised several objections to the Special Master's estimation of the value of assets available to satisfy restitution contained in the Special Master's Final Report. The Court need not resolve those objections before entering a Final Restitution Order because the Special Master only "provided [them] for informational purposes, specifically to help the Court gauge how the Special Master's recommended restitution award compares to the value of the assets that have been designated as Primary Restitution Assets." (Doc. 245 at 36). Because they have not yet been monetized and used to actually pay restitution to victims, their value is not relevant to determining the losses suffered by victims at this point.

restitution award. The United States requests the Court conduct a *de novo* of the Special Master's recommendations and an evaluation of Defendant's filings regarding restitution alongside all filings made by others seeking restitution, and enter a final order of restitution in a form substantially similar to that proposed by the Special Master in his Final Report.

RESPECTFULLY SUBMITTED, this 17th day of August, 2026.

DALLAS J.E. KAPLAN
ATTORNEY FOR THE UNITED STATES[16]

***/s/ Daniel Ryan***
Daniel Ryan
Dana Washington
Assistant United States Attorneys
United States Attorney's Office
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-3222
daniel.ryan@usdoj.gov

LORINDA I. LARYEA
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

***/s/ Lyndie M. Freeman***
Lyndie M. Freeman
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue
Washington, DC 20005
Telephone: 202-616-5315
lyndie.freeman@usdoj.gov

[16] Acting under authority conferred by 28 U.S.C. § 515.