**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GREG E. LINDBERG,<br>Defendant. | Case No. 5:19-CR-22-MOC<br>Case No. 3:23-CR-48-MOC<br>Judge Max O. Cogburn, Jr. |

**DEFENDANT'S REPLY TO THE SPECIAL MASTER'S RESPONSE (DOC. 323) OPPOSING DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER DENYING HIS SUBPOENA REQUEST**

Defendant Greg E. Lindberg respectfully submits this Reply to the Special Master's Response (3:23 Doc. No. 323) opposing Defendant's Motion for Reconsideration of the Order Denying his Subpoena Request (3:23 Doc. No. 309). For the reasons set forth below, the Motion should be granted, and the data and methodology on which the restitution determination rests should be produced.

Defendant's position has not changed, and it does not change here: the tainted Special Master's report should be thrown out in its entirety, and none of it may be adopted, relied upon, or placed on the record. Defendant's objections to the appointment, the combined and conflicted role, and the reliability of every figure the Special Master produced are set out in Defendant's contemporaneous objections and are incorporated by reference. Defendant seeks the underlying data and methodology for one purpose: because the Special Master's report is being used to fix restitution and to trigger a forfeiture money judgment of up to $230 million against Defendant, Defendant is entitled to examine the data on which those figures rest before the order enters. The request for production is not a concession that the report can be salvaged—it cannot. It is a protective measure to prevent a premature and effectively

irreversible forfeiture and restitution order from entering on a record the Special Master refuses to complete.

The Response casts the Special Master as willing to produce the data voluntarily. The record is otherwise. When Defendant asked the Special Master, in writing, to place the requested data on the court record under seal—the same course the Special Master himself had represented, in his Report and Recommendations, that he could take, 3:23 Doc. No. 106 at 29—the Special Master's entire answer was a single word: "No." Ex. 1 (email of M. Martinez, counsel for the Special Master, Aug. 17, 2026; also filed as 3:23 Doc. No. 309-1). That flat refusal to put the data on the record, not any dispute over the "manner of disclosure," is what necessitated the Motion and this Reply.

One threshold point bears emphasis. The Order denying the subpoenas (3:23 Doc. No. 304) issued out of the sequence Defendant had requested. At the August 10, 2026 hearing, Defendant asked the Court not to rule on the subpoena motion (3:23 Doc. No. 248) then, but to hold it pending the Court's issue-by-issue resolution of the several dispositive and evidentiary motions then pending. The subpoena motion is not freestanding: it is the discovery mechanism that supplies the record for the causation, loss, offset, and accounting disputes raised in Defendant's pending motions (3:23 Doc. Nos. 234, 278, 280), and both the need for and the proper scope of the subpoenaed valuation material turn on how those issues are resolved. Entering the denial before those motions were addressed—and contrary to Defendant's request to defer—is itself a reason to reconsider, so that the subpoena question is decided in its

proper sequence and the record on those issues is complete for review in the Fourth Circuit. The Supreme Court has recognized as much. *United States v. Dieter*, 429 U.S. 6, 8 (1976) (per curiam) (recognizing "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors").

## I. The Special Master answers a request Defendant did not make: Defendant seeks all data and methodology on which restitution rests—not merely the valuation estimates for the Primary Restitution Assets.

At the threshold, the Special Master recasts the request. His Response treats Defendant as seeking only documentation "backing up the Special Master's estimates of the value that may be extracted from the 'Primary Restitution Assets'" (3:23 Doc. No. 323 at 2), and then declares those estimates "not a critical component of restitution" that "neither affect Defendant's base restitution responsibility nor the restitution offsets" (id.). That was not the ask, and the recast is the Response's central error.

Defendant's Motion sought the data and methodology on which the restitution determination rests as a whole, beginning with the accounting the MVRA commands. The Court must determine restitution in "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on "a complete accounting of the losses to each victim," id. § 3664(a)—that is, a victim-by-victim accounting of the losses—and Defendant's Motion demanded precisely that this complete accounting be placed in the record. 3:23 Doc. No. 309, § IV. The Motion also sought, as a distinct category, "the method of calculation of the offsets and credits the Special Master applied or disallowed," along with the methodology and data underlying the valuation of the Primary Restitution

Assets and Specified Affiliated Companies. 3:23 Doc. No. 309, § VI. These are the two sides of the restitution equation—the loss the complete accounting must establish, and the credits and offsets that net against it. In short, Defendant seeks the data behind the entire restitution calculation—the accounting of the loss the statute commands, the valuations, and the credits and offsets—not merely the Special Master's asset-value estimates (the "Mid"-range figure of $998 million, 3:23 Doc. No. 246 at 36). The methodology and valuations Defendant requests thus include the primary restitution data itself—the data underlying the approximately $1.655 billion restitution figure and each victim's loss, including the underlying spreadsheets from which those numbers were built—which has never been placed before this Court in any form other than the Special Master's report: a narrative that states his conclusions without the underlying detail necessary to test them. A report is not the data. The primary restitution data of approximately $1.655 billion, and the spreadsheets behind it, have never been put before the Court at all.

That the request reaches the whole of the calculation is not an overreach; it is the direct consequence of the accounting the MVRA commands. A "complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), is by its terms the entire body of data and methodology underlying the restitution figure—the loss claimed, the derivation of each victim's share, the valuations, and the credits and offsets that net against the loss. An accounting that omits the data behind its numbers is no accounting at all; it is a bare bottom line. Nor is the Special Master's report itself the accounting: a narrative document reciting the conclusions the Special Master reached

is not a complete accounting of anything. The accounting is the underlying data—the financial records, valuations, and computations—and the methodology from which those numbers were derived, not a document setting out the numbers the Special Master wrote down. If § 3664(a) did not compel that underlying data and methodology, the provision would have no work to do. Defendant made precisely this demand in conferral, asking the Special Master to place on the record "all of the data" underlying the valuations and explaining that "a single lumped range, with its particulars withheld, cannot satisfy those provisions or permit the de novo determination the Court is required to make." Ex. 1; see 18 U.S.C. § 3664(d)(6). The Government must prove each victim's loss by a preponderance, id. § 3664(e), and cannot satisfy a statute commanding a complete accounting by reporting a lumped range while withholding the accounting itself.

The recast is refuted by the four corners of the Motion the Special Master answers—and by arithmetic. The Motion requests, as a distinct category, "the method of calculation of the offsets and credits the Special Master applied or disallowed," 3:23 Doc. No. 309, § VI, so the assertion that the request "neither affect[s] . . . the restitution offsets" (3:23 Doc. No. 323 at 2) cannot stand. And a credit or offset is, by definition, a reduction applied against a restitution obligation; it cannot be evaluated apart from the loss calculation it is netted against. It is therefore impossible to test the credits and offsets the Special Master concedes are in play without the underlying restitution calculation against which each offset is applied. The Special Master cannot litigate the offsets while withholding the calculation the offsets reduce.

The recast also defeats itself. If, as the Special Master insists, the valuation estimates "do not impact the restitution analyses in any manner" (3:23 Doc. No. 323 at 7), then the base restitution figure and the per-victim loss must rest on some other data and methodology—precisely the data Defendant seeks and the Special Master has never produced. Either the estimates drive restitution, in which case they must be produced and tested, or they do not, in which case the Special Master must produce the data that does; he cannot place a $1.655 billion figure and a per-victim allocation on the record and refuse the basis for both. Nor is the premise correct: restitution is the amount owed less the credits and offsets to which Defendant is entitled, 18 U.S.C. § 3664(f), (j), and those offsets turn on what the assets actually yielded on disposition, including the Becket sale, the ClanWilliams sale, and any other sales or dispositions of the Primary Restitution Assets and Specified Affiliated Companies. The data and methodology Defendant seeks therefore include the documents, terms, and proceeds of the ClanWilliams sale and of every other completed sale, which show what each asset in fact produced. The Special Master himself measures Defendant's offsets by the "actual payments ultimately received by victims" (3:23 Doc. No. 323 at 4); he cannot measure the offsets by what the assets produced while withholding the data showing what they produced. That measure is not the one the MVRA prescribes. Under the Act, the credit against a property loss is the value of the property returned or recovered, measured as of the date of its return, 18 U.S.C. § 3663A(b)(1)(B), and the statute directs that the fact a victim "has received or is entitled to receive compensation with respect to a loss from insurance or any other source" shall not be

considered in fixing restitution at all, id. § 3664(f)(1)(B). The only reduction keyed to what a victim actually receives is for compensatory damages later recovered in a civil proceeding for the same loss, id. § 3664(j)(2). The offset is therefore a function of the value of the assets returned to and recovered for the victims—a valuation the Special Master refuses to show—not of the payments a victim happens to have received. Whether the Special Master applied the measure the statute requires, and whether his valuations are sound, cannot be tested without the underlying disposition and valuation data. Offset, moreover, is not confined to affirmative credits for value returned or recovered. Any portion of the claimed loss that the data shows was caused not by Defendant's offense but by an intervening actor—the Rehabilitator, the Special Master/Receiver, or another third party—is not Defendant's loss at all, and its subtraction operates as an offset against the amount attributable to him. Restitution reaches only the harm the offense "directly and proximately" caused, 18 U.S.C. § 3663A(a)(2), and the Government bears the burden of proving that causal link, id. § 3664(e). A loss attributable to someone else must therefore come out of the figure just as a credit does—and, like a credit, it cannot be identified, tested, or subtracted without the loss data and the methodology showing how each component of the claimed loss was derived and to whom it was attributed.

This is also why the request reaches the companies' financial records and not merely a valuation summary. The Primary Restitution Assets and Specified Affiliated Companies are going concerns generating millions of dollars in annual revenue—not bankrupt entities whose worth is measured by the debt against them. Unlike a

bankruptcy liquidation, where outstanding debt may stand in for value, the enterprise value of an operating, revenue-generating business can be assessed only from its financial reports, board reports, letters of intent, and offers to purchase; those records fix the enterprise value that the Special Master's debt-based liquidation figure does not capture. 3:23 Doc. No. 309, § VI. Testing whether the Special Master undervalued these companies—and thereby overstated both the restitution shortfall and the forfeiture measured against it—requires those underlying financial records, which only compulsory process or on-the-record production can supply.

To the extent this Reply broadens the scope of what Defendant seeks beyond the Motion, that broadening is warranted—indeed compelled—by the Special Master's own Response. Having now characterized his figures as "guesses," "predictions," and "inherently unreliable" (3:23 Doc. No. 323 at 3–4), the Special Master has made the case for full disclosure clearer still: the more the restitution rests on admitted guesswork, the more essential it is that the entire restitution—the complete accounting, the underlying data, and the methodology—be placed on the record where the Court and Defendant can test it. A number the proponent himself concedes is a guess cannot be entered as a restitution judgment of approximately $1.655 billion, and a forfeiture of up to $230 million measured against it, without the data behind it. The Special Master's disclaimers do not narrow the request; they compel its full breadth.

## II. The forfeiture exposure of up to $230 million requires the data now, and Defendant's agreement to a formula is not a waiver of his right to test the number in it.

The Special Master concedes that his estimate drives Defendant's forfeiture exposure. The Forfeiture Order fixes a money judgment equal to "the lesser of either (1) $230,000,000 or (2) the difference between the amount of restitution that this Court orders and the Special Master's estimate, as of the date restitution is ordered, of the 'Mid' point value of the 'Primary Restitution Assets.'" 3:23 Doc. No. 160 at 1; see 3:23 Doc. No. 323 at 3. A number the Special Master himself calls a "best guess" therefore determines a forfeiture measured in the hundreds of millions of dollars. That is not a reason to deny the data; it is the reason the data must be produced.

Because the forfeiture money judgment is defined as the difference between two numbers—the restitution the Court orders and the Special Master's Mid estimate of the value of the Primary Restitution Assets—testing the forfeiture requires the data behind both. 3:23 Doc. No. 160 at 1. The judgment is the gap between what Defendant is said to owe and what his assets are said to be worth, and each side of that subtraction drives its size: an overstated restitution obligation and an understated asset valuation each enlarge the forfeiture, dollar for dollar, up to the $230 million cap. Defendant therefore cannot test the forfeiture exposure the Special Master concedes his figures create without both the full methodology for calculating the restitution obligation and the methodology and data for valuing the assets available to satisfy it. Producing one half of the subtraction while withholding the

other leaves the number that fixes a judgment of up to $230 million half-tested and half-hidden.

The Special Master's contrary argument (3:23 Doc. No. 323 at 3 n.7)—that because Defendant executed the Forfeiture Order and agreed to use the estimate "good, bad, or ugly," any defect in methodology "would not change the forfeiture amount"—does not withstand scrutiny. Agreeing to a formula that incorporates the Special Master's Mid estimate is not an agreement that the estimate is accurate, and it is not a waiver of the right to examine the data that fixes the size of the judgment. The judgment moves with the estimate: the lower the Special Master's Mid figure, the larger the difference between restitution and that figure, and the larger the resulting forfeiture, up to the $230 million cap. A defendant does not surrender the right to test a number simply because he agreed to a formula in which it appears—least of all a number the proponent himself disclaims as a guess. Moreover, Defendant's agreement to use the Mid estimate was made against, and premised on, the valuation of the AAPC assets as it then stood. That premise no longer holds: the AAPC valuation has materially changed, and an agreement to accept an estimate built on a superseded valuation does not survive a material change to the very input on which it rested. Defendant did not agree to be bound to a Mid figure recalculated on materially different assumptions, still less to forgo examining how that figure was derived. The agreement fixes the formula; it does not immunize the inputs from examination before the judgment is entered.

## III. The pending appeal is protective; it does not cure the need for the data before the final restitution order enters.

The Special Master argues that because Defendant "already appealed the Forfeiture Order" (3:23 Doc. No. 323 at 3–4, citing 3:23 Doc. No. 192), "any need for additional discovery on the Special Master's estimation methodology is not immediate." The appeal is protective. It preserves Defendant's rights against the judgment already entered; it neither supplies, nor excuses the absence of, the data the restitution determination requires, and it does not make the need for that data any less immediate. The immediacy argument is, in any event, a red herring. An appeal does not stop the forfeiture, and it does not relieve the proponent of building the record on which the forfeiture must rest. Nor is the preliminary order the operative one: by its own terms the money judgment is measured by the Special Master's estimate "as of the date restitution is ordered," 3:23 Doc. No. 160 at 1, so the forfeiture amount is fixed only when the final restitution order enters—a date that has not arrived. Because the number that fixes the forfeiture is set at that final order, and not by the preliminary order Defendant appealed, the time to examine the data underlying it is now, before the final order enters, not later on appeal from a preliminary order the final determination will supersede.

First, the restitution determination remains open. Restitution may be fixed up to ninety days after sentencing, 18 U.S.C. § 3664(d)(5), and the order is not final until entered, id. § 3664(o); *Dolan v. United States*, 560 U.S. 605 (2010). No final order of restitution has entered. The Forfeiture Order itself measures the money judgment by the Special Master's estimate "as of the date restitution is ordered," 3:23 Doc. No. 160

at 1—a date that has not arrived. The data is therefore needed now, before that order, not after it.[1]

Second, an appeal cannot reconstruct a record that was never made. If the final order enters on a record from which the Special Master's methodology and data were withheld, the appellate court will have nothing on the point to review. A protective appeal secures Defendant's right to challenge the judgment; it does not manufacture the evidentiary record that 18 U.S.C. § 3664(e) requires the proponent to build in the first instance. The remedy for a record that lacks the basis for its central figures is to complete the record before the order enters—not to enter the order and then appeal the absence of proof. The appeal thus protects Defendant's position; it does not resolve, and cannot substitute for, the present need to examine the data before the restitution and forfeiture order is fixed.

## IV. The Special Master's own disclaimers are the reason the data must be produced and tested, and his handling of Damovo confirms the concern.

The Special Master describes his own work in terms that compel production. He states that he "did not commission formal business valuations," that his advisors relied instead on "documents, information, and judgments prepared by those persons charged with managing the 'Primary Restitution Assets,'" that "all business valuations are inherently unreliable," that his estimation "merely reflects the Special Master's best guess at what might happen in the future," and that there is a

[1] The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

"necessary inaccuracy in such forecasting." 3:23 Doc. No. 323 at 3–4; see 3:23 Doc. No. 246. When the proponent of a number brands it a "best guess" and a forecast of "necessary inaccuracy," the party against whom it is used is entitled to the documents beneath it—to test how far the disclaimer runs, whether the guess is even a reasonable one, and what the persons "managing the 'Primary Restitution Assets'" actually told the Special Master. That is the very point of the request: to test how far the Special Master's own account of guesses, predictions, and estimates goes.

The Special Master's handling of the Damovo asset confirms the need. Damovo has not been sold; it remains on the block. Yet, notwithstanding a pending offer of $400 to $500 million, the Special Master proposes to dispose of Damovo for debt—a fraction of that offer—despite his duty to maximize value for the benefit of persons due restitution. That an officer who purports to value these assets would propose to sell one for the amount of the debt against it in the face of a $400-to-$500-million offer undermines confidence in his figures and consolidates Defendant's position that every report the Special Master has touched is unreliable. It also illustrates precisely why the underlying data is needed: the same data that would show what Damovo is worth, and what the market has offered for it, is the data the Special Master refuses to place on the record. Defendant doubts the veracity of the Special Master's submissions, and he is entitled to examine the data underlying each of them rather than accept the Special Master's characterization that the numbers, though admittedly guesswork, need not be shown.

## V. The proponent bears the burden; the argument that the offsets present only legal disputes does not answer the request for the data behind the loss.

The Special Master argues that the offsets Defendant identifies present legal rather than factual disputes, that he "is not disputing Defendant's figures for ANY of the offsets identified in the chart," and that the Fourth Circuit "can assume all of Defendant's numbers are correct" and still adopt his legal reasoning. 3:23 Doc. No. 323 at 7; see id. at 7 & nn.14–15. That answers only the offsets. It does not answer—because it cannot—the request for the data and methodology behind the base restitution figure and the victim-by-victim loss. Those are factual determinations, and the Government, as the proponent of restitution, bears the burden of proving the amount of each victim's loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). A proponent that places a $1.655 billion figure and a per-victim allocation on the record must produce the data that supports them; it may not withhold that basis and rest on the assertion that Defendant's separate offset requests fail "as a matter of law."[2]

The Special Master's recharacterization of these disputes as purely "legal" mistakes both their nature and his role. Causation, foreseeability, and the offsets are

[2] Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, *see Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *Southern Union Co. v. United States*, 567 U.S. 343, 360 (2012) (applying *Apprendi* to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

questions of law and fact: they turn on what actually happened to the assets and the money—what was recovered, what was returned, and what each asset yielded—as well as on the legal standards that govern them. On each, the Government bears the burden of proof. 18 U.S.C. § 3664(e). The factual half of those mixed questions cannot be resolved without the underlying data, and establishing it is the Government's obligation, not Defendant's. Asking the Special Master to produce the facts is not asking him to do anything the statute does not already require of him: a special master under 18 U.S.C. § 3664(d)(6) is appointed "for proposed findings of fact and recommendations," subject to de novo determination by the Court. Developing and disclosing the facts is his assigned task; rendering legal conclusions is not, and the legal questions are for the Court to decide de novo. The request therefore keeps the Special Master squarely within the four corners of the MVRA—and asks no more of him than the statute already contemplates—while permitting Defendant to test whether the Government has met its burden of proof. The Special Master cannot decline the factual half of a mixed question by relabeling the whole of it "legal," and the tainted Special Master, of all officers, should stay within what the statute provides.

Each of these determinations carries a factual predicate that only the data can supply. Causation asks whether each claimed loss was in fact proximately caused by the offense conduct rather than by intervening market forces, third-party decisions, or the Special Master's own dispositions; foreseeability asks what harm was in fact reasonably foreseeable; and the credits and offsets ask what value was in fact

returned to and recovered for the victims, asset by asset, including what each Primary Restitution Asset actually yielded or has been offered. Those are factual questions bound up with legal standards—questions of law and fact—and on each the Government bears the burden of proof by a preponderance of the evidence. 18 U.S.C. § 3664(e). Labeling the resulting disputes "legal" neither dissolves their factual core nor shifts to Defendant a burden the statute places on the Government. Defendant sets out this law-and-fact framework in full in his Reply Regarding Restitution—Proximate Cause, Amount, and Offsets (3:23 Doc. No. 300), responding to the Government's Omnibus Response (3:23 Doc. No. 279), which he incorporates herein by reference. As Defendant there explains, causation and foreseeability are elements the Government must prove, not "proposed findings" the Special Master may supply by fiat, and the factual materials bearing on them are what Defendant seeks here. The point for present purposes is narrow: the data Defendant seeks is the factual foundation on which the Government's burden must be tested, and the Special Master's development and disclosure of that factual foundation is precisely what 18 U.S.C. § 3664(d)(6) contemplates—no more, and no less.

Chief among the facts the Government must prove—and among the data the Special Master refuses to place on the record—is what happened to the companies after Defendant transferred them out of his control. Control of the insurers passed first to the State Rehabilitator in 2018 and then to the Special Master/Receiver, and much of the loss the Special Master attributes to Defendant materialized only after those transfers, through the intervening decisions of the Rehabilitator, the Special

Master/Receiver, and other third parties—including below-value dispositions and the rejection of arm's-length, face-value offers. Whether Defendant's offense conduct proximately caused a post-transfer loss, or whether an intervening actor's decision broke the causal chain, is a question of fact on which the Government bears the burden. 18 U.S.C. § 3664(e). Defendant briefed these intervening, post-transfer facts at length in his Reply Regarding Restitution (3:23 Doc. No. 300, Parts VII–X, XII), which he incorporates herein. The seven principal post-transfer "causation" rulings—Issues 11 through 17—each charge Defendant with a loss that materialized only after control passed, and together they total approximately $1.745 billion—more than the entire restitution figure. They are summarized, with the amount attributed to Defendant and the intervening fact the Government must prove as to each, in the first table of Exhibit 2. The offsets and credits the Special Master disallowed—each amount, how it is calculated, and the third-party custodian holding the records needed to prove it—are set out in the second table of Exhibit 2; those records are held by NHC, the insurance companies, Paladin, and the Rehabilitator, not by Defendant, which is why compulsory process or on-the-record production is the only route to them. The data showing what became of each company after it left Defendant's hands is thus not collateral to restitution; it is the evidence by which the Government's proximate-cause burden must be tested—and it is precisely the data the Special Master will not produce.

The Special Master's report does not address the facts of this intervening cause at all. It attributes the post-transfer declines to Defendant without identifying,

quantifying, or accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself, whose below-value dispositions and post-transfer management produced much of the shortfall now charged to Defendant. That silence is not a neutral omission. Under 18 U.S.C. § 3664(e), the Government bears the burden of proving that the offense conduct proximately caused each loss; where the loss materialized through an intervening actor's conduct, it is the Government's burden to introduce facts showing why that intervening cause does not break the causal chain and does not reduce or eliminate Defendant's liability. The Government cannot carry a burden it never addresses, and it cannot address it by adopting a report that is itself silent on the point. A conclusion that Defendant is liable for a post-transfer loss, unaccompanied by any facts disaggregating the losses the intervening actors caused, is an assertion, not proof.

Nor can the United States Court of Appeals for the Fourth Circuit supply what the record omits. Proximate cause, and the effect of an intervening cause, are questions of fact; an appellate court does not find facts in the first instance, and it cannot do so on a record that does not include the losses caused by the intervening actors—Michael Dinius and the third parties, including the Special Master. If the figures are finalized on the present record, and the data showing what each intervening actor did and what loss each caused is never placed before this Court, there will be nothing on the decisive causation question for the Fourth Circuit to review. That is why the data must be produced and placed on the record now: so that

the Government's proximate-cause burden can be tested here, and so that a complete record of the intervening-cause facts is preserved for review in the Fourth Circuit.

For the same reason, the Subpoena Denial Order's statement that "Defendant has not shown that the information is necessary to finalize restitution" (3:23 Doc. No. 304 at 1) cannot stand alongside the Special Master's simultaneous insistence on using his figures to finalize restitution and to fix forfeiture. Information that determines the amount of the restitution judgment and the size of the forfeiture money judgment is necessary by definition. That the Special Master would prefer to supply "further background—on the record—regarding the Special Master's methodology" in the form of argument in his Response (3:23 Doc. No. 323 at 6) is no substitute for the underlying data; argument about a methodology is not the methodology, and it is not the data.

## VI. Confidentiality is resolved by the Court's own Standard Criminal Discovery Order; the manner-of-disclosure dispute is not a ground to deny production.

The Special Master states that he will produce the materials voluntarily, without a subpoena, subject to a confidentiality agreement and a protective order, and he attaches this Court's Standard Criminal Discovery Order to his Response. 3:23 Doc. No. 323 at 4–5; see 3:23 Doc. No. 309-1 at 10. Defendant agrees to receive and handle these materials under that Standard Criminal Discovery Order—the Court's own standing order—which provides that sensitive financial materials "shall be reviewed with the defendant in the presence of the defense team," that "the defense team shall maintain custody and control of such materials," and that they are not to

be further disclosed. Standard Criminal Discovery Order (attached to 3:23 Doc. No. 323). That order fully answers the confidentiality concern. Defendant does not require, and does not seek, a separate confidentiality agreement as a precondition to production; the Court's existing order suffices.

The Special Master's professed willingness to produce is difficult to reconcile with his conduct. In his Report and Recommendations, the Special Master represented that, "[u]pon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an in camera setting." 3:23 Doc. No. 106 at 29. In August 2026, asked in writing to do the very same thing, he answered in a single word: "No." Ex. 1. A party genuinely willing to produce does not refuse, in one word, to place the data where the Court and the defendant can actually use it. What the Special Master frames as a dispute over the "manner of disclosure" is, in substance, a refusal to put the data on the record at all—which is why the distinction between placing material on the record under seal and disclosing it to the public matters here.

Nor is there any doubt about the vehicle. The Special Master professes to be "unaware of any such protective order" (3:23 Doc. No. 323 at 8 & n.19), but Defendant identified it in conferral: the Government's own standing protective order, which already governs all of the Government's discovery in this criminal case, so that no new agreement is needed. 3:23 Doc. No. 309 at 8; Ex. 1. The Government agreed that "a protective order . . . is appropriate here" and represented that it does "not object to [the defense] getting relevant data from the Special Master." Ex. 1. With the

Government's consent and an existing protective order available, the only holdout is the Special Master, who will produce the data privately but will not let it enter the record—the one condition the MVRA does not permit, because private production that keeps the data off the docket forecloses the Court's de novo determination on a complete accounting, 18 U.S.C. § 3664(a), (d)(6), and forecloses review in the Fourth Circuit.

The Special Master mischaracterizes Defendant's position as a demand that sensitive information be broadcast to "the general public." 3:23 Doc. No. 323 at 5–6 & nn.11–13, 20 (quoting 3:23 Doc. No. 309-1). That is not the ask. Defendant's position is that where the Special Master's data drives the restitution and forfeiture the Court is asked to order, that data must be before the Court and part of the record on which the order rests—under seal where appropriate—so that the determination is not made on figures the Court and Defendant cannot see. There is a difference between placing material "on the record" before the Court, under seal, and disclosing it to the public; the Special Master conflates the two. Defendant does not seek to injure victims. He seeks to prevent an unexamined number—one the Special Master calls a guess—from injuring him through a restitution judgment and a forfeiture of up to $230 million. The interests of third-party professionals and asset managers can be protected by the same sealing and Standard-Discovery-Order procedures; those interests are a reason to produce under safeguards, not a reason to withhold the data from the person against whom it is being used.

There is a further, independent reason the data must be placed on the Court's record now, and not produced privately or deferred. Defendant has requested that the Government open a criminal investigation into the Special Master's disposition of approximately $1 billion in assets. Lodging the complete underlying data and methodology with the Court now—rather than leaving it in the sole possession of the officer whose own dispositions are the subject of that request—preserves it against any risk of loss, alteration, or spoliation and ensures that a complete and accurate record is fixed while the events are fresh. Because the Special Master's conduct is itself the subject of the requested inquiry, the integrity of the data is best protected by placing it on the record now, under seal where appropriate, where it is preserved for the Court, for Defendant, and for review by an authority within the Executive Branch other than the prosecutor and personnel involved in this case. Deferring production, or leaving the data in the Special Master's hands, would leave the only records of a billion-dollar disposition in the custody of the very officer whose handling of it is in question.

**VII. The request is neither vague nor made in bad faith.**

The Special Master's remaining objections—that the request is "vague," shifting between a "narrower subset" and "all of the documents," and that the subpoenas are sought in "bad faith" to "delay, distract, and hinder" (3:23 Doc. No. 323 at 8–9 & nn.17–18)—do not withstand the precise statement of the request set out above. Any narrowing reflects Defendant's willingness to confer and to limit scope, not vagueness; the core of the request has been constant: all data and methodology

on which restitution rests, including the data behind the $1.655 billion figure, the victim-by-victim loss calculation, and the credits and offsets. And the purpose is the opposite of bad faith. Defendant seeks to test figures the Special Master himself disclaims as guesses, before an effectively irreversible forfeiture and restitution order enters. It is the entry of a multi-hundred-million-dollar forfeiture and a $1.655 billion restitution judgment on an admittedly "inherently unreliable" estimate, without the data, that would work the injustice—not Defendant's effort to see the numbers first.

The mechanism is proper as well. Rule 17(c) is available for post-trial motions and sentencing. *United States v. Winner*, 641 F.2d 825, 833 (10th Cir. 1981). Its relevancy and specificity requirements, *see United States v. Nixon*, 418 U.S. 683, 699–700 (1974), apply with less rigor after conviction than at trial. As to the custodians other than the Special Master—NHC Holdings, LLC, the insurance companies, Paladin, and the Bermuda liquidators, who hold the records—neither the Special Master nor the Government has standing to resist subpoenas for documents in which it claims no privilege or proprietary interest. *In re Grand Jury Subpoena John Doe*, 584 F.3d 175, 184 n.14 (4th Cir. 2009); *accord Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979); *United States v. Beckford*, 964 F. Supp. 1010, 1023 (E.D. Va. 1997); *United States v. Nachamie*, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000) (Government lacked standing to quash Rule 17(c) subpoenas served on non-parties absent a legitimate independent interest); *United States v. Gordon*, 247 F.R.D. 509, 510 (E.D.N.C. 2007). And the Court may grant the same relief in a form that raises no third-party or overbreadth concern at all—by directing its own appointee to place his

valuation methodology and supporting data on the record under the existing protective order, on the authority of the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the Court's inherent supervisory authority over its own appointee. Federal Rule of Civil Procedure 53 does not itself govern this criminal proceeding; the authority for the reference is the MVRA. Defendant set out these grounds in full in his Motion for Reconsideration (3:23 Doc. No. 309, Parts VI, VIII), which he incorporates herein.

The premises of the original Order fare no better. That Order rested in part on the contentions that the defense "already possess[es]" the information and that the material is "likely available by other means." Neither survives the record. Whatever communications and filings the defense holds, it does not possess the one category that matters—the methodology and underlying data by which the Special Master valued the assets—which the Special Master has withheld, reporting only a single lumped range; prior counsel sought these very particulars and were told they would not be provided. Ex. 1 ("Katten has asked for this in the past. We do not have this information."). Nor is the material "available by other means": the institutional holders of the books, records, and valuations—the North Carolina insurance companies and NHC—disputed the Special Master's authority to compel the information and declined to furnish it, and the efforts of Defendant and of Paladin were unavailing. The Special Master alone holds the data and will not place it on the record; compulsory process, or an order directing on-the-record production under the existing protective order, is the only route.

## VIII. The premise that the data lies elsewhere has now collapsed: after a diligent search it is in no one's hands—including, by the Government's own admission, the Government's.

Since this matter was briefed, the factual premise on which the Special Master resisted production has come apart. On August 26, 2026, the defense served a written, itemized demand identifying with specificity every category of data, valuation, and communication that had been promised in the parties' conferrals and never produced. The Government first responded that Defendant already possessed the materials in the files of former counsel. That is not so: former counsel and current counsel have each conducted a diligent search of their files, and none of the identified materials was produced to either by the Special Master or by the Government. When former counsel was copied on the correspondence and the defense supplied the specific list of everything promised and never received, the Government reversed course and represented that it does not have the information. That sequence is dispositive of the Order's "already possess[es]" and "available by other means" rationales alike. The data is in no one's hands within this proceeding: the Defendant does not have it; the Court has only the figures filed under seal, with no underlying data; and, by its own admission, the Government does not have it. The Special Master and the custodians subject to his authority are the sole remaining repository—which is precisely why compulsory process, or an order directing on-the-record production, is required. These issues, and the demand for this data and for the ex parte communications, have been raised by both former counsel and current counsel.

Current counsel could not have raised this sooner, and did not sleep on it. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026—and learned it as a direct consequence of the Government's own emails representing that the data had all been provided to former counsel. Running that representation to ground—by asking former counsel and searching the files—revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen. That is how the unconstitutional, one-sided character of the proceeding came to light. The issue is therefore timely and preserved, not waived.

## IX. The proceeding is infected with ex parte communications to which the Defendant has no access, contrary to the appointing order and due process; the issue is preserved for the Fourth Circuit.

There is a further reason the communications must be produced and placed on the record. The restitution proceeding is infected with ex parte communications to which the Defendant has been given no access: communications between the Special Master (and his advisors) and the Government, and between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. Mr. Dinius valued the North Carolina insurers at approximately $641 million in November 2018 and, with the

Rehabilitator, holds the insurers' records. As the Court's neutral, the Special Master may not confer with one party, or with the interested custodians, about the merits off the record and outside the Defendant's presence. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); ex parte contact between a court's own neutral and one side is impermissible and must occur on the record, where the parties can participate, *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289 (3d Cir. 2004); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts); and the order appointing a master must state the circumstances, if any, in which the master may communicate ex parte with a party, Fed. R. Civ. P. 53(b)(2)(B).

The appointing order underscores the impropriety. It has two parties, and only two—the United States and Greg E. Lindberg—and it authorizes no ex parte communication at all: the Special Master must "regularly update the Parties throughout the diligence," Order ¶ 5, and advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. See Fed. R. Civ. P. 53(b)(2)(B) (the appointing order must state the circumstances, if any, in which the master may communicate ex parte with a party). The order thus required the Special Master to keep the Defendant, a Party, informed, and authorized no ex parte contact whatever. The order appointing the Special Master contains no ex parte communication procedures whatever. And in a criminal proceeding the

process must comport with constitutional due process: no ex parte communication with the adjudicating neutral is permissible. Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here—this is a criminal case, the order authorized no such contact, and the Constitution forbids fixing a criminal punishment on facts developed through communications the Defendant cannot see or rebut. Instead the Defendant was shut out of the very communications—between the Special Master (and his advisors) and the Government, and between the Special Master (and his advisors) and any other third party, including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that produced the restitution figure and the valuations. Those communications must be produced and placed on the Court's record: if the contact was proper, production costs nothing; if it was ex parte contact about the merits, the Defendant is entitled to know it. Defendant raises, and expressly preserves, this ex parte and due process issue for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

The scope of what was withheld cannot be minimized. Any effort to recast these ex parte contacts as a handful of discrete, benign exchanges understates a proceeding that, for the most part, was conducted off the record and outside the Defendant's presence. In light of that attempted minimization, and to preserve a complete record

of it, Defendant is contemporaneously filing a motion to compel the production of the entire list—both the data underlying the challenged figures, including the underlying spreadsheets and the methodology by which those figures were built, and the ex parte communications between the Special Master (and his advisors) and each participant identified above, including M3, the Government, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius. Because most of the data and communications on which the restitution and forfeiture figures rest were developed ex parte, that production is necessary to fix, now, the full extent of what was withheld and from whom, so that the issue is preserved in its entirety for review by the United States Court of Appeals for the Fourth Circuit. A minimized subset would leave the Fourth Circuit to review a record that does not reflect the true scope of the ex parte process; counsel's duty to their client requires that the whole of it—the entire list—be placed before the Court and preserved, and Defendant expressly does so here.

The order's only mechanism for action affecting these assets is a motion to the Court: paragraph 15 provides that a motion "to expand or narrow the scope of Primary Restitution Assets … shall be heard upon notice and hearing." Order ¶ 15; see id. ¶ 10 (motion or application to the Court for instruction or clarification). None of that occurred. The reduction of AAPC—a Primary Restitution Asset—to near zero does precisely what paragraph 15 governs: it narrows the value of the restitution assets and triggers the forfeiture money judgment; yet it was accomplished with no motion, no notice, and no hearing, on valuation data the Defendant never saw. The

same is true of the low, middle, and high valuations and the approximately $1.655 billion loss figure, which were developed on data drawn ex parte from NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, Paladin, and Mr. Dinius—including the $641 million Dinius valuation and the Rehabilitator's records, the NCIC loan and repayment data, the ILA/MOU and ULICO reconciliations, and the bankers' marketing and sale figures—without any motion, notice to the Defendant, or hearing at which the Defendant could test the data or be heard. The order specified motion, notice, and hearing; the process delivered ex parte data-gathering and a sealed result. All of Mr. Dinius's data—including the credits and the offsets he supplied and those he disallowed—is data to which the Defendant has never been given access. Belated production cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996). Production is therefore necessary but not sufficient; the report must be set aside. Because many of the participants refused to recognize the Special Master's authority, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it, and the report cannot be salvaged, only set aside.

Defendant recognizes that the Court seeks to enter a final order of restitution and forfeiture. A final order entered on this record, however, would be fatally flawed. The tribunal that produced the figures operated without the ordinary rules of a judicial proceeding: for the most part it functioned ex parte, with the Government, NHC Holdings, LLC, the North Carolina insurance companies, Michael Dinius, Wes Camden, and Williams Mullen participating in, and benefiting from, an arrangement to which the Defendant had no access—while those same interested parties refused to recognize this Court's authority and refused to place any of the underlying data on the record. In a criminal case, that defect is fatal. Restitution under the MVRA is criminal punishment, and neither restitution nor a sentence may rest on figures generated in an ex parte process the Defendant could never see or test—least of all a sentence the Government urged by representing that "there is more evidence now." Because the defect goes to the integrity of the process and not merely to the completeness of the record, it cannot be cured by belated production alone. Defendant documents it and places it on the record now, and expressly preserves it, in discharge of counsel's duty to their client, for review by the United States Court of Appeals for the Fourth Circuit.

It does not matter which characterization of the Special Master the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master

functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach to them directly and fully, *Kyles v. Whitley*, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment. Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

## X. In essence, the process the Special Master defends outsources Article III adjudication to an officer who alone holds the data—a private judge.

Reduced to its essence, the Special Master's position is this. Neither this Court nor the Defendant has access to the data underlying the restitution and forfeiture figures; that data is held by NHC Holdings, LLC, the insurance companies, and the Special Master's professionals. Yet the Court is asked to enter a restitution judgment of approximately $1.655 billion and a forfeiture of up to $230 million, and the Defendant is already serving a twelve-year sentence built in part on the same figures. Only the Special Master has the data, and he will not give it to the Defendant. That is not adjudication; it is adjudication outsourced to an officer who alone holds the facts and keeps them from both the tribunal that must decide and the person who must serve the sentence and pay the judgment. A determination in which the decisionmaker cannot see the evidence, and the person to be punished is forbidden to see it, is the very definition of a private judge—the antithesis of the Article III

adjudication the Constitution requires, and of the de novo, on-the-record determination the MVRA commands. 18 U.S.C. § 3664(d)(6), (e). Because restitution under the MVRA is criminal punishment, *Ellingburg v. United States*, 607 U.S. 163, 146 S. Ct. 564 (2026), it must be fixed by the Court, on a record the Court and the Defendant can examine—not by an officer who keeps the data to himself. The answer is not to proceed on a record only the Special Master can see; it is to require the data to be produced, so that the Court's determination is the Court's own.

Even completing the record, however, will not by itself cure the defect here, because the figures are structurally tainted at their source. They are not merely undisclosed; they are the product of a disqualified officer who combined the roles of investigator, adverse advocate, valuer, and asset-liquidator, and who generated through his own below-value dispositions the very shortfalls he now counts as loss. Data can test a figure produced by a neutral process; it cannot rehabilitate a figure produced by a tainted one. Disclosure is therefore necessary but not sufficient: the data must be produced so that no order enters on numbers the Court and the Defendant cannot see, but the Court's own findings must be drawn from untainted evidence, not from the Special Master's figures—which, for the reasons set out in Defendant's objections, cannot be adopted, relied upon, or placed on the record as, or as the basis for, a restitution order regardless of what data is later supplied. The production Defendant seeks is thus a floor, not a cure: it is the minimum necessary to prevent a premature and irreversible order from entering on an unexamined

record, not a validation of figures the officer's disqualification has already fatally compromised.

Until the Fourth Circuit or this Court throws out the tainted Special Master's report in its entirety, that ultimate relief has not yet arrived—and in the interim a restitution and forfeiture order may enter that inflicts irreversible harm. Defendant is therefore entitled, at a minimum, to all of the data and methodology on which the challenged figures rest, so that he may test them and at least prevent an irreversible order from entering while his challenge to the report itself remains pending. Access to the data is the protective measure that holds the line until the report is set aside; it is the least the process requires, not the most, and it cannot be denied on the theory that the report will speak for itself.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant the Motion for Reconsideration and order the production—under the Court's Standard Criminal Discovery Order, and under seal to the extent appropriate—of all data and methodology on which the restitution determination rests, including (1) the data and methodology underlying the approximately $1.655 billion restitution figure before credits and offsets, (2) the calculation of the amount due to each victim, as the Special Master defines victims, victim by victim, and (3) the data and methodology underlying each credit and offset. Absent that production, the Court should decline to enter restitution and forfeiture on the present record, and, if the cause and amount of the victims' losses cannot be fairly resolved on the record before it, should decline

to order restitution rather than enter it on an incomplete and inaccurate one. See 18 U.S.C. § 3663A(c)(3)(B). A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government, and until it is produced no such determination can be made. In all events, the tainted Special Master's report should be thrown out, and none of it should be adopted, relied upon, or placed on the record.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Kenneth N. Barnes*
Kenneth N. Barnes
Barnes Legal, PLLC
356 Travel Lite Dr.
Raleigh, NC 27603
919-524-1977
Email: barnesatty@aol.com

*/s/ Vivek Ramachandran*
Vivek Ramachandran
Dhamma Law PLLC
418 Broadway, Suite N
Albany, NY 12207
Email: vramachandran@dhammalaw.com
Admitted pro hac vice

*Counsel for Greg E. Lindberg*

## CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

*/s/ Kenneth Barnes*
Kenneth Barnes
*Counsel for Greg E. Lindberg*