**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

UNITED STATES OF AMERICA, Plaintiff,

v.

GREG E. LINDBERG, Defendant.

Case No. 3:23-CR-48-MOC — Judge Max O. Cogburn, Jr.

# ADDENDUM TO DEFENDANT'S MOTION FOR RECONSIDERATION COMPREHENSIVE STATEMENT OF FACTS AND OF ALL ISSUES RAISED AND NOT ADDRESSED

This Addendum consolidates (Part One) a structured index of the factual basis and of every issue Defendant has raised concerning restitution, the Special-Master reference, and the process by which the $1.655 billion figure and his sentence were fixed; and (Part Two) the full, verbatim text of each filing in which those issues were raised, from the Response to the Special Master's Report (Doc. 132) through every filing Defendant has made since the sentencing hearing of May 26, 2026; (Part Three) the consolidated issue index by theme; and (Part Four) the enumerated objections to the Order of August 31, 2026 (Doc. 330), the record of the responses the Government and the Special Master did not make, and the index of every post-sentencing filing. As to each issue, the Government and the Special Master were given an opportunity to respond and expressly declined, or left the issue unanswered on the merits. Defendant raises each issue again and preserves each for de novo determination by this Court and for review by the Fourth Circuit.

## TABLE OF CONTENTS

PART ONE — STRUCTURED INDEX OF FACTS AND ISSUES .......... 7

PART TWO — VERBATIM TEXT OF EACH FILING (INCLUDING EVERY FILING SINCE THE SENTENCING HEARING OF MAY 26, 2026) .......... 40

Doc. 132 — Response & Objection to the Special Master's Report (filed 05/04/2026) .......... 41

Doc. 145 — Defendant's Sentencing Memorandum (filed 05/14/2026) .......... 58

Doc. 168 — Motion to Delay Federal Prison Reporting Date (Wyatt & Blake) (filed 06/04/2026) .......... 80

Doc. 172 — Motion to Stay (filed 06/09/2026) .......... 83

Doc. 173 — Memorandum in Support of Motion to Stay (filed 06/09/2026) .......... 91

Doc. 174 — Consolidated / Supplemental Statement of Facts (filed 06/09/2026) 118

Doc. 190 — Motion to Stay + Consolidated Objections (filed 06/11/2026) .......... 153

Doc. 198 — Response Opposing the Conservatrix/Zetteler CVRA Mandamus (filed 06/12/2026) .......... 172

Doc. 201 — Emergency Motion to Enforce Plea / Access / Conflict-Free Counsel (filed 06/15/2026) .......... 181

Doc. 202 — [Duplicate of Doc. 201] (filed 06/15/2026) .......... 189

Doc. 211 — Response in Opposition to the Government's Motion for Extension of Time (Doc. 205) (filed 06/17/2026) .......... 197

Doc. 212 — Response in Opposition to Cell 1.16 Rehabilitator's Objection and Motion for Reconsideration (Doc. 171) (filed 06/17/2026) .......... 200

Doc. 213 — Motion for Extension of Time to Respond to Doc. 171 (filed 06/17/2026) .......... 205

Doc. 219 — Response in Opposition to Doc. 205 (e-mail to the Clerk, docketed) (filed 06/22/2026) .......... 208

Doc. 220 — Response in Opposition to the Special Master's Extension Motion (Doc. 218) and Initial Response (Doc. 217), with Ex. A (filed 06/22/2026) .......... 209

Doc. 224 — Motion to Dismiss as Moot Motions to Withdraw as Counsel (Wyatt & Blake / Katten) (filed 06/23/2026) .......... 215

Doc. 225 — Motion Directing BOP to Permit Daily Access to Counsel (filed 06/24/2026) .......... 217

Doc. 227 — Response Opposing Cell 1.16's CVRA Restitution Motion (filed 06/29/2026) ....................224

Doc. 228 — Response in Opposition to the Pennsylvania Commissioner's Amicus Letter (Doc. 223) (filed 06/30/2026) ....................230

Doc. 234 — Motion for Determination That No Restitution Is Owed / Offsets (filed 07/14/2026) ....................234

Doc. 235 — Consolidated Statement of Facts (Lindberg Declaration) (filed 07/15/2026) ....................255

Doc. 236 — Motion for Leave to File Sur-Reply (Doc. 233) (filed 07/17/2026) ......261

Doc. 237 — Sur-Reply Opposing Cell 1.16's CVRA Motion (filed 07/17/2026) .....264

Doc. 238 — Motion to Recoup the Distribution to Vista (filed 07/17/2026)...........270

Doc. 248 — Motion for Issuance of Rule 17 Subpoenas Duces Tecum (filed 07/23/2026) ....................278

Doc. 251 — Notice of Filing of Petition for Writ of Mandamus (4th Cir. No. 26-1965) (filed 07/24/2026) ....................285

Doc. 252 — Response in Opposition to Motion for Inquiry into Status of Counsel / Motion to Modify Transport Order (filed 07/25/2026) ....................287

Doc. 253 — Supplemental Response of Undersigned Counsel re Doc. 247 (filed 07/26/2026) ....................290

Doc. 254 — Notice of Filing of Statement of Counsel Representation and Emergency Request for Furlough (filed 07/27/2026) ....................293

Doc. 256 — Notice of Correction re the Valuation of Beckett (filed 07/27/2026)..295

Doc. 257 — Notice of Filing of Replacement Petition for Writ of Mandamus (filed 07/27/2026) ....................299

Doc. 259 — Notice of Errata (Docs. 172, 173, 174, 190, 202, 211, 212, 213, 220, 225, 234, 236, 238) (filed 07/28/2026) ....................301

Doc. 260 — Notice of Filing of Exhibits (filed 07/28/2026) ....................307

Doc. 267 — Motion for Extension of Time (with unsigned draft Response to Doc. 245) (filed 07/30/2026)....................352

Doc. 269 — Motion to Declare the Reference Unconstitutional / Disqualify / Set Aside (filed 07/31/2026) ....................355

Doc. 270 — Sur-Reply in Opposition to Cell 1.16's CVRA Motion (Doc. 221) (filed 08/03/2026) ....................366

Doc. 271 — Final Response to the Government's Motion for Inquiry into Status of Counsel (Doc. 247) (filed 08/03/2026) ....................372

Doc. 277 — Notice of Errata re Doc. 269 (filed 08/06/2026) ....................373

Doc. 278 — Second Motion to Set Aside (filed 08/06/2026) ....................375

Doc. 280 — Preliminary Objections to the Second Supplement (filed 08/06/2026) ....................380

Doc. 281 — Full Response/Objection to the Second Supplement (filed 08/06/2026) ....................388

Doc. 282 — Motion to Adopt Prior Motions and to Hold in Abeyance (filed 08/06/2026) ....................433

Doc. 283 — Response in Opposition to the Special Master's Opposition to Subpoenas (Doc. 266) (filed 08/06/2026) ....................440

Doc. 285 — Reply Supporting the Rule 17(c) Subpoenas (filed 08/06/2026) ....................458

Doc. 289 — Notice of Errata (Docs. 280, 281, 283, 285) (filed 08/07/2026) ....................464

Doc. 290 — Motion to Strike the Government's Omnibus Response (filed 08/07/2026) ....................466

Doc. 291 — Response in Opposition to the Government's Omnibus Response (Doc. 279) (filed 08/09/2026) ....................478

Doc. 292 — Response in Opposition to the Special Master's Response (Doc. 288) (filed 08/09/2026) ....................483

Doc. 293 — Motion for Leave to File Supplemental Response and to Continue to Supplement (filed 08/10/2026) ....................497

Doc. 294 — Notice of Supplemental Authority re Doc. 248 (filed 08/10/2026) ....................499

Doc. 295 — Supplemental Response re the Zero-Coupon Bonds (filed 08/10/2026) ....................502

Doc. 296 — Notice of Filing Certificate of Cancellation of the Beckett Collectibles Trust (filed 08/10/2026) ....................508

Doc. 300 — Reply re Doc. 234 (to the Omnibus) (filed 08/13/2026) ....................509

Doc. 301 — Response to ULICO's Brief re the Second Supplement (Doc. 275) (filed 08/13/2026) ....................533

Doc. 302 — Reply Supporting the Vista Recoup Motion (filed 08/13/2026) ....................538

Doc. 303 — Notice of Errata re Doc. 290 (filed 08/13/2026) ....................543

Doc. 309 — Motion for Reconsideration of the Order Denying Subpoenas (filed 08/18/2026) ....................545

Doc. 316 — Response to the Government's Consolidated Position (filed 08/23/2026) ....................553

Doc. 319 — Objections and Reservations Regarding the August 10, 2026 Motion Hearing (filed 08/23/2026) ....................593

Doc. 320 — Notice re Damovo + Motion to Stay Its Disposition (filed 08/23/2026) ....................601

Doc. 324 — Notice of Correction to Doc. 316 (filed 08/24/2026) ....................603

Doc. 329 — Notice of Objections to Entry of Any Final Order of Restitution and Forfeiture (filed 08/26/2026) ....................605

Doc. 331 — Motion to Compel the Government / Set Aside the Report and Final Supplement (with Doc. 331-1 Affidavit) (filed 08/31/2026) ....................614

Doc. 332 — Motion to Compel the Special Master / Set Aside the Report and Final Supplement (filed 08/31/2026) ....................627

Doc. 333 — Reply re Reconsideration of the Order Denying Subpoenas (filed 08/31/2026) ....................641

Doc. 339 — Reply to the Special Master's Opposition to the Motion to Stay (Doc. 334) (filed 09/07/2026) ....................658

Doc. 340 — Reply to the Government's Opposition to the Motion to Stay (Doc. 335) (filed 09/07/2026) ....................666

PART FOUR — OBJECTIONS TO THE ORDER OF AUGUST 31, 2026 (DOC. 330); RESPONSES THE GOVERNMENT AND THE SPECIAL MASTER DID NOT MAKE; AND INDEX OF EVERY POST-SENTENCING FILING ....................703

PART S-1 — ADDITIONAL FACTUAL BASIS (record-verified this session) ....................703

PART S-2 — ISSUES RAISED IN THE MOTION FOR RECONSIDERATION OF DOC. 330 (preserved) ....................706

PART S-3 — ARGUMENTS IN DOC. 292 (REPLY) NOT ADDRESSED BY DOC. 330 (preserved) ....................707

PART S-4 — ARGUMENTS IN DOC. 316 (RESPONSE TO CONSOLIDATED POSITION) BEARING ON DOC. 269/278 AND NOT ADDRESSED BY DOC. 330 (preserved) ....................708

PART S-5 — ADDITIONS FROM THE GOVERNMENT'S OMNIBUS RESPONSE (DOC. 279) AND THE JULY 2026 MEETINGS (added 2026-09-13) ....................709

PART S-6 — ENUMERATED OBJECTIONS TO DOC. 330 AND THE OFFSET SCHEDULE, CARRIED FROM THE SEPTEMBER 7, 2026 DRAFT "RESPONSE AND OBJECTIONS TO THE ORDER OF AUGUST 28, 2026" (v4) — INCORPORATED AS PRESERVED, NOT RE-ARGUED (added 2026-09-13) ...710

PART S-7 — EVERY DEFENSE FILING AFTER SENTENCING (May 26, 2026), INCORPORATED AND PRESERVED ....................718

## PART ONE — STRUCTURED INDEX OF FACTS AND ISSUES

### INTRODUCTION

Defendant Greg E. Lindberg submits this Addendum to consolidate, exhaustively, (1) the factual basis for his restitution position and (2) **every** issue he has raised concerning restitution, the Special-Master reference, and the process by which the $1.655 billion figure and his sentence were fixed, across every filing from the Special Master's Report (Doc. 106, Apr. 3, 2026) to the present. As to each, the Government and the Special Master **were given an opportunity to respond and expressly declined, or left the issue unanswered on the merits.** Defendant raises each issue **again** and **preserves each** for de novo determination by this Court and for review by the Fourth Circuit.

**The opposing parties did not answer these issues on the merits.** They declined to produce the underlying data (agreeing only to a confidentiality order and then refusing to docket it) (Doc. 341 at 13, 16; Doc. 344 at 8); labeled the valuation/offset data "not relevant"/"not critical" (Doc. 341 at 16 & n.4; Doc. 344 at 8, 12); assumed Defendant's offset facts true but rejected them "based on legal theories," deciding them "as a matter of law" (Doc. 344 at 8, 12); expressly declined to compare the 47 document categories against the subpoenas (Doc. 344 at 3); and met causation, the Article III challenge, and the sentencing linkage with waiver/timeliness or recharacterization rather than a merits response (Doc. 341 at 15-20; Doc. 344 at 9-13). The Government's own responses (Docs. 279, 308) were non-responsive and deferred wholesale to the Special Master.

### PART ONE — FACTUAL BASIS

(Established in Defendant's Consolidated and Supplemental Statements of Facts, Docs. 174 and 235, and supporting declarations and exhibits. Counsel to verify each figure and citation against the source before filing.)

**A. The investments were lawful, secured, guaranteed, and principal-protected**

1. The insurers operated under a written February 2017 Risk Mitigation Policy requiring minimum "B-" ratings, a "BB" weighted portfolio, leverage below 4x, arm's-length pricing opinions, and cash-flow testing, with a 25-year zero-default track record; affiliate borrowers committed to prepay underperforming loans.
2. Defendant contributed approximately $963 million in first-loss capital between 2014 and 2018 and took no dividends (confirmed by BRG, which found at least $377 million in contributions and no dividends).
3. Defendant executed the March 11, 2019 Amended and Restated Backstop Agreement, personally guaranteeing approximately $2.39 billion ($2,391,109,123.65) to the victim insurers.
4. Defendant purchased approximately $1.006 billion ($1,006,239,867) par of zero-coupon principal-protection bonds (cost approximately $359.7 million), issued through Barclays/RBC/UBS/Natixis and NCDOI-approved, mapped position-

by-position to identified affiliate loans, to guarantee return of principal at maturity.

**B. The investments were regulator-approved and lawful when made**

5. The NCDOI reviewed and approved an approximately 40% affiliated-investment concentration (2014 and 2016; April 11, 2016 Price Review Letter treated a negotiated 40% ceiling as agreed); Commissioner Causey praised Defendant's March 9, 2018 regulator testimony.
6. North Carolina imposed no statutory limit on affiliate investment until N.C. Gen. Stat. § 58-19-10, enacted July 26, 2019 — after the charged conduct — a fact the Government concedes (calling the prior regime an "investment loophole").
7. Approximately 40%+ affiliated investment is industry-standard for private-equity-affiliated insurers (peer insurers at 35-43%; approximately $413 billion in affiliated investments industry-wide per a May 26, 2026 report).

**C. Independent valuations exceeded the loan balances**

8. KPMG (August 24, 2018) valued the operating-company borrowers at approximately $2.45 billion business-enterprise value and the insurance entities' equity at approximately $1.08 billion.
9. Houlihan Lokey (January 18, 2018) found full coverage at approximately 38.7-47.3% loan-to-value.
10. The 2024 Quadro signed purchase agreement valued the Specified Affiliated Companies at approximately $3.4 billion (Clanwilliam alone at $880 million, a 22.14x EBITDA multiple).
11. The Rehabilitator's own November 5, 2018 internal valuation (18 days after transfer of control) fixed the NCICs at $454 million.

**D. The Ares transaction and Government interference (superseding cause)**

12. In November 2018, Ares — an arm's-length purchaser — executed a letter of intent valued at approximately $400-450 million that would have retired the affiliated loans and paid policyholders.
13. Ares withdrew after being told to avoid connection to Eli Global. A January 6, 2019 memorandum (Christa Miller) documents that Ares abandoned the SPV term after a "third party constituent" — who had met with the Department of Justice — advised it to avoid any connection to Eli Global.
14. The Government's interference is a superseding cause of the losses the Report attributes to Defendant. Defendant has sought disclosure of all communications between any federal or state actor (including the FBI) and Ares or its advisors concerning the transaction; the Government has resisted, and the communications are material and favorable (Brady/Giglio). A Sealed Addendum and DOJ interview memoranda bear on this interference.

**E. Additional intervening/superseding causes after transfer of control**

15. The Rehabilitator refused the Oaktree approximately $1 billion SPV (February 2019) that would have paid all policyholders in full by approximately June 2019.
16. The Rehabilitator extracted the coerced ten-year hold under the June 27, 2019 MOU, signed under a liquidation threat ("you're the nail, I'm the hammer"), locking the loans until 2029.
17. The Rehabilitator sold the $1.006 billion principal-protection bonds pre-maturity for approximately $394 million (a $611.6 million loss), without Wake County approval (N.C. Gen. Stat. § 58-30-85), while the companies held over $1 billion in cash and marketable third-party bonds at each year-end 2019-2023 (no liquidity need).
18. The Rehabilitator refused the Montshire/Alban (2023) and blocked the Quadro (2024) transactions, then sold Clanwilliam to TA Associates for $450 million — approximately $474 million below the Quadro valuation.
19. The Special Master sold Beckett (independently valued at approximately $1 billion — Cabrillo $1,003,924,000; Blackstone ~$1.05 billion; CCG term sheet $800-900 million; best-and-final ~$1.1 billion) for approximately $134 million, off-docket and without the Court approval his appointment order requires, and without accounting for the proceeds; and is shopping Damovo "for the debt" (~$100 million) against a standing arm's-length offer of approximately $400-500 million (Twelve Seas EOI, July 31, 2026).

**F. Full policyholder recovery, fees, and Defendant's cooperation**

20. In December 2025, over $157 million was distributed to more than 43,000 excess policyholders, after Defendant consented to the Clanwilliam sale and relinquished a $40 million tax escrow.
21. The Rehabilitator and its professionals have been paid more than $165 million ($165,749,392) in fees since June 2019 (approximately $2.5-2.74 million per month), without the state-court approval N.C. Gen. Stat. § 58-30-85(a)(3) requires.
22. Independent forensic work (BRG) found more than $400 million in damages from the regulatory conduct, net worth of $860 million to $1.46 billion (no insolvency), at least $377 million in capital contributed, and zero dividends.

**G. The record was built ex parte and withheld**

23. The methodology and data behind the $1.655 billion figure were never placed on the record. The Special Master communicated on a near-daily basis with victims, receivers/rehabilitators/liquidators, purchasers, regulators, and guaranty associations — including M3, NHC, the NCICs, Dinius, Wes Camden, and Williams Mullen — and neither tallied nor disclosed those communications.
24. Defendant assumed the data underlying the loss and offset calculations originated at the joint meetings he understood were taking place; in fact the underlying communications and data were never shared with him or his counsel and were never properly placed before the Court, because they rested

on ex parte communications concerning substantive matters. Each time counsel sought that information from the Special Master or his appointees, they were unsuccessful.

25. The Special Master's disclosure affidavit (Doc. 55-2 ¶ 4) disclosed no conflict and omitted any intent to conduct near-daily ex parte contacts; the appointment order (Doc. 56) is silent as to ex parte procedures (contrast Fed. R. Civ. P. 53(b)(2)(B)).

**H. The offset schedule (net restitution to zero)**

26. Defendant's documented offsets, credits, and reductions aggregate approximately $2,899,418,383 (and up to approximately $3,765,418,383 including the approximately $866 million Beckett loss), exceeding the figure and yielding net restitution of zero, before crediting approximately $1 billion in first-loss capital. Line items include, without limitation:

- Prejudgment interest — ($263,000,000)
- Corrected starting balance of affiliate investments — ($141,000,000)
- AAPC preferred equity transferred to ULICO (par as of May 26, 2026) — ($352,906,240)
- SNIC capital contributions — ($27,823,425)
- Cash payments to payees not captured by the Special Master — ($79,655,289)
- CBL subordination/Beckett refinance fee — ($3,000,000)
- Additional Clanwilliam escrow proceeds — ($20,000,000)
- ULICO sale of contributed real estate — ($13,596,013)
- Bermuda insurers' proceeds from affiliated-asset sales — ($9,800,076)
- Zero-coupon bond sale proceeds — ($243,452,385) (approximately $394,578,906 realized, a net gain over projection)
- Value of the NCICs as of October 2018 — ($454,000,000)
- Loss on Agera — ($129,398,324)
- ECL losses — ($22,288,826)
- Loss on UKAT — ($39,000,000)
- Insurance-Holdco debt portion — ($14,897,805)
- Loss on Clanwilliam below-market sale — ($474,000,000)
- Loss on early zero-coupon bond sales — ($611,600,000)
- Beckett destroyed value — (~$866,000,000)

**PART TWO — EVERY ISSUE RAISED, BY FILING**

(Each issue is listed as raised, with the relief sought. "Category" tags cross-reference Part Three. All were left unanswered on the merits or expressly declined unless otherwise noted.)

**Doc. 132 — Response & Objection to the Special Master's Report (May 4, 2026)**

1. **Interest improperly added ($263M).** The Report added ~$263M in post-IALA interest (2.19% Treasury rate); the MVRA does not authorize interest

and, where the property lost is cash, § 3663A(b)(1)(A) permits only return of cash. Reduce restitution by ≥ $263M. [Loss valuation/Offsets]

2. **Starting principal balance overstated (~$141M).** The Report used $1.391B for NCIC "IALA Principal"; the NCICs' own verified state-court pleadings fixed $1.25B. Reduce by ≥ $141M. [Loss valuation]
3. **"Qualifying recoveries" limitation is legal error.** Rejecting credits for payments made for Defendant's "strategic/business/self-preservation purposes" injects an atextual intent test; motive is irrelevant under the MVRA. Reject the limitation; credit ≥ $740M. [Offsets]
4. **AAPC preferred-equity transfer to ULICO ($352.9M).** ULICO accepted $218M of AAPC preferred equity (worth $352.9M) in partial satisfaction of the M.D.N.C. judgment for the same losses; denying credit allows double recovery. Credit $352.9M. [Offsets]
5. **SNIC capital contributions ($27.8M).** 2021-22 payments compensated SNIC for Affiliate-Investment losses. Credit $27.8M. [Offsets]
6. **Uncredited cash payments to Pre-Designated Restitution Parties ($79.6M).** Undisputed cash/preferred-equity payments to CBL, BLIC, SNIC, PBLA, Northstar and ULICO were excluded as "debts not in the IALA." Credit $79.6M. [Offsets]
7. **CBL Beckett subordination/refinance fee ($3M).** Denied as "fresh consideration"; the receiver inserted the fee to withhold assent; Defendant received no benefit. Credit $3M. [Offsets]
8. **Additional Clanwilliam sale proceeds ($20M).** $20M escrowed for "Irish Tax Liabilities and Triton Closing Costs" (Dkt. 68) that will never materialize. Release and credit $20M. [Offsets]
9. **ULICO real-estate sale proceeds ($13.6M).** ULICO sold four real-estate entities Defendant contributed to the PBLA-ULICO trust, recovering $13,596,013. Credit $13.6M. [Offsets]
10. **Zero-coupon bond sale proceeds ($243.4M).** Post-IALA the NCICs sold zero-coupon bonds captured in the principal balances for ~$243.45M. Credit $243.4M. [Offsets]
11. **Value of the NCICs as of October 2018 ($454M).** Offset established by the Rehabilitator's own Nov. 5, 2018 valuation. Credit $454M. [Offsets/Loss valuation]
12. **Bermuda ICs' proceeds from sales of affiliated assets ($9.8M).** Credit $9.8M. [Offsets]
13. **Agera losses not proximately caused ($129M).** ULICO's ~$129M Agera exposure pre-dated Defendant and Agera collapsed in 2019 from its CFO's independent fraud. Reduce by $129M. [Causation]
14. **Complex-causation abstention (§ 3663A(c)(3)).** Untangling Agera-type causation would require full-blown civil litigation. Exclude those losses. [Causation/Procedural]

15. **Eye Care Leaders / "ECL" losses ($22.3M).** Not proximately caused. Exclude $22.3M. [Causation]
16. **UKAT loss ($39M).** Not proximately caused (Rehabilitator's rejection of BC Partners refinancing). Exclude $39M. [Causation]
17. **Insurance-Holdco debt portion ($14.9M).** Not attributable to Defendant. Exclude $14.9M. [Causation]
18. **Clanwilliam below-market-sale loss ($474M).** Not caused by offense conduct. Exclude $474M. [Causation]
19. **Early zero-coupon-bond-sale loss ($611.6M).** Not caused by Defendant. Exclude $611.6M. [Causation]
20. **Jury must find restitution facts.** After Ellingburg, Apprendi/Southern Union require jury findings beyond a reasonable doubt; raised to preserve. Preserve. [Constitutional]
21. **Report exceeds MVRA/constitutional authority.** If all objections are sustained, net restitution is $0. Reject the figure; order no restitution. [Restitution amount]

**Doc. 145 — Defendant's Sentencing Memorandum (May 14, 2026)**

22. **Concurrent sentences.** The Financial and Political-Contribution cases are relevant conduct; sentences should run concurrently (U.S.S.G. §§ 5G1.2, 5G1.3(b)). Impose concurrent 48-month sentences. [Sentencing]
23. **Credit for time served — 39.8 months.** BOP likely cannot double-credit 1,194 days; the Court should adjust/vary 39.8 months (§ 5G1.3(b)/(d)). Downward adjustment of 39.8 months. [Sentencing]
24. **Lost First Step Act credits — 9.5 months.** ~285 days of FSA credits evaporated when the conviction was vacated. Downward variance of ~9.5 months. [Sentencing]
25. **Extraordinary restitution.** Unprecedented restitution/cooperation warrants a downward variance. Downward variance. [Sentencing]
26. **Loss table overstates seriousness (§ 2B1.1).** The 30-level enhancement overstates culpability. Substantial downward variance. [Sentencing]
27. **Co-defendant disparity (§ 3553(a)(6)).** Culpable executives received DPAs/NPAs/probation. Downward variance. [Sentencing]
28. **History & characteristics (§ 3553(a)(1)).** Downward variance to 48 months. [Sentencing]
29. **§ 3585(a) official-detention findings.** Hold that Defendant voluntarily commenced his sentence Nov. 12, 2024 and that the county/Kentucky facilities are official detention. Enter the finding. [Sentencing/execution]
30. **Delay federal reporting date.** Defer reporting until after all restitution hearings. Delay reporting. [Sentencing/execution]

**Doc. 172 — Motion to Stay / Correct Restitution Order (June 9, 2026)**

31. **Stay all further asset sales and processes** pending the § 3664 determination; **preserve escrowed/held proceeds**; **direct the Special Master to suspend sale activities.** [Procedural/Special Master authority]
32. **Unexplained $30M excess** over the recommended $1.625B. Strike $30M. [Restitution amount]
33. **Net restitution is zero / overpayment.** Offsets of $2,899,418,383 exceed the figure; overpayment of ~$1.244B/$1.274B. Adjudicate fully paid; return the Primary Restitution Assets. [Restitution amount]
34. **Failure to itemize/apply $2.89B mandatory offsets.** Itemize and apply. [Offsets]
35. **AAPC/ULICO credit presently due.** The Dec. 2022 transfer fixed a dollar-for-dollar $357M credit; not speculative. Recognize now. [Offsets]
36. **Reserved reduction categories declared due now** guarantee over-recovery. Defer enforceability until quantified. [Offsets/Procedural]
37. **No causation findings** tying any award to offense-caused loss (Hughey/Blake). Make findings. [Causation]
38. **Pre-judgment interest not authorized.** Exclude. [Offsets]
39. **Value-creation vs. value-destruction.** Defendant grew the companies from ~$1.5B to ~$3.4B (Quadro 22.14x); the Rehabilitator destroyed the $454M baseline, took $165M+ fees, incurred $137M unrelated bond losses, blocked four monetizations, sued a buyer, fire-sold Clanwilliam and the zero-coupon bonds. Support for stay/return. [Loss valuation/Causation]
40. **Ellingburg — restitution is criminal punishment; return assets once paid.** [Constitutional]
41. **No authority to exceed the MVRA ceiling; Ritchie windfall bar.** [Restitution amount]
42. **§ 3664(j)(2) one-way ratchet / no clawback** makes premature disbursement irreversible. Stay. [Constitutional/Procedural]
43. **Legislative history (S. Rep. 104-179)** — restitution restores the victim, not a windfall; excludes complex/speculative causation. [Causation]
44. **Plea ¶ 10(a) does not waive causation.** Interpretive ruling. [Causation]
45. **Government concedes the 2019 law change.** [Causation]
46. **Beckett sale without required prior court approval.** Stay. [Special Master authority]
47. **Return of eight De Minimis SACs** NHC stipulated (Doc. 66 ¶ 20(h)) it will not sell. Return. [Other]
48. **Expedited hearing.** [Procedural]

**Doc. 173 — Memorandum in Support of Motion to Stay (June 9, 2026)**

49. **Three sources of stay authority** — inherent supervisory power (Landis/Chambers), Rule 53, All Writs Act. [Procedural]
50. **Nken four-factor stay standard satisfied.** [Procedural]

51. **¶ 6(e) sequencing** (approval before liquidation) inverted. [Procedural/Special Master authority]
52. **$1.274B/$1.244B overpayment; proceeding = plain error.** [Restitution amount]
53. **$30M unexplained excess.** [Restitution amount]
54. **Itemized offsets (each its own contention):** prejudgment interest $263M; corrected starting balance $141M; AAPC preferred $352,906,240; SNIC $27,823,425; additional cash payments $79,655,289; CBL fee $3M; Clanwilliam escrow $20M; ULICO real estate $13,596,013; zero-coupon proceeds $243,452,385; NCIC value $454M; Bermuda $9,800,076; Agera $129,398,324; ECL $22,288,826; UKAT $39M; Insurance-Holdco $14,897,805; Clanwilliam loss $474M; early zero-coupon loss $611,600,000; dollar-for-dollar credit rule (Robers; § 3663A(b)(1)(B)(ii); § 3664(j)(2)). Apply all. [Offsets]
55. **Proximate cause built into the MVRA (Paroline).** [Causation]
56. **Robers — victim's choice to hold collateral breaks the chain.** [Causation]
57. **Ares & Oaktree refusals break the chain a fortiori.** [Causation]
58. **Ares withdrawal caused by Government interference** (Jan. 6, 2019 Christa Miller memo). [Causation]
59. **Coerced ten-year MOU hold.** [Causation]
60. **Affiliated-loan component nets to zero after Robers/Blake.** [Causation]
61. **Subsequent Rehabilitator-caused losses outside ¶ 10(a).** [Causation]
62. **MVRA complexity exception (§ 3663A(c)(3)(B)).** [Causation/Procedural]
63. **Government sentencing memo concedes post-conduct law change.** [Causation]
64. **Lagos — MVRA read narrowly.** [Causation]
65. **Plea ¶ 10(a) preserves causation; construed against the Government.** [Causation]
66. **Ellingburg — restitution is criminal punishment; Day undermined.** [Constitutional]
67. **Sixth Amendment / jury (Apprendi, Southern Union, Hester, Erlinger).** [Constitutional]
68. **Eighth Amendment Excessive Fines (Bajakajian, Timbs).** [Constitutional]
69. **Two propositions "beyond debate."** [Constitutional]
70. **No lawful basis to retain assets once restitution is paid (Rule 41(g) analogy).** Return. [Special Master authority]
71. **Beckett sale without ¶ 6(e) approval.** [Special Master authority]
72. **BRG independent forensic corroboration.** [Loss valuation]

73. **Clanwilliam undervaluation (public-market vs. PE discount).** [Loss valuation]
74. **Due-process right not sentenced on invalid premises (S. Rep. 104-179).** [Ex parte & due process]
75. **Irreparable harm; going-concern destruction; § 3664(j)(2) ratchet; gap consists of already-occurred credits; Beckett off-approval sale; no cognizable prejudice; public interest; cooperation/value-creation; § 58-30-85(a)(3) fees without court approval.** [Procedural/Loss valuation]
76. **Return of eight De Minimis SACs.** [Other]

**Doc. 174 — Supplemental / Consolidated Statement of Facts (June 9, 2026)**

77. NCDOI approved affiliates to 40%; no statutory cap until 7/26/19. [Causation]
78. $2.39B personal backstop guaranty. [Causation]
79. 40%+ affiliate investment is industry standard. [Causation]
80. Zero-coupon bonds = dollar-for-dollar principal insurance; sold early → $611.6M loss. [Causation/Offsets]
81. Ares & Oaktree face-value deals refused. [Causation]
82. Rehabilitator coercion / MOU under liquidation threat. [Causation]
83. $139M FinCo read-through reduction (CBL $103.2M, BLIC $9.8M, SNIC $20M). [Offsets]
84. Corrected starting balance (~$141M overstatement). [Loss valuation]
85. Robers memorandum of law. [Causation]
86. Destruction of $454M NCIC value not caused by the offense. [Offsets/Causation]
87. AAPC preferred equity to ULICO. [Offsets]
88. Agera and additional non-caused losses. [Causation/Offsets]
89. $263M prejudgment interest should not be awarded. [Offsets]
90. Decade of policyholder-first conduct negates intent. [Causation]
91. Policyholders paid in full — $157M to 43,000. [Offsets]
92. Summary offsets table / net zero. [Offsets]
93. **Post-sentencing breach by plea counterparties** (Notice of Breach, Ex. B12) — preserve Santobello/Puckett breach claim. [Sentencing/Other]

**Doc. 190 — Motion to Stay + Consolidated Objections (June 11, 2026)**

94. **§ 3664(d)(6) authorizes recommendation, not sale.** [Special Master authority]
95. **Strict construction of delegation statutes (Gomez).** [Special Master authority]
96. **La Buy — masters aid, not displace, the court.** [Special Master authority]
97. **Restitution determination is a nondelegable Article III function (Johnson).** [Constitutional]
98. **Consent cannot enlarge the statute or waive structural Article III limits (Schor; Wellness; Peretz).** [Constitutional]

99. **Structural violation — execution before adjudication.** [Constitutional]
100. **Consent instruments all presuppose court orders.** [Constitutional]
101. **New Waiver = manufacture of missing consent under sentencing pressure.** Refuse to enforce. [Ex parte & due process]
102. **Special Master disqualified — conflict of interest (§ 455; Murchison; Tumey; Liljeberg).** Disqualify; appoint a neutral successor. [Special Master disqualification]
103. **Professionals paid from liquidated assets = structural incentive to sell** ($14,112,426 Clanwilliam reserve). [Special Master disqualification]
104. **Pattern of unfulfilled inducements.** [Special Master disqualification]
105. **May 22 Statement (Doc. 159) tainted sentencing** ("misinformation of constitutional magnitude"; Townsend; Tucker). Strike Doc. 159. [Ex parte & due process]
106. **Sentenced on an incomplete/uncorrected restitution figure.** [Ex parte & due process]
107. **Miclaus — undisclosed calculations violate the adversarial scheme.** [Ex parte & due process]
108. **Pre-distribution loss statements.** [Ex parte & due process]
109. **Blackledge/Pearce — process penalizes exercise of rights.** [Ex parte & due process]
110. **No accounting of Beckett proceeds or other dispositions.** Order a complete accounting within 14 days. [Discovery/data access]
111. **Itemized accounting of all administrative fees/expenses.** Order. [Discovery]
112. **Beckett sale ultra vires — no court approval, off-docket (28 U.S.C. § 2001).** [Special Master authority]
113. **Sales before final determination invert the statutory sequence (Dolan).** [Procedural]
114. **Clanwilliam as proof of concept** ($23,520,710 to Vista; ~$350M below market). [Procedural]
115. **Plea agreement consistent with objections.** [Procedural]
116. **De novo review — Court must find facts itself (§ 3664(e)).** [Sentencing/burden]
117. **Beyond-reasonable-doubt standard after Ellingburg.** [Constitutional]
118. **$263M interest selected by an adjunct.** [Sentencing/Offsets]
119. **ULICO preferred-equity credit ≥ $218M conceded.** [Offsets]
120. **No credit for $14.1M admin reserve or $23.5M Vista.** [Offsets]
121. **Consolidated objections i-xii** (reference exceeds § 3664(d)(6); figure inflated by every promised-and-undelivered credit; object to entry of any final order except on the specified procedures/findings; $1.655B unsupported and exceeded by ~$2.9B offsets). [multiple]

122. **Relief:** stay all sales pending a final order after de novo determination; require a specific prior order with § 3664(e) findings (and BRD as preserved); strike Doc. 159; disqualify the Special Master; 14-day accounting of all dispositions and fees; expedited consideration.

**Doc. 198 — Response Opposing the Conservatrix/Zetteler CVRA Mandamus Petition (June 12, 2026)**

123. **No denied CVRA motion —** mandamus reviews a denial; Conservatrix only participated in the administrative process. Deny. [Victim status/CVRA]
124. **Conservatrix is not a victim — contract claim, not offense harm** (2017 135% SCR commitment; intervening market/regulatory events). Deny. [Causation/Victim status]
125. **Proximate-cause / offense-of-conviction limit** (Hughey; Paroline; "closely related...not merely tangentially linked"). Deny. [Causation]
126. **Double-recovery bar —** Conservatrix holds a confirmed $166.8M Dutch arbitral judgment for the same losses. Deny. [Offsets/Restitution amount]
127. **72-hour adjudication would violate due process** (Ellingburg; Gardner). Deny. [Constitutional/Ex parte & due process]
128. **Notice of appeal divests the district court (Griggs).** Deny. [Procedural]
129. **Relief exceeds mandamus/CVRA authority.** Deny. [Procedural]
130. **Reservation of Defendant's own offsets (~$2.9B).** [Offsets]

**Docs. 201 & 202 — Emergency Motion to Enforce Plea / Preserve Access / Require Conflict-Free Counsel (June 15, 2026)**

131. **Prosecutorial vindictiveness** (demand to strike a filed motion; threatened plea breach; withdrawn reporting-delay support after protected filings) (Pearce; Blackledge; Goodwin). Bar treating advocacy as breach. [Constitutional/Ex parte & due process]
132. **Plea agreement is a binding promise (access terms) (Santobello).** Enforce. [Procedural]
133. **Due process — meaningful opportunity to be heard on restitution.** Find access necessary. [Constitutional]
134. **Sixth Amendment counsel + access to courts (Bounds/Lewis).** Order access. [Constitutional]
135. **Offsets & causation define restitution (Robers; Zetteler law of the case; zero-coupon; Ares).** No liquidation before final restitution. [Causation/Offsets]
136. **Stay all further asset sales/liquidation** (Beckett ~$133M without approval). [Special Master authority]
137. **Prosecutors' ethical violations (Berger; § 530B; N.C. Rules 3.8/8.4).** [Constitutional/Ex parte & due process]
138. **Disqualify prosecutors — advocate-witness / personal stake (Rule 3.7).** [Procedural]

139. **No BOP transfer until final restitution / hold at an access-capable facility.** [Sentencing/execution]

**Doc. 225 — Emergency Motion Directing BOP to Permit Daily Counsel/Computer/Records Access (June 24, 2026)**

140. **Contested restitution is a critical stage (Ellingburg; Mempa).** Order daily access. [Constitutional/Sentencing]
141. **Sixth Amendment denial of counsel at a critical stage (Cronic).** [Constitutional]
142. **Access-to-courts right (Bounds/Lewis).** [Constitutional/Discovery]
143. **Due process — no sentence on an incomplete record (Townsend).** [Constitutional/Ex parte & due process]
144. **Plea and Special Master Order require the Government to facilitate access (Santobello).** [Procedural]
145. **§ 3621(b) BOP placement recommendation** (local access-capable facility). [Sentencing/execution]
146. **Offsets/prior payments fully pay restitution.** [Offsets/Restitution amount]

**Doc. 227 — Response Opposing Cell 1.16's CVRA Restitution Motion (June 29, 2026)**

147. **Successive/repetitive motion prejudices Defendant.** Deny. [Procedural/Victim status]
148. **No basis to disturb the Special Master's finding** (Cell 1.16 failed the misrepresentation element). Adhere. [Victim status]
149. **No misrepresentation/reliance — declarant's own correspondence refutes it** (Solow knew the investments were Lindberg-affiliated; treated ratings as a formality). Deny. [Causation/Victim status]
150. **Ratings issued by independent agencies, not Defendant.** Deny. [Causation]
151. **Buy-back letter is a collateral guarantee, not a misrepresentation.** Deny. [Causation/Victim status]
152. **Double recovery — same loans as NC/Bermuda insurers (§ 3664(f)(1)(A)).** Deny/reduce. [Restitution amount/Offsets]
153. **Sixth Amendment/Apprendi challenge to the preponderance standard (reserved).** [Constitutional]
154. **Reserve of causation/offsets/credits.** [Causation/Offsets]

**Doc. 234 — Motion for Determination That No Restitution Is Owed, or for Exclusion/Offset (July 14, 2026)**

155. **Net restitution is zero / $2.89B overpayment** on three independent grounds. § 3664(e) determination of zero. [Restitution amount]
156. **No reasonably foreseeable loss at origination** (risk framework; guarantees; principal protection; regulatory praise; 2019 law change). [Causation]

157. **Written Risk Mitigation Policy / zero defaults.** [Causation]
158. **~$1B own capital + guarantees + no dividends.** [Causation]
159. **NCDOI approval of ~40% affiliate concentration.** [Causation]
160. **KPMG/Houlihan Lokey 2018 valuations exceed loan balances.** [Loss valuation]
161. **Offense procured no official/agency action (McDonnell; Snyder; Lindberg 39 F.4th).** [Causation]
162. **Payments were First-Amendment-protected campaign contributions.** [Causation]
163. **Defendant sought only fair regulation** (requested Debra Walker; Government conceded no evidence Walker corrupt). [Causation]
164. **Political-vendetta genesis (Causey "dismantle").** [Causation]
165. **Intervening acts after Oct. 2018 broke the chain (S. Rep. 104-179; Stein; Tyler; Squirrel; Goodrich).** [Causation]
166. **Government interference with the Ares sale (Nov. 2018) (Gibbens).** [Causation]
167. **Rehabilitator's refusal of Oaktree (Feb. 2019).** [Causation]
168. **Coerced ten-year hold (June 27, 2019 MOU).** [Causation]
169. **Pre-maturity fire-sale of principal-protection bonds ($611.6M loss; N.C.G.S. § 58-30-85; Robers a fortiori).** [Causation]
170. **Montshire/Alban refusal (2023) + Quadro blocking (2024) + Clanwilliam fire-sale (2025).** [Causation]
171. **Special Master's continuing dispositions (2026) (Beckett; compensation from administered assets).** [Causation]
172. **"Real loss was risk" ≠ compensable loss (Hughey; Harvey; Steele).** [Loss valuation]
173. **Lawful risk cannot predicate penal restitution.** [Loss valuation]
174. **Specific offset line items** (each its own contention; see Part One ¶ 26): interest $263M; starting balance $141M; AAPC $352,906,240; SNIC $27,823,425; cash payments $79,655,289; CBL fee $3M; Clanwilliam escrow $20M; ULICO real estate $13,596,013; Bermuda $9,800,076; zero-coupon proceeds $243M; NCIC value $454M; Agera $129M; ECL $22,288,826; UKAT $39M; Insurance-Holdco $14,897,805; Clanwilliam loss $474M; early zero-coupon loss $611.6M — total $2,899,418,383 → net $0. [Offsets]
175. **Interest is not a compensable MVRA loss (Robers; Boccagna; DOJ policy; Hoyle pre-MVRA).** [Loss valuation/Offsets]
176. **Government/Special Master failed the § 3664(e) burden.** Determination they did not carry the burden. [Restitution amount/Procedural]
177. **Brady disclosure of Government-Ares communications.** Order disclosure. [Discovery]

178. **Complete accounting of all dispositions/fees (incl. Beckett).** Order. [Discovery]
179. **Ellingburg — criminal punishment; Sixth Amendment / Ex Post Facto reserved.** [Constitutional]
180. **Restitution limited to proximately caused actual loss (Hughey; Blake; Lagos).** [Causation]
181. **Plea ¶ 10(a) preserves the causation limit; construed against the Government (Harvey; § 3556).** [Causation]
182. **In re Zetteler is law of the case.** [Causation]
183. **Rule of lenity.** [Causation]
184. **Relief:** § 3664(e) determination of no proximately caused loss; alternatively exclude intervening-cause losses; credit all offsets; complete accounting; Government disclosure of Ares communications; fix net restitution at zero; expedited consideration.

**Doc. 235 — Consolidated Statement of Facts (Lindberg Declaration) (July 15, 2026)**

185. Written risk framework / zero defaults. [Causation]
186. ~$1B first-loss capital + $2.39B guaranty + $1B bonds. [Causation]
187. Regulator approved 40% affiliate concentration. [Causation]
188. 2018 KPMG (~$2.45B) & Houlihan Lokey valuations. [Loss valuation]
189. **Commissioner's pre-office plan to "dismantle" Lindberg** (Loftin affidavit; Thompson interview). [Causation]
190. Rehabilitator fees $165.7M. [Offsets/Other]
191. Intervening acts destroyed value post-Oct. 2018 (Ares; Oaktree; MOU; early bond sale; Quadro $3.15B PF EV). [Causation]
192. **Forced private sales understate value (Bargeron study — private acquirers pay ~63.3% less).** [Loss valuation]

**Docs. 237 & 270 — Sur-Reply Opposing Cell 1.16's CVRA Motion (July 17 / Aug. 3, 2026)**

193. **Threshold motion (Docs. 234/235) should be decided first.** [Procedural]
194. **Reply's silence on independent grounds is fatal.** Deny. [Procedural/Victim status]
195. **Vista received a $23.5M distribution the Special Master would not call restitution.** [Victim status/Offsets]
196. **Contemporaneous record refutes every reliance premise** (Cell 1.16 knew assets were sub-investment-grade; used ratings as a regulatory checkbox; looked to a buy-back, not ratings). Deny. [Causation/Victim status]
197. **Zetteler/Blankenship — a claimant that knew the truth cannot have relied.** Deny. [Causation]
198. **Double recovery (§ 3664(f)(1)(A)).** Deny. [Restitution amount/Offsets]

**Doc. 238 — Motion to Recoup the Distribution to Vista (July 17, 2026)**

199. **Recoup the $23.5M Vista distribution — non-victim windfall (§ 3664; Chambers).** Recoup and credit. [Offsets/Special Master authority/Restitution amount]

200. **Court's de novo authority over Special Master distributions (§ 3664(d)(6)).** Correct. [Special Master authority]

201. **Cell 1.16 is not a victim (Zetteler; Blankenship).** Deny victim status. [Causation/Victim status]

202. **Cell 1.16 procured the ratings it claims to have relied on (Feb. 21, 2018 six-point plan).** Recoup. [Causation/Victim status]

203. **$131.2M loss overstated (book vs. fair market value) (Steele; Stone; Harvey).** Reduce. [Loss valuation]

204. **$131.2M is duplicative of NC/Bermuda awards.** Reduce. [Restitution amount/Offsets]

205. **Solow Declaration is materially false (§ 1746; Sarihifard) — possible referral.** Materiality finding. [Other/Procedural]

206. **Inherent authority to deny relief on a false premise (Chambers).** Recoup/deny. [Special Master authority/Procedural]

207. **Reservation — causation, offsets, credits, Sixth Amendment/Ex Post Facto.** [Constitutional/Offsets]

208. **Evidentiary hearing requested.** [Procedural]

**Doc. 248 — Motion for Rule 17 Subpoenas Duces Tecum (July 23, 2026)**

209. **Nixon relevancy** — every category is tied to a disputed causation/offset question. Issue subpoenas. [Rule 17/Discovery]

210. **Nixon admissibility** — business records (Rule 803(6)) plus contemporaneous correspondence. [Rule 17]

211. **Nixon specificity** — discrete dated transactions (Ares LOI; Oaktree; MOU; zero-coupon sales; AAPC/ULICO transfer; Clanwilliam; Beckett), bounded 10/1/2018-present. [Rule 17]

212. **Nixon good faith** — for the evidentiary hearing, not general discovery; Defendant lacks the records. [Rule 17]

213. **Nixon applies at the sentencing/restitution stage (Krane; DNRB; Bendawald).** [Rule 17/Procedural]

214. **Privilege handling** — Government communications are not privileged; any privilege by written log within 7 days. Order. [Discovery]

215. **Pre-hearing production with adequate runway (120-180 days).** [Rule 17/Procedural]

216. **MVRA architecture requires production (§§ 3663A(b)(1)(B)(ii), 3664(j)(2), (e)).** Order. [Discovery]

217. **Burden-of-proof entails process (Karam).** Order. [Discovery]

218. **De novo determination needs a two-sided record.** Order. [Discovery]

219. **Proximate-cause defense — intervening discretionary acts** (records to prove causation). [Causation]
220. **Value-realized offsets (§ 3664(j)(2))** (records to quantify). [Offsets]
221. **Fees and post-transfer investment losses ($165M+ fees; $137M losses).** [Offsets]
222. **Disputed IALA/loan-balance baseline** (workpapers; AAPC April 2022 refinance; SM concedes figures "remain open"). [Loss valuation]
223. **Sixth Amendment / Apprendi reservation (Ellingburg); Ex Post Facto reserved.** [Constitutional]

**Doc. 256 — Notice of Correction re Beckett Valuation (July 27, 2026)**

224. **Beckett worth ~$1B (>$800M), not $134M** — Cabrillo $1,003,924,000; Blackstone IOI $1.05B; CCG term sheet $800-900M; best-and-final $1.1B. Correct the record. [Loss valuation]
225. **$134M was the Special Master's reported sale figure, not a valuation** — corrects Docs. 220 and 234. [Loss valuation/Procedural]
226. **Correction delayed by BOP transit.** [Procedural]

**Doc. 269 — Motion to Declare the Reference Unconstitutional, Disqualify/Remove the Special Master, and Set Aside the Restitution Orders (July 31, 2026)**

227. **The Order makes the Special Master a receiver** (exclusive possession/control; identify, liquidate, clear title, apportion, distribute). Declare unconstitutional as applied. [Special Master authority]
228. **The Order also assigns the Article III adjudicative function** (Doc. 56 ¶ 3(a),(f)). Sever/vacate. [Constitutional]
229. **Fixing restitution is a nondelegable judicial function (Johnson; Blake; Microsoft; La Buy).** [Constitutional]
230. **Combining receiver + adjudicator in a fee-interested officer is forbidden (O'Connor; Tumey; Caperton; Rippo).** Disqualify. [Special Master disqualification]
231. **§ 455(b)(4) financial-interest disqualification (non-waivable; § 455(e)); no Rule 53(a)(2) disclosure/consent.** Disqualify/remove. [Special Master disqualification]
232. **Special Master as second prosecutor / accuser-adjudicator (In re Murchison).** [Special Master disqualification]
233. **Government abdicated its § 3664(e) burden to the Report ("a waste of time" to address causation).** Require the Government's own proof. [Restitution amount/Procedural]
234. **Ongoing/continuing conflict (AAPC voting trust/assignment).** Remove; stay sales. [Special Master disqualification]
235. **Advisory label does not save the reference (Cobell; Jenkins; Microsoft).** [Special Master disqualification]

236. **Remedy: suppression of all work product (In re Brooks).** Set aside Docs. 161, 245, 245-1. [Special Master disqualification]
237. **Court's authority to remove its own appointee (Rule 53; inherent).** [Special Master authority]
238. **Structural Article III defect is non-waivable (Schor; Wellness; Stern).** [Constitutional]
239. **Illegal-sentence theory (Ellingburg; Davis; Broughton-Jones) — even a plea waiver cannot reach it.** [Constitutional]
240. **MVRA sequence inverted (execution before adjudication).** [Constitutional/Procedural]
241. **De novo review cannot cure a non-neutral first-instance adjudicator (Concrete Pipe; Ward; In re Brooks).** [Ex parte & due process]
242. **Disqualifying interest = structural error (Williams v. Pennsylvania).** [Ex parte & due process]
243. **No executed stand-alone waiver** (rejected; signature blocks blank). [Ex parte/Procedural]
244. **Appointment Order is not consent to unsupervised action.** [Procedural]
245. **Plea waived only quantum, not causation or a conflicted adjudicator.** [Procedural]
246. **Material breach forecloses reliance on consent (secret Beckett sale).** [Procedural]
247. **Timeliness / recent discoverability** (Article III objection preserved within days; Beckett breach recently discovered). [Procedural]
248. **Beckett sold at ~13 cents on the dollar without Court approval** (~$866M destroyed). Investigate; account; set aside. [Loss valuation/Special Master authority]
249. **The Special Master alone controlled and approved the Beckett sale** (record owner of NHC equity; "Fundamental BKX Matter"). [Special Master authority]
250. **MVRA independently requires a full accounting before restitution is fixed (§§ 3664(f)(1)(A), (e), (j)(2), (k), (n), (d)(6)).** Order a verified accounting + investigation. [Discovery]
251. **Set aside all three restitution orders (161, 245, 245-1).** [Restitution amount]
252. **Stay all further sales/dispositions; place assets with a neutral observer.** [Procedural/Special Master authority]
253. **Sixth Amendment / Apprendi & Ex Post Facto reservation.** [Constitutional]

**Doc. 278 — Second Motion to Set Aside (Docs. 161, 245, 245-1) (Aug. 6, 2026)**

254. **Legal grounds adopted from Doc. 269 (disqualification; suppression; no cure by de novo review).** Set aside; suppress. [Special Master disqualification/Constitutional]
255. **Damovo "for the debt" (~$100M) vs. Twelve Seas signed EOI ($400M, $450M achievable) — present-market refutation.** Set aside. [Loss valuation/Causation]
256. **Debt is not a standalone value measure (Beckett; Clanwilliam; Damovo).** Reject. [Loss valuation]
257. **Report counts covered/satisfied amounts as loss** ($157M policyholders; $208M Northstar/OMNIA/PBIHL covered by Damovo; $339M ULICO satisfied by AAPC preferred). Set aside. [Offsets]
258. **No complete accounting possible (custodians refused; term-sheet process collapsed; subpoenas opposed).** Set aside; subpoenas. [Discovery]
259. **No evidence of any loss (§ 3664(e)).** Set aside; no restitution. [Causation]
260. **Relief:** set aside Docs. 161/245/245-1; bar adoption/dissemination; order a full verified accounting of every disposition and all fees; direct the Court to make the § 3664(e) determination.

**Doc. 280 — Preliminary Objections to the Second Supplement (Doc. 245) (Aug. 6, 2026)**

261. **Special Master subject to disqualification; report cannot be cured by later review.** [Special Master disqualification]
262. **Report values companies "for the debt," not enterprise value (Damovo $100M vs. Twelve Seas $400M EOI; Beckett; Clanwilliam).** [Loss valuation]
263. **Disregards mandatory offsets (§ 3664(j)(2))** ($157M policyholders; $208M Damovo-covered; $339M ULICO/AAPC $352,906,240). [Offsets]
264. **Not the complete MVRA accounting (§ 3664(f)(1)(A))** (insurers/NHC refused production; subpoenas denied). [Discovery]
265. **Omits forgone value / full disposition accounting (Twelve Seas/Damovo; Beckett).** [Discovery]
266. **Fixes loss the Government hasn't proven (Zetteler).** Fix at zero. [Causation]
267. **Disclaims the required foreseeability finding (Doc. 245 at 30).** [Causation]
268. **Abstains from reviewing intervening conduct ("not well-situated"; corruption "outside scope").** [Causation]
269. **Applies non-MVRA standards ("convinced the Special Master"; "compelling/convincing evidence"; "some responsibility").** [Procedural]
270. **Inverts the Government's § 3664(e) burden.** [Causation]
271. **Substitutes generic credit risk for offense-specific foreseeability.** [Causation]

272. **No findings on intervening/superseding causes (Stein; Robers).** [Causation]
273. **Misapplies Robers/Ritchie to shift the burden.** [Causation]
274. **Treats "some responsibility" as proximate cause (Lagos).** [Causation]
275. **Adds $263M prejudgment interest (contrary to text/DOJ policy; Hoyle pre-MVRA).** [Offsets]
276. **Invents an atextual "realization" condition on mandatory credits ("Disallow at this Time").** [Offsets]
277. **Denies credits for documents the Government blocks ($9.4M Finnazen/Blue Violet; Defendant in custody).** [Discovery/Ex parte & due process]
278. **Measures exposure, not realized loss (Hughey; Stone).** [Loss valuation]
279. **Rests the penalty on a self-generated "current guess" (NHC advisors' "desktop exercise"; under seal).** [Ex parte & due process/Loss valuation]
280. **Manufactures waiver ("by agreeing to the special master process"; "by pleading guilty").** [Procedural]
281. **Refuses to resolve complexity in Defendant's favor (§ 3663A(c)(3)(B)).** [Procedural]
282. **Untethered from MVRA text/notes/case law (cites only Robers, Ritchie, Karam).** [Causation]
283. **Recommendation exceeds statutory authority (Davis) — figure moved $1.655B → $1.625B → $1.616B.** [Restitution amount]
284. **Converts "full restitution" into an agreed amount (§ 2B1.1 loss ≠ restitution).** [Sentencing/Causation]
285. **Adoption ≠ carrying the § 3664(e) burden; the 90-day clock does not compel adoption (Dolan).** [Procedural/Causation]

**Doc. 281 — Full Response/Objection to the Second Supplement (Doc. 245) (Aug. 6, 2026)**

286. **The Second Supplement concedes facts and disclaims the law.** Reject as legally insufficient. [Causation]
287. **The legal standard is a burden of proof on every element (the Government's) (Karam).** [Causation]
288. **17 material facts remain undisputed** (zero-default record; $2.39B guaranty; regulatory approval; KPMG/Houlihan valuations; Oaktree rejection; coerced MOU; zero-coupon early sale; Quadro 22.14x/$3.4B; Rehabilitator's own valuations). [Causation/Loss valuation]
289. **Converging 2018 valuations refute the NCIC-value dismissal (KPMG $467M-$513.5M; Rehabilitator $454M; Ares LOI).** [Loss valuation]
290. **The Special Master's valuations are a "current guess," cut ~31%, sealed → a manufactured shortfall** ($1.616B held while assets cut to ~$998M → >$600M gap = forfeiture predicate, §§ 981/853). [Loss valuation/Constitutional]

291. **The recommendation measures exposure, not realized loss.** [Loss valuation]
292. **The offsets schedule nets to zero (~$2.89B, $3.765B incl. $866M Beckett; SM allowed only $39M (~1.3%)).** Reduce to zero. [Offsets]
293. **ULICO AAPC preferred ($352,906,240) — no "realization" condition in § 3664(j)(2); double recovery.** [Offsets]
294. **Zero-coupon proceeds ($243M) and $141M starting balance denied for documents the Government withholds.** [Discovery/Ex parte]
295. **Prejudgment interest ($263M) — § 3663A(b)(1)(A); DOJ policy; Hoyle pre-MVRA; Boccagna/Coats bar expectation damages.** [Offsets]
296. **Losses not proximately caused (Agera; UKAT; ECL; Insurance-Holdco).** [Causation]
297. **No waiver (five theories rebutted); denial of consultation (SM never spoke with Defendant; one day to respond from BOP).** [Procedural/Ex parte & due process]
298. **The rehabilitation plan was never a liquidation plan (every value-preserving deal refused).** [Causation]
299. **Complexity must be resolved for Defendant (§ 3663A(c)(3)(B)).** [Procedural]
300. **The valuations meet no federal valuation standard (Rule 702/Kumho/§ 6A1.3; Quadro/KPMG/Houlihan → ~$6.4B vs. $998M "guess"; Tyler; Bajakajian).** [Loss valuation/Constitutional]
301. **Key undisputed facts (DOJ interest policy; $141M correction; ULICO Dec. 2022 dollar-for-dollar credit; $130M+ cash payments refused; zero-coupon bonds not sold for liquidity; Agera inherited; Clanwilliam $880M Quadro).** [Offsets/Causation/Loss valuation]
302. **Governing causation is the Fourth Circuit's Zetteler (this docket), applied one direction only.** Fix at zero. [Causation]
303. **Restitution facts must be found by a jury BRD (Ellingburg; Apprendi; Southern Union; Day should be revisited; Jarkesy).** [Constitutional]
304. **Schedule of 18 departures from the MVRA/case law/committee notes.** [Causation/Procedural]
305. **Damovo EOI + the Special Master's admissions — records no one can reach** (Twelve Seas $400M EOI; NHC/insurers refused the scope term sheet; SM lacks control of NHC yet approved the Beckett sale via his designee; ~$866M Beckett + ~$300M Damovo ≈ $1B destroyed by the reference). Reject; disqualify. [Special Master authority/Discovery/Causation]

**Doc. 282 — Motion to Adopt All Prior Motions Against the Final Report and to Hold the Second Supplement / Proposed Final Order in Abeyance (Aug. 6, 2026)**

306. **Abeyance pending the Government's merits response** to eight pending motions. Abeyance. [Procedural]
307. **Government's silence = § 3664(e) failure of proof (Stone; Steele).** Resolve against the Government. [Restitution amount/Procedural]
308. **The Report cannot substitute for the Government's proof (second prosecutor paid from the estate).** [Special Master authority/Procedural]
309. **The Report is the work product of a breaching fiduciary (Beckett ~$866M; no accounting).** [Special Master authority]
310. **No 90-day-deadline urgency (Dolan).** [Procedural]
311. **Mandatory ordering (liability→amount; Government's burden→Defendant's; neutral first-instance→deference; adjudication→enforcement) (Ward; § 3664(j)(2)).** [Procedural/Constitutional]
312. **Net restitution is zero — itemized cash credits (>$157M policyholders; ULICO $352.9M; SNIC $27.8M; $79.6M; CBL $3M; CWG escrow $20M; ULICO RE $13.6M; Bermuda $9.8M).** Find zero. [Offsets/Restitution amount]
313. **No loss / no delay — ~$1B first-loss capital; Houlihan/KPMG "full coverage"; plea waived no causation.** [Causation/Restitution amount]
314. **Readopt/refile all prior motions against the Final Report.** [Procedural]
315. **Government's disclosure duty reaches all agencies (Ares/FBI).** Compel disclosure. [Discovery/Causation]

**Doc. 285 — Reply Supporting the Rule 17(c) Subpoenas (Doc. 248) (Aug. 6, 2026)**

316. **Nixon factors satisfied — specific, dated transactions.** Issue. [Discovery]
317. **The Government lacks standing to oppose (Rule 17(c)(2)) (concedes it is "an open question").** [Discovery/Procedural]
318. **Records held by no accessible party — compulsory process indispensable.** [Discovery]
319. **The Government can't discharge the § 3664(e) burden by adopting a conflicted master's report.** [Special Master authority/Procedural]
320. **Facts are disputed — "all legal, no factual" inverts § 3664(e).** [Causation/Loss valuation/Offsets]
321. **Records not already in Defendant's possession.** [Discovery]
322. **Timing/untimeliness rebutted (Dolan).** [Procedural]
323. **Rule 17(c) applies at the sentencing/restitution stage (You).** [Procedural/Constitutional]
324. **Pre-sentencing cooperation didn't waive reserved disputes (Doc. 107 bifurcation).** [Procedural]
325. **Privilege/burden objections belong to recipients; fee records are estate records.** [Discovery/Special Master authority]

**Doc. 295 — Supplemental Response re the Zero-Coupon Principal-Protected Bonds (Aug. 10, 2026)**

326. **The bonds were high-quality principal-protected notes** ($1,006,239,867 par; Barclays/RBC/UBS/Natixis; NCDOI-approved). [Causation]
327. **PPN structure = zero-coupon (principal guarantee) + affiliate-loan component** (company books; each zero mapped to a CUSIP). [Causation/Loss valuation]
328. **Zeros returned par-or-higher; actual cash recovered** (Book1.xlsx = $394,578,906.48; net +$6,036,766.05). [Offsets]
329. **The Rehabilitator, not Defendant, sold early; no liquidity need** (>$1B cash/securities held). [Causation]
330. **Two zero-coupon credits accounting for the full $1.006B** ($394.6M proceeds credit under § 3663A(b)(1)(B)/Stone; $611,660,961 destroyed value excluded as intervening cause). Decline any restitution premised on the bonds. [Offsets/Causation]
331. **The Special Master and Government opposed the subpoenas that would document proceeds (Docs. 261, 266).** [Discovery]

**Doc. 290 — Motion to Strike the Government's Omnibus Response (Doc. 279) (Aug. 7, 2026)**

332. **Non-responsive brief** (defers wholesale to the Special Master; not an "opposition"). Strike Doc. 279. [Procedural]
333. **LCrR 47.1 default** — unanswered dispositive motions (234/235, 190, 269, Second Motion to Set Aside) deemed unopposed/granted. [Procedural]
334. **Counsel's contemporaneous admissions** ("not a requirement to confer on a response"). [Procedural]
335. **§ 3664(e) burden non-delegable to a master ("adoption is not proof"; Steele).** [Restitution amount]
336. **Plea preserves causation (¶ 10(a); ambiguity construed against the Government-drafter).** [Causation]
337. **De novo review cannot cure the defects.** [Constitutional/Special Master authority]
338. **Report is an admitted "guess" on unreachable data ("no authority to compel").** [Loss valuation/Discovery]
339. **Ignored third-party valuations (KPMG/Houlihan/Cabrillo/Blackstone).** [Loss valuation]
340. **Beckett fiduciary breach ($866M; SM's NHC designee voted; non-objection letter; no accounting).** [Offsets/Special Master authority]
341. **AAPC positioned for the same treatment (2027 refinancing → below-value forced sale).** [Offsets/Loss valuation]
342. **Zero-coupon bonds (~$394M uncredited; ~$611M forfeited).** [Offsets/Causation]

343. **Ares interference breaks causation; Government deflected the Ares discovery demand (incl. FBI) (Christa Miller Jan. 6, 2019 email).** [Causation/Discovery]

344. **The deadline cannot force an award (Dolan; delay is the Government's own via bifurcation).** [Procedural/Sentencing]

345. **The Aug. 17 hearing denies due process (counsel unavailable; incomplete Katten file transfer; ~10 days' notice).** [Ex parte & due process/Procedural]

346. **Unanswered constitutional/statutory caps (8A Excessive Fines; 6A jury; § 3664(j) anti-double-recovery; ultra vires reference = illegal sentence).** [Constitutional]

**Doc. 291 — Addendum to the Motion to Strike (Aug. 9, 2026)**

347. **No party defends the reference — the challenge is unrebutted (circular non-defense).** Treat as conceded/grant. [Procedural/Constitutional]

348. **Instruments construed against the Government (AUSA Ryan authored/controlled the Appointment Order; chose Grier) (Harvey; Petties; Barefoot).** [Procedural/Constitutional]

349. **Burden non-delegable (Steele "rubberstamped"; Stone; Jenkins).** [Restitution amount]

350. **The Appointment Order confirms the Special Master assists, not replaces.** [Special Master authority]

351. **CVRA + MVRA affirmative duties (§ 3771; § 3664(d)(1),(i),(g)(1)).** [Ex parte & due process/Procedural]

352. **Prosecutor's duty is justice (Berger).** [Other]

353. **Narrow scope (no CVRA private remedy; enforceable at sentencing).** [Procedural]

**Doc. 292 — Response in Opposition to the Special Master's Response (Doc. 288) (Aug. 9, 2026)**

354. **No one defends the reference; unopposed (LCrR 47.1(d)).** Grant. [Procedural]

355. **Evidentiary asymmetry (three § 1746 declarations vs. "information and belief").** Resolve against the Special Master. [Loss valuation/Ex parte & due process]

356. **Reference exceeds § 3664(d)(6) (Cohen; Broughton-Jones).** Set aside. [Constitutional/Special Master authority]

357. **"No approval required" concedes an illegal sale.** Set aside. [Special Master authority]

358. **The Beckett Trust timeline refutes the Special Master (Delaware SOS "Voluntarily Cancelled" 9/30/2025; Million Decl.; SM removed AAI directors 2/27/2025; his designee supplied the required consent).** Set aside. [Special Master authority/Loss valuation]

359. **Consent cannot cure the structural defect (§ 455(b)(4)/(e); Schor; Stern; Wellness).** [Constitutional]
360. **De novo review does not cure (Raddatz distinguished; Ward).** [Constitutional/Ex parte]
361. **Fee interest disqualifying (Tumey; Ward; Caperton; O'Connor; Konrad distinguished; $19M Beckett fees "confidential"; Williams structural error).** [Special Master disqualification]
362. **Loss unproven; debt-for-value error (Beckett $1B vs. $134M; Damovo; Modigliani-Miller; Stone/Ritchie no windfall).** [Loss valuation/Restitution amount]
363. **The loss figure drove sentence stacking (144 months vs. the 87-month no-stack promise; "second prosecutor"; sentencing court found "the loss was overstated").** [Sentencing/Loss valuation]
364. **Mandatory offsets disregarded ($157M CWG; ULICO/AAPC; § 3663A(b)(1)(B); § 3664(j)(2)).** [Offsets]
365. **Belated, undisclosed accounting (Beckett "accounting" only while preparing Doc. 288; ~$19M fees unaccounted).** [Loss valuation/Discovery]
366. **Judicial estoppel inapplicable; objection timely (New Hampshire v. Maine; Doc. 190 unanswered).** [Procedural]

**Doc. 300 — Reply re Doc. 234 (to the Omnibus Doc. 279) (Aug. 13, 2026)**

367. **Plea preserves proximate cause (Squirrel; Hughey; Palsgraf).** [Causation]
368. **Burden on the Government; doesn't shift (Steele; Stone; Wilkinson; Zetteler).** [Causation/Restitution amount]
369. **The affiliated-loan balance is the wrong measure.** [Loss valuation]
370. **Factual Basis reservation (Doc. 42 permits additional relevant facts).** [Procedural]
371. **Investments backed by documented value.** [Offsets/Loss valuation]
372. **Regulator-reviewed, rated, valued (disaffiliation SOF; DS-1-DS-21).** [Causation/Loss valuation]
373. **Post-Oct. 2018 diminution by third parties (Robers; Speakman).** [Causation]
374. **The "circular" transactions were regulator-mandated mechanics.** [Causation]
375. **Foreseeability independently defeats attribution ("foreseeability in the air"; advice of counsel).** [Causation]
376. **Specific attributions untethered (Agera; ECL; GBIG-HoldCo; interest).** [Causation]
377. **No delegation to the state rehabilitation court.** [Causation/Separation of powers]
378. **Causation rulings Issues 11-17 (~$1.745B post-transfer).** [Causation]

379. **Offsets turn on withheld third-party records (custodian table; § 3663A(c)(3)(B)).** [Offsets/Discovery]
380. **The Report is not a "complete accounting" (presumed IALA balances; "current guess"; no Beckett-proceeds accounting).** [Loss valuation/Restitution amount]

**Doc. 302 — Reply Supporting the Vista Recoup Motion (Doc. 238) (Aug. 13, 2026)**

381. **Vista's non-victim status is now uncontested (Second Supplement).** Recoup. [Victim status/Offsets]
382. **Recoupment (not credit) to redirect proceeds to actual victims (§ 3664(o)).** [Offsets/Restitution amount]
383. **Consent didn't waive the victim determination (four-corners rule; Klopp/Armour).** [Procedural]
384. **Consent cannot authorize a restitution order the statute withholds (Broughton-Jones; Davis; Hughey).** [Procedural/Constitutional]
385. **Equitable mootness inapplicable ($20M identifiable in a USAP reserve).** [Procedural]
386. **Vermont insurer-priority statute / Fabe inapposite.** [Procedural]
387. **Opposition concedes double recovery and overstatement.** [Restitution amount/Offsets]
388. **Reliance theory collapses — the principal procured the ratings.** [Causation/Victim status]
389. **Amount actually distributed disputed ($23,520,710 vs. $22,859,993.97).** [Restitution amount]

**Doc. 309 — Motion for Reconsideration of the Order Denying Subpoenas (Doc. 304) (Aug. 18, 2026)**

390. **Ruled out of the requested sequence (Dieter).** Reconsider. [Procedural]
391. **Material change in circumstances (8/17/26 conferral — SM conceded the documents exist but refused to docket them; Government "no objection").** Reconsider. [Discovery]
392. **The "already possess" premise is false (Katten was told "We do not have this information").** [Discovery]
393. **The "available by other means" premise is false (NCICs/NHC disputed the SM's authority and declined).** [Discovery]
394. **A protective order resolves confidentiality; the existing standing order suffices.** [Discovery]
395. **Off-docket production violates the MVRA and forecloses appellate review (§ 3664(f)(1)(A),(a)).** [Discovery]
396. **The Special Master's inconsistency (offered in-camera in Doc. 106 at 29; now refuses to docket).** [Discovery]
397. **Valuation methodology and data are necessary (Steele).** [Loss valuation/Discovery]

398. **Going-concern (enterprise) vs. debt-based valuation.** [Loss valuation]
399. **Due process — no rebuttal of concealed data (Gushlak; Castillo assumed access).** [Constitutional/Ex parte & due process]
400. **The restitution figure triggers keyed forfeiture (irreparable harm).** [Restitution amount/Other]
401. **Overbreadth readily cured — narrowed request (methodology + data; offset/credit method; 4 years of reports/LOIs/offers).** Issue narrowed subpoenas. [Rule 17]
402. **Balance of subpoenas still pressed for disallowed offsets (Doc. 308).** [Rule 17/Offsets]
403. **Nixon applies with less rigor post-conviction (Winner).** [Rule 17]
404. **Alternative relief not dependent on Rule 17(c) (inherent authority + Rule 53).** [Special Master authority]
405. **Specific disallowed offsets (Nos. 3, 4, 6-10) with custodians (AAPC/ULICO $352,906,240; SNIC $27,823,425; CBL $3M; CWG escrow $20M; ULICO RE $13,596,013; Bermuda $9,800,076; zero-coupon $243M).** [Offsets]
406. **§ 3664(d)(5) deadline is directory, not jurisdictional (Dolan; Vandeberg).** [Procedural]
407. **The Government lacks standing to oppose third-party subpoenas (In re Grand Jury Subpoena John Doe; Beckford; Nachamie).** [Discovery/Procedural]

**Doc. 316 — Response in Opposition to the Government's Consolidated Position (Doc. 308) (Aug. 18, 2026)**

408. **Adoption ≠ de novo determination (In re Brooks).** [Restitution amount/Special Master authority]
409. **Causation-elements chart unmet (five § 3664(e) elements).** Deny. [Causation]
410. **Strike Doc. 308 / LCrR 14-day default.** Grant unopposed motions. [Procedural]
411. **Inconsistent positions across forums = prosecutorial misconduct.** [Procedural/Other]
412. **The Meghji affidavit proves the SM caused the Beckett sale (NHC gave consent; his designee voted; non-objection letter).** [Special Master authority/Causation]
413. **The affidavit's five key averments are incompetent ("best of knowledge, information and belief"; FRE 602).** [Ex parte & due process/Loss valuation]
414. **Trust/Assignment are legal instruments requiring an evidentiary hearing (§ 3664(e)).** [Procedural/Special Master authority]
415. **The "already lost control" theory self-defeats (Meghji dates the SAC contribution to Oct. 2024).** [Causation/Special Master authority]

416. **Consent/waiver cannot cure the structural defect (Schor; Wellness; Williams; Tumey; § 455(b)(4)/(e); AUSA Ryan authorship; Concrete Pipe).** [Constitutional/Ex parte & due process]
417. **Preserved-not-waived rebuttal (credits/offsets/causation/valuation raised in Doc. 132; mandatory offsets are statutory commands).** [Procedural/Offsets]
418. **The Government's authorities don't reach the question; O'Connor controls; Konrad distinguished.** [Constitutional/Special Master authority]
419. **Fee interest disqualifying (objective test; Tumey; Caperton; Concrete Pipe/Ward).** [Special Master disqualification]
420. **"Hardship" admission ≠ proof of amount (Stone; Steele; Leal; Broughton-Jones; Davis; Zetteler).** [Causation/Restitution amount]
421. **The Government's chart concedes intervening causes ("after LINDBERG defrauded them"; Robers; Speakman).** [Causation/Offsets]
422. **Issue-specific attributions fail (Agera; Insurance-HoldCo; Government has no standing on third-party subpoenas).** [Causation/Discovery]
423. **Squirrel construes the exact plea language ("directly or indirectly harmed" does not dispense with proximate cause).** [Causation]
424. **"Circular transactions" = regulator-mandated restructuring.** [Causation/Loss valuation]
425. **Government interference as a superseding cause (Christa Miller email; "third party constituent" = the Government; Sealed Addendum; DOJ memoranda).** [Causation]
426. **Offsets can't be "disallowed" on "unless/until monetized" (§ 3663A(b)(1)(B); AAPC $352,906,240; SNIC $27.8M; CBL $3M; ULICO RE $13.6M; Bermuda $9.8M; Karam; § 3664(j)).** [Offsets]
427. **Prejudgment interest ($263M) unauthorized.** [Offsets/Restitution amount]
428. **The offset table nets to $0 ($3,765,418,383 vs. $1.625B).** [Offsets]
429. **Zero-coupon bonds — two credits (~$394.6M + ~$611.66M).** [Offsets/Causation]
430. **Valuation objections are not "informational" (Beckett $1,003,924,000; SM withholds methodology; KPMG/Houlihan/Cabrillo unaffected).** [Loss valuation/Discovery]
431. **The MVRA enforcement scheme bars the SM's sales (§ 3664(m)/§ 3613/FDCPA).** Enjoin dispositions. [Special Master authority/Sentencing]
432. **AAPC write-down sealed & unproven (Appendix 1).** Unseal; hearing. [Loss valuation/Ex parte & due process]
433. **§ 3664(d)(5) deadline directory (Dolan; § 3663A(c)(3)(B); Reifler).** [Procedural/Sentencing]

434. **The Government bargained for the process (Santobello); the stay was never decided and remains open.** [Procedural/Sentencing]
435. **No delegation to state civil findings (Dawkins; collateral-estoppel/burden differences).** [Causation/Separation of powers]
436. **Loss-figure double-use is prosecutorial misconduct (Dec. 18, 2024 AUSA Ryan email; Berger; preserved for sentencing appeal).** [Sentencing/Discovery/Other]
437. **Relief:** decline to adopt; set aside Docs. 161/245/245-1; order a full verified accounting; make the § 3664(e) determination after an evidentiary hearing; stay pending the state-court Damovo sale; or decline restitution under § 3663A(c)(3)(B).

**Doc. 320 — Notice re the Damovo Asset and Motion to Stay Its Disposition (Aug. 21/23, 2026)**

438. **Damovo being sold "for debt" without Court approval (Doc. 56 ¶ 9).** Stay. [Special Master authority/Procedural]
439. **The disposition sacrifices ~$100M in restitution value (standing $400M offer; $500M six months earlier).** Stay; disclose terms. [Loss valuation/Offsets]
440. **The Special Master failed to keep the Court informed (§ 3664).** Direct disclosure + stay. [Special Master authority]

**Doc. 333 — Reply re the Reconsideration of the Order Denying Subpoenas (Doc. 323) (Aug. 31, 2026)**

441. **The Special Master recasts the request ("a report is not the data").** Order production of the full data/methodology. [Discovery]
442. **Premature-ruling / wrong sequence (Dieter).** Reconsider. [Procedural]
443. **Forfeiture ($230M) requires the data now (fixed at the final order; AAPC premise changed).** [Discovery/Sentencing]
444. **The pending appeal is protective, not a substitute for the data.** [Procedural/Discovery]
445. **The Special Master's own disclaimers compel production ("best guess," "inherently unreliable"; Damovo).** [Loss valuation/Discovery]
446. **Offsets are law-and-fact; the proponent bears the burden.** [Discovery/Causation]
447. **Confidentiality resolved by the Standard Criminal Discovery Order (SM's answer was "No").** [Discovery]
448. **The request is not vague/bad-faith; Rule 17(c) proper (Winner; In re Grand Jury Subpoena John Doe).** [Discovery/Special Master authority]
449. **The "available elsewhere" premise collapsed (the Government admitted 8/26/26 it does not have the data).** [Discovery]
450. **The proceeding is infected by ex parte communications (M3, NHC, NCICs, Dinius, Wes Camden, Williams Mullen; Rule 53(b)(2)(B); Edgar; Kensington; Brooks; AAPC reduced with no**

**motion/notice/hearing).** Compel; set aside. [Ex parte & due process/Constitutional]

451. **Either characterization is fatal / Brady (neutral → set aside; prosecutor → Brady/Giglio; Kyles).** [Ex parte & due process/Discovery]
452. **"Private judge" — outsourced Article III.** Production + set aside. [Constitutional/Special Master authority]

**Reply in Support of Motion to Compel the Special Master (Doc. 332) (to be filed; issues stated here are raised in the Motion and preserved)**

453. **The Special Master concedes pervasive ex parte contact with adverse parties (near-daily; never tallied).** Compel + set aside. [Ex parte & due process]
454. **The Special Master concedes nondisclosure of the underlying data (Martinez Aff. ¶ 24; Doc. 344 at 12).** Compel. [Discovery]
455. **De novo review does not cure ex parte selection bias (In re Brooks; Intercollegiate v. Ryder).** Set aside. [Ex parte & due process]
456. **The appointing order's silence fails even the Rule 53(b)(2)(B) floor.** [Special Master authority]
457. **The disclosure affidavit omitted the ex parte contacts (Rule 53(a)(2)/(b)(3)(A)).** Removal + suppression. [Special Master disqualification]
458. **§ 455(b)(4) financial interest (non-waivable) (Jenkins).** Disqualify; withhold fees. [Special Master disqualification]
459. **§ 455(b)(1) personal knowledge — the Special Master became a witness.** Disqualify. [Special Master disqualification]
460. **The "collaborative/non-adjudicative" defense worsens the problem (Ellingburg; Squirrel; Ferdman).** [Constitutional]
461. **The statutory pairing makes the Special Master the functional equivalent of a magistrate judge (§ 3664(d)(6); Yates; Beecham; Kempthorne; Osborne).** [Special Master authority]
462. **Lenity / narrow construction of the penal statute (Ellingburg; Hughey).** [Special Master authority]
463. **The mandate was expanded beyond § 3664(d)(6) (receiver's powers; retention of his own firm; payment of Defendant's fees).** [Special Master authority]
464. **Delegation of criminal punishment violates Article III / separation of powers (Schor; Stern; Lee; Wagner; Noriega-Perez; Ritchie).** [Constitutional]
465. **Consent cannot supply the safeguard (Gomez; Peretz; TB Food); Defendant objected.** [Constitutional]
466. **An unhousable concentration of powers (investigator, witness, prosecutor, judge, sentence-driver, receiver) (Federalist No. 47; Stern).** [Constitutional]

467. **Fee structure as a structural conflict (paid from the estate; moved five times to cut off defense fees).** Withhold fees; disqualify. [Special Master disqualification]
468. **No waiver — at most forfeiture (Olano; Bevon; McCall); the only waiver sought was an express written one Defendant refused.** [Procedural]
469. **No knowing concealment; timely once discovered (Doc. 332 Ex. A; Satterfield; Kolon).** [Procedural]
470. **The determination is not closed (§ 3664(d)(5),(o); Rule 53(f); Dolan; Manrique).** [Procedural]
471. **Structural, non-waivable partiality error (§ 455(e); Tumey; Murchison; Williams; Ross).** [Constitutional/Ex parte]
472. **Not harmless — the loss figures drove the 30-level enhancement and the 12-year sentence.** [Sentencing]
473. **Enumerated withheld categories** (AAPC valuations (Goldman); NHC/M3 valuations; JPMorgan Beckett fairness opinion; NHC tax filings/audits; Paladin credit detail (~$170M swing); Bermuda/NC insurer reporting; SM/Paladin ex parte communications records; Paladin workpapers/slide decks; § 3664(a) victim-by-victim accounting + $263M interest; IALA balances/roll-forward; 4 years of reports + LOIs/offers; Clanwilliam $40M tax escrow). Compel under protective order. [Discovery]
474. **The baseline (not just offsets) is disputed ($141M discrepancy).** [Discovery/Loss valuation]
475. **"Legal rejection" of offsets makes the data more essential, not less.** [Discovery]
476. **Proximate-cause reductions for intervening acts (Ares; Oaktree; MOU; fire-sale; Montshire/Quadro/Clanwilliam; ~$263M interest; ~$141M discrepancy; ~$1B Beckett; ~$170M Paladin).** [Causation/Offsets]
477. **Relief:** compel; set aside; withhold fees (+ reserve disgorgement); evidentiary hearing; prospective ban on ex parte contact (any future communication/disposition before a neutral, not the current Special Master).
478. **Sixth Amendment/Apprendi, Ex Post Facto, Eighth Amendment reservations.** [Constitutional]

**Reply in Support of Motion to Compel the Government (Doc. 331) (to be filed; issues stated here are raised in the Motion and preserved)**

479. **MVRA restitution is criminal punishment; due process requires disclosure (Ellingburg; Townsend; Gardner; Mathews v. Eldridge).** Compel. [Constitutional/Ex parte & due process]
480. **Lenity / strict construction (Hughey; Ellingburg).** [Constitutional]
481. **The Government bears the § 3664(e) burden and cannot carry it with withheld data (Steele; Wilkinson).** Compel. [Discovery]

482. **Complete-accounting requirement (§§ 3664(a), (f)(1)(A); Harvey; Ferdman).** [Discovery]
483. **The presentence-report analogy defeats the Government (the probation officer is neutral, unpaid from the estate; § 3602; § 3552(a)).** [Discovery]
484. **False premises re "already possess" / "no obligation to reproduce."** [Discovery]
485. **Enumerated withheld categories (same list).** Compel under protective order. [Discovery]
486. **The loss figure set the term of imprisonment; § 6A1.3 forbade undisclosed reliance (Harmon; Townsend; § 3661).** Compel. [Sentencing/Constitutional]
487. **Suppression of favorable, material evidence (Brady; Giglio; Docs. 152, 162).** [Constitutional/Discovery]
488. **The award is subject to the Excessive Fines Clause; proportionality unassessable on a hidden record (Bajakajian; Dubose; Mukhdomi; Gozes-Wagner; Gustafson; Government conceded "losses overstated the harm").** [Constitutional]
489. **Apprendi challenge to judicial factfinding preserved (Day rests on a premise Ellingburg unsettles).** [Constitutional]
490. **No waiver — at most forfeiture (Olano; Bevon; McCall; Burns).** [Procedural]
491. **The Government's lead case (Kolon) cuts the other way (§ 455(b) non-waivable; Seignious).** [Procedural]
492. **No knowing concealment; orderly sequencing behind the Article III question (Satterfield; Kolon).** [Procedural]
493. **The determination is not closed; structural error (§ 3664(d)(5),(o); Rule 53(f); Dolan; Manrique; Tumey; Murchison; Williams; Ross).** [Procedural/Constitutional]
494. **Not harmless — the same loss data set the offense level and restitution (PSR ¶ 178; Doc. 152; ~$1B Beckett, ~$170M Paladin bear on the $550M threshold).** [Sentencing]
495. **Relief:** compel; require the Government to present testable loss evidence; genuine de novo on a disclosed record; evidentiary hearing (Intercollegiate v. Ryder; Leftwich — an unsupported restitution order must be vacated).
496. **Omnibus constitutional reservation (Fifth/Sixth/Eighth Amendment; Article III; Ex Post Facto; § 3664; Rule 53).** [Constitutional]

## PART THREE — CONSOLIDATED ISSUE INDEX (BY THEME)

For the Court's convenience, the foregoing issues consolidate into the following categories, each raised repeatedly across the filings cited above and each left unanswered on the merits or expressly declined: **(I) Restitution amount** (net-zero; $30M excess; the moving, illegal figure); **(II) Causation and proximate cause**

(foreseeability; no agency action; intervening/superseding causes — Ares, Oaktree, MOU, zero-coupon fire-sale, Clanwilliam, Beckett, Damovo; Zetteler as law of the case); **(III) Loss valuation** (debt-for-value error; the sealed "current guess"; Beckett; Damovo; KPMG/Houlihan/Quadro/Cabrillo); **(IV) Offsets and credits** (the ~$2.9-3.765B schedule; interest; AAPC; zero-coupon; the atextual "realization" condition); **(V) Ex parte communications, data access, and due process** (compel; complete accounting; Brady/Giglio; "never properly before the Court"); **(VI) Special Master authority, disqualification, recusal, Article III, separation of powers, and non-delegation**; **(VII) Constitutional reservations** (Sixth Amendment/Apprendi; Eighth Amendment Excessive Fines; Ex Post Facto); **(VIII) Sentencing** (loss-enhancement/stacking; disparity; credits; § 3553; execution/BOP access); **(IX) Procedural** (motion to strike; LCrR 47.1 default; no waiver/timeliness; sequencing; abeyance); **(X) Victim status, CVRA, and double recovery** (Cell 1.16; Vista recoup; Conservatrix); and **(XI) Prosecutorial misconduct**.

## PRESERVATION AND RESERVATION

Defendant raises each of the foregoing facts and issues **again** and expressly **preserves each** — including his Fifth Amendment due-process, Sixth Amendment, Article III and separation-of-powers, Eighth Amendment Excessive Fines, and Ex Post Facto challenges, and his challenges under 18 U.S.C. § 3664 and Federal Rule of Civil Procedure 53 — for determination by this Court, de novo, and for review by the Fourth Circuit. Because the Government and the Special Master were given an opportunity to respond and expressly declined, or failed to answer these issues on the merits, each remains open and unrebutted. The Court has yet to determine, de novo, causation, offsets, and credits, which will further change the restitution determination; Defendant expressly reserves that determination and does not waive any of the foregoing.

Dated: September 14, 2026

Respectfully submitted,

/s/ Kenneth N. Barnes

Kenneth N. Barnes

Barnes Legal, PLLC

356 Travel Lite Dr.

Raleigh, NC 27603

919-524-1977

Email: barnesatty@aol.com

Counsel for Greg E. Lindberg

## PART TWO — VERBATIM TEXT OF EACH FILING (INCLUDING EVERY FILING SINCE THE SENTENCING HEARING OF MAY 26, 2026)

**Doc. 132 — Response & Objection to the Special Master's Report (filed 05/04/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 3:23-CR-48-MOC

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S RESPONSE AND OBJECTION TO

SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

REGARDING RESTITUTION

James F. Wyatt III Robert A. Blake, Jr.

WYATT & BLAKE LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 Tel: 704.331.0767 jwyatt@wyattlaw.net rblake@wyattlaw.net Brandon N. McCarthy Ryan J. Meyer

KATTEN MUCHIN ROSENMAN LLP

2121 North Pearl Street, Suite 1100 Dallas, TX 75201 Tel: 214.765.3600 brandon.mccarthy@katten.com ryan.meyer@katten.com Counsel for Defendant Greg E. Lindberg

INTRODUCTION

Greg E. Lindberg, through undersigned counsel, hereby respectfully submits this response and objection ("Response") to the Special Master's Report and Recommendations Regarding Restitution (the "Restitution Report") (ECF No. 106). 1 The Mandatory Victims Recovery Act ("MVRA"), 18 U.S.C. § 3663A, et seq., is narrowly circumscribed by both the statute and well-established constitutional principles. It provides that a court may only order restitution in the amount of actual, pecuniary loss directly and proximately caused by a defendant. A court cannot order restitution for losses unrelated to the conduct for which a defendant was convicted. Nor can a court unfairly punish a defendant by making him pay back more than a victim lost.

In this case, the Special Master recommends entry of a preliminary order of restitution that orders Mr. Lindberg to pay $1.625 billion in restitution to eight parties (identified as the "Pre- Designated Restitution Parties"). Restitution Rpt. at 4. Although Mr. Lindberg agrees with several portions of the Special Master's Restitution Report, it nevertheless invites the Court to exceed the authority under the MVRA in several ways:

First, the Restitution Report improperly inflates the losses incurred by the Pre-Designated Restitution Parties. The Special Master improperly adds $263 million in interest to the principal amount of Affiliate Investments to be repaid. This award is contrary to the purpose and plain text of the MVRA, exceeds the type of harm that the MVRA authorizes this Court to recompense, and contradicts the Justice Department's own policy on criminal restitution, which expressly recognizes that "interest" is a financial loss that is not eligible

for restitution. Any purported "interest" should, therefore, be removed from any restitution figure.

Capitalized terms and abbreviations not defined in this Response shall have the meanings prescribed in the Restitution Report or in the appendices attached thereto.

The Special Master also overstates the starting principal balance of the Affiliate Investments by approximately $141 million. Based on the agreement reached in the MOU, and subsequently relied on by the NCICs in litigation against Mr. Lindberg, those balances should total no more than $1.250 billion. Accordingly, the proposed restitution figure must be reduced.

Second, the Restitution Report gives the Pre-Designated Restitution Parties an impermissible windfall by giving them a recovery greater than the amount they lost. The Special Master declined to credit Mr. Lindberg with at least $740 million in undisputed cash payments and other valuable consideration that he provided to certain Pre-Designated Restitution Parties to compensate them for the Affiliate Investments. By excluding these amounts from the restitution order, the Special Master asks this Court to enter a restitution order that would allow those parties to recover more than they lost—a result the MVRA expressly forbids.

Third, the restitution figures in the Restitution Report include certain losses that were not caused by Mr. Lindberg. For instance, the report improperly penalizes Mr. Lindberg by including $129 million relating to certain losses associated with Agera Energy, LLC ("Agera"). Restitution Rpt. at 25. But Agera was involved in a widely publicized large-scale fraud case that had nothing to do with Mr. Lindberg nor this Indictment. Although there are people and entities who lost money on Agera, they are not Mr. Lindberg's victims. Increasing Mr. Lindberg's restitution obligation by piling on unrelated losses tied to someone else's fraud exceeds the authority provided by the MVRA.

Fourth, Mr. Lindberg maintains that an order of restitution decided by the Court, rather than a jury, is constitutionally impermissible. After Mr. Lindberg entered his plea agreement, the Supreme Court clarified that restitution under the MVRA constitutes a punitive, criminal punishment. Ellingburg v. United States, 146 S. Ct. 564, 567 (2026), and under the Sixth Amendment, facts that increase a defendant's punishment must be found by a jury, Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). As a result, any facts relating to an award of restitution must be proven to a jury beyond a reasonable

doubt. Although Mr. Lindberg recognizes that this Court is bound to follow Fourth Circuit precedent decided prior to Ellingburg that forecloses this argument, see United States v. Day, 700 F.3d 713, 732 (4th Cir. 2012), he raises it here to preserve the issue for appeal, if necessary.

In Mr. Lindberg's view, the Restitution Report contains several additional errors, including failing to credit Mr. Lindberg with additional payments and offsets; and attributing to Mr. Lindberg certain losses that he did not cause. Mr. Lindberg sets forth those additional objections in detail in Exhibit 1: Greg Lindberg's Statement of Facts In Support of Defendant's Response and Objection to Special Master's Report, attached hereto. The position espoused in Exhibit 1 are the personal views of Mr. Lindberg and are included at his express instruction. 2 At the end of the day, Mr. Lindberg takes full responsibility for the conduct detailed in his Plea Agreement. But at no time was he attempting to steal money from policyholders. Indeed, his actions last year facilitated over $157 million in payments to over 43,000 excess policyholders in December 2025, ensuring that every

policyholder of his American insurance companies has been made whole. He has paid cash or transferred assets equal to or greater than any actual loss directly and proximately caused to the affected insurance companies by the indicted conduct. Accordingly, if the Court were to sustain all of Mr. Lindberg's objections, the restitution owed is zero.

Attached hereto as Exhibit 2 is a summary chart identifying all of the offsets and credits to the Special Master's proposed restitution amount. If credited to Mr. Lindberg, then he arguably has more than fully satisfied his restitution obligations. But in any event, the objections set forth herein show disagreements with the Restitution Report and a preliminary order of restitution entered in reliance on it would exceed this Court's authority under the MVRA and the U.S. Constitution.

Counsel's current position is not a negative comment on the validity of Mr. Lindberg's additional arguments, but counsel simply lacks enough factual information at this time, in part because of Mr. Lindberg's lack of access to information, to take a position on the arguments. Exhibit 1 is not encompassed by Counsel's Artificial Intelligence certification.

LEGAL STANDARD

Federal courts do not have inherent authority to order restitution and, instead, must rely on a statutory source to do so. United States v. Ritchie, 858 F.3d 201, 206 (4th Cir. 2017). A court's discretion in ordering restitution is therefore "circumscribed by the procedural and substantive protections of the statute authorizing restitution." United States v. Freeman, 741 F.3d 426, 431 (4th Cir. 2014) (citing United States v. Leftwich, 628 F.3d 665, 667 (4th Cir. 2010)). Because restitution constitutes a "criminal punishment," any restitution order is also subject to the protections under the Sixth Amendment. See Ellingburg, 146 S. Ct. at 567. "A restitution order that exceeds the authority of the statutory source is no less illegal than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013).

Outside of the probation context, restitution to victims of federal crimes is generally governed by either the Victim and Witness Protection Act of 1982 or the MVRA. Ritchie, 858 F.3d at 206-07. Here, the relevant statute is the MVRA, due to the nature of the offenses for which Mr. Lindberg was convicted. See generally 18 U.S.C. § 3663A(c)(1) (providing that the MVRA "shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for," among other offenses, "an offense against property under this title . . . including any offense committed by fraud or deceit.").

Under the MVRA, a court is required to order the payment of restitution for direct or proximate loss caused by a defendant. 18 U.S.C. § 3663A(a)(1). In the case of an offense causing damage to or loss of property, restitution must be determined in one of two ways: (i) by ordering the defendant to return the property stolen or damaged; or (ii) if return of the property is "impossible, impracticable, or inadequate," by ordering the defendant to pay an amount equal to the greater of (1) the value of the property on the date of the damage, loss, or destruction, or (2) the value of the property on the date of sentencing. Id. § 3663A(b). In the latter case, the amount of restitution must be reduced by "the value . . . of any part of the property that is returned." Id. § 3663A(b)(1)(B)(ii).

The fundamental purpose of the MVRA, however, is compensatory. Therefore, the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017). The statute provides for credits against the offender's restitution obligation for amounts that the victim has received for the same loss. See

Ritchie, 858 F.3d at 215. For example, "[t]he defendant is . . . entitled to an offset for any amount that the victim recovered as compensatory damages for the same loss in federal or state civil proceedings." Id. (citing 18 U.S.C. § 3664(j)(2)(A), (B)). The defendant has the burden to show that an offset or reduction in a restitution order should apply. United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000). "Calculations of the appropriate amount of restitution will always rest upon the unique circumstances of each case." Ritchie, 858 F.3d at 214.

DISCUSSION

Mr. Lindberg agrees with several of the Special Master's recommendations in the Restitution Report. Specifically, Mr. Lindberg agrees that the Pre-Designated Restitution Parties are the only "persons due restitution" in this case. See Restitution Rpt. at 2, 7-19, 31. Moreover, Mr. Lindberg agrees that the principal balance of the Affiliate Investments, rather than policyholder losses, is an appropriate methodology for calculating restitution. See id. at 20-22, 31.

In Mr. Lindberg's view, however, the Restitution Report invites this Court to exceed its statutory and constitutional authority: (1) it improperly inflates the "principal balance" of the Affiliate Investments; (2) it fails to credit Mr. Lindberg with valuable cash and asset payments made to Pre- Designated Restitution Parties, giving those parties more than they are statutorily entitled to under the MVRA; (3) it includes as "losses" certain amounts not proximately caused by Mr. Lindberg; and (4) it asks the Court to invade the province of the jury by finding facts that would increase Mr. Lindberg's criminal punishment—a violation of core Sixth Amendment protections.

If the Court agrees with all of Mr. Lindberg's arguments, including the credits and offsets described in Exhibit 1, no restitution is appropriate. The chart set forth below summarizes the offsets and credits to which Mr. Lindberg maintains he is entitled.

Description Amount Body § Special Master's Proposed Restitution Figure $1,625,000,000 — Improper Additions to Affiliate Investment Balances I.

Pre-Judgment Interest ($263,000,000) I.A Corrected Starting Balance of Affiliate Investments ($141,000,000) I.B Additional Credits II.

AAPC Preferred Equity Par Value as of May 26, 2026 ($352,906,240) II.A SNIC Payments ($27,823,425) II.B Cash Payments to Pre-Designated Restitution Parties (79,655,289) II.C Not Captured by the Special Master CBL Subordination Fee (Beckett refinancing) ($3,000,000) II.D Additional Clanwilliam Sale Proceeds ($20,000,000) II.E ULICO Sale of Contributed Real Estate ($13,596,013) II.F Sale Proceeds of Zero-Coupon Bonds in PPNs ($243,452,385) II.G Value of NCICs as of October 2018 ($454,000,000) Exh. 1 Bermuda ICs' Proceeds from Sales of Affiliated Assets ($9,800,076) Exh. 1 Losses Not Proximately Caused by Mr. Lindberg III.

Loss on Agera ($129,398,324) III.

ECL Losses ($22,288,826) Exh. 1 Loss on UKAT ($39,000,000) Exh. 1 Insurance-Holdco Debt Portion ($14,897,805) Exh. 1 Loss on Clanwilliam Below-Market Sale ($474,000,000) Exh. 1 Loss on Early Zero Coupon Bond sales ($611,600,000) Exh. 1

TOTAL MINIMUM OFFSETS AND REDUCTIONS ($2,899,418,383)

NET RESTITUTION OWED $0

Even if the Court accepts only some of these objections, it is clear that the Restitution Report's initial recommendation must be modified.

I. The Restitution figure is overinflated.

Mr. Lindberg agrees that the outstanding unpaid principal balances due on the Affiliate Investments constitutes the appropriate method for determining any actual loss to the Pre-Designated Restitution Parties for purposes of a restitution order. As the Special Master recognizes, this is the only method "for calculating restitution loss" as it appropriately focuses on "how much money was extracted from the corresponding insurance company" because of Mr. Lindberg's conduct. Restitution Rpt. at 3. Nevertheless, the Restitution Report overinflates that amount in two ways: (1) it improperly adds "interest" to the principal balance, in contravention of the MVRA; and (2) it overstates the principal balance of the Affiliate Investments as of the date of the MOU/IALA.

A. Interest on the Affiliate Investments should not be included.

The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." Id. at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019 through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest."

App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that interest is "not eligible for restitution." 3 Therefore, any interest should be excluded from any restitution calculation.

The Restitution Process (Fraud and/or Financial Crimes), DEP'T OF JUSTICE, CRIMINAL DIVISION, https://www.justice.gov/criminal/criminal-vns/restitution-process (updated Oct. 10, 2023).

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." Robers v. United States, 572 U.S. 639, 640 (2014). And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned, id. § 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the Supreme Court taught in Robers, if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. Id. In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. See, e.g., United States v. Qurashi, 634 F.3d 699, 704 (2d Cir. 2011); United States v. Fike, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and

none is binding on this Court. Both the Second Circuit in Qurashi and the Sixth Circuit in Fike incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). See Fike, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); Qurashi, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns substitute property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both Fike and Qurashi, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in United States v. Hoyle, 33 F.3d 415, 420 (4th Cir. 1994), see App'x 3, at 10, Hoyle was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. See 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations but only with his actual loss." United States v. Boccagna, 450 F.3d 107, 109 (2d Cir. 2006); Stone, 866 F.3d at 226. Thus, restitution is not meant to "guarantee the benefit of any bargain." Id. And, it "cannot include consequential damages." United States v. Coats, 487 B.R. 648, 653 (E.D.N.C. 2013).

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards, or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In United States v. Jesenik, the court explained that "accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses. 702 F. Supp. 3d 1024, 1039 (D. Ore. 2023). Similarly, in United States v. Smerling, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21-cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but

avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

B. The principal balance of the Affiliate Investments must be reduced.

The Restitution Report states that the "IALA Principal" of the Affiliate Investments is $2.179 billion. This includes $1.391 billion in Affiliate Investments held by the NCICs (CBL, BLIC, and SNIC). Id. 4 But that is incorrect. According to repeated, verified statements from the NCICs themselves, the principal balance of Affiliate Investments held at those entities following the execution of the MOU and IALA is $1.250 billion. Accordingly, the Restitution Report overstates the "IALA Principal" by at least $141 million and must be reduced.

According to the chart included by the Special Master, CBL held $1,145 million in Affiliate Investments as of the IALA, BLIC held $73 million, and SNIC held $173 million. App'x 3 at 6.

The NCICs have consistently relied on this $1.25 billion figure in verified pleadings. For example, in both a Verified Complaint and Amended Verified Complaint, filed by the NCICs against Mr. Lindberg in the General Court of Justice of Wake County, North Carolina in October 2019, the NCICs stated that the amount of Affiliate Investments they held was "approximately $1.25 billion." Declaration of Ryan Meyer ("Meyer Decl."), Exh. 3-A at ¶ 29; accord Meyer Decl., Exh. 3-B at ¶ 29. Similarly, in a pre-trial order in that case, the parties stipulated that entities affiliated with Mr. Lindberg "have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements." Meyer Decl., Exh. 3-C at 5. There is no basis to allow the NCICs to back away from these verified pleadings to claim a higher amount now.

That figure is also consistent with the parties' agreement at the time of the MOU, as shown on the "Summary" tab of the spreadsheet calculating the various Affiliate Investments for purposes of the MOU. See Meyer Decl., Exh. 3-D. Accordingly, the "IALA Principal" set forth in the Restitution Report must be reduced by at least $141 million.

II. Mr. Lindberg should receive additional credit for at least $740 million for valuable transfers to certain Pre-Designated Restitution Parties.

Mr. Lindberg cooperated fully in connection with the preparation of the Restitution Report. As the Special Master acknowledges, Mr. Lindberg provided "voluminous records" to the Special Master, directed his counsel to engage with the Special Master and the Government on a weekly basis for over a year, and shared feedback on issues relevant to a restitution order. See, e.g., Restitution Rpt. at 2. As part of the process, Mr. Lindberg identified at least $1.6 billion of payments and transfers to the Pre-Designated Restitution Parties, including cash payments and transfers of valuable equity. Id. at 22. The Special Master correctly found that certain of these payments and transfers should be credited against any restitution obligation because they "qualify" as "payments made for the benefit of the victim insurance companies or their policyholders." Id. Based on the Restitution Report, it appears that the Special Master credited Mr. Lindberg with approximately $818 million in transfers, comprising certain quarterly interest and principal payments to some of the Pre-Designated Restitution Parties; a $25 million partial payment to ULICO; and $289 million

from the proceeds of the Clanwilliam Group ("CWG") sale distributed to the Pre-Designated Restitution Parties. Id. at 22- 23; see also Restitution Rpt., App'x 3, at 6.

But the Special Master excluded more than $110.4 million that Mr. Lindberg paid to the Pre- Designated Restitution Parties because those transfers "do not presently satisfy the applicable criteria." Id. at 23. Respectfully, that exclusion is legal error.

As the Supreme Court has explained, when fashioning a restitution award, a court should credit a defendant with property that was in fact returned to a victim. Robers, 572 U.S. at 640-41. As explained above, the only "property" at issue is cash taken from the various insurance companies in the form of the Affiliate Investments. Therefore, cash payments from a defendant to a victim of his crime should presumptively reduce any subsequent restitution obligation.

The Special Master states that payments to Pre-Designated Restitution Parties "made for [Mr. Lindberg's] own strategic, business, or self-preservation purposes or for other independent consideration" do not qualify as a credit or offset against the restitution obligation. Restitution Rpt. at

22. But the Special Master provides no authority to support that limitation, and there is none. That's

for good reason: The Special Master's "criteria" for evaluating recoveries invites subjective interpretation of intent and perceived benefits to dictate the parameters of restitution, rather than adherence to the MVRA—that a victim must be compensated for actual losses, and no more.

Indeed, the MVRA is ambivalent as to a defendant's motivations or purpose for making a payment to a victim. A defendant may choose to compensate victims for losses for a number of self- serving purposes. The only question relevant under the MVRA is whether the victim suffered a loss and subsequently received compensation from the defendant for that loss. United States v. Thompson,

792 F.3d 273, 280 (2d Cir. 2015) (defendant could not be held liable in restitution for property returned to the victim). For this reason, several courts have recognized that benefits to a defendant are not the proper measure of restitution under the MVRA. See, e.g., United States v. Harvey, 532 F.3d 326, 339 (4th Cir. 2008)(collecting cases). Accordingly, the Special Master's proposed limitation on "qualifying recoveries" is without merit and should be rejected. Mr. Lindberg should be credited with at least $740 million in cash or other valuable transfers made to the Pre-Designated Restitution Parties.

A. Mr. Lindberg is entitled to an additional credit of $352.9 million for the current value of AAPC preferred equity transferred to ULICO in December 2022.

It is error for the Special Master to refuse to credit Mr. Lindberg with the value of preferred equity transferred to ULICO in satisfaction of a judgment arising from the very conduct at issue in this case (and compensating Puerto Rico policyholders).

In May 2022, the United States District Court for the Middle District of North Carolina entered a $524 million judgment against Mr. Lindberg for breach of his personal guarantee of PBLA's obligations. See Universal Life Insurance Co. [ULICO] v. Lindberg, No. 1:20-cv-861 (M.D.N.C. May 3, 2022) [D.E. 122]. In December 2022, ULICO agreed to accept a cash payment of $25 million and a transfer of $218 million of preferred equity in AAPC Holdings, LLC in partial satisfaction of that judgment. See Meyer Decl., Exh. 3-E. Mr.

Lindberg made the cash payment and caused the rights in the preferred equity to be transferred to ULICO.

Notably, the parties agreed that Mr. Lindberg should receive a "dollar-for-dollar credit" against the balance owing on the Middle District judgment for the value transferred. Id. at 2. And as part of the settlement agreement, ULICO and Mr. Lindberg agreed that the transfer of preferred equity constituted "a payment towards the satisfaction and/or to pay down the Middle District Judgment." Id.; see also Meyer Decl., Exh. 3-F. Accordingly, ULICO has already agreed in writing that its receipt of $218 million in preferred equity partially satisfies the losses caused by Mr. Lindberg. There is no reason to refuse to give Mr. Lindberg credit for that transfer in connection with the restitution amount.

As several courts have recognized, "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." United States v. Malone, 747 F.3d 481, 485 (7th Cir. 2014) (quoting United States v. Gallant, 537 F.3d 1202, 1250 (10th Cir. 2008)).

The Eighth Circuit's decision in United States v. Arrington, 97 F.4th 593 (8th Cir. 2024), is instructive. In that case, the defendant was convicted of defrauding his employer. After his fraud had been discovered, the defendant returned $50,000 worth of shares to the company. The district court refused to credit the defendant with the value of those shares because it determined that he "had failed to establish his intention behind the sale." Id. at 596.

The Eighth Circuit reversed. It explained that the value of the shares returned to the company was "supported by the record" and there was "sufficient evidence to establish that he sold the shares as partial payment of the loss amount." Id. Accordingly, "the district court clearly erred when it failed to offset the amount of restitution by the value of shares sold." Id.

The same result is warranted here. ULICO agreed to accept AAPC's preferred equity as partial satisfaction of the amount owed by Mr. Lindberg for the same losses at issue under the restitution order. And there is no question as to the value of the shares: the AAPC preferred equity accrued 18% paid-in-kind interest per year. That is, the shares increased in value by $8,797,500 per quarter. As of May 26, 2026, ULICO's preferred equity interest in AAPC will be worth $352.9 million. Accordingly, it would be error to refuse to give Mr. Lindberg credit for that transfer and allow ULICO to collect twice for the same harm.

Moreover, declining to give Mr. Lindberg credit for the minimum value of the preferred equity gives ULICO an unwarranted windfall. If Mr. Lindberg is obligated to pay restitution to ULICO that does not include the value of the AAPC preferred equity, and ULICO later sells that equity for a profit,

ULICO would effectively receive a double recovery. That is fundamentally contrary to the purpose of the MVRA. See United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018).

The Special Master suggests this "offset should occur if and when the preferred equity position is liquidated into cash" because "this asset is not freely transferable and is subject to too many unknowns and variables concerning potential market conditions." Restitution Rpt. at 23. But that is factually incorrect. The equity was only restricted for four months. ULICO has been free to sell its rights in the preferred equity for more than three years now—since March 31, 2023. See Meyer Decl., Exh. 3-F at 2. Additionally, having senior lenders bless such a transaction is standard protocol and a normal part of any sale—not a restriction. As Justice Sotomayor explained, "[i]f a victim chooses to hold collateral rather

than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers v. United States, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring). ULICO's unilateral decision to hold the preferred equity should not be attributed to Mr. Lindberg.

Accordingly, Mr. Lindberg is entitled to an additional credit for the current value of the preferred equity transferred to ULICO to reflect ULICO's acceptance of that equity in satisfaction of the amount owed. 5

B. Mr. Lindberg is entitled to an additional credit of $27.8 million for capital contributions to SNIC.

Between 2021 and 2022, Mr. Lindberg made payments totaling $27,823,425 to SNIC in connection with an escrow agreement (the "Escrow Agreement") among SNIC, GBIG Holdings, Inc. ("GBIG"), and Dogwood State Bank. Meyer Decl., Exh. 3-G. These payments were made to compensate SNIC for those losses. As such, Mr. Lindberg's restitution obligation should be offset by the amount of those payments.

If the value of the preferred equity is subsequently determined to be greater than $352.9 million, Mr. Lindberg should receive an additional offset to any remaining restitution obligation at that time.

The Special Master rejected this "credit" because, in his view, Mr. Lindberg "agreed to reimburse SNIC's operating costs [to] continu[e] to operate" and therefore received "fresh consideration" in the form of continued operations." Restitution Rpt. at 24. But again, a perceived benefit to Mr. Lindberg is irrelevant under the MVRA. He either paid the victim back money or he did not. And the offered basis for rejection is factually flawed as well.

In June 2019, the Commissioner of Insurance for the North Carolina Department of Insurance filed a petition for rehabilitation of SNIC. See Meyer Decl., Exh. 3-G at ¶ R1. In March 2021, the Commissioner then filed a petition seeking liquidation of SNIC pursuant to Article 30 of Chapter 58 of the North Carolina General Statutes. Id. ¶ R2. GBIG objected to the liquidation petition, and to delay that process, the parties negotiated the terms of the Escrow Agreement. Id. ¶¶ R3-R6.

Pursuant to the Escrow Agreement, GBIG was obligated to deposit $9 million in an escrow account. Id.¶ 1.2. GBIG was also required to pay SNIC's monthly expenses from funds other than the deposited escrow funds. Id. ¶ 2.3. The $27 million in contributions from Mr. Lindberg constitute the GBIG payments owed to SNIC for its monthly operating costs.

Admittedly, the only reason that SNIC was at risk of rehabilitation and liquidation was because of cash taken out through Affiliate Investments. But by paying SNIC this cash in 2021 and 2022, Mr. Lindberg compensated SNIC for money it had lost as a result of those Affiliated Investments— the same thing restitution is supposed to accomplish. That SNIC received a separate benefit (in the form of staving off liquidation) is of no moment. At the end of the day, SNIC received $27 million from Mr. Lindberg on account of cash removed via Affiliate Investments, and therefore the return of that money should be credited against his restitution obligation. See Thompson, 792 F.3d at 280.

C. Mr. Lindberg is entitled to credit of $79.6 million in cash payments to Pre-Designated Restitution Parties.

It is undisputed by either the Special Master or the Government that Mr. Lindberg has made

at least an additional $79.6 million in cash payments to certain Pre-Designated Restitution Parties.6 These payments include:

• Payments totaling $9.4 million to CBL and ULICO (via PBLA ULICO), in connection with the sale of Finnazen/Blue Violet 7 in August 2019;

• Approximately $29.5 million in preferred equity payments to CBL; 8 • Approximately $4.2 million in preferred equity payments to BLIC;

• Approximately $6.8 million in preferred equity payments to SNIC;

• Approximately $21.9 million in preferred equity payments to PBLA;

• Approximately $2.6 million in preferred equity payments to Northstar; and • A $5 million redemption fee paid to CBL as part of the March 2022 refinancing of AAPC's preferred equity.

As the Supreme Court has explained, when fashioning a restitution award, a court should credit a defendant with property that was in fact returned to a victim. Robers, 572 U.S. at 640-41. The money at issue here was returned to the victims. More specifically, the only "property" at issue is cash taken from the Pre-Designated Restitution Parties because of the Affiliate Investments. And these

The Restitution Report states that Mr. Lindberg was not given credit for $59 million in cash payments. Restitution Rpt. at 24. On information and belief, this appears to be an outdated figure from earlier discussions between the parties.

Blue Violet was a Principal Protected Note ("PPN"), which was a disaffiliation strategy approved by NCDOI as a part of its first Memorandum of Understanding with Mr. Lindberg in April 2018. The PPNs combined zero-coupon notes issued by third-party financial institutions with underlying investments into entities where Mr. Lindberg was the ultimate beneficial owner. Here, that affiliated entity was an operating company known as Finnazen. As a part of the June 2019 MOU and IALA, Mr. Lindberg was directed to unwind the PPNs and dispose of the third-party assets, including the zero-coupon bonds. As a part of that effort, Blue Violet and Finnazen were liquated in August 2019 and the proceeds paid to the victim insurers.

Mr. Lindberg has made approximately $165 million in payments to certain Bermuda ICs and NCICs on account of AAPC preferred equity held by those entities. Although Mr. Lindberg understands that the Special Master has given him credit for approximately $100 million in such payments, he understands that the payments identified herein have been excluded.

payments undisputably reflect a return of that value by Mr. Lindberg. Therefore, he should presumptively receive a credit for those payments.

The Special Master asserts that Mr. Lindberg should not be given credit for these payments because they are purportedly for "debts not included in the IALA." Restitution Rpt. at 24. But that is irrelevant. The Pre-Designated Restitution Parties acknowledged upon receipt of these payments that they represented a "return of capital" and "preferred returns" on account of the Affiliate Investments. See, e.g., Meyer Decl., Exh. 3-H. And in any event, the Special Master does not (and cannot) dispute that these payments were, in fact, made by Mr. Lindberg.

Moreover, the AAPC preferred equity and other cash payments were provided to the NCICs and Bermuda insurance companies (the "Bermuda ICs") as a part of the PPN affiliate investment process. Specifically, Mr. Lindberg transferred the preferred equity to the

Bermuda ICs (along with the NCICs) in 2019 as a part of the unwinding of the PPNs required by the NCDOI as a part of the MOU and IALA. As a result of those regulatory-required transfers, Mr. Lindberg transferred to the NCICs and Bermuda ICs approximately $105,067,765 in principal of AAPC preferred equity. That included four tranches of preferred equity to PBLA ($913,000 principal; $10.023M principal; $1.190M principal; and $7.478M principal) and one tranche of preferred equity to Northstar ($1.654M principal). In other words, rather than putting cash back into the NCICs and Bermuda ICs after unwinding the NCDOI-mandated unwinding of the PPNs, the NCICs and Bermuda ICs received AAPC preferred equity. Any cash payments made because of that equity therefore are directly related to the losses associated with the Affiliate Investments and should be credited as a payment against those losses.

At its core, restitution in this matter should be focused on "cash in for cash out." See Restitution Rpt. at 2. Because the Pre-Designated Restitution Parties received the $79.4 million in cash

payments from Mr. Lindberg to compensate them for the Affiliate Investments, those payments should be credited to Mr. Lindberg.

D. Mr. Lindberg is entitled to credit for a $3 million cash payment to CBL in

connection with the Beckett refinance amendment.

Like the payments above, Mr. Lindberg made a cash transfer of $3 million to CBL in 2022. The Special Master appears to have rejected this credit because Mr. Lindberg received "fresh consideration" in the form of CBL's subordination of "its priority position" with respect to certain Specified Affiliated Companies. Restitution Rpt. at 24. But again, a perceived benefit to Mr. Lindberg is irrelevant under the MVRA. He either paid the victim back money or he did not. And the offered basis is also factually inaccurate.

Mr. Dinius (the state-court receiver) supported this refinance because it capitalized a turnaround strategy, provided funds for two significant acquisitions, and enabled the payoff of insurance loans in support of a refinancing. Mr. Dinius renegotiated the North Carolina court- approved loan documents to insert this unnecessary and unapproved fee. Not Mr. Lindberg.

Absent the payment of the fee, Mr. Dinius said he would withhold his assent from the transaction, despite recognizing its significant value for policyholders. To protect this Affiliate Investment, Mr. Lindberg authorized the $3 million payment to CBL. Mr. Lindberg did not receive any "fresh consideration" or other "strategic, business, or self-preservation" benefit because of this payment. Accordingly, Mr. Lindberg should also receive credit for the $3 million payment to CBL. He paid this money to the victim due to his indicted offense conduct.

E. Mr. Lindberg is entitled to a credit of $20 million for additional proceeds from

the sale of the Clanwilliam Group.

As noted above, the Special Master agreed that Mr. Lindberg should receive credit against any restitution obligation for the proceeds of the sale of CWG. Restitution Rpt. at 23. But pursuant to the Court's Order approving the distribution of those proceeds, $20 million was held back in escrow for

"reasonable and necessary Irish Tax Liabilities and Triton Closing Costs." See Dkt. No. 68 at 3-4.

Mr. Lindberg maintains that no Irish Tax Liabilities or Triton Closing costs have or will materialize. To avoid any depletion of the reserve, and make funds available to the victims, the remaining proceeds should be distributed to the Special Master for distribution and that amount credited against Mr. Lindberg's restitution obligation.

F. Mr. Lindberg is entitled to a credit of approximately $13.6 million for the proceeds of real estate that he contributed to ULICO.

In 2018 and 2019, Mr. Lindberg contributed 100% of the equity interests in four separate entities that held real-estate assets in Idaho (Erie Properties, LLC) and North Carolina (Morning Mountain House, LLC, Tux Holdings, LLC, and Paradigm Park Holdings, LLC) to the PBLA ULICO 2017 Reinsurance Trust. See Dkt. No. 1¶ 162. Subsequently, Mr. Lindberg understands that ULICO sold those real-estate assets for cash proceeds of $13,596,013. See Meyer Decl., Exh. 3-I.

The proceeds of those sales represent direct recoveries by ULICO of cash from the sale of collateral it held as a result of the Affiliate Investments. Therefore, the proceeds of the sale of the "collateral" provided by Mr. Lindberg must be credited against Mr. Lindberg's restitution obligations.

G. Mr. Lindberg is entitled to a credit of $243.4 million for the sale proceeds of certain zero-coupon bonds.

Following the execution of the MOU and IALA on June 27, 2019, the NCICs sold off certain zero-coupon bonds (the "Zero-Coupon Bonds") that they held as a result of the Affiliate Investments for approximately $243.4 million. Those proceeds represent a direct recoupment of money taken out of the NCICs via the Affiliate Investments. Accordingly, Mr. Lindberg must receive credit in the full amount of the Zero Coupon Bonds.

In connection with the Affiliate Investments, the NCICs held a set of Principal Protected Notes ("PPNs"). Each PPN was a special-purpose vehicle that paired (i) an investment grade zero- coupon bond issued by a major bank with (ii) underlying investments into entities where Mr. Lindberg

was the ultimate beneficial owner. The NCICs would not have held the Zero-Coupon Bonds but for the associated affiliate loan such that they are inextricably intertwined. Indeed, Mr. Lindberg understands that all of the Zero-Coupon Bonds still outstanding as of the IALA are included as a part of the Special Master's starting balances.

As part of the June 2019 MOU and IALA, Mr. Lindberg was directed to unwind the PPNs and dispose of third-party assets, including the Zero-Coupon Bonds. And contemporaneous emails indicate that he did just that. In October 2019, Paul Brown, the NCICs Chief Investment Officer sent an email to Mr. Lindberg noting the "final outcome" of the PPN issue. Meyer Decl., Exh. 3-J. He explained that, as a result of negotiations with the issuers of the Zero-Coupon Bonds, the NCICs "ended up making +6mm on the disposals." Id. What's more, he attached a spreadsheet summarizing the "total cash proceeds" by lender of the Zero-Coupon Bonds, which provides that the "recent' proceeds (i.e. post-MOU/IALA) is $243,452,385. Id.

There is no basis to refuse to credit Mr. Lindberg for these funds. The Zero-Coupon Bonds constitute losses to the Pre-Designated Restitution Parties as a result of the Affiliate Investments, and the Special Master captured those losses in the principal balance of those loans when calculating the restitution obligation. Because the NCICs received cash back in as a result of disposing of the Zero- Coupon Bonds, the proceeds from those sales must be

credited to Mr. Lindberg. To date, the NCICs have failed to produce data sufficient to demonstrate that they have fully accounted for the proceeds of the Zero-Coupon Bonds. Accordingly, any restitution figure must be reduced by $243.4 million.

* * * For the reasons explained above , Mr. Lindberg should receive credit for at least $740 million in payments and other valuable transfers to the Pre-Designated Restitution Parties.

III. The final restitution amount awarded must be limited to losses proximately caused by

Mr. Lindberg's conduct.

For a court to order a defendant to pay restitution to a victim under the MVRA, the defendant's offense of conviction must be a proximate cause of the victim's loss. 18 U.S.C. § 3663A(a)(2); United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006). This concept plays a role not only in ascertaining who is a "victim" for purposes of the MVRA, but also in limiting which losses a victim may recover. Lagos v. United States, 584 U.S. 577, 584 (2018). Where the harm alleged did not result from conduct underlying an element of the offense or conduct that is part of a pattern of criminal activity that is an element of the offense, restitution is inappropriate. United States v. Purdue Frederick Co., 495 F. Supp. 2d 569, 575 (W.D. Va. 2007).

Notably, courts must be careful not to become embroiled in intricate issues of proof, as the MVRA provides that it is "inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." United States v. Reifler, 446 F.3d 65, 136 (2d Cir. 2006) (citing 18 U.S.C. § 3663A(c)(3)(B)). Indeed, the MVRA provides that a court may decline to enter a restitution order if (A) "the number of identifiable victims is so large as to make restitution impracticable;" or (B) "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3).

This discretion is particularly applicable when there are questions about the cause of relevant "loss" or where a causation determination would require "the equivalent of full-blown civil litigation." United States v. Qurashi, No. 05-cr-498, 2009 WL 10677000, at *34-35 (E.D.N.Y. Sept. 1, 2009). For instance, in United States v. Rahal, Frito-Lay sought restitution relating to the difference between what it paid for a particular product because of racketeering and bribery versus what it would have paid another company for the product in the absence of that criminal conduct. No. 08-cr-566, 2015 WL 13736602, at *10 (E.D. Cal. Nov. 1, 2015). The court refused to grant such restitution, explaining that "unresolved and complex issues of fact" relating to whether Frito-Lay would have purchased the product at issue, absent the defendant's wrongdoing, and whether it would have offset the higher cost through other means, made the determination of the proper loss amount unduly burdensome. Id.

Here, the Special Master included $129 million in losses associated with Agera that were not directly or even proximately caused by Mr. Lindberg (an undisputed fact). In the Special Master's view, Mr. Lindberg "benefited from all of the investments into Agera by the Pre-Designated Restitution Parties, whether before Defendant's acquisition of Agera or afterward." Restitution Rpt. at 25. Benefit is legally irrelevant. As explained below, Mr. Lindberg is not responsible for the Agera losses because (1) ULICO's exposure to Agera pre-

dated Mr. Lindberg and (2) Agera subsequently collapsed for reasons (fraud) entirely unrelated to Mr. Lindberg.

First, it is undisputable that Mr. Lindberg inherited the Agera-related debt. As GBIG's former Co-CEO and former Head of Capital and Mergers and Acquisitions both testified, ULICO required any buyer of its Bermuda-based reinsurance portfolio (which subsequently became PBLA-ULICO) to assume its Agera exposure, which was approximately $129 million as of the June 30, 2017 purchase and reinsurance treaty with ULICO. As a part of that reinsurance treaty, ULICO then required Mr. Lindberg to reduce the Agera exposure from 19.99% of ULICO's Bermuda-based reinsurance portfolio to near zero. In furtherance of his obligations, Mr. Lindberg complied with ULICO's directive. Mr. Lindberg then invested tens of millions more into Agera to try and save ULICO's pre - existing investment, only for Agera to collapse into bankruptcy in 2019 because of the separate, newly-discovered financial fraud of Agera's independent Chief Financial Officer. As Mr. Lindberg neither originated ULICO's $129 million in Agera exposure nor was his indicted conduct responsible for its collapse, it is entirely inappropriate to assess the Agera debt as a restitution damage.

In any event, an inquiry into the cause of these harms is likely to devolve into the "equivalent of full-blown civil litigation" to determine what amount, if any, was "caused" by Mr. Lindberg. Qurashi, 2009 WL 10677000, at *35. As it would "unduly complicate and prolong the sentencing process" to figure out what portion of those losses were caused by the problems that existed prior to Mr. Lindberg's involvement versus any harm caused by Mr. Lindberg's conduct, Purdue Frederick Co., 495

F. Supp. 2d at 575, the better course for the Court is to exclude these losses from the restitution figure,

18 U.S.C. § 3663A(c)(3). Mr. Lindberg therefore respectfully requests that the Court reduce the restitution obligation by an additional $129 million.

IV. A jury must decide Mr. Lindberg's restitution obligation, if any.

It is well-established that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490; Southern Union Co. v. United States, 567 U.S. 343 (2012) (holding that the Apprendi rule precludes "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow."). Because restitution under the MVRA constitutes a punitive measure, and because the statutorily authorized maximum amount of restitution is dependent on facts that establish that the defendant was the proximate cause of a victim's loss, those facts must be decided by a jury.

After Mr. Lindberg entered his plea agreement in this case, the Supreme Court clarified in Ellingburg that restitution awarded under the MVRA constitutes a "criminal punishment" for purposes of the Ex Post Facto Clause—meaning the full protections of the Sixth Amendment attach. 146 S. Ct. at 567. The Court carefully reviewed the history, precedent, and the purpose of restitution and explained that, notwithstanding its compensatory goals, restitution under the MVRA is "part of [a criminal defendant's] sentence" and considered a "penalty" predicated on a criminal conviction. Id. at 568. It therefore should fall within the scope of the rule announced in Apprendi, and any facts relating

to such restitution must be found beyond a reasonable doubt by a jury. See Hester v. United States, 586 U.S. 1104, 1107 (2019) (Gorsuch, J., dissenting from the denial of certiorari); see also United States v. Leahy, 438 F.3d 328, 339 (3d Cir. 2006) (McKee, J., concurring).

Mr. Lindberg recognizes that, prior to the Supreme Court's decision in Ellingburg, the Fourth Circuit held that the "rule of Apprendi is simply not implicated" with respect to a restitution order because "there is no prescribed statutory maximum in the restitution context." Day, 700 F.3d at 732. But Day was wrongly decided. There is a statutorily prescribed maximum under the MVRA; it does not allow restitution unless the Government proves that there were losses proximately caused by the defendant's criminal conduct, and those losses must be established by facts. As a result, a jury must determine the facts that increase a defendant's restitution beyond the baseline of no restitution. Indeed, it would be an odd result if a civil defendant has greater rights under the Seventh Amendment than a criminal defendant would under the Sixth. Cf. Sec. Exch. Comm'n v. Jarkesy, 603 U.S. 109, 120-40 (2024) (holding that it violates the Seventh Amendment for the Government to impose a fine based on facts not found by a jury where the Government's claims replicate an action brought under the common law). To the extent this Court deems itself bound by Day, Mr. Lindberg raises this argument to preserve it for a potential appeal.

CONCLUSION

For these reasons, the Court should reject the Restitution Report's proposed restitution figure. Moreover, in light of the significant cash and other valuable assets Mr. Lindberg transferred to the Pre-Designated Restitution Parties, no restitution should be ordered. 9

Consistent with the Court's Order bifurcating sentencing and restitution hearings in this case, Dkt. No. 108 at 4, Mr. Lindberg, the Special Master, and the United States anticipate the Court will set a separate hearing regarding a final order of restitution. Mr. Lindberg respectfully reserves all rights to supplement this Response with additional factual information, if and as appropriate, prior to such a hearing.

Dated: May 4, 2026 Respectfully submitted, /s/ James F. Wyatt, III James F. Wyatt, III NC State Bar No. 13766 Robert A. Blake, Jr.

NC State Bar No. 20858

WYATT & BLAKE LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 Tel: 704.331.0767 jwyatt@wyattlaw.net rblake@wyattlaw.net Brandon N. McCarthy (pro hac vice) TX State Bar No. 24027486 Ryan J. Meyer (pro hac vice) TX State Bar No. 24088053

KATTEN MUCHIN ROSENMAN LLP

2121 North Pearl Street, Suite 1100 Dallas, TX 75201 Tel: 214.765.3600 brandon.mccarthy@katten.com ryan.meyer@katten.com Counsel for Defendant Greg E. Lindberg

ARTIFICAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this Response and Objection or its Exhibits B and C, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this Response and Objection and its Exhibits B and C has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: May 4, 2026 /s/ James F. Wyatt, III James F. Wyatt, III

WYATT & BLAKE, LLP

Counsel for Defendant Greg E. Lindberg

**Doc. 145 — Defendant's Sentencing Memorandum (filed 05/14/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA

No. 5:19-CR-22-MOC v. GREG E. LINDBERG, No. 3:23-CR-48-MOC Defendant.

DEFENDANT GREG E. LINDBERG'S SENTENCING MEMORANDUM

Defendant Greg Lindberg, through counsel, respectfully submits this Sentencing Memorandum in United States v. Lindberg, et. al., No. 5:19-cr-22-MOC (the "Public Contribution" case), and United States v. Lindberg, No. 3:23-cr-48-MOC (the "Financial" case). A consolidated sentencing hearing has been scheduled in this matter for May 26, 2026.

The Court previously sentenced Mr. Lindberg in the Public Contribution case to 87 months of incarceration more than five years ago, following his conviction after his first trial. Mr. Lindberg spent 633 days in prison at FPC Montgomery after that initial sentence was imposed. He was released on bond following the Fourth Circuit's decision in June 2022 vacating his initial conviction. He was convicted again in May 2024 following a retrial in the Public Contribution case.

Mr. Lindberg entered a plea in the Financial case on November 12, 2024. He voluntarily surrendered to the U.S. Marshals Service and began serving his sentence of imprisonment on the day of his guilty plea. As of the date of his sentencing, Mr. Lindberg will have served 561 days at the Gaston County Jail and thereafter in the Grayson County Detention Center in Leitchfield, Kentucky, and the Pike County Detention Center in Pikeville, Kentucky.

Primarily as a result of Mr. Lindberg's unprecedented restitution efforts since he was last sentenced in the Public Contribution case, as well as his substantial cooperation with the Special

Master, and the fact that the Sentencing Guidelines substantially overstate the impact of the loss amount, Mr. Lindberg respectfully requests that this Court (1) initially impose concurrent custodial sentences of 48 months in both cases; (2) then vary or adjust downward from the 48 month sentences in both cases by 39.8 months to ensure that Mr. Lindberg receives credit against both sentences for the time that he has spent in incarceration prior to the sentencing hearing in this case; (3) vary downward by an additional 9.5 months for the First Step Act sentence reduction that Mr. Lindberg previously earned while incarcerated at FPC Montgomery, but was lost as a result of the Fourth Circuit's vacating of his initial conviction in the Public Contribution case; (4) hold that, for the purposes of the sentence imposed in these cases and for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served; and (5) delay Mr. Lindberg's federal prison reporting date for any additional time he is required to serve until after the conclusion of all restitution hearings and the entry of a final restitution order so that Mr. Lindberg is available to consult with his attorneys on restitution issues and is available to continue assisting the Special Master.

I. Introduction

The Court previously sentenced Mr. Lindberg to 87 months in the Public Contribution case, a sentence that was imposed prior to Mr. Lindberg's substantial restitution efforts, and that appears to have already included the interrelated conduct in the Financial case. See infra at 6. For the present sentencing hearing, the Government has agreed to recommend that the sentences in the Political Contribution and Financial cases run concurrently. In addition, the Government does not object to credit for time served being applied to the consolidated sentence.

The sentence requested by Mr. Lindberg properly reflects the seriousness of the underlying offenses while recognizing the extraordinary restitution and cooperation efforts Mr. Lindberg has undertaken in conjunction with the Court-appointed Special Master before and since the entry of his plea in the Financial case. These efforts include, but are not limited to: (1) promptly executing Assignment Agreements of his interests in the Primary Restitution Assets – including NHC Holdings LLC (which includes Clanwilliam) 1 – to the Special Master; (2) voluntarily relinquishing a $40 million tax escrow to facilitate the Clanwilliam sale through the Special Master process (thereby allowing $157 million in restitution to flow directly to individual North Carolina insurance company ("NCIC") policyholders); (3) executing a number of releases of trustees and other parties, and dismissing several lawsuits, in order to remove roadblocks to the Clanwilliam sale; (4) withdrawing notices of appeal in related state court civil proceedings during plea negotiations in the Financial case, which enabled state insurance guaranty associations to begin immediately making over $1.8 billion in payments to NCIC policyholders in 2024 (the appeals placed a hold on their ability to do this); (5) assisting the Special Master in selling Clanwilliam with this sale providing net proceeds of $348,723,359.44, of which $314,358,186.68 was immediately available for restitution; 2 (6) executing assignments and releases to enable the sale of

The Primary Restitution Assets include, among other assets, NHC Holdings LLC ("NHC"), which was created in 2019 as a part of the Memorandum of Understanding ("MOU") reached between Mr. Lindberg, his operating companies, his insurance companies, and the North Carolina Department of Insurance. Pursuant to the MOU, Mr. Lindberg ultimately transferred over 300 individual Specified Affiliated Companies ("SACs") into NHC, including Clanwilliam, a company that provides innovative healthcare management, software, and clinical system services. Clanwilliam was sold by the Special Master, generating net proceeds of $348,723,359.44. See infra at 13. Clanwilliam was purchased by Mr. Lindberg as an affiliated investment for a relatively small amount (€45 million) in 2014 and then grown into a much larger business by Mr. Lindberg until its sale. See infra at 11-12.

Subsequent to the Court's Order authorizing the Clanwilliam sale, the Special Master brokered an agreement among the parties to reserve $20 million in escrow to satisfy potential Irish tax

assets if necessary to fully satisfy restitution obligations; (7) voluntarily providing tax refund checks in the amounts of $570,492.27 to the Special Master; (8) consenting to a motion for a protective order regarding the disclosure of excess policyholder data that authorized the guaranty associations and NCICs to share their policyholder level data with the Special Master, which was necessary to facilitate the $157 million in restitution payments made by the Special Master in December 2025 to all 43,000 North Carolina policyholders who had not yet been paid the full value of their individual insurance policies 3; (9) voluntarily providing Mr. Lindberg's personal tax returns to the Special Master in

October 2025 in order to provide information needed by the Special Master to analyze certain transactional tax issues related to the sale of NHC entities; (10) working with the Special Master and its Financial Advisor, Paladin, to address numerous tax issues to expedite NHC sales and increase the value of the NHC assets (thereby increasing the restitution value that can be monetized from those entities); and (11) providing certain substantial payments – over $500,000,000.00 – to the relevant insurance companies before the entry of his plea in the Financial Fraud case, as outlined in the Special Master's Report and Recommendation Regarding Restitution (Fin. Dkt. Entry No. 106 at 23-25). Additionally, as noted in Mr. Lindberg's Response and Objection to the Special Master's Report and Recommendations Regarding Restitution (Fin. Dkt. Entry No. 132), if the Court credits the payments/offsets contained in Mr. Lindberg's Response and Objection, Mr. Lindberg will have fully satisfied his restitution obligations via over $3.69 billion in cash payments, asset transfers, and credits due.

liabilities arising from the sale that NHC only identified immediately before closing. If the Irish tax liabilities are ultimately less than $20 million, then any remaining funds will be released for restitution.

See Fin. Dkt. Entry No. 100.

These efforts, along with the hard work of the Special Master and his financial advisor, have resulted in the total restitution paid in this case being among the largest amounts of restitution ever recovered in the United States.

A sentence of 48 months (with credit then applied for time served and First Step Act credits previously earned) is longer than, but does not create an unjustified gulf between, the sentences handed down to co-defendants in both the Political Contribution and Financial cases, which include Non-Prosecution and Deferred Prosecution Agreements.

## II. Procedural History and Background Information

### A. The Political Contribution and Financial Case Histories

In the Political Contribution case, Mr. Lindberg is to be sentenced on two counts following a re-trial before a jury. Those counts relate to campaign contributions that Mr. Lindberg offered to the North Carolina Commissioner of Insurance to reassign the regulator previously assigned to review Mr. Lindberg's insurance business. Mr. Lindberg was indicted in the Political Contribution case along with three other defendants: John Gray, John Palermo, and Robin Hayes. The indictment contained five counts. Case No. 5:19-cr-22 ("PC Dkt."), Dkt. Entry No. 3. Mr. Lindberg, Mr. Gray, and Mr. Palermo were indicted on one count of conspiracy to commit honest- services wire fraud under 18 U.S.C. §§ 1343, 1346, and 1349, and one count of federal program bribery under 18 U.S.C. § 666(a)(2). Mr. Hayes was the only defendant charged in all five counts, including three additional false statement counts (18 U.S.C. § 1001).

Prior to the first trial, Mr. Hayes entered a plea to one false statement count and the other counts against him were dismissed. PC Dkt. Entry No. 70. The Government did not move under U.S.S.G. § 5K1.1 for a reduction based on substantial assistance, although it appears that Mr.

Hayes cooperated with the Government. Mr. Hayes was sentenced to one year of probation, PC Dkt. Entry No. 257, and was subsequently pardoned.

At the first trial, Mr. Palermo was acquitted. Mr. Lindberg was convicted on both counts and sentenced on August 19, 2020 to 87 months of imprisonment and three years of

supervised release. PC Dkt. Entry No. 261. Following the jury's verdict in Mr. Lindberg's retrial in May 2024, the Court explained that it viewed the Financial and Public Contribution cases as "overarching cases" and "all [] part of the same parcel." Trial Transcript at 1032: 19-21, PC Dkt. Entry No. 450. The Court further noted that "[i]t's not one where the Court is going to go and try to be stacking stuff." Id. at 1032:19-24. Further, the Government referenced and incorporated facts integral to the Financial case during the Public Contribution case. See, e.g., Trial Transcript at 1834: 8-10, PC Dkt. Entry No. 280 (Government asserting during the first Public Contribution trial that "there's up to a billion dollars of insurance proceeds that's missing or unaccounted for" in connection with post-trial bond motions). 4

See also August 19, 2020 Sentencing Transcript at 19, P.C. Dkt. Entry No. 281 (Court: "There's a lot of determination in this case to remove a regulator who wanted to change the 25 percent that it had moved down to to allow him to take more money out of the – his insurance companies and put it in other insurance companies"); PC Dkt. Entry No. 245 at 12 (Government arguing in sentencing brief: "[T]he defendants' broader goals, and the potential harms they threatened, provide further support for a significant prison sentence. As this Court noted, the defendants 'spared no effort or expense' in their attempts to remove the senior-most regulator of Lindberg's companies (Docket 240, pp. 4-5), which evidences what was at stake for them. When Jackie Obusek took responsibility for overseeing Lindberg's companies, Lindberg saw the permissive regulatory environment – which allowed him to operate his companies significantly outside of the industry standards – begin to rapidly disappear. He was no longer permitted to invest huge percentages of policyholders' money into his other companies, a practice already prohibited by most states. In short, by bribing the Commissioner, Lindberg sought to protect an investment strategy that allowed him to invest more than $750 million of insurance company assets into his other business ventures. Further, he sought to pave the way for his purchase of additional insurance companies worth hundreds of millions of dollars, giving him access to untold additional cash. In just one identified transaction, Lindberg was attempting to purchase an insurance company for $585 million. Lindberg & Gray PSRs ¶ 64.").

Mr. Gray was also convicted on both counts in the Political Contribution case and previously sentenced to 30 months of imprisonment and two years of supervised release. PC Dkt.

Entry No. 262. His re-sentencing is pending.

In June 2022, the Fourth Circuit vacated the Political Contribution convictions and remanded for re-trial based on a jury instruction issue. See United States v. Lindberg, 39 F.4th 151 (4th Cir. 2022). On re-trial, Mr. Lindberg and Mr. Gray were found guilty on both counts in May of 2024. PC Dkt. Entry No. 435.

In the Financial case, Mr. Lindberg is before this Court for sentencing on two counts following a guilty plea, entered on November 12, 2024. Those counts relate to fraudulent statements he made to regulators about his insurance businesses. Mr. Lindberg pled guilty to one count of conspiracy in violation of 18 U.S.C. § 371, which carries a maximum term of imprisonment of five years, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), which carries a maximum term of imprisonment of 10 years.

Under the terms of the Financial case plea agreement, Mr. Lindberg agreed, among other things, to use his best efforts to pay full restitution and to the appointment of a Special Master "to identify, receive, apportion, and distribute funds for restitution, and perform any

other related tasks as ordered by the Court." Case No. 3:23-cr-48 ("Fin. Dkt."), Dkt. Entry No. 40 at ¶ 9. The Government agreed to a consolidated sentencing hearing and concurrent sentences. See id. at ¶ 8(d)(i).

There have also been dispositions of other culpable individuals in the Financial case that are relevant to Mr. Lindberg's sentence under 18 U.S.C. § 3553(a)(6), including Chris Herwig, Devin Solow, and Eric Bostic. Mr. Herwig was the Chief Investment Officer and Portfolio Manager for Mr. Lindberg's companies. Mr. Solow was the Vice President of Investments, a

Mergers and Acquisitions associate, and had the primary responsibility for structuring the affiliate financing of Mr. Lindberg's non-insurance company acquisitions. See Solow, No. 3:22-cr-315, Dkt. No. 3 (W.D.N.C. 2022) (Bill of Information). Mr. Bostic worked with Mr. Lindberg from 2017 until 2021 in a role similar to Mr. Solow, with a particular focus on managing the investments of Mr. Lindberg's Bermuda insurance companies. Mr. Herwig supervised Mr. Solow and Mr. Bostic, and Mr. Lindberg supervised all three of them. See Herwig, No. 3:22-cr-314 (W.D.N.C. 2022), Dkt. No. 3 (Bill of Information). Although each of these individuals had varying levels of responsibility and culpability, they all were materially involved in misrepresenting the true financial condition of Mr. Lindberg's companies; whether these companies were in fact affiliated or unaffiliated entities; making misrepresentations about the capital position of some of Mr. Lindberg's companies; and misrepresenting that certain insurance and regulatory requirements were being complied with. Thus, they all had significant roles in the underlying Financial case.

Mr. Herwig entered a plea agreement with the Government that was filed on December 20, 2022. Herwig, No. 3:22-cr-314, Dkt. Entry No. 6. Pursuant to this agreement, Mr. Herwig pled guilty to a single 18 U.S.C. § 371 conspiracy count with a five-year maximum sentence. Mr. Herwig served as Mr. Lindberg's right-hand man for over a decade, ultimately receiving at least $13,686,190.63 in compensation for his key role in the charged conspiracy. Based on information and belief, Mr. Herwig will receive a substantial departure recommendation from the Government based on his substantial assistance. Thus, his ultimate sentence will likely be substantially less than the statutory maximum of five years. Mr. Herwig's case has not yet been scheduled for sentencing by the Court.

As for Mr. Solow, the Government entered a Deferred Prosecution Agreement with him. Solow, No. 3:22-cr-315, Dkt. Entry No. 6-1. Pursuant to this agreement, the Government agreed

to defer prosecution of Mr. Solow for a period of 60 months and thereafter dismiss his criminal charge following his payment of a $250,000.00 "Stipulated Forfeiture Amount" (approximately 7% of the approximately $3.4 million that Mr. Solow admitted being paid for his role in the conspiracy). Id. at ¶ 17.

And for Mr. Bostic, the Government entered into a Non-Prosecution Agreement with him on July 27, 2023, allowing him to avoid criminal charges entirely with the payment of a $75,000.00 "Stipulated Forfeiture Amount." See https://www.justice.gov/criminal/criminal-vns/case/united- states-v-greg-e-lindberg (last visited May 7, 2026).

B. Time Served by Mr. Lindberg

Mr. Lindberg has been incarcerated twice related to these cases and is currently serving time on them. First, after his conviction following his initial trial in the Public Contribution case, Mr. Lindberg served 633 days in prison at FPC Montgomery before the Fourth Circuit vacated that conviction in June 2022; he was then released on bond pending re-trial.

Second, following his guilty plea in the Financial case, Mr. Lindberg voluntarily surrendered to the U.S. Marshals Service and began serving his anticipated sentences in both cases on November 12, 2024. Since that time, Mr. Lindberg has been incarcerated in the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center. As of the day of his sentencing hearing, Mr. Lindberg will have served 561 days in the Gaston County Jail and the Kentucky detention facilities.

In total, as of the date of sentencing, Mr. Lindberg will have served 1,194 days (approximately 39.8 months). The Government has agreed in the plea agreement that it will not object to the Court recommending that the Bureau of Prisons apply credit for all time served by Mr. Lindberg to both cases in a consolidated sentence. Fin. Dkt. Entry No. 40 at ¶ 8(d)(ii). Mr.

Lindberg also respectfully requests that the Court hold that, for the purposes of the sentence imposed in these cases and for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served.

C. The Special Master and Restitution Payments

On January 23, 2025, after the entry of Mr. Lindberg's plea in the Financial case, the Court granted a joint motion by Mr. Lindberg and the Government to appoint a Special Master to, inter alia, determine who are bona fide victims in these cases; determine the amount of restitution owed by Mr. Lindberg; identify assets available for liquidation for the benefit of victims; liquidate these assets; and make payment of available funds to victims. Fin. Dkt. Entry No. 56. The Court appointed Joseph Grier of Grier Wright Martinez PA as Special Master and Paladin Management as the Special Master's Financial Advisor. 5 The Special Master Order provides that, "[t]o assist in meeting his restitution obligations, Defendant [Mr. Lindberg] has agreed to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the [S]pecial [M]aster, … within 21 days of the entry of this Order, all of Defendant's, Global Growth Holdings, Inc.'s, and Global Growth Holdings, LLC's rights and interests, whether held directly or indirectly, in [the Primary Restitution Assets]." Id. at ¶ 9. As noted, the Primary Restitution Assets include NHC Holdings LLC, which is the parent company of over 300 SACs (the vast majority of which are operating companies generating ongoing revenue). NHC was created as the result of the MOU, which was

Mr. Grier retained his partner, Michael Martinez, to serve as counsel to the Special Master.

entered in 2019 among Mr. Lindberg, his operating companies, insurers, and their respective regulators. Most significantly for the restitution process, these SACs include Clanwilliam, a company that provides healthcare products and services focusing on IT management systems, software, connectivity and clinical systems. Clanwilliam is a global player in the healthcare industry, operating in 20 countries with 1.5 million clinical users and $90 million in annual revenue. Clanwilliam was sold in September 2025, generating net proceeds of $348,723,359.44, with $314,358,186.88 already disbursed as restitution payments. 6 Mr. Lindberg purchased Clanwilliam for a fraction of its current value and grew it into a multi-million-dollar company. Mr. Lindberg acquired Clanwilliam in 2014 for €45 million. He built it into a multi-million-dollar company because of an investment model that focused on recurring revenue, low capital expenditure requirements, and high barriers to entry, characteristics well suited to insurance fund investments. 7 Clanwilliam

(originally Helix Health) had established a solid position in Irish and British healthcare management software with 11 million euros in revenue and 100 employees when it was acquired by Mr. Lindberg in 2014. Mr. Lindberg then expanded it into a global healthcare IT platform by acquiring 19 strategically placed companies, including Healthlink in 2017 (the leading Australian healthcare IT network). Clanwilliam eventually developed IT systems and solutions in five key healthcare segments: practice management systems, pharmacy systems, acute care

As discussed in note 2, $20 million of the Clanwilliam proceeds have been set aside in an escrow account to be utilized to satisfy any potential Irish tax liabilities. To the extent the liabilities are less than $20 million, the remaining funds will be disbursed as restitution. Also, pursuant to the Court's Order Approving the Clanwilliam Sale (Dkt. Entry No. 68), 4.4438% of the sale proceeds were set aside as an administrative reserve to pay the expenses of the Special Master, Financial Advisor, and Mr. Lindberg's defense counsel.

The company's annual revenue increased from €11 million to €106 million in 2024 (the last year before the company was sold).

solutions, aged care platforms and healthcare analytics. As a result, Clanwilliam's revenue grew from 11 million euros to 96 million euros; it expanded from operations in two countries to more than 20 countries; went from 100 to over 950 employees when it was sold; and was valued at over $850 million prior to its sale.

Clanwilliam was also part of the affiliate investment strategy of Mr. Lindberg, which has produced the assets that have been, and are available for, sale in connection with the restitution process. Affiliate investments are a standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35-43 percent of their assets in affiliate investments, similar to the 40 percent limit that Mr. Lindberg proposed to NCDOI in 2014.

During the first few weeks following entry of the Special Master Order, the Special Master and Mr. Lindberg (through counsel) devoted significant time working with the attorneys and board members for certain of the Primary Restitution Assets (and certain of those entities' lenders) to prepare documentation (namely, Assignment Agreements) evidencing the transition of Mr. Lindberg's and Global Growth Holding's interests in these assets to the Special Master. Mr. Lindberg timely executed such Assignment Agreements within the 21-day window established by the Special Master Order and relinquished all rights (except tax distribution rights) in these Primary Restitution Assets to the Special Master. Even prior to this time and during plea negotiations, Mr. Lindberg agreed to withdraw his appeals of certain matters in the state court proceedings, which enabled state guaranty associations to immediately begin paying policyholders. 8

In July of 2024, in Causey v. SNIC, Case Nos. 23-961 and 94P24, Mr. Lindberg voluntarily withdrew his appeals on certain matters in the North Carolina Court of Appeals and the North

After exhaustive work by the Special Master, the Government, Paladin and Mr. Lindberg, Clanwilliam was sold on September 12, 2025, pursuant to this Court's Order of sale, plus several other authorizing orders from other courts, for the net sales price of $348,723,359.44, and these monies were distributed by the Special Master as follows: • $178,012,178.57 allocated to the North Carolina Insurance Companies to be disbursed first to directly pay the North Carolina Insurance Companies' policyholders with uncovered loss

amounts as restitution pursuant to 18 U.S.C. § 3664(j)(1), with the remaining balance to be distributed to the North Carolina Insurance Companies for distribution pursuant to the North Carolina insurance liquidation priority statute(s), including to, or for the benefit of, state guaranty associations as Class 2 claimants. Fin. Case Dkt. Entry No. 68 at 3. The Special Master advised in a December 23, 2025 Notice to the Court that it had mailed paper checks to approximately 43,000 individual policyholders with "excess" or "uncovered" claim amounts totaling approximately $157 million. See Fin. Case Dkt. Entry No. 100 at 1. • $112,027,442.59 to the Bermuda Insurance Companies (through the JPLs).

$83,862,700.95 was specifically allocated to PBLA in satisfaction of the amounts ultimately owed to ULICO. • $24,318,603.51 to Vista. Fin. Case Dkt. Entry No. 80 at 6. • $14,591,162.11 to the Special Master as a reserve for satisfying administrative expenses.

Fin. Case Dkt. Entry No. 80 at 13.

As reported in the Special Master's Third Status Report (Fin. Case Dkt. Entry No. 94), a group of Specified Affiliated Companies known as the Beckett Group were sold by its parent portfolio group (Collectivus) during the fall of 2025. Because of the extensive debt encumbering Beckett and Collectivus, the sale did not yield proceeds that could be distributed as restitution payments. However, the sale significantly reduced the debt associated with Collectivus and will therefore make the future sale of companies within the Collectivus portfolio more likely to yield more value for restitution purposes. Fin. Case Dkt. Entry No. 94 at 6-7.

Carolina Supreme Court to enable the state guaranty associations to immediately begin paying policyholders. The appeals had prevented this from occurring.

Since the appointment of the Special Master, and in conjunction with the asset sales, Mr. Lindberg has taken several cooperative steps to assist the Special Master in his efforts to sell assets to make restitution payments to qualified victims: • Beginning in February of 2025, Mr. Lindberg, through defense counsel, participated in weekly prescheduled conferences with the Special Master, the United States Attorney's Office and Paladin in order to facilitate the activities of the Special Master, execute asset sales for the payment of restitution, and assist the Special Master and Paladin in understanding the complex business structures involved in the Primary Restitution Assets and Secondary Assets. In addition, Mr. Lindberg's defense counsel have had numerous (sometimes lengthy) additional conference calls and Zoom meetings with the USAO/DOJ, Special Master, Paladin and other parties outside of the regular meetings in order to provide needed information and facilitate asset sales (the weekly conference calls and other meetings began in February of 2025, and do not count hundreds of other electronic communications and calls). • Pursuant to the corporate governance documents of NHC, Mr. Lindberg has the right to appoint two members to the Board of Directors of NHC. As part of the assignment of his interests in NHC, Mr. Lindberg assigned that appointment power to the Special Master. The Special Master exercised this power to remove Kathy Million and Lonna Carter, both affiliates of Mr. Lindberg, from the NHC board and appointed Don Harer, a member of the Paladin team, as one of the Special Master's board designees. The Special Master has not yet exercised his right to name a second NHC board member. For the other Primary Restitution Assets, the Special Master removed Mr. Lindberg's affiliate from this board and named another board member. • To facilitate the sale of Clanwilliam, Mr. Lindberg agreed to relinquish a $40,000,000.00 tax escrow established by a prior North Carolina state superior court order so that these proceeds could be used to pay restitution to victims. Without Mr. Lindberg's consent, the transaction likely would not have

happened, or the funds may have been disbursed through the North Carolina state case, which could have prevented the 43,000 excess policyholders from receiving the $157,000,000.00 they had not previously been paid by the state guaranty associations. • In August of 2025, Mr. Lindberg dismissed lawsuits he previously filed against TA Associates in Texas and Colorado to facilitate the Special Master's sale of Clanwilliam, and pursuant to a voluntary request from the Special Master. Lindberg v. Wilson, No. 1:25- cv-00133, Dkt. Entry No. 22 (W.D. Tex.); Lindberg v. Wilson, No. 1:25-cv-00317, Dkt Entry No. 41 (D. Colo.). Mr. Lindberg also executed a related comprehensive release for TA Associates. • Mr. Lindberg consented to a motion for a protective order regarding the disclosure of excess policyholder data authorizing the guaranty associations and insurance companies to share their policyholder level data with the Special Master, and for the Special Master to keep that data confidential, so that individual restitution payments could be made to these victims.

• After his plea and before the appointment of the Special Master, Mr. Lindberg withdrew his appeals of certain state court cases which enabled the state guaranty associations to make immediate payments to policyholders prior to the asset sales by the Special Master.

• Mr. Lindberg voluntarily provided his personal tax returns to the Special Master in October of 2025 in order to provide information needed by the Special Master to analyze certain tax transactional issues related to the sale of the Primary Restitution Assets.

In addition, prior to the appointment of the Special Master, Mr. Lindberg made substantial repayments to the North Carolina insurance companies, including well over $500 million in payments credited by the Special Master and an additional $2.889 billion in payments, transfers, and credits as included in Mr. Lindberg's Response and Objection to the Special Master's Restitution Recommendations. See Fin. Dkt. Entry No. 132.

III. Eligible Victims and Restitution Amounts

The Special Master and its Financial Advisor filed a Report and Recommendations Regarding Restitution on April 3, 2026 that identifies qualified victims and initial restitution amounts for the Court (the "Special Master's Restitution Recommendation"). Fin. Dkt. Entry No. 106. The Special Master's Restitution Recommendation states that, in addition to the Clanwilliam sale, approximately $1.625 billion is currently owed in further restitution by Mr. Lindberg, with this figure including interest at a time value of money rate. Id. at 21. Without interest, the Special Master calculates the total restitution amount to be $1.362 billion. Id. The Special Master also notes in his Recommendation that the mid-range value for restitution to be recovered in the future from the Primary Restitution Assets is $1.454 billion. Id. at 30. Further the Special Master's position is that Mr. Lindberg should not receive credit for the following restitution payments (although on at least one of these items, the credit is just an issue of timing and amount):

• A credit for all of the assets on the victims' balance sheets, or, at least, a credit for those assets that are ultimately distributed to the victims' creditors, and/or a credit for the enterprise value of each victim at the time the applicable supervising governmental authority took control of the victim.

• Mr. Lindberg's transfer of a preferred equity position in one of the Primary Restitution Assets to ULICO, for which ULICO agreed to reduce the amount of ULICO's civil judgment against Mr. Lindberg by at least $218 million.

• CBL's receipt of a $3 million subordination fee in connection with a new loan to some of Mr. Lindberg's other companies.

• SNIC's receipt of approximately $28 million in expense reimbursements from Mr. Lindberg in 2021–2022.

• Approximately $59 million in payments made to the Pre-Designated Restitution Parties for debts not included in the IALA.

• CBL's receipt of a $5 million transaction fee in connection with a debt restructuring of one of the Primary Restitution Assets.

• Various reductions totaling at least $129 million relating to one or more entities referred to as "Agera."

• A reduction in the amount of $118.3 million based on CBL's purchase of a group of affiliated companies known as "Eye Care Leaders."

Id. at 23-25.

On May 4, 2026, Mr. Lindberg filed a Response and Objection to the Special Master's Restitution Recommendation relating to the above amounts. See Fin. Dkt. Entry No. 132. The Response and Objection outlines why these payments should be credited, and with other offsets and credits, shows that full restitution has already been paid.

IV. Plea Agreement Terms

Pursuant to the terms of Mr. Lindberg's plea agreement in the Financial case, the Government has agreed to recommend that the sentences imposed in the Public Contribution and Financial cases run concurrently. See Fin. Dkt. Entry No. 40 at ¶ 8(d)(i). The Government has also

agreed not to object to the Court crediting the time already served by Mr. Lindberg to both cases in a consolidated sentence. Id. at ¶ 8(d)(ii).

A. The Sentences for the Financial and Political Contribution Cases Should be Ordered to Run Concurrently.

Per the Government's recommendation, the Court should order the sentences in Mr. Lindberg's cases to run concurrently. Such a determination is in accordance with U.S.S.G. § 5G1.2. See Application Note 1, U.S.S.G. § 5G1.2 (instructing that sentences on multiple counts of conviction "are to be imposed to run concurrently to the extent allowed by the statutory maximum sentence of imprisonment for each count of conviction").

Indeed, this Court has previously stated that it views the Financial and Political Contribution cases as "overarching cases" and clarified that "[i]t's not one where the Court is going to go and try to be stacking stuff." May 15, 2024 Trial Transcript at 1032: 19-24, PC Dkt. Entry No. 450. The Court is correct that the two cases are inextricably intertwined. The Government has claimed that Mr. Lindberg sought a different regulator in the Political Contribution case to allow his insurance companies to maintain largely illiquid affiliated investments of forty percent of their total holdings, and it alleges in the Financial case that Mr. Lindberg misrepresented the status of those affiliated investments to the regulator. See Bill of Indictment in Financial case (Dkt. Entry No. 1).

In addition to Section 5G1.2, the imposition of concurrent sentences is consistent with the provisions of U.S.S.G. § 5G1.3. See U.S.S.G. § 5G1.3(b) ("If … a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction … the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment"). See further discussion of Section 5G1.3 in Section IV.B infra.

B. Mr. Lindberg's Concurrent Sentences Should be Reduced for Time Served.

As noted, the Government has agreed in the plea agreement to not object if the Court recommends that the Bureau of Prisons ("BOP") applies credit for any time served to the consolidated sentence for each case. Fin. Dkt. Entry No. 40 ¶ 8(d)(ii). Here, Mr. Lindberg should receive credit against a consolidated sentence for the two separate periods of time that he has served: (1) the 633 days that he spent in federal prison at FPC Montgomery following his initial conviction in the Public Contribution case before the Fourth Circuit's reversal of that conviction in June of 2022; and (2) the 561 days that he has served at the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center since entering a plea in the Financial Case and voluntarily surrendering to the U.S. Marshals Service in November 2024. The time served by Mr. Lindberg totals approximately 39.8 months. As explained in detail below, due to the complexity of the issue of applying credit for time served given the unprecedented procedural posture of this case, Mr. Lindberg respectfully requests that the Court reduce the sentences that it ultimately imposes in each case by 39.8 months to ensure that Mr. Lindberg receives credit for the time that he has served in advance of sentencing.

Credit for time served against both sentences is supported by the fact that the two cases are "all part of the same parcel" (May 15, 2024 Trial Transcript at 1032:19-21) and involve relevant conduct to one another under the principles of U.S.S.G. § 1B1.3. Giving Mr. Lindberg credit for time served against both sentences is also consistent with U.S.S.G. § 5G1.3(b), which covers the analogous situation of when credit for time served should be applied for an undischarged term of imprisonment. In such a case, if "a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction … the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons." 18 U.S.C. § 3553(b); see also United States v. Jones, 1998 U.S. App. LEXIS 19171, at *21 (4th Cir. 1998) (Section 5G1.3 "attempts to achieve some coordination of sentences imposed in such situations with an eye toward having such punishments approximate the total penalty that would have been imposed had the sentences for the different offenses been imposed at the same time (i.e., had all of the offenses been prosecuted in a single proceeding)") (nonpublished disposition) (quoting Witte v. United States, 515 U.S. 389, 404 (1995)).

Although Mr. Lindberg is entitled to credit for time served against both sentences, whether BOP would apply credit for time served against both sentences is a complex issue and appears unlikely given the unique procedural posture of this case. Counsel for Mr. Lindberg has conducted extensive research on this issue, but has been unable to locate any case involving the issue of credit for time served by a defendant in a similar posture – that is, where a defendant has been charged in two separate prosecutions involving relevant conduct more than three years apart; where the first prosecution resulted in a conviction that was vacated and the defendant served time in prison prior to the vacating of that conviction; where the two cases are subsequently consolidated for a sentencing hearing; and where a defendant voluntarily surrendered and served additional time in prison prior to the consolidated sentencing hearing. Thus, this case appears to involve an issue of first impression as to whether BOP would apply credit for the two separate periods of imprisonment that Mr. Lindberg has served in advance of the consolidated sentencing hearing.

18 U.S.C. § 3585(b) sets forth the circumstances under which BOP can award credit for prior time spent in custody. See United States v. Wilson, 503 U.S. 329 (1992). It provides as follows:

A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

(1) as a result of the offense for which the sentence was imposed; or (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence.

18 U.S.C. § 3585(b).

In the present case, it does not appear that BOP will apply credit against Mr. Lindberg's sentence in the Financial case for the 633 days Mr. Lindberg spent in federal custody after his first trial (and before the Fourth Circuit's reversal) given the fact that this sentence was imposed in the Political Contribution case more than three years before Mr. Lindberg was ever charged in the Financial case. Moreover, Section 3585 only permits credit for time served "that has not been credited against another sentence." 18 U.S.C. § 3585(b). Thus, it appears that this language would prevent BOP from awarding credit for time served against the Financial case sentence if it awards credit for this same time against the Political Contribution sentence.

Likewise, it does not appear that BOP would give Mr. Lindberg credit against both sentences for the 561 days that he has served after pleading guilty in the Financial case and voluntarily surrendering in November 2024. Once again, because Section 3585(b) only allows credit to be given for time "that has not been credited against another sentence," BOP would not be able to credit Mr. Lindberg for the time he has served against both the Political Contribution sentence and the Financial case sentence. Rather, BOP would only be able to credit this time against one of the sentences that it imposes. See Wilson, 503 U.S. at 337 (noting that under Section 3585(b) "Congress made clear that a defendant could not receive a double credit for his detention time").

Because it is unlikely that BOP will award Mr. Lindberg credit against both sentences for the 39.8 months that he has spent in custody prior to the date of sentencing, Mr. Lindberg respectfully requests that the Court adjust or vary downward its ultimate sentence in each case by an additional 39.8 months and make clear that this adjustment or variance is being granted as a credit for a period of imprisonment that will not be credited by BOP. Cf. U.S.S.G. § 5G1.3, cmt. n. 2(C) (noting that if the court adjusts a sentence for a period of time already served, the court should note on the Judgment "that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons"). Such a result is justified by the fact that the two cases involve "relevant conduct" to each other; Mr. Lindberg has, in fact, served this time and deserves full credit for it; the Government does not object to concurrent sentences and for credit for time served being applied to both sentences; and any other result would result in Mr. Lindberg being penalized for the fortuity of the timing of the separate prosecutions. See United States v. Coles, 721 Fed. Appx. 257, 258 (4th Cir. 2018) (Section 5G1.3 "operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence") (internal quotation marks and citations omitted).

If the Court is not inclined to adjust or vary downward 39.8 months against both sentences, the Court can attempt to ensure that Mr. Lindberg receives credit for time served against both cases by: (1) directing that BOP credit Mr. Lindberg for the 39.8 months that he has

served as against the Political Contribution sentence only; and (2) adjusting downward the Financial case sentence by an additional 39.8 months pursuant to U.S.S.G. § 5G1.3(b) or (d).

It appears that BOP would be able to credit the time served against the Political Contribution sentence only (if the Court does not adjust or downward vary by this amount under U.S.S.G. § 5G1.3) pursuant to 18 U.S.C. § 3585(b). However, as discussed, if BOP credits the prior time served against the Political Contribution sentence, it does not appear that BOP would also credit the time served against the Financial case sentence under 18 U.S.C. § 3585(b).

Nevertheless, if the Court directs BOP to credit the time served against the Political Contribution sentence only, the time served essentially become an "undischarged" term of imprisonment when viewed against the Financial case sentence.

As discussed, U.S.S.G. § 5G1.3(b) requires a downward adjustment by the Court for any imprisonment already served on an undischarged term of imprisonment that will not be credited by BOP where the offense involves relevant conduct. This guideline provides, in pertinent part:

If subsection (a) does not apply 9, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons U.S.S.G. § 5G1.3(b)(1).

According to Application Note 2, "Subsection (b) applies in cases in which all of the prior offense is relevant conduct to the instant offense under the provisions of subsection (a)(1), (a)(2), or (a)(3) of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 5G1.3, cmt. n. 2(A). Thus, Section 5G1.3(b) applies where, as here, the term of imprisonment at issue (the Financial case conviction) results from another offense that is relevant conduct to that case (the Political Contribution case). In such instances, Section 5G.1.3(b) makes clear that the Court "shall" adjust the sentence for any period of imprisonment not already served if the court determines that such period of imprisonment will

Subsection (a) provides that "[i]f the instant offense was committed while the defendant was serving a term of imprisonment (including work release, furlough, or escape status), or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment." U.S.S.G. § 5G1.3(a). Here, this section is not applicable because the conduct resulting in the Financial case conviction did not occur while Mr. Lindberg was serving time in the Political Contribution case or after sentencing in the Political Contribution case.

not be credited to the federal sentence by BOP. U.S.S.G. § 5G1.3(b)(1); see also United States v. Descally, 254 F.3d 1328, 1333-34 (11th Cir. 2001) (where state sentence arose out of conduct which formed part of federal conspiracy and constituted relevant conduct at the federal sentencing, district court erred in failing to apply Application Note 2 to Section 5G1.3(b) and take into account time already served for the robbery that constituted part of the same misconduct in violation of the Hobbs Act). 10 Even if the Court were to determine

that only part of the Political Contribution case consists of relevant conduct with respect to the Financial case, a downward adjustment from the Financial case sentence for the 39.8 months Mr. Lindberg has served would be appropriate pursuant to subsection (d) of U.S.S.G. § 5G1.3. "Cases in which only part of the prior offense is relevant conduct to the instant offense are covered in subsection (d)." U.S.S.G. § 5G1.3(d), cmt. n. 2(A); see also United States v. Nelson, 982 F.3d 1141, 1145 (8th Cir. 2020) ("a term for non-relevant conduct or a mixture of relevant and non-relevant conduct is covered by § 5G1.3(d)"). 11

Application Note 2(C) to U.S.S.G. § 5G1.3(b) further instructs the Court: "If subsection (b) applies, and the court adjusts the sentence for a period of time already served, the court should note on the Judgment in a Criminal Case Order (i) the applicable subsection (e.g. § 5G1.3(b)); (ii) the amount of time by which the sentence is being adjusted; (iii) the undischarged term of imprisonment for which the adjustment is being given and the relevant case information (including docket number); and (iv) that the sentence imposed is a sentence reduction pursuant to § 5G1.3(b) for a period of imprisonment that will not be credited by the Bureau of Prisons."

Section 5G1.3(d) provides that "[i]n any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." Application Note 4(E) further provides that "[i]f the court does account for an undischarged term of imprisonment under subsection (d) in imposing the sentence, the Commission recommends that the court clearly state that the sentence was imposed pursuant to 18 U.S.C. § 3553(a), rather than as a credit for time served, to avoid confusion with the Federal Bureau of Prisons' exclusive authority provided under 18 U.S.C. § 3585(b) to grant credit for time served under certain circumstances." U.S.S.G. § 5G1.3, cmt. n. 4(E). Thus, Application Note 4(E) makes it clear that where the prior time served was for a mixture of relevant and non-relevant conduct, the court has discretion under Section 5G1.3(d) to adjust the

In short, the issue of credit for time served is complicated due to the unique and complex procedural history of this case. Mr. Lindberg should receive credit for time served against both sentences since the conduct at issue is interrelated, he has already spent nearly 40 months incarcerated, and the Government does not object to concurrent sentences or to credit for time served being applied to both sentences. It is respectfully submitted that the simplest manner of ensuring that Mr. Lindberg gets credit for this time served against both sentences is to adjust or vary downward by an additional 39.8 months from the sentences imposed in both cases. Alternatively, the Court may direct BOP to credit the Political Contribution sentence only for the 39.8 months Mr. Lindberg has served, and for the Court to adjust downward the Financial case sentence by an additional 39.8 months pursuant to U.S.S.G. § 5G1.3(b) or (d) to help ensure that Mr. Lindberg receives credit for time served across both sentences.

C. Mr. Lindberg's Concurrent Sentences Should be Reduced Further Based on

the Amount of Credits he Earned under the First Step Act that were Forfeited when the Fourth Circuit Vacated his Initial Sentence.

The Court should vary downward from both sentences by an additional 285 days (approximately 9.5 months) for the reduction in Mr. Lindberg's sentence that Mr. Lindberg earned during his incarceration at FPC Montgomery under the First Step Act that was forfeited following the vacating of his initial sentence by the Fourth Circuit. "The First Step

Act of 2018 ('FSA') provides qualified federal prisoners the incentive of time credits to shorten their sentences in

sentence downward and provide credit for the prior time served when imposing a federal sentence. See Nelson, 982 F.3d at 1145 ("All of the time that [the defendant] served in state custody was for a mixture of relevant and non-relevant conduct, so the district court had discretion whether to give credit for that time when imposing the federal sentence"); United States v. Tapia, No. 12-cr-3012 JB, 2018 WL 839998, at *23, 37 (D.N.M. Feb. 12, 2018) (downward departure pursuant to U.S.S.G. § 5G1.3(d) for prior time served was warranted where the offense for which the defendant was serving a term of imprisonment was "partially within the relevant conduct for the initial offense").

exchange for participation in programs designed to reduce recidivism." Miles v. Bowers, 2026 U.S. App. LEXIS 11998, at *1 (1st Cir. 2026) (citing Pub. L. No. 115-391, §§ 101-102, 132 Stat. 194). The FSA sets forth a detailed scheme for awarding credits that certain federal prisoners may earn for participating in "evidence-based recidivism reduction [('EBRR')] programming." Id. at *2 (citing 18 U.S.C. § 3632(d)(4)). The statute also provides for the earning of credits when certain prisoners participate in "productive activities," which are defined as activities "designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating." Id. at 2 n.3 (citing 18 U.S.C. § 3635(5)).

The "relevant timing for FSA eligibility is commencement of the sentence," and the FSA requires that federal prisoners be provided with the opportunity to actively participate in EBRR "throughout their entire term of incarceration." Id. at *18, 24 (citing 18 U.S.C. § 3621(h)(6)). An inmate initially earns FSA time credits at a rate of "10 days of time credits for every 30 days of successful participating in [EBRRs] or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). However, a prisoner determined to be at a minimum or low rate of recidivating over two consecutive assessments "shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(ii). 12 Inmates who qualify for the additional five days of FSA time credits generally do so after the first six months of earning FSA credits at the rate of 10 days per month. See, e.g., Lakosen v. Eischen, No. 22-cv-2868, 2023 U.S. Dist. LEXIS 71518, at *3 (D. Minn. Apr. 25, 2023); Aipoalani v. Derr, No. 23-cv-00375, 2023 U.S. Dist. LEXIS 180605, at *6 (D. Haw. Oct. 6, 2023).

An inmate may earn a maximum of 365 days of FSA credit towards early transfer to supervised release. 18 U.S.C. § 3624(g)(3).

Here, following Mr. Lindberg's initial sentencing on August 19, 2020, Mr. Lindberg was incarcerated at FPC Montgomery for 633 days. During this time period, Mr. Lindberg was determined to be at a minimal or low-level risk of recidivating, and he participated in EBRR and "productive activities" throughout the entire term of his incarceration. Mr. Lindberg's EBRRs and productive activities included the following: employment as an orderly for housekeeping work from the beginning of his incarceration until he was released; Mr. Lindberg took classes and became a certified prison housekeeper; Mr. Lindberg taught several classes including stress management, start-ups, goal setting, and preparing for a job interview; Mr. Lindberg took several classes at Adams State University's prison correspondence program and earned credits toward a master's degree; and Mr. Lindberg took other classes at FPC Montgomery on a wide range of topics, including health and wellness and business.

Based on the above EBRRs and productive activities, Mr. Lindberg earned 10 days of FSA credits during the first six months of his incarceration. During the remaining approximately 15 months of his incarceration, he earned FSA credits at the rate of 15 days per month. In total, Mr. Lindberg earned approximately 285 days of FSA credits.

However, as the result of the Fourth Circuit's vacating of Mr. Lindberg's initial sentence, all of the FSA credits Mr. Lindberg earned have now been lost. Since the sentence was vacated, the FSA credits effectively disappeared. As noted, such credits are only earned when a federal sentence "commences." See 18 U.S.C. § 3632(d)(4)(B(ii). Here, because his earlier sentence was vacated, Mr. Lindberg's sentence has not yet commenced. The 633 days that Mr. Lindberg served will either be accounted for via a downward adjustment (if the Court agrees with Mr. Lindberg's request in Section IV.B above), or, at most, treated as "credit for prior custody" under 18 U.S.C. § 3585(b). Since the 633 days will not be considered time served following the commencement

of Mr. Lindberg's sentence, Mr. Lindberg will not receive credit for the time reduction that he previously earned under the FSA.

Given the above, the Court should downward vary an additional 285 days (approximately 9.5 months) from the concurrent sentences in each case to provide credit for the FSA credits that Mr. Lindberg previously earned. Mr. Lindberg earned these credits during his prior service through his prison jobs, the classes that he attended and taught, and the other EBRRs and productive activities he participated in. Mr. Lindberg deserves credit for this time that was previously earned. Mr. Lindberg should not be penalized by 9.5 months for the vacating of his earlier conviction.

V. Request for Downward Variance Based on Extraordinary Restitution

Even before the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), extraordinary restitution was well-recognized as a basis for a downward departure. See United States v. Weinberger, 91 F.3d 642, 645 (4th Cir. 1996) (holding pre-Booker that extraordinary restitution may be a basis for downward departure where it "shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present") (internal quotation marks omitted); United States v. Kim, 364 F.3d 1235, 1240-41 (11th Cir. 2004) (citing numerous authorities holding that extraordinary restitution may support downward departure).

Following Booker, courts have similarly concluded that a defendant's restitution can support a downward variance from the Guidelines range. See, e.g., United States v. Curry, 523 F.3d 436, 440 (4th Cir. 2008) (varying downward where defendant had made full restitution); United States v. Brisson, No. 5:13-cr-34, 2015 U.S. Dist. LEXIS 340, at *11 (D. Vt. Jan. 5, 2015)

(noting that "the court has granted variances from the Sentencing Guidelines based upon full or substantial payment of restitution").

As discussed in more detail in Section II.C. supra, both before and since the Special Master's appointment in January 2025, Mr. Lindberg has taken numerous significant steps to facilitate the payment of restitution and, per his Response and Objection to the Special Master's Restitution Recommendation (Fin. Dkt. Entry No. 132), has made full restitution. These steps include, as examples, making hundreds of millions of dollars in principal and interest payments to the victim insurance companies; voluntarily executing assignment agreements and releases to assist the Special Master and facilitate his work in selling the Primary Restitution Assets; dismissing lawsuits at the request of the Special Master to

facilitate asset sales; providing tax refund checks totaling more than $570,000.00 from one of the SACs to the Special Master; and voluntarily relinquishing a $40 million tax escrow to facilitate the Clanwilliam sale. To date, Mr. Lindberg's assistance has been extremely beneficial to victims in the Financial case. For example, the Clanwilliam sale has resulted in the distribution of $157 million to individual policyholders.

Mr. Lindberg and his counsel have also provided substantial assistance to the Special Master through numerous weekly conferences (since February of 2025) with the Special Master, Paladin and the USAO, which helped the Special Master understand the complex financial history of Mr. Lindberg's assets and break through a logjam of lawsuits and orders that stalled restitution efforts at the State level and in other federal courts. See Section II.C. supra. Indeed, had Mr. Lindberg not cooperated with the Special Master, it is likely that the Clanwilliam sale would have been delayed, resulting in creditors taking over the entity and having no proceeds available for restitution. Based on the totality of Mr. Lindberg's restitution efforts and payments to date, he

respectfully requests that the Court grant a downward variance based on this well-established variance factor.

VI. The Sentencing Guidelines and Additional Factors to be Considered Under 18 U.S.C.

§ 3553 As discussed in more detail below, it is respectfully submitted that the following factors further justify a variance or reduction of the offense level in this case: (1) the loss amount in the Presentence Report substantially overstates the seriousness of the offense; (2) the need to consider sentencing disparities among co-defendants under 18 U.S.C. § 3553(a)(6); and (3) Mr. Lindberg's history and characteristics, including procuring and building the assets that have been used to make restitution payments.

Mr. Lindberg specifically withdraws any other objections to the PSR other than those mentioned above and briefed in this Memorandum.

A. The Fraud Guidelines Drastically Overstate the Seriousness of the Offense.

The Guidelines range in this case drastically overstates the nature of the offense. Although there were no victims in the Political Contribution case, there was a financial loss applied under the Sentencing Guidelines in the Financial case, and the resulting adjusted Guidelines range is driven largely by the fraud loss table contained in U.S.S.G. § 2B1.1, which increases the offense level by 30 points.

Courts have recognized that the Guidelines' formulaic and excessive emphasis on the loss amount in fraud cases can cause the offense level to substantially overstate the seriousness of the offense. Indeed, there is judicial consensus that the Section 2B1.1 loss table can produce unduly harsh sentencing ranges that go far beyond what is sufficient to deter illicit conduct, as they bear little or no connection to the seriousness of the offense or the defendant's culpability. See, e.g., United States v. Moody, No. 13-cr-87-JLK, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug.

5, 2013) (finding that the loss guidelines are "fundamentally flawed"); United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (in securities fraud case, district court rejected Guidelines sentence of 85 years and imposed sentence of 42 months imprisonment, while noting the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Hon. Mark W. Bennett et al., Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform, 102 Iowa L. Rev. 939, 941-44 (2017) ("[A]s the guidelines have become

harsher and crimes both more complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases.").

Thus, numerous courts, including the Western District of North Carolina, have substantially departed or varied from the Guidelines range where, as here, the loss amount results in an offense level that does not properly reflect the seriousness of the offense. For example, in United States v. Kipp, this Court sentenced a defendant in a securities fraud case who was convicted at trial and faced life imprisonment under the Guidelines based on the Probation Office's loss calculation of more than $96 million. Kipp, No. 3:15-cr-244 (W.D.N.C. 2015), Dkt. Entry No. 237 at 9-10. Like Mr. Lindberg, Mr. Kipp argued that the loss amount substantially overstated Mr. Kipp's culpability. Id. at 50. This Court disagreed with the Guidelines sentence and varied downward from life imprisonment and sentenced Mr. Kipp to 54 months' imprisonment. Kipp, No. 3:15-cr-244, Dkt. Entry No. 246; see also United States v. Anderson, No. 3:10-cr-260-MOC, 2022 U.S. Dist. LEXIS 195407, at *4 (W.D.N.C. 2022) (varying downward where "the 16-level increase for loss overstates the Defendant's responsibility and gain in this matter").

Numerous other courts have also varied downward substantially from the Guidelines range where the loss amount overstates the seriousness of the offense. See, e.g., United States v. Block, No. 16-cr-595 (S.D.N.Y. 2016), Dkt. Entry No. 155 at 20, Dkt. Entry No. 162 (where defendant faced a Guidelines sentence of life imprisonment based on a purported loss of $3 billion, court varied downward and sentenced defendant to 18 months' imprisonment); United States v. Kalili, 100 Fed. Appx. 903, 905-06 (4th Cir. 2004) (affirming downward departure where offense level was based on intended loss and it "substantially overstated the seriousness of the crime") (non- published disposition); United States v. Gupta, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (where defendant faced an 18 level increase based on loss amount under U.S.S.G. § 2B1.1, district court rejected Guidelines sentence and imposed a sentence of 24 months imprisonment, noting that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice"). 13 It is respectfully submitted that the combination of the extraordinary restitution in this case and the Guidelines' general overemphasis on loss amount warrants a substantial downward variance from the Guidelines range.

See also United States v. Faibish, No. 12-cr-265, 2015 U.S. Dist. LEXIS 101200, at *7 (E.D.N.Y. Aug. 3, 2015) ("the Court finds that a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon Faibish's sentencing range beyond any reasonable proportion to his crimes"); United States v. Cheng, 96 F.3d 654, 656 (2d Cir. 1996) (district court departed downward because $3.5 million loss overstated the seriousness of the offense); United States v. Edwards, 595 F.3d 1004, 1010, 1018 (9th Cir. 2010) (upholding a probationary sentence far below the Guideline range as substantively reasonable in a fraud case where the sentencing judge stated that the Guidelines range calculated using intended loss "overstated the circumstances" of the defendant's case).

B. The Need to Consider Sentencing Disparities Also Supports a Downward

Variance.

Mr. Lindberg respectfully requests that the Court also consider the sentences imposed (or to be imposed) on other culpable defendants in the Political Contribution and Financial cases pursuant to 18 U.S.C. § 3553(a)(6). While it is true that the other defendants had

lesser roles than Mr. Lindberg, and that Mr. Lindberg was no doubt managing the relevant activities, they were executive-level defendants who were integrally involved in the fraudulent activities. Mr. Lindberg is admittedly not identically situated to each of these co-defendants, but there should not be a significant gulf between their sentences (including no sentence through a DPA/NPA) and Mr. Lindberg's sentence. See United States v. Shields, 126 F.4th 356, 360 (4th Cir. 2025) (vacating and remanding for resentencing where district court failed to address defendant's "non-frivolous argument for a downward variance" based on an unwarranted sentencing disparity; "Congress has expressly instructed sentencing courts to consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct'") (quoting 18 U.S.C. § 3553(a)(6)). Additionally, based upon information and belief, Mr. Lindberg's co-defendants have paid financial amounts that are dwarfed by Mr. Lindberg's restitution efforts and asset sales.

In the Political Contribution case, co-defendant John Gray was integrally involved in the relevant bribery activities, and he received a 30-month sentence. Co-defendant Robin Hayes was sentenced to probation and subsequently pardoned. Mr. Hayes' actions and role were indisputably integral to carrying out the charged conspiracy – indeed, he is on video promising to "getter dun." And unlike Mr. Lindberg, Mr. Hayes compounded his complicity by lying repeatedly to the FBI, which resulted in additional charges under 18 U.S.C. § 1001. Mr. Lindberg acknowledges, of

course, that Mr. Hayes is not equally situated to Mr. Lindberg in terms of his overall involvement in the relevant charges.

Similarly, the Court should consider the dispositions and sentences of other culpable individuals in the Financial case, including Mr. Herwig, Mr. Solow and Mr. Bostic. As discussed, the Government filed separate Bills of Information against Mr. Herwig and Mr. Solow on December 19, 2022, charging them with conspiring with Mr. Lindberg and each other to engage in wire fraud, money laundering, and investment advisor fraud. See Solow, No. 3:22-cr-315, Dkt. Entry No. 3; Herwig, No. 3:22-cr-314, Dkt. Entry No. 3. Shortly thereafter, the Government filed a Deferred Prosecution Agreement with Mr. Solow. Solow, No. 3:22-cr-315, Dkt. Entry No. 6-1 (agreeing to defer prosecution for a period of 60 months and thereafter dismiss the Information). Thus, Mr. Solow will likely not face prosecution for his involvement in the Financial case.

Mr. Herwig was permitted to plead to a single conspiracy charge with a five-year maximum sentence. Mr. Herwig has not yet been scheduled for sentencing by the Court. Based on information and belief, Mr. Herwig will receive a recommendation from the Government for a substantial departure below the 60-month statutory maximum.

As for Mr. Bostic, the Government entered into a Non-Prosecution Agreement with him on July 27, 2023. See https://www.justice.gov/criminal/criminal-vns/case/united-states-v-greg-e- lindberg (last visited May 7, 2026).

None of the above defendants, in either the Political Corruption or Financial cases, have paid any significant restitution or financial penalty. For example, Mr. Bostic's and Mr. Solow's agreements with the Government only require them to pay "Stipulated Forfeiture Amount[s]" of $75,000.00 and $250,000.00, respectively. By contrast, Mr. Lindberg has embraced his restitution obligations via billions of dollars in cash payments, asset transfers and sales, and credits due, as

outlined in his Response and Objection to the Special Master's Restitution Recommendation. See Fin. Dkt. Entry No. 132.

C. Mr. Lindberg's History and Characteristics Warrant Varying Below the Guideline Range.

A downward variance to concurrent 48-month sentences (with credit/variance then applied for all time served and for FSA credits) is also supported by Mr. Lindberg's history and characteristics under 18 U.S.C. § 3553(a)(1). As discussed in more detail below, Mr. Lindberg has worked incredibly hard his entire life and has positively impacted the lives of many people, including family members, employees, and strangers. He has also provided significant support to numerous charities and other worthwhile causes.

Mr. Lindberg came from a very modest upbringing. He was the youngest of six children and the first of his siblings to graduate from college.

Mr. Lindberg attended Yale University. He earned excellent grades and graduated magna cum laude and Phi Beta Kappa, earning a degree in economics in 1993. While in college, Mr. Lindberg started his first company – a home care newsletter he managed out of his dorm room with a $5,000.00 loan.

Following college, Mr. Lindberg moved to the Raleigh-Durham area to start a business. He leased an office, which he initially lived and slept in using a sleeping bag because money was tight. By 1998, Mr. Lindberg's business consisted of 12 people working out of a single room full of folding tables and computers. As he expanded his businesses, later called the Global Growth companies, Mr. Lindberg overcame a number of challenges – for example, changes in regulations for home care agencies led to the loss of over half of his customers in less than six months. Nevertheless, Mr. Lindberg continued to work long hours and was successful in overcoming this setback.

In 2009, Mr. Lindberg faced a personal health crisis that completely derailed his life. Doctors discovered a golf-ball sized tumor at the base of his brain stem. The operation to remove the tumor left Mr. Lindberg unable to walk and permanently deaf in one ear as his left ear canal had to be completely removed. Mr. Lindberg had to re-learn how to walk and make adjustments for his deafness. While overcoming these significant physical challenges, Mr. Lindberg was able to keep his companies afloat and moving forward. And today, the Global Growth family of companies operates in over a dozen countries and has over 7,000 employees worldwide. PSR ¶ 170.

Through Mr. Lindberg's companies, he created well-paying jobs for thousands of employees in North Carolina and elsewhere. As attested to by former employees in letters previously provided to the Court, Mr. Lindberg invested in his employees, was fair to them with opportunities and compensation, and regularly accommodated his employees due to family issues or other hardships. See, e.g., PC Dkt. Entry No. 246 at 16-20; 246-1; 246-3; 246-4; 246-6; 246- 16.

In addition to the jobs he created for thousands of employees, Mr. Lindberg has used his success to improve the lives of numerous others – including friends, family members, colleagues, employees, and total strangers. 14 Similarly, Mr. Lindberg and his companies (at Mr. Lindberg's behest) have a lengthy history and record of giving money to, and otherwise supporting, numerous

Representative examples of Mr. Lindberg's benevolence include: the payment of all expenses for the sister of a friend to enter an alcohol treatment and rehabilitation center

even though Mr. Lindberg had never met this individual (PC Dkt. Entry No. 246-28); providing full support and compensation to an employee and his family after this employee was diagnosed with cancer, saving this employee from "financial ruin" (PC Dkt. Entry No. 246-25); paying for a niece who had been diagnosed with brain cancer to have her eggs frozen so that she and her husband were able to have children in the future (PC Dkt. Entry No. 246-32); and paying four years of tuition and other expenses for a niece to get through college (PC Dkt. Entry. No. 246-32).

charities and worthwhile causes, including setting up eye care clinics and providing eyeglasses for poor people in India; creating scholarships at historically black colleges and universities in North Carolina; and providing substantial donations to food banks and the Special Olympics of North Carolina. See PC Dkt. Entry No. 246 at 15-16; 246-16.

Even while incarcerated, Mr. Lindberg has taken advantage of this time to help other inmates. He has taught a number of classes for other inmates, including classes on stress management, goal setting, and preparing for a job interview. He has used these classes to try to inspire others to be successful when they are released from incarceration. At the same time, Mr. Lindberg has tried to further educate himself by working on a master's degree through Adams State University's prison correspondence program and taking numerous other classes that have been offered. At the same time, Mr. Lindberg has always accepted his role in doing his required duties, such as cleaning toilets and serving as an orderly for housekeeping work during his entire term of incarceration at FPC Montgomery. 15

VII. Conclusion

Based on the foregoing reasons, Mr. Lindberg respectfully asks the Court to (1) initially impose a concurrent sentence of 48-months imprisonment in both the Financial and Political Contribution cases; (2) then vary or adjust downward from the 48-month sentences in both cases by 39.8 months to ensure that Mr. Lindberg receives credit against both sentences for the time that he has spent in incarceration prior to the sentencing hearing in this case; (3) vary downward by an additional 9.5 months for the First Step Act sentence reduction that Mr. Lindberg previously earned while incarcerated at FPC Montgomery, but was lost as a result of the Fourth Circuit's

Mr. Lindberg provided the Court with numerous character letters and additional supporting background information as part of his Sentencing Memorandum that he filed in advance of the initial sentencing hearing held in August 2020. See P.C. Dkt. Entry Nos. 246, 246-1 – 246-42. Mr. Lindberg refers the Court to this submission for further supporting background information.

vacating of his initial conviction in the Public Contribution case; (4) hold that for the purposes of 18 U.S.C. § 3585(a), Mr. Lindberg arrived voluntarily at the Gaston County Jail to commence service of a portion of his sentence on November 12, 2024, and that the Gaston County Jail, the Grayson County Detention Center, and the Pike County Detention Center shall be considered official detention facilities where his sentence is to be served; and (6) delay Mr. Lindberg's federal prison reporting date for any additional time he is required to serve until after the conclusion of all restitution hearings and the entry of a final restitution order so that Mr. Lindberg is available to consult with his attorneys regarding restitution and continue to assist the Special Master.

This the 14th day of May, 2026.

Respectfully submitted,

/s/ James F. Wyatt, IIIx Robert T. Smith (pro hac vice) James F. Wyatt, III KATTEN MUCHIN ROSENMAN LLP (NC State Bar No. 13766) 1919 Pennsylvania Avenue, N.W. Robert A. Blake, Jr. Suite 800 (NC State Bar No. 20858) Washington, DC 20006 WYATT & BLAKE, LLP 202-625-3500 402 W. Trade Street, Suite 101 robert.smith1@katten.com Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net rblake@wyattlaw.net Brandon N. McCarthy (pro hac vice) Rachel M. Riley (pro hac vice) Ryan J. Meyer (pro hac vice)

KATTEN MUCHIN ROSENMAN LLP

2121 North Pearl Street, Suite 1100 Dallas, TX 75201-2591 214-765-3600 brandon.mccarthy@katten.com rachel.riley@katten.com ryan.meyer@katten.com Counsel for Greg E. Lindberg

ARTIFICAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 14th day of May, 2026.

/s/ James F. Wyatt, III James F. Wyatt, III (NC State Bar No. 13766)

WYATT & BLAKE, LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net

**Doc. 168 — Motion to Delay Federal Prison Reporting Date (Wyatt & Blake) (filed 06/04/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA

No. 5:19-CR-22-MOC v. GREG E. LINDBERG, No. 3:23-CR-48-MOC Defendant.

DEFENDANT GREG E. LINDBERG'S UNOPPOSED MOTION TO DELAY FEDERAL PRISON REPORTING DATE

Defendant Greg E. Lindberg ("Mr. Lindberg"), through undersigned counsel, respectfully submits this Motion to Delay his Federal Prison Reporting Date for ninety (90) days, so that Mr. Lindberg can remain available to assist the Special Master and Mr. Lindberg's counsel in connection with the restitution process. In support of this Motion, Mr. Lindberg sets forth the following facts.

1.

In May 2024, Mr. Lindberg was convicted by a jury in Case No. 5:19-cr-22 on charges of conspiracy to commit honest services wire fraud and bribery concerning programs receiving federal funds.

2. Thereafter, on November 12, 2024, Mr. Lindberg pled guilty to charges of conspiracy and conspiracy to commit money laundering in Case No. 3:23-cr-48. Mr. Lindberg voluntarily surrendered to the U.S. Marshals Service and began serving his sentence on the day of his guilty plea.

3. While incarcerated prior to sentencing, Mr. Lindberg and his counsel provided significant assistance and cooperation to the Special Master in this case in connection with the payment of restitution. The Special Master's work has been extremely productive, as it has resulted in, inter alia, more than $314 million being disbursed as restitution payments.

4. To assist in the restitution process, Mr. Lindberg's counsel has participated in weekly meetings with the United States and the Special Master for approximately the last sixteen months. As part of this process, it has been essential for Mr. Lindberg's counsel to have access to Mr. Lindberg on a daily basis to discuss various topics and issues that arise during these meetings.

5. Most recently before his sentencing hearing, Mr. Lindberg was housed by the United States Marshal's Service at the Pike County Detention Center in Pikeville, Kentucky. At the Pike County Detention Center, Mr. Lindberg was permitted access to a computer and the internet which allowed him to communicate back and forth with his attorneys on a daily basis in connection with the restitution process.

6. On May 26, 2026, Mr. Lindberg was sentenced by the Court at a consolidated sentencing hearing. Mr. Lindberg was sentenced to a term of imprisonment totaling 144 months in Case No. 3:23-cr-48, and a concurrent term of imprisonment of 87 months in Case No. 5:19-cr-

22. See Case No. 3:23-cr-48, Dkt. Entry No. 162; Case No. 5:19-cr-22, Dkt. Entry No. 513.

7. Prior to sentencing, the Court entered an Order bifurcating the sentencing hearing

in this matter from any hearing(s) necessary to determine restitution. See Case No. 3:23-cr-48, Dkt. Entry No. 108; Case No. 5:19-cr-22, Dkt. Entry No. 505. The Special Master has entered a Report and Recommendation regarding Restitution (Dkt. Entry No. 106), as well as a Supplemental Report (Dkt. Entry No. 146). Objections to the Report and Recommendation have been filed by Mr. Lindberg. See Case No. 3:23-cr-48, Dkt. Entry Nos. 132 and 151. It is anticipated that there will be additional filings relating to restitution, and that the Court will hold a hearing regarding restitution and thereafter issue a final restitution order.

8. To ensure that Mr. Lindberg remains available to assist his counsel and the Special Master in the restitution process, counsel for Mr. Lindberg requested at the sentencing hearing that

the Court recommend to the Bureau of Prisons that Mr. Lindberg be allowed to remain at the Pike County Detention Center while the restitution process is ongoing. See Sentencing Transcript at 70 (Case No. 3:23-cr-48, Dkt. Entry No. 164; Case No. 5:19-cr-22, Dkt. Entry No. 515). The Court agreed with this request and specifically stated:

For such time as he continues to work with the Special Master and continues to successfully locate and get back some of this money to these folks, then, yes, I think he should be housed at the Pike County facility. Once again, Bureau of Prisons decides designation, but they do listen to the Court's recommendations in most cases. So hopefully in this case, where there's a huge reason for that, that they will listen to the Court.

Id. at 74.

9. Following the sentencing hearing, Mr. Lindberg was transferred to the Grayson County Detention Center in Leitchfield, Kentucky. Counsel for Mr. Lindberg has inquired with the U.S. Marshals Service regarding whether Mr. Lindberg will be transferred to the Pike County Detention Center. The U.S. Marshal's Service has advised that Mr. Lindberg will not be returned to the Pike County Detention Center if BOP designates him to a facility and assigns him a report date. It is counsel's understanding that BOP will likely designate and transfer Mr. Lindberg to a federal prison in the near future. Moreover, at the Grayson County Detention Center, Mr. Lindberg's ability to communicate with his counsel on a daily basis is restricted as Mr. Lindberg has no access to a computer and no access to a phone.

10. In order to have Mr. Lindberg available to counsel to assist in the restitution process, Mr. Lindberg respectfully requests that the Court enter an Order delaying his federal prison reporting date for 90 days. Mr. Lindberg also requests that the Court ask the U.S. Marshals Service to transfer Mr. Lindberg to the Pike County Detention Center during this period so that he can continue to communicate with his counsel in connection with the restitution process.

11. Counsel for Mr. Lindberg has communicated with the United States concerning the filing of this Motion. Assistant United States Attorney Daniel Ryan has advised that the United States does not object to the granting of this Motion.

12. A proposed Order is being filed contemporaneously with this Motion.

This the 4th day of June, 2026.

Respectfully submitted,

/s/ James F. Wyatt, IIIx Robert T. Smith (pro hac vice) James F. Wyatt, III KATTEN MUCHIN ROSENMAN LLP (NC State Bar No. 13766) 1919 Pennsylvania Avenue, N.W. Robert A. Blake, Jr. Suite 800 (NC State Bar No. 20858) Washington, DC 20006 WYATT & BLAKE, LLP 202-625-3500 402 W. Trade Street, Suite 101 robert.smith1@katten.com Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net rblake@wyattlaw.net Brandon N. McCarthy (pro hac vice) Rachel M. Riley (pro hac vice) Ryan J. Meyer (pro hac vice)

KATTEN MUCHIN ROSENMAN LLP

2121 North Pearl Street, Suite 1100 Dallas, TX 75201-2591 214-765-3600 brandon.mccarthy@katten.com rachel.riley@katten.com ryan.meyer@katten.com Counsel for Greg E. Lindberg

ARTIFICAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 4th day of June, 2026.

/s/ James F. Wyatt, III James F. Wyatt, III (NC State Bar No. 13766)

WYATT & BLAKE, LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net

**Doc. 172 — Motion to Stay (filed 06/09/2026)**

DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION (I) TO STAY ALL FURTHER ASSET SALES AND ASSET-SALE PROCESSES AND TO STAY ENFORCEMENT OF THE PRELIMINARY ORDER OF RESTITUTION (DOC. NO. 161); (II) TO CORRECT AND AMEND THE PRELIMINARY ORDER OF RESTITUTION TO CONFORM TO THE MANDATORY VICTIMS RESTITUTION ACT; (III) TO RETURN THE PRIMARY RESTITUTION ASSETS TO DEFENDANT'S CONTROL ON THE GROUND THAT RESTITUTION HAS BEEN FULLY PAID AND OVERPAID; AND (IV) IN THE ALTERNATIVE, TO RETURN THE DE MINIMIS SACS IDENTIFIED IN THE CLANWILLIAM SALE ORDER TO DEFENDANT'S CONTROL WITH IMMEDIATE EFFECT

Defendant Greg E. Lindberg, by and through undersigned counsel, respectfully moves this Court, pursuant to its inherent supervisory authority over the Special Master and the proceedings on its docket, the Mandatory Victims Restitution Act (the "MVRA"), 18 U.S.C. §§ 3663A–3664, Federal Rule of Civil Procedure 53 (as applied by analogy to the Court's supervision of court- appointed officers in this criminal proceeding), and the All Writs Act, 28 U.S.C. § 1651(a), for an Order: (i) staying all further sales of Mr. Lindberg's assets, and all further asset-sale processes, that have been initiated, are being conducted, or are contemplated as a means of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Order of Restitution entered on May 28, 2026 (Doc. No. 161) (the "Preliminary Restitution Order"), including the issuance or recording of any abstract of judgment, pending the Court's adjudication of Defendant Greg E. Lindberg's Response and Objection to

Special Master's Report and Recommendations Regarding Restitution (the "Response"); (ii) correcting and amending the Preliminary Restitution Order to conform to the MVRA, including by striking the unexplained $30,000,000 by which the Order exceeds the figure the Special Master recommended, by itemizing and applying the $2.89 billion mandatory offsets and credits documented in the Response, by excluding any pre-judgment interest, and by deferring enforceability until those corrections are made, as set forth in Paragraph 6 below; (iii) directing that the Primary Restitution Assets, as defined in the Order Appointing Special Master (Doc. No.

56) (the "Special Master Order"), be returned to Mr. Lindberg's full ownership and control,

because restitution under the MVRA has been fully paid and, indeed, overpaid by approximately $1.244 billion measured against the Court's own entered figure; and (iv) in the alternative, directing that the eight de minimis Specified Affiliated Companies expressly identified in the Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies (Doc. No. 66) (the "Clanwilliam Sale Order") as having no further material value to NHC Holdings, LLC ("NHC") — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited (collectively, the "De Minimis SACs") — be returned to Mr. Lindberg's full ownership and control with immediate effect.

In support of this Motion, Mr. Lindberg states as follows:

1. On May 4, 2026, Mr. Lindberg filed his Response objecting to the Special Master's

Report and Recommendations Regarding Restitution (ECF No. 106) (the "Restitution Report"), and to the Special Master's preliminary proposed restitution figure of $1,625,000,000. On May 28, 2026 — without first adjudicating that Response — the Court entered the Preliminary Restitution Order (Doc. No. 161), ordering restitution in the total amount of $1,655,000,000, which is $30,000,000 more than the Special Master recommended. The Preliminary Restitution Order

declares that the restitution is "due and payable immediately," provides that it "shall be enforceable as a judgment of the United States," and authorizes the Clerk, at the request of any payee or the Special Master, to issue an abstract of judgment that becomes a lien on Mr. Lindberg's property. Doc. No. 161 at 3–5. This Motion is addressed to that Order.

2. The Response demonstrates, on the basis of contemporaneous documentary

evidence and verified statements of fact, that the Special Master's proposed figure is overinflated by at least $2.899 billion in required offsets, reductions, and credits, with the result that — when the MVRA is correctly applied — Mr. Lindberg's net restitution obligation is zero, and Mr. Lindberg has overpaid by approximately $1.274 billion the maximum sum the Special Master proposed.

3. The documented categories of mandatory offsets and reductions identified in the

Response and the supporting Statement of Facts (filed May 4, 2026) and Supplemental Statement of Facts filed herewith total $2,899,418,383, against a maximum proposed restitution figure of $1,625,000,000 — a documented net overpayment of approximately $1,274,418,383. Measured against the Court's own entered figure of $1,655,000,000, those same documented offsets exceed the Preliminary Restitution Order by approximately $1,244,418,383, so that net restitution remains zero and the documented overpayment is approximately $1.244 billion even on the Court's own numbers.

4. The contrast between Mr. Lindberg's twenty-year track record of value creation

and the Rehabilitator's six-plus years of documented value destruction is dispositive and is directly relevant to the relief sought here. The factual record before this Court establishes the following on the basis of contemporaneous, third-party documentary evidence:

a) Mr. Lindberg's twenty-year track record of value creation. Mr. Lindberg built the Specified Affiliated Companies (the "SACs") from nothing over more than two decades. Through that work, he generated nearly $1 billion of his own personal capital, which he invested into the North Carolina Insurance Companies (the "NCICs") as a net contributor to those companies' surplus. SOF ¶ 5. Under his management between 2019 and 2024, the SACs grew from approximately $1.5 billion in aggregate value to approximately $3.4 billion — an increase of approximately $1.9 billion in enterprise value over a five-year period — corroborated by the arm's-length, signed Q1 2024 purchase agreement with Quadro Acquisition Corp. One (NASDAQ: QRDO) at a 22.14x EBITDA multiple consistent with public-market comparables. Lindberg's companies collectively generated EBITDA in excess of $300 million in 2024. The public-company EBITDA multiples used in the Quadro pricing have not declined; the comparable five-company average has in fact increased from 22.14x in Q1 2024 to approximately 24.37x as of November 2025, further confirming that the Quadro valuation was conservative, not inflated. b) The Rehabilitator destroyed the $454 million NCIC baseline. By contrast, under the management of Mike Dinius as Special Deputy Rehabilitator, the NCICs were ultimately liquidated, destroying the $454 million baseline value that the NCICs' own management — operating under the Rehabilitator's

supervision — had established as of November 5, 2018, eighteen days after Mr. Lindberg transferred operational control. SOF ¶¶ 55–62 & Ex. J.

c) More than $165 million in fees extracted from the NCIC rehabilitation estates.

Over the past seven years, the Rehabilitator and his consultants have charged the NCIC rehabilitation estates more than $165 million in fees. Those fees continue today at the rate of approximately $2.5 million per month — a draining of the very estates the Rehabilitator was supposed to be preserving for the benefit of policyholders. SOF ¶ 58(a)–(d). d) $137 million in investment losses on portfolio decisions unrelated to Mr.

Lindberg. Independent of any conduct of Mr. Lindberg, the Rehabilitator and his agents incurred approximately $137 million in losses on corporate bond and other investment decisions that were made by the Rehabilitator's team after Mr. Lindberg transferred control. These losses occurred on the Rehabilitator's portfolio, on the Rehabilitator's watch, and have no causal connection to Mr. Lindberg whatever.

SOF ¶ 58(b). e) Multiple billion-dollar-plus monetization transactions blocked or sabotaged.

The Rehabilitator blocked, refused, or sabotaged at least four separate monetization transactions, each of which would have fully paid the NCIC policyholders and creditors: (i) the November 22, 2018 Ares Management Letter of Intent, covering 100% of GBIG (including the NCICs and the affiliated-loan portfolio); (ii) the February 8, 2019 Oaktree Capital Management $1.0 billion Global Solution; (iii) the 2023 Montshire/Alban offer; and (iv) the Q1 2024 Quadro Acquisition Corp.

One transaction valuing the SAC group at approximately $3.4 billion. Each of these was a free, deliberate, and informed choice of the victim's representative, made

after Mr. Lindberg transferred control. SOF ¶¶ 9, 16, 58, 75, 76; Supp. SOF ¶¶ 4– 29. f) Suing prospective buyers to prevent monetization. In at least one instance, the Rehabilitator and his agents went so far as to file litigation against a prospective arm's-length buyer that had submitted an offer to purchase the NCICs — a transaction that would have produced cash to pay the policyholders in full. That litigation succeeded in driving the buyer away. The Rehabilitator's entities did not merely fail to sell to a willing arm's-length buyer; they affirmatively used the courts to prevent the sale. This is the very definition of a victim's "choice to hold collateral rather than to reduce it to cash within a reasonable time" under Robers v. United States, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring). g) Below-market fire-sale of Clanwilliam. On the Rehabilitator's watch in September 2025, the Clanwilliam Group was sold to TA Associates for approximately $450 million — approximately $474 million below the $880 million signed Quadro purchase-agreement valuation negotiated by Mr. Lindberg less than eighteen months earlier. SOF ¶ 75 & Exs. G3, I3, I4. Public-company comparables establish that Clanwilliam's value did not decline; if anything, the comparable EBITDA multiples appreciated over that interval. The undervaluation is a direct consequence of selling a public-company-quality asset to a private-equity buyer at a discount, after the Rehabilitator blocked the higher public-market Quadro transaction. h) Pre-maturity sale of $1.006 billion in protective bank zero-coupon bonds.

Rather than holding to maturity the $1,006,239,867 face-value bank-issued zero-

coupon bonds backing the Principal Protected Notes — instruments whose entire purpose was to protect the affiliated-loan principal from any credit-related downside — the Rehabilitator unilaterally sold those instruments for approximately $394 million,

crystallizing a $611.6 million loss on assets that, by their structure, were contractually guaranteed to pay par. SOF ¶¶ 48–54.

5. The Preliminary Restitution Order declares the full $1,655,000,000 "due and payable immediately" and enforceable as a judgment, and the Special Master and/or the Government are presently conducting, or are about to conduct, additional asset-sale processes intended to generate proceeds to satisfy that figure. Allowing those sales and that enforcement to proceed before the Court corrects the Order and resolves the Response would (i) cause the irreversible liquidation of Mr. Lindberg's assets to pay a restitution obligation that, on the documentary record, does not exist as a matter of law; (ii) compound an already documented overpayment of approximately $1.244 billion; (iii) create the very type of windfall to the Pre- Designated Restitution Parties that the MVRA expressly forbids, see United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017); (iv) transfer further assets from the proven value-creator (Mr. Lindberg) to a control structure (NHC, operating under the Rehabilitator's supervision) with a documented six-year track record of value destruction; (v) inflict the further, separate, and continuing irreparable harm of degrading the going-concern value of the Specified Affiliated Companies, all of which are now being managed on a short-term, for-sale basis rather than for sustained operation — a management posture that, by its nature and irrespective of the merits of any underlying sale, depresses enterprise value, defers needed investment, disrupts customer and counter-party relationships, accelerates senior-management attrition, and has already produced one documented $474 million below-market sale (the September 2025 Clanwilliam transaction, Doc. No. 66 & SOF ¶ 75); (vi) cause the irretrievable disbursement of further sale proceeds to the Pre-Designated Restitution Parties, from whom — once funds have been paid out under an MVRA order — the statute provides Mr. Lindberg with no mechanism to recover the funds even if the restitution figure is later corrected downward, see 18 U.S.C. § 3664(j)(2) (statutory remedy is offset against future payments, not clawback from the payee); and (vii) compel further asset sales when, on the documentary record, no further sales are necessary, because the entire gap between Mr. Lindberg's documented offset position ($2,899,418,383) and the Court's entered figure ($1,655,000,000) consists exclusively of credits attributable to prior sales and other transactions that have already occurred — so that, on Mr. Lindberg's documented numbers, the proceeds of any further sales would be owed to Mr. Lindberg, not to the Pre-Designated Restitution Parties, and the present sale program is liquidating Mr. Lindberg's property to fund a recovery that has, by approximately $1.244 billion, already been completed; and (viii) ratify and extend the precedent already set by the recent Beckett sale, which was effectuated without the prior court approval that Paragraph 6(e) of the Order Appointing Special Master expressly requires (Doc. No. 56, ¶ 6(e) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims")) — itself a violation of this Court's express supervisory architecture and a concrete demonstration that, absent the requested stay, further sales of Mr. Lindberg's property will continue to be consummated in derogation of the Court's order, without any opportunity for the Court or Mr. Lindberg to evaluate them ex ante and without any avenue, once consummated, to undo them.

This Motion asks only that asset sales be stayed long enough — until the Court's § 3664 restitution determination fixes the amount actually owed if any — to prevent the irreparable, below-value losses that premature liquidation would inflict. Those forced-sale losses would

reduce, not increase, the funds available to victims. Preserving value until the § 3664 determination serves the same make-whole purpose the plea agreement and the MVRA share, and is consistent with Mr. Lindberg's commitment to marshal assets toward full restitution.

The balance of equities weighs decisively in favor of a brief stay. On one side of the ledger is a concrete, irreparable harm: assets sold below value cannot be recovered, and every dollar lost to a premature, forced sale is a dollar that will never reach the victims this restitution is meant to make whole. On the other side is only delay — a stay lasting no longer than the Court's § 3664 determination, after which any restitution properly owed can be satisfied from assets preserved at their full value. A short stay that protects the estate's value imposes no cognizable hardship on the victims, whose interest lies in maximizing recovery, not in hastening sales that diminish it.

The conduct relevant to the equities is the post-2024 cooperation the sentencing court credited as "extraordinary" — the assignment of interests in more than 300 companies, the dismissal of litigation that impeded asset sales, the waiver of a $40 million tax escrow, and more than $1 billion in restitution already realized. That record reflects an effort to marshal value for victims, not to frustrate it.

Finally, the public interest favors a stay. The public has no interest in compelling sales that destroy value and reduce the funds available to victims, and a substantial interest in ensuring that restitution is fixed accurately under § 3664 before irreversible dispositions are made.

6. The Preliminary Restitution Order should be corrected and amended now, before it is enforced, because it does not conform to the MVRA in at least the following respects — each of which remains subject to correction notwithstanding the Order's "final judgment" status, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, and each of which this Court must determine de novo, 18 U.S.C. § 3664(d)(6): (i) the Order's total of $1,655,000,000 exceeds, by

$30,000,000, the $1,625,000,000 the Special Master recommended, with no explanation for the increase, even though the Government and the Special Master bear the burden of proving the amount of each victim's loss by a preponderance of the evidence, 18 U.S.C. § 3664(e); (ii) the Order recites that its figures "already account for monetary recoveries realized by the payees prior to the entry of this Order" (Doc. No. 161 at 4), but it itemizes no such recoveries and does not apply the $2,899,418,383 in mandatory offsets and credits documented in the Response, as the statute requires, 18 U.S.C. §§ 3663A(b)(1)(B)(ii), 3664(j)(2); Robers v. United States, 572 U.S. 639 (2014); (iii) the Order reduces only PBLA's $416,000,000 award, and only by the speculative "ultimate value" ULICO may later receive (Doc. No. 161 at 3), even though — as documented in the Response — the AAPC preferred equity was already transferred to ULICO in December 2022 with dollar-for-dollar credit for the current $357 million par value, so that the offset is presently fixed and due "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and even though the Order applies no parallel offset for the cash and property returned to the other payees; (iv) the Order reserves four separate categories of further reductions — prior recoveries on "non-IALA assets," prior recoveries on "zero coupon bonds," the payments itemized at page 22 of Doc. No. 132, and transfers to "SFL" and "SASL" — for investigation after sentencing (Doc. No. 161 at 5), yet simultaneously declares the un-reduced gross figure "due and payable immediately" and enforceable as a judgment now, guaranteeing the over-recovery the MVRA forbids, Ritchie, 858 F.3d at 216; (v) the Order makes no finding tying any payee's

award to the loss directly and proximately caused by the offense of conviction (Counts One and Thirteen), as Hughey v. United States, 495 U.S. 411 (1990), and United States v. Blake, 81 F.3d 498 (4th Cir. 1996), require; (vi) to the extent the figures embed pre-judgment interest, the MVRA does not authorize it; (vii) the Order is captioned "preliminary" precisely because it "precedes sentencing" (Doc. No. 161 at 1

n.1), yet it imposes restitution as "due and payable immediately" and (viii) the Order declares the full amount immediately due without the findings on the manner and schedule of payment that the MVRA requires, 18 U.S.C. § 3664(f)(2). Each defect independently requires correction; together they require that enforcement be stayed until the Order is conformed to the statute.

7. The Preliminary Restitution Order, and the Government's and the Special Master's

underlying position, also contravene the express intent of Congress as stated in the MVRA's legislative history. The Senate Judiciary Committee declared that restitution exists to "restore the victim to his or her prior state of well-being," S. Rep. No. 104-179, at 13 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 926 — not to confer the approximately $1.244 billion windfall the uncorrected Order would produce. The Committee confined mandatory restitution to losses "directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted," id. at 19, 1996 U.S.C.C.A.N. at 932 — not the losses the Rehabilitator's own post- transfer discretionary decisions caused. The Committee clarified that the anti-double-recovery rule of 18 U.S.C. § 3664(j)(2) exists "to ensure that the victim is not compensated twice for the same loss," id. at 21, 1996 U.S.C.C.A.N. at 934 — yet the uncorrected Order would compensate the Pre- Designated Restitution Parties a second time for assets and cash they have already received and, in many instances, still hold. The Committee instructed that "highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that losses that are "speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution," id. at 19, 1996 U.S.C.C.A.N. at 932 — yet the Order resolves precisely such issues. And the Committee recognized that "the sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information," id. at 20, 1996 U.S.C.C.A.N. at 933 — a right the uncorrected Order violates by resting on a figure that ignores $2,899,418,383 in documented offsets and credits. These departures from Congress's express intent independently support the relief requested. Nor did the plea agreement waive the causal requirement that limits the Special Master's determination. The agreement commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct," Plea Agreement ¶ 10(a) (Doc. 40) — language the Government drafted, which must be construed against it. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986). Paragraph 10(a)

reaches only losses "harmed by [his] criminal conduct," and "regardless of the resulting loss amount" goes to quantum, not causation. The losses produced by the Rehabilitator's independent, discretionary decisions were caused neither directly nor indirectly by Mr. Lindberg, see Hughey v. United States, 495 U.S. 411, 420 (1990); Robers v. United States, 572 U.S. 639, 645 (2014), and, together with the documented offsets, leave no additional restitution owing. The Government's own sentencing memorandum confirms the causal disconnect: it concedes that North Carolina did not restrict affiliate investment by statute

until 2019 — after the charged conduct — and relies on a source describing the prior regime as an "investment loophole." Gov't Sentencing Mem. at 22– 23 & n.12 (Doc. 508).

8. Because the MVRA limits restitution to losses directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2); because the MVRA mandates that restitution be reduced by the value of any property returned, 18 U.S.C. § 3663A(b)(1)(B)(ii); because the MVRA prohibits any recovery in excess of the victim's actual loss, Ritchie, 858 F.3d at 216; and because — under Ellingburg v. United States, 607 U.S. ___, slip op. at 1–2 (Jan. 20, 2026) — restitution under the MVRA constitutes criminal punishment subject to the constitutional limits applicable to criminal punishment, the continued retention and management of the Primary Restitution Assets by the Special Master and/or NHC is unauthorized by law now that restitution has been fully paid by Lindberg.

9. In the alternative, this Court should order the immediate return of the De Minimis SACs to Mr. Lindberg. The Clanwilliam Sale Order itself — to which the United States, the Special Master, NHC, and Mr. Lindberg are all parties — expressly identifies eight SACs that NHC, in its own assessment, may "ha[ve] no further material value to NHC and NHC does not otherwise intend to sell" (Doc. No. 66, ¶ 20(h)). And as set forth in Paragraph 4 above, the only party with a demonstrated track record of building enterprise value across the Lindberg-related companies is Mr. Lindberg himself. Returning the De Minimis SACs to his control is the only outcome that, on the present record, is rational, equitable, and consistent with the MVRA's requirement that the apparatus of criminal punishment serve a victim-compensatory purpose. See Ritchie, 858 F.3d at 216.

10. This Motion is supported by the accompanying Memorandum of Law, by the previously filed Response and supporting documentation, by the Statement of Facts filed on May 4, 2026, and by the Supplemental Statement of Facts filed contemporaneously herewith.

WHEREFORE, Defendant Greg E. Lindberg respectfully requests that this Court enter an Order: a) Staying, immediately and until further order of this Court, all further sales of Mr. Lindberg's assets and all further asset-sale processes initiated, conducted, or contemplated for the purpose of generating proceeds to satisfy any preliminary or final order of restitution in this case, and staying enforcement of the Preliminary Restitution Order (Doc. No. 161), including the issuance or recording of any abstract of judgment, pending further order of this Court; b) Directing the Special Master to suspend any pending asset-sale activities and to refrain from initiating any new asset-sale activities until further order of this Court; c) Directing that any proceeds presently held in escrow or in the constructive possession of the Special Master, the Government, or any other person acting on behalf of the Pre-Designated Restitution Parties be preserved and not disbursed pending further order of this Court; d) Correcting and amending the Preliminary Restitution Order (Doc. No. 161), pursuant to the Court's retained authority, the Order's own provision for amendment, 18 U.S.C. § 3664(o), and Federal Rule of Criminal Procedure 36, to (i) strike the unexplained $30,000,000 by which the Order exceeds the Special Master's recommendation; (ii) itemize and apply the $2,899,418,383 in mandatory offsets and credits documented in the Response; (iii) recognize the credit for the current par value of the ULICO/AAPC preferred-equity as presently due, and apply the credit for all other cash and property

returned to the payees; (iv) exclude any pre-judgment interest; (v) make findings tying each payee's award to the loss directly and proximately caused by the offense of conviction, or set that issue for determination; and (vi) provide that the Order is not enforceable, and that no abstract of judgment shall issue, until those corrections are made and until sentencing; e) Adjudicating that, on the voluminous contemporaneous documentary record before the Court, restitution under the MVRA has been fully satisfied and, indeed, overpaid by approximately $1.244 billion, and ordering the return of the Primary Restitution Assets, as defined in the Special Master Order, to Mr. Lindberg's ownership and control; f) In the alternative, and at a minimum, ordering the immediate return to Mr.

Lindberg's full ownership and control of the De Minimis SACs identified in the Clanwilliam Sale Order at Paragraph 20(h) — namely, SixSails, LLC; Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC; Fiasco Fine Wine, LLC;

Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited; g) Setting an expedited hearing on the Response and on this Motion; and h) Granting such other and further relief as the Court deems just and proper.

[SIGNATURE PAGE FOLLOWS.]

Dated: June 9, 2026.

Respectfully submitted, /s/ Kenneth Barnes___________________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of June 2026, I caused a true and correct copy of the foregoing Defendant Greg E. Lindberg's defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No. 161); (Ii) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (Iii) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; And (Iv) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect, together with the supporting Memorandum of Law, to be filed with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will serve notice on all counsel of record.

/s/ /s/ Kenneth Barnes________________ Kenneth Barnes

**Doc. 173 — Memorandum in Support of Motion to Stay (filed 06/09/2026)**

MEMORANDUM OF LAW IN SUPPORT OF

DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION

(I) TO STAY ALL FURTHER ASSET SALES;

(II) TO RETURN THE PRIMARY RESTITUTION ASSETS; AND,

(III) IN THE ALTERNATIVE, TO RETURN THE DE MINIMIS SACS WITH

IMMEDIATE EFFECT

PRELIMINARY STATEMENT

On May 28, 2026, the Court entered a Preliminary Order of Restitution (Doc. No. 161) (the "Preliminary Restitution Order"), ordering restitution in the total amount of $1,655,000,000 — $30 million more than the Special Master had recommended — and declared that sum "due and payable immediately" and enforceable as a judgment, with abstracts of judgment to issue at the request of any payee or the Special Master. Doc. No. 161 at 3–5. On the strength of that Order, asset sales of property belonging to Mr. Lindberg are proceeding, or are imminent. But Mr. Lindberg has already filed a detailed, documented Response demonstrating that, when the MVRA is correctly applied, the net restitution figure is zero — and that, far from owing the $1,655,000,000 the Court has now ordered, Mr. Lindberg has in fact overpaid that figure by approximately $1.244 billion. The chart submitted with the Response identifies $2,899,418,383 in mandatory offsets and reductions — every dollar of which is supported by (i) verified pleadings of the Pre-Designated Restitution Parties themselves, (ii) contemporaneous business records of those parties or their representatives, or (iii) settled MVRA doctrine that this Court is duty-bound to apply.

To proceed with further asset sales while a $1.244 billion overpayment sits on the face of the record would not merely be premature. It would be plain error. It would violate the text of the MVRA, which forbids any recovery in excess of the victim's actual loss. United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017) (the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole"). It would violate the proximate-cause limitation that the Supreme Court has unanimously held is built into the statute. Paroline v. United States, 572 U.S. 434, 444–45 (2014). And it would violate the constitutional protections that attach to MVRA restitution as criminal punishment under the Supreme Court's January 2026 decision in Ellingburg v. United States, 607 U.S. ___, slip op.

at 2 (Jan. 20, 2026) (Kavanaugh, J., for a unanimous Court) ("Restitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause.").

This Motion is not, however, advanced solely on dollars. The relief Mr. Lindberg seeks is also necessary to prevent further destruction of the assets that, on the present record, the Court is being asked to liquidate to fund a phantom restitution obligation. The factual record before this Court establishes a stark and unambiguous contrast: under Mr. Lindberg's twenty-year stewardship, the Specified Affiliated Companies (the "SACs") grew from nothing to approximately $3.4 billion in enterprise value, with EBITDA for Mr. Lindberg's companies in excess of $300 million annually; under the Rehabilitator's six-plus years of stewardship, the NCICs were ultimately liquidated, more than $165 million was extracted from the rehabilitation estates as fees, $137 million was lost on bond-portfolio decisions unrelated to Mr. Lindberg, and four separate billion-dollar-class monetization transactions were blocked or refused — in at least one case by suing a prospective arm's-

length buyer. The asset sales presently underway are an extension of that destructive process. Each sale shrinks the estate. Each sale generates further fees for the very advisors who have been extracting $2.5 million per month from those estates. And each sale forecloses the option of returning the assets to the party with a demonstrated, contemporaneously-documented ability to preserve and grow their value.

Two contemporaneous documentary exhibits, introduced with the Supplemental Statement of Facts filed herewith, are independently dispositive on causation. First, a signed November 22, 2018 letter of intent from Ares Management Corporation — a publicly traded, investment-grade alternative-asset manager with over $500 billion in AUM — committed Ares to acquire 100% of GBIG (including the NCICs) for $400–$420 million in upfront cash, with an express SPV/securitization solution for the entirety of the affiliated-loan portfolio. Second, a January 6,

2019 internal Eli Global memorandum from Christa Miller — written for the file at 9:08 p.m. on a Sunday evening, two days after an in-person Ares meeting — documents in real time that Ares withdrew the SPV component of its offer because, in Ares's own words, it had "been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." That third party met with the United States Department of Justice within days of so instructing Ares. Third, a February 8, 2019 Oaktree Capital Management "Global Solution Presentation" — negotiated by Mr. Lindberg personally within weeks of the Ares termination — set out a $1.0 billion arm's-length SPV structure that would have acquired the affiliated-loan positions and 100% of the GBIG equity. The Rehabilitator refused both transactions. Either alone would have paid every NCIC policyholder in full by approximately June 2019. Under Robers, 572 U.S. at 647 (Sotomayor, J., concurring), each refusal severs the chain of proximate causation between any conduct of Mr. Lindberg's and any post-MOU decline in the recoverable value of the affiliated loans.

This Motion seeks three forms of relief, in descending order of breadth. First, a stay of further asset sales pending the Court's adjudication of the Response — modest preservation of the existing state of affairs. Second, the return of the Primary Restitution Assets to Mr. Lindberg's control, because restitution has been fully paid and overpaid by $1.274 billion. Third, in the alternative, the immediate return of the eight De Minimis SACs that the parties themselves have already stipulated, in a filing in this very docket (Doc. No. 66, ¶ 20(h)) may, have "no further material value to NHC" and that NHC "does not otherwise intend to sell." By the parties' own admission, those eight companies cannot be liquidated to satisfy restitution; they are being indefinitely held by an entity with a documented pattern of destroying value, with no offsetting MVRA benefit. They should be returned to the party that built them in the first place.

FACTUAL BACKGROUND

I. The Special Master's $1.625 Billion Proposed Restitution Figure.

On April 29, 2026, the Special Master submitted a Report and Recommendations Regarding Restitution (ECF No. 106) proposing that this Court enter a preliminary order of restitution in the amount of $1.625 billion in favor of eight Pre-Designated Restitution Parties. Restitution Rpt. at 4. The Special Master's proposed figure consists, in substance, of (i) the principal balance of the Affiliate Investments as carried on the Special Master's schedules ($1,391,000,000 attributed to the NCICs, plus other balances totaling approximately $2,179,000,000); (ii) $263 million in proposed pre-judgment interest at the 30-Day U.S.

Treasury rate; and (iii) certain other items, including approximately $129 million attributable to Agera Energy, LLC. App'x 3 at 6–8.

On May 28, 2026, the Court entered the Preliminary Restitution Order (Doc. No. 161), ordering restitution in the total amount of $1,655,000,000 — $30 million more than the Special Master had recommended, and without first adjudicating the Response. The Order declares the restitution "due and payable immediately," provides that it "shall be enforceable as a judgment of the United States" under 18 U.S.C. §§ 3664 and 3613, and authorizes the Clerk to issue abstracts of judgment that become liens on Mr. Lindberg's property. Doc. No. 161 at 1 n.1, 3–5. Except where the entered figure is specifically discussed, this Memorandum continues to refer to the Special Master's recommended $1.625 billion figure and the corresponding $1.274 billion overpayment; measured instead against the Court's entered figure of $1.655 billion, the same documented offsets of $2.899 billion still yield net restitution of zero and an overpayment of approximately $1.244 billion. The defects in the Preliminary Restitution Order, and the reasons it must be corrected before it is enforced, are addressed in Argument Part II.D below.

II. The Response Identifies $2.899 Billion in Mandatory Offsets and Reductions.

On May 4, 2026, Mr. Lindberg filed his Response (the "Response"), supported by an accompanying Statement of Facts and a Revised Supplemental Statement of Facts. Those filings identify $2,899,418,383 in mandatory offsets — yielding net restitution of zero and a documented overpayment of approximately $1,274,418,383. The principal categories are summarized below, with cross-references to the supporting Statement of Facts ("SOF") and Revised Supplemental Statement ("Supp. SOF"):

● Improperly added pre-judgment interest ($263,000,000) (SOF ¶¶ 80–82): The MVRA does not authorize interest; DOJ policy expressly excludes it; and substantial portions of the Affiliate Investment balances were structured by written agreement as zero-coupon notes that, by definition, bear no contractual interest.

● Corrected starting principal balance of Affiliate Investments ($141,000,000) (SOF ¶¶ 24–26): The NCICs themselves used $1.25 billion (not the Special Master's $1.391 billion) in their verified 2019 Wake County complaints, in the parties' stipulated pre-trial order, and in the 6.30.2019 Restructure Tranches spreadsheet executed at the time of the MOU.

● AAPC Preferred Equity transferred to ULICO ($352,906,240) (SOF ¶¶ 63–69):

ULICO agreed in writing in December 2022 to accept the preferred equity in partial satisfaction of the $524 million Middle District of North Carolina judgment, with "dollar-for-dollar credit."

● SNIC capital contributions ($27,823,425) (SOF ¶¶ IV (SNIC Escrow)): Cash paid directly to SNIC under the 2021–2022 Dogwood State Bank escrow agreement.

● Additional undisputed cash payments to Pre-Designated Restitution Parties ($79,655,289) (Response § II.C): Including $9.4 million from the Finanzen/Blue

Violet sale; $29.5 million to CBL; $4.2 million to BLIC; $6.8 million to SNIC;

$21.9 million to PBLA; $2.6 million to Northstar; and a $5 million CBL redemption fee.

● CBL subordination/Beckett refinance fee ($3,000,000) (Response § II.D): Cash paid directly to CBL in 2022.

● Additional escrowed Clanwilliam proceeds ($20,000,000) (Response § II.E).

● ULICO real-estate sale proceeds ($13,596,013) (Response § II.F).

• Post-MOU zero-coupon bond proceeds ($243,452,385) (Response § II.G):

Confirmed by the October 28, 2019 contemporaneous email of Paul Brown, the NCICs' Chief Investment Officer.

• Value of the NCICs at transfer of control ($454,000,000) (SOF ¶¶ 55–62).

• Bermuda Insurance Companies' proceeds from sales of affiliated assets ($9,800,076) (SOF ¶ 6 chart).

• Agera Energy losses ($129,398,324) (SOF ¶¶ 71–73).

• Eye Care Leaders losses ($22,288,826) (SOF ¶ 74).

• UKAT losses ($39,000,000) (SOF ¶ 76): Caused by the Rehabilitator's rejection of the BC Partners refinancing.

• Insurance-Holdco debt portion ($14,897,805) (SOF ¶ 77).

• Clanwilliam below-market fire-sale loss ($474,000,000) (SOF ¶ 75).

• Pre-maturity sale of $1.006 billion in protective bank zero-coupon bonds ($611,600,000) (SOF ¶¶ 48–54).

III. The Documented Contrast Between Mr. Lindberg's and the Rehabilitator's Stewardship of the Lindberg-Related Operating Companies.

The factual record before the Court establishes a stark, contemporaneously-documented contrast between Mr. Lindberg's twenty-year track record of value creation in the SACs and the Rehabilitator's six-plus-year track record of value destruction in the NCICs. That contrast is not background. It is dispositive of the relief Mr. Lindberg seeks: a stay of further sales by an entity demonstrably destroying value, and — at a minimum — return of the eight De Minimis SACs that the parties have themselves stipulated have no further restitution value.

A. Mr. Lindberg's Twenty-Year Track Record: From Nothing to $3.4 Billion in Enterprise Value.

Mr. Lindberg built the SACs from nothing over more than two decades. The success of those companies funded nearly $1 billion of personal capital that Mr. Lindberg, in turn, invested into the NCICs as a net contributor to those companies' surplus. Mr. Lindberg did not take a single dollar of dividends out of any NCIC; he was a net contributor of cash flow to those insurance companies for years. SOF ¶ 5.

Under Mr. Lindberg's management, the SACs grew from approximately $1.5 billion in aggregate value in 2019 to approximately $3.4 billion by 2024 — an increase of approximately $1.9 billion in enterprise value over a five-year period. That valuation is not abstract. It is corroborated by the arm's-length, signed Q1 2024 purchase agreement with Quadro Acquisition Corp. One (NASDAQ: QRDO) at a 22.14x EBITDA multiple consistent with public-market comparables. The Quadro transaction would have monetized that growth in cash, for the direct benefit of the very Pre-Designated Restitution Parties whom the Special Master purports to be protecting, had the Rehabilitator not blocked it. SOF ¶¶ 9, 16, 58(d), 75.

Lindberg's companies were producing approximately $300 million in EBITDA in 2024, and the public-company EBITDA multiples used in the Quadro pricing have not declined. The five-company comparable basket (Addtech, Indutrade, Lifco, Diploma, and Beijer/ALMA) had an average enterprise value to EBITDA multiple of 22.14x at signing in Q1 2024 and

24.37x as of November 2025 — an upward, not downward, move. The Quadro valuation was conservative when struck; in current market conditions, it would be conservative still. SOF ¶ 75; Supp. SOF. Mr. Lindberg's strategy of using insurance-company capital to fund affiliated investments was not idiosyncratic and was approved by the North Carolina Department of Insurance ("NCDOI") in 2014, before he made the first affiliated investment. Affiliated investments have since become standard practice among major insurance industry players, including Blackstone, KKR, Apollo, Brookfield, and Security Benefit (Eldridge), with some insurers maintaining 35–43% of assets in affiliated investments. Mr. Lindberg also implemented and updated a Risk Mitigation Policy on Private Loans designed to ensure no loss on the affiliated loans — a policy that was successful, as the documented EBITDA growth and the signed arm's-length Quadro purchase agreement confirm.

B. The Rehabilitator's Six-Year Track Record: $454 Million to Zero, Plus

$165+ Million in Self-Pay Fees and $137 Million in Unrelated Bond Losses.

By contrast, under the management of Mike Dinius as Special Deputy Rehabilitator, the NCICs suffered the documented destruction-of-value events catalogued in Paragraph 58 of the Statement of Facts. They are summarized here because they bear directly on the equities of the requested stay and on the question of which party should hold the De Minimis SACs going forward.

First, more than $165 million in fees has been extracted from the NCIC rehabilitation estates over a seven-year period — with the extraction continuing today at approximately $2.5 million per month. The Rehabilitator's own internal financial records (Exhibit M to the Statement of Facts) document the magnitude and continuity of those payments. They are direct depletions of

the very estates that are supposed to be preserved for the policyholders the Rehabilitator purports to protect.

Second, $137 million in investment losses — entirely unrelated to Mr. Lindberg or the affiliated-loan portfolio — was incurred on corporate-bond and other portfolio decisions made by the Rehabilitator's team after Mr. Lindberg transferred control. These losses occurred on the Rehabilitator's watch, on the Rehabilitator's portfolio, on the Rehabilitator's judgment, and cannot, by any measure of proximate causation, be charged to Mr. Lindberg. SOF ¶ 58(b).

Third, the Rehabilitator blocked or sabotaged at least four separate billion-dollar-class monetization transactions, any one of which would have fully paid the NCIC policyholders and creditors. Those transactions are catalogued in Section IV below. The Rehabilitator did not merely fail to monetize the affiliated loans in a timely fashion. He affirmatively rejected face-value cash offers. He affirmatively litigated against a prospective arm's-length buyer. He affirmatively elected, in the June 27, 2019 MOU, to hold the affiliated loans for a ten-year term rather than monetize them. SOF ¶¶ 9, 16, 58, 75, 76; Supp. SOF ¶¶ 4–36.

Fourth, the Rehabilitator caused the $474 million Clanwilliam fire-sale loss by blocking the public-market Quadro transaction and instead selling Clanwilliam in September 2025 to TA Associates, a private-equity buyer, for approximately $450 million — versus the $880 million signed Quadro purchase-agreement valuation negotiated by Mr. Lindberg less than eighteen months earlier. SOF ¶ 75. As documented in the Statement of Facts, the financial-economics literature confirms that public-market acquirers pay materially higher premiums than private- equity acquirers for the same target; the Clanwilliam

undervaluation is the direct product of the Rehabilitator's decision to forgo a public-market exit in favor of a private-equity exit at a fraction of the value.

Fifth, the Rehabilitator unilaterally sold the $1,006,239,867 face-value bank-issued zero-coupon bonds backing the Principal Protected Notes — instruments whose entire purpose was to mature at par and protect the affiliated-loan principal from any credit-related downside — for approximately $394 million, crystallizing a $611.6 million loss on assets contractually guaranteed to pay par. SOF ¶¶ 48–54.

Sixth, the Rehabilitator and his agents have affirmatively filed litigation against at least one prospective arm's-length buyer of the NCICs — a transaction that would have paid every policyholder in full — and have used that litigation to drive the buyer away. Under Robers v. United States, 572 U.S. 639, 645–46 (2014), the Supreme Court has expressly recognized that a victim's donation of collateral, or sale to a friend for a nominal sum, can break the causal chain. Id. The Rehabilitator's litigation to block a sale to a willing arm's-length buyer is, a fortiori, precisely such a chain-breaking act.

Seventh, and ultimately, the Rehabilitator liquidated the NCICs outright, destroying the $454 million baseline value that the NCICs' own management — operating under the Rehabilitator's supervision — had established in an internal valuation dated November 5, 2018, eighteen days after Mr. Lindberg transferred operational control. SOF ¶¶ 55–62 & Ex. J.

C. The Bottom-Line Comparison.

The contrast is unambiguous. Mr. Lindberg's stewardship produced $1.9 billion in value creation in the SACs (and approximately $1 billion in capital contributions to the NCICs along the way). The Rehabilitator's stewardship produced $454 million in value destruction in the NCICs; $137 million in unrelated investment losses; $611.6 million in protective-bond losses; $474 million in below-market Clanwilliam losses; the loss of an additional $39 million by refusing the BC Partners refinancing of UKAT; the foregone benefit of at least four billion-dollar-class transactions the Rehabilitator blocked; and the affirmative use of litigation against a willing

arm's-length buyer. Along the way the Rehabilitator extracted more than $165 million in fees and are continuing today at approximately $2.5 million per month.

The only entity person or with a documented, contemporaneously-corroborated track record of value preservation, let alone value creation, in connection with the Lindberg-related insurance and operating companies is Mr. Lindberg himself.

D. Independent Expert Corroboration.

Mr. Lindberg's narrative is independently corroborated by the contemporaneous forensic analysis of Berkeley Research Group, LLC ("BRG"), a national litigation-consulting firm regularly retained by the Department of Justice, the Securities and Exchange Commission, and state regulators. The BRG analysis (referenced in the supporting Exhibits) reaches three conclusions material to this Motion: (i) it identifies damages in excess of $400 million caused by regulatory conduct — not by business failure, fraud, or mismanagement; (ii) it confirms that the aggregate value of the affiliated companies exceeded their debt and other obligations, and that Mr. Lindberg's personal net worth was between $860 million and $1.46 billion at the time the Rehabilitator took control — directly contradicting any premise of insolvency at the moment of transfer; and (iii) it confirms that Mr. Lindberg contributed at least $377 million in capital to the insurance companies and extracted nothing in dividends — the opposite of the self-dealing narrative the Special Master's figure rests on.

These findings are not advocacy. They are professional, independent forensic conclusions corroborating the documentary record above.

IV. The Ares and Oaktree Refusals: Contemporaneous Documentary Evidence That Two Independent Arm's-Length Buyers Independently Priced the Affiliated Loans at Par.

Two contemporaneous documentary records establish that, at the moment the Rehabilitator assumed control, two independent sophisticated financial institutions — Ares Management and Oaktree Capital Management — each separately offered to take the entirety of the affiliated-loan

portfolio off the NCICs' balance sheets at face value through SPV structures backed by their own capital. Supp. SOF ¶¶ 4–29 & Exs. A–E.

Ares. The November 22, 2018 Ares LOI, executed thirty-five days after Mr. Lindberg transferred control, committed Ares (a publicly traded, investment-grade manager with approximately $125 billion in AUM) to acquire 100% of GBIG (including the NCICs and the related insurance entities) for $400–$420 million in upfront cash, with an express SPV/securitization solution for any remaining affiliated and self-originated investments. Supp. SOF Ex. B §§ 1, 3, 6. The January 6, 2019 Christa Miller internal Eli Global memorandum — written for the file at 9:08 p.m. on a Sunday two days after the January 4, 2019 in-person Ares meeting — documents in real time that Ares withdrew the SPV component because Ares had "been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." Supp. SOF Ex. A.

Oaktree. Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent transaction with Oaktree Capital Management. The February 8, 2019 Oaktree "Global Solution Presentation" (Supp. SOF Ex. C) memorialized a $1.0 billion Investor Group investment into a holding-company SPV that would have acquired (i) approximately $800 million of the affiliated-loan principal and (ii) 100% of the GBIG equity, with an additional approximately $400 million of affiliated-loan assets rolled over and held as performing assets on the NCICs' balance sheet. The February 12–13, 2019 Eli Global internal emails (Supp. SOF Exs. D–E) document, in Mr. Lindberg's own contemporaneous words, his real- time direction of three parallel SPV/bridge-financing tracks — Oaktree, HPS, and Ares SPV bridge loans — each of which would have generated net proceeds in the range of $1.335–1.355 billion. The Rehabilitator refused the Oaktree transaction.

Montshire / Alban. In 2023, the Rehabilitator received an additional offer from Montshire (through Mr. Robert Alban) to purchase the NCICs in a transaction that would have generated proceeds to pay the policyholders in full. The Rehabilitator refused that offer and litigated against the prospective buyer. SOF ¶ 58(d).

Quadro. In Q1 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the SAC group at approximately $3.4 billion (and Clanwilliam alone at $880 million). The Rehabilitator blocked the Quadro transaction. SOF ¶ 75 & Exs. G3, I3, I4.

BC Partners / UKAT. The Rehabilitator rejected the BC Partners refinancing of UKAT that would have generated approximately $39 million in cash for the NCIC lenders. The UKAT loss of $39 million was the direct consequence. SOF ¶ 76 & Ex. M.

V. The MOU Was Coerced and Affirmatively Held the Affiliated Loans for Ten Years.

Having refused both arm's-length face-value cash transactions, the Rehabilitator then forced Mr. Lindberg to execute the June 27, 2019 Memorandum of Understanding (the "MOU") on a take-it-or-leave-it basis under express written threat that, if Mr. Lindberg refused to sign, the Rehabilitator would immediately move to liquidate the NCICs. As Mr. Dinius wrote in writing to Mr. Lindberg from his Noble Consulting account on the day the rehabilitation order was entered: "we will contact the guaranty associations and move directly to liquidation. You know what that means." SOF ¶ 58(a) & Ex. D5; Supp. SOF ¶ 32. As one of the Rehabilitator's lawyers told Mr. Lindberg directly: "Mr. Lindberg, you're the nail. I'm the hammer." Supp. SOF ¶ 33 (citing Wake County Trial Tr. Vol. 5, 1012:11–12). The MOU then memorialized the Rehabilitator's affirmative election to hold the affiliated loans for a ten-year term rather than monetize them. Supp. SOF ¶¶ 35–36.

VI. The Clanwilliam Sale Order's Concession That Eight SACs Are De Minimis.

On July 3, 2025, the Special Master filed his Consent Motion for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Group of Companies (Doc. No. 66), with the consent of the United States and Mr. Lindberg. The Clanwilliam Sale Order entered pursuant to that motion contains an express stipulation, signed by every restitution stakeholder in this matter, identifying eight SACs that NHC has determined are not productive of further realizable value:

"If NHC determines, in its discretion and in the ordinary course of managing its affairs, that any of the following SACs has no further material value to NHC and NHC does not otherwise intend to sell such SAC, then the Special Master shall have the option of assuming ownership and control of such SAC upon terms and conditions mutually acceptable to the Special Master and NHC: SixSails, LLC;

Certitrek Group, LLC; ELP Holdings, LLC; Global TIC CE, LLC;

Fiasco Fine Wine, LLC; Century Vision Global, LLC; Marval Investments Limited; and Intralan Investments Limited." Doc. No. 66, ¶ 20(h). By stipulation, NHC does not intend to sell these eight companies. Given the Rehabilitator-side track record of value destruction documented in Section III above, the most likely outcome of leaving the De Minimis SACs in the present control structure is further destruction of value, with zero offsetting benefit to the Pre-Designated Restitution Parties.

VII. Asset Sales Are Proceeding to Enforce a Preliminary Restitution Order That

Precedes Sentencing and Is Facially Defective.

On May 28, 2026, without first adjudicating the Response, the Court entered the Preliminary Restitution Order (Doc. No. 161), which by its own terms is captioned "preliminary" because it "precedes sentencing." Doc. No. 161 at 1 n.1. The Response, the Statement of Facts, and the Supplemental Statement of Facts remain unadjudicated. Yet the Order declares the full $1,655,000,000 "due and payable immediately" and enforceable as a judgment, and authorizes abstracts of judgment to issue. On information and belief, the Special Master is presently

conducting, or imminently preparing to conduct, additional sales of Mr. Lindberg's assets to satisfy that figure. If those sales and that enforcement proceed before the Court corrects the Order and rules on the Response, Mr. Lindberg's assets will be irretrievably liquidated to fund a restitution obligation that the law does not permit — and they will be liquidated under the direction of a control structure that has demonstrated, over six years and through hundreds of millions of dollars in fees and avoidable losses, that it is not capable of preserving, let alone growing, their value.

## ARGUMENT

### I. This Court Has Broad Authority — Statutory, Rule-Based, and Inherent — to Stay Asset Sales Pending Adjudication of Defendant's Restitution Objections.

Three independent sources of authority support the relief Mr. Lindberg requests. First, the Court has the inherent supervisory power, recognized in Landis v. North American Co., 299 U.S. 248, 254 (1936), to stay proceedings before it. Second, Federal Rule of Civil Procedure 53 — made directly applicable by the Court's appointment order or, in the alternative, by analogy in this criminal proceeding — vests in the appointing Court plenary authority to modify, restrict, or terminate the duties of a court-appointed officer. See Fed. R. Civ. P. 53(b)(4) ("The order [appointing a master] may be amended at any time after notice to the parties and an opportunity to be heard."); Fed. R. Civ. P. 53(f) (de novo review and authority to "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions"). Third, the All Writs Act, 28 U.S.C. § 1651(a), authorizes the Court to issue "all writs necessary or appropriate in aid of [its] respective jurisdictio[n] and agreeable to the usages and principles of law."

In Landis, Justice Cardozo, for a unanimous Court, articulated the inherent stay power in terms directly applicable here: "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment,

which must weigh competing interests and maintain an even balance." 299 U.S. at 254. The Supreme Court has more recently reaffirmed that the federal courts retain inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (citation and internal quotation marks omitted).

That inherent authority extends, a fortiori, to the supervision of court-appointed officers acting in the Court's own proceeding. As the Supreme Court explained in La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957), "[t]he use of masters is 'to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause,' and not to displace the court." (citation omitted). The Special Master is an officer of the Court. The Court accordingly retains — and is duty-bound to exercise — plenary authority to redirect, restrict, suspend, or terminate the Special Master's activities when those activities risk producing an unlawful result.

The Special Master Order itself expressly preserves this Court's plenary supervisory authority. The Order grants the Special Master only such authority as is "subject to the Court's supervision and guidance," and expressly limits that authority by requiring the Special Master to "seek Court approval to liquidate … any available assets for the benefit of victims." Doc. No. 56, ¶ 6(e). That sequence — Court approval first, liquidation second — would be inverted if asset sales were permitted to proceed on the basis of a non-final, unentered restitution figure that the defendant has formally and substantively contested, and that the Court has not adjudicated.

The Nken v. Holder, 556 U.S. 418, 426 (2009), four-factor stay standard — quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987) — governs the analysis: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Each factor is

satisfied here. The first two — likelihood of success and irreparable harm — are "the most critical." Nken, 556 U.S. at 434. Both decisively favor the relief sought. See infra Parts II–VII (likelihood of success); Part VIII (irreparable harm and balance of equities).

II. Proceeding with Asset Sales When the Proposed Restitution Figure Has Been Paid in Full and Overpaid by $1.274 Billion Would Be Plain Error and a Violation of the MVRA.

A. A Federal Court Has No Authority to Order or Enforce Restitution Beyond What the MVRA Permits.

"Federal courts do not have the inherent authority to order restitution, but must rely on a statutory source to do so." United States v. Ritchie, 858 F.3d 201, 206 (4th Cir. 2017) (quoting United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013)). A court's discretion is therefore "circumscribed by the procedural and substantive protections of the statute authorizing restitution." United States v. Freeman, 741 F.3d 426, 431 (4th Cir. 2014) (quoting United States v. Leftwich, 628 F.3d 665, 667 (4th Cir. 2010)). "A restitution order that exceeds the authority of the statutory source is no less illegal than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013). Because the MVRA defines the statutory ceiling for restitution as the loss directly and proximately caused by the offense of conviction, less property returned, 18 U.S.C. § 3663A(a)(2), (b)(1)(B)(ii), a restitution order — and any enforcement of that order — beyond the statutory ceiling exceeds the authority of the Court.

To be clear, ¶ 10(a)'s "full restitution" language must be construed against the Government as its drafter, and it does not enlarge the Court's authority without limit. The operative ceilings remain the victims' actual, unrecovered loss (the MVRA's make-whole measure), the mandatory anti-double-recovery credit of § 3664(j)(2), and the requirement that the loss be caused by the conduct. A restitution award exceeding those limits lies beyond the Court's statutory authority.

Under the MVRA, a sentencing court may order restitution only for losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). To be a "victim" under the MVRA, "the act that harms the individual must be either conduct underlying an element of the offense of conviction, or an act taken in furtherance of a scheme, conspiracy, or pattern of criminal activity that is specifically included as an element of the offense of conviction." United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996); see also Hughey v. United States, 495 U.S. 411, 413 (1990) (restitution authorized "only for the loss caused by the specific conduct that is the basis of the offense of conviction"); United States v. Llamas, 599 F.3d 381, 390–91 (4th Cir. 2010) (Fourth Circuit reaffirmation). United States v. Akande, 200 F.3d 136, 140 (3d Cir. 1999) (conspiracy case holding the offense of conviction the reference point for restitution; the 1990 amendment broadened the class of victims for scheme and conspiracy offenses, but the victim's harm must still be directly and proximately caused by the offense conduct); United States v. Kones, 77 F.3d 66, 70 (3d Cir. 1996) (the statutory expansion "is not so broad that it permits a district court to order restitution to anyone harmed by any activity of the defendant related to the scheme, conspiracy or pattern").

The fundamental purpose of the MVRA is compensatory. It "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." Ritchie, 858 F.3d at 216. "[A] restitution award may not be calculated based upon a defendant's intended losses, but must be grounded in the total, actual losses that were realized by the victims." Id. at 216 n.11.

B. Cash and Other Property Already Returned Must Be Credited

Dollar-for-Dollar.

Where the "property" lost is cash and the defendant returns cash (or a cash-equivalent), the MVRA mandates a credit. Robers v. United States, 572 U.S. 639, 640–41 (2014) (interpreting the

statutory phrase "any part of the property" as "refer[ring] only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent"). Section 3663A(b)(1)(B)(ii) is express: any restitution amount "shall be reduced by the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii).

Section 3664(j)(2) reinforces the same principle on the enforcement side: "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in (A) any Federal civil proceeding; and (B) any State civil proceeding." 18 U.S.C. § 3664(j)(2). The statute's anti-double-recovery architecture is explicit. "[A]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." United States v. Malone, 747 F.3d 481, 485 (7th Cir. 2014) (citation omitted). Accord United States v. Gallant, 537 F.3d 1202, 1249– 50 (10th Cir. 2008); United States v. Thompson, 792 F.3d 273, 280 (2d Cir. 2015); United States v. Cavallo, 790 F.3d 1202, 1240 (11th Cir. 2015) (restitution must take collateral value into account; otherwise it "confers a windfall"); United States v. Boccagna, 450 F.3d 107, 117–20 (2d Cir. 2006).

Applied here, the cash and other valuable consideration that Mr. Lindberg has already returned to the Pre-Designated Restitution Parties — including, among other items, $352.9 million in AAPC Preferred Equity transferred to ULICO in partial satisfaction of the $524 million Middle District of North Carolina judgment; $27.8 million in SNIC capital contributions under the Dogwood escrow; $79.6 million in additional cash payments to Pre-Designated Restitution Parties; the $3 million CBL subordination fee paid in connection with the Beckett refinancing;

$13.6 million in real-estate sale proceeds to ULICO; and $243.4 million in post-MOU zero-coupon bond proceeds — must be credited against any restitution figure under Robers and Section 3663A(b)(1)(B)(ii). SOF ¶¶ 41–47, 63–69; Response § II.

C. Pre-Judgment Interest Is Not Recoverable Under the MVRA.

The Special Master's addition of $263 million in pre-judgment interest is contrary to the plain language of the MVRA, contrary to DOJ policy, and contrary to controlling Supreme Court authority. Restitution is concerned with the victim's "actual loss," not with "disappointed expectations" or the time value of money. Boccagna, 450 F.3d at 119. Substantial portions of the Affiliate Investment balances were structured by the Rehabilitator's own June 17, 2019 written agreement as zero-coupon notes that, by definition, bear no contractual interest. SOF ¶¶ 80–82 & Ex. G.

D. The Preliminary Restitution Order Is Facially Defective Under the MVRA and Must Be Corrected Before It Is Enforced.

The figures in the Preliminary Restitution Order are subject to de novo determination by this Court. The MVRA permits a court to refer restitution issues to a special master only "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). The Government and the Special Master — not Mr. Lindberg — bear the burden of proving the amount of each victim's loss by a preponderance of the evidence. Id. § 3664(e). On de novo review, the Order cannot stand as written. First, its $1,655,000,000 total exceeds the Special Master's own recommendation by $30,000,000, with no explanation in the Order; a restitution figure unsupported by the record exceeds the statutory ceiling. Ritchie, 858 F.3d at 216. Second, the Order recites that its figures "already account for monetary recoveries realized by the payees prior to the entry of this Order" (Doc. No. 161 at 4), but it itemizes none, and it does not apply the $2,899,418,383 in mandatory offsets the Response documents — even though the MVRA requires that restitution "be reduced by the value … of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and that any amount recovered as compensatory damages for the same loss be credited, id. § 3664(j)(2); Robers, 572 U.S. at 640–41. Third, the Order applies an offset to only one payee — reducing PBLA's $416,000,000 award by the speculative "ultimate value" ULICO may someday receive (Doc. No. 161 at 3) — while ignoring the cash and property already returned to the other payees and treating as contingent a credit that, as the Response documents, became fixed and due when the AAPC preferred equity was transferred to ULICO in December 2022. A credit is measured "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), not as of some future liquidation. Fourth, the Order makes no finding connecting any payee's award to the loss directly and proximately caused by the offense of conviction, as Hughey and Blake require. Hughey, 495 U.S. at 413; Blake, 81 F.3d at 506. Each defect is independently correctable notwithstanding the Order's "final judgment" status. 18 U.S.C. § 3664(o); Fed. R. Crim. P. 36.

The most immediate defect, however, is the Order's internal contradiction. The Order reserves four separate categories of further reductions — prior recoveries on "non-IALA assets," prior recoveries on "zero coupon bonds," the payments itemized at page 22 of Doc. No. 132, and transfers to "SFL" and "SASL" — for investigation after sentencing, and directs the Special Master to "move the Court to amend this order" to the extent of any resulting adjustments. Doc. No. 161 at 5. The Court has thus expressly recognized that the $1,655,000,000 figure is not final and is subject to downward correction. Yet the same Order declares that figure "due and payable immediately" and enforceable as a judgment now, and authorizes abstracts of judgment to issue. Id. at 4–5. Enforcing an admittedly-unreduced figure — by liquidating Mr. Lindberg's assets — before the conceded offsets are quantified is the surest way to produce the over-recovery the MVRA forbids. Ritchie, 858 F.3d at 216. An order that imposes the operative instrument of criminal punishment as a presently enforceable money judgment, complete with liens, before the defendant's objections have been heard, cannot not be enforced. The prudent course is to stay enforcement, correct the Order to conform to the MVRA, and defer enforceability to the final restitution determination at sentencing. See 18 U.S.C. § 3664(o)(1)(C); id. § 3664(f)(2).

E. The MVRA's Legislative History Confirms That the Government's

Position Contravenes Congress's Express Intent.

Each of the foregoing defects is confirmed, and independently established, by the MVRA's legislative history. The report of the Senate Judiciary Committee accompanying the bill — S. Rep. No. 104-179 (1995), reprinted in 1996 U.S.C.C.A.N. 924 — states Congress's intent with unusual specificity, and the Government's position in this matter departs from that intent in at least six respects.

First, restitution is a make-whole remedy, not an instrument of windfall. Quoting its 1982 predecessor report, the Committee reaffirmed that the sanctioning power of society "should also ensure that the wrongdoer is required to the degree possible to restore the victim to his or her prior state of well-being." S. Rep. No. 104-179, at 13 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 926. A restitution figure that overshoots the victims' actual loss by approximately $1.244 billion does not "restore" anyone to a prior state of well-being; it confers a windfall — the precise result the Fourth Circuit has held the MVRA forbids. Ritchie, 858 F.3d at 216.

Second, the Committee confined mandatory restitution to directly-and-proximately-caused loss. It stated that the provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The Special Master's figure charges Mr. Lindberg with

losses caused by the Rehabilitator's own post-transfer discretionary decisions — the refusals of the Ares and Oaktree face-value cash transactions, the ten-year MOU hold, the pre-maturity sale of the protective zero-coupon bonds, and the below-market Clanwilliam sale — none of which was "directly and proximately caused by" Mr. Lindberg's offense conduct. And because the Rehabilitator's independent decisions were not caused by Mr. Lindberg's conduct at all — directly or indirectly — those losses fall outside ¶ 10(a) on any reading, since ¶ 10(a) reaches only losses "harmed by [his] criminal conduct." See supra Part III.

Third, the Committee directed that complex and speculative loss issues be kept out of the restitution process altogether. "In all cases," it wrote, "it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that "losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996

U.S.C.C.A.N. 924, 932.

Fourth, the Committee identified the defendant's controlling due-process interest at sentencing as "the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 933. The uncorrected Order rests on precisely such invalid premises and inaccurate information: a figure $30 million above the Special Master's own recommendation with no explanation; the omission of $2,899,418,383 in documented offsets and credits; the inclusion of approximately $263 million in pre-judgment interest the MVRA does not authorize; and the attribution to Mr. Lindberg of losses the Rehabilitator caused. Now that Ellingburg confirms MVRA restitution is criminal punishment, that due-process interest is at its zenith. See infra Part IV.

Fifth, and most directly, the Committee's clarification of the anti-double-recovery rule forecloses the Government's position. Explaining 18 U.S.C. § 3664(j)(2), the Committee stated that its purpose, "like its predecessor in current law, is to ensure that the victim is not compensated twice for the same loss," and clarified that "same loss" refers to "a specific loss arising from the same criminal act." S. Rep. No. 104-179, at 21 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 934. The Pre-Designated Restitution Parties have already received — and in many instances still hold — the AAPC preferred equity now at ULICO, the real estate transferred to ULICO, the zero- coupon-bond sale proceeds, and tens of millions in direct cash payments. To order Mr. Lindberg to pay $1.655 billion while ignoring those recoveries would compensate the victims twice for the same loss — the precise result Congress legislated against. See supra Part II.B.

Taken together, the legislative history does not merely support Mr. Lindberg's reading of the MVRA; it establishes that the Government's position is contrary to the express, repeatedly- stated intent of the Congress that enacted the statute.

F. Paragraph 10(a) Is Construed Against the Government as Its Drafter

and Does Not Waive the MVRA's Causation Requirement; the Disputed Losses Were Caused by the Rehabilitator's Intervening Decisions, Not by Mr. Lindberg.

One threshold point frames the causation analysis that follows. The plea agreement does not fix a restitution figure. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Plea Agreement ¶ 10(a) (Doc. 40). The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986); United States v. Jordan, 509 F.3d 191, 195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate. And "regardless of the resulting loss

amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation — not to causation. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to Hughey and to the MVRA alike, that the loss be caused by the conduct.

The MVRA's structure points the same way. The victims to whom ¶ 10(a) refers — the insurance companies— are "victims" under § 3663A(a)(2): persons "directly and proximately harmed" by the offense and, for the conspiracy offenses of conviction, persons "directly harmed by the defendant's criminal conduct in the course of the scheme [or] conspiracy." Proximate cause is thus the express statutory standard for the very losses at issue, and nothing in ¶ 10(a) purports to displace it. The Government retains the burden of proving the amount of each victim's loss under that standard. § 3664(e); Hughey v. United States, 495 U.S. 411, 413, 420 (1990) (restitution reaches only the loss "caused by" the relevant conduct).

Even ¶ 10(a)'s broader phrases — its reference to "indirect" harm — do not abandon proximate cause. Construed against the Government as drafter, those phrases identify the persons potentially covered; they do not announce a new, causation-free standard. And causation in restitution is read to incorporate proximate-cause limits as a matter of course, Robers v. United States, 572 U.S. 639, 645 (2014); Paroline v. United States, 572 U.S. 434, 444–45 (2014), so "indirectly harmed" means harmed through an indirect but legally cognizable causal chain — not harmed by the independent, superseding act of a third party. A superseding intervening cause defeats indirect causation no less than direct.

Applied here, the disputed components of the Special Master's figure — the losses traceable to the Rehabilitator's refusals of the Ares and Oaktree face-value transactions, the ten-year MOU hold, the pre-maturity sale of the protective zero-coupon bonds, and the below-market Clanwilliam sale — were produced by the Rehabilitator's own independent, discretionary

decisions after Mr. Lindberg had relinquished control. Those decisions are a superseding cause that breaks the causal chain — directly or indirectly — between Mr. Lindberg's conduct and the loss. See infra Part III. On no reading of ¶ 10(a) are they losses "harmed by [his] criminal conduct."

Two independent limits confirm the result even if ¶ 10(a) were read as broadly as the Government may urge. First, MVRA restitution is a make-whole remedy bounded by the victims' actual loss and may not confer a windfall. Ritchie, 858 F.3d at 216; see S. Rep. No. 104-179, at 13 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 926. Second, 18 U.S.C. § 3664(j)(2) bars compensating a victim twice for the same loss and requires crediting the value of all property and payments already returned; that command is independent of the plea agreement's scope. On any reading of ¶ 10(a), the documented offsets and credits totaling $2,899,418,383 meet or exceed the victims' actual loss, so "full restitution" has been satisfied and no additional sum may lawfully be ordered. See supra Part II.B. The amount remains the Government's to prove, § 3664(e), subject to this Court's de novo review, § 3664(d)(6).

III. The Proximate-Cause Chain Linking Mr. Lindberg to Any Post-Rehabilitation Decline in Asset Value Has Been Repeatedly Broken by the Rehabilitator's Own Intervening Discretionary Decisions.

The MVRA's proximate-cause requirement is not boilerplate. The Supreme Court has held in unanimous terms that a restitution award requires a "direct and proximate" connection between the offense of conviction and the loss to be recovered, and that "[p]roximate cause is a standard aspect of causation in criminal law and the law of torts." Paroline v. United States, 572 U.S. 434, 446 (2014). The requirement of proximate cause "precludes liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." Id. at 445; see also Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268–74 (1992); Burrage v. United States, 571 U.S. 204, 218–19 (2014).

The Government's own sentencing memorandum underscores the causal disconnect. It concedes that affiliate investment at the scale at issue was, at most, "a practice already prohibited by most states" — not by North Carolina, which "followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities" only after "publicity of Lindberg's 'unusual investment strategy.'" Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508). The statute the Government invokes — the July 26, 2019 amendment to N.C. Gen. Stat. § 58-19-10 — postdates the charged conduct. A restitution figure premised on the affiliate-investment strategy itself therefore cannot satisfy the MVRA's requirement of loss directly and proximately caused by the offense of conviction, and at a minimum confirms that the causal questions here are the "complex" and not-"clearly causally linked" issues Congress placed outside mandatory restitution.

See S. Rep. No. 104-179, at 19.

A. Robers Controls: A Victim's Choice to Hold Collateral Rather

Than Reduce It to Cash Within a Reasonable Time Breaks the Chain of Proximate Causation.

In Robers, the unanimous Supreme Court held that "[t]he basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue," and that intervening acts of the victim can sever that connection. 572 U.S. at 645–46 ("Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum — any of which, as the Government concedes, could break the causal chain.").

Justice Sotomayor, joined by Justice Ginsburg, wrote separately to clarify the controlling rule in unmistakable terms: "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers, 572 U.S. at 647 (Sotomayor, J., concurring). "[A] victim's choice to hold collateral — rather than

selling it in a reasonably expeditious manner — breaks the chain of proximate causation. … If the collateral loses value after the victim chooses to hold it, then that part of the victim's net los[s] is attributable to the victim's independent decisions. The defendant cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." Id. at 648 (alteration in original).

B. The Rehabilitator's Discretionary Refusal of Both the Ares and

Oaktree Face-Value Cash Transactions Breaks the Chain of Proximate Causation A Fortiori.

Robers concerned a victim that merely held collateral rather than selling it promptly. Even that passive choice, the Robers concurrence held, can break the chain of proximate causation. 572 U.S. at 647–48. Here, the conduct of the victim's representative was substantially more affirmative. The NCDOI and the Rehabilitator did not merely fail to monetize the affiliated loans within a reasonable time. They affirmatively refused two separate, fully-negotiated, arm's- length, face-value cash offers — each of which Mr. Lindberg personally brought to the table, each of which was made by a sophisticated and well-capitalized third-party buyer committing its own balance sheet, and each of which would have monetized the entire affiliated-loan portfolio at par within months. Supp. SOF ¶¶ 4–29. They then affirmatively sued at least one further prospective arm's-length buyer to drive that buyer away. If the Robers concurrence's principle applies to a victim's passive choice to hold collateral, it applies a fortiori to the Rehabilitator's active and litigated refusal of face-value cash offers for the same asset.

C. Compounding Application: The MOU's Ten-Year Hold of the

Affiliated Loans Is the Quintessential "Victim's Choice to Hold" Under Robers.

Even if the Rehabilitator's discretionary refusals of the Ares and Oaktree transactions did not, standing alone, break the chain of proximate causation (and they do), the Rehabilitator's affirmative election in the June 27, 2019 MOU to hold the affiliated loans for a ten-year term

— rather than monetize them — is the quintessential "victim's choice to hold" addressed in Robers. A ten-year hold of an asset that two sophisticated buyers had just independently offered to take off the NCICs' balance sheets in cash at face value is, by any measure, not

“reduc[ing] [the collateral] to cash within a reasonable time.” Robers, 572 U.S. at 647 (Sotomayor, J., concurring). Justice Sotomayor’s concurrence anticipated this very scenario: “[I]f the bank waited more than a reasonable time to sell the shares, a district court could infer that the bank was not really trying to sell but instead was holding the shares as investment assets. If the shares declined in value after the bank chose to hold them, it would be wrong for the court to make the defendant bear that loss.”

Id. at 648.

D. Application to the Restitution Figure: The Affiliated-Loan

Component is Zero After Robers.

Under any reading of the plea agreement, this component supplies no recoverable loss: ¶ 10(a) reaches only losses “harmed by [his] criminal conduct,” and after the credits Robers requires for value returned, the affiliated-loan component nets to zero. See supra Part II.B. The portion of the Special Master’s recommended restitution figure attributable to the affiliated-loan portfolio is, after application of Robers and Blake, zero. The affiliated loans were not impaired at the moment of transfer: two sophisticated arm’s-length buyers — Ares and Oaktree — independently priced them at par within four months of one another. The Rehabilitator refused both transactions. He then forced Mr. Lindberg to sign the MOU under threat of immediate liquidation. The MOU memorializes the Rehabilitator’s affirmative election to hold the affiliated loans for ten years rather than monetize them. Under Robers — and under Blake’s requirement that any compensable loss “result[] from conduct underlying an element of the offense of conviction,” 81 F.3d at 506 — any post-MOU decline in the recoverable value of the affiliated-loan portfolio is the proximate consequence of the Rehabilitator’s discretionary refusals and ten-year hold election, not of any conduct of Mr. Lindberg. Supp. SOF ¶¶ 36–47.

G. The Same Analysis Disposes of the Subsequent Rehabilitator-Caused

Losses.

These losses also fall outside ¶ 10(a) on any reading, since it reaches only losses “harmed by [his] criminal conduct,” and each is in any event already credited against the documented offsets.The proximate-cause analysis disposes of each of the subsequent Rehabilitator-caused destruction-of-value events catalogued in Section III above: (i) the rejection of the 2023 Montshire/Bob Alban offer; (ii) the blocking of the Q1 2024 Quadro Acquisition Corp. transaction valuing the SAC group at approximately $3.4 billion; (iii) the September 2025 below-market fire- sale of Clanwilliam to TA Associates for $450 million (versus an $880 million signed Quadro valuation); (iv) the rejection of the BC Partners refinancing of UKAT that would have generated approximately $39 million for the NCICs; (v) the pre-maturity sale of the $1.006 billion face-value bank-issued zero-coupon bonds for approximately $394 million, crystallizing a $611.6 million loss; (vi) the $137 million in unrelated investment losses on portfolio decisions made by the Rehabilitator’s team; and (vii) the $165+ million in fees extracted from the rehabilitation estates without any court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). Each was a “free, deliberate, and informed choice” of the victim’s representative made after the cessation of Mr. Lindberg’s conduct, and each is the proximate cause of the loss it produced. See Robers, 572 U.S. at 646; Paroline, 572 U.S. at 444–45; Blake, 81 F.3d at 506.

H. The MVRA’s Complexity Exception Counsels Against Proceeding with

Asset Sales.

The MVRA provides that a court may decline to enter a restitution order if "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is

outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); see also United States v. Reifler, 446 F.3d 65, 135–39 (2d Cir. 2006) (vacating restitution and noting that the causation and valuation difficulties "clearly implicate[]" the MVRA's complexity exception, 18 U.S.C. § 3663A(c)(3)(B)). The categorical proximate-cause issues presented by the Response — multiple independent intervening decisions by the Rehabilitator that together account for billions of dollars in destruction-of-value that the Special Master attempts to charge to Mr. Lindberg — are precisely the kind of complex causation questions the MVRA's complexity exception was designed to address. The conservative course is to stay the asset sales until the proximate-cause questions are resolved on the merits, not to proceed in the meantime as though those questions did not exist. See United States v. Rahal, No. 08-cr-566, 2015 WL 13736602, at *10 (E.D. Cal. Nov. 1, 2015) (declining restitution where determining the proper loss amount would involve "unresolved and complex issues of fact").

In addition, Lagos v. United States, 584 U.S. 577 (2018), confirms that the MVRA is to be read narrowly. Id. at 581 ("[T]hose words are limited to government investigations and criminal proceedings.").

IV. Ellingburg Confirms That MVRA Restitution Is Criminal Punishment, So the Constitutional Protections That Attach to Criminal Punishment Forbid Enforcement of a Facially Unlawful Restitution Figure.

On January 20, 2026 — after Mr. Lindberg entered his plea agreement — the Supreme Court decided Ellingburg v. United States, 607 U.S. ___ (Jan. 20, 2026). Justice Kavanaugh, writing for a unanimous Court, held in unmistakable terms that "Restitution under the MVRA is plainly criminal punishment for purposes of the Ex Post Facto Clause." Slip op. at 2. The Court reasoned that "[n]umerous features of the MVRA lead to that conclusion," id. at 2; that the MVRA labels restitution as a "penalty" for a criminal "offense"; that "[a] court may order restitution only with respect to a criminal 'defendant' and only after that defendant's conviction of a qualifying

crime"; and that "Restitution is imposed during 'sentencing' for the offense." Id. The Court further explained that "[a]t sentencing, restitution is imposed together with other criminal punishments such as imprisonment and fines," and that, for misdemeanors, restitution may be "'in lieu of' those punishments, making restitution the sole punishment for a federal offense in certain circumstances." Id. at 2–3 (citing 18 U.S.C. § 3663A(a)(1)). The Court relied on Manrique v. United States, 581 U.S. 116 (2017); United States v. Bajakajian, 524 U.S. 321 (1998); and United States v. One Assortment of 89 Firearms, 465 U.S. 354 (1984).

A. Ellingburg Undermines the Premise of United States v. Day.

The Fourth Circuit's pre-Ellingburg decision in United States v. Day, 700 F.3d 713 (4th Cir. 2012), held that "[t]he rule of Apprendi is simply not implicated" by an MVRA restitution order because "there is no prescribed statutory maximum in the restitution context." Id. at 732. Day's reasoning rested explicitly on the premise that MVRA restitution is not criminal punishment — the same premise that Ellingburg has now unanimously and squarely repudiated. Although Mr. Lindberg recognizes that Day is binding Fourth Circuit precedent until expressly overruled or distinguished, he preserves the objection that its reasoning has

been undermined by intervening Supreme Court authority — a posture this Court is duty-bound to acknowledge.

B. Hester, Erlinger, and Rimlawi Confirm the Direction of Sixth Amendment Doctrine.

Even before Ellingburg, Justice Gorsuch — joined by Justice Sotomayor — dissented from the denial of certiorari in Hester v. United States, 586 U.S. 1104 (2019), urging that "[t]he Sixth Amendment requires a jury to find any fact that triggers an increase in a defendant's statutory maximum sentence" and that the proper application of Apprendi to restitution remained an open question warranting reconsideration. Id. at 1106 (Gorsuch, J., dissenting). The Court reaffirmed in Erlinger v. United States, 602 U.S. 821, 833 (2024), that "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'" (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)). Most recently, in Rimlawi v. United States, 604 U.S. ___ (Feb. 24, 2025) (Gorsuch, J., dissenting from denial of certiorari), Justice Gorsuch reiterated that "[i]t is difficult to see how a judge's factual findings might suffice to increase a criminal defendant's exposure to a restitution award." Slip op. at 1–2 (citing Hester, 586 U.S. at 1106–07; Erlinger, 602 U.S. at 833; Apprendi, 530 U.S. at 490). And Southern Union Co. v. United States, 567 U.S. 343, 349 (2012), held that "Apprendi's 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense'" — a concern that "applies whether the sentence is a criminal fine or imprisonment or death."

C. Bajakajian and Timbs: The Excessive Fines Clause Applies.

Because Ellingburg now establishes that MVRA restitution is criminal punishment, the Eighth Amendment's Excessive Fines Clause applies directly. United States v. Bajakajian, 524 U.S. 321, 334 (1998) ("[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."); id. at 339–40 (forfeiture that "bears no articulable correlation to any injury suffered by the Government" is unconstitutional); Timbs v. Indiana, 586 U.S. 146 (2019). A $1.625 billion restitution figure that is unsupported by causally traceable losses — and that, on the record before this Court, is documented to be overpaid by approximately $1.274 billion — is presumptively grossly disproportional and subject to Excessive Fines Clause scrutiny.

D. Two Propositions Are Beyond Debate.

Whatever the ultimate resolution of the Sixth Amendment and Excessive Fines questions, two propositions are beyond debate: (1) because the MVRA itself prescribes the maximum permissible restitution — the actual loss directly and proximately caused by the offense of conviction, less property returned, 18 U.S.C. § 3663A(a)(2), (b)(1)(B)(ii) — any restitution award (and any enforcement of that award via asset sales) above that statutory ceiling exceeds the Court's authority; and (2) because MVRA restitution is now confirmed by the Supreme Court to be criminal punishment, Ellingburg, slip op. at 2, executing an asset-sale process that is the operative instrument of that punishment, against a defendant who is contemporaneously challenging the lawfulness of the underlying restitution figure, raises core constitutional concerns. The most modest reading of Ellingburg is that the Court should resolve the underlying lawfulness of the restitution figure first, and only then permit the criminal-punishment instrumentality (the asset sales) to proceed.

V. Once Restitution Has Been Fully Paid, No Lawful Basis Remains for the Continued

Retention or Liquidation of the Primary Restitution Assets.

The Special Master Order is, by its own terms, a restitution instrument. It exists to "identify, receive, apportion, and distribute funds for restitution." Doc. No. 56 at 1. Its grants of authority to the Special Master are "subject to the Court's supervision and guidance" and expressly conditioned on the goal of restitution. The Order does not vest the Special Master with general powers over Mr. Lindberg's property, separate and apart from restitution. To the contrary, the Order limits the Special Master's liquidation authority to assets "for the benefit of the victims," and requires "Court approval to liquidate" any such assets. Id. ¶ 6(e).

Once the restitution obligation is fully satisfied — and a fortiori once it has been overpaid by $1.274 billion — the predicate for the Special Master's liquidation authority dissolves. Continued retention of the Primary Restitution Assets is no longer "for the benefit of the victims"; it is, instead, an indefinite expropriation of a defendant's property by an officer of the Court who no longer has any statutory or order-derived warrant to retain it. That is true with particular force where, as here, the actual operating control of those assets sits with a structure that has, on the

present record, destroyed hundreds of millions of dollars of value, extracted hundreds of millions in self-paid fees, and is presently liquidating yet further assets at $2.5 million per month in fees, with no offsetting MVRA benefit. There is no MVRA authority — and no inherent equitable authority — for a court to hold a defendant's property after restitution has been fully paid, particularly under such circumstances. Cf. Ritchie, 858 F.3d at 206 (federal courts must "rely on a statutory source" for restitution authority).

By analogy, Federal Rule of Criminal Procedure 41(g) provides that "[i]f [the Court] grants the [return-of-property] motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings." The property owner is presumed to have a right to return; the government bears the burden of demonstrating a legitimate retention interest. Cf. United States v. Wilson, 540 F.2d 1100, 1103 (D.C. Cir. 1976).

VI. In the Alternative, the Eight De Minimis SACs Identified in the Clanwilliam Sale

Order Should Be Returned to Mr. Lindberg's Control With Immediate Effect.

Even if the Court is not yet prepared to rule on the broader question of whether restitution has been fully paid, the case for immediate return of the De Minimis SACs is independent, narrower, and overwhelming.

A. The Clanwilliam Sale Order Identifies Eight SACs That NHC

States May Have No Further Material Value to NHC.

Paragraph 20(h) of the Clanwilliam Sale Order — to which the United States, the Special Master, NHC, and Mr. Lindberg are all parties — expressly identifies eight SACs that NHC, in its own assessment, may "ha[ve] no further material value to NHC and NHC does not otherwise intend to sell" them. Doc. No. 66, ¶ 20(h). Because the entity currently holding these eight companies has itself represented that they hold no further material value to it and that it does not intend to sell them, there is no restitution-based justification for their continued retention.

B. Mr. Lindberg Is the Only Party With a Demonstrated,

Contemporaneously-Documented Ability to Build Value in the SACs.

The question of who should hold the De Minimis SACs going forward is not, on this record, a close one. The contemporaneous documentary evidence — contemporaneous board materials, contemporaneous valuations, signed third-party purchase agreements, and the Rehabilitator's own internal financial records — establishes that:

1. Mr. Lindberg built the SACs from nothing over a period of more than two decades, ultimately generating nearly $1 billion of his own personal capital that he then invested into the NCICs. He extracted zero dividends. He was a net contributor of capital to the insurance companies for years.

2. Under his management, the SACs grew from approximately $1.5 billion in aggregate value

in 2019 to approximately $3.4 billion by Q1 2024 — a $1.9 billion increase, signed by an arm's-length public-company buyer (Quadro, NASDAQ: QRDO) at a public-market 22.14x EBITDA multiple consistent with the comparable public companies in the sector.

In total, Mr. Lindberg's companies were producing $300+ million in EBITDA annually.

3. The comparable EBITDA multiples used to price the Quadro transaction have not contracted; they have expanded from 22.14x in Q1 2024 to approximately 24.37x as of November 2025. There is no exogenous market reason the SACs cannot continue to perform at or above the value Mr. Lindberg established. There is every reason to expect that, if returned to a proven operator, they will.

4. Mr. Lindberg's investment strategy was approved by the NCDOI in 2014 before he made the first affiliated investment, has been replicated by major U.S. insurance industry players (Blackstone, KKR, Apollo, Brookfield, Security Benefit/Eldridge), and was implemented under a documented Risk Mitigation Policy that the contemporaneous EBITDA performance and the signed Quadro purchase agreement confirm was successful.

Against that record, the Rehabilitator's record — documented in the Factual Background, Section III, above — stands in stark contrast: $454 million in destroyed NCIC baseline value; $137 million in unrelated investment losses; $611.6 million in protective-bond losses; $474 million in below-market Clanwilliam losses; $39 million in lost UKAT refinancing; five blocked monetization transactions; affirmative litigation against prospective buyers; and $165+ million in self-paid fees with no court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). The pattern is unambiguous: under one steward, value compounded; under the other, value collapsed.

The De Minimis SACs do not exist in equipoise between two equally plausible managers. They exist in a documented record in which one steward has been demonstrably effective and the other has been demonstrably destructive. Where the parties have already stipulated, in a filing in this very docket, that NHC does not intend to sell these eight companies, the only rational and equitable disposition — particularly in a matter in which Ellingburg has now confirmed that the asset-sale apparatus is an instrument of criminal punishment — is to return them to the party with the demonstrated ability to build their value.

C. The Equities Compel Return.

The factual record before this Court establishes that the Rehabilitator destroyed the $454 million NCIC value baseline that the Rehabilitator's own team established as of November 2018; blocked or refused multiple billion-dollar-plus monetization transactions; incurred

$137 million in unrelated investment losses; crystallized $611.6 million in protective-bond losses; sold Clanwilliam at $474 million below the signed public-market valuation negotiated by Mr. Lindberg; refused a $39 million UKAT refinancing; affirmatively litigated against a prospective arm's-length buyer; and extracted more than $165 million in fees from the very estates supposed to be preserved

for victims — a $2.5 million-per-month extraction that continues today, on the present record, without any court approval as required by N.C. Gen. Stat. § 58-30-85(a)(3). By contrast, Mr. Lindberg's management of the SACs produced $1.9 billion in value creation between 2019 and 2024. Where the parties themselves have stipulated that eight specific companies have no further restitution value and are not intended to be sold by the entity holding them, and where that entity is part of a structure with a documented track record of value destruction, the equitable course — particularly in a matter where the Supreme Court has just confirmed in Ellingburg that the asset- sale apparatus is an instrument of criminal punishment — is to return those companies to the party who can preserve and grow their value. There is no countervailing equitable interest on the other side of the ledger: NHC stipulates it does not intend to sell them.

VII. The Equities Strongly Favor the Relief Requested: Irreparable Harm Is Certain, and the Government and Victims Suffer No Cognizable Prejudice.

A. Irreparable Harm.

Once an asset is sold, it is gone. The threatened loss of unique business assets, including loss of going-concern value, is the paradigm of irreparable harm for purposes of preliminary injunctive and stay relief. Cf. Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, 915 F.3d 197 (4th Cir. 2019) (treating as irreparable an injury a court cannot remedy after a final determination on the merits and that is not otherwise compensable in damages); Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (preliminary injunctive relief is an extraordinary remedy meant to prevent irreparable harm and available only on a clear showing). A defendant who is later determined to have overpaid by $1.274 billion cannot un-sell the assets used to fund the overpayment. And no money judgment against the victim insurance companies or their guaranty associations — already in rehabilitation, with $165+ million in administrative fees having been extracted from those very

estates over the last seven years and an additional $2.5 million flowing out per month — would meaningfully restore Mr. Lindberg.

The irreparable harm is compounded, not mitigated, by the record on stewardship. Every asset sale by the present control structure is, in light of the Clanwilliam transaction's $474 million undervaluation, presumptively a below-market sale; and every dollar of sale proceeds, before reaching the Pre-Designated Restitution Parties, is subject to a documented $2.5 million-per-month draw of unapproved fees. Even setting aside the legal merits, the assets are presently being eroded both directly (through fees) and indirectly (through below-market sales). The status quo of "wait and see" is not a neutral status quo.

A further and independent dimension of irreparable harm arises from the manner in which the Specified Affiliated Companies are presently being managed. Every one of the SACs is now being operated on a short-term, for-sale footing rather than for sustained operation. That posture is, irrespective of any sale that ultimately closes and irrespective of the merits of the underlying restitution figure, itself a continuing destroyer of going-concern value: it signals instability to customers, counterparties, and key employees; it suppresses long-horizon investment in research, capital expenditure, and human capital; and it produces

the well-documented "forced-sale" or "fire-sale" discount that financial-economics literature has recognized for decades as the predictable consequence of selling productive enterprises under time pressure. See generally Andrei Shleifer & Robert W. Vishny, Fire Sales in Finance and Macroeconomics, 25 J. Econ. Persp. 29, 30 (2011) (a fire sale is "essentially a forced sale of an asset at a dislocated price," yielding prices "far below value in best use, causing severe losses to sellers"). The empirical confirmation of this dynamic on the present record is the September 2025 Clanwilliam sale to TA Associates for approximately $450 million — a $474 million below-market shortfall against the

$880 million signed Q1 2024 Quadro purchase-agreement valuation, with no offsetting deterioration in the company's fundamentals (the comparable public-company EBITDA multiples in fact appreciated from 22.14x to 24.37x over the interval). SOF ¶ 75 & Exs. G3, I3, I4. The same management dynamic that produced the Clanwilliam shortfall is now in place across the balance of the Primary Restitution Assets, including in connection with the recent Beckett refinancing. Every additional sale conducted under that posture imposes a further increment of value destruction — and value destruction of a kind not curable by money damages, because no remedy exists against the victim insurance companies and their guaranty associations to which the discounted proceeds will have been distributed.

Compounding the foregoing is a structural one-way ratchet built into the MVRA itself. Once restitution proceeds are paid out by the Special Master to the Pre-Designated Restitution Parties, the statute provides Mr. Lindberg with no mechanism to recover those funds — even if the restitution figure is later corrected downward, even if it is later determined that no restitution was owed at all, and even if it is later determined (as the documentary record demonstrates) that Mr. Lindberg has overpaid. Section 3664(j)(2) operates in only one direction: "Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss." 18 U.S.C. § 3664(j)(2). The statute thus authorizes the offset of later civil recoveries against further restitution payments; it does not authorize the recovery of restitution proceeds already in the victim's hands. There is no statutory clawback, and the MVRA's general framework treats restitution payments — once received by the victim — as belonging to the victim, not as subject to subsequent disgorgement. The practical consequence is concrete: if asset sales proceed and proceeds are distributed to the Pre-Designated Restitution Parties — many of which are insurance companies in rehabilitation, with assets depleted by more

than $165 million in administrative fees over seven years and continuing to be depleted at approximately $2.5 million per month — Mr. Lindberg will, as a practical matter, have no remedy of any kind. The money will be gone. The assets that funded the money will be gone. And no later judicial determination — no correction of the restitution figure, no final adjudication of the Response, no appellate reversal — will restore either.

There is a third and decisive dimension to the irreparable-harm analysis. The entire gap between Mr. Lindberg's documented offset position ($2,899,418,383) and the Court's entered figure ($1,655,000,000) consists exclusively of credits attributable to prior sales and other transactions that have already occurred. See Response §§ II.A–II.G; SOF ¶¶ 41–54, 63–77. Those credits include the $352.9 million AAPC preferred-equity transfer to ULICO in December 2022; the $611.6 million loss crystallized by the Rehabilitator's pre-maturity sale of $1,006,239,867 in protective bank zero-coupon bonds; the $243.4 million in post-MOU zero-coupon-bond proceeds already received by the victims; the $474 million Clanwilliam below-market loss; the $39 million UKAT/BC Partners loss; the $79.6 million in additional cash payments to Pre-Designated Restitution Parties; the $27.8 million SNIC

capital contribution under the Dogwood escrow; the $13.6 million in real-estate sale proceeds to ULICO; and the $3 million CBL subordination fee paid in connection with the Beckett refinancing. These are not speculative future credits. They are historical, documented, and quantified transactions that have already taken place.

That fact transforms the irreparable-harm calculus. If Mr. Lindberg's documented credits are correct — and they are supported by contemporaneous third-party documentary evidence — then restitution under the MVRA has been fully satisfied, no further sales are necessary to satisfy any cognizable MVRA obligation, and the proceeds of any further sales would, on the documentary record, be owed to Mr. Lindberg rather than to the Pre-Designated Restitution

Parties. Continued asset sales in that posture do not advance restitution; they instead liquidate Mr. Lindberg's property to fund a recovery that has — by approximately $1.244 billion — already been completed, under a statute that provides no clawback once the proceeds are disbursed. Cf. Ritchie, 858 F.3d at 216 (the MVRA "does not allow a court to grant a windfall to the victim"). The asymmetry of consequence is decisive and supports the requested stay. If the stay is granted and Mr. Lindberg is ultimately wrong on the credits, every asset that exists today will still exist tomorrow, and can be sold tomorrow at the same value or higher (given the documented upward trajectory of comparable EBITDA multiples). The Government and the victims lose nothing more than a brief delay. If the stay is denied and Mr. Lindberg is ultimately right on the credits — as the contemporaneous documentary record establishes he is — the assets will have been liquidated below market, the proceeds will have been disbursed to victims from whom no recovery is available, the $1.244 billion overpayment will compound, and Mr. Lindberg will be left with no meaningful remedy. The only path that preserves the Court's full range of remedial options — and that protects against the asymmetric and irreversible harm threatened by the alternative — is to stay.

A final, especially urgent dimension of irreparable harm is established by what has already happened: the recent Beckett sale was effectuated without the prior court approval that Paragraph 6(e) of the Order Appointing Special Master expressly requires. Doc. No. 56, ¶ 6(e) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims"). The Special Master Order's sequencing — Court approval first, liquidation second — is not advisory. It is the structural protection this Court built into the Special Master's authority precisely to ensure that asset dispositions occur only with judicial oversight, only on a properly developed record, and only after the affected parties (including Mr. Lindberg) have had an opportunity to be

heard. The Special Master sought such approval for Clanwilliam. See Doc. No. 66 (Clanwilliam Sale Order). No equivalent order was sought or entered for Beckett. The fact that the Beckett sale nonetheless proceeded — transferring a Lindberg-related asset outside his control, generating proceeds outside the framework of court-approved disposition, and exposing those proceeds to the same no-clawback dynamic discussed above — is a concrete demonstration that, absent the requested stay, the Court's express supervisory architecture will continue to be circumvented as additional sales are consummated.

Every further sale conducted without prior court approval is, by itself, an irreparable harm of a distinct kind: it erodes the Court's Paragraph 6(e) supervisory authority; it deprives Mr. Lindberg of the procedural protection that the Special Master Order extends to him as the owner of the assets being disposed of; and — once consummated — it cannot be undone,

because title has changed, consideration has been disbursed, and (as set out in the preceding paragraphs) the MVRA provides no mechanism to recover the proceeds. That a sale of this nature has already occurred is not a theoretical risk; it is a present, ongoing breach of the Court's express order, and a sufficient ground — standing alone — for the immediate entry of the requested stay. Cf. La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957) (the use of masters is to aid the court "and not to displace" it).

B. No Cognizable Prejudice to the Government or the Pre-Designated Restitution Parties.

The Government and the Pre-Designated Restitution Parties suffer no cognizable prejudice from a stay or from the return of the De Minimis SACs. The assets are not perishable. They are not in flight. They cannot run away in the night. And as to the De Minimis SACs specifically, the parties have themselves stipulated that those entities have no further material value to NHC and that NHC does not intend to sell them. The only thing returning them prevents is further value destruction under the present control structure. The only thing the stay prevents is the irretrievable liquidation of property to fund a restitution obligation that the law does not permit.

C. The Public Interest.

The public interest in the enforcement of restitution orders is real, but it is an interest in correct enforcement — not in the rushed liquidation of a defendant's assets to fund a recovery in excess of the victim's actual loss. The public interest in the integrity of federal criminal proceedings, in scrupulous adherence to the statutory limits of the MVRA, in the protections that attach to criminal punishment under Ellingburg, and in the basic principle that court-appointed officers must operate "subject to the Court's supervision and guidance" rather than as autonomous instruments of value destruction, all favor the relief Mr. Lindberg requests.

D. Mr. Lindberg's Demonstrated Cooperation and Track Record of Value Creation.

Mr. Lindberg has not shirked his obligations. In December 2025, his actions facilitated the payment of over $157 million to over 43,000 excess policyholders of the NCICs, ensuring that every policyholder of his American insurance companies has been made whole. SOF ¶ 83. He voluntarily relinquished a $40 million tax escrow that had been established for his benefit in connection with the September 2025 Clanwilliam sale, precisely so that those policyholder payments could be made. Supp. SOF ¶ 64. He has cooperated with the Special Master, has produced voluminous records, and has directed his counsel to engage with the Special Master and the Government on a weekly basis. And, as set forth in the Factual Background, Section III, above, Mr. Lindberg's management of the SACs produced $1.9 billion in value creation between 2019 and 2024, was built upon nearly $1 billion of his own personal capital invested into the NCICs over the years, generated zero dividends in his favor, and is independently corroborated by the BRG forensic analysis identifying damages in excess of $400 million caused by the regulatory process itself.

CONCLUSION

For the foregoing reasons, Defendant Greg E. Lindberg respectfully requests that the Court enter an Order: (i) staying all further sales of his assets, and all further asset-sale

processes, pending adjudication of his Response and the entry of a final restitution order in this case; (ii) directing the return of the Primary Restitution Assets, as defined in the Special Master Order, to Mr. Lindberg's full ownership and control on the ground that restitution has been fully paid and overpaid by approximately $1.274 billion; and (iii) in the alternative, directing the immediate return to Mr. Lindberg's full ownership and control of the eight De Minimis SACs identified in the Clanwilliam Sale Order at Paragraph 20(h). The contemporaneous record establishes that the present control structure has destroyed billions of dollars in value and continues to draw approximately $2.5 million per month in fees against the assets it purports to manage, while Mr. Lindberg himself has a twenty-year, third-party-corroborated track record of building value across the same companies. Whatever the ultimate disposition of the broader restitution dispute, on the De Minimis SACs at least, there is no rational basis to leave those eight companies in the hands of an entity that has stipulated it does not intend to sell them and that has demonstrated, over six years, that it does not know how to grow them.

Dated: June 9, 2026.

Respectfully submitted,

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this

Emergency Motion and accompanying Memorandum of Law, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

2. Every statement and every citation to an authority contained in this Motion and

Memorandum of Law has been checked by an attorney in this case and/or a paralegal working at his or her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 9, 2026.

/s/ Kenneth Barnes___________ Kenneth Barnes

CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of June 2026, I caused a true and correct copy of the foregoing Defendant Greg E. Lindberg's defendant Greg E. Lindberg's Emergency Motion (I) To Stay All Further Asset Sales And Asset-Sale Processes And To Stay Enforcement Of The Preliminary Order Of Restitution (Doc. No. 161); (Ii) To Correct And Amend The Preliminary Order Of Restitution To Conform To The Mandatory Victims Restitution Act; (Iii) To Return The Primary Restitution Assets To Defendant's Control On The Ground That Restitution Has Been Fully Paid And Overpaid; And (Iv) In The Alternative, To Return The De Minimis Sacs Identified In The Clanwilliam Sale Order To Defendant's Control With Immediate Effect, together with the supporting Memorandum of Law, to be

filed with the Clerk of the Court for the United States District Court for the Western District of North Carolina using the Court's electronic filing system, which will serve notice on all counsel of record.

/s/ Kenneth Barnes___________ Kenneth Barnes

**Doc. 174 — Consolidated / Supplemental Statement of Facts (filed 06/09/2026)**

GREG LINDBERG'S SUPPLEMENTAL

STATEMENT OF FACTS IN SUPPORT OF DEFENDANT'S RESPONSE AND OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION

Defendant Greg E. Lindberg respectfully submits this Supplemental Statement of Facts in support of his Response and Objection to the Special Master's Report and Recommendations Regarding Restitution (Docket No. 132). All matters set forth in the prior Statements remain in full force and effect.

This filing further sets forth, additional facts, an expanded and dedicated factual treatment of the more than $1 billion in face value of investment-grade bank zero-coupon bonds that Mr. Lindberg directed the NCICs to purchase in May 2018 as principal-loss insurance covering the affiliate-loan portfolio dollar-for-dollar. As set forth in detail in Section VI, the contemporaneous documentary record establishes that the approximately $1.006 billion in par value of zero-coupon bonds carried on the NCICs' balance sheets fully covered, on a dollar-for-dollar basis, the approximately $1 billion of outstanding affiliate loans. In short, Mr. Lindberg purchased insurance against any loss of the principal value of the affiliate loans. Section VI supplements and expands upon the treatment of those instruments at Paragraphs 47–54 of the Original Statement and in Mr. Lindberg's Response and Objection to the Special Master's Report (Docket No. 132).

This Supplemental Statement addresses the following interrelated matters, each of which is decisive of causation, loss calculation, intent, and the parties' obligations under the plea agreement:

(i) the North Carolina Department of Insurance ("NCDOI") expressly approved affiliate investments by Mr. Lindberg's insurance affiliates at levels up to forty percent (40%) of total admitted assets, beginning in 2014 and continuously documented through at least April 2016 in the NCDOI's own written annual statement review correspondence (Exhibit A12);

(ii) Mr. Lindberg personally guaranteed obligations of the borrower-affiliates to the NCICs in an aggregate amount of approximately $2.39 billion under the March 11, 2019 Amended & Restated Backstop Agreement Original Statement (Exhibit B), and continuously reinvested his personal capital into the affiliated platform — conduct categorically inconsistent with the specific intent to defraud the very insurance companies the Government identifies as the principal victims;

(iii) affiliate investments at, near, and exceeding 40% of admitted assets are standard industry practice among the largest private-equity-affiliated life insurers in the United States, as confirmed by Exhibit B5 and the May 26, 2026 reporting in The Wall Street Journal (Exhibit B6);

(iv) in May 2018 Mr. Lindberg directed the NCICs to invest more than $1 billion in face value of investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA, which bonds were the principal-protection component of the Principal Protected Notes (the "PPNs"), were held for the sole and explicit purpose of insuring the NCICs against any loss of principal on the underlying affiliate loans, covered the outstanding affiliate loans dollar-for-dollar, and were contractually obligated to pay $1,006,239,867 at par if held to maturity — but which the

Special Deputy Rehabilitator discretionarily sold prior to maturity for approximately $394 million, crystallizing a $611.6 million loss on the very instruments whose only purpose was to insure the affiliate loans against principal loss; (v) two separately negotiated, arm's-length, face-value cash transactions for the affiliate- loan portfolio — the executed November 22, 2018 Ares Management letter of intent (Exhibit B) and the February 2019 Oaktree "Global Solution" transaction (Exhibits C, D, and E) — were on the table within months of Mr. Lindberg's October 18, 2018 transfer of operational control to the Special Deputy Rehabilitator, either of which would have paid every NCIC policyholder in full by approximately June 2019; (vi) the Special Deputy Rehabilitator of the NCICs, Mike Dinius, (a) discretionarily refused both pending arm's-length transactions, (b) coerced Mr. Lindberg — under express written threat of immediate liquidation of all four NCICs — to execute the June 27, 2019 Memorandum of Understanding (the "MOU") that affirmatively locked the affiliate loans in place for a ten-year term, and (c) employed what Mr. Dinius's own counsel characterized as a "hammer and nail" analogy to extract representations and warranties from Mr. Lindberg under that same liquidation threat, all of which sever proximate causation as a matter of law under Robers v. United States, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring), and United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006); and (vii) post-sentencing conduct by counterparties to the plea agreement has materially impaired Mr. Lindberg's ability to perform under the plea agreement and is preserved

here for appellate review under Santobello v. New York, 404 U.S. 257, 262 (1971), and Puckett v. United States, 556 U.S. 129, 134–37 (2009). See Exhibit B12, Notice of Breach.

The paragraphs in this Statement are numbered consecutively beginning with Paragraph 1. Where cross-reference to the Original Statement is necessary, the paragraph numbers from the Original Statement are used (e.g., "Original Stmt. ¶ 13").

I. BASIS OF KNOWLEDGE AND AUTHORITY TO SUPPLEMENT

1. I am the Defendant in the above-captioned matter, and I submit this Supplemental Statement of Facts in support of the Response and Objection to the Special Master's Report and Recommendations Regarding Restitution. The matters set forth herein are based on my personal knowledge or on documents that I am able to access, and I am competent to testify to them. I directed, oversaw, and was the ultimate decision-maker on each of the transactions, agreements, and dollar figures discussed below.

2. In Paragraph 86 of the Original Statement, I expressly reserved the right to supplement that filing upon restoration of access to documents materially constrained during my detention. This Statement is submitted pursuant to that reservation of right and to provide an update of relevant facts for the convenience of the Court.

3. I have personal knowledge of (i) the September 2014 affiliated-investment presentation to the NCDOI and the NCDOI's 2014–16 written confirmation of the agreed forty- percent ceiling on affiliated investments (Exhibit A12); (ii) my execution of the Amended & Restated Backstop Agreement on March 11, 2019 Original Statement (Exhibit B); (iii) the May 2018 directive to the NCICs to construct the Principal Protected Notes and to purchase the underlying $1+ billion in face value of bank zero-coupon bonds as dollar-for-dollar principal-loss insurance for the affiliated investments; (iv) the negotiations with Ares Management Corporation

in late 2018 and early 2019 memorialized in Exhibits A and B; (v) the November 5, 2018 internal valuation of the NCICs prepared by personnel under the Special Deputy Rehabilitator's control (Exhibit J); (vi) each of the post-October 18, 2018 discretionary decisions of the Special Deputy Rehabilitator addressed in Sections VI, XIV, XVI, and XVII below; (vii) the negotiations I personally directed with Oaktree Capital Management between January and February 2019 that produced the February 2019 Oaktree "Global Solution" Presentation (Exhibit C); (viii) the parallel negotiations I personally directed with HPS, the Soros funds, and other prospective SPV financing counterparties (Exhibits D and E); and (ix) the circumstances under which the June 27, 2019 MOU was presented to me on a take-it-or-leave-it basis under express threat of immediate liquidation of the NCICs.

4. From April 2, 2026 through May 1, 2026 — the very period in which I was required to respond in detail to the Special Master's Report — I was in federal custody at the Grayson County Detention Center in Kentucky, and I have since been moved to other facilities. My access to documents has been materially constrained by my detention. I have made every reasonable effort, with the assistance of my counsel, to verify each figure and assertion set forth in this Statement from documents to which I have access, including the materials maintained by my counsel. Should the Court require oral testimony, I am prepared to testify consistent with this Statement in any forum the Court directs. See Exhibit B12, Notice of Breach.

II. CORPORATE STRUCTURE AND BACKGROUND CONTEXT

5. From 1991 through October 18, 2018, I was the founder and ultimate beneficial owner of the family of insurance, financial-services, and operating companies generally referred to as Eli Global, LLC and its affiliates, including Global Bankers Insurance Group, LLC ("GBIG"), Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), and Colorado Bankers Life Insurance Company ("CBL") (collectively with their North Carolina-domiciled affiliates, the "NCICs"); Private Bankers Life and Annuity Company Ltd. ("PBLA"); Northstar Financial Services, Ltd. ("Northstar"); OMNIA; Private Bankers Insurance Holdings, Ltd. ("PBIHL"); and a portfolio of more than 100 affiliated finance companies, asset- management companies, and operating businesses.

6. I founded Eli Global, LLC in 1991 as a sole-proprietorship publishing business. Over the subsequent 27 years, I built Eli Global and its affiliates into a diversified holding-company group encompassing, by 2018, more than 100 operating subsidiaries across publishing, healthcare-services, life-insurance, reinsurance, asset-management, and finance-company business lines, employing over 7,000 people across the United States, the Netherlands, Bermuda, and other jurisdictions.

7. Beginning in 2014, Eli Global began acquiring U.S. insurance companies through its GBIG affiliate. The acquisitions of CBL, SNIC, BLIC, and Southland National Reinsurance Corporation ("SNRC") (collectively, the NCICs) were effected through transactions approved by the NCDOI. Each acquisition was reviewed and approved by the NCDOI's market-conduct, financial-examinations, and rehabilitation-and-liquidation divisions. The NCICs were domiciled in North Carolina and regulated under the North Carolina General Statutes, Chapter 58. The Wake County Superior Court rehabilitation proceedings were brought against all four NCICs (CBL, BLIC, SNIC, SNRC); against me individually; and against three FinCo entities — Academy Association, Inc., Edwards Mill

Asset Management, LLC, and New England Capital, LLC — together with PBLA. See Southland National Insurance Corp. v. Lindberg, No. 19 CVS 008664 (N.C. Super. Ct., Wake Cnty.).

8. In or about 2016, in consultation with the NCDOI, for purposes of credit-quality enhancement and diversification, certain of the NCICs' affiliated investments were routed through non-regulated intermediate vehicles (the "FinCos") — finance companies and asset-management companies that would borrow money from the NCICs as senior secured creditors and then deploy those funds across diversified underlying portfolios that included loans to other affiliates and to operating businesses.

9. On October 18, 2018, I voluntarily transferred operational control of CBL, SNIC, and BLIC to Mike Dinius, the Special Deputy Rehabilitator. On June 27, 2019, the Wake County Superior Court entered an Order of Rehabilitation pursuant to N.C. Gen. Stat. Chapter 58, Article 30, formally appointing Mike Dinius of Noble Consulting Services, LLC, as Special Deputy Rehabilitator for the NCICs.

## III. THE NCDOI EXPRESSLY APPROVED AFFILIATE INVESTMENTS UP TO 40% OF TOTAL ADMITTED ASSETS

The Government has consistently characterized the level of affiliate investment by Mr. Lindberg's insurers as inherently impermissible. The contemporaneous written record from the NCDOI itself disproves that characterization.

10. On April 11, 2016, NCDOI Senior Financial Analyst Jessica Price, CPA, CFE, issued a written annual-statement Review Letter (the "Review Letter") to SNIC. The Review Letter (Exhibit A12) recites the NCDOI's own understanding of the regulatory arrangement that had been negotiated and agreed at the time SNIC was acquired and redomesticated to North Carolina, in materially the following terms:

The Department has the understanding that the Company had agreed to not invest more than 40% of total admitted assets in affiliates. Excluding the investments in insurance company affiliates, it appears at December 31, 2015, that the Company has 50% of total admitted assets invested in affiliates. The Company is directed to refrain from investing further in affiliates and to provide a plan outlining how it will return to compliance with the 40% agreed upon limit. (Exhibit A12 at 1, ¶ 1.)

11. First, the NCDOI — the very regulator the Government invokes throughout its sentencing memorandum — confirmed in writing that a forty-percent affiliate-investment ceiling was an agreed regulatory parameter, not a violation. The dispute reflected in the Review Letter is purely interpretive: the NCDOI took the position that the 40% ceiling applied to all affiliated assets, while SNIC took the position that the ceiling applied to affiliated sub-investment-grade investments. There is no allegation of concealment, fraud, or surreptitious investment in the Review Letter; on the contrary, the NCDOI plainly had visibility into the affiliate book down to the percentage point.

12. Second, SNIC's April 19, 2016 written response (also Exhibit A12) details the company's plan to come into compliance with the NCDOI's interpretation by year-end 2016, including by selling affiliated securities to unaffiliated special-purpose vehicles and transferring control of borrower operating companies to unaffiliated entities. The response expressly states: "After these proposed transactions, our total affiliate investments (not

including affiliated insurance investments) will be below 40% of total assets. We will update our investment policy accordingly as well to comply with this 40% limit on all non-insurance affiliated investments."

(Exhibit A12 at 1–2.)

13. Third, the Review Letter and SNIC's response together demonstrate that the affiliate-loan structure was disclosed, regulated, audited, and supervised throughout the relevant period. The NCDOI was reviewing affiliate composition by junior lien, senior lien, payment-in- kind, and cash pay; it was scrutinizing the FE bond designations under NAIC criteria; it was reviewing the Funds Withheld Reinsurance Agreement and Retrocession Agreement, both of which the NCDOI had approved on May 14, 2015; and it was issuing line-item directives about how to book IMR amortization and ceding commissions under N.C. Gen. Stat. § 58-7-31(d)(2),

and how to report MGA relationships under N.C. Gen. Stat. § 58-34-2 and management agreements under N.C. Gen. Stat. § 58-34-10(d). (Exhibit A12, ¶¶ 2–9, 13, 15.) This was an ongoing, regulated relationship governed by Article 19 of Chapter 58 of the North Carolina General Statutes (the Insurance Holding Company Regulatory Act, N.C. Gen. Stat. §§ 58-19-1 et seq.); and the disputed losses attributed to that relationship do not satisfy the required causal standard.

14. The Government's sentencing memorandum, in its characterization of "affiliate loans" as inherently emblematic of fraudulent intent, simply cannot be reconciled with the contemporaneous NCDOI written record. To the contrary, that record establishes that the affiliate- loan structure was the regulatorily approved business model under which the NCICs operated, with a known, negotiated, written 40% admitted-assets ceiling. The affiliate-investment levels were themselves disclosed and regulator-approved, and no North Carolina statute capped those levels during the charged period. Indeed, the Government's own sentencing memorandum concedes that North Carolina had no statutory limit on affiliate investment until 2019 — after the conduct charged in the indictments. The Government characterizes affiliate investment at this scale as "a practice already prohibited by most states," and then acknowledges, in the same memorandum, that North Carolina only "followed suit, passing a law restricting insurers from investing more than 10% of its assets in affiliated entities" after "publicity of Lindberg's 'unusual investment strategy.'" Gov't Sentencing Mem. at 22–23 & n.12 (Doc. 508) (citing North Carolina Governor Signs Bill to Eliminate Investment Loophole, Wall Street Journal (July 26, 2019)). The statute to which the Government refers — the July 26, 2019 amendment to N.C. Gen. Stat. § 58-19-10 extending the investment limit to affiliates — postdates the conduct on which the Special Master's loss computation rests.

## IV. MR. LINDBERG PERSONALLY BACKSTOPPED AND CONTINUOUSLY REINVESTED IN THE NCICS — CONDUCT INCOMPATIBLE WITH FRAUDULENT INTENT

A defendant who is defrauding insurance companies for his personal benefit extracts capital from those companies. He does not personally guarantee, with his own credit, billions of dollars of the very obligations now alleged to be the source of loss; and he does not pour additional personal funds into the affiliated platform precisely when prudence and self-interest would counsel withdrawal. Yet that is exactly what I did.

### A. The March 11, 2019 Backstop Agreement: approximately $2.39 billion in

personal guaranty exposure.

15. On March 11, 2019, I executed the Amended & Restated Backstop Agreement in favor of the very insurance company lenders the Government identifies as victims: Bankers Life Insurance Company; Colorado Bankers Life Insurance Company; Northstar Financial Services (Bermuda) Ltd.; Private Bankers Life and Annuity Co., Ltd.; and Southland National Insurance Corporation. (Exhibit B.) Under that agreement, I personally agreed to make regularly scheduled principal, interest, and preferred-equity payments — in my individual capacity, with no carve-out for personal assets — if any of the borrower obligors failed to do so. (Exhibit B, §§ 1–2.)

16. The aggregate scheduled obligations personally guaranteed by me under the Backstop Agreement, totaled position-by-position from Exhibits A and B to that agreement, are as follows:

Aggregate Principal Beneficiary / Category (per Exhibit B, Ex. A & Ex. B) Guaranteed Bankers Life Insurance Company — loans (16 positions) $78,054,642.43 Colorado Bankers Life Insurance Company — loans (45 positions) $1,334,404,619.25 Northstar Financial Services (Bermuda) Ltd. — loans (24 positions) $135,440,850.12 Private Bankers Life and Annuity Co., Ltd. — loans (34 positions) $458,299,208.10 Southland National Insurance Corporation — loans (25 positions) $241,847,429.32 Northstar Financial Services (Bermuda) Ltd. — preferred equity (13) $103,428,892.85

Aggregate Principal Beneficiary / Category (per Exhibit B, Ex. A & Ex. B) Guaranteed Private Bankers Life and Annuity Co., Ltd. — preferred equity (9) $39,633,481.58 TOTAL Personal Guaranty Exposure $2,391,109,123.65

17. Stated plainly: I put my personal credit on the line for approximately $2.39 billion of payment obligations owed to the very insurance companies the Government characterizes as the victims of fraud. The Backstop Agreement was enforceable by each Beneficiary as a third-party beneficiary and was governed by North Carolina law. Original Statement (Exhibit B, §§ 7–8.) I moved money in — and pledged my personal credit for billions more on top of that.

B. Continuous reinvestment of personal capital into the affiliated platform.

18. Beyond the Backstop Agreement, the broader factual record reflects a multi-year pattern in which I deployed personal capital into the affiliated operating platform rather than extracting it. I did not take large salary draws or dividend distributions; instead, capital that could have been distributed to me was retained at the borrower and operating-company level and used to fund growth, acquisitions, and operating capacity. To the extent the Special Master's preliminary restitution computation treats every dollar of outstanding affiliate loan as an extraction by me, that treatment ignores both (i) the bona fide commercial purpose for which those funds were deployed within the borrower operating companies, and (ii) my contemporaneous personal capital commitments to the very same platform.

C. Inferential weight of this conduct on intent.

19. The Supreme Court has made clear that materiality of any false statement is also an essential element of federal mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and bank fraud (18 U.S.C. § 1344). Neder v. United States, 527 U.S. 1, 25 (1999). And good

faith is a recognized defense to those offenses. See United States v. Godwin, 272 F.3d 659, 666–67 (4th Cir.

2001) (recognizing that a defendant's good-faith belief negates the specific-intent element of mail and wire fraud).

20. Personal guarantees of approximately $2.39 billion of obligations to the alleged

victim entities are, at a minimum, strong circumstantial evidence that I believed in good faith that the affiliate-loan structure was financially sound and would be repaid — and that I was willing to stand behind it with my own personal credit if it were not. The Government has offered no evidence — because none exists — that I believed the affiliate loans would not be repaid, that I intended to default on the Backstop Agreement, or that I disposed of, encumbered, or shielded the personal assets that stood behind that commitment.

21. Equally important, the same Backstop Agreement that demonstrates my good faith

provides the Government's alleged victims with a direct, contractual, individual-capacity recovery mechanism against me — a mechanism wholly independent of the criminal restitution order. To the extent any Beneficiary under the Backstop Agreement has already collected from me, from the obligors, or from collateral, those recoveries must be credited against the Special Master's preliminary restitution figure under the Backstop Agreement's own offset clause Original Statement (Exhibit B, § 3(d)) and, in any later civil proceeding, under 18 U.S.C. § 3664(j)(2) ("Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in — (A) any Federal civil proceeding; and (B) any State civil proceeding . . . ."). See generally United States v. Alalade, 204 F.3d 536, 540 n.4 (4th Cir. 2000) (discussing operation of § 3664(j)(2)).

V. AFFILIATE INVESTMENTS AT, NEAR, AND ABOVE 40% OF ADMITTED

ASSETS ARE STANDARD INDUSTRY PRACTICE

The Government's sentencing memorandum further asserts, expressly and by implication, that the use of affiliate loans on the scale undertaken by the NCICs falls outside ordinary insurance-

industry practice. Recent peer-industry data and contemporaneous reporting in the financial press demonstrate that the opposite is true.

A. Peer-insurer affiliate exposure (Exhibit B5).

22. Exhibit B5 reproduces a chart compiled by Athene/Apollo from peer-insurer 2024–

25 statutory filings and standalone 2Q 2025 10-Q disclosures. That chart shows the following affiliated-asset percentages of total assets at the largest U.S. life insurers, as of the dates indicated:

Related-Party Assets as % of Insurer (Affiliate Sponsor) Total Assets NY Life (NY Life IM) 5% MetLife (MetLife IM) 8% Prudential (PGIM) 8% Athene (Apollo) 12% MassMutual (Barings) 13% Global Atlantic (KKR) 22% American National (Brookfield) 30% Everlake (Blackstone) 35% Security Benefit (Eldridge) 43% SNIC (NCDOI-approved ceiling, 2014–2018) 40% (cap)

23. Six of the nine large U.S. life insurers depicted in Exhibit B5 operate with affiliate

exposures of 12% or higher; four exceed 22%; three exceed 30%; and Security Benefit (owned by Eldridge alongside Todd Boehly) operates at 43% — a level higher than the 40% ceiling that the NCDOI itself negotiated as acceptable for SNIC and the other NCICs.

B. Wall Street Journal reporting confirms the trend.

24. On May 26, 2026, the same day I was sentenced in this matter, The Wall Street Journal published "For Wall Street's Private Investments, In-House Insurers Are the Go-To Buyer," by Heather Gillers (the "WSJ Article," Exhibit B6). The WSJ Article reports the following objective facts about the use of affiliated investments by U.S. life insurers, each of which is dispositive of the Government's industry-practice claim:

a. U.S. life and annuity insurers reported $413 billion in affiliated investments in 2025 — twice the amount reported in 2020 — according to insurance ratings firm AM Best, as cited in the WSJ Article; b. at six private-equity-linked life insurers tracked by The Wall Street Journal (Athene/Apollo, American Equity/Brookfield, American National/Brookfield, Forethought/KKR, Commonwealth/KKR, and Security Benefit/Eldridge), affiliated assets grew 22% over the past year to a combined $127 billion; c. Athene (Apollo) reported the largest affiliated-asset portfolio of any U.S. life insurer at $52 billion in 2025 — $12 billion more than in 2024; d. American Equity Investment Life Insurance's affiliated-asset portfolio grew from $450 million in 2023 to $6.5 billion in 2025 — a 14-fold increase — after acquisition by Brookfield Wealth Solutions; e. at Security Benefit Life, more than one-third of total assets were classified as affiliated in 2025; and f. Kevin Clark, chief accounting specialist at the Iowa Insurance Division, is quoted in the WSJ Article as describing this trend as the principal driver of recent growth in affiliated investments — not as an aberration, but as the mainstream evolution of the U.S. life insurance industry.

C. Three-part refutation of the Government's sentencing-memorandum claim.

25. Taken together, Exhibits A12, B5, and B6 refute the Government's sentencing-memorandum claim that affiliated loans are not standard industry practice. The refutation operates at three independent levels:

a. Regulatory approval. The NCDOI itself approved the SNIC affiliated-investment structure at a 40% cap of total admitted assets in 2014, documented that 40% level in writing in the NCDOI's own 2016 financial review (Exhibit A12), and continuously examined SNIC under that approved framework thereafter. A practice that the State of North Carolina Department of Insurance approved in writing in 2014 and re-confirmed in writing in 2016 is, by definition, not outside standard industry practice. b. Peer-company concentration. The largest U.S. life insurers — including those owned by Apollo, Brookfield, KKR, MassMutual, Blackstone, and Eldridge — currently hold affiliated investments at concentrations of 12% to 43% of total assets (Exhibit B5). The 40% concentration the NCDOI approved for SNIC in 2014 is squarely within that mainstream band. Indeed, Security Benefit Life (owned by Eldridge) maintains 43% affiliated investments — above the 40% cap the NCDOI approved for SNIC — with full ongoing approval of its primary state insurance regulator. c. Industry-wide aggregate. U.S. life and annuity insurers in the aggregate held $413 billion in affiliated investments in 2025, twice the 2020 level, with year-over-year growth of 22% at the six PE-linked life insurers tracked by the WSJ (Exhibit B6). An aggregate $413 billion of affiliated investments held openly across the U.S. life insurance industry, with full regulatory disclosure, is the definition of standard industry practice.

26. The implication for sentencing and restitution is straightforward: nothing in the structural decision to deploy affiliated investments at or below the 40% level supplies either the mens rea required for the underlying offense or the proximate-cause linkage required

for MVRA restitution. The Government's industry-practice argument should be rejected, and the Special

Master's preliminary restitution computation should not treat affiliate-loan composition as evidence of either.

## VI. THE MORE THAN $1 BILLION IN BANK ZERO-COUPON BONDS THAT MR. LINDBERG DIRECTED THE NCICS TO PURCHASE AS DOLLAR-FOR-DOLLAR PRINCIPAL-LOSS INSURANCE FOR THE AFFILIATE LOANS — AND THE REHABILITATOR'S DISCRETIONARY PRE-MATURITY SALE THAT CRYSTALLIZED $611.6 MILLION IN LOSS

Independent of the Ares and Oaktree transactions (Sections XII and XIII below), independent of the Backstop Agreement (Section IV above), and independent of every other credit identified in this Statement, I implemented in May 2018 a dedicated principal-protection layer for the affiliate-loan portfolio. The structure consisted of more than $1 billion in face value of investment-grade zero-coupon bonds issued by four global money-center banks, held inside the Principal Protected Notes (the "PPNs") on the NCICs' balance sheets, whose only economic purpose was to insure the NCICs, dollar-for-dollar, against any loss of principal on the affiliate loans. The contemporaneous documentary record — including Exhibits H, H2, I2, and M5 to the Original Statement and Exhibit M6 attached hereto — establishes that the approximately $1.006 billion in par value of those bonds fully covered the approximately $1 billion of outstanding affiliate loans. In short, I purchased insurance against any loss of the principal value of the affiliate loans. The Rehabilitator's subsequent unilateral pre-maturity sale of those bonds, without the supervising court's approval, crystallized $611.6 million of loss on the very instruments whose only function was to prevent such loss.

### A. The May 2018 directive: more than $1 billion in bank zero-coupon bonds purchased as a one-to-one principal-loss overlay on the affiliate-loan portfolio.

27. In May 2018, pursuant to a memorandum of understanding with the NCDOI (Original Stmt. Exhibit M5), I directed the NCICs to construct the Principal Protected Notes and to purchase, as the protective layer inside those PPNs, more than $1 billion in face value of

investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. Held to maturity, those bonds were contractually obligated to pay $1,006,239,867 at par. See Original Stmt. ¶¶ 48–49 & Exhibits H2, I2.

28. The economic and regulatory purpose of those bond purchases was singular and explicit: to place inside the NCICs a portfolio of bank-credit zero-coupon instruments whose maturity payouts — each backed by the balance sheet of a major global bank — would equal or exceed the entire face value of the affiliate-loan portfolio. The bonds were not investments in the ordinary commercial sense. They were a principal-loss insurance overlay on the affiliate-loan portfolio. If any single affiliate borrower had defaulted on principal, the contractually mandated par payment of the corresponding zero-coupon bond at maturity was available to the NCICs to make the policyholders whole without recourse to any other balance-sheet asset of the NCICs.

### B. How a Principal Protected Note works: the insurance mechanism.

29. A Principal Protected Note, as the name indicates, is an instrument that protects the

principal of a loan. Each PPN was a special-purpose vehicle that paired (i) an investment-grade, bank-issued zero-coupon bond with (ii) an underlying affiliate investment. The structure and approval of the PPNs were reviewed by the NCDOI's financial-examinations division as part of the disaffiliation framework established under the first NCDOI memorandum of understanding in 2018. (Original Stmt. Exhibit M5.)

30. The bank zero-coupon bonds underlying the PPNs were issued by major investment-grade financial institutions, including Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. These bonds carried credit ratings on par with their issuing institutions (each in the investment-grade range), traded at or near treasury yields, and were freely tradable in institutional markets.

31. The architecture of a representative PPN, using a Barclays Bank zero-coupon bond, illustrates the insurance mechanism: Barclays issued a 30-year zero-coupon bond with a face amount of $70 million; the NCICs purchased the bond at a discounted present value of approximately $28 million (approximately 40 cents on the dollar); and Barclays was contractually obligated to redeem the bond at par ($70 million) at maturity. The implied yield on that purchase was approximately 3% over the 30-year term. The $28-million-cost / $70-million-face Barclays zero was placed inside a PPN whose principal was, by construction, fully protected — no matter what happened to any other investment inside the PPN, the embedded bank zero would pay $70 million at maturity. This is a standard institutional principal-protection arrangement, not an exotic structure.

32. The PPN thus functions like an insurance policy that protects the principal of the affiliate loan from downside. And like an insurance policy, a PPN delivers its full protective value only if it is allowed to run its course. A PPN, when sold early, will return only a fraction of the principal that is guaranteed at maturity. Just as cashing out a life-insurance policy years before it matures returns only a small fraction of the death benefit, selling a zero-coupon bond before maturity drastically reduces the amount of money recovered relative to its contractually guaranteed par value. The entire point of the structure — the reason these instruments are called Principal Protected Notes — is that the principal is protected, precisely for the downside scenario the affiliate loans were said to present.

C. Dollar-for-dollar coverage: the approximately $1.006 billion in zero-coupon bonds fully covered the approximately $1 billion in outstanding affiliate loans.

33. The decisive fact for the restitution analysis is the one-to-one correspondence between the protective bonds and the affiliate loans they were purchased to insure. I directed the NCICs to purchase $1,006,239,867 in par value of bank zero-coupon bonds for the express purpose of protecting the principal of each individual affiliate investment in its entirety, so long as the corresponding zero-coupon bond was held to maturity. As of October 18, 2018 — the date I transferred operational control to the Special Deputy Rehabilitator — every dollar of affiliate loan held by the NCICs was matched, dollar-for-dollar at par, by a corresponding investment-grade bank zero-coupon bond contractually scheduled to pay $1,006,239,867 at maturity.

34. Stated directly: the approximately $1 billion of zero-coupon bonds carried on the balance sheets of the NCICs fully covered the approximately $1 billion of outstanding affiliate loans. The protective bond portfolio was not partial, not approximate, and not subordinate. It was a complete, par-for-par overlay on the affiliate-loan book. That

structural redundancy is the single most important fact bearing on any claim that the affiliate-loan portfolio threatened a "hole" in the NCICs' balance sheets at the moment of transfer: it did not, because the bank zero-coupon bonds stood directly behind it, dollar-for-dollar, with the credit of four global money-center banks.

35. The implication for the Special Master's loss calculation is direct and dispositive. The premise on which the restitution figure ultimately rests — that the affiliate loans were impaired and that their continued presence on the NCICs' balance sheets created an uncovered deficit — cannot be reconciled with the contemporaneous existence of a $1.006 billion par-payable bank- bond portfolio purchased and held for the sole purpose of insuring those very loans against any loss of principal. The loans were insured. I insured them. The insurance was in place, on the balance sheet, dollar-for-dollar, on the day I transferred control.

D. The NCDOI expressly permitted the purchase of the protective bonds.

36. The principal-protection structure was not a unilateral or concealed maneuver. It is customary for insurance companies to hold high-quality bonds to maturity, and particularly so for highly rated instruments like the PPN zero-coupon bonds; life insurers routinely purchase highly

rated, long-dated bonds carrying very low regulatory capital charges. Indeed, PPNs with guaranteed payoffs at maturity are one of the policy levers insurance regulators themselves rely upon to ensure the security of capital. The NCDOI expressly permitted the NCICs, acting under my direction, to purchase these bonds in May 2018. (Original Stmt. Exhibit M5.) The purchase was intended to prevent any downside risk to policyholders or the NCICs and to ensure that the capital underlying the affiliate loans was secure for as long as the PPNs were held to maturity.

E. Bond-by-bond cross-walk to the affiliated investments.

37. The cross-walk between the bank zero-coupon bond positions and the underlying affiliated investments they were purchased to protect is established by the contemporaneous PPN/zero-coupon worksheet produced by the Rehabilitator (via Paladin) and circulated to counsel in May 2026. See Exhibit M6 attached hereto. As reflected in that worksheet, the bank zero-coupon bond positions tie directly to specific PPN names and to the underlying affiliate-loan positions they were structured to protect. By way of example, the Natixis Bank zero-coupon note in the aggregate face amount of $150 million was originally allocated $75 million to the PPN held by Pierre Mendes and $75 million to the PPN held by White Tree, on a 50/50 basis; White Tree was dissolved before June 30, 2019 and therefore does not appear in the post-dissolution Independent Actuarial Loss Analysis, and the corresponding Citi position on the worksheet was sold on September 16, 2019. The operative point is that the more than $1 billion in zero-coupon bond face value was solely backing affiliated investments — not generic investment exposure, not surplus, and not any other purpose. See Exhibit M6.

F. The Rehabilitator's discretionary pre-maturity sale crystallized $611.6 million in loss on the very instruments designed to prevent affiliate-loan loss.

38. After taking operational control of the NCICs on October 18, 2018, and notwithstanding the contractual obligation of each issuer to pay par at maturity, the Special Deputy

Rehabilitator made the unilateral discretionary decision to sell the bank zero-coupon bonds underlying the PPNs prior to maturity for aggregate proceeds of approximately $394 million, rather than holding them to maturity for the full par recovery of $1,006,239,867. Dinius had represented to me that his intention at the time of the execution of the MOU was to rehabilitate the NCICs. After the MOU was signed, however, Dinius promptly switched into liquidation mode and sold all of the zero-coupon bonds. Instead of holding the PPNs to maturity to recover the full $1.006 billion, Dinius sold them for less than 40% of their guaranteed value. That decision — made without advance approval by the Wake County Superior Court and without notice to me — crystallized a loss of approximately $611.6 million on instruments whose entire purpose was to protect the principal of the affiliated investments from any credit-related downside.

39. The injury the Rehabilitator caused has two analytically distinct components, both of which point to the same dispositive conclusion. First, the Rehabilitator's affirmative decision to sell the embedded bank zero-coupon bonds prior to maturity crystallized the time-value-of- money discount embedded in the zeros' market price. Had the bonds simply been held to maturity — which would have required no action whatsoever, because the issuers were contractually obligated to redeem at par — the NCICs would have realized the full par redemption value of over $1 billion with zero credit risk. Dinius's unilateral decision to sell early, not the asset itself, gave rise to any time-value loss. Second, and entirely separate from the first, the Rehabilitator collected the cash and gave no credit for it against the borrowers' principal balance. Whether he sold the zeros at a discount or at a premium, the cash actually received must reduce principal dollar-for- dollar. Crediting fewer dollars than the Rehabilitator received from the sale of an affiliated asset results in a windfall to the Rehabilitator.

G. The Rehabilitator had multiple alternatives to the fire-sale and chose to ignore each of them.

40. Dinius had at least three alternatives to selling the bonds at a loss, each of which he chose to ignore. First, Dinius could have simply continued to hold the zero-coupon bonds to maturity, requiring no action and yielding the full $1.006 billion par payment. Second, Dinius could have used the zero-coupon bonds to credit-enhance the affiliate investments in order to complete a sale of the insurance companies — precisely the kind of structure that Ares and Oaktree had each independently proposed. Third, Dinius could have borrowed against the zero-coupon bonds, monetizing near-term liquidity while preserving the $1 billion maturity payoff. He pursued none of these. He chose instead the single alternative that destroyed the most value: a pre-maturity fire-sale for less than 40 cents on the dollar of guaranteed par.

H. Two distinct, separately-supportable credits totaling approximately $1.006 billion.

41. Two distinct credit entries follow from the Rehabilitator's pre-maturity disposition of the bank zero-coupon bonds, each of which must be applied against any restitution figure the Court ultimately enters, and each of which the Special Master's preliminary computation appears not to credit:

(i) $394 million credit for actual sale proceeds. The Rehabilitator's sale of the bank zero-coupon bonds produced approximately $394 million in cash proceeds for the NCIC estates. Those proceeds, by their nature, are available to the very victim entities the Special Master

identifies. Under 18 U.S.C. § 3664(j)(2) and United States v. Alalade, 204 F.3d 536, 540 n.4 (4th Cir. 2000), any restitution figure entered by this Court must be reduced dollar-for-dollar by the $394 million already in the NCIC estates as a direct consequence of the bonds whose only purpose was to protect those very estates.

(ii) $611.6 million credit for crystallized loss caused by the Rehabilitator's discretionary pre-maturity sale. The $611.6 million differential between the $1,006,239,867 par maturity value and the $394 million sale proceeds is, under Robers v. United States, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring, joined by Ginsburg, J.), and the binding Fourth Circuit authority of United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006), the proximate consequence of the Rehabilitator's discretionary post- October-18-2018 election not to hold the bonds to maturity. It is not the proximate consequence of any conduct underlying any element of my offense of conviction. That $611.6 million is therefore not properly attributable to me and is fully credit-eligible against any preliminary restitution figure.

42. Together, those two credits total approximately $1.006 billion — a credit that, applied alone, would reduce the Special Master's preliminary $1.655 billion figure to approximately $649 million before any of the other credits set forth in this Statement and in my Response and Objection to the Special Master's Report (Docket No. 132) are applied.

I. Robers v. United States controls: the Rehabilitator's pre-maturity sale breaks the chain of proximate causation.

43. Justice Sotomayor's concurrence in Robers squarely addresses this very scenario. "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers, 572 U.S. at 647 (Sotomayor, J., concurring). And: "If the collateral loses value after the victim chooses to hold it, then that part of the victim's net loss is attributable to the victim's independent decisions. The defendant cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." Id. at 648.

44. The converse of that principle applies with even greater force here. Where Robers teaches that a passive victim choice to hold collateral past a reasonable time breaks the chain of proximate causation, an affirmative victim choice to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity — thereby foregoing $611.6 million of contractually-mandated par value that was the entire purpose of holding the instrument — breaks the chain a fortiori. The $611.6 million crystallized loss is "attributable to the victim's independent decisions" and "cannot be made to [be borne]" by me. Robers, 572 U.S. at 648 (Sotomayor, J., concurring). The bonds were a held-to-maturity, par-payable instrument; the Rehabilitator chose to sell them before maturity; and the resulting loss is his, not mine.

J. The Rehabilitator's failure to obtain Wake County Superior Court approval before selling the bonds.

45. Under N.C. Gen. Stat. § 58-30-85 and the Wake County Superior Court's June 27, 2019 Consent Order of Rehabilitation, the Special Deputy Rehabilitator is required to obtain advance court approval for material asset dispositions, compensation arrangements, and transactions affecting the estates of the NCICs in rehabilitation. The Rehabilitator's discretionary pre-maturity sale of the bank zero-coupon bonds underlying the PPNs in 2019

was not presented to the Wake County Superior Court for approval before the sales occurred. The failure to obtain court approval before the transaction is independently relevant to the restitution analysis because it confirms that the disposition was the discretionary act of the Rehabilitator alone, exercised without supervising-court oversight, and therefore cannot be laid at my feet for purposes of MVRA proximate-cause analysis.

K. The Principal Protection Structure.

46. The bank zero-coupon bond facts set forth in this Section VI are not a peripheral accounting matter. They are the heart of the principal-protection structure I built into the NCICs in 2018 precisely to ensure that no affiliate-loan credit event could ever cause a loss of principal to the NCICs. I purchased, with the credit of four global banks, more than $1 billion of par-payable insurance against exactly the loss the Government now seeks to charge to me. The Rehabilitator's discretionary decision to dismantle that protection prior to maturity is exactly the kind of post- offense, intervening, discretionary act of the victim's own representative that the Supreme Court in Robers, the Fourth Circuit in Davenport, and this Court in administering the MVRA must treat as breaking the chain of proximate causation.

VII. THE CORRECTED STARTING BALANCE OF THE AFFILIATE INVESTMENTS — THE $141 MILLION REDUCTION

47. The Special Master uses $1,391 million as the NCIC starting principal balance for purposes of the restitution calculation. Restitution Rpt., App'x 3 at 6. That figure is overstated by $141 million. The correct opening balance, as agreed by all parties at the time of execution of the MOU on June 27, 2019, is $1,250 million — the same number used extensively in the NCICs' 2019 litigation filings. See Original Statement Exhibit O (evidencing the agreed opening principal balance for the NCICs); Original Statement Exhibit K1.

48. The NCICs have consistently relied on this $1.25 billion figure in verified pleadings. In both a Verified Complaint and an Amended Verified Complaint filed by the NCICs against me in the General Court of Justice of Wake County, North Carolina in October 2019, the NCICs stated that the amount of Affiliate Investments they held was "approximately $1.25 billion." Declaration of Ryan Meyer ("Meyer Decl."), Exh. 3-A ¶ 29; accord Meyer Decl., Exh. 3-B ¶ 29. Similarly, in a pre-trial order in that case, the parties stipulated that entities affiliated with me "have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements." Meyer Decl., Exh. 3-C at 5. There is no basis to allow the NCICs to back away from these verified pleadings to claim a higher amount now.

49. This $141 million discrepancy is documented in two independent ways. First, the June 30, 2019 Restructure Tranches spreadsheet agreed upon by the parties signing the MOU (cell K44 of the MOU Schedule worksheet, attached as part of Original Statement Exhibit K1) shows the agreed $1,250 million figure, including the addbacks referenced in the spreadsheet; the formula in cell C41 (the net balance of senior debt owed to CBL) computes the CBL net senior balance as the gross balance reduced by the Read-Through

Principal value of $215,786,742.08 (cell E4), reflecting the FinCo-level read-through reduction discussed in Section X below. Second, the same $1,250 million figure (after adding in the addbacks noted on the spreadsheet) is the figure used by the NCICs themselves in their 2019 litigation filings in the Wake County Superior Court rehabilitation proceedings. The $141 million difference between the Special Master's $1,391 million and the agreed $1,250 million is an arithmetic consequence of two adjustments — both of which were specifically negotiated with Mr. Dinius and reflected in his own June 17, 2019 email (Original Statement Exhibit G).

VIII. THE JUNE 17, 2019 EMAIL FROM MIKE DINIUS ORIGINAL STATEMENT (EXHIBIT G)

50. Attached as Original Statement Exhibit G to the Response is a true and correct copy of an email I received on June 17, 2019, at the email address gelindberg@gmail.com (and/or my then-active corporate-email accounts), from Mike Dinius at his Noble Consulting account, MDinius@noblecon.net. The email was copied to John Murphy of Noble Consulting and Mohsin Meghji of M-III Partners. The subject line was "MOU and Loan Amendment." I have personal knowledge of receiving the email contemporaneously, and I have reviewed the email and the

attached "NHC Debt Structure (Proposed Revised)" table to confirm that Original Statement Exhibit G is authentic and that no language has been altered.

51. The Dinius email of June 17, 2019 contains in its body Mr. Dinius's own table titled "NHC Debt Structure (Proposed Revised)." In Mr. Dinius's own writing, that table sets forth the following, which is quoted without alteration: a. "Total outstanding less adjustments: $2,258,210,171." b. "Less all Agera to 10-year zero on NHC: $(200,985,363) — to be repaid by NHC cash flow or refi within 10 years." c. "Less all PBLA main to 10-year zero on NHC: $(203,276,330) — $300M of PBLA surplus will cover." d. "Less Malta debt and pref, stays in place as zero coupon 7-year note: $(140,566,677) — Cash flow from offshore growth, remaining SASL, then refi if needed." e. "Less ins co debt and pref stays in place as zero coupon 7-year note: $(250,481,888) — $350M value of CBL, SNIC, BLIC covers this." f. "Less NHC pref 10 year: $(375,252,161) — NHC cash flow or refi within 10 years." g. "Less NHC junior 10 year: $(87,647,752) — NHC cash flow." h. "New NHC Senior, Cash Pay, due 6-30-23: $1,000,000,000 — As agreed — NHC cash flow or refi by 6-30-23."

52. The arithmetic of Mr. Dinius's own table confirms the $1 billion cap. Starting from $2,258,210,171 in total outstanding obligations, the table applies $1,258,210,171 in reductions across the seven non-cash-pay tranches (Agera, PBLA Main, Malta, insurance-co, NHC pref, NHC junior, and the NHC 10-year zero). The result is exactly $1,000,000,000 in cash-pay senior debt, which Mr. Dinius personally identifies as "As agreed." The figure $1,000,000,000 was the figure I agreed to with Mr. Dinius.

53. Mr. Dinius's June 17, 2019 email is one in a series of emails between Mr. Dinius and me in the days immediately preceding the rehabilitation order. The June 26, 2019 emails between Mr. Dinius (MDinius@noblecon.net), Greg Johnson (gjohnson@eliglobal.com), Chris

Herwig (cherwig@eliglobal.com), and Brian Stewart (Brian.Stewart@globalbankers.com) — sent the day before the rehabilitation order — confirm in Mr. Dinius's own words how he personally directed the FinCo / read-through schedule architecture. In Mr. Dinius's own writing on June 26, 2019:

Just so we are clear, I would like it scheduled as it is from the Insurance companies to the fincos. Don't worry about how it is structured from the fincos to the underlying borrowers. Also, since we are pulling Agera, Ins holdcos and others out separately, we are going to deduct those at the bottom of each individual exhibit. For example, if there is $10m of Agera in the senior loans to fincos, those amounts of fincos will be at the full amount, then we will show a negative at the bottom for Agera.

54. Mr. Dinius's June 26, 2019 directive — "we are going to deduct those at the bottom of each individual exhibit" — is the precise read-through reduction architecture that I agreed to with Mr. Dinius at the Durham meeting and that is reflected in the Read-Through Principal worksheet of the MOU schedule. He directed the architecture in his own words, in writing, the day before the rehabilitation order was entered. There is no colorable basis on which the read-through reduction can now be characterized as anything other than what Mr. Dinius personally directed.

IX. THE DURHAM MEETING AND PRE-MOU NEGOTIATIONS

55. The MOU was first proposed by Mr. Dinius on or about May 9, 2019. Following his proposal, in late May or early June 2019, prior to the execution of the MOU, I met in person with Mr. Dinius at offices located in Durham, North Carolina. At that meeting and in subsequent communications, I told Mr. Dinius the following, in substance: a. The Agera Energy investment, which I had inherited as part of my June 2017 acquisition of the PBLA-Bermuda reinsurance portfolio from Beechwood Partners, was originated by Platinum Partners, not by me. The investment was, by mid-2019, a

known write-off following the discovery of financial fraud by Agera's independent Chief Financial Officer. b. The Insurance-Holdco debt — debt issued by the holding companies that owned the NCICs — had originated through GBIG-management-driven acquisitions and would be unable to service principal in the ordinary course because the NCICs were in rehabilitation. Mr. Dinius and I agreed that, with the NCICs not generating cash to service the holding-company debt, the Insurance-Holdco debt could not be treated as cash-pay senior debt. c. At the time of the Durham meeting, I estimated the combined Agera-attributable balance at approximately $200 million and the combined Insurance-Holdco-attributable balance at approximately $250 million. Mr. Dinius's subsequent June 17, 2019 email refined these figures (using $200,985,363 for Agera, $250,481,888 for insurance-co debt and pref, and $140,566,677 for Malta debt and pref); the refined figures are the figures used herein. d. The combined Agera, Malta, and Insurance-Holdco exposure (totaling $592,033,928 across the three categories per Mr. Dinius's June 17, 2019 table) had to be converted to long-dated zero-coupon obligations rather than treated as performing cash-pay debt. e. Where a FinCo's portfolio contained zero-coupon paper of this character, the senior debt that FinCo had issued back to the NCICs had to be reduced proportionally — because no cash-paying asset could service that senior debt. I explained this principle to Mr. Dinius using the AFA structure as the worked example: a FinCo with a $500 million portfolio, of which $100 million (20%) consisted of zero-coupon paper, would need to have 20% of its senior debt to the NCICs eliminated.

56. Mr. Dinius agreed to each of these propositions in our discussions in May–June 2019. His subsequent June 17, 2019 email memorialized the agreement at the NHC level (the $1 billion cap and the seven non-cash-pay tranches). His subsequent June 26, 2019 email — quoted above — memorialized the corresponding read-through architecture at the FinCo / exhibit level. The corresponding read-through reduction at the FinCo level was

implemented through the June 30, 2019 Restructure Tranches spreadsheet, which was agreed by all parties at the time of the MOU execution. See Original Statement Exhibit K1.

X. THE $139 MILLION FINCO READ-THROUGH REDUCTION

57. The FinCo read-through reduction, in the amount of $132,993,217.98 (rounded to $133 million in earlier discussions and refined to $139 million based on the most current input data), is the proportional reduction in senior debt issued by the FinCos to the NCICs to reflect the percentage of each FinCo's portfolio that consisted of zero-coupon paper. The $132,993,217.98 figure is computed as the sum of three components: a. $103,195,834.06 — CBL FinCo-zero attribution; b. $9,806,363.87 — BLIC FinCo-zero attribution; and c. $19,991,020.05 — SNIC FinCo-zero attribution.

58. These components are reflected in the Read-Through Principal tab of the MOU schedule (cells E12:G13 of the Original Statement Exhibit K1 spreadsheet on the Read-Through Principal tab). The $139 million figure includes minor refinement to the underlying inputs but is, to my knowledge, the most accurate current figure based on data presently available.

59. The $139 million figure is also independently corroborated by the figure used by the NCICs in their own 2019 litigation filings: $1.391 billion (the Special Master's NCIC starting balance) less approximately $133–$139 million read-through equals approximately $1.258 billion, which is the figure the NCICs themselves used in their verified court filings. The convergence of

the contemporaneous spreadsheet, Mr. Dinius's June 17, 2019 email, and the NCICs' own verified litigation positions is strong corroboration that the read-through reduction was understood and applied at the time of MOU execution. Further, the NCICs' use of the $1.25 billion principal balance in their 2019 litigation is alone dispositive evidence that this is the correct starting principal balance.

XI. DISPOSITION OF THE PPN-EMBEDDED ZERO-COUPON BONDS — THE $243 MILLION MINIMUM CASH CREDIT

60. Following the entry of the Order of Rehabilitation on June 27, 2019, the Special Deputy Rehabilitator took possession of all of the PPN positions and, with the assistance of Paul Brown, the NCICs' Chief Investment Officer, began unwinding the PPNs and disposing of the underlying zero-coupon bonds. Section VI above addresses the $611.6 million in loss caused by the pre-maturity sale; this Section XI addresses the separate, undisputed cash proceeds the NCICs received from those dispositions, which must be credited dollar-for-dollar against principal.

61. Attached as Original Statement Exhibit H is a true and correct copy of an email I received on October 28, 2019 from Paul Brown at his Global Bankers email address (paul.brown@globalbankers.com), copying Chris Herwig. In that email, Mr. Brown contemporaneously documented the NCICs' final disposition of the remaining PPN-embedded zero-coupon bonds, reporting that, with a dip in rates, the team went back to the issuers of the remaining zeros and, through a combination of negotiation and pressure, improved their terms, and that the NCICs "ended up making +6mm on the disposals." He attached a spreadsheet summarizing the total cash proceeds by lender of the zero-coupon bonds, which provides that the recent (i.e., post-MOU/IALA) proceeds were $243,452,385.

62. Based on (i) Mr. Brown's October 28, 2019 email; (ii) the absence of any

communication from the Rehabilitator or his agents indicating that the final tranche was disposed

of for any amount other than $243 million; and (iii) the disposition records provided by Paul Brown, the final-tranche disposition produced $243 million in cash to the NCICs, post-MOU. See Original Statement Exhibit H.

63. The full PPN-zeros cash receipts to the NCICs total approximately $394 million.

The $243 million October 2019 final-tranche figure is, by Mr. Brown's own description, the "remaining" PPN zeros — i.e., what was left after earlier dispositions. The earlier dispositions plus the final tranche aggregate to approximately $394 million in total cash receipts to the NCICs from the PPN zeros. It cannot be precisely identified, given my current lack of information, what portion (if any) of the $394 million total was disposed of prior to the MOU's execution on June 27, 2019, versus after that date. The complete set of disposition records is held by the Special Deputy Rehabilitator and Noble Consulting, and I respectfully request that the Special Master direct production of those records so that the precise pre-MOU versus post-MOU split can be determined. The $243 million October 2019 final-tranche figure is unambiguously post-MOU and is the conservative minimum credit; the full $394 million is the maximum credit if all dispositions are determined to have been post-MOU. This Statement and the Response chart adopt $243 million as the minimum.

64. There is no basis to refuse to credit me for these funds. The zero-coupon bonds

constitute losses to the Pre-Designated Restitution Parties as a result of the Affiliate Investments, and the Special Master captured those losses in the principal balance of those loans when calculating the restitution obligation. Because the NCICs received cash back as a result of disposing of the zero-coupon bonds, the proceeds from those sales must be credited to me. To date, the NCICs have failed to produce data sufficient to demonstrate that they have fully accounted for

the proceeds of the zero-coupon bonds. Accordingly, any restitution figure must be reduced by at least $243.4 million.

## XII. EXHIBITS A AND B — THE EXECUTED NOVEMBER 22, 2018 ARES LETTER OF INTENT ESTABLISHES THAT THE ARES TRANSACTION WAS A FULLY-FORMED, ARM'S-LENGTH, FACE-VALUE ACQUISITION DEFEATED BY THIRD-PARTY GOVERNMENT PRESSURE — NOT BY ANY CONDUCT OF MINE

### A. Exhibit B — Authentication and content of the executed November 22, 2018 Ares Letter of Intent.

65. Attached as Exhibit B is a true and correct copy of the Proposal dated November

22, 2018 transmitted by Ares Management, L.P. ("Ares") to me as Chairman & Founder of Eli Global, to Lou Hensley as CEO & President of GBIG, and to Paul Brown as CIO of GBIG (the "Ares LOI"). The Ares LOI is signed on behalf of Ares by Michael Arougheti, Co-Founder, Director, Chief Executive Officer & President of Ares Management, and by David Reilly, Partner of Ares Management. The Ares LOI is countersigned by Lou E. Hensley as CEO of GBIG, accepting the binding provisions (Sections 12 and 16) of the Ares LOI on behalf of GBIG.

66. The Ares LOI proposed a 100% equity acquisition by Ares of the U.S. business of

GBIG, expressly defined as comprising nine enumerated entities, including each of the NCICs that are the principal claimed victims of the Special Master's recommended restitution figure. The Ares LOI is not a speculative or unfunded expression of interest. It is an executed letter of intent — countersigned by GBIG's CEO — from a public, investment-grade alternative-asset manager committing its own balance sheet. As Ares represented to me in writing in Section 3 of the LOI (titled "Sources of Financing"):

Ares will be the singular, fully funded cash purchaser of GBIG equity. In May 2014, Ares completed an initial public offering (current market capitalization of approximately $5 billion) on the New York Stock Exchange (NYSE: ARES).

As a result of the IPO, our $1.0bn revolving credit facility, our investment grade rating and historical public debt and preferred offerings, we have access to significant capital to fund the Proposal.

67. Ares proposed two priced cash structures in Section 1 of the LOI. "Purchase Price Option A" called for an upfront cash payment of $400 million at closing plus an additional up-to- $50 million earnout. "Purchase Price Option B" called for a higher upfront cash payment of $420 million at closing subject to a $20 million claw-back. In either case the upfront consideration was payable in cash at transaction closing — not in stock or contingent paper.

68. Of decisive importance to the proximate-cause analysis below, Section 6 of the Ares LOI (titled "Investment Portfolio") expressly committed Ares to a structure pursuant to which the entirety of the affiliated-loan portfolio could be removed from the NCICs' balance sheets through a securitization vehicle backed by Ares's own balance sheet:

We expect the asset portfolio delivered at closing to be free of affiliate investments and self-originated investments (including the principal protected notes); however, to the extent some of these investments are outstanding at transaction close, Ares would be willing to work to arrive at a mutually agreeable solution for remaining investments with the Company. As discussed with management, Ares is willing to entertain a structure whereby any remaining affiliate and self-originated investments would be contributed to a securitization along with a material amount of other Eli Global assets and the Company or Ares would retain the senior most tranche.

B. Exhibit A — The January 6, 2019 Christa Miller email attributes the withdrawal of the SPV component to a "third party constituent" with "power."

69. Attached as Exhibit A is a true and correct copy of an internal Eli Global email dated January 6, 2019, sent at 9:08 PM by Christa Miller of Eli Global (cmiller@eliglobal.com) to Peter Nordberg (PNordberg@eliglobal.com), and copied to me (gel@eliequity.com) and Chris Herwig (cherwig@eliglobal.com). The subject line is "For the files." Ms. Miller's stated purpose was to memorialize comments made in the January 4, 2019 meeting with Ares. Ms. Miller's email confirms each of the following, in her own contemporaneous words quoted without alteration:

a. Ares and Eli Global had entered exclusivity, and the SPV-backed retention of affiliated loans was a key driver of the deal: "When we entered into exclusivity with Ares related to their proposed purchase of the US insurance companies, a key component of their offer was that they were willing to keep a certain limited amount of affiliated loans after closing through an SPV structure that they proposed." b. At the January 4, 2019 meeting, Ares disclosed that it was withdrawing the SPV component and attributed the withdrawal to a

"third party constituent": "In response, they said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." c. Ares had made the same disclosure on December 21, 2018 and refused to identify the source when asked: "They had made a similar comment in a call that we had with them on December 21. In that call, they said that they had been advised to not have any ongoing ties to Eli Global after close. When we asked who had given them this advice, they refused to say." d. Ms. Miller documented the temporal proximity of the Ares disclosure to a meeting between Ares and the U.S. Department of Justice: "This call took place soon after a meeting/call that Ares had with the DOJ." e. Ms. Miller's contemporaneous conclusion, written for the Eli Global file, is unequivocal: "In neither the meeting on Friday or the call on December 21 did Ares specifically mention the DOJ or NCDOI. However, it seems very likely from their comments on both occasions that they have been heavily influenced by a third party with power."

C. Exhibits A and B together establish that the Ares transaction was defeated by third-party government pressure on the buyer, not by any conduct of mine.

70. As of November 22, 2018 — just thirty-five days after I transferred operational control of the NCICs to the Special Deputy Rehabilitator — Ares Management had executed a written, signed letter of intent committing to acquire 100% of the NCICs and the rest of GBIG for $400–$420 million in upfront cash plus contingent consideration, with an express SPV/securitization solution for the affiliated-loan portfolio. As documented contemporaneously by Christa Miller, the SPV-backed retention component was withdrawn between November 22, 2018 and January 4, 2019 not because of any change in the credit quality of the affiliated loans, not because of any change in the value of the NCICs, and not because of any act or omission of mine — but because Ares was directly instructed by a "third party constituent" with "power" to "avoid any ongoing connection to Eli Global after the close." Had the Ares transaction closed on the parties' working timetable, the entirety of the NCICs' policyholder obligations would have been assumed by an investment-grade, publicly-traded alternative-asset manager; every NCIC policyholder would have been paid in full by approximately June 2019; and no state Guaranty Association would have advanced a single dollar.

XIII. EXHIBITS C, D, AND E — THE INDEPENDENT FEBRUARY 2019 OAKTREE CAPITAL MANAGEMENT $1.0 BILLION SPV TRANSACTION I PERSONALLY NEGOTIATED WOULD LIKEWISE HAVE REMOVED ALL AFFILIATED LOANS FROM THE NCICS' BALANCE SHEETS AT FACE VALUE BY JUNE 2019

71. The Ares letter of intent was not the only contemporaneous arm's-length evidence that the affiliated-loan portfolio was marketable and capable of being acquired by a sophisticated financial buyer at face value. Within weeks of the termination of the Ares affiliated-loan-SPV component, I personally directed the structuring and negotiation of a separate, independent arm's- length transaction with Oaktree Capital Management, L.P. ("Oaktree") — one of the largest credit-focused alternative-asset managers in the world. Those negotiations produced the February 2019 Oaktree "Global Solution Presentation," the most current version of which (as of February 8, 2019) is attached as Exhibit C.

72. The Oaktree Global Solution Presentation describes an arm's-length transaction

structured around a $1.0 billion Investor Group (defined therein as "IG") investment into a holding-company special purpose vehicle that would have acquired both (a) the affiliated-loan positions then held by GBIG and (b) 100% of the GBIG equity, with the Investor Group's investment at the SPV holding-company level structured as a loan secured by 100% of the SPV's assets. In Oaktree's own words in the "Executive Summary" of Exhibit C:

IG will fund a [$1.0B] investment into an SPV Holding Company that will be used to acquire 1. loan positions held by GBIG and 2. 100% of the GBIG equity from Owner. The IG investment at the SPV Holding Company level will be structured as a loan secured by 100% of the SPV's assets.

73. Translated into operative effect on the NCICs, the Oaktree structure would have (a) paid down approximately $800 million of the affiliated-loan principal in cash at the SPV-level acquisition, (b) paid an additional $200 million to acquire 100% of the NCIC equity, and (c) caused approximately $400 million of additional affiliated-loan assets to be rolled over and held as performing assets on the NCICs' balance sheet — a $1.4 billion aggregate transaction. The remaining affiliated-loan balance after the Oaktree SPV paydown would have been substantially below the threshold that the Special Deputy Rehabilitator subsequently used to justify the rehabilitation order and the ten-year hold prescribed by the June 27, 2019 MOU.

A. Exhibits D and E — Contemporaneous February 12–13, 2019 internal correspondence confirming multiple independent SPV-financing tracks were live and actionable.

74. Attached as Exhibit D is a true and correct copy of an email I sent on Tuesday, February 12, 2019 at 4:57 PM to Christa Miller, Chris Herwig, and Rob Kiesel, with the subject line "Re: Ares." In that email I instructed my team to advance, in parallel, three independent SPV/bridge-financing tracks — Oaktree, HPS, and "Ares SPV bridge loans and/or Ares retained assets" — each of which by itself would have monetized the affiliated-loan portfolio at face value. In my own words in Exhibit D: "suggest we push these three options daily with some vigor."

75. Attached as Exhibit E is a true and correct copy of my email of Wednesday, February 13, 2019 at 4:23 PM to Chris Herwig (cc Christa Miller and Rob Kiesel), with the subject line "Re: Ares." Exhibit E forwards Mr. Herwig's contemporaneous status update sent earlier that same day: "Rob received new LOI from OakTree … he will circulate and we can mark up this evening. Issue with those guys is that they are looking for longer term hold but we can propose shorter and move that forward. Meeting in LA Friday." My contemporaneous response — preserved verbatim in Exhibit E — was: "Excellent progress. Suggest we push these options hard. Happy to help." That sequence is decisive contemporaneous evidence that, far from being passive or obstructionist, I was personally directing, in real time and in writing, the parallel pursuit of multiple arm's-length face-value transactions, any one of which would have monetized the affiliated loans and paid every NCIC policyholder in full.

B. Two independent arm's-length market tests of the same affiliated-loan portfolio — each priced at par.

76. That two unrelated, sophisticated financial institutions — Ares in November 2018

and Oaktree in February 2019 — each independently underwrote, in writing and on the basis of their own capital, separately negotiated SPV structures capable of taking the entirety of the affiliated-loan portfolio off the NCICs' balance sheets at face value, is decisive contemporaneous market evidence that the affiliated loans were not impaired and were not the source of any "hole" in the NCICs' balance sheets at the time the Rehabilitator took control. The relevant decision- makers at Ares (Michael Arougheti, David Reilly) and Oaktree did not need to take my word for

the quality of the affiliated-loan portfolio. They conducted their own due diligence, on their own dime, with their own counsel and advisors, and they concluded — independently of one another — that the portfolio could be taken off the NCICs' balance sheets at par.

77. Read together with the bank zero-coupon bonds described in Section VI above,

Exhibits B and C provide an unbroken three-layer cushion behind the affiliated-loan portfolio as of late 2018 and early 2019: (i) the underlying borrower-operating-company cash flow (in excess of $300 million in consolidated EBITDA by 2024); (ii) the more than $1 billion in face value of investment-grade bank zero-coupon bonds held inside the PPNs as a dollar-for-dollar principal- loss overlay; and (iii) two arm's-length face-value cash transactions, each independently underwritten by a sophisticated buyer, either of which would have monetized the entire affiliated- loan portfolio at par within months. No rational fact-finder, on this record, can attribute the bulk of the Special Master's preliminary loss figure to my offense conduct.

## XIV. THE NCDOI AND THE REHABILITATOR — NOT I — DISCRETIONARILY CHOSE NOT TO PROCEED WITH EITHER TRANSACTION; HAVING REFUSED BOTH, THEY THEN COERCED ME TO SIGN THE JUNE 27, 2019 MOU UNDER EXPRESS THREAT OF IMMEDIATE LIQUIDATION AND AFFIRMATIVELY ELECTED TO HOLD THE AFFILIATED LOANS FOR A TEN-YEAR TERM

78. At the time each transaction was on the table, I no longer held operational control

of the NCICs. The NCDOI and the Special Deputy Rehabilitator did. I transferred operational control of the NCICs to the Special Deputy Rehabilitator on October 18, 2018 with the express understanding that he would close the pending Ares sale. See Original Stmt. ¶ 13. The November 5, 2018 internal valuation prepared by personnel under Mr. Dinius's own control (Exhibit J) valued the NCICs at $454 million as of the transfer date.

79. The discretionary decision whether to close each transaction therefore rested with

the Rehabilitator and the NCDOI, subject only to the supervisory authority of the Wake County

Superior Court — not with me. The Rehabilitator and the NCDOI made the discretionary choice not to proceed with the Ares transaction in early 2019, and separately and independently elected not to proceed with the Oaktree transaction in or after February 2019. Each refusal was a free, deliberate, and informed choice of the victim's own representative; each occurred after I had ceded operational control; and neither was within my power to direct or to prevent.

### A. The MOU was presented to me on a take-it-or-leave-it basis under express threat of immediate liquidation of the NCICs.

80. The June 27, 2019 MOU between GBIG-related entities and the NCDOI/Rehabilitator was not the product of arm's-length negotiation. It was presented to me on a take-it-or-leave-it basis approximately 48 hours before the rehabilitation order was to be entered by the Wake County Superior Court, and was accompanied by an express written threat that, if I refused to sign, the Rehabilitator would immediately move to liquidate the NCICs. As Mr. Dinius wrote to me — in writing, from his Noble Consulting account — at the time of the MOU's execution: we will contact the guaranty associations and move directly to liquidation. You know what that means.

81. I signed the MOU only because the alternative the Rehabilitator placed before me was the immediate destruction of the NCICs through liquidation. I executed the MOU under that explicit duress, in order to protect policyholders from the harm that the Rehabilitator was threatening to inflict on them.

B. The MOU affirmatively chose to hold the affiliated loans for ten years — a choice the Rehabilitator made after refusing two face-value cash offers for the same asset.

82. The MOU itself memorializes the Rehabilitator's affirmative election to hold the affiliated-loan portfolio for a ten-year term rather than monetize it. In the months leading up to the

MOU, the Rehabilitator had refused both the Ares transaction (which would have monetized the loans at face value in cash, with an Ares-backed securitization option for any residual) and the Oaktree transaction (which would have paid down $800 million of the affiliated-loan principal in cash and rolled the remainder into an Oaktree SPV). Instead of monetizing the loans at par with either Ares or Oaktree, the Rehabilitator chose, in the MOU, to keep the affiliated loans on the NCICs' balance sheets on a ten-year schedule.

XV. THE REHABILITATOR'S "HAMMER AND NAIL" COERCION OF REPRESENTATIONS AND WARRANTIES

83. Closely related to the foregoing is a second category of rehabilitator coercion that bears directly on the integrity of any representations and warranties signed by me during the rehabilitation. Special Deputy Rehabilitator Mike Dinius, in negotiating those representations and warranties, employed what he himself characterized to me, through his counsel, as a "hammer and nail" analogy: I was the nail; Mr. Dinius held the hammer; and the choice presented was to sign or face liquidation of all four NCICs. As one of the Rehabilitator's lawyers told me directly in the days before the MOU was signed: "Mr. Lindberg, you're the nail. I'm the hammer." (Trial Tr. (Vol. 5) p. 1012:11–12.) There was no meaningful negotiation, no opportunity to revise material terms, and no realistic alternative. The representations and warranties were not arm's-length, market-consistent terms; they were dictated.

84. The doctrine of economic duress is well established. Under generally accepted contract principles, "if a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." Restatement (Second) of Contracts § 175(1) (Am. Law Inst. 1981); see also id. § 176 (defining "improper threat" to include threats that breach a duty of good faith and fair dealing, and threats that use power for illegitimate ends). The threat of liquidation was wrongful because it leveraged

the Rehabilitator's statutory control over the NCICs to extract from me, in my personal capacity, instruments and admissions that the Rehabilitator could not have obtained by lawful means.

85. To the extent the Government, the Special Master, or any civil litigant relies upon representations and warranties signed by me during the rehabilitation as the basis for either a finding of fact, a measure of loss, or a credit determination, the record must reflect the conditions under which those instruments were executed. The "hammer and nail" demand renders those instruments evidence of the Rehabilitator's leverage, not of my voluntary acknowledgment. This is independently relevant to the restitution proceedings because (i) several of the components of the Special Master's preliminary restitution computation appear to rest, directly or indirectly, on representations and warranties extracted by the Rehabilitator under these conditions, and (ii) the conduct described establishes a pattern — documented contemporaneously — in which the Rehabilitator deliberately preserved and locked in the very exposures whose continued presence is now invoked against me.

## XVI. MEMORANDUM OF LAW: UNDER ROBERS V. UNITED STATES AND ITS PROGENY, THE ARES AND OAKTREE TRANSACTIONS — EACH REFUSED BY THE REHABILITATOR — BREAK THE CHAIN OF PROXIMATE CAUSATION AS A MATTER OF LAW, AND THE REHABILITATOR'S TEN-YEAR MOU HOLD AND PRE-MATURITY BOND SALE COMPOUND THAT BREAK BEYOND REPAIR

### A. The MVRA's proximate-cause requirement.

86. Under the Mandatory Victims Restitution Act, restitution is permitted only for losses "directly and proximately" caused by the offense conduct. 18 U.S.C. § 3663A(a)(2). The burden of demonstrating the amount of the loss "shall be on the attorney for the Government," 18 U.S.C. § 3664(e), and "any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," id. The Supreme Court has expressly limited restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction."

Hughey v. United States, 495 U.S. 411, 413 (1990). The Fourth Circuit has held in binding terms that, to be a "victim" under the MVRA, a person must show that the harm "result[ed] from conduct underlying an element of the offense of conviction." United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996); see also United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006). The Supreme Court has confirmed that proximate cause "is a standard aspect of causation in criminal law and the law of torts," Paroline v. United States, 572 U.S. 434, 444 (2014), requires "a sufficient connection" between the offense and the result, and "preclude[s] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity," id. at 444–45. The legislative history confirms this limitation in the Government's own words: the Senate Judiciary Committee stated that mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The plea agreement's "full restitution" commitment (¶ 10(a)) must be construed against the Government as its drafter, and it did not waive the requirement

that the loss be caused by Mr. Lindberg's conduct. The losses traceable to the Rehabilitator's intervening discretionary decisions were caused neither directly nor indirectly by Mr. Lindberg, and in any event have already been offset. The amount of restitution was instead committed to the Special Master for determination under 18 U.S.C. § 3664, subject to the Court's de novo review. § 3664(d)(6). The proximate-cause limitation therefore remains fully applicable to the determination of the restitution owed. Indeed, Hughey itself arose from a plea agreement, yet the Supreme Court confined restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey, 495 U.S. at 413.

87. The Supreme Court further confirmed in Lagos v. United States, 584 U.S. 577 (2018), that the MVRA is to be "narrowly" construed, id. at 582–84, and that the statute "specifically lists the kinds of losses" that it covers, id. Where the harm alleged did not result from conduct underlying an element of the offense of conviction — and a fortiori where the harm was caused by the discretionary decisions of third parties acting after the cessation of the defendant's conduct — restitution is unavailable.

B. Robers v. United States controls: a victim's choice to hold collateral rather than reduce it to cash within a reasonable time breaks the chain of proximate causation.

88. In Robers v. United States, 572 U.S. 639 (2014), the Supreme Court — unanimously — addressed the very proximate-cause question presented here under the very same MVRA provisions invoked by the Special Master. The Court held that intervening acts of the victim can sever the causal connection: "Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum — any of which, as the Government concedes, could break the causal chain." Id. at 646.

89. Justice Sotomayor, joined by Justice Ginsburg, wrote separately to clarify the rule that controls here in unmistakable terms: "If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers, 572 U.S. at 647 (Sotomayor, J., concurring). And: "[A] victim's choice to hold collateral — rather than selling it in a reasonably expeditious manner — breaks the chain of proximate causation. … If the collateral loses value after the victim chooses to hold it, then that part of the victim's net loss is attributable to the victim's independent decisions. The defendant cannot be regarded as the proximate cause of that part of the loss, and so cannot be made to bear it." Id. at 648 (alterations, citations, and internal quotation marks omitted).

C. Application to the Ares and Oaktree refusals.

90. Robers concerned a victim that merely held collateral rather than selling it promptly. Even that passive choice, the Robers concurrence held, can break the chain of proximate causation. Here, the conduct of the victim's representative was substantially more affirmative. The NCDOI and the Rehabilitator did not merely fail to monetize the affiliated loans within a reasonable time. They affirmatively refused two separate, fully-negotiated, arm's-length, face- value cash offers — each of which I personally brought to the table, each of which was made by a sophisticated and well-capitalized third-party buyer committing its own balance sheet, and each of which would have monetized the entire affiliated-loan portfolio at par within months. If the Robers concurrence's principle applies

to a victim's passive choice to hold collateral, it applies a fortiori to the Rehabilitator's affirmative choice to refuse two separately negotiated full-value cash offers for the same asset.

D. Compounding application: the MOU's ten-year hold and the pre-maturity bond sale.

91. Even if the Rehabilitator's discretionary refusals of the Ares and Oaktree transactions did not, standing alone, break the chain of proximate causation (and they do), the Rehabilitator's affirmative election in the June 27, 2019 MOU to hold the affiliated loans for a ten-year term — rather than monetize them — is the quintessential "victim's choice to hold" addressed in Robers. A ten-year hold of an asset that two sophisticated buyers had just independently offered to take off the NCICs' balance sheets in cash at face value is, by any measure, not "reduc[ing] [the collateral] to cash within a reasonable time." Robers, 572 U.S. at 647 (Sotomayor, J., concurring). And as detailed in Section VI above, the Rehabilitator's pre-maturity sale of more than $1 billion in face value of bank zero-coupon bonds whose only purpose was to insure the affiliated-loan portfolio against any loss of principal compounds the proximate- cause break a second and independently dispositive time.

E. The Special Master's loss figure cannot survive the Robers analysis.

92. The portion of the Special Master's recommended restitution figure attributable to the affiliated-loan portfolio is, after application of Robers and Davenport, zero. The affiliated loans were not impaired at the moment of transfer: two sophisticated arm's-length buyers — Ares and Oaktree — independently priced them at par within four months of one another. The Rehabilitator refused both transactions. He then forced me to sign the MOU under threat of immediate liquidation. The MOU memorializes the Rehabilitator's affirmative election to hold the affiliated loans for ten years rather than monetize them. The Rehabilitator separately and discretionarily sold the bank zero-coupon bonds before maturity, crystallizing $611.6 million in loss on principal-protection instruments. Under Robers — and under Davenport's requirement that any compensable loss "result from conduct underlying an element of the offense of conviction," 445 F.3d at 374 — any post-MOU decline in the recoverable value of the affiliated-loan portfolio is the proximate consequence of the Rehabilitator's discretionary refusals and ten-year hold election, not of any conduct of mine.

93. In any event, were the Court to undertake the inquiry into whether and to what extent any portion of the claimed loss is attributable to my offense conduct as distinct from the post-October 18, 2018 discretionary conduct of the Rehabilitator and the unidentified third-party constituent who pressured Ares, that inquiry would require litigation extending "over many months, if not years," which would "unduly complicate and prolong the sentencing process." United States v. Purdue Frederick Co., 495 F. Supp. 2d 569, 574–75 (W.D. Va. 2007). For offenses described in 18 U.S.C. § 3663A(c)(1)(A)(ii) or (iii), the MVRA itself provides that it "shall not apply" where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); see also United States v. Reifler, 446 F.3d 65, 135–39 (2d Cir. 2006). Congress's intent is to the same effect. The Senate Judiciary Committee directed

that "highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution," and that "losses in which the amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The causation and valuation questions the Special Master's figure resolves are precisely the "highly complex" and "speculative" issues Congress placed beyond the reach of mandatory restitution.

94. The point is dispositive: the NCICs and the Rehabilitator cannot, in 2026, demand approximately $1.655 billion in restitution measured by a claimed decline in the recoverable value of an asset that they themselves affirmatively chose to hold for ten years — after refusing two separate arm's-length face-value cash offers for the same asset, after threatening to liquidate the NCICs if I did not sign the very MOU that imposed that ten-year hold, and after separately liquidating the more than $1 billion in bank zero-coupon bonds whose only purpose was to ensure that no such loss could occur. This result is irreconcilable with the make-whole purpose Congress assigned to restitution. The Senate Judiciary Committee reaffirmed that restitution exists to "restore the victim to his or her prior state of well-being." S. Rep. No. 104-179, at 13 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 926. A restitution figure measured by a loss that the victim's own representative caused, and that exceeds the victim's actual loss, does not restore anyone to a prior state of well-being; it confers a windfall the MVRA does not permit.

## XVII. THE DESTRUCTION OF THE $454 MILLION IN NCIC VALUE WAS NOT PROXIMATELY CAUSED BY MY OFFENSE CONDUCT — FULL CREDIT IS REQUIRED UNDER THE MVRA

95. As set forth in Paragraphs 55–62 of the Original Statement, eighteen days after I transferred operational control of the NCICs to the Special Deputy Rehabilitator — on November 5, 2018 — the management of the NCICs (acting under the Rehabilitator's supervision and on a record hostile to me) prepared an internal valuation valuing the NCICs at $454 million. See Original Stmt. ¶ 56 & Exhibit J. That valuation is the most reliable contemporaneous measure of fair market value at the moment of transfer because (i) it was prepared by persons under the Rehabilitator's control; (ii) it was prepared just 18 days after the transfer, when no material change in the underlying businesses had occurred; and (iii) it was prepared for the Rehabilitator's internal financial-management purposes, not as litigation evidence.

96. Applying the Robers-based proximate-cause framework set forth in Section XVI above to the $454 million in NCIC value that was destroyed after October 18, 2018 yields a single, dispositive conclusion: that destruction was not proximately caused by my offense conduct. Each of the discretionary acts set forth below was undertaken after I had ceased to control the NCICs, was within the exclusive discretion of third parties (principally the Rehabilitator), and represented a free, deliberate, and informed choice to act in a manner that destroyed value rather than preserve it: a. Refusal of the Ares Transaction. As established by Exhibits A and B and Sections XII and XIV above, the Ares Management acquisition would have paid every NCIC policyholder in full by approximately June 2019. The transaction was defeated by third-party government pressure on the buyer and by the Rehabilitator's subsequent refusal to re-engage. That refusal is the proximate cause of the loss of the Ares alternative. It is not

my conduct. b. Refusal of the Oaktree Transaction. As established by Exhibits C, D, and E and Sections XIII and XIV above, the Oaktree "Global Solution" structure would have channeled a $1.0 billion Oaktree investment into a holding-company SPV that would have acquired the affiliated-loan positions held by the NCICs and 100% of the GBIG equity. The Rehabilitator elected not to proceed. That discretionary refusal is an independent, intervening, and superseding cause of the post-October 18, 2018 destruction of NCIC value. c. "Day One" Liquidation Posture, Hammer-and-Nail Coercion, and Ten-Year MOU Hold. On June 27, 2019 — the very day the rehabilitation order was entered — Mr. Dinius wrote to me from his Noble Consulting account stating: "we will contact the guaranty associations and move directly to liquidation. You know what that means." Original Stmt. ¶ 58(a) & Exhibit D5. His counsel told me directly, "Mr.

Lindberg, you're the nail. I'm the hammer." Trial Tr. (Vol. 5) p. 1012:11–12. He never re-engaged with Ares or Oaktree. He forced me to sign the MOU under threat of immediate liquidation. He then elected, in the MOU itself, to hold the affiliated loans for a ten-year term rather than monetize them. d. Refusal of the 2023 Montshire/Alban Offer. In 2023, I negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the NCICs. Original Stmt. ¶ 58(c) & Exhibits O3, O4.

That transaction, like Ares and Oaktree before it, would have generated proceeds

sufficient to pay every NCIC policyholder in full. The Rehabilitator's response was to reject the offer and to file litigation against Mr. Alban. e. Blocking the Q1 2024 Quadro Transaction. In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion (at a 22.14x EBITDA multiple consistent with public comparables), and valuing Clanwilliam alone at $880 million. Original Stmt. ¶¶ 16, 58(d), 75 & Exhibits G3, I3, I4. The Rehabilitator blocked the Quadro transaction over my repeated objections and then forced a September 2025 below-market fire-sale of Clanwilliam to TA Associates for $450 million — a $474 million destruction of value attributable entirely to the Rehabilitator's discretionary decision to block the Quadro deal. f. Pre-Maturity Sale of the $1.006 Billion in Protective Bank Zero-Coupon Bonds.

As detailed in Section VI above and in Paragraphs 47–54 of the Original Statement, the Rehabilitator made the unilateral discretionary decision to sell the bank zero - coupon bonds underlying the Principal Protected Notes prior to maturity for approximately $394 million, rather than holding them to maturity for the full par recovery of $1,006,239,867. That decision crystallized a $611.6 million loss on instruments whose entire purpose was to protect the principal of the affiliated investments from any credit-related downside. g. Extraction of More Than $165 Million in Administrative Fees. The Rehabilitator extracted more than $165 million in administrative fees from the very NCIC estates the Special Master now seeks to have me further compensate, including over $25 million

paid to Noble Consulting and Mr. Dinius personally. See Original Stmt. ¶ 58(i) & Exhibit M.

97. Each of the discretionary acts described above satisfies the classic definition of an intervening, superseding cause: each was a free, deliberate, and informed choice of a third party — principally the Rehabilitator — made after the cessation of my conduct, and each was the proximate cause of the loss it produced. Under Paroline, Davenport, Robers, 572 U.S. at 647 (Sotomayor, J., concurring), and Purdue Frederick Co., the chain of proximate

causation linking my offense conduct to the destruction of the $454 million in NCIC value is broken. I am due a full $454 million credit in addition to full credit for the $611.6 million loss on the bank zero-coupon bonds.

## XVIII. THE AAPC PREFERRED EQUITY TRANSFERRED TO ULICO — THE $352 MILLION CREDIT

98. As set forth in Paragraphs 63–69 of the Original Statement, a substantial portion of the affiliated investments that the Special Master attributes to me as restitution-eligible loss consisted of approximately $352 million in preferred equity issued by Academy Association, Inc.- related entities (the "AAPC Preferred Equity") that was, in fact, transferred to and is now held by ULICO ("ULICO") in connection with the resolution of the ULICO reinsurance relationship. To the extent the AAPC Preferred Equity is now an asset of ULICO, its value cannot also be counted as an unrecovered loss of the NCICs; doing so double-counts the same asset.

99. The ULICO relationship has been the subject of separate federal litigation. See Universal Life Insurance Co. v. Lindberg, No. 1:20-cv-861 (M.D.N.C.) [D.E. 122] (M.D.N.C. May 3, 2022). That litigation resulted in a judgment in the approximate amount of $524 million, which was thereafter resolved by a December 2022 settlement (Original Stmt. Exhibits A and B). The AAPC Preferred Equity transferred in connection with that resolution carried an 18% payment-in-kind ("PIK") accrual rate and was subject to transfer restrictions for only approximately four months, after which it was freely transferable. The economic value of the AAPC Preferred Equity — approximately $352 million — is presently held by ULICO and must be credited against any restitution figure under 18 U.S.C. § 3664(j)(2) and the anti-double-recovery principles discussed in Sections IV and XVI above. This matter is the subject of the pending Puerto Rico federal arbitration. See Lindberg v. ULICO, No. 26-cv-01026-MAJ (D.P.R.). Congress enacted § 3664(j)(2) precisely to prevent this. The Senate Judiciary Committee explained that the provision's purpose "like its predecessor in current law, is to ensure that the victim is not compensated twice for the same loss," and clarified that "same loss" refers to "a specific loss arising from the same criminal act." S. Rep. No. 104-179, at 21 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 934. Because ULICO already holds the AAPC Preferred Equity, counting its approximately $352 million value as an unrecovered loss of the NCICs would compensate the victims twice for the same loss — the precise result Congress legislated against.

## XIX. ADDITIONAL LOSSES NOT PROXIMATELY CAUSED BY MY OFFENSE CONDUCT

100. As set forth in Paragraphs 70–77 of the Original Statement, several additional categories of claimed loss included in the Special Master's preliminary computation were not proximately caused by any conduct underlying an element of my offense of conviction, and each is fully credit-eligible under Hughey, Blake, Davenport, and Robers: a. Agera Energy — approximately $129 million. The Agera Energy investment was originated by Platinum Partners and was inherited by me as part of the June 2017 acquisition of the PBLA-Bermuda reinsurance portfolio from Beechwood. It became a write-off following the discovery of financial fraud committed by Agera's independent Chief Financial Officer — the criminal conduct of a third party wholly independent of

any conduct of mine. The approximately $129 million in Agera-attributable loss was not proximately caused by my offense conduct. b. ECL — approximately $22.2 million. The approximately $22.2 million in ECL- attributable loss arose from circumstances independent of any conduct underlying an element of my offense of conviction and is fully credit-eligible. c. Clanwilliam — approximately $474 million. As set forth in Section XVII(e) above, the Rehabilitator blocked the Q1 2024 Quadro transaction (which valued Clanwilliam at $880 million) and then forced a September 2025 below-market sale of Clanwilliam to TA Associates for approximately $450 million, destroying approximately $474 million in value. That destruction is attributable to the Rehabilitator's discretionary decision, not to my offense conduct. d. UKAT — approximately $39 million. The approximately $39 million in UKAT- attributable loss arose from circumstances independent of any conduct underlying an element of my offense of conviction and is fully credit-eligible. e. Insurance-Holdco Debt — approximately $14.87 million. As set forth in Section IX above, the Insurance-Holdco debt could not be serviced as cash-pay senior debt because the NCICs in rehabilitation were not generating cash to service holding-company debt — a fact Mr. Dinius expressly agreed to and reflected in his June 17, 2019 email. The approximately $14.87 million in Insurance-Holdco-attributable loss is not properly chargeable to me.

101. Each of these categories is independently supported by the proximate-cause authorities set forth in Section XVI above. The Government has not carried, and cannot carry, its

burden under 18 U.S.C. § 3664(e) of demonstrating by a preponderance of the evidence that any of these losses resulted from conduct underlying an element of the offense of conviction.

XX. OTHER CREDITS DUE

102. As set forth in Paragraphs 78–79 of the Original Statement, I am entitled to the following additional credits, each of which represents value already received by or available to the NCIC estates and each of which the Special Master's preliminary computation does not appear to credit: a. Idaho and North Carolina Real Estate — approximately $13.5 million. Real-estate assets located in Idaho and North Carolina, with an approximate aggregate value of $13.5 million, was transferred to ULICO and must be credited against any restitution figure. b. Additional Clanwilliam Escrow — approximately $20 million. An additional approximately $20 million Clanwilliam-related escrow is available to the NCIC estates and must be credited. As set forth in Section XXII below, in September 2025 I voluntarily relinquished a $40 million tax escrow established for my benefit so that the Clanwilliam sale could proceed and the excess policyholders could be paid.

XXI. PRE-JUDGMENT INTEREST SHOULD NOT BE AWARDED — THE $263 MILLION REDUCTION

103. As set forth in Paragraphs 80–82 of the Original Statement, the Special Master's preliminary computation includes approximately $263 million in pre-judgment interest. That interest should not be awarded, for two independent reasons.

104. First, the restructured affiliate-loan tranches were, by the express terms of the June 17, 2019 Dinius email and the MOU, converted to zero-coupon obligations that bear no interest.

(Original Statement Exhibit G; see Section VIII above.) Mr. Dinius's own June 17, 2019 table converts the Agera, PBLA-main, Malta, insurance-co, and NHC tranches to "10-year zero," "7- year note" zero-coupon, and similar non-interest-bearing instruments. An award

of pre-judgment interest on obligations that the victim's own representative contractually converted to zero-coupon, non-interest-bearing instruments would be contrary to the parties' agreement and would manufacture a category of loss that does not exist.

105. Second, pre-judgment interest is not available under the MVRA where, as here, the underlying loss figure is itself contested and the delay in resolution is attributable to the victim's own representative — the Rehabilitator — whose discretionary refusals of the Ares, Oaktree, Montshire/Alban, and Quadro transactions, and whose pre-maturity sale of the protective bonds, are the proximate cause of any delay in policyholder recovery. See Sections XVI and XVII above. The approximately $263 million in pre-judgment interest should be eliminated from any restitution figure.

## XXII. A DECADE OF CONTEMPORANEOUSLY-DOCUMENTED CONDUCT PLACING POLICYHOLDER SECURITY AHEAD OF MY OWN ECONOMIC INTERESTS

106. The proximate-cause analysis set forth above does not stand alone. It is reinforced by — and is the natural product of — a sustained, decade-long course of conduct in which, from the very inception of my investments in the insurance business, I took repeated, costly, and well- documented steps to ensure that policyholders were fully secure.

107. 2014 — NCDOI Approval and Personal Guarantee of All Affiliated Investments. When I first proposed the affiliated-investment structure to the NCDOI in September 2014, I did not merely seek approval of the structure — I affirmatively offered to personally guarantee every affiliated investment held by my North Carolina insurers. See Original Stmt. ¶ 4 & Exhibit A2. The affiliated-investment strategy that the NCDOI approved in 2014 — capped at 40 percent of total admitted assets — has since been adopted (and in some cases exceeded) by Blackstone, Brookfield, KKR, Eldridge, and Apollo. See Sections III and V above and Exhibits A12, B5, and B6.

108. 2015 — Formal Affiliate-Investment Risk-Management Policy. In 2015, I implemented a formal, written affiliate-investment risk-management policy governing how the NCICs would underwrite, monitor, and limit affiliated exposures. The policy instituted credit-quality requirements, concentration limits, periodic reporting, and reserve-style protections — none of which were required by the NCDOI but all of which I adopted and followed in order to enhance the protection of policyholders. See Exhibit B21.

109. 2017 — Personal $17 Million Cash Infusion to CBL Within 48 Hours of the McCord Fraud Discovery. In 2017, when fraud committed by Ron McCord and First Mortgage Company was discovered as having affected an investment held by CBL, within 48 hours of the fraud's discovery I personally funded $17 million directly into CBL to absorb the loss and restore the affected balances. The McCord fraud was the criminal conduct of a third party wholly independent of any conduct of mine. The 2017 infusion is the paradigmatic example of how I actually behaved in the face of unexpected losses to my insurance companies: I wrote a personal check.

110. May 2018 — $1+ Billion in Investment-Grade Bank Zero-Coupon Bonds Purchased as Principal-Loss Insurance for the Affiliate Loans. As detailed in Section VI above and in Paragraphs 47–54 of the Original Statement, in May 2018, pursuant to a memorandum of understanding with the NCDOI (Original Stmt. Exhibit M5), I directed the NCICs to construct the Principal Protected Notes and to purchase, as the protective layer inside those PPNs, more than $1

billion in face value of investment-grade zero-coupon bonds issued by Barclays Bank PLC, Bank of Montreal, Royal Bank of Canada, and Natixis SA. Held to maturity, those bonds were contractually obligated to pay $1,006,239,867 at par — covering the affiliate loans dollar-for- dollar.

111. November 2018 — Executed Ares Letter of Intent. On November 22, 2018, just thirty-five days after I had transferred operational control of the NCICs to the Special Deputy Rehabilitator, I executed an arm's-length letter of intent with Ares Management Corporation (Exhibit B) that committed Ares to acquire 100% of the NCICs and the rest of GBIG for upfront cash consideration of $400–$420 million. Had it closed, every NCIC policyholder would have been paid in full by approximately June 2019.

112. February 2019 — Independent Oaktree Capital Management $1.0 Billion SPV Transaction. Within weeks of the Ares termination, I personally directed the negotiation with Oaktree Capital Management memorialized in Exhibits C, D, and E. As I wrote to my team in Exhibit D, "suggest we push these three options daily with some vigor." The Rehabilitator elected not to proceed.

113. March 10–11, 2019 — Execution of the Amended & Restated Backstop Agreement. On March 11, 2019, I executed the Amended & Restated Backstop Agreement in favor of the very insurance company lenders the Government identifies as victims, personally guaranteeing approximately $2.39 billion of affiliated-loan and preferred-equity obligations. See Section IV above and Original Statement Exhibit B.

114. June 27, 2019 — Forced Execution of the MOU Under Threat of Immediate Liquidation. As established in Section XIV above, I executed the MOU under express written threat from the Rehabilitator that, if I did not sign, he would immediately contact the guaranty

associations and "move directly to liquidation." I signed in order to protect policyholders from the harm the Rehabilitator was threatening to inflict on them.

115. 2014–2018 — Zero Dividends Taken From the NCICs. During the entire period from 2014 through 2018 — when I controlled the NCICs — I never took a single dollar in dividends from the North Carolina insurance companies. The capital I committed to the insurance companies, and the earnings of those companies, were retained in the regulated insurance estates rather than distributed to me.

116. 2023 — Montshire/Bob Alban Investor Group Offer. In 2023, undeterred by the Rehabilitator's refusals of the Ares and Oaktree transactions, I negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the NCICs. The Rehabilitator's response was to reject the offer and to file litigation against Mr.

Alban.

117. Q1 2024 — Signed $880 Million Quadro Acquisition Corp. (NASDAQ: QRDO) Transaction. In Q1 2024, Quadro Acquisition Corp. One signed a purchase agreement valuing the SAC group at approximately $3.4 billion and Clanwilliam alone at $880 million. The Rehabilitator blocked the Quadro transaction over my repeated objections.

118. September 2025 — Consent to the Clanwilliam Sale and Voluntary Relinquishment of $40 Million in Tax Distributions. In September 2025, when the Clanwilliam sale through the Special Master process was finally permitted to proceed, I voluntarily consented to the sale and agreed to relinquish a $40 million tax escrow that had been established for my

benefit. Without that consent, the 43,000 excess policyholders would not have received the $157 million they had not previously been paid.

119. Taken in chronological sequence, the conduct described above establishes a single, unbroken pattern beginning in 2014 and continuing to the present: at every juncture at which I had a choice between protecting policyholders and protecting myself, I chose the policyholders. The cause of the six-year-plus delay in policyholder payments is the conduct of the NCDOI and the Rehabilitator in defeating the Ares, Oaktree, Montshire/Alban, and Quadro transactions — and in liquidating the bank zero-coupon bonds pre-maturity — and is not my conduct.

## XXIII. POLICYHOLDER PAYMENTS — THE POLICYHOLDERS HAVE BEEN PAID

120. As set forth in Paragraphs 83–84 of the Original Statement, the NCICs' policyholders have been paid. In December 2025, following my September 2025 consent to the Clanwilliam sale and my voluntary relinquishment of the $40 million tax escrow, a distribution of more than $157 million was made to more than 43,000 excess policyholders — the amounts those policyholders had not previously been paid.

121. The Special Master's preliminary computation does not appear to credit these recoveries from collateral and obligor entities, the bank zero-coupon bond proceeds, the AAPC/ULICO offset, or the asset-sale proceeds already received by the Rehabilitator. Each of these must be credited against any restitution figure.

## XXIV. SUMMARY OF REQUIRED OFFSETS, CREDITS, AND REDUCTIONS

122. The following table summarizes the principal offsets, credits, and reductions established in the foregoing sections and in the Original Statement. Each figure is detailed, and its evidentiary and legal basis set forth, in the section of this Statement cross-referenced in the right- hand column. Certain categories below are alternative or partially overlapping measures of the same underlying value destruction (for example, the destruction of NCIC enterprise value and certain discretionary post-transfer dispositions); the categories are reconciled in their respective

sections, and the figures below are presented as claimed in the Original Statement. The dispositive point is that the aggregate of the offsets and credits established herein exceeds the Special Master's preliminary restitution figure, such that the net restitution properly owed is $0. Offset / Credit / Reduction Amount § Correction of NCIC starting principal balance ($1.391B → $1.25B) $141,000,000 VII FinCo read-through reduction $139,000,000 X Zero-coupon bond cash proceeds (18 U.S.C. § 3664(j)(2)) $394,000,000 VI, XI Zero-coupon bond crystallized loss from pre-maturity sale (Robers) $611,600,000 VI Destruction of NCIC enterprise value at transfer $454,000,000 XVII AAPC preferred equity now held by ULICO $352,000,000 XVIII Agera Energy (not proximately caused) $129,000,000 XIX ECL (not proximately caused) $22,200,000 XIX Clanwilliam value destruction (Quadro blocked; forced fire-sale) $474,000,000 XIX UKAT (not proximately caused) $39,000,000 XIX Insurance-Holdco debt (non-cash-pay) $14,870,000 XIX Idaho and North Carolina real estate $13,500,000 XX Additional Clanwilliam escrow $20,000,000 XX Pre-judgment interest (should not be awarded) $263,000,000 XXI Special Master's preliminary restitution figure $1,655,000,000 NET RESTITUTION PROPERLY OWED (offsets exceed $0 figure)

123. Even on the most conservative view — crediting only the zero-coupon bond credits (approximately $1.006 billion, Section VI), the starting-balance correction ($141 million, Section VII), the FinCo read-through ($139 million, Section X), and the AAPC/ULICO offset ($352 million, Section XVIII) — the aggregate offsets of approximately $1.638 billion,

supplemented by any single additional category established above, exceed the Special Master's preliminary figure. The net restitution properly owed, after application of the offsets and credits to which I am entitled under the MVRA and applicable Fourth Circuit authority, is $0.

XXV. CONCLUSION AND SUMMARY

124. The foregoing facts, supported by contemporaneous documentary exhibits, establish the following propositions, each of which is material to the restitution determination and to the integrity of the plea-agreement record:

1. Affiliate investment up to a 40% admitted-assets ceiling was the expressly approved NCDOI regulatory framework for the NCICs, documented in the April 19, 2016 SNIC/NCDOI correspondence (Original Statement Exhibit A12).

2. I personally guaranteed approximately $2.39 billion of obligations owed to the very insurance companies the Government identifies as victims, and continuously reinvested personal capital into the affiliated platform — conduct categorically incompatible with fraudulent intent Original Statement (Exhibit B; Section IV above).

3. Affiliate investment at, near, and exceeding 40% is standard industry practice among the largest private-equity-affiliated U.S. life insurers, as confirmed by Exhibit B5 and the May 26, 2026 Wall Street Journal reporting (Exhibit B6).

4. In May 2018, I directed the NCICs to invest more than $1 billion in face value of investment-grade bank zero-coupon bonds as dollar-for-dollar principal-loss insurance for the affiliate loans (Section VI above and Original Stmt. ¶¶ 47–54). The approximately $1.006 billion in par value fully covered the approximately $1 billion in outstanding affiliate loans. The Rehabilitator's discretionary pre-maturity sale of those bonds for approximately $394 million crystallized a $611.6 million loss on the very instruments whose only purpose was to prevent affiliate-loan loss — yielding two separate credits totaling approximately $1.006 billion against the Special Master's preliminary restitution figure.

5. Two arm's-length, face-value cash transactions for the affiliate-loan portfolio — Ares (November 2018) and Oaktree (February 2019) — were on the table within months of my October 18, 2018 transfer of operational control, either of which would have paid every NCIC policyholder in full by approximately June 2019 (Exhibits A, B, C, D, and E).

6. The Special Deputy Rehabilitator broke the chain of proximate cause by (a) refusing both pending transactions, (b) compelling me, under threat of immediate liquidation, to execute the MOU locking the affiliate loans in place for ten years, (c) extracting representations and warranties under the express "hammer and nail" framing, and (d) discretionarily selling the bank zero-coupon bonds before maturity.

125. As summarized in Section XXV above, the aggregate of the offsets, credits, and reductions established herein exceeds the Special Master's preliminary restitution figure, such that the net restitution properly owed is $0. I respectfully submit this Supplemental Statement of Facts to ensure that the foregoing matters are fully and accurately before the Court as it addresses the contested preliminary restitution order, the pending Emergency Motion to Stay, and related restitution-phase matters.

XXVI. PRESERVATION OF ERROR FOR APPELLATE REVIEW

126. To the extent any factual or legal contention set forth above has not previously been raised in a discrete filing in this matter, I expressly preserve each such contention for appellate review. The contentions specifically preserved by this filing include, without limitation: (i) the lack of "direct and proximate" causation between the offense of conviction and the losses asserted in the Special Master's preliminary restitution computation, see 18 U.S.C. § 3663A(a)(2); Hughey v. United States, 495 U.S. 411, 413 (1990); United States v. Blake, 81 F.3d 498, 506 (4th Cir.

1996); Paroline v. United States, 572 U.S. 434, 444–46 (2014); (ii) the intervening-cause and offset arguments arising from the Rehabilitator's conduct — including the discretionary refusals of the Ares and Oaktree transactions, the ten-year MOU hold, the "hammer and nail"-coerced representations and warranties, and the pre-maturity sale of the bank zero-coupon bonds — and the failure of the preliminary restitution computation to credit recoveries and offsets to which I am entitled under 18 U.S.C. § 3664(e), (j)(2), see Robers v. United States, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring, joined by Ginsburg, J.); United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006); United States v. Alalade, 204 F.3d 536, 540 n.4 (4th Cir. 2000); and (iii) the duress-based challenge to representations, warranties, and ten-year lock-in agreements extracted by the Rehabilitator, see Restatement (Second) of Contracts §§ 175–176 (Am. Law Inst.

1981).

XXVII. RESERVATION OF RIGHTS

127. I expressly reserve the right to further supplement this Statement to (i) provide additional documentary support upon further restoration of access to my files, including, in particular, the PPN/zero-coupon worksheet and the bond-by-bond cross-walk to the underlying affiliated investments described in Section VI above, and the complete disposition records for the PPN-embedded zero-coupon bonds described in Section XI above; (ii) reflect any disposition records produced by the Special Deputy Rehabilitator regarding the PPN-zero dispositions, including the precise pre-MOU versus post-MOU split of the $394 million in total proceeds; (iii) reflect any updated valuations of the AAPC Preferred Equity beyond the $352 million figure set forth in Section XVIII above; (iv) provide further sworn testimony at any evidentiary hearing the Court may convene; (v) introduce further documentary evidence concerning the negotiations with Ares, Oaktree, HPS, the Soros funds, Landmark Partners, Collier Capital, Lexington, Nomura, and

other prospective SPV-financing counterparties between November 2018 and June 2019; (vi) incorporate by reference any additional matters set forth in my contemporaneously filed Emergency Motion , Memorandum of Law ,and Response and Objection to the Special Master's Report (Docket No. 132); and (vii) seek any further relief from this Court necessary to remediate the Rehabilitator's ongoing impairment of my access to counsel as described in Section VI(K) above. All matters set forth in the Original Statement are incorporated herein by reference and remain in full force and effect.

**Doc. 190 — Motion to Stay + Consolidated Objections (filed 06/11/2026)**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

No. 5:19-cr-22-MOC Plaintiff, v. No. 3:23-cr-00048-MOC

GREG E. LINDBERG, EXPEDITED CONSIDERATION

Defendant. REQUESTED

DEFENDANT'S EMERGENCY MOTION TO STAY ALL ASSET SALES AND ASSET-SALE PROCESSES PENDING ENTRY OF A FINAL RESTITUTION ORDER AND DE NOVO ARTICLE III DETERMINATION, AND CONSOLIDATED OBJECTIONS TO THE PRELIMINARY ORDER OF RESTITUTION (DOC. 161), THE SCOPE OF THE SPECIAL MASTER REFERENCE, AND THE SPECIAL MASTER'S STATEMENT (DOC. 159), WITH INCORPORATED MEMORANDUM OF LAW

Defendant Greg E. Lindberg respectfully moves this Court, on an emergency basis, for an order staying all sales and dispositions of assets, and all asset-sale processes (including without limitation marketing, solicitation of bids, negotiation of letters of intent or purchase agreements, and closings), conducted by or at the direction of the Special Master or any person acting in concert with him, pending (1) this Court's entry of a final order of restitution after a de novo determination of all disputed restitution issues, and (2) this Court's adjudication, upon motion and after an opportunity to be heard, of any specific request to approve any specific sale. This filing is made within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], and every ground stated herein is asserted both in support of the requested stay and as an objection to the Preliminary Order of Restitution, to the scope and implementation of the Special Master reference, and to the Special Master's Statement Concerning Defendant's Cooperation [Doc. No. 159]. Defendant's previously filed motion to stay [Docs. 172-188] are incorporated by reference, and the grounds stated in that motion are likewise asserted as objections to the Preliminary Order of Restitution. Pursuant to LCrR 47.1, the supporting memorandum is incorporated below;

Defendant's Supplemental Statement of Facts (Addendum), cited herein as the "Statement of Facts," is attached hereto; and a proposed order is submitted herewith.

INTRODUCTION

Congress has spoken with precision about what a special master may do in a federal criminal restitution proceeding, and it is not this. The only express authority for a special master in this setting is 18 U.S.C. § 3664(d)(6), and its text is narrow: the court "may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." A special master may propose; only the Court may decide; and nothing in the statute empowers a master to liquidate a defendant's assets—least of all before any final restitution determination exists.

This Court's own Order Appointing Special Master enforces the same design. It directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the

victims," to "select an appropriate method and timetable and seek Court approval to liquidate . . . any available assets," and to "oversee and help accomplish the liquidation with Court approval." Doc. No. 56, at 6 (emphases added). Court approval is not an ornament in that order; it is the mechanism by which § 3664(d)(6)'s de novo guarantee operates.

The process on the ground has departed from that design in three escalating respects. First, the Becket asset was sold without any order of this Court—indeed, without any trace on this Court's docket: no motion, no notice, no order. Defendant's counsel learned of the sale only orally, in a weekly meeting with the Special Master's team in or about December 2025. [Statement of Facts ¶ 11.] Second, even the Clanwilliam transaction—to which Defendant consented at the urging of the Special Master and the United States, while expressly preserving his valuation objections—proceeded and its $318 million in estimated proceeds were distributed without a final restitution order and without any final determination of the restitution number. Doc. No. 66, ¶¶ 18, 21(b). The Special Master himself conceded the point: "[i]n an ideal set of circumstances, the

Special Master would have completed his restitution victim analyses—and made recommendations to the Court concerning the same—before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims." Doc. No. 66, ¶ 24. Third, Defendant's pending submissions document offsets of approximately $2.9 billion against the $1.655 billion preliminary figure [Doc. 161], which, if credited on de novo review, yield zero net restitution. Every asset sold before that determination is an irreversible penalty imposed before the penalty has been adjudicated. The reference as implemented exceeds § 3664(d)(6), displaces this Court's nondelegable Article III duty to resolve restitution disputes "by the court by the preponderance of the evidence," 18 U.S.C. § 3664(e), and deprives Defendant of the de novo determination the statute guarantees. A stay of all further sales and sale processes— with any future disposition requiring a specific, contested motion and this Court's own findings— is the minimum relief necessary to restore the statutory and constitutional order of operations.

FACTUAL AND PROCEDURAL BACKGROUND

1. On November 12, 2024, Defendant pleaded guilty to Counts One and Thirteen pursuant

to a written plea agreement. Doc. No. 40. In it, Defendant agreed "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Doc. No. 40, ¶ 9 (emphasis added). Defendant consented, in other words, to a court-supervised process—not to dispositions of his assets unmediated by orders of this Court.

2. On January 23, 2025, the Court entered its Order Appointing Special Master, naming

Joseph W. Grier, III, pursuant to 18 U.S.C. § 3664(d)(6). Doc. No. 56. That order directs the Special Master to "identify all assets available for liquidation . . . for the benefit of the victims"; to "select an appropriate method and timetable and seek Court approval to liquidate . . . any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation

with Court approval." Doc. No. 56, at 6. The order further provides that none of the Special Master's authority is intended to authorize the violation of any other federal or state court orders.

Doc. No. 56, at 10, ¶ 16.

3. On July 3, 2025, the Special Master filed a Consent Motion for an order approving the

disposition of the net proceeds—estimated at $318,000,000—from the sale of the Clanwilliam Group of Companies, a transaction conducted under the supervision of the Wake County Superior Court and restrained by that court's injunction and its March 14, 2023 Clanwilliam order. Doc. No. 66, ¶¶ 10–18. Defendant consented to that disposition at the urging of the Special Master and the United States, to avoid the loss of the transaction—while expressly preserving, by agreement with the United States, his right to contest the true value of Clanwilliam for restitution-offset purposes. Defendant's preserved position, communicated in writing to the Special Master's counsel, is that Clanwilliam was sold at approximately $450 million against a market value of approximately $800 million—roughly $350 million below the value of the asset when contributed to NHC in October 2024. [Ex. S2, Lindberg–Martinez Correspondence (Aug. 14, 2025).]

4. The Clanwilliam Consent Motion is candid about its own irregularity. The Special Master acknowledged that "[i]n an ideal set of circumstances," his "restitution victim analyses" and "recommendations to the Court concerning the same" would have been completed "before seeking Court approval of (i) a restitution asset sale or (ii) how funds from such a sale would be disbursed to victims," and that the distribution "almost certainly will deviate in some degree from the general victim restitution apportionment later approved by the Court." Doc. No. 66, ¶ 24. The motion disbursed $23,520,710 to Vista even though "the Special Master is unsure whether the Special Master will recommend that the Court treat Vista as a victim in this proceeding." Doc. No. 66, ¶ 26 n.8. And it asked that distributions be credited against "Defendant's ultimate restitution obligations as determined by a future order of restitution entered by the Court"—a concession that no such order existed. Doc. No. 66, ¶ 21(b) (emphasis added). The Special Master's assurance that he "anticipates collecting enough funds in the future to equalize distributions" (Doc. No. 66, ¶ 26) only underscores the problem: equalization depends on liquidating still more assets before the obligation those liquidations are meant to satisfy has been adjudicated.

5. On May 14, 2026—twelve days before sentencing—the Special Master presented Defendant with a "Consent, Waiver, and Acknowledgement" bearing an effective date of May 15, 2026 (the "New Waiver"). [Ex. W.] Its recitals assert that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price at which Primary Restitution Assets are sold, subject to only the approval of the Court," and characterize Defendant's execution of the instrument as "cooperation" the Special Master "deems . . . necessary" under the appointment order. Its operative clauses would waive Defendant's "right to object to any sale, the manner of the sale, the timing of the sale, and the price at which the Primary Restitution Assets are sold"; confine Defendant to a single "timely objection" in the approval proceeding; and release—and covenant not to sue—a beneficiary class that expressly includes "the Special Master" himself, together with purchasers, financing sources, and insurers. [Ex. W.] On May 22, 2026—four days before sentencing—the Special Master filed a Statement Concerning Defendant's Cooperation, itemizing Defendant's non-execution of waivers among its "clarifications" to Defendant's cooperation showing and announcing that the Special Master "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Defendant has not executed the New Waiver. The conflict of interest embedded in this sequence is addressed in Part V, infra.

6. The New Waiver episode was not isolated; it fit a pattern of promises made to induce

Defendant's cooperation and never honored, while adverse material moved promptly. After Defendant produced emails documenting the Zero Coupon Bond sales, the Special Master promised to correct the restitution analysis to credit those sales—a correction that was supposed to be made even before Defendant's objections were due. No correction was ever filed or made, before sentencing or since. [Statement of Facts ¶¶ 4–5; Doc. No. 173 Ex. M.] Other sale credits promised to Defendant—including the ECL credits—likewise never materialized before sentencing. [Statement of Facts ¶ 6.] And Defendant waived a $40,000,000 court-approved tax escrow in the Clanwilliam transaction on the condition—never fulfilled—that the de minimis companies be transferred to him on an unrestricted basis; the Clanwilliam order instead gave the Special Master the option to assume those companies, Doc. No. 66, ¶ 20(h), at least one of which has since been shut down. [Ex. S2.] The asymmetry is one-way: commitments that would reduce the restitution figure or benefit Defendant were promised and never delivered, while the statement adverse to Defendant was filed four days before sentencing.

7. The Special Master has not disclosed how the proceeds of completed dispositions have been used or applied. No accounting of the proceeds of the Becket sale has been provided to Defendant, and Defendant does not know whether other sales or dispositions have occurred, because none has been disclosed. [Statement of Facts ¶ 3.] A court-appointed fiduciary administering a defendant's assets for restitution owes the Court and the parties a complete accounting of every disposition and of the application of every dollar of proceeds; none has been made.

8. On May 26, 2026, the Court sentenced Defendant. On May 28, 2026, the Court entered a Preliminary Order of Restitution in the amount of $1.655 billion. [Doc. 161.] By its own terms,

the order is preliminary; no final order of restitution has been entered; and Defendant's objections and consolidated offset submissions—documenting recoveries, transfers, and payments to the recipient insurance company estates totaling approximately $2.9 billion, including the preserved Clanwilliam valuation differential—remain pending before the Court. [Doc. 161.]

9. Notwithstanding the absence of any final restitution determination, and notwithstanding Doc. No. 56's express requirement of Court approval, the Becket asset was sold—and there is no evidence of that sale anywhere on the record of this Court. No motion seeking approval of a Becket sale, no notice of such a sale, and no order authorizing one appears on the docket. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings with the Special Master's team described in Doc. No. 159, ¶ 1. [Statement of Facts ¶ 11.] On information and belief, additional sale processes are underway or imminent. Absent a stay, assets will continue to pass irretrievably to third parties before the Court has determined whether any restitution is owed at all.

LEGAL STANDARD

This Court has inherent authority to control its own orders of reference and the conduct of its own appointees, and to stay proceedings ancillary to its judgments. In evaluating a stay, courts weigh the familiar four factors: (1) the movant's likelihood of success on the merits; (2) irreparable injury absent a stay; (3) injury to other parties; and (4) the public interest. Nken v. Holder, 556

U.S. 418, 434 (2009).

ARGUMENT

I. Section 3664(d)(6) Authorizes a Special Master to Recommend—Not to Sell.

The Mandatory Victims Restitution Act supplies the sole express authority for a special master in a criminal restitution proceeding, and it confines the office to a single function: "The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." 18 U.S.C. § 3664(d)(6). Three textual limits follow. The master's output is "proposed" findings and "recommendations"—advice, not action. The subject matter is issues arising in connection with a "proposed" order of restitution— the statute presumes the master's work precedes and informs the Court's final order, not that the master enforces an order that does not yet exist. And every recommendation is "subject to a de novo determination of the issue by the court"—a guarantee that is meaningless if the recommended (or unrecommended) disposition has already been consummated and the asset is gone.

Selling assets is none of these things. A sale is not a proposed finding; it is an executed, largely irreversible disposition. When delegation statutes touching the judicial power are at issue, they are construed strictly, precisely to avoid the constitutional questions that broad readings would raise. Gomez v. United States, 490 U.S. 858, 864 (1989). Section 3664(d)(6) cannot be stretched from "may recommend" into "may liquidate."

The legislative history confirms that the design was deliberate. The reference provision appeared in the Judiciary Committee's bill in precisely the form Congress enacted—a master limited to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. The Committee described the procedures it was enacting as "a streamlined process for the determination of . . . the amount of restitution," explained that "the need for finality and certainty in the sentencing process dictates that this determination be made quickly," and insisted that "restitution must be considered a part of the criminal sentence." S. Rep. No. 104-179, at 20. Congress designed a prompt, court-centered determination followed by enforcement of the resulting judgment. A multi-year liquidation program that sells first, distributes second, and determines—if ever—last is not an administration of the statute; it is its inversion.

II. The Restitution Determination Is a Nondelegable Article III Judicial Function.

The judicial power of the United States is vested in Article III courts and may be exercised only by them. U.S. Const. art. III, § 1; Stern v. Marshall, 564 U.S. 462, 484 (2011). Congress wrote that principle directly into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e). The Fourth Circuit enforces this allocation strictly. In United States v. Johnson, 48 F.3d 806, 808–09 (4th Cir. 1995), the court held that the determination of restitution—there, merely the amounts and timing of payments—is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the assets from which restitution would be paid before the restitution obligation has even been fixed.

The Supreme Court's special-master jurisprudence is as follows: masters exist "to aid judges in the performance of specific judicial duties, as they may arise in the progress of a

cause," and "not to displace the court." La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957) (quoting Ex parte Peterson, 253 U.S. 300, 312 (1920)). In La Buy, references that handed the master the parties' basic issues were condemned as "little less than an abdication of the judicial function," and the Supreme Court approved the extraordinary remedy of mandamus to vacate them. Id. at 256–57. A reference under which the master does not merely hear disputed restitution issues but

disposes of the defendant's property—without court approval and without any final restitution determination—goes further than anything La Buy condemned. Defendant raises this respectfully and in the first instance here, where it belongs: this Court retains full authority to confine its reference to the boundaries Congress set.

III. Defendant's Consent Cannot Supply What the Statute and Article III Withhold.

The anticipated response—that Defendant "agreed" to the Special Master in his plea agreement, Doc. No. 40, ¶ 9, and consented to the Clanwilliam disposition, Doc. No. 66—fails for three independent reasons. Consent operates within settled limits, and each one forecloses reliance on it here.

First, consent cannot enlarge a statute. Parties may no more amend § 3664(d)(6) by stipulation than they may confer subject-matter jurisdiction by agreement. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982). Indeed, Schor makes the analogy explicit: where structural limits are implicated, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III." Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850–51 (1986). Where Congress intends party consent to expand restitution authority, it says so expressly: 18 U.S.C. § 3663(a)(3) permits restitution "to the extent agreed to by the parties in a plea agreement." That provision proves the rule. Consent enlarges the scope of restitution only because a statute authorizes it; no provision of the MVRA or any other statute authorizes parties to transfer the adjudicative or liquidation function itself from the court to a master.

Second, Article III's structural guarantee is not the parties to waive. Schor holds that the right to an Article III adjudicator is "personal" and "subject to waiver," 478 U.S. at 848, but that

"notions of consent and waiver cannot be dispositive" where Article III's structural limitations are at issue, "because the limitations serve institutional interests that the parties cannot be expected to protect." Id. at 851. Wellness International Network, Ltd. v. Sharif, 575 U.S. 665 (2015), permitted bankruptcy judges to adjudicate Stern claims on the parties' knowing and voluntary consent precisely because bankruptcy judges act under the appointment, removal, and review authority of Article III courts—the structural safeguards remained intact. Peretz v. United States, 501 U.S. 923 (1991), is to the same effect in the criminal context: "no such structural protections are implicated" by consent to a magistrate judge's supervision of felony voir dire, the Court explained, because magistrates "are appointed and subject to removal by Article III judges" and "the entire process takes place under the district court's total control and jurisdiction." Id. at 937 (quoting United States v. Raddatz, 447 U.S. 667, 681 (1980)). The teaching of these cases is uniform: consent legitimizes a supervised adjunct; it cannot legitimize an adjunct who has slipped the court's supervision. A special master who disposes of assets without court approval is not the supervised actor Wellness and Peretz describe—he is the unsupervised exercise of judicial power that Schor holds no party can authorize. This Court's own order conditioned the

reference the same way, appointing a master to resolve restitution issues "under the Court's supervision and guidance."

Doc. No. 56, at 3, ¶ 7.

Third, consent is measured by its terms, and every instrument of Defendant's consent presupposes court orders. The plea agreement consents to a special master performing tasks "as ordered by the Court." Doc. No. 40, ¶ 9. The appointment order conditions liquidation—twice— on "Court approval." Doc. No. 56, at 6. The Clanwilliam consent was transaction-specific, given by motion on notice, with valuation objections expressly preserved. Doc. No. 66. Wellness requires that consent be knowing and voluntary as to the adjudication actually conducted; a blanket,

prospective consent to unspecified future sales without court orders cannot be extracted from documents whose every operative clause presupposes them. Defendant consented to a master who recommends and who liquidates only with Court approval. He did not—and could not—consent to dispositions unmediated by orders of this Court. The consent documents are not a defense to the Becket sale; they are evidence that it was never authorized.

The point runs deeper than the scope of consent because the deviation here is structural. Congress prescribed an order of operations, and this Court's appointment order faithfully reproduced it. Under the MVRA, the court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); enters a restitution order that then becomes a final judgment, § 3664(o); and only then do the civil enforcement mechanisms attach, upon entry of judgment, § 3613(c), (f). Doc. No. 56 mirrors that architecture: identify the assets; "seek Court approval to liquidate"; accomplish liquidation "with Court approval." Doc. No. 56, at 6. In both designs, Article III adjudication comes first, execution comes second, and every act of the adjunct passes through the court. That sequencing is not a stylistic preference; it is the constitutional condition on which the use of a non-Article III adjunct rests. Wellness and Peretz sustained adjuncts precisely because "the entire process takes place under the district court's total control and jurisdiction"—appointment, supervision, review, and the final word all belonging to the Article III judge. Peretz, 501 U.S. at 937.

As implemented, the process inverted that sequence at every step: assets were liquidated before any final restitution determination existed; proceeds were distributed under a formula the Special Master concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. No. 66, ¶ 24; the Becket sale occurred off the record entirely; and the corrective

inputs promised to the Court's process—the Zero Coupon Bond credits, the ECL credits, the other promised credits—never arrived. What remains is execution without adjudication: criminal punishment, Ellingburg v. United States, 607 U.S. 163, 166 (2026), carried into effect by a private appointee operating outside the supervision that is the constitutional precondition for his existence. That is not a defect in Defendant's personal right to an Article III adjudicator, which Schor holds waivable, 478 U.S. at 848; it is a defect in the structural allocation of the judicial power, which Schor holds no party can waive: "the parties cannot by consent cure the constitutional difficulty," because the limitations "serve institutional interests that the parties cannot be expected to protect." Id. at 850–51. Under Wellness, supervision is what makes the adjunct constitutional; the record shows the supervision did not occur; the conclusion follows. A structural violation of this kind persists

no matter what Defendant signed, said, or consented to, and it requires correction by the Court whether or not any party asks for it.

IV. The New Waiver Confirms the Defect: An Attempt to Manufacture the Missing Consent, Sought by a Conflicted Officer Under Sentencing Pressure.

The New Waiver is the program reduced to writing. Its recitals declare that the Special Master "has full discretion to liquidate the Primary Restitution Assets, including determination of the timing of sale(s) and the price . . . , subject to only the approval of the Court." [Ex. W.] That is not what this Court ordered, and it is not what Congress authorized. Doc. No. 56 directs the Special Master to identify assets and to "seek Court approval to liquidate" them, accomplishing any liquidation "with Court approval," Doc. No. 56, at 6; and § 3664(d)(6) confines the office to proposed findings and recommendations subject to de novo determination by the Court. An instrument reciting "full discretion" over timing and price—with Court approval reduced to a backstop and the defendant's objection rights waived in advance—is an attempt to obtain by private contract the authority that the statute and the appointment order withhold. As shown in Part III, supra, consent cannot supply that authority. The New Waiver is the proof that the Special Master understands this: one does not seek a waiver of rights one believes do not exist. And the demand sought more protection than this Court chose to give. The appointment order already shields the Special Master in calibrated, court-controlled terms: "No person may pursue any claim against the Special Master . . . without first seeking leave of the Court," and he bears no liability "for any action or omission taken or made in good faith." Doc. No. 56, at 9, ¶ 13. The New Waiver would replace that protection—a leave-of-court gate and a good-faith condition, both of which keep the Court in control—with an absolute personal release and covenant not to sue, with no leave requirement and no good-faith limitation, enforceable against Defendant by specific performance without bond. An officer does not demand a broader release than the Court conferred unless he wants protection the Court's own order withholds.

Nor could consent extracted in these circumstances ever satisfy Wellness's requirement that waiver of Article III rights be knowing and voluntary. The chronology speaks for itself. The New Waiver was presented on May 14, 2026, twelve days before sentencing. On May 22, 2026— four days before sentencing—the Special Master filed a public statement to the sentencing court itemizing Defendant's non-execution of waivers among the "clarifications" to Defendant's cooperation showing and announcing that he "expects that Defendant will execute the New Waiver before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. A waiver of statutory and constitutional objection rights, demanded as "cooperation" by the very officer reporting on the defendant's cooperation to the judge about to sentence him, is the antithesis of a voluntary relinquishment. It is leverage. And the leverage was applied by an officer with a disqualifying stake in the outcome: the New Waiver's beneficiary clause runs expressly to "the Special Master" himself—releasing him, personally, from suit—while his professionals are compensated from the very assets whose accelerated, unopposed liquidation the waiver is designed to "streamline." Doc. No. 56, at 9–10; Doc. No. 66, ¶ 20(d)(i) ($14,112,426 administrative reserve). The recitals themselves brand the absence of Defendant's waiver as something that "will impair the value" of the assets—recasting rights Congress conferred as obstacles to be cleared. The Special Master's own filing concedes the pattern, acknowledging that at least one of his demands on Defendant came "[a]lthough arguably exceeding the scope of the Special Master's authority." Doc. No. 159, ¶ 3. These circumstances are detailed in Part

V, infra, under 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy). For present purposes, they confirm why a stay is necessary: the sale program is being driven by an officer whose interests favor speed and foreclosure of objections, in tension with the adjudication-first sequence the statute commands.

V. The Special Master Is Disqualified From Recommending or Adjudicative Functions: He Demanded, as "Cooperation," a Release Running to Himself, While His Professionals Are Compensated From the Assets He Liquidates.

"[N]o man can be a judge in his own case." In re Murchison, 349 U.S. 133, 136 (1955). That command of due process was announced in criminal cases and applies of its own force here, binding every officer who exercises adjudicative power, whatever the label of the proceeding. This Court's own appointment order then supplies the standard in terms: the office exists, by the Court's express finding, because "an experienced, neutral, and disinterested person should be appointed to assist the Court," resolving restitution issues "under the Court's supervision and guidance." Doc. No. 56, at 3, ¶ 7. Neutrality and disinterest are not imported into this case from the civil rules; they are the express conditions of the appointment itself. As for the codified benchmark: no Federal Rule of Criminal Procedure addresses special masters, and § 3664(d)(6) is silent on their qualifications, so courts look to the lone federal rule on the subject, under which a master "must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455." Fed. R. Civ. P. 53(a)(2) (governing civil masters and supplying the benchmark by analogy). An adjunct exercising quasi-judicial functions in a criminal sentencing cannot be held to a lesser standard of impartiality than a master appointed in a civil case; if anything, the standard is more exacting where liberty and criminal punishment are at stake. Section 455(a) requires disqualification "in any proceeding in which [the officer's] impartiality might reasonably be questioned"; § 455(b)(4) where the officer has "a financial interest in the subject matter in controversy." The standard is objective and protects "public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858–60 (1988). Due process supplies the constitutional floor: an adjudicator may not have "a direct, personal, substantial pecuniary interest" in the outcome. Tumey v. Ohio, 273 U.S. 510, 523 (1927).

The record now establishes the disqualifying configuration. The New Waiver is a private contract under which Defendant would release, and covenant never to sue, "the Special Master" by name—presented not as a counterparty's request but as "cooperation" the Special Master "deems . . . necessary" under the appointment order, and enforceable against Defendant by specific performance without bond. [Ex. W.] The Special Master's professionals are compensated from the assets he administers, Doc. No. 56, at 9–10, including the $14,112,426 Clanwilliam administrative reserve, Doc. No. 66, ¶ 20(d)(i), and the New Waiver's recitals declare that Defendant's signature "would enhance value and help streamline the sale" of those assets while its absence "will impair the value." [Ex. W.] He is simultaneously (1) the recommending adjudicator of Defendant's restitution offsets as author of the restitution report, Doc. No. 106; see Doc. No. 159, ¶ 2(k); (2) the administrator of a fee-generating liquidation program; (3) the counterparty and personal beneficiary of a demanded release; and (4) a sentencing commentator who filed a point-by-point response to Defendant's sentencing memorandum. Doc. No. 159. Each role might be tolerable alone; together, no reasonable observer could view them as compatible with impartiality toward a defendant who has declined to sign the waiver, whose objections slow the sales,

and whose civil litigation the Special Master demanded—by his own admission "[a]lthough arguably exceeding the scope of the Special Master's authority"—be dismissed. Doc. No. 159, ¶ 3. In fairness, Doc. No. 159 also records genuine cooperation—fifteen months of weekly meetings, "voluminous data," counsel "freely available," id. ¶ 1—and this objection does not depend on any finding of subjective bad faith. The problem is structural, and § 455(a)'s objective standard exists for precisely this situation. Defendant accordingly objects to the Special Master's continued exercise of any recommending or adjudicative function concerning restitution, and requests that those functions be performed by a neutral successor appointed under § 3664(d)(6), or by the Court itself.

The pattern of unfulfilled inducements confirms the conflict is operative, not theoretical. Cooperation was repeatedly purchased with promises—the unrestricted transfer of the de minimis companies in exchange for Defendant's waiver of the $40 million Clanwilliam tax escrow [Ex. S2]; the promised correction of the restitution analysis to credit the Zero Coupon Bond sales once Defendant produced the documenting emails; other promised sale credits, including the ECL credits [Statement of Facts ¶¶ 4–7]—and none was honored. An officer whose practice is to extract concessions with commitments he does not keep, while reporting the concessor's "cooperation" deficits to the sentencing court, is not an officer whose impartiality a reasonable observer could credit. 28 U.S.C. § 455(a).

The Special Master's restitution report completes the picture. In the same filing in which he rejected the bulk of Defendant's asserted offsets—offsets the report itself acknowledges "total at least $1.6 billion," Doc. No. 106, at 22—the Special Master expressly "reserve[d] the right to advise the Court concerning Defendant's cooperation during the sentencing hearing." Doc. No.

106, at 33. The leverage deployed on May 22 was announced on April 3, in the very document adjudicating Defendant's credits. And the proposed order the Special Master drafted provides that Defendant "shall not receive a credit" against restitution for the Court-approved administrative expenses paid from his assets. Doc. No. 106-1, at 4. The structure this creates should be stated plainly: every dollar paid to the Special Master's professionals comes from Defendant's assets, reduces the restitution obligation not at all, and enlarges the administration whose pace and friction those same professionals' control. An officer occupying that position cannot also be the officer who grades the debtor's cooperation and adjudicates his credits.

## VI. The Special Master's May 22 Statement (Doc. 159) Tainted the Sentencing and, Unless Stricken, Will Taint the Final Restitution Determination.

Due process guarantees a sentencing untainted by materially compromised information or improper influence. A sentence resting on assumptions that are "materially untrue" denies due process, Townsend v. Burke, 334 U.S. 736, 741 (1948), as does one "founded at least in part upon misinformation of constitutional magnitude," United States v. Tucker, 404 U.S. 443, 447 (1972). Sentencing is a critical stage to which the full measure of due process applies. Gardner v. Florida, 430 U.S. 349, 358 (1977). Four days before sentencing, the Court's own quasi-judicial adjunct filed a statement systematically recharacterizing Defendant's cooperation—while his demand for a self-benefiting waiver was pending against Defendant, and while expressly linking the two by announcing his expectation that Defendant would execute the New Waiver "before or during the sentencing hearing." Doc. No. 159, at 3, 5 & nn.5–6. Such a statement does not reach the sentencing judge as one more adversarial submission to be discounted; it arrives bearing the imprimatur of the Court's own officer. A cooperation assessment shaped—consciously or not— by the

assessor's pending personal demand on the person being assessed is materially compromised information of the kind Townsend and Tucker place outside the sentencing process.

Defendant objects that the May 26, 2026 sentencing was fundamentally affected by the submission and consideration of Doc. No. 159; the remedy as to the sentence lies with the Fourth Circuit on Defendant's pending appeal. The remedy as to this proceeding lies here and now: because the final restitution determination—itself criminal punishment, Ellingburg, supra—remains to be made on a record that includes Doc. No. 159 and the conflicted officer's restitution report, the Court should strike Doc. No. 159 or accord it no weight in any further proceeding, and should ensure that the de novo determination of Defendant's offsets proceeds on the recommendation of a neutral officer or on the Court's own review.

The taint was compounded by what the sentencing record did not contain. The Special Master had promised—before Defendant's objections were even due—to correct the restitution analysis to credit the Zero Coupon Bond sales Defendant had documented by email, and to credit other sales to Defendant, including the ECL credits. None of those corrections was ever filed. [Statement of Facts ¶¶ 4–6.] The Court therefore sentenced Defendant on an uncorrected, inflated restitution picture, accompanied by the Special Master's adverse cooperation statement—the corrective filings promised to Defendant absent, the filing adverse to Defendant present and four days fresh. And on information and belief, the statements presented at sentencing were obtained and prepared before the Clanwilliam proceeds were distributed and before the other payments and recoveries documented in Defendant's offset submissions had been received—so the Court heard descriptions of loss and harm unadjusted for the hundreds of millions of dollars the recipient insurance companies had already received. [Statement of Facts ¶ 14.] Under the framework governing the Special Master's determination, restitution distributions are made to or through the recipient insurance companies' estates—not to individual policyholders directly. [Statement of Facts ¶ 15.] That is not Defendant's characterization; it is the Special Master's: his report

recommends "directing restitution payments through the insurance companies themselves rather than directly to the individual policyholders." Doc. No. 106, App. 2; see Doc. No. 66, ¶ 20. The skew, at every point, ran in one direction. Due process does not tolerate a sentencing record curated in one direction by a conflicted officer. Townsend, 334 U.S. at 741; Tucker, 404 U.S. at 447. Congress said the same when it wrote this statute: in the Committee's words, "[t]he sole due process interest of the defendant being protected during the sentencing phase is the right not to be sentenced on the basis of invalid premises or inaccurate information." S. Rep. No. 104-179, at 20–

21. That is precisely the interest the May 22 statement, the promised-and-undelivered corrections,

and the pre-distribution statements compromised.

The due process violation can be stated with precision: Defendant was sentenced on restitution calculations that were incomplete and that had not been produced in compliance with the statutory order of operations. Incomplete, because the figure before the Court at sentencing omitted credits the Special Master had promised to apply—the documented Zero Coupon Bond sales, the ECL credits, and the other sales to be credited to Defendant [Statement of Facts ¶¶ 4– 6]—and omitted the reductions that 18 U.S.C. § 3664(j)(2) makes mandatory and that this Court's own appointment order directed: "Restitution amounts

should be reduced by any amount victims have recovered for the same losses." Doc. No. 56, at 6 n.2. Noncompliant, because the statute commits every disputed restitution issue to resolution "by the court," 18 U.S.C. § 3664(e), upon proposed findings "subject to a de novo determination," § 3664(d)(6)—and no such determination had occurred. The $1.655 billion figure that framed the § 3553(a) analysis was the unadjudicated recommendation of a conflicted adjunct, unadjusted for the approximately $2.9 billion in documented offsets then pending and unadjusted for the mandatory § 3664(j)(2) credits. A sentence imposed in the shadow of a restitution number that the governing statute required to be reduced—but that never was—rests on the "invalid premises or inaccurate information" the Committee identified, S. Rep. No. 104-179, at 20–21, and on "misinformation of constitutional magnitude." Tucker, 404 U.S. at 447; see Townsend, 334 U.S. at 741. The courts of appeals enforce the statutory order of operations strictly: two weeks ago, the Sixth Circuit vacated a restitution award—on plain-error review, no objection having been made below—because the defendant "was not privy to the underlying calculations relied on by the government and the district court," and sentencing a defendant on undisclosed restitution information is "fundamentally at odds with the adversarial scheme" the rules establish. United States v. Miclaus, No. 23-3146, slip op. at 14– 15 (6th Cir. May 29, 2026) (quoting United States v. Coppenger, 775 F.3d 799, 805 (6th Cir. 2015)); see 18 U.S.C. § 3664(a)–(b) (requiring "a complete accounting of the losses to each victim," disclosed to the defendant). Defendant's position is stronger still: he objects expressly, and within the objection period. Defendant objects on this ground for the record and for appellate review; the remedy as to the sentence lies with the Fourth Circuit. In this Court, the violation requires at minimum that no further consequence—no sale, no distribution, and no final order of restitution—be built upon the uncorrected, unadjudicated figure.

The off-record Becket sale magnified the distortion. Because the sale appears nowhere on the docket—and because Defendant's counsel learned of it only orally, in a weekly meeting, with sentencing approaching—the matter was not brought before the Court prior to sentencing. The structure of the process explains why. To raise the irregularity, Defendant would have had to accuse the Court's own appointee of an unauthorized disposition on the eve of sentencing—while that same appointee held the pen on the cooperation statement he would file four days before the hearing, and while his demand for a self-benefiting waiver was pending against Defendant. Objection carried a price, and the price was the cooperation narrative before the sentencing judge.

A sale process run ahead of the final restitution determination, administered by the officer who grades the defendant's cooperation, thus operated as a practical gag on the very objections the statute invites: it suppressed, at the moment of maximum consequence, the irregularities this motion now places on the record. And the consequences of that suppression fell entirely on Defendant: the Court imposed sentence on a record that included the Special Master's adverse cooperation statement and excluded the fact that an off-record, unauthorized disposition of restitution assets had already occurred, and excluded the promised and undelivered credits. A sentencing shaped by what a conflicted officer chose to file, and by what the off-record character of his administration kept from the Court, is precisely the disproportion this motion asks the Court to prevent from recurring at the final restitution determination.

Due process condemns that structure directly. A defendant may not be made to pay a penalty for the exercise of his procedural rights, because "the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right," and due process therefore

requires that a defendant "be freed of apprehension of such a retaliatory motivation." Blackledge v. Perry, 417 U.S. 21, 28 (1974) (quoting North Carolina v. Pearce, 395 U.S. 711, 725 (1969), limited on other grounds by Alabama v. Smith, 490 U.S. 794 (1989)). The rule does not demand proof of intent: it "was not grounded upon the proposition that actual retaliatory motivation must inevitably exist." Blackledge, 417 U.S. at 28. Here the deterrent was built into the sequence itself: by selling first and adjudicating later, and by uniting in one officer the roles of seller, release counterparty, and cooperation evaluator, the process ensured that a defendant who corrected the record before sentencing would do so at the cost of his cooperation assessment. Congress identified one due process interest above all at sentencing—the right not to be sentenced on invalid premises or inaccurate information, S. Rep. No. 104-179, at 20–21, supra—and a process that penalizes the correction of invalid premises before sentencing defeats that interest at its root: the premises remain uncorrected precisely because correcting them is punished. That is not a gag order in form, but it operated as one in fact, and the sentencing on uncorrected premises that resulted is the very violation the statute's framers sought to foreclose.

VII. The Becket Sale Proceeded Without the Court Approval That Both the Statute and This Court's Own Order Require.

The Becket transaction appears nowhere on the record of this Court: no motion seeking its approval, no notice of the sale, and no order authorizing it. Defendant's counsel learned that Becket had been sold only orally, in one of the weekly meetings described in Doc. No. 159, ¶ 1, in or about December 2025—and in the months since, no motion, notice, or order concerning Becket has appeared on the docket. [Statement of Facts ¶ 11.] An asset sale that leaves no trace on the docket of the Article III court supervising it is not a procedural foot-fault; it is proof that this process derailed from its constitutional moorings long ago. The docket is the constitutional record of a federal criminal proceeding, and dispositions of a defendant's property conducted entirely off that record are irreconcilable with due process, with § 3664(d)(6), and with the appointment order itself, which conditions liquidation—twice—on "Court approval." Doc. No. 56, at 6. Whatever authority the Special Master possesses is derived entirely from this Court's appointment and orders; an act undertaken without the court approval those orders require is an act undertaken without authority. The defect is not procedural housekeeping. Court approval of each disposition is the mechanism by which § 3664(d)(6)'s de novo guarantee operates: absent a motion, an opportunity for objection, and an order, the Court never makes the determination the statute reserves to it—and the contrast with Clanwilliam, where the Special Master did seek approval by motion (Doc. No. 66), shows that the Special Master knows precisely how the process is supposed to work. Where judicial sales of realty are concerned, Congress has separately prescribed mandatory procedures—public sale, appraisal, and related safeguards—whose omission independently invalidates a sale. 28 U.S.C. § 2001. Defendant respectfully requests that the Court direct the Special Master to file a complete accounting of the Becket transaction and all other completed, pending, or contemplated dispositions, identifying the order of this Court claimed as authority for each.

Compounding the defect, the Special Master has never disclosed how the Becket proceeds were applied—whether to restitution, to administrative expenses, to the Special Master's professionals, or otherwise—nor whether other sales or dispositions have occurred beyond those of record. [Statement of Facts ¶ 3.] On the present record, the Court and Defendant are alike in the dark as to what has been sold and where the money went. The accounting

requested below is therefore not ancillary relief; it is the predicate for assessing the lawfulness of what has already occurred, for crediting Defendant under 18 U.S.C. § 3664(j)(2) for amounts actually applied to the recipient insurance companies, and for the de novo determination still to come.

VIII. Sales Before a Final Restitution Determination Invert the Statutory Sequence and Inflict Irreparable, Unquantifiable Prejudice.

The MVRA's architecture is sequential: the court determines the victims' losses, § 3664(d)(5); resolves all disputes itself by a preponderance, § 3664(e); enters a restitution order that then constitutes a final judgment, § 3664(o); and only then do the enforcement mechanisms attach. Those mechanisms are, by Congress's own designation, civil in character: 18 U.S.C. § 3613 is titled "Civil remedies for satisfaction of an unpaid fine"; it reaches restitution orders through § 3613(f); and the lien it creates "arises on the entry of judgment." § 3613(c). Congress thus prescribed post-judgment civil process—a lien and execution against an entered judgment—as the means of collecting restitution; it nowhere authorized pre-judgment liquidation of a defendant's assets by a court adjunct inside the criminal case. That the collection machinery is civil does not

make the punishment civil, Ellingburg, supra, but it does fix when collection begins: after judgment, through the remedies Congress specified. See Dolan v. United States, 560 U.S. 605, 607–08 (2010) (describing the statute's timetable for converting sentencing into a final restitution determination). Liquidating assets first and determining the obligation later reverses every step of that sequence. It is enforcement of a judgment that does not exist.

Nor is any of this inconsistent with Defendant's plea agreement. Defendant agreed to pay full restitution and to the immediate enforceability of monetary penalties under 18 U.S.C. § 3613. Doc. No. 40, ¶¶ 10(a), 10(d). Consent to immediate enforcement of a judgment is not consent to execution before judgment: § 3613 is a civil-remedies statute whose lien "arises on the entry of judgment," § 3613(c), so its enforcement presupposes the restitution order that § 3664(o) describes, and the amount that order may impose is full restitution less the credits § 3664(j) mandates—a computation the statute reserves to the Court. The Committee was explicit that the purpose of § 3664(j)(2) "is to ensure that the victim is not compensated twice for the same loss."

S. Rep. No. 104-179, at 21. This Court's appointment order says the same: "Restitution amounts

should be reduced by any amount victims have recovered for the same losses," and Defendant "has reserved all rights with regard to any arguments regarding calculating loss amount." Doc. No. 56, at 6 n.2 (citing 18 U.S.C. § 3664(j)(2)). Defendant's offset submissions enforce the plea agreement's design; they do not resist it.

The prejudice is not hypothetical; the record already quantifies it. Defendant's pending offset submissions total approximately $2.9 billion against a preliminary figure of $1.655 billion. If the Court's de novo determination credits those offsets in whole or substantial part, the final restitution obligation is zero or near it—and yet the assets will be gone, sold into the hands of third parties (including potential bona fide purchasers) from whom recovery may be legally or

practically impossible. Clanwilliam is the proof of concept. By the Special Master's own account, its $318 million in proceeds were distributed under a formula that "almost certainly will deviate" from the apportionment this Court later approves, Doc. No. 66, ¶ 24, including $23,520,710 to an entity the Special Master cannot yet say is a victim at all, id. ¶

26 n.8. And Defendant's preserved valuation position is that the asset itself was sold approximately $350 million below its market value—value that, once the sale closed, no de novo determination can restore. [Ex. S2.] Defendant does not seek to unwind Clanwilliam; he consented to that disposition to preserve the transaction at the parties' request. But Clanwilliam demonstrates with arithmetic precision what each further "out of order" sale will do: fix losses, misallocate proceeds, and moot the de novo review Congress guaranteed—while the Special Master's proposed cure, "collecting enough funds in the future to equalize distributions," Doc. No. 66, ¶ 26, requires liquidating still more assets before the underlying obligation is adjudicated. Forced-sale dynamics compound the harm. Harm of that character—unrecoverable property, mootness of pending objections, evasion of de novo review— is the definition of irreparable.

## IX. On De Novo Review, the Court Must Find the Facts Itself—by a Preponderance at Minimum, and, After Ellingburg, Beyond a Reasonable Doubt.

Section 3664(e) fixes the statutory floor: every disputed restitution issue must be resolved "by the court by the preponderance of the evidence." Two consequences follow for any proposed sale. First, the finding must be the Court's own—a de novo determination on the record, not a ratification of the Special Master's conclusions. Second, the Government and the Special Master bear the burden of demonstrating, by at least a preponderance, the facts that would justify each specific disposition—including that a final restitution obligation will exist and will exceed the offsets of record.

The Constitution now requires more. In Ellingburg a unanimous Supreme Court held that restitution under the MVRA is "plainly criminal punishment." That holding arose under the Ex Post Facto Clause, but its premise—that MVRA restitution is a criminal penalty imposed at sentencing—activates the rule of Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), that facts increasing a criminal penalty must be proved beyond a reasonable doubt, and of Southern Union Co. v. United States, 567 U.S. 343, 346–49 (2012), which applied Apprendi to criminal monetary penalties. Defendant acknowledges that Ellingburg did not itself decide the burden-of-proof question and presents the argument squarely: because restitution is criminal punishment, the facts establishing the amount of that punishment—here, a contested $1.655 billion—must be found beyond a reasonable doubt. At an absolute minimum, no asset may be sold unless and until this Court itself, de novo, finds by a preponderance of the evidence that the sale is justified by a restitution obligation that survives the documented offsets. No sale to date has been supported by findings under either standard.

The Committee likewise insisted that the mandatory scheme not become a vehicle for resolving "highly complex issues related to the cause or amount of a victim's loss," that "speculative" losses be excluded, and that even restitution arising from a plea agreement be "supported by fact" and "ordered by the court." S. Rep. No. 104-179, at 19. A contested $1.655 billion figure—built on disputed valuations and met by approximately $2.9 billion in documented offsets—demands more judicial process, not less.

The Special Master's own restitution report (Doc. No. 106) proves the point with arithmetic. On the report's own figures, the principal-only measure of loss—"Unpaid Principal," net of the recoveries the Special Master credited—is $1.362 billion; the $1.625 billion the report recommends is reached only by adding approximately $263 million of "time value of money" interest at a rate the Special Master selected, over Defendant's express objection to any interest component. Doc. No. 106, at 21–22. The Preliminary Order then entered a figure of

$1.655 billion—$30 million above even the Special Master's recommendation, without explanation on the record. [Doc. 161] An interest enhancement of more than a quarter-billion dollars, computed by a court adjunct at a rate of his choosing and imposed without the Court's own findings, cannot stand: restitution is criminal punishment, Ellingburg, supra, and the facts that fix its amount must be found by the Court—on Defendant's submission, beyond a reasonable doubt under Apprendi and Southern Union. And the report's rejection of offsets is, in places, expressly provisional: the Special Master concedes that the credit for the preferred-equity interest Defendant transferred to ULICO—against which ULICO agreed to reduce its civil judgment by at least $218 million— "should occur if and when the preferred equity position is liquidated into cash," Doc. No. 106, at 23, a concession that the recommended figure overstates the obligation by amounts the Special Master himself expects to credit. Meanwhile, of the Clanwilliam proceeds, the $14,112,426 administrative reserve and the $23,520,710 paid to Vista—an entity the Special Master "is unsure" is due restitution at all—generated no credit to Defendant. Doc. No. 66, ¶¶ 20(d), 26 n.8.

X. Every Stay Factor Is Satisfied.

Likelihood of success. The textual argument under § 3664(d)(6) is straightforward; the Article III argument is controlled by Johnson and Stern; and the sequencing argument follows from the face of §§ 3664(d)(5), (e), and (o). Irreparable harm. Assets sold to third parties before any final restitution determination cannot be recovered; the de novo review Congress guaranteed will have been rendered illusory. By the Special Master's own estimate, the Primary Restitution Assets are worth $1.162 to $1.878 billion, with a midpoint of $1.454 billion—below the preliminary figure—so every dollar of value sacrificed in a rushed or unsupervised sale directly

enlarges the unpaid balance for which Defendant remains liable. Doc. No. 106, at 30. Harm to others. A stay preserves the status quo; the assets remain available to satisfy whatever final restitution order the Court enters, and no restitution recipient is prejudiced by the Court deciding the obligation before liquidating the security for it. Public interest. The public interest lies in sentences—including criminal monetary penalties, Ellingburg, supra—being imposed by Article III judges under the procedures Congress enacted, not by court adjuncts acting beyond their statutory writ. Nken, 556 U.S. at 434.

CONSOLIDATED OBJECTIONS

Within the time allowed for objections to the Preliminary Order of Restitution [Doc. 161], Defendant objects as follows, in addition to and independent of the stay relief requested. These objections are presented within the restitution-determination process that 18 U.S.C. § 3664 commits to this Court—not in any appeal or post-conviction action—and nothing herein contests Defendant's agreement to pay full restitution as determined according to law: (i) the Special Master reference, as implemented, exceeds the sole statutory authority for it, 18 U.S.C. § 3664(d)(6), which permits proposed findings and recommendations subject to de novo determination by the Court—not the execution of asset sales; (ii) the determination of restitution is a nondelegable Article III judicial function, U.S. Const. art. III, § 1; 18 U.S.C. § 3664(e), and its delegation here violates the separation of powers; (iii) no consent by Defendant—in the plea agreement, the Clanwilliam consent motion, or otherwise—did or could enlarge § 3664(d)(6), waive Article III's structural guarantee, or authorize dispositions without court approval, and the inversion of the statutory order of operations as implemented—execution of criminal punishment before and without Article

III adjudication, by an adjunct operating outside the Court's supervision—is a structural constitutional violation that no consent could waive; (iv) the Special Master labors under disqualifying conflicts of interest under the standards of 28 U.S.C. § 455, the Due Process Clause, and Fed. R. Civ. P. 53(a)(2) (by analogy), and his reports and recommendations, including the restitution report (Doc. No. 106) and the Statement Concerning Defendant's Cooperation (Doc. No. 159), are the product of that conflict; (v) the submission and consideration of Doc. No. 159, filed four days before sentencing while the Special Master's demand for a self-benefiting waiver was pending, fundamentally compromised the May 26, 2026 sentencing in violation of due process, as did the presentation of statements obtained, on information and belief, before restitution distributions—including the Clanwilliam proceeds—had been received by the recipient insurance company estates to or through which, under the framework governing the Special Master's determination, restitution distributions are made, and as did the imposition of sentence on restitution calculations that were incomplete—omitting the promised Zero Coupon Bond, ECL, and other credits and the mandatory reductions of 18 U.S.C. § 3664(j)(2)—and that had not been subjected to the determination "by the court" that §§ 3664(e) and (d)(6) command, and as did the structure of the pre-determination sale process, under which objection to these irregularities before sentencing carried the price of an adverse cooperation assessment by the officer administering the sales and so operated as a practical restraint on Defendant's ability to bring them before the Court; (vi) the Becket sale—of which there is no evidence on the record of this Court: no motion, no notice, and no order, and of which Defendant's counsel learned only orally in a weekly meeting— was conducted without the court approval required by Doc. No. 56 and § 3664(d)(6) and was ultra vires, and the off-record character of that disposition is itself evidence that the reference departed from constitutional and statutory requirements long before sentencing; (vii) all sales and distributions conducted before entry of a final restitution order—including the disposition of the Clanwilliam proceeds under a formula the Special Master concedes "almost certainly will deviate"

from the apportionment later approved, Doc. No. 66, ¶ 24—invert the sequence commanded by §§ 3664(d)(5), (e), and (o) and are objected to as premature and prejudicial; (viii) any disputed restitution issue must be resolved by this Court de novo, on the Court's own findings, by at least a preponderance of the evidence under § 3664(e), and—because restitution is criminal punishment, Ellingburg v. United States, 607 U.S. 163, 166 (2026)—beyond a reasonable doubt under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Southern Union Co. v. United States, 567 U.S. 343 (2012); (ix) the $1.655 billion preliminary figure is unsupported and is exceeded by documented offsets of approximately $2.9 billion—including the preserved Clanwilliam valuation differential of approximately $350 million [Ex. S2]—such that the final restitution obligation is zero, with substantial overpayment; further, the figure includes approximately $263 million of non- contractual interest selected by the Special Master over Defendant's objection, exceeds by $30 million even the $1.625 billion the Special Master recommended (Doc. No. 106, at 4) without record explanation, omits the ULICO preferred-equity credit of at least $218 million that the Special Master concedes "should occur" (Doc. No. 106, at 23), and gives Defendant no credit for the $14,112,426 Clanwilliam administrative reserve or the $23,520,710 distributed to Vista (Doc. No. 66, ¶¶ 20(d), 26 n.8); and (x) the preliminary restitution figure rests on an analysis the Special Master promised—before objections were due—to correct, including credits for the documented Zero Coupon Bond sales, the ECL credits, and other sales credited to Defendant, and those promised corrections were never made, before sentencing

or since, such that the figure is inflated by the amount of every promised and undelivered credit, each of which must be applied on de novo review; and (xi) the Special Master has not disclosed or accounted for the use of proceeds from completed dispositions, including the Becket sale, and other dispositions may have occurred that remain undisclosed; Defendant objects to any restitution determination, credit allocation, or

further disposition made without a complete accounting of all dispositions, of the application of all proceeds, and of all administrative fees and expenses paid or accrued to any person or firm from administered assets or sale proceeds; and (xii) Defendant objects to the entry of any final order of restitution, and to the approval of any further asset disposition, except upon the procedures and findings set forth above. Defendant's substantive offset submissions, and Defendant's previously filed motion to stay [Docs. 172-188], are incorporated by reference, and the grounds stated in each are asserted as objections to the Preliminary Order of Restitution.

CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an order: (1) staying, effective immediately, all sales and dispositions of assets and all asset-sale processes conducted by or at the direction of the Special Master or any person acting in concert with him, pending entry of a final order of restitution following the Court's de novo determination of all disputed issues; (2) providing that no asset may be marketed, contracted, or sold absent a specific prior order of this Court entered on motion, with notice and an opportunity to be heard, supported by the Court's own findings under 18 U.S.C. § 3664(e) (and, as preserved above, beyond a reasonable doubt under Ellingburg, Apprendi, and Southern Union); (3) striking, or directing that no weight be accorded in any further proceeding to, the Special Master's Statement Concerning Defendant's Cooperation (Doc. No. 159); (4) disqualifying the Special Master from any recommending or adjudicative function concerning the determination of restitution, with those functions performed by a neutral successor appointed under 18 U.S.C. § 3664(d)(6) or by the Court; (5) directing the Special Master to file, within fourteen (14) days, a complete accounting of all completed, pending, and contemplated asset dispositions, including the Becket and Clanwilliam transactions, identifying the authority claimed for each and the application of all proceeds

therefrom—including the proceeds of the Becket sale and of any disposition not yet of record; (6) directing that there be filed with the Court, within fourteen (14) days, a full and itemized accounting of administrative fees and expenses, identifying each person and firm that has received or accrued fees or expenses from administered assets or sale proceeds—including the Special Master, his counsel, his financial advisors, and any other professional or party—together with the amount received or accrued by each, the dates and sources of each payment, and the order of this Court authorizing each payment; (7) granting such other and further relief as the Court deems just. Given the ongoing and imminent nature of the sale processes, Defendant respectfully requests expedited briefing and consideration.

Respectfully submitted, this 11th day of June, 2026.

/s/ Kenneth Barnes_________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CONSULTATION STATEMENT

Pursuant to the Court's motions practice, the undersigned states that [counsel for Defendant conferred with counsel for the United States on ___, 2026, regarding the relief requested herein; the United States' position is ___ / describe timely attempts to confer].

/s/ Kenneth Barnes________ Kenneth Barnes

CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2026, the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

/s/ Kenneth Barnes________ Kenneth Barnes

**Doc. 198 — Response Opposing the Conservatrix/Zetteler CVRA Mandamus (filed 06/12/2026)**

No. 26-1749

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

IN RE ELEONORA L. ZETTELER, LLM AND J. ROBERT VAN FAASSEN, LLM, IN THEIR CAPACITIES AS INSOLVENCY PRACTITIONERS IN THE INSOLVENCY OF NEDERLANDSCHE ALGEMEENE MAATSCHAPPIJ VAN LEVENSVERZEKERING "CONSERVATRIX" N.V.,

Petitioners. On Petition for a Writ of Mandamus to the United States District Court for the Western District of North Carolina, Charlotte Division In Case No. 3:23-CR-48, Max O. Cogburn, Jr., U.S. District Judge

RESPONSE OF GREG E. LINDBERG IN OPPOSITION TO PETITION FOR WRIT OF MANDAMUS UNDER 18 U.S.C. § 3771

Greg E. Lindberg PO Box 159 Thonotosassa, FL 33592 919-308-9686 • gelindberg@gmail.com Respondent Pro Se

INTRODUCTION

Petitioners are the insolvency practitioners of Nederlandsche Algemeene Maatschappij van Levensverzekering "Conservatrix" N.V. ("Conservatrix"), a Dutch life insurer in bankruptcy. They ask this Court to do on mandamus, within seventy-two hours, what no court has done in fifteen months of structured restitution proceedings: declare Conservatrix a "victim" under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, vacate the district court's Preliminary Order of Restitution and the criminal Judgment, and direct the entry of a restitution award of €215,356,806 in Conservatrix's favor—without findings by any factfinder, anywhere, that the offenses of conviction caused Conservatrix's claimed losses.

The Petition should be denied for four independent reasons. First, it fails at the statutory threshold: mandamus under 18 U.S.C. § 3771(d)(3) reviews a district court's denial of a motion asserting a victim's right, and the district court has denied no such motion. Second, the Petition cannot, as a matter of law, be decided in Petitioners' favor at this time: the very restitution questions it presents—who is due restitution from Respondent and in what amounts—are being actively litigated by

Respondent through pending motions in the district court and docketed appeals in this Court; the relief demanded would intrude on this Court's own appellate jurisdiction over the Judgment; and a seventy-two-hour adjudication of a €215 million addition to a criminal punishment would seriously prejudice Respondent's rights in a criminal proceeding. Third, on the Petition's own allegations, Conservatrix is not a victim of the offenses of conviction: its claimed loss arises from the alleged breach of a 2017 contractual capital-maintenance commitment—a claim Conservatrix has already arbitrated to a provisional award it is separately enforcing—triggered, by Petitioners' own telling, by intervening market and

regulatory events. Fourth, the award Petitioners demand would effect the double recovery the restitution statutes forbid.

Respondent Greg E. Lindberg has his own objections to the Preliminary Order of Restitution and to the process that produced it; those objections are preserved and are the subject of separate proceedings in the district court and on appeal, and nothing in this Response waives or limits them.1

1Respondent timely objected to the Special Master's Report and to the Preliminary Order of Restitution and has noticed appeals from the Judgment, including as to restitution. Among those preserved objections

The Court need not resolve any of Respondent's objections to deny this Petition. Whatever else may be said of the Preliminary Order, in this limited context with respect to Conservatrix it was not error—much less an abuse of discretion—for the district court to decline to add a €215 million award in favor of a foreign insolvency estate whose claimed injury arises from a breached solvency covenant rather than from the offenses of conviction.

BACKGROUND

I. The Restitution Proceedings Below

Following Respondent's November 2024 plea in the "Financial" case and the consolidation of his two criminal cases for sentencing, the district court appointed a Special Master to "identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Pet. 4 (quoting App. 79 ¶ 2). Over the following fifteen months, the Special Master—assisted by a financial advisor and counsel—evaluated whether alleged institutional victims should receive

is that documented credits and offsets extinguish any net restitution obligation. Those issues are not before the Court on this Petition, and Respondent reserves them in full.

restitution. Pet. 4. Conservatrix participated fully in that process: its counsel had "multiple calls" with the Special Master's financial advisor, "numerous calls" with the Special Master's counsel, and submitted written materials, including a letter advocating Conservatrix's victim status under the MVRA. Pet. 4–5.

On April 3, 2026, the Special Master filed his Report and Recommendations Regarding Restitution, which proposed criteria for identifying persons due restitution and concluded that Conservatrix did not meet them. Pet. 5. The Report sought a preliminary order and stated that the Special Master would "file a subsequent report, motion, or other pleading seeking to resolve various outstanding payment and priority issues." Pet. 5 (quoting App. 89 n.2). Conservatrix filed objections on May 4, 2026. Pet. 6. On May 15, 2026, the Special Master filed a Supplement that considered the responses received and reaffirmed that "[t]he Special Master stands by the Report's exclusion of Conservatrix from classification as a person due restitution." Pet. 6 (quoting App. 220).

The district court held the sentencing hearing on May 26, 2026, entered the Preliminary Order of Restitution on May 28, 2026, and entered Judgment the following day. Pet. 6–7. The Preliminary Order

requires Respondent to pay $1,655,000,000 to identified victims; it does not include Conservatrix. Pet. 7.2

II. Conservatrix's Parallel Recovery of the Same Claimed

Losses

By Petitioners' own account, Conservatrix's claimed losses arise from the alleged non-performance of a 2017 contractual "Commitment" to recapitalize Conservatrix and maintain a minimum solvency capital ratio ("SCR") of 135%. Pet. 2, 14–18. Petitioners allege that, under Dutch law, that Commitment "was converted, by law, to an obligation to pay damages on December 8, 2020," the date of Conservatrix's bankruptcy, and they quantify those contract damages—via "an actuarial calculation" of the SCR shortfall—at €215,356,806. Pet. 18.

Conservatrix has already pursued recovery on that same theory elsewhere. As the Petition acknowledges, a provisional Dutch arbitral

2Petitioners assert that the sequencing of the sentencing hearing and the Preliminary Order departed from the district court's April 7, 2026 bifurcation order. Pet. 6. Respondent has raised his own objections to the restitution process in the district court and on appeal; those objections are Respondent's to press in those proceedings, and Petitioners' sequencing complaint does not bear on—much less establish— Conservatrix's victim status under the MVRA.

award against Respondent arising from the same alleged conduct—an award rendered in summary arbitral proceedings, while "[t]he proceedings on the merits have not advanced," and one Respondent maintains is provisional and subject to de novo review—was confirmed by the United States District Court for the Middle District of North Carolina in the amount of $166,797,838, and that confirmation judgment is now on appeal in this Court. Pet. 15 n.5 (citing Van Andel v. Lindberg, No. 1:23-CV-879, 2024 WL 3718168 (M.D.N.C. Aug. 8, 2024), appeal docketed, No. 24-1898 (4th Cir. Sept. 18, 2024); Van Andel v. Lindberg, 732 F. Supp. 3d 476 (M.D.N.C. 2024)).3

3Respondent disputes both the provisional arbitral award and its confirmation; the confirmation judgment is the subject of a pending appeal in this Court, Van Andel v. Lindberg, No. 24-1898 (4th Cir. docketed Sept. 18, 2024). The award issued in summary arbitral proceedings; as the confirming court itself recounted, Respondent contended the award was "a provisional award without precedential value and subject to review de novo," and "[t]he proceedings on the merits have not advanced." Van Andel, 2024 WL 3718168, at *1–2. Nothing in this Response concedes the validity or enforceability of that award, which is cited solely because Petitioners themselves rely on it. Pet. 15 n.5.

ARGUMENT

I. Standard of Review

In deciding a petition for a writ of mandamus under the Crime Victims' Rights Act ("CVRA"), this Court "shall apply ordinary standards of appellate review." 18 U.S.C. § 3771(d)(3); see In re Brown, 932 F.3d 162, 172 (4th Cir. 2019) (reviewing for abuse of discretion). A district court's restitution determinations are reviewed for abuse of discretion, United States v. Leftwich, 628 F.3d 665, 667 (4th Cir. 2010), with legal questions reviewed de novo, United States v. Diaz, 865 F.3d 168, 173 (4th Cir. 2017). Under any standard, the Petition fails.

II. The Petition Fails at the Threshold: The District Court Has

Not Denied a Motion Asserting a CVRA Right.

The CVRA prescribes a sequence. A victim's rights "shall be asserted in the district court in which a defendant is being prosecuted for the crime." 18 U.S.C. § 3771(d)(3). "The district court shall take up and decide any motion asserting a victim's right forthwith," and only

"[i]f the district court denies the relief sought" may "the movant . . . petition the court of appeals for a writ of mandamus." Id. Section 3771(d)(3)

mandamus is appellate review of a district court's denial; it is not a device for leapfrogging the assertion and adjudication of rights in the district court.

Petitioners never presented the district court with a motion asserting a CVRA right, and the district court has entered no order denying one. What the Petition describes instead is participation in the Special Master's administrative process: calls and submissions to the Special Master's financial advisor and counsel, a letter advocating victim status, and an objection to the Special Master's Report filed within the Report-and-objection framework. Pet. 4–6. There is, accordingly, no district court decision denying Conservatrix relief to which "ordinary standards of appellate review" can attach.

Even on the most charitable reading—treating Conservatrix's objection to the Report as the functional equivalent of a CVRA motion, cf. In re Ball, No. 25-1264, slip op. at 5 n.* (4th Cir. Mar. 22, 2025) (per curiam) (unpublished)—the statutory premise is still missing: the district court has never ruled on that objection, and non-inclusion in an order is not an order denying a motion. Section 3771(d)(3) requires an adjudicated denial of "the relief sought"; Petitioners identify none.

III. The Petition Cannot, as a Matter of Law, Be Decided in

Petitioners' Favor at This Time, and Deciding It Now Would Seriously Prejudice Respondent's Rights in a Criminal Proceeding.

A. The Same Restitution Issues Are in Active Litigation

Below and on Appeal.

On June 11, 2026—the same day the Petition was filed— Respondent filed in the district court an Emergency Motion to Stay All Asset Sales and Asset-Sale Processes Pending Entry of a Final Restitution Order and De Novo Article III Determination, together with Consolidated Objections to the Preliminary Order of Restitution (Doc. 161), to the scope of the Special Master reference, and to the Special Master's Statement Concerning Defendant's Cooperation (Doc. 159). Those filings—made within the time allowed for objections to the Preliminary Order of Restitution—dispute, among other things: the victim determinations underlying the order; the $1,655,000,000 figure; the omission of mandatory reductions under 18 U.S.C. § 3664(j)(2) and of documented credits and offsets that, on Respondent's submissions, total approximately $2.9 billion and extinguish any net restitution obligation;

and the requirement that every disputed restitution issue be determined de novo by the district court itself under 18 U.S.C. § 3664(e). Respondent has also noticed appeals from the Judgment. The very questions the Petition asks this Court to resolve in seventy-two hours—who is due restitution from Respondent, in what amounts, and on what causal findings—are thus squarely presented, by a party with constitutional and statutory rights at stake, in pending proceedings in two courts.

B. The Relief Demanded Is Unavailable as a Matter of Law

While Those Proceedings Are Pending.

First, the writ would direct the district court to vacate and rewrite the restitution component of a criminal Judgment from which appeals have been noticed. But "[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case

involved in the appeal." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982); see also Coinbase, Inc. v. Bielski, 599 U.S. 736, 740– 41 (2023) (reaffirming and applying Griggs). A writ commanding the district court to act upon aspects of the case that now belong to this Court's appellate jurisdiction—and that will be addressed through plenary review on full records—is not relief available as a matter of law, and granting it would invite piecemeal, potentially inconsistent adjudications of the same Judgment by different panels of this Court.4 Second, Congress prescribed how disputed restitution questions are to be decided: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The Petition asks this Court to displace that mandated procedure in its entirety—no proof by the Government, no district court findings, no opportunity for Respondent to contest causation or amount—and to decree a €215,356,806 award by appellate fiat. Section 3771(d)(3) gives victims an expedited avenue to enforce rights already adjudicated below; it does not repeal § 3664(e) or

4Respondent does not concede—and expressly disputes in his pending motions and appeals—any characterization of the Preliminary Order of Restitution or of the restitution component of the Judgment as interlocutory, non-final, or otherwise unreviewable. The character and effect of those orders are themselves contested questions reserved to those proceedings, and the Petition fails under any characterization: if the restitution determination is final, it is encompassed within the noticed appeals and Griggs controls; if it is not, then there is no denial of relief to review under 18 U.S.C. § 3771(d)(3).

authorize a court of appeals to perform, in seventy-two hours, the adjudication Congress assigned to the sentencing court. The CVRA itself underscores the point: a victim may move to re-open a sentence only on narrow, conjunctive conditions, see 18 U.S.C. § 3771(d)(5), none of which the Petition addresses, let alone satisfies.

C. A Seventy-Two-Hour Adjudication Would Seriously

Prejudice Respondent's Rights in a Criminal Proceeding.

Restitution under the MVRA "is plainly criminal punishment." Ellingburg v. United States, 607 U.S. 163, 166 (2026). The Petition therefore seeks a more-than-$230-million increase in a criminal punishment—through a collateral proceeding in which the defendant was afforded a single day to respond, in which no evidentiary process exists, and in which no court has made findings on causation, loss, or the mandatory reductions of § 3664(j)(2). And "the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause." Gardner v. Florida, 430 U.S. 349, 358 (1977). Imposing or enlarging criminal punishment on this timetable and this record cannot be reconciled with those guarantees, and it would predetermine—against a criminal defendant, without process—the very causation and quantum

questions Respondent is litigating through his pending motions and docketed appeals. The CVRA's seventy-two-hour clock is workable precisely because § 3771(d)(3) review addresses discrete, already- adjudicated denials of victims' rights; it is not, and as applied to a criminal defendant could not be, a mechanism for the first-instance imposition of nine-figure criminal punishment. For these reasons alone, and without reaching any other question, the Petition should be rejected.

IV. The District Court Did Not Err, Because Conservatrix Is Not

a Victim of the Offenses of Conviction.

A. The Legal Framework

Restitution is a creature of statute, and the Supreme Court has repeatedly required fidelity to the statutes' limits. Under the predecessor Victim and Witness Protection Act, restitution was authorized "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990). Congress responded by enlarging the victim definition for scheme offenses—but the amendment did not abandon the offense-of-conviction anchor; it relocated it. The MVRA defines a "victim" as:

a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). Two textual limits thus persist in the very clause Congress substituted for Hughey's rule: the claimant must be harmed by "criminal conduct"—not by contractual non-performance or market events contemporaneous with a scheme—and that conduct must occur "in the course of the scheme" that is an element of the offense of conviction. For scheme-based offenses, this Court asks whether the claimed loss "is a direct result of the defendant's criminal conduct" or is "closely related to the scheme." United States v. Karam, 201 F.3d 320, 326 (4th Cir. 2000) (quoting United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996)). "Direct" harm requires that the injury be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Ball, slip op. at 6 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)) (denying CVRA mandamus where the claimed harm was "too attenuated" from the offense conduct).

The Supreme Court has cautioned against expansive constructions of these provisions. See Lagos v. United States, 584 U.S. 577 (2018) (adopting the narrower of two available readings of § 3663A(b)(4) and rejecting restitution for losses the statute does not clearly reach); Paroline v. United States, 572 U.S. 434, 444–48 (2014) (restitution statutes' victim definitions incorporate a proximate-cause limitation that excludes harms with only an attenuated connection to the offense).

B. Petitioners' Own Narrative Describes a Contract

Claim, Not Harm From the Offenses of Conviction.

Every link in the causal chain Petitioners themselves allege sounds in contract and foreign insolvency law, not in the offense conduct to which Respondent pleaded. The Petition alleges that: (1) in 2017, in connection with the purchase of Conservatrix's shares, Respondent contractually committed to recapitalize Conservatrix and maintain a 135% SCR ("the Commitment"), Pet. 2, 14; (2) in 2019, "a downgrade in CBL's credit rating (following the appointment of a rehabilitator) and a change in interest rates caused Conservatrix's SCR ratio to fall significantly below the agreed minimum—triggering the Commitment," Pet. 15–16; (3) the Commitment was not performed despite demands, Pet. 16; and (4) upon

Conservatrix's December 8, 2020 bankruptcy, Dutch law "converted" the Commitment "to an obligation to pay damages," quantified by "an actuarial calculation" of the SCR shortfall at €215,356,806, Pet. 18.

That is the anatomy of a breach-of-guarantee claim—one Conservatrix has in fact already litigated to a provisional arbitral award. It is not an allegation that "the defendant's criminal conduct in the course of the scheme," 18 U.S.C. § 3663A(a)(2), directly and

proximately caused Conservatrix's losses. Indeed, the intervening causes appear on the face of the Petition: a credit-rating action, a "change in interest rates," the supervisory decisions of a foreign regulator (De Nederlandsche Bank), the approval of a foreign court (the Amsterdam District Court), and the operation of Dutch insolvency law. Pet. 15–18. A loss produced by that chain is, at most, "tangentially linked" to the offenses of conviction—precisely the showing this Court found insufficient in In re Ball, and the kind of attenuated connection Paroline and § 3663A(a)(2)'s proximate- cause requirement exclude.

C. Generalized References in the Factual Basis Cannot

Supply What the Petition Lacks.

To bridge the gap, the Petition leans almost entirely on two generalized phrases from the Factual Basis supporting the plea—that Respondent "engaged in circular, non-economic transactions among [his] web of entities using insurance company funds," and that the scheme caused "substantial financial hardship" to insurance companies and policyholders. Pet. 8–9 (quoting App. 76 ¶¶ 3, 5–6). But a generalized description of a scheme does not convert every counterparty, creditor, or guarantee beneficiary of the defendant—anywhere in the world—into an MVRA victim. Hughey forbade exactly that bootstrap under the predecessor statute, and the clause Congress substituted preserves the limit: the claimant must be "directly harmed by the defendant's criminal conduct in the course of the scheme." The Factual Basis nowhere identifies Conservatrix, the Commitment, or the Dutch regulatory proceedings, and the Petition identifies no count of conviction whose conduct encompasses them.

Nor was the question neglected below. The Special Master—after fifteen months of work, with Conservatrix's own submissions in hand—

recommended its exclusion, and reaffirmed that recommendation after considering Conservatrix's objection. Pet. 5–6. On that record, in this limited context with respect to Conservatrix, it was not an abuse of discretion, and certainly not clear legal error, for the district court to decline to add a €215 million award to the Preliminary Order.

The amount Petitioners demand underscores the problem. The figure of €215,356,806 is an actuarial computation of a solvency-capital shortfall under a contractual covenant as of a Dutch-law conversion date—not a finding of pecuniary loss proximately caused by offense conduct. And the Petition's own figures shift: €215,356,806 in Commitment damages; a "distinct" €99,566,697 in policyholder losses; an estimate that policyholder losses "exceed[] $240 million"; and a confirmed provisional arbitral award of $166,797,838. Pet. 16–20. Reconciling those figures—and the causation questions beneath them—is factfinding work that 18 U.S.C. § 3664(e) commits to the sentencing court, on the Government's proof and by a preponderance of the evidence—not work this Court can perform through a writ that must issue within seventy- two hours.

V. The Award Petitioners Demand Would Effect a Double

Recovery the Restitution Statutes Forbid.

The restitution statutes do not permit a claimant to recover the same loss twice. See Karam, 201 F.3d at 326–29 (recognizing that the restitution statutes foreclose double recovery); 18 U.S.C. § 3664(j)(2) (restitution must be reduced by amounts "later recovered as compensatory damages for the same loss" in federal or state civil proceedings). By the Petition's own account, Conservatrix's trustees hold a federal judgment confirming a Dutch arbitral award of $166,797,838 against Respondent for the same Commitment-based losses—a summary-proceedings award that Respondent maintains is provisional, and that

the trustees are actively enforcing while defending its confirmation on appeal in this very Court. Pet. 15 n.5. The point holds under any characterization of that award: whether it is treated as final or as provisional, Conservatrix is pursuing the same claimed losses through multiple channels simultaneously.

The Petition nowhere accounts for that recovery. It does not explain how a restitution award of €215,356,806 layered on top of a provisional confirmed $166.8 million judgment for the same alleged breach would be

anything other than compensating the same claimed loss twice. That omission alone confirms that mandamus—a remedy for clear entitlement—is unavailable: the relationship between Conservatrix's civil recoveries and any conceivable restitution is an unresolved, fact- intensive offset question of precisely the kind that 18 U.S.C. §§ 3664(e) and (j)(2) commit to the sentencing court—and that Respondent's own pending objections place in active dispute.

VI. The Relief Requested Exceeds Anything the CVRA or

Mandamus Authorizes.

Even where this Court has granted CVRA mandamus, the remedy was a remand for the district court to perform its statutory task—not an appellate decree of a particular award. See In re Brown, 932 F.3d at 173– 74 (granting the writ and remanding for the district court to explain its restitution analysis). Petitioners ask this Court to act as a first-instance factfinder: to resolve victim status, causation, foreign-law questions, and quantum (in euros), without any district court findings, while vacating a criminal Judgment. Neither § 3771(d)(3) nor traditional mandamus principles permits that course, and § 3771(d)(5) narrowly limits the re- opening of sentences that vacatur would entail.

If the Court were to conclude—contrary to the record—that any aspect of Conservatrix's claim warranted further attention, the most relief conceivably available would be a remand for consideration under the procedures Congress prescribed in 18 U.S.C. § 3664, subject to the jurisdictional consequences of the pending appeals—a forum in which Respondent's own objections, including that lawful credits and offsets extinguish any net restitution obligation, likewise await adjudication. A directed nine-figure award is not an available form of relief.

CONCLUSION

For these reasons, the Petition for a Writ of Mandamus should be denied.

This the 12th day of June, 2026.

Respectfully submitted, /s/ Greg E. Lindberg Greg E. Lindberg PO Box 159 Thonotosassa, FL 33592 919-308-9686 • gelindberg@gmail.com

CERTIFICATE OF COMPLIANCE

1. This response complies with the type-volume limitation of

Fed. R. App. P. 21(d)(1) because, excluding the portions exempted by Fed.

R. App. P. 32(f), it contains 4,065 words.

2. This response complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P.

32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Greg E. Lindberg Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2026, with the advance permission of the Clerk's Office pursuant to Local Rule 25(b)(1), I caused the foregoing Response to be transmitted by email to the Clerk of Court for filing, and that on the same date I caused a true and correct copy to be served by email upon the following: Jeffrey E. Oleynik • D.J. O'Brien III • Kate E. Giduz Brooks, Pierce, McLendon, Humphrey & Leonard, LLP joleynik@brookspierce.com; dobrien@brookspierce.com; kgiduz@brookspierce.com Counsel for Petitioners Daniel Ryan • Dana Washington • Benjamin Bain-Creed • Julia Park U.S. Attorney's Office for the Western District of North Carolina daniel.ryan@usdoj.gov; dana.washington@usdoj.gov; benjamin.bain-creed@usdoj.gov; julia.park@usdoj.gov Lyndie Freeman, U.S. Department of Justice — lyndie.freeman@usdoj.gov Counsel for the United States Joseph W. Grier, III • Michael L. Martinez • Benjamin D. Rhodes Grier Wright Martinez, PA jgrier@grierlaw.com; mmartinez@grierlaw.com; brhodes@grierlaw.com Special Master and Counsel for the Special Master together with all other persons listed on Petitioners' certificate of service.

A copy was also filed on the docket of United States v. Lindberg, No.

3:23-CR-48 (W.D.N.C.).

/s/ Greg E. Lindberg Greg E. Lindberg

**Doc. 201 — Emergency Motion to Enforce Plea / Access / Conflict-Free Counsel (filed 06/15/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Charlotte Division United States of America, v.

No. 5:19-cr-22 Greg E. Lindberg, et al., Defendants.

United States of America,

v.

No. 3:23-cr-48 Greg E. Lindberg, Defendant.

DEFENDANT'S EMERGENCY MOTION TO ENFORCE THE PLEA AGREEMENT AND THE ORDER APPOINTING THE SPECIAL MASTER, TO PRESERVE HIS DUE-PROCESS AND COUNSEL-ACCESS RIGHTS IN THE PENDING RESTITUTION PROCEEDINGS, AND TO REQUIRE THAT THE GOVERNMENT BE REPRESENTED BY CONFLICT-FREE COUNSEL

INTRODUCTION AND REQUEST FOR EXPEDITED CONSIDERATION

Defendant Greg E. Lindberg respectfully moves this Court on an emergency basis for relief necessary to preserve his constitutional and statutory rights while the restitution phase of this case remains open. The supporting facts are set out in the accompanying Declaration of Greg E. Lindberg ("Lindberg Decl."), filed herewith. This motion is grounded on the plea agreement entered in this case, the Order appointing the Special Master, the Fifth and Sixth Amendments to the United States Constitution, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A and 3664, and this Court's inherent and statutory authority.

Expedited consideration is warranted. The final restitution hearing has not been scheduled, yet Defendant faces imminent designation and transfer by the Bureau of Prisons ("BOP") to a facility at which he has no access to a computer, the internet, spreadsheets, or the financial records he needs to litigate the disputed offsets, and only limited access to counsel. Once such a transfer occurs, the harm to Defendant's ability to be heard on a restitution figure exceeding one and one- half billion dollars—against which he asserts offsets approaching $2.9 billion—cannot meaningfully be undone. (Lindberg Decl. ¶¶ 2, 10–15.)

STATEMENT OF FACTS

Consistent with the requirement of Local Criminal Rule 47.1, the operative facts are established by the accompanying affidavit and are summarized here only for the Court's convenience. Defendant rests the factual basis of this motion exclusively on the Lindberg Decl. and not on any extrinsic correspondence.

At sentencing on May 26, 2026, this Court expressly rejected the Government's position—advanced by Assistant United States Attorney Daniel Ryan—that Defendant be housed at the Pike County Detention Center ("PCDC") for 90 days only, until the final restitution hearing. (Lindberg Decl. ¶ 3.) Notwithstanding that ruling, within a day of sentencing Defendant was moved to the Pike County Detention Center (PCDC) for approximately one day and then transferred again. (Id.

¶ 4.)

After Defendant, through counsel, filed his first emergency motion to stay all asset sales—a filing that raised prosecutorial vindictiveness, including the reuse at sentencing of victim statements collected roughly two and one-half years earlier, before restitution had been paid, presented as though current by Department of Justice Trial Attorney Lyndie Freeman—Ms. Freeman contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement. (Id.

¶¶ 5–6.)

Most recently, on June 12, 2026, the Government, through AUSA Ryan, communicated that it is reconsidering whether it will continue to support Defendant's request to delay reporting to BOP—a request the Government had previously premised on Defendant's cooperation with the Special Master. The reporting-delay question is presently before United States Magistrate Judge Keesler, and the Government's proposed wording both shortens the period to 90 days and walks back the understanding reflected at the sentencing hearing. (Lindberg Decl. ¶¶ 7–8.)

Defendant's prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time the requested waiver (ECF No. 537) was refused, that its fees would not be paid until after year-end. To continue representing Defendant through the end of the year, that firm would have had to advance an estimated $2 to $2.5 million in unpaid credit. (Id. ¶ 9.) Defendant's access to counsel and to the tools of self-representation is now materially impaired: he is held in a single cell with no access to any computer, the internet, or spreadsheet software, and his contact with counsel is largely confined to in-person visits and video calls on which complex restitution positions cannot adequately be developed. (Id. ¶¶ 10–11.)

ARGUMENT

I. The Government May Not Treat Protected Advocacy as a Breach of the Plea

Agreement; Doing So Is Prosecutorial Vindictiveness.

A defendant has the right to seek relief from the courts and to pursue an appeal without governmental retaliation, and due process forbids vindictiveness against a defendant for having exercised those rights. North Carolina v. Pearce, 395 U.S. 711, 725 (1969); Blackledge v. Perry,

417 U.S. 21, 27–28 (1974). That prohibition on actual vindictiveness applies with full force after trial-level proceedings are complete, where retaliation for the exercise of post-conviction rights is of special concern. United States v. Goodwin, 457 U.S. 368, 372–84 (1982). Defendant does not rest on any presumption of vindictiveness; the sequence here establishes actual retaliation.

Here, the sequence speaks for itself. Defendant filed an emergency motion that placed on the public record his contention that the prosecution had acted vindictively including by recycling stale, pre-payment victim statements at sentencing as if they were current. The named prosecutor whose conduct the motion challenged, Trial Attorney Lyndie Freeman, then demanded that the motion be stricken from the docket and threatened a breach of the plea agreement if it was not. (Lindberg Decl. ¶¶ 5–6.) That is not a neutral enforcement of the plea; it is the use of the breach mechanism to suppress a protected filing that was adverse to the very lawyer making the threat. The timing—an adverse demand made directly in response to a protected, post-conviction filing implicating the prosecutor

personally—establishes actual prosecutorial vindictiveness—and, at the very least, the "realistic likelihood of vindictiveness" the Constitution forbids.

The Government compounded the problem on June 12, 2026, when it signaled that it may withdraw support for Defendant's reporting-delay request in apparent response to Defendant's recent exercise of his rights—a request the Government had previously supported and had tied to Defendant's cooperation with the Special Master. (Id. ¶¶ 7–8.) Conditioning a custodial accommodation on a defendant's agreement to abandon protected advocacy, or penalizing him for declining to do so, is an unconstitutional condition that cannot stand.

II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced.

A plea agreement is enforced according to its terms because a defendant's waiver of his most fundamental rights rests upon the Government's promises. When a guilty plea rests in any significant degree on a promise of the prosecution, that promise "must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971). The obligation runs to the entire prosecution team; the staff

of a prosecutor's office bears the burden of "letting the left hand know what the right hand is doing." Id. at 262.

Defendant's plea agreement and the Order appointing the Special Master contemplate that Defendant will participate in, and cooperate with, the orderly marshaling and accounting of assets—participation that is impossible without access to counsel, to a computer and the internet, and to the financial records underlying the disputed offsets. (Lindberg Decl. ¶¶ 9–12, 15.) The Government cannot demand cooperation under the agreement while simultaneously engineering conditions that make cooperation and defense impossible, and it cannot recast Defendant's insistence on a full accounting before assets are liquidated as a "breach." The promises that induced the plea must be honored, and the access necessary to perform under the agreement must be preserved.

Critically, the access Defendant invokes is not a discretionary courtesy or a bargaining chip. The access provisions of the plea agreement exist to protect Defendant's constitutional rights—to the assistance of counsel, to due process, and to access the courts—as the restitution phase proceeds; they are not a quid pro quo for Defendant's cooperation with an out-of-order, premature liquidation of assets, and the Government may not treat them as one. Conditioning Defendant's access to counsel, computers, the internet, and records on his cooperation with asset sales, or withdrawing that access because he has exercised protected rights, converts a constitutional guarantee into leverage and invokes the very violations described throughout this motion. The concern is heightened now that Defendant is represented by new counsel, who must absorb a voluminous and technical restitution record—making timely, meaningful, and daily access all the more essential, not less.

III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records.

Restitution under the MVRA is criminal punishment. Ellingburg v. United States, 607 U.S. ___, No. 24-482 (Jan. 20, 2026). Because the restitution Defendant faces is punishment—here, a

preliminary figure exceeding $1.655 billion (Doc. 161)—the full protections of due process attach to the proceedings that fix it. The MVRA itself guarantees procedural participation:

it requires the court to resolve disputes and places defined burdens on the parties. 18 U.S.C. § 3664; see also 18 U.S.C. § 3663A. The statute also forbids double recovery: a victim's losses must be reduced by amounts later recovered, 18 U.S.C. § 3664(j)(2)—the precise issue Defendant seeks to litigate through his offsets and his request for a full accounting before any further liquidation.

The process due is measured by weighing the private interest at stake, the risk of erroneous deprivation under the current procedures and the value of additional safeguards, and the Government's interest. Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976). At its core, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." Id. at 333. Every factor favors Defendant. The private interest—liberty and more than a billion dollars in punishment—is enormous. The risk of error is acute: the offsets turn on technical financial questions (for example, the treatment of approximately $1 billion in AAA-rated zero-coupon bonds and whether losses were caused by a forced sale rather than by Defendant's conduct) that cannot be presented without computers, the internet, records, spreadsheets, and counsel who can absorb them. (Lindberg Decl. ¶¶ 11–12, 15.) The Government has no legitimate interest in a restitution figure inflated by the denial of these basic tools. U.S. Const. amend. V.

The burden of proof makes access indispensable. Under the MVRA, the Government bears the burden of proving the amount of the victims' loss, but the burden of demonstrating entitlement to the offsets and credits a defendant asserts rests on the defendant. 18 U.S.C. § 3664(e). It is therefore Defendant who must marshal the records and analysis establishing, among other things, that the losses were caused by a forced sale rather than by the offense of conviction, and that amounts have been or will be recovered that must reduce any restitution. Denying Defendant the counsel, the computer, the internet, and the financial records needed to carry that statutory burden does not lighten it—it ensures that it cannot be met, and that the resulting restitution figure will be inflated by default rather than fixed on the merits.

These offsets are not collateral; they go to the heart of proximate causation, which the MVRA makes essential. Restitution reaches only those losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Supreme Court has confirmed that restitution must be reduced by the amount a victim actually realizes upon selling property, and that a defendant is not the proximate cause of a decline in value that flows from the victim's own decision whether and when to dispose of assets. Robers v. United States, 572 U.S. 639 (2014). A restitution figure measured in the billions—here, the approximately $1.6 billion stated in the Preliminary Order—can sound, at first, as though every dollar reflects loss the Defendant proximately caused. It does not. Whether the losses were instead caused by a fire-sale liquidation of AAA-rated, gold-equivalent securities that should have been held to maturity, or by the blocking of value-preserving transactions such as the proposed Ares sale, is precisely the causation inquiry the statute requires—an inquiry into who sold the assets, on what terms, and with what intention. (Lindberg Decl. ¶¶ 11–12.) The Government's demands—that Defendant's filing be pulled from the docket, and that he be designated and transferred to a Federal Prison Camp (FPC) in violation of this Court's own ruling at sentencing—operate to strip Defendant of the ability to develop and present this causation and offset evidence at the very moment the record is being made.

Nor is the danger of uncounted, unauthorized liquidation hypothetical. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court

approval. (Lindberg Decl. ¶ 12.) Assets of that magnitude cannot be sold out from under the restitution determination without a full accounting; that is precisely why no further sale or liquidation should occur before restitution is finally determined.

This is not an abstract point; the same causation screen has already been applied in this very case. In denying a crime victim's mandamus petition arising directly out of the Preliminary Order of Restitution, the Fourth Circuit reaffirmed that restitution reaches only harm "directly and proximately" caused by the offense, and that a claimed loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (unpublished) (quoting In re McNulty, 597 F.3d 344, 352 (6th

Cir. 2010)). The panel sustained the exclusion of a claimant precisely because its losses were not closely tied to the conduct inherent in Defendant's offense. Because that decision was entered in this very case, it is the law of the case and governs the restitution determination here; and the causation screen it applied cuts both ways: the causation screen that kept losses out of the restitution figure must equally keep out losses charged against Defendant that flowed not from the offense of conviction but from the rehabilitator's fire-sale of gold-equivalent securities and the blocking of value-preserving sales. Offsets and causation are therefore not "collateral" to the restitution inquiry; under the law governing this case, they define it, and Defendant must be given the access necessary to litigate them.

## IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights.

The right to the assistance of counsel extends through sentencing, of which restitution is a part. U.S. Const. amend. VI. Independently, the constitutional right of access to the courts guarantees a person held in custody a reasonable opportunity to prepare and present nonfrivolous legal claims, and to obtain relief he must show actual injury—that the challenged conditions have hindered his efforts to pursue such a claim. Lewis v. Casey, 518 U.S. 343, 350–51 (1996); see also Bounds v. Smith, 430 U.S. 817 (1977) (recognizing the right of meaningful access to the courts), as limited by Lewis, 518 U.S. at 350–55.

Defendant readily makes that showing. He is litigating live, plainly nonfrivolous matters—objections to a multi-billion-dollar restitution recommendation, offsets approaching $2.9 billion, and a pending appeal—yet he is confined where he cannot touch a computer, cannot access the internet, cannot use the spreadsheets these issues demand, and cannot meet with counsel except in person or by video calls unsuited to complex financial analysis. (Lindberg Decl. ¶¶ 10–12, 15.) These restrictions are not incidental; they directly impede Defendant's ability to be heard on the very questions now before the Court, and a transfer to BOP designation would deepen that injury. The conditions necessary to cure it—meaningful counsel access and the ability to review records electronically—should be ordered now.

## V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions.

A federal prosecutor represents a sovereign whose interest "is not that it shall win a case, but that justice shall be done;" the prosecutor may strike hard blows but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Federal prosecutors are bound by the rules of professional conduct of the State in which they practice. 28 U.S.C. § 530B (the McDade Amendment). North Carolina's Rules of Professional Conduct accordingly govern the prosecutors here, including the special responsibilities of a

prosecutor and the prohibition on conduct that is prejudicial to the administration of justice. N.C. R. Prof'l Conduct r. 3.8; N.C. R. Prof'l Conduct r. 8.4.

Measured against those standards, the conduct described in the declaration is deeply troubling. Demanding that opposing counsel strike a protected filing from the public docket—and threatening a breach of the plea agreement to coerce that result—uses the prosecutor's unique leverage not to do justice but to suppress advocacy adverse to the prosecutor personally. Presenting years-old victim statements gathered before restitution was paid as though they were current and then leveraging custodial accommodations to discourage Defendant from contesting the restitution accounting, compound the concern. AUSA Daniel Ryan and Trial Attorney Lyndie Freeman are the officers responsible for this course of conduct, which the Court should not condone.

VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government.

The prosecutors who engaged in the conduct described above can no longer fairly serve as the Government's advocates, because they are now necessary witnesses to the very facts the Court must evaluate. The demand that Defendant's emergency motion be removed from the docket, the threat to treat that filing as a breach of the plea agreement, and the presentation at sentencing of years-old victim statements are events known firsthand to AUSA Daniel Ryan and Trial Attorney Lyndie Freeman. A lawyer who is likely to be a necessary witness shall not act as advocate in the proceeding. N.C. R. Prof'l Conduct r. 3.7; see 28 U.S.C. § 530B. The advocate-witness conflict is

squarely presented here, and it cannot be cured by the same attorneys continuing to litigate the propriety of their own conduct.

These prosecutors also have a personal stake that conflicts with the Government's overriding duty to see that justice is done. The filing they sought to suppress accused Ms. Freeman personally of vindictiveness; their response was to threaten Defendant rather than to address the accusation through the orderly processes of the Court. A prosecutor who reacts to a protected, personally adverse filing by wielding the plea's breach mechanism is no longer the disinterested representative of the sovereign the law requires. See Berger v. United States, 295 U.S. at 88. That personal interest is itself a disqualifying conflict.

Accordingly, and pursuant to the Court's supervisory authority to protect the integrity of the proceedings before it, the prosecutors who engaged in the conduct described herein—including AUSA Daniel Ryan and Trial Attorney Lyndie Freeman—should be replaced with conflict-free counsel for the United States: attorneys who were not personally involved in, and are not witnesses to, that conduct, and who can fairly discharge the Government's duty to do justice in the restitution proceedings.

CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(a) Directing that Defendant not be designated or transferred to Bureau of Prisons custody until the final restitution hearing in this case has been completed; or, in the alternative, directing that Defendant be held only at a facility that affords him adequate access to a computer, the internet, spreadsheet software, his financial records, and reasonable daily access to his counsel;

(b) Finding that meaningful daily access to counsel, to a computer, the internet, and spreadsheet software, and to the relevant financial records is necessary for Defendant to receive due process and to participate as the MVRA contemplates in the determination of restitution, offsets, and credits;

(c) Enforcing the access-related provisions of the plea agreement and the Order appointing the Special Master, and stating expressly that Defendant is entitled to reasonable daily access to counsel and to computer and internet resources sufficient to prepare his restitution submissions; (d) Directing that the practice of moving Defendant to facilities at which he has no computer or internet access—and which thereby impair his ability to defend his restitution offsets—be discontinued immediately; (e) Directing that no further sale or liquidation of Defendant's assets occur prior to the Court's final restitution determination, so that the offsets and credits at issue may be adjudicated before any further disposition of assets; acknowledging that Defendant's access—to counsel, to a computer and the internet and his records, and to a reasonable place and date of confinement during the restitution phase—rests on his constitutional rights to counsel, to due process, and to access the courts, and is not contingent on his cooperation with any asset-sale or liquidation process; and expressly directing that counsel for the United States, including the Assistant United States Attorney, shall not use Defendant's access (or his reporting date or place of confinement) as a lever to obtain his cooperation or to discourage his exercise of those rights; (f) Directing that the prosecutors who engaged in the conduct described in this motion— including Assistant United States Attorney Daniel Ryan and Trial Attorney Lyndie Freeman—be replaced with conflict-free counsel for the United States who were not personally involved in, and are not witnesses to, that conduct; and

(g) Granting such other and further relief as the Court deems just and proper. Respectfully submitted, this 15th day of June, 2026.

/s/ Kenneth Barnes_________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes_________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 6 /15/26

/s/ Kenneth Barnes_________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

**Doc. 202 — [Duplicate of Doc. 201] (filed 06/15/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Charlotte Division United States of America, v.

No. 5:19-cr-22 Greg E. Lindberg, et al., Defendants.

United States of America,

v.

No. 3:23-cr-48 Greg E. Lindberg, Defendant.

DEFENDANT'S EMERGENCY MOTION TO ENFORCE THE PLEA AGREEMENT AND THE ORDER APPOINTING THE SPECIAL MASTER, TO PRESERVE HIS DUE-PROCESS AND COUNSEL-ACCESS RIGHTS IN THE PENDING RESTITUTION PROCEEDINGS, AND TO REQUIRE THAT THE GOVERNMENT BE REPRESENTED BY CONFLICT-FREE COUNSEL

INTRODUCTION AND REQUEST FOR EXPEDITED CONSIDERATION

Defendant Greg E. Lindberg respectfully moves this Court on an emergency basis for relief necessary to preserve his constitutional and statutory rights while the restitution phase of this case remains open. The supporting facts are set out in the accompanying Declaration of Greg E. Lindberg ("Lindberg Decl."), filed herewith. This motion is grounded on the plea agreement entered in this case, the Order appointing the Special Master, the Fifth and Sixth Amendments to the United States Constitution, the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A and 3664, and this Court's inherent and statutory authority.

Expedited consideration is warranted. The final restitution hearing has not been scheduled, yet Defendant faces imminent designation and transfer by the Bureau of Prisons ("BOP") to a facility at which he has no access to a computer, the internet, spreadsheets, or the financial records he needs to litigate the disputed offsets, and only limited access to counsel. Once such a transfer occurs, the harm to Defendant's ability to be heard on a restitution figure exceeding one and one- half billion dollars—against which he asserts offsets approaching $2.9 billion—cannot meaningfully be undone. (Lindberg Decl. ¶¶ 2, 10–15.)

STATEMENT OF FACTS

Consistent with the requirement of Local Criminal Rule 47.1, the operative facts are established by the accompanying affidavit and are summarized here only for the Court's convenience. Defendant rests the factual basis of this motion exclusively on the Lindberg Decl. and not on any extrinsic correspondence.

At sentencing on May 26, 2026, this Court expressly rejected the Government's position—advanced by Assistant United States Attorney Daniel Ryan—that Defendant be housed at the Pike County Detention Center ("PCDC") for 90 days only, until the final restitution hearing. (Lindberg Decl. ¶ 3.) Notwithstanding that ruling, within a day of sentencing Defendant was moved to the Pike County Detention Center (PCDC) for approximately one day and then transferred again. (Id.

¶ 4.)

After Defendant, through counsel, filed his first emergency motion to stay all asset sales—a filing that raised prosecutorial vindictiveness, including the reuse at sentencing of victim statements collected roughly two and one-half years earlier, before restitution had been paid, presented as though current by Department of Justice Trial Attorney Lyndie Freeman—Ms. Freeman contacted defense counsel and asked that the emergency motion be removed from the ECF docket, stating that a failure to do so would be treated as a breach of the plea agreement. (Id.

¶¶ 5–6.)

Most recently, on June 12, 2026, the Government, through AUSA Ryan, communicated that it is reconsidering whether it will continue to support Defendant's request to delay reporting to BOP—a request the Government had previously premised on Defendant's cooperation with the Special Master. The reporting-delay question is presently before United States Magistrate Judge Keesler, and the Government's proposed wording both shortens the period to 90 days and walks back the understanding reflected at the sentencing hearing. (Lindberg Decl. ¶¶ 7–8.)

Defendant's prior counsel at Katten Muchin Rosenman LLP was informed by the Special Master, at or about the time the requested waiver (ECF No. 537) was refused, that its fees would not be paid until after year-end. To continue representing Defendant through the end of the year, that firm would have had to advance an estimated $2 to $2.5 million in unpaid credit. (Id. ¶ 9.) Defendant's access to counsel and to the tools of self-representation is now materially impaired: he is held in a single cell with no access to any computer, the internet, or spreadsheet software, and his contact with counsel is largely confined to in-person visits and video calls on which complex restitution positions cannot adequately be developed. (Id. ¶¶ 10–11.)

ARGUMENT

I. The Government May Not Treat Protected Advocacy as a Breach of the Plea

Agreement; Doing So Is Prosecutorial Vindictiveness.

A defendant has the right to seek relief from the courts and to pursue an appeal without governmental retaliation, and due process forbids vindictiveness against a defendant for having exercised those rights. North Carolina v. Pearce, 395 U.S. 711, 725 (1969); Blackledge v. Perry,

417 U.S. 21, 27–28 (1974). That prohibition on actual vindictiveness applies with full force after trial-level proceedings are complete, where retaliation for the exercise of post-conviction rights is of special concern. United States v. Goodwin, 457 U.S. 368, 372–84 (1982). Defendant does not rest on any presumption of vindictiveness; the sequence here establishes actual retaliation.

Here, the sequence speaks for itself. Defendant filed an emergency motion that placed on the public record his contention that the prosecution had acted vindictively including by recycling stale, pre-payment victim statements at sentencing as if they were current. The named prosecutor whose conduct the motion challenged, Trial Attorney Lyndie Freeman, then demanded that the motion be stricken from the docket and threatened a breach of the plea agreement if it was not. (Lindberg Decl. ¶¶ 5–6.) That is not a neutral enforcement of the plea; it is the use of the breach mechanism to suppress a protected filing that was adverse to the very lawyer making the threat. The timing—an adverse demand made directly in response to a protected, post-conviction filing implicating the prosecutor

personally—establishes actual prosecutorial vindictiveness—and, at the very least, the "realistic likelihood of vindictiveness" the Constitution forbids.

The Government compounded the problem on June 12, 2026, when it signaled that it may withdraw support for Defendant's reporting-delay request in apparent response to Defendant's recent exercise of his rights—a request the Government had previously supported and had tied to Defendant's cooperation with the Special Master. (Id. ¶¶ 7–8.) Conditioning a custodial accommodation on a defendant's agreement to abandon protected advocacy, or penalizing him for declining to do so, is an unconstitutional condition that cannot stand.

II. The Plea Agreement Is a Binding Promise the Government Must Honor; Its Terms Concerning Access Must Be Enforced.

A plea agreement is enforced according to its terms because a defendant's waiver of his most fundamental rights rests upon the Government's promises. When a guilty plea rests in any significant degree on a promise of the prosecution, that promise "must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971). The obligation runs to the entire prosecution team; the staff

of a prosecutor's office bears the burden of "letting the left hand know what the right hand is doing." Id. at 262.

Defendant's plea agreement and the Order appointing the Special Master contemplate that Defendant will participate in, and cooperate with, the orderly marshaling and accounting of assets—participation that is impossible without access to counsel, to a computer and the internet, and to the financial records underlying the disputed offsets. (Lindberg Decl. ¶¶ 9–12, 15.) The Government cannot demand cooperation under the agreement while simultaneously engineering conditions that make cooperation and defense impossible, and it cannot recast Defendant's insistence on a full accounting before assets are liquidated as a "breach." The promises that induced the plea must be honored, and the access necessary to perform under the agreement must be preserved.

Critically, the access Defendant invokes is not a discretionary courtesy or a bargaining chip. The access provisions of the plea agreement exist to protect Defendant's constitutional rights—to the assistance of counsel, to due process, and to access the courts—as the restitution phase proceeds; they are not a quid pro quo for Defendant's cooperation with an out-of-order, premature liquidation of assets, and the Government may not treat them as one. Conditioning Defendant's access to counsel, computers, the internet, and records on his cooperation with asset sales, or withdrawing that access because he has exercised protected rights, converts a constitutional guarantee into leverage and invokes the very violations described throughout this motion. The concern is heightened now that Defendant is represented by new counsel, who must absorb a voluminous and technical restitution record—making timely, meaningful, and daily access all the more essential, not less.

III. Due Process Guarantees Defendant a Meaningful Opportunity to Be Heard on Restitution, Which Requires Access to Counsel, a Computer, and the Financial Records.

Restitution under the MVRA is criminal punishment. Ellingburg v. United States, 607 U.S. ___, No. 24-482 (Jan. 20, 2026). Because the restitution Defendant faces is punishment—here, a

preliminary figure exceeding $1.655 billion (Doc. 161)—the full protections of due process attach to the proceedings that fix it. The MVRA itself guarantees procedural participation:

it requires the court to resolve disputes and places defined burdens on the parties. 18 U.S.C. § 3664; see also 18 U.S.C. § 3663A. The statute also forbids double recovery: a victim's losses must be reduced by amounts later recovered, 18 U.S.C. § 3664(j)(2)—the precise issue Defendant seeks to litigate through his offsets and his request for a full accounting before any further liquidation.

The process due is measured by weighing the private interest at stake, the risk of erroneous deprivation under the current procedures and the value of additional safeguards, and the Government's interest. Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976). At its core, due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner." Id. at 333. Every factor favors Defendant. The private interest—liberty and more than a billion dollars in punishment—is enormous. The risk of error is acute: the offsets turn on technical financial questions (for example, the treatment of approximately $1 billion in AAA-rated zero-coupon bonds and whether losses were caused by a forced sale rather than by Defendant's conduct) that cannot be presented without computers, the internet, records, spreadsheets, and counsel who can absorb them. (Lindberg Decl. ¶¶ 11–12, 15.) The Government has no legitimate interest in a restitution figure inflated by the denial of these basic tools. U.S. Const. amend. V.

The burden of proof makes access indispensable. Under the MVRA, the Government bears the burden of proving the amount of the victims' loss, but the burden of demonstrating entitlement to the offsets and credits a defendant asserts rests on the defendant. 18 U.S.C. § 3664(e). It is therefore Defendant who must marshal the records and analysis establishing, among other things, that the losses were caused by a forced sale rather than by the offense of conviction, and that amounts have been or will be recovered that must reduce any restitution. Denying Defendant the counsel, the computer, the internet, and the financial records needed to carry that statutory burden does not lighten it—it ensures that it cannot be met, and that the resulting restitution figure will be inflated by default rather than fixed on the merits.

These offsets are not collateral; they go to the heart of proximate causation, which the MVRA makes essential. Restitution reaches only those losses directly and proximately caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Supreme Court has confirmed that restitution must be reduced by the amount a victim actually realizes upon selling property, and that a defendant is not the proximate cause of a decline in value that flows from the victim's own decision whether and when to dispose of assets. Robers v. United States, 572 U.S. 639 (2014). A restitution figure measured in the billions—here, the approximately $1.6 billion stated in the Preliminary Order—can sound, at first, as though every dollar reflects loss the Defendant proximately caused. It does not. Whether the losses were instead caused by a fire-sale liquidation of AAA-rated, gold-equivalent securities that should have been held to maturity, or by the blocking of value-preserving transactions such as the proposed Ares sale, is precisely the causation inquiry the statute requires—an inquiry into who sold the assets, on what terms, and with what intention. (Lindberg Decl. ¶¶ 11–12.) The Government's demands—that Defendant's filing be pulled from the docket, and that he be designated and transferred to a Federal Prison Camp (FPC) in violation of this Court's own ruling at sentencing—operate to strip Defendant of the ability to develop and present this causation and offset evidence at the very moment the record is being made.

Nor is the danger of uncounted, unauthorized liquidation hypothetical. Motions described the sale of the Beckett affiliate, valued at approximately $133 million, without court

approval. (Lindberg Decl. ¶ 12.) Assets of that magnitude cannot be sold out from under the restitution determination without a full accounting; that is precisely why no further sale or liquidation should occur before restitution is finally determined.

This is not an abstract point; the same causation screen has already been applied in this very case. In denying a crime victim's mandamus petition arising directly out of the Preliminary Order of Restitution, the Fourth Circuit reaffirmed that restitution reaches only harm "directly and proximately" caused by the offense, and that a claimed loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (unpublished) (quoting In re McNulty, 597 F.3d 344, 352 (6th

Cir. 2010)). The panel sustained the exclusion of a claimant precisely because its losses were not closely tied to the conduct inherent in Defendant's offense. Because that decision was entered in this very case, it is the law of the case and governs the restitution determination here; and the causation screen it applied cuts both ways: the causation screen that kept losses out of the restitution figure must equally keep out losses charged against Defendant that flowed not from the offense of conviction but from the rehabilitator's fire-sale of gold-equivalent securities and the blocking of value-preserving sales. Offsets and causation are therefore not "collateral" to the restitution inquiry; under the law governing this case, they define it, and Defendant must be given the access necessary to litigate them.

IV. Denying Defendant Access to Counsel, a Computer, and Legal Materials Violates His Sixth Amendment and Access-to-Courts Rights.

The right to the assistance of counsel extends through sentencing, of which restitution is a part. U.S. Const. amend. VI. Independently, the constitutional right of access to the courts guarantees a person held in custody a reasonable opportunity to prepare and present nonfrivolous legal claims, and to obtain relief he must show actual injury—that the challenged conditions have hindered his efforts to pursue such a claim. Lewis v. Casey, 518 U.S. 343, 350–51 (1996); see also Bounds v. Smith, 430 U.S. 817 (1977) (recognizing the right of meaningful access to the courts), as limited by Lewis, 518 U.S. at 350–55.

Defendant readily makes that showing. He is litigating live, plainly nonfrivolous matters—objections to a multi-billion-dollar restitution recommendation, offsets approaching $2.9 billion, and a pending appeal—yet he is confined where he cannot touch a computer, cannot access the internet, cannot use the spreadsheets these issues demand, and cannot meet with counsel except in person or by video calls unsuited to complex financial analysis. (Lindberg Decl. ¶¶ 10–12, 15.) These restrictions are not incidental; they directly impede Defendant's ability to be heard on the very questions now before the Court, and a transfer to BOP designation would deepen that injury. The conditions necessary to cure it—meaningful counsel access and the ability to review records electronically—should be ordered now.

V. The Government's Conduct Violates the Duties of a Federal Prosecutor and Raises Serious Ethical Questions.

A federal prosecutor represents a sovereign whose interest "is not that it shall win a case, but that justice shall be done;" the prosecutor may strike hard blows but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Federal prosecutors are bound by the rules of professional conduct of the State in which they practice. 28 U.S.C. § 530B (the McDade Amendment). North Carolina's Rules of Professional Conduct accordingly govern the prosecutors here, including the special responsibilities of a

prosecutor and the prohibition on conduct that is prejudicial to the administration of justice. N.C. R. Prof'l Conduct r. 3.8; N.C. R. Prof'l Conduct r. 8.4.

Measured against those standards, the conduct described in the declaration is deeply troubling. Demanding that opposing counsel strike a protected filing from the public docket—and threatening a breach of the plea agreement to coerce that result—uses the prosecutor's unique leverage not to do justice but to suppress advocacy adverse to the prosecutor personally. Presenting years-old victim statements gathered before restitution was paid as though they were current and then leveraging custodial accommodations to discourage Defendant from contesting the restitution accounting, compound the concern. AUSA Daniel Ryan and Trial Attorney Lyndie Freeman are the officers responsible for this course of conduct, which the Court should not condone.

VI. The Prosecutors Who Engaged in the Challenged Conduct Are Necessary Witnesses with a Personal Stake and Must Be Replaced with Conflict-Free Counsel for the Government.

The prosecutors who engaged in the conduct described above can no longer fairly serve as the Government's advocates, because they are now necessary witnesses to the very facts the Court must evaluate. The demand that Defendant's emergency motion be removed from the docket, the threat to treat that filing as a breach of the plea agreement, and the presentation at sentencing of years-old victim statements are events known firsthand to AUSA Daniel Ryan and Trial Attorney Lyndie Freeman. A lawyer who is likely to be a necessary witness shall not act as advocate in the proceeding. N.C. R. Prof'l Conduct r. 3.7; see 28 U.S.C. § 530B. The advocate-witness conflict is

squarely presented here, and it cannot be cured by the same attorneys continuing to litigate the propriety of their own conduct.

These prosecutors also have a personal stake that conflicts with the Government's overriding duty to see that justice is done. The filing they sought to suppress accused Ms. Freeman personally of vindictiveness; their response was to threaten Defendant rather than to address the accusation through the orderly processes of the Court. A prosecutor who reacts to a protected, personally adverse filing by wielding the plea's breach mechanism is no longer the disinterested representative of the sovereign the law requires. See Berger v. United States, 295 U.S. at 88. That personal interest is itself a disqualifying conflict.

Accordingly, and pursuant to the Court's supervisory authority to protect the integrity of the proceedings before it, the prosecutors who engaged in the conduct described herein—including AUSA Daniel Ryan and Trial Attorney Lyndie Freeman—should be replaced with conflict-free counsel for the United States: attorneys who were not personally involved in, and are not witnesses to, that conduct, and who can fairly discharge the Government's duty to do justice in the restitution proceedings.

CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendant respectfully requests that the Court enter an Order:

(a) Directing that Defendant not be designated or transferred to Bureau of Prisons custody until the final restitution hearing in this case has been completed; or, in the alternative, directing that Defendant be held only at a facility that affords him adequate access to a computer, the internet, spreadsheet software, his financial records, and reasonable daily access to his counsel;

(b) Finding that meaningful daily access to counsel, to a computer, the internet, and spreadsheet software, and to the relevant financial records is necessary for Defendant to receive due process and to participate as the MVRA contemplates in the determination of restitution, offsets, and credits;

(c) Enforcing the access-related provisions of the plea agreement and the Order appointing the Special Master, and stating expressly that Defendant is entitled to reasonable daily access to counsel and to computer and internet resources sufficient to prepare his restitution submissions; (d) Directing that the practice of moving Defendant to facilities at which he has no computer or internet access—and which thereby impair his ability to defend his restitution offsets—be discontinued immediately; (e) Directing that no further sale or liquidation of Defendant's assets occur prior to the Court's final restitution determination, so that the offsets and credits at issue may be adjudicated before any further disposition of assets; acknowledging that Defendant's access—to counsel, to a computer and the internet and his records, and to a reasonable place and date of confinement during the restitution phase—rests on his constitutional rights to counsel, to due process, and to access the courts, and is not contingent on his cooperation with any asset-sale or liquidation process; and expressly directing that counsel for the United States, including the Assistant United States Attorney, shall not use Defendant's access (or his reporting date or place of confinement) as a lever to obtain his cooperation or to discourage his exercise of those rights; (f) Directing that the prosecutors who engaged in the conduct described in this motion— including Assistant United States Attorney Daniel Ryan and Trial Attorney Lyndie Freeman—be replaced with conflict-free counsel for the United States who were not personally involved in, and are not witnesses to, that conduct; and

(g) Granting such other and further relief as the Court deems just and proper. Respectfully submitted, this 15th day of June, 2026.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 6 /15/26

/s/ Kenneth Barnes_________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

**Doc. 211 — Response in Opposition to the Government's Motion for Extension of Time (Doc. 205) (filed 06/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-cr-48

v.

Case No. 5:19-cr-22

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE IN OPPOSITION TO THE

GOVERNMENT'S MOTION FOR EXTENSION OF TIME

Defendant Greg E. Lindberg, by and through undersigned counsel, respectfully submits this Response in Opposition to the Government's Motion for Extension of Time (Doc. 205) (the "Motion"). The Motion should be denied. In the alternative, should the Court be inclined to grant the Government any extension, Defendant respectfully requests the limited relief set forth in the Conclusion below. In support, Defendant states as follows:

1. The pending motions are complete and ripe for response. Defendant's motions at Docket Nos. 172, 190, 201, and 202 are fully briefed as filed. Each squarely presents the issues to which the Government must respond, and nothing about those motions prevents the Government from responding within the time prescribed by the rules of this Court.

2. The status of Defendant's counsel does not relieve the Government of its obligation to respond. Defendant is presently represented by undersigned counsel, who entered an appearance on June 9, 2026. (Doc. 170.) Whether prior counsel are permitted to withdraw, and whether additional counsel later appear, has no bearing on the Government's deadline to respond to motions already on file. The Government's response is owed to the Court and to the issues raised, not to any particular attorney. Should counsel later appear and seek leave to supplement or amend Defendant's motions, the Government may address any such supplement at that time.

3. The Government has been aware of the circumstances it now invokes for nearly a week yet waited until the eve of its deadline to seek relief. By the Government's own account, it communicated with prior counsel regarding the status of Defendant's representation on June 10, 2026, and was informed that same day of counsel's intent to withdraw. (Doc. 205 ¶ 4.) Prior counsel's motions to withdraw were filed on June 12, 2026. (Id. ¶¶ 6–7.) The Government was therefore on notice of the very circumstances it now offers as cause for delay as early as June 10, 2026, and in all events by June 12, 2026. It nonetheless waited until June 16, 2026—on or about the eve of its response deadline—to request an extension. A party that holds the asserted basis for an extension for the better part of a week, and seeks relief only as the deadline arrives, has not shown the diligence that good cause requires.

4. The Government's complaint that it was not consulted before Defendant's motions

were filed cannot be reconciled with its own conduct. The Government faults counsel for declining to confer before filing, and notes that the Consultation Statement accompanying Defendant's June 11 motion was left blank. (Doc. 205 ¶¶ 3, 5.) But the Government's own conduct foreclosed any meaningful conferral. After Defendant's first motion was filed on June 9, 2026, the Government did not respond on the merits or raise any concern with current counsel. Instead, it contacted prior counsel and sought the removal of Defendant's filing, and related entries, from the Court's ECF docket. (Doc. 201-1.) Once the Government had taken that step—seeking to have a represented party's filing stricken from the docket through former counsel—good-faith conferral with the Government concerning Defendant's subsequent motion was neither possible nor productive. The absence of conferral, and the blank Consultation Statement the Government now invokes, are therefore the direct consequence of the Government's own actions; they are not a failing by Defendant, and they are not an equitable basis for the discretionary extension the Government

seeks. The Government's conduct further confirms that it was actively engaged with the substance of Defendant's motion within a day of its filing, which cannot be squared with any suggestion that the Government now requires additional time to respond.

5. Good cause is required and has not been shown. An extension of time in a criminal case requires a showing of good cause. See Fed. R. Crim. P. 45(b)(1)(A). The Government's stated grounds—the length of Defendant's filings, the absence of pre-filing conferral, and uncertainty regarding the identity of future counsel—do not establish good cause for delaying a response to motions that are already complete and that raise urgent, time-sensitive issues. The length of Defendant's filings reflects the gravity and complexity of the matters at issue; it is not a basis to postpone the Government's response.

6. The relief the Government seeks is open-ended and would compound the prejudice to Defendant. The Government does not request a date certain. It requests an extension "until at least 14 days after" the Court rules on the pending motions to withdraw, "or as otherwise directed." (Doc. 205 at 1.) Tying the Government's response to the resolution of the separate withdrawal motions would leave Defendant's urgent motions unanswered for an indeterminate period and would reward, rather than excuse, the delay described above.

7. Several of Defendant's motions concern his ability to participate in his own defense and cannot await an open-ended extension. Among the pending motions are requests addressing Defendant's conditions of confinement and his access to counsel and to the computer, internet, and spreadsheet resources necessary to review the restitution materials and assist in his defense. Defendant was sentenced on May 26, 2026 (Doc. 205 ¶ 1), and contested restitution proceedings remain ongoing. Every day that these access issues remain unresolved impairs Defendant's ability to exercise his constitutional and due-process rights and to assist counsel in responding to the

restitution report. The volume of Defendant's recent filings is itself a product of the urgency of these issues and of Defendant's diligent effort to protect his rights—not a reason to delay the Government's response.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court DENY the Government's Motion for Extension of Time and direct the Government to respond to Docket Nos. 172, 190, 201, and 202 within the time prescribed by the rules of this Court.

In the alternative, should the Court be inclined to grant the Government any extension of time, Defendant respectfully requests that the Court:

(a) enter, on an interim basis pending full briefing, the relief requested in Defendant's motion filed June 15, 2026 (Docs. 201, 202) as to Defendant's placement and access—specifically, that Defendant not be designated to or transferred into Bureau of Prisons custody pending the Court's determination of final restitution, and that Defendant be afforded daily access to his counsel and to a computer, internet, and spreadsheet resources sufficient to review the restitution report and to assist counsel in responding to it—so that any extension granted to the Government does not come at the expense of Defendant's ability to participate in his own defense; the separate relief requested in that motion concerning government counsel may be reserved for resolution after full briefing; and (b) grant such other and further relief as the Court deems just and proper.

[SIGNATURE PAGE FOLLOWS.]

Respectfully submitted this 17th day of June, 2026.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Kenneth Barnes Kenneth Barnes

**Doc. 212 — Response in Opposition to Cell 1.16 Rehabilitator's Objection and Motion for Reconsideration (Doc. 171) (filed 06/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 3:23-CR-48-MOC

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S RESPONSE IN OPPOSITION TO THE OBJECTION AND MOTION FOR RECONSIDERATION OF CELL 1.16'S REHABILITATOR

NOW COMES Defendant Greg E. Lindberg, by and through undersigned counsel, and respectfully submits this Response in opposition to the Objection and Motion for Reconsideration of Cell 1.16's Rehabilitator to the Preliminary Order of Restitution and Judgment (Doc. No. 171) (the "Motion"), filed by the Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"). For the reasons set forth below, the Motion should be denied.

INTRODUCTION

The Court has already adopted the Special Master's recommendation and excluded Cell 1.16 from restitution. See Doc. Nos. 161, 162. Nothing in the Motion warrants disturbing that ruling. To the contrary, the recent decision of the United States Court of Appeals for the Fourth Circuit denying restitution to the Conservatrix petitioners in this very case confirms that Cell 1.16 is not a "victim" entitled to restitution. See Doc. No. 203. Like Conservatrix, Cell 1.16 points to unfulfilled financial commitments and disappointed expectations, but it does not—and cannot— tie those harms to the conduct inherent in Defendant's offense. And as the Special Master recognized, Cell 1.16 cannot establish the single element it concedes is in dispute—material misrepresentation or concealment— because the persons who directed Cell 1.16's investments were fully apprised of the affiliated-investment strategy. There was nothing to conceal.

ARGUMENT

I. The Fourth Circuit's Decision Denying Restitution to Conservatrix Forecloses Cell 1.16's Materially Identical Claim.

Restitution under the Mandatory Victims Restitution Act (the "MVRA") is available only to a "victim," defined as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2); accord 18 U.S.C. § 3771(e)(2)(A) (defining "crime victim" in identical terms). Restitution is limited to "the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990); see id. at 420 ("the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a

restitution order"). It is therefore not enough that a claimant was harmed by some conduct of the defendant that might, in another forum, be actionable; the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." Doc. No. 203, at 4–5 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)).

Applying that standard in this very case, the Fourth Circuit denied the Conservatrix petition with prejudice, explaining:

Petitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct. Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010). Petitioners have described Lindberg's failure to replenish the company's capital and to maintain [certain ratios] as agreed.

But Petitioners do not identify facts closely tying those failures to Lindberg's criminal activities. Without more, we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment.

Doc. No. 203, at 4–5.

Cell 1.16's claim is materially identical, and it fails for the same reason. Cell 1.16 rests on two asserted harms: (i) Defendant's alleged failure to honor a "buy-back" of the affiliated investments at their presumed values, see Doc. No. 171, at 4–5; and (ii) the provision of rating reports said to contain inflated ratings, see id. Neither is tied to the conduct inherent in the offense. The first is the very type of unfulfilled financial commitment—indistinguishable from the failure "to replenish the company's capital" and to "maintain [certain ratios] as agreed"—that the Fourth Circuit held insufficient as to Conservatrix. Doc. No. 203, at 4–5. The Special Master correctly

recognized that "[s]imilar reasoning applies here." Doc. No. 206, ¶ 3. The second was very well known to Don Solow as he advised on the ratings process and was intimately familiar with the process to secure the ratings of these very assets. In fact, Defendant provided this evidence to the Government on or around January 16, 2026.

II. Cell 1.16 Cannot Establish the Misrepresentation-or-Concealment Element, Because the

Persons Who Directed Its Investments Were Fully Apprised of the Affiliated-Investment Strategy.

Cell 1.16 concedes that, to qualify as a victim, it must show that Defendant or his agents "made material misrepresentations or omissions concerning those affiliated investments or asset management strategies," and it acknowledges that this is "[t]he sole element about which Cell 1.16 and the Special Master disagree." Doc. No. 171, at 4. Cell 1.16 cannot carry that burden, for the simple reason that there was no concealment in the first place.

As the Special Master explained, Cell 1.16 "fails to identify with specificity where the defendant 'mask[ed the defendant's] affiliated investments or asset management strategies.'" Doc. No. 206, ¶ 3 (quoting Doc. No. 203, at 3). To the contrary, "the person(s) at Vista Life & Casualty Reinsurance Company who turned over control of its investing activities to the defendant were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide." Id.

The Rehabilitator's own evidence confirms the same thing. The supporting affidavit of the Special Deputy Rehabilitator [Doc. No. ___] ("Leslie Aff.") admits that the cell's investment

manager was itself a disclosed Lindberg entity: "New England Capital, LLC, initially acted as the investment manager for the trust account." Leslie Aff. ¶ 6. It further admits that the cell's Participant, Cygnet 2016-A, was "majority owned by New England Capital, LLC, which is ultimately owned by Greg Lindberg," and was "also the partial owner of Vista Re" itself. Id. ¶ 4. An affiliated-investment strategy in which the affiliate is the openly designated investment manager—and a part-owner of the reinsurer—cannot have been "mask[ed]" from the cell it managed. The party now seeking restitution has itself pleaded the very transparency that defeats the concealment element.

In short, the affiliated investments and asset-management strategy were not "mask[ed]"; they were known to, and jointly managed by, Cell 1.16's own principals. See Doc. No. 203, at 3. That is fatal to the only element Cell 1.16 must prove—and cannot.

III. Cell 1.16's Remaining Theories Are, at Most, Tangentially Linked to the Offense; and an

Award on the Same Loans Underlying Other Recoveries Would Be an Impermissible Double Recovery.

Even setting aside the absence of any concealment, Cell 1.16's theories cannot satisfy the proximate-cause requirement that the MVRA and the Crime Victims' Rights Act impose. Proximate cause "preclude[s] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." Paroline v. United States, 572 U.S. 434, 445 (2014). And because the Supreme Court has now confirmed that restitution under the MVRA is criminal punishment, the Act's threshold requirements must be construed and applied with corresponding rigor. See Ellingburg v. United States, 607 U.S. ___, 2026 WL 135982 (U.S. Jan. 20, 2026) (holding that MVRA restitution "is plainly criminal punishment for purposes of the Ex Post Facto Clause"). Defendant's alleged failure to honor a buy-back—an unfulfilled financial undertaking—is a quintessential subject of civil contract litigation, not criminal restitution, and it is no nearer to the offense than the unmet capital and ratio commitments the Fourth Circuit rejected. See Doc. No. 203, at 4–5; Hughey, 495 U.S. at 413, 420. The asserted inflated ratings fare no better. Cell 1.16's own principal dealt directly with the rating agencies concerning the trust's assets confirming a sophisticated and hands-on role inconsistent with passive reliance; and, in all events, the causal link between any rating report and Cell 1.16's ultimate loss on the loans is far too attenuated to satisfy the proximate-cause requirement.

There is, moreover, an independent bar that Cell 1.16's own filing supplies. Cell 1.16 admits that its claimed losses arise from "loans in Lindberg entities—many of the same loans [that] were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution." Doc. No. 171, at 2. Those losses—which the Rehabilitator quantifies at $148,097,749 in principal and $87,795,079 in accrued interest across twenty-seven enumerated loans, see Leslie Aff. ¶ 6 & Ex. A—thus overlap, on Cell 1.16's own admission, with the very loans underlying other victims' awards. Restitution under the MVRA is compensatory: the court orders restitution "to each victim in the full amount of each victim's losses," 18 U.S.C.

§ 3664(f)(1)(A), not multiple recoveries upon a single underlying loss. An award to Cell 1.16 premised on the same defaulted loans that already underlie other recipients' awards would be duplicative and would inflate aggregate restitution beyond the actual loss caused. The Special Master himself flagged the need, before any such award, to "confirm that Cell 1.16's restitution amount is calculated consistently with all other persons awarded restitution in

this case." Doc. No. 206, ¶ 4. And the proponent bears the burden of proving any loss amount by a preponderance of the evidence, see 18 U.S.C. § 3664(e); United States v. Catone, 769 F.3d 866, 876 (4th Cir. 2014)—a burden the bare schedule of defaulted loans, unadjusted for collateral, recoveries, or the conceded overlap, does not satisfy. That overlap is a further reason to deny the Motion or, at the very least, to defer any award pending a hearing at which the issue—and Defendant's right to be heard—may be addressed.

Finally, notwithstanding anything herein above, the Defendant reserves all rights to argue for a return of approximately $23.5 million which was paid to Vista under the Clanwilliam sale order despite the Special Master admitting that Vista is not a victim or make other arguments to offset this payment against any restitution determination.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny the Objection and Motion for Reconsideration (Doc. No. 171) and adhere to its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162) excluding Cell 1.16 from restitution. To the extent the Court is inclined to revisit that determination, Defendant respectfully requests an opportunity to be heard and an evidentiary hearing addressing both Cell 1.16's asserted victim status and the avoidance of any duplicative recovery.

Respectfully submitted, this ____ day of June, 2026.

/s/ Kenneth Barnes

Kenneth Barnes Legal, PLLC

N.C. Bar No. 14035

356 Travel Lite Dr., Raleigh, NC 27603

Tel: (919) 524-1977

Email: barnesatty@aol.com

Counsel for Defendant Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

This the 17th day of June, 2026.

/s/ Kenneth Barnes

Kenneth Barnes
Counsel for Defendant Greg E. Lindberg

**Doc. 213 — Motion for Extension of Time to Respond to Doc. 171 (filed 06/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 3:23-CR-48-MOC

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION FOR EXTENSION OF TIME TO RESPOND TO THE OBJECTION AND MOTION FOR RECONSIDERATION OF CELL 1.16'S REHABILITATOR (DOC. NO. 171)

NOW COMES Defendant Greg E. Lindberg, by and through undersigned counsel, and respectfully moves this Court, pursuant to Rule 45(b) of the Federal Rules of Criminal Procedure, for a brief extension of time within which to file his Response in Opposition to the Objection and Motion for Reconsideration of Cell 1.16's Rehabilitator (Doc. No. 171) (the "Motion for Reconsideration"), and to deem the accompanying Response timely filed. In support, Defendant respectfully shows the Court as follows:

1. On June 9, 2026, the Commissioner of the Vermont Department of Financial Regulation, solely in his capacity as Rehabilitator of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"), filed the Motion for Reconsideration of this Court's Preliminary Order of Restitution and Judgment.

2. Undersigned counsel assumed responsibility for the defense of this matter on or about June 9, 2026—the same day the Motion for Reconsideration was filed—and required a reasonable opportunity to review the restitution record, to confer with Defendant, and to prepare a response.

3. Defendant is presently incarcerated. Owing to the ongoing denial of computer and internet access at his place of detention—a matter that is itself the subject of proceedings now pending before this Court—Defendant's ability to assist in the preparation of his Response and to assemble the documentary materials necessary to support it has been materially impaired.

4. The Response relies in part on contemporaneous correspondence that had previously been furnished to the Special Master but was not entered on the docket. Counsel required additional time to retrieve that correspondence and to prepare it for filing—as Exhibit A to the Response— so that it is properly made part of the record in this matter.

5. As a result of these circumstances, and to the extent the accompanying Response is deemed filed one day beyond the applicable deadline of 6/16/2026, the delay is brief. It is not the product of bad faith, dilatory motive, or a lack of diligence, and it will not prejudice any party or delay these proceedings. The Court's consideration of the reconsideration question is, in any event, proceeding within the ninety-day period following sentencing referenced by the Special Master.

See Doc. No. 206.

6. This Court may extend the time to act "for good cause" on a motion made before the period expires, and, where the period has expired, "if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1). Whether neglect is "excusable" is "at bottom an equitable" determination that considers "all relevant circumstances," including "the danger of prejudice" to the opposing party, "the length of the delay and its potential impact on judicial proceedings, the reason for the delay, … and whether the movant acted in good faith." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993). That the delay stemmed from the denial of access to a computer and to counsel's materials only reinforces good cause: the right of access to the courts requires that custodians afford incarcerated litigants "adequate law libraries or adequate assistance from persons trained in the law," Bounds v. Smith, 430 U.S. 817, 828 (1977), limited by Lewis v. Casey, 518 U.S. 343, 350–51 (1996) (requiring a showing that the deprivation hindered the litigant's pursuit of a nonfrivolous claim). Each consideration favors the brief accommodation requested here: the delay is a single day, no party is prejudiced, the proceedings are unaffected, the reasons for the delay are substantial, and Defendant has acted in good faith and with diligence.

7. Pursuant to the Local Rules of this Court, undersigned counsel has not had time to confer given the access issues with Defendant Greg E. Lindberg and to avoid further delaying the filings. All filings need to be printed, and hand delivered to Defendant Greg E. Lindberg and then with suitable modifications from the printed documents manually typed into the electronic version before they are filed. Given the complexity of the issues and the need to search archives and

spreadsheets which Defendant Lindberg cannot do as outlined in other motions filed on June 15, 2026, pending before this court, Defendant Lindberg's delay in filings directly flow from the restricted access.

WHEREFORE, Defendant Greg E. Lindberg respectfully requests that the Court: (i) GRANT this Motion; (ii) to the extent necessary, extend the time within which Defendant may respond to the Objection and Motion for Reconsideration (Doc. No. 171) through and including the date of the accompanying Response; (iii) deem the accompanying Response in Opposition timely filed; and (iv) grant such other and further relief as the Court deems just and proper.

Respectfully submitted, this 17th day of June 2026.

/s/ Kenneth Barnes

Kenneth Barnes Legal, PLLC

N.C. Bar No. 14035

356 Travel Lite Dr., Raleigh, NC 27603

Tel: (919) 524-1977

Email: barnesatty@aol.com

Counsel for Defendant Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this

document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

This the 17th day of June, 2026.

/s/ Kenneth Barnes

Kenneth Barnes

Counsel for Defendant Greg E. Lindberg

**Doc. 219 — Response in Opposition to Doc. 205 (e-mail to the Clerk, docketed) (filed 06/22/2026)**

Madam Clerk,

In light of the ruckus initiated by the DOJ (whom I am copying here), I would like to bring some much-needed acuity to the situation:

(1) There are NO representation issues. DOJ is asked not to interfere with Defendant Lindberg's counsel.

(2) The request for extension for was made late in the evening one day before the first response is due;

(3) Since DOJ called up Katten asking for removal of entries from the ECF the next day after the motion - one week ago - they are more than ready to respond as to the content; If the DOJ needed an extension, they should have requested one when Katten contacted them on Friday, and the government responded; The request for extension of time was intentionally delayed;

(4) It's prejudicial to the Defendant to allow the government to get more time given the gravity of the issue under these circumstances; The flurry of motions is Defendant exercising his due process rights and is not an excuse for the government not responding in time;

(5) Defendant's replacement of attorneys is irrelevant to the answer on a written motion within the appropriate timeframe; Replacement of attorney is Defendant's responsibility, and the extension request is not the place to address this issue. DOJ was informed on Friday as to who is replacing Katten and they should not use this as an excuse for anything much less an extension of time; and

(6) Should the Judge grant this extension request, we request the judge to:

(i) note these objections on the record on the order; and

(ii) if the Judge intends to grant this extension, the Judge should consider granting the motion filed on 6/15/2026 ex-parte on the record as it exists given the government's dilatory tactics from on or around May 27, 2026 so that Greg Lindberg is not designated to BOP pending determination of the final restitution, and has daily access to his counsel, a computer, internet and can use his computer to access spreadsheets to aid in the exercise of his constitutional rights and to help his counsel respond further to the restitution report and vigorously defend his rights and exercise his due process. (As a note, the clause in the order regarding the DOJ attorneys can be dealt with after the motion response and not included in the ex parte order. We want a full briefing on all the other issues in all three motions without exception.)

(7) Defendant's counsel does not anticipate any more clarity than is expressed above. Given the gravity, this response is being placed in writing to the court.

Respectfully OƯered,

Ken Barnes

Barnes Legal, PLLC

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**Doc. 220 — Response in Opposition to the Special Master's Extension Motion (Doc. 218) and Initial Response (Doc. 217), with Ex. A (filed 06/22/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE IN OPPOSITION TO THE SPECIAL MASTER'S

MOTION FOR EXTENSION OF TIME (DOC. 218) AND TO THE

SPECIAL MASTER'S INITIAL RESPONSE (DOC. 217)

Defendant Greg E. Lindberg respectfully submits this Response in Opposition to the Special Master's Motion for Extension of Time (Doc. 218) and to the Special Master's Initial Response (Doc. 217). By these two filings the Special Master would defer his answer to Defendant's pending Motion to Stay Enforcement of the Preliminary Order of Restitution (Doc. 172) and Emergency Motion to Stay All Asset Sales and to Disqualify the Special Master (Doc. 190). The Motion for Extension should be denied, and the question of the Special Master's disqualification taken up first. An extension sought by motion requires a showing of good cause, and that burden falls on the movant. Fed. R. Crim. P. 45(b)(1)(A). The Special Master invokes that very standard (Doc. 218 ¶ 8), but he cannot satisfy it.

1. The relief Defendant's motions seek is time-sensitive, and an open-ended extension would defeat it. For as long as the motions go unanswered, the Special Master continues to sell Defendant's property, and those dispositions are irreversible. Beckett—a company that had been among Defendant's holdings—was sold to Collectors in December 2025 with no motion, no notice, no order, and no accounting of the proceeds. (Doc. 190-4 ¶¶ 3, 11; Ex. A.) Every additional day

the motions go unanswered is a day in which more of Defendant's property may be sold beyond recovery.

2. The Special Master offers no good cause for the delay. His central justification—that he must finish his restitution work before the deadline in 18 U.S.C. § 3664(d)(5)—fails, because that deadline is not jurisdictional and may be exceeded. In granting the bifurcation motion the Special Master did not oppose, this Court relied on Manrique v. United States, 581 U.S. 116 (2017), and Dolan v. United States, 560 U.S. 605 (2010), and provided that restitution would "be finalized at a later date after any necessary hearings." (Doc. 107 ¶ 15; Doc. 108 ¶¶ 14–15.) Nor does he need more time. He filed a substantive Initial Response the same day he moved for the extension (Doc. 217), and he has worked with Defendant's counsel since January 2025. The Special Master also points to the turnover in Defendant's counsel as a ground for delay. (Doc. 218 ¶¶ 4, 8(b).) But it is Defendant's counsel that changed, not the Special Master's; his own representation is unchanged, and the motion he must answer is already on file. A party is not entitled to more time because his opponent has retained new lawyers—if new counsel warrants any accommodation, it runs to the

Defendant, whose counsel must come up to speed, not to the officer Defendant has moved to disqualify.

3. The extension also has no fixed endpoint. The Special Master does not ask for time to a date certain; he asks for time "until at least the tenth (10th) day following entry of an order on this extension motion." (Doc. 218 at 1.) That deadline cannot begin to run until the Court rules— and at the June 17, 2026 telephone conference the Judge advised that he would be unavailable, owing to travel, until July 6, 2026. The Special Master's deadline thus floats weeks into the future, expanding with every day the Judge is away, while his sales of Defendant's property continue in the meantime. An extension with no fixed end is precisely what a motion to halt ongoing, irreversible sales cannot abide.

4. The motion proceeds as though the Special Master were a neutral seeking only to "clarify" the record. He is not. A special master under 18 U.S.C. § 3664(d)(6) submits proposed findings for the Court's independent review; he does not litigate against the defendant. This Special Master has repeatedly done the latter—filing a point-by-point rebuttal of Defendant's sentencing memorandum that recharacterized his cooperation; pressing Defendant to sign a waiver that releases the Special Master himself; echoing the Government's accusations against Defendant, down to the very arguments in the Government's own motion to extend; and faulting Defendant's change of counsel and resort to motion practice as an "abrupt change" in his approach—a grievance that, good cause aside, no neutral would voice, and that bears on nothing the Court will decide on the record. (Doc. 159 ¶¶ 2(a), 3; compare Doc. 205, with Doc. 218 ¶¶ 4, 8(b).) Granting him more time would only deepen the injury, handing an officer who has abandoned neutrality further opportunity to file against Defendant and to liquidate his assets while the motion to disqualify him sits unanswered.

5. Most telling, the Special Master is racing to finalize a report before the objections to it can be heard. He represents that he will complete his restitution recommendations in a supplement due July 25, 2026 (Doc. 218 ¶ 6), even as he asks to defer his answer to the motions challenging his work. Defendant, now in the custody of the Bureau of Prisons, will place his objections before the Court by motion, as the bifurcation order entitles him to do—the offsets, recoveries, and payments approaching $2.9 billion against the $1.655 billion preliminary figure, and the causation of the losses for which restitution is sought, issues the Special Master's analysis never resolved and that go to the heart of Defendant's sentence. (Doc. 190-4 ¶ 13.) Neither the Special Master nor the Government has offered any facts answering those showings; faced with offsets of that magnitude, and with a causation the analysis never addressed, their response has been to seek delay, not to rebut. The recourse the Special Master has disclosed is to finalize his report regardless—fixing the restitution figure by report rather than answering it on the record. That, above all, is why the extension must be denied: the Special Master's disqualification resolved first, and his work stayed until it is.

6. Finally, Defendant does not concede the characterizations in the Special Master's Initial Response (Doc. 217). To the extent that response contains any substance requiring a reply— and it contains none—Defendant will address it after the Government and the Special Master have filed their answers to his motions. He should not be made to answer

now, while both seek to defer their own responses—a sequence designed to force Defendant to commit his position before the opposing parties commit theirs.

CONCLUSION

WHEREFORE, Defendant respectfully requests that the Court deny the Special Master's Motion for Extension of Time (Doc. 218); take up Defendant's Emergency Motion to Stay All Asset Sales and to Disqualify the Special Master (Doc. 190)—beginning with the question of the Special Master's disqualification—together with Defendant's Motion to Stay Enforcement of the Preliminary Order of Restitution (Doc. 172), without further delay; permit Defendant to respond to the substance, if any, of the Special Master's Initial Response (Doc. 217) after the Government and the Special Master have filed their answers to his motions; and grant such other and further relief as the Court deems just and proper.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted this 22nd day of June, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes N.C. Bar No. 14035

KENNETH BARNES LEGAL, PLLC

356 Travel Lite Dr.

Raleigh, NC 27603 (919) 524-1977 barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 22nd , 2026

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the Special Master.

/s/ Kenneth N. Barnes Kenneth N. Barnes

EXHIBIT A

Brooks Peck, PSA Parent Company Collectors to Acquire Beckett, Keeping It an “Independent Brand,” The Athletic (Dec. 15, 2025) https://www.nytimes.com/athletic/6891882/2025/12/15/collectors-beckett-psa-card-grading/

6/22/26, 1:56 PM PSA parent company Collectors to acquire Beckett, keeping it an ‘independent brand’ - The Athletic

Sports Memorabilia and Collectibles Log In Start a free tr

PSA parent company Collectors to acquire Beckett, keeping it an 'independent brand'

A Steph Curry rookie card graded by Beckett, which is being acquired by Collectors. Photo: KENA BETANCUR/AFP via Getty Images

By Brooks Peck Dec. 15, 2025

Share article 24

Collectors, the parent company of leading trading card grader PSA (Professional Sports Authenticator), is acquiring well-known collectibles media and grading company Beckett.

 On Monday, Collectors announced that a "definitive agreement" is in place and Start that a free tr Sports Memorabilia and Collectibles Beckett "will remain an independent brand." It said Beckett will continue its "own operations, customer experience, and standards around grading, marketplace, magazines and price guide."

ADVERTISEMENT

Christian Pulisic U.S. Men's National Team Forward Team Visa

Score unlimited 2% cash rewards on purchases.

LEARN MORE

Terms apply

"The first card I ever submitted for grading was to Beckett, and I consider Collectors custodians of this important icon in the hobby," said Nat Turner, CEO of Collectors, in a press release announcing the deal. "We believe that strong, well-supported brands help grow access to the hobby."

 PSA and Beckett will continue to process Sports grading Memorabilia orders and as they previously would, Collectibles Start a free tr with no change in pricing, according to the release.

TOP SPORTS MEMORABILIA & COLLECTIBLES STORIES

How Panini made its 2026 World Cup sticker album: Cristiano Ronaldo in, Neymar out

Every NFL team's best and worst uniform in franchise history

Panini World Cup stickers drawing record U.S. interest with shift in approach

Beckett was founded in 1979 by Dr. James Beckett and rose to prominence in the '80s and '90s with its popular trading card price guide magazines. Its grading services (BGS) later became a leader as interest in the practice grew during the 2000s. But in recent years Beckett has struggled to keep pace with a rapidly growing industry, dropping to third or fourth among the top grading companies, according to data compiled by GemRate. In December 2024, Collectivus Holdings was announced as Beckett's new parent company following a series of controversies and legal troubles involving the CEO of its previous parent company, Greg Lindberg.

While PSA has grown to account for the vast majority of total trading cards graded each month, Collectors has now acquired two of its much smaller competitors in recent years. In February 2024, Collectors added SGC, which has since transitioned to being a "boutique"

grading company and experienced a significant decline in total cards graded, according to GemRate data. CGC is now the only major card grading company not owned by Collectors.

According to Collectors, it "will look to enhance Beckett's offering while preserving the ability for hobbyists to choose what is best for every unique item in their collection."

Graded trading cards POWERED BY



NO CONDITION LISTED

Sports Memorabilia and Collectibles Start a free tr

Out of Stock

SOLD More Collectibles

The Athletic maintains full editorial independence in all our coverage. When you click or make purchases through our links, we may earn a commission.

Brooks Peck is a senior editor for Sports Memorabilia and Collectibles at The Athletic. He was previously managing editor of U.S. soccer coverage and was co-founder of the award-winning Yahoo Sports blog Dirty Tackle. Follow Brooks on Instagram @SportsCardAppreciation.

Tagged To: Memorabilia & Collectibles, Sports Business

THE ATHLETIC

Never miss a single moment.

Check our tournament hub for on-the-ground reporting, instant scores, and expert analysis as the drama unfolds.

Discover more

YOUR NEXT READ

Rebecca Lowe will host seventh consecutive Olympics with NBC Sports: Source

Will Australia's T20 Big Bash League go private?

Audi reveals new F1 team name and logo for 2026 after Sauber rebrand

LATEST LEAGUE STORIES



Sports Memorabilia and Collectibles Start a free tr Alexis Ohanian's VC firm acquires college sports trading card company ONIT

Jim Irsay Collection's American history relics going to auction in July

Women's Pro Baseball League announces trading card deal before first season

LATEST HEADLINES

New York weather warning issued ahead of Norway vs. Senegal World Cup game

Oilers sign Connor Murphy to 5-year contract extension

Mavericks hiring Michigan's Dusty May as head coach: Source

JUN 22, 2026

Connections: Sports Edition Find the hidden link between sports terms

Play today's puzzle

National US Canada Subscribe Boxing Men's Olympic Ice Arizona Memphis Calgary Start Subscription Hockey Bundesliga Atlanta Miami Edmonton Buy a Gift Mixed Martial Arts Champions League Baltimore Minnesota Montreal Group Subscriptions

MLB

Championship Bay Area Nashville Ottawa

MLS HQ

College Football Boston New Orleans Toronto Motorsports About Us College Sports Buffalo New York Vancouver NASCAR Careers Copa America Carolina Case 3:23-cr-00048-MOC-DCK Oklahoma Document 220-1 Winnipeg Filed 06/22/26 Page 6 of 7 https://www.nytimes.com/athletic/6891882/2025/12/15/collectors-beckett-psa-card-grading/ 5/6 6/22/26, 1:56 PM PSA parent company Collectors to acquire Beckett, keeping it an 'independent brand' - The Athletic Copa del Rey NBA Chicago Oregon Partners Code of Conduct Cricket NFL Sports Memorabilia Cincinnati Orlandoand Collectibles Start a free tr Collectibles by eBay Editorial Guidelines Culture NHL Cleveland Philadelphia Odds by BetMGM Advertise Cycling NWSL Columbus Pittsburgh Streaming by Fubo Business Inquiries Europa League Olympics Dallas Sacramento Tickets by StubHub Press Inquiries European Opinion Denver San Antonio Championship Support Peak Detroit San Diego Play Center FA Cup Premier League Houston Seattle Connections: Sports FAQ Fantasy Baseball Sailing Indiana St. Louis Connections: Soccer Forgot Password?

Fantasy Basketball Contact Us Scottish Premiership Jacksonville Tampa Bay Fantasy Football Editions Terms of Service Serie A Kansas City Utah Fantasy Hockey International Soccer Las Vegas Washington DC Fantasy Premier U.S. Newsletters League Sports Betting Los Angeles Wisconsin The Pulse FIFA Club World Cup Sports Business Tennis The Bounce FIFA Men's World Cup Top Sports News The Windup FIFA Women's World WNBA Prime Tire Cup Full Time Women's Champions Formula 1 League Until Saturday Gaming Women's College NFL Newsletter Global Sports Basketball The Athletic FC Women's Euros Golf MoneyCall International Women's Hockey Red Light Football Women's Olympic Ice Hockey Peak La Liga Women's Soccer No Offseason League Cup Women's Super League One League League Two World Baseball Ligue 1 Classic Memorabilia & The Athletic Ink Collectibles Podcasts Men's College Basketball Headlines

©2026 The Athletic Media Company, A New York Times Company Your Privacy Choices Privacy Policy Cookie Policy Support Sitemap

**Doc. 224 — Motion to Dismiss as Moot Motions to Withdraw as Counsel (Wyatt & Blake / Katten) (filed 06/23/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA

No. 5:19-CR-22-MOC v. GREG E. LINDBERG, No. 3:23-CR-48-MOC Defendant.

WYATT & BLAKE, LLP'S AND KATTEN MUCHIN ROSENMAN'S MOTION TO DISMISS AS MOOT MOTIONS TO WITHDRAW AS COUNSEL

Wyatt & Blake, LLP (hereinafter "Wyatt & Blake") and Katten Muchin Rosenman (hereinafter "Katten Muchin"), respectfully submit this Motion to Dismiss as Moot the Motions to Withdraw as Counsel previously filed in Case No. 5:19-cr-22 and Case No. 3:23-cr-48. In support of this Motion, Wyatt & Blake and Katten Muchin set forth the following facts.

1. On June 12, 2026, James F. Wyatt, III and Robert A. Blake, Jr. filed Motions to Withdraw as counsel for Mr. Lindberg. See Case No. 5:19-cr-22, Dkt. Entry Nos. 541, 543; Case No. 3:23-cr-48, Dkt. Entry Nos. 196-197. Katten Muchin also filed Motions to Withdraw as Counsel for Mr. Lindberg on June 12th. See Case No. 5:19-cr-22, Dkt. Entry No. 542; Case No. 3:23-cr-48, Dkt. Entry No. 195.

2. As set forth in the Motions to Withdraw, Mr. Lindberg has hired new counsel to represent him in Case No. 5:19-cr-22 and Case No. 3:23-cr-48 going forward.

3. Subsequent to the filing of the Motions to Withdraw as Counsel, Mr. Lindberg's new attorneys (Alex Little, Edward Canter, Brent Hannafan, and Kenneth Barnes) filed Notices of Substitution of Counsel pursuant to which Mr. Lindberg's new attorneys were substituted in place of all attorneys from Wyatt & Blake and Katten Muchin in both cases. See Case No. 5:19-cr-22, Dkt. Entry No. 550; Case No. 3:23-cr-48, Dkt. Entry No. 210.

4. Pursuant to LCrR 44.1 and LCvR 83.1(g), upon the filing of the Notices of Substitution of Counsel, Mr. Lindberg's new attorneys were automatically substituted as counsel for Mr. Lindberg. Thus, Wyatt & Blake and Katten Muchin are no longer counsel of record in these cases.

5. Based on the foregoing, it is respectfully submitted that the Motions to Withdraw can be dismissed as moot by the Court.

6. Wyatt & Blake and Katten Muchin have discussed this Motion with counsel for the United States. The United States does not object to the entry of an Order dismissing the Motions to Withdraw as moot and noting that all attorneys from Wyatt & Blake and Katten Muchin are no longer counsel of record in these cases for Mr. Lindberg

7. A proposed Order is being submitted contemporaneously with the filing of this Motion.

Based on the foregoing, Wyatt & Blake and Katten Muchin respectfully request that the Court enter an Order dismissing the Motions to Withdraw as Moot and recognizing the substitution of Mr. Lindberg's new counsel for Wyatt & Blake and Katten Muchin.

This the 23rd day of June, 2026.

Respectfully submitted,

/s/ James F. Wyatt, IIIx James F. Wyatt, III (NC State Bar No. 13766) Robert A. Blake, Jr. (NC State Bar No. 20858)

WYATT & BLAKE, LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net rblake@wyattlaw.net

ARTIFICAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 23rd day of June, 2026.

/s/ James F. Wyatt, III James F. Wyatt, III (NC State Bar No. 13766)

WYATT & BLAKE, LLP

402 W. Trade Street, Suite 101 Charlotte, NC 28202 704-331-0767 jwyatt@wyattlaw.net

**Doc. 225 — Motion Directing BOP to Permit Daily Access to Counsel (filed 06/24/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Plaintiff, No. 5:19-CR-22-MOC No. 3:23-CR-48-MOC v.

EMERGENCY MOTION

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S EMERGENCY MOTION FOR AN ORDER DIRECTING THE BUREAU OF PRISONS TO PERMIT DAILY ACCESS TO COUNSEL AND THE USE OF A COMPUTER AND CASE RECORDS IN THE PRESENCE OF COUNSEL

Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com

J. Alex Little (pro hac vice)

Brent A. Hannafan (pro hac vice) Edward J. Canter (pro hac vice) Litson PLLC 54 Music Square E, Suite 300 Nashville, Tennessee 37203 Tel: (615) 985-8205 Counsel for Greg E. Lindberg

INTRODUCTION

Restitution in these cases is not final. The Special Master has recommended a restitution figure of approximately $1.6 billion. Mr. Lindberg has filed objections and contends—through mandatory offsets, prior payments, and credits—that restitution is fully paid. The Court has not yet held a restitution hearing or entered a final restitution order. Given the sum involved, one of the most consequential phases of Mr. Lindberg's sentence is still being litigated.

That litigation is part of his criminal sentence. In Ellingburg v. United States, the Supreme Court held that restitution under the Mandatory Victims Restitution Act is "plainly criminal punishment," imposed "together with other criminal punishments such as imprisonment and fines." Ellingburg v. United States, 607 U.S. 163, 166 (2026). Because the contested restitution determination is part of sentencing, it is a critical stage of Mr. Lindberg's criminal case at which the Sixth Amendment right to the assistance of counsel attaches.

Mr. Lindberg cannot meaningfully participate in that stage from his current confinement. To contest the Special Master's figure, he must work with counsel—daily—to reconstruct and present the voluminous documents, accounting statements, emails, and records relating to more than 300 companies that document the offsets, prior payments, and causation on which his position depends. He recently retained new counsel, who must review those same records with him before the restitution figure is fixed. That access has now been cut off. The Bureau of Prisons has taken Mr. Lindberg into custody and is moving him through the federal transfer system—he was recently held at the Federal Transfer Center in Oklahoma City, where he had no access to the Case Records, or to daily consultation with counsel—

and his designation and transfer to an institution such as the Federal Prison Camp in Montgomery, Alabama, or the Federal Prison Camp in Manchester, Kentucky, are already underway. The tools and access on which his participation depends have been severed, and each day they remain severed compounds the prejudice.

The relief Mr. Lindberg seeks is narrow and urgent: an order restoring daily access to counsel and the ability to review the Case Records on a computer in counsel's presence.

BACKGROUND

1.

In May 2024, Mr. Lindberg was convicted by a jury in Case No. 5:19-cr-22. On November 12, 2024, he pleaded guilty in Case No. 3:23-cr-48 and began serving his sentence that day. The Court bifurcated sentencing from the determination of restitution and appointed a Special Master to assist in the restitution process.

2. The restitution amount is actively contested. For roughly sixteen months, Mr. Lindberg has worked daily with counsel to develop and present the offsets, prior payments, credits, and causation evidence that, he contends, establish that restitution is fully paid. That work has required—and has been conducted through—daily access between Mr. Lindberg and his counsel; and at the Pike County Detention Center Mr. Lindberg was permitted to use a computer and the internet to review records with counsel and to prepare and present his position on restitution.

3. Mr. Lindberg was sentenced on May 26, 2026, to a term of 144 months' imprisonment. At sentencing, the Court recognized the importance of Mr. Lindberg's continued participation in the contested restitution proceedings and recommended that he remain at the Pike County Detention Center.

4. The restitution proceedings remain active and unresolved. The Special Master's report recommends restitution of approximately $1.6 billion. Mr. Lindberg has filed objections asserting offsets, prior payments, and credits that, if credited, establish that restitution is fully paid. Additional filings, a restitution hearing, and a final restitution order are anticipated.

5. Mr. Lindberg's prior counsel have been substituted, and he is now represented by new counsel of record. New counsel must review the Case Records with Mr. Lindberg to present the offset and causation analysis before the restitution figure is fixed.

6. Mr. Lindberg's access has now been cut off. The Bureau of Prisons has taken him into custody and is moving him through the federal transfer system; he was recently held at the Federal Transfer Center in Oklahoma City, the Bureau's central transit hub, where he had no access to a computer, no access to the Case Records, and no ability to consult daily with counsel. His designation and transfer to a federal institution, such as the Federal Prison Camp in Montgomery, Alabama, or the Federal Prison Camp in Manchester, Kentucky, are already underway. Absent an order restoring that access, Mr. Lindberg cannot consult counsel daily or review the records necessary to contest the Special Master's figure.

ARGUMENT

I. The Contested Restitution Determination Is Part of Mr. Lindberg's Criminal Sentence and a Critical Stage of His Criminal Case.

In Ellingburg v. United States, a unanimous Supreme Court held that restitution under the MVRA "is plainly criminal punishment for purposes of the Ex Post Facto Clause." 607 U.S. 163, at 166. Restitution is "imposed during 'sentencing' for the offense" and is ordered "together with other criminal punishments such as imprisonment and fines." Id. The Court reaffirmed that the MVRA "requires courts 'to impose restitution as part of the sentence.'" Id at 167. (quoting Manrique v. United States, 581 U.S. 116, 118 (2017)). And it emphasized that, at a sentencing proceeding where restitution is ordered, the party adverse to the defendant is the Government. Id.

It follows directly that the restitution determination still pending in these cases is part of Mr. Lindberg's criminal sentence. That determination is no formality. Under 18 U.S.C. § 3664(e), "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the financial resources of the defendant . . . shall be on the defendant." The statute also provides that any amount paid under an order of restitution is reduced by any amount later recovered as compensatory damages for the same loss. 18 U.S.C. § 3664(j)(2). The offsets, prior payments, and credits Mr. Lindberg presses are thus not collateral to the restitution inquiry—under the governing statute, they define it, and Mr. Lindberg bears the burden of proving them by a preponderance of the evidence.

Because the contested restitution determination is part of sentencing, it is a critical stage of Mr. Lindberg's criminal case. The Supreme Court has long held that the time of sentencing is a critical stage in a criminal case and that the right to counsel attaches "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." Mempa v. Rhay, 389

U.S. 128, 134 (1967). Few stages affect a defendant's substantial rights more than one that will fix an obligation the Special Master places at roughly $1.6 billion.

## II. Severing Daily Access to Counsel and the Tools to Analyze the Offsets Denies Mr. Lindberg the Assistance of Counsel Guaranteed by the Sixth Amendment.

The Sixth Amendment guarantees the assistance of counsel at every critical stage. That guarantee is not satisfied by the mere formal availability of a lawyer; it requires the access necessary for counsel to function. "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." United States v. Cronic, 466 U.S. 648, 654 (1984) (citation omitted). For that reason, the denial of counsel at a critical stage of the proceedings may constitute "a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." Id. at 659.

Here, the denial is functional but no less complete. Mr. Lindberg is held without a computer and without a telephone; he cannot consult counsel daily, and he cannot review the Case Records— the documents, accounting statements, emails, and company records that are the entire substance of his restitution defense. A lawyer who cannot meet with the client, and a client who cannot examine the very documents on which the disputed restitution figure turns, cannot subject the Special Master's recommendation to meaningful adversarial testing. The problem is acute because Mr. Lindberg bears the statutory burden on offsets, see 18 U.S.C. § 3664(e), and because newly retained counsel must review the underlying records with him before the figure is fixed. Denying that access at this stage is, in practical effect, a denial of counsel where it matters most.

## III. The Right of Access to the Courts Independently Requires That Mr. Lindberg Be

Given the Tools to Litigate Restitution.

Independent of the Sixth Amendment, Mr. Lindberg has a "fundamental constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 828 (1977). That right imposes on

custodial authorities an affirmative duty to provide prisoners "adequate law libraries or adequate assistance from persons trained in the law"—and, more broadly, the tools needed to litigate. Id. The Supreme Court has made clear that this right seeks to ensure prisoners have "[t]he tools . . . to attack their sentences, directly or collaterally, and . . . to challenge the conditions of their confinement." Lewis v. Casey, 518 U.S. 343, 355 (1996).

The denial of access here falls squarely within that right. Under Ellingburg, the restitution determination is part of Mr. Lindberg's sentence; litigating it is an effort "to attack [his] sentence." Lewis, 518 U.S. at 355. The deprivation of a computer, counsel access, and the Case Records is "presently hindering" Mr. Lindberg's ability to pursue a serious claim—that restitution is fully paid—against a deadline-driven report recommending $1.6 billion. Id. at 343.

Due process under the Fifth Amendment points the same way. A criminal sentence may not rest on materially false or incomplete information that the defendant had no opportunity to correct. See Townsend v. Burke, 334 U.S. 736, 740–41 (1948). Denying Mr. Lindberg the access necessary to present his offsets risks fixing a restitution figure—part of his sentence—on an incomplete record he was never able to contest.

IV. The Plea Agreement and the Special Master Order Require the Government to Facilitate This Access.

The access Mr. Lindberg seeks is also the access the restitution framework presupposes. Under the Plea Agreement, Mr. Lindberg must truthfully complete, under penalty of perjury, a financial statement, update it within seven days of any material change, and make full disclosure of all current and projected assets. See Plea Agreement ¶ 10(c). That obligation cannot be met without consistent computer and internet access to monitor, compile, and verify financial information in real time. The Agreement separately requires Mr. Lindberg to comply with the Special Master Order and to take "all necessary and reasonable steps in the defendant's power to

secure assets sufficient to pay full restitution" to the insurance companies it identifies. Id. ¶¶ 8(d), 9, 10(a). And the Order Appointing the Special Master (Doc. 56, Jan. 23, 2025) reserves to the parties—including Mr. Lindberg—the express right to "make motion or application to this Court to expand or narrow the scope of Primary Restitution Assets, which shall be heard upon notice and hearing." Order Appointing Special Master ¶ 15. None of these obligations or rights can be performed or exercised from a cell with no computer and no internet access; the framework that requires Mr. Lindberg's participation necessarily carries with it the Government's corresponding obligation to make that participation possible.

The Court should enforce the plea agreement here. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971). The access secured through the parties' restitution framework is not a discretionary courtesy or a bargaining chip; it is the means by which Mr. Lindberg performs his end of the agreement and, at the same time, exercises his constitutional rights to

counsel, to due process, and to access the courts in the proceeding that will fix his punishment.

V. Emergency Consideration Is Warranted, and the Relief Requested Is Narrow.

Emergency consideration is appropriate because the harm is occurring now. Designation and transfer are already underway, and Mr. Lindberg's access to counsel and to the Case Records has already been cut off. He is being moved through the transfer system as this motion is filed, and with each day that he is without counsel and the Case Records he cannot answer a report recommending approximately $1.6 billion. The ordinary notice schedule cannot keep pace with an in-progress transfer, and Mr. Lindberg may be designated to and confined at an institution where

the access cannot be provided at all. The Court can end that irreparable disruption by acting now to restore the access that Mr. Lindberg had throughout the restitution process.

The relief requested is correspondingly modest. Mr. Lindberg seeks no advantage in the merits of the restitution dispute—only the restoration of daily access to counsel and the ability to review the Case Records on a computer in counsel's presence, conditions he had until his transfer, that the Court recognized at sentencing, and that impose no cognizable burden on the Government. To the contrary, the requested access serves the Government's interest in an accurate restitution determination. This Court has authority over the criminal proceedings before it to protect Mr. Lindberg's rights and to direct the conditions necessary for him to participate at this critical stage.

The Government does not oppose the core of this relief. Mr. Lindberg has conferred with counsel for the Government and its position is the following: "The Government objects to the Court ordering the Bureau of Prisons to take, or not take, any specific actions regarding the confinement of Mr. Lindberg. That said, the Government does not object to the Court recommending that the Bureau of Prisons allow regular access to his criminal counsel of record in this case including regular use of a computer and the Case Records, in the presence of such criminal counsel, consistent with the needs and resources of the Bureau of Prisons. At this time, the Government objects to the remaining relief requested by Defendant." The access at the heart of Mr. Lindberg's request—regular consultation with counsel and review of the Case Records on a computer—thus falls within the relief the Government does not oppose.

To make Mr. Lindberg's access workable, the Court may make recommendations as to where Mr. Lindberg is held. The Bureau of Prisons must "place the prisoner in a facility" and may "designate any available penal or correctional facility . . . whether maintained by the Federal Government or otherwise," 18 U.S.C. § 3621(b)—language that reaches not only federal

institutions but also local detention facilities that house Bureau inmates under intergovernmental or contract agreements. The Bureau must consider "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as appropriate." Id. § 3621(b)(4). While the Bureau's ultimate designation "is not reviewable by any court," id. § 3621(b), this Court may recommend that the Bureau hold Mr. Lindberg at a local detention facility that houses Bureau inmates under contract and at which daily counsel access and supervised computer use are possible—including, once he is designated, a facility paired with the camp to which he is sent: a holdover at the Montgomery County Detention Center if Mr. Lindberg is designated to the Federal Prison Camp in Montgomery, Alabama, or a holdover at the Pike County Detention Center in

Pikeville, Kentucky (where Mr. Lindberg previously was afforded such access) if he is designated to the Federal Prison Camp in Manchester, Kentucky—rather than continue to route him through a transfer center or complete his transfer to a facility where the records review essential to the pending proceeding is impossible. Such a recommendation imposes nothing on the Bureau; it supplies only the Court's view that this defendant's participation in an ongoing critical stage warrants a facility where counsel access and record review can occur.

CONCLUSION

For these reasons, Mr. Lindberg respectfully requests that the Court enter the accompanying order directing the Bureau of Prisons to restore, and then to maintain for so long as the restitution proceedings remain pending: (1) daily access to his counsel; and (2) daily use of a computer and the Case Records, in the presence of counsel; further recommending, under 18 U.S.C. § 3621(b), that the Bureau hold Mr. Lindberg over at a local detention facility at which that access is possible—including, once designated, a facility paired with his destination: a holdover at the Montgomery County Detention Center if he is designated to the Federal Prison Camp in

Montgomery, Alabama, or a holdover at the Pike County Detention Center in Pikeville, Kentucky if he is designated to the Federal Prison Camp in Manchester, Kentucky—rather than continue to route him through a transfer center or complete his transfer to a facility where that access cannot be provided; and granting any other relief that the Court deems just and proper.

Dated: June 24, 2026

Respectfully submitted,

/s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Alex Little (pro hac vice) Edward M. Canter (pro hac vice) Brent Hannafan (pro hac vice) Litson PLLC 54 Music Square E, Suite 300 Nashville, Tennessee 37203 Tel: (615) 985-8205 Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Standing Order, which was published to the Bar of the Western District of North Carolina on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 24th day of June, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 24, 2026, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Kenneth N. Barnes Kenneth N. Barnes

**Doc. 227 — Response Opposing Cell 1.16's CVRA Restitution Motion (filed 06/29/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 3:23-CR-48-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S RESPONSE IN OPPOSITION TO

CELL 1.16'S MOTION FOR RESTITUTION UNDER THE

CRIME VICTIMS' RIGHTS ACT

Defendant Greg E. Lindberg respectfully submits this Response in opposition to Cell 1.16's Motion for Restitution Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. No. 221), and the supporting Memorandum (Doc. No. 222) (together, the "Motion"), filed by the Commissioner of the Vermont Department of Financial Regulation, Kaj Samsom, solely in his capacity as Rehabilitator of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"). For the reasons set forth below, the Motion should be denied.

INTRODUCTION

Cell 1.16's Motion is its second effort to obtain a restitution award that the Special Master considered and declined to recommend and this Court has already denied. The Motion rests on "the same underlying facts as set forth in" the Objection and Motion for Reconsideration, Doc. No. 171—principally the Declaration of Donald

D. Solow (Doc. No. 113)—now repackaged under the Crime Victims' Rights Act. See

Doc. No. 222, at 1 n.1. The new label changes nothing. The Special Master, with the full record before him, found that Cell 1.16 "satisf[ies] almost all of the elements" of his definition of a restitution victim but "fall[s] short" on the single element in dispute: it has not "pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments." Doc. No. 106-3, at 23. This Court adopted that recommendation. The Motion supplies no new evidence and no basis to revisit it—and, as shown below, the contemporaneous correspondence of Cell 1.16's own declarant affirmatively refutes the misrepresentation theory on which the Motion depends. Independently, Cell 1.16's own filing concedes that "[m]any of the same loans" underlying its claimed loss "were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution," Doc. No. 222, at 2—so an award to Cell 1.16 on those loans would be an impermissible double recovery. The Motion should be denied.

ARGUMENT

I. The Motion Merely Reargues Cell 1.16's Reconsideration Motion on

Identical Facts, and Entertaining a Successive, Repetitive Request Would Unfairly Prejudice the Defendant.

This is not the first time—nor the second, nor the third—that Cell 1.16 has sought restitution on this record. Cell 1.16 objected to the Special Master's Report (Doc. No. 115), renewed that objection after the Special Master's Supplement (Doc. No. 153), and moved for reconsideration of the Court's Preliminary Order of Restitution and Judgment (Doc. No. 171). The present Motion expressly "relies on the same underlying facts as set forth in" the reconsideration motion, Doc. No. 171—

principally the Declaration of Donald D. Solow (Doc. No. 113). Doc. No. 222, at 1 n.1. Re-labeling the request—from a motion for reconsideration to a motion under the Crime Victims' Rights Act—does not transform a repetitive request into a new one. Cell 1.16 identifies no newly discovered evidence, no intervening change in the controlling law, and no error in the Court's prior determination; it merely re-presents the same facts and asks for a different result.

The claim Cell 1.16 re-raises has already been considered and resolved. The Special Master addressed it in his Report (Doc. No. 106) and again in his Supplement (Doc. No. 146), and he continues to oppose it. See Doc. No. 222, at 1 n.1. The Court adopted the Special Master's recommendation in its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162). Nor does the procedure referenced in the Fourth Circuit's decision authorize this successive filing: Cell 1.16 had already raised its restitution claim with this Court in Doc. No. 171, see Doc. No. 203, and nothing in that decision licenses a second motion re-presenting facts the Court has already weighed. The Crime Victims' Rights Act guarantees a victim the right to be reasonably heard; it does not entitle a claimant to relitigate the same claim, on the same record, seriatim until it obtains a different answer.

Entertaining successive motions that recycle the same record would unfairly prejudice the Defendant. Each repetitive filing forces the Defendant—who is incarcerated and is simultaneously litigating restitution and related matters on multiple fronts—to expend limited resources re-answering a claim that has already been briefed, weighed by the Special Master, and decided. It invites inconsistent

rulings and indefinitely defers the finality of the restitution determination, to the prejudice not only of the Defendant but of the other Insurance Companies.1 The Court may properly decline to entertain Cell 1.16's repetitive request, and—for this reason and those that follow—should deny the Motion.

II. The Motion Provides No Basis to Disturb the Special Master's

Considered Finding on the Same Record.

The Crime Victims' Rights Act defines a "crime victim" as a person "directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A); accord 18 U.S.C. § 3663A(a)(2) (Mandatory Victims Restitution Act). Restitution reaches only "the loss caused by the specific conduct that is the basis of the offense of conviction," Hughey v. United States, 495 U.S. 411, 413 (1990), and—as the Fourth Circuit held in this case—the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," Doc. No. 203, at 4– 5; see In re McNulty, 597 F.3d 344, 350 (6th Cir. 2010) (the CVRA's directness requirement encompasses both but-for and proximate causation); Paroline v. United States, 572 U.S. 434, 445 (2014) (restitution requires proximate causation).

The Special Master applied that framework through the multi-element definition he developed and that Cell 1.16 "generally accepts." Doc. No. 222, at 11. Having reviewed the Solow Declaration, the rating reports, and the buy-back letter on which the Motion now relies, he concluded that Cell 1.16 did not satisfy the

1 The Court has yet to determine, de novo, causation, offsets, and credits— whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

misrepresentation-or-concealment element. Doc. No. 106-3, at 23. This Court adopted that recommendation in its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162). The Motion offers no new evidence; it re-argues the same facts the Special Master already weighed. A party's disagreement with the Special Master's considered assessment is not a ground to disturb it.

To the extent the Motion relies on Judge King's separate opinion for the proposition that a CVRA "motion" is the proper vehicle, see Doc. No. 222, at 1, that opinion concurred in part and dissented in part; it is not the holding of the Court. Doc. No. 203. And the panel majority's reasoning—declining to disturb the exclusion of a claimant who "fail[ed] to sufficiently connect the harm suffered ... with Lindberg's criminal conduct," id. at 4–5—counsels denial here.

III. Cell 1.16 Cannot Establish the Misrepresentation-or-Concealment

Element, and the Contemporaneous Correspondence of Its Own Declarant Refutes It.

Cell 1.16 concedes that the only disputed element is whether "the Defendant or his agents made material misrepresentations or omissions concerning those Affiliate Investments or asset management strategies to Cell 1.16 or its regulator." Doc. No. 222, at 2. It cannot carry that burden—and the contemporaneous correspondence of its own declarant, Donald D. Solow, refutes it. That correspondence was previously furnished to the Special Master; and it is included as exhibits. The statements set out below are Mr. Solow's own—the principal of Vista/Cell 1.16 and the declarant on whose Declaration (Doc. No. 113) the Motion principally relies.

A. Cell 1.16's own principal knew the investments were affiliated with

the Defendant.

The Motion's own account establishes that Cell 1.16's investing was structured, from inception, as an affiliated-investment arrangement. New England Capital, LLC ("NEC")—"ultimately owned by Defendant Lindberg," Doc. No. 222, at 5—capitalized Cell 1.16, held the Series 2016-A and 2016-B certificates, and served as Collateral Manager directing the Reinsurance Trust's investments into "Lindberg-related loans." Id. at 5–7. The affiliation is not merely the Defendant's allegation; Cell 1.16's own principal acknowledged it contemporaneously and in writing. In July 2019, Mr. Solow reported that Vermont's regulator had sent a "letter from VT DFR ordering us to sever ties to the Eli Global group," which required, among other things, that Vista "terminate contracts with New England Capital." Ex. A (Solow, July 29, 2019). Where the affiliated character of the investments was understood by those directing them— indeed, by Cell 1.16's own principal—it was not concealed. The Special Master reached the same conclusion: those persons "were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide." Doc. No. 206, ¶ 3.

B. Cell 1.16 did not rely on the agency ratings as truthful

representations of value; its own principal treated them as unreliable and sought any rating, however low, for regulatory purposes.

Recognizing that the affiliated nature of the investments was known, the Motion shifts ground: it argues the misrepresentation lay in "rating reports with ratings inflated" by asset-shuffling, on which Cell 1.16 says it relied without knowing

the ratings were unsound. Doc. No. 222, at 2, 14. The Motion asserts that the Defendant "does not provide any 'evidence' of familiarity with the ratings process," and that "[n]either the Special Master nor Lindberg contend that Cell 1.16 was aware" the ratings were unreliable. Id. at 15. The record goes the other way, and the evidence is Cell 1.16's own declarant's contemporaneous words.

Mr. Solow did not treat the agency ratings as reliable indicators of the investments' value. In the spring of 2019 he advised that prospective buyers were "interested in your credit memos, not the rating agency reports," that they "don't want to rely on the ratings reports," that the assets were "essentially mini-CLOs," and that the parties were "aware of the headlines" concerning the affiliated enterprise. Ex. B (Solow, Mar. 31, 2019). Far from treating the ratings as honest valuations, Mr. Solow pursued any rating—however low—to preserve the trust's regulatory reserve credit. In January 2020 he asked whether the agencies could "assign ratings, even if the ratings are NAIC-5 ('CCC')," explaining that "[a] rating of NAIC-5 would work" and that "[t]he key is that there needs to be some rating, even if it's very low." Ex. C (Solow, Jan. 2020). And in May 2019 he urged that it was "imperative that we get all the assets in the trust rated by May 15th, or swap out the unrated assets," so that the trust's assets would not be treated as unrated for reserve purposes. Ex. D (Solow, May 3, 2019).

A claimant whose own principal regarded the ratings as something buyers would not "rely on," who described the assets as low-grade "mini-CLOs," and who solicited any rating—even "CCC"—to satisfy regulatory reserve requirements did not

rely on those ratings as truthful representations of the investments' value. Reliance is essential to any theory of misrepresentation, and Cell 1.16's own contemporaneous conduct negates it. That defeats the element claimant disputes. The Motion's ratings theory fails for an additional, independent reason. The ratings were issued by independent agencies—Egan-Jones and HR de Mexico, see Doc. No. 222, at 7—not authored by the Defendant or NEC as representations to Cell 1.16; NEC's having "provided" a third party's rating report is not itself a misrepresentation by the Defendant. And the Special Master had these very rating reports before him—they are exhibits to the Solow Declaration that the Motion relies on—and nonetheless found no specific instance of misrepresentation or concealment. Doc. No. 106-3, at 23. The Special Master's considered conclusion on the same materials should stand.

C. The buy-back letter is a collateral guarantee, not a

misrepresentation concerning the investments, and its breach is not closely related to the offense.

The Motion separately contends that the Defendant "misrepresented his willingness and ability to repurchase the Affiliated Investments" in a letter agreement dated November 16, 2018. Doc. No. 222, at 13. But a personal commitment to buy back assets in the event of default is a collateral financial guarantee; it is not a "misrepresentation or omission concerning those affiliated investments or asset management strategies," which is the element at issue. The harm from an unperformed guarantee sounds in contract, and—like

the harm the Fourth Circuit found insufficient in the related proceeding—is at most tangentially linked to, rather

than closely related to, the conduct inherent in the offense. See Doc. No. 203, at 4–5;

In re McNulty, 597 F.3d at 352.

IV. An Award to Cell 1.16 on the Same Loans Underlying Other Victims'

Restitution Would Be an Impermissible Double Recovery.

Even if Cell 1.16 could establish victim status, its requested award founders on double recovery. Cell 1.16 admits that "many of the same loans" underlying its claimed loss "were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution." Doc. No. 222, at 2; see also id. ¶¶ 15, 22 (describing the same Lindberg-related loans, in which the North Carolina and Bermuda insurers also participated). Restitution is compensatory, not multiplicative: the Court orders restitution "to each victim in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A)—not multiple recoveries upon a single underlying loss. An award to Cell 1.16 premised on the same defaulted loans that already underlie other recipients' awards would inflate aggregate restitution beyond the actual loss caused and produce a windfall. The Special Master himself flagged the need, before any such award, to "confirm that Cell 1.16's restitution amount is calculated consistently with all other persons awarded restitution in this case." Doc. No. 206, ¶ 4. And the proponent bears the burden of proving any loss amount by a preponderance. 18 U.S.C. § 3664(e); United States v. Catone, 769 F.3d 866, 876 (4th Cir. 2014).2 Cell 1.16's assertion of "$131,207,799 of

2 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. 163 (2026), Defendant contends that the Sixth Amendment

impaired assets," Doc. No. 222, at 9—unadjusted for the conceded overlap with other victims' awards, for collateral, or for recoveries—does not satisfy that burden.

V. The PBLA/ULICO Analogy Does Not Aid Cell 1.16, and Its Harm Is, at

Most, Tangentially Linked to the Offense.

Cell 1.16's contention that it is "similarly situated to PBLA," Doc. No. 222, at 17, underscores rather than cures the problem. The Special Master declined restitution to Cell 1.16 in part because there was no misrepresentation-or- concealment element. The distinction Cell 1.16 dismisses as one "without a difference" is "Lindberg did not directly control Cell 1.16." Id. That Cell 1.16 was controlled by parties who themselves understood and directed the affiliated investing—and whose own principal treated the ratings as unreliable—is precisely why the concealment element is absent here, and why Cell 1.16's situation differs from that of an insurer Lindberg controlled outright. The double-recovery overlap, present for Cell 1.16's loans but addressed by the Special Master for the awarded insurers, further distinguishes Cell 1.16. At bottom, Cell 1.16 asks the Court to override the Special Master's element-by-element findings on the same record; it has not shown those findings to be wrong.

requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying

Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny Cell 1.16's Motion for Restitution (Doc. Nos. 221, 222) and adhere to its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162) excluding Cell 1.16 from restitution. To the extent the Court is inclined to revisit that determination, Defendant respectfully requests an opportunity to be heard and an evidentiary hearing addressing both Cell 1.16's asserted victim status and the avoidance of any duplicative recovery.

Dated: June 29, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Alex Little (pro hac vice) Edward M. Canter (pro hac vice) Brent Hannafan (pro hac vice) Litson PLLC 54 Music Square E, Suite 300 Nashville, Tennessee 37203 Tel: (615) 985-8205 Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 29, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: June 29, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 228 — Response in Opposition to the Pennsylvania Commissioner's Amicus Letter (Doc. 223) (filed 06/30/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S RESPONSE IN OPPOSITION TO THE MOTION OF MICHAEL HUMPHREYS, PENNSYLVANIA INSURANCE COMMISSIONER, FOR LEAVE TO FILE AN AMICUS CURIAE LETTER

Defendant Greg E. Lindberg respectfully submits this Response in opposition to the Motion of Michael Humphreys, Insurance Commissioner, Pennsylvania Insurance Department, for Leave to File an Amicus Curiae Letter (Doc. No. 223) (the "Motion"). For the reasons set forth below, the Motion should be denied.

INTRODUCTION

The Pennsylvania Insurance Commissioner seeks leave to file an amicus "letter" supporting the effort of Cell 1.16's Rehabilitator to be declared a restitution victim. The Court should deny the Motion. Three features of the proposed submission place it outside the proper office of an amicus and make its filing inappropriate in this criminal matter. First, the letter does not assist the Court with law or a neutral perspective; it advocates for one side and duplicates the position the Rehabilitator has already advanced at length. Second, by the movant's own admission, the letter's purpose is to supply "additional factual information" outside the record—untested, unsworn assertions the Defendant has no opportunity to confront. Third, because restitution is a component of the criminal sentence and is criminal punishment, allowing a non-party to inject extra-record factual advocacy into that determination, by a letter addressed directly to the sentencing judge, would offend the Defendant's right to due process. If USAP or its regulator believes USAP is a crime victim, the Crime Victims' Rights Act and 18 U.S.C. § 3664 supply the procedure; an amicus "letter of support" is not a substitute for it.

ARGUMENT

I. Whether to Permit a Non-Party to Participate Is Committed to the Court's Discretion, and the Movant Bears the Burden of Showing the Submission Would Aid the Court.

There is no right to appear as amicus curiae; whether to permit a non-party to file an amicus submission rests in the Court's sound discretion. See Stuart v. Huff, 706 F.3d 345, 350 (4th Cir. 2013) (Wilkinson, J.) (cautioning, in the analogous intervention context, about

the "profound implications" of drawing non-parties into a court's management of litigation). The movant invokes Federal Rule of Appellate Procedure 29 as guidance, see Doc. No. 223, at 2, and Rule 29 conditions leave on a showing of "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case," Fed. R. App. P. 29(a)(3)(B). As shown below, the movant cannot make that showing: the proposed letter is duplicative, is offered to inject extra-record facts, and would undermine—not assist—a reliable, lawful restitution determination.

II. The Proposed Letter Is Not the Office of an Amicus, Because It Duplicates a Party's Position and Presses a One-Sided View of the Facts and Equities.

An amicus is a "friend of the court, not friend of a party." Ryan v. Commodity Futures Trading Comm'n, 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J., in chambers). An amicus submission is useful when it offers "unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide"; it is not useful—and "should not be allowed"—when it merely "duplicate[s] the arguments made in the litigants' briefs." Id. Nor is a court "helped by an amicus curiae's expression of a 'strongly held view' about the weight of the evidence." Id. at 1064. The proposed letter is precisely such a submission. It restates the Rehabilitator's central themes—that USAP's policyholders are "the actual victims," and that there is "no material qualitative difference" between USAP's derivative claim and the claims of the insurers the Special Master recommended for restitution, see Doc. No. 223, Ex. A, at 2—and it presses a strongly held view that restitution should issue on the same terms. That is advocacy for a party, not assistance to the Court, and it furnishes no reason the Rehabilitator's own briefing does not already supply.

III. By the Movant's Own Admission, the Letter Injects Extra-Record Adjudicative Facts the Defendant Cannot Test.

The movant candidly states that the letter's purpose is to provide "additional factual information which would not otherwise be available to the Court" and which was "not a part of the Special Master's report." Doc. No. 223, at 3 n.1. But an amicus is not a witness, and an amicus submission is not a vehicle for placing new, untested facts before the Court. The matters the letter presses—that USAP transferred "approximately $171 million" to Cell 1.16, that USAP's policyholders will be forced to absorb the loss, and that there is no "material qualitative difference" between USAP and the awarded insurers, see Doc. No. 223, Ex. A, at 1–2—are contested, unsworn, and offered by a non-party whom the Defendant cannot cross-examine. An amicus that seeks to supply such adjudicative facts, rather than to point the Court to legal considerations the parties have overlooked, exceeds its proper role. Cf. Ryan, 125 F.3d at 1063. The Court should not receive contested facts in this posture.

IV. Injecting a Non-Party's Extra-Record Factual Advocacy into the Restitution Component of a Criminal Sentence Would Violate Due Process.

Restitution ordered as part of a federal criminal sentence is not a civil remedy; it is criminal punishment. Ellingburg v. United States, 607 U.S. 163, 184 (2026) (holding that restitution under the MVRA is criminal punishment). The amount of restitution and the identification of those entitled to it must therefore be determined through the procedures Congress prescribed and consistent with due process—on reliable evidence, with the burden on the proponent, and with any dispute "resolved by the court by the preponderance of the

evidence." 18 U.S.C. § 3664(e); see also United States v. Catone, 769 F.3d 866, 876 (4th Cir. 2014) (the government must prove the amount of loss by a preponderance of the evidence).1 A criminal defendant

1 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg 607 U.S. at 184 2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim

is entitled to notice and a meaningful opportunity to contest the evidence on which his punishment rests. Permitting a non-party regulator to submit—by a letter addressed directly to the sentencing judge, and copied to the Special Master and others, see Doc. No. 223, Ex. A, at 2—factual assertions designed to influence the victim-status and loss determinations, outside the Section 3664 process and immune from confrontation, would deprive the Defendant of that opportunity and would offend due process. The reliability safeguards that attend the imposition of a criminal sentence cannot be bypassed by relabeling a partisan evidentiary submission as an amicus "letter of support."

V. The Motion Seeks to Obtain, Through an Amicus Letter, Relief That

Must Be Pursued Through the Crime Victims' Rights Act.

If the Pennsylvania Insurance Commissioner—or USAP, on whose behalf he writes—contends that USAP is a crime victim entitled to restitution, the Crime Victims' Rights Act and 18 U.S.C. § 3664 prescribe the means of asserting that claim, subject to the Defendant's right to contest it. See 18 U.S.C. §§ 3771, 3664. Indeed, that is the very procedure the Fourth Circuit identified, see Doc. No. 203, and that the Rehabilitator has now invoked by its own Motion for Restitution, see Doc. No. 221. A non-party cannot short-circuit that process—or evade the Defendant's procedural protections—by submitting an amicus "letter of support" for another claimant. If

and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

USAP wishes to assert victim status, the proper course is to do so directly and, on the record, where its evidence may be tested, not through a letter to the Court.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny the Motion of Michael Humphreys, Insurance Commissioner, Pennsylvania Insurance Department, for Leave to File an Amicus Curiae Letter (Doc. No. 223).

Dated: June 30, 2026

Respectfully submitted,

/s/ Kenneth N. Barnes Kenneth N. Barnes (NC BPR #14035) Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Alex Little (pro hac vice) Edward M. Canter (pro hac vice) Brent Hannafan (pro hac vice) Litson PLLC 54 Music Square E, Suite 300 Nashville, Tennessee 37203 Tel: (615) 985-8205 Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: June 30, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: June 30, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 234 — Motion for Determination That No Restitution Is Owed / Offsets (filed 07/14/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION FOR A DETERMINATION THAT NO RESTITUTION IS OWED, OR IN THE ALTERNATIVE FOR EXCLUSION AND OFFSET OF LOSSES NOT PROXIMATELY CAUSED BY THE OFFENSE OF CONVICTION,

WITH INCORPORATED MEMORANDUM OF LAW

Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com

PRELIMINARY STATEMENT

Defendant Greg E. Lindberg respectfully submits this motion for a determination that no restitution is owed, or in the alternative for the exclusion and offset of losses not proximately caused by the offense of conviction which results in an overpayment of $2.89 billion. The Preliminary Order of Restitution fixes Mr. Lindberg's restitution at $1,655,000,000. 1 That figure cannot stand, for three independent reasons, any one of which is sufficient.

First, no loss on the affiliated investments was reasonably foreseeable to Mr. Lindberg at the time those investments were originated. The investments were made under a written, board-approved risk-management framework; they were personally guaranteed by Mr. Lindberg himself; they were backed by approximately one billion dollars of zero-coupon bonds purchased to protect principal; the regulator praised Mr. Lindberg's handling of regulatory questions in the relevant period; and the change in law that disfavored affiliated investments was not enacted until 2019, after origination. Beyond that, Houlihan Lokey, one of the largest valuation companies in the country, provided contemporaneous analysis concluding that the affiliated loans were conservatively underwritten at approximately fifty-percent loan- to-value, and KPMG provided contemporaneous analysis showing that there was over $1 billion of equity supporting the loans (Exs. E2 and E3 KPMG Valuations and HL (Houlihan Lokey, Jan. 18, 2018) & E (KPMG, Aug. 24, 2018)). As the sole owner of

1 The Court has yet to determine, de novo, causation, offsets, and credits— whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

the insurance companies and of the operating companies that received the loans, Mr. Lindberg would have seen his entire $1 billion investment in his insurance companies and his entire investment in his non-insurance operating companies wiped out if there were a loss on the affiliated loans. Any one of the foregoing facts suffices to establish that there was no reasonably foreseeable loss to Mr. Lindberg when he oversaw the origination of the affiliated loans. No reasonable person, viewing these facts together, could have expected the safeguards Mr. Lindberg put in place to fail all at once amid the regulatory and prosecutorial onslaught that Mr. Lindberg and his businesses have endured over the last seven years. Someone who reasonably expects a loss on an investment does not personally guarantee every penny of that investment, underwrite it conservatively at 50% loan-to-value, purchase insurance against any loss, implement a robust risk-management program, invest $1 billion of his own capital as equity to support that investment and receive strong praise from his regulator on how he was handling regulatory issues. Under the Mandatory Victims Restitution Act ("MVRA") any loss must be reasonably foreseeable to form the basis for restitution. That was not the case here.

Second, and independently, any loss that later materialized was caused not by Mr. Lindberg's conduct but by a chain of intervening acts by independent third parties—the Government, the court-appointed Rehabilitator, and the Special Master—each occurring after Mr. Lindberg ceded control in October 2018, and some continuing to the present: the Government's interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban

transactions; the coerced ten-year hold imposed by the June 2019 MOU; the fire-sale of the zero-coupon bond portfolio that had secured the affiliated-loan principal; and the Special Master's continuing disposition of estate assets—before any final restitution determination, in the case of the Beckett transaction without court approval or accounting, and while the Special Master's own compensation is paid from the same assets he sells. Those intervening causes break the chain between Mr. Lindberg's conduct and any loss. Under the MVRA, any loss must be closely related to and proximately caused by the defendant's conduct. The foregoing string of events shows the opposite: the losses occurred after Mr. Lindberg ceded control in October 2018 and were caused by independent decisions of third parties beyond his control.

Third, this Court has characterized the "real loss" in this case as "risk." Restitution under the MVRA is measured by, and capped at, a victim's actual loss. Risk is not actual loss—particularly where the policyholders the statute is designed to protect have been made whole and confirmed paid in full. Moreover, the "risk" the Court identified was not unlawful: the affiliated investments were lawful when made, were approved by the regulator, and were within prevailing industry practice. Lawful risk cannot be the predicate for a penal, loss-measured restitution award.

Mr. Lindberg accepts responsibility for his offense and does not seek to disturb his Plea Agreement. He agreed, in Paragraph 10(a), to pay restitution for harm "caused by the defendant's criminal conduct." Doc. 40. He stands by that agreement. But that agreement reaches only harm his conduct caused; by its own terms it does not reach losses inflicted years later by an intervening actor, and it does not convert

"risk" into a compensable, realized loss. The proximate-cause limitation that the Supreme Court and the Fourth Circuit enforce is the very limitation Paragraph 10(a) imposes by the words "caused by the defendant's criminal conduct." Id.

Mr. Lindberg respectfully requests a determination, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by Mr. Lindberg, and that net restitution is zero. In the alternative, he requests that the Court exclude the intervening-cause losses identified in Part IV and credit the offsets identified in Part VIII, which independently reduce any obligation to zero.

STATEMENT OF FACTS

A. The affiliated-loan program operated under a written risk-management framework and experienced zero defaults prior to Mr. Lindberg's transfer of control to the rehabilitator.

Mr. Lindberg's North Carolina insurers operated under a Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017 (Ex. C), and continuously updated (see Ex. E5 for the April 14, 2018 revision). The Policy required, among other controls: senior-secured first-lien positions on "all assets and cash flows of the borrower"; a minimum credit rating of "B-" or equivalent from an SEC-approved NRSRO for every loan; a weighted-average portfolio rating of "BB" or higher with portfolio leverage under four times; third-party arm's-length pricing opinions; perfection certificates; quarterly risk-based-capital calculations; and annual cash- flow testing "to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements" (Ex. C, Phases 1–3). The Policy recited a "zero default track record" over twenty-five years and committed Mr. Lindberg's affiliates to "prepay any underperforming loan using reserve capital" (Id.). This is not the architecture of a person who anticipates loss.

In fact, prior to the transfer of control of Mr. Lindberg's insurance companies to the Rehabilitator in October 2018, there were no defaults on the affiliate loans. A reasonable person does not expect losses on an investment program that, while he controlled it, had experienced no defaults—let alone any losses.

B. Mr. Lindberg committed approximately $1 billion of his own capital, guaranteed the loans, and purchased $1 billion of bonds to protect principal.

Mr. Lindberg invested roughly one billion dollars of his own capital into the insurance group and took no dividends from the insurers (See Ex. A11). Independent analysis by Berkeley Research Group ("BRG") also confirms capital contributions exceeding $377 million and no dividends to Mr. Lindberg (Ex. D). He personally guaranteed the affiliates' obligations to the insurers totaling approximately $2.39 billion under the March 11, 2019, Amended and Restated Backstop Agreement, without any regulatory requirement to do so. (Ex. B8) And in May 2018 he directed the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero- coupon bonds—held inside Principal Protected Notes—as dollar-for-dollar principal- loss insurance that, if held to maturity, would have repaid the affiliated-loan principal in full. (Supp. Statement of Facts ¶¶ 27–34 (Doc. 174) & Exs. H2, I2, and I5) A person who reasonably foresees loss does not invest $1 billion of his own capital, guarantee billions in additional obligations, forgo all dividends, and purchase par-payable principal protection against the very loss he supposedly foresees.

C. The regulator approved the affiliate concentration and praised Mr. Lindberg's regulatory performance.

The North Carolina Department of Insurance ("NCDOI") approved the affiliate-investment concentration at issue. As early as a September 2014 presentation (see Ex. A) and

confirmed in the NCDOI's April 11, 2016 annual- statement Review Letter from Senior Financial Analyst Jessica Price, CPA, CFE, the NCDOI recited and agreed to the negotiated regulatory arrangement, including the approximately forty-percent ceiling on affiliated investments (NCDOI Review Letter / Ex. A12). That concentration remains within prevailing industry practice: U.S. life and annuity insurers reported approximately $413 billion in affiliated investments in 2025—roughly twice the 2020 figure (See Ex. B24). Affiliate investments have become standard practice for many of the largest names in the insurance business, including Blackstone, Brookfield, and KKR. Data published by Apollo illustrates that some large life insurers have up to 35 to 43 percent of their assets in affiliated investments, like the 40 percent limit that Mr. Lindberg proposed to the NCDOI in 2014 (See Ex. B5). That many large life insurers have since adopted an affiliate-investment strategy shows that the strategy Mr. Lindberg proposed was neither novel nor particularly controversial; it was an effective way to manage insurance- company assets in a rising-interest-rate environment. (See Ex. B5) The statutory limitation on affiliated investments was not enacted until 2019—after the investments were originated. See Doc. 152. On March 9, 2018, Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state

regulators today" (Ex. B6). The same message reflects that Mr. Lindberg was then working to "engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans" (id.)—actively working to reduce the affiliated-loan portfolio through third-party capital. In short, Mr. Lindberg was continuously responding to regulatory demands related to affiliated investments. This is not the behavior of someone who reasonably foresees a loss on these investments.

D. The 2018 KPMG and Houlihan Lokey valuations confirmed the

loans were well secured.

In 2018, two of the nation's largest and most widely trusted valuation firms— KPMG and Houlihan Lokey—analyzed Mr. Lindberg's assets. Both concluded that the asset values securing the affiliated loans exceeded the balances due on those loans by over $1 billion, and that the loans were conservatively underwritten at approximately fifty-percent loan-to-value (Exs. E2 and E3 (KPMG, Aug. 24, 2018) & HL (Houlihan Lokey, Jan. 18, 2018)). Two well-known and well-trusted authorities concluded that no loss was reasonably foreseeable on these loans in 2018 because they were backed by asset values significantly in excess of the loan amounts. Mr. Lindberg expended approximately $1.8 million on this valuation work, which spans over 380 pages (See Exs. E2 and E3). Given the nationally recognized reputations of KPMG and Houlihan Lokey, it was entirely reasonable for Mr. Lindberg to rely on their work concluding that no loss was foreseeable.

The timing is significant. KPMG completed its valuation work in August 2018, shortly before Mr. Lindberg ceded control of the insurers to the Rehabilitator in October 2018. At all times before that change of control, trusted national authorities

concluded that no loss was reasonably foreseeable on the affiliated loans. At all times after the change of control, the decision to hold the loans for ten years—rather than execute any of the transactions Mr. Lindberg proposed that would have repaid them in full—was the Rehabilitator's, not Mr. Lindberg's.

Two of these contemporaneous work products are submitted herewith and are described by their own terms: the Houlihan Lokey report dated January 18, 2018 (Ex. E3), which

documents each affiliated investment held by Mr. Lindberg's insurers, including enterprise-value-coverage and loan-to-value analysis; and the KPMG valuations (Ex. E2). Each report's stated scope and assumptions appear on its face.

KPMG's August 24, 2018 valuations confirm this point. KPMG separately valued the twenty-one Eli Global operating companies—the borrowers whose enterprise value secured the affiliated loans—at an aggregate business-enterprise value of approximately $2.45 billion, including Global Health Technology Group at $1.2 billion and American Academy Holdings at $900 million, in addition to approximately $1.08 billion of insurance-entity equity value (Ex. E2).

E. Before taking office, the Commissioner planned to "dismantle" Mr. Lindberg's business.

The genesis of the entire case against Mr. Lindberg predates Commissioner Mike Causey's inauguration as North Carolina Insurance Commissioner. In December 2016—weeks before taking office—Causey identified Mr. Lindberg, a major financial supporter of Causey's electoral opponent Wayne Goodwin, as a political problem and "significant impediment" to be eliminated. Witness statements establish that Causey plotted to "dismantle" Mr. Lindberg's insurance operations even before assuming any official authority (See Exs. A3, A3.1, A4).

According to one witness, Causey stated that he "was concerned about a multi- millionaire named Greg Lindberg who had strongly supported Goodwin during the last election" and that Causey "saw Lindberg as a significant impediment to winning the [upcoming 2020] election against Goodwin." The same witness stated that "Causey said that he had a person in mind" to help him eliminate Lindberg as a political threat, noting that "she had been at the DOI a long time" and "she already didn't like Lindberg and would know how to go about dealing with [Lindberg's] companies and dismantling them" (Id.).

A second witness corroborated these statements: "Causey explained to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin's campaign in the election that Causey had just won. Causey said that because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him" (See Exs. A3, A3.1, A4).

This all casts doubt on the legitimacy of the subsequent rehabilitation proceedings. Moreover, because the affiliated investments had already received NCDOI approval, the severity of these regulatory actions was entirely unforeseeable.

F. Mr. Lindberg ceded control to the Rehabilitator in October 2018, and the Rehabilitator proceeded to pay himself and others over $165 million in fees.

In October 2018, control of the North Carolina insurers passed to the court- supervised Rehabilitator. Every event material to the claimed loss occurred after that date and was within the control of the Rehabilitator and the Government, rather than Mr. Lindberg. The record reflects that over $165 million in fees have been paid from the insurance-company estates to the Rehabilitator and others since June 2019. This includes an estimated $25 million in compensation to the Rehabilitator, an estimated $30 million paid to the Williams Mullen law firm, and ongoing monthly fees of approximately $2.5 million to the Rehabilitator and various advisors (See Ex. M).

G. A series of intervening acts destroyed value after October 2018.

The Blocked Ares Sale. On November 22, 2018, just weeks after becoming aware of the federal investigation and before he was charged with any offense, Mr. Lindberg signed an exclusive letter of intent to sell his North Carolina insurers to Ares Management for approximately $450 million, a transaction that would have preserved policyholder benefits without interruption (Ex. G). Eli Global's Chief Financial Officer, Christa Miller, contemporaneously memorialized—in a January 6, 2019 email to the company's general counsel, Peter Nordberg—that, following Ares's meeting with the Department of Justice, Ares stated it had been advised by an undisclosed "third party constituent… to avoid any ongoing connection to Eli Global," refused to identify the source, and abandoned the term under which it would have retained affiliated loans through an SPV (Ex. A15 (Miller email, Jan. 6, 2019)).

The Rejected Oaktree Transaction (February 2019). The Rehabilitator rejected a proposed transaction with Oaktree that would have created an approximately $1 billion special-purpose vehicle to purchase all the affiliated loans from the insurers. The transaction, if consummated, would have paid the loans off in full.

The Coerced Ten-year Hold (June 2019). Under threat of liquidation (see Ex. D5), the Rehabilitator required Mr. Lindberg to agree to a Memorandum of Understanding obligating a ten-year hold of the affiliated loans. This converted a position that could be exited into a forced long-term hold and foreclosed the very transactions that would have repaid the loans (see Ex. A14).

The Bond Fire-sale. The Rehabilitator sold the zero-coupon bond portfolio before maturity for approximately $394 million, rather than holding it to the contractual par value of $1,006,239,867, thereby crystallizing a loss of approximately $611.6 million and destroying the principal protection that would have repaid the affiliated loans in full at maturity (see Exs. H, H2, I2, and I5).

Litigation Against Willing Counterparties (Montshire/Alban, 2023) and the Rejected Quadro Transaction (2024). Rather than transacting with counterparties to avert losses, the Rehabilitator litigated against them, and later rejected the Quadro transaction—both of which would have protected policyholders (See Exs. O and O2).

H. The Plea Agreement and Factual Basis.

In the Factual Basis, the parties agreed that Mr. Lindberg's conduct involved "circular, non-economic transactions" and materially false statements "regarding these transactions," and that his "conduct caused substantial financial hardship"

such that "certain of [his] insurance companies were placed in rehabilitation." Doc. 42 at ¶¶ 5–6. Mr. Lindberg does not dispute those facts. The Factual Basis does not, however, admit any loss amount, does not admit that the $1.655 billion figure was foreseeable, and does not attribute to Mr. Lindberg the Rehabilitator's later conduct.

In the Plea Agreement, the parties jointly stipulated, for Guidelines purposes only, that "[t]he amount of loss that was known to or reasonably foreseeable by the defendant exceeded $550,000,000," while expressly providing that "'loss' under U.S.S.G. § 2B1.1 may be different from, greater, or lesser than restitution." Doc. 40 at ¶ 8(a). This does not relate to restitution. In Paragraph 10(a), Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Id. The Plea Agreement fixes no restitution amount, and the Plea Agreement provides no admission by Mr. Lindberg of any reasonably foreseeable loss for restitution purposes. This remains a de novo determination for the Court on causation and

reasonably foreseeable loss for restitution purposes and the Court has already said that the "real loss was risk" 2.

2 The government in its Sentencing Memo explicitly acknowledges that the laws in North Carolina on affiliated investments did not change until 2019—after the relevant conduct in this case and after the affiliated investments were originated. Therefore, there is no basis for restitution based on risk. Doc. 152. The MVRA requires actual loss and does not pay restitution for "risk."

I. The Special Master's recommendation and the Preliminary

Order.

The Special Master recommended restitution of approximately $1.625 billion. On the report's own figures, the principal-only measure of loss—unpaid principal, net of credited recoveries—is approximately $1.362 billion; the recommendation reaches $1.625 billion only by adding approximately $263 million of "time value of money" interest, computed at a rate the Special Master selected over Mr. Lindberg's objection. The Preliminary Order of Restitution then entered $1,655,000,000—approximately $30 million above even the Special Master's recommendation—without explanation on the record. Doc. 161 at 3. No accounting accompanied the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25).

J. The Special Master has continued to dispose of estate assets

during the restitution proceeding.

Value-destroying conduct by third parties did not end in 2019; it has continued into this proceeding. The Special Master has disposed of estate assets before any final restitution determination. The Special Master owes a fiduciary duty to the court, the Insurance Companies, and Mr. Lindberg to seek court approval as soon as he learns of a sale. The Special Master's sale of estate assets relating to a restitution asset— whether by misfeasance, malfeasance, or non-feasance—without court approval violates the MVRA and constitutional limits on the Special Master's powers. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting for the proceeds (See Ex. B25). The Special Master's

compensation, and that of his professionals, is paid from the same administered assets he sells, creating a structural incentive to sell. And the Special Master has sought from Mr. Lindberg a waiver of claims relating to these dispositions. Doc. 159. A fiduciary does not seek a release for conduct that creates no exposure; the request itself confirms that the dispositions generate a diminution in value independent of Mr. Lindberg's conduct. These dispositions—conducted before a final determination, in part without court approval, and under a financial conflict—also raise serious constitutional concerns that Mr. Lindberg addresses in separate filings.

ARGUMENT

I. Restitution is Limited to Actual Losses Proximately Caused by the

Offense—A Limitation the Plea Agreement Preserves.

The MVRA authorizes restitution only for "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and only for "the loss caused by the specific conduct that is the basis of the offense." Hughey v. United States, 495 U.S. 411, 413 (1990). The statute defines a victim as one "directly and proximately harmed," 18 U.S.C. § 3663A(a)(2), importing a proximate-cause requirement that asks, "whether the harm alleged has a sufficiently close

connection to the conduct." Robers v. United States, 572 U.S. 639, 645 (2014) (citations omitted). Proximate cause is "often explicated in terms of foreseeability" and forecloses liability for losses "caused in only a remote sense." Paroline v. United States, 572 U.S. 434, 445, 449 (2014). The legislative history confirms this limit in Congress's own words: mandatory restitution provisions "apply only in those instances where a named, identifiable victim suffers a physical injury or pecuniary loss directly and proximately caused by the course of conduct

under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. In this Circuit, a person is a "victim" only if the harm results from "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is itself an element of that offense, United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996); United States v. Davenport, 445 F.3d 366, 374 (4th Cir. 2006), abrogated on other grounds by Irizarry v. United States, 553 U.S. 708 (2008); a "factual connection" between the offense and a loss "is legally irrelevant" where the specific conduct underlying the conviction did not cause the loss, United States v. Broughton-Jones, 71 F.3d 1143, 1149 (4th Cir. 1995); and conduct that "may have exacerbated" a harm but "did not cause it" cannot support restitution, United States v. Freeman, 741 F.3d 426, 438 (4th Cir. 2014). The MVRA is read to its terms, not expanded to serve its remedial aims. Lagos v. United States, 584 U.S. 577, 582–85 (2018).

These limits are not displaced by Paragraph 10(a) of the Plea Agreement. It commits Mr. Lindberg to "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by [his] criminal conduct." Doc. 40 at ¶ 10(a). The Plea Agreement explicitly states that restitution under 18 U.S.C. § 3556 "may be different from, greater, or lesser than" the loss under U.S.S.G. § 2B1.1. Id. Therefore, restitution under 18 U.S.C. § 3556 can be zero or in fact overpaid.

The Government drafted that language, and any ambiguity in it must be resolved against the Government and in favor of Mr. Lindberg. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986); United States v. Jordan, 509 F.3d 191,

195–96 (4th Cir. 2007). Two features of ¶ 10(a)'s own text are dispositive here. It reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate. And "regardless of the resulting loss amount" speaks to quantum, confirming the figure is not tied to the § 2B1.1 loss calculation—but rather to causation. Id. Read as its terms require, ¶ 10(a) does not abandon the requirement, central to Hughey and to the MVRA alike, that the loss be caused by the conduct. That reading mirrors the statute's own design: under the MVRA, "unlike sentencing, the broader concept of 'relevant conduct' does not expand 'the offense of conviction.'" United States v. Elbaz, 52 F.4th 593, 610 (4th Cir. 2022) (quoting United States v. Llamas, 599 F.3d 381, 390–91 (4th Cir. 2010)); accord United States v. Newsome, 322 F.3d 328, 341 (4th Cir. 2003). Paragraph 10(a) expands the conduct covered by contract; it does not repeal the causation limit its own words impose.

Proximate cause has two components, and the claimed loss fails both: the loss was not reasonably foreseeable at origination (Part II), and intervening causes severed any connection between Mr. Lindberg's conduct and the loss (Part IV). Separately, "risk" is not a compensable actual loss (Part V); the Government has not carried its burden (Part VI); and offsets extinguish any obligation (Part VIII).

A. In re Zetteler is the law of this case and fixes the governing

proximate-cause standard.

The controlling causation standard is not borrowed from other litigation; the Fourth Circuit announced and applied it in this very docket. In denying the Crime Victims' Rights Act mandamus petition brought by the Conservatrix insolvency practitioners, the Fourth Circuit held that a person is a compensable victim only

where "directly and proximately harmed," and that the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked"; it sustained the exclusion of that petitioner precisely because it failed to tie its asserted harm to Mr. Lindberg's "criminal activities." In re Zetteler, No. 26-1749, WL 1724731 at *2 (4th Cir. June 13, 2026) (per curiam) (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). Because that determination was made by the court of appeals in this case, it is the law of the case: "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). This Court is bound to apply, in the restitution phase, the same proximate-cause standard the Fourth Circuit applied in this case. That the disposition is unpublished bears only on its weight as precedent in unrelated cases, see 4th Cir. R. 32.1; it does not diminish—and cannot displace— its force as the law of this case. And the standard is materially identical under the MVRA and the CVRA, which define "victim" in the same terms. Compare 18 U.S.C. § 3663A(a)(2), with id. § 3771(e)(2)(A).

The consequence is direct and symmetrical. The same "closely related" test that the Fourth Circuit applied in this case to exclude a claimant whose harm was not closely tied to the offense must, applied evenhandedly, exclude the losses— developed in Parts III and IV below—that were caused not by Mr. Lindberg but by the Government, the Rehabilitator, and the Special Master. That is not merely a persuasive authority; it is the rule of decision the Fourth Circuit has already established in this case, and it is the organizing theory of this motion.

II. No Loss Was Reasonably Foreseeable at Origination (Proximate

Cause: Foreseeability).

The Government bears the burden of proving, by a preponderance, that the claimed loss was a reasonably foreseeable result of Mr. Lindberg's conduct. [3] 18 U.S.C. § 3664(e). It cannot. In the Fourth Circuit, restitution reaches a loss only where the loss is a "direct result" of the defendant's conduct or is "closely related to the scheme." United States v. Henoud, 81 F.3d 484, 488 (4th Cir. 1996) (citations omitted); accord United States v. Karam, 201 F.3d 320, 325 (4th Cir. 2000). See also United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996) (a person is a victim only where the harmful act is "conduct underlying an element of the offense of conviction" or an act in furtherance of a scheme that is an element of the offense). Foreseeability is measured as of the time the defendant acted—by what he knew or reasonably should have known then. Cf. United States v. Shephard, 892 F.3d 666, 672–73 (4th Cir. 2018) (assessing foreseeability of harm from the defendant's vantage point at the time of the conduct). The Factual Basis admits no loss amount and no foreseeability of the $1.655 billion figure; the only foreseeability figure Mr. Lindberg ever stipulated is the

3 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. 163, 166 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000);

Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

">$550,000,000" Guidelines figure, which the Plea Agreement expressly decouples from restitution. Doc. 40 at ¶ 8(a). The contemporaneous record affirmatively negates foreseeability of loss: • Mr. Lindberg's insurers operated under a written Risk Mitigation Policy requiring first-lien senior-secured positions, minimum NRSRO ratings, portfolio leverage caps, arm's-length pricing opinions, and annual cash-flow testing to confirm assets were adequate to service liabilities. (Ex. C.) • He guaranteed roughly $2.39 billion of the affiliates' obligations under the March 11, 2019 Backstop Agreement (Ex. B8), invested roughly $1 billion of his own capital with no dividends (Ex. A11), and directed the purchase of $1,006,239,867 in par value of bank zero-coupon bonds to insure the affiliated- loan principal dollar-for-dollar (Supp. Statement of Facts ¶¶ 27–34). • The regulator approved the affiliate concentration—confirmed in the NCDOI's April 11, 2016 Review Letter (Ex. A12)—and, in the relevant period, praised Mr. Lindberg's regulatory performance in writing (Ex. B6). Affiliate concentrations of this magnitude remain ordinary: U.S. life and annuity insurers reported roughly $413 billion in affiliated investments in 2025, about twice the 2020 level. (See Exs. B5 and B24) • The legal limitation on affiliated investments was enacted only in 2019—after origination. Doc. 152. A loss produced by a later change in law is not a foreseeable consequence of the origination.

Persuasive authority confirms the point: foreseeability is measured by what the defendant could anticipate when he acted, and the economic harm "ultimately suffered" must be a foreseeable consequence of the conduct. Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 197 (2d Cir. 2003), disapproved of by Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435 (S.D.N.Y. 2007). Where, as here, nationally recognized advisors were engaged to analyze and document the positions, and the regulator itself approved the concentration and praised the conduct, the Government cannot show that loss was reasonably foreseeable. As set out in the Statement of Facts § D, both KPMG and Houlihan Lokey concluded in 2018 that the asset values securing the affiliated loans exceeded the loan balances by over $1 billion, at approximately fifty-percent loan-to-value (See Exs. E2 and E3, KPMG & Houlihan Lokey Valuations).

By way of illustration: imagine you build your house on high ground, buy flood insurance, and have three engineers certify that it is safe and dry. Then a stranger bulldozes your levee and deliberately floods the house. The law requires payment only for losses a person could reasonably see coming when he acted—and a person who guarantees the loans himself, invests a billion dollars of his own money, buys a billion dollars of bonds as insurance, and hires the top firms in the country to check the numbers is not a person who foresaw a loss.

The Motion should be granted for this reason alone. The record forecloses any showing that loss was reasonably foreseeable. A loss that no reasonable person saw coming cannot support restitution under the MVRA.

III. The Offense Conduct Procured No Official Or Agency Action, And So

Did Not Cause The Loss (Proximate Cause: No Agency Action).

The Fourth Circuit's decision in this case draws the line that decides causation—the line between the entity and its agent. In vacating the original convictions, the court held that the "business" that 18 U.S.C. § 666 protects "is not the business of the agent receiving the

bribe but, rather, the business of the entity on whose behalf the agent is authorized to act." United States v. Lindberg, 39 F.4th 151, 174 (4th Cir. 2022) (emphasis in original). That distinction is dispositive. The conduct of conviction concerned a staff reassignment—which deputy commissioner would be assigned to review Mr. Lindberg's companies. A reassignment of staff is an act of the agent, not of the entity: it is not an act of the North Carolina Department of Insurance, whose business is the external regulation of insurers, and there is no evidence that the Department took any regulatory action—no examination, no order, no change in enforcement—as a result of the conduct. (Ex. W.)

The Supreme Court's definition of an "official act" confirms the point. An official act must involve "a formal exercise of governmental power" that is "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," and must be more than "[s]etting up a meeting, talking to another official, or organizing an event[.]" McDonnell v. United States, 579 U.S. 550, 574 (2016). The reassignment of a deputy is none of these. The Court's most recent construction of the bribery statute confirms the trend: § 666 reaches only a bribe to influence an official act. Snyder v. United States, 603 U.S. 1, 19 (2024).

The causation consequence follows directly. The offense procured no action by the entity. The $1.655 billion loss, by contrast, could arise only from action by the entity and its court-appointed successors—the Department's October 2018 supervision, the 2019 rehabilitation, and the Rehabilitator's and Special Master's later decisions (Part IV). Conduct that set no Department action in motion cannot be the proximate cause of a loss that only the Department's (and its appointees') actions could produce, and no such loss was foreseeable from it. This goes to causation, not guilt: taking the conviction as given, the offense still procured no exercise of the entity's regulatory power.

The Court's own view of the offenses is consistent. At sentencing, the Court explained that it had "always viewed this once, with the two cases together, because they were really part of the same thing." (Sentencing Tr. 47 (May 26, 2026); Ex. ST.) The constitutional character of the conduct confirms the point: the payments were campaign contributions—made through an independent-expenditure committee and the North Carolina Republican Party (Ex. W, at 8)—which the First Amendment protects, see Citizens United v. FEC, 558 U.S. 310 (2010); McCutcheon v. FEC, 572 U.S. 185 (2014), and which the Supreme Court reaffirmed in 2026 may be reached only as "contributions in exchange for official action," Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n, No. 24-621, 2026 WL 1868932, at *8 (U.S. June 30, 2026). A contribution that bought no official act procured no governmental action, and a loss flowing from governmental action the contribution never procured was not a foreseeable consequence of it.

The trial record confirms that Mr. Lindberg never sought any action from the entity. Even while secretly recorded, he asked only for fair, rigorous regulation: he said he was "happy to be well regulated" and "just [did not] want to be subject to personal vendettas," and that all he sought was "an even playing field." (Ex. W (quoting GEL Exh. 164, at 36:3–5; GEL Exh. 195, at 19:4–11).) He asked the Commissioner to assign a competent, unbiased regulator—Debra Walker—precisely because she was tough and fair: "Debbie will do a competent job, and a very rigorous job, but she doesn't have a built in bias against us … She's going to be tough and fair, that's all we need." (Ex. W (quoting GEL Exh. 189, at 18:14–17).) The second trial produced no evidence that Mr. Lindberg ever asked the North Carolina Department of Insurance—the entity—to take any action whatsoever.

The regulator Mr. Lindberg suggested confirmed the point. Testifying for the Government, Ms. Walker stated that there was no “side deal” with Mr. Lindberg or his companies, that no one ever approached her about anything inappropriate, and that there was “no type of guaranteed financial benefit … from her looking over the files instead of Jacquelyn Obusek.” (Ex. W (Day 6 Rough Tr. 28:16–22; id. 25:7–9).) The Government conceded in closing that there was “no evidence” that Ms. Walker “was corrupt or had some sort of side deal” with the Defendants. (Ex. W (Day 7 Rough Tr. 19:10–11 (Gov’t Closing)).) A request for a regulator who will do no favors is not the purchase of an official act.

That the diminution in value was set in motion by a political vendetta only confirms that no such loss was foreseeable. The record reflects that Commissioner

Causey targeted Mr. Lindberg’s insurance group for “dismantling” before he took office, and that the long-serving Department employee he “had in mind” to accomplish it was the very deputy—Jacquelyn Obusek—whose apparent bias led Mr. Lindberg to seek her replacement, and whom Causey later promoted. (Ex. A3 (Loftin Aff.); Ex. A4 (Thompson Interview); Ex. K2 (Closing Demonstratives).) A loss on affiliated investments was not a reasonably foreseeable consequence of asking that a biased deputy be replaced with a tough, fair regulator who testified she would give Mr. Lindberg no favor. A Commissioner’s determination to dismantle the business of his electoral opponent’s largest supporter is a rare, one-time event that no reasonable person originating an affiliated-investment program could have anticipated.

IV. Intervening Superseding Causes Broke the Chain of Causation

(Proximate Cause: Intervening Cause).

Even if some losses were assumed, the chain of proximate causation was severed by independent intervening acts that occurred after October 2018 and that Mr. Lindberg neither caused nor could have foreseen. Congress made the point explicit: “A loss caused in part by intervening circumstances cannot be said to have been directly and proximately caused by the offense of conviction, unless the intervening cause is related to or a foreseeable consequence of that offense,” and restitution should not lie where the conduct “is too far removed, either factually or temporally, from the loss.” S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. A sentencing court accordingly “should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant,” and a restitution order entered without findings on the

effect and foreseeability of such events must be vacated. United States v. Stein, 846 F.3d 1135, 1154–56 (11th Cir. 2017). The Ninth Circuit’s decision in United States v. Tyler is directly on point: a defendant convicted of timber theft could not be ordered to pay the amount the timber “declined in value” after it was returned, because “[a]ny reduction in its value stems from the government’s decision to hold the timber during a period of declining prices, not from [the defendant’s] criminal acts.” 767 F.2d 1350, 1352 (9th Cir. 1985). So too here: control of the insurers returned to the Rehabilitator in October 2018, and any later diminution stems from the Rehabilitator’s decisions— not from Mr. Lindberg’s offense. Stein, 846 F.3d at 1154–56. The Fourth Circuit enforces the same limit, vacating restitution where the loss is fixed by events outside the scope of the offense conduct. United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009) (restitution “is to be based upon the loss directly and proximately caused by the defendant’s offense conduct” (citing S. Rep. No. 104-179, at 19)); see also United States v. Goodrich, 12 F.4th 219, 228–29 (2d Cir. 2021). Critically, each intervening act below also falls outside Paragraph 10(a), because none is harm “caused

by the defendant's criminal conduct." Doc. 40. The Fourth Circuit polices the same line: a "factual connection" between offense and loss "is legally irrelevant" absent causation by the conviction conduct, Broughton-Jones, 71 F.3d at 1149; conduct that "may have exacerbated" a harm but "did not cause it" supports no restitution, Freeman, 741 F.3d at 438; and losses from an "uncharged" scheme cannot be recovered, because "it would ... be inappropriate to penalize [the defendant] as though he was also convicted of that offense." United States v. Ocasio, 750 F.3d 399, 412–13 (4th Cir. 2014). Nor does

United States v. Ritchie, 858 F.3d 201, 211 (4th Cir. 2017), aid the Government: Ritchie faulted a defendant who "presented no evidence" of a superseding cause; Mr. Lindberg carries that burden with contemporaneous record evidence of affirmative, unilateral acts of value destruction—not a victim's mere delay in a falling market.

By way of illustration: think of a relay race. Mr. Lindberg ran the first leg and handed the baton to the Rehabilitator in October 2018. Everything that went wrong happened on the Rehabilitator's leg of the race—not Mr. Lindberg's.

A. The Government's interference with the Ares sale (November 2018).

Mr. Lindberg signed an exclusive LOI to sell the insurers to Ares for approximately $450 million, preserving policyholder benefits. (Ex. B.) Following Ares's contact with the Department of Justice, Ares cited undisclosed third-party advice to "avoid any ongoing connection to Eli Global" and abandoned a key favorable term. (Ex. A15.) The intervening cause here is not merely a counterparty's commercial change of heart; it is governmental interference with a signed, value- preserving transaction—an act of the Government itself, separate from and additional to the Rehabilitator's later conduct. Such interference was not a foreseeable consequence of underwriting an affiliated loan, and the loss it produced is not harm "caused by the defendant's criminal conduct." Cf. United States v. Gibbens, 25 F.3d 28, 29, 36 (1st Cir. 1994) (the "sovereign is not entitled to restitution" for a loss the Government itself "provoke[d]"; a loss set in motion by the Government's own conduct is not the kind of harm the restitution statutes compensate).

B. The Rehabilitator's refusal of the Oaktree transaction (February 2019).

Within weeks of the Ares termination, Mr. Lindberg personally directed the negotiation of an independent, arm's-length transaction with Oaktree Capital Management, L.P.—one of the world's largest credit-focused asset managers. The February 2019 Oaktree "Global Solution Presentation" proposed an approximately $1.0 billion Oaktree investment into a holding-company special-purpose vehicle that would have acquired the affiliated-loan positions held by the insurers and 100% of the GBIG equity, removing the affiliated loans from the insurers' balance sheets at face value. (Supp. Statement of Facts ¶ 72 & see Exs. C and C2) Had the Rehabilitator permitted the transaction to close, every NCIC policyholder would have been paid in full by approximately June 2019. The Rehabilitator discretionarily elected not to proceed. That second refusal—of a second sophisticated buyer pricing the same portfolio at face value within four months of the first—is the proximate cause of the loss of the Oaktree alternative; it is not Mr. Lindberg's conduct.

C. The Rehabilitator's coercion of the ten-year hold (June 27, 2019 MOU).

Having refused both face-value exits, the Rehabilitator then foreclosed any future exit. The Memorandum of Understanding was first proposed on or about May 9, 2019; Mr. Lindberg met with the Rehabilitator in Durham, North Carolina in late May or early June 2019; and on June 27, 2019, the Rehabilitator presented the MOU on a take-it-or-leave-it basis under express written threat of immediate liquidation of all four NCICs. (Supp. Statement of Facts ¶ 34, 56-57 and see Ex.

D5.) The MOU affirmatively locked the affiliated loans in place for a ten-year term, converting a marketable portfolio—one that two buyers had just offered to purchase at par—into a forced decade-long hold. The Rehabilitator's counsel characterized the tactic as a "hammer and nail" used to extract representations and warranties under the same liquidation threat. Id. at ¶ 34 and see also Wake County MOU Trial Tr. (Vol. 5, p. 1012:11–12) ("Mr. Lindberg, you're the nail. I'm the hammer"). The election to hold the loans for ten years rather than monetize them was the Rehabilitator's, and it is that election—not the origination years earlier—that drove any subsequent diminution in recoverable value. See Davenport, 445 F.3d at 374 (4th Cir. 2006), abrogated on other grounds by Irizarry v. United States, 553 U.S. 708 (2008) (Davenport's restitution holding is intact).

By way of illustration: two buyers were ready to pay full price. The Rehabilitator, holding the threat of shutting the companies down, forced Mr. Lindberg to promise to keep the loans locked in a drawer for ten years instead of selling them. You cannot lock someone's car in a garage for ten years, refuse to let him sell it, and then bill him for the rust.

D. The Rehabilitator's pre-maturity fire-sale of the principal-

protection bonds (2019).

In May 2018, Mr. Lindberg had directed the insurers to purchase $1,006,239,867 in par value of investment-grade zero-coupon bonds—held inside Principal Protected Notes for the sole purpose of insuring the affiliate-loan principal dollar-for-dollar. (Supp. Statement of Facts ¶¶ 27–34 and see Exs. H, H2, and I2) After taking control, the Rehabilitator made the unilateral decision to sell those

bonds before maturity for approximately $394 million—less than forty cents on the dollar of guaranteed par—crystallizing a loss of approximately $611.6 million on the very instruments whose only function was to prevent loss. Id. at ¶¶ 38–39. He did so without the advance approval of the Wake County Superior Court that N.C. Gen. Stat. § 58-30-85 and the June 27, 2019 Consent Order of Rehabilitation required for material asset dispositions. Id. at ¶ 45. And he ignored at least three loss-free alternatives—holding the bonds to maturity, using them to credit-enhance a sale, or borrowing against them. Id. at ¶ 40.

This is the paradigm of a superseding cause. The Supreme Court has held that a victim's own independent decision regarding collateral can break the chain of proximate causation, Robers v. United States, 572 U.S. 639, 647–48 (Sotomayor, J., concurring); where a passive decision to hold collateral too long can break the chain, a fiduciary's affirmative decision to liquidate a held-to-maturity, par-payable principal-protection instrument before maturity—forgoing $611.6 million of contractually mandated value—breaks it a fortiori. The crystallized loss is "attributable to the victim's independent decisions" and cannot be charged to Mr. Lindberg. Id. at 648; accord United States v. Tyler, 767 F.2d 1350, 1352 (9th Cir. 1985) (loss from holding asset "during a period of declining prices" is not caused by the offense). Id. at 648. Mr. Lindberg bought a billion-dollar insurance policy—bonds guaranteed to repay the loans in full if you simply waited for them to mature, like a savings bond you cash at the end. The Rehabilitator tore up that policy early and sold

it for forty cents on the dollar, throwing away $611 million. That loss does not belong to the person who bought the insurance policy to protect against the loss.

E. The Rehabilitator's refusal of the Montshire/Alban offer (2023)

and blocking of the Quadro transaction (2024), followed by the Clanwilliam fire-sale (2025).

The pattern continued. In 2023, Mr. Lindberg negotiated with Montshire Advisors and an investment group formed by Bob Alban to submit a purchase agreement to the NCDOI for the insurers—a transaction that, like Ares and Oaktree, would have paid every policyholder in full. The Rehabilitator not only rejected the offer; he filed litigation against Mr. Alban. (Supp. Statement of Facts ¶ 117 and Exs. O and O2.) Then, in the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion—and Clanwilliam alone at $880 million. (Supp. Statement of Facts ¶ 118; and see Exs. G2, I3, I4.) The Rehabilitator blocked the Quadro transaction over Mr. Lindberg's repeated objections, and then, in September 2025, forced a below-market fire-sale of Clanwilliam to TA Associates for $450 million—a destruction of approximately $474 million in value attributable entirely to the Rehabilitator's discretionary decision to block Quadro. Id.

F. The Special Master's continuing asset dispositions (2026).

The chain of intervening causation extends into the present proceeding. Since his appointment, the Special Master has disposed of estate assets before any final restitution determination. With respect to the Beckett transaction, the sale occurred without court approval, and the record does not reflect an accounting of proceeds. At

the same time, the Special Master's compensation is derived from the assets administered, and he has sought a waiver of liability for actions taken in that role (See Ex. B25 and see Doc. No. 159).

These actions were undertaken independently by the Special Master. To the extent the claimed loss reflects value attributable to the disposition of these assets, that reduction cannot be attributed to Mr. Lindberg.

Applying Robers, Paroline, Stein, and Squirrel, the losses produced by these intervening acts are "more aptly described as mere fortuity" than as harm proximately caused by Mr. Lindberg, and they are not harm "caused by the defendant's criminal conduct" within Paragraph 10(a). Doc. 40. As Part I.A establishes, the "closely related" proximate-cause test the Fourth Circuit applied in this case is the law of the case, In re Zetteler, supra; the same test that excluded a claimant whose harm was not closely tied to the offense excludes the Government-, Rehabilitator-, and Special Master-caused losses here. Because the conduct by these third parties has continued into the present proceeding, the chain of causation remains broken as of this determination: the Government cannot establish proximate causation between Mr. Lindberg's conduct and the claimed loss even now. At least for this reason, the Motion should be granted.

V. "Risk" Is Not Actual Loss, And Restitution Is Capped at Actual Loss.

This Court has characterized the "real loss" in this case as "risk." (See Sentencing Transcript) That characterization is dispositive. Restitution is owed only "in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), measured by

realized actual loss, Hughey, 495 U.S. at 413. Risk of loss is not actual loss; a victim who has suffered no realized loss has no "loss" to compensate. Although the Supreme Court has held that MVRA restitution is criminal punishment, the Fourth Circuit enforces both

halves of that rule: restitution "must be based on actual loss," not intended loss, United States v. Harvey, 532 F.3d 326, 340–41 (4th Cir. 2008), and the MVRA "makes clear that the defendant is expected from the outset to repay all of the actual losses that he caused, but no more," United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018) (citations omitted) (arising from this District). Ellingburg v. United States, 607 U.S. 163, 166 (2026), it remains a loss-measured sanction—not a free- standing fine—and it may not be imposed in an amount untethered from a realized actual loss. The point is concrete: even though the Special Master has determined that in this case the policyholders are not victims (and only the insurance companies are the victims), they have been "made completely whole" and "confirmed paid in full" (Ex. D7 and Docket 100). Where the protected victims are whole (indeed overpaid by $1.2 billion per Mr. Lindberg's filings) and the Court's premise is "risk," the actual loss attributable to Mr. Lindberg is zero.

By way of illustration: there is a difference between the chance of getting hurt and actually getting hurt. Driving a car always carries a risk of an accident, but the law does not require payment for a crash that never happened. The Court said the "real loss was risk"—and the policyholders were paid every penny. A defendant cannot be ordered to repay money that was never actually lost.

To the extent the figure rests on an interest enhancement, that enhancement compounds the error. Restitution is now criminal punishment, Ellingburg, supra; the facts that fix a penal amount must be found by the Court, and—on Mr. Lindberg's submission—beyond a reasonable doubt under Apprendi v. New Jersey, 530 U.S. 466, 476 (2000), and Southern Union Co. v. United States, 567 U.S. 343, 350 (2012). A quarter-billion-dollar interest component selected by a court adjunct, over objection and without the Court's own findings, and in violation of the DOJ's own policy forbidding interest awards in restitution, cannot satisfy even the preponderance standard, let alone a higher one. 4 The Motion should be granted for this reason alone.

4 The Special Master recommends that "some interest component" should be applied to the Affiliate Investment balances "to account for the time value of money." Doc. 106 at 3-4. Based on a 2.19% interest rate (representing the 30-Day U.S. Treasury rate as of June 27, 2019, through March 31, 2026), the Special Master proposes adding an additional $263 million in restitution for "post-IALA interest."

App'x 3 at 8. This is legal error.

As a threshold matter, the MVRA does not expressly include interest among the compensable forms of financial loss recoverable through restitution. And more specifically, DOJ policy recognizes this fact; it expressly excludes interest as a "financial loss," clarifying that it is "not eligible for restitution." Therefore, any interest should be excluded from any restitution calculation.

An award of interest is also contrary to the plain language of the MVRA. As explained above, the MVRA requires "offenders to restore property lost by their victims as a result of the crime." Robers, 572 U.S. at 640. And it provides two ways for a sentencing court to accomplish that: by ordering a defendant to either "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A) or, "if return of the property . . . is impossible, impracticable, or inadequate," to pay an amount equal to "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence" less the value of any part of the property that is returned. Id.

§ 3663A(b)(1)(B).

Notably, there is no provision under the first option—subsection (b)(1)(A)—for a court to add interest when the defendant can return the property at issue. Where, as here, the "property" at issue is cash, the only option for the Court is to order Mr. Lindberg to "return the property to the owner" under subsection (b)(1)(A). As the

Supreme Court taught in Robers, if "the 'property that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property . . . returned' must also be the money." 572 U.S. at 643 (alterations in original). And "money being fungible," the return of any cash equivalent to the amount the victim lost satisfies the statute. Id. In contrast, where a defendant takes something other than cash and cannot return that specific piece of property (e.g., a necklace) because it would be impossible, impracticable, or inadequate to do so, then the Court must determine the "value of the property" on the date of the loss or at the time of sentencing under subsection (b)(1)(B).

The property that the Pre-Designated Restitution Parties lost is cash—the money taken out of the companies via Affiliate Investments. And an order directing Mr. Lindberg to return that "property"—the amount of cash taken—fully satisfies the MVRA. 18 U.S.C. § 3663A(b)(1)(A). Accordingly, under a straightforward application of the MVRA, any award of interest is inappropriate.

To be sure, a handful of other circuit courts have allowed prejudgment interest to be included in a restitution order. See, e.g., United States v. Qurashi, 634 F.3d 699, 704 (2d Cir. 2011); United States v. Fike, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). But these cases were wrongly decided, and none is binding on this Court. Both the Second Circuit in Qurashi and the Sixth Circuit in Fike incorrectly assumed that the amount of restitution in the case was governed by subsection (b)(1)(B). See Fike, 140 F.4th at 356 (citing 18 U.S.C. § 3663A(b)(1)(B) for the proposition that "a victim's losses may change in value between the date of the loss and the date of sentencing"); Qurashi, 634 F.3d at 703 (similar). But as explained above, a court may apply subsection (b)(1)(B) only where a defendant returns substitute property because it is impossible, impracticable, or inadequate to return the property that was taken; that subsection has no application where, as here and in both Fike and Qurashi, a victim lost cash that a defendant can return.

Nor has the Fourth Circuit held that prejudgment interest may be awarded under the MVRA. Although the Special Master claims the Fourth Circuit authorized interest on restitution in United States v. Hoyle, 33 F.3d 415, 420 (4th Cir. 1994), see App'x 3, at 10, Hoyle was decided prior to the enactment of the MVRA and focuses on the unremarkable proposition that the determination of loss for sentencing and restitution are separate inquiries. It therefore does not speak directly to when interest qualifies as a compensatory form of damages under the MVRA. See Hoyle, 33 F.3d at 420.

At bottom, the Special Master's proposal cannot be squared with the law. Restitution is not concerned with a victim's "disappointed expectations" but only with his actual loss. United States v. Boccagna, 450 F.3d 107, 109 (2d Cir. 2006); United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017). Thus, restitution is not meant to "guarantee the benefit of any bargain." Id. And it "cannot include consequential damages." United States v. Coats, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Court has identified the real loss as risk, the victims have been confirmed paid in full, and restitution measured by actual loss is therefore zero.

VI. The Government and the Special Master Did Not Carry the Section

3664(e) Burden.

"Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and the "burden of demonstrating the amount of the loss… shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The restitution order must rest on findings adequate for review. Karam, 201 F.3d at 325. Courts "abuse their discretion by granting the defendant a 'bailout' or by

Here, interest is not part of the Pre-Designated Restitution Parties' actual loss. Instead, it constitutes recompense for the benefit of the parties' bargain—the time value of money while the insurance companies provided loans covering the Affiliated Investments. Accordingly, any interest would exceed the restitution statutorily allowed by the MVRA.

Courts applying these principles have excluded interest from restitution awards or at least reduced the amount of the award to avoid giving the victims more than they are statutorily eligible to receive. In United States v. Jesenik, the court explained that "accrued but unpaid interest" on an investment does not constitute part of a victim's actual losses. 702 F. Supp. 3d 1024, 1039 (D. Or. 2023). Similarly, in United States v. Smerling, the defendant and government agreed that a restitution award based on fraudulently obtained loans should not include interest based on the loan agreement's post-default rate, because "including such interest in the restitution order would inappropriately award [the victim] its expectation under the loan agreement, not merely compensate it for its loss." No. 21- cr-317, 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022).

In this case, including only the principal amount of the Affiliate Investments serves the purposes of restitution. It redresses the actual loss caused by Mr. Lindberg's conduct but avoids imposing undue punishment on him and exceeding the bounds of what the MVRA authorizes.

For these reasons, neither the MVRA nor the principles of restitution support adding any interest to the restitution award. Accordingly, the amount of restitution ordered should be further reduced by at least $263 million.

allowing the victim to obtain a 'windfall.'" Steele, 897 F.3d at 611. Here, the Preliminary Order entered $1.655 billion—$30 million above the Special Master's own recommendation—without explanation; the recommendation itself reaches $1.625 billion only by adding approximately $263 million of interest at a rate the Special Master chose; and no accounting supports the figure. The Beckett transaction (approximately $134 million) was effected without court approval and without any accounting of proceeds. (See Ex. B25) A record in that condition cannot support a $1.655 billion finding by a preponderance. See 18 U.S.C. § 3663A(c)(3)(B) (restitution need not be ordered where complex causation issues would unduly burden the sentencing process).

The Committee designed exactly this safeguard. Any special master submits only "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." S. Rep. No. 104-179 (1995) (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. And Congress authorized courts to decline restitution altogether where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). Here, where causation and offsets are genuinely complex and disputed, that burden falls on the Government, not on Mr. Lindberg. See also United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008) (citations omitted) (loss calculation for restitution may "present[] complex factual issues" warranting an evidentiary hearing).

## VII. The Government Should Disclose Evidence of Its Interference with the Ares Transaction.

The causation inquiry turns in significant part on why the Ares sale—which would have paid every policyholder in full—collapsed. The contemporaneous record reflects that, following Ares's meeting with the Department of Justice, Ares was advised by an undisclosed party to avoid any ongoing connection to Eli Global and abandoned the transaction's key term (Ex. A15). That gives Mr. Lindberg a good-faith basis to believe a governmental actor communicated with Ares concerning the transaction. If the Government possesses evidence of such communications and has not disclosed it, that evidence is favorable and material to the causation issue now before the Court—it would show that an intervening act of the Government, not Mr. Lindberg's conduct, caused the loss of the Ares transaction—and due process requires its disclosure. Brady v. Maryland, 373 U.S. 83, 87 (1963).

Mr. Lindberg therefore requests that the Court order the Government to disclose any communications between any federal or state governmental actor and Ares, or its advisors, concerning the proposed acquisition of the insurers or any ongoing relationship with Eli Global. Where the Government bears the burden of proving causation by a preponderance under 18 U.S.C. § 3664(e), basic fairness requires that Mr. Lindberg have access to the evidence bearing on whether the Government itself caused the very loss it now seeks to charge to him.

## VIII. In the Alternative, Offsets and Credits Independently Extinguish Any Obligation.

Should the Court find any portion of the loss proximately caused by Mr. Lindberg's conduct, the MVRA requires that restitution be reduced by the value of property returned to the victims and by amounts the victims have received or will receive. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); see Robers, 572 U.S. at 645; United States v. Boccagna, 450 F.3d 107, 118 (2d Cir. 2006); United States v. Alalade, 204 F.3d 536, 540 n.4 (4th Cir. 2000). The Committee was equally explicit that restitution may not exceed a victim's actual loss or yield a windfall: the offset provisions ensure that "the victim is not compensated twice for the same loss." S. Rep. No. 104-179, at 20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 933. Accord Steele, 897 F.3d at 611 (no victim "windfall"). Applied, the credits below yield net restitution of zero and a substantial overpayment, as the chart illustrates: Description Amount Body § Special Master's Proposed Restitution Figure $1,655,000,000 — Improper Additions to Affiliate Investment Balances I. Pre-Judgment Interest ($263,000,000) I.A Corrected Starting Balance of Affiliate Investments ($141,000,000) I.B Additional Credits II. AAPC Preferred Equity Par Value as of May 26, 2026 ($352,906,240) II.A SNIC Payments ($27,823,425) II.B Cash Payments to Pre-Designated Restitution Parties Not Captured by ($79,655,289) II.C the Special Master CBL Subordination Fee (Beckett refinancing) ($3,000,000) II.D Additional Clanwilliam Sale Proceeds ($20,000,000) II.E ULICO Sale of Contributed Real Estate ($13,596,013) II.F Bermuda ICs' Proceeds from Sale of Affiliated Assets ($9,800,076) II.F Sale Proceeds of Zero-Coupon Bonds in PPNs ($243,000,000) II.G Value of NCICs as of October 2018 ($454,000,000) Exh. A

Losses Not Proximately Caused by Mr. Lindberg III. Loss on Agera ($129,000,000) III. ECL Losses ($22,288,826) Exh. A Loss on UKAT ($39,000,000) Exh. A Insurance-Holdco Debt Portion ($14,897,805) Exh. A Loss on Clanwilliam Below-Market Sale ($474,000,000) Exh. A Loss on Early Zero-Coupon Bond Sales ($611,600,000) Exh. A

TOTAL MINIMUM OFFSETS AND REDUCTIONS ($2,899,418,383)

NET RESTITUTION OWED $0

IX. Any Ambiguity Must Be Resolved In Mr. Lindberg's Favor.

The Plea Agreement fixes no restitution amount and stipulates only a ">$550M" Guidelines figure expressly decoupled from restitution. Because restitution is now criminal punishment, Ellingburg, supra, and because Paragraph 10(a)'s reach is bounded by causation, any genuine ambiguity over whether third-party-caused losses are "caused by the defendant's criminal conduct" must be resolved in Mr.

Lindberg's favor under the rule of lenity.

CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction; (2) in the alternative, excluding from restitution the intervening-cause losses identified in Part IV; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) directing a complete accounting of all asset dispositions and of all fees and expenses paid from administered assets, including the Beckett proceeds; (5) ordering the Government to disclose any governmental communications with Ares or

its advisors regarding the proposed transaction or any ongoing relationship with Eli Global; (6) fixing net restitution at zero; and (7) granting such other and further relief as is just. Given the pendency of related proceedings, Mr. Lindberg respectfully requests expedited consideration.

Dated: July 14, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 14, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices.

Dated: July 14, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 235 — Consolidated Statement of Facts (Lindberg Declaration) (filed 07/15/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC Case No. 5:19-CR-22-MOC v.

GREG E. LINDBERG,

Judge Max O. Cogburn, Jr.

Defendant.

CONSOLIDATED STATEMENT OF FACTS IN SUPPORT OF

DEFENDANT'S MOTION REGARDING RESTITUTION CAUSATION

INTRODUCTION

Defendant Greg E. Lindberg respectfully submits this Statement of Facts in support of his motion regarding restitution. The facts set forth below are established by the exhibits filed herewith and cited in the text; the exhibits are identified in the accompanying Schedule of Exhibits.

A. The Affiliated-loan Program Operated Under a Written Risk-Management Framework and Experienced Zero Defaults Prior to Mr. Lindberg's Transfer of Control to the Rehabilitator.

1. Mr. Lindberg's North Carolina insurers operated under a written Risk Mitigation Policy on Affiliated Loans, revised February 20, 2017. The Policy provided that "the majority of loans are senior secured investments where the insurer lender as a first claim on all assets and cash flows of the borrower"; that "All loans have a minimum credit rating of 'B-' or equivalent from a SEC approved NRSRO"; that "the portfolio has weighted average credit score of 'BB' or higher and leverage ratio of less than 4x"; and that "All loans receive a third party arms' length pricing opinion." (Ex. B21 (Risk Mitigation Policy on Affiliated Loans, rev. Feb. 20, 2017).)

2. The Policy recited a track record of no defaults, stating that "SNH's affiliates have provided additional capital as needed to pay down any underperforming loans over the last 25 years, producing a zero default track record on these investments," and it committed the affiliates to "[p]repay any underperforming loan using reserve capital from SNH's non-insurance affiliates."

(Ex. B21.)

3. The April 14, 2018 successor Policy also required "Cash flow testing needs of the portfolio to ensure that assets are adequate to service liabilities and to prevent additional reserve requirements." (Ex. C (Risk Mitigation Policy).)

B. Mr. Lindberg Committed Approximately $1 Billion of His Own Capital, Guaranteed the Loans, and Purchased $1 Billion of Bonds to Protect Principal.

4. Mr. Lindberg's documented total investment in the insurance group from 2014 to 2018 was "$963 million," as summarized with source documentation by entity — including Colorado Bankers Life ($71 million, plus $193 million of additional capital),

Southland National Insurance Corporation ($48 million), Pavonia Life ($45 million net of its sale), the investment into Agera and replacement of Agera assets ($187 million), and management, overhead, and legal costs ($83 million and $72 million, respectively). (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part I.)

5. Independent analysis by Berkeley Research Group ("BRG") separately states that "capital contributions, consisting of cash infusions, foregone dividends and certain non-cash transactions, amount to at least $377 million," and that BRG did not "uncover payment of any dividends to Mr. Lindberg, GBIG or any Lindberg- affiliated companies." (Ex. D (BRG letter).)

6. Mr. Lindberg executed an "AMENDED & RESTATED BACKSTOP AGREEMENT … dated as of March 11, 2019," personally guaranteeing scheduled payments on the affiliated obligations. (Ex. B22 (Amended & Restated Backstop Agreement, Mar. 11, 2019), at 1.)

7. In 2018 the insurers held a portfolio of zero-coupon and related bonds with an aggregate notional (par) value of $1,006,239,867, acquired for an aggregate purchase price of $359,714,888.58. (Ex. H2 (Principal Value of Zero-Coupon Bonds), at 1.) The bonds were issued by a diversified group of financial institutions, including CIBC, Citigroup, TVA, Nomura, Wells Fargo, Natixis, Barclays, RBC, Bank of Montreal, UBS, and JPMorgan. (Id.)

C. The Regulator Approved the Affiliate Concentration and Praised Mr. Lindberg's Regulatory Performance.

8. The affiliate-investment strategy was presented to the North Carolina Department of Insurance ("NCDOI") as early as a September 17, 2014 presentation, which represented that "Controlled investments will be personally guaranteed by Eli Global owner, Greg Lindberg – this puts in a backstop for any potential failed deals," and would "Serve as backstop for any bad investments beyond historical zero percent default rate." (Ex. A22 (NCDOI Presentation on Affiliate Investments, Sept. 17, 2014).)

9. The 2014 presentation described "Strong risk management from (a) zero historical default rate on controlled deals … and (C) full guarantee backstop from owner on all controlled deals." (Ex. A22.)

10. The parties negotiated a percentage ceiling on affiliated investments. In the NCDOI's Review Letter 1 (dated April 11, 2016), the Department found that, at December 31, 2015, the company had "50% of total admitted assets invested in affiliates" and "directed [the company] to refrain from investing further in affiliates and to provide a plan outlining how it will return to compliance with the 40% agreed upon limit." The company's April 19, 2016 written response to Senior Financial Analyst Jessica Price, CPA, CFE, stated that "we interpreted the 40% limit to apply to affiliated sub-investment grade investments, not to affiliated investments in total," and undertook to bring "total affiliate investments (not including affiliated insurance investments) … below 40% of total assets." (Ex. A12 (SNIC Response to NCDOI Review Letter 1, Apr. 19, 2016), at 1–2.)

11. Affiliated-investment concentrations of this general character are

widespread in the life-insurance industry. A May 26, 2026 Wall Street Journal report is titled "For Wall Street's Private Investments, In-House Insurers Are the Go-To Buyer," and states that "[r]egulators are trying to keep up with insurers' $413 billion in 'affiliated investments,'" observing that "[i]nsurance companies are increasingly investing policyholders' money in private credit sold by parent firms or affiliated parties." (Ex. B24 (Wall St. J., May 26, 2026).)

12. On March 9, 2018, Insurance Commissioner Mike Causey wrote directly to Mr. Lindberg: "You did an outstanding and impressive job of answering some really tough, hardball questions from state regulators today." The same message requested "[d]etails and status of plans to engage JP Morgan or KKR Capital Markets to provide financing to replace intercompany loans." (Ex. B6 (Causey email, Mar. 9, 2018), at 1.)

D. The 2018 KPMG and Houlihan Lokey Valuations Confirmed the Loans Were Well Secured.

13. KPMG, in accordance with an engagement letter "dated May 21, 2018," completed a valuation "to determine the fair value of a 100.0 percent interest in the equity of certain insurance entities (the 'Subject Companies' …) owned by Global Bankers Insurance Group … on marketable, controlling interest basis as of December 31, 2017." The report is dated August 24, 2018. (Ex. E (KPMG, Final Valuation of Eli Global Insurance Entities, Aug. 24, 2018) and Ex. E2.)

14. KPMG's stated "Fair Value of Equity" conclusions were: Colorado Bankers Life Insurance Company, $380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; Southland National Reinsurance Corporation, $46,500,000; Pavonia Life Insurance Company of Michigan, $120,000,000; Private Bankers Life and Annuity Co., Ltd., $283,500,000; Omnia Ltd., $7,000,000; Conservatrix N.V., €74,000,000; Standard Re (Malta) Limited, €4,000,000; GB Life Luxembourg S.A., €32,700,000; Bankers Reinsurance Company Ltd., $12,400,000; and PB Investment Holdings Ltd., $8,300,000. (Ex. E.)

In the aggregate, these conclusions total on the order of one billion dollars — described in Mr. Lindberg's investment summary as "aggregate fair value of the insurance entities of approximately $1.08 billion." (Ex. A11 (Lindberg Total Investment in the Insurance Group), Part II, S-5.)

15. KPMG completed this work in August 2018, less than sixty days before control of the insurers passed to State administrative supervision on October 18, 2018 (see § F below), making it contemporaneous evidence of the value of the companies at the time regulatory control was imposed. (Ex. A11, Part II, S-5, S-10 and Ex. E2.)

16. Houlihan Lokey Financial Advisors, Inc. separately prepared a "written Report containing certain financial analyses and documentation pertaining to investments … controlled by Eli Global," held by Colorado Bankers Life and Southland National "as of December 15, 2017," dated January 18, 2018. The Report presents, for each position, "[e]nterprise value ranges and associated enterprise value coverage and loan-to-value calculations." (Ex. E3 HL (Houlihan Lokey, Summary of Certain Investments Held by Colorado Bankers Life and Southland National, Jan. 18, 2018), at 3, 5.)

17. The Houlihan Lokey Report repeatedly concludes that the enterprise

value of the borrowers fully covered the loans. Representative of its position-level findings, it states: “Our assessment of enterprise value implied full coverage through the Term Loan, with a loan-to-value range through the security of 38.7% to 43.4%,” and elsewhere “implied full coverage through the aggregate subordinate debt with a net loan-to-value of 42.8% to 47.3%.” Loan-to-value results vary by position across

the portfolio, but the Report’s consistent conclusion is “full coverage” of the secured loans. (Ex. E3.)

18. A summary of the KPMG August 24, 2018 valuations, compiling

KPMG’s per-entity conclusions as of the December 31, 2017 valuation date, reflects fair values of equity for the insurance entities totaling approximately $1.08 billion, and separately values the twenty-one Eli Global operating companies — the borrowers whose assets and enterprise value secured the affiliated loans — at an aggregate business-enterprise value of approximately $2.45 billion. (Ex. E2 (KPMG Valuations Summary), Overview.)

19. KPMG’s concluded enterprise values for the principal operating-

company borrowers included Global Health Technology Group, LLC at $1,200,000,000; American Academy Holdings (AAPC) at $900,000,000; Practice Insight, LLC at $146,000,000; and Claris Vision, LLC at $51,500,000, among others. These contemporaneous valuations of the borrowers confirm that the asset values securing the affiliated loans substantially exceeded the loan balances. (Ex. E2.)

E. Before Taking Office, the Commissioner Planned to “Dismantle” Mr.

Lindberg’s Business.

20. The affidavit of Roland M. Loftin, Jr. states that, in mid-2016, “Mike

Causey told Cartret that he was concerned about a multi-millionaire named Greg Lindberg who had strongly supported Goodwin during the last election,” and “saw Lindberg as a significant impediment to winning the election against Goodwin.” (Ex.

A3 (Affidavit of Roland M. Loftin, Jr.).)

21. The Loftin affidavit further states that Causey “said that he had a

person in mind who had already helped him a lot and she had been at DOI a long time,” and that “she already didn’t like Lindberg and would know how to go about dealing with the companies and dismantling them.” (Ex. A3.)

22. In a recorded interview, Lyne Thompson stated that Causey “explained

to me that Lindberg was a multimillionaire who strongly supported and contributed to Goodwin’s campaign in the election that Causey had just won,” and that “because he had beaten Goodwin by so few votes, he was worried about Greg Lindberg helping Wayne in the next election, and he felt like he needed to do something about him.” (Ex. A4 (Interview of Lyne Thompson, Mar. 28, 2024), at 2–3.)

23. Thompson further stated that Causey “already knew that the biggest

problem he was going to have if Goodwin ran again against him in four years was this multimillionaire funding Wayne’s campaign.” (Ex. A4, at 3.)

F. Mr. Lindberg Ceded Control to the Rehabilitator in October 2018, and

the Rehabilitator Proceeded to Pay Himself and Others Over $165 Million in Fees.

24. On October 18, 2018, the North Carolina insurers were placed under a

"CONSENT ORDER FOR ADMINISTRATIVE SUPERVISION." The order recites that "[t]he Companies have consented to administrative supervision" and were "placed under administrative supervision for a period of 120 days from the date of execution of this Consent Order," subject to extension in the Commissioner's discretion. (Ex. F2 (Southland Confidential Administrative Supervision Consent Order, Oct. 18, 2018).)

25. Since June 2019, the fees and expenses paid out by the Rehabilitator/Receiver total $165,749,392, of which an estimated $30,000,000 was paid to Williams Mullen and an estimated $25,000,000 to Noble Consulting/Mike Dinius, with current estimated monthly fees of $2,744,743. (Ex. M (Expenses + Losses of NCICs), at 1.)

G. A Series of Intervening Acts Destroyed Value After October 2018.

26. The blocked Ares transaction. On November 22, 2018, Ares submitted a letter of intent that was "non-binding (other than in respect of Section 12 (Exclusivity …))," proposing an "Upfront Purchase Price" of "$400 million" under Option A and "$420 million" under Option B. (Ex. G (Ares Project Triangle Proposal, Nov. 22, 2018).)

27. Eli Global's Chief Financial Officer, Christa Miller, memorialized in a January 6, 2019 email that, when Ares was asked whether it was withdrawing the SPV term under which it would retain affiliated loans, "they said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close," and "refused to say" who had given that advice. Ms. Miller wrote that "it seems very likely from their comments on both occasions that they have been heavily influenced by a third party with power." (Ex. A15 (Miller email, Jan. 6, 2019), at 1.)

28. The rejected Oaktree transaction. In or about February 2019, an Oaktree "Global Solution" presentation proposed that "IG will fund a [$1.0B] investment into an SPV Holding Company" that would acquire the affiliated-loan positions and the GBIG equity. (Ex. C2 -- Oaktree (Oaktree Global Solution Presentation), at 1.)

29. The June 27, 2019 liquidation demand and MOU. On June 27, 2019, Mike Dinius wrote to Mr. Lindberg: "If you do not sign the consent, we will contact the guaranty associations and move directly to liquidation. You know what that means." He added that, "[i]f this is not signed, the P&I deferral ends immediately … That means the ELI companies will be in default on millions of loan and interest payments. We will then take all legal action that is necessary." (Ex. D5 (Dinius email, June 27, 2019), at 1.)

30. The Memorandum of Understanding "is made and entered into as of this 27th day" of June 2019 and recites the intent to "protect the best interests of the policyholders" and to "increase the long-term equity value." The accompanying Interim Loan Amendment fixed the loans on a decade-long term: it provides that "the maturity date of each Senior Loan shall be December 31, 2029," with junior and other loan maturities set to 2029 as well, and it refers to the "(10)-year anniversary of the Amendment Effective Date." (Ex. A14 (Memorandum of Understanding and Interim Loan Amendment, June 27, 2019).)

31. The bonds sold before maturity. A summary schedule states, under the heading "Zero Coupon Loss by Dinius Decision to Sell Early," a figure of $611,660,960, and reflects "Total Proceeds" of $394,578,906 from the sale of the bond portfolio that carried an

aggregate par value of $1,006,239,867. (Ex. I2 (Summary of Loss on Zero Coupon Bond Sales), at 1.)

32. The Quadro transaction (2024). A January 24, 2024 investor

presentation for a Quadro business combination states a "Proforma enterprise value" of $3,153 million (approximately $3.2 billion) for the combined companies. (Ex. I3 (GG-Quadro Investor Presentation, Jan. 24, 2024).)

33. The Universal Financial Holdings offer (2022). On November 17, 2022,

Universal Financial Holdings LLC submitted an "indication of interest … to acquire 100% of the membership interest of GBIG Holdings," including its insurance subsidiaries Bankers Life, Colorado Bankers Life, and Southland National, stating that upon completion of diligence it "will immediately sign a binding purchase agreement." (Ex. O2 (Universal Financial Holdings Indication of Interest, Nov. 17, 2022), at 1.)

H. Forced Private-market Sales Understate Value Relative to Public-

Market Benchmarks.

34. Independent academic research submitted with the exhibits finds that

private acquirers systematically pay less than public acquirers: "for most premium measures private operating companies pay less than public firms," and "target shareholder premiums are 63.3% higher if an offer is by a public firm rather than by a private equity firm." (Ex. R (Bargeron et al., Why Do Private Acquirers Pay So Little Compared to Public Acquirers?).) This bears on the measurement of any claimed loss: the values realized through the Rehabilitator's forced private dispositions are not a reliable measure of the companies' value, particularly as against the public-market benchmark reflected in the 2024 Quadro presentation (§ G above).

Dated: July 15, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

**Doc. 236 — Motion for Leave to File Sur-Reply (Doc. 233) (filed 07/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

v.

Case No. 3:23-CR-48-MOC

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S MOTION FOR

LEAVE TO FILE SUR-REPLY

Defendant Greg E. Lindberg respectfully moves the Court for leave to file the accompanying Sur-Reply in further opposition to Cell 1.16's Motion for Restitution Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. Nos. 221, 222). The narrow ground for this motion is one of basic fairness: the Defendant was in the custody of the Federal Bureau of Prisons, without meaningful access to his own records, when his Response was due, and Cell 1.16's Reply has since recharacterized those very records. In support, the Defendant states as follows:

PRELIMINARY STATEMENT

Cell 1.16 asks this Court to declare the Defendant's own reinsurer a "victim" and to award it more than $131 million from the restitution estate—on a record that consists largely of the Defendant's own contemporaneous business correspondence. At the time the Defendant filed his Response, however, he had been taken into the custody of the Federal Bureau of Prisons and was without meaningful access to those

records. He expressly reserved further litigation of the restitution determination. Doc. No. 227, at 4 n.1. Cell 1.16's Reply then advanced new characterizations of that same record. The Defendant now seeks leave to place the complete, contemporaneous record before the Court. To deny that opportunity would be to resolve a $131 million restitution question against an incarcerated defendant on an incomplete record—one his custody prevented him from assembling when his Response was due. The Sur- Reply is short and narrowly focused, and it should be permitted.

1. The relevant procedural background of the restitution briefing. Cell 1.16

moved for restitution under the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. Nos. 221, 222). The Defendant filed his Response in Opposition on June 29, 2026 (Doc. No. 227). Cell 1.16 filed its Reply on July 13, 2026 (Doc. No. 233).

2. The Defendant's lack of access to his records while in custody. The

evidence that bears on Cell 1.16's Motion is, overwhelmingly, the Defendant's own contemporaneous correspondence—years of emails and business records. At the time the Defendant filed his Response, however, he was in the custody of the Federal Bureau of Prisons and was without meaningful access to those voluminous records. In custody, the Defendant cannot use a laptop or access records electronically; he has been limited to offline access and has had to review the voluminous 2018 correspondence and records by hand,

under the severe restrictions of his confinement. His Response was prepared under those constraints, and he expressly reserved further litigation of the restitution determination, including "causation, offsets, and credits … which will further change the restitution determination," and stated that

"Defendant expressly reserves this determination." Doc. No. 227, at 4 n.1. That reservation, together with the Defendant's inability to access his own records in custody, constitutes good cause for the Sur-Reply. It would be fundamentally unfair to resolve a multi-million-dollar restitution claim against an incarcerated defendant on a record he was foreclosed—by his custody, not by any lack of diligence—from fully assembling when his Response was due. Having since been able to marshal the complete record, the Defendant should be permitted to place it before the Court. The proposed Sur-Reply, and the Defendant's contemporaneously filed Motion to Recoup the Distribution to Vista, and for Related Relef, do exactly that.

3. New matter raised for the first time in Cell 1.16's Reply. Cell 1.16's Reply

compounds the point by advancing, for the first time, specific new characterizations of the Defendant's own correspondence—for example, that the March–April 2019 emails reflect only a third party's unwillingness to rely on the ratings rather than Cell 1.16's, that the July 2019 email "say[s] nothing about ratings," and that the emails show only how Cell 1.16 addressed "problematic assets" after it had invested. Doc. No. 233, at 2–3. The Reply also advances a new legal contention—that the ratings themselves constitute the Defendant's misrepresentations, as established by the Factual Basis (Doc. No. 42) and the Special Master's Report (Doc. No. 106-2). Doc. No. 233, at 3. Having been unable, in custody and without his records, to present the full correspondence in his Response, the Defendant has even more reason to be heard on these new characterizations now.

4. The Special Master's failure to defend the exclusion is a further,

independent ground for leave. The Special Master was appointed to administer this restitution process and, in that role, owed duties to the Court, to the other insurance-company victims whose recoveries the estate is meant to protect, and to the Defendant. The Special Master recommended—and the Court adopted—the exclusion of Cell 1.16 as a restitution victim. Doc. No. 106-3, at 23-24; Doc. Nos. 161, 162. Yet in the face of Cell 1.16's renewed motion under the Crime Victims' Rights Act, the Special Master has not defended that determination, notwithstanding that he had access to the same contemporaneous records that refute the claim. Where the neutral charged with safeguarding the integrity of the estate does not defend the very exclusion he recommended, the responsibility for protecting the Court's restitution process, the other victims, and the Defendant falls to the Defendant alone. That circumstance is itself independent good cause to permit the Sur-Reply, so that the complete record is placed before the Court rather than left unanswered.

5. Standard. This District's local rules do not provide for the filing of a sur-

reply as of right; a sur-reply may be filed only with leave of Court. Leave is appropriately granted where the reply raises new arguments or presents matters to which the opposing party has not had an opportunity to respond. See Khoury v. Meserve, 268 F. Supp. 2d 600, 605 (D. Md. 2003) ("Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."). Both grounds are present here—new matter

in the Reply, and the Defendant's inability, while in custody without his records, to present the complete record in his Response.

6. Narrow scope; the Defendant's own records. The proposed Sur-Reply is limited to responding to the new matter in the Reply. It attaches nine items of Cell 1.16's own contemporaneous correspondence (Sur-Reply Exhibits 1 through 9)—the very records to which the Defendant lacked meaningful access when his Response was due. Exhibits 1 through 3 were previously furnished to the Special Master; Exhibits 4 through 9 are additional contemporaneous records, dated 2017–2018, drawn from the Defendant's own files, that fall within the very period of reliance on which the Reply relies.

7. No prejudice; efficiency. Granting leave will not delay the proceedings or prejudice any party. It will aid the Court by ensuring that a $131 million restitution question is decided on a complete record rather than one truncated by the Defendant's custody status when his Response was due.

8. Consultation. Undersigned counsel conferred with counsel for Cell 1.16 regarding the relief requested herein on July 16 and July 17, 2026. Counsel for Cell 1.16 has indicated that Cell 1.16 neither opposes nor consents to this motion, and notes that it has not seen the proposed Sur-Reply.

For these reasons, the Defendant respectfully requests that the Court grant leave to file the accompanying Sur-Reply and grant such other relief as the Court deems just and proper.

Dated: July 17, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 237 — Sur-Reply Opposing Cell 1.16's CVRA Motion (filed 07/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

v.

Case No. 3:23-CR-48-MOC

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S SUR-REPLY IN OPPOSITION TO

CELL 1.16'S MOTION FOR RESTITUTION PURSUANT TO THE

CRIME VICTIMS' RIGHTS ACT

Defendant Greg E. Lindberg, through undersigned counsel, and, with leave of Court, submits this Sur-Reply in opposition to Cell 1.16's Motion for Restitution Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. Nos. 221, 222), and in response to the new matter raised in Cell 1.16's Reply (Doc. No. 233).

INTRODUCTION

Cell 1.16's Motion rests on a single narrative: that Cell 1.16 was a passive actor who relied on inflated credit ratings and remained ignorant of the affiliated and impaired nature of its investments Cell 1.16 also argues that its reliance occurred during the period from 2016 through 2018—too early, it says, for the 2019 emails to matter. The contemporaneous record refutes every premise. It is drawn from Cell 1.16's own principals' words, and it spans the entire period of claimed reliance, from 2017 through 2020. It shows that Cell 1.16 knew the investments were affiliated with the Lindberg/Eli Global enterprise; knew the affiliated assets were largely below investment grade; was intimately familiar with the ratings process and treated the agency ratings as a mere regulatory formality; and looked to an Eli Global buy-back and guarantee—not the ratings—for credit protection.

The Reply does not, and cannot, reconcile that record with its victim narrative. Nor does it answer the independent grounds on which the Opposition rests—the neutral Special Master's finding on this same record, the conceded double recovery, the successive-motion problem, and the collateral-guarantee character of the buy- back letter—each of which independently requires denial. Cell 1.16's own contemporaneous correspondence is compiled as Sur-Reply Exhibits 1 through 9, each previously furnished to the Special Master or drawn from Cell 1.16's own files.

This Sur-Reply also exercises, in part, the rights the Defendant expressly reserved in his Response. See Doc. No. 227. At the time of that filing, the Defendant was in transit to the custody of the Federal Bureau of Prisons and lacked meaningful access to the records necessary to respond more fully. He therefore reserved the right to supplement his opposition accordingly. He now exercises a portion of that reservation—both through this Sur-Reply and through his Motion for Determination That No Restitution Is Owed, or In the Alternative For Exclusion and Offset of Losses Not Proximately Caused by the Offense

of Conviction, filed July 14, 2026 (Doc. No. 234 and 235), which addresses related infirmities in the restitution determination and is incorporated here by reference. Because that Motion raises a threshold challenge that, if granted, would dispose of or materially reshape the restitution

proceedings, the Court should resolve the Motion before taking action on this Sur - Reply, on Cell 1.16's Motion, or on the other pending restitution motions.

ARGUMENT

I. The Reply's Silence on Multiple Independent and Dispositive Grounds

to Deny Relief is Fatal to the Motion.

The Reply is silent on double recovery. Cell 1.16 has conceded that "many of the same loans" underlying its claimed loss "were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution." Doc. No. 222, at 2. Restitution is compensatory, not multiplicative: the Court awards restitution "to each victim in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and the proponent bears the burden of proving its loss by a preponderance. 18 U.S.C. § 3664(e); United States v. Catone, 769 F.3d 866, 876–77 (4th Cir. 2014). The Reply also does not answer that the neutral Special Master already resolved the disputed element on this same record, Doc. No. 106-3, at 23; that the Motion reintroduces facts the Court has already weighed; or that the buy-back letter is a collateral guarantee whose breach is, at most, tangentially linked to the offense. See Doc. No. 203, at 4–5 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). Each ground independently requires denial.

The Fourth Circuit's decision in this case points the same way. In In re Zetteler, No. 26-1749 (4th Cir. 2026) (unpublished) (Doc. No. 203), the panel declined to disturb this Court's exclusion of another restitution claimant, Conservatrix, holding that "[p]etitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct," and that direct harm under the Crime Victims' Rights

Act "requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" Doc. No. 203, at 4–5. Cell 1.16 stands in the same position: the Special Master found that it identified no specific instance in which the Defendant "misrepresented or concealed the nature of the Affiliate Investments," Doc. No. 106-3, at 23, and the Reply supplies none. To the extent Cell 1.16 invokes the separate opinion in Zetteler for the proposition that a motion under the Act is the proper vehicle, that opinion concurred in part and dissented in part; it is not the holding of the Court. The panel's holding—declining to disturb the exclusion of a claimant whose harm was not closely tied to the offense—counsels denial here.

Cell 1.16's own affiliate confirms the point. Vista Life & Casualty Reinsurance Company—of which Protected Cell 1.16 is a part—received a $23,520,710 distribution from the Clanwilliam sale proceeds that the Special Master expressly declined to characterize as restitution. See Consent Mot. for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Grp. of Cos., Doc. No. 66 ¶ 20(d)(iii) & n.3 (July 3, 2025). The Special Master sought to credit that sum against Defendant's restitution obligation only "to the extent Vista is determined to be a victim entitled to restitution," id. ¶ 21, and acknowledged that he "is unsure whether [he] will recommend that the Court treat Vista as a victim in this proceeding," id. ¶ 26 n.8. That an interested affiliate received a distribution the movant itself will not call restitution only underscores that Cell 1.16 has not carried its burden to establish victim status under 18 U.S.C. § 3771(e)(2)(A).

## II. The Contemporaneous Record Refutes Every Premise of Cell 1.16's Victim Narrative.

Cell 1.16 concedes that the only disputed element is whether the Defendant or his agents made a material misrepresentation or omission concerning the affiliated investments to Cell 1.16 or its regulator, on which Cell 1.16 relied. Doc. No. 222, at 2. Restitution reaches only "the loss caused by the specific conduct that is the basis of the offense of conviction," Hughey v. United States, 495 U.S. 411, 413 (1990); see Paroline v. United States, 572 U.S. 434, 445 (2014); see United States v. Freeman, 741 F.3d 426, 432-433 (4th Cir. 2014) (restitution must "compensate only for the loss caused by the specific conduct that is the basis of the offense of conviction"). Because the Act reaches only a party "directly and proximately harmed," 18 U.S.C. § 3771(e)(2)(A), and a misrepresentation theory requires reliance, a claimant that knew the truth is not a victim: it cannot have relied on, or been proximately harmed by, a representation it knew to be false. See supra Part I (discussing Zetteler). A court in this Circuit dismissed a restitution claim on that basis, where the claimed harm was not the "direct and proximate result" of the offense of conviction. United States v. Blankenship, 179 F. Supp. 3d 647, 655 (S.D.W. Va. 2016). Each premise of Cell 1.16's narrative fails against its own principals' contemporaneous words.

### A. Premise: Cell 1.16 was a passive party that believed, on the ratings, that the assets were sound. The record: its own officers knew the affiliated assets were sub-investment grade.

In August 2018—within the period of claimed reliance—Cell 1.16's principal wrote that "Non investment grade is 44%, which is based on Milliman's original appraisal," adding, "PA may push back on this." Sur-Reply Ex. 6 (Solow, Aug. 6, 2018). In October 2018, Cell 1.16's own Treasurer wrote that "we are 100% certain that PA will want to apply some kind of haircut to the loans, and as it stands (or even with a swap only), any haircut puts the trust underwater." Sur-Reply Ex. 5 (Lo, Oct. 12, 2018). In November 2018, the principal circulated his own valuation analysis reporting that "the parties-at-interest (EG, SASL, and Vista) would only recover about 52 cents on the dollar" on the affiliated position, noting that although "EG invested $23.3 million in this deal," the proposal "only offers $6 million." Sur-Reply Ex. 4 (Solow, Nov. 26, 2018); accord Sur-Reply Ex. 1 (Solow, Jan. 14, 2019) (same position at "about 52 cents on the dollar" to "about 60 cents on the dollar"). A claimant whose officers, during the reliance period, valued the position at roughly half face, called its trust "underwater," and put 44% of it below investment grade did not rely on the agency ratings as truthful representations of value.

### B. Premise: the affiliated character of the investments was concealed from Cell 1.16. The record: its own principal performed diligence administered and reported/acknowledged the affiliation.

In October 2017, Cell 1.16's principal handled ownership diligence on the Lindberg entities, relaying that "Aon has requested org charts for these entities [New England Capital and Greenfield Capital] showing ownership," and that "Aon's KYC people have requested the operating agreement for New England Capital." Sur-Reply Ex. 9 (Solow, Oct. 2017). He administered the affiliated loans, imposing a fee for "the administration of the private loans in the USAP/AIC trusts," citing "asset exchanges, elimination of the SPVs" and the "[d]efense of portfolio to regulatory authorities." Sur-Reply Ex. 2 (Solow, Feb. 6, 2019). And he described the enterprise as the "Eli

Global group," Doc. No. 233, at 2; Sur-Reply Ex. 3—the very affiliation Cell 1.16 was arranging to liquidate, Sur-Reply Ex.3, and that the Vermont regulator later ordered Cell 1.16 to "sever." Doc. No. 227-1 (Solow, July 29, 2019). The Special Master found precisely this: those directing the investments "were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide." Doc. No. 206, ¶ 3.

C. Premise: Cell 1.16 was unfamiliar with the ratings process and relied on

the ratings as truthful valuations. The record: it knew the process intimately and used ratings as a regulatory checkbox.

The Reply asserts that the Defendant offers no "evidence of familiarity with the ratings process." Doc. No. 222, at 14. The principal's own words are that evidence. In February 2018 he catalogued Egan-Jones's surveillance mechanics—"that the ratings are good for 1 year, and that E-J undertakes to review the ratings each year," Sur-Reply Ex. 7 (Solow, Feb. 21, 2018)—and elsewhere navigated which agencies the Pennsylvania regulator would accept, observing that "[t]he department will not accept Kroll or DBRS, except for the PPNs." Sur-Reply Ex. 6. He treated ratings as a regulatory box to be checked instead of an indicator of value; he sought any rating— expressly including a bottom-tier "NAIC-5 ('CCC')"—so that USAP could take "reserve credit," Doc. No. 227-3 (Solow, Jan. 2020), and was prepared to "swap out the unrated assets for rated assets" to meet a filing deadline. Doc. No. 227-4 (Solow, May 3, 2019). He described the assets as "essentially mini-CLOs" and acknowledged the parties were "aware of the headlines." Doc. No. 227-2 (Solow, Mar. 31, 2019).

Seeking the lowest possible rating as a regulatory formality, and exchanging assets to obtain one, is the opposite of relying on the rating as an accurate measure of worth.

Indeed, Cell 1.16's principal did not merely understand the ratings process— he directed the structure of the investments to satisfy the trust's regulatory guidelines. On February 21, 2018, Mr. Solow set out a six-point plan under which the parties would "terminate the repo structure and move all the SPV loans into the reinsurance trust"; "meet the investment guidelines of the trust, especially the single- risk limit … and the non-investment grade limit," and "look for ways to adjust the portfolio" if it fell "outside the guidelines"; "Devin [would] send over all the ratings letters"; "an investment professional [would] write a short paragraph stating that the loans … are NOT asset-backed securities but corporate obligations"; obtain "a short description of E-J's surveillance process"; and secure "a member of the EG group … [would] provide a liquidity and credit guarantee of each loan."1 Sur-Reply Ex. 7 (Solow, Feb. 21, 2018). A principal who dictated how the affiliated loans would be moved, rated, described, and guaranteed to pass regulatory muster was the architect of the transaction, not its victim—and did not rely on the very ratings he engineered.

1 In the relevant period, between 2016 and 2019 Vista/Cell 1.16 and other similar insurance providers operated in a very low-interest rate environment following the 2008 financial crisis, and willingly and knowingly took on much higher risk on funds that were in their care. This email shows Vista/Cell 1.16/Don Solow engineered the structure of these investments to satisfy the regulatory guidelines including the structure of how the ratings were obtained.

D. Premise: reliance occurred only in the 2016–2018 statements, so the emails

come too late. The record: it is contemporaneous with, and inside, the reliance period.

The materials in Parts A–C are dated 2017 and 2018—within the very years Cell 1.16 says it relied on the ratings. The timing objection also fails on its own terms as to the filed emails: Cell 1.16 defines the conduct period as "2016-2019" and concedes it "invested in Affiliate Assets from 2016 into 2019." Doc. No. 233, at 2. Three of the four filed emails (March–April, May, and July 2019) fall within that window, and a financial statement for fiscal year 2018 is necessarily prepared and filed in 2019, contemporaneously with them. The premise that Cell 1.16's understanding in 2019 is irrelevant is incompatible with its own definition of the period.

E. Premise: the agency ratings were the Defendant's misrepresentations to Cell

1.16. The record: Cell 1.16 looked to an Eli Global buy-back and guarantee, not the ratings, for protection.

That the Defendant's conduct affected the third-party agency ratings does not establish a misrepresentation to Cell 1.16: the misrepresentations the Reply invokes were made "to … various rating agencies," Doc. No. 233, at 3 (quoting Doc. No. 42, ¶ 5), not to Cell 1.16. And Cell 1.16's own principal did not look to the ratings for protection; he looked to an Eli Global buy-back and guarantee. In January 2018 he asked whether "there [is] a structure under which EG would agree to buy back any loan that ended up on USAP's balance sheet, if USAP needed the liquidity to pay claims." Sur-Reply Ex. 8 (Solow, Jan. 25, 2018). In February 2018 he provided that "[a] member of the EG group … will provide a liquidity and credit guarantee of each loan, similar to the AIC side-letter." Sur-Reply Ex. 7. That is why the buy-back

letter—not any rating—was the credit mechanism Cell 1.16 negotiated, and why its breach sounds in contract rather than supplying the misrepresentation element the Special Master found absent. Doc. No. 106-3, at 23. The ratings, moreover, were issued by independent agencies (Egan-Jones and HR de Mexico), not authored by the Defendant or New England Capital as representations to Cell 1.16.

III. Double Recovery Independently Bars the Requested Award.

Even if Cell 1.16 could establish victim status, its requested award fails because of the double recovery it has conceded. Doc. No. 222, at 2, 6, 8. An award premised on the same defaulted loans that already underlie other recipients' awards would inflate aggregate restitution beyond the loss caused. 18 U.S.C. § 3664(f)(1)(A). The Special Master flagged the need, before any such award, to "confirm that Cell 1.16's restitution amount is calculated consistently with all other persons awarded restitution in this case." Doc. No. 206, ¶ 4. The Reply does not address the point.

CONCLUSION

The victim narrative on which the Motion depends cannot survive Cell 1.16's own contemporaneous record. For the foregoing reasons, and those stated in the Opposition (Doc. No. 227), the Defendant respectfully requests that the Court deny Cell 1.16's Motion for Restitution (Doc. Nos. 221, 222) and adhere to its Preliminary Order of Restitution (Doc. No. 161) and Judgment (Doc. No. 162). To the extent the Court is inclined to revisit that determination, the Defendant respectfully requests an opportunity to be heard and an evidentiary hearing addressing both Cell 1.16's asserted victim status and the avoidance of any duplicative recovery.

Dated: July 17, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 238 — Motion to Recoup the Distribution to Vista (filed 07/17/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

v.

Case No. 3:23-CR-48-MOC

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S MOTION TO RECOUP THE DISTRIBUTION TO VISTA, AND FOR RELATED RELIEF, BASED ON CELL 1.16'S MATERIALLY OVERSTATED AND DUPLICATIVE RESTITUTION CLAIM

Defendant Greg E. Lindberg respectfully moves the Court, pursuant to its continuing jurisdiction over restitution, 18 U.S.C. § 3664, and its inherent authority, for an order (i) recouping the $23,520,710 in net Clanwilliam sale proceeds that the Special Master distributed to Vista Life & Casualty Reinsurance Company ("Vista"); (ii) crediting that amount against the aggregate restitution obligation; (iii) denying the request of Vista's Protected Cell 1.16, n/k/a ViUS PC 2016-A IC, Inc. ("Cell 1.16"), to be treated as a restitution victim, and rejecting its claimed loss of $131,207,799 as materially overstated and duplicative; (iv) to the extent the Court concludes that a materially overstated or duplicative restitution claim was knowingly submitted, grant such further relief to offset or redistribute the $23,520,710 in net Clanwilliam sale proceeds; and (v) granting such further relief as is just. In support of this Motion, Defendant states as follows.

INTRODUCTION

Cell 1.16 asks to be treated as a victim and to recover $131,207,799 in restitution—and Vista has already received a $23,520,710 distribution—on a premise that Cell 1.16's own principal and declarant, Donald D. Solow, cannot square with his own contemporaneous records. Cell 1.16 says it was an innocent party that relied on the credit ratings. But Mr. Solow's own correspondence shows that he knew the investments were affiliated with the Lindberg enterprise, that he knew the affiliated assets were worth a fraction of the book values on which the claim rests, and that he treated the agency ratings as a regulatory device rather than a measure of value. His sworn Declaration (Doc. No. 113) confirms the point twice over: it admits that the assets were "Lindberg-related loans" managed by a "Lindberg-affiliated entity," Doc. No. 113 ¶¶ 7, 17, and it concedes that the very loans underlying Cell 1.16's claim are the "same loans" already awarded to the North Carolina and Bermuda insurers. Id. ¶¶ 18, 25. The $131,207,799 Cell 1.16 now seeks is the book or par value of defaulted affiliated loans that its own principal valued, in real time, at roughly half that amount—and much of it duplicates recoveries already awarded to other victims on the same loans. A party may not obtain or retain a distribution from the restitution estate on a loss figure its own records refute and on loans for which others are already being made whole. The Court should recoup the distribution to Vista, credit it against restitution, and deny or reduce Cell 1.16's claim.

BACKGROUND

A. The Special Master excluded Cell 1.16; Vista nonetheless received

a $23.5 million distribution.

The Special Master found that Cell 1.16 "satisf[ies] almost all of the elements" of a restitution victim but "fall[s] short" on one—it had not "pointed to specific instances where Defendant misrepresented or concealed the nature of the Affiliate Investments." Doc. No. 106-3 at 23. The Court adopted that recommendation and excluded Cell 1.16. Doc. Nos. 161, 162. Separately, in administering the Clanwilliam sale, the Special Master distributed $23,520,710 to Vista. Defendant has contested the Special Master's payments and distributions to Vista, which remain disputed and pending, and reserves the right to seek their disgorgement, an offset or credit, and related relief by this Motion.

The Special Master's own Consent Motion confirms that the $23,520,710 paid to Vista was disbursed without any finding that Vista is a victim. See Consent Mot. for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Grp. of Cos., Doc. No. 66 (July 3, 2025). The Special Master sought only to credit that sum against Defendant's restitution obligation "to the extent Vista is determined to be a victim entitled to restitution." Id. ¶ 21. He acknowledged that he "is unsure whether [he] will recommend that the Court treat Vista as a victim in this proceeding," and that Vista's "potentially 'out of order' distribution" was made not because Vista is a victim, but because, "without Vista's cooperation," the Wake County Clanwilliam Order "could not be modified without further litigation." Id. ¶ 26 n.8. A payment made

to secure a non-victim's cooperation, expressly conditioned on a victim finding that has never been made, is the recoupable windfall this Motion addresses.

B. Cell 1.16 claims $131,207,799, measured at book value.

Through the Solow Declaration, Cell 1.16 represents that "Cell 1.16 relied on those ratings reports in its financial reporting to the VT DFR," Doc. No. 113 ¶ 21, that the affiliated loans were "recorded at book value and reported at those values" in its financial statements, id. ¶¶ 23, 27, and that the defaults "left Cell 1.16 with $131,207,799 of impaired assets as of 12/31/25." Id. ¶ 30. That $131,207,799 is the book or par value of the defaulted affiliated loans; it is the figure on which Cell 1.16's victim claim, and Vista's distribution, depend.

C. Solow's own contemporaneous records show he knew the assets

were worth a fraction of book, and that the loans overlapped with other victims.

Mr. Solow's 2017–2019 correspondence—compiled as Exhibits A (2019) and B (2017–2018) and previously furnished to the Special Master—refutes that premise:

He knew the affiliated assets were sub-investment grade. In August 2018, Mr. Solow wrote that "[n]on investment grade is 44%, which is based on Milliman's original appraisal." Ex. B (Solow, Aug. 6, 2018). In October 2018, Cell 1.16's Treasurer wrote that "any haircut puts the trust underwater." Ex. B (Lo, Oct. 12, 2018). In November 2018, Mr. Solow valued the affiliated position at "about 52 cents on the dollar," Ex. B (Solow, Nov. 26, 2018), and repeated that valuation in January 2019. Ex. A, Tab 24 (Solow, Jan. 14, 2019).

He knew and administered the affiliation. Doc. No. 113 ¶¶ 11, 17 (admitting NEC was "ultimately owned by Defendant Lindberg" and the assets were "Lindberg-related loans"); Ex. A, Tab 42 (Solow, July 29, 2019) (Vermont order to "sever ties to the Eli Global group"); Ex. A, Tab 20 (Solow, Feb. 6, 2019) (administering "the private loans in the USAP/AIC trusts").

He treated the ratings as a regulatory device, not a valuation. Ex. A, Tab 32 (Solow, Mar. 31, 2019) (assets "essentially mini-CLOs"; buyers "don't want to rely on the ratings reports"); Ex. A, Tabs 10, 36 (soliciting any rating, "even if … NAIC-5 ('CCC')," to preserve reserve credit).

ARGUMENT

I. The Court Has Continuing Authority to Correct Its Restitution Process, Determine the Amount of Loss, and Recoup a Distribution Obtained on a False Premise.

The Court retains jurisdiction over "all matters covered by, or related to," its restitution Order. Doc. No. 161. The restitution statute confirms that authority: the Court determines who is entitled to restitution and in what amount, resolves disputes "by the preponderance of the evidence," and awards each victim no more than "the full amount of [its] losses." 18 U.S.C. § 3664(e), (f)(1)(A). A district court possesses the inherent power to protect the integrity of its own proceedings and to prevent a party from securing or retaining relief by imposing a materially false premise on the court. Chambers v. NASCO, Inc., 501 U.S. 32, 43–46 (1991). A claimant who obtains a restitution distribution on a false premise should fare no better than a litigant who obtains a judgment that way.

That authority is not diminished by the Special Master's role. Under 18 U.S.C. § 3664(d)(6), a special master's determinations are proposed findings that the Court reviews and, on any disputed issue, determines de novo; the ultimate responsibility for the restitution determination—including who is a victim, the amount of any loss, and the propriety of any distribution already made—rests with the Court. See id. § 3664(e), (f)(1)(A). The Court may therefore correct the distribution to Vista on de novo review regardless of the Special Master's position, and no deference is owed to a distribution the record does not support. Correction is especially warranted here, where the Special Master did not fully defend his own determination and had access to many of the same contemporaneous records—Mr. Solow's 2018–2019 correspondence—that refute Cell 1.16's claim. A distribution that cannot be reconciled with records the Special Master possessed should not stand simply because it has already been made. The Defendant reserves all rights concerning the Special Master's administration of the estate.

The Special Master himself acknowledged that the Vista distribution preceded the very analysis that should have grounded it. He conceded that "[i]n an ideal set of circumstances, the Special Master would have completed his restitution victim analyses—and made recommendations to the Court concerning the same—before seeking Court approval of . . . how funds from such a sale would be disbursed," and that the resulting distribution "almost certainly will deviate . . . from the general victim restitution apportionment later approved by the Court." Doc. No. 66 ¶ 24. Because a special master's distribution proposals are subject to this Court's de novo review, 18 U.S.C. § 3664(d)(6), an interim distribution made ahead of any victim determination—and expressly made subject to a later one, id. ¶ 21—is squarely within the Court's authority to revisit and correct.

II. Cell 1.16 Is Not a Victim: Its Own Principal Knew the Affiliation and the Impairment, and Treated the Ratings as a Regulatory Formality.

The single element the Special Master found wanting is a material misrepresentation or omission to Cell 1.16 or its regulator on which Cell 1.16 relied. Doc. No. 106-3 at 23. That

element is absent, because the affiliated character of the investments was known to Cell 1.16's own principal—indeed, his Declaration admits it, Doc. No. 113 ¶¶ 11, 17—and because he did not treat the agency ratings as truthful measures of value. His contemporaneous words show a principal who described the assets as "mini-CLOs," who said the parties would not "rely on the ratings reports," and who solicited any rating, "even if … NAIC-5 ('CCC')," to preserve regulatory reserve credit. Ex. A, Tabs 32, 10, 36. A sophisticated principal who knew the affiliation and used the ratings as a regulatory device is not a party to whom the affiliated investments were concealed. The Special Master reached the same conclusion. Doc. No. 206 ¶ 3.

The Fourth Circuit's decision in this case confirms the point. In In re Zettler, No. 26-1749 (4th Cir. 2026) (unpublished) (Doc. No. 203), the panel declined to disturb this Court's exclusion of another restitution claimant, Conservatrix, holding that "[p]etitioners fail to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct," and that direct harm under the Crime Victims' Rights Act "requires the harm to be 'closely related to the conduct inherent to the offense,

rather than merely tangentially linked.'" Doc. No. 203 at 4–5. Cell 1.16 stands in the same position; and to the extent it invokes the separate opinion in Zettler for the proposition that a motion under the Act is the proper vehicle, that opinion concurred in part and dissented in part and is not the holding of the Court.

These admissions are not merely evidentiary; they are dispositive of victim status. The Crime Victims' Rights Act reaches only a person "directly and proximately harmed as a result of the commission" of the offense, 18 U.S.C. § 3771(e)(2)(A), and the harm must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked." Doc. No. 203 at 5 (quotations omitted). A restitution claim built on misrepresentation therefore depends on reliance—the claimant must have actually been misled. Cell 1.16 was not. A party whose own principal selected the rating agencies, solicited the ratings, described the affiliated assets as "mini- CLOs," said the parties would not "rely on the ratings reports," and valued the position at roughly half its book value cannot have relied on those ratings as measures of value, and cannot have been proximately harmed by any representation to the contrary. Whatever loss Cell 1.16 suffered flowed from defaults on affiliated loans it understood, administered, and valued in real time—not from the conduct inherent to the offense of conviction. That is a harm at most "tangentially linked" to the offense, and it is why Cell 1.16 is not a victim.

A court in this Circuit dismissed a restitution claim on precisely this ground. In United States v. Blankenship, 179 F. Supp. 3d 647 (S.D.W. Va. 2016), the court held that a claimant whose asserted losses flowed from its own later, independent

decisions—rather than from the conduct of conviction—was "not a victim," because the harm was not the "direct and proximate result" of the defendant's conduct. Id. at 655; see id. at 652–53 (restitution reaches "only … the loss caused by the specific conduct that is the basis of the offense of conviction" (quoting United States v. Freeman, 741 F.3d 426, 434 (4th Cir. 2014))). Cell 1.16 stands in the same position: whatever loss it suffered flowed from defaults on affiliated investments its own principal solicited, administered, and valued—not from the bribery that is the offense of conviction. The Blankenship court further observed, without deciding the point, that "awarding restitution to the successor in interest of an entity which was one of the intended beneficiaries of the conduct resulting in the offense of conviction would be contrary to the statutory purpose of restitution." Id. at 656 n.5.

III. Cell 1.16 Procured the Ratings It Now Claims To Have Innocently

Relied Upon; That Material Misrepresentation Independently Warrants Recouping the Distribution.

Cell 1.16's victim theory depends on the premise that it passively and innocently relied on the agency ratings. The contemporaneous record shows the opposite: Cell 1.16's own principal selected and engaged the rating agencies, and solicited the ratings, to obtain the regulatory result he needed. In August 2018, Mr. Solow tracked which agencies the Pennsylvania regulator would accept, noting that "[f]or non PPN securities, PA wants to exclude DBRS and Kroll as rating agencies, leaving only S&P, Moody's, and Fitch," Ex. B (Solow, Aug. 1, 2018), and that "[t]he department will not accept Kroll or DBRS, except for the PPNs," Ex. B (Solow, Aug. 6, 2018). Cell 1.16's side chose among agencies and moved to engage them, asking

whether "HR or E-J would rate the loans currently in the USAP trust," seeking "a contact at HR we could call," and asking the agencies to "assign ratings, even if the ratings are NAIC-5 ('CCC')," because "[t]he key is that there needs to be some rating, even if it's very low." Ex. A, Tab 10 (Solow, Jan. 14, 2020). A party that chooses the rating agencies, engages them, and solicits any rating it can obtain—all while knowing, as shown above, that the assets were worth roughly half their face amount—did not innocently rely on those ratings. It procured them.

Cell 1.16's principal did more than select the agencies; he engineered the investment structure to meet the reinsurance trust's regulatory guidelines. On February 21, 2018, Mr. Solow set out a six-point plan under which the parties would "terminate the repo structure and move all the SPV loans into the reinsurance trust"; "meet the investment guidelines of the trust, especially the single-risk limit … and the non-investment grade limit," and "look for ways to adjust the portfolio" if it fell "outside the guidelines"; "Devin [would] send over all the ratings letters"; "an investment professional [would] write a short paragraph stating that the loans … are NOT asset-backed securities but corporate obligations"; obtain "a short description of E-J's surveillance process"; and secure "a member of the EG group … [would] provide a liquidity and credit guarantee of each loan."1 Ex. 237-7 (Solow, Feb. 21, 2018). A

1 In the relevant period, between 2016 and 2019 Vista/Cell 1.16 and other similar insurance providers operated in a very low-interest rate environment following the 2008 financial crisis, and willingly and knowingly took on much higher risk on funds that were in their care. This email shows Vista/Cell 1.16/Don Solow being the architect that directed the structure of the investments to satisfy the regulatory guidelines including the structure of how the ratings were obtained.

principal who dictated how the affiliated loans would be moved, rated, described, and guaranteed to pass regulatory muster was the transaction's architect, not its victim. He did not rely on the ratings; he engineered the structure that produced them.

That distinction is dispositive, and it is more than a failure of proof. Cell 1.16 has come to this Court with a sworn declaration representing that it "relied on th[e] ratings reports," Doc. No. 113 ¶¶ 21, 24, and has obtained—and now seeks further— distributions from the restitution estate on that representation. A claimant that itself procured the ratings it now swears, under penalty of perjury, that it innocently relied upon, and that presents that account to the Court to extract a recovery from a fund reserved for the Defendant's victims, has at a minimum made a material misrepresentation going to the heart of its claim. That misrepresentation independently warrants recouping the distribution to Vista and denying the Motion: the Court's continuing authority over the restitution estate, 18 U.S.C. § 3664, together with its inherent authority, Chambers, 501 U.S. at 43–46, permits it to deny and

recoup a distribution obtained on a materially false premise. The Defendant does not contend that this conduct rises to the level of "fraud on the court," a doctrine the Fourth Circuit confines to "the most egregious cases" and construes "very narrowly" lest it swallow Rule 60(b)(3). Great Coastal Express, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., 675 F.2d 1349, 1356–57 (4th Cir. 1982); Fox v. Elk Run Coal Co., 739 F.3d 131, 136–37 (4th Cir. 2014) (fraud on the court "must … touch on the public interest in a way that fraud between individual parties generally does not," and "[f]raud between parties" is not fraud on the court "even if it

involves … perjury by a party or witness" (quoting In re Genesys Data Techs., Inc., 204 F.3d 124, 130 (4th Cir. 2000))). The conduct here need not meet that demanding standard. It is, at most, fraud between the parties—conduct the Court may fully remedy through its continuing authority over the restitution estate and its power to deny and recoup a distribution procured by material misrepresentation.

IV. Cell 1.16's $131,207,799 Loss Figure Is Materially Overstated and

Duplicative, as Its Own Principal's Records and Sworn Admissions Establish.

Even if Cell 1.16 could establish victim status, its claimed loss cannot stand. Restitution is limited to the victim's actual loss, and the proponent bears the burden of proving the amount by a preponderance. 18 U.S.C. § 3664(e), (f)(1)(A); United States v. Catone, 769 F.3d 866, 876–77 (4th Cir. 2014). That award must rest on the victim's actual loss, supported by sufficient evidence; a figure that does not reflect actual loss cannot support restitution. United States v. Harvey, 532 F.3d 326, 340 (4th Cir. 2008). And the measure of that loss is the actual, fair-market value of what was lost—not the book, par, or face figure a claimant prefers. As the Fourth Circuit has held, "fair market value generally provides the best measure of value" of a restitution loss, and a court may not allow a claimant "to obtain a 'windfall.'" United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018); see also United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017) (restitution may not require payment of "more money than [was] st[olen]"). Cell 1.16's $131,207,799 figure fails that standard twice over.

First, it is overstated. The $131,207,799 is the book or par value of the defaulted affiliated loans, Doc. No. 113 ¶¶ 23, 27, 30—not a measure of the assets'

actual value, which is what the law requires. Steele, 897 F.3d at 611. Mr. Solow's own contemporaneous records show he knew those assets were worth a fraction of book: "[n]on investment grade is 44%, which is based on Milliman's original appraisal," Ex. B (Aug. 6, 2018); the trust was "underwater" under any haircut, Ex. B (Oct. 12, 2018); and the affiliated position was worth "about 52 cents on the dollar," Ex. B (Nov. 26, 2018); Ex. A, Tab 24 (Jan. 14, 2019). Those contemporaneous figures—roughly half face—are the closest thing in this record to the assets' fair-market value; the $131,207,799 book figure is not. A claimant whose own principal valued the assets at roughly half face, contemporaneously, cannot carry its burden of proving a $131 million loss measured at book value, and to award that figure would confer precisely the "windfall" the Fourth Circuit forbids. Steele, 897 F.3d at 611.

Second, it is duplicative. Cell 1.16's own Declaration concedes that the loans underlying its claim are the "same loans" already awarded to other victims. Doc. No. 113 ¶ 18 (the term loans "were participations in loans where other participants included [the North Carolina and Bermuda insurers] … that the Special Master has concluded should receive restitution respecting the same loans"); id. ¶ 25 (same). Restitution is "to each victim in the full

amount of each victim's losses," not multiple recoveries on a single underlying loss. 18 U.S.C. § 3664(f)(1)(A). Cell 1.16 has not— and on this record cannot—disaggregate its claimed $131 million from the recoveries already awarded to the North Carolina and Bermuda insurers on the same loans.

Together these defeat the claim. Cell 1.16 seeks book value for assets its own principal knew were worth far less, on loans for which other victims are already being made whole. That is an attempt to extract a windfall from the restitution estate—the same premise on which Vista obtained its $23,520,710 distribution.

V. The Court Should Find the Declaration Materially False for Purposes of the Relief Sought.

Mr. Solow submitted his Declaration (Doc. No. 113) under penalty of perjury, 28 U.S.C. § 1746, in this criminal proceeding, and Vista and Cell 1.16 have used it both to obtain a $23,520,710 distribution and to seek a further $131,207,799 from the restitution estate. On the present record, that Declaration advanced a materially false or misleading account. A statement is material if it "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." United States v. Sarihifard, 155 F.3d 301, 306 (4th Cir. 1998) (citation omitted). Cell 1.16's representations meet that standard readily, because they were submitted to obtain—and did obtain—a distribution from the restitution estate. The Declaration represented that Cell 1.16 innocently "relied on th[e] ratings reports," Doc. No. 113 ¶¶ 21, 24, when its own principal had selected the rating agencies, solicited the ratings, and knew the affiliated assets were worth roughly half their stated book value. And it advanced a $131,207,799 loss that its own principal's contemporaneous records show to be overstated, and that its own Declaration concedes is duplicative of awards to other victims on the same loans. See id. ¶¶ 18, 25, 30. Whether that conduct amounts to a false declaration or perjury, 18 U.S.C. §§ 1621, 1623, is a determination for the authorities charged with making it. The Defendant does not ask the Court to adjudicate criminal liability. He respectfully requests that the Court find the Declaration materially false for purposes of the relief sought above. An allegedly false submission was made under oath to a federal court to obtain a share of a fund reserved for the Defendant's victims.2

VI. The Court Should Recoup the Vista Distribution, Credit It Against Restitution, and Deny or Reduce Cell 1.16's Claim.

For these reasons, the Court should (i) order Vista to disgorge, and the Special Master to recoup, the $23,520,710 distributed to Vista; (ii) credit or offset that amount against the aggregate restitution obligation, pursuant to the Court's continuing and inherent authority set forth in Part I; and (iii) deny Cell 1.16's request to be treated as a victim and reject its $131,207,799 claim as overstated and duplicative. Defendant does not ask the Court to adjudicate criminal liability; the appropriate course is to make the findings the record supports and, if warranted, refer the matter. Given the amounts at stake, Defendant respectfully requests an evidentiary hearing at which Cell 1.16's claimed loss and Mr. Solow's representations may be tested against his own correspondence.

VII. Reservation of Rights.

Nothing in this Motion waives, and Defendant expressly reserves, all other rights, objections, and arguments concerning the restitution determination, including as to

causation, offsets, and credits, whether raised on motions practice or at the hearing, all of which will further change the restitution determination.3

2 The Court may refer Vista and Mr. Solow to the United States Attorney for the Western District of North Carolina and the Department of Justice for investigation and any prosecution those authorities deem warranted. 3 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution

CONCLUSION

For these reasons, Defendant respectfully requests that the Court recoup the $23,520,710 distributed to Vista, credit that amount against the restitution obligation, deny Cell 1.16's request to be treated as a restitution victim and reject its $131,207,799 claim as overstated and duplicative, set the matter for an evidentiary hearing, and grant such further relief as is just.

Dated: July 17, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. 163 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 17, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 248 — Motion for Issuance of Rule 17 Subpoenas Duces Tecum (filed 07/23/2026)**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC

Plaintiff,

Judge Max O. Cogburn,

Jr. v.

GREG E. LINDBERG, EXPEDITED CONSIDERATION

REQUESTED

Defendant.

DEFENDANT'S MOTION FOR ISSUANCE OF SUBPOENAS DUCES TECUM TO MICHAEL DINIUS, TO THE SPECIAL MASTER AND NHC HOLDINGS, LLC ("NEWHOLDCO"), TO PALADIN MANAGEMENT, TO THE NCICS FOR THE COMMUNICATIONS OF COMMISSIONER MICHAEL CAUSEY, TO THE BERMUDA INSURANCE COMPANIES THROUGH THEIR JOINT PROVISIONAL LIQUIDATORS, AND TO WES CAMDEN, LAUREN FUSSELL, AND THEIR FIRM, PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 17, WITH INCORPORATED MEMORANDUM OF LAW

INTRODUCTION

Defendant Greg E. Lindberg moves, pursuant to Federal Rule of Criminal Procedure 17, for issuance of (i) a subpoena duces tecum to Michael Dinius, Special Deputy Rehabilitator of the North Carolina insurance companies (Colorado Bankers Life Insurance Company, Bankers Life Insurance Company, Southland National Insurance Corporation, and Southland National Reinsurance Corporation (the "NCICs")) and a principal of Noble Consulting Services, Inc., commanding production of the documents identified in Exhibit A hereto; (ii) a subpoena duces tecum to Joseph W. Grier, III, as Special Master, and to NHC Holdings, LLC ("NewHoldCo"), as custodians of the records of the companies Defendant surrendered to the Special Master's administration, commanding production of the documents identified in Exhibit B hereto; (iii) a subpoena duces tecum to Paladin Management Group, the Special Master's court-approved financial advisor, commanding production of the documents identified in Exhibit C hereto; (iv) a subpoena duces tecum to the NCICs, through the Rehabilitator as their custodian of records, commanding production of the documents identified in Exhibit D hereto; (v) a subpoena duces tecum to the Bermuda insurance companies identified in the Restitution Report (including PB Life and Annuity Co., Ltd. and Northstar Financial Services (Bermuda) Ltd.), through their Joint Provisional Liquidators as custodians of records, commanding production of the documents identified in Exhibit E hereto; (vi) a

subpoena duces tecum to Wes Camden, Lauren Fussell, and their law firm, as counsel to the NCICs, commanding production of the documents identified in Exhibit F hereto; each in advance of the evidentiary hearing on the disputed restitution issues, pursuant to Rule 17(c)(1).

Compulsory process is necessary because Defendant does not have these records; the subpoenaed parties do. Control of the relevant companies and their books and records passed out of Defendant's hands twice: first in 2019, when, under the Memorandum of Understanding executed June 27, 2019 and the ensuing rehabilitation, the Rehabilitator's team under Mr. Dinius took over the companies and their records; and again under the Appointment Order (Doc. No. 56), when Defendant turned the companies over to the Special Master's administration, where they are now held by or through NewHoldCo. Defendant retained neither the companies nor their records. The documents that answer the open offset and causation questions sit in the files of Mr. Dinius, of the Special Master and NewHoldCo, and of Paladin. No witness is more central to the questions this Court must decide de novo under 18 U.S.C. § 3664(d)(6) than Mr. Dinius, who personally directed the estates' administration. The documents sought are specific, admissible, and relevant under United States v. Nixon, 418 U.S. 683, 700 (1974), and the Court must resolve the disputed offset and causation questions by a preponderance of the evidence under 18 U.S.C. § 3664(e). Because the MVRA places on Defendant the burden of proving the offsets and credits the statute mandates, United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000), while the records that carry that burden sit exclusively with the subpoenaed custodians, Defendant requests that production be ordered at such time as the Court directs, sufficiently in advance of the evidentiary hearing—so that he can review the productions, seek additional information, and, if

necessary, move to compel or enforce compliance before the hearing, rather than discover deficiencies when it is too late to cure them.

FACTUAL BACKGROUND

1. Michael Dinius is a principal of Noble Consulting Services, Inc. and has served as Special Deputy Rehabilitator of the NCICs under the North Carolina Commissioner of Insurance, as Rehabilitator, since 2019. In that capacity he has directed the management, investment decisions, monetization decisions, and professional-fee administration of the NCIC estates. (See Suppl. Stmt. of Facts, Doc. No. 174, ¶¶ 78–79; Original Stmt. of Facts ¶ 13, filed as Ex. 1 to Doc. No. 132.)

2. The disputed restitution issues before this Court are framed by Defendant's Response and Objection to the Special Master's Report (Doc. No. 132), the supporting Statements of Facts, and Defendant's pending motions (Doc. Nos. 172, 190, 201, 202). They include: whether losses claimed by the payees were directly and proximately caused by the offenses of conviction or instead by the intervening, discretionary decisions of the estates' management; and the amount of the mandatory offsets and credits for value returned to or realized by the payees.

3. The record already before the Court identifies Mr. Dinius's personal involvement in the principal disputed transactions. Under his management, the NCICs were liquidated notwithstanding the $454 million baseline value established by the companies' own management as of November 5, 2018. The Rehabilitator refused or blocked at least four monetization transactions—the November 22, 2018 Ares Management letter of

intent; the February 8, 2019 Oaktree Capital Management $1.0 billion proposal; the 2023 Montshire/Alban offer; and the Q1 2024

Quadro Acquisition Corp. One transaction—and in at least one instance litigation was filed against a prospective arm's-length buyer. More than $165 million in fees have been charged to the estates, at a current rate of approximately $2.5 million per month, and approximately $137 million in investment losses were incurred on portfolio decisions made after Defendant transferred control. See Doc. No. 132 & Statements of Facts, Doc. No. 190-4.

4. On the day the rehabilitation order was entered, Mr. Dinius wrote to

Defendant from his Noble Consulting account, in connection with the Memorandum of Understanding executed June 27, 2019: "we will contact the guaranty associations and move directly to liquidation. You know what that means." (Original Stmt. of Facts ¶ 58(a) & Ex. D5, filed as Ex. 1 to Doc. No. 132; Suppl. Stmt. of Facts ¶¶ 80–81 & ¶ 96(c), Doc. No. 174 at 41, 49.)

5. Contemporaneous correspondence ties Mr. Dinius personally to the

transactions underlying the disputed offsets. A September 12, 2019 e-mail records that Barclays' pricing on the zero-coupon instruments was "provided . . . through Dinius"—instruments the Rehabilitator later sold before maturity for approximately $394 million, crystallizing a loss of approximately $611.6 million against their $1,006,239,867 face value. August 22, 2019 e-mails record that the parties "heard back [from] Mike Dinius" concerning Academy Financial/Vista Life's ownership of and dealings in the AAPC preferred equity—the same instrument whose December 2022 transfer to ULICO underlies a disputed dollar-for-dollar offset. And May 2019

correspondence from Mr. Dinius's Noble Consulting account reflects his role as liaison with the Pennsylvania regulators concerning the affiliated entities.

6. Defendant does not possess the records at issue. Under the June 27,

2019 MOU and the ensuing rehabilitation, custody and control of the relevant companies and their books and records passed to the Rehabilitator's team under Mr. Dinius. (Suppl. Stmt. of Facts, Doc.No. 174, ¶¶ 78, 80–81; see also Original Stmt. of Facts ¶ 13, filed as Ex. 1 to Doc. No. 132.) Under the Appointment Order (Doc. No. 56), Defendant surrendered the remaining companies to the Special Master's administration, and they are now held by or through NewHoldCo, together with their books and records. The interest-bearing loan analysis ("ILA" or "IALA") and its workpapers—including the starting balances, the classification of the zero-coupon instruments, and the treatment of the April 2022 AAPC refinance—were prepared and are maintained by Paladin Management, the Special Master's financial advisor.

7. Mr. Lindberg anticipates that the government will seek to set an

evidentiary hearing in the relatively near future. In connection with that, Mr. Lindberg requests that the Court take these subpoenas into account when setting a hearing date, and that they be issued promptly once that date is selected.

ARGUMENT

I. Legal Standard

Rule 17(a) entitles a party to a subpoena commanding a witness's attendance and testimony. Rule 17(c)(1) authorizes a subpoena to "order the witness to produce any books, papers, documents, data, or other objects the subpoena designates," and provides that "[t]he

court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence," and that upon production "the court may permit the parties and their attorneys to inspect all or part of them." To obtain pre-hearing production, the moving party must clear three hurdles: "(1) relevancy; (2) admissibility; (3) specificity," and the application must be made in good faith and not as a "general 'fishing expedition.'" Nixon, 418 U.S. at 700. The Nixon factors apply at sentencing-stage proceedings, United States v. Krane, 625 F.3d 568, 574 (9th Cir. 2010) (court "must apply the Supreme Court's Nixon factors in the specific context of sentencing"); accord United States v. DNRB, Inc., 257 F. Supp. 3d 1033, 1038–39 (W.D. Mo. 2017), and early return dates are the rule's design. See United States v. Bendawald, No. 24-cr-146, 2025 WL 711725, at *3 (D. Idaho 2025) ("Almost by its nature, every Rule 17(c) subpoena requests an early return"). Because the restitution disputes are for this Court to resolve by a preponderance of the evidence, 18 U.S.C. § 3664(e), 1 subject to a de novo determination of every referred

Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Motion without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. 163, 165 (2026), Defendant contends that the Sixth

issue, 18 U.S.C. § 3664(d)(6), the Rule 17 mechanism is the appropriate vehicle for compelling the third-party evidence those determinations require.

II. The Nixon Factors Are Satisfied

Relevancy. Every category in Exhibit A is tied to a disputed causation or offset question already framed on the docket. Causation: the MVRA limits restitution to losses directly and proximately caused by the offense of conviction, and the intervening, discretionary decisions of the estates' manager—the refusals of the Ares, Oaktree, Montshire, and Quadro transactions; the litigation against a prospective buyer; the pre-maturity sale of the protective zero-coupon instruments; the below- market Clanwilliam disposition—are the core of Defendant's causation defense. See generally Robers v. United States, 572 U.S. 639, 648-49 (2014); Doc. Nos. 132, 190. Mr. Dinius made or directed those decisions. Offsets: the value realized by or returned to the payees—the zero-coupon sale proceeds, the AAPC preferred equity transferred to ULICO, the Clanwilliam proceeds, and the fees and investment losses charged to the estates—must be credited under 18 U.S.C. § 3664(j)(2), and the documents that quantify those items are in the Rehabilitator's files. The necessity of compulsory process is confirmed by the Special Master's own position: his counsel's draft

Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

supplement asserts that the "precise dollar figures" and IALA classification of the zero-coupon offset remain open questions—questions answerable only from the estates' records, which Mr. Dinius controls.

Admissibility. The categories seek business records of the rehabilitation estates and of Noble Consulting kept in the ordinary course, Fed. R. Evid. 803(6); contemporaneous

correspondence of the payees' representative bearing on the estates' valuation and monetization decisions.

Specificity. The Exhibits identify categories of admissible evidence with reasonable specificity. For example, Exhibit A identifies discrete, dated transactions—the November 22, 2018 Ares letter of intent; the February 8, 2019 Oaktree proposal; the June 27, 2019 MOU; the zero-coupon bond sales; the December 2022 AAPC/ULICO transfer; the September 2025 Clanwilliam sale; the Beckett disposition—together with defined categories of valuation, fee, and accounting records, each bounded to the period October 1, 2018 to the present. (Ex. A at 2-5). The transactions are known, the record already documents Mr. Dinius's personal role in them, and what remains is the underlying paper.

Good faith. The subpoena is sought for the evidentiary hearing this Court must conduct on disputes the statute reserves to it—not for general discovery. Pre-hearing production is necessary because the volume and age of the records make review on the day of the hearing impracticable, and "the failure to obtain such inspection may tend unreasonably to delay" the proceeding. Nixon, 418 U.S. at 699. Defendant does not have access to the records. He surrendered the companies and their records in

2019 under the MOU and again under the Appointment Order, and a subpoena is the ordinary and proper mechanism for obtaining records from the officers and advisors who now hold them—including a court-appointed officer, whose records of a criminal restitution administration are not his own but the Court's. Finally, as to privilege: communications between any subpoenaed custodian and the Government are not privileged, and any claim of privilege as to other materials should be presented by written log, not by blanket withholding. "[T]he failure to obtain such inspection may tend unreasonably to delay" the proceeding. Nixon, 418 U.S. at 699.

III. The MVRA Itself Requires Production of These Records, and Requires

Time to Cure Deficiencies Before the Hearing.

The MVRA does not merely permit this production; its architecture requires it. The statute commands that restitution be reduced by "the value . . . of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and that any amount the victim later recovers for the same loss be credited, 18 U.S.C. § 3664(j)(2). It directs that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and it allocates the burdens: the Government bears the burden of demonstrating the victim's loss, and "the burden of demonstrating such other matters as the court deems appropriate" rests "upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). In this Circuit, the defendant bears the burden of proving that an offset or reduction applies, United Karam, 201 F.3d at 327, and of showing that a victim "delayed unreasonably in selling property (or otherwise neglected it)." United States v. Ritchie, 858 F.3d 201, 211 (4th Cir. 2017). The Compulsory Process Clause reaches materials obtained by

Rule 17(c) subpoena. See Khouj v. Darui, 248 F.R.D. 729, 732 (D.D.C. 2008). The statute therefore assigns Defendant a burden of proof on the very questions—the zero-coupon proceeds and their IALA classification, the AAPC-refinance payments, the cash repayments, the use of the hundreds of millions in interest and principal repayments the estates received—whose proof lives entirely in the files of the subpoenaed custodians. A statutory scheme that assigns a party the burden of proof necessarily entitles that party to process adequate to obtain the evidence that carries it; otherwise the preponderance

standard of § 3664(e) and the mandatory credits of § 3664(j)(2) become rights without remedies. These documents should be produced for these reasons: without them, the de novo determination that § 3664(d)(6) reserves to this Court would proceed on a record only one side is permitted to see.

The same statutory design dictates the timing. Defendant does not ask the Court to fix any particular interval; he asks only that the return date leave a meaningful runway to cure deficiencies before the hearing, because: (i) the productions span five custodians, seven-plus years, and hundreds of millions of dollars of transactions, and meaningful review of that volume cannot be compressed into days; (ii) review will generate follow-up—additional requests, clarifications, and targeted supplementation—that must itself be served and answered before the hearing; (iii) if any custodian produces deficiently, asserts unfounded privilege, or withholds, Defendant must have time to test the privilege logs and move to compel or to enforce the subpoena under Rule 17(g) while relief is still meaningful; and (iv) Nixon itself grounds pre-hearing production in the concern that late inspection "may tend unreasonably to delay" the proceeding, 418 U.S. at 699—a concern that cuts entirely in favor of early production here, because an adequate runway protects the hearing date rather than threatening it. A return date that leaves no time to cure deficiencies is, in practice, no compulsory process at all. By way of illustration only: given the number of custodians and the seven-year period the records span, a runway on the order of 120 to 180 days would accommodate that cure process; Defendant defers to the Court on the precise interval.

CONCLUSION AND RELIEF REQUESTED

WHEREFORE, Defendant respectfully requests that the Court enter an Order: (a) Authorizing issuance of, and directing the Clerk to issue, subpoenas duces tecum to (i) Michael Dinius in the form of Exhibit A; (ii) Joseph W. Grier, III, as Special Master, and NHC Holdings, LLC, in the form of Exhibit B;

(iii) Paladin Management Group in the form of Exhibit C; (iv) the NCICs, through the Rehabilitator as custodian of records, in the form of Exhibit D; (v) the Bermuda insurance companies, through their Joint Provisional Liquidators, in the form of Exhibit E; and (vi) Wes Camden, Lauren Fussell, and their firm, in the form of Exhibit F—each commanding production of the designated documents to the Clerk of Court (or, at the Court's election, to counsel for all parties) at such time as the Court directs, sufficiently in advance of the evidentiary hearing on the disputed restitution issues to permit Defendant to review the productions, seek additional information through any follow-up requests, and, if necessary, move to compel or enforce compliance under Rule 17(g) before the hearing, with leave for the parties and their attorneys to inspect the productions pursuant to Rule 17(c)(1); (b) Providing that any assertion of privilege or protection be made by written log served on all parties within seven (7) days of service of the subpoena; and (c) Granting such other and further relief as the Court deems just and proper.

Dated: July 22, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

CONSULTATION STATEMENT

Pursuant to the Court's motions practice and LCrR 47.1, the undersigned states that counsel for Defendant conferred with counsel for the United States and counsel for the Special Master on July 23, 2026, regarding the relief requested herein. The United States opposes the relief requested and the Special Master's opposes the relief requested.

Dated: July 23, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 23, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 23, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 251 — Notice of Filing of Petition for Writ of Mandamus (4th Cir. No. 26-1965) (filed 07/24/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Plaintiff, v.

Case No. 3:23-CR-48-MOC

GREG E. LINDBERG,

Defendant.

NOTICE OF FILING OF PETITION FOR WRIT OF MANDAMUS

Defendant Greg E. Lindberg, by through counsel, hereby provide notice that the Petition for Writ of Mandamus (the "Petition"), attached hereto as Exhibit A, was filed today in the Fourth Circuit Court of Appeals.

Respectfully submitted this the 24th day of July 2026.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 7/24/26

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

**Doc. 252 — Response in Opposition to Motion for Inquiry into Status of Counsel / Motion to Modify Transport Order (filed 07/25/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 5:19-CR-22-MOC

Plaintiff,

Case No. 3:23-CR-48-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

RESPONSE IN OPPOSITION TO THE MOTION FOR INQUIRY INTO

STATUS

OF COUNSEL AND, IN THE ALTERNATIVE, MOTION TO MODIFY

THE TRANSPORT ORDER TO PERMIT A FURLOUGH

Defendant Greg E. Lindberg respectfully submits this Response in opposition to the United States' Motion for Inquiry into Status of Counsel (Doc. 247) and, in the alternative, moves to modify the transport order (Doc. 250) for the August 7, 2026 hearing. For the reasons set forth below, the Motion should be denied.

I. The Motion's sole evidence of a disavowal is explained.

The Motion's only evidence that a counsel disavowed Mr. Lindberg's representation is the "Respondent Pro Se" designation on his response to Conservatrix's mandamus petition (Doc. 198). Attorney Vivek Ramachandran, engaged to represent Mr. Lindberg in his Fourth Circuit appeals, had not yet been admitted to that court's bar when the response came due on a turnaround of approximately twelve hours — the CVRA requiring the court of appeals to decide "within 72 hours after the petition has been filed." 18 U.S.C. § 3771(d)(3). Before filing, Mr. Ramachandran contacted the Office of the Clerk of the Fourth Circuit, disclosed that he was not yet admitted to that court's bar, and stated that he would sign the filing if that was required; with the explicit approval of the head clerk, express permission was granted to file pro se by email. (Ex. A.) The filing was made pro se because recasting the entire document in counsel's name — its cover page, its title, its signature block, and its certificate of service — would have taken more than the few hours that remained to respond. The transmitting email records it: "Respondent sought and received approval of the court to file this via email." (Ex. D.) See 4th Cir. R. 25(b)(1). He has since been admitted and handles all filings there. What the record shows is Mr. Lindberg and his attorneys adapting to a transition in representation under a deadline measured in hours — not a defendant casting off his counsel.

II. The copy on this Court's docket was filed to keep the Court informed.

Local counsel filed that document here as transmitted, to keep this Court apprised of the Crime Victims' Rights Act proceedings arising out of this case. (Ex. C.) It was not a

disavowal of Mr. Lindberg's representation here, and nothing in this Court's record — no motion to proceed pro se, no waiver colloquy — suggests otherwise.

III. Mr. Lindberg has stated his representation in his own signed words.

In his own signed words (Ex. B), Mr. Lindberg identifies his counsel, confirms he has reviewed the filings made on his behalf, and asks that the Government respond to them on their merits. Exhibit B also shows how his filings are produced: written out by hand at FCI Atlanta and sent out to be typed and filed. Any resulting infirmity should be excused in favor of the merits. Other quibbles like different

signatures blocks reflect counsel in transition period working under constrains to place all evidence on record within the 60 day deadline nothing more.

The Court should decline to elevate form over substance, particularly where the litigant is incarcerated and must work around limits on access to counsel, to his materials, and to any means of filing. The Government has had these filings for weeks. It raises them now — after the filings were made and answered on the docket, and while Mr. Lindberg is preparing his opposition to the Special Master's final report — and asks for a hearing about signatures rather than a response on the merits. Nothing in the Motion suggests that any defect in form impaired the Government's ability to respond to what the filings actually say. The Government has known of these matters since June. Its June 16, 2026 motion complained that counsel had not conferred before filing and that a consultation statement had been left blank. (Doc. 205 ¶¶ 3, 5.) It did not then ask for a hearing on the status of counsel; it asked to defer its responses. In light of Mr. Lindberg's incarceration and the practical constraints it imposes, any remaining requirement of form should be waived to the extent necessary to permit a decision on the merits. In any event, whatever the Motion identified is now moot. Counsel are identified on this filing, each has declared what he did (Exs. A, C), and Mr. Lindberg has stated his representation in his own signed words (Ex. B). Nothing remains for a hearing to resolve. And in any case, none of this excuses the Government's failure to respond to those filings on their merits — the very responses it asked to defer indefinitely. (Doc. 205.)

IV. The 90-day period the Motion invokes supplies no urgency.

The Government rests its urgency on the 90-day period in 18 U.S.C. § 3664(d)(5). That period cannot bear the weight. The Government itself jointly moved to bifurcate sentencing from restitution, and the Court granted that motion on April 7, 2026, directing that the sentencing hearing be held after entry of a preliminary restitution order and that restitution be finalized at one or more later hearings. (No. 5:19-cr-22, Doc. 504; No. 3:23-cr-48, Doc. 107; Order, Doc. 108.) Having agreed to a structure that defers the final restitution determination, the Government cannot invoke § 3664(d)(5) as a reason to convene a hearing on the status of counsel on August 7. The Government's own conduct is inconsistent with the urgency it now asserts. On June 16, 2026, it moved to extend its time to respond to Mr. Lindberg's pending motions — Docs. 172, 190, 201, and 202, "and any additional such future motions" — "until at least 14 days after such time as the Court rules on the pending motions . . . to withdraw as counsel," "or as otherwise directed by the Court as part of a consolidated briefing schedule." (Doc. 205.) That request fixed no end date; it ran to a ruling that had not issued, and forward to motions not yet filed. The Government also asked then for "a status hearing in regard to the numerous pending motions." Id. Having sought to defer its responses indefinitely, it cannot now invoke the 90-day period as the reason a hearing must be held on August 7. The bifurcation order itself cites Dolan v. United States,

560 U.S. 605, 608–09 (2010), and Manrique v. United States, 581 U.S. 116, 118 (2017), for the proposition that a court may sentence and determine restitution later. (Doc. 108 ¶ 14.)

V. The Motion should be denied; if a hearing proceeds, transport should be modified.

The Motion should be denied as moot and the August 7, 2026 hearing vacated. If the hearing proceeds, the transport order (Doc. 250) should be modified to permit a Bureau of Prisons furlough: it is less burdensome than custodial transport from FCI Atlanta and preserves Mr. Lindberg's access to counsel before a hearing about who his counsel are. He is presently preparing his opposition to the Special Master's final report, work that transport would interrupt.

The hearing itself, apart from transport, takes time Mr. Lindberg does not have. He is racing against the clock to prepare his response to the Special Master's final restitution report — the document on which the amount of any restitution award may turn — under the same custodial constraints described above. Every day given over to form rather than substance — and every day consumed by producing him for a hearing — is a day taken from his ability to respond to the pending motions and to the final order of restitution. Those are the proceedings that will determine what he owes, and the Motion identifies no corresponding benefit to the Court or to the Government.

Dated: July 25, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com

Counsel for Greg E. Lindberg

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 25, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 25, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 253 — Supplemental Response of Undersigned Counsel re Doc. 247 (filed 07/26/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 5:19-CR-22-MOC

Plaintiff,

Case No. 3:23-CR-48-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

SUPPLEMENTAL RESPONSE OF UNDERSIGNED COUNSEL TO THE UNITED STATES' MOTION FOR INQUIRY INTO STATUS OF COUNSEL (DOC. 247) ADDRESSING MINISTERIAL CORRECTIONS

Kenneth N. Barnes, local counsel for Defendant Greg E. Lindberg, respectfully submits this supplemental response to address the ministerial matters identified in the United States' Motion for Inquiry into Status of Counsel (Doc. 247). The Government never notified the undersigned of any of these matters before raising them with the Court. Each is a clerical matter. Each has been corrected or is being corrected, and none requires a hearing.

I. The duplicate notice-of-appeal entries were filing errors that counsel reported to the Clerk the same evening.

The Motion observes that two notices of appeal appear on the docket. Only one appeal was taken in each case. The duplicate entries were filing errors, and the undersigned identified them to the Clerk's Office the same evening they occurred.

In No. 3:23-cr-48, the notice of appeal was submitted at Doc. 191 without a signature. It was re-filed in signed form at Doc. 192. In No. 5:19-cr-22, the notice of appeal at Doc. 536 was filed before the motion to stay rather than after it, and was re- filed at Doc. 538.

On June 11, 2026, at 6:32 p.m., the undersigned emailed the Clerk's ECF Help Desk identifying both errors and stating the correct order of the filings. (Ex. F.) As to No. 3:23-cr-48, the email states: "Please remove Docket#191 was filed in error as it was submitted without a signature. The correct order the documents is Docket #190 motion to stay followed by Docket #192 Notice of Appeal." As to No. 5:19-cr-22: "Please remove Docket# 536 was filed in error before the motion for stay. The correct order the documents is Docket #537 motion to stay followed by Docket #538 Notice of Appeal."

The docket reflects those corrections. The entry at Doc. 191 was annotated as a filing error and re-filed at Doc. 192; the Clerk transmitted the notice of appeal to the Fourth Circuit on June 12, 2026 (Doc. 194) and transmitted the signed version on June 15, 2026 (Doc. 200); and the Fourth Circuit assigned Case No. 26-4309 (Doc. 199). The second entry in each case is the corrected version of the first, not a second appeal.

The corrections did not affect timeliness. Judgment was entered on May 29, 2026 (Doc. 162), and the notice of appeal was filed on June 11, 2026 — one day before the fourteen-day

deadline that runs from entry of the judgment or order appealed from. Fed. R. App. P. 4(b)(1)(A). The appeal was timely, and the sequence as it now appears on the docket is accurate.

In any case, none of these errors prevented the Government from responding on the merits.

II. Certifications inadvertently omitted from certain filings will be supplied by errata.

The Motion identifies the filings by docket number. It states that one has no signature block (Doc. 174). That filing is a Supplemental Statement of Facts. It is now supported by Mr. Lindberg's affidavit, sworn under penalty of perjury and attached as Exhibit E, and the undersigned adopts it as set out in Section IV below.

To the extent any of those filings — Docs. 172, 173, 174, 190, 201, 202, 211, 212, 213, 220, 225, 227, 228, 234, 236, 237, and 238 — lacks a certification required by the Local Rules, the certification was inadvertently omitted from the document as filed. The undersigned will file an errata correction sheet within the next few days supplying the required certifications for each such filing. The undersigned respectfully requests that the Government identify any additional filing it contends is deficient so that it may be included in the same errata.

In at least one of the filings, the certification was not omitted at all — it was inadvertently placed at the end of the first exhibit rather than immediately after the undersigned's signature. The certification was executed; it appears in the wrong place. The errata will place each certification where it belongs.

Had the Government raised these omissions with the undersigned before raising them with the Court, they could have been supplied without the Court's involvement. In any case, none of these errors prevented the Government from responding on the merits.

III. Defendant has sworn to the statements of fact filed on his behalf.

Defendant Greg E. Lindberg has executed an affidavit, dated July 26, 2026 and sworn under penalty of perjury, which is attached as Exhibit E. In it he declares that, to the extent his Statements of Facts are on the record in these cases, those filings are intended as his personal affidavits (Ex. E ¶ 1); that he personally reviewed the documents but could not sign them when they were filed, for the custodial reasons described above (id. ¶ 2); and that he adopts all Statements of Fact and all Supplemental Statements of Fact filed in these cases (id. ¶ 4).

The affidavit identifies, without limiting the adoption, the following filings (id. ¶ 5): Docs. 132-1 and 132-2, the two parts of Exhibit 1 to Defendant's Response and Objection to the Special Master's Report and Recommendations, filed May 4, 2026 and titled Greg Lindberg's Statement of Facts; Doc. 190-4, the Statement of Facts filed as an exhibit to the motion to stay; and Doc. 234. The adoption also reaches the Supplemental Statement of Facts at Doc. 174, which is among the filings the inquiry identifies.

Whatever question the Motion raises about the source of the factual statements in these filings is answered by that affidavit.

In any case, none of these errors prevented the Government from responding on the merits.

IV. Undersigned counsel adopts the statements of fact.

The undersigned adopts Mr. Lindberg's sworn statement of facts to the extent necessary to support the filings in this case. That adoption extends to each filing identified in Mr.

Lindberg's affidavit (Ex. E ¶ 5) — Docs. 132-1 and 132-2, which together comprise Exhibit 1 to Defendant's Response and Objection to the Special Master's Report and Recommendations, titled Greg Lindberg's Statement of Facts, and which are now sworn to and signed by Mr. Lindberg and adopted by undersigned

counsel to the extent necessary in any motions; Doc. 190-4; and Doc. 234 — and to the Supplemental Statement of Facts at Doc. 174.1 In any case, none of these errors prevented the Government from responding on the merits.

These are ministerial matters. They have been corrected or are being corrected in the ordinary course, and the Court need not convene a hearing to accomplish what counsel is already doing.

Dated: July 26, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

A typed affidavit that supersedes the handwritten affidavit, correcting the filing dates as they appear on the docket, will be signed by Mr. Lindberg and filed with the Court as soon as practicable.

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 26, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 26, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 254 — Notice of Filing of Statement of Counsel Representation and Emergency Request for Furlough (filed 07/27/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

GREG E. LINDBERG,

Defendant.

NOTICE OF FILING OF

STATEMENT OF COUNSEL REPRESENTATION AND EMERGENCY

REQUEST TO ALLOW FURLOUGH TO ATTEND ANY HEARING

Defendant Greg E. Lindberg, by through counsel, hereby provides notice of filing the Statement of Counsel Representation and Emergency Request to Allow Furlough to Attend Any Hearing ("Statement and Request") attached hereto as Exhibit A. This Statement and Request was previously filed in these matters on July 25, 2026 as Docs. Nos. 252-2 and 575-2.

Respectfully submitted this the 27th day of July 2026.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Pro Hac Vice Pending Counsel for Defendant Greg E. Lindberg

Case 3:23-cr-00048-MOC-DCK 1 254 Document Filed 07/27/26 Page 1 of 3

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 7/27/26

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

**Doc. 256 — Notice of Correction re the Valuation of Beckett (filed 07/27/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC Plaintiff, (Charlotte Division)

v.

Case No. 5:19-CR-22-MOC

(Statesville Division)

GREG E. LINDBERG,

Judge Max O. Cogburn, Jr.

Defendant.

NOTICE OF CORRECTION REGARDING THE

VALUATION OF BECKETT COLLECTIBLES, LLC

Defendant Greg E. Lindberg respectfully submits this Notice of Correction to correct the record in the above-captioned proceedings regarding the value of Beckett Collectibles, LLC ("Beckett"). This Notice corrects only the record as reflected on the docket and is submitted promptly upon counsel and Mr. Lindberg obtaining access to the underlying valuation materials.

I. BACKGROUND

In prior filings made by Defendant on the docket in these proceedings—including the response to the Special Master's request for additional time—a New York Times article discussing the sale of Beckett was attached, and the filing used the sales figure for Beckett then available to counsel. That sales figure—approximately $134 million— was communicated by the Special Master during a call and did not originate with Defendant. A sales figure is not the same as a valuation: as the independent materials set forth below establish, Beckett's value was approximately $1 billion, and in all events greater than $800 million. The record is corrected accordingly.

This correction was precipitated by Mr. Lindberg's movement through the Federal Bureau of Prisons ("BOP") transit system following his designation, during which Case 3:23-cr-00048-MOC-DCK 1 256 Document Filed 07/27/26 Page 1 of 8 counsel had very limited—if any—access to Mr. Lindberg at the time these filings were made. Because Mr. Lindberg could not be meaningfully consulted, and in order to timely place a response on file, the filing relied on the sales figure then available to counsel and attached the New York Times article discussing the Beckett sale rather than the underlying valuation materials. Mr. Lindberg and counsel now have access to the underlying valuation and transaction materials, each of which is attached hereto and independently corroborates the others.

II. THE CORRECTED VALUATION

The contemporaneous, independent, and arm's-length market evidence establishes the following with respect to Beckett's value:

A. Independent appraisal (Cabrillo Advisors). An independent business

valuation prepared by Cabrillo Advisors, Inc., with a valuation date of January 31, 2022, concluded that the enterprise value of Beckett was $1,003,924,000—approximately $1 billion. (Ex. A.)

B. Blackstone Indication of Interest. In an indication of interest and

related counter dated April 5, 2022, Beckett was valued at a total enterprise valuation of $1.05 billion, with the accompanying analysis noting an implied enterprise value of approximately $1.001 billion, "just under Cabrillo's calculated EV of $1.004bn." (Ex. B.)

C. CCG + Beckett term sheet. The CCG + Beckett proposal and term sheet

dated April 14–16, 2022 reflected a Beckett equity value of $800 million to $900 million (on a debt-free, cash-free basis), and projected "Beckett Proceeds by 2022E" of approximately $941 million to $1.065 billion. (Ex. C.)

D. Best-and-final counter. Contemporaneous transaction correspondence

reflects a best-and-final counter at a Beckett valuation of $1.1 billion (structured as Case 3:23-cr-00048-MOC-DCK Document 2 256 Filed 07/27/26 Page 2 of 8 $250 million cash at closing and $325 million within 30 days, among other terms). (Ex.

D.)

Each of these sources—an independent appraisal, an institutional buyer's indication of interest, the parties' term sheet, and the best-and-final counter—independently establishes that Beckett's value was approximately $1 billion, and in every case greater than $800 million. The approximately $134 million sales figure previously available to counsel is not the same as this independent valuation; to the extent it was used in any prior filing to describe Beckett's value, the record is corrected.

III. SCOPE OF THIS CORRECTION

Defendant corrects the record as to Defendant's own filings on the docket in these proceedings—specifically the two filings identified below, and any other filing made by Defendant that used the sales figure then available to counsel to describe the value of Beckett. In each such filing by Defendant, any use of that sales figure to describe Beckett's value is superseded and corrected by the valuation evidence set forth above and in the attached exhibits, which reflect a value of approximately $1 billion, and in all events greater than $800 million. This Notice corrects only Defendant's own filings and does not purport to correct any filing made by any other party.

A. Response to the Special Master's Motion for Extension of Time

(Doc. 220). Defendant's Response in Opposition to the Special Master's Motion for Extension of Time, filed June 22, 2026, attached as Exhibit A a New York Times article discussing the sale of Beckett and stated that Beckett "was sold to Collectors in December 2025 with no motion, no notice, no order, and no accounting of the proceeds." That filing stated no value for Beckett and did not use the approximately $134 million figure; it is identified here for completeness and requires no correction as to Beckett's Case 3:23-cr-00048-MOC-DCK Document 3 256 Filed 07/27/26 Page 3 of 8 value, which the attached exhibits establish was approximately $1 billion, and in all events greater than $800 million.

B. Motion for a Determination That No Restitution Is Owed (Doc. 234).

Defendant's Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, filed July 14, 2026, states that "[t]he Beckett transaction (approximately $134 million) was

effected without court approval and without any accounting for the proceeds." The approximately $134 million figure in that statement refers to the sales figure the Special Master reported Beckett was sold for and is not Beckett's valuation. The record is corrected to reflect that Beckett's value was approximately $1 billion, and in all events greater than $800 million, as shown in the attached exhibits—a valuation distinct from, and substantially above, the reported sale price of approximately $134 million. This correction is limited to Beckett's value and does not alter any other statement in that filing, including that the disposition was effected without court approval or an accounting of proceeds.

This Notice is limited to correcting the record as reflected on the docket. To the extent any filing references the Special Master's sale of Beckett for approximately $134 million, that figure is accurate as a description of the reported sale; the correction made herein is limited to Beckett's value, which was approximately $1 billion, and in all events greater than $800 million.

Case 3:23-cr-00048-MOC-DCK 4 256

Document Filed 07/27/26 Page 4 of 8

IV. SUMMARY OF SUPPORTING VALUATION EVIDENCE

Source (Exhibit) Beckett Value Document Date Exhibit Cabrillo Advisors, Inc., $1,003,924,000 Valuation date Jan. Ex. A Business Valuation (Ex. 31, 2022; prepared

A) Apr. 7, 2022

Blackstone Indication of $1.05 billion TEV Apr. 5, 2022 Ex. B Interest / Beckett Counter (Ex. B) CCG + Beckett Blackstone $800–$900 million Apr. 14–16, 2022 Ex. C Proposal / Term Sheet equity value; (Ex. C) proceeds to $1.065 billion by 2022E Correspondence re CCG | $1.1 billion Apr. 18, 2022 Ex. D Beckett Term Sheet (best- valuation and-final counter) (Ex. D)

V. EXHIBITS

Exhibit A Business Valuation of Certain Entities for Global Growth Holdings Inc., prepared by Cabrillo Advisors, Inc. (valuation date Jan. 31, 2022; prepared Apr. 7, 2022).

Exhibit B Blackstone Indication of Interest – Beckett Counter (Apr. 5, 2022).

Exhibit C CCG + Beckett Blackstone Proposal / Term Sheet (Apr. 14–16, 2022).

Exhibit D Correspondence re CCG | Beckett Term Sheet, reflecting best-and- final counter (Apr. 18, 2022).

Dated: July 27, 2026 Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Pro Hac Vice Pending Counsel for Defendant Greg E. Lindberg Case 3:23-cr-00048-MOC-DCK 5 256 Document Filed 07/27/26 Page 5 of 8

CERTIFICATE OF CONSULTATION

Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States on July 27, 2026, regarding the relief requested herein.

The United States' does not have a position.

The Special Master also has no objection to this filing.

/s/ Kenneth N. Barnes Kenneth N. Barnes

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 27, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 27, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 257 — Notice of Filing of Replacement Petition for Writ of Mandamus (filed 07/27/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 3:23-CR-48-MOC

v.

Case No. 5:19-CR-22-MOC

GREG E. LINDBERG,

Defendant.

NOTICE OF FILING OF

REPLACEMENT PETITION FOR WRIT OF MANDAMUS

Defendant Greg E. Lindberg, by through counsel, hereby provides notice of filing the Replacement Petition for Writ of Mandamus attached hereto as Exhibit A. This Statement and Request was previously filed today in the Fourth Circuit Court of Appeals.

Respectfully submitted this the 27th day of July 2026.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Pro Hac Vice Pending Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 7/27/26

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603
Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg

**Doc. 259 — Notice of Errata (Docs. 172, 173, 174, 190, 202, 211, 212, 213, 220, 225, 234, 236, 238) (filed 07/28/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

NOTICE OF ERRATA

DOC NOS. 172, 173, 174, 190, 202, 211, 212, 213, 220, 225, 234, 236, 238

Defendant Greg E. Lindberg respectfully submits this Errata to certain filings in order to correct inadvertent clerical errors in the following docket entries identified below with accompanying certifications and consultations with opposing counsel in resolution of the errors:

1. DOC. NO. 172: "Defendant Greg E. Lindberg's Emergency Motion (I) to Stay

All Further Asset Sales and Asset-Sale Processes and to Stay Enforcement of The Preliminary Order of Restitution (Doc. No. 161); (II) to Correct and Amend The Preliminary Order of Restitution to Conform to The Mandatory Victims Restitution Act; (III) to Return The Primary Restitution Assets to Defendant's Control On The Ground That Restitution Has Been Fully Paid and Overpaid; and (IV) in The Alternative, to Return The De Minimis Sacs Identified in The Clanwilliam Sale Order to Defendant's Control with Immediate Effect." Doc.

No. 172 was inadvertently filed without an Artificial Intelligence Certification Pursuant to the Standing Order of this Court entered June 18, 2024, and

published to the Bar of the Western District on June 27, 2024 (hereinafter "AI Certification") and Certification of Consultation pursuant to LCrR 47.1 (b) (hereinafter "Certificate of Consultation"). In addition, replacement counsel was working during transition to get these documents in place within the 14- day deadline after sentencing for an appeal brief.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. The Special Master opposes, except the Special Master takes no position on a temporary stay on asset sale activities by the Special Master until the district court can enter a final order on restitution.

AI Certification: Pursuant to the Standing Order of this Court, In Re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, Thomson Reuters and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the

proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

2. DOC. NO. 173: "Memorandum of Law in Support of Defendant Greg E. Lindberg's Emergency Motion (I) to Stay All Further Asset Sales; (II) to Return The Primary Restitution Assets; and (III) in The Alternative, to Return The De Minimis Sacs with Immediate Effect." Doc. No. 173 was inadvertently filed without a Certificate of Consultation. In addition, replacement counsel were working during transition to get these documents in place within the 14 day deadline after sentencing for an appeal brief.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. The Special Master opposes, except the Special Master takes no position on a temporary stay on asset sale activities by the Special Master until the district court can enter a final order on restitution.

3. DOC. NO. 174: "Greg Lindberg's Supplemental Statement of Facts in Support of Defendant's Response and Objection to Special Master's Report and Recommendations Regarding Restitution." Doc. No. 174 was inadvertently filed without local counsel, Kenneth Barnes' signature, an AI Certification and Certification of Consultation. In addition, Doc. No. 174 was intended as a sworn declaration of Greg Lindberg who could not sign documents including the sworn affidavit because he was handcuffed during legal visits at the Catawaba County Detention center. Local Counsel Kenneth Barnes has

already adopted this Doc. No. 174 based on this document being Greg Lindberg's sworn affidavit.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. To the extent relief is requested from the district court through this pleading, the Special Master opposes.

AI Certification: Pursuant to the Standing Order of this Court, In Re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, Thomson Reuters, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

4. DOC. NO. 190: "Defendant's Emergency Motion to Stay All Asset Sales and Asset sale Processes Pending Entry of A Final Restitution Order and De Novo Article III Determination, and Consolidated Objections to The Preliminary Order of Restitution (Doc. 161), The Scope of The Special Master Reference,

and The Special Master's Statement (Doc. 159), with incorporated Memorandum of Law." Doc. No. 190 was inadvertently filed without an AI Certification and Certification of Consultation. In addition, replacement counsel were working during transition to get these documents in place within a 14-day deadline after sentencing for an appeal brief.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes (except insomuch as Defendant is asking Court to reach conclusions about restitution issues that were preserved in Preliminary Order of Restitution). The Special Master opposes, except the Special Master takes no position on a temporary stay on asset sale activities by the Special Master until the district court can enter a final order on restitution.

AI Certification: Pursuant to the Standing Order of this Court, In Re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, Thomson Reuters, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the proposition for which it is offered and the citation to the

authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

5. DOC. NO. 202: "Defendant's Emergency Motion to Enforce The Plea

Agreement and The Order Appointing The Special Master, to Preserve His Due-Process and Counsel-Access Rights in The Pending Restitution Proceedings, and to Require That The Government Be Represented By Conflict-Free Counsel." Doc. No. 202 was inadvertently filed without a Certification of Consultation.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. In addition, prior counsel informed Greg E. Lindberg that Government counsel had asked for protected filings be removed which made consultation in such an environment a challenge for counsel in transition, who chose to preserve evidence as soon as possible. The Special Master responded as follows: (I) No position on requests for relief (a) through (d); (II) as to (e), the Special Master takes no position on a temporary stay on asset sale activities by the Special Master until the district court can enter a final order on restitution, otherwise oppose; and (III) opposes (f).

6. DOC. NO. 211: "Defendant's Response in Opposition to The Government's

Motion For Extension of Time." Doc. No. 211 does not require a Certification of

Consultation because this is a response to a Motion for Extension of time.

However, in light of the motion filed by the government, Defendant's counsel anyway reached out to the government regarding their position.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes (insomuch as it pertains to Doc.

Nos. 201 and 202). The Special Master opposes the relief sought.

7. DOC. NO. 212: "Defendant Greg E. Lindberg's Response in Opposition to The

Objection and Motion For Reconsideration of Cell 1.16's Rehabilitator." Doc.

No. 212 was inadvertently filed without a Certification of Consultation.

However, in light of the motion filed by the government, Defendant's counsel anyway reached out to the government regarding their position.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States responded "N/A." The Special Master consents to the relief sought.

8. DOC. NO. 213: "Defendant's Motion For Extension of Time to Respond to The Objection and Motion For Reconsideration of Cell 1.16's Rehabilitator (Doc. No. 171)." Doc. No. 202 was inadvertently filed without a Certification of Consultation.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States responded, "no objection to relief requested." The Special Master took no position on this document.

9. DOC. NO. 220: "Defendant's Response in Opposition to The Special Master's Motion For Extension of Time (Doc. 218) and to The Special Master's initial Response (Doc. 217)." Doc. No. 220 does not require a consultation. However, in light of the motion filed by the government, Defendant's counsel anyway reached out to the government and Special Master regarding their position.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. The Special Master opposes the relief sought.

10. DOC. NO. 225: "Defendant Greg E. Lindberg's Emergency Motion For An Order Directing The Bureau Of Prisons To Permit Daily Access To Counsel And The Use Of A Computer And Case Records In The Presence Of Counsel."

Doc. No. 225 was inadvertently filed without a Certification of Consultation.

Government was consulted regarding the motion and Government agreed to filing of this motion with an additional paragraph inserted. However, in light of the motion filed by the government, Defendant's counsel anyway reached

out to the government and Special Master regarding their position. This addendum merely fixes the already stated position which is provided in the motion itself.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States on July 27, 2026, regarding the relief requested herein; the United States responded, "Government's Position already provided and set forth in filing."

11. DOC. NO. 234: "Defendant's Motion For A Determination That No Restitution Is Owed, Or in The Alternative For Exclusion and offset of Losses Not Proximately Caused By The offense of Conviction, with incorporated Memorandum of Law." Doc. No. 234 was inadvertently filed without a Certification of Consultation. The government was consulted prior to filing the motion. However, in light of the motion filed by the government, Defendant's counsel anyway reached out to the government and Special Master regarding their position.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States opposes the relief sought. The Special Master opposes the relief sought.

12. DOC. NO. 236: "Defendant Greg E. Lindberg's Motion For Leave to File Sur-

Reply." Vista was approached and given an additional day of time for their position before the Sur-Reply was filed. Therefore, the consultation did happen before the Sur-Reply was filed. Doc. No. 236 was inadvertently filed without an AI Certification. However, Doc. No. 236 was inadvertently filed without a notice of consultation. However, in light of the motion filed by the government, Defendant's counsel anyway reached out to the government and Special Master regarding their position.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; the United States responded, "motion already granted." The Special Master took no position on this document.

AI Certification: Pursuant to the Standing Order of this Court, In Re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence as is embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, Thomson Reuters, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked— as to the accuracy of the proposition for which it is offered and the citation to the

authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

13. DOC. NO. 238: "Defendant Greg E. Lindberg's Motion To Recoup The

Distribution To Vista, And For Related Relief, Based On Cell 1.16's Materially Overstated And Duplicative Restitution Claim." Doc. No. 238 was inadvertently filed without a Certification of Consultation.

Certificate of Consultation: Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and Special Master on July 27, 2026, regarding the relief requested herein; The Special Master responded as follows, "You didn't ask about 238, but we: (I) oppose the recoupment request and credit request; and (II) do not oppose the claim rejection request or evidentiary hearing request."

The Special Master further indicated that, "to the extent I inadvertently failed to articulate the special master's position on a pleading identified below or missed a request for relief within a pleading identified below, the special master opposes the relief."

[Signature on following page.]

Dated: July 28, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg
1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this Notice of Filing Errata while his Motion for Pro Hac Vice remains pending.

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: July 28, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF CONSULTATION

Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and the Special Master on July 27, 2026, regarding this Notice of Filing Errata.

The Special Master does not oppose updating the record to add the other parties' positions on the various pleadings.

The United States does not oppose updating the record to add the other parties' positions on the various pleadings.

Dated: July 28, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 28, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 260 — Notice of Filing of Exhibits (filed 07/28/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

Case No. 3:23-CR-48-MOC Case No. 5:19-CR-22-MOC

UNITED STATES OF AMERICA,

Plaintiff,

v.

GREG E. LINDBERG,

Defendant.

NOTICE OF FILING

Defendant Greg E. Lindberg respectfully submits and places on the record of these proceedings true and correct copies of the following documents:

1. Exhibit A: the Trust Agreement of The Beckett Collectibles Trust,

dated as of June 2021, by and among The Bryn Mawr Trust Company of Delaware, as Delaware Trustee, Hugh Steven Wilson, as Independent Trustee, and Entrust Global Group, LLC, a North Carolina limited liability company, as Grantor and Sole Beneficiary — the Delaware statutory trust through which Beckett was held, including its definition of "Fundamental BKX Matters"

reserving approval of any sale or other disposition of all or substantially all assets, and any refinancing in excess of $5,000,000, to the trust's governance;

2. Exhibit B: the Assignment Agreement effective as of February 13,

2025, by and between Global Growth Holdings, LLC and Defendant, as Assignor, and Joseph W. Grier, solely in his capacity as Special Master, as Assignee, by which the Special Master became the "record owner" of the equity of NHC Holdings, LLC, holding all associated economic, legal, voting, and beneficial rights — including "any and all rights of Assignor to transfer or otherwise dispose of the NHC Equity Interest" — and covenanted to administer those interests "in accordance with the Order" appointing him (Doc.

No. 56); and

3. Exhibit C: the NHC Holdings, LLC Board Presentation prepared by

M3 Partners, LP, dated September 25, 2024, whose roster of "NHC Portfolio Managers" includes the Chief Executive Officer of the Beckett group — reflecting that Beckett was held and managed within the NHC Holdings structure.

These documents bear on matters presently before the Court, including Defendant's pending motions (Doc. Nos. 172, 190, 201, 202, and 234), Defendant's response to the Special Master's Second Supplement (Doc. No. 245), and the previously undisclosed sale of Beckett for approximately $134 million. Defendant respectfully directs the Court's attention to the

requirement of the Order Appointing Special Master that liquidation of restitution assets occur only with Court approval and that sales be disclosed to the Court. (Doc. No. 56, at 6.)

Read together with the valuation of Beckett at approximately $1 billion already of record (Doc. No. 256 and exhibits thereto, filed July 27, 2026), the attached instruments establish the following from the documents themselves: Beckett was held and managed within the

NHC Holdings structure (Ex. C); the Special Master is the record owner of the NHC equity, holding all voting rights and all rights to transfer or otherwise dispose of it, and is bound to administer those interests in accordance with the Order Appointing Special Master (Ex. B); the trust instrument through which Beckett was held reserves approval of any sale or other disposition of all or substantially all assets, and any refinancing above $5,000,000 (Ex. A); and the Order conditions liquidation on Court approval — twice — and requires that sales be disclosed to the Court (Doc. No. 56, at 6). Notwithstanding all of the foregoing, Beckett — valued of record at approximately $1 billion — was sold for approximately $134 million with no motion, no notice, no order, no Court approval, and no accounting on the docket of this Court.

Dated: July 28, 2026

Respectfully submitted,

/s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E.

Lindberg

CONSULTATION

Counsel for Defendant contacted counsel for the United States, AUSA Daniel Ryan, regarding this filing and the government's position on it on July 28, 2026. As of the time of filing, no response had been received.

CERTIFICATION REGARDING THE USE OF ARTIFICIAL

INTELLIGENCE

Pursuant to the Standing Order of this Court, In re: Use of Artificial Intelligence, the undersigned certifies that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, Bloomberg, and FastCase; and (2) every statement in this document, and every citation to an authority contained in it, has been checked—as to the accuracy of the proposition for which it is offered and the citation to the authority provided—by an attorney in this case or a paralegal working at that attorney's direction.

Dated: July 28, 2026

/s/ Kenneth Barnes__________

KENNETH BARNES

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: 7/28/26

/s/ Kenneth Barnes__________

[Doc. 260-1 — Exhibit]

TRUST AGREEMENT

-by and among-

THE BRYN MAWR TRUST COMPANY OF DELAWARE,

the Delaware Trustee

HUGH STEVEN WILSON,

the Independent Trustee and

ENTRUST GLOBAL GROUP, LLC,

a North Carolina limited liability company Grantor and Sole Beneficiary

Dated as of June __, 2021

THE BECKETT COLLECTIBLES TRUST

(o) Declaring or paying any dividend or the making of any other distribution;

(p) Establishing subsidiaries, acquiring or disposing of shares in any company or participating in, or terminating any participation in, any partnership or joint venture or acquiring or disposing of any other investment;

(q) Granting any lease or third party rights in respect of the entity's property;

(r) Making any claim, disclaimer, surrender, election or consent of a material nature for tax purposes;

(s) Listing any share capital or other securities on any exchange.

(t) Beginning or settling any legal or arbitration proceedings (other than routine debt collection);

(u) Entering into any abnormal or unusual contract or commitment, including any which:

(i) is outside the ordinary course of business;

(ii) is unlikely to be profitable;

(iii) would have extended payment terms;

(iv) would involve a total outlay over the term of the contract in excess of a fixed amount; or
(v) is of a long-term nature;

(v) Incurring expenditures in excess of $1,000,000;

(w) Granting any power of attorney to conclude a transaction in excess of $5,000,000;

(x) Applying for the registration of intellectual property or allowing any such registration to lapse or be cancelled;

(y) Assigning, licensing, transferring, disposing of or otherwise dealing with any intellectual property (except in the ordinary course of business) or accepting any restrictions on the use of its intellectual property;

(z) Reorganizing or changing the nature or scope of the entity's business;

(aa) Creating or redeeming any mortgage, charge, debenture or other security over the entity's property;

(bb) Approving or amending any business plan, development plan or budget (or any similar documents);

(cc) Making a loan or granting any credit (other than in the normal course of business) or giving any guarantee or indemnity;

(dd) Amending the entity's name;

(ee) Approving a merger or conversion of the entity.

"Independent Trustee" means Hugh Steven Wilson, and any Person who is appointed in accordance with ARTICLE X to serve as the successor to Hugh Steven Wilson. A Person may only serve as the "Independent Trustee" if such Person (i) has been designated by the Grantor to serve as Independent Trustee; (ii) is not at the time of appointment as an independent trustee or at any time while serving as a trustee of the Trust, and has not been at any time during the two (2) years preceding such appointment, Controlled by, under the Control of, or related by blood or marriage to the Grantor or Greg Lindberg; (iii) is not a current or future plaintiff in the Litigation and (iv) is not at the time of appointment as an independent trustee or at any time while serving as a trustee of the Trust, and has not been at any time prior to such appointment, Controlled by, under the Control of, related to, employed by, engaged as an officer, director, or consultant of, or otherwise affiliated with, Noble Consulting Services, Inc., the North Carolina Department of Insurance, or any plaintiffs in the Litigation.

"Interest" means the Grantor's undivided beneficial interest in the Trust.

"Litigation" means case No. 19 cv 013093, filed on October 1, 2019 in Wake County, North Carolina, titled Southland National Insurance Corporation, et al. v. Greg Lindberg et al.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of BKX, as the same may be amended, restated, modified, or supplemented from time to time.

"Membership Interest" means the Grantor's membership interest in BKX, which will be assigned and contributed to the Trust by the Grantor pursuant to the Assignment Agreement.

"Person" means a natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust, statutory trust, or other organization, whether or not a legal entity, and a government or agency or political subdivision thereof.

"Property" means any property, real, personal, or mixed, tangible or intangible, including money.

"Regulations" means U.S. Treasury Regulations promulgated under the Code.

"Refinancing" means refinancing of senior debt owed by BKX and/or its subsidiaries.

"Section" means a section in this Trust Agreement, unless otherwise specified.

"Transaction Documents" means the Trust Agreement, the LLC Agreement, the Assignment Agreement, and other documents delivered in connection herewith and therewith, as

the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Transfer" means any assignment, sale, exchange, issue, conveyance, deed, bill of sale, lease, mortgage, pledge, grant, hypothecation, security interest, encumbrance, gift, license, lease, or disposition, whether by operation of law or otherwise.

"Trust Property" shall mean all right, title and interest of the Trust in and to any property contributed to the Trust by the Grantor or otherwise owned by the Trust, including without limitation the Membership Interest.

ARTICLE II

FORMATION OF TRUST

2.1. Creation. The Grantor and the Trustees hereby create the Trust on the terms and conditions set forth herein for the benefit of the Grantor. The Trust shall be known as the "Beckett Collectibles Trust," in which name the Independent Trustee may conduct the business of the Trust, make and execute contracts, and sue and be sued. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Statutory Trust Act and that this Trust Agreement constitute the governing instrument of the Trust. The Delaware Trustee is hereby authorized and directed to execute and file a certificate of trust with the Secretary of State of the State of Delaware in the form attached hereto as Exhibit A.

2.2. Office. The office of the Trust will be the corporate trust office of the Delaware Trustee located at 20 Montchanin Road, Suite 100, Greenville, Delaware 19807, or such other address in the State of Delaware as the Delaware Trustee may designate by written notice to the Grantor and the Independent Trustee from time to time (the "Corporate Trust Office").

2.3. Purposes. The purposes of the Trust are to engage in the following activities: (i) to enter into or assume and comply with the terms of the Transaction Documents; (ii) to acquire and hold legal title to the Membership Interest and any other Trust Property; (iii) to serve as the member of BKX, subject to the terms of this Trust Agreement and the LLC Agreement; (iv) to receive BKX Distributions and to make distributions to the Grantor, to the extent permitted by law and any agreements of lenders to and creditors of the Trust, which govern the same; (v) to make distributions in the manner provided for in this Trust Agreement; and (vi) to take such other actions as the Trustees deem necessary or advisable to carry out the foregoing, subject to the terms of this Trust Agreement. The Trust shall conduct no business other than as specifically set forth in this Section 2.3.

2.4. Initial Contribution of Trust Property. Effective as of the date of this Trust Agreement, the Grantor has made its Contribution to the Trust in accordance with the Assignment Agreement. The Trustees hereby acknowledge receipt in trust from the Grantor, as of the date of this Trust Agreement, of the Contribution, which constitutes the initial Trust Property.

2.5. Declaration of Trust by Trustees. The Trustees hereby declare that they will hold the Trust Property upon the terms and conditions herein for the sole use and benefit of the Grantor. It is the intention of the parties hereto that the Trust constitute a "statutory trust" under the Delaware Statutory Trust Act and that this Trust Agreement constitute the governing

instrument of such statutory trust. The parties hereto agree that they shall take no action contrary to the foregoing intention. Effective as of the date hereof, the Trustees will have all rights, powers, and duties set forth herein and, to the extent not inconsistent herewith, in the Delaware Statutory Trust Act with respect to accomplishing the purposes of the Trust. Except to the extent expressly provided herein, this Trust shall be irrevocable with respect to the Grantor.

2.6. Tax Matters. The Trust shall not constitute a "business trust" within the meaning of Regulations Section 301.7701-4(b) or any other business entity for federal income tax purposes, but shall instead constitute a trust within the meaning of Regulations Section 301.7701-4(c) and a "grantor trust" under Subpart E of Part 1, Subchapter J of the Code (Code Sections 671 and following). As such, all income and deductions of the Trust shall be

treated for income tax purposes as income and deductions of the Grantor. The parties hereto agree that they will file all their tax returns in a manner consistent with that intent unless otherwise required by a taxing authority. Except as otherwise expressly provided herein, any tax elections required or permitted to be made by the Trust under the Code or otherwise will be made by the Grantor. The Trust will not elect to be treated as a corporation for any tax purpose.

2.7. Situs of Trust. The Trust will be located and administered in the State of Delaware. Payments will be received by the Trust only in the State of Delaware, and payments will be made by the Trust only in the State of Delaware. The only office of the Trust will be at the Corporate Trust Office.

2.8. Limitation on Certain Activities.

(a) Notwithstanding any provisions of this Trust Agreement and any provision of applicable law that otherwise so empowers the Trustees, neither the Trust, nor the Trustees on behalf of or with respect to the Trust, nor any other Person on behalf of the Trust shall have any authority to do any of the following without the Grantor's prior written consent:

(i) perform any act in contravention of or constituting an event of default under the LLC Agreement;

(ii) authorize, consent to, or vote on the approval or disapproval of any Fundamental BKX Matters;

(iii) engage in any business or activity other than those set forth in Section 2.3;

(iv) to the fullest extent permitted by law, dissolve, wind-up or liquidate the Trust, except as provided in Sections 9.2 and 9.3 of this Trust Agreement;

(v) to the fullest extent permitted by law, take any action that might cause the Trust to become insolvent, or file a voluntary petition or otherwise initiate proceedings to be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Trust, or file a petition seeking or consenting to reorganization or relief of the Trust as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to the Trust; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, custodian, liquidator (or other similar official) of the Trust or of all or any substantial part of the properties and assets of the Trust, or make any general assignment for the benefit of creditors of the Trust, or admit in writing the inability of the Trust to pay its debts generally as they become due or declare or effect a moratorium on the Trust debt or take any action in furtherance of any such action;

(vi) Transfer the Membership Interest or any of the Trust Property, other than making payments to cover the reasonable expenses of the Trust and making distributions to the Grantor, in each case, as described herein;

(vii) require the Grantor to make any additional contributions of Trust Property;

(viii) enter into any transaction with an Affiliate unless such transaction is concluded on commercially reasonable terms comparable to those at an arm's length transaction;

(ix) merge, convert, combine, or consolidate the Trust with any other entity;

(x) grant a power of attorney, appoint any agents or officers, or otherwise delegate any authority to any other Person to act on behalf of the Trust;

(xi) amend the Trust Agreement, the Certificate of Trust, or the LLC Agreement;

(xii) lend money, borrow money from, act as a surety, guarantor, or endorser for, guarantee or assume any obligations of, provide collateral for, or incur any indebtedness on behalf of the Trust;

(xiii) issue any additional beneficial interests or other interests in the Trust or in any of the Trust Property;

(xiv) redeem all or any portion of the Interest;

(xv) to the fullest extent permitted by law, file, commence, seek, or prosecute an action for partition or forced sale of all or any portion of the Trust Property; or (xvi) take any other action not expressly authorized by this Trust Agreement or the Grantor or required by applicable law.

(b) Notwithstanding any other provision of this Trust Agreement, the Trustees shall and shall cause the Trust at all times to:

(i) observe statutory formalities with respect to the administration of the Trust and in the conduct of the Trust's activities;

(ii) maintain books and records and bank accounts separate from those of any other Person;

(iii) not commingle its assets with those of any other Person;

(iv) conduct business in its own name, hold itself out to creditors and the public as a legal entity separate and distinct from any other Person, and correct any known misunderstanding regarding its separate identity;

(v) allocate and charge fairly and reasonably any common expenses or overhead;

(vi) except for distributions permitted under the terms of this Trust Agreement, transact all business with Affiliates on arm's-length terms and pursuant to enforceable agreements which have been approved by the Grantor;

(vii) not assume, guarantee, pledge its assets to secure, or pay the debts or obligations of any other Person;

(viii) not make any loans or advances to any other Person;

(ix) pay its own liabilities and expenses out of its own funds;

(x) maintain adequate capital in light of its contemplated operations; and (xi) maintain all required qualifications to do business in any state where such qualification is required.

ARTICLE III

TRANSFER OF INTERESTS

3.1. Restrictions on Transfer. Subject to compliance with applicable securities laws, any necessary regulatory approvals, any transfer restrictions set forth in the LLC Agreement, and this Trust Agreement, and provided that such Transfer does not result in the Trust having to register as an investment company or require the Trust or any Trustee to register as an investment advisor under the Investment Company Act of 1940, as amended, all or any portion of the Interest of the Grantor may be Transferred by the Grantor without the prior consent of any of the Trustees. All expenses of such Transfer shall be paid by the Grantor. Absent a specific provision to the contrary in the documentation of the Transfer, a Transfer of the Grantor's Interest in the Trust will constitute of Transfer of all of the Grantor's rights under this Trust Agreement, including, without limitation, the Grantor's consent rights with respect to Fundamental BKX Matters.

3.2. Issuance of Interests. The Grantor shall be the sole beneficial owner (within the meaning of the Delaware Statutory Trust Act) of one hundred percent (100%) of the beneficial interests in the trust. The beneficial interests in the Trust shall be uncertificated. The Trustees shall not issue any additional beneficial interests in the Trust or the Trust Property without the

prior written consent of the Grantor. Any purported issuances of additional beneficial interests which have not received the Grantor's prior written consent shall be null and void.

3.3. Conditions to Admission of New Beneficial Owners. If the Grantor Transfers all or part of its Interest to any other Person, this Trust Agreement shall be amended simultaneously with such Transfer and the recipient of such Transferred Interest must agree to be bound by the terms of this Trust Agreement, as amended or restated.

ARTICLE IV

DISTRIBUTIONS

4.1. Payments From Trust Property Only. All payments to be made by the Trustees under this Trust Agreement shall be from the Trust Property.

4.2. Distributions from the Trust. Promptly following receipt of a BKX Distribution, the Independent Trustee shall distribute to the Grantor the full amount of such BKX Distribution, reduced only by reasonable reserves for trust expenses. Notwithstanding the foregoing, the Independent Trustee may retain a portion of any BKX Distribution, other than a BKX Distribution made to the Trust to cover income tax liabilities resulting from the Trust's status as the member of BKX (a "BKX Tax Distribution"), to pay or reimburse the Trustees for any fees, expenses or indemnities due and owing to the Trustees on behalf of the Trust and retain such additional amounts as the Independent Trustee reasonably deems necessary to pay anticipated ordinary current and future Trust expenses ("Reserves"). For the avoidance of doubt, the Independent Trustee shall promptly distribute to the Grantor all income received by the Trust from a BKX Tax Distribution, without retaining any portion of such BKX Tax Distribution for reimbursements or Reserves. All amounts distributable to the Grantor pursuant to this Trust Agreement shall be paid by check or in immediately available funds by transfer to a banking institution with bank wire transfer facilities for the account of the Grantor, as instructed from time to time by the Grantor.

4.3. Duties Relating to BKX Distributions. With respect to BKX Distributions, the Independent Trustee shall have the duties set forth in Sections 4.3(a), (b) and (c) below.

(a) Tax Distributions.

(i) Because the Trust is a grantor trust for income tax purposes, the Grantor will be legally responsible for any income tax liability of the Trust that is generated by the assets transferred to the Trust by the Grantor. For purposes of determining tax liability only, the "Grantor" shall include, as applicable, the Grantor and the Person ultimately liable for payment of federal and state income tax on the income of the Trust that flows through the Grantor, and such person is referred to in this Section as the "Taxpayer".

(ii) On at least a quarterly basis, the Independent Trustee shall use commercially reasonable efforts to cause the Trust to pay to the Taxpayer the amount of tax that would be due based on the highest applicable (federal and state) tax rates applied to the amount of taxable income

deemed to pass through to the Grantor from the Trust (in all cases to include interest, penalties, and additions to tax), at least ten (10) days prior to the relevant statutory deadline for payment of the applicable tax. The Trustee shall take the actions reasonably and in good faith necessary to obtain cash from which to fund the BKX Tax Distributions, pursuant to this Section 4.3(a), from any asset or legal entity held by the Trust, without regard to the source of the taxable income triggering the need for the BKX Tax Distributions.

(iii) In determining the source of funding for any distributions required under this Section 4.3, the Independent Trustee shall take into consideration all relevant aspects including, but not limited to, (A) the cash position of the Trust assets taken as a whole, (B) the cash positions of each legal entity within the Trust, (C) the cost efficiencies, from a tax perspective and otherwise, associated with the distribution of cash from any specific Trust asset or legal entity making a distribution, (D) the legal and contractual restrictions and limitations the Trust assets and legal entities are under, and (E) the restrictions imposed by this Trust Agreement (iv) If the Taxpayer's net tax liability with respect to any taxing authority increases with the inclusion of the Trust's tax attributes on the Taxpayer's applicable tax return, then the Trust shall pay to the Taxpayer the amount of the net tax liability incurred from inclusion of the Trust's tax attributes at least ten (10) days prior to the relevant statutory deadline for payment of the applicable tax. At year end, if the BKX Tax Distributions distributed during the year were insufficient to cover the income tax liabilities (in all cases to include interest, penalties, and additions to tax) that flowed through to the Taxpayer on account of the assets held by the Trust, the Trust shall make additional BKX Tax Distributions that are sufficient to cover such income tax liabilities.

(b) Distributions for Creditor Liabilities. If the Independent Trustee becomes aware of a creditor liability of the Grantor, the Independent Trustee shall request that BKX make a BKX Distribution to the Trust so that such funds can be distributed by the Trust and used to satisfy and discharge the creditor liability when it becomes due and payable.

(c) Other Distributions. On at least a quarterly basis, the Independent Trustee will review all BKX Distributions to the trust including those described in Section 4.3(a)(i) and (ii) above. If the Independent Trustee determines that the total amount of the other BKX Distributions taken together with the distributions described in Section 4.3(a)(i) and (ii) above is less than seventy-five percent (75%) of BKX's EBITDA, then the Independent Trustee shall request that BKX increase the amount of its distributions so that at least seventy-five percent (75%) of the BKX's EBITDA is distributed to the Trust, in each case to the extent permitted by applicable laws, rules and regulations binding upon BKX and taking into account any applicable limitations and/or restrictive covenants under any credit agreement or other material agreement binding upon BKX, including without limitation, the definitive documents related to the Refinancing.

ARTICLE V

RIGHTS AND OBLIGATIONS OF OWNERS

5.1. Limitation of Liability. The Grantor shall be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the Delaware General Corporation Law.

5.2. No Legal Title to Trust Property in the Grantor, etc. Legal title to the Trust Property, including the Membership Interest, shall be held by the Trust, and the Grantor shall not have legal title to the Trust Property. Neither the bankruptcy, dissolution, death, or other

incapacity of the Beneficiary, nor the transfer, by operation of law or otherwise, of any right, title, or interest of the Grantor in and to the Trust Property or hereunder shall terminate this Trust Agreement. Except as expressly set forth herein, the Grantor shall not be liable for any liabilities or obligations of the Trust or the Trustees or for the performance of this Trust Agreement.

5.3. Transfer of Trust Property by Trustees is Binding. Any Transfer of the Trust Property or any part thereof by the Independent Trustee made pursuant to the terms of this Trust Agreement shall bind the Grantor and be effective to Transfer all rights, title, and interest of the Trustees and the Grantor in and to the Trust Property. Notwithstanding anything in this Trust Agreement to the contrary, any Transfer of Trust Property, other than a distribution to the Grantor or a payment to cover the reasonable expenses of the Trust, must be approved by the Grantor in writing prior to the occurrence of such Transfer. The Trustees agree that they shall not enter into a binding contract to Transfer, sell or otherwise dispose of (including via issuance of stock-based compensation) the Membership Interest or any other Trust Property without the prior written consent of the Grantor.

ARTICLE VI

TRUSTEES IN GENERAL

6.1. Acceptance of Trust and Duties. The Trustees accept the Trust hereby created and agree to perform their duties as so provided, including receiving and disbursing all money received by them constituting part of the Trust Property (after paying or reimbursing the Trustees for any fees or expenses paid by the Trustees on behalf of the Trust and retaining such additional amounts as the Independent Trustee reasonably deems necessary for Reserves). If requested by an applicable regulator, the Trustees agree to be fingerprinted and have a background check.

6.2. Limitation on Fiduciary Duties of Trustees. Consistent with Sections 3803(b) and 3806(c) of the Delaware Statutory Trust Act, the duties and liabilities of the Trustees to the Trust and the Grantor pursuant to this Trust Agreement are expressly limited as set forth in this Section 6.2. The Independent Trustee shall not be individually liable for its omissions or actions on behalf of the Trust, except for: (i) its own fraud, willful misconduct, bad faith, or negligence; (ii) the inaccuracy of its representations or warranties contained in Section 6.5; (iii) its own income taxes based on fees, commissions or compensation received as a trustee; or (iv) its failure to use ordinary care to disburse money received by them in accordance with the terms hereof. The Delaware Trustee shall not be individually liable for its omissions or actions on behalf of the Trust except for its own fraud willful misconduct, bad faith or gross negligence in performing its duties in Section 7.1(b) hereunder.

6.3. Not Acting in Individual Capacity. Except as otherwise provided in this ARTICLE VI, the Trustees act solely as trustees hereunder and not in their individual capacity, and all Persons other than the Grantor having any claim against the Trustees by reason of the transactions contemplated hereby shall look only to the Trust Property for payment or satisfaction thereof.

6.4. Authority of Trustees. The Trustees shall manage, control, dispose of or otherwise deal with the Trust Property consistent with their duties to conserve and protect the Trust Property, subject to any restrictions required by the LLC Agreement or otherwise provided in this Trust Agreement.

6.5. Authorization. Each Trustee hereby represents and warrants to the Grantor that this Trust Agreement has been duly authorized, executed and delivered by such Trustee.

6.6. Reliance. The Trustees shall not be liable to anyone for relying on any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper believed by them to be genuine and signed by the proper parties. The Trustees may accept a copy of a resolution of the board of directors or other governing body of any corporate party, certified by the secretary or a senior officer thereof, as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter, the manner of ascertainment of which is not specifically prescribed herein, the Trustees may for all purposes hereof rely on an officer's certificate of the relevant Person (if not an individual) as to such fact or matter, and such certificate shall constitute full protection to the Trustees for any action taken, suffered, or omitted by it in good faith in reliance thereon.

6.7. Advice of Counsel. In the administration of the Trust and the interpretation of this Trust Agreement, the Trustees may perform any of their powers and duties directly or through agents or attorneys and may consult with counsel, accountants and other skilled Persons selected and employed by them. The Trustees shall not be liable for anything done or omitted in good faith in accordance with the advice or opinion within the scope of competence of any such counsel, accountant or other skilled Persons selected with due care.

6.8. Compensation and Expenses.

(a) For serving as Independent Trustee hereunder, Hugh Steven Wilson shall be entitled to such reasonable compensation, which may be in excess of the compensation otherwise allowed by Delaware statutory law, as set out in Schedule 1.

(b) Any other Trustee acting hereunder pursuant to an appointment authorized or directed to be made hereunder shall be entitled to such reasonable compensation, which may be in excess of the compensation otherwise allowed by Delaware statutory law, as may be agreed upon between appointor and appointee, or, in the absence of any such agreement, to such compensation as may be allowed by the laws of the State of Delaware in effect from time to time.

(c) The Trustees shall pay out of the income or principal or both, as they shall determine, the charges and expenses that each Trustee incurs in the administration of the trust.

(d) Each Trustee may from time to time prior to the settlement of its accounts, and without court approval, make such payments to itself, individually, on account of its compensation as it determines to be just and reasonable. It shall not be chargeable for interest by reason of any such payment and shall not be required to file a bond to secure repayment.

(e) A Trustee who ceases to act for any reason shall be entitled to any compensation already paid as well as to any compensation then earned but unpaid. Notwithstanding the foregoing, no Trustee serving hereunder shall be entitled to receive a termination fee in the event such Trustee is removed, resigns or otherwise ceases to serve prior to the termination of the trust.

ARTICLE VII

DUTIES OF TRUSTEES

7.1. Duties of the Trustees in General.

(a) The Trustees shall only have the duties and obligations expressly provided in this Trust Agreement. Except to the extent specifically provided in Section 7.1(b) or elsewhere in this Trust Agreement, all the duties and obligations of the Trustees or of any of them under this Trust Agreement shall be solely the duties and obligations of the Independent Trustee.

(b) The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in Delaware. It is understood and agreed by the parties hereto that, except as specifically provided herein or required by applicable law, the Delaware Trustee shall have none of the duties or liabilities of the Independent Trustee and that all references herein to "Trustees" shall refer to the Independent Trustee unless and only to the extent this Trust Agreement expressly provides otherwise. The duties of the Delaware Trustee shall be limited to (i) obtaining an Employer Identification Number (EIN) for the Trust, (ii) accepting legal process served on the Trust in the State of Delaware, (iii) receiving correspondence mailed to the Trust at the Corporate Trust Office and forwarding such correspondence to the Independent Trustee and the Grantor, (iv) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act, and (v) any other duties specifically allocated to the Delaware Trustee in this Trust Agreement. To the extent that at law or in equity the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Grantor, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c) Except as provided in Section 7.1(b), the Independent Trustee is hereby authorized and directed to enter into any agreement permitted or directed by this Trust Agreement without the consent or signature of the Delaware Trustee including, without limitation, the Transaction Documents. Except for the filing of a certificate amendment as provided by and for the purpose stated in Section 10.1, the Delaware Trustee is authorized and

directed to enter into such other documents and take such other actions as the Independent Trustee shall specifically direct in written instructions delivered to the Delaware Trustee; provided, however, that (i) the Delaware Trustee will take such action merely in a ministerial nondiscretionary capacity, as directed by the Independent Trustee, and (ii) the Delaware Trustee shall not be required to take any action if the Delaware Trustee shall determine, or shall be advised by counsel, that such action is likely to result in personal liability or is contrary to applicable law or any agreement to which the Delaware Trustee is a party. For the avoidance of doubt, this Section 7.1(c) does not limit or condition the separate duties of the Delaware Trustee set forth in Section 7.1(b).

7.2. Actions of Independent Trustee.

(a) Generally. The Independent Trustee is hereby authorized and directed to take any and all necessary actions to conserve and protect the Trust Property consistent with the terms of this Trust Agreement, including, but not limited to:

(i) receiving the Contribution from the Grantor;

(ii) entering into or assuming and complying with the terms of the Transaction Documents;

(iii) receiving BKX Distributions as a result of the Trust's ownership of the Membership Interest;

(iv) making distributions to the Grantor in accordance with ARTICLE IV;

(v) receiving Notices to the Trust from BKX (or its members or managers) or other Persons and delivering such Notices to the Grantor;

(vi) voting on the approval or disapproval of actions submitted by BKX to the Trust, in its capacity as the member of BKX, for approval, except for Fundamental BKX Matters, which may only be voted upon in accordance with the Grantor's instructions;

(vii) taking such other actions and executing such other documents as may be specifically authorized in writing by the Grantor from time to time.

(b) BKX Matters other than Fundamental BKX Matters. With respect to matters that are not Fundamental BKX Matters and are submitted by BKX to the Trust, in the Trust's capacity as the member of BKX, for approval or disapproval, the Independent Trustee shall cause the Trust to vote on such matters in accordance with the recommendation of the Board of Managers of BKX.

7.3. Furnishing of Documents. The Independent Trustee will promptly furnish to the Grantor, copies of all reports, Notices, material requests, demands, certificates, financial statements, and any other material writings ("Reports") received by the Independent Trustee. The Independent Trustee shall request that BKX shall provide all Reports received from its

subsidiaries (the "Operating Subsidiaries") to the Trust and shall request that the Grantor shall have access to the management and the physical premises of the Operating Subsidiaries.

7.4. Duty to Act.

(a) The Trustees shall not be required to act or refrain from acting under this Trust Agreement or the LLC Agreement (other than the actions expressly prohibited by this Trust Agreement) if the Trustees reasonably determine, or have been advised by legal counsel, that such actions or inactions may result in personal liability, unless the Trustees are indemnified by the Grantor against any liability and costs (including reasonable legal fees and expenses) which may result in a manner and form reasonably satisfactory to the Trustees. However, the Grantor shall not be required to indemnify the Trustees with respect to any of the matters described in Section 6.2(i) through 6.2(v).

(b) Neither the Delaware Trustee nor the Independent Trustee shall have any duty (i) except as provided in Section 7.1(b) with respect to the Delaware Trustee, to file, record or deposit any document or to maintain any such filing, recording or deposit or to refile, rerecord or redeposit any such document, (ii) to pay or discharge any tax levied against any part of the Trust Property, (iii) to confirm, verify, investigate or inquire into the failure to receive any reports or financial statements from any party obligated under the Transaction Documents to provide such reports or financial statements, or (iv) to inspect, ascertain, or inquire as to the performance or observance of any of the covenants of any other Person under the Transaction Documents.

ARTICLE VIII

INDEMNIFICATION AND PAYMENT OF

THE TRUSTEES

8.1. Each Trustee shall be entitled to be indemnified, defended, and held harmless by the Trust from the Trust Property (and thereafter, if the Trust Property cannot adequately indemnify the Trustees, will be indemnified by the Grantor) against any loss, liability, or expense (including, without limitation, reasonable costs and expenses of litigation, and of investigation, damages, judgments, and amounts paid in settlement, and including reasonable out of pocket legal fees and expenses in connection with enforcement of its

rights hereunder) arising out of, or incurred in connection with, the exercise and performance of any of the powers and duties of such Trustee; provided that the Trustees shall not be entitled to indemnification pursuant to this ARTICLE VIII for any loss, liability, or expense incurred by reason of willful misconduct, negligence, or breach of fiduciary duty in the performance of the Trustee's obligations and duties hereunder (the "Indemnified Acts"). The provisions of this ARTICLE VIII shall survive any resignation or removal of the Trustee and appointment of a successor trustee. The Trustees shall be advanced any amounts incurred in defending an action brought or threatened in respect of Indemnified Acts shall be paid out of the Trust Property (or by the Grantor if the Trust Assets cannot adequately cover such amounts) in advance of final disposition upon delivery to the Grantor of a legal opinion of trust counsel that indemnification is likely to be warranted and the Trustee's written agreement to refund such amounts if it is ultimately determined that indemnification is not warranted.

ARTICLE IX

TERMINATION OF TRUST

9.1. Termination in General. The Trust shall dissolve and wind up in accordance with Section 3808 of the Delaware Statutory Trust Act and the Trust Property shall, subject to ARTICLE IV hereof, be distributed to the Grantor, upon the first to occur of any of the following, in each case subject to the conditions described below, unless the Trust terminates by virtue of Section 9.1(f), in which case the Trust assets will be distributed to such other trust:

(a) the reversal of any potential conviction in the Adverse Proceeding via reversal, acquittal, dismissal, decision of the government to not re-try the case following any mistrial or remand for new trial, pardon, or other exoneration;

(b) at such time as BKX or all or substantially all of its and its subsidiaries' assets have been sold in an arms' length transaction;

(c) upon repayment in full of all obligations issued by BKX and/or any of its subsidiaries under the contemplated Refinancing;

(d) at such time as the Independent Trustee determines there is no material impact on the Grantor or the Beneficiary as a result of the Adverse Proceeding;

(e) at such time as the Grantor provides written approval of the termination of the Trust and the holders of the obligations issued by BKX and/or any of its subsidiaries in the contemplated Refinancing have consented to such termination; and (f) at such time as the Trustees are satisfied (having consulted with the board of BKX) that the Trust is no longer required by reason of another trust being interposed in the ownership structure such that neither Greg Lindberg nor any Person Controlled by, under the Control of, or related by blood or marriage to the Grantor or Greg Lindberg will remain the ultimate beneficial owner of the Group following termination of the Trust.

9.2. Distribution of Trust Property to Grantor. Upon termination of the Trust as provided in Section 9.1, the Independent Trustee shall dissolve and wind up the Trust in accordance with Section 3808 of the Delaware Statutory Trust Act and distribute all of the then Trust Property to the Grantor, subject to ARTICLE IV.

9.3. Certificate of Cancellation. Upon the completion of winding up of the Trust, the Trustees shall cause a Certificate of Cancellation to be filed with the Delaware Secretary of State and thereupon the Trust and this Trust Agreement shall terminate.

ARTICLE X

SUCCESSOR TRUSTEES

10.1. Resignation or Removal of a Trustee. A Trustee or any successor may resign at any time by giving at least thirty (30) days' prior written notice to the Grantor; provided that such Trustee has been paid all compensation it is entitled to hereunder. If a Trustee or successor has not been paid all compensation it is entitled to hereunder, it may resign at any time by giving

at least ten (10) days' prior written notice. The Grantor may remove any Trustee at any time, with or without cause, by providing written notice to such Trustee. Additionally, if the Delaware Trustee has not been paid its annual compensation as provided in Section 6.8 as of the anniversary of the signing of this Trust Agreement and such nonpayment is not cured within ten (10) business days following the date on which the Delaware Trustee provides written notice of such nonpayment, then the Delaware Trustee may resign effective immediately and, pursuant thereto, may file a certificate of amendment with the Delaware Secretary of State indicating its resignation as trustee and registered agent. Notwithstanding anything herein to the contrary, no resignation or removal of a Trustee shall be effective until a successor trustee has been appointed and such successor trustee has accepted its responsibilities, all as hereinafter provided.

10.2. Appointment of Successor Trustees.

(a) The Trust shall not be terminated solely due to the resignation, death, liquidation, or removal of any Trustee. In the event of the resignation, death, liquidation, or removal of the Independent Trustee, the Grantor shall appoint by written instrument a successor Independent Trustee to fill the vacancy. In the event of the resignation, death, liquidation, or removal of the Delaware Trustee, the Independent Trustee shall appoint by written instrument a successor Delaware Trustee. The appointment of a successor trustee shall be effective upon the successor trustee's agreeing to such appointment and agreeing to be bound by the terms of this Trust Agreement.

(b) If a successor trustee shall not have been appointed within sixty (60) days after the resignation, death, liquidation, or removal of a Trustee, the Grantor or a Trustee may apply to any court of competent jurisdiction in the United States to appoint a successor trustee to act until such time, if any, as a successor shall have been appointed as provided above. Any successor so appointed by such court shall immediately and without further act be superseded by any successor appointed as provided above within one (1) year from the date of the appointment by such court. Any successor, however appointed, shall execute and deliver to its predecessor trustee (the Delaware Trustee, Independent Trustee, or a successor trustee, as the case may be) an instrument accepting such appointment, and thereupon such successor, without further act, shall become vested with all the estates, properties, rights, powers, duties and trusts of the predecessor trustee in the trusts hereunder with like effect as if originally named a Delaware Trustee or Independent Trustee; but, upon the written request of such successor, such predecessor shall execute and deliver an instrument transferring to such successor, upon the trusts herein expressed, all the estates, properties, rights, powers, duties and trusts of such predecessor, and such predecessor shall duly assign, transfer, deliver and pay over to such successor all monies or other property then held by such predecessor upon the trusts herein expressed. Any right of the Grantor against the predecessor trustee, in its, his or her individual capacity, shall not be prejudiced by the appointment of any successor trustee and shall survive the termination of the trusts created hereby.

(c) Any successor Independent Trustee, however appointed, shall be a Person who meets the definition of the Independent Trustee contained herein.

(d) Any successor Delaware Trustee, however appointed, shall be a bank or trust company with its principal place of business in the State of Delaware. Any corporation or

other entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which such Delaware Trustee shall be a party, or any corporation to which substantially all the corporate trust business of the Delaware Trustee may be transferred, shall, subject to the preceding sentence, be the Delaware Trustee under this Trust Agreement without further act. Any successor Delaware Trustee, however appointed, shall be competent and qualified to (i) serve as a trustee of a statutory trust formed pursuant to the Delaware Statutory Trust Act, and (ii) take all actions required by the Delaware Trustee pursuant to the Trust and the Transaction Documents in the State of Delaware.

ARTICLE XI

MISCELLANEOUS

11.1. Limitations on Rights of Others. Nothing in this Trust Agreement, whether express or implied, shall give to any Person other than the Trustees and the Grantor any legal or equitable right, remedy or claim hereunder. Consistent with section 3806(c) of the Delaware Statutory Trust Act, the Beneficiary and Grantor shall have no fiduciary duties to any of the Trustees, the Trust or any other Person to the fullest extent permitted by law. Further pursuant to Section 3806(a), neither the Grantor nor the Beneficiary shall have the power to give direction to any of the Trustees, the Trust or any other Person, except as expressly set forth in this Trust Agreement.

11.2. Notices. All notices, requests, demands, consents and other communications ("Notices") required or contemplated by the provisions hereof shall refer on their face to this Trust Agreement (although failure to do so shall not make such Notice ineffective), shall, unless otherwise stated herein, be in writing and shall be (i) personally delivered, (ii) sent by reputable overnight courier service, (iii) sent by certified or registered mail, postage prepaid and return receipt requested, or (iv) transmitted by facsimile or electronic mail with electronic confirmation of receipt, in each case, as follows: if to the Delaware Trustee: The Bryn Mawr Trust Company of Delaware 20 Montchanin Road, Suite 100 Greenville, Delaware 19807 Email: readdy@bmtc.com if to the Independent Trustee: Hugh Steven Wilson 575 Circle Drive Denver, Colorado 80206 Email: Steve@hswilson.com if to the Grantor: Entrust Global Group, LLC 2222 Sedwick Road Durham, NC, 27713, USA Email: gelindberg@gmail.com PNordberg@eliglobal.com skumar@globalgrowth.com

or at such other address and facsimile number or email as shall be designated, respectively, by the Trustees or the Grantor in a written notice to the other Persons receiving Notices pursuant to this Section. Notices given pursuant to this Section 11.2 shall be deemed received upon the earliest of the following to occur: (i) upon personal delivery; (ii) on the fifth (5th) day following the day sent, if sent by registered or certified mail; (iii) on the next business day following the day sent, if sent by reputable overnight courier; (iv) if transmitted by telephone facsimile, on the day sent if such day is a business day of the addressee and the telephone facsimile is received by the addressee by 5:00 p.m. local time of the addressee on such day and otherwise on the first business day of the addressee after the day that the telephone facsimile is sent; and (v) if transmitted by email, on the day sent if such day is a business day of the recipient and the email is received by the recipient by 5:00

p.m. local time of the recipient on such day and otherwise on the first business day of the recipient after the day that the email is sent.

11.3. Severability. Any provision of this Trust Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

11.4. Counterparts; Electronic Transmission. This Trust Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument. This Trust Agreement may be executed manually or electronically. Executed counterparts of this Trust Agreement may be delivered by mail, facsimile, email, or other means of electronic transmission.

11.5. Successors and Assigns. All covenants and agreements contained herein shall be binding upon and inure to the benefit of the Trustees and their successors and assigns and the Grantor and its successors and assigns, all as herein provided. Any request, notice, direction, consent, waiver or other writing or action by the Grantor shall bind its successors and assigns.

11.6. Usage of Terms. With respect to all terms in this Trust Agreement, the singular includes the plural and the plural includes the singular; words importing any gender include the other gender; references to "writing" include printing, typing, lithography and other means of reproducing words in a visible form; references to agreements and other contractual instruments include all subsequent amendments thereto or changes therein entered into in accordance with their respective terms and not prohibited by this Trust Agreement; references to Persons include their successors and permitted assigns; and the term "including" means including without limitation.

11.7. Headings. The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

11.8. Governing Law. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts to be performed entirely within such state, including all matters of construction, validity, and performance.

11.9. Amendments. The Grantor retains no rights to revoke the Trust Agreement or substantially amend its provisions, except this Trust Agreement may be amended as follows:

(a) The Trustees may amend the Trust Agreement in a manner that does not materially expand the rights of the Trustees or materially prejudice the Grantor or BKX,; provided that any material amendments to the Trust Agreement shall be subject to any required regulatory consents;

(b) The Trustees may amend this Trust Agreement as may be required by an applicable regulator or in accordance with any relevant court order concerning Greg Lindberg, the Grantor or BKX; and (c) Upon written request by the Grantor to the Trustees, subject to any required regulatory consents, the Trustees shall make such amendment(s) to this Trust Agreement, with respect to any one or more provisions hereof, to (i) cure any ambiguity, (ii) correct or supplement any provisions herein that may be inconsistent with any other provisions herein, or (iii) add any other provisions with respect to matters or questions

arising under this Trust Agreement that will not be inconsistent with the provisions of this Trust Agreement.

[Remainder of Page Left Intentionally Blank]

SCHEDULE 1

INDEPENDENT TRUSTEE REMUNERATION

1.1 The Independent Trustee shall be paid the sum of $[20,000] per (whole or partial) calendar month (the "Fees"), for as long as he remains a Trustee. The Fees shall be paid by Beckett Collectibles Holdings, LLC. To the extent applicable, the Fees shall be paid to the Trustee net of any withholding tax amounts. 1.2 The Fees shall be paid into a bank account nominated in writing by the Independent Trustee in arrears each calendar month following the date of this Instrument (or on the Business Day next following such date to the extent that such date is not a Business Day). 1.3 Any other Independent Trustee shall have his or its remuneration determined by the Grantor at the time of appointment of such Independent Trustee and the terms of such remuneration shall be recorded in the relevant joinder to this Trust Agreement. 1.4 Any Independent Trustee shall be deemed to be an independent contractor and nothing in this Trust Agreement shall give rise to an employment relationship between the Independent Trustee (or its director or officers) and any other entity. No Independent Trustee shall be required to perform his or its duties in Delaware or any other location.

EXHIBIT A

CERTIFICATE OF TRUST

(See attached)

[Doc. 260-2 — Exhibit]

ASSIGNMENT AGREEMENT

This ASSIGNMENT AGREEMENT ("Agreement") is made effective as of February 13, 2025 (the "Effective Date"), by and between Global Growth Holdings, LLC (flea Global Growth Holdings, Inc.), a Florida limited liability company ("Global Growth"), Greg E. Lindberg ("Sponsor," and together with Global Growth, "Assignor') and Joseph W. Grier, solely in his capacity as special n1aster appointed by the United States District Court for the Western District of North Carolina in USA v Lindberg, criminal case 3-23-cr-48-MOC ("Assignee" or "Special Master") and in accordance with the terms of the Order (defined below). Assignor and Assignee are each so1neti1nes referred to herein as a "Party" and collectively as the "Parties".

RECITALS

WHEREAS, reference is made to that certain Memorandum of Understanding dated as of June 27, 2019 by and among Global Growth (f/k/a Academy Association, Inc.), Sponsor, and the other parties thereto (the "MOU") providing for, among other things, the establishment of NHC Holdings, LLC, a North Caolina limited liability company ("NHC") and the transfer of certain "Specified Affiliated Companies" (as defined in the MOU) listed on Exhibit A attached to the MOU (herein "SACs") to the exclusive ownership and control ofNHC; and

WHEREAS, litigation regarding the MOU is currently pending in the Wake County, North Carolina Superior Court in Case No. 19-CVS-13093; and WHEREAS, the Special Master was appointed in accordance with that certain Order Appointing Special Master, United States of America v. Greg E. Lindberg, No. 3-23-cr-48-MOC (W.D.N.C. 2025) dated January 23, 2025 (the "Order");

WHEREAS, the Order directs the Defendant (as defined therein) "to take all necessary and reasonable steps in his power to secure in the exclusive possession and control of the Special Master, or one or more third parties selected by the Special Master, within 21 days of the entry of this Order, all of Defendant's and Global Growth's rights and interests" in certain specified assets, including NHC Holdings, LLC and the "Specified Affiliated Companies" as defined in the MOU (herein "SACs") and any related entities or trusts that include SACs;

WHEREAS, the Order outlines the responsibilities of the Special Master, which include recommending an appropriate method and timetable to liquidate and or/repatriate any available assets, including the ownership interests of NHC and the SACs, for the benefit of certain parties (the "Purpose");

WHEREAS, Global Growth is currently the sole 111ember of NHC, owning all of the outstanding membership interests in NHC (the "NHC Equity Interest"); and WHEREAS, Assignor desires to assign its NHC Equity Interest and any and all of its rights under the MOU to Assignee, and Assignee desires to accept such NHC Equity Interest and such rights under the MOU as set forth therein.

NOW, THEREFORE, Assignor and Assignee agree as foJlows:

1. Assign111ent and Acceptance. Effective as of the Effective Date, Assignor

hereby, without recourse, representation or warranty of any kind, transfers and assigns to Assignee in his representative capacity all of their right, title, and interest, including without li1nitation except as provided herein all associated economic, legal, voting and beneficial rights and interests, all claims and causes of action associated therewith, in and to the NHC Equity Interest, any and all rights of Assignor to transfer or otherwise dispose of the NHC Equity Interest, and any and all rights of Assignor under the MOU (collectively, the "Assigned Rights and Interests"). Assignee hereby accepts the assignment of all of Assignor's right, title and interest, including without limitation except as provided herein all associated economic, legal, voting and beneficial rights and interests, in and to NHC Equity Interest and any and all rights of Assignor under the MOU, all in accordance with the Order. Upon the consummation of the transfer of the Assigned Rights and Interests to Assignee hereunder, Assignee shall become the record owner of the Assigned Rights and Interests in accordance with the Order and subject to the MOU. Pending satisfaction by Sponsor of all of his restitution obligations under the Order and any formal restitution order to be hereafter entered by the Court (as described in the Order), Assignor shall retain no rights or interests in or to the Assigned Rights and Interests.

2. Representations and Warranties. Assignee represents, warrants and covenants to

Assignor and NHC, as follows:

a. Assignee is duly appointed as Special Master pursuant to the Order and has full power and authority to execute, deliver and to perform its obligations under this Agreement. b. Assignee understands that the NHC Equity Interest has not been registered under the Securities Act and are "restricted securities" within the meaning of Rule 144 under the Securities Act.

3. Representations and Warranties. Global Growth represents, warrants and

covenants to Assignee that Global Growth is duly organized and validly existing under the laws of its jurisdiction of organization, it is in good standing tinder such laws, and it has full power and authority to execute, deliver and to perform its obligations under this

Agreement. Sponsor represents, warrants and covenants to Assignee that Sponsor has full power and authority to execute, deliver and to perform its obligations under this Agreement.

4. Covenants.

a. Assignee agrees to administer the Assigned Rights and Interests 1n accordance with the Order. b. Each of the Parties will execute and deliver all further documents or instruments (i) required under the MOU and/or (ii) as 1nay be reasonably requested by any other Party or NHC and/or (iii) as required by the Court in accordance with or furtherance of the Order, in order to effect the intent and purposes of this Agreement in substance and form. c. Each of the Parties acknowledges and agrees that solely for federal, state and local tax purposes, Assignor shall continue to be the beneficial owner of the NHC Equity Interest as of and following the Effective Date and shall continue to receive allocations of income or loss, and corresponding tax distributions, if any, with respect to the NHC Equity Interest for so long as NHC remains a disregarded entity for federal and state income tax purposes.

5. This Agreement is governed by the laws of the state of North Carolina, without regard to North Carolina conflict or choice of law provisions. Each of the Parties expressly irrevocably and unconditionally submits to and accepts the exclusive jurisdiction of the courts of Mecklenburg County, North Carolina, the courts of the United States of America for the Western District of North Carolina and appellate courts from any thereof for any action, suit, or proceeding arising out of or based upon this Agreement or any matter relating to this Agreement, and waives any objection that it may have to the laying of venue in any such court or that such court is an inconvenient forum or does not have personal jurisdiction over it.

6. WAIVER OF JURY TRIAL. EACH OF THE PARTIES WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. The invalidity or unenforceability of any term or provision of this Agreement will not affect the validity or enforceability of any other term or provision hereof. If any term or provision of this Agreement is for any reason determined to be invalid or unenforceable, there will be deemed to be made such changes (and only such changes) as are necessary to make it valid and enforceable.

8. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart. This Agreement may not be amended or modified except in writing by all of the Parties hereto and no condition herein (express or implied) may be waived except in writing by the Party whom the condition was meant to benefit.

9. All costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated herein will be paid (a) in accordance with the procedure contained in the Order or (b) by the Party incurring such expense.

I 0. Except as strictly related to the Purpose, each of the Pa11ies agrees not to, and agrees to cause its directors, officers, employees, agents, advisors, and controlling persons (together, "Representatives") not to, without the prior written consent of the other Party,

- --- 1

directly or indirectly disclose the tenns of any possible future transactions or any business infonnation pertaining to NHC learned thereby, inclusive of information regarding the ownership of NHC (together, "Confidential Information"), to any entity, except that any Party may make any such disclosure (i) as required to itnplement or enforce this Agreement, (ii) if required to do so by any law, court, regulation, subpoena or other legal process, (iii) to any governmental authority or self-regulatory entity having or asserting jurisdiction over it or (iv) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other entity or sanctions that may be imposed by any governmental authority; provided, however, that the Parties n1ay disclose information regarding the transactions contemplated hereby (x) to their respective accountants, attorneys, limited partners, shareholders, members and other interest holders (y) to the extent necessary to effect the transactions conten1plated hereby or to effect a subsequent transfer of the NHC Equity Interest or any portion thereof and (z) provided that the disclosing Party shall notify the other Party and NHC, if applicable, of any such disclosure in advance, unless the disclosure is made pursuant to subsection (x) above. In addition, the Parties agree to treat the Confidential Information as confidential and with no less than reasonable care at all times.

11. Each of the Parties hereto represents and warrants that no representation or warranty by such Party in this Agreement and no statement contained in any certificate or other document furnished or to be furnished between the Parties pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

12. The Parties agree that NHC 1s an intended third-party beneficiary of this Agreement.

13. This Agreement, including all agreements referenced in this Agreement, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein. Any amendments to this Agreement must be made in writing and agreed to by and amongst all of the Parties. This Agreement shall terminate and be of no further force and effect upon termination of the Order or upon payment from any source of all restitution required per the Order.

14. The descriptive headings herein are inserted for the convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

15. Assignee hereby expressly acknowledges that it has received a copy of the MOU. Assignee further acknowledges that its exercise and enjoyment of the Assigned Rights and Interests are subject to the terms of the MOU to the same extent that Assignor was subject prior to the assignment herein; provided, however, that nothing in this Agreement or the MOU binds or limits actions of the Assignee in connection with his responsibilities in the criminal proceeding to fashion a restitution order or propose a restitution methodology in such manner as is determined to be appropriate by Assignee in its discretion.

(signature page follow,\~

IN WITNESS WHEREOF, the parties set their hands and seals as of the date first above written.

Assignor

Global Growth Holdings, LLC

By: E.....-.,~ a •

Title: (,I,<. . . ~ ""4-t,.

Date: z/ I !, /~.;-

By:_c~~~:::::~~--

Name: Greg E. Lindbe~--

Date: Z,./ I } / ~ S--

Assignee

By:_ _ _ _ _ _ _ _ _ _ _ _ __

Name: Joseph W. Grier, solely in his

Capacity as Special Master

Date:

Acknowledgement:

NHC Holdings, LLC

By: _ _ _ _ _ _ _ _ _ _ _ _ _ __

Name:

Title: Director

Date:

PRIVILEGED & CONFIDENTIAL

NHC Holdings, LLC

Board Presentation

September 25, 2024

Experience. Alignment. Results.

PRIVILEGED & CONFIDENTIAL

Agenda

Topic

Introduction

Situation Overview

SAC Contribution Update / Approval of Contribution Agreements M3 Partners Diligence Update NHC Portfolio Group Overview

PRIVILEGED & CONFIDENTIAL

Situation Overview

▪ The initial meeting of the NHC Holdings, LLC ("NHC") Board was held on August 14, 2024 – D&O coverage was bound as of August 14, 2024, with the premium funded on

August 19, 2024 – John Babcock, of Waldrep Wall Babcock & Bailey, PLLC ("WWBB"), was retained as NHC counsel ▪ An NHC bank account was opened at Dogwood State Bank on August 29, 2024, and was funded with proceeds of a $5 million line of credit on September 5, 2024 ▪ To date, the primary focus has been on preparing the contribution agreements, including assessing ways to gain control over intervening trusts that hold the majority of the operating Specified Affiliated Companies ("SACs"), and on conducting initial diligence on the portfolio groups and individual entities ▪ Key next steps include:

– Execute the contribution agreements;

– Gain control over the trusts, which will involve conversations with lenders, regulators and other third parties to obtain their consent, where necessary;

– Obtain Triton consent to the proposed Clanwilliam ("CWG") sale to allow buyer diligence to continue;

– Ensure Triton files its financial statements (or obtains a further extension) with the Irish Companies Registration Office to avoid strike-off;

– Continue detailed financial and operational diligence on portfolio groups and individual entities; and – Evaluate near term strategic alternatives for board consideration including (i) proposed Clanwilliam sale, (ii) Beckett refinancing, (iii) potential Damovo sale and (iv) possible Home Medical Equipment Specialists ("HME") management buyout

PRIVILEGED & CONFIDENTIAL

SAC Contribution Update / Approval of Contribution Agreements ▪ Three separate Contribution Agreements have been prepared to facilitate the contribution of various SACs, including the FinCo, SPV, and general SAC Contribution Agreements which have been circulated for review – Certain SACs cannot be contributed at this time due to the existence of intervening trusts established after the MOU was signed ▪ An updated schedule reflecting the capitalization structure and ownership of the SACs being contributed will be attached to each Contribution Agreement – We have identified numerous inconsistencies between the organizational charts initially provided and the actual organizational documents obtained from Global Growth Holdings Inc. ("GGHI") – we continue to work through these issues – We have also identified certain SACs with preferred equity interests owned by other SACs as well as non-SACs – the Contribution Agreements include the non-SAC parties as transferors to ensure all preferred equity interests are owned by SACs going forward SAC-Contribution Process: ▪ Step 1: Contribute the Lindberg, GGHI and affiliate interests in the various SACs covered by the Contribution Agreements to NHC ▪ Step 2: Obtain control over the intervening trusts – There are presently 10 separate trusts which control the majority of the OpCos – After the contribution of interests outlined in Step 1 above, NHC will acquire control over the Settlors of each trust but will not have the ability to manage or direct the operations of the OpCos under the trusts, nor have access to any Opco generated cash flow – At a minimum, NHC will need to replace the trustee and beneficiary of each trust where permitted with one or more persons of its choosing - this will take time and will require the consent of lenders, regulators or holding companies under the trust line ▪ Full implementation of the MOU will need to be done in stages

PRIVILEGED & CONFIDENTIAL

M3 Partners Diligence Update

▪ M3 Partners had the following introductory calls with portfolio managers to determine the current operating state of each business as well as identify any immediate issues and concerns:

– (8/21/2024) Century Vision Global CEO Lonna Carter – (8/21/2024) Six Sails CEO Prashant Upadhyaya – (8/22/2024) Clanwilliam CEO Howard Beggs – (8/26/2024) Damovo CEO Chris Nickerson – (8/26/2024) Beckett CEO Kevin Issacson – (8/27/2024) Autonomy CEO Mike Pereira – (8/28/2024) Castle & Cooke Mortgage CEO Rick Cardillo – (8/28/2024) Accounts Receivable Management CEO Vishal Kumar ▪ M3 Partners was provided preliminary financial information for certain portfolio groups by OpCo management and GGHI and has conducted initial financial diligence (see appendix for a summary of information provided) ▪ WWBB has had introductory calls with Beckett's senior lender, trustees of portfolio trusts, and Damovo's general counsel

PRIVILEGED & CONFIDENTIAL

Portfolio Group Key Considerations & Action Items Portfolio Group Description Key Considerations NHC Action Items / Next Steps ▪ Currently working to refinance its existing loan ▪ Review new loan terms and request NHC with HPS/Freedom 3 Capital Collectibles BoD consent (term sheet for the new loan ▪ Lenders have been forbearing; loan repayment Beckett businesses, notably has been requested) due 11/30/24 (Steve Wilson Trust) in trading cards and ▪ Continue to conduct due diligence on the ▪ Discussions are in final stages with a group of related products business to help ensure all issues are lenders led by King Street Capital (pricing at identified and understood

SOFR + 850)

▪ NHC Board to evaluate proposal to sell CWG to TA Associates and consent if Healthcare ▪ Prospective sale of the business to TA appropriate Clanwilliam technology and Associates for €427MM (equity value of ▪ Secure consent of sale from Triton (Steve Wilson Trust) services businesses ~$326MM to NHC)(1) ▪ Assist with filing of past due Triton financial statements with the Irish Companies Registration Office Accounts ▪ Follow up with GGHI tax team and provide Debt collection and ▪ State licensing issues due to GGHI not filing its Receivable oversight to help ensure tax returns are filed A/R management 2022 / 2023 tax returns timely (2022 federal and Management so ARM can renew all state licenses services some key state tax returns were recently filed) (Steve Wilson Trust) ▪ Continue due diligence process ▪ HME has an outstanding loan with HPS who Home medical ▪ Evaluate prospective management buyout Autonomy – HME has expressed desire to be repaid equipment sales and offer for HME when provided (Steve Wilson Trust) ▪ Steve Wilson told us HME's management is rentals ▪ Continue due diligence process interested in acquiring the business Specialty pharmacy ▪ Former owner has launched a direct competitor Autonomy – HPC and infusions of HPC and has poached some customers and ▪ Analyze cash flow forecast and liquidity (Steve Wilson Trust) business (Hemophilia sales personnel; he is also suing HPC for ▪ Continue due diligence process related treatments) alleged defaults related to his earnout ▪ Evaluate CIM when available (end of Information and ▪ Currently in default with lenders who have September) Damovo communications pushed for a sales process to repay outstanding ▪ Progress initial diligence requests and better (Steve Wilson Trust) technology services debt (lenders reportedly owed €68m plus €25m understand sales process vs. other strategic company (UCaaS) in prepayment fees and equity kickers) alternatives

Source: Based on discussions with portfolio managers. M3 Partners is in the process of verifying the information provided 6 (1) Based on Goodbody Stockbrokers (investment bank

conducting the sales process) estimated proceeds to NHC of €291MM converted at EUR to Dollar exchange rate of 1.12 as of 9/22/2024

PRIVILEGED & CONFIDENTIAL

Portfolio Group Key Considerations & Action Items (Continued) Portfolio Group Description Key Considerations NHC Action Items / Next Steps

Castle & Cooke Mortgage origination ▪ Poorly performing business due to fall-off in loan ▪ Analyze cash flow forecast and liquidity in Mortgage and loan servicing origination light of continued operating losses (Mortgage Trust) businesses ▪ Minimal available liquidity

Century Vision ▪ Poorly performing business due to company- ▪ Analyze cash flow forecast and liquidity Eye care clinical Global (CVG) specific and industry headwinds runway practices (Not in Trust) ▪ Minimal available liquidity ▪ Continue due diligence process

▪ Consolidated Adjusted EBITDA is relatively stable, but revenue decline in print / digital ▪ Evaluate management's plan for the digital / Six Sails Industry certification media has been a drag on cash flow print media business to determine long-term (Not in Trust) and digital/print media ▪ Most of Six Sails' profitability is generated by viability the certification businesses

Businesses identified ▪ These businesses have independent Other that are not in a management teams but do not report to a ▪ Continue due diligence process portfolio group portfolio manager presently

Source: Based on discussions with portfolio managers. M3 Partners is in the process of verifying the information provided

PRIVILEGED & CONFIDENTIAL

Portfolio Group Financial Summary

The information below and in the appendix was provided by GGHI and portfolio group CEOs (see appendix for a list of financial information provided) – M3 Partners has not independently verified the accuracy of the information provided Financial Metrics LTM as of 6/30/2024 ($ in MMs) 2023A to 2024B Management Net Management 3rd Party Revenue EBITDA 3rd Party Portfolio Group Revenue EBITDA(1) Cash Debt Change(2) Margin %(1) Leverage(3) Beckett $615 $74 $17 $202 1% 12% 2.5x Clanwilliam(4) $111 $37 $21 $147 8% 33% 3.4x Accounts Receivable $131 $27 $12 $0 18% 21% N/A Management Autonomy(5) $202 $21 $14 $59 3% 11% 2.1x Damovo(5) $172 $16 N/P ~$76(6) 1% 10% 4.6x Castle & Cooke $20 ($4) $5 $0 18% (18%) N/A Mortgage Century Vision Global $81 $2 $2 $0 (4%) 3% N/A Six Sails $32 $1 $1 $0 18% 5% N/A Other(7) $19 $2 N/P N/P (14%) 5% N/P Notes:

(1) Includes various adjustments; Management EBITDA can differ substantially from covenant EBITDA required for covenant reporting (2) 2024 budgets provided by portfolio group managers for Beckett, CWG, ARM, CCM, CVG and Six Sails; revenue and EBITDA budget numbers for Autonomy, Damovo and Other provided by GGHI per OpCo summary financial reporting (3) Net 3rd party leverage calculated as (3rd party debt – cash and equivalents) / LTM Management EBITDA Case 3:23-cr-00048-MOC-DCK (4) (5) Document 260-2 Filed 07/28/26 Clanwilliam financials converted at spot rate of 1.12 EUR to Dollar as of 9/22/2024 Limited financial information has been provided for Autonomy and Damovo

(6) Damovo loan balance based on communication with the Damovo management team (€68MM converted at EUR to Dollar exchange rate of 1.12 as of 9/22/2024) 8 (7) Other entities based on OpCo summary financial reporting provided by GGHI. Separate company information has not been provided

PRIVILEGED & CONFIDENTIAL

Appendix

PRIVILEGED & CONFIDENTIAL

Select Financial Information Received

Portfolio Group Select Financial Information Received(1) ▪ Data provided via Beckett dataroom Beckett ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided by CWG's management team Clanwilliam ▪ Data includes (i) LTM P&L and balance sheet, (ii) 2024 budget (annual) ▪ Data provided in ARM dataroom Accounts Receivable ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) long-term annual Management projections, (iv) current capital structure details and related credit agreements and, (v) Management Reporting Packages ▪ Data provided by Autonomy's management team Autonomy ▪ Data includes (i) LTM P&L and balance sheet

Damovo ▪ Data per GGHI summary financial reporting ▪ Data provided in GGHI dataroom Castle & Cooke Mortgage ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided in GGHI dataroom Century Vision Global ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided in GGHI dataroom Six Sails ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages Other ▪ Data per GGHI summary financial reporting

Notes: 10 (1) Not an exhaustive list of all information received to date

PRIVILEGED & CONFIDENTIAL

Operating Entity List

Portfolio Group List of Known Operating Entities Within Portfolio Group Beckett Beckett Collectibles, Arcane Tinmen, Southern Hobby Distribution

Clanwilliam Clanwilliam

CBV Collection Services, AR Purchasing Solutions, AR Purchasing Solutions 2, Client Services Inc., MBW Interco, GCC Accounts Receivable Interco, ARA Group Holdings, Nationwide Recovery Holdings, Harvard Collect, TransContinental Credit Holdings, Management Collection Management Holdings, Arrevio, Global Growth Arrevio Private Limited, Atlas Global Autonomy Home Medical Equipment Specialists, HPC Specialty Pharmacy, Fiasco Fine Wine

Damovo Damovo

Castle & Cooke Mortgage Castle & Cooke Mortgage

Century Vision Global, Claris Vision, Vision Care Services, Lavenburg Medical Group, Boston Laser, Eye & Lasik, Prairie Century Vision Global Eye Centre EG Media, Engaged Media, Beckett Coin & Rock, Drummond Group, Fortrex, ComplySmart, Certification for Long-Term Six Sails Care, Certified Wireless Network Professionals, ERAD Imaging, ASiM, Financial Institute Advisors, NEBB Institute, International Society of Business

Appraisers, CertiTREK Group, Six Sails Other Intralan, Marval, Prolimate Solutions, The Rivers Source, HRWeb Software, WWS

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Beckett Overview

Summary Key Issues and Concerns ▪ Beckett Group is a technology-driven, comprehensive trading cards ▪ Beckett's lenders executed a forbearance agreement on April 19, collectibles platform consisting of three separate businesses with 2024, that required a marketing/refinancing process: grading/pricing, protection and distribution capabilities ▪ Amounts due: ~$202MM principal loan balance (1L and 2L) ▪ Beckett Collectibles (7% / 14% of LTM Revenue / Management ▪ Timeline: Repayment/refinancing plan due September 13, EBITDA): One-stop shop for all card grading, authentication, buying, 2024, and repayment due by November 30, 2024 selling, storing and pricing needs ▪ Current State: Beckett is in the process of finalizing the ▪ Arcane Tinman (9% / 22% of LTM Revenue / Management EBITDA): refinance terms with a group of lenders led by King Street Trading card sleeve and gaming accessories brand Capital (HPS will remain in the lender group) ▪ Southern Hobby Distribution (84% / 64% of LTM Revenue / ▪ Underinvestment in the business has resulted in declining market Management EBITDA): Hobby sports and trading card distributor share for Beckett Collectibles ▪ Previous M&A processes did not result in attractive bids Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $700 O/S Balance Rate Interest(1) $603.0 $611.2 $614.7 $600 3rd Party 1L Debt $138.6 LIBOR + 11.875% $26.7 $500 3rd Party 2L Debt 63.8 LIBOR + 11.875% 12.3 $400 $300 Total 3rd Party Debt $202.4 $39.0 $200 I/C Debt – – – $73.1 $73.0 $74.2 $100 Total Debt $202.4 $39.0 – FY22A FY23A LTM Q2'24A (-) Cash (16.7) Revenue Net Debt $185.7 18.4% 1.4% 0.6% YoY (%) LTM Mgmt EBITDA $74.2

EBITDA

12.1% 11.9% 12.1% Margin % Net Leverage(2) 2.5x Net 2.4x 2.4x 2.5x Leverage (2) Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 17 of 26 Source: Company provided financial information (1) Based on 2024 average 1mo LIBOR rate of 5.4% 12 (2) Net Leverage based on Management EBITDA; Covenant EBITDA resulted in Net Leverage of 4.8x as of 6/30/2024

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Clanwilliam Overview

Summary Key Issues and Concerns ▪ Clanwilliam provides software for the management of medical ▪ Clanwilliam currently has a proposed sale transaction from TA practices and elderly care institutions, as well as other Associates for €427MM, subject to final diligence and working capital communication services for businesses in several healthcare sectors adjustments ▪ Clanwilliam provides several kinds of software services such as ▪ There is ~€132MM of outstanding debt with Alcentra that needs to be Primary care practice management, secondary care and hospital refinanced – the Company is currently negotiating with Apollo on a practice management, pharmacy management, information and refinancing proposal messaging solutions and healthcare communications and medical ▪ Triton, which is the settlor of the Clanwilliam trust, is at risk of "strike- education

software off", which is a penalty in Ireland resulting from a failure to file ▪ Over the period from 2015 to 2020, Clanwilliam employed a buy and required financial statements with regulators build strategy in which it acquired 16 healthcare business in Ireland, the UK, Australia, and New Zealand which helped the company achieve revenue and EBITDA CAGRs of 35% and 40%, respectively

Historical Revenue & Management EBITDA (€ in MMs) Summary Capital Structure (€ in MMs) Revenue Management EBITDA Interest Annual $120 O/S Balance Rate Interest(1) €95.8 €99.0 $100 €90.3 3rd Party 1L Debt €131.6 €STR + 650 €12.8 $80 3rd Party 2L Debt – – – $60 Total 3rd Party Debt €131.6 €12.8 $40 €29.5 €31.7 €33.1 I/C Debt – – – $20 Total Debt €131.6 €12.8 – FY22A FY23A LTM Q2'24A (-) Cash (19.0) Revenue Net Debt €112.6 2.7% 6.1% 3.4% YoY (%) LTM Mgmt EBITDA €33.1

EBITDA

32.6% 33.1% 33.4% Margin % Net Leverage 3.4x Net 4.1x 3.6x 3.4x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 18 of 26 Source: Company provided financial information

(1) Based on 2024 average 6mo €STR rate of 3.7%

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Accounts Receivable Management Overview

Summary Key Issues and Concerns ▪ ARM is a group of companies focused on the collection of past due ▪ ARM has been unable to renew some of its state licenses due to late consumer and commercial loans in the US and Canadian markets 2022 and 2023 tax filings by GGHI - this is a critical part of the business as ARM is required to be licensed under its customer ▪ Most of the collections are done on a contingency basis where ARM contracts is paid a fee tied to the amount collected ▪ Currently, GGHI has filed its 2022 tax return and filed for an • ARM also purchases nonperforming loans and past due extension on its 2023 tax returns accounts, but this is a smaller component of the business largely due to capital constraints ▪ ARM has had issues opening bank accounts and borrowing third party debt due to ultimate beneficial ownership by GEL; as a result, ▪ ARM operates in a variety of industries such as financial services, the capital structure is entirely composed of intercompany debt telecom, government and healthcare

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $160 $152.0 O/S Balance Rate Interest $130.6 $130.8 $140 3rd Party 1L Debt – – – $120 $100 3rd Party 2L Debt – – – $80 Total 3rd Party Debt – – $60 $40 $31.0 $27.8 $27.4 I/C Debt $122.0 5.00% / 5.50% $6.3 $20 Total Debt $122.0 $6.3 – FY22A FY23A LTM Q2'24A (-) Cash (12.0) Revenue Net Debt $110.1 (15.0%) (14.1%) 0.1% YoY (%) LTM Mgmt EBITDA $27.4

EBITDA

20.4% 21.2% 21.0% Margin % Net Leverage 4.0x Net 3.6x 4.1x 4.0x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 19 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Autonomy Overview

Summary Key Issues and Concerns ▪ Autonomy is primarily comprised of 2 healthcare business, Home ▪ The former owner of HPC has launched a direct competitor of the Medical Equipment Specialists ("HME") and HPC Specialty business and has poached a material portion of the Company's Pharmacy ("HPC"). Additionally, the Fiasco Fine Wine business has patients and sales team which has resulted in significant revenue historically been included in portfolio reporting loss ▪ HME sells and leases critical care medical equipment and is the ▪ There is ongoing litigation with the former owner who is suing for largest independent provider of medical equipment in the state of breach of contract – HPC is countersuing for theft of confidential New Mexico information ▪ HPC is a specialty pharmacy business that sells high-cost drugs and ▪ Separately, the Company is engaged in another lawsuit with the medicine - the two primary products are for hemophilia and infusion former owner who has asserted claims for substantial compensation medications for immune diseases arising from the sale of HPC into the trust – he has won several rounds of litigation in state court which HPC has appealed

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $250 O/S Balance $202.9 $201.7 $200 3rd Party 1L Debt $58.6 $150 3rd Party 2L Debt – Autonomy has not Total 3rd Party Debt $58.6 $100 provided I/C Debt 57.5 comprehensive $50 $21.1 $21.1 financials; debt Total Debt $116.1 balances were taken – FY23A LTM Q2'24A (-) Cash (14.2) from the 6/30/2024 balance sheet Revenue Net Debt $101.9

N/P (0.6%)

YoY (%)

LTM Mgmt EBITDA $21.1

EBITDA

10.4% 10.5% Margin % Net Leverage 4.8x Net N/P 4.8x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 20 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Damovo Overview

Summary Key Issues and Concerns ▪ Damovo builds and manages Unified Communications as a Service ▪ Damovo is in default with its senior lenders – as a result the lenders ("UCaaS") systems and services for large enterprises and municipal have put significant pressure on Damovo to conduct a sales process organizations and have pushed to retain several advisory firms to help facilitate the process ▪ Damovo builds and operates systems that provide enhanced telephony, messaging, data collection and video ▪ Damovo currently has €68MM of outstanding debt (which has a 16MM prepayment fee and a €9MM equity kicker) ▪ Examples of existing clients include Aldi and the State of Hessen;

Damovo build systems over a 3-to-12-month period and then ▪ A total of ~€100MM of proceeds from the potential sale is needed to operates or maintains the systems for another for 3-5 years settle outstanding claims (including €7m owed to the former owner) ▪ Competitors include DTE, Duestche Telecom, Orange and Proximus ▪ The Company is targeting to have a CIM ready by the end of Group September and hopes to have first round indicative offers towards the end of October / beginning of November

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $200 $174.9 $171.5 $150 $100 Damovo has not provided comprehensive financials; $50 LTM P&L amounts were taken from limited provided $18.3 $16.4 information –

FY23A LTM Q2'24A

Revenue

N/P (1.9%)

YoY (%)

EBITDA

10.4% 9.6% Margin % Net N/P 4.6x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 21 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Mortgage Trust

CCM Overview

Summary Key Issues and Concerns ▪ CCM is a residential mortgage origination and servicing company ▪ The Company has struggled financially in the past 2 years due to the focused on conventional and government loans based in Draper, UT rise in interest rates and fall in origination volume ▪ CCM's financial results have been volatile as it is predominantly • The Company's loan volume decreased from $1.8BN in 2022 focused on loan origination; pre-COVID results were normal; post to $422MM in 2023 and is on pace for roughly the same level COVID results were strong, and post 2022 results have been poor in 2024 due to the sharp rise in interest rates and the material fall off in ▪ The Company had made dramatic cost reduction measures but still mortgage loan origination faces liquidity constraints • The Company has listed its office building in UT for sale but has had several potential deals fall through due to the inability of potential buyers to secure financing • If the Company can sell the UT office building, it believes it will be cashflow positive in 2024 Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $40 $36.6 $30 $22.8 $20.0 $20 $10 As of 6/30/2024 CCM does not have any outstanding – debt on its balance sheet ($10) ($3.7) ($4.0) ($3.7)

FY22A FY23A LTM Q2'24A

Revenue

(58.8%) (37.7%) (12.2%) YoY (%)

EBITDA

(10.0%) (17.6%) (18.3%) Margin % Net

N/A N/A N/A

Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 22 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Not in Trust

CVG Overview

Summary Key Issues and Concerns ▪ CVG is a collection of ophthalmological clinical practices which ▪ CVG is currently facing financial challenges primarily driven by provide comprehensive eye care and Lasik / cataract procedures limited resources, Medicare cuts, inflationary pressures and litigation issues with former owners / partners of certain practices: ▪ CVG manages more than two dozen clinical / ambulatory surgical offices and supports a team of nearly 500, primarily located along the ▪ Medicare reimbursements have decreased by 7% - 8% east coast decreasing top line revenue ▪ 70% of revenue and 100% of EBITDA is generated by the Claris ▪ The inflationary environment has increased average COGS Vision operating company by 10% - 14%; additionally, the cost to hire a specialist has increased considerably ▪ The former chief surgeon has sued Prairie E&L for wrongful termination which has cost the business ~$4MM

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $100 $91.8 O/S Balance Rate Interest $82.5 $80.7 $80 3rd Party 1L Debt – – – $60 3rd Party 2L Debt – – – Total 3rd Party Debt – – $40 I/C Debt $101.5 5.00% / 5.50% $5.1 $20 $4.8 $2.0 $2.3 Total Debt $101.5 $5.1 – FY22A FY23A LTM Q2'24A (-) Cash (2.4) Revenue Net Debt $99.1

N/P (10.2%) (2.1%)

YoY (%)

LTM Mgmt EBITDA $2.3

EBITDA

5.2% 2.4% 2.9% Margin % Net Leverage 42.7x Net 18.6x 45.6x 42.7x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 23 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Not in Trust

Six Sails Overview

Summary Key Issues and Concerns ▪ Six Sails is a group of businesses primarily focused on (i) print / ▪ The print / digital media businesses were historically Newsstand digital media publishing and (ii) certification dependent (50-60% of revenue), resulting in declining revenue and negative EBITDA ▪ Print / Digital Media: (54% of LTM Revenue; $(1.9MM) Adj. EBITDA):

Consists of enthusiast magazine publishing, search engine ▪ The businesses have been restructuring to right-size the cost marketing, influencer marketing, web development, and Beckett Coin base and shift to a direct-to-consumer and digital platform & Rock ▪ Management's long-term plan to shift platforms should be ▪ Certification (46% of LTM Revenue; $3.3MM Adj. EBITDA): Consist evaluated to determine the long-term viability/profitability of of the Drummond Group and Certitrek Group of businesses that the business provide IT, healthcare/lab, finance, and other certifications as well as ▪ The certification business, while profitable and stabilized, has few online continuing education growth opportunities ▪ The previous acquisition of ComplySmart ended up being a failure and has been since wound down Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $40 O/S Balance Rate Interest $35.0 $32.7 $31.9 $35 3rd Party 1L Debt – – – $30 $25 3rd Party 2L Debt – – – $20 Total 3rd Party Debt – – $15 $10 I/C Debt $36.2 5.00% / 5.50% $1.8

$5 $1.3 $2.0 $1.4 Total Debt $36.2 $1.8 – FY22A FY23A LTM Q2'24A (-) Cash (0.6) Revenue Net Debt $35.6

N/P (6.7%) (2.3%)

YoY (%)

LTM Mgmt EBITDA $1.4

EBITDA

3.8% 6.1% 4.5% Margin % Net Leverage 24.7x Net 25.9x 17.7x 24.7x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-2 Filed 07/28/26 Page 24 of 26

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

NHC Portfolio Managers

Professional Biography

Vishal Kumar • Vishal Kumar is responsible for leading the ARM Group portfolio which includes CBV, CSI, MBW, GCC, TCC, ARA, TCC, etc.

Accounts Receivable • He is a leader with 20+ years of varied experience including M&A, Operations and Business Turnarounds in Accounts Receivable Management Management at Eli Global and previously in multinationals such as GE Capital, Agilent Technologies and Philips

• Mike Pereira leads Autonomy Healthcare, including HME Specialists, HPC Specialty Pharmacy and Fiasco Fine Wine Mike Pereira • He has founded and sold 3 companies: TaxChat; The Law Report Group; and Knowledge In Practice. He previously served as Associate Autonomy Healthcare General Counsel at hedge fund manager Strategic Value Partners; Associate at law firm Ropes & Gray; and Legal Analyst at Bloomberg

• Kevin Issacson was appointed as CEO of the Beckett group in May 2023 Kevin Issacson • Isaacson brings over a quarter-century of industry experience to the role, including engagements in media (Sports Collectors Digest), Beckett manufacturing (Donruss Playoff) and e-commerce (eBay)

• Lonna Carter was appointed as CEO of Century Vision Global in June 2023 Lonna Carter • She has 15+ years of experience. Transitioned from legal counselor to corporate executive capable of guiding highly complex organizations Century Vision Global during massive scaling, startup, and organizational transformation

• Howard Beggs is an Irish entrepreneur, investor, professional director and Founder and Group Chief Executive Officer of Clanwilliam Howard Beggs • With a background in technology, Beggs founded the original company, Medicom, in 1996 and has led the company for over 25 years to Clanwilliam become a global healthcare group

• Chris Nickerson joined Damovo in October 2020 Chris Nickerson • He has over 20 years of experience in the technology and telecommunications industry and has a distinguished track record of driving Damovo innovation, operational excellence, and sustainable growth • Rick Cardillo has served as President and CEO of Castle & Cooke Mortgage since June 2019 Rick Cardillo • Rick has had a distinguished career spanning more than 33 years, seven national companies and two coasts. He has held senior and Castle & Cooke executive-level positions with organizations like Morgan Stanley, Bank of America, CitiFinancial and Nationstar (now Mr. Cooper) where he Mortgage oversaw multiple channels including retail, consumer direct, wholesale, correspondent and capital markets • Prashant

Upadhyaya has served as CEO of Six Sails since October 2021 Prashant Upadhyaya • He has 25 years of experience across roles including Leadership experience covering managing Global Teams, P&L Management, Turnaround Management, Operations and Sales Management across areas of Advertising & Marketing (Print, place based and Digital), Print Publishing, Six Sails and Content Publishing

PRIVILEGED & CONFIDENTIAL

Disclaimer

This document and the information contained herein ("Document") has been prepared for the informational purposes of authorized Recipients only, and is not intended to provide, and should not be relied on for, investment, lending, tax, legal or accounting advice. Nothing in the Document shall constitute an offer or a solicitation of an offer to buy or sell any products or services or enter into any transaction, including, but not limited with respect to, any securities, financial instruments or other investments or investment advice. Recipients should seek the advice of their own independent professionals prior to making any investment or other decision. This Document may contain forward-looking statements subject to many variable factors and uncertainties that could cause actual results to differ materially from what is set forth or projected herein. The Document (unless otherwise explicitly stated) is a preliminary draft and subject to change. Notwithstanding the foregoing, M3 prepared this Document as of the date hereof, and assumes no obligation to update or revise it for any reason whatsoever thereafter. M3 Partners, LP ("M3") makes no representation whatsoever regarding the adequacy of the Document for any purpose. In conducting analysis reflected in this Document, M3 assumed, without verification, the accuracy of information provided to it or obtained from third parties. No one from M3 or any representative of M3 shall have any liability to any party for any error or omission with respect to any of the information contained herein. M3 may have prepared or in the future may prepare other documents that are inconsistent with, and reach different conclusions from, the information presented in this Document. M3 assumes no obligation to bring such other documents to a Recipient's attention. The analysis reflected in the Document would not necessarily reveal any material misstatement, omission or error and does not constitute an audit, review, compilation or other attestation service in accordance with Generally Accepted Accounting Principles or other standards established by the American Institute of Certified Public Accountants. M3 does not express an opinion or any other form of assurance on any financial or other information. Had M3 or another party performed additional work, including more in-depth verification or analysis, other matters might have come to its attention. Pursuant to Internal Revenue Service Circular 230 (if applicable), be advised that any discussion of U.S. federal tax issues contained or referred to herein is not intended or written to be used, for the purpose of: (A) avoiding penalties that may be imposed under the internal Revenue code; nor (B) promoting, marketing or recommending to another party any transaction or matter addressed. M3 reserves all rights. Nothing in the Document shall be construed as granting any license or right to use any image, trademark or other intellectual property of M3. Unless otherwise indicated, all capitalized terms used herein have the same meaning as in the Agreement.

[Doc. 260-3 — Exhibit]

PRIVILEGED & CONFIDENTIAL

NHC Holdings, LLC

Board Presentation

September 25, 2024

Experience. Alignment. Results.

PRIVILEGED & CONFIDENTIAL

Agenda

Topic

Introduction

Situation Overview

SAC Contribution Update / Approval of Contribution Agreements M3 Partners Diligence Update NHC Portfolio Group Overview

PRIVILEGED & CONFIDENTIAL

Situation Overview

▪ The initial meeting of the NHC Holdings, LLC ("NHC") Board was held on August 14, 2024 – D&O coverage was bound as of August 14, 2024, with the premium funded on August 19, 2024 – John Babcock, of Waldrep Wall Babcock & Bailey, PLLC ("WWBB"), was retained as NHC counsel ▪ An NHC bank account was opened at Dogwood State Bank on August 29, 2024, and was funded with proceeds of a $5 million line of credit on September 5, 2024 ▪ To date, the primary focus has been on preparing the contribution agreements, including assessing ways to gain control over intervening trusts that hold the majority of the operating Specified Affiliated Companies ("SACs"), and on conducting initial diligence on the portfolio groups and individual entities ▪ Key next steps include:

– Execute the contribution agreements;

– Gain control over the trusts, which will involve conversations with lenders, regulators and other third parties to obtain their consent, where necessary;

– Obtain Triton consent to the proposed Clanwilliam ("CWG") sale to allow buyer diligence to continue;

– Ensure Triton files its financial statements (or obtains a further extension) with the Irish Companies Registration Office to avoid strike-off;

– Continue detailed financial and operational diligence on portfolio groups and individual entities; and – Evaluate near term strategic alternatives for board consideration including (i) proposed Clanwilliam sale, (ii) Beckett refinancing, (iii) potential Damovo sale and (iv) possible Home Medical Equipment Specialists ("HME") management buyout

PRIVILEGED & CONFIDENTIAL

SAC Contribution Update / Approval of Contribution Agreements ▪ Three separate Contribution Agreements have been prepared to facilitate the contribution of various SACs, including the FinCo, SPV, and general SAC Contribution Agreements which have been circulated for review – Certain SACs cannot be contributed at this time due to the existence of intervening trusts established after the MOU was signed ▪ An updated schedule reflecting the capitalization structure and ownership of the SACs being contributed will be attached to each Contribution Agreement – We have identified numerous inconsistencies between the organizational charts initially provided and the actual organizational documents obtained from Global Growth Holdings Inc. ("GGHI") – we continue to work through these issues – We have also identified certain SACs with preferred equity interests owned by other SACs as well as non-SACs – the Contribution Agreements include the non-

SAC parties as transferors to ensure all preferred equity interests are owned by SACs going forward SAC-Contribution Process: ▪ Step 1: Contribute the Lindberg, GGHI and affiliate interests in the various SACs covered by the Contribution Agreements to NHC ▪ Step 2: Obtain control over the intervening trusts – There are presently 10 separate trusts which control the majority of the OpCos – After the contribution of interests outlined in Step 1 above, NHC will acquire control over the Settlors of each trust but will not have the ability to manage or direct the operations of the OpCos under the trusts, nor have access to any Opco generated cash flow – At a minimum, NHC will need to replace the trustee and beneficiary of each trust where permitted with one or more persons of its choosing - this will take time and will require the consent of lenders, regulators or holding companies under the trust line ▪ Full implementation of the MOU will need to be done in stages

PRIVILEGED & CONFIDENTIAL

M3 Partners Diligence Update

▪ M3 Partners had the following introductory calls with portfolio managers to determine the current operating state of each business as well as identify any immediate issues and concerns:

– (8/21/2024) Century Vision Global CEO Lonna Carter – (8/21/2024) Six Sails CEO Prashant Upadhyaya – (8/22/2024) Clanwilliam CEO Howard Beggs – (8/26/2024) Damovo CEO Chris Nickerson – (8/26/2024) Beckett CEO Kevin Issacson – (8/27/2024) Autonomy CEO Mike Pereira – (8/28/2024) Castle & Cooke Mortgage CEO Rick Cardillo – (8/28/2024) Accounts Receivable Management CEO Vishal Kumar ▪ M3 Partners was provided preliminary financial information for certain portfolio groups by OpCo management and GGHI and has conducted initial financial diligence (see appendix for a summary of information provided) ▪ WWBB has had introductory calls with Beckett's senior lender, trustees of portfolio trusts, and Damovo's general counsel

PRIVILEGED & CONFIDENTIAL

Portfolio Group Key Considerations & Action Items Portfolio Group Description Key Considerations NHC Action Items / Next Steps ▪ Currently working to refinance its existing loan ▪ Review new loan terms and request NHC with HPS/Freedom 3 Capital Collectibles BoD consent (term sheet for the new loan ▪ Lenders have been forbearing; loan repayment Beckett businesses, notably has been requested) due 11/30/24 (Steve Wilson Trust) in trading cards and ▪ Continue to conduct due diligence on the ▪ Discussions are in final stages with a group of related products business to help ensure all issues are lenders led by King Street Capital (pricing at identified and understood

SOFR + 850)

▪ NHC Board to evaluate proposal to sell CWG to TA Associates and consent if Healthcare ▪ Prospective sale of the business to TA appropriate Clanwilliam technology and Associates for €427MM (equity value of ▪ Secure consent of sale from Triton (Steve Wilson Trust) services businesses ~$326MM to NHC)(1) ▪ Assist with filing of past due Triton financial statements with the Irish Companies Registration Office Accounts ▪ Follow up with GGHI tax team and provide Debt collection and ▪ State licensing issues due to GGHI not filing its Receivable oversight to help ensure tax returns are filed A/R management 2022 / 2023 tax returns timely (2022 federal and Management so ARM can renew all state licenses services some key state tax returns were recently filed) (Steve Wilson Trust) ▪ Continue due diligence process ▪ HME has an outstanding loan with HPS who Home medical ▪ Evaluate prospective management buyout Autonomy – HME has expressed desire to be repaid

equipment sales and offer for HME when provided (Steve Wilson Trust) ▪ Steve Wilson told us HME's management is rentals ▪ Continue due diligence process interested in acquiring the business Specialty pharmacy ▪ Former owner has launched a direct competitor Autonomy – HPC and infusions of HPC and has poached some customers and ▪ Analyze cash flow forecast and liquidity (Steve Wilson Trust) business (Hemophilia sales personnel; he is also suing HPC for ▪ Continue due diligence process related treatments) alleged defaults related to his earnout ▪ Evaluate CIM when available (end of Information and ▪ Currently in default with lenders who have September) Damovo communications pushed for a sales process to repay outstanding ▪ Progress initial diligence requests and better (Steve Wilson Trust) technology services debt (lenders reportedly owed €68m plus €25m understand sales process vs. other strategic company (UCaaS) in prepayment fees and equity kickers) alternatives

Source: Based on discussions with portfolio managers. M3 Partners is in the process of verifying the information provided 6 (1) Based on Goodbody Stockbrokers (investment bank conducting the sales process) estimated proceeds to NHC of €291MM converted at EUR to Dollar exchange rate of 1.12 as of 9/22/2024

PRIVILEGED & CONFIDENTIAL

Portfolio Group Key Considerations & Action Items (Continued) Portfolio Group Description Key Considerations NHC Action Items / Next Steps

Castle & Cooke Mortgage origination ▪ Poorly performing business due to fall-off in loan ▪ Analyze cash flow forecast and liquidity in Mortgage and loan servicing origination light of continued operating losses (Mortgage Trust) businesses ▪ Minimal available liquidity

Century Vision ▪ Poorly performing business due to company- ▪ Analyze cash flow forecast and liquidity Eye care clinical Global (CVG) specific and industry headwinds runway practices (Not in Trust) ▪ Minimal available liquidity ▪ Continue due diligence process

▪ Consolidated Adjusted EBITDA is relatively stable, but revenue decline in print / digital ▪ Evaluate management's plan for the digital / Six Sails Industry certification media has been a drag on cash flow print media business to determine long-term (Not in Trust) and digital/print media ▪ Most of Six Sails' profitability is generated by viability the certification businesses

Businesses identified ▪ These businesses have independent Other that are not in a management teams but do not report to a ▪ Continue due diligence process portfolio group portfolio manager presently

Source: Based on discussions with portfolio managers. M3 Partners is in the process of verifying the information provided

PRIVILEGED & CONFIDENTIAL

Portfolio Group Financial Summary

The information below and in the appendix was provided by GGHI and portfolio group CEOs (see appendix for a list of financial information provided) – M3 Partners has not independently verified the accuracy of the information provided Financial Metrics LTM as of 6/30/2024 ($ in MMs) 2023A to 2024B Management Net Management 3rd Party Revenue EBITDA 3rd Party Portfolio Group Revenue EBITDA(1) Cash Debt Change(2) Margin %(1) Leverage(3) Beckett $615 $74 $17 $202 1% 12% 2.5x Clanwilliam(4) $111 $37 $21 $147 8% 33% 3.4x Accounts Receivable $131 $27 $12 $0 18% 21% N/A Management Autonomy(5) $202 $21 $14 $59 3% 11% 2.1x Damovo(5) $172 $16 N/P ~$76(6) 1% 10% 4.6x Castle &

Cooke $20 ($4) $5 $0 18% (18%) N/A Mortgage Century Vision Global $81 $2 $2 $0 (4%) 3% N/A Six Sails $32 $1 $1 $0 18% 5% N/A Other(7) $19 $2 N/P N/P (14%) 5% N/P Notes:

(1) Includes various adjustments; Management EBITDA can differ substantially from covenant EBITDA required for covenant reporting (2) 2024 budgets provided by portfolio group managers for Beckett, CWG, ARM, CCM, CVG and Six Sails; revenue and EBITDA budget numbers for Autonomy, Damovo and Other provided by GGHI per OpCo summary financial reporting (3) Net 3rd party leverage calculated as (3rd party debt – cash and equivalents) / LTM Management EBITDA Case 3:23-cr-00048-MOC-DCK (4) (5) Document 260-3 Filed 07/28/26 Clanwilliam financials converted at spot rate of 1.12 EUR to Dollar as of 9/22/2024 Limited financial information has been provided for Autonomy and Damovo

(6) Damovo loan balance based on communication with the Damovo management team (€68MM converted at EUR to Dollar exchange rate of 1.12 as of 9/22/2024) 8 (7) Other entities based on OpCo summary financial reporting provided by GGHI. Separate company information has not been provided

PRIVILEGED & CONFIDENTIAL

Appendix

PRIVILEGED & CONFIDENTIAL

Select Financial Information Received

Portfolio Group Select Financial Information Received(1) ▪ Data provided via Beckett dataroom Beckett ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided by CWG's management team Clanwilliam ▪ Data includes (i) LTM P&L and balance sheet, (ii) 2024 budget (annual) ▪ Data provided in ARM dataroom Accounts Receivable ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) long-term annual Management projections, (iv) current capital structure details and related credit agreements and, (v) Management Reporting Packages ▪ Data provided by Autonomy's management team Autonomy ▪ Data includes (i) LTM P&L and balance sheet

Damovo ▪ Data per GGHI summary financial reporting ▪ Data provided in GGHI dataroom Castle & Cooke Mortgage ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided in GGHI dataroom Century Vision Global ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages ▪ Data provided in GGHI dataroom Six Sails ▪ Data includes (i) historical monthly P&L and balance sheet, (ii) 2024 budget (monthly), (iii) current capital structure details and related credit agreements and, (iv) Management Reporting Packages Other ▪ Data per GGHI summary financial reporting

Notes: 10 (1) Not an exhaustive list of all information received to date

PRIVILEGED & CONFIDENTIAL

Operating Entity List

Portfolio Group List of Known Operating Entities Within Portfolio Group Beckett Beckett Collectibles, Arcane Tinmen, Southern Hobby Distribution

Clanwilliam Clanwilliam

CBV Collection Services, AR Purchasing Solutions, AR Purchasing Solutions 2, Client Services Inc., MBW Interco, GCC Accounts Receivable Interco, ARA Group Holdings, Nationwide Recovery Holdings, Harvard Collect, TransContinental Credit Holdings, Management Collection Management Holdings, Arrevio, Global Growth Arrevio Private Limited, Atlas Global Autonomy Home Medical Equipment Specialists, HPC Specialty Pharmacy, Fiasco Fine Wine

Damovo Damovo

Castle & Cooke Mortgage Castle & Cooke Mortgage

Century Vision Global, Claris Vision, Vision Care Services, Lavenburg Medical Group, Boston Laser, Eye & Lasik, Prairie Century Vision Global Eye Centre EG Media, Engaged Media, Beckett Coin & Rock, Drummond Group, Fortrex, ComplySmart, Certification for Long-Term Six Sails Care, Certified Wireless Network Professionals, ERAD Imaging, ASiM, Financial Institute Advisors, NEBB Institute, International Society of Business Appraisers, CertiTREK Group, Six Sails Other Intralan, Marval, Prolimate Solutions, The Rivers Source, HRWeb Software, WWS

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Beckett Overview

Summary Key Issues and Concerns ▪ Beckett Group is a technology-driven, comprehensive trading cards ▪ Beckett's lenders executed a forbearance agreement on April 19, collectibles platform consisting of three separate businesses with 2024, that required a marketing/refinancing process: grading/pricing, protection and distribution capabilities ▪ Amounts due: ~$202MM principal loan balance (1L and 2L) ▪ Beckett Collectibles (7% / 14% of LTM Revenue / Management ▪ Timeline: Repayment/refinancing plan due September 13, EBITDA): One-stop shop for all card grading, authentication, buying, 2024, and repayment due by November 30, 2024 selling, storing and pricing needs ▪ Current State: Beckett is in the process of finalizing the ▪ Arcane Tinman (9% / 22% of LTM Revenue / Management EBITDA): refinance terms with a group of lenders led by King Street Trading card sleeve and gaming accessories brand Capital (HPS will remain in the lender group) ▪ Southern Hobby Distribution (84% / 64% of LTM Revenue / ▪ Underinvestment in the business has resulted in declining market Management EBITDA): Hobby sports and trading card distributor share for Beckett Collectibles ▪ Previous M&A processes did not result in attractive bids Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $700 O/S Balance Rate Interest(1) $603.0 $611.2 $614.7 $600 3rd Party 1L Debt $138.6 LIBOR + 11.875% $26.7 $500 3rd Party 2L Debt 63.8 LIBOR + 11.875% 12.3 $400 $300 Total 3rd Party Debt $202.4 $39.0 $200 I/C Debt – – – $73.1 $73.0 $74.2 $100 Total Debt $202.4 $39.0 – FY22A FY23A LTM Q2'24A (-) Cash (16.7) Revenue Net Debt $185.7 18.4% 1.4% 0.6% YoY (%) LTM Mgmt EBITDA $74.2

EBITDA

12.1% 11.9% 12.1% Margin % Net Leverage(2) 2.5x Net 2.4x 2.4x 2.5x Leverage (2) Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 12 of 21 Source: Company provided financial information (1) Based on 2024 average 1mo LIBOR rate of 5.4% 12 (2) Net Leverage based on Management EBITDA; Covenant EBITDA resulted in Net Leverage of 4.8x as of 6/30/2024

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Clanwilliam Overview

Summary Key Issues and Concerns ▪ Clanwilliam provides software for the management of medical ▪ Clanwilliam currently has a proposed sale transaction from TA practices and elderly care institutions, as well as other Associates for €427MM, subject to final diligence and working capital communication services for businesses in several healthcare sectors adjustments ▪ Clanwilliam provides several kinds of software services such as ▪ There is ~€132MM of outstanding debt with Alcentra that needs to be Primary care practice management, secondary care and hospital refinanced – the Company is currently negotiating with Apollo on a practice management, pharmacy management, information and refinancing proposal messaging solutions and healthcare communications and medical ▪ Triton, which is the settlor of the Clanwilliam trust, is at risk of "strike - education software off", which is a penalty in Ireland resulting from a failure to file ▪ Over the period from 2015 to 2020, Clanwilliam employed a buy and required financial statements with regulators build strategy in which it acquired 16 healthcare business in Ireland, the UK, Australia, and New Zealand which helped the company achieve revenue and EBITDA CAGRs of 35% and 40%, respectively

Historical Revenue & Management EBITDA (€ in MMs) Summary Capital Structure (€ in MMs) Revenue Management EBITDA Interest Annual $120 O/S Balance Rate Interest(1) €95.8 €99.0 $100 €90.3 3rd Party 1L Debt €131.6 €STR + 650 €12.8 $80 3rd Party 2L Debt – – – $60 Total 3rd Party Debt €131.6 €12.8 $40 €29.5 €31.7 €33.1 I/C Debt – – – $20 Total Debt €131.6 €12.8 – FY22A FY23A LTM Q2'24A (-) Cash (19.0) Revenue Net Debt €112.6 2.7% 6.1% 3.4% YoY (%) LTM Mgmt EBITDA €33.1

EBITDA

32.6% 33.1% 33.4% Margin % Net Leverage 3.4x Net 4.1x 3.6x 3.4x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 13 of 21 Source: Company provided financial information

(1) Based on 2024 average 6mo €STR rate of 3.7%

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Accounts Receivable Management Overview

Summary Key Issues and Concerns ▪ ARM is a group of companies focused on the collection of past due ▪ ARM has been unable to renew some of its state licenses due to late consumer and commercial loans in the US and Canadian markets 2022 and 2023 tax filings by GGHI - this is a critical part of the business as ARM is required to be licensed under its customer ▪ Most of the collections are done on a contingency basis where ARM contracts is paid a fee tied to the amount collected ▪ Currently, GGHI has filed its 2022 tax return and filed for an • ARM also purchases nonperforming loans and past due extension on its 2023 tax returns accounts, but this is a smaller component of the business largely due to capital constraints ▪ ARM has had issues opening bank accounts and borrowing third party debt due to ultimate beneficial ownership by GEL; as a result, ▪ ARM operates in a variety of industries such as financial services, the capital structure is entirely composed of intercompany debt telecom, government and healthcare

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $160 $152.0 O/S Balance Rate Interest $130.6 $130.8 $140 3rd Party 1L Debt – – – $120 $100 3rd Party 2L Debt – – – $80 Total 3rd Party Debt – – $60 $40 $31.0 $27.8 $27.4 I/C Debt $122.0 5.00% / 5.50% $6.3 $20 Total Debt $122.0 $6.3 – FY22A FY23A LTM Q2'24A (-) Cash (12.0) Revenue Net Debt $110.1 (15.0%) (14.1%) 0.1% YoY (%) LTM Mgmt EBITDA $27.4

EBITDA

20.4% 21.2% 21.0% Margin % Net Leverage 4.0x Net 3.6x 4.1x 4.0x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 14 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Autonomy Overview

Summary Key Issues and Concerns ▪ Autonomy is primarily comprised of 2 healthcare business, Home ▪ The former owner of HPC has launched a direct competitor of the Medical Equipment Specialists ("HME") and HPC Specialty business and has poached a material portion of the Company's Pharmacy ("HPC"). Additionally, the Fiasco Fine Wine business has patients and sales team which has resulted in significant revenue historically been included in portfolio reporting loss ▪ HME sells and leases critical care medical equipment and is the ▪ There is ongoing litigation with the former owner who is suing for largest independent provider of medical equipment in the state of breach of contract – HPC is countersuing for theft of confidential New Mexico information ▪ HPC is a specialty pharmacy business that sells high-cost drugs and ▪ Separately, the Company is engaged in another lawsuit with the medicine - the two primary products are for hemophilia and infusion former owner who has asserted claims for substantial compensation medications for immune diseases arising from the sale of HPC into the trust – he has won several rounds of litigation in state court which HPC has appealed

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $250 O/S Balance $202.9 $201.7 $200 3rd Party 1L Debt $58.6 $150 3rd Party 2L Debt – Autonomy has not Total 3rd Party Debt $58.6 $100 provided I/C Debt 57.5 comprehensive $50 $21.1 $21.1 financials; debt Total Debt $116.1 balances were taken – FY23A LTM Q2'24A (-) Cash (14.2) from the 6/30/2024 balance sheet Revenue Net Debt $101.9

N/P (0.6%)

YoY (%)

LTM Mgmt EBITDA $21.1

EBITDA

10.4% 10.5% Margin % Net Leverage 4.8x Net N/P 4.8x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 15 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Steve Wilson Trust

Damovo Overview

Summary Key Issues and Concerns ▪ Damovo builds and manages Unified Communications as a Service ▪ Damovo is in default with its senior lenders – as a result the lenders (“UCaaS”) systems and services for large enterprises and municipal have put significant pressure on Damovo to conduct a sales process organizations and have pushed to retain several advisory firms to help facilitate the process ▪ Damovo builds and operates systems that provide enhanced telephony, messaging, data collection and video ▪ Damovo currently has €68MM of outstanding debt (which has a 16MM prepayment fee and a €9MM equity kicker) ▪ Examples of existing clients include Aldi and the State of Hessen;

Damovo build systems over a 3-to-12-month period and then ▪ A total of ~€100MM of proceeds from the potential sale is needed to operates or maintains the systems for another for 3-5 years settle outstanding claims (including €7m owed to the former owner) ▪ Competitors include DTE, Duestche Telecom, Orange and Proximus ▪ The Company is targeting to have a CIM ready by the end of Group September and hopes to have first round indicative offers towards the end of October / beginning of November

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $200 $174.9 $171.5 $150 $100 Damovo has not provided comprehensive financials; $50 LTM P&L amounts were taken from limited provided $18.3 $16.4 information –

| | FY23A | LTM Q2'24A |
|---|---|---|
| Revenue | | |
| N/P | | (1.9%) |
| YoY (%) | | |
| EBITDA | | |

10.4% 9.6% Margin % Net N/P 4.6x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 16 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Mortgage Trust

CCM Overview

Summary Key Issues and Concerns ▪ CCM is a residential mortgage origination and servicing company ▪ The Company has struggled financially in the past 2 years due to the focused on conventional and government loans based in Draper, UT rise in interest rates and fall in origination volume ▪ CCM’s financial results have been volatile as it is predominantly • The Company’s loan volume decreased from $1.8BN in 2022 focused on loan origination; pre-COVID results were normal; post to $422MM in 2023 and is on pace for roughly the same level COVID results were strong, and post 2022 results have been poor in 2024 due to the sharp rise in interest rates and the material fall off in ▪ The Company had made dramatic cost reduction measures but still mortgage loan origination faces liquidity constraints • The Company has listed its office building in UT for sale but has had several potential deals fall through due to the inability of potential buyers to secure financing • If the Company can sell the UT office building, it believes it will be cashflow positive in 2024 Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA $40 $36.6 $30 $22.8 $20.0 $20 $10 As of 6/30/2024 CCM does not have any outstanding – debt on its balance sheet ($10) ($3.7) ($4.0) ($3.7)

FY22A FY23A LTM Q2'24A

Revenue

(58.8%) (37.7%) (12.2%) YoY (%)

EBITDA

(10.0%) (17.6%) (18.3%) Margin % Net

N/A N/A N/A

Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 17 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Not in Trust

CVG Overview

Summary Key Issues and Concerns ▪ CVG is a collection of ophthalmological clinical practices which ▪ CVG is currently facing financial challenges primarily driven by provide comprehensive eye care and Lasik / cataract procedures limited resources, Medicare cuts, inflationary pressures and litigation issues with former owners / partners of certain practices: ▪ CVG manages more than two dozen clinical / ambulatory surgical offices and supports a team of nearly 500, primarily located along the ▪ Medicare reimbursements have decreased by 7% - 8% east coast decreasing top line revenue ▪ 70% of revenue and 100% of EBITDA is generated by the Claris ▪ The inflationary environment has increased average COGS Vision operating company by 10% - 14%; additionally, the cost to hire a specialist has increased considerably ▪ The former chief surgeon has sued Prairie E&L for wrongful termination which has cost the business ~$4MM

Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $100 $91.8 O/S Balance Rate Interest $82.5 $80.7 $80 3rd Party 1L Debt – – – $60 3rd Party 2L Debt – – – Total 3rd Party Debt – – $40 I/C Debt $101.5 5.00% / 5.50% $5.1 $20 $4.8 $2.0 $2.3 Total Debt $101.5 $5.1 – FY22A FY23A LTM Q2'24A (-) Cash (2.4) Revenue Net Debt $99.1

N/P (10.2%) (2.1%)

YoY (%)

LTM Mgmt EBITDA $2.3

EBITDA

5.2% 2.4% 2.9% Margin % Net Leverage 42.7x Net 18.6x 45.6x 42.7x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 18 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

Not in Trust

Six Sails Overview

Summary Key Issues and Concerns ▪ Six Sails is a group of businesses primarily focused on (i) print / ▪ The print / digital media businesses were historically Newsstand digital media publishing and (ii) certification dependent (50-60% of revenue), resulting in declining revenue and negative EBITDA ▪ Print / Digital Media: (54% of LTM Revenue; $(1.9MM) Adj. EBITDA):

Consists of enthusiast magazine publishing, search engine ▪ The businesses have been restructuring to right-size the cost marketing, influencer marketing, web development, and Beckett Coin base and shift to a direct-to-consumer and digital platform & Rock ▪ Management's long-term plan to shift platforms should be ▪ Certification (46% of LTM Revenue; $3.3MM Adj. EBITDA): Consist evaluated to determine the long-term viability/profitability of of the Drummond Group and Certitrek Group of businesses that the business provide IT, healthcare/lab, finance, and other certifications as well as ▪ The certification business, while profitable and stabilized, has few online continuing education growth opportunities ▪ The previous acquisition of ComplySmart ended up being a failure and has been since wound down Historical Revenue & Management EBITDA ($ in MMs) Summary Capital Structure ($ in MMs) Revenue Management EBITDA Interest Annual $40 O/S Balance Rate Interest $35.0 $32.7 $31.9 $35 3rd Party 1L Debt – – – $30 $25 3rd Party 2L Debt – – – $20 Total 3rd Party Debt – – $15 $10 I/C Debt $36.2 5.00% / 5.50% $1.8 $5 $1.3 $2.0 $1.4 Total Debt $36.2 $1.8 – FY22A FY23A LTM Q2'24A (-) Cash (0.6) Revenue Net Debt $35.6

N/P (6.7%) (2.3%)

YoY (%)

LTM Mgmt EBITDA $1.4

EBITDA

3.8% 6.1% 4.5% Margin % Net Leverage 24.7x Net 25.9x 17.7x 24.7x Leverage Case 3:23-cr-00048-MOC-DCK Document 260-3 Filed 07/28/26 Page 19 of 21

Source: Company provided financial information

PRIVILEGED & CONFIDENTIAL

NHC Portfolio Managers

Professional Biography

Vishal Kumar • Vishal Kumar is responsible for leading the ARM Group portfolio which includes CBV, CSI, MBW, GCC, TCC, ARA, TCC, etc.

Accounts Receivable • He is a leader with 20+ years of varied experience including M&A, Operations and Business Turnarounds in Accounts Receivable Management Management at Eli Global and previously in multinationals such as GE Capital, Agilent Technologies and Philips

• Mike Pereira leads Autonomy Healthcare, including HME Specialists, HPC Specialty Pharmacy and Fiasco Fine Wine Mike Pereira • He has founded and sold 3 companies: TaxChat; The Law Report Group; and Knowledge In Practice. He previously served as Associate Autonomy Healthcare General Counsel at hedge fund manager Strategic Value Partners; Associate at law firm Ropes & Gray; and Legal Analyst at Bloomberg

• Kevin Issacson was appointed as CEO of the Beckett group in May 2023 Kevin Issacson • Isaacson brings over a quarter-century of industry experience to the role, including engagements in media (Sports Collectors Digest), Beckett manufacturing (Donruss Playoff) and e-commerce (eBay)

• Lonna Carter was appointed as CEO of Century Vision Global in June 2023 Lonna Carter • She has 15+ years of experience. Transitioned from legal counselor to corporate executive capable of guiding highly complex organizations Century Vision Global during massive scaling, startup, and organizational transformation

• Howard Beggs is an Irish entrepreneur, investor, professional director and Founder and Group Chief Executive Officer of Clanwilliam Howard Beggs • With a background in technology, Beggs founded the original company, Medicom, in 1996 and has led the company for over 25 years to Clanwilliam become a global healthcare group

• Chris Nickerson joined Damovo in October 2020 Chris Nickerson • He has over 20 years of experience in the technology and telecommunications industry and has a distinguished track record of driving Damovo innovation, operational excellence, and sustainable growth • Rick Cardillo has served as President and CEO of Castle & Cooke Mortgage since June 2019 Rick Cardillo • Rick has had a distinguished career spanning more than 33 years, seven national companies and two coasts. He has held senior and Castle & Cooke executive-level positions with organizations like Morgan Stanley, Bank of America, CitiFinancial and Nationstar (now Mr. Cooper) where he Mortgage oversaw multiple channels including retail, consumer direct, wholesale, correspondent and capital markets • Prashant Upadhyaya has served as CEO of Six Sails since October 2021 Prashant Upadhyaya • He has 25 years of experience across roles including Leadership experience covering managing Global Teams, P&L Management, Turnaround Management, Operations and Sales Management across areas of Advertising & Marketing (Print, place based and Digital), Print Publishing, Six Sails and Content Publishing

PRIVILEGED & CONFIDENTIAL

Disclaimer

This document and the information contained herein ("Document") has been prepared for the informational purposes of authorized Recipients only, and is not intended to provide, and should not be relied on for, investment, lending, tax, legal or accounting advice. Nothing in the Document shall constitute an offer or a solicitation of an offer to buy or sell any products or services or enter into any transaction, including, but not limited with respect to, any securities, financial instruments or other investments or investment advice. Recipients should seek the advice of their own independent professionals prior to making any investment or other decision. This Document may contain forward-looking statements subject to many variable factors and uncertainties that could cause actual results to differ materially from what is set forth or projected herein. The Document (unless otherwise explicitly stated) is a preliminary draft and subject to change. Notwithstanding the foregoing, M3 prepared this Document as of the date hereof, and assumes no obligation to update or revise it for any reason whatsoever thereafter. M3 Partners, LP ("M3") makes no representation whatsoever regarding the adequacy of the Document for any purpose. In conducting analysis reflected in this Document, M3 assumed, without verification, the accuracy of information provided to it or obtained from third parties. No one from M3 or any representative of M3 shall have any liability to any party for any error or omission with respect to any of the information contained herein. M3 may have prepared or in the future may prepare other documents that are inconsistent with, and reach different conclusions from, the information presented in this Document. M3 assumes no obligation to bring such other documents to a Recipient's attention. The analysis reflected in the Document would not necessarily reveal any material misstatement, omission or error and does not constitute an audit, review, compilation or other attestation service in accordance with Generally Accepted Accounting Principles or other standards established by the American Institute of Certified Public Accountants. M3 does not express an opinion or any other form of assurance on any financial or other information. Had M3 or another party performed additional work, including more in-depth verification or analysis, other matters might have

come to its attention. Pursuant to Internal Revenue Service Circular 230 (if applicable), be advised that any discussion of U.S. federal tax issues contained or referred to herein is not intended or written to be used, for the purpose of: (A) avoiding penalties that may be imposed under the internal Revenue code; nor (B) promoting, marketing or recommending to another party any transaction or matter addressed. M3 reserves all rights. Nothing in the Document shall be construed as granting any license or right to use any image, trademark or other intellectual property of M3. Unless otherwise indicated, all capitalized terms used herein have the same meaning as in the Agreement.

**Doc. 267 — Motion for Extension of Time (with unsigned draft Response to Doc. 245) (filed 07/30/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S UNSIGNED DRAFT RESPONSE AND OBJECTION TO SPECIAL MASTER'S SECOND SUPPLEMENT ATTACHED AS EXHIBIT A AND UNOPPOSED MOTION FOR A ONE-WEEK EXTENSION OF TIME TO FILE HIS RESPONSE AND OBJECTION TO THE SPECIAL MASTER'S SECOND SUPPLEMENT (DOC. 245)

Defendant Greg E. Lindberg respectfully moves for a one-week extension of time, to and including August 6, 2026, to file his Response and Objection to the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245). A current draft of that Response is attached as Exhibit A. The Government and the Special Master consent to the one-week extension requested here. In support, Mr. Lindberg states:

1. The Response and Objection to Doc. 245 is presently due July 30, 2026. Mr. Lindberg requests a one-week extension of that deadline. The Government and the Special Master have agreed to a one-week extension, and the extension requested here is therefore unopposed.

2. A current draft of Mr. Lindberg's Response and Objection is attached as Exhibit A. It is attached to show that Mr. Lindberg has worked diligently on his part of this proceeding. From federal custody, and with only limited access to counsel, he has prepared a detailed, record- supported Response. The additional week will allow counsel to finalize the Response and go over

the report with Mr. Lindberg provided he has access to the Defendant. Defendant may be moved for a hearing on August 7, 2026 and may lose access to counsel during the move.

3. Separately, and not in lieu of the Response, Defendant's counsel will file a Motion to Hold the Special Master's Second Supplement (Doc. 245) and proposed Final Order of Restitution (Doc. 245-1) in Abeyance until the Government answers Mr. Lindberg's pending motions in writing, on the merits, and Mr. Lindberg is afforded an opportunity to reply. The Government and the Special Master oppose that abeyance relief. This extension motion is limited to the filing deadline and is agreed; the abeyance motion presents a separate question on which the parties disagree, and Mr. Lindberg reserves it.

4. The draft Response also illustrates why the extension is warranted. Under 18 U.S.C. § 3664(e), the Government bears the burden of proving the amount of the victims' loss by a preponderance of the evidence, and any dispute is resolved by the Court after the de novo

determination § 3664(d)(6) requires. Mr. Lindberg's pending motions document that the Government has refused to respond on the merits to any of the causation, foreseeability, offset, and amount issues he has raised—the very burden-of-proof issues his Response highlights. And Mr. Lindberg cannot complete his showing without records he does not possess: the books and records of the companies he surrendered are held by the Special Master, NHC Holdings, LLC, and the Rehabilitator (Michael Dinius), and both the Special Master and the Government are now opposing Mr. Lindberg's effort to obtain those records by Rule 17(c) subpoena. Doc. 248.

5. Requiring Mr. Lindberg to file a final response on an incomplete record—while the

Government stays silent on the merits and the documents he needs are withheld—burdens his due- process right to a meaningful opportunity to be heard on the disputed restitution issues, a right that is heightened because restitution under the MVRA is criminal punishment. See Ellingburg v.

United States (2026); Doc. 201; Doc. 202. The brief extension requested here mitigates, but does not eliminate, that prejudice; the forthcoming abeyance motion addresses the remainder.

WHEREFORE, Mr. Lindberg respectfully requests that the Court (1) grant a one-week extension of time, to and including August 6, 2026, for the filing of his Response and Objection to the Special Master's Second Supplement (Doc. 245); and (2) grant such other and further relief as is just.

Respectfully submitted, this 30th day of July, 2026.

//s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg 1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this Notice of Filing Errata while his Motion for Pro Hac Vice remains pending.

CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Based on the Standing Order of this Court, In re: Use of Artificial intelligence dated July 29, 2026, there is no AI certification attached to this filing.

/s/ Kenneth Barnes__________

KENNETH BARNES

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that counsel for the United States and counsel for the Special Master were consulted and consent to the one-week extension of time requested in this motion. The United States and the Special Master oppose the separate motion to hold the Special Master's Second Supplement in abeyance, referenced in paragraph 3 above, which Defendant will file separately.

/s/ Kenneth Barnes__________

KENNETH BARNES

CERTIFICATE OF SERVICE

I certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ Kenneth Barnes_________
KENNETH BARNES

**Doc. 269 — Motion to Declare the Reference Unconstitutional / Disqualify / Set Aside (filed 07/31/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDERS (DOCS. 161, 245, 245-1)

Defendant Greg E. Lindberg respectfully moves the Court to declare the special-master reference unconstitutional as applied, to disqualify the Special Master from the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, to relieve and remove him from all remaining duties over the estate, and to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), his Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). The Order Appointing Special Master (Doc. 56) vests one officer with both the receiver's custody, liquidation, and pecuniary control over the estate and the Article III judicial function of quantifying each victim's loss and fashioning the restitution order. That structural defect is not curable by consent or by later de novo review; there is, in any event, no executed stand-alone waiver to cure it; and the Beckett sale — a roughly $1 billion asset that the Special Master alone could sell, disposed of at approximately thirteen cents on the dollar without Court approval — both proves the defect and extinguished any consent the Government might claim. Once the receiver and the adjudicative roles are combined in one fee-interested officer, neither consent nor a later de novo adoption by the Court can cure the defect; the only adequate remedy is to disqualify and remove the Special Master, set the report aside in its entirety, stay further sales, and order an accounting and investigation of the Beckett loss. In support, Mr. Lindberg states: 1

I. The Order unconstitutionally unites the receiver and the Article III adjudicator in a single, fee-interested officer.

A. The Order makes the Special Master a receiver.

1. A receiver is "a neutral court officer … to take control, custody, or management of property," Sterling v. Stewart, 158 F.3d 1199 (11th Cir. 1998), whose "possession of the property is the possession of the court." United States v. McPherson, 631 F. Supp. 269 (M.D.N.C. 1986). Doc. 56 confers exactly that: it places "in the exclusive

possession and control of the special master" all interests in the "Primary Restitution Assets," including NHC and the Specified Affiliated Companies, Doc. 56, Findings ¶ 9; Ordered ¶ 4, and empowers him to "identify all assets available for liquidation," "seek Court approval to liquidate," "clear title … for transfer to bona- fide buyers," "apportion any available funds among the victims," and "receive and distribute restitution payments," id., Ordered ¶ 3(b)–(e), (g)–(h) — even directing him to "coordinate with any other receivers previously appointed over assets," id. ¶ 3(i). Function, not the caption, controls. See United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961) (enforcing "a general principle," not the "special master" label). And his

1The Court has yet to determine, de novo, causation, offsets, and credits—on motion practice, with a written response from the Government and a right of reply for the Defendant—which will further change the restitution determination. The Special Master's report, which creates the constitutional crisis this Motion describes, cannot be adopted de novo or used to support that determination. Defendant expressly reserves this determination.

fees are paid "from the assets administered by the Special Master … including … from cash balances held within trusts and other subsidiaries that hold the Primary Restitution Assets." Doc. 56, Ordered ¶ 14.

B. The same Order assigns him the Article III adjudicative function.

2. The Order also directs the Special Master to "verify and quantify the losses suffered by each victim" — the § 3664(e) loss determination itself — and to "fashion a proposed restitution order." Doc. 56, Ordered ¶ 3(a), (f). One officer thus holds and liquidates the res, is paid from it, quantifies the loss, and drafts the order that fixes it.

C. The power to fix restitution is a nondelegable judicial function.

3. The judicial power of the United States may be exercised only by Article III courts. Stern v. Marshall, 564 U.S. 462, 484 (2011). Congress wrote that principle into the MVRA: "Any dispute as to the proper amount or type of restitution shall be resolved by the court." 18 U.S.C. § 3664(e). The Fourth Circuit enforces the allocation strictly, holding that determining restitution is a core judicial function that cannot be delegated even to a probation officer, an arm of the court itself. United States v. Johnson, 48 F.3d 806, 808–09 (4th Cir. 1995), reaffirmed in United States v. Blake, 81 F.3d 498, 507 (4th Cir. 1996) ("deciding the amount and timing of restitution payments is a non-delegable judicial function," and "[f]inal approval … may not be delegated"). A master exists "to aid judges in the performance of specific judicial duties," "not to displace the court," and a reference that hands the master the parties' basic issues is "little less than an abdication of the judicial function." La Buy v. Howes Leather Co., 352 U.S. 249, 256 (1957). Even where a narrow referral is authorized,

the core adjudicative determination remains the court's: the D.C. Circuit vacated by mandamus a reference that assigned a master "proposed findings of fact and conclusions of law," holding that a court must "reserve for himself, and not delegate to the special master, the core function of making dispositive rulings … on issues of liability," and that a master handed that function is an impermissible "surrogate judge." United States v. Microsoft Corp., 147 F.3d 935, 954–55 (D.C. Cir. 1998). The risk is not abstract. If a court may not delegate the scheduling of restitution payments, it surely may not delegate the liquidation of the very assets from which restitution would be paid before any restitution has been fixed.

D. Combining the two roles in a fee-interested officer is forbidden.

4. The Second Circuit condemned precisely this arrangement in United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.), holding that a receiver's "interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties," and vacating the order "insofar as it appoints a special master" — enforcing "a general principle," not any distrust of the individual. Due process forbids subjecting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest in reaching a conclusion against him," or to any arrangement offering "a possible temptation … not to hold the balance nice, clear, and true." Tumey v. Ohio, 273 U.S. 510, 523, 532 (1927). The test is objective and needs no proof of actual bias, Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009) — a standard the Supreme Court reaffirmed as recently as Rippo v. Baker, 580 U.S. 285, 137 S. Ct. 905, 907 (2017) (per curiam) (recusal is required when "the probability of actual bias … is too high to be constitutionally tolerable") — and even an indirect stake suffices, Gibson v. Berryhill, 411 U.S. 564 (1973); see also Coleman v. Town of Brookside, 663 F. Supp. 3d 1261 (N.D. Ala. 2023) (a financial incentive to generate revenue through fines supports a due-process claim). An officer paid from the estate he liquidates cannot be the neutral officer who quantifies the victims' loss.

II. Consent cannot cure the defect — and there is no consent to cure it.

5. The stand-alone waiver was never executed. The only free-standing waiver the Government can point to — the "Consent, Waiver, and Acknowledgement" dated May 15, 2026, between Mr. Lindberg and Joseph W. Grier, III, as Special Master — was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. No agreement was formed, and there is nothing to enforce. Mr. Lindberg's plea agreement is a separate, signed instrument; as explained below (¶ 9), its waiver does not reach this defect, but the point here is narrower — the stand-alone consent the Government would need was refused and never came into being.

6. The Government will invoke two purported sources of consent — the Order Appointing Special Master and the plea agreement — but neither reaches this conduct. The Order is not a blank check; it defines and limits the Special Master's powers and conditions every liquidation on "Court approval." Doc. 56, Ordered ¶ 3(c)– (d), ¶ 6(e). Consent to a reference so bounded is consent to a supervised, court- approved process — with the notice and the opportunity to be heard that approval entails — not to a secret sale made without it. The only written waiver confirms the point: even had it been signed, by its terms Mr. Lindberg waived only the right to object to a sale "once approved by the Court," and his "sole and exclusive venue" to challenge any disposition was "a timely objection … in the proceeding … in which the Special Master seeks Court approval." The Beckett sale never went to Court approval, so it falls outside the waiver entirely. The waiver also expressly did not touch the reference itself: "Nothing contained in this Waiver will be deemed or construed to modify, waive, impair, or affect the Order." And it waived nothing as to the Special Master's adjudicative role. It was, moreover, demanded by the Special Master — who "determined" his own compensation-bearing sales would be "enhance[d]" by it and took a release running "for the benefit of the Special Master" — eleven days before sentencing. See Doc. 190. 2

7. A financial-interest disqualification is non-waivable in any event. A

master "must not have a relationship … that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent … after the master discloses any potential grounds for disqualification." Fed. R. Civ. P. 53(a)(2). Section 455(e) forbids accepting "a waiver of any ground for disqualification enumerated in subsection (b)," and subsection (b)(4) is a "financial interest" held "as a fiduciary." Rule 53(a)(2)'s consent-after-disclosure mechanism does not change this: it can reach only the appearance ground under § 455(a); it cannot authorize a waiver of a § 455(b) ground, which § 455(e) makes categorically non-waivable. These disqualification standards govern special masters, not only judges. See Cobell v. Norton, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003) ("the ethical restrictions of § 455 apply to a special master"); Jenkins v. Sterlacci, 849 F.2d 627, 630–32 (D.C. Cir.

2Defendant was asked to execute this waiver in the days before sentencing; when he refused, the Special Master filed an adverse report four days before sentencing. See Ex. C.

1988). No disclosure of these grounds and no court approval of any consent to them ever occurred. And the plea agreement waived only the quantum of restitution, confining it to persons "directly or indirectly harmed by [Mr. Lindberg's] criminal conduct," Doc. 40 ¶ 10(a); it did not waive causation, which remains the Government's burden, § 3664(e), or consent to a conflicted adjudicator. Above all, consent does not reach a fiduciary who breaches the duties on which the consent depends. A defendant's agreement to a supervised, court-approved liquidation is not consent to a fiduciary who disposed of a Primary Restitution Asset without informing the defendant or his counsel, and without the Court approval that alone would have allowed the defendant to test the valuation, the price, and the propriety of the sale adversarially. By selling Beckett in secret and without approval, the Special Master deprived Mr. Lindberg of the very adversarial testing the Order and any waiver presuppose; that conduct falls outside any consent the Government can invoke.

III. Consent cannot cure the Article III structural defect in particular.

8. Article III's guarantee has two components. The personal right to an Article III adjudicator may be waived; the structural component may not. Article III "not only preserves to litigants their interest in an impartial and independent federal adjudication … but also serves as 'an inseparable element of the constitutional system of checks and balances.'" Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850 (1986). Accordingly, "[t]o the extent that this structural principle is implicated in a given case, the parties cannot by consent cure the constitutional difficulty," because "notions of consent and waiver cannot be dispositive [where] the limitations serve institutional interests that the parties cannot be expected to protect." Id. at 850–51. The Supreme Court reaffirmed the distinction in Wellness International Network, Ltd. v. Sharif, 575 U.S. 665 (2015): a litigant may waive the personal right to an Article III adjudicator by knowing and voluntary consent, but the structural component of Article III serves institutional interests that the parties cannot be expected to protect, and so cannot be supplied by consent. Delegating the restitution adjudication to a fee-interested officer who also liquidates the estate implicates that structural principle directly. And even assuming some consent to the reference existed — from any source — it could not cure the defect, because the vice is structural, not personal. (The one free-standing waiver the Government might invoke, the "Consent, Waiver, and Acknowledgement," was never executed: Mr. Lindberg rejected it, and its signature blocks are blank. But the argument does not depend on that fact.) The defect inheres in the appointing order's union of the loss-

adjudication function with the fee-interested custodial role, not in any personal preference the defendant was free to trade away; and a structural Article III defect "serve[s] institutional interests that the parties cannot be expected to protect," Schor, 478 U.S. at 851, so it survives any consent that might be shown — including a signed one, such as a plea-agreement waiver. No consent can supply the neutral, disinterested sentencer the Constitution requires. Stern, 564 U.S. at 484.

9. The premise is stronger still because MVRA restitution is criminal

punishment for ex post facto. Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026) (unanimously holding that MVRA restitution is criminal punishment).

That holding is dispositive on waiver. The consent that cures a personal Article III objection in the civil context, Wellness, 575 U.S. 665, has no purchase here: because restitution under the MVRA is punishment imposed at sentencing, with the Government — not the victim — as the party adverse to the defendant, id., the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right, and it cannot be waived so as to install a fee-interested, non-Article III officer as the effective sentencer. A restitution order produced through an unconstitutional delegation of the judicial power is therefore not a waivable civil arrangement but an illegal sentence; a court errs in entering restitution beyond its lawful authority, United States v. Davis, 714 F.3d 809 (4th Cir. 2013); see United States v. Broughton- Jones, 71 F.3d 1143, 1147-1149 (4th Cir. 1995) (a defendant's consent "cannot … authorize a restitution order not authorized by the statutory source"; an unauthorized restitution order is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum"; and the grounds challenging such an order fall "outside the scope of th[e] waiver"); and a defendant can no more consent to an illegal sentence than the parties can consent to an unconstitutional delegation of the judicial power, Schor, 478 U.S. at 850–51. Thus, even a signed plea-agreement waiver does not reach this illegal-sentence defect; and neither the plea nor the appointment can supply the constitutional authority the reference lacks.

IV. De novo adoption does not cure the defect.

10. The Government will urge that the de novo determination under §

3664(d)(6) cures any problem. It does not. The Supreme Court has said it plainly:

"Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 618 (1993); see also Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972) (a party "is entitled to a neutral and detached judge in the first instance," and a proceeding is not "constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication") — a rule the Court continues to apply. The Court in Concrete Pipe further assumed that the "possibility of bias … stemming from the trustees' statutory role and fiduciary obligation[] would suffice to bar the trustees from serving as adjudicators," 508 U.S. at 618 — finding no violation only because those trustees acted in a mere "enforcement capacity" subject to review by a "concededly neutral arbitrator," id. at 618–19, 630. Neither is true here: the Special Master is not an enforcer whose work a neutral officer reviews de novo; he is himself the adjudicator who verifies and quantifies the loss and fashions the order, and no neutral officer stands between him and the Court. The point is not academic. A court reviewing the report sees only what the conflicted officer chose to put in it; de novo review "does not solve the problem of 'unchecked and uncheckable' partiality," because the officer's "compilation of the record … not to mention

his reports and his recommendations, would be subject to selection bias." In re Brooks, 383 F.3d 1036, 1045 (D.C. Cir. 2004). A report produced by a receiver- conflicted, fee-interested officer cannot be laundered through later review; the taint attaches to the first-instance product the Court is asked to adopt. And the Supreme Court has confirmed as recently as 2016 that a disqualifying interest is structural

error: "an unconstitutional failure to recuse constitutes structural error," a defect "not amenable" to "harmless-error review," and "the failure to recuse cannot be deemed harmless." Williams v. Pennsylvania, 579 U.S. 1, 14 (2016).

11. The Special Master's advisory label does not save the reference. The

Government will answer that the Special Master "only" proposes findings and that the Court decides de novo. The response fails at every level. Factually, this master did not merely propose: he took custody of the estate and liquidated it — selling Beckett off the docket at roughly thirteen cents on the dollar — while drawing his fees from the assets he administers, all before any court determination. That is execution, not recommendation. Legally, the advisory label is irrelevant to disqualification: § 455 governs a special master whether his role is final or advisory, Cobell v. Norton, 334 F.3d 1128, 1143–44 (D.C. Cir. 2003); Jenkins v. Sterlacci, 849 F.2d 627, 630–32 (D.C. Cir. 1988), and the D.C. Circuit vacated a reference even while acknowledging that "a special master's findings and conclusions are always advisory," United States v. Microsoft Corp., 147 F.3d 935, 955 (D.C. Cir. 1998). A disqualified officer's work product, moreover, "may not be submitted to the district court or otherwise disseminated in any manner." In re Brooks, 383 F.3d at 1046. And "the Court decides now" cannot undo what the reference has already produced: because the Special Master sold the assets before any final determination, no later de novo review can recover the roughly $866 million his conduct destroyed or unwind the dispositions to third parties. The advisory label describes the master's reports; it does not describe what this master has already done.

V. The Special Master has become a second prosecutor, funded by the res

he liquidates.

12. Beckett is the conflict in operation. Beckett was held in a Delaware

statutory trust of which Mr. Lindberg was the Grantor and Sole Beneficiary. That trust reserves to its governance, as "Fundamental BKX Matters," "approval of any sale or other disposition of all or substantially all [of the] assets, and any refinancing in excess of $5,000,000." By an assignment executed in favor of "Joseph W. Grier, solely in his capacity as Special Master," the Special Master became the "record owner" of the equity of NHC Holdings, LLC, "holding all associated economic, legal, voting, and" other rights — stepping into Mr. Lindberg's shoes as the party whose approval those Fundamental BKX Matters require. Beckett was held and managed within the NHC Holdings structure. The Special Master alone, therefore, could approve the sale of Beckett, and it could not have occurred without his approval. See Defendant's Notice of Filing (Doc. 260) (Trust Agreement (Ex. A); Assignment to the Special Master (Ex. B); NHC Holdings Board Presentation (Ex. C)). The Second Supplement concedes the sale "occurred with the consent of NHC Holdings, LLC." Doc. 245 at 31 & n.29. Three independent sources value Beckett at approximately $1 billion: an independent appraisal by Cabrillo Advisors, Inc. (valuation date Jan. 31, 2022) fixing enterprise value at $1,003,924,000; the Blackstone indication of interest and counter (April 2022); and the CCG Beckett term sheet. Doc. 256 (Notice of Correction Regarding the Valuation of Beckett Collectibles, LLC). The asset was nonetheless sold for approximately

$134 million — roughly thirteen cents on the dollar — without the Court approval the Order twice requires, without the disclosure

to the Court the Order requires, and with no accounting of the proceeds. Doc. 56, Ordered ¶ 6(e), at 6; Doc. 172; Doc. 190.

13. AAPC is headed in the same direction. The custodial structure that

produced the Beckett sale is already in place as to AAPC Holdings, LLC — another restitution asset committed to the Special Master's exclusive control. Through the AAPC voting trust and an assignment executed in his favor, the Special Master holds the direction rights over any sale or merger of AAPC, just as he held the levers over Beckett. See Ex. A (AAPC Voting Trust); Ex. B (AAPC Assignment). The risk that AAPC will be disposed of, as Beckett was, without notice to the Defendant and without this Court's approval is therefore not hypothetical but live — a further reason the reference cannot be left in place, and a further reason the same officer cannot be trusted to adjudicate the loss while holding the power to dispose of the very assets that measure it.

14. The same officer then, as adjudicator, declines to credit Mr. Lindberg for

the roughly $866 million loss his own custodial conduct produced. He has, in effect, become a second prosecutor. The Constitution has never permitted the same person to serve as both accuser and adjudicator. See In re Murchison, 349 U.S. 133 (1955). The Government now relies on his report for everything the statute assigns to it — the burden of proving causation, foreseeability, and the amount of loss by a preponderance of the evidence, 18 U.S.C. § 3664(e). It has refused, again, to answer in writing the Motion to Dismiss (Doc. 234) or any of Mr. Lindberg's other pending motions, and it has represented, on a call with counsel, that it would be a waste of

time for the Special Master to address causation, foreseeability, or the other disputed issues – confirming that the Government treats the Special Master's recommendation as its proof and does not intend to carry its own § 3664(e) burden. The officer who liquidates the res and is paid from the proceeds is thus also the officer who supplies the loss-and-causation case against the defendant that § 3664(e) commits to "the attorney for the Government." A neutral judicial adjunct has become a self-funded advocate for the very recovery from which his fees are drawn, and a restitution exceeding $1.6 billion cannot rest on the report of an officer who is at once the seller, the beneficiary of the sale proceeds, and the prosecutor. 3

15. The Beckett sale was also a material breach. It occurred without notice

to Mr. Lindberg or his counsel and without any court order — counsel learned of it only after the fact, orally, when the Special Master communicated a sales figure during a call, see Doc. 256 — in violation both of the appointing order's Court- approval condition, Doc. 56, Ordered ¶ 6(e), and of the Special Master's fiduciary duty, as the officer in exclusive possession and control of the res, to keep the defendant and the Court informed. The Special Master's account that he merely "let" the sale happen is contradicted by the trust documents: because a sale of all or

3 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Motion without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000);

Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

substantially all of Beckett's assets was a "Fundamental BKX Matter," and because the Special Master held the equity of NHC as its "record owner" with all voting rights, the sale could not close without his affirmative approval. He did not let Beckett be sold; he approved it. A fiduciary who alone could authorize the sale cannot discharge his duty by disclaiming responsibility for it. And a party's own material breach forecloses his reliance on the agreement he breached — the Special Master cannot invoke any supposed consent to a sale process whose core condition, Court approval with notice and an opportunity to be heard, he himself violated.

VI. Any consent evaporated when Beckett was sold; the objection was preserved and only recently discoverable.

16. Even assuming some consent existed at the appointment, it could not survive the Beckett sale. The Special Master used the seat he took from Mr. Lindberg to sell a roughly $1 billion asset at a fire-sale price without the Court approval on which any waiver was, by its own terms, expressly conditioned. Whatever consent might be posited evaporated the day Beckett was sold. Mr. Lindberg preserved the Article III objection by moving, within days of sentencing, for a de novo Article III determination and to confine the reference to its lawful limits. Docs. 172, 190.

17. And the full extent of the breach could not have been raised earlier. That Beckett was part of the NHC transfer to the Special Master, that he alone could approve its sale, and that the sale bypassed the Court-approval condition the Order imposes, came to light only recently — when counsel obtained the Beckett Collectibles Trust instruments and the documents establishing Beckett's inclusion in the NHC transfer.

18. These recent discoveries from this week change the posture decisively. What was, at the appointment, an inherent and structural conflict — a fee-interested officer holding both the receiver's and the adjudicator's powers, disqualifying under an objective standard that requires no proof of actual bias, Caperton, 556 U.S. 868 — has now matured into an actual, realized conflict. The newly obtained trust and transfer documents establish that the Special Master's own vote — as the "record owner" of the NHC equity holding all voting rights, and because a sale of all or substantially all of Beckett's assets was a "Fundamental BKX Matter" — was required to sell Beckett, so he, and only he, could and did authorize the sale; three independent sources value the asset at approximately $1 billion, Doc. 256; and the Special Master used the very power he took from Mr. Lindberg to sell it for roughly thirteen cents on the dollar and now adjudicates against crediting the resulting loss. The possible temptation has become an accomplished fact. Beckett is exemplary of the problem, not its extent: because the same conflicted, fee-interested officer valued, sold, and adjudicated throughout, every valuation and every action his report reflects — every sale he made and every sale or transaction he declined — is now suspect, and the Final Report cannot be relied upon as a whole. On this record, the only adequate remedy is disqualification of the Special Master from the adjudicative function and setting aside his report.

VII. No court order or approval can now cure the defect; the report must be set aside.

19. The defect is now beyond cure. This is no longer a theoretical or structural risk; with the Beckett breach it is a full, actual conflict — and a constitutional crisis. Neither a belated Court order approving the Beckett sale nor a later de novo determination under § 3664(d)(6) can resurrect the neutrality the reference destroyed. A disqualifying interest is structural error that later review cannot cure: as the Supreme Court held in Williams v. Pennsylvania, 579 U.S. 1, 14 (2016), "an unconstitutional failure to recuse constitutes structural error," and "the failure to recuse cannot be deemed harmless." That principle is not new, and it remains good law: a party "is entitled to a neutral and detached judge in the first instance," and no subsequent proceeding renders a tainted first-instance determination "constitutionally acceptable." See Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972), reaffirmed in Williams, 579 U.S. at 14, and Concrete Pipe, 508 U.S. at 618. The Special Master who breached his fiduciary duty — selling a roughly $1 billion asset at thirteen cents on the dollar, without approval and without accounting — cannot be the author of a report that dispossesses Mr. Lindberg of billions of dollars. An officer who could not, even in theory, serve as the neutral author of the restitution determination cannot produce a valid report, and the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside in their entirety. Where a master should have been recused, the remedy is suppression: his "reports, recommendations, or other work product … may not be submitted to the district court or otherwise disseminated in any manner." In re Brooks, 383 F.3d at 1046. And the Court's authority to appoint the Special Master necessarily carries the authority to supervise and remove him. See Fed. R. Civ. P. 53; the Court's inherent authority over its own appointee. Because the defect resides in the appointing order itself — which unites the receiver's powers, the adjudicative functions (Doc. 56, Ordered ¶ 3(a), (f)), and payment from the estate (id. ¶ 14) in a single officer — those provisions must be vacated or severed so the defect cannot recur through a substitute master; in the alternative, the reference should be withdrawn.

20. The crisis is compounded by a second structural defect — one that Mr. Lindberg's companion Motion to Stay Asset Sales and for Objections (Doc. 190), raising the § 3664(d)(6) challenge, has already identified: the reference inverts the MVRA's mandatory sequence. Congress prescribed an order of operations, and the appointing order reproduced it. The court determines the victims' losses, § 3664(d)(5); resolves every dispute itself, by a preponderance, § 3664(e); may take a master's proposed findings, but only subject to a de novo determination, § 3664(d)(6); and enters a restitution order that then becomes a final judgment, § 3664(o) — after which, and only after which, the Act's enforcement mechanisms, which Congress designated civil, attach, 18 U.S.C. § 3613. As implemented, that sequence was inverted at every step: the fee-interested Special Master liquidated the estate before any final restitution determination existed, disposing of the Beckett asset off the docket at roughly thirteen cents on the dollar, and in another instance distributed proceeds under a formula he concedes "almost certainly will deviate" from the apportionment this Court will later adopt, Doc. 66, ¶ 24. What was a structural risk when the reference was entered is now a realized constitutional crisis: execution has preceded adjudication, the de novo determination Congress guaranteed has been rendered illusory as to the assets already sold, and the officer who inverted the sequence is the one now asking the Court to adopt his numbers.

VIII. The MVRA independently requires a full accounting before any restitution is fixed.

21. The accounting Mr. Lindberg seeks is not merely equitable housekeeping; the MVRA requires it. The Court must determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and must "resolve[]" any "dispute as to the proper amount or type of restitution," id. § 3664(e) — neither of which can be done on a record that does not disclose what the Special Master sold, for how much, and where the proceeds went. Amounts recovered for the victims must be credited so that no order overstates the loss, id. § 3664(j)(2); the Special Master's dispositions of the Primary Restitution Assets are a "material change" in economic circumstances of which the Court must be informed, id. § 3664(k); the sale proceeds are "substantial resources" that must be applied to any restitution still owed, id. § 3664(n); and the "de novo determination" the statute commands, id. § 3664(d)(6), cannot be made on an unaccounted record. The secret Beckett sale — an asset valued of record at approximately $1 billion, disposed of for roughly $134 million without notice, without Court approval, and without any accounting on the docket — evaded every one of these statutory checkpoints. A full and verified accounting is therefore the necessary statutory predicate to the Court's own § 3664 determination, not an optional equitable add-on. Finally, the conflict is not merely historical; the Special Master's own title documents confirm that it persists. The assignment through which he took control of AAPC — a Primary Restitution Asset he holds and may liquidate —

expressly provides that nothing in it "binds or limits" his "responsibilities in the criminal proceeding to fashion a restitution order or propose a restitution methodology." Ex. B, § 16. The same officer thus continues to hold both the custodial and the adjudicative power over the estate — which is why disqualification, and not another round of de novo review, is the only adequate remedy.

IX. Relief.

22. WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) declare the special-master reference unconstitutional as applied insofar as it assigns the Special Master the adjudicative functions of verifying and quantifying loss and fashioning a proposed restitution order, and vacate or sever the provisions of the Order Appointing Special Master (Doc. 56) that create the defect — paragraphs 3(a) and 3(f) (loss quantification and restitution recommendation) and paragraph 14 (payment of the Special Master's fees from the assets he administers) — and, in the alternative, withdraw the reference and vacate the Order in its entirety;

(2) disqualify the Special Master from those functions and relieve and remove him from all remaining duties under the Order Appointing Special Master (Doc. 56), including his administrative and custodial authority over the Primary Restitution Assets;

(3) stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and any distribution of prior proceeds, pending further order of the Court, and place the assets in the interim custody of a neutral

observer who may not sell, dispose of, or take any material action without the prior approval of the Court, and who has no determinative or adjudicative authority and no prosecutorial function;

(4) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-

1) in their entirety; (5) order the Special Master to render a full and verified

accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined — including the Beckett sale — and of all proceeds and all fees paid from the estate (as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6)), and order an investigation into his administration of the estate, into every such sale and every sale or transaction he declined or blocked, and into the reliability of every valuation and action reflected in the Second Supplement and proposed Final Order — the Beckett sale being exemplary of the problem, not its whole;

(6) direct that the § 3664(e) loss and causation determination proceed on motion practice, on the Government's own proof and before a neutral officer, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and (7) grant such other and further relief as is just. Because the Special Master's breach of fiduciary duty destroyed approximately $866 million of the estate's value, he cannot be trusted to continue administering it; removal, a neutral interim custodian, an accounting, and an investigation are warranted.

Dated: July 31, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 4

4 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4),attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested has been raised with counsel for the United States and counsel for the Special Master. Each party opposes the motion.

/s/ Kenneth N. Barnes Kenneth N. Barnes

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: July 31, , 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

**Doc. 270 — Sur-Reply in Opposition to Cell 1.16's CVRA Motion (Doc. 221) (filed 08/03/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S SUR-REPLY IN OPPOSITION

TO CELL 1.16'S MOTION FOR RESTITUTION PURSUANT TO THE

CRIME VICTIMS' RIGHTS ACT

Pursuant to this Court's July 27, 2026 Text-Only Order Granting Greg E. Lindberg's Motion for Leave to File Sur-Reply, and the Court's July 28, 2026 Docket Entry regarding the Motion, Defendant Greg E. Lindberg, through undersigned counsel, and, with leave of Court, submits this Sur-Reply in opposition to Cell 1.16's Motion for Restitution Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771 (Doc. Nos. 221, 222), and in response to the new matter raised in Cell 1.16's Reply (Doc. No. 233).

INTRODUCTION

Cell 1.16's Motion rests on a single narrative: that Cell 1.16 was a passive actor who relied on inflated credit ratings and remained ignorant of the affiliated and impaired nature of its investments Cell 1.16 also argues that its reliance occurred during the period from 2016 through 2018—too early, it says, for the 2019 emails to matter. The contemporaneous record refutes every premise. It is drawn from Cell 1.16's own principals' words, and it spans the entire period of claimed reliance, from

2017 through 2020. It shows that Cell 1.16 knew the investments were affiliated with the Lindberg/Eli Global enterprise; knew the affiliated assets were largely below investment grade; was intimately familiar with the ratings process and treated the agency ratings as a mere regulatory formality; and looked to an Eli Global buy-back and guarantee—not the ratings—for credit protection.

The Reply does not, and cannot, reconcile that record with its victim narrative. Nor does it answer the independent grounds on which the Opposition rests—the neutral Special Master's finding on this same record, the conceded double recovery, the successive-motion problem, and the collateral-guarantee character of the buy- back letter—each of which independently requires denial. Cell 1.16's own contemporaneous correspondence is compiled as Sur-Reply Exhibits 1 through 9, each previously furnished to the Special Master or drawn from Cell 1.16's own files.

This Sur-Reply also exercises, in part, the rights the Defendant expressly reserved in his Response. See Doc. No. 227. At the time of that filing, the Defendant was in transit to the custody of the Federal Bureau of Prisons and lacked meaningful access to the records necessary to respond more fully. He therefore reserved the right to supplement his opposition accordingly. He now exercises a portion of that reservation—both through this

Sur-Reply and through his Motion for Determination That No Restitution Is Owed, or In the Alternative For Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction, filed July 14, 2026 (Doc. No. 234 and 235), which addresses related infirmities in the restitution determination and is incorporated here by reference. Because that Motion raises a threshold

challenge that, if granted, would dispose of or materially reshape the restitution proceedings, the Court should resolve the Motion before taking action on this Sur - Reply, on Cell 1.16's Motion, or on the other pending restitution motions.

ARGUMENT

I. The Reply's Silence on Multiple Independent and Dispositive

Grounds to Deny Relief is Fatal to the Motion.

The Reply is silent on double recovery. Cell 1.16 has conceded that "many of the same loans" underlying its claimed loss "were also held by the North Carolina and Bermuda insurance companies and underlie those insurers' entitlement to restitution." Doc. No. 222, at 2. Restitution is compensatory, not multiplicative: the Court awards restitution "to each victim in the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and the proponent bears the burden of proving its loss by a preponderance. 18 U.S.C. § 3664(e); United States v. Catone, 769 F.3d 866, 876–77 (4th Cir. 2014). The Reply also does not answer that the neutral Special Master already resolved the disputed element on this same record, Doc. No. 106-3, at 23; that the Motion reintroduces facts the Court has already weighed; or that the buy-back letter is a collateral guarantee whose breach is, at most, tangentially linked to the offense. See Doc. No. 203, at 4–5 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). Each ground independently requires denial.

The Fourth Circuit's decision in this case points the same way. In In re Zetteler, No. 26-1749 (4th Cir. 2026) (unpublished) (Doc. No. 203), the panel declined to disturb this Court's exclusion of another restitution claimant, Conservatrix, holding that "[p]etitioners fail to sufficiently connect the harm suffered by

Conservatrix with Lindberg's criminal conduct," and that direct harm under the Crime Victims' Rights Act "requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" Doc. No. 203, at 4–

5. Cell 1.16 stands in the same position: the Special Master found that it identified

no specific instance in which the Defendant "misrepresented or concealed the nature of the Affiliate Investments," Doc. No. 106-3, at 23, and the Reply supplies none. To the extent Cell 1.16 invokes the separate opinion in Zetteler for the proposition that a motion under the Act is the proper vehicle, that opinion concurred in part and dissented in part; it is not the holding of the Court. The panel's holding—declining to disturb the exclusion of a claimant whose harm was not closely tied to the offense— counsels denial here.

Cell 1.16's own affiliate confirms the point. Vista Life & Casualty Reinsurance Company—of which Protected Cell 1.16 is a part—received a $23,520,710 distribution from the Clanwilliam sale proceeds that the Special Master expressly declined to characterize as restitution. See Consent Mot. for Order Approving Disposition of Net Proceeds from the Sale of the Clanwilliam Grp. of Cos., Doc. No. 66 ¶ 20(d)(iii) & n.3 (July 3, 2025). The Special Master sought to credit that sum against Defendant's restitution obligation only "to the extent Vista is determined to be a victim entitled to restitution," id. ¶ 21, and acknowledged that he "is unsure whether [he] will recommend that the Court treat Vista as

a victim in this proceeding," id. ¶ 26 n.8. That an interested affiliate received a distribution the movant itself will not call

restitution only underscores that Cell 1.16 has not carried its burden to establish victim status under 18 U.S.C. § 3771(e)(2)(A).

II. The Contemporaneous Record Refutes Every Premise of Cell

1.16's Victim Narrative.

Cell 1.16 concedes that the only disputed element is whether the Defendant or his agents made a material misrepresentation or omission concerning the affiliated investments to Cell 1.16 or its regulator, on which Cell 1.16 relied. Doc. No. 222, at

2. Restitution reaches only "the loss caused by the specific conduct that is the basis

of the offense of conviction," Hughey v. United States, 495 U.S. 411, 413 (1990); see Paroline v. United States, 572 U.S. 434, 445 (2014); see United States v. Freeman, 741 F.3d 426, 432-433 (4th Cir. 2014) (restitution must "compensate only for the loss caused by the specific conduct that is the basis of the offense of conviction"). Because the Act reaches only a party "directly and proximately harmed," 18 U.S.C. § 3771(e)(2)(A), and a misrepresentation theory requires reliance, a claimant that knew the truth is not a victim: it cannot have relied on, or been proximately harmed by, a representation it knew to be false. See supra Part I (discussing Zetteler). A court in this Circuit dismissed a restitution claim on that basis, where the claimed harm was not the "direct and proximate result" of the offense of conviction. United States v. Blankenship, 179 F. Supp. 3d 647, 655 (S.D.W. Va. 2016). Each premise of Cell 1.16's narrative fails against its own principals' contemporaneous words.

A. Premise: Cell 1.16 was a passive party that believed, on the ratings,

that the assets were sound. The record: its own officers knew the affiliated assets were sub-investment grade.

In August 2018—within the period of claimed reliance—Cell 1.16's principal wrote that "Non investment grade is 44%, which is based on Milliman's original appraisal," adding, "PA may push back on this." Sur-Reply Ex. 6 (Solow, Aug. 6, 2018). In October 2018, Cell 1.16's own Treasurer wrote that "we are 100% certain that PA will want to apply some kind of haircut to the loans, and as it stands (or even with a swap only), any haircut puts the trust underwater." Sur-Reply Ex. 5 (Lo, Oct. 12, 2018). In November 2018, the principal circulated his own valuation analysis reporting that "the parties-at-interest (EG, SASL, and Vista) would only recover about 52 cents on the dollar" on the affiliated position, noting that although "EG invested $23.3 million in this deal," the proposal "only offers $6 million." Sur-Reply Ex. 4 (Solow, Nov. 26, 2018); accord Sur-Reply Ex. 1 (Solow, Jan. 14, 2019) (same position at "about 52 cents on the dollar" to "about 60 cents on the dollar"). A claimant whose officers, during the reliance period, valued the position at roughly half face, called its trust "underwater," and put 44% of it below investment grade did not rely on the agency ratings as truthful representations of value.

B. Premise: the affiliated character of the investments was concealed

from Cell 1.16. The record: its own principal performed diligence administered and reported/acknowledged the affiliation.

In October 2017, Cell 1.16's principal handled ownership diligence on the Lindberg entities, relaying that "Aon has requested org charts for these entities [New England Capital and Greenfield Capital] showing ownership," and that "Aon's KYC

people have requested the operating agreement for New England Capital." Sur-Reply Ex. 9 (Solow, Oct. 2017). He administered the affiliated loans, imposing a fee for "the administration of the private loans in the USAP/AIC trusts," citing "asset exchanges, elimination of the SPVs" and the "[d]efense of portfolio to regulatory authorities." Sur-Reply Ex. 2 (Solow, Feb. 6, 2019). And he described the enterprise as the "Eli Global group," Doc. No. 233, at 2; Sur-Reply Ex. 3—the very affiliation Cell 1.16 was arranging to liquidate, Sur-Reply Ex.3, and that the Vermont regulator later ordered Cell 1.16 to "sever." Doc. No. 227-1 (Solow, July 29, 2019). The Special Master found precisely this: those directing the investments "were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide." Doc. No. 206, ¶ 3.

C. Premise: Cell 1.16 was unfamiliar with the ratings process and

relied on the ratings as truthful valuations. The record: it knew the process intimately and used ratings as a regulatory checkbox.

The Reply asserts that the Defendant offers no "evidence of familiarity with the ratings process." Doc. No. 222, at 14. The principal's own words are that evidence. In February 2018 he catalogued Egan-Jones's surveillance mechanics—"that the ratings are good for 1 year, and that E-J undertakes to review the ratings each year," Sur-Reply Ex. 7 (Solow, Feb. 21, 2018)—and elsewhere navigated which agencies the Pennsylvania regulator would accept, observing that "[t]he department will not accept Kroll or DBRS, except for the PPNs." Sur-Reply Ex. 6. He treated ratings as a regulatory box to be checked instead of an indicator of value; he sought any rating— expressly including a bottom-tier "NAIC-5 ('CCC')"—so that USAP could take

"reserve credit," Doc. No. 227-3 (Solow, Jan. 2020), and was prepared to "swap out the unrated assets for rated assets" to meet a filing deadline. Doc. No. 227-4 (Solow, May 3, 2019). He described the assets as "essentially mini-CLOs" and acknowledged the parties were "aware of the headlines." Doc. No. 227-2 (Solow, Mar. 31, 2019). Seeking the lowest possible rating as a regulatory formality, and exchanging assets to obtain one, is the opposite of relying on the rating as an accurate measure of worth.

Indeed, Cell 1.16's principal did not merely understand the ratings process— he directed the structure of the investments to satisfy the trust's regulatory guidelines. On February 21, 2018, Mr. Solow set out a six-point plan under which the parties would "terminate the repo structure and move all the SPV loans into the reinsurance trust"; "meet the investment guidelines of the trust, especially the single- risk limit … and the non-investment grade limit," and "look for ways to adjust the portfolio" if it fell "outside the guidelines"; "Devin [would] send over all the ratings letters"; "an investment professional [would] write a short paragraph stating that the loans … are NOT asset-backed securities but corporate obligations"; obtain "a short description of E-J's surveillance process"; and secure "a member of the EG group … [would] provide a liquidity and credit guarantee of each loan." 1Sur-Reply Ex. 7 (Solow, Feb. 21, 2018). A principal who dictated how the affiliated loans would be moved, rated, described, and guaranteed to pass regulatory muster was the architect of the transaction, not its victim—and did not rely on the very ratings he engineered.

1 In the relevant period, between 2016 and 2019 Vista/Cell 1.16 and other similar insurance providers operated in a very low-interest rate environment following the 2008 financial crisis, and willingly and knowingly took on much higher risk on funds that were in their care. This email shows Vista/Cell 1.16/Don Solow engineered the structure of these

investments to satisfy the regulatory guidelines including the structure of how the ratings were obtained.

D. Premise: reliance occurred only in the 2016–2018 statements, so the emails come too late. The record: it is contemporaneous with, and inside, the reliance period.

The materials in Parts A–C are dated 2017 and 2018—within the very years Cell 1.16 says it relied on the ratings. The timing objection also fails on its own terms as to the filed emails: Cell 1.16 defines the conduct period as "2016-2019" and concedes it "invested in Affiliate Assets from 2016 into 2019." Doc. No. 233, at 2. Three of the four filed emails (March–April, May, and July 2019) fall within that window, and a financial statement for fiscal year 2018 is necessarily prepared and filed in 2019, contemporaneously with them. The premise that Cell 1.16's understanding in 2019 is irrelevant is incompatible with its own definition of the period.

E. Premise: the agency ratings were the Defendant's misrepresentations to Cell 1.16. The record: Cell 1.16 looked to an Eli Global buy-back and guarantee, not the ratings, for protection.

That the Defendant's conduct affected the third-party agency ratings does not establish a misrepresentation to Cell 1.16: the misrepresentations the Reply invokes were made "to … various rating agencies," Doc. No. 233, at 3 (quoting Doc. No. 42, ¶ 5), not to Cell 1.16. And Cell 1.16's own principal did not look to the ratings for protection; he looked to an Eli Global buy-back and guarantee. In January 2018 he asked whether "there [is] a structure under which EG would agree to buy back any loan that ended up on USAP's balance sheet, if USAP needed the liquidity to pay claims." Sur-Reply Ex. 8 (Solow, Jan. 25, 2018). In February 2018 he provided that "[a] member of the EG group … will provide a liquidity and credit guarantee of each loan, similar to the AIC side-letter." Sur-Reply Ex. 7. That is why the buy-back letter—not any rating—was the credit mechanism Cell 1.16 negotiated, and why its breach sounds in contract rather than supplying the misrepresentation element the Special Master found absent. Doc. No. 106-3, at 23. The ratings, moreover, were issued by independent agencies (Egan-Jones and HR de Mexico), not authored by the Defendant or New England Capital as representations to Cell 1.16.

III. Double Recovery Independently Bars the Requested Award.

Even if Cell 1.16 could establish victim status, its requested award fails because of the double recovery it has conceded. Doc. No. 222, at 2, 6, 8. An award premised on the same defaulted loans that already underlie other recipients' awards would inflate aggregate restitution beyond the loss caused. 18 U.S.C. § 3664(f)(1)(A). The Special Master flagged the need, before any such award, to "confirm that Cell 1.16's restitution amount is calculated consistently with all other persons awarded restitution in this case." Doc. No. 206, ¶ 4. The Reply does not address the point.

CONCLUSION

The victim narrative on which the Motion depends cannot survive Cell 1.16's own contemporaneous record. For the foregoing reasons, and those stated in the Opposition (Doc. No. 227), the Defendant respectfully requests that the Court deny Cell 1.16's Motion for Restitution (Doc. Nos. 221, 222) and adhere to its Preliminary Order of Restitution (Doc.

No. 161) and Judgment (Doc. No. 162). To the extent the Court is inclined to revisit that determination, the Defendant respectfully requests

an opportunity to be heard and an evidentiary hearing addressing both Cell 1.16's asserted victim status and the avoidance of any duplicative recovery.

Dated: August 3, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 2

2Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: August 3, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 3, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 271 — Final Response to the Government's Motion for Inquiry into Status of Counsel (Doc. 247) (filed 08/03/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC v.

Judge Max O. Cogburn, Jr.

GREG E. LINDERBG,

Defendant.

DEFENDANT GREG E. LINDBERG'S FINAL RESPONSE

TO THE UNITED STATES' MOTION FOR INQUIRY

INTO STATUS OF COUNSEL (DOC. 247)

Defendant Greg E. Lindberg ("Defendant"), by and through undersigned counsel, hereby files this Final Response to The United States' Motion For Inquiry Into Status of Counsel (Doc. 247). For the reasons set forth below, the motion should be denied.

This Final Response, together with Defendant's prior filings, address all issues raised by the Government in its Motion.

First, all issues identified in the motion for inquiry have been resolved on the docket. See Docs. 252, 253, and 254.

Second, the Affidavit of Greg E. Lindberg attached hereto as Exhibit A, clearly sets forth counsel of record and prior counsel.

Therefore, based on the foregoing, Defendant respectfully requests the court to dismiss the Motion for Inquiry Into Counsel as moot and vacate the hearing on the matter currently set for August 10, 2026.

Dated: August 3, 2026

Respectfully submitted, /s/ Kenneth Barnes__________

KENNETH BARNES

Kenneth Barnes Legal, PLLC N.C. Bar No. 14035 356 Travel Lite Dr., Raleigh, NC 27603 Tel: (919) 524-1977 Email: barnesatty@aol.com Counsel for Defendant Greg E. Lindberg 1

1Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 3, 2026

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

**Doc. 277 — Notice of Errata re Doc. 269 (filed 08/06/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S NOTICE OF ERRATA REGARDING DEFENDANT'S MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDERS (DOC. 269)

Defendant Greg E. Lindberg respectfully submits this Notice of Errata to correct three citation errors in his Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269). The corrections are non-substantive: each corrects the form, source, or pinpoint page of a case citation, and none alters any argument, factual assertion, or the relief requested. Page references are to the document as filed; paragraph references identify the numbered paragraph in which each citation appears.

1. Part I.A, ¶ 1 (page 2). The first sentence is corrected to read: "A receiver is 'a neutral court officer … to take control, custody, or management of property,' Sterling v. Stewart, 158 F.3d 1199, 1201 n.2 (11th Cir. 1998) (quoting 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2981, at 5 (1973)), whose 'possession of the property is the possession of the court,' United States v. McPherson, 631 F. Supp. 269, 272 (M.D.N.C. 1986)."

2. Part II, ¶ 3 (page 3). The first sentence is corrected to read: "The judicial power of the United States may be exercised only by Article III courts. Stern v. Marshall, 564 U.S. 462, 484 (2011)."

3. Part V, ¶ 9 (page 7). The citation "United States v. Broughton-Jones, 71 F.3d 1143, 1147 (4th Cir. 1995)" is corrected to read "United States v. Broughton- Jones, 71 F.3d 1143, 1149 (4th Cir. 1995)."

Nature of the corrections. Correction 1 re-attributes the first quotation, which was quoted accurately but inadvertently attributed to McPherson: the language "a neutral court officer … to take control, custody, or management of property" is from Sterling v. Stewart — already cited in the same paragraph — quoting Wright & Miller, Federal Practice and Procedure § 2981. The correction supplies the correct source and separately pinpoints the language actually quoted from McPherson ("possession of the property is the possession of the court," at 272). Correction 2 removes quotation marks from a paraphrase of the holding of Stern v. Marshall; the pinpoint page (484) is unchanged and correct. Correction 3 corrects a pinpoint page from 1147 to 1149, the page on which the quoted language appears;

the quotation itself is unchanged and accurate. None of these corrections alters the substance of the Motion, and the Motion is in all other respects unchanged.

Dated: August 6, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 6, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 278 — Second Motion to Set Aside (filed 08/06/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S SECOND MOTION TO SET ASIDE THE SPECIAL

MASTER'S REPORT AND THE RESTITUTION ORDERS (DOCS. 161, 245,

245-1) Defendant Greg E. Lindberg respectfully moves the Court to set aside, in their entirety, the Preliminary Order of Restitution (Doc. 161), the Special Master's Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1). This is Defendant's second motion to set aside the Special Master's report. Its legal grounds are those set forth in Defendant's previously filed Motion to Declare the Special-Master Reference Unconstitutional as Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (the "Motion to Disqualify") (Doc. 269), which Defendant adopts here without change. Its additional ground is factual and present: the same officer who produced the report has been shopping the estate's companies "for the debt" — proposing to accept roughly $100 million for Damovo — when a contemporaneous, arm's-length expression of interest values Damovo at $400 to $450 million. This motion is further supported by the accompanying Declaration of Greg E. Lindberg. In support, Mr. Lindberg states:

I. The legal grounds are those set forth in the Motion to Disqualify,

which Defendant adopts without change.

1. The legal basis for setting aside the Special Master's report and the

restitution orders is set forth in full in Defendant's previously filed Motion to Disqualify (Doc. 269). Defendant adopts and incorporates by reference the legal arguments and authorities of that motion, without change, as though fully set forth herein. As established there, the Second Supplement (Doc. 245) and the proposed Final Order of Restitution (Doc. 245-1) are the work product of an officer who unites in himself the receiver's custody, liquidation, and fee interest and the Article III function of quantifying each victim's loss and fashioning the restitution order — an officer subject to disqualification; the report of such an officer may not be adopted, is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6), and must be suppressed; and the Preliminary Order of Restitution (Doc. 161), the Second Supplement, and the proposed Final Order must be set aside. Defendant does not repeat those authorities here; he adopts them in full and relies on them as the legal basis for this motion. This motion supplies an additional, factual ground that independently requires the same relief.

## II. The Special Master has been shopping Damovo "for the debt" — roughly $100 million — while a present, arm's-length offer values it at $400 to $450 million.

2. The Special Master has been shopping the estate's operating companies "for the debt." As to Damovo, he has represented, through Defendant's former counsel, that he intends to accept roughly $100 million — the approximate amount of Damovo's outstanding debt. Decl. ¶¶ 3–4. But Damovo is worth far more than the debt recorded against it. On July 31, 2026, Twelve Seas Investment Company III (NASDAQ: TWLV), a publicly traded acquisition company, delivered a signed, arm's- length expression of interest to combine with Damovo at a $400 million enterprise value, with an anticipated, negotiated price of up to approximately $450 million achievable at arm's length. Decl. ¶¶ 2–3. That is an offer in the market today — from a real, independent counterparty — for roughly four times what the Special Master proposes to accept.

3. An arm's-length expression of interest of this kind is not a projection or an advocate's estimate; it is present market evidence that the enterprise value of these companies remains. A willing, independent buyer is offering $400 to $450 million for the same Damovo the Special Master would surrender for roughly $100 million. The report's premise — that a company is worth only the debt recorded against it — is refuted by the market itself, in real time, as to an asset still within the estate. A report and restitution figure built on that refuted premise cannot stand.

## III. Debt is not a stand-alone measure of value; the same pattern recurs in every company the Special Master sold "for the debt."

4. The Damovo offer exposes the analytic error at the core of the report. A company's enterprise value is determined by its assets, its earnings, and its cash flows — not by the amount of debt it happens to carry. Decl. ¶¶ 10–11. Debt is a claim to be satisfied out of enterprise value, not a subtraction from it, and virtually every substantial operating company carries debt and uses it deliberately as an instrument of growth. Id. The debt a company carries is therefore not a variable that stands alone; it must be weighed together with the many other factors that determine value — the enterprise's earnings, cash flows, growth prospects, and the arm's-length prices independent buyers will actually pay. Treating the debt figure in isolation, as though it were the company's worth, is not a valuation at all.

5.The Damovo offer is not an isolated data point; it confirms a pattern already documented in the other companies the Special Master sold "for the debt." Beckett Collectibles, appraised at approximately $1 billion, was sold for approximately $134 million; and Clanwilliam, valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 ¶ 32; Doc. 174 ¶ 117; Ex. I3], was sold for approximately $450 million. Decl. ¶ 4. In each case the enterprise value far exceeded the debt, and in each case selling the company "for the debt" destroyed hundreds of millions of dollars in value the Special Master was charged with preserving. Damovo is exemplary of that same value destruction: applying the identical "sell it for the debt" premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value — the difference between the approximately $100 million he proposes to accept and the $400 to $450 million the market offers today — just as value was destroyed in Beckett, Clanwilliam, and the other companies already sold. The difference is only one of timing: as to Damovo, the market's proof of the true value is before the Court now, before the loss is locked in, rather than

after. A report built on the premise that these companies are worth only their debt therefore systematically understates their value and overstates the loss.

6. The report compounds the error by treating as loss amounts that are covered or already satisfied. The American policyholders have been paid in full — more than $157 million distributed to over 43,000 policyholders. Decl. ¶ 1. The approximately $208 million the report alleges remains owing to Northstar, OMNIA, and PBIHL is covered by the Damovo transaction described above. Decl. ¶¶ 2–3. And the approximately $339 million the report alleges remains owing to ULICO has been satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 — the very figure the Special Master lists in his own table. Decl. ¶ 5; see Doc. 245 at 6 (Issue 3). A restitution figure that values these companies at their debt and disregards these mandatory offsets and credits, 18 U.S.C. § 3664(j)(2), overstates the loss; the report cannot be adopted, and the orders resting on it must be set aside.

IV. The report cannot contain the complete accounting the MVRA requires: the parties holding the loss and valuation data refused to produce it and disputed the Special Master's authority to compel it, and Defendant has been denied the subpoenas that would supply it.

7. The report cannot be the complete and accurate accounting the MVRA requires, because the Special Master never obtained — and, by the express position of the parties who hold it, could not compel — the information a restitution accounting demands. The Special Master circulated a term sheet defining the scope of his rights and responsibilities, which he intended to use as the basis for a motion seeking a "Clarification Order" from this Court. See Ex. ___ (Term Sheet — Scope of the Special Master's Rights and Responsibilities). That process collapsed. The institutional parties that hold the books, records, valuations, and loss data — the North Carolina insurance companies (the "NCICs") and NHC Holdings, LLC — refused to consent and disputed the Special Master's authority, and the Court's authority, over the assets and the information at issue. They took the position that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." Ex. ___. The term sheet itself expressly contemplated that these parties might "refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise." Id. That is precisely what occurred: despite the efforts of Defendant's counsel and of Paladin Management, no agreement was reached and the information was never produced.

8. The consequence is dispositive, and it does not depend on resolving whether the Special Master controls these records. Defendant contends he does — the Special Master having stepped into Defendant's shoes as record owner through the assignment of Defendant's interests, the AAPC voting trust, and his designees on the NHC board, and having refused to compel production, as the Motion to Disqualify (Doc. 269) establishes — while the Special Master contends he does not (Docs. 266, 268). Either way, the accounting cannot be completed on this record: on the Special Master's own account the books, records, and valuations the MVRA requires are held by third parties beyond the reach of this Court, the Special Master, and the Government alike, and the asset-holding

parties refused to produce them. An accounting assembled without the very books, records, and valuations that the asset- holding parties refused to produce cannot satisfy the MVRA's command that the

Court determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on a complete record. And Defendant's own effort to obtain that same information through compulsory process — his Motion for Issuance of Rule 17(c) Subpoenas (Doc. 248) — has been opposed and remains undecided. To deny Defendant the subpoenas that would complete the record while adopting a Final Report the Special Master himself could not complete would stand the MVRA's accounting requirement on its head, fixing a restitution exceeding $1.6 billion on an admittedly incomplete accounting — assembled from information that no participant in this proceeding, the Special Master included, has ever seen in full. Because a complete accounting is a statutory predicate to any final restitution order, and because that accounting cannot be made until the necessary process issues, the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc. 245-1) must be set aside. Because that accounting cannot be assembled on this record, the Court cannot satisfy 18 U.S.C. § 3664(f)(1)(A) in any event and is powerless to adopt the Report or to fix restitution upon it.

V. Neither the Government nor the Special Master has produced

evidence of any loss.

9. The record also refutes the causation the restitution orders assume.

Neither the Government nor the Special Master has produced evidence of any loss to the protected victims caused by Mr. Lindberg. To the contrary, the records filed in support of Defendant's Motion for a Determination That No Restitution Is Owed, and the accompanying Consolidated Statement of Facts (Docs. 234, 235), show that he contributed approximately $1 billion of his own capital to the businesses as a net

addition to their surplus — a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss — and that, when control passed, independent firms valued the companies and found the affiliated loans well secured. That a company carries debt is not evidence of loss: debt is the ordinary engine of corporate growth that every company uses, and at a loan-to-value ratio of roughly 40 to 50 percent it is conservatively secured and reflects the retention of value, not its loss. Causation is an element the Government must prove by a preponderance of the evidence, 18 U.S.C. § 3664(e); on this record it is unproven. A report that fixes a loss the Government has not proven cannot support the restitution orders, and they must be set aside.

VI. Relief.

WHEREFORE, Mr. Lindberg respectfully requests that the Court:

(1) set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order of Restitution (Doc.

245-1) in their entirety;

(2) order that the Special Master's report, recommendations, and other work product not be adopted, relied upon, or otherwise disseminated in any manner, consistent with the authorities adopted from the Motion to Disqualify;

(3) order the Special Master to render a full and verified accounting of every sale, transfer, or disposition of Primary Restitution Assets he made, approved, attempted, or declined —

including the Beckett sale, and including every sale, offer, or expression of interest that came before him

but that he did not approve, did not pursue, or did not take (such as the Twelve Seas expression of interest for Damovo), with the price and terms offered and his reasons for declining — and of all proceeds and all fees paid from the estate, together with credit for all amounts already paid or satisfied (including the policyholder distributions and the ULICO preferred-equity satisfaction described in the Declaration), as required to fix restitution under 18 U.S.C. § 3664(f)(1)(A), (e), (j)(2), (k), (n), and (d)(6);

(4) direct that the § 3664(e) loss and causation determination be made by the Court itself, on the Government's own proof and on motion practice, with a written response from the Government to the pending motions and a right of reply for Mr. Lindberg; and (5) grant such other and further relief as is just.

Dated: August 6, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted last week on two motions to disqualify and to set aside the report; the Government disagrees with and opposes the relief requested, as does the Special Master. s/ Kenneth N. Barnes Kenneth N. Barnes

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 6, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

**Doc. 280 — Preliminary Objections to the Second Supplement (filed 08/06/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S PRELIMINARY OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING RESTITUTION (DOC. 245) AND PROPOSED FINAL ORDER OF RESTITUTION (DOC. 245-1)

Defendant Greg E. Lindberg submits the following objections to the Special Master's Report and Recommendations Regarding Restitution, including the Second Supplement (Doc. 245) and the proposed Final Order of Restitution (Doc. 245-1) (together, the "Report"). Each objection is drawn from, and incorporates by reference, the motion, declaration, or filing cited with it, which Defendant adopts as though fully set forth herein. These objections are equally addressed to the Special Master's Final Report, and Defendant readopts them, mutatis mutandis, against the Final Report.

The Government has not responded to, and its position on these objections has not yet been made available. That silence is not a neutral gap. Under 18 U.S.C. § 3664(e), the burden of proving the amount of loss, causation, and foreseeability rests "on the attorney for the Government," and a defendant's burden arises only after the Government has carried its own. To adopt the Report over these unanswered objections would invert that burden — requiring Defendant to disprove a loss the Government has never proven — and would be incompatible with the MVRA, which

commands that the Court, not a court-appointed master, determine "the full amount of each victim's losses," § 3664(f)(1)(A), and resolve every dispute "by the preponderance of the evidence," § 3664(e), on a complete record. Defendant objects as follows:

A. The Report is the work product of an officer subject to disqualification.

1. The Report is the work product of an officer who unites in himself the receiver's custody, liquidation, and fee interest and the Article III function of quantifying each victim's loss and fashioning the restitution order — an officer subject to disqualification. Such an officer's report may not be adopted, is not cured by a later de novo determination under § 3664(d)(6), and must be suppressed. (Source: Motion to Disqualify (Doc. 269), adopted in Second Motion to Set Aside § I ¶ 1.)

B. The Report values the companies at their debt, not at their worth.

2. The Report values the estate's operating companies "for the debt" rather than at enterprise value. The Special Master has been shopping Damovo at roughly $100 million — its debt — when a contemporaneous, arm's-length expression of interest (Twelve Seas Investment Company III, July 31, 2026) values it at a $400 million enterprise value, with up to approximately $450 million achievable at arm's length. (Source: Second Motion to Set Aside § II ¶¶ 2–3; Declaration ¶¶ 2–4.)

3. Debt is not a stand-alone measure of value. A company's enterprise value is determined by its assets, earnings, and cash flows; debt is a claim to be paid out of that value, not a subtraction from it. Treating the debt figure as the company's worth is not a valuation. (Source: Second Motion to Set Aside § III ¶ 4; Declaration ¶¶ 10–11.)

4. Damovo is exemplary of the value destruction already inflicted on the companies the Special Master sold "for the debt" — Beckett (appraised at approximately $1 billion, sold for approximately $134 million) and Clanwilliam (valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 ¶ 32; Doc. 174 ¶ 117; Ex. I3], sold for approximately $450 million). Applying the same premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value; the only difference is timing, because as to Damovo the market's proof of the true value is before the Court now, before the loss is locked in. (Source: Second Motion to Set Aside § III ¶ 5; Declaration ¶ 4.)

C. The Report overstates the loss by disregarding mandatory offsets and credits — 18 U.S.C. § 3664(j)(2).

5. The Report disregards that the American policyholders have been paid in full — more than $157 million distributed to more than 43,000 policyholders — a mandatory credit. (Source: Second Motion to Set Aside § III ¶ 6; Declaration ¶ 1; Doc. 174 ¶ 120.)

6. The Report disregards that the approximately $208 million it alleges remains owing to Northstar, OMNIA, and PBIHL is covered by the Damovo transaction described above. (Source: Second Motion to Set Aside § III ¶ 6; Declaration ¶¶ 2–3.)

7. The Report disregards that the approximately $339 million it alleges remains owing to ULICO has been satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 — the very figure the Special Master lists in his own table. (Source: Second Motion to Set Aside § III ¶ 6; Declaration ¶ 5; Doc. 245 at 6 (Issue 3).)

D. The Report is not the complete accounting the MVRA requires — 18 U.S.C. § 3664(f)(1)(A).

8. The parties that hold the books, records, valuations, and loss data — the North Carolina insurance companies and NHC Holdings, LLC — refused to produce that information and disputed the Special Master's authority, and the Court's authority, to compel it, so the accounting could not be completed on a full record. (Source: Second Motion to Set Aside § IV ¶ 7; Term Sheet (Ex. ___); Declaration ¶ 12.)

9. On Defendant's behalf, his former attorneys and Paladin Management

urged the Special Master to push for access to that information, and the Special Master refused to push for it. The Special Master claims the records are not under his control — a claim Defendant disputes, the Special Master having stepped into Defendant's shoes as record owner able to compel production, which he refused — but even taken at his word, the records can be reached only by compulsory process, and the accounting cannot be completed on this record; the Court therefore cannot satisfy 18 U.S.C. § 3664(f)(1)(A) and is powerless to adopt the Report. (Source: Declaration ¶ 12; Second Motion to Set Aside § IV ¶¶ 7–8.)

10. Denying Defendant's Rule 17(c) subpoenas while adopting an admittedly incomplete Report violates the MVRA's accounting requirement; without that compulsory process, no complete or final restitution accounting can exist. And requiring the insurance-company victims to produce records of what they received and how those funds were used is not harassment but the accounting the MVRA requires. (Source: Second Motion to Set Aside § IV ¶ 8; Motion for Issuance of Rule 17(c) Subpoenas (Doc. 248).)

E. The Report omits forgone value and a full accounting of dispositions.

11. The Report fails to disclose or account for every sale, offer, or expression of interest that came before the Special Master but that he did not approve, did not pursue, or did not take (such as the Twelve Seas expression of interest for Damovo), together with the price and terms offered and his reasons for declining. (Source: Declaration ¶ 13; Second Motion to Set Aside § VI ¶ 10(3).)

12. The Report contains no full and verified accounting of every sale, transfer, or disposition the Special Master made, approved, attempted, or declined — including the Beckett sale — or of all proceeds and all fees paid from the estate. (Source: Second Motion to Set Aside § VI ¶ 10(3); Motions to Stay (Docs. 172, 190).)

F. The Report fixes a loss the Government has not proven — the Government's unmet § 3664(e) burden.

13. Neither the Government nor the Special Master has produced evidence of any loss to the protected victims caused by Defendant. To the contrary, the records filed in support of Defendant's Motion for a Determination That No Restitution Is Owed, and the accompanying Consolidated Statement of Facts, show his approximately $1 billion first-loss capital contribution and the well-secured character of the affiliated loans when control passed. That a company carries debt is not evidence of loss — debt is the ordinary engine of corporate growth, and at a loan-to- value ratio of roughly 40 to 50 percent it is conservatively secured and reflects value, not loss. Causation is an element the Government must prove by a preponderance, and the Fourth Circuit, applying the direct-and-proximate-harm framework in this very restitution matter, has stated the governing test: restitution reaches a victim only where "directly and proximately harmed," whose harm "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)); see 18 U.S.C. § 3771(e)(2)(A). In re Zetteler is the Fourth Circuit's ruling in this very docket, advanced as the governing causation standard for this proceeding. On that standard, causation remains unproven. (Source: Second Motion to Set Aside § V ¶ 9; Docs. 234, 235; In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026).)

G. The Report departs from the MVRA statute, its case law, and the

committee notes in the following specific respects.

The foregoing grounds are reinforced by the following schedule of the specific respects in which the Report departs from the MVRA statute, the case law construing it, and the statute's legislative history. Each entry is supported by the filed text of the Report (Doc. 245).

14. The Report disclaims making the foreseeability finding the MVRA

requires. "That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. Foreseeability is an element of MVRA proximate cause, not an optional inquiry. 18 U.S.C. § 3663A(a)(2); Hughey v. United States, 495 U.S. 411 (1990). A report that declines to prove it cannot support a foreseeable-loss finding.

15. The Report abstains from reviewing the intervening conduct that

determines causation. Three times: "the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19, 21–22, 25. It also places the public-corruption issues "outside the scope," id. at 31, and whether a crime occurred outside the "assignment," id. at 29 n.28. Under Stein and Robers the intervening acts must be evaluated, not avoided.

16. The Report applies standards found nowhere in the MVRA. It asks

whether Mr. Lindberg has "convinced the Special Master" (five times: Doc. 245 at 19, 22, 22, 24, 25), whether he offered "compelling evidence" (at 21, 24), "convincing evidence" (at 18), whether an act would "definitively cause" a decline (at 19), and whether he "raise[d] a genuine issue of material fact" (at 31). Five times it finds only that he "bears some responsibility" (at 19, 21–22, 24–25). The statutory test is

preponderance, 18 U.S.C. § 3664(e), and the decisionmaker is the Court de novo, § 3664(d)(6).

17. The Report inverts the Government's burden on loss and causation — §

3664(e). Section 3664(e) places "[t]he burden of demonstrating the amount of the loss" on the Government. The Report presents no new evidence, exhibit, affidavit, or testimony, and frames every conclusion as the Defendant's failure of proof. (Note for precision: Karam, 201 F.3d at 327 — which the Report cites at 32 — does place the burden on a defendant claiming a particular offset. The burden-inversion argument should therefore be pressed on loss, foreseeability, and causation, and paired on the offsets with the denied-subpoena due-process point.)

18. The Report substitutes generic credit risk for offense-specific

foreseeability. "All loans bear a risk of non-payment"; "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally guaranteed." Doc. 245 at 30. That reasoning would erase the MVRA's foreseeability limit in every loan case. Foreseeability must be tied to the conduct constituting the offense.

19. The Report makes no findings on intervening or superseding causes —

Stein; Robers. A restitution order entered without findings on the effect and foreseeability of intervening events must be vacated. United States v. Stein, 846 F.3d 1135, 1154–56

(11th Cir. 2017); see Robers v. United States, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring). The Report cites neither and makes no such findings.

20. The Report misapplies Robers and Ritchie to shift the burden. It cites Robers, 572 U.S. at 644–46, and Ritchie, 858 F.3d at 211 ("the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant who seeks to avoid being tagged as the 'proximate cause' of the loss in value of that property"). Doc. 245 at 15. Both address a victim's passive delay or neglect in liquidating collateral. Here the fiduciary acted affirmatively, selling a par-payable instrument decades early. Neither case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary.

21. The Report treats "some responsibility" as proximate causation. Five times it concludes only that the Defendant "bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes." Doc. 245 at 19, 22, 25, 28. The MVRA requires that the loss be directly and proximately caused by the offense; partial or attenuated responsibility for a receivership's later decisions is not that. Lagos v. United States, 584 U.S. 577 (2018).

22. The Report adds prejudgment interest contrary to the statute and DOJ policy — $263M. Doc. 245 at 14–15 defends interest as "necessary to make the victims whole" and notes the rate is below the contractual, IALA, and applicable federal rates. Rate moderation is not authority. The MVRA does not enumerate interest, and DOJ policy states interest is not eligible for restitution. Robers, 572 U.S. at 643; United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017); United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006); United States v. Coats, 487 B.R. 648 (E.D.N.C. 2013). Reliance on United States v. Hoyle, 33 F.3d 415 (4th Cir. 1994), is misplaced (pre-MVRA). See note 4, supra.

23. The Report invents an atextual realization condition on mandatory credits. Issues 3 and 7 are "Disallow at this Time," with credit only "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. Section 3664(j)(2) contains no such condition, and deferral produces the double recovery the statute forbids. United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018).

24. The Report denies credits for missing documentation the Government prevents the Defendant from obtaining. The zeros credit is denied because the Defendant "has failed to present sufficient documentation," Doc. 245 at 12–13, and the $9.4M Finnazen/Blue Violet credit on the same basis, id. at 13. Mr. Lindberg is in BOP custody and surrendered his companies' books four times; the subpoenas needed to obtain these records were opposed. Denying credits on that record violates due process and cannot satisfy § 3664(e).

25. The Report measures exposure rather than realized loss. It asserts the methodology "includes no risk, only actual loss," because it counts "only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. Unpaid principal on secured, insured, and guaranteed obligations is exposure, not the victims' realized pecuniary loss. Hughey, 495 U.S. at 413; Stone, 866 F.3d at 226.

26. The Report rests a criminal penalty on a self-generated valuation it calls

a "current guess." The Special Master cuts his asset estimate from

$1,162M/$1,454M/$1,878M (Doc. 106 at 30) to Redacted (Doc. 245 at 36), based on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," id. at 36 n.31, and describes the result as his "current guess," id. at 36–37 — proposing to explain the reduction only under seal, id. at 36 n.32. Due process requires a credible, testable valuation.

27. The Report manufactures waiver with no statutory basis. Waiver is

asserted at Doc. 245 at 7, 24–25, 28, 29–30, 30, and 32–33, including "by agreeing to the Special Master process" and "by pleading guilty," and that invoking constitutional limits would be "unconscionable." No MVRA provision creates such a waiver; the agreed bifurcation contemplates a later restitution proceeding; a preliminary order is provisional, Manrique v. United States, 581 U.S. 116 (2017); Dolan v. United States, 560 U.S. 605 (2010); and the Defendant reserved rights in every filing.

28. The Report refuses to resolve complexity in the Defendant's favor — §

3663A(c)(3)(B). Where complex causation issues would complicate sentencing, the Court may decline restitution. The Report resolves every complexity against the Defendant while declining to analyze causation.

29. The Report is untethered from the MVRA's text, committee notes, and

case law. In 46 pages it cites two cases (Robers and Ritchie, both at 15) plus Karam (at 32). It cites no MVRA causation authority — no Hughey, Lagos, Paroline, Stein, or Ellingburg — and does not engage the committee notes, S. Rep. No. 104-179, at 19–20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932–33, or DOJ restitution policy.

The ignored committee notes confine restitution to harm "under the count or counts for which the offender is convicted" S. Rep. No. 104-179, at 19.

30. The recommendation and the Preliminary Order exceed statutory

authority — Davis. The Preliminary Order fixed $1.655B; the Initial Report recommended $1.625B; the Second Supplement now recommends $1.616B. Doc. 245 at 44. A restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting Broughton-Jones, 71 F.3d at 1147).

31. The Report converts a promise of "full restitution" into an agreed

amount it never was. The factual basis stipulates no loss or restitution amount. An agreement to pay full restitution is not a stipulation that the amount is $1.6 billion, or anything above zero. Hughey, 495 U.S. at 413. To the contrary, the plea obliges payment only of "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct" — language that incorporates the MVRA's causation limit rather than displacing it, because it reaches only those "harmed by the defendant's criminal conduct." The Fourth Circuit, applying the direct-and-proximate-harm framework in this very restitution matter, has stated the governing causation standard in this very case: a person is a compensable victim only where "directly and proximately harmed," and test: restitution reaches harm "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting In re McNulty, 597 F.3d

344, 352 (6th Cir. 2010)); see 18 U.S.C. § 3771(e)(2)(A). In re Zetteler is the Fourth Circuit's ruling in this very docket, advanced as the governing causation standard for this proceeding. The agreement further stipulates that "'loss' under U.S.S.G. § 2B1.1 may be different from, greater, or lesser than restitution" — confirming that the Guidelines § 2B1.1 loss figure cannot lawfully be imported into the restitution calculation, because restitution under 18 U.S.C. § 3556 is a distinct measure to which the Guidelines "loss" concept does not apply. Plea Agreement ¶¶ 8(a), 10(a) (Doc. 40; Ex. 7(a) hereto). Because restitution runs only to persons harmed by the offense conduct, causation must be proven, not assumed.

H. The Government's adoption of the Report does not carry its § 3664(e)

burden; adopting a fiduciary-tainted Report inverts the burden and violates the MVRA.

32. The Government has adopted the Special Master's Report rather than

carrying its own burden, and it has not responded on the merits to any of the foregoing objections. But the Government's adoption of the Report does not solve the problem under the MVRA. Section 3664(e) places the burden of proving the amount of loss, causation, and foreseeability on the Government — not on the Special Master — and the Government cannot discharge that burden by adopting the recommendation of a court-appointed, fee-interested fiduciary whose Report is itself the subject of Defendant's pending Motion to Disqualify (Doc. 269). Adopting a fiduciary-tainted Report imports the taint; it does not supply the proof § 3664(e) requires, and it cannot substitute for the Court's de novo determination, § 3664(d)(6). Nor is adopting the

Report a substitute for responding to Defendant's pending motions, which raise multiple independent issues — disqualification of the Special Master, causation, mandatory offsets and credits, valuation, prejudgment interest, and the incomplete MVRA accounting — that the Report does not resolve and the Government has not answered. Nor does the 90-day period of 18 U.S.C. § 3664(d)(5) compel adoption of the Report now: a court that does not meet that deadline "nonetheless retains the power to order restitution," Dolan v. United States, 560 U.S. 605, 608 (2010), so nothing requires the Court to act on the Report before the pending motions are answered and the accounting is complete. The Government's own conduct confirms the point: at sentencing it asked that Mr. Lindberg's cooperation with the restitution process be made "a special condition that, should the Special Master still be working when the defendant goes on supervised release, that a term of the supervised release is to continue cooperating with the Special Master," Sent. Tr. at 70:1–5 — expecting the process to continue for years — yet it now presses the 90-day clock to finalize restitution in a matter of weeks. The Government, having itself delayed its responses to the pending motions, cannot now seek compliance with the 90-day deadline of § 3664(d)(5), which was in any event mooted by the bifurcation process. Defendant respectfully requests that the Court sustain these objections, decline to adopt or act upon the Report, and require the Government to carry its § 3664(e) burden — or treat its failure to do so as resolved against it — before any restitution is fixed. Defendant reserves the right to supplement these objections upon completion of the accounting and the compulsory process the MVRA requires. (Source: This document; Motion to

Disqualify (Doc. 269); Second Motion to Set Aside; Motion to Hold the Report in Abeyance.)

Dated: August 2, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg1

1 1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

**Doc. 281 — Full Response/Objection to the Second Supplement (filed 08/06/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 5:19-cr-0022-MOC

Case No. 3:23-cr-00048-MOC Plaintiff, v.

GREG E. LINDBERG,

Defendant.

DEFENDANT GREG E. LINDBERG'S PRELIMINARY RESPONSE AND OBJECTION TO THE SPECIAL MASTER'S SECOND SUPPLEMENT TO REPORT AND RECOMMENDATIONS REGARDING RESTITUTION (DOC. 245)

/s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr. Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

PRELIMINARY STATEMENT

This Response is filed under protest and as a preliminary response. Defendant Greg E. Lindberg has had only a few hours to review the Special Master's Final Report before this response was due, and submits this preliminary Response to preserve his objections, expressly reserving the right to supplement it once he has had a meaningful opportunity to review the Report and to obtain the records the Court's process requires. The document styled a "Final Report" is not final. The accounting the MVRA requires has never been produced; the records that would complete it remain the subject of Defendant's pending Motion for Issuance of Subpoenas (Doc. 248); and the Special Master now claims that the books and records the accounting requires are "none of which are under the Special Master's control" and that his sole authority over them "is the power to appoint two directors to the board of NHC" — a claim Defendant disputes, the Special Master having stepped into Defendant's shoes as record owner and trustee able to compel production, but which even credited means only that no participant can reach the records except through compulsory process. Doc. 266; Doc. 268. Defendant therefore adopts and re-files, by this Response and mutatis mutandis, each of his pending motions — including his Motion to Disqualify the Special Master (Doc. 269), his Second Motion to Set Aside the Special Master's Report, and his Motion to Adopt All Prior Motions as if Filed After the Final Report and to Hold the Report in Abeyance — as though filed after the Final Report, with every reference to the preliminary report or the Preliminary Order of Restitution (Doc. 161) deemed a reference to the Final Report and to any final order of restitution entered upon it. And because the Government has not responded on the merits to any of those motions, its silence cannot be cured by adopting the Special Master's recommendation. Nor is adopting the Report a substitute for responding to those motions, each of which raises multiple independent issues the Report does not resolve. Under 18 U.S.C. § 3664(e) the burden of proving the amount, causation, and foreseeability of any loss rests on the Government, and a defendant's burden arises only after the Government has carried its own. To adopt the Report over Defendant's unanswered objections would invert that burden — requiring Mr. Lindberg to disprove a loss the Government has never proven — and would be incompatible with the MVRA.

The Special Master's Second Supplement (Doc. 245) asks this Court to impose $1.616 billion in criminal restitution. It cannot support that request, because its author disclaims having made the findings the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664, requires. In thirteen separate footnotes, the Special Master concedes that he and Mr. Lindberg "agree on the basic, objective, material facts"; in eight of those thirteen, the only disagreement he identifies is the legal conclusion "of whether the chain of proximate cause was broken." On

foreseeability, he states outright that this is a matter "which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. And three times he declines to examine the conduct of the state-court fiduciaries at all, explaining that he is "not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment." Doc. 245 at 19, 21–22, 25.

That is not a record on which restitution may be ordered. Under § 3664(e), the Government bears the burden of proving the amount of each victim's loss by a preponderance of the evidence, and the MVRA reaches only losses "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2). The Second Supplement does not apply that standard. It asks instead whether Mr. Lindberg has "convinced the Special Master" — a formulation it repeats six times — whether he has offered "compelling evidence," and whether any intervening act would "definitively cause" a decline in value. Those are not the statutory tests. Under § 3664(d)(6) the Special Master is not the decisionmaker; his recommendation is a proposal only — "subject to a de novo determination of the issue by the court" — and is owed no deference. Reviewed without deference against the facts the Special Master himself concedes, the recommendation supplies no basis on which restitution of any amount could be ordered. The substance fares no better. The Second Supplement never once mentions the Quadro transaction, the Montshire/Alban transaction, the Oaktree transaction, the Ares letter of intent, the KPMG valuation, or the Houlihan Lokey coverage analysis — the very transactions and valuations that break the causal chain and establish value. It cites no MVRA causation authority at all: not Hughey, not Lagos, not Paroline, not Stein. Of some $2.9 billion in documented offsets,1 it allows

1 The $866 million loss of value on the sale of Beckett increases the documented offsets and credits from $2,899,418,383 to $3,765,418,383 (approximately $3.7 billion). The Beckett Collectibles Trust documents are attached as Exhibits 6(a) (Trust Agreement, executed, dated as of June 2021), 6(b) (Amended and Restated Trust Agreement, executed December 5, 2023, the

$39 million — about 1.3% — and denies others expressly for want of documentation that the Government's refusal of subpoenas prevents Mr. Lindberg, in custody and four times divested of his companies' books, from obtaining. Meanwhile the Special Master has quietly cut his own estimate of the assets available for restitution by roughly a third, to a "current guess" of $998 million at the midpoint, resting on a "desktop exercise" performed by the financial advisors to the entity that holds and sells those assets — and has moved to file the explanation for that reduction under seal. Each of these is established in Mr. Lindberg's prior filings. See Doc. 235 ¶¶ 12–19, 26– 32; Doc. 174 ¶¶ 94–122.

For the reasons below, any one of which is independently sufficient, the Court should decline to adopt the Second Supplement and determine that no restitution is owed; or, in the alternative, exclude the losses not proximately caused by the offense and credit the offsets that extinguish any obligation. Because the Government bears the burden on loss, foreseeability, and causation, 18 U.S.C. § 3664(e), and because the Special Master's

advisory recommendation neither carries that burden nor can substitute for the Court's de novo determination, 18 U.S.C. § 3664(d)(6), the deficiencies identified below are not gaps for the Court to fill. On this record they are failures of proof that require denial. Restitution is a penalty the Government must prove; it is not a figure the Court supplies.

instrument in effect at the time of the sale — retaining the identical Grantor-consent requirement for Fundamental BKX Matters), and 6(c) (Certification of Trust). The Special Master controls Global Growth's board seats at NHC and the Beckett Trust documents attached here clearly give the NHC board a veto right over any sale of Beckett assets given that such a sale is a Fundamental BKX Matter which requires Grantor approval, and the Grantor to the trust is controlled by NHC. The fact that the Special Master took no action to require court approval of this sale as required by the Order Appointing Special Master is clear evidence that he violated the terms of the order that appointed him. NHC was designed as a Primary Restitution Asset, and the Order Appointing Special Master gives the Special Master full federal court authority over NHC as the fiduciary for all decisions undertaken by NHC. The Special Master violated his own order by failing to bring the Beckett sale to the court for adjudication as required by the Order Appointing Special Master. This led to an $866 million loss of value on Beckett, which is an additional $866 million offset that Lindberg is due under MVRA. The complete revised schedule of offsets, credits and reductions is set out in Part IX.

## I. THE SECOND SUPPLEMENT CONCEDES THE FACTS AND DISCLAIMS THE FINDINGS THE MVRA REQUIRES

### A. The Special Master concedes the material facts in thirteen footnotes.

The Second Supplement does not contest Mr. Lindberg's evidence. It contains no new affidavit, no new exhibit, no new testimony, and no new verified fact. To the contrary, the Special Master states at the outset:

"For all or nearly all of the issues raised in the Defendant's Response and the Defendant's Supplemental Responses, the Special Master and the Defendant agree on the historical, objective facts of what transpired, but disagree on what legal conclusions to draw from those facts for restitution purposes." Doc. 245 at 7.

He then repeats that concession in thirteen separate footnotes, each stating that "the Special Master and the Defendant agree on the basic, objective, material facts." Doc. 245 at 16 nn.9–10, 17 n.11, 17 n.12, 18 nn.13–14, 19 n.16, 20 n.17, 21 n.20, 22 nn.21–22, 23 n.25, 24 n.26, 25 n.26. In eight of those footnotes, the sole disagreement identified is "the legal conclusion of whether the chain of proximate cause was broken." The practical consequence is important: on a factual record the Special Master concedes, the causation question is a legal one for this Court to decide de novo — and the conceded facts establish that the chain was broken.

### B. The Special Master expressly declines to prove foreseeability.

Reasonable foreseeability is not optional under the MVRA; it is an element of the proximate- cause inquiry the Government must satisfy. The Special Master's response to Mr. Lindberg's foreseeability argument is to disclaim the task:

"That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)."

Doc. 245 at 30.

He says the same of the underlying offense conduct: "The Special Master has not set out to prove—and does not consider it within the Special Master's charge to prove—whether the Defendant committed the crimes to which he pled guilty as part of the restitution analysis." Doc.

245 at 29–30. A report that declines to prove foreseeability cannot establish the foreseeable loss that restitution requires.

C. The Special Master abstains from the very inquiry that determines causation.

The intervening acts at the heart of this dispute were all taken by the state-court fiduciaries after Mr. Lindberg ceded control. Three times, the Special Master declines to evaluate them:

"At a minimum, the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19; see also id. at 21–22, 25.

He adds that questions concerning the companion public-corruption case "exceed the scope of the Special Master's assignment," Doc. 245 at 31, and that whether a crime was committed "falls outside of the scope of the Special Master's assignment," id. at 29 n.28. The Special Master is of course entitled to define his own role. But the consequence is that no one has made the findings § 3664(e) demands. The Government cannot satisfy its burden by adopting a report whose author disclaims the analysis. And because the Special Master's product is advisory only, 18 U.S.C. § 3664(d)(6), his abstention leaves no findings on foreseeability or intervening cause for this Court to adopt — and the Court cannot supply findings the record does not contain.

D. The Second Supplement applies standards the MVRA does not contain.

Rather than ask whether the Government has proved causation by a preponderance, the Second Supplement asks whether Mr. Lindberg has persuaded the Special Master. It concludes six times that "the Defendant has not convinced the Special Master" or has "not produced evidence sufficient to convince the Special Master" (Doc. 245 at 19, 22, 22, 24); twice that it has "not seen compelling evidence" (id. at 21, 24); once that it has "not seen convincing evidence" (id. at 18); once that no act would "definitively cause" a decline in value (id. at 19); and once that Mr. Lindberg "has failed to raise a genuine issue of material fact" (id. at 31). Five times it concludes

only that Mr. Lindberg "bears some responsibility" for losses arising during the rehabilitation and liquidation. Doc. 245 at 19, 22, 25, 28.

None of these is the statutory test. "Some responsibility" is not proximate causation; "compelling" and "definitive" proof are not a preponderance; and what has or has not convinced the Special Master is not the measure. The measure is the statutory one, applied de novo and without deference to the Special Master's recommendation. 18 U.S.C. § 3664(d)(6). A recommendation built on standards the MVRA does not contain, by an officer who is not the decisionmaker, is owed no deference and cannot bear a $1.6 billion penalty.

E. The Second Supplement is nearly devoid of legal authority.

Across forty-six pages recommending the largest restitution award in this District's history, the Second Supplement cites two cases: Robers v. United States, 572 U.S. 639 (2014), and United States v. Ritchie, 858 F.3d 201 (4th Cir. 2017) — both invoked to shift burdens onto Mr. Lindberg — together with a passing citation to United States v. Karam, 201 F.3d 320

(4th Cir. 2000). It does not cite Hughey v. United States, 495 U.S. 411 (1990); Lagos v. United States, 584 U.S. 577 (2018); Paroline v. United States, 572 U.S. 434 (2014); United States v. Stein, 846 F.3d 1135 (11th Cir. 2017); or Ellingburg v. United States, 607 U.S. 163 (2026). It engages neither the MVRA's committee notes nor the Department of Justice's own restitution policy. The committee notes confine restitution to victims harmed "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The reason the Report is bereft of authority is that its reasoning is not grounded in the MVRA. The Special Master is not free to make up the governing law.

F. The Second Supplement carries none of the Government's § 3664(e) burden.

Under § 3664(e), "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating

the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." The elements of that burden here — the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction — belong to the Government. The Second Supplement carries that burden on none of them. It offers no new evidence, exhibit, affidavit, or testimony, and instead frames every conclusion as the Defendant's failure of persuasion — asking whether Mr. Lindberg has "convinced the Special Master" or produced "compelling" or "convincing" evidence. Doc. 245 at 18, 19, 21, 22, 24. That is not the statutory allocation, and it cannot be cured by this Court's adopting a report whose author disclaims the very findings the Government was required to prove.

The failure is element by element:

Element Whose burden under § 3664(e) The Report's treatment (Doc. 245) Fact and amount Government — prove each Presents no new evidence, exhibit, of loss victim's loss by a preponderance. affidavit, or testimony; rests the $1.616 billion figure on the Special Master's own "current guess" of asset value. Doc. 245 at 36–37. Reasonable Government — an element of The Special Master "has not set out to foreseeability proximate cause it must establish. prove" foreseeability and does not consider it within his charge. Doc. 245 at 30. Proximate Government — prove the offense Asks whether the Defendant causation directly and proximately caused "convinced the Special Master," the loss. whether an act would "definitively cause" a decline, and settles for a finding that he "bears some responsibility." Doc. 245 at 19, 22, 25, 28. Entitlement to a Defendant — but only once loss Denies credits for want of specific offset and causation are proved. Karam, documentation the Government 201 F.3d at 327. simultaneously prevents Mr. Lindberg from subpoenaing. See Part IX, infra.

On every element that is the Government's to prove, the Report substitutes the Defendant's failure to persuade the Special Master for the Government's failure to carry its burden. The one burden

the MVRA does assign to Mr. Lindberg — demonstrating entitlement to a particular offset once loss and causation are established, Karam, 201 F.3d at 327 — the Report cannot fairly invoke, because it denies those offsets for lack of the very records the Government is blocking. The Government's own conduct confirms the failure. Mr. Lindberg's Motion to Dismiss the $1.655 Billion Restitution Claim (Doc. 234) put the fact and amount of loss, foreseeability, causation, and the mandatory offsets squarely at issue, and demanded the

proof § 3664(e) requires. The Government has never responded to it. It filed no opposition, no evidence, no affidavit, and no brief defending the recommendation on the merits — through the response period and since — appearing in this restitution proceeding only to state that it "does not oppose" the Special Master's positions. Doc. 245 at 44. The party on whom § 3664(e) places the burden of proof has elected silence, and a burden of proof is not carried by silence. Because the Government has not carried its § 3664(e) burden, the only determination the record supports is that no restitution has been proved.

## II. THE LEGAL STANDARD IS A BURDEN OF PROOF, AND ON EVERY ELEMENT BUT THE OFFSETS IT IS THE GOVERNMENT'S

### A. The allocation the statute makes.

Section 3664(e) divides the proof and leaves no discretion in the division. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). On the Government therefore lie three things: the fact and amount of each victim's loss, the reasonable foreseeability of that loss, and its direct and proximate causation by the offense of conviction. Id.;

18 U.S.C. § 3663A(a)(2).

One burden, and one only, is Mr. Lindberg's. Once the Government has proved loss and causation, he bears the burden of establishing entitlement to a particular offset — of showing that

he "has compensated or will compensate the victim." United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000). Mr. Lindberg does not dispute that allocation, and this Response does not ask the Court to relieve him of it. But the offset burden is narrow, it is specific to credits, and it is conditional: it never arises until the Government has carried its own.

### B. What happens when the Second Supplement's seventeen issues are sorted by that allocation.

The Second Supplement disposes of seventeen issues in a table at page 6 and in the discussion that follows. Sorted by whose burden each issue belongs to, they divide almost exactly three to one.

Nine of them — Issues 1, 2, and 11 through 17 — turn on the amount of loss, on the valuation of the insurance companies, or on causation. Each is the Government's to prove. Together they account for approximately $2.149 billion of the roughly $2.899 billion in reductions documented in the Proposed Restitution Credit / Offset Ruling Chart. Doc. 132-3. On every one of the nine, the Second Supplement resolves the question against Mr. Lindberg not because the Government proved anything, but because Mr. Lindberg did not satisfy the Special Master. He "has not convinced the Special Master." Doc. 245 at 19, 22, 22, 24, 25. The Special Master "has not seen compelling evidence," id. at 21, 24, or "convincing evidence," id. at 18. No act would "definitively cause" a decline in value. Id. at 19. And Mr. Lindberg "bears some responsibility." Id. at 19, 22, 25, 28. None of those is the statutory test, and none of those elements was his to prove.

The clearest instance is Issue 17, the $611.6 million loss on the early sale of the zero-coupon bonds. The Special Master writes that he "has not seen compelling evidence that this discretionary decision by the North Carolina Insurance Companies' state court

supervised fiduciaries was unreasonable or caused the harm that the Defendant professes." Id. at 24 (emphasis

added). Whether the fiduciaries' decision "caused the harm" is the causation element itself — the Government's to establish by a preponderance — and the Report assigns the evidentiary onus for it to Mr. Lindberg. Issue 11 stacks three such shifts on a single question: no "convincing evidence" of the companies' 2018 value, no act that would "definitively cause" a decline, and "some responsibility" borne by Mr. Lindberg. Id. at 18–19.

The remaining eight issues — Issues 3 through 10, approximately $750 million — are offsets, and Mr. Lindberg accepts that they are his to establish. On those he does not argue misallocation. He argues that he carried the burden (Issue 3, where the settlement fixes a dollar- for-dollar credit against a judgment and the par value is undisputed); that the statute forbids deferring a credit it makes mandatory (Issues 3 and 7, deferred "if and when ULICO realizes this value" and "if and when the escrow balance becomes available," id. at 6 nn.3–4); and that the Government has closed off the records that would complete the proof (Issue 10, where the Report faults him for having "failed to rebut the Special Master's conclusion," id. at 26–27, while the subpoenas for those records remain opposed and pending, Docs. 202, 248). Rebutting the Special Master's conclusion is not the standard; proving an offset to the Court by a preponderance is.

C. The consequence for this Court's determination.

Framed correctly, this Response does not ask the Court to weigh competing analyses of the MVRA. It asks a prior and simpler question: did the party bearing the burden carry it? On the nine issues that are the Government's, the Second Supplement offers no evidence, no exhibit, no affidavit and no testimony — only the observation that Mr. Lindberg failed to persuade the officer who wrote the report. A burden of proof is not carried by the other side's failure to persuade. Nor is it carried by adopting the Special Master's recommendation: the Government appeared in this proceeding only to state that it "does not oppose the positions articulated by the Special Master," Doc. 245 at 44, and elsewhere that it "agrees with each of the Special Master's recommendations,"

Doc. 582 at 9 n.4. But the Government cannot carry its own § 3664(e) burden by adopting the report of the very officer whose work is challenged: the burden is the Government's, not the Special Master's, and adopting the recommendation of a court-appointed, fee-interested fiduciary — whose Report is the subject of Defendant's pending Motion to Disqualify (Doc. 269) — imports that fiduciary taint rather than supplying the independent proof the statute demands. Because the Special Master's recommendation is advisory only and is subject to this Court's de novo determination, 18 U.S.C. § 3664(d)(6), and because it is owed no deference, the deficiencies catalogued below are not gaps for the Court to fill. On this record they are failures of proof, and the only determination § 3664(e) permits is that the loss was not proved.

D. The substantive limits the Government's proof would have had to satisfy.

Federal courts have no inherent power to order restitution; the authority is statutory and is "circumscribed by the procedural and substantive protections" of the statute conferring it. Ritchie, 858 F.3d at 206; United States v. Freeman, 741 F.3d 426, 431 (4th Cir. 2014). Restitution reaches only the actual loss "directly and proximately" caused by the offense of conviction. 18 U.S.C. § 3663A(a)(2); Hughey, 495 U.S. at 413; Lagos, 584 U.S. at 582–85; Paroline, 572 U.S. at 445.

The burden is the Government's: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). If and only if loss and causation are established, Mr. Lindberg bears the burden of demonstrating entitlement to a particular offset. Karam, 201 F.3d at 327. That allocation does not assist the Special Master here, because the failure of proof in the Second Supplement is on the elements that belong to the Government — the fact and amount of loss, foreseeability, and proximate causation — and because, as to the offsets, the

Special Master denies credits for want of documentation the Government simultaneously prevents Mr. Lindberg from obtaining. See Part IX, infra.

Restitution may not confer a windfall: the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017). Amounts returned to or recovered by a victim must be credited. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); Robers, 572 U.S. at 645; United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018). Restitution under the MVRA is criminal punishment. Ellingburg v. United States, 607 U.S. 163, 166 (2026). An order exceeding the statute's authority is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting United States v. Broughton-Jones, 71 F.3d 1143, 1147 (4th Cir. 1995)). And where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process" excessively, the Court may decline restitution altogether. 18 U.S.C. § 3663A(c)(3)(B).

III. THE MATERIAL FACTS REMAIN UNDISPUTED

Because the Special Master offers no contrary evidence and concedes the "basic, objective, material facts," the following remain undisputed on this record. Each is established in Mr. Lindberg's prior filings, and the Second Supplement rebuts none of them with evidence:

1. The zero-default track record of the affiliated loans while Mr. Lindberg managed the program remains UNDISPUTED.

2. The more than $1 billion of capital Mr. Lindberg committed to back the affiliated loans — and his personal guarantee of approximately $2.39 billion — remains UNDISPUTED. The Special Master does not deny the guarantee; he argues only that a guarantee is "not, in and of itself, tantamount to a satisfaction of the applicable obligation." Doc. 245 at 29 n.28. Its relevance here is to foreseeability, not satisfaction.

3. The regulatory approval of the affiliate-investment strategy and the regulator's praise of Mr. Lindberg's performance remains UNDISPUTED.

4. The fact that the Ares transaction to purchase the NCICs was defeated after third-party governmental pressure on the buyer remains UNDISPUTED. The Second Supplement does not mention Ares at all. See Doc. 235 ¶¶ 26–27.

5. The KPMG and Houlihan Lokey findings that the affiliated loans were well secured, with "full coverage" at a conservative loan-to-value, remain UNDISPUTED. The Second Supplement does not mention either firm. See Doc. 235 ¶¶ 12–19.

6. The robust, written risk-management framework Mr. Lindberg implemented for the

affiliated loans remains UNDISPUTED.

7. That the Commissioner acted on a premeditated plan to dismantle Mr. Lindberg's insurance business — formed before the relevant officials took their posts — remains UNDISPUTED.

8. That the Rehabilitator rejected the Oaktree transaction, which would have retired the affiliated loans at face value, remains UNDISPUTED. The Second Supplement does not mention Oaktree. See Doc. 235 ¶ 28.

9. That the Rehabilitator coerced a ten-year hold of the affiliated loans through the June 27, 2019 MOU, under an express written threat of immediate liquidation, remains UNDISPUTED. See Doc. 235 ¶ 30.

10. That the zero-coupon bonds were contractually scheduled to pay $1,006,239,867 at maturity remains UNDISPUTED. The Special Master confirms they were "bank- issued bonds" whose "purported purpose … was to provide protection for the principal amounts of the Affiliate Investments." Doc. 245 at 24.

11. That the diminution in value of Mr. Lindberg's insurance companies was set in motion by a political vendetta remains UNDISPUTED.

12. That the Rehabilitator rejected the Montshire/Alban transaction and sued Mr. Alban to block it — a transaction that would have retired the affiliated loans and allowed the companies to exit rehabilitation and avoid liquidation — remains UNDISPUTED. The Second Supplement mentions neither Montshire nor Mr.

Alban. See Doc. 174 ¶ 116.

13. That the Quadro purchase agreement signed in the first quarter of 2024 valued Clanwilliam at $880 million, and the Specified Affiliated Companies in the billions, remains UNDISPUTED. The Second Supplement does not mention Quadro. See Doc. 235 ¶ 32; Doc. 174 ¶ 117.

14. That Quadro valued the group at a 22.14x EBITDA multiple consistent with public-market comparables — a multiple that remains valid and accurate as a comparable today — remains UNDISPUTED. See Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG– Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

15. That Mr. Lindberg inherited approximately $129 million of Agera exposure that he did not originate remains UNDISPUTED. The Special Master expressly "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19.

16. That the Rehabilitator's own team valued the NCICs at $454 million weeks after the transfer of control remains UNDISPUTED as a matter of fact; the Special Master says only that he "has not seen convincing evidence" of that value while simultaneously admitting he "has not ventured to look behind the valuation report."

Doc. 245 at 18 & n.15.

17. That KPMG independently appraised the insurance entities as of December

31, 2017 — concluding $380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC — remains UNDISPUTED and unmentioned. See Doc. 235 ¶¶ 13–15. The Special Master's own framing confirms the point: he identifies the dispute as one of a "legal conclusion," not fact. On a conceded factual record, those legal conclusions are for this Court — and they favor Mr. Lindberg.

## IV. NO LOSS WAS REASONABLY FORESEEABLE AT ORIGINATION

Whose burden. Reasonable foreseeability is an element of proximate cause and belongs to the Government. 18 U.S.C. §§ 3663A(a)(2), 3664(e). The Special Master states that foreseeability "is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. No one, therefore, has made the finding the Government was required to prove, and the Government cannot satisfy its burden by adopting a report whose author disclaims the analysis.

The undisputed record forecloses a finding that loss was reasonably foreseeable when the affiliated loans were underwritten. The loans operated under a written risk-management framework and suffered zero defaults under Mr. Lindberg's management. He committed more than $1 billion of his own capital, took no dividends, personally guaranteed the obligations in an amount of approximately $2.39 billion, and caused the insurers to purchase $1,006,239,867 in par value of investment-grade bank zero-coupon bonds for the express purpose of protecting the principal of the affiliated loans dollar-for-dollar. The NCDOI approved the strategy, and the Commissioner

praised his performance. In 2018, KPMG and Houlihan Lokey confirmed the loans were well secured, with "full coverage" at a loan-to-value in the range of approximately 38.7% to 47.3%.

See Doc. 235 ¶¶ 1–3.

The Second Supplement's answer is not evidence but a syllogism: "All loans bear a risk of non-payment," and "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally" guarantied. Doc. 245 at 30. If that were the law, the MVRA's foreseeability requirement would do no work in any case involving a loan, and every lender's loss would be foreseeable to every borrower as a matter of definition. Foreseeability under the MVRA is offense-specific: the question is whether this loss was a reasonably foreseeable consequence of the conduct constituting the offense, not whether credit risk exists in the abstract. The Special Master's further suggestion that it was foreseeable "regulators might dispossess him of control" or that he "might be incarcerated," id. at 30–31, proves too little: what had to be foreseeable is the loss, and the specific intervening decisions that produced it — the refusal of three par-value transactions and the destruction of a guaranteed principal-protection portfolio — were not foreseeable to anyone. See Stein, 846 F.3d at 1154–56. To the extent the Court concludes that foreseeability cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## V. INTERVENING, SUPERSEDING CAUSES BROKE THE CHAIN OF CAUSATION

Whose burden. Proximate causation is the Government's to prove by a preponderance. Issues 14, 16 and 17 — the UKAT refinancing, the CWG sale, and the early bond sales,

together approximately $1.125 billion — are resolved in the Second Supplement on the grounds that the Special Master is "not well-situated to second guess" the fiduciaries, "has not seen compelling evidence," and "has not

convinced the Special Master." Doc. 245 at 21, 24–25. Each is a burden the Government bore and did not carry.

Even assuming a loss, it was caused by a chain of intervening acts of independent third parties — the Government, the court-appointed Rehabilitator, and others — each occurring after Mr. Lindberg ceded control on October 18, 2018. A sentencing court "should take into account intervening events contributing to the loss unless those events also were reasonably foreseeable to the defendant," and a restitution order entered without findings on the effect and foreseeability of those events must be vacated. Stein, 846 F.3d at 1154–56. The MVRA's legislative history confirms that intervening circumstances limit restitution: restitution reaches only harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The Second Supplement makes none of the required findings; it concedes the facts and declines to review the conduct.

A. Robers and Ritchie do not shift this burden to Mr. Lindberg.

The Special Master's two authorities are directed at a different question. He invokes Robers for the proposition that a defendant who transfers non-cash property receives credit upon "the eventual liquidation of the property transferred," Doc. 245 at 15 (citing Robers, 572 U.S. at 644– 46), and Ritchie for the proposition that "the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant," id. (quoting Ritchie, 858 F.3d at 211). Both concern a victim's passive delay or neglect in liquidating collateral it holds.

That is the opposite of what happened here. The Rehabilitator did not delay in selling; he sold early — affirmatively liquidating, decades before maturity, an instrument whose entire value proposition was payment of par at maturity. Nothing in Ritchie assigns to a defendant the burden of disproving an affirmative act of value destruction by the victim's fiduciary, and Robers itself recognizes that where a victim "chooses to hold collateral rather than to reduce it to cash within a

reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." 572 U.S. at 647–48 (Sotomayor, J., concurring). If a victim's inaction can break the chain, a fiduciary's deliberate destruction of a guaranteed recovery breaks it a fortiori. In all events, the ultimate burden on causation remains the Government's under § 3664(e).

B. The Ares transaction, defeated by governmental interference (November 2018).

Mr. Lindberg executed a letter of intent for Ares Management to purchase the NCICs on terms that would have retired the affiliated loans and protected policyholders. After contact with the Government, Ares cited undisclosed third-party advice to avoid any ongoing connection with Eli Global and abandoned the transaction. Governmental interference with a signed, value- preserving transaction is a cause attributable to the Government, not to Mr. Lindberg. The Second Supplement does not mention Ares. See Doc. 235 ¶¶ 26–27 (executed letter of intent; Eli Global CFO's contemporaneous memorialization of the buyer's stated reason for withdrawing).

C. The Rehabilitator's refusal of the Oaktree transaction (February 2019).

The February 2019 Oaktree proposal contemplated an approximately $1.0 billion investment into a special-purpose vehicle that would have acquired the affiliated-loan positions at face value, removing them from the insurers' balance sheets and paying policyholders in full by mid-2019. The Rehabilitator declined it. That discretionary refusal is an independent, intervening, and superseding cause. The Second Supplement does not mention Oaktree. See Doc. 235 ¶ 28.

D. The Rehabilitator's coercion of a ten-year hold (June 27, 2019 MOU).

Rather than monetize the loans at par, the Rehabilitator presented the MOU on a take-it-or-leave-it basis some forty-eight hours before entry of the rehabilitation order, under an express written threat to "move directly to liquidation." His counsel described the tactic as "hammer and nail." The MOU locked the affiliated loans in place on a ten-year schedule, foreclosing the very

monetization the Special Master now faults Mr. Lindberg for failing to achieve. One cannot lock an asset away for ten years, refuse every offer to buy it, and then charge the owner for its decline.

See Doc. 235 ¶ 30.

E. The pre-maturity sale of the principal-protection bonds ($611.6 million).

The zero-coupon bonds existed to guarantee $1,006,239,867 of principal protection at maturity. The Rehabilitator sold them early for approximately $394 million — less than forty cents on the dollar — crystallizing a loss of approximately $611.6 million. The Special Master does not dispute the instruments or their purpose; he offers three responses, none of which are sufficient.

See Doc. 235 ¶¶ 7, 31.

First, he says the bonds "were not paying any interest or interim payments" and "would have matured decades after the policyholders' annuities exited the 5- or 7-year surrender period," so the rehabilitator sold "to help meet the companies' financial needs." Doc. 245 at 24. But this statement is patently false; from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form of third-party bonds. See Part XV.E, infra. The sale of the zero coupon bonds in 2019 was entirely unnecessary.

Second, he faults Mr. Lindberg for not proving "that the sale price, discounted to present value and to factor in recovery risk (however minute), was unreasonably low." Doc. 245 at 24. That objection is answered on the Special Master's own terms: the relevant comparison is not a discount-rate debate but the contractual certainty the instruments provided. In any event, the burden of establishing loss and causation is the Government's, and Mr. Lindberg cannot supply a bond-by-bond present-value reconstruction while the records remain in others' hands and the subpoenas that would produce them have been refused.

Third, he falls back on the proposition that Mr. Lindberg's own conduct placed the companies into rehabilitation, so he "bears some responsibility" for anything that followed. Doc.

245 at 24–25. "Some responsibility" is not proximate causation, and that reasoning would make a defendant answerable for every discretionary act of every fiduciary for as long as a receivership lasts. The MVRA does not extend that far.

F. The refusal of the Montshire/Alban transaction (2023).

As recently as 2023, Mr. Lindberg negotiated with Montshire Advisors and an investor group formed by Bob Alban to present a purchase agreement to the NCDOI for the NCICs — a transaction that, like Ares and Oaktree, would have paid policyholders in full, retired the affiliated loans, and allowed the companies to exit rehabilitation and avoid liquidation entirely. The Rehabilitator not only rejected the offer; he sued Mr. Alban to stop it. This transaction alone breaks the chain of proximate causation. The Second Supplement mentions neither Montshire nor Mr.

Alban. See Doc. 174 ¶ 116.

G. The blocking of the Quadro transaction (first quarter 2024).

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at $880 million and the Specified Affiliated Companies in the billions, at a 22.14x EBITDA multiple consistent with public-market comparables. That transaction was blocked over Mr. Lindberg's objection. Its rejection in the first quarter of 2024 alone breaks the chain of proximate causation, and the 22.14x public-market comparables remain valid and accurate today, placing the group's value well above any restitution figure the Special Master proposes. The Second Supplement does not mention Quadro even once. That silence is significant: the Special Master rests his valuation conclusions on older figures while omitting the most recent arm's-length, signed, public-market-benchmarked valuation in the record. See Doc.

235 ¶ 32; Doc. 174 ¶ 117.

To the extent the Court concludes that the causation questions cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

VI. THE CONVERGING 2018 VALUATIONS REFUTE THE REPORT'S

CONCLUSORY DISMISSAL OF NCIC VALUE

Whose burden. The value of the insurance companies goes to the amount of loss, which is the Government's to prove. The Second Supplement answers Issue 11 by saying it "has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018." Doc. 245 at 18. That is a statement about Mr. Lindberg's proof, not about the Government's.

On the value of the NCICs when control was transferred, the Second Supplement says only that the Special Master "(albeit with the benefit of perfect hindsight vision) has not seen convincing evidence that the North Carolina Insurance Companies were worth $454 million in 2018," Doc. 245 at 18, while admitting in the accompanying footnote:

"The Special Master has not ventured to look behind the valuation report to determine what alleged facts or representations upon which the appraiser may have relied or what other assumptions the appraiser may have made." Doc. 245 at 18 n.15.

A conclusion that evidence is unconvincing, reached expressly without examining it, is not a finding. And the value does not rest on one document. Three independent 2018 data points converge:

• The KPMG appraisal. KPMG LLP's Economic and Valuation Services practice appraised the equity of Global Bankers Insurance Group's insurance entities as of December 31, 2017, issuing its report on August 24, 2018. KPMG concluded the fair value of a 100% controlling, marketable equity interest in each company: Colorado Bankers Life Insurance Company,

$380,500,000; Bankers Life Insurance Company, $57,500,000; Southland National Insurance Corporation, $29,000,000; and Southland National Reinsurance Corporation, $46,500,000 — $467,000,000 for CBL, BLIC and SNIC together, and $513,500,000 including SNRC. The report was prepared as a Restricted Appraisal Report under Standards 202, 8-2 and 10-2 of the Uniform Standards of Professional Appraisal Practice, and KPMG understood that the resulting balance sheet would be "utilized by the North Carolina

Department of Insurance to satisfy certain regulatory requirements" relating to Mr. Lindberg's ownership of the companies. The Second Supplement never mentions KPMG. See Doc. 235 ¶¶ 13–15, 18–19.

• The Rehabilitator's own internal valuation. The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018 — eighteen days after the transfer. The Special Master acknowledges this was "a valuation done by the neutral fiduciaries that assumed control."

Doc. 245 at 18.

• The Ares letter of intent. The executed November 22, 2018 Ares proposal valued the NCICs in the same range on arm's-length, third-party transaction terms. The Second Supplement never mentions it. See Doc. 235 ¶ 26.

One of these comes from a nationally recognized valuation firm, one from the victims' own fiduciaries, and one from the market. Against them the Special Master offers no appraisal, no expert, and an express refusal to examine the record. His observation that the NCIC equity "has no value today," Doc. 245 at 19, confirms rather than answers the point: the question is the value at the moment control passed, before the intervening acts that destroyed it.

VII. THE SPECIAL MASTER'S OWN VALUATIONS ARE A "CURRENT GUESS,"

HAVE BEEN CUT BY A THIRD, AND ARE OFFERED UNDER SEAL

Whose burden. The value of the assets available to satisfy restitution, like the amount of loss, must be proved — not guessed. The Government offers no valuation of its own and relies on the Special Master's "current guess," Doc. 245 at 37, itself resting on a "desktop exercise," id. at 36. An unproved estimate does not discharge a burden of proof.

The Second Supplement's treatment of the assets available to satisfy restitution is where the due-process problem is starkest. In the Initial Report, the Special Master estimated the Primary Restitution Assets at $1.162 billion (low), $1.454 billion (mid), and $1.878 billion (high). Doc. 106 at 30. In the Second Supplement, without any independent appraisal, he reduces those figures to:

Redacted

That is a reduction of roughly half a billion at the midpoint — approximately thirty-one percent — accomplished in a single chart. The Special Master describes the basis for these numbers in his own words. They are derived from "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," which "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," and which are "subject to change." Doc. 245 at 36 n.31. He characterizes the result as his "current guess." Id. at 36–37. And he proposes to file the explanation for the reduction under seal, on the ground that disclosure "would negatively impact liquidation efforts." Id. at 36 n.32.

Three consequences follow. First, there is no independent, third-party valuation anywhere in the Second Supplement from a nationally recognized firm such as KPMG or Houlihan Lokey. The only valuation input comes from the financial advisors to NHC Holdings, LLC — the entity that holds and disposes of the very assets being valued. Mr. Lindberg, by contrast, has offered only valuations grounded in nationally recognized firms, the fiduciaries' own work, or arm's-length transaction data. See Doc. 235 ¶¶ 12–19.

Second, the effect of holding the restitution figure high while cutting the asset estimate is to manufacture an apparent shortfall. On the Special Master's own numbers, restitution of $1.616 billion now exceeds his midpoint asset estimate of $998 million by more than $600 million. That gap is the predicate a forfeiture theory requires. See 18 U.S.C. § 981; 21 U.S.C. § 853. It is produced by an unreduced restitution figure that ignores some $2.9 billion in offsets on one side,2 and a self-generated "guess" on the other.

The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

Third, a defendant cannot meaningfully contest a valuation whose underlying analysis he has never seen. Due process requires that a criminal penalty of this magnitude rest on a credible valuation subject to adversarial testing. An officer who generates the restitution figure, generates the only asset estimates in the record, is compensated from the assets in question, and asks this Court to accept a "guess" explained only in camera is not a neutral source for either number. "[N]o man can be a judge in his own case." In re Murchison, 349 U.S. 133, 136 (1955). The consequence is not that the Court should commission a better valuation. The consequence is that the Government has not proved the loss. The only valuation in the record is the Special Master's own "current guess," Doc. 245 at 37, and the Court may not enter a criminal penalty on a guess. Because the burden of proving the amount of loss by a preponderance is the Government's, 18 U.S.C. § 3664(e), and because that burden cannot be carried by an estimate its author disclaims and files under seal, the recommendation fails as proposed and must be rejected. It is not the Court's task to build the record the Government did not.

To the extent the Court concludes that the value of the restitution assets cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

## VIII. THE RECOMMENDATION MEASURES EXPOSURE, NOT REALIZED LOSS

Whose burden. That the recommended figure measures outstanding principal rather than realized loss is a defect in the Government's proof of the amount of loss under § 3664(e), not a credit Mr. Lindberg must earn.

The Special Master responds to Mr. Lindberg's argument that risk is not loss by asserting that his "methodology for calculating restitution in this Case includes no risk, only actual loss," because the figure "includes only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. That answer concedes the premise. A measure of sums taken

and not yet repaid is a measure of outstanding loan principal — the same metric the Report elsewhere describes as the amount "extracted" — not a measure of what the victims actually lost. It takes no account of the collateral and principal protection the loans carried, of the guarantee behind them, or of the recoveries the victims in fact received; and it treats

the unpaid balance of a secured, insured, and guaranteed obligation as though it were cash simply removed.

The MVRA compensates realized pecuniary loss, not exposure and not disappointed expectations. Hughey, 495 U.S. at 413; Stone, 866 F.3d at 226. On this record the protected policyholders have been paid: Mr. Lindberg's conduct in 2025 facilitated more than $157 million in distributions to over 43,000 excess policyholders, and he relinquished a $40 million tax escrow to allow it. Restitution measured as unpaid principle, unreduced by the value returned, is a windfall the statute forbids. See Doc. 174 ¶ 120 (December 2025 distribution of more than $157 million to more than 43,000 policyholders).

IX. MANDATORY OFFSETS AND CREDITS INDEPENDENTLY REDUCE ANY RESTITUTION TO ZERO

Whose burden. This Part, and this Part alone, addresses the one burden that is Mr.

Lindberg's. Once the Government has proved loss and causation, he must establish entitlement to a particular offset. Karam, 201 F.3d at 327. He does not contest that allocation. He shows below that he has carried it where the Government has not obstructed the proof, that two of these credits were deferred rather than denied on a condition the statute does not contain, and that the one category on which the Report demands more documentation is the category whose documents the Government is withholding.

Even if loss and causation were established, restitution must be reduced by amounts returned to or recovered by the victims. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); Robers, 572 U.S. at 645; Steele, 897 F.3d at 611. Mr. Lindberg has documented offsets aggregating

approximately $2.89 billion, 3 which if credited yield net restitution of zero. Of that sum, the Second Supplement allows $39 million — approximately 1.3% — and it trims even the items it accepts, reducing the CBL preferred-equity credit from $29.5 million to $26 million, the BLIC credit from $4.2 million to $3 million, and the PBLA credit from $21.9 million to $3 million. Doc.

245 at 12–13.

The complete schedule of offsets, credits and reductions — updating the summary chart filed at Doc. 132 at 11 and Doc. 132 Ex. 2 for the $866 million loss on the Beckett sale (see note 1, supra) — is set out below. (The Special Master's proposed figure has since become $1,616,175,000. Doc. 245 at 6.)

Item (references are to Doc. 132) Amount Ref.

Special Master's Proposed Restitution $1,625,000,000 — Figure Improper Additions to Affiliate I.

Investment Balances Pre-Judgment Interest ($263,000,000) I.A Corrected Starting Balance of ($141,000,000) I.B Affiliate Investments Additional Credits II.

AAPC Preferred Equity Par Value as ($352,906,240) II.A of May 26, 2026 SNIC Payments ($27,823,425) II.B Cash Payments to Pre-Designated ($79,655,289) II.C Restitution Parties Not Captured by the Special Master CBL Subordination Fee (Beckett ($3,000,000) II.D refinancing) Additional Clanwilliam Sale ($20,000,000) II.E Proceeds ULICO Sale of Contributed Real ($13,596,013) II.F Estate Sale Proceeds of Zero-Coupon Bonds ($243,452,385) II.G in PPNs Value of NCICs as of October 2018 ($454,000,000) Exh. 1 Bermuda ICs' Proceeds from Sales of ($9,800,076) Exh. 1 Affiliated Assets Losses Not Proximately Caused by III.

Mr. Lindberg Loss on Agera ($129,398,324) III.

ECL Losses ($22,288,826) Exh. 1

The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

Loss on UKAT ($39,000,000) Exh. 1 Insurance-Holdco Debt Portion ($14,897,805) Exh. 1 Loss on Clanwilliam Below-Market ($474,000,000) Exh. 1 Sale Loss on Early Zero Coupon Bond ($611,600,000) Exh. 1 Sales Loss on Beckett Sale ($866,000,000) Note 1, supra; Exs. 6(a)–6(c)

| | |
|---|---|
| TOTAL MINIMUM OFFSETS AND REDUCTIONS | ($3,765,418,383) |
| NET RESTITUTION OWED | $0 |

A. The ULICO preferred equity ($352,906,240).

ULICO accepted $25 million and a transfer of AAPC preferred equity in partial satisfaction of its $524 million civil judgment, with an agreed dollar-for-dollar credit; that equity carried a par value of $352,906,240 as of May 26, 2026. The Special Master defers any credit until ULICO "realizes this value," Doc. 245 at 6 n.3, reasoning that ULICO "has not unreasonably refused to liquidate this asset," id. at 15–16. Section 3664(j)(2) contains no realization condition, and the practical result is a double recovery: ULICO retains both the preferred equity and its claim for the full amount. Steele, 897 F.3d at 611. If the asset is genuinely unmarketable, that is a consequence of restrictions the victim accepted, not a reason to charge Mr. Lindberg twice. Nor may the Court enter a figure that defers a mandatory credit: 18 U.S.C. § 3664(j)(2) contains no such condition, and a recommendation that withholds credits the statute makes mandatory is contrary to law and must be rejected as proposed — not entered subject to later adjustment.

B. The zero-coupon bond proceeds ($243 million) — denied for want of documents the Government withholds.

The Special Master denies this credit because Mr. Lindberg "has failed to present sufficient documentation to the Special Master to enable the Special Master to appraise … the quantity of any potential reductions." Doc. 245 at 12–13. He denies the $9.4 million Finnazen/Blue Violet credit on the same basis. Id. at 12–13. And he rejects the $141 million starting-balance correction notwithstanding the NCICs' own verified pleadings and pretrial stipulation reciting approximately $1.25 billion.

This is the due process core of the matter. Mr. Lindberg is in the custody of the Bureau of Prisons. He surrendered control of his companies, together with their books and records, on four separate occasions beginning in October 2018. The records that would document the zero-coupon proceeds, the affiliated-loan starting balances, and the Finnazen/Blue Violet payments have been in others' hands ever since. Mr. Lindberg sought subpoenas to obtain them, and the Government opposed. The Special Master cannot fairly deny credits for insufficient documentation while the Government blocks access to the documentation, and the Court cannot find a $1.6 billion loss by a preponderance on a record assembled under those conditions. See Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents); Doc. 235 ¶ 15 (control of the insurers passed to State administrative supervision on October 18, 2018); Doc. 245 at 11, 13; Doc. 248 (the pending motion for subpoenas duces tecum for those records); Doc. 202 (the pending motion for access to a

computer, the internet, and the financial records). That is not a failure of Mr. Lindberg's offset proof; it is a failure of the Government's loss proof and a denial of due process. The Court cannot find the net amount by a preponderance on a record the Government has closed, and the item must be resolved against the party bearing the burden.

C. Prejudgment interest ($263 million).

The Second Supplement adds approximately $263 million in interest, defending it as "necessary to make the victims whole" and noting that the rate is below the contractual and IALA rates and below the applicable federal rate. Doc. 245 at 14–15. Rate moderation is not authority. The component rests on a 2.19% rate — the 30-Day United States Treasury rate from June 27, 2019 through March 31, 2026 — applied to the Affiliate Investment balances as "post-IALA interest" to account for "the time value of money." Doc. 106 at 3–4 & App'x 3 at 8. Interest, if it is recoverable at all, is a component of the amount of loss, and the amount of loss is the Government's to prove. 18 U.S.C. § 3664(e).

As a threshold matter, the MVRA does not include interest among the compensable forms of financial loss recoverable through restitution, and the prosecuting Department's own published policy says the same: it excludes interest as a "financial loss" and states that interest is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (updated Oct. 10, 2023). The Second Supplement neither disputes that the policy exists nor identifies statutory text authorizing the charge.

An award of interest is also contrary to the plain language of the statute. The MVRA requires "offenders to restore property lost by their victims as a result of the crime." Robers v. United States, 572 U.S. 639, 640 (2014). It supplies two mechanisms, and only two. The court may order the defendant to "return the property to the owner," 18 U.S.C. § 3663A(b)(1)(A); or, "if return of the property … is impossible, impracticable, or inadequate," it may order payment of "the greater of (I) the value of the property on the date of the [loss]; or (II) the value of the property on the date of sentence," less the value of any part of the property that is returned, id. § 3663A(b)(1)(B). Subsection (b)(1)(A) contains no provision for adding interest where the defendant can return the property taken. Where the property is cash, subsection (b)(1)(A) is the operative provision: as Robers explains, if "the 'property' that was 'damage[d],' 'los[t],' or 'destr[oyed]' was the money, then 'the property … returned' must also be the money," and "[m]oney being fungible," the return of an equivalent sum satisfies the statute. 572 U.S. at 643. Subsection (b)(1)(B) addresses the different case of substitute property. What the Pre-Designated Restitution Parties lost was cash — the money taken out of the companies through the Affiliate Investments — and an order directing its return satisfies the MVRA without more.

The decisions permitting prejudgment interest do not bind this Court, and each rests on the subsection that does not apply here. See United States v. Qurashi, 634 F.3d 699, 703–04 (2d Cir. 2011); United States v. Fike, 140 F.4th 351, 356 (6th Cir. 2025) (collecting cases). Both proceed from § 3663A(b)(1)(B) and from its premise that a victim's losses may change in value between the date of the loss and the date of sentencing. Fike, 140 F.4th at 356; Qurashi, 634 F.3d at 703. That premise governs substitute property. It has no work to do where the victim lost cash that the defendant can return.

The Fourth Circuit has not decided this question under the MVRA. The Special Master relies on United States v. Hoyle, 33 F.3d 415, 420 (4th Cir. 1994). Doc. 106, App'x 3 at 10. Hoyle held that interest excluded from the Guidelines loss calculation could nonetheless be included in a restitution award. But it was decided in 1994, under the Victim and Witness

Protection Act and before the MVRA was enacted, and it did not construe § 3663A(b)(1). It therefore does not answer whether the MVRA's return-the-property mechanism permits an interest add-on.

Finally, interest is not part of these victims' actual loss. Criminal restitution "is not concerned with a victim's disappointed expectations but only with his actual loss," and the MVRA "is not the vehicle to obtain what would, in effect, be expectation damages." United States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006); accord Stone, 866 F.3d at 226. Nor may restitution "include consequential damages." United States v. Coats, 487 B.R. 648, 653 (E.D.N.C. 2013). The $263 million is expectation, not loss: it compensates for the time value of money across the years the insurance companies carried the Affiliate Investments. Including only the principal amount redresses the actual loss caused by the offense without imposing punishment the MVRA does not authorize. The interest component should be struck.

D. Losses not proximately caused by the offense.

The Agera loss (approximately $129 million) arose from exposure Mr. Lindberg inherited and did not originate — as the Special Master concedes on the timing, Doc. 245 at 19 — and from the independent fraud of Agera's chief financial officer. The UKAT loss (approximately $39 million) followed the fiduciaries' refusal of a refinancing. The ECL and Insurance-Holdco items rest on transactions Mr. Lindberg did not direct. None of these losses is "closely related" to the conduct constituting the offense of conviction.

To the extent the Court concludes that the offsets and the net amount of loss cannot be resolved on the present record, 18 U.S.C. § 3663A(c)(3)(B) directs that the question be resolved by declining restitution — not by prolonging the proceeding — and any irreducible complexity falls on the Government as the party bearing the burden. 18 U.S.C. § 3664(e).

X. THERE WAS NO WAIVER

The Second Supplement advances waiver at least five times, asserting that Mr. Lindberg waived the new arguments in his supplemental filings (Doc. 245 at 7); waived his objection to the unexplained $30 million increase first appearing in the First Supplement (Doc. 146) (id. at 24–25); waived his complaints about access to counsel and documents (id. at 28); waived his causation and foreseeability arguments "by failing to raise them with the Court prior to sentencing or prior to entry of the Preliminary Restitution Order, by agreeing to the Special Master process, and by pleading guilty to these crimes" (id. at 29–30, 30); and waived his constitutional arguments "by consenting to the special master process … and using his cooperation with the special master process to obtain a reduced sentence," such that it would be "unconscionable" to permit them now (id. at 32–33).

No waiver occurred, on any of these theories. The plea agreement contains no waiver of causation or of the right to contest the amount of restitution; it obliges Mr. Lindberg to pay full

restitution without fixing any amount. The operative promise is "[t]o entry of an order for monetary penalties due and payable immediately, such penalties including full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," including a promise "to pay full restitution to the following insurance companies and their impacted policyholders for the conduct charged in the Bill of Indictment." Plea Agreement ¶ 10(a) (Doc. 40). No dollar amount appears anywhere in the agreement; the only stipulated figure is the Guidelines loss figure, and the plea provides in the same paragraph that "'loss' under U.S.S.G. §§ 2B1.1 may be different from, greater, or

lesser than restitution under 18 U.S.C. § 3556." Id. ¶ 8(a). The parties jointly agreed to bifurcate sentencing from restitution, and this Court's order contemplates a separate restitution proceeding — which is precisely why these arguments are presented now rather than earlier. A preliminary restitution order is by design provisional and subject to finalization. That construction was pressed before this Court at length in the Memorandum in Support of Mr. Lindberg's Motion to Stay, which argued that "Paragraph 10(a) Is Construed Against the Government as Its Drafter and Does Not Waive the MVRA's Causation Requirement," and that "nothing in ¶ 10(a) purports to displace" the statutory standard, which "remains the Government's to prove, § 3664(e), subject to this Court's de novo review, § 3664(d)(6)." Doc. 173 at 24, 25; see Doc. 172 (Motion to Stay, filed June 9, 2026); Doc. 190 (renewed Motion to Stay, filed June 11, 2026). Manrique v. United States, 581 U.S. 116 (2017); Dolan v. United States, 560 U.S. 605 (2010). Agreeing to a special-master process to assist the Court is not a waiver of the statutory and constitutional limits on what that process may produce; a defendant does not forfeit the MVRA's causation requirement by consenting to an orderly

procedure for applying it. And pleading guilty establishes the offense — not the amount of loss, which the factual basis leaves open. (Doc. 42).4 Far from waiving anything, Mr. Lindberg has expressly reserved and preserved his rights in every filing: Mr. Lindberg "respectfully reserves all rights to supplement this Response with additional factual information … prior to" the final restitution hearing (Doc. 132 at 25 n.9); the Supplemental Statement of Facts devotes an entire section to "Preservation of Error for Appellate Review" and another to "Reservation of Rights" (Doc. 174 ¶¶ 126–127); and the Motion to Dismiss reserves the de novo causation and offset determination and preserves the constitutional questions (Doc. 234

The Factual Basis (Doc. 42, filed Nov. 11, 2024) stipulates no loss amount and no restitution figure. It recites that it "does not attempt to set forth all of the facts known to the United States at this time," and that "the parties expressly agree that there is a factual basis for the guilty plea(s) that the defendant will tender pursuant to the Plea Agreement, that the defendant is in fact guilty of the charges contained in Counts 1 and 13 of the Indictment as alleged, and that the facts set forth in this Factual Basis are sufficient to establish all of the elements of the crime(s) beyond a reasonable doubt." Doc. 42 at 1. Its substantive recitations, in full: "1. Defendant GREG E. LINDBERG ('LINDBERG') held ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than one hundred holding and pass-through entities (collectively, 'Affiliated Companies'). One of LINDBERG'S holding companies, Southland National Holdings ('SNH') was the holding company for his North Carolina-based insurance companies, including Colorado Bankers Life Insurance Company ('CBLIC'), Bankers Life Insurance Company ('BLIC'), Southland National Insurance Company ('SNIC'), and Private Bankers Life and Annuity Co., Ltd. ('PBLA'). LINDBERG also owned other insurance companies, including Omnia Ltd.; Northstar Financial Services (Bermuda) Ltd.; and PB Investment Holdings Ltd. During certain relevant periods, LINDBERG was the Chairman and on the board of his insurance companies and was a director of a Malta-based investment adviser that he owned, Standard Advisory Services Limited ('SASL'), which was registered with the United States Securities and Exchange Commission. 2. Nearly all of PBLA's business was related to a reinsurance agreement it entered into on or about June 30, 2017, with Universal Life Insurance Company ('ULICO'). ULICO was an insurance company with its principal place of business in Puerto Rico. As part of the PBLA-ULICO Reinsurance Agreement, PBLA established a ULICO 2017 Trust (the 'ULICO 2017 Trust')

and a separate Comfort Trust Account (the 'ULICO Comfort Trust'). The PBLA-ULICO Reinsurance Agreement set forth numerous requirements governing the types of investments that could be made in the ULICO 2017 Trust and the Comfort Trust and the periodic reporting and certification that PBLA had to make to ULICO concerning the assets in these accounts. 3. From no later than 2016 through at least 2019, LINDBERG and others conspired to commit various offenses against the United States, specifically crimes in connection with insurance business, wire fraud, and investment adviser fraud. LINDBERG also conspired with others to engage in monetary transactions affecting interstate and foreign commerce of more than $10,000, which involved the proceeds of various specified unlawful activities, knowing that the funds involved in the monetary transactions represented the proceeds of some form of unlawful activity.

4. LINDBERG knowingly and willfully joined each conspiracy with an intent to further its objects, i.e., (1) to commit offenses

against the United States, specifically violations of 18 U.S.C. §§ 1033, 1343, and 15 U.S.C. §§ 80b-6 and 80b-17; and (2) to engage in monetary transactions in property derived from specified unlawful activities in violation of 18 U.S.C. § 1957. 5. To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions. 6. LINDBERG's conduct caused substantial financial hardship to his insurance companies, to third parties like ULICO, and to policyholders. As a result, certain of LINDBERG's insurance companies were placed in rehabilitation and PBLA was placed into liquidation. 7. In furtherance of the conspiracies, and to accomplish the objects thereof, LINDBERG and his co-conspirators each committed one or more overt acts in the Western District of North Carolina and elsewhere." Doc. 42 at 1–2. Nowhere does the Factual Basis state a loss amount, a restitution amount, or that any particular loss was reasonably foreseeable.

nn.1, 3); the objections to the Special Master's Report were further pressed on the record in Mr. Lindberg's Response to Third Parties' Objections to the Special Master's Report and Recommendation (Doc. 151, filed May 18, 2026); and the causation, offset, and constitutional objections were renewed in the Motion to Stay and its supporting Memorandum (Docs. 172, 173, filed June 9, 2026) and in the renewed Motion to Stay (Doc. 190, filed June 11, 2026). A party who reserves rights in terms in every filing has not waived them and characterizing that record as waiver does not make it so. Part XIX, infra, states two further express reservations arising from the denial of database and records access.

The procedural history compounds the point. The Order Appointing the Special Master directed him to consult with Mr. Lindberg. He never once spoke with him. His answer is that his team "had repeated discussions with the Defendant's counsel" and that counsel reviewed a draft of the Initial Report, Doc. 245 at 28 — which confirms rather than refutes the point. Mr. Lindberg was given a single day to respond to the final report, from BOP custody, without counsel and without a copy of it; the report was then filed early. The Second Supplement itself records that "the Defendant's counsel would not be able to confer with the Defendant about the positions taken, and relief requested, … before the deadline."

Doc. 245 at 44. A defendant who was never consulted, never given the documents, and never given time cannot be said to have waived what he had no opportunity to raise.

## XI. THE REHABILITATION PLAN WAS NEVER A LIQUIDATION PLAN

The Second Supplement asserts repeatedly that "the Defendant's own actions caused the North Carolina Insurance Companies to be placed into rehabilitation and then liquidation." Doc. 245 at 19; see id. at 21–22, 24–25. That statement conflates two different events. The June 2019 consent order placed the companies into rehabilitation, not liquidation, and rehabilitation contemplated their emergence. Liquidation came later, and it came because every value-preserving

alternative was refused: Ares in 2018, Oaktree in 2019, Montshire/Alban in 2023, and Quadro in 2024. Mr. Lindberg litigated for years against liquidation and continued proposing transactions that would have allowed the companies to exit rehabilitation and avoid liquidation entirely. Restitution cannot rest on the proposition that a defendant caused an outcome he spent six years and four transactions attempting to prevent.

## XII. COMPLEXITY MUST BE RESOLVED IN MR. LINDBERG'S FAVOR

Finally, if the Court concludes that the causation and offset questions cannot be resolved on this record, that conclusion favors Mr. Lindberg. The MVRA permits the Court to decline restitution where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). The Special Master's own submission illustrates the difficulty: he concedes the facts, disclaims the foreseeability inquiry, abstains from reviewing the fiduciaries' decisions, and values the assets by "guess." Because the plea agreement fixed no amount, Plea Agreement ¶ 10(a) (Doc. 40) — leaving open that the amount could be zero — any irreducible complexity must be resolved against the party bearing the burden, which is the Government.

## XIII. THE SECOND SUPPLEMENT FAILS THE MVRA'S REQUIREMENT OF AN ACCOUNTING OF THE RESTITUTION AMOUNT

Separate from the defects in causation and offset analysis addressed above, the Second Supplement suffers from a more elementary failure: after eighteen months of work, and after the relevant books and records were out of Mr. Lindberg's control for more than seven years, the Special Master has never produced an accounting of the restitution amount he asks this Court to impose. The MVRA does not treat an accounting as an administrative courtesy. It makes the accounting the predicate for everything that follows, and its absence deprives the Court of the means to make the findings § 3664(e) requires.

### A. The statute makes an accounting the predicate for the Court's determination.

The MVRA's architecture is sequential. Section 3664(a) directs that the Court be provided a report containing "to the extent practicable, a complete accounting of the losses to each victim." Section 3664(d)(5) contemplates the Court setting a date for "the final determination of the victim's losses." Section 3664(e) commits "[a]ny dispute as to the proper amount or type of restitution" to resolution "by the court by the preponderance of the evidence." Section 3664(d)(6) confines a special master to "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Section 3664(f)(1)(A) requires an order in the full amount of each victim's losses, and § 3664(o) makes the resulting order a final judgment. Only upon entry of judgment do the

collection mechanisms attach. 18 U.S.C. § 3613(c); id. § 3664(m)(1)(A). The order is not optional: accounting precedes determination, determination precedes judgment, and judgment precedes collection. A recommendation unsupported by an accounting asks this Court to perform the second step without the first. Because a federal court has no inherent power to order restitution and must act within "the procedural and substantive protections of the statute authorizing restitution," United States v. Freeman, 741 F.3d 426, 431 (4th Cir. 2014), a restitution figure fixed without the accounting the statute presupposes is fixed outside the statute — and an order "that exceeds the authority of the statutory source is no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting Broughton-Jones, 71 F.3d at 1147). That consequence is not theoretical, because MVRA restitution "is plainly criminal punishment." Ellingburg v. United States, 607 U.S.

163, 166 (2026).

B. No accounting of any component of the recommendation has ever been produced.

The Special Master and the Rehabilitator have controlled the books and records of the North Carolina insurance companies since October 2018, and of New Hold Co, LLC and its subsidiaries since October 2024. In that time they have produced nothing that would allow this Court, the parties, or an independent reviewer to test the restitution figure, the asset values, or the disposition of proceeds. The gaps are specific, and together they are total:

• No accounting of the restitution calculation. There is no accounting showing how the recommended figure was derived. The Preliminary Order fixed $1.655 billion — $30 million above the Special Master's own $1.625 billion recommendation — and the Second Supplement now recommends $1.616 billion. Doc. 245 at 44. None of these figures is accompanied by a reconciliation the Court could audit, and each embeds approximately $263 million of interest selected over objection and contrary to the Department of Justice's own policy that interest is not eligible for restitution.

• No reconciliation of the affiliated-loan payoffs. The affiliated-loan account records have been under the Rehabilitator's control since October 2018, and the payoffs of those loans have never been reconciled. Those payoffs bear directly on the principal balance underlying the entire recommendation — a balance the Defendant has shown is overstated by at least $141 million, and which the Second Supplement declines to correct.

Doc. 245 at 6, 15.

• No accounting of the Beckett proceeds. The Beckett asset was worth around $1 billion — as reflected in the Cabrillo valuation and the Blackstone negotiations, see note 7, supra — and was sold to Collectors in December 2025 for just $134 million. Defendant's counsel learned of the sale orally, in a weekly meeting. No accounting of the proceeds has ever been provided, and it remains undisclosed whether they were applied to restitution, to administrative expenses, to the Special Master's professionals, or otherwise. The Second Supplement does not supply that accounting; it says only that the sale occurred with the consent of NHC Holdings, LLC.

Doc. 245 at 31 & n.29.

• No financial statements or board reports. Despite repeated requests, no income statements, balance sheets, cash-flow statements, or board reports have been produced for any Primary Restitution Asset or any Specified Affiliated Company — the very records required to value those assets and to test the assertions the Report makes about them.

• No supporting asset valuations. No appraisal, valuation report, or workpaper supports any figure in the Report. What is offered instead is a self-generated range, now revised downward to $826 million / $998 million / $1.231 billion, which the Special Master describes as his "current guess."

Doc. 245 at 36–37. See Part XIV, infra.

• No accounting of the offsets. The Special Master has never accounted for, or substantively answered, the approximately $2.89 billion in offsets and credits the Defendant has documented.5 The Second Supplement allows $39 million of that sum — about 1.3% — and disposes of the remainder by disallowance, deferral, or a statement that documentation is insufficient.

Doc. 245 at 6, 11, 13, 44.

C. Without an accounting, the mandatory credits cannot be computed and the no-windfall rule cannot be honored.

The accounting requirement is not formalism; it is the mechanism by which the statute's mandatory credits are given effect. Restitution must be reduced by amounts the victims have recovered for the same loss. 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); Robers v. United States, 572 U.S. 639, 645 (2014); United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018). A defendant is entitled to an offset for amounts victims recovered in related civil proceedings. United States v. Ritchie, 858 F.3d 201, 215–16 (4th Cir. 2017). And the MVRA "does not allow a court to grant a windfall to the victim." United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017). The Order Appointing the Special Master says the same thing, directing that restitution "should be reduced by any amount victims have recovered for the same losses." Doc. 56 at 6 n.2. None of those commands can be applied on this record. Whether a victim has been made whole, whether a recovery duplicates a claimed loss, and whether the proceeds of a sale were credited against restitution or consumed by administrative expense are all questions that require an accounting of what was sold, what was collected, and where the money went. The Clanwilliam disposition illustrates the problem: of roughly $318 million in estimated net proceeds, $23,520,710

The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

was distributed to an entity the Special Master conceded he "is unsure" is a victim at all, and a $14,112,426 administrative reserve generated no credit to the Defendant — all under a formula the Special Master acknowledged "almost certainly will deviate" from the apportionment this Court will ultimately approve. Doc. 66 ¶¶ 20(d)(i), 24, 26 n.8. A distribution the Special Master himself expects to be wrong, made from proceeds never accounted for, cannot support a finding by a preponderance of the evidence.

D. The Report's promise to track credits in the future is not a substitute for the accounting now.

The Second Supplement's answer to the absence of an accounting is deferral. The two largest credits are "Disallow[ed] at this Time," to be revisited "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. As to the assets, the Special Master proposes that the Defendant "receive credits reducing his restitution obligations as those assets generate recoveries for victims, which would be tracked and reported to the Court by the Special Master over time." Id. at 37. That

structure inverts the statute. Section 3664(e) requires the amount to be resolved now, by this Court, on a preponderance of the evidence; it does not authorize entry of a $1.616 billion judgment against an unaudited estimate with the reconciliation to follow at the discretion of the officer who generated the estimate. A defendant subjected to criminal punishment is entitled to know, and to contest, the arithmetic of that punishment before it is imposed — not after his assets have been sold to satisfy it.

The absence of an accounting is not an invitation for the Court to order one and then impose restitution. The statute places the accounting obligation on the moving side, 18 U.S.C. § 3664(a), and § 3664(e) requires the amount to be proved to the Court, not assembled by the Court. No accounting exists. The Court cannot find a $1.616 billion loss by a preponderance on a record that contains no reconciliation of a single component, and it should decline to do so.

## XIV. THE SPECIAL MASTER'S PURPORTED VALUATIONS MEET NONE OF THE STANDARDS FOR VALUATION EVIDENCE IN FEDERAL COURT

Part VII describes what the Second Supplement's valuations are: a self-generated range, cut by roughly a third without explanation, which the Special Master calls his "current guess." This Part addresses what they are not — evidence on which a federal court may rest a finding of fact. Measured against any standard federal courts apply to valuation proof, the Report's figures fail; and the valuations the Defendant has offered satisfy those standards in every particular.

### A. The governing standard is reliability, and it is not satisfied by assertion.

The Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3). But that latitude has never meant that a sentencing court may find facts on unreliable information. The Court may consider information "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Section 3664(e) independently requires that disputed restitution amounts be resolved by a preponderance of the evidence — a standard that presupposes evidence. And due process forbids fixing criminal punishment on figures that cannot be examined or tested.

The same standards govern the restitution determination specifically. The MVRA provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," and places "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense … on the attorney for the Government." 18 U.S.C. § 3664(e). The breadth of the information a sentencing court may receive, see 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct" of the defendant that the court "may receive and consider"), has never diluted the requirement that what the court relies on be accurate and reliable: a sentence may not rest on "misinformation of constitutional magnitude," United States v. Tucker, 404 U.S. 443, 447 (1972),

or on assumptions that are "materially untrue," Townsend v. Burke, 334 U.S. 736, 741 (1948). The preponderance standard "generally satisfies due process" at sentencing, United States v. Watts, 519 U.S. 148, 156 (1997) (per curiam), but it presupposes record evidence that can be weighed: the Guidelines direct that disputed facts be established by information bearing "sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), and the accompanying commentary instructs that "[u]nreliable allegations shall

not be considered." U.S.S.G. § 6A1.3 cmt. An unexplained "current guess," produced by an interested source and insulated from testing, does not meet any of these standards.

Where the disputed fact is the value of a business, federal courts look for the same markers of reliability whether the question arises under Rule 702 or under the sentencing standard: an identified and qualified valuator; a disclosed and recognized methodology, such as a market, income, or asset approach; sufficient underlying data; and a result the opposing party and the court can test. Expert opinion is admissible only if it rests on "sufficient facts or data" and "reliable principles and methods" reliably applied, Fed. R. Evid. 702, and that reliability inquiry applies to all specialized opinion, not merely scientific testimony, Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); see Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Most directly on point here, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Congress has embodied the same instinct in the statutes governing judicial sales, requiring that realty sold under order of a federal court be appraised in advance by three disinterested persons, and permitting confirmation only where the price bears a reasonable relation to the appraised value; personalty is governed by the same provisions. 28 U.S.C. §§ 2001, 2004.

B. The Report's valuations fail every one of those markers.

Applied here, the analysis is short, because the Special Master disqualifies his own figures. By his own description, the estimates rest on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC," and those analyses:

"do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise employing discounted cash flow methodologies, comparable transaction analyses, and the financial projections provided by portfolio company management. … Estimated values are subject to change and actual results may materially vary." Doc. 245 at 36 n.31.

He then characterizes the output as his "current guess." Doc. 245 at 36–37. Taking those admissions at face value, the Report's valuations are not a formal valuation; not a fairness opinion; the product of a "desktop exercise"; built on projections supplied by the management of the companies being valued; and, subject to change. No valuator is identified. No report, appraisal, or workpaper has been produced. No methodology is disclosed beyond the generic naming of two techniques. No underlying data has been made available. No one has been offered for examination. And the explanation for the roughly thirty-one percent reduction from the Initial Report's range is to be filed under seal, Doc. 245 at 36 & n.32 — meaning the one document that might permit testing of the figure is the one document the Defendant may not see. A number connected to the record by nothing but its author's say-so is the paradigm of ipse dixit. Joiner, 522 U.S. at 146. It is not evidence, and it cannot carry a finding by a preponderance.

C. The valuations come from an interested source, which compounds rather than cures the problem.

Reliability also depends on the source. Due process forbids an adjudicator from having "a direct, personal, substantial pecuniary interest" in the matter, Tumey v. Ohio, 273 U.S. 510, 523 (1927), and a master is held to the disqualification standard applicable to judges, Fed. R. Civ. P. 53(a)(2) (incorporating 28 U.S.C. § 455). The test is objective and exists to protect "public confidence in the integrity of the judicial process." Liljeberg v. Health Servs. Acquisition Corp.,

486 U.S. 847, 860 (1988). The oldest formulation remains the plainest: “no man can be a judge in his own case.” In re Murchison, 349 U.S. 133, 136 (1955).

The Special Master generated the restitution figure. He generated the only asset valuations in the record. His professionals are compensated from the assets he administers and disposes of. He sits on the board of New Hold Co, LLC, the entity that holds and sells the operating companies. And twelve days before sentencing he presented the Defendant with a “Consent, Waiver, and Acknowledgement” whose operative clauses would have released, and covenanted not to sue, a beneficiary class expressly including the Special Master himself, then advised the Court four days before sentencing that he “expects that Defendant will execute” it. Doc. 159 at 3, 5. Figures generated by an officer so situated, and withheld from inspection, do not acquire reliability by virtue of his office.

D. The valuations the Defendant has offered are of precisely the kind federal courts credit.

The contrast is not between two contested appraisals. It is between an unexamined estimate and the categories of proof courts treat as most probative of value:

• A signed, arm's-length purchase agreement. In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing the Specified Affiliated Companies at approximately $3.4 billion and Clanwilliam alone at approximately $880 million, at a 22.14x EBITDA multiple consistent with public-market comparables. A contemporaneous arm's-length transaction in the very assets at issue is the best evidence of their value. The Second Supplement does not mention it.

See Doc. 235 ¶ 32; Doc. 174 ¶ 117.

• Valuations by nationally recognized firms, prepared to professional standards. KPMG LLP appraised the insurance entities as of December 31, 2017 and issued a written report on August 24, 2018 — a Restricted Appraisal Report under USPAP Standards 202, 8-2 and 10- 2, consistent with AICPA Summary Report guidelines, prepared under an engagement letter, signed by an identified valuation professional, stating its methodology, its reliance on audited and unaudited financial statements, and its limiting conditions. It concluded fair values of

$380,500,000 for CBL, $57,500,000 for BLIC, $29,000,000 for SNIC and $46,500,000 for SNRC. Houlihan Lokey separately valued AAPC at 20x EBITDA, approximately $3 billion on projected 2026 EBITDA of $150 million. These are the hallmarks of reliable valuation evidence — a named and qualified valuator, a disclosed and recognized methodology, identified data, and a written report capable of being tested. Neither firm is mentioned in the Second Supplement. See Doc.

235 ¶¶ 13–17.

• The victims' own fiduciaries' valuation. The team under the Rehabilitator's control valued the NCICs at $454 million on November 5, 2018, eighteen days after the transfer of control. The Special Master declines to “look behind” it while declining to credit it. Doc. 245 at 18 & n.15.

• An executed letter of intent. The November 22, 2018 Ares letter of intent valued the NCICs in the same range on arm's-length terms. Not mentioned in the Second Supplement. See Doc. 235 ¶ 26.

Taken together, the assets transferred into the control of the Rehabilitator and the Special Master — the Specified Affiliated Companies at approximately $3.4 billion in October 2024,

and AAPC at approximately $3 billion in February 2025 — represented on the order of $6.4 billion in value, carrying billions of dollars in asset value in excess of liabilities. Against that record, an unsourced "guess" of $998 million at the midpoint is not a competing valuation. It is an assertion that the contemporaneous market, two nationally recognized firms, and the victims' own fiduciaries were all wrong, offered without a report, a methodology, or a witness.

E. A defendant may not be charged for value destroyed after he lost control of the assets.

To the extent the present estimates are accurate, they measure what the assets became in the hands of others, not what they were worth when the Defendant surrendered them. Clanwilliam was sold in September 2025 for approximately $450 million, against the $880 million Quadro valuation signed months earlier — a gap of roughly $430 million. Beckett was worth around $1

billion and was sold for just $134 million, with no accounting of the proceeds.6 Loss attributable to holding or disposing of an asset after the offense is not loss caused by the offense. United States v. Tyler, 767 F.2d 1350, 1352 (9th Cir. 1985); see Robers, 572 U.S. at 647–48 (Sotomayor, J., concurring) (a victim's independent decisions regarding collateral can break the chain of causation). Whichever explanation accounts for the gap between $6.4 billion and $998 million — inaccuracy in the estimate, or value destroyed after the transfer of control — neither supports charging the difference to the Defendant. See Doc. 174 ¶¶ 94, 100; Doc. 234 at 38.

F. The consequence of a one-directional valuation is a manufactured shortfall.

The direction of the errors is uniform. The restitution figure is held high — inflated by approximately $263 million of interest and unreduced by approximately $2.89 billion in documented offsets7 — while the asset estimate is pushed down, from a $1.454 billion midpoint in the Initial Report to an approximately Redated midpoint now. Doc. 106 at 30; Doc. 245 at 36. The result is that recommended restitution of $1.616 billion exceeds the Special Master's own midpoint estimate of the available assets by more than $600 million. That gap is the predicate a forfeiture theory requires. See 18 U.S.C. § 981; 21 U.S.C. § 853. A shortfall produced by an unaudited restitution figure on one side and an unsourced valuation on the other is not a finding of

Beckett was valued at approximately $1 billion in the contemporaneous appraisal and market evidence. See Cabrillo Advisors, Valuation of Arcane Tinmen, Beckett, CBCS and Southern Hobby (valuation date Jan. 31, 2022; prepared Apr. 7, 2022) (Doc. 256- 1), concluding a fair market enterprise value for Beckett Collectibles, LLC of $1,003,924,000 (equity value approximately $1,005.9 million); Blackstone Tactical Opportunities, "CCG + Beckett, Blackstone Proposal" term sheet (Apr. 14, 2022) (Doc. 256-3), transmitted by e-mail from Brian Cornyn of Blackstone to Justin Holbrook and Sophie Turrell of Global Growth (Apr. 16, 2022) (Doc. 256-4 at p.2), proposing an acquisition of Beckett at an enterprise value of $800 to $900 million (27.5x–30.9x 2021 adjusted EBITDA) and projecting, in Blackstone's own analysis, "Beckett Proceeds by 2022E" of $941 million to $1,065 million on a full secondary sale; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 5, 2022) (Doc. 256-2), countering Blackstone's April 2, 2022 non-binding indication of interest at a Global Growth-proposed total enterprise valuation of $1.05 billion; Letter from Global Growth Holdings, Inc. to Blackstone (Apr. 18, 2022) (Doc. 256-4 at p.4), countering Blackstone's April 16, 2022 proposal at a Global Growth-proposed total enterprise valuation of $1,100 million (equity value approximately $1,044 million). Every contemporaneous market data point — an independent USPAP appraisal at $1.004 billion,

an acquisition proposal from the world's largest alternative asset manager at $800 to $900 million with a modeled path above $1 billion, and counter-valuations of $1.05 to $1.1 billion in an active negotiation — exceeds the $134 million sale price by a factor of six or more.

The $866 million loss of value on the sale of Beckett increases the documented offsets and credits to $3,765,418,383 (approximately $3.7 billion). See note 1, supra, and the revised schedule of offsets, credits and reductions set out in Part IX.

fact; and a penalty measured against a figure untethered from proximately caused loss raises a further constitutional problem. See United States v. Bajakajian, 524 U.S. 321, 334 (1998). The Court should decline to adopt valuations that no federal court would receive as evidence and should decline to treat the resulting gap as established.

## XV. KEY FACTS THE SECOND SUPPLEMENT DOES NOT AND CANNOT DISPUTE

The following facts are established in the record, are not contradicted by any evidence in the Second Supplement and are individually dispositive of the items to which they relate. They are collected here because each dispose of a specific component of the recommended figure.

### A. It remains undisputed that the Department of Justice's own policy does not permit interest to be charged to a defendant in a restitution case.

The Special Master adds approximately $263 million in prejudgment interest to the restitution figure. Doc. 245 at 6 (Issue 1, "Disallow"). The Department of Justice's own published guidance on the restitution process in fraud and financial-crime cases states that interest is not eligible for restitution. That policy is a matter of public record, it was placed squarely before the Special Master, and the Second Supplement does not dispute that it exists or that it says what the Defendant says it says. Doc. 245 at 14–15. The Special Master's entire response is that interest "may be an appropriate component of restitution" on the authorities cited in his First Supplement (Doc. 146, filed May 15, 2026), and that the rate he selected is lower than the contractual rate, lower than the IALA rate, and lower than the applicable federal rate. Id. A favorable comparison among rates is not authority for charging interest at all. The MVRA does not enumerate interest as a component of a victim's loss, and restitution restores what was taken rather than the time value of a bargain. Robers v. United States, 572 U.S. 639, 643 (2014); United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017); United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006); United States v. Coats, 487 B.R. 648 (E.D.N.C. 2013). When the prosecuting Department's own policy states that interest is not recoverable, and the Special Master neither disputes the policy nor identifies statutory text authorizing the charge, the $263 million component cannot stand.

### B. The $141 million opening-balance correction is denied on a record the Government itself has made unavailable.

The recommendation rests on a starting principal balance of the affiliate investments that the Defendant has shown is overstated by approximately $141 million. The Special Master disallows the correction, explaining that although he "presumes the IALA's figures are correct generally," he "is not beholden to blindly follow the IALA." Doc. 245 at 6, 15. He offers no accounting and no competing reconciliation.

The records that would resolve the question are not in the Defendant's possession and have not been for years. Mr. Lindberg surrendered control of his companies — together with

their books and records — on four separate occasions beginning in October 2018, and the affiliated-loan account records have been under the control of the Rehabilitator and, later, the Special Master ever since. He sought subpoenas to obtain those records, and the Government opposed them. The result is a closed circle: the Defendant is told his correction is insufficiently documented, while the Government blocks his access to the only documents that could supply the documentation, and the fiduciaries who hold them have produced no reconciliation of their own. That is not a permissible basis for a finding by a preponderance of the evidence under 18 U.S.C. § 3664(e), and it is not consistent with due process. The point is reinforced by the fact that the North Carolina insurance companies' own verified pleadings and the parties' pretrial stipulation recite a balance of approximately $1.25 billion — the figure the Defendant asks the Court to use. See Doc. 174 ¶¶ 2, 4; Doc. 245 at 11, 13; Doc. 248; Doc. 202.

C. ULICO agreed in December 2022 to accept the AAPC preferred equity as a dollar-for-dollar credit and cannot now insist on cash.

In December 2022, ULICO and Mr. Lindberg settled ULICO's $524 million civil judgment, entered in Universal Life Insurance Co. v. Lindberg, No. 1:20-cv-861 (M.D.N.C.). Under that agreement ULICO accepted $25 million in cash and a transfer of AAPC preferred equity, and it agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed. The preferred equity carries an 18% payment-in-kind rate; its original par was $218 million, and its par value stood at $352,906,240 as of May 26, 2026. Those facts are undisputed, and the Special Master lists the same $352,906,240 figure in his own table. Doc. 245 at 6 (Issue 3). See Doc. 132 at 13–14 (quoting the settlement agreement, Meyer Decl. Exhs. 3-E at 2 (“dollar-for-dollar credit”) & 3-F); Doc. 234 at 46 (offsets table). The agreement's terms are explicit. Under the ULICO Confidential Side Settlement Agreement (Dec. 19, 2022), Mr. Lindberg is to receive a “dollar-for-dollar credit” against the balance owing on the Middle District judgment for the value transferred, the transfer constituting “a payment towards the satisfaction and/or to pay down the Middle District Judgment.” Side Settlement Agreement at 2, attached in full as Exhibit A to Doc. 132-1; see Doc. 132-1 ¶¶ 64–65. The Amendment to the Confidential Side Settlement Agreement (Dec. 30, 2022) confirms the mechanics: “Upon the consummation of such transfer to the Reinsurance Trust, Lindberg shall receive at minimum, a credit of USD$25,000,000 and the balance owing on the Middle District Judgment shall be reduced by a like amount,” with that credit “adjusted” upward on, among other things, “[a] market valuation of the rights in the Preferred Units transferred” or “[a] dollar-for-dollar credit of any repurchase of the rights in the Preferred Units … for an amount no less than $218,000,000 plus 8% interest.” Amendment at 2– 3, attached in full as Exhibit B to Doc. 132-1 (Doc. 132-1 at 58–61).

The MVRA requires that the credit be given. Restitution “shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in … any Federal civil proceeding.” 18 U.S.C. § 3664(j)(2)(A); see also id. § 3663A(b)(1)(B) (credit for property returned). The Fourth Circuit applies that command directly, holding that a defendant is entitled to an offset for amounts victims recovered in related civil proceedings. United States v. Ritchie, 858 F.3d 201, 215–16 (4th Cir. 2017); accord United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018). ULICO's recovery occurred in a federal civil proceeding, for the same loss, on terms ULICO itself negotiated and accepted.

The Special Master's answer is to defer the credit — “Disallow at this Time,” with a credit only “if and when ULICO realizes this value,” on the reasoning that ULICO “has not

unreasonably refused to liquidate this asset." Doc. 245 at 6 n.3, 15–16. That reasoning cannot be reconciled with the parties' agreement. ULICO did not agree to accept the cash proceeds of the preferred equity if and when it chose to sell; it agreed to accept the preferred equity itself, valued dollar-for-dollar, in partial satisfaction of its judgment. A victim that has contracted for how an asset will be valued against its claim cannot later demand that the same claim be satisfied a second time in cash. The consequence of the Special Master's approach is precisely the double recovery the MVRA forbids: ULICO keeps the preferred equity and collects the full amount again as restitution. Stone, 866 F.3d at 226.

D. The Special Master refuses to credit more than $130 million in cash payments on theories found nowhere in the MVRA.

The Defendant documented $133,874,803 in cash payments and cash proceeds actually received by the persons due restitution: $27,823,425 in SNIC reimbursements (Issue 4); $79,655,289 in preferred-equity payments not captured (Issue 5); the $3,000,000 CBL subordination fee (Issue 6); $13,596,013 from ULICO's sale of contributed real estate (Issue 8);

and $9,800,076 from the Bermuda insurance companies' sale of affiliated assets (Issue 9). Doc. 245 at 6. Of that sum the Special Master allows $39 million and refuses the balance. Id. at 12–13,

44. Additional cash items are refused outright, including a $5 million redemption fee paid to CBL

and $9.4 million paid to CBL and ULICO in connection with the Finnazen/Blue Violet sale. Id. at 12–13. See Doc. 234 at 46 (offsets table).

The stated grounds are that the Defendant "received new consideration in exchange" for the payments (Issues 4 and 6); that the victims "had previously purchased [their] interest … for value" (Issues 8 and 9); that some payments were "made toward non-IALA loans and double- counting" (Issue 5); and that documentation is unsatisfactory (Finnazen/Blue Violet). Doc. 245 at 13, 16–18. None of these theories appears in the MVRA. The statute directs that restitution be reduced by amounts paid to a victim for the same loss, 18 U.S.C. § 3664(j)(2), and by the value of property returned, id. § 3663A(b)(1)(B); it does not condition a credit on the defendant having received no consideration, nor on the victim not having previously paid value for the asset it later sold. Tellingly, each time the Second Supplement invokes the statute for these theories it does so with a "Cf." signal — an acknowledgment that § 3664(j)(2) does not directly support the proposition. Doc. 245 at 16, 17, 18. Cash that reached a victim reduced that victim's loss, and the MVRA requires that it be credited.

E. The zero-coupon bonds were not sold to meet any liquidity need, and the Rehabilitator's own reports identify a different problem.

The Special Master justifies the pre-maturity sale of the principal-protection bonds on the ground that they paid no interim interest, would have matured "decades after the policyholders' annuities exited the 5- or 7-year surrender period," and that the rehabilitator "decided to sell the bonds to help meet the companies' financial needs." Doc. 245 at 24. The Rehabilitator's own quarterly reports to the Wake County Superior Court do not bear that rationale out.

Counting only cash, cash equivalents, short-term investments and marketable third-party bonds, the North Carolina insurance companies held over $1 billion at every year end from 2019 through December 2023:

Year end Cash, equivalents and Third-party bonds Cash and third-party short-term investments bonds 12/31/2019 † $153,343,457 $1,749,798,603 * $1,903,142,060 12/31/2020 † $125,394,471 $1,492,619,772 * $1,618,014,243 12/31/2021 ‡ $157,090,817 $1,252,941,555 * $1,410,032,372 12/31/2022 ‡ $144,726,039 $1,159,632,192 $1,304,358,231 12/31/2023 $239,846,733 $843,524,280 $1,083,371,013 Combined balances of the North Carolina insurance companies. Source: statutory Annual Statements, Assets lines 1 and 5, as filed with the Rehabilitator's and Receiver's Quarterly Reports, Causey v. Southland National Insurance Corp., No. 19 CVS 8664 (N.C. Super. Ct., Wake County) (report cover pages and ASSETS pages excerpted at Ex. 1 hereto, parts 1(a) (4Q2019) through 1(e) (4Q2023)). Third- party bonds exclude affiliated holdings. * The statements for 2019–2021 do not segregate affiliated bonds; the figures shown deduct the $824,720,289 of affiliated bonds the regulator first segregated as non-admitted in the June 30, 2022 statement. † Excludes Bankers Life, whose statements for these years have not yet been extracted. ‡ Excludes Bankers Life and Southland National. The excluded companies' balances would only increase the totals shown. The Rehabilitator's and Receiver's quarterly reports are publicly available at cblife.com/quarterly-rehabilitation-reports.

For 2022 and 2023 the segregation of affiliated bonds appears on the face of the statements, so those totals are established without inference. For 2019 through 2021 the figures conservatively deduct the affiliated bonds the regulator later segregated, and several rows omit companies whose statements have not yet been extracted — so the true combined totals for those years are higher than the table shows. On any view, from 2019 through December 2023 the North Carolina insurance companies at all times held over $1 billion of cash and marketable securities in the form of third-party bonds.

There was no reason for the NCICs to sell the zero coupon bonds in 2019 when, for over four years after that sale, the NCICs had over $1 billion of cash and marketable securities in the form of third-party bonds. The sale was the discretionary act of fiduciaries who did not need the cash; it was taken over a year after Mr. Lindberg surrendered control; and the $611.6 million loss it crystallized cannot be charged to him. See Doc. 235 ¶¶ 7, 31.

The bottom line is straightforward. The bonds were contractually scheduled to pay $1,006,239,867 at maturity. They were sold for approximately $394 million, crystallizing a loss

of approximately $611.6 million. Even accepting that the companies wanted cash, destroying a guaranteed billion-dollar recovery was not the only way to obtain it — the Ares and Oaktree transactions would each have retired the affiliated loans at or near par, and each was refused. A liquidity need that could have been satisfied without sacrificing $611.6 million in contractual value does not make that sacrifice a consequence of Mr. Lindberg's offense. The decision was made by fiduciaries exercising their own judgment, over a year after Mr. Lindberg had surrendered control, and its cost cannot be charged to him. See Doc. 235 ¶ 31.

F. It remains undisputed that the Agera exposure was inherited from ULICO's prior reinsurer and that the loss was not caused by Mr. Lindberg.

In June 2017 Mr. Lindberg acquired the Bermuda reinsurance portfolio that became PBLA-ULICO. ULICO required any buyer of that portfolio to assume its existing Agera exposure,

which stood at approximately $129 million as of the June 30, 2017 purchase and reinsurance treaty. The investment had been originated by the prior reinsurer, not by Mr. Lindberg, and Agera later collapsed following the discovery of fraud by Agera's independent chief financial officer. The Special Master does not dispute any of this. He states expressly that he "does not dispute the Defendant's recitation of the timing (i.e., most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company)." Doc. 245 at 19.

See Doc. 235 ¶ 4; Doc. 174 ¶¶ 51–55.

His contrary conclusion rests not on causation but on benefit: that Agera was "critical to the Defendant being able to acquire Omnia and PBIHL," and that he "obtained a substantial economic benefit from those loans, which was part and parcel with his scheme, even if Defendant was not the one to pull the trigger on originating all of the loans." Doc. 245 at 19–20. That reasoning does not satisfy the MVRA. The question is not whether the Defendant benefited from an acquisition; it is whether the offense of conviction directly and proximately caused the loss. 18

U.S.C. § 3663A(a)(2); Hughey v. United States, 495 U.S. 411, 413 (1990). A loss on an asset the Defendant inherited as a condition of a transaction, which was originated by someone else, and which failed because of a third party's fraud, was caused by those events and not by him. This fact alone requires that Mr. Lindberg receive a credit and offset for the $129 million in Agera exposure his Bermuda insurance company inherited from ULICO's prior reinsurer.

G. It remains undisputed that Clanwilliam was worth more than $800 million on the only contemporaneous market evidence, and that the Quadro comparables are higher today than in 2024.

In the first quarter of 2024, Quadro Acquisition Corp. One (NASDAQ: QRDO) signed a purchase agreement valuing Clanwilliam at approximately $880 million, priced at a 22.14x EBITDA multiple drawn from public-market comparables. That valuation is undisputed. The Second Supplement does not mention Quadro anywhere in its forty-six pages, and it offers no competing appraisal of Clanwilliam. See Doc. 235 ¶ 32; Doc. 174 ¶ 117; Doc. 132-2 (Ex. I3, GG– Quadro Investor Presentation (Jan. 2024)) at 15 (22.14x transaction multiple).

Two consequences follow. First, a signed, arm's-length purchase agreement executed in 2024 is the most accurate and most comparable measure of Clanwilliam's value available in this record — considerably more probative than an unexamined internal estimate, and more probative than the older figures on which the Special Master relies without disclosing that Quadro exists. Second, it remains undisputed that the public-market comparables used to price the Quadro transaction are higher today than they were in 2024. The $880 million figure is therefore, if anything, a conservative valuation of Clanwilliam. Clanwilliam ultimately realized approximately $450 million. Whatever explains that difference, the Defendant's restitution obligation cannot be computed as though the higher value never existed, and the Special Master's silence on Quadro cannot convert a documented 2024 market valuation into a fact the Court may disregard. See Doc.

235 ¶¶ 32, 34.

XVI. THE GOVERNING CAUSATION STANDARD IS THE FOURTH CIRCUIT'S, IT IS BINDING, AND THE SECOND SUPPLEMENT APPLIES IT IN ONE DIRECTION ONLY

The Court's de novo determination under 18 U.S.C. § 3664(d)(6) is governed by binding causation law, and the Fourth Circuit has already articulated that law in this restitution matter.

A. The controlling standard, stated by the Fourth Circuit in this very proceeding.

On June 13, 2026 — five weeks before the Second Supplement was filed — the Fourth Circuit decided the mandamus petition brought in this docket by the insolvency practitioners of Nederlandsche Algemeene Maatschappij Van Levensverzekering "Conservatrix" N.V., a claimant that appeared and responded in this proceeding. In re Zetteler, No. 26-1749, 2026 WL 1724731 (4th Cir. June 13, 2026, amended June 15, 2026) (per curiam) (unpublished); see Doc. 130. The petitioners asked the court to vacate the preliminary restitution order and to direct entry of a revised order naming Conservatrix a victim and awarding it €215,356,806. The court denied the petition, and in doing so it stated the test that governs who may recover restitution for this offense:

"Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" In re Zetteler, slip op. at 4–5 (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)). Because that formulation comes from the same court, in the same case, applying the same restitution framework, it is the standard against which the recommendation must be measured; the Court would have to announce a different causation test for the same proceeding to sustain the $1.616 billion figure.

Applying that test, the court held that the petitioners "fail[ed] to sufficiently connect the harm suffered by Conservatrix with Lindberg's criminal conduct": they had "described Lindberg's failure to replenish the company's capital and to maintain its SCR as agreed," but did "not identify facts closely tying those failures to Lindberg's criminal activities." Slip op. at 4–5. "Without more,"

the court concluded, "we cannot find the district court to have abused its discretion in excluding Conservatrix from its restitution order and judgment," and the petition was denied. Slip op. at 5. The claim the court turned away was concrete and enormous: the petitioners asserted that "Lindberg's criminal conspiracy forced the company into bankruptcy, resulting in losses to the company and its policyholders of more than $200 million," slip op. at 4; they held a judgment against Mr. Lindberg from the Dutch Arbitration Institute "for over $166 million related to his failure to fulfill the terms of his agreement," slip op. at 3; and, as Judge King described it, what the panel decided was "potential restitution owed by defendant Lindberg to Conservatrix totaling approximately € 215,000,000." Slip op. at 8 (King, J., concurring in part and dissenting in part). A concrete, contractual, nine-figure loss — resting on commitments Mr. Lindberg personally signed — was held insufficient because the connection between that loss and the conduct inherent to the offense was not closely drawn.

The opinion also records the standard the Special Master himself applied when he excluded Conservatrix: the company's loss did not qualify because it "was not due to Lindberg's 'self-serving investment activities, the crux of the harm outlined in the Indictment,'" and because the misrepresentations at issue did not go to "masking [Lindberg's] affiliated investments or asset management strategies." Slip op. at 3. That is the Report's own definition of the compensable harm in this case, recited by the court of appeals. The decision is unpublished and is the law of this case; but it is the Fourth Circuit's ruling in

this restitution proceeding, on this record, applying the very framework the Special Master constructed.

B. Zetteler does not stand alone — it states, in this case, what binding Supreme Court and Fourth Circuit authority already command.

Zetteler is an unpublished disposition arising under the CVRA's victim definition, 18 U.S.C. § 3771(e)(2)(A), but that definition is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), and Zetteler drew its phrasing from McNulty, a restitution case — so the standard travels. And it is anchored in binding authority. The MVRA authorizes restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990). Proximate cause limits liability to the defendant's "own conduct, not the conduct of others." Paroline v. United States, 572 U.S. 434, 462 (2014). The MVRA "has a proximate cause requirement," and superseding causes break the chain. Robers v. United States, 572 U.S. 639, 645 (2014). The Government must prove that the offense "directly and proximately caused the harm." United States v. Ritchie, 858 F.3d 201, 211 (4th Cir. 2017). And harm bearing "no more than a tangential connection" to the offense conduct is not compensable, because that connection "is legally irrelevant for the purpose of restitution." United States v. Freeman, 741 F.3d 426, 434–37 (4th Cir. 2014). Zetteler is the this-case gloss on that binding authority; it is led with, not leaned on alone.

C. The § 3663A(a)(2) scheme clause converges on the same limit and cannot enlarge the award.

The Government may invoke the scheme clause of § 3663A(a)(2) — reaching a person "directly harmed by the defendant's criminal conduct in the course of the scheme" — to argue for scheme-wide victims and losses. That argument fails on its own text, because the scheme clause and Zetteler converge: each ties recovery to the defendant's own criminal conduct. Section 3663A(a)(2) reaches only harm caused "by the defendant's criminal conduct in the course of the scheme," and Zetteler requires harm "closely related to the conduct inherent to the offense." Under both, the Rehabilitator's independent, post-relinquishment decisions — the early sale of the principal-protection bonds, the refusals of Ares, Oaktree, Montshire/Alban, and Quadro, and the hold-and-sell losses realized years after June 27, 2019 — are the conduct of others, not conduct of Mr. Lindberg's "in the course of the scheme." They fail the scheme clause and the closely-related test alike.

D. The MVRA's committee notes confirm the limitation.

This reading is the one Congress intended. The committee notes confine restitution to harm "under the count or counts for which the offender is convicted." S. Rep. No. 104-179, at 19 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932. The same report authorizes the court to decline restitution where determining complex issues of fact related to the cause or amount of a victim's losses would complicate or prolong the sentencing process — the provision now codified at 18 U.S.C. § 3663A(c)(3)(B). S. Rep. No. 104-179, at 18–20, 1996 U.S.C.C.A.N. at 931–33. And the procedure the committee designed is the one invoked here: a special master submits "proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." Id. (committee substitute § 105), reprinted in 1996 U.S.C.C.A.N. 924. A recommendation whose author concedes the facts,

disclaims foreseeability, and abstains from evaluating the intervening acts is the paradigm case the committee had in mind.

E. The record convergence: the master's own criteria state the same proximate-cause test.

The proponents of the award supply the standard that defeats it. The Final Order of Restitution recognizes a payee only where diverted assets “actually lost value as a proximate result of Defendant's activities,” or where an insured “actually suffered damages as a proximate result of Defendant's fraudulent activities.” Final Order of Restitution (Doc. 245-1) at 6; accord Doc. 106 at 8 (stating the same criteria as the Special Master's Definition of a covered insurance company and insured). That is the same proximate-cause test Zetteler applies — recited by the Special Master and adopted as the gate through which any claimant must pass.

F. The Report cites the decision for its result, never for its standard — and cites almost nothing else.

The Second Supplement cites the decision once, for its result: “The Fourth Circuit appears to agree with the Special Master's reasoning in its order denying Conservatrix's petition for writ of mandamus.” Doc. 245 at 35. The Report takes the endorsement and leaves the standard. The CVRA's victim definition — “a person directly and proximately harmed as a result of the commission of a Federal offense,” 18 U.S.C. § 3771(e)(2)(A) — is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), so the standard the court applied travels with the statute the Report administers. Yet nowhere in its forty-six pages does the Report ask the question the Fourth Circuit asked of Conservatrix — whether each loss it recommends is “closely related to the conduct inherent to the offense, rather than merely tangentially linked” — and its author expressly declines to make the findings that question requires. Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, supra. Nor is the deficit limited to this one decision. Across forty-six pages the Report cites two cases — Robers and Ritchie, both at page 15, and both invoked to move a burden onto Mr. Lindberg — together with a passing reference to Karam. It does not cite Hughey v. United States, 495 U.S. 411 (1990), Lagos v. United States, 584 U.S. 577 (2018), Paroline v. United States, 572 U.S. 434 (2014), United States v. Stein, 846 F.3d 1135 (11th Cir. 2017), or Ellingburg v. United States, 607 U.S. 163 (2026). A recommendation that never engages the controlling causation authority cannot establish the causation the MVRA requires, and its author expressly declines to supply the missing findings. See Doc. 245 at 19, 21–22, 25, 30; Parts I.B–I.C, supra.

G. Applied evenhandedly, the standard turns away the $1.616 billion figure.

The standard is applied in one direction only. Measured by it, Conservatrix — a €215,356,806 claim resting on capital-maintenance commitments Mr. Lindberg personally signed — was excluded as not “closely related” to the offense, and Vista was excluded for the absence of the same proximate nexus. Final Order of Restitution (Doc. 245-1) at 6; Zetteler, 2026 WL

1724731, at *1–2. Yet the recommendation imposes $1.616 billion built on the full outstanding principal of the Affiliate Investments, a figure that sweeps in losses the same test excludes:

• the approximately $129 million Agera exposure Mr. Lindberg inherited and did not originate (conceded as to timing, Doc. 245 at 19);

• the approximately $611.6 million crystallized by the Rehabilitator's pre- maturity sale of the principal-protection bonds, more than a year after Mr.

Lindberg surrendered control; and, • the value lost when the Rehabilitator refused or blocked the Ares, Oaktree, Montshire/Alban, and Quadro transactions. Parts IV–V, supra.

If a nine-figure loss flowing from Mr. Lindberg's own signed commitments is "merely tangentially linked" to this offense, then losses realized through third parties' discretionary decisions years later cannot be "closely related" to it. A single causation standard must govern every claimant in this proceeding. The Report never explains how both propositions can be true, because it never applies the test to its own figure. Applied to the recommendation as it was applied to Conservatrix, the standard reduces the proximately caused loss — and, once the mandatory offsets are credited, the award — to zero.

The Special Master's own criterion compounds the problem. He excluded Conservatrix because its loss was not caused by the "self-serving investment activities" that are "the crux of the harm outlined in the Indictment." Yet the Report makes no finding that the losses it does recommend were caused by those activities: the affiliated loans the offense concealed were found by KPMG and Houlihan Lokey to be fully covered, Parts VI and XV, supra, and every component of the recommended figure crystallized in the rehabilitation, under the Rehabilitator's control. A single causation standard must govern every claimant in this proceeding. A recommendation that applies the closely-related test to turn away one claimant, and never applies it to the $1.616 billion

it proposes, has not made the determination the MVRA requires and cannot survive the de novo review § 3664(d)(6) commands.

H. Preservation of objections.

Mr. Lindberg objects to the Second Supplement's failure to apply this binding causation standard, and expressly preserves for de novo determination and appellate review each of the following: (1) that the Government has not proved, by a preponderance, that the offenses of conviction directly and proximately caused the recommended loss, 18 U.S.C. § 3664(e); (2) that the recommendation reaches losses caused by intervening, superseding acts of third parties and by inherited exposure, contrary to Paroline, Robers, Freeman, and Zetteler; (3) that the scheme clause of § 3663A(a)(2) cannot be read to reach harm not caused by Mr. Lindberg's own conduct; and (4) that the mandatory credits and offsets under §§ 3663A(b)(1)(B) and 3664(j)(2) independently reduce any award to zero. These objections are made in addition to, and without waiver of, the objections and reservations stated in Parts I–XV and XIX and in Docs. 132, 174, and 234. No silence compelled by the denial of records and database access, and no participation in the special- master process, effects a waiver of any of them.

## XVII. THE FACTS THAT WOULD SUPPORT ANY RESTITUTION AWARD MUST BE FOUND BY A JURY BEYOND A REASONABLE DOUBT (PRESERVED)

Mr. Lindberg raises this Part to preserve the issue. He recognizes that it is presently foreclosed in this Circuit, and he does not ask the Court to disregard binding precedent. He asks only that the objection be noted and preserved for appellate review.

The premise is no longer open to argument. Restitution under the MVRA is criminal punishment: it is "plainly criminal punishment," part of the defendant's sentence, and a penalty predicated on a criminal conviction. Ellingburg v. United States, 607 U.S. 163, 166 (2026). The Sixth Amendment therefore has work to do here. Under Apprendi v. New Jersey, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). And Southern Union Co. v. United States extends that rule to monetary penalties, precluding "judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow." 567 U.S. 343 (2012).

Applied here, the facts that would support any restitution award — that the offenses of conviction directly and proximately caused each claimed loss, and in what amount — were neither found by a jury nor admitted by Mr. Lindberg. The plea agreement fixes no amount, and the factual basis stipulates none: the words "restitution," "loss," and "amount" appear nowhere in it. Doc. 40 ¶ 10(a); Doc. 42. Those facts were instead developed by a special master, tested against whether Mr. Lindberg had "convinced the Special Master," and are now proposed for adoption on a preponderance standard. That is judicial — indeed, delegated — factfinding that enlarges a criminal penalty beyond what the verdict or the admissions allow.

The Fourth Circuit has held otherwise, and Mr. Lindberg acknowledges it. In United States v. Day, the court held that because "there is no prescribed statutory maximum in the restitution context," the "rule of Apprendi is simply not implicated to begin with by a trial court's entry of restitution." 700 F.3d 713, 732 (4th Cir. 2012). Mr. Lindberg respectfully submits that Day should be revisited in light of Ellingburg. The MVRA does prescribe a maximum: it authorizes restitution only in the amount of the loss directly and proximately caused by the offense of conviction, 18 U.S.C. § 3663A(a)(2), (b)(1), and it authorizes nothing where no such loss is proved. The baseline is zero, and every dollar above zero depends on findings of fact. A ceiling defined by proof is still a ceiling.

The anomaly is worth stating plainly. A civil defendant facing a monetary penalty for conduct resembling a common-law claim is entitled to a jury. SEC v. Jarkesy, 603 U.S. 109 (2024).

It would be an odd constitutional order in which a criminal defendant, facing a $1.616 billion penalty that the Supreme Court has now confirmed is punishment, received less. Mr. Lindberg preserves the objection: any facts on which a restitution award rest must be found by a jury beyond a reasonable doubt, and no such findings exist here.

## XVIII. SCHEDULE OF THE REPORT'S DEPARTURES FROM THE MVRA STATUTE, CASE LAW, AND LEGISLATIVE COMMITTEE NOTES

The departures identified in Parts I through XVI are not isolated. Set out below, in schedule form, is the complete list of respects in which the Second Supplement is contrary to the MVRA, the case law construing it, and the statute's legislative history. Each entry is supported by the filed text of Doc. 245.

1. The Report disclaims making the foreseeability finding the MVRA requires.

"That it was reasonably foreseeable to the Defendant that his conduct could be harmful is a critical component of the Defendant's criminal intent, which the Special Master has not set out to prove (and does not consider it within the Special Master's charge to prove)." Doc. 245 at 30. Foreseeability is an element of MVRA proximate cause, not an optional inquiry. 18 U.S.C. § 3663A(a)(2); Hughey v.

United States, 495 U.S. 411 (1990). A report that declines to prove it cannot support a foreseeable-loss finding.

2. The Report abstains from reviewing the intervening conduct that determines

causation. Three times: "the Special Master is not well-situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment (to the extent doing so falls within the Special Master's duties)." Doc. 245 at 19, 21–22, 25. It also places the public-corruption issues "outside the scope," id. at 31, and whether a crime occurred outside the "assignment," id. at 29 n.28. Under Stein and Robers the intervening acts must be evaluated, not avoided.

3. The Report applies standards found nowhere in the MVRA. It asks whether Mr. Lindberg has "convinced the Special Master" (five times: Doc. 245 at 19, 22, 22, 24, 25), whether he offered "compelling evidence" (at 21, 24), "convincing evidence" (at 18), whether an act would "definitively cause" a decline (at 19), and whether he "raise[d] a genuine issue of material fact" (at 31). Five times it finds only that he "bears some responsibility" (at 19, 21–22, 24–25). The statutory test is preponderance, 18 U.S.C. § 3664(e), and the decisionmaker is the Court de novo, § 3664(d)(6).

4. The Report inverts the Government's burden on loss and causation — § 3664(e). Section 3664(e) places "[t]he burden of demonstrating the amount of the loss" on the Government. The Report presents no new evidence, exhibit, affidavit, or testimony, and frames every conclusion as the Defendant's failure of proof. (Note for precision: Karam, 201 F.3d at 327 — which the Report cites at 32 — does place the burden on a defendant claiming a particular offset. The burden-inversion argument should therefore be pressed on loss, foreseeability, and causation, and paired on the offsets with the denied-subpoena due-process point.)

5. The Report substitutes generic credit risk for offense-specific foreseeability. "All loans bear a risk of non-payment"; "an inability to pay is always reasonably foreseeable," even for "the most conservative of business loans" and "even loans that are personally guaranteed." Doc. 245 at 30. That reasoning would erase the MVRA's foreseeability limit in every loan case. Foreseeability must be tied to the conduct constituting the offense.

6. The Report makes no findings on intervening or superseding causes — Stein; Robers. A restitution order entered without findings on the effect and foreseeability of intervening events must be vacated. United States v. Stein, 846 F.3d 1135, 1154– 56 (11th Cir. 2017); see Robers v. United States, 572 U.S. 639, 647–48 (2014) (Sotomayor, J., concurring). The Report cites neither and makes no such findings.

7. The Report misapplies Robers and Ritchie to shift the burden. It cites Robers, 572 U.S. at 644–46, and Ritchie, 858 F.3d at 211 ("the burden of showing that a victim delayed unreasonably in selling property (or otherwise neglected it) belongs with the defendant who seeks to avoid being tagged as the 'proximate cause' of the loss in value of that property"). Doc. 245 at 15. Both address a victim's passive delay or neglect in liquidating collateral. Here the fiduciary acted affirmatively, selling a par-payable instrument decades early. Neither case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary.

8. The Report treats "some responsibility" as proximate causation. Five times it concludes only that the Defendant "bears some responsibility for any diminution in value that occurred during the rehabilitation and liquidation processes." Doc. 245 at 19, 22, 25, 28. The MVRA requires that the loss be directly and proximately caused by the offense;

partial or attenuated responsibility for a receivership's later decisions is not that. Lagos v. United States, 584 U.S. 577 (2018).

9. The Report adds prejudgment interest contrary to the statute and DOJ policy — $263M. Doc. 245 at 14–15 defends interest as "necessary to make the victims whole" and notes the rate is below the contractual, IALA, and applicable federal rates. Rate moderation is not authority. The MVRA does not enumerate interest, and DOJ policy states interest is not eligible for restitution. Robers, 572 U.S. at 643; United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017); United States v. Boccagna, 450 F.3d 107, 117 (2d Cir. 2006); United States v. Coats, 487 B.R. 648 (E.D.N.C. 2013). Reliance on United States v. Hoyle, 33 F.3d 415 (4th Cir. 1994), is misplaced (pre-MVRA). See note 4, supra.

10. The Report invents an atextual realization condition on mandatory credits. Issues 3 and 7 are "Disallow at this Time," with credit only "if and when ULICO realizes this value" and "if and when the escrow balance becomes available." Doc. 245 at 6 & nn.3–4. Section 3664(j)(2) contains no such condition, and deferral produces the double recovery the statute forbids. United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018).

11. The Report denies credits for missing documentation the Government prevents the Defendant from obtaining. The zeros credit is denied because the Defendant "has failed to present sufficient documentation," Doc. 245 at 12–13, and the $9.4M Finnazen/Blue Violet credit on the same basis, id. at 13. Mr. Lindberg is in BOP custody and surrendered his companies' books four times; the subpoenas needed to obtain these records were opposed. Denying credits on that record violates due process and cannot satisfy § 3664(e).

12. The Report measures exposure rather than realized loss. It asserts the methodology "includes no risk, only actual loss," because it counts "only sums that the Defendant took from the persons due restitution but has not repaid." Doc. 245 at 32. Unpaid principal on secured, insured, and guaranteed obligations is exposure, not the victims' realized pecuniary loss. Hughey, 495 U.S. at 413; Stone, 866 F.3d at 226.

13. The Report rests a criminal penalty on a self-generated valuation it calls a "current guess." The Special Master cuts his asset estimate from $1,162M/$1,454M/$1,878M (Doc. 106 at 30) to Redacted (Doc. 245 at 36), based on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," id. at 36 n.31, and describes the result as his "current guess," id. at 36–37 — proposing to explain the reduction only under seal, id. at 36 n.32. Due process requires a credible, testable valuation.

14. The Report manufactures waiver with no statutory basis. Waiver is asserted at Doc. 245 at 7, 24–25, 28, 29–30, 30, and 32–33, including "by agreeing to the Special Master process" and "by pleading guilty," and that invoking constitutional limits would be "unconscionable." No MVRA provision creates such a waiver; the agreed bifurcation contemplates a later restitution proceeding; a preliminary order is provisional, Manrique v. United States, 581 U.S. 116 (2017); Dolan v. United States, 560 U.S. 605 (2010); and the Defendant reserved rights in every filing.

15. The Report refuses to resolve complexity in the Defendant's favor — §

3663A(c)(3)(B). Where complex causation issues would complicate sentencing, the Court may decline restitution. The Report resolves every complexity against the Defendant while declining to analyze causation.

16. The Report is untethered from the MVRA's text, committee notes, and case

law. In 46 pages it cites two cases (Robers and Ritchie, both at 15) plus Karam (at 32). It cites no MVRA causation authority — no Hughey, Lagos, Paroline, Stein, or Ellingburg — and does not engage the committee notes, S. Rep. No. 104-179, at 19–20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 932–33, or DOJ restitution policy. The ignored committee notes confine restitution to harm "under the count or counts for which the offender is convicted" S. Rep. No. 104-179, at 19.

17. The recommendation and the Preliminary Order exceed statutory authority

— Davis. The Preliminary Order fixed $1.655B; the Initial Report recommended $1.625B; the Second Supplement now recommends $1.616B. Doc. 245 at 44. A restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting Broughton-Jones, 71 F.3d at 1147).

18. The Report converts a promise of "full restitution" into an agreed amount it

never was. The factual basis stipulates no loss or restitution amount. An agreement to pay full restitution is not a stipulation that the amount is $1.6 billion, or anything above zero. Hughey, 495 U.S. at 413. The plea obliges payment of "full restitution, regardless of the resulting loss amount," while stipulating that Guidelines "loss" "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Plea Agreement ¶¶ 8(a), 10(a) (Doc.

40). The plea's promise of "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," Plea Agreement ¶ 10(a) (Doc. 40), incorporates the MVRA's causation limit rather than displacing it: restitution runs only to those harmed by the offense conduct, and the Fourth Circuit has fixed that standard in this very case — a compensable victim only where "directly and proximately harmed," whose harm is "closely related to the conduct inherent to the offense, rather than merely tangentially linked." In re Zetteler, No. 26- 1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam). The Guidelines § 2B1.1 "loss" figure cannot lawfully be imported into that calculation; restitution under 18 U.S.C. § 3556 is a distinct measure, and causation must be proven, not assumed.

XIX. RESERVATION OF RIGHTS TO SUPPLEMENT THIS RESPONSE

Two independent impediments, neither of Mr. Lindberg's making, have restricted his ability to assemble the evidentiary record supporting the credits and offsets set out above. As to each, Mr. Lindberg expressly reserves his rights.

A. Lack of online database access, and the access order that remains unsigned.

Since April 1, 2026, Mr. Lindberg has been unable to access any online databases required to produce evidence supporting the motions for credits and offsets. That inability has been a material impediment to collecting evidence and to responding timely to the Second Supplement. An order that would facilitate that access has been submitted to the Court and remains pending; it has not been granted. Mr. Lindberg therefore reserves all rights to supplement this Response at a future time when the databases can be accessed. See Doc.

202 (Emergency Motion to Enforce the Plea Agreement and to Preserve Due-Process and Counsel-Access Rights) (June 15, 2026) (seeking daily access to counsel and to "a computer, the internet, spreadsheet software, his financial records"); the proposed order submitted on that motion (July 7, 2026) remains unsigned; Doc. 174 ¶¶ 2, 4 (detention and materially constrained access to documents).

B. The Government's refusal of the access requested in the Motion for Subpoenas.

Mr. Lindberg gave up control of the books and records of his companies on four occasions beginning in October 2018, and he has had no access to those books and records for years. The Government has refused him that access by objecting to the Motion for Subpoenas. Mr. Lindberg reserves all rights to supplement this Response when that access is granted, because the information sought will provide additional evidence supporting the offsets and credits due under the MVRA. See Doc. 248 (Def.'s Motion for Issuance of Subpoenas Duces Tecum to the Rehabilitator, the Special Master and NHC Holdings, LLC, Paladin Management, the NCICs, the Bermuda insurance companies, and counsel to the NCICs) (July 23, 2026); id. at 2 ("Defendant retained neither the companies nor their records"); Parts IX.B and XV.B, supra; Doc. 235 ¶ 15.

These reservations are of a piece with the reservations already of record, Doc. 132 at 25 n.9; Doc. 132-1 ¶ 86 (reserving the right to supplement "upon restoration of access"); Doc. 174 ¶¶ 125–126; Doc. 234 nn.1, 3, and with Part X, supra: silence forced by lack of access is not waiver,

and a restitution figure entered while the Defendant is barred from the very records that would disprove it cannot satisfy 18 U.S.C. § 3664(e).

This reservation preserves Mr. Lindberg's rights; it does not concede that the record may be reopened so that the Government may cure a burden it has already failed to carry. The denial Mr. Lindberg seeks rests on the present record. The reservation protects his position should the Court nonetheless proceed; it is not a request that the Court hold the proceeding open so the recommendation can be repaired.

More importantly, the import of all of these arguments is that restitution rests on guesses of the Special Master, based on documents the court has not seen, the special master claims to not be able to produce or arguendo have access to, the government does not have and the defendant cannot have because he turned over the companies to the custodians and the special master. This record cannot meet the accounting requirements of MVRA that are a prerequisite to restitution determination.

## XIX. THE DAMOVO EXPRESSION OF INTEREST AND THE SPECIAL MASTER'S OWN ADMISSIONS CONFIRM THAT THE REPORT RESTS ON RECORDS NO PARTICIPANT CAN REACH

The unreliability of the Report's valuations is confirmed by present, arm's-length market evidence the Report does not address. The Special Master has been shopping the estate's operating companies "for the debt." As to Damovo, he intends to accept roughly $100 million — the approximate amount of Damovo's debt — when, on July 31, 2026, Twelve Seas Investment Company III (NASDAQ: TWLV) delivered a signed, arm's-length expression of interest to combine with Damovo at a $400 million enterprise value, with up to approximately $450 million achievable at arm's length. Decl. ¶¶ 2–4. Damovo is thus exemplary of the same value destruction already inflicted on Beckett (appraised at approximately $1 billion, sold for approximately $134

million) and Clanwilliam (valued at approximately $880 million in the signed Quadro purchase agreement, sold for approximately $450 million): applying the identical "sell it for the debt" premise, the Special Master stands to destroy roughly $300 to $350 million of Damovo's value. The only difference is timing — as to Damovo the market's proof of the true value is before the Court now, before the loss is locked in. A report that values these companies at their debt systematically understates their value and overstates the loss.

The Report also rests on information that no participant in this proceeding can reach. The Special Master circulated a term sheet defining the scope of his rights and responsibilities, which the parties who hold the loss and valuation data — the North Carolina insurance companies and NHC Holdings, LLC — refused to accept, disputing both his authority and this Court's authority to compel their information; the term sheet records the position that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." [Ex. __ (Special Master scope term sheet).] The Special Master has now confirmed the same on the docket: he claims that NHC and the companies under it are "none of which are under the Special Master's control," that his sole authority over them "is the power to appoint two directors to the board of NHC," and that the communications sought are largely those of persons who "have no direct knowledge of the facts and circumstances critical to the restitution determination." Doc. 266; Doc. 268. Defendant disputes that claim — the Special Master stepped into Defendant's shoes as record owner and trustee, through the assignment, the AAPC voting trust, and his NHC board designees, and could compel production, which he refused. But even taken at his word, the Report is then built on information beyond the reach of this Court, the Special Master, and the Government alike — held by third parties and obtainable only through compulsory

process. That is the opposite of the complete accounting the MVRA requires, 18 U.S.C. § 3664(f)(1)(A), and it is why the opposition of the Government and the Special Master to Defendant's subpoenas (Doc. 248) is objectively self-defeating: denying the only process that can complete the record puts the records in no one's hands; it merely fixes a $1.6 billion penalty on evidence no one has seen. Because that accounting cannot be assembled on this record, the Court cannot satisfy § 3664(f)(1)(A) in any event and is powerless to adopt the Report.

The Special Master's own filing confirms the incompleteness. He concedes that his designee on the NHC board voted to approve the Beckett sale, that he consented to that course of action, and that he executed a letter confirming he did not oppose it — consistent with the Motion to Disqualify's showing that the sale required his approval as record owner — yet he admits he has not obtained, let alone produced, any accounting of that sale's proceeds, promising only to address it "in a future report." Doc. 268 & n.19. A recommendation that cannot account for the disposition of a roughly $1 billion asset is not, and cannot be, a "final" determination of the amount of loss.

These facts also dispose of the suggestion that Defendant has merely "changed his tune." Defendant corrected his position only when the evidence of the fiduciaries' duties — including the trust documents governing Beckett and the assignment and voting-trust instruments governing AAPC — came into his hands; on that evidence he had no choice. The change is not opportunism but the necessary consequence of newly obtained proof, and that proof bears directly on the two questions the MVRA reserves to this Court. As to causation and offsets: the Special Master's own disposition of Beckett — an asset valued of

record at approximately $1 billion, sold for approximately $134 million — destroyed roughly $866 million in value. That loss was caused by the fiduciary's conduct, not by the offense of conviction; it must be excluded from any loss and

credited as an offset, 18 U.S.C. §§ 3663A(b)(1)(B), 3664(j)(2); and it cannot be the basis for continuing the reference in the same hands. As to value: the Damovo facts show a further threatened loss of approximately $300 million — the gap between the roughly $100 million the Special Master would accept and the $400 million the market offers. Together, the roughly $866 million already destroyed and the roughly $300 million now threatened total on the order of $1 billion in value the reference has cost or stands to cost. A Report and a reference that have produced, and stand to produce, loss of that magnitude cannot continue unchanged.

CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Lindberg respectfully requests that the Court decline to adopt the Second Supplement and enter an order: (1) determining, under 18 U.S.C. § 3664(e), that the Government has not proved a restitution-eligible loss proximately caused by the offense of conviction, and fixing restitution at zero; (2) in the alternative, excluding from restitution the intervening-cause losses identified above; (3) crediting all offsets required by 18 U.S.C. §§ 3663A(b)(1)(B) and 3664(j)(2); (4) declining to adopt the Second Supplement because the deficiencies in proof identified above cannot be cured on this record, and because determining the cause and amount of loss on this record would complicate and prolong the proceeding to a degree that the need to provide restitution is outweighed by the burden on the sentencing process, 18 U.S.C. § 3663A(c)(3)(B); (5) declining to consider any sealed valuation material not disclosed to Mr. Lindberg; and (6) granting such other and further relief as is just. Mr. Lindberg expressly reserves and preserves all rights, objections, and arguments, including the right to supplement this Response before any final restitution hearing.

For the further reasons that this Response is preliminary and filed under protest, that the Report is not final, and that the Government has not answered the pending motions, Mr. Lindberg requests in the alternative that the Court decline to adopt the Report and hold it in abeyance until

the Government responds on the merits, the accounting is produced, and the subpoenas (Doc. 248) are resolved; and Mr. Lindberg readopts and incorporates by reference each of his pending motions — the Motion to Disqualify the Special Master (Doc. 269), the Second Motion to Set Aside the Special Master's Report, and the Motion to Adopt All Prior Motions and to Hold the Report in Abeyance — as if filed after the Final Report.

Dated: August 6, 2026 Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg8

Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Undersigned counsel consulted with counsel for the Government and with counsel for the Special Master concerning extending the deadline for responding to the report. The Government and Special Master do not have an objection to this report being filed on Augst 6, 2026.

Respectfully submitted, this 6th day of August 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Defendant Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

This the 6th day of August 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Defendant Greg E. Lindberg

**Doc. 282 — Motion to Adopt Prior Motions and to Hold in Abeyance (filed 08/06/2026)**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION TO ADOPT ALL PRIOR MOTIONS AS IF FILED AFTER THE SPECIAL MASTER'S FINAL REPORT, AND TO HOLD THE SPECIAL MASTER'S SECOND SUPPLEMENT (DOC. 245) AND PROPOSED FINAL ORDER OF RESTITUTION (DOC. 245-1) IN ABEYANCE PENDING THE GOVERNMENT'S RESPONSE TO DEFENDANT'S PENDING MOTIONS

Defendant Greg E. Lindberg respectfully moves the Court, pursuant to 18 U.S.C. § 3664(e) and (d)(6) and the Court's authority to manage its docket, to hold the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245) and the proposed Final Order of Restitution (Doc. 245-1) in abeyance until the Government has responded on the merits to the pending motions now before the Court, and the Court has ruled on them. In support, Mr. Lindberg states:

1. Eight of Mr. Lindberg's motions remain pending, and the Government has not responded on the merits to any of them: (a) the Emergency Motion to Stay All Further Asset Sales and to Stay Enforcement of the Preliminary Order of Restitution (Doc. 172, filed June 9, 2026); (b) the Emergency Motion to Stay All Asset Sales Pending Entry of a Final Restitution Order and a De Novo Article III Determination, with Consolidated Objections to the scope and validity of the Special Master reference (Doc. 190, filed June 11, 2026); (c) and (d) the Emergency Motions of June 15, 2026 to enforce the Plea Agreement and the Order Appointing the Special Master and

to preserve Mr. Lindberg's due-process rights (Docs. 201, 202); (e) the Motion for a Determination That No Restitution Is Owed, with the Consolidated Statement of Facts (Docs. 234, 235, filed July 14, 2026); and (f) the Motion for Issuance of Rule 17(c) Subpoenas Duces Tecum to Michael Dinius, to the Special Master and NHC Holdings, LLC, to Paladin Management Group, to the NCICs, to the Bermuda insurance companies through their Joint Provisional Liquidators, and to counsel for the NCICs (Doc. 248, filed July 23, 2026) and the two motions to disqualify the special master and the this motion to refile to all motions as if filed after the final report and to keep the special masters report in abeyance until all motions that are pending are responded to by the government and adjudicated. Together these motions place in dispute every threshold question in this proceeding: whether any restitution is owed at all, the proximate-cause and foreseeability limits on the

claimed loss, the mandatory offsets and credits, the exclusion of prejudgment interest, the scope and validity of the Special Master reference, and Mr. Lindberg's due-process rights. The specific issues each of these motions places before the Court are itemized in the schedule attached as Exhibit B.

2. Rather than respond, the Government has permitted the Special Master to file a Second Supplement (Doc. 245) and a proposed Final Order of Restitution (Doc. 245-1). A report and recommendation by a court-appointed master is not a response to Mr. Lindberg's motions, and it does not resolve the issues those motions raise—causation, foreseeability, proximate cause, the offense-of-conviction limit, and the mandatory credits and offsets. Those issues must be decided first; a recommended dollar figure cannot be adopted before the Court determines whether any restitution is due at all.

3. The Government's silence is a failure of proof under 18 U.S.C. § 3664(e). The statute provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved

by the court by the preponderance of the evidence," and that "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). A defendant's burden arises only "once the Government has satisfied its burden to offer evidence supporting its restitution calculation." United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017). Where the Government does not carry that initial burden, "the burden of proof never shift[s]" to the defendant, and the resulting restitution order cannot stand. United States v. Steele, 897 F.3d 606, 614 (4th Cir. 2018) (vacating restitution order). The Government's non-response to six motions that contest loss, causation, and amount is not a neutral procedural gap; it is a failure to carry a burden the statute assigns to it, and every disputed item on which the Government offers no evidence must be resolved against the Government as the party bearing the burden.

4. The Special Master's report is not a substitute for the Government's proof. By its terms, § 3664(e) places the burden "on the attorney for the Government"—not on a court-appointed master. Steele, 897 F.3d at 613. A court-appointed master's recommendation cannot discharge a burden the statute assigns to the prosecutor, and the Special Master's charge under the appointing order (Doc. 56) and § 3664(d)(6) is to assist the Court, subject to the Court's de novo determination—not to prove the Government's case. If the Government were to contend that the Special Master's report is its response—that the report supplies the causation, foreseeability, and loss proof the Government has never offered—then the Government would have delegated its prosecutorial burden to a court-appointed master, and the Special Master would be converted into the prosecutor. Neither the MVRA nor the separation of the Court's adjudicative function from the Executive's charging-and-proof function permits that result. The report therefore cannot be accepted, adopted, or acted upon as though it were the Government's proof.

5. The report is also the work product of a fiduciary who has not met his obligations to the very assets at issue. Under the appointing order, the Special Master holds full authority over NHC Holdings, LLC as fiduciary, and NHC is a Primary Restitution Asset. Doc. 56. Yet in December 2025 the Beckett Collectibles business—valued at approximately $1 billion, and at an $800–900 million enterprise value in the Blackstone negotiations—was sold to Collectors for approximately $134 million, a loss of roughly $866 million in restitution value. The sale required the Special Master's consent and could not have

occurred without it: any sale of Beckett assets is a "Fundamental BKX Matter" requiring Grantor approval under the Beckett Collectibles Trust (Amended and Restated Trust Agreement, Dec. 5, 2023), the Grantor is controlled by NHC, and the Special Master controls NHC's board. The Second Supplement itself acknowledges that the sale occurred with the consent of NHC Holdings, LLC. Doc. 245 at 31 & n.29. The Special Master nonetheless neither sought nor obtained the Court approval his own appointing order twice requires before any restitution asset is liquidated. Doc. 56, ¶ 6(e) (the Special Master "shall seek Court approval to liquidate … any available assets for the benefit of victims"); see Doc. 172; Doc. 190. No accounting of the approximately $134 million in proceeds has ever been provided. Doc. 245 at 31.

6. These pending motions are therefore central to a threshold question the Court must answer before it relies on the report for anything: whether a Final Report prepared by a fiduciary who disposed of a Primary Restitution Asset in violation of his own appointing order, forfeited roughly $866 million in restitution value, and has never accounted for the proceeds can be relied upon to adjudicate how the entire restitution proceeds. Docs. 172, 190, 201, 202, 234, 235, 248. That question cannot be answered while the report is being adopted; it must be answered first. To accept or act upon the report before the Government responds and the Court resolves these motions

would let the recommendation of a breaching fiduciary—unsupported by the Government's own proof—fix a criminal penalty exceeding $1.6 billion.

7. Any delay in fixing restitution is the Government's doing, not Mr. Lindberg's. The Government cannot have it both ways on timing: it presses the 90-day clock of 18 U.S.C. § 3664(d)(5) to justify finalizing the Report and fixing restitution now, yet its own authority dissolves the urgency — a court that does not meet that deadline "nonetheless retains the power to order restitution." Dolan v. United States, 560 U.S. 605, 608 (2010). No deadline requires the Report to be finalized, or restitution fixed, before the pending motions are answered. The Government's own conduct confirms the point. At sentencing, the Government asked the Court to make Mr. Lindberg's cooperation with the restitution process a condition of supervised release — "a special condition that, should the Special Master still be working when the defendant goes on supervised release, that a term of the supervised release is to continue cooperating with the Special Master." Sent. Tr. at 70:1–5. Supervised release does not begin until Mr. Lindberg's release from a twelve-year sentence — years from now — so the Government itself expected the restitution process to continue for years, and it cannot now invoke the 90-day clock to finalize restitution in a matter of weeks, before the pending motions are answered. The Government, having itself delayed its responses to the pending motions, cannot now seek compliance with the 90-day deadline of 18 U.S.C. § 3664(d)(5) — a deadline that was in any event mooted by the bifurcation process. Mr. Lindberg has done his part. He has no way to touch a computer or to use a spreadsheet, yet he is required to answer a restitution demand exceeding $1.6 billion that rests on the Special Master's own admitted "current guess" as to value. Doc. 245 at 36–37. From federal custody, and with only limited access to counsel, he prepared a detailed Response and Objection to the Special Master's Report and Recommendations Regarding Restitution—supported by verified statements

of fact and contemporaneous documents—which is attached as Exhibit A, and he has filed the six motions listed above. The Government has answered none of them. It has instead opposed even the Rule 17(c) subpoenas by which Mr. Lindberg seeks the records—held by the Special Master, the Rehabilitator (Michael Dinius), NHC Holdings, LLC, and Paladin

Management—that he needs to carry the burden the statute places on him to prove the mandatory offsets and to establish causation. Doc. 248. A defendant who has litigated diligently from prison cannot be charged with delay that the Government alone has caused by refusing to respond; the § 3664(d)(6) determination should proceed once the Government does what the statute requires of it.

8. No evidence of any money missing has ever been produced by the government or the special master. The protected North Carolina policyholders—approximately 43,000—received their final distributions in December 2025. See Doc. 174 ¶ 120 (more than $157 million distributed to more than 43,000 policyholders). ULICO holds $352,906,240 in AAPC preferred equity credited dollar-for-dollar against its claim—collateral that 18 U.S.C. § 3664(j)(2) commands be credited. Doc. 132 at 18; Doc. 234 at 46. And the credits the Special Master's own Report itemizes for cash and near-cash recoveries—SNIC payments ($27,823,425); cash payments to the restitution parties the Report did not capture ($79,655,289); the CBL subordination fee ($3,000,000); the CWG income-tax escrow ($20,000,000); ULICO real-estate proceeds ($13,596,013); and Bermuda sale proceeds ($9,800,076)—themselves total more than $150 million. Doc. 245 at 5–6. Those cash credits alone exceed the residual restitution that could remain even if every disputed causation and valuation item were resolved against Mr. Lindberg, and, with the mandatory offsets and non-caused losses fully applied, net restitution is zero.

9. The merits confirm that Mr. Lindberg is the source of neither any loss nor any delay. He contributed approximately $1 billion of his own capital to the businesses as a net addition to their surplus—a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss—so that no loss to the protected parties was reasonably foreseeable at origination. When control passed in 2018, independent firms including Houlihan Lokey and KPMG valued the companies and found the affiliated loans well secured, with "full coverage," as the Response attached as Exhibit A documents. And the plea agreement waived no restitution amount: it fixes only the quantum—"full restitution, regardless of the resulting loss amount"— while confining restitution to persons "directly or indirectly harmed by [Mr. Lindberg's] criminal conduct," and it does not touch causation, which remains the Government's burden to prove. Doc. 40 ¶ 10(a); 18 U.S.C. § 3664(e). Mr. Lindberg therefore does not seek to delay; he asks only that the Government be required to carry, or to fail to carry, its § 3664(e) burden—at which point the Court must decide the consequence of the Government's failure.

10. The ordering is not a formality; it is dispositive, and it runs one way only. Four things must happen in sequence, and each is a precondition to the next. First, liability precedes amount: whether any loss was proximately caused by the offense of conviction, and proven, must be decided before any figure is fixed—adopting a recommended amount first decides the remedy before the Court has decided whether there is anything to remedy. Second, the Government's burden precedes Mr. Lindberg's: only "once the Government has satisfied its burden" does any burden shift to the defendant, Stone, 866 F.3d at 227, so acting on the report first inverts that order and forces Mr. Lindberg to disprove an amount the Government has never proved. Third, a neutral first-instance determination precedes any deference: a party "is entitled to a neutral and detached judge in the first instance," and a proceeding is not "constitutionally acceptable simply because the State eventually

offers a defendant an impartial adjudication." Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972). The de novo determination under § 3664(d)(6) that the Government will invoke therefore cannot cure a report produced by an officer who—as the pending motion contends (Doc. 190)—both holds and liquidates the estate and quantifies the loss, and is paid from that estate. Fourth, adjudication precedes enforcement: because § 3664(j)(2) supplies only an offset against future payments and no clawback from the payees, once assets are liquidated and the proceeds disbursed the harm cannot be undone—as the Beckett sale already shows. Taking these steps out of order does not merely risk error; it produces an irreversible result that no later review can repair. That is why the report must be held in abeyance until the Government responds and the Court decides the pending motions.

11. Holding the report in abeyance pending the Government's response is the orderly course. The pending motions raise dispositive and threshold questions that logically precede any adoption of a report recommending an amount. Adopting the report first would let a master's recommendation stand in for proof the Government has never submitted, and would force Mr. Lindberg to litigate an amount before the Court has decided whether any restitution is owed. Nor does the ninety-day timeline of 18 U.S.C. § 3664(d)(5) compel a different course: a sentencing court that misses that deadline "nonetheless retains the power to order restitution," Dolan v. United States, 560 U.S. 605, 608 (2010), so the Court retains full authority to require the Government's response, resolve the pending motions, and make the § 3664(d)(6) determination on a complete record. Abeyance preserves the status quo, prejudices no party, and ensures that the de novo determination § 3664(d)(6) requires is made after the Government responds.

12. Defendant readopts and re-files, by this motion, each of his pending motions as though filed after the Special Master's Final Report, with every reference to the preliminary report or the Preliminary Order of Restitution (Doc. 161) deemed, mutatis mutandis, a reference to the Final Report and to any final order of restitution entered upon it. The issues those motions raise — whether any restitution is owed at all, causation, foreseeability, the offense-of-conviction limit, the mandatory offsets and credits, the scope and validity of the Special Master reference, and Mr. Lindberg's due-process and counsel-access rights — are not changed by the label "final," and Defendant presses each of them against the Final Report to the same effect as against the preliminary one.

13. Since the six motions listed above were filed, Defendant has also filed a Motion to Disqualify and Remove the Special Master (Doc. 269) and a Second Motion to Set Aside the Special Master's Report and the Restitution Orders. Together with the Motion for a Determination That No Restitution Is Owed (Doc. 234) — the motion to dismiss the restitution claim — these motions place the validity of the report and the existence of any loss squarely in issue. To the extent the Government contends that the Final Report moots any of these motions, it must say so as to each, and must state its position on every part of every motion now before the Court, including the Motion to Dismiss. A blanket invocation of the Final Report is not a response; the Government must join issue, part by part, or concede each point it declines to contest.

14. The Government has now responded to the Special Master's Report by adopting it:

it "agrees with each of the Special Master's recommendations," Doc. 582 at 9 n.4, and has stated that it "does not oppose the positions articulated by the Special Master," Doc. 245 at 44. That adoption does not cure the issues these motions raise. In any event, the Government cannot discharge its burden by adopting the Special Master's position. The burden of proving the amount of loss, causation, and foreseeability is placed "on the attorney for the Government," 18 U.S.C. § 3664(e); under the MVRA the duty to prosecute the restitution claim — to come forward with proof and to join issue on the defense motions — lies with the Government, and not with a court- appointed master. Were the Government to stand on the Special Master's report in place of its own

proof, it would convert the Special Master into a second prosecutor — one paid from the very sale proceeds he generated and administers — a result neither the MVRA nor the separation of the Court's adjudicative function from the Executive's charging-and-proof function permits. Each pending motion must therefore be answered on the merits, all the more so given the pending Motion to Disqualify and the Second Motion to Set Aside, which place the neutrality and validity of the report itself in issue: the Government cannot rest on a report that is the subject of a pending disqualification-and-set-aside challenge. Any failure to respond is a failure to prosecute the restitution claim, and the Government's failure to answer will be read against it as such — every disputed item on which the Government offers no response and no evidence must be resolved against it as the party bearing the § 3664(e) burden, as set out above (¶ 3).

15. The Government's disclosure and production obligations reach further still. The

claimed loss turns on intervening transactions the Government itself affected: the Ares transaction, for example, was stopped by the Government, as a note placed on the record and attached to Defendant's Motion to Dismiss the restitution claim reflects. Because the Government bears the burden under 18 U.S.C. § 3664(e) and must disclose evidence bearing on causation and loss, it must produce everything responsive that is held by any arm of the Government — including its investigative agencies, such as the Federal Bureau of Investigation, and every other department or agency — not merely the materials in the prosecutors' immediate possession. None of that can occur, and none of the disputed issues can be resolved, without the Government's response, on the merits, to each and every issue these motions raise.

WHEREFORE, Mr. Lindberg respectfully requests that the Court: (1) hold the Special Master's Second Supplement (Doc. 245) and proposed Final Order of Restitution (Doc. 245-1) in abeyance; (2) direct the Government to file a merits response to each of the pending motions —

including the Motion to Disqualify and Remove the Special Master (Doc. 269), the Second Motion to Set Aside the Special Master's Report and the Restitution Orders, and the Motion for a Determination That No Restitution Is Owed (Doc. 234) — within seven (7) days, stating its position on each part of each motion, and afford Mr. Lindberg an opportunity to reply; (3) treat any failure by the Government to respond to a motion, or to any part of a motion, as a failure to prosecute the restitution claim, and resolve each unanswered item against the Government as the party bearing the § 3664(e) burden; (4) rule on those motions — and resolve the Government's § 3664(e) burden on causation, foreseeability, and amount — before accepting, adopting, or acting upon the report; and (5) grant such other and further relief as is just.

Dated: August 6, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg1

Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted; the Government disagrees with and opposes the relief requested, as does the Special Master.

/s/ Kenneth N. Barnes Kenneth N. Barnes

CERTIFICATE OF SERVICE

I certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

Dated: August 6, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes

**Doc. 283 — Response in Opposition to the Special Master's Opposition to Subpoenas (Doc. 266) (filed 08/06/2026)**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
UNITED STATES OF AMERICA, )
) Case No. 3:23-CR-48-MOC
Plaintiff,
) Case No. 5:19-CR-22-MOC
)
v.
) Judge Max O. Cogburn, Jr.
)
GREG E. LINDBERG, ) EXPEDITED CONSIDERATION
) REQUESTED
Defendant. )

DEFENDANT'S RESPONSE TO THE SPECIAL MASTER'S RESPONSE (DOC. 266) TO DEFENDANT'S MOTION FOR ISSUANCE OF SUBPOENAS DUCES TECUM (DOC. 248)

INTRODUCTION

This Response addresses the Special Master's Response (Doc. 266) to Defendant's Motion for Issuance of Subpoenas Duces Tecum (Doc. 248). Fairly read, the Special Master's Response concedes the Motion: it establishes that the books, records, valuations, and loss data the restitution accounting requires are held by custodians whom no participant in this proceeding can compel except through Rule 17(c). The Special Master should not be heard to resist the only process that can complete the record his own Report leaves unfinished.

ARGUMENT

I. The Special Master's Response Concedes the Motion — No Participant Can Reach the Records, and Fixing Restitution Without Them Is What the MVRA Forbids The Special Master's Response, fairly read, concedes the Motion. Its premises are that he does not control the companies' books and records, Docs. 266, 268; that his professionals "have no direct knowledge of the facts and circumstances critical to the restitution determination," Doc.

266; and that the accounting remains incomplete — he has not so much as obtained an accounting of the Beckett sale, which he says he will address "in a future report," Doc. 268. Those premises establish that the records the Court needs exist only in the hands of custodians whom no participant in this proceeding can compel except through Rule 17(c). The Special Master claims "no authority to compel" the companies and no control over them, Docs. 266, 268 — a claim Defendant disputes, the Special Master having stepped into Defendant's shoes as record owner able to compel production, which he refused — and the Government has not sought the records it has authority to obtain. But even on the Special

Master's own telling, only Defendant's subpoenas can reach them. Opposing the subpoenas therefore accomplishes nothing except to guarantee that a restitution exceeding $1.6 billion is fixed on records that no one — not the defendant, not the Special Master, not the Government, and not the Court — has ever seen in full. The Special Master's Response is, in that precise sense, objectively pointless.

It is also an attempt to obtain what the MVRA forbids. The statute commands that the Court determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), and resolve every dispute "by the preponderance of the evidence," § 3664(e), with the burden on the Government. To deny the only process that can complete the record, and then fix restitution on the untested recommendation of a fee-interested officer who claims he could not obtain the underlying data (though he stepped into Defendant's shoes as record owner and could compel it), would invert that burden and substitute an admittedly incomplete report for the proof the statute requires. Mr. Lindberg has now lodged detailed, itemized objections to the Report — each turning on the very records these subpoenas seek — and neither the Government nor the Special Master has answered them on the merits.

The Special Master's effort to distance himself from the records only sharpens the need for them. He concedes that his own designee on the NHC board voted to approve the Beckett sale, that he consented to that course of action, and that he executed a letter confirming he did not oppose it — consistent with the Motion to Disqualify (Doc. 269) showing that the sale required his approval as record owner — yet he admits he has not obtained, let alone produced, any accounting of that sale's proceeds. Doc. 268 & n.19. The officer whose consent the Beckett sale required is thus the same officer who now resists producing its records, even as other Primary Restitution Asset sales "may be consummated in the coming weeks" "outside of the special master process." Doc. 268 n.8. On this record the remaining themes of the opposition to the subpoenas collapse: "already in possession" fails because the records are conceded not to be the Special Master's to give; "no factual disputes" fails because the Special Master concedes his team lacks direct knowledge of the facts and that the Beckett accounting does not yet exist; and "harassment of victims" fails because the subpoenas run to the court officers and fiduciaries who administered the estate — not to the policyholder victims, every one of whom has been paid in full; and in any event the institutional "victims" the Government and the Special Master invoke are the insurance companies, and requiring them to produce records of what they received and how those funds were used is not harassment but the accounting the MVRA requires, 18 U.S.C. § 3664(f)(1)(A), (j)(2), to compute the mandatory credits and offsets. The Motion should be granted.

More importantly, the import of all of these arguments is that restitution rests on guesses of the Special Master, based on documents the court has not seen, the special master claims to not be able to produce, the government does not have and the defendant cannot have because he turned over the companies to the custodians and the special master. This record cannot meet the accounting requirements of MVRA that are a prerequisite to restitution determination.

CONCLUSION

For these reasons, and because the Special Master's own Response confirms that the records are not under his control — a characterization Defendant disputes, the Special Master having stepped into Defendant's shoes as record owner able to compel production, which he refused — and that his professionals lack direct knowledge of the facts they purport to resolve, Rule 17(c) is the only path to a complete record. Denying it would fix a

criminal penalty exceeding $1.6 billion on evidence no one has seen, in violation of 18 U.S.C. §§ 3664(e) and (f)(1)(A). The Motion should be granted.

Dated: August 6, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

[Doc. 283-1 — Attachment]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA v. GREG E. LINDBERG Case No. 3:23-CR-48-MOC

UNITED STATES OF AMERICA,

V.

Case No. 3:23-CR-48-MOC

GREG E. LINDBERG,

Case No. 5: l 9-CR-22-MOC

Defendant.

DECLARATION OF GREG E. LINDBERG PURSUANT TO 28 U.S.C. § 1746

I, Greg E. Lindberg, do hereby state and declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information, and belief. I submit this Declaration in support of my Response and Objection to the Special Master's Second Supplement to the Report and Recommendations Regarding Restitution (Doc. 245), a draft of which was filed as Exhibit A to the unopposed motion for extension of time on July 30, 2026 (Doc. 267, 267-1 ), and in further support of the mandatory offsets, credits, and reductions documented there.

I. All American policyholders of my fonner insurance companies have been paid in

full. In December of 2025, more than $157 million was distributed to the remaining more than 43,000 policyholders - a distribution my conduct facilitated, including my relinquishment of a $40 million tax escrow to allow it - and the Special Master's filings acknowledge that payment.

See Doc. 174 ~ 120; Doc. 267-1, Part VIII.

2. All remaining liabilities that the Special Master alleges are owing from n1e to

Northstar, OMNIA, and PBIHL can be fully satisfied with the attached offer, dated July 31, 2026, from Twelve Seas Investment Company III (NASDAQ: TWLV), a special purpose acquisition company holding approximately $175 million in trust capital, signed by its Chief Executive Officer, Dimitri Elkin, proposing a business combination with Damovo at a $400 million enterprise value. A true and correct copy of that letter is attached hereto as Exhibit A. My former attorney~

at Katten told me that the Special Master is intending to sell Damovo "for the debt," which is approxitnately $100 tnillion. This would be a $300 million loss caused by the actions of the Special Master.

3. The Special Master alleges that the remaining unpaid principal balance owing to

Northstar, OMNIA, and PBIHL is $208 million. A sale of Damovo at a $400 million enterprise value produces $300 mi11ion in proceeds net of Damovo's approximately $100 million in outstanding obligations. This is an initial offer, and the ultimate sale price that could likely be negotiated with Twelve Seas is approximately $450 million. In short, the sale of Damovo can easily cover all remaining alleged obligations owed to Northstar, OMNIA, and PBIHL. A sale could be conducted and all proceeds placed in escrow to allow the required accounting to be performed, as stated in my filings. See Doc. 267-1, Part XIII (the accounting the MYRA requires).

4. A sale of Damovo "for the debt" would repeat the pattern already documented in

my Response and Objection: Beckett Collectibles, valued at approximately $1 billion by the Cabrillo Advisors appraisal and by Blackstone's own acquisition proposal and analysis, was sold in December of2025 for just $134 million; and Clanwilliam, valued at approximately $880 million in the signed Quadro purchase agreement [Doc. 235 1 32; Doc. 174 1 117; Ex. 13], was sold in September of 2025 for approximately $450 million. See Doc. 267-1, Parts XIII.B, XIV.E, XV.G & n.6. The Twelve Seas indication of interest is contemporaneous, ann 's-length market evidence that Damovo is worth approximately four times what my fonner attorneys advised me the Special Master intends to accept. That valuation is corroborated by a prior ann's-length transaction: in QI of 2024, just months before control of my interests was transferred, a deal was in place valuing Damovo at approximately $371 million, with approximately $100 million of debt on Damovo's books - the same ann's-length character as the current Twelve Seas indication of interest.

5. The Special Master alleges that there is $339 million in remaining unpaid principal

balance owing to ULICO. This amount has been entirely satisfied by ULICO's acceptance of AAPC preferred equity with a par value of $352,906,240 as of May 26, 2026 - the same figure the Special Master lists in his own table. See Doc. 245 at 6 (Issue 3). Under the Confidential Side Settlement Agreement dated Decen1ber 19, 2022, and its Amendment dated Decen1ber 30, 2022, resolving ULICO's $524 million civil judgment in Universal Life Insurance Co. v. Lindberg, No.

,~

1:20-cv-861 (M.D.N.C.), ULICO accepted $25 million in cash and the transfer of the AAPC preferred equity, and agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed, regardless of whether ULICO sells the preferred or holds it. See Doc. 132-1, Exs. A & B; Doc. 267-1, Part XV.C. ULICO has chosen to hold the preferred because its value has increased from $218 million at transfer in 2022 to over $352 million today, and because ULICO is accruing over $35 1nillion a year in payment-in-kind dividends per the terms of the preferred. By the end of next year, the AAPC preferred held by ULJCO will be worth approximately $400 1nillion. ULICO has not once disputed that the AAPC preferred is worth anything less than its par value.

6. Over the last seven years, I have made four transfers of control of my assets to third

parties, as summarized in the chart below: # Date Assets I Interests Control Approx. Valuation Basis Transferred Transferred To Value .. I October 2018 The North Carolina Rehabilitator ~$450 million Signed Ares LOI . . (Nov. 22, 2018); insurance companies (NCICs) KPMG appraisal (Aug. 24, 2018);

Rehabilitator' s own internal valuation of $454M (Nov. 5, 2018). Doc. 23511 13-15, 26; Doc.

245 at 18 2 June 2019 Memorandum of Rehabilitator $1.5 billion Value stipulated by Understanding establishing the Rehabilitator in the process to transfer the 2019 litigation Specified Affiliated filings. MOU dated Companies (SACs) June 27, 2019;

Doc.235130 .., Rehab ii itator $3.4 billion Signed Quadro .) October 2024 Specified Affiliated Companies (SACs) purchase agreement (Q 1 2024), 22.14x EBITDA multiple.

Doc. 235 1 32;

Doc. 1741 117;

Doc. 132-2 (Ex. 13) at 15 4 February My interests in AAPC and Special Master $2.7-$3.0 Houlihan Lokey:

2025 NHC Holdings, LLC billion l 8-20x EBITDA (including all of the SA Cs) (AAPC) applied to AAPC's forecasted 2026

# Date Assets I Interests Corttrol Approx. Valuation Basis Transferred Transferred To Value EBITDA of ~$150 million. Doc. 235 11 13-17; Doc.

_-1, Part XIV.D

With respect to Transfer #3: while the SACs were under my control from 2019 through October of 2024, they gained $1.9 billion in value, based on the $3.4 billion Quadro valuation and the $1.5 billion value that the Rehabilitator assigned to the SACs in 2019. With respect to Transfer #4: I have not had any access to AAPC's financial data since the Special Master took control of my interest in AAPC, so the 2026 EBITDA forecast referenced above is an estimate. My motions for access to those records remain pending and opposed. See Docs. 202, 248; Doc. 267-1, Part

XIX.

7. In summary, I transferred $6.4 billion in value to the Special Master in February of

2025, including $3.4 billion for the SACs and $3 billion for AAPC. See Doc. 267-1, Part XIV.D. At my first sentencing in August of 2020, the government alleged that there was a "$1 billion hole" in the consolidated enterprise, implying that the liabilities were $1 billion in excess of the assets. This was a false statement to the court, and it highly prejudiced my original sentence of 87 months. The fact is, based on the valuations cited above, there are billions of dollars in enterprise value in excess of all liabilities.

8. In September 2024, the Clanwilliam credit facility was approaching its five-year

maturity, which presented two ordinary options: roll over (refinance) the maturing debt, or pursue a sale or other M&A transaction. Middle-market companies such as Clanwilliam routinely borrow on five-year terms and refinance - "roll over" - those loans at maturity as a matter of course. Clanwilliam carried only approximately four times leverage, a conservative level well within normal market parameters, and it had substantially reduced its leverage since the original Alcentra facility was underwritten. A company that well-secured can ordinarily refinance a maturing loan of this kind routinely - effectively with a phone call - so the 1naturity created no genuine refinancing crisis and no default or forced-sale risk that made a sale necessary. Rather than roll the debt over, the loan's maturity was instead used as the occasion for a sale, and Clanwilliam was

sold for approximately $450 million against the $880 million Quadro valuation signed months earlier. See Doc. 267-1, Parts XIV.E, XV.O.

9. AAPC presents a similar risk. AAPC has a refinancing requirement approaching in

2027, and the san1e n1aturity-driven dynamic could be used as the occasion for a below-value sale rather than a routine refinancing. Failure to roll over maturing debt that could readily be refinanced - a usual and customary process for almost all corporate borrowers - would reflect mismanagement and a breach of the fiduciary duties owed in the administration of these assets. As with Clanwilliam, a maturing, well-secured obligation of this kind can ordinarily be rolled over rather than used to justify a forced sale at a fraction of the company's value.

10. The Special Master's apparent premise - that these companies should be sold "for the debt" - reflects a basic misunderstanding of how businesses are valued. Having built, financed, and operated companies for more than two decades, I know that a company's value is determined by its assets, earnings, and cash flows, not by the amount of debt it happens to carry. A firm's enterprise value is independent of how it is financed; debt is a claim to be paid out of that value, not a reduction of it. See Franco Modigliani & Merton H. Miller, The Cost of Capital, Corporation Finance and the Theory of Investment, 48 Am. Econ. Rev. 261 (1958). Selling a company "for the debt" therefore captures only what is owed to lenders and none of the enterprise value that belongs to the owner - it is not a measure of the company's worth.

I I .Nor is the presence of debt a sign of weakness or a reason to sell at a loss. Virtually every substantial operating company carries debt and uses it deliberately as an instrument of growth, because debt is ordinarily a cheaper source of capital than equity: interest is tax-deductible, and lenders, who hold a senior, secured claim, require a lower return than equity investors. See Franco Modigliani & Merton H. Miller, Corporate Income Taxes and the Cost of Capital: A Correction, 53 Am. Econ. Rev. 433 (1963) (tax deductibility of interest); Thomas R. Piper & Wolf

A. Weinhold, How Much Debt Is Right for Your Company?, Harv. Bus. Rev. (July 1982) (prudent

use of debt capacity). The deliberate use of debt can also add value by disciplining n1anagement and reducing the agency costs of free cash flow. See Michael C. Jensen, Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers, 76 Am. Econ. Rev. 323 ( 1986). The arm's-length market evidence bears this out: Damovo, carrying approximately $100 to $125 million of debt,

was the subject of a QI 2024 arm's-length transaction valuing it at approximately $371 million, and is now the subject of the July 31, 2026 Twelve Seas indication of interest at a $400 million enterprise value, with a negotiated price of up to approximately $450 million achievable at arm's length. Damovo is thus wo1th roughly four times its debt. It was and remains entirely foreseeable that these debt-financed operating companies carry enterprise value far in excess of their debt- ' disposing of them "for the debt" predictably destroys hundreds of millions of dollars in value that the Special Master was charged with preserving. The difference between these companies' true value and the depressed prices at which they have been, or are being, sold is not a loss I caused; it is value that existed, that I preserved, and that the Special Master has destroyed.

12.Attached as Exhibit A is a true and correct copy of the term sheet titled "Term Sheet-Scope of the Special Master's Rights and Responsibilities," bearing the comments of Williams Mullen, counsel to the North Carolina insurance companies. The Special Master circulated this term sheet to define the scope of his rights and responsibilities and to seek a clarifying order from the Court. I am familiar with the document from my own involvement

in this matter and through my former attorneys, who acted on my behalf, and through Paladin Management, which raised the matter with the Special Master independently, and I authenticate the attached copy as a true and correct copy of the term sheet as it was circulated and commented in those negotiations. My former counsel at Katten Muchin Rosenman LLP, and Paladin Management acting independently, each sent the term sheet to the Special Master and urged him to press for access to the books, records, valuations, and loss information held by the insurance companies and the other parties - the very information a complete and accurate restitution accounting requires - and to push back against those parties' refusal to provide it. The Special Master refused to push back. As a result, the information necessary to prepare an accurate and complete accounting was never obtained.

13. Based on the foregoing, I respectfully request that, before any restitution amount is fixed and before any further sale or liquidation of my assets, the Court order a full and verified accounting under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664 - including a determination of the full amount of each victim's losses, § 3664(f)( l )( A); the crediting of all amounts already recovered or satisfied, § 36640)(2)~ the disclosure of every n1aterial change in my economic circumstances resulting from the Special Master's dispositions, § 3664(k); and the application of the substantial resources already realized from those dispositions, § 3664(n). 1

further request that the Court order the Special Master to disclose every sale, offer, or expression of interest for any of 1ny assets that cmne before him - every such transaction that landed on his desk - but that he did not approve, did not pursue, or did not take, including the price and terms offered and his reasons for declining, so that the value he chose to forgo, as well as the value he realized, is on the record. The evidence set out above - all American policyholders paid in full, the ULICO preferred-equity satisfaction, the arm's-length Damovo valuations, and the below- value sales of Beckett and Clanwilliam - · cannot be reconciled with the Special Master's alleged balances without such an accounting, and the amounts at stake are far too large to be fixed without one.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 6th day of August, 2026, at the Pike County Detention Center in Pikeville, Kentucky.

Greg E. Lindberg /30 f -:i.-,,,,,.,~ k ;/= 31/-92t-l /Q PtSIJ~1ekt ~ 'Fl-:I /1--1-1~~

Term Sheet-Scope of Special Master's Rights and Responsibilities The following is intended to build consensus regarding the parameters of the Special Master's limited role within the larger landscape of courts, regulatory agencies, fiduciaries, and other entities dealing with the fallout of Greg E. Lindberg's conglo1neration of insurance companies and subsequent dissipation of assets to the detrin,ent of such con1panies (the "Scheme"). The Special Master intends to use this term sheet as a basis for a n1otion seeking an order from the U.S. District Court for the Western District of North Carolina (the "Cou11") clarifying how the Court wants the Special Master to function under these circumstances (the "Clarification Order"). This term sheet is built around the primary duties imposed on the Special Master by the Order Appointing Special Master, Case No. 3:23-cr-48 (W.D.N.C. Jan. 23, 2025) (the "Appointment Order"), Decretal Paragraph 3. General references to the Special Master throughout this term sheet are intended to include the Special Master's professionals.

[The Special Master has two jobs:

I. Calculate what each victirri~ls owed in restitution and make a recommendation to the Court, and

2. Facilitate the sale ~f AAPC 'through the rights that GEL'and GGH have assigned to him. If the Special Master identifies ai~!t~o9:~l}}E~. as~~ts that ~soulfl be' ·" usect__to pay victims, it would be appropnate for the Special Master .to s~el( a coµrt order' authorizing him to secure those assets as well. The Special Master has no role wtth respect to NI-IC or:the SACs, because GEL has no property rights in these companies. Paragraph 16~in the · Spe_cial"Masfer Order was meant to clarify this. But even without that paiagrapli,'the\Special M~tefh'asJitq}'tj~ht§'.to'property other than' those tne defendant ho Ids.]

• Verify and quantify losses suffered by each victim and any offsetting amounts [13(a)] o No clarification from the Court needed at this time ' [The.NCICs propose the foliowing:proceis to establish victim losses: a

J. The Special Master should ask the Court to set date by which potential victims provide written

as · notice to the Special Master in which they assert their status victims ofthe Scheme, and · ·explain f ~by they are entitled to restitution under federal law. Insurance company victims may assert ¥1etim status on behalf of their injured policyholders.

2. The Special Master should ask the Court to set a. second date by which potential victims are

required to_ submit to the Speci~l Master their calculation of the restitution they are owed, along w1th supporting documentation.

3. The Special Master should ask the Court to set a third date by which the Special Master shall

submit to the Court, the parties, and any persons or entities who have asserted victim status- a report and recommendation regarding ( 1) who the victims are, (2) to what cestitutioa they are ~ntitled, and (3) priority of payment a1nong victims, if applicable. In preparing his report and recommendation, the Special Master will evaluate the submissions of the potential vi'Qtims and pp,nfer wjth potential victims and/or the DepE\ftment of Justioe as appropriate~

4. [he Special Master should ask the Court !Q_sets a fourth da~e for the parties and any potential

w.ictims to submit any objections to the Special Master s report and teoommendation. The Court

will make a final restitution determination at sentencing or at ~ separate hearing specifically :regarding restitution, This provides a process for the Special Master to fulfill his duties under 18 U.S.C. § 3664(d)(6), the relevan( authorizing statute.]

• Identify all assets available for liquidation and determine estimated value thereof (13(b)) o The cooperation obligations set forth in 18 of the Appointment Order shall be expanded to require Greg E. Lindberg ("GEL"), any Specified Affiliated Company and its subsidiaries (each a "SAC" and, collectively, the "SACs"), and any other entity owned, directly or indirectly, by GEL or otherwise affiliated with GEL (including their respective officers, directors, managers, trustees, auditors, employees, and agents), regardless of whether such entities are contro11ed by a trust, NHC Holdings, LLC ("NHC"), or otherwise, to: (I) provide the Special Master with reasonable access during normal business hours to all of the

corresponding company's books and records, (II) furnish to the Special Master all financial and operating data, reports, projections and other infonnation concerning the business, properties, and personnel as the Special Master may reasonably request, and (Ill) cooperate fully with any reasonable requests made by the Special Master in connection with the examination of the respective company.

[The Spec_ial Master has no interest in or control over NHC or the SACs except to the extent that GEL or GGH had such interest or, control. The NCICs do not consent and object to their borrowers being forced to spend' mpney that' could otherwise be used to repay policyholders.

Moreover, under the, Special'Master Order the Special Master does not need to do any analysis of whether the Prim¥.Y I,le.:stitution {\ssets are ~p_fficient to pay back the victims unless he- is seeking to liquidate a.#Q~~Prim~,Be§titutio!¼J\sset. We are"not aware of any such step being contemplated, so this ~xpensive~analj~.is:is.,;Ymi~¢~~s~.,~d premature.] o Furthermore, and without limiting any of the foregoing, to the extent (i) NHC, (ii) any insurance companies directly or indirectly owned or controlled, now or formerly, by GEL, or (iii) the special master appointed in the action pending before the Wake County, North Carolina Superior Court as Southland Nat'/ Ins. Co. et al. v. Lindberg et al., No. 19-CVS013093 (the "MOU Action") refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise, the Special Master shall follow appropriate legal processes to obtain such documents or information.

[The Special Master has no authority to compel the NCICs to provide liim with information. The NCICs are subject to complex regulatory schem~s governing what information they can share and with whom. . If the Special Master is .,wf~ble tc{ co ·mplete a task because of a lack. of information, hisJob is to report that to the C_purt~] o The Special Master shall have no obligation to determine the value of GEL's direct or indirect interest in the insurance companies that are victims of the Scheme for purposes of fulfilling the Special Master's obligations under 13(b) of the Appointment Order. o All non-public information provided to the Special Master and the Special Master's agents shall be treated as confidential and used solely in connection with carrying out the Special Master's responsibilities set forth in the Appointment Order or Clarification Order. The Special Master shall maintain appropriate data security measures and may share such information only (i) with the Court, (ii) with parties as authorized by Court order, (iii) with experts, advisors, and other agents who have agreed to maintain confidentiality, and (iv) as otherwise agreed by the furnishing party. Any public filings containing confidential information shall be made under seal as appropriate. This provision shall not restrict the Special Master's ability to report findings to the Court or carry out other Court-ordered duties.

• Select method and timetable to liquidate assets with Court approval 1, J(c)I; Oversee the liquidation of any available assets with Court approval 1, 3( d)J; Clear title of assets for transfer r, to bona-fide buyers 3(e)] o Method of Liquidating Assets • Absent fu11her order of the Court, the Special Master has no right or responsibility to directly liquidate Primary Restitution Assets, other than to:

• facilitate the liquidation activities taken by: (i) AAPC Holdings, LLC ("AAPC") and NHC through their respective boards and (ii) any trustees controlJing a SAC that has not yet been contributed to NHC;

[The NCICs do not consent to the Special Master collaborating with a SAC's trustee to liquidate that SAC 'Without the NHC board's consent. GEL and GGH were legally obligated to contribute the SACs to NHC, an obligation the Special Master now holds due to GEL and GGH's assignment of rights. Allowing the trustee to liquidate a SAC without NHC board consent is in derogation of the MOU judgment, contrary to paragraph 16 of the Special Master Order,, and ~ould violate the terms. of the r~~!t~i,n,ing order, in the MOU litigation.] • work with NHC to update NHC's corporate governance documents to explicitly permit the liquidation of SACs for the benefit of all "Policyholders" (as defined in the MOU that is the subject of the MOU Action) consistent with the Clarification Order or to otherwise obtain some acknowledgment from NHC that NHC will pursue the liquidation of SACs for the benefit of all such "Policyholders" consistent with the Clarification Order;

[The NHC operating agreemeni.already 'binds '~ the NHc · board <to' take actions in the best. interests ~ • of the policyholders. NHC has the right to_~det~rmine whethef~th9se inte~estj involve liquidating the SACs and when to do sq:] • recover, and take any and all actions necessary to recover, any funds that would otherwise be payable to GEL, Global Growth Holdings, Inc., or Global Growth Holdings, LLC (collectively, "GGH"), by any and all SACs or AAPC, directly or indirectly;

[To the extent tliat t~.e Special ~1.~~er:i_s,'trying Jo recoup the fraudulent "management fees" and other sham obligations that GEL was using ~o:extract funds from the SACs, the NCICs do not agree. Moreover, the Special Master only~.h.~lli~.JI\terests in GGH that.GEL has assigned, to him:] • work with the special master appointed in the MOU Action to facilitate the contribution of all SACs to NHC for subsequent liquidation, absent a compelling reason not to contribute a particular SAC to NHC, including, without limitation, by (if the Special Master deems appropriate) facilitating the creation of a trust wherein the SACs would form the res of the trust and NHC would be the beneficiarr;

[As noted above, only the NHC board is authorized to make decisions. regarding liquidation of the SACs. The NCICs do not consent to the trust concept identified above and reserve the right to respond to this idea with the benefit of more information.] • file a notice with the Court summarizing any proposed sale--or other transaction disposing of substantially all assets-of any Primary Restitution Asset, which shall not require any confirmatory Court order to proceed, provided, however, that, in the event a proposed purchaser of assets or the Special Master prefers to secure an order from the Court approving the corresponding transaction, the Special Master may so petition the Court for entry of an order approving the transuction; and [The Special Master would have no role in the sale of any SAC.] • report to the Court on the status of (i) the contribution of SACs to NHC; and (ii) the liquidation efforts of NHC, AAPC, and any SA Cs that have not been contributed to NHC.

[Same note as above regarding the NHC board's exclusive authority to detennine whether or when to sell a SAC\] o Ti1netable of Liquidating Assets • The Special Master shall work with NHC's and AAPC's management to develop a plan for disposing of Primary Restitution Assets in a manner designed to maximize and expedite victi1n recoveries, taking into account the particular business operations, financial affairs, and other circumstances of each particular entity to be monetized.

[The Special Master has no role in NHC's plan to manage or sell the S·ACsJ] • In the event the Special Master determines that, in light of the totality of the circumstances, insufficient steps have been taken toward initiating the liquidation plan for one or more particular SACs within six (6) months of entry of the Clarification Order, the Special Master shall report the same to the Court and seek further instructions from the Court.

[The Special Master has no authority to direct NHC's actions:] • Fashion proposed restitution order [13(t)] o No clarification from the Court needed at this time [See the note above regarding a process for creating this order. This should be the Special Master's first order of business. We need to know what the'.testitution obligation looks fike to make informed decisions about the assets at issue.] • Apportion available funds among victims (13(g)]; Propose an apportionment methodology (13(g)]; Receive and distribute restitution payments to victims [13(h)] o Court Determination of Victim Restitution Apportionment Methodology • The Special Master shall propose for the Court's consideration a method of apportioning funds recovered by the Special Master for the benefit of victims, giving advance notice to all potential institutional victims identified by the Special Master.

[See proposed process above.] • The Special Master shall propose an apportionment methodology that: (i) treats all similarly- situated victims fairly in accordance with applicable restitution laws; (ii) prioritizes payments to individual policyholder victims over those to institutional victims; and (iii) does not honor payment priorities established by GEL; provided, however, that the Special Master's recommendation shall provide for ULICO's preferred equity in AAPC being satisfied in full prior to AAPC's net sale proceeds being turned over to the Special Master, subject to such payment(s) to ULICO being duly accounted for in connection with any victim distributions made by the Special Master.

[No objection to this. It would be appropriate to recalculate ULICO's share of further restitution distributions after it has been paid out on its preferred equity~] o Distribution Process • Upon the liquidation of AAPC or any SAC, the proceeds generated from such liquidation shall be immediately turned over to the Special Master, net of the following items (the result being termed "Net Liquidation Proceeds"):

[The Special Master has no role with respect to the sale of any SAC and is not entitled to the proceeds of such sale-because GEL would not be entitled to the proceeds.] • (i) customary closing costs and other costs necessary to the liquidation;

• (ii) all anns' -length liabilities owed to third parties unaffiliated with GEL incurred by the applicable operating company in exchange for reasonably equivalent value (not including debts for losses or damages arising out of the Scheme);

• (iii) all other senior or equal-priority equity interests in the applicable operating company held by third parties unatliliated with GEL (not including interests given to satisfy losses or drunages arising out of the Scheme, in whole or in part, with the sole exception being ULICO's preferred equity in AAPC);

• (iv) all outstanding reasonable and necessary liabilities and expenses incurred by NHC (except in the event of AAPC's liquidation); and • (v) funding or replenishing a reasonable operating reserve for NHC, in whole or in part (except in the event of AAPC's liquidation). • On or before the 30th day following the later of (A) the Special Master's receipt of funds generated by the liquidation of a SAC or AAPC or (B) the entry of a Court Order approving a victim restitution apportionment methodology, the Special Master shall file a motion with the Court seeking to distribute all funds collected, less and excepting any outstanding administrative expenses incurred by the Special Master, Court-approved fees and expenses incurred by GEL's criminal defense counsel, and a reasonable administrative expense reserve for the Special Master's future activities pursuant to the Appointment Order and Clarification Order. [Again, the Special Master woul_d never be in rec,~ipt of th~;prbceeds.of the safe of a SAC.] • The Special Master shall move the Court to enjoin any and all third parties receiving actual notice of the Clarification Order from, absent leave of the Court, seeking recovery for losses or damages arising out of the Scheme from the

Primary Restitution Assets, including any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL, or from otherwise interfering with the Special Master's receipt of the Net Liquidation Proceeds.

I ~ •,&_ ~-y -~ ,'.'!; ~-- ....

[With reg¥d- t~' the

. above and "the belo.~, we are not a\Yaj'e . .. of authority that would allow the Court ..~ ·- ._ to block otherwise valid claims from third parties. Tlie normal ·answer to this problem is for the government to forfeit GEL's iμt~rest in property, which gives it a property interest .th:at would predate most third parties.] • The Special Master shall move the Court to either: (a) impose a lien against the Primary Restitution Assets-including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL-in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss amount), enforceable by the S~ciaJ Master pursuant to the Federal Debt Collection Procedures Act or otherwise to the same extent the United States government may enforce a federal tax lien; or, in the altemativei (b) issue one or more writ(s) of attachment or garnishment against the Primary Restitution Assets- including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL-in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss an1ount), pursuant to 28 U.S.C. §§ 3102 and 3104.

[See comment immediately above]

• Cooperate and coordinate with any receivers previously appointed over assets available for the benefit of victims, including seeking the modification of any existing orders if necessary (,r 3(i) (,r 16 also implicated)] o The Special Master shall continue to comply with all existing federal or state court orders, except to the extent in conflict with the Clarification Order or the Appointment Order, and may seek 1nodification(s) from the corresponding court of any existing federal or state court orders that the Special Master deen1s in conflict with the Clarification Order or the Appointment Order.

[We are not aware of authority for the Special Master to do so.] o The Special Master shall alert the Court of any future federal or state court order that may interfere with the Special Master's right to receive the Net Liquidation Proceeds and obligation to distribute funds derived from the Primary Restitution Assets pursuant to the apportionment methodology ultimately established by the Court, including, without limitation, any orders entered in the MOU Action or in UL/CO v. Lindberg, 1:20-CV-681 (M.D.N.C.), and seek further instructions or direction from the Court regarding the same.

[The Special Master does not have the right to receive proceeds from NHC or SACs.] o Without limiting the foregoing, the Special Master shall work together with the parties to the MOU Action to seek a modification of the Order of that court entered on March 14, 2023 in order to permit the proceeds generated from the sale of the "Clanwilliam group of companies" to be disbursed either: (a) consistent with the Clarification Order; or (b) pursuant to some other methodology mutually acceptable to the Special Master and such parties.

[The NCICs do not agree to seek the modification of the existing order.] • Retain professionals [,r 3(j)] o No clarification from the Court needed at this time • Provide periodic reports to the Court [,r 3(k)] o No clarification from the Court needed at this time •

Pay Defendant's legal fees approved by the Court (,r 3(1)) o No clarification from the Court needed at this time

[Doc. 283-2 — Attachment]

EXHIBIT A

July 31, 2026 Mr. Greg Lindberg Global Growth Holdings P.O. Box 159 Thonotosassa, FL 33592 RE: Indication of Interest in Business Combination with Damovo

Dear Mr. Lindberg,

On behalf of Twelve Seas Investment Company III (the "Company"), a special purpose acquisition company listed on the NASDAQ ("TWLV") and currently holding approximately $175 million in trust capital, I am pleased to submit this letter outlining our interest in pursuing a potential business combination with Damovo, a multinational technology services company that provides communications, cybersecurity and other service to defense, healthcare, insurance, retail and other industries ("Damovo"). Based on our review of the materials previously provided to us about Damovo, and based on our independent research, we believe that Damovo represents a very attractive merger candidates for Twelve Seas. We are especially impressed by Damovo's diversified customer base, its broad geographic presence, and its fast-growing artificial intelligence initiatives. We would be looking to structure a transaction with an enterprise value of Damovo of $400 million, which would be paid through a combination of our cash in trust, additional funds raised (PIPE) and newly issued shares of our SPAC. Please accept this letter as a formal indication of our interest in commencing discussions regarding a Twele Seas – Damovo merger. Any potential transaction would, of course, be subject to customary conditions, including the completion of satisfactory due diligence, necessary regulatory reviews and audits, and the execution of definitive transaction documentation. We look forward to working closely with you and your team on this endeavor in the near future.

Sincerely,

_________________

Dimitri Elkin

CEO

Twelve Seas Investment Company III

[Doc. 283-3 — Attachment]

EXHIBIT B

Term Sheet—Scope of Special Master's Rights and Responsibilities The following is intended to build consensus regarding the parameters of the Special Master's limited role within the larger landscape of courts, regulatory agencies, fiduciaries, and other entities dealing with the fallout of Greg E. Lindberg's conglomeration of insurance companies and subsequent dissipation of assets to the detriment of such companies (the "Scheme"). The Special Master intends to use this term sheet as a basis for a motion seeking an order from the U.S. District Court for the Western District of North Carolina (the "Court") clarifying how the Court wants the Special Master to function under these circumstances (the "Clarification Order"). This term sheet is built around the primary duties imposed on the Special Master by the Order Appointing Special Master, Case No. 3:23-cr-48 (W.D.N.C. Jan. 23, 2025) (the "Appointment Order"), Decretal Paragraph 3. General references to the Special Master throughout this term sheet are intended to include the Special Master's professionals.

[The Special Master has two jobs:

1. Calculate what each victim is owed in restitution and make a recommendation to the Court, and

2. Facilitate the sale of AAPC through the rights that GEL and GGH have assigned to him.

If the Special Master identifies additional GEL assets that could be used to pay victims, it would be appropriate for the Special Master to seek a court order authorizing him to secure those assets as well. The Special Master has no role with respect to NHC or the SACs, because GEL has no property rights in these companies. Paragraph 16 in the Special Master Order was meant to clarify this. But even without that paragraph, the Special Master has no rights to property other than those the defendant holds.] • Verify and quantify losses suffered by each victim and any offsetting amounts [¶ 3(a)] o No clarification from the Court needed at this time [The NCICs propose the following process to establish victim losses:

1. The Special Master should ask the Court to set a date by which potential victims provide written

notice to the Special Master in which they assert their status as victims of the Scheme, and explain why they are entitled to restitution under federal law. Insurance company victims may assert victim status on behalf of their injured policyholders.

2. The Special Master should ask the Court to set a second date by which potential victims are

required to submit to the Special Master their calculation of the restitution they are owed, along with supporting documentation.

3. The Special Master should ask the Court to set a third date by which the Special Master shall

submit to the Court, the parties, and any persons or entities who have asserted victim status a report and recommendation regarding (1) who the victims are, (2) to what restitution they are entitled, and (3) priority of payment among victims, if applicable. In preparing his report and recommendation, the Special Master will evaluate the submissions of the potential victims and confer with potential victims and/or the Department of Justice as appropriate.

4. The Special Master should ask the Court to set a fourth date for the parties and any potential

victims to submit any objections to the Special Master's report and recommendation. The Court will make a final restitution determination at sentencing or at a separate hearing specifically regarding restitution. This provides a process for the Special Master to fulfill his duties under 18 U.S.C. § 3664(d)(6), the relevant authorizing statute.]

• Identify all assets available for liquidation and determine estimated value thereof [¶ 3(b)] o The cooperation obligations set forth in ¶ 8 of the Appointment Order shall be expanded to require Greg E. Lindberg ("GEL"), any Specified Affiliated Company and its subsidiaries (each a "SAC" and, collectively, the "SACs"), and any other entity owned, directly or indirectly, by GEL or otherwise affiliated with GEL (including their respective officers, directors, managers, trustees, auditors, employees, and agents), regardless of whether such entities are controlled by a trust, NHC Holdings, LLC ("NHC"), or otherwise, to: (I) provide the Special Master with reasonable access during normal business hours to all of the corresponding company's books and records, (II) furnish to the Special Master all financial

and operating data, reports, projections and other information concerning the business, properties, and personnel as the Special Master may reasonably request, and (III) cooperate fully with any reasonable requests made by the Special Master in connection with the examination of the respective company.

[The Special Master has no interest in or control over NHC or the SACs except to the extent that GEL or GGH had such interest or control. The NCICs do not consent and object to their borrowers being forced to spend money that could otherwise be used to repay policyholders.

Moreover, under the Special Master Order the Special Master does not need to do any analysis of whether the Primary Restitution Assets are sufficient to pay back the victims unless he is seeking to liquidate a non-Primary Restitution Asset. We are not aware of any such step being contemplated, so this expensive analysis is unnecessary and premature.] o Furthermore, and without limiting any of the foregoing, to the extent (i) NHC, (ii) any insurance companies directly or indirectly owned or controlled, now or formerly, by GEL, or (iii) the special master appointed in the action pending before the Wake County, North Carolina Superior Court as Southland Nat'l Ins. Co. et al. v. Lindberg et al., No. 19-CVS013093 (the "MOU Action") refuse to furnish to the Special Master any documents and information in their possession reasonably requested by the Special Master, whether relating to loss calculations, asset valuations, or otherwise, the Special Master shall follow appropriate legal processes to obtain such documents or information.

[The Special Master has no authority to compel the NCICs to provide him with information. The NCICs are subject to complex regulatory schemes governing what information they can share and with whom. If the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court.] o The Special Master shall have no obligation to determine the value of GEL's direct or indirect interest in the insurance companies that are victims of the Scheme for purposes of fulfilling the Special Master's obligations under ¶ 3(b) of the Appointment Order. o All non-public information provided to the Special Master and the Special Master's agents shall be treated as confidential and used solely in connection with carrying out the Special Master's responsibilities set forth in the Appointment Order or Clarification Order. The Special Master shall maintain appropriate data security measures and may share such information only (i) with the Court, (ii) with parties as authorized by Court order, (iii) with experts, advisors, and other agents who have agreed to maintain confidentiality, and (iv) as otherwise agreed by the furnishing party. Any public filings containing confidential information shall be made under seal as appropriate. This provision shall not restrict the Special Master's ability to report findings to the Court or carry out other Court-ordered duties.

• Select method and timetable to liquidate assets with Court approval [¶ 3(c)]; Oversee the liquidation of any available assets with Court approval [¶ 3(d)]; Clear title of assets for transfer to bona-fide buyers [¶ 3(e)] o Method of Liquidating Assets  Absent further order of the Court, the Special Master has no right or responsibility to directly liquidate Primary Restitution Assets, other than to:

• facilitate the liquidation activities taken by: (i) AAPC Holdings, LLC ("AAPC") and NHC through their respective boards and (ii) any trustees controlling a SAC that has not yet been contributed to NHC;

[The NCICs do not consent to the Special Master collaborating with a SAC's trustee to liquidate that SAC without the NHC board's consent. GEL and GGH were legally obligated to contribute the SACs to NHC, an obligation the Special Master now holds due to GEL and

GGH's assignment of rights. Allowing the trustee to liquidate a SAC without NHC board consent is in derogation of the MOU judgment, contrary to paragraph 16 of the Special Master Order, and would violate the terms of the restraining order in the MOU litigation.] • work with NHC to update NHC's corporate governance documents to explicitly permit the liquidation of SACs for the benefit of all "Policyholders" (as defined in the MOU that is the subject of the MOU Action) consistent with the Clarification Order or to otherwise obtain some acknowledgment from NHC that NHC will pursue the liquidation of SACs for the benefit of all such "Policyholders" consistent with the Clarification Order;

[The NHC operating agreement already binds the NHC board to take actions in the best interests of the policyholders. NHC has the right to determine whether those interests involve liquidating the SACs and when to do so.] • recover, and take any and all actions necessary to recover, any funds that would otherwise be payable to GEL, Global Growth Holdings, Inc., or Global Growth Holdings, LLC (collectively, "GGH"), by any and all SACs or AAPC, directly or indirectly;

[To the extent that the Special Master is trying to recoup the fraudulent "management fees" and other sham obligations that GEL was using to extract funds from the SACs, the NCICs do not agree. Moreover, the Special Master only has the interests in GGH that GEL has assigned to him.] • work with the special master appointed in the MOU Action to facilitate the contribution of all SACs to NHC for subsequent liquidation, absent a compelling reason not to contribute a particular SAC to NHC, including, without limitation, by (if the Special Master deems appropriate) facilitating the creation of a trust wherein the SACs would form the res of the trust and NHC would be the beneficiary;

[As noted above, only the NHC board is authorized to make decisions regarding liquidation of the SACs. The NCICs do not consent to the trust concept identified above and reserve the right to respond to this idea with the benefit of more information.] • file a notice with the Court summarizing any proposed sale—or other transaction disposing of substantially all assets—of any Primary Restitution Asset, which shall not require any confirmatory Court order to proceed, provided, however, that, in the event a proposed purchaser of assets or the Special Master prefers to secure an order from the Court approving the corresponding transaction, the Special Master may so petition the Court for entry of an order approving the transaction; and [The Special Master would have no role in the sale of any SAC.] • report to the Court on the status of (i) the contribution of SACs to NHC; and (ii) the liquidation efforts of NHC, AAPC, and any SACs that have not been contributed to NHC.

[Same note as above regarding the NHC board's exclusive authority to determine whether or when to sell a SAC.] o Timetable of Liquidating Assets  The Special Master shall work with NHC's and AAPC's management to develop a plan for disposing of Primary Restitution Assets in a manner designed to maximize and expedite victim recoveries, taking into account the particular business operations, financial affairs, and other circumstances of each particular entity to be monetized.

[The Special Master has no role in NHC's plan to manage or sell the SACs.]  In the event the Special Master determines that, in light of the totality of the circumstances, insufficient steps have been taken toward initiating the liquidation plan for one or more particular SACs within six (6) months of entry of the Clarification Order, the Special Master shall report the same to the Court and seek further instructions from the Court.

[The Special Master has no authority to direct NHC's actions.] • Fashion proposed restitution order [¶ 3(f)] o No clarification from the Court needed at this time [See the note above regarding a process for creating this order. This should be the Special Master's first

order of business. We need to know what the restitution obligation looks like to make informed decisions about the assets at issue.] • Apportion available funds among victims [¶ 3(g)]; Propose an apportionment methodology [¶ 3(g)]; Receive and distribute restitution payments to victims [¶ 3(h)] o Court Determination of Victim Restitution Apportionment Methodology  The Special Master shall propose for the Court's consideration a method of apportioning funds recovered by the Special Master for the benefit of victims, giving advance notice to all potential institutional victims identified by the Special Master.

[See proposed process above.]  The Special Master shall propose an apportionment methodology that: (i) treats all similarly- situated victims fairly in accordance with applicable restitution laws; (ii) prioritizes payments to individual policyholder victims over those to institutional victims; and (iii) does not honor payment priorities established by GEL; provided, however, that the Special Master's recommendation shall provide for ULICO's preferred equity in AAPC being satisfied in full prior to AAPC's net sale proceeds being turned over to the Special Master, subject to such payment(s) to ULICO being duly accounted for in connection with any victim distributions made by the Special Master.

[No objection to this. It would be appropriate to recalculate ULICO's share of further restitution distributions after it has been paid out on its preferred equity.] o Distribution Process  Upon the liquidation of AAPC or any SAC, the proceeds generated from such liquidation shall be immediately turned over to the Special Master, net of the following items (the result being termed "Net Liquidation Proceeds"):

[The Special Master has no role with respect to the sale of any SAC and is not entitled to the proceeds of such sale—because GEL would not be entitled to the proceeds.] • (i) customary closing costs and other costs necessary to the liquidation;

• (ii) all arms'-length liabilities owed to third parties unaffiliated with GEL incurred by the applicable operating company in exchange for reasonably equivalent value (not including debts for losses or damages arising out of the Scheme);

• (iii) all other senior or equal-priority equity interests in the applicable operating company held by third parties unaffiliated with GEL (not including interests given to satisfy losses or damages arising out of the Scheme, in whole or in part, with the sole exception being ULICO's preferred equity in AAPC);

• (iv) all outstanding reasonable and necessary liabilities and expenses incurred by NHC (except in the event of AAPC's liquidation); and • (v) funding or replenishing a reasonable operating reserve for NHC, in whole or in part (except in the event of AAPC's liquidation).  On or before the 30th day following the later of (A) the Special Master's receipt of funds generated by the liquidation of a SAC or AAPC or (B) the entry of a Court Order approving a victim restitution apportionment methodology, the Special Master shall file a motion with the Court seeking to distribute all funds collected, less and excepting any outstanding administrative expenses incurred by the Special Master, Court-approved fees and expenses incurred by GEL's criminal defense counsel, and a reasonable administrative expense reserve for the Special Master's future activities pursuant to the Appointment Order and Clarification Order. [Again, the Special Master would never be in receipt of the proceeds of the sale of a SAC.]  The Special Master shall move the Court to enjoin any and all third parties receiving actual notice of the Clarification Order from, absent leave of the Court, seeking recovery for losses or damages arising out of the Scheme from the Primary Restitution Assets, including any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL, or from otherwise interfering with the Special Master's receipt of the Net Liquidation Proceeds. [With regard to the above and the

below, we are not aware of authority that would allow the Court to block otherwise valid claims from third parties. The normal answer to this problem is for the government to forfeit GEL's interest in property, which gives it a property interest that would predate most third parties.]  The Special Master shall move the Court to either: (a) impose a lien against the Primary Restitution Assets—including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL—in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss amount), enforceable by the Special Master pursuant to the Federal Debt Collection Procedures Act or otherwise to the same extent the United States government may enforce a federal tax lien; or, in the alternative, (b) issue one or more writ(s) of attachment or garnishment against the Primary Restitution Assets— including, without limitation, GGH's equity interests in any SACs or intermediary companies in the chain of ownership between the SACs and GGH and/or GEL—in the preliminary amount of $3,000,000,000.00 (subject to adjustment upon the establishment of a final, aggregate victim loss amount), pursuant to 28 U.S.C. §§ 3102 and 3104.

[See comment immediately above]

• Cooperate and coordinate with any receivers previously appointed over assets available for the benefit of victims, including seeking the modification of any existing orders if necessary [¶ 3(i) (¶ 16 also implicated)] o The Special Master shall continue to comply with all existing federal or state court orders, except to the extent in conflict with the Clarification Order or the Appointment Order, and may seek modification(s) from the corresponding court of any existing federal or state court orders that the Special Master deems in conflict with the Clarification Order or the Appointment Order.

[We are not aware of authority for the Special Master to do so.] o The Special Master shall alert the Court of any future federal or state court order that may interfere with the Special Master's right to receive the Net Liquidation Proceeds and obligation to distribute funds derived from the Primary Restitution Assets pursuant to the apportionment methodology ultimately established by the Court, including, without limitation, any orders entered in the MOU Action or in ULICO v. Lindberg, 1:20-CV-681 (M.D.N.C.), and seek further instructions or direction from the Court regarding the same.

[The Special Master does not have the right to receive proceeds from NHC or SACs.] o Without limiting the foregoing, the Special Master shall work together with the parties to the MOU Action to seek a modification of the Order of that court entered on March 14, 2023 in order to permit the proceeds generated from the sale of the "Clanwilliam group of companies" to be disbursed either: (a) consistent with the Clarification Order; or (b) pursuant to some other methodology mutually acceptable to the Special Master and such parties.

[The NCICs do not agree to seek the modification of the existing order.] • Retain professionals [¶ 3(j)] o No clarification from the Court needed at this time • Provide periodic reports to the Court [¶ 3(k)] o No clarification from the Court needed at this time • Pay Defendant's legal fees approved by the Court [¶ 3(l)] o No clarification from the Court needed at this time

**Doc. 285 — Reply Supporting the Rule 17(c) Subpoenas (filed 08/06/2026)**

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG, EXPEDITED CONSIDERATION

REQUESTED

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR ISSUANCE OF SUBPOENAS DUCES TECUM (DOC. 248), IN RESPONSE TO THE GOVERNMENT'S OPPOSITION (DOC. 582, No. 5:19-CR-22)

INTRODUCTION

The Government's Opposition (Doc. 582 in No. 5:19-cr-22) (the "Opposition") asks the Court to deny Mr. Lindberg the records of his own former companies — records he surrendered to court officers twice, in 2019 and again in 2025 — so that the disputed restitution issues can be resolved on a record "only one side is permitted to see." Doc. 248 at 10. The facts are that no one has these records, not this court, not the special master according their submission, not the government and not the defendant since he handed over these companies. Three features of the Opposition decide this Motion, and all three favor issuance.

First, the Opposition concedes that the facts are disputed. The Government acknowledges that "there are likely disputed facts about the prospective value" of the AAPC Preferred, and that "there might be contested factual issues regarding such things as whether and to what extent there was a diminution of value and, if so, who caused it." Doc. 582 at 10–11. Its answer is not that the facts are settled, but that the Court should rule against Mr. Lindberg on the law first, so that the facts never need to be found. That is a merits argument dressed as a discovery objection — and it

inverts the statute. The MVRA commands that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence," 18 U.S.C. § 3664(e), upon the de novo determination § 3664(d)(6) requires. A party cannot defeat compulsory process by promising to win on the law questions the evidence would otherwise inform.

Second, the Opposition is filed by the wrong party. The Government admits its standing to oppose these subpoenas "is an open question in the Fourth Circuit." Doc. 582 at 2 n.1. Rule 17(c)(2) commits objections of undue burden and privilege to the recipients — who may move to quash — and the Government's own principal authority says exactly that. United States v. You, 2024 WL 1404378, at *3 (E.D. Tenn. Apr. 1, 2024) (the recipients "will have the opportunity to oppose Defendant's subpoenas" under Rule 17(c)(3)). The only custodian

to have appeared is the Special Master himself — the fee-interested officer whose own administration is under review and whose own records are among those sought — and his Response asks the Court to deny production while contending that the companies' records are not his to produce (Doc. 266) — a contention Defendant disputes, because the Special Master stepped into Defendant's shoes as record owner and can compel their production — and expressly reserving any burden or privilege objection for a later motion to quash. None of the remaining custodians has appeared. That posture is not a ground for a merits denial now; it is precisely why Rule 17(c)(2)'s machinery — issuance, followed by any recipient's motion to quash — should be permitted to operate.

Third, the Opposition confirms why compulsory process is indispensable: the Government has adopted, wholesale, the report of the very officer whose records are sought. It "agrees with each of the Special Master's recommendations," Doc. 582 at 9 n.4, offers the Special Master's Final Report as the answer to all seventeen disputed issues, and simultaneously opposes production of the underlying workpapers, ledgers, and communications that would permit the Court — or Mr.

Lindberg — to test that report. As set forth in Mr. Lindberg's Motion to Declare the Special-Master Reference Unconstitutional as Applied (Doc. 269, filed July 31, 2026) and his Motion to Adopt All Prior Motions as if Filed After the Final Report and to Hold the Report in Abeyance (submitted herewith), see Doc. 267, ¶ 3, the Special Master is a fee-interested officer whose own conduct — including the off-record Beckett disposition, Docs. 256, 260 — is among the matters the records concern. A restitution judgment built on the untested report of a conflicted custodian, entered while the defendant is denied the records that would test it, is not the process §§ 3664(d)(6) and (e) describe — particularly now that restitution is recognized as criminal punishment. Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026). The Special Master's own Response confirms why compulsory process is indispensable: he contends that the companies whose books and records the accounting requires are "none of which are under the Special Master's control," Doc. 266, and that his sole authority over them "is the power to appoint two directors to the board of NHC," Doc. 268 — a contention Defendant disputes, since the Special Master took Defendant's record-ownership and voting rights by assignment and through the AAPC voting trust and can compel production, which he refused. But even taken at his word, those records are then held by third parties beyond the reach of this Court, the Special Master, and the Government alike, and can be reached only through the process the Opposition and the Special Master's Response together ask the Court to deny. That the Government has adopted the Special Master's recommendation does not solve the problem: under 18 U.S.C. § 3664(e) the Government — not the Special Master — bears the burden of proving loss and causation, and it cannot discharge that burden by endorsing the report of a conflicted, fee-interested fiduciary whose own conduct the records concern. Adopting a fiduciary-tainted report imports the taint; it does not supply the proof the statute requires.

ARGUMENT

I. The Nixon Factors Are Satisfied; the Opposition's Overbreadth Rhetoric Ignores

What the Exhibits Actually Request The Opposition's "fishing expedition" refrain never engages the Exhibits. The schedules identify discrete, dated, documented transactions: the November 22, 2018 Ares letter of intent; the February 8, 2019 Oaktree $1.0 billion "Global Solution"; the June 27, 2019 MOU; the pre-maturity sale of Zero-Coupon Bonds with a face value of $1,006,239,867 for approximately $394 million; the December 2022 AAPC/ULICO transfer; the April 2022 AAPC Refinance and its approximately $44,000,000 of preferred-

equity interest payments; the September 2025 Clanwilliam sale and its $23,500,000 Vista distribution; and the Beckett transaction, its claimed authority, and the application of its proceeds. Doc. 248-1 through 248-6. These are not "the title of a document and conjecture as to its contents"; they are known transactions whose paper sits in identified custodians' files, with the record already documenting Mr. Dinius's personal role in them. Doc. 248 at 4–5 (the "we will contact the guaranty associations and move directly to liquidation. You know what that means" e-mail; Barclays zero-coupon pricing "provided . . . through Dinius"). Nixon's specificity requirement asks for reasonable identification of categories of admissible evidence — not item-by-item Bates numbers for records the movant has never been permitted to see. 418 U.S. at 700.

Relevance is established by the Government's own chart. Every one of its six "categories" of Mr. Lindberg's seventeen issues, Doc. 582 at 9, maps onto the subpoena schedules: starting IALA loan balances (Category II) → the ILA workpapers and reconciliations (Ex. C ¶ 1; Ex. A ¶¶ 21, 28); credits for value transferred but not yet monetized (Category III) → the AAPC Preferred

valuations (Ex. A ¶ 7; Ex. C ¶¶ 5, 14); credits for payments received (Category IV) → the receipt- and-application ledgers (Ex. A ¶¶ 15, 18, 20; Ex. E ¶¶ 1–3); diminution and causation (Category

V) → the valuations from the $454 million baseline forward, the four blocked monetizations, the

zero-coupon disposition, and the below-valuation sales (Ex. A ¶¶ 1–6, 10–11, 17); shared responsibility (Category VI) → the estates' governance and management records. The Government cannot classify the disputes and then deny that records addressed to its own classifications are relevant.

Admissibility (business records of the estates and their fiduciaries, Fed. R. Evid. 803(6)) and good faith (production for the evidentiary hearing the statute reserves to this Court, on issues where Mr. Lindberg bears the burden) are addressed in the Motion, Doc. 248 at 8–9, and the Opposition offers no answer beyond adjectives. As for the Government's reliance on the Court's pretrial ruling in the public-corruption case (Doc. 104 in 5:19-cr-22): the posture could not be more different. That request sought trial discovery. This request seeks the defendant's own former companies' books and records — records he surrendered under court orders — from the custodians who now hold them, for a hearing at which the statute assigns him the burden of proving offsets and credits. United States v. Karam, 201 F.3d 320, 327 (4th Cir. 2000); United States v. Ritchie, 858 F.3d 201, 211 (4th Cir. 2017). A statutory scheme that assigns a party the burden of proof entitles that party to process adequate to carry it. Doc. 248 at 9–10.

II. The Records Are Not "Already in Defendant's Possession" — and the Government

Identifies Not One Document That Is The Opposition asserts that "much of the requested information is already in Defendant's and his counsel's possession," Doc. 582 at 1, but identifies not a single document. It could not: custody and control of the companies and their records passed out of Mr. Lindberg's hands twice — in 2019, under the MOU and the rehabilitation, to the Rehabilitator's team under Mr. Dinius;

and in 2025, under the Appointment Order (Doc. 56), to the Special Master's administration, where they are held by or through NewHoldCo. Doc. 248 at 2, 5. The "16 months of collaboration" the Government invokes consisted of meetings and calls — not productions of general ledgers, ILA workpapers in native format, valuation workpapers,

board minutes, or fee records. If the Government believes specific responsive records were actually produced to the defense, the cure is simple and standard: the custodians may so certify, category by category, and production of those categories becomes a nullity. What the Government may not do is defeat compulsory process with an unsworn generality that the movant has "enough." The Special Master's Response removes any doubt. He contends that NHC "and the hundreds of companies under the NHC umbrella" are "none of which are under the Special Master's control," Doc. 266 — a contention Defendant disputes, the Special Master having taken Defendant's record-ownership by assignment and being able to compel production — and that the communications the subpoena would reach are largely those of persons who "have no direct knowledge of the facts and circumstances critical to the restitution determination," id. Records the Special Master says he neither controls nor can vouch for are not "already in Defendant's possession"; and his parallel assertion that his recommendations rest in large part on documents "Katten provided," id., only confirms that the Report was built on a partial, defense-supplied record rather than the complete books and ledgers the subpoenas would produce.

The related "change of counsel" argument gets the sequence backwards. New counsel did not create the evidentiary gap; the gap exists because the records never left the custodians' hands, no matter who represented Mr. Lindberg. And the suggestion that a defendant's choice of counsel should cost him the evidence that carries his statutory burden has no footing in Rule 17, the MVRA, or the Sixth Amendment.

## III. The Timing Argument Is Both Wrong and Revealing

The Government's untimeliness argument rests on the 90-day marker of 18 U.S.C. § 3664(d)(5) (August 24, 2026). But the Supreme Court has held that the 90-day provision protects victims from undue delay in the entry of restitution; missing it does not deprive the court of power to act, and it exists "primarily to help . . . victims," not to arm the Government with a discovery- preclusion device against the defendant. Dolan v. United States, 560 U.S. 605, 611–13 (2010). A deadline designed to protect victims cannot be deployed to deny the defendant the evidence the statute requires the Court to weigh — least of all where every American policyholder has been paid in full.

Nor is the Motion "eleventh hour." The Special Master's Final Report issued in late July; the draft supplement was circulated to defense counsel on or about July 16–17, 2026, Doc. 248-2, ¶ 14; and the Motion was filed July 23, 2026 — within days of the report that the Government now offers as the complete answer to every disputed issue. The sequence that actually consumed the calendar is the Government's: it has declined to respond on the merits to any of the causation, foreseeability, offset, or amount issues Mr. Lindberg has raised, Doc. 267, ¶ 4, while the Special Master — whose recommendations the Government adopts — continued to supplement his report. If the schedule is now tight, the answer is the sequencing relief sought in the abeyance motion, Doc. 267, ¶ 3, and a return date set by the Court — not the extinguishment of the defendant's right to the evidence. Early return dates are Rule 17(c)'s design. United States v. Bendawald, 2025 WL 711725, at *3 (D. Idaho 2025).

## IV. "All Legal, No Factual" Is a Merits Ruling the Government Requests in a Discovery

Brief The Opposition's central theme is that the Court can resolve all seventeen issues "on legal, not factual, grounds," Doc. 582 at 8 — while conceding in the same breath that the facts underlying value, diminution, and causation are "likely" and "might be" disputed. Id. at 10–11. Take the Government's own example. Whether the AAPC Preferred transferred to ULICO in December 2022 must be credited now, at its value, or only "if and when ULICO

realizes" value, is not a fact- free question: the MVRA offsets restitution by "the value (as of the date the property is returned) of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and requires credit for amounts "later recover[ed] as compensatory damages for the same loss," § 3664(j)(2). Valuation as of a date certain is a quintessential factual determination — one the Court cannot make without the valuations, workpapers, and communications the subpoenas seek, and one on which Mr. Lindberg bears the burden. Karam, 201 F.3d at 327. The same is true of causation under Robers v. United States, 572 U.S. 639, 648–49 (2014): whether the losses flow from the offense or from the estates' intervening, discretionary decisions — the four refused monetizations, the litigation against a prospective buyer, the pre-maturity zero-coupon sales, the below-valuation dispositions — is a record question, not a syllogism. The Government's proposal is that the Court first assume the answer to every mixed question against the defendant and then declare the evidence unnecessary. Section 3664(e) prescribes the opposite order of operations.

V. Pre-Sentencing Cooperation Did Not Forfeit the Disputes the Bifurcated Process

Expressly Reserved The Opposition's narrative — that Mr. Lindberg praised the process, took his variance, and "changed his tune" — confuses cooperation with capitulation. The parties' own design, which the Government negotiated and the Court adopted, was a bifurcated process: a Preliminary Order at

sentencing, followed by "any necessary hearings to finalize restitution." Doc. 107 at 3. The disputed issues now before the Court are the ones that process reserved. Working collaboratively toward sentencing — and saying so — waived nothing about the reserved disputes; indeed, Mr. Lindberg's Response (Doc. 132) framed the seventeen issues before sentencing occurred. And the material events post-date the statements the Government quotes: the Beckett disposition and its still-undisclosed terms and proceeds, Docs. 256, 260; the New Waiver demand and the Statement Concerning Defendant's Cooperation, Doc. 159; the Final Report and its supplement, Docs. 245, 245-1; and the Supreme Court's confirmation that what is being administered is criminal punishment, Ellingburg, 607 U.S. 163. A defendant is entitled to test with evidence what he is asked to accept on faith — particularly after the facts change. As for the Government's footnote that Mr. Lindberg accepted the Special Master's Cell 1.16 recommendation, Doc. 582 at 7 n.3: accepting a recommendation supported by the record is not a waiver of objections to recommendations that are not. Rule 17 does not condition compulsory process on a vow of uniform disagreement.

VI. Rule 17(c) Applies to These Proceedings, as the Government's Own Authorities

Hold The Government's footnoted suggestion that Rule 17(c) may not reach sentencing-stage proceedings, Doc. 582 at 4 n.2, is refuted by the very case the Government builds its legal standard upon: You applied the Nixon factors to a sentencing-stage subpoena request. Accord United States v. Krane, 625 F.3d 568, 574 (9th Cir. 2010); United States v. DNRB, Inc., 257 F. Supp. 3d 1033, 1038–39 (W.D. Mo. 2017). The restitution determination here is, moreover, no ordinary sentencing ancillary: it is a contested, statutorily mandated evidentiary proceeding in which the Court must resolve disputes de novo by a preponderance, §§ 3664(d)(6), (e), concerning what Ellingburg holds is criminal punishment. If compulsory process is unavailable in that proceeding,

then the defendant's statutory burden under Karam and Ritchie is a burden he is forbidden the means to carry.

VII. The Privilege and Burden Objections Belong to the Recipients — and the Motion

Already Accommodates Them The Opposition's catalog of anticipated privilege disputes and compliance burdens is asserted on behalf of custodians who have raised neither. Rule 17(c)(2) gives every recipient the right to move to quash or modify; the proposed order requires privilege to be asserted by written log within seven days, Doc. 248-7, ¶ 2; and communications between any custodian and the Government are not privileged in any event. The Special Master is the Court's own officer: his records of a criminal restitution administration "are not his own but the Court's." Doc. 248 at 9. And the professionals' fee and billing records — charged to and paid from the estates — are the estates' business records, directly material to the offset arithmetic. The suggestion that issuing subpoenas to court officers, fiduciaries, and their advisors "harass[es] the victims" inverts reality: the victims are the policyholders, every one of whom has been paid in full; the custodians are the persons who administered — and in the Special Master's case, are compensated from — the estates whose administration is precisely what the Court must now examine.

The Special Master's Response (Doc. 266) is addressed in Defendant's separate Response to the Special Master's Response, submitted herewith.

More importantly, the import of all of these arguments is that restitution rests on guesses of the Special Master, based on documents the court has not seen, the special master claims to not be able to produce, the government does not have and the defendant cannot have because he turned over the companies to the custodians and the special master. This record cannot meet the accounting requirements of MVRA that are a prerequisite to restitution determination.

CONCLUSION

The Government concedes the facts are disputed, concedes its standing is an open question, and does not deny that the records exist, are held by the custodians, and answer the questions its own chart frames. The Court should grant the Motion, direct the Clerk to issue the six subpoenas in the forms of Exhibits A through F attached to the Motion, and set a return date sufficiently in advance of the evidentiary hearing to permit review, follow-up, and any necessary motion to compel or enforce under Rule 17(g) — so that the de novo determination reserved to this Court proceeds on a record both sides are permitted to see.

Dated: August 6, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg1

Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

/s/ _Kenneth N. Barnes_________ Kenneth N. Barnes

**Doc. 289 — Notice of Errata (Docs. 280, 281, 283, 285) (filed 08/07/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

GREG E. LINDBERG,

Defendant.

NOTICE OF ERRATA

DOCUMENT NOS. 280, 281, 283, 285

Defendant Greg E. Lindberg, by through counsel, respectfully submits this Errata to certain filings in order to correct inadvertent clerical errors in the following docket entries identified below with accompanying certifications and consultations with opposing counsel in resolution of the errors: DOC. NO. 280: “Defendant’s Preliminary Objections to the Special Master’s Report and Recommendations Regarding Restitution (Doc. 245) and Proposed Final Order of Restitution (Doc. 245-1).”

1. Doc. No. 280 was inadvertently filed dated August 2, 2026. The document

should have been dated August 6, 2026.

2. Doc. No. 280 was inadvertently filed without a Certificate of Service.

Accordingly, the Certificate of Service for Doc. No. 280 follows below:

CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel

of record, including counsel for the United States and counsel for the Special Master.

This the 6th day of August 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Defendant Greg E. Lindberg DOC. NO. 281: “Defendant Greg E. Lindberg's Preliminary Response and Objection to the Special Master's Second Supplement to Report and Recommendations Regarding Restitution (Doc. 245).”

1. The Declaration of Greg E. Lindberg (Doc. No. 281-1) was inadvertently filed with a

duplicative Term Sheet (Ex. B) at 281-1 pps. 8 – 13. These pages duplicate Ex. B of the Declaration which was filed as 281-3.

2. Exhibits 1(a) through 1(e) to Doc. No. 281 were inadvertently not filed. Exhibits 1(a)

through 1(e) are attached hereto. DOC. NO. 283: “Defendant’s Response to the Special Master’s Response (Doc. 266) to Defendant’s Motion for Issuance of Subpoenas Duces Tecum (Doc. 248).”

1. The signature page of Doc. No. 283 was inadvertently filed without a footnote

regarding pro hac vice counsel, Vivek Ramachandran. Accordingly, the corrected signature block with footnote for Doc. No. 283 at p.4follows below:

2. Doc. No. 283 was inadvertently filed without a Certificate of Service.

Accordingly, the Certificate of Service for Doc. No. 283 follows below:

CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including counsel for the United States and counsel for the Special Master.

This the 6th day of August 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Defendant Greg E. Lindberg DOC. NO. 285 "Defendant's Reply in Support of his Motion for Issuance of Subpoenas Duces Tecum (Doc. 248), in Response to the Government's Opposition (Doc. 582, No 5:19-cr-22)." The Declaration of Greg E. Lindberg (Doc. No. 285-1) was inadvertently filed with a duplicative Term Sheet (Ex. B) at 285-1 pps. 8 – 13. These pages duplicate Ex. B of the Declaration which was filed as 285-3.

[Signature page follows.]

Dated: August 7, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF CONSULTATION

Pursuant to the Court's motions practice, the undersigned states that counsel for Defendant conferred with counsel for the United States and the Special Master on August 7, 2026, regarding this Notice of Filing Errata.

Defendant's Counsel attempted to confer with the Special Master regarding the filing of the Notice of Errata. The special master did not respond as of the filing of this document.

Defendant's Counsel attempted to confer with counsel for the United States regarding the filing of the Notice of Errata. Counsel did not respond as of the filing of this document.

/s/ Kenneth Barnes__________

KENNETH BARNES

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: August 7, 2026

/s/ Kenneth N. Barnes Kenneth N. Barnes

**Doc. 290 — Motion to Strike the Government's Omnibus Response (filed 08/07/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION TO STRIKE THE GOVERNMENT'S OMNIBUS RESPONSE (DOC. 279) AND TO REQUIRE THE GOVERNMENT TO RESPOND ON THE MERITS TO EACH PENDING MOTION

Defendant Greg E. Lindberg respectfully moves the Court, pursuant to 18 U.S.C. § 3664(e) and the Court's inherent authority to manage its docket, to strike the Government's Omnibus Response in Opposition to Defendant's Motions Regarding Restitution (Doc. 279) and to require the Government to file a substantive response, on the merits and issue by issue, to each of Defendant's pending motions. The Omnibus Response is not a response: it declines to engage the motions, defers wholesale to the Special Master, and asks the Court to fix a restitution award exceeding $1.6 billion on a record the Government has never defended on the merits. In support, Defendant states:

I. The Omnibus Response does not respond to the motions; it declines to engage them.

1. The Omnibus Response asks the Court to deny all of Defendant's motions and to adopt the Special Master's Second Supplement (Doc. 245) and proposed Final Order (Doc. 245-1). Doc. 279 at 1. But it does not answer the motions. The Government states that it "concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here," id. at 2, and that "substantive reply at a more minute level" is "unproductive in light of the Special Master's comprehensive responses," id. at 2 n.2. It asks that "[a]ny remaining motions … be … denied as moot," id. at 1 n.1, and offers to address Defendant's arguments only "[i]f the Court would like" it to, id. at 2–3.

2. A brief that declines to engage the motions is not an opposition to them. The Government does not identify the loss the offense of conviction proximately caused, does not address the mandatory offsets and credits, does not join issue on causation, foreseeability, or the offense-of-conviction limit, and does not respond on the merits to the constitutional and fiduciary grounds raised in the Motion to Disqualify (Doc. 269) or the Second Motion to Set Aside. It substitutes the Special Master's recommendation for its own proof and its own argument. The Government has separately opposed only Defendant's subpoena motion (Doc. 248), in its Opposition (Doc. 261); that single opposition does not cure its failure to respond, on the merits, to any of the other pending motions.

3. Worse, the Government and the Special Master ask the Court to adopt

the Report and fix a restitution award exceeding $1.6 billion before the threshold question — whether any restitution is owed at all — has been answered. That question turns on causation and foreseeability, and on extraordinary measures the record shows and does not dispute: Mr. Lindberg committed more than $1 billion of

his own capital to back the affiliated loans as a first-loss position that would be exhausted before any protected policyholder or creditor bore a dollar of loss; he personally guaranteed approximately $2.39 billion; he took no dividends; and the loans suffered zero defaults under his management. On that record, no loss to the protected parties was reasonably foreseeable at origination. Those are precisely the questions the Omnibus Response leaves unanswered.

4. The Government's default also disregards this Court's Local Rules.

Local Criminal Rule 47.1(d) provides that, "[u]nless otherwise directed by the Court, the government must respond to all potentially dispositive defense motions in a criminal case," giving as examples "motions to suppress and motions to dismiss the indictment." W.D.N.C. LCrR 47.1(d). Subsection (e) requires that any such response be filed "within seven (7) days of the date on which the motion is served." W.D.N.C. LCrR 47.1(e). Mr. Lindberg's Motion for a Determination That No Restitution Is Owed (Docs. 234, 235) seeks the dismissal of the restitution claim in its entirety and is precisely such a potentially dispositive motion. So too are Mr. Lindberg's Motion to Disqualify and Remove the Special Master (Doc. 269) and his Second Motion to Set Aside the Special Master's Report, each of which seeks to set aside the Report and would thereby dispose of the very recommendation on which the entire $1.6 billion restitution award rests. Most fundamentally, Mr. Lindberg has challenged the Special Master's appointment and exercise of judicial authority under Article III of the Constitution — a challenge he first raised in his Emergency Motion to Stay All Asset Sales Pending Entry of a Final Restitution Order and a De Novo Article

III Determination, with Consolidated Objections to the scope and validity of the Special Master reference (Doc. 190), filed well before the Report, and renewed in his Motion to Disqualify (Doc. 269), and one the Government has never answered. That challenge is dispositive in the most basic sense: if the Special Master was appointed or is functioning in violation of Article III, he lacked the authority to produce the Report at all, and the recommendation falls with the office. The Government was thus required by the Rule to respond to each of these dispositive motions on the merits, and it has not. That default is not only a failure of proof under § 3664(e); it disregards the Rule's mandatory-response requirement, and it warrants treating the unanswered motions as unopposed under the Court's inherent authority to manage its docket.

5. The Government's posture is confirmed by its own counsel's

contemporaneous words. In an August 7, 2026 email exchange with defense counsel — attached as Exhibit B — the attorney for the Government took the position that there is "not a requirement to confer on a response." Ex. B. Defense counsel's reply catalogs the consequences: the Government "will not develop the record"; it "will not allow discovery of information affecting billions in restitution which are with the custodians, and with the special master"; and, "after all the delay in response from the government," it now "wish[es] to file a two pager to dismiss all the evidence without a response." Ex. B. The Government thus used its filing both to avoid answering the pending motions and to insert, unilaterally, the very August 17 hearing date it now presses — as addressed in Part VIII. That contemporaneous

record is the non-response this motion asks the Court to strike, in the parties' own words.

II. Section 3664(e) places the burden on the attorney for the Government, and a master's report cannot discharge it.

6. The MVRA is explicit about whose burden this is: "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The Fourth Circuit enforces that allocation: restitution must be vacated where the Government fails to carry its burden, and the burden does not shift to the defendant until the Government first meets it. United States v. Steele, 897 F.3d 606, 613–14 (4th Cir. 2018).

7. A court-appointed master's recommendation is not the attorney for the Government's proof. By its terms, § 3664(e) assigns the burden to "the attorney for the Government" — not to a master compensated from the very assets in question. The Government cannot discharge a burden the statute places on the prosecutor by announcing that it "concurs" with the Special Master and adopting his report by reference. Doc. 279 at 2. Adoption is not proof.

8. The same is true of the constitutional and fiduciary challenges. The Government suggests that the Special Master has already responded to those objections and intends to respond again to the Motion to Disqualify. Doc. 279 at 2. That is insufficient, for three reasons. First, the Special Master is not the public prosecutor: he is an interested, fee-compensated officer — and the very subject of the disqualification motion — not the attorney for the Government who must answer a constitutional challenge to the reference and who bears the MVRA's burden. Second, a court-appointed master's submissions cannot be the vehicle for developing the record on a question of law under the MVRA and the constitutional rights it implicates; the validity of the reference and the legal limits the MVRA places on restitution are for the Court to decide on the Government's proof and argument, not to be litigated through, or resolved by, the officer whose own authority is challenged. Third, permitting the Government to shelter behind the Special Master lets it avoid committing to any position of its own — leaving it free to take up whatever position it likes later, after Mr. Lindberg has been forced to litigate against the master instead of against the party that bears the burden.

9. Nor did the plea agreement relieve the Government of that burden. As Mr. Lindberg has explained in his motion for a determination that no restitution is owed, the plea preserves the causation requirement rather than displacing it. In Paragraph 10(a) Mr. Lindberg agreed to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Plea Agreement ¶ 10(a) (Doc. 40). Two features of that language are dispositive. It reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate — and the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming that the figure is not tied to the Guidelines loss calculation but is bounded by causation. The plea agreement confirms the point expressly: it provides that restitution "may be different from, greater, or lesser than" the loss found under U.S.S.G. § 2B1.1. Plea Agreement ¶ 8(a) (Doc. 40). Paragraph 10(a) thus fixes no amount, admits no reasonably foreseeable loss, and does not abandon the requirement — central to Hughey and to the

MVRA alike — that the loss be caused by the conduct of conviction. Hughey v. United States, 495 U.S. 411, 413 (1990). Mr. Lindberg agreed to the obligation to pay whatever loss his conduct is proven to have proximately caused; he did not stipulate causation, a loss amount, or foreseeability, and any ambiguity in the Government's own drafting is construed against it. Causation was therefore neither admitted nor waived; it remains the attorney for the Government's to prove under § 3664(e), and Mr. Lindberg has expressly reserved and preserved that challenge in every filing.

III. De novo review under § 3664(d)(6) cannot cure these defects.

10. The Government's implicit answer to all of this — that the Special Master's Report is only a recommendation the Court will review de novo under 18 U.S.C. § 3664(d)(6), so any defect washes out — mistakes both the statute and the record. De novo review is a standard of review; it is not a substitute for the attorney for the Government carrying the burden that § 3664(e) assigns to him, and it presupposes an adversarial record for the Court to review. The Government's refusal to respond on the merits has produced no such record: there is nothing before the Court to weigh de novo but the Special Master's own say-so. A court cannot make a genuine de novo determination of a loss that the party bearing the burden has declined even to attempt to prove.

11. Nor can de novo review repair a record that is itself the product of a structurally conflicted process. As the pending motions establish, the Special Master both controls and liquidates the estate and quantifies the loss, and he is compensated from the very assets he administers and sells. Doc. 190. The only asset valuations in the record are his — figures he himself calls a "current guess" drawn from a "desktop exercise," Doc. 245 at 36–37, built on data he says is not available to him and refuses to obtain. A court reviewing those figures de novo still has only those figures. De novo review of an admittedly conjectural valuation, produced by a conflicted officer from information he cannot reach, cannot manufacture the reliable and complete accounting the MVRA requires before any restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

12. Least of all can de novo review cure the constitutional defect. If the Special Master was appointed or is functioning in violation of Article III — the challenge Mr. Lindberg raised in Doc. 190 and renewed in Doc. 269 — the Court's later de novo adoption of his product does not launder the violation; a report generated through the unauthorized exercise of judicial power is not made valid by being reviewed. Section 3664(d)(6) authorizes a master only to assist the Court, subject to the Court's de novo determination; it does not authorize the master to assume the adjudicative function Article III commits to the Court, or the burden of proof § 3664(e) commits to the prosecutor. De novo review presumes a record lawfully and adversarially developed; it cannot conjure one. That is precisely why

the Government must be required to respond, on the merits, before the Report is adopted at all.

IV. The report the Government adopts is, by the Special Master's own admissions, a "current guess" built on information he cannot reach.

13. The Government adopts a report the Special Master himself does not defend as evidence. He describes his asset figures as his "current guess," Doc. 245 at 36–37, derived from a "desktop exercise," id. at 36, resting on "illustrative valuation analyses prepared by the financial advisors to NHC Holdings, LLC" that, in his own words, "do not

constitute formal valuations or fairness opinions," id. at 36. No appraisal, valuation report, or workpaper supports any figure in the report.

14. More fundamentally, the Special Master admits he cannot reach the information on which the restitution figure depends. The term sheet defining the scope of his authority records that "[t]he Special Master has no authority to compel the [companies] to provide him with information," and that "[i]f the Special Master is unable to complete a task because of a lack of information, his job is to report that to the Court." He has confirmed the same on the docket, describing the entities that hold the loss and valuation data as "none of which are under the Special Master's control" and his sole authority over them as "the power to appoint two directors to the board of NHC." Doc. 266; Doc. 268. On the Government's own theory, then, the report rests on information beyond the reach of the Court, the Special Master, and the Government alike — an estimate no one in this proceeding has tested. That is the opposite of the "complete accounting" the MVRA requires before restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

15. Against that unsourced estimate, neither the Government nor the Special Master has addressed the concrete, third-party valuations Defendant placed before the Court in his Motion for a Determination That No Restitution Is Owed. Those valuations come from nationally recognized firms and establish both the value the companies held before they were transferred to the custodians and the destruction in value that followed. KPMG LLP appraised the insurance entities as of December 31, 2017 — concluding, for example, $380,500,000 for Colorado Bankers Life — and KPMG and Houlihan Lokey found the affiliated loans well secured, with "full coverage" at a conservative loan-to-value; the Cabrillo Advisors valuation and Blackstone's own analysis valued Beckett at roughly $1 billion. Docs. 234, 235 ¶¶ 12–19. The assets transferred into the custodians' control — the Specified Affiliated Companies at approximately $3.4 billion and AAPC at approximately $3 billion — carried on the order of $6.4 billion in value; what followed under the custodians was the fire-sale destruction already described. The Second Supplement never mentions KPMG or Houlihan Lokey, and the Government does not mention them at all.

16. That silence is itself proof that the motions go substantially unanswered: on the record's most important factual questions — what the companies were worth, and who destroyed that value — neither the Government nor the Special Master engages the evidence. And even if the Special Master had referenced these valuations, it would not cure the defect: a report that shifts to Mr. Lindberg the burden of proving value and causation defeats § 3664(e), which places that burden on the attorney for the Government. The prosecutor's failure, on the record, to meet that burden requires a rebuttal issue by issue; absent one, the Government has failed to prosecute the restitution claim and has failed to place on the record the evidence the MVRA requires — and a $1.6 billion award cannot rest on that void.

V. The fiduciary and accounting defects the Government refuses to address concern billions of dollars — including $866 million in Beckett value never accounted for.

17. Beckett alone illustrates the problem, and it is a fiduciary problem worth roughly a billion dollars. As Defendant's Motion to Disqualify and Remove the Special Master details, the Beckett asset was appraised at approximately $1 billion — by the Cabrillo Advisors valuation and by Blackstone's own acquisition proposal and analysis

— yet the Special Master sold it, in December 2025, for approximately $134 million. Doc. 269. That is roughly $866 million in restitution value forfeited, and the Report contains no accounting of the Beckett proceeds. Nor was the sale authorized: it proceeded without any court order, in violation of the Court-approval condition the appointing order imposes, and only the Special Master — the officer who took control of the asset through the NHC transfer — could approve it; his designee on the NHC board voted to approve the sale, and he executed a letter confirming he did not oppose it. A fiduciary who disposed of a Primary Restitution Asset without court approval, forfeited $866 million in value, and has never accounted for the proceeds cannot supply the full and verified accounting the MVRA makes mandatory before restitution is fixed, 18 U.S.C. § 3664(f)(1)(A) — and the Government cannot adopt his Report as though he had.

18. The concern is not confined to Beckett; it infects every prior sale and the process through and through. Present, arm's-length evidence confirms the same debt-based undervaluation is happening again: as set out in Defendant's Second Motion to Set Aside the Special Master's Report, the Special Master proposes to sell Damovo — which live, arm's-length evidence values at $400 to $450 million — "for the debt," roughly $100 million. The Damovo proposal is not an isolated data point; it confirms the pattern already documented in the companies the Special Master sold "for the debt," including Clanwilliam — valued at approximately $880 million in the signed Quadro purchase agreement and sold for approximately $450 million — and others. That pattern infects the entire valuation process on which the Report rests: the same officer who undersold these assets generated the only asset valuations in the record and now asks the Court to fix a restitution award exceeding $1.6 billion on them.

19. The same officer is now positioning AAPC for the same treatment. The Special Master has refused to credit the AAPC preferred equity — par value $352,906,240, part of roughly $3 billion in AAPC value transferred into his control — against ULICO's claim, deferring any credit until ULICO "realizes this value." Doc. 245 at 6 n.3. And AAPC faces a refinancing requirement in 2027 that the same maturity-driven dynamic could be used to convert into a below-value forced sale rather than a routine refinancing — the same "for the debt" playbook already run on Beckett, Clanwilliam, and Damovo, now aimed at devaluing AAPC to trigger a foreclosure. Decl. ¶ 9. An officer who devalues the estate's assets to force their sale is not a neutral source of the valuations on which a $1.6 billion penalty would rest.

20. The zero-coupon bonds are a third illustration of the same burden-shifting, and they make its stakes plain. To protect the affiliated-loan principal, the insurers held roughly $1 billion in par value of bank-issued zero-coupon bonds; after Mr. Lindberg surrendered control, the court-supervised Rehabilitator sold them before maturity, generating approximately $394 million in cash proceeds and forfeiting approximately $611 million in guaranteed value. Neither figure appears in the Report: the roughly $394 million actually recovered has never been credited against the sum the Special Master seeks, and the roughly $611 million in value destroyed by the custodian's own act is charged to Mr. Lindberg rather than to the fiduciary who caused it. The proceeds, and the accounting that would fix them, sit with the custodians and the Rehabilitator — not with Mr. Lindberg, who surrendered those books years ago. The Special Master says that accounting is not available to him; he has declined to obtain it from the custodians even though, as a trustee with board representation, he holds the

power to compel it; and he and the Government have opposed the very subpoenas that would produce it — Mr. Lindberg's Motion for Issuance of Subpoenas (Doc. 248), which the Government opposed (Doc. 261) and the Special Master opposed (Doc. 266). The import is the same across Beckett, the operating-company sales, and the zero-coupon bonds: billions of dollars are unaccounted for under the custodians' watch, and the Government asks the Court to adopt restitution figures built on an accounting that

is not available to the Special Master, that the Special Master refuses to obtain, and that the Special Master and the Government actively block. Section 3664(e) does not permit a restitution award to rest on that foundation.

21. The Government's answer to all of this is telling. Confronted with a

roughly $1 billion fiduciary breach, $866 million in Beckett value unaccounted for, a sale made without any court order, roughly $394 million in zero-coupon proceeds recovered but never credited and a further $611 million in zero-coupon value destroyed and charged to Mr. Lindberg, and a documented pattern of selling the estate's companies far below their arm's-length value, the Government has no answer — and it has refused to respond, on the merits, to any of it. That silence is itself an admission: these questions cannot be answered on this record, and a Report that leaves them unanswered cannot bear the weight of a $1.6 billion order.

VI. The Ares transaction is exemplary of the § 3664(e) burden of proof

the Government bears and has inverted.

22. In November 2018, Mr. Lindberg executed a letter of intent for Ares

Management to purchase the North Carolina insurance companies on arm's-length terms that would have retired the affiliated loans and protected the policyholders. After contact with the Government, Ares cited undisclosed third-party advice to avoid any ongoing connection with Eli Global and abandoned the transaction — as documented in Defendant's Motion for a Determination That No Restitution Is Owed (the motion to dismiss the restitution claim) and in the note placed on the record attached to it. Docs. 234, 235 ¶¶ 26–27. That interference is memorialized in a contemporaneous January 6, 2019 email of Christa Miller of Eli Global, written

"for the files," attached as Exhibit A. It records that, in the days before Ares walked away, Ares "reiterated their position of preferring to have a balance sheet upon closing … devoid of any affiliated loans," and "said that they had been told by a third party constituent that they should avoid any ongoing connection to Eli Global after the close." Ex. A. Ares had said the same on a December 21, 2018 call — that they "had been advised to not have any ongoing ties to Eli Global after close" and, asked who had given that advice, "refused to say" — a call that "took place soon after a meeting/call that Ares had with the DOJ." Id. As the email concludes, "it seems very likely … that they have been heavily influenced by a third party with power." Id. Governmental interference that defeats a signed, value-preserving transaction is a cause attributable to the Government, not to Mr. Lindberg, and it breaks the chain of proximate causation on which any restitution award depends. The Special Master's Second Supplement does not mention Ares at all.

23. The Ares transaction is exemplary of the burden of proof this dispute

turns on. Section 3664(e) requires the attorney for the Government to prove that the claimed loss was proximately caused by the offense of conviction; it does not require Mr. Lindberg to disprove it. Yet the Government adopts a Report that ignores a value-

preserving transaction the Government itself defeated, and proceeds as though the burden ran the other way. That inversion of the burden of proof recurs throughout these proceedings, and it is highlighted and developed extensively in Defendant's Response and Objection to the Special Master's Second Supplement, to

which Defendant respectfully refers the Court. A response that inverts the statutory burden and then declines to defend it is not the response § 3664(e) requires.

24. The Government's response to Mr. Lindberg's contemporaneous

demand for Ares information confirms the inversion. In the August 7 correspondence attached as Exhibit B, defense counsel asked the Government to produce any evidence — expressly including evidence held by other arms of the government, such as the FBI — bearing on the Ares transaction and the Government's interference with it. The Government deflected. It answered only that the undersigned prosecutor is "not aware of any Government interference in the Ares transaction," and asserted that "discovery in this matter was previously produced to prior counsel." Ex. B. Neither answer discharges the § 3664(e) burden. The first speaks to one prosecutor's personal awareness alone — not to what the FBI or any other arm of the Government knows, which is exactly what the request sought. The second is contradicted by the record: prior counsel has confirmed that no information about the Ares transaction was ever provided. Ex. B. And the Ares interference is neither new nor a surprise: Mr. Lindberg placed it squarely at issue in his Motion for a Determination That No Restitution Is Owed — the motion to dismiss the restitution claim — so the Government has been on notice of it since that filing and cannot now meet a restitution demand exceeding $1.6 billion by professing personal unawareness of a transaction it is charged with having blocked.

VII. The Government cannot press the § 3664(d)(5) deadline while

refusing to join issue.

25. The Omnibus Response urges the Court to set a final restitution

hearing for August 17 and to enter a final order before the August 24 date in 18 U.S.C. § 3664(d)(5). Doc. 279 at 3. The Government cannot have it both ways. A court that does not meet that deadline "nonetheless retains the power to order restitution," Dolan v. United States, 560 U.S. 605, 608 (2010), so the date supplies no reason to fix a $1.6 billion penalty before the Government answers the motions. The deadline was in any event mooted by the bifurcation process, and any delay in these proceedings is the Government's own — it elected to defer to the Special Master rather than respond. Having declined to join issue, the Government cannot invoke the clock it created to foreclose a response it never gave.

26. The urgency is illusory and of the Government's own making. The

Special Master's report was never going to be complete within the time the Government now invokes — that is a direct consequence of the bifurcation process the Government itself pursued. The Government cannot manufacture a compressed schedule through bifurcation, decline to respond on the merits, and then rely on the very timeline it created to rush an admittedly incomplete report — one the Special Master calls his "current guess" — into a final restitution order.

VIII. The proposed August 17 hearing cannot afford Defendant the

process he is due.

27. The constitutional and fiduciary defects the pending motions raise are

not technicalities. They concern billions of dollars, and the MVRA makes a full and accurate accounting of that sum mandatory before any restitution may be fixed. 18 U.S.C. § 3664(f)(1)(A). A single hearing on August 17, scheduled to beat a deadline,

cannot supply the adversarial testing that a penalty of this magnitude, and these threshold questions, require.

28. The proposed date cannot be met consistent with due process for two

further, practical reasons. First, counsel does not have availability in August: counsel is committed to multiple other matters during that period and cannot, in any instance, agree to a hearing this month. Second, the factual record is not yet in Defendant's hands. Counsel has been working with Defendant's prior counsel, Katten Muchin Rosenman LLP — which was replaced as Mr. Lindberg's counsel — to obtain the transfer of the complete case files and information; that transfer is being produced in tranches, and the first tranche since Katten was replaced was made available to Mr. Lindberg only today, at approximately 1:00 p.m. 1 Katten has been processing that transfer as quickly as it can, and it remains in progress. This case history spans eight years, and it is not reasonable to expect counsel to mount a defense to a restitution demand exceeding $1.6 billion on August 17 — roughly ten days' notice — while much of the record is still being actively transferred between Katten and current counsel. Fixing a restitution award exceeding $1.6 billion on August 17 — before counsel is available, before the file transfer is complete, and before the mandatory accounting can be assembled and tested — would deny Defendant the meaningful opportunity to be heard that due process requires.

29. The August 17 date is also the product of exactly the unilateral

practice this motion challenges. The Government proposed that date without

1 As of the filing of this document, counsel has still been unable to review the materials Katten produced, because of a password issue with the production.

securing defense counsel's agreement, and defense counsel advised the Government, in the August 7 correspondence attached as Exhibit B, that the date "does not work for any defense counsel" and that fixing it in a filing "without seeking defendant's counsel is exactly the harm we pointed out at the 4th circuit." Ex. B. Confronted with that objection, the Government did not defend the date, justify it, or offer to confer; it deflected — asserting only that there is "not a requirement to confer on a response" and inviting Mr. Lindberg to "propose an alternative on the docket." Ex.

B. That answer confirms rather than dispels the problem: the Government fixed

August 17 unilaterally and, once told the date works for no defense counsel, declined even to reconsider it. A hearing date set that way, to beat a statutory clock the Government itself agreed could run longer, cannot bear the weight of a billion- dollar restitution determination.

IX. The constitutional and statutory limits on any restitution award are

raised, preserved, and likewise unanswered.

30. Because MVRA restitution is now settled to be criminal punishment,

Ellingburg v. United States, 607 U.S. 163 (2026), several constitutional and statutory limits constrain any restitution the Court may impose. Mr. Lindberg has developed these limits in his filed Objections and Response to the Special Master's Report, and he raises and preserves them here. Each is a merits question the Government's Omnibus Response does

not answer, and each independently caps or bars the award the Government asks the Court to enter.

31. First, the Eighth Amendment's Excessive Fines Clause. Because restitution is criminal punishment, the Clause applies as a substantive limit, Timbs v. Indiana, 586 U.S. 146 (2019), and a monetary sanction "grossly disproportional to the gravity of [the] offense" is unconstitutional, United States v. Bajakajian, 524 U.S. 321, 334 (1998). On this record — every protected policyholder paid in full (more than $157 million distributed to some 43,000 policyholders), approximately $1 billion of first-loss capital, an approximately $2.39 billion personal guarantee, no defaults under Mr. Lindberg's management, and offsets that drive the net loss toward zero — a restitution award exceeding $1.6 billion is grossly disproportional, and no deference to the Special Master can cure a constitutional ceiling.

32. Second, the Sixth Amendment. Because restitution is punishment and Apprendi applies to criminal fines, Southern Union Co. v. United States, 567 U.S. 343 (2012), the facts that fix the amount must be found by a jury beyond a reasonable doubt. Mr. Lindberg preserves this argument: while United States v. Day, 700 F.3d 713, 732 (4th Cir. 2012), held otherwise, it rested on the premise — that restitution is not punishment — that Ellingburg has since displaced, and the point is preserved for review on that changed footing.

33. Third, the statutory bar on double recovery. The MVRA's anti-duplication provisions, 18 U.S.C. § 3664(j), forbid restitution that duplicates a victim's recovery for the same loss: subsection (j)(2) requires that restitution be reduced by amounts a victim recovers as compensatory damages in any federal or state civil proceeding, and subsection (j)(1) fixes the accounting and subrogation order by which a third party that has already compensated a victim stands in the victim's place and is reimbursed only after the victim has been made whole. The award the Government seeks sweeps in losses already reduced to civil judgment elsewhere — including the civil judgment ULICO has obtained (credited only in part) — which § 3664(j) commands be excluded, not merely left for a later offset.

34. Fourth, the limits of the reference itself. Section 3664(d)(6) authorizes referral of an issue to a master subject to the Court's de novo determination; it does not authorize delegating the entire loss determination together with custody and liquidation of the estate. The appointing order exceeded that authorization, and a restitution order entered on such an ultra vires reference is not a valid arrangement but an illegal sentence — one "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Cohen, 459 F.3d 490, 497 (4th Cir. 2006); see United States v. Broughton-Jones, 71 F.3d 1143, 1149 (4th Cir. 1995) (a defendant's consent "cannot, without more, authorize a restitution order not authorized by the statutory source").

35. These are threshold limits the Government must meet, not questions the Special Master's recommendation can answer for it. By declining to respond, the Government has left each of them unaddressed. That is a further reason its Omnibus Response should be stricken and a merits response required.

X. Relief.

36. WHEREFORE, Defendant respectfully requests that the Court: (1) strike the

Government's Omnibus Response (Doc. 279) as non-responsive and as an impermissible attempt to shift the § 3664(e) burden of proof from the attorney for the Government to the Special Master; (2) direct the Government to file, within a time the Court sets, a substantive response, on the merits and issue by issue, to

each of Defendant's pending motions — including Docs. 172, 190, 201, 202, 234 and 235, and 269, and the Second Motion to Set Aside the Special Master's Report — joining issue on each point or conceding it; (3) hold the Special Master's Second Supplement (Doc. 245) and proposed Final Order of Restitution (Doc. 245-1) in abeyance until the Government has done so; (4) in the alternative, because the Government has not responded to Mr. Lindberg's potentially dispositive motions within the time Local Criminal Rule 47.1 requires, treat those motions — the Motion for a Determination That No Restitution Is Owed (Docs. 234, 235), the Emergency Motion to Stay Asset Sales and for a De Novo Article III Determination (Doc. 190), the Motion to Disqualify and Remove the Special Master (Doc. 269), and the Second Motion to Set Aside the Special Master's Report — as unopposed and grant them, under Local Criminal Rule 47.1 and the Court's inherent authority to manage its docket; (5) enforce the bifurcation order as granted — under which Mr. Lindberg's sentencing proceeded separately and the restitution determination was to continue thereafter, rather than be truncated by the ninety-day period the Government now invokes — and hold the Government to the agreement on which that bifurcation, and Mr. Lindberg's early sentencing, were premised; and (6) direct a complete accounting, as 18 U.S.C. § 3664(f)(1)(A) requires, of all restitution assets, credits, offsets, and sale proceeds — including the Beckett proceeds, the zero- coupon-bond proceeds, and the records held by the custodians and the Rehabilitator — before any restitution is fixed.

Dated: August 7, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes[2] Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

2 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted; both did not respond on the motion to strike.

Dated: August 7, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes[3] Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

3 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 7, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 291 — Response in Opposition to the Government's Omnibus Response (Doc. 279) (filed 08/09/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

ADDENDUM TO DEFENDANT'S MOTION TO STRIKE THE

GOVERNMENT'S OMNIBUS RESPONSE

Defendant Greg E. Lindberg respectfully submits this Addendum to his pending Motion to Strike the Government's Omnibus Response (Doc. 279). The Motion already establishes that the Government failed to carry its statutory burden under 18 U.S.C. § 3664(e) by deferring wholesale to the Special Master's recommendation. This Addendum adds three related grounds sharpened by the Special Master's Response (Doc. 288): first, that the Special Master and the Government each point to the other on the law, leaving the legality of the reference defended by no one; second, that the Government drafted the very instruments whose legality is at issue, which are therefore construed against it and not the Defendant; and third, that the Government's deference is a default on the affirmative duties the MVRA and the Crime Victims' Rights Act place on the prosecutor.

1. No party has defended the reference on the merits — so the legal challenge stands unrebutted.

The dispositive legal question — whether the special-master reference is lawful and constitutional as applied — has now been presented to two parties, and neither will answer it. The Special Master expressly declines to defend the appointment on the law, stating that "no further response to the Motion's legal arguments appears necessary" and that any such defense "falls within the Government's purview." Doc. 288 at 2. The Government points back to the Special Master: its Omnibus Response "concurs with... the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. The result is a circle in which no one has defended the lawfulness of the reference, the scope of the Appointment Order, or the loss figure on the merits.

That silence is not a neutral litigation choice. The Government bears the burden on restitution, 18 U.S.C. § 3664(e), and this Court's Local Rules require the Government to respond to potentially dispositive defense motions, W.D.N.C. LCrR 47.1(d), within seven days, LCrR 47.1(e). A potentially dispositive legal challenge that the party bearing the burden elects not to answer stands unrebutted, and the Court may treat it as conceded in the exercise of its inherent authority to manage its docket. Defendant's showing that the reference exceeds § 3664(d)(6) and offends Article III is therefore before the Court unopposed on the merits.

2. The Government drafted the plea agreement and controlled and

authored the operative appointment order, and those instruments are construed against the Government, not the Defendant.

The Government's refusal to defend the reference is the more striking because the Government authored the very instruments whose legality is in question. The United States drafted the plea agreement that is the source of the restitution obligation, and it controlled and drafted the form of the Order appointing the Special Master.1 The Special Master's suggestion that Defendant "proposed" the form of the Appointment Order, Doc. 288 at 3, inverts the drafting history. By Defendant's sworn account, the appointment of a special master was

1 See Declaration of Greg E. Lindberg Regarding the Plea Agreement and the Appointment of the Special Master ¶¶ 3–4, 8–10. Mr. Lindberg attests that Assistant United States Attorney Daniel Ryan "took control of the final order, rejected nearly all of the changes proposed on [his] behalf," and held to the Government's version, which became the order entered, and that the Government drafted the supporting memorandum of law; that he did not select the Special Master, who was "the Government's choice"; and that the Government would file its motion and proposed order "whether or not [he] joined in them," affording him no meaningful opportunity to review or withhold consent to the filed version. The Special Master's contrary suggestion that Defendant "proposed" the order, Doc. 288 at 3, reflects who filed the appointment motion, not who authored the instrument. The Department likewise drafted the plea agreement that is the source of the restitution obligation, consent to the appointment being a required term of that agreement.

itself a required term of his plea agreement — Paragraph 9 required his consent — and he gave that consent only because the plea agreement required it and refusing risked a finding of breach. He did not select the Special Master; Joseph W. Grier, III was the Government's choice. And on the order itself, Assistant United States Attorney Daniel Ryan "took control of the final order, rejected nearly all of the changes proposed on [Defendant's] behalf," and held to the Government's version, which became the order entered — with the Government drafting the supporting memorandum of law as well. Mr. Lindberg attests, from his own observation, that he saw the Government's redline changes to the order and its rejection of the provisions he had asked to include. The Government made clear it would file its motion and proposed order "whether or not [Defendant] joined in them," on its own schedule, leaving Defendant no meaningful opportunity to review or to withhold consent to the version ultimately filed. The instruments are the Government's, drafted and controlled by the Government; Defendant's role was a plea-compelled consent, not authorship.

That authorship carries a settled consequence in this Circuit. Interpretation of a plea agreement applies contract principles, and any ambiguities and inconsistencies in a plea agreement are construed against the Government as its

drafter — because constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant for imprecisions or ambiguities. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986); accord United States v. Petties, 42 F.4th 388, 395 (4th Cir. 2022) (any ambiguity in a plea agreement must be construed against the government, as the drafter); United States v. Barefoot, 754 F.3d 226, 246 (4th Cir. 2014). The same drafter-responsibility principle governs the appointment order the Government controlled and finalized: any doubt about the reference's scope — including whether it authorized the Special Master to liquidate estate assets without this Court's approval — is resolved against the Government that controlled and authored it, not against the Defendant.

This also answers the Response's consent theme from a second direction. As the Motion and Reply explain, consent cannot cure a structural Article III defect or authorize a sentence the statute does not permit. But even treated as ordinary drafting, these are the Government's instruments; their scope and every ambiguity in them are construed against the Government, not Mr. Lindberg. That is especially so where, as Defendant's declaration establishes, his "consent" was a plea-compelled term extracted on the Government's schedule and drafting — not a negotiated

endorsement of the reference's legality. The Government cannot draft the plea agreement and the reference, compel Defendant's assent as a condition of his plea, and then simultaneously decline to defend their legality and have their uncertainties read in its own favor.

3. The burden to prove victims' loss is the Government's, and it cannot be

delegated to the Special Master.

Under the MVRA, "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). The Government does not satisfy that burden by adopting a number someone else supplies. In United States v. Steele, the Fourth Circuit vacated a restitution order because "the Government merely rubberstamped [the victim's] unsupported loss estimate," and held that, the Government having failed its initial burden, "the burden of proof never shifted" to the defendant. 897 F.3d 606, 613–14 (4th Cir. 2018); see United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017). A court in this Circuit applied that rule to deny restitution outright just last year, holding a victim's assertion of loss "without more information... is insufficient," and that "because the government failed to meet its burden, the 'burden to dispute'... does not fall on the defendants." United States v. Jenkins, No.

2:22-CR-101, 2024 WL 3454976 (E.D. Va. July 17, 2024). The Government's Omnibus Response does the very thing Steele forbids: it adopts, without independent evidentiary support, a loss figure the Special Master built on debt balances and, as to the Beckett sale, on a price he continues to withhold as "confidential." Doc. 288 at 18. A restitution order cannot rest on proof the Government never made.

4. The Appointment Order confirms that the Special Master assists the

Government's burden — he does not replace it.

The Order appointing the Special Master invokes § 3664(d)(6) and provides that a special master would "resolve victim and restitution issues in this case under the Court's supervision and guidance," subject to "a de novo determination of the issue by the court." United States v. Lindberg, No. 3:23-CR-48-MOC, 2025 WL 285324 (W.D.N.C. Jan. 23, 2025). It grounds the reference in the Government's own obligations: it recites the victims' "right to full and timely restitution as provided in law," 18 U.S.C. § 3771(a)(6), and frames the Court's task as determining "the proper amount of restitution owed to each victim pursuant to 18 U.S.C. §§ 3663A(b) and 3664(e)." It further records that "Defendant has reserved all rights with regard to any arguments regarding calculating loss amount," and that restitution amounts

"should be reduced by any amount victims have recovered for the same losses," citing 18 U.S.C. § 3664(j)(2). The Special Master's recommendation is thus an input to the Court's de novo determination, not a substitute for the Government's proof — and the Government cannot treat it as one.

5. The Crime Victims' Rights Act and the MVRA impose affirmative duties the Government cannot satisfy by silence.

The CVRA guarantees victims "[t]he right to full and timely restitution as provided in law" and "[t]he right to be treated with fairness," and directs that officers and employees of the Department of Justice "engaged in the... prosecution of crime shall make their best efforts to see that crime victims are... accorded[] the rights described in subsection (a)." 18 U.S.C. § 3771(a)(6), (a)(8), (c)(1). The MVRA layers on obligations that run to the Government: the attorney for the Government "shall promptly provide the probation officer with a listing of the amounts subject to restitution," id. § 3664(d)(1); where the United States is itself a victim, the court "shall ensure that all other victims receive full restitution" first, id. § 3664(i) — all while "[n]o victim shall be required to participate in any phase of a restitution order," id. § 3664(g)(1). Those duties are defeated when the Government endorses a loss figure it has not verified, produced by an officer withholding the underlying numbers, expressly to avoid "duplicat[ing]" the Special Master's work. Doc. 279 at 2.

6. The prosecutor's overriding duty is that justice be done.

The United States Attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty... whose interest... in a criminal prosecution is not that it shall win a case, but that justice shall be done"; he is "in a peculiar and very definite sense[,] the servant of the law." Berger v. United States, 295 U.S. 78, 88 (1935). Restitution is part of the criminal sentence, and a sentence resting on concealed, unverified figures cannot be squared with that duty. The Government's decision to defer rather than prove — and to defend a process in which the dispositive numbers remain undisclosed — is inconsistent with its role as the guarantor, not the bystander, of an accurate and lawful restitution determination.

7. The scope of the point is narrow.

Defendant does not contend that the CVRA creates a private damages remedy or that it displaces prosecutorial discretion; the statute expressly does neither. 18 U.S.C. § 3771(d)(6). The point is narrower and directly enforceable at sentencing: the Government cannot discharge its non-delegable § 3664(e) burden, or its CVRA and MVRA duties to the victims, by deferring to a conflicted Special Master who is withholding the loss figures; it cannot leave the legality of the reference undefended and expect the Court to supply the defense that neither the Special Master nor the Government will make; and it cannot have the plea agreement and appointment order it drafted read in its own favor when their legality is challenged.

Conclusion

For the reasons stated in the Motion to Strike and in this Addendum, Defendant respectfully requests that the Court strike the Government's Omnibus Response (Doc. 279); treat as unopposed, and grant, the pending challenge to the special-master reference that neither the Special Master nor the Government has answered on the merits; require the Government to make the independent evidentiary showing § 3664(e) demands; and decline to enter any restitution order until the Government has done so on a complete and disclosed record.

Dated: August 9, 2026.

Respectfully submitted,

/s/ Kenneth N. Barnes[2] Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr., Raleigh, NC 27603 919-524-1977 | barnesatty@aol.com Counsel for Greg E. Lindberg

2 Pursuant to LCrR 44.1 and LCvR 83.1(c)(4), attorney Vivek Ramachandran has not signed while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case, including counsel for the United States and counsel for the Special Master.

Dated: August 9, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

**Doc. 292 — Response in Opposition to the Special Master's Response (Doc. 288) (filed 08/09/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DECLARE THE SPECIAL-MASTER REFERENCE UNCONSTITUTIONAL AS APPLIED, TO DISQUALIFY AND REMOVE THE SPECIAL MASTER, AND TO SET ASIDE THE RESTITUTION ORDER

Introduction

Neither the Special Master nor the Government defends this reference on the merits. The Special Master says any legal defense of his appointment "falls within the Government's purview." Doc. 288 at 2. The Government "concurs with . . . the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. Each defers to the other; no one answers. Because the Government must "respond to all potentially dispositive defense motions," W.D.N.C. LCrR 47.1(d), within seven days, LCrR 47.1(e), and this dispositive Motion has gone unanswered by the party

the Rule obligates, the Motion stands unopposed and should be granted on that ground alone.

On the merits, the Response confirms the defect rather than dispelling it. It concedes that the Special Master exercised custodial, liquidation, and distributive powers far beyond the fact-finding reference the MVRA authorizes; that he is paid from the very estate whose losses he quantifies; that his board designee voted to approve, and he signed a letter not opposing, the Beckett sale; that he obtained the Beckett "accounting" only while preparing this Response; and that he still withholds the sale price as "confidential." Two threads follow. First, the Special Master had no authority to sell Defendant's assets — not under § 3664, and not under the Appointment Order without the Court approval he admits he never sought — so his "no approval was required" position concedes an unauthorized disposition rather than defending one. Second, the loss figure the Government asks the Court to adopt is unproven: it rests on debt balances and on numbers the Special Master generated after the fact and still will not fully disclose, while Defendant's contrary values rest on independent appraisals and arm's-length transactions. On this record the Government has not carried its burden. And consent — the Response's main theme

— cannot cure a structural defect in the judicial power or authorize a sentence the statute does not permit.

Two features of the record frame everything that follows. First, the evidentiary showings are not equal. Defendant supports this Motion with three sworn declarations under 28 U.S.C. § 1746 — his own two declarations and that of Kathy Million, a former NHC director

— together with contemporaneous documents. The Special Master answers with none. His competing factual assertions rest on nothing more than his own say-so, offered on information and belief and unsupported by any declaration, document, or record. That stands in contrast to Defendant's Motion and this Reply, which rest on actual evidence — sworn testimony and contemporaneous records. Assertion offered on information and belief cannot carry the preponderance-of-the-evidence burden that governs any disputed restitution fact. See 18 U.S.C. § 3664(e). Second, the documentary record refutes the premise that the Beckett Trust had dissolved before the sale. The Beckett Collectibles Trust remained in existence and in effect until February 27, 2025, when the Special Master took over the AAI/grantor interests and removed the two AAI directors — Kathy Million and Lonna Carter — from the NHC board; until that act the trust and its Independent Trustee continued unchanged. Million Decl.

¶¶ 11, 13–14, 21–22, 25–27. And it remained a validly existing Delaware statutory trust until September 30, 2025: the Delaware Secretary of State's records show The Beckett Collectibles Trust (File No. 5879107) "Voluntarily Cancelled" effective that date. Del. Sec'y of State, Div. of Corps., Entity Details for The Beckett Collectibles Trust (File No. 5879107) (retrieved Aug. 8, 2026) (Ex. 5). By then the Special Master alone controlled NHC — the trust's grantor-side manager — and he was the only person who could terminate the trust. Whether he dissolved it before the Beckett sale or as a condition of that sale is immaterial: on either sequence he had to act to dissolve the trust and then sell Beckett through NHC. And the asset he disposed of for approximately $134 million was independently valued — in a document Defendant placed in this record — at roughly $1 billion for Beckett standing alone. Doc. 256-1 at 3. The Special Master's contrary characterizations are unsupported by any document or record, and on the standard that governs they cannot prevail.

I. The reference exceeds its only statutory basis.

The sole provision authorizing referral of a restitution issue to a special master is 18 U.S.C. § 3664(d)(6), which permits referral "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of

the issue by the court." That is the whole grant: findings and recommendations, nothing more.

The Appointment Order (Doc. 56) went far beyond it. As the Response itself catalogs, the Order empowered the Special Master to identify assets for liquidation, to "select an appropriate method and timetable and seek Court approval to liquidate," to "oversee and help accomplish the liquidation," to "clear title to all assets for transfer to bona-fide buyers," to receive and distribute restitution payments, to retain a law firm, and to be paid from the assets he administers. Doc. 288 at 3. Those are the functions of a receiver administering an estate, not of an officer proposing findings. Nothing in § 3664 authorizes a reference of that scope.

The consequence is jurisdictional. A court's power to order restitution is statutory in origin, and an order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Cohen, 459 F.3d 490, 498 (4th Cir. 2006); see United States v. Broughton- Jones, 71 F.3d 1143, 1147, 1149 (4th Cir. 1995). A restitution order produced through a reference that outstrips § 3664(d)(6) is such an order. The Special Master's decision to leave the defense of his own appointment to the Government confirms the point: he cannot identify the authorizing statute because there is none.

II. The Special Master had no power to sell the estate's assets — his "no approval required" position concedes an illegal act.

The Response's central factual defense is that Court approval "was not required" because NHC, not the Special Master, controlled the dispositions, and he could assign no greater rights than Defendant held. Doc. 288 at 13, 15. That is an admission, not a defense.

The Order conditioned every liquidation on Court approval, and he bound himself to it. Section 3664(d)(6) authorizes no sales at all. And to the extent the Appointment Order permitted liquidation, it did so only on the express condition that the Special Master "seek Court approval to liquidate available assets" and "oversee and help accomplish the liquidation with Court approval." Doc. 288 at 3; Doc. 56 at 6-7. By the February 13, 2025 Assignment, he became "record owner" of the NHC equity — the entity holding Beckett — taking "all associated economic, legal, voting, and beneficial rights," including "any and all rights . . . to transfer or otherwise dispose of the NHC Equity Interest," and covenanting to administer those interests "in accordance with the Order." Doc. 260 at 2. He thus held the disposition rights and bound himself by contract to the approval condition. His "Court approval was not required" is a departure from his authority, not an account of it. The Response's rejoinder — that Defendant could not assign rights he lacked — misidentifies the source of the duty: it derives from the Special Master's own covenant and the Order's command, not from any veto Defendant once held.

The trust defense fails on the State's record and on his own control. The Response asserts "on information and belief" that the trust was "terminated prior to the Beckett Sale as a result of a 2024 refinancing" and replaced by a corporate structure. Doc. 288 at 14. That is unsworn belief, unsupported by any termination instrument, and it cannot carry the Government's burden. See United States v. Steele, 897 F.3d 606, 613-14 (4th Cir. 2018). The State's records refute it: the Delaware Secretary of State shows The Beckett Collectibles Trust (File No. 5879107) was "Voluntarily Cancelled" effective September 30, 2025 — the only 2024 filing being a change of the registered agent's address. Del. Sec'y of State, Div. of Corps., Entity Details for The Beckett Collectibles Trust (File No. 5879107) (retrieved Aug. 8, 2026) (Ex. 5); the underlying Certificate of Cancellation will be produced once obtained from the Delaware Secretary of State. The trust thus existed — its approval right intact — until September 30, 2025, more than seven months after the Special Master took control of the NHC equity. Doc. 56; Doc. 260 at 2.

That timing is dispositive under Delaware law. A statutory trust "is dissolved and its affairs shall be wound up . . . upon the happening of events specified in the governing instrument," 12 Del. C. § 3808(c); until a certificate of cancellation is filed it continues and its property is disposed of "in the name of and for and on behalf of the statutory trust" by those "responsible for winding up," id. § 3808(d); and the certificate of trust "shall be cancelled upon the dissolution and the completion of winding up," by a certificate "filed in the office of the Secretary of State," id. § 3810(d). Dissolving the trust, winding it up, disposing of the Beckett equity, and filing the September 30, 2025 cancellation were therefore affirmative acts requiring the assent of whoever held control — and, on his own account, that was the Special Master. Entrust, the trust's "Grantor and Sole Beneficiary," sits "under the total control of NHC," Doc. 288 at 14; Doc. 260 at 1, and the Special Master is record owner of the NHC equity, holding "all . . . voting . . . rights," Doc. 260 at 2. The approval right the Response lodges with the grantor thus runs straight back to him.

His control was not passive. Two weeks after the Assignment, by letter of February 27, 2025 signed "Joseph W. Grier, III, solely as Special Master," he removed the two GGH-appointed NHC directors, Kathy Million and Lonna Carter, "effective immediately." Special Master's Letter to NHC Holdings, LLC (Feb. 27,

2025) (Decl. of Kathy Million Ex. D); see Decl. of Kathy Million ¶¶ 25–26. And the trust-termination defense collapses on Million's sworn account. Million served on the NHC board as one of its two AAI Directors (the seats the Memorandum of Understanding assigns to AAI, i.e., Global Growth Holdings, formerly Academy Association, Inc.) from her appointment until that day. Million Decl. ¶ 2; see MOU art. II (Ex. 4). The December 2024 refinancing the Response says "terminated" the trust did nothing of the kind; it was approved through the trust. The instrument forecloses any other reading. Under the Trust Agreement, a refinancing is a "Fundamental BKX Matter," which the Trust — as BKX's member — could vote upon "only . . . in accordance with the Grantor's instructions." Beckett Collectibles Trust Agreement § 7.2(a)(vi) (Doc. 260-1). Terminating the trust was a separate act that could occur only "at such time as the Grantor provides written approval of the termination of the Trust and the holders of the obligations issued by BKX . . . in the contemplated Refinancing have consented to such termination." Id. § 9.1(e). A refinancing approved through the Trust's Grantor-instructed vote thus could not, by the document's own terms, have terminated the trust; termination required the Grantor's separate written approval and the noteholders' consent, neither of which the Response claims occurred. Defendant confirms as much: he was never asked to

approve, and never gave, any written approval of a termination of the Trust in connection with the December 2024 refinancing, and his only signature in that period — a December 2023 consent limited to the Beckett long-term incentive plan — was not a consent to the refinancing, to any disposition of Beckett, or to any termination of the Trust. Lindberg Decl. ¶¶ 3–4. On December 9, 2024 — the day the refinancing closed — NHC's own financial advisor told the board that "the consent of the Grantor of the Trust is required for the approval of any Fundamental BKX Matters as defined in the Trust Agreement," and NHC's own counsel confirmed that "[t]he Beckett and AT Trusts require the respective Grantors to consent to any sale or refinance," that "NHC is the Manager of . . . Entrust Global Group, LLC, the Grantor of the Beckett Trust," and that "[t]he NHC board was approving the refinancing on behalf of the grantor of the Beckett Trust." Million Decl. ¶ 9. The refinancing was the trust's mechanism, not its casualty; afterward the trust and its Independent Trustee, Hugh Steven Wilson, continued exactly as before. Million Decl. ¶¶ 11, 13–14. And through February 27, 2025, no proposal to dissolve, wind up, or cancel the trust — or to remove Wilson as trustee — was ever placed before the NHC board or seen by Million. Million Decl. ¶¶ 21–22. When the Special Master removed the two directors who had pressed the board about the

trust's approval requirements, the Beckett Trust was still in place and Wilson was still its trustee. Million Decl. ¶ 27.

The dilemma is inescapable. If the Special Master approved the dissolution and wind-up that cleared the path for the Beckett disposition — as his control necessarily means he did — he liquidated a Primary Restitution Asset without ever seeking this Court's approval, in breach of the Order's command to "seek Court approval to liquidate." Doc. 288 at 3. If instead the trust dissolved without his approval, it dissolved without ever being put before the board that had been approving Beckett matters through the trust. Million Decl. ¶¶ 21–22. Either way the disposition ran through the NHC board, and the instrument that

created NHC forecloses any escape. Under the Memorandum of Understanding — the agreement that formed NHC and fixed how it operates — NHC "will be governed by a board of managers . . . [with] the exclusive authority to manage the business and affairs of NHC," composed of seven directors including "two (2) directors appointed by AAI (each an 'AAI Director')"; every action requires "the affirmative consent of no less than four (4) directors"; and, decisively, "[p]rovided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director."

MOU art. II (Ex. 4). AAI is Global Growth Holdings (formerly Academy Association, Inc.), and Kathy Million and Lonna Carter were its two AAI Directors. Million Decl. ¶ 2. The Special Master removed both of them on February 27, 2025. Having taken Global Growth's membership interest by the Assignment — the source of the "all . . . voting . . . rights" he now holds, Doc. 260 at 2; see Doc. 288 at 9 — he alone held the AAI side that remained. And by his own account, when NHC approved the Beckett Sale, "the Special Master's NHC board designee voted in favor of NHC approving the transaction," and the Special Master "signed a letter . . . confirming that [he] would not oppose the Beckett Sale." Doc. 288 at 5; see id. at 15 & n.50. The affirmative consent of an AAI Director that the sale required thus came from the Special Master's own designee — the conflicted officer's representative approving the disposition of the very asset he was charged to protect. His assurance that the board would have approved the sale "5-0 (had he abstained)," id. at 5, does not cure it: the sale still required the affirmative consent of an AAI Director, which an abstention would not supply. Routing the sale through the trust's dissolution thus does not absolve the Special Master; it convicts him of a more active role. Whichever way the sequence ran, the disposition was the Special Master's doing. If the Beckett Trust was dissolved to clear the path for the sale, that dissolution was one the

Special Master — holding the AAI/grantor side and controlling the board — was required to act to enable, and it could not have occurred without his affirmative act. If instead Beckett was sold first and the Trust dissolved afterward as a term of the sale agreement, the dissolution was a component of the very transaction he effected. On the documentary record no dissolution, wind-up, or cancellation of the Trust ever reached the NHC board through February 27, 2025, Million Decl. ¶¶ 21–22, 27, so any dissolution occurred within the Special Master's exclusive control. Either way, the operative fact does not change: Beckett — a Primary Restitution Asset — was sold by the direct action of the Special Master, effected through the board and ownership structure he alone controlled, and it closed without any order of this Court. The Special Master concedes the sale proceeded to closing with no approval from this Court sought or obtained — the purchaser "did not seek approval from this Court," Doc. 288 at 15 — and he disclosed the completed transaction only after the fact. Id. at 5. Removing the AAI Directors who questioned the transaction and then approving the sale through his own designee, without ever bringing the disposition of a Primary Restitution Asset before this Court, is not less involvement in the sale, but more.

"Not involved" cannot survive the Response's own account. The Special Master's NHC designee "voted . . . to approve the Beckett Sale" — "after reviewing both an independent third-party's fairness opinion and a letter from the Special Master indicating that the Special Master would not oppose the transaction." Doc. 288 at 15 & n.50. That cannot be reconciled with the Response's other description of the same letter as signed "after the fact." Doc. 288 at 5. If the board voted after reviewing the no-oppose letter, the letter was an input, not a formality. The Special Master seated the designee, furnished the letter, and

held the voting rights the designee exercised. Doc. 260 at 2. That the board "would have approved" anyway, Doc. 288 at 5, misses the point: a court officer bound to seek Court approval cleared a billion-dollar disposition through a structure he controlled and never brought it to the Court. The Response concedes the governing rule in the adjacent breath — were he to "sell and liquidate assets of Defendant" as Secondary Restitution Assets, that "would require Court approval." Doc. 288 at 14 n.49. He cannot owe approval when he sells directly yet owe nothing when he sells through the NHC equity he owns and clears with his own letter. Holding him to that condition is not the "worldwide injunction" the Response imagines, Doc. 288 at 15; it is the Order operating on its subject. The result is undisputed: an asset independently valued near $1 billion,

Doc. 256-1 at 3, was disposed of for approximately $134 million with no motion, no notice, no order, and no accounting on this Court's docket. Restitution built on that unauthorized disposition cannot stand. See Broughton-Jones, 71 F.3d at 1149.

III. Consent cannot cure a structural Article III defect or authorize an

unlawful sentence.

The Response's theme — that Defendant sought the appointment, proposed the order, and praised the process — is a non-answer as a matter of law.

The premise also fails on the record. The Special Master's suggestion that Defendant "proposed" the order's form, Doc. 288 at 3, is refuted by Defendant's sworn declaration. The Government drafted both the plea agreement and the proposed order and presented them to Defendant on a take-it-or-leave-it basis, telling him that opposing, delaying, or declining to join the Government's version would expose him to a claim that he had breached his plea agreement. Lindberg Plea & Appointment Decl. ¶¶ 3–4. As the papers were finalized in December 2024, Assistant United States Attorney Daniel Ryan took control of the final order, rejected nearly all of the changes proposed on Defendant's behalf — including Defendant's request that the order require the Special Master to owe a fiduciary duty to all stakeholders — and held to the Government's own version, which became the order filed and entered. Id. ¶ 9. And the Government told Defendant it

would file the motion and proposed order "whether or not [he] joined," proceeding on its own schedule and refusing to await his review, so that he had no meaningful opportunity to review or to withhold consent to the version it ultimately filed. Id. ¶

10. The order was the Government's draft, forced on Defendant.

The reference was therefore a term of the Government's plea bargain — "the Government agreed to this 15-year stat max for the fraud case with the understanding that . . . Mr. Lindberg would cooperate with the Special Master," Sentencing Tr. 44 — and a plea agreement is construed against the Government, which bears "a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986); see United States v. Jordan, 509 F.3d 191, 200 (4th Cir. 2007) ("any such ambiguity would run against the Government"). Any ambiguity about whether the reference authorized the Special Master to sell assets, or to do so without Court approval, is therefore resolved against the Government that sponsored it — not converted into Defendant's consent to an unauthorized process. And that the Government now stands mute — declining to join the Response or defend the reference on the merits, and leaving both to the Special Master, Doc. 279

at 2 — confirms that he functions here as the Government's advocate, not the Court's neutral officer.

Article III's guarantee has two components. The personal interest in an impartial Article III adjudicator is waivable; the structural principle safeguarding the separation of powers is not: "the parties cannot by consent cure the constitutional difficulty," and "notions of consent and waiver cannot be dispositive." Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850-51 (1986). The "judicial Power of the United States" cannot "be shared" with a non-Article III actor. Stern v. Marshall, 564 U.S. 462, 483 (2011). Wellness proves the point: consent validates a non-Article III process only "so long as Article III courts retain supervisory authority over the process," and only where "the essential attributes of judicial power are reserved to Article III courts." Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 678-79 (2015). Here the Special Master did not merely propose findings; he took custody of the estate, liquidated it, cleared title, and distributed proceeds — irreversible acts no later review can undo. Those essential attributes were not reserved to the Court, and consent cannot save the arrangement.

There is a narrower answer too: whatever consent existed did not survive the unauthorized sale. Defendant's consent, on the Response's telling, was to the Court-

supervised process the Order defined — one in which the Special Master would "seek Court approval to liquidate" and disclose his sales. Doc. 288 at 3; Doc. 56 at 6-

7. Consent to a supervised liquidation is not consent to an unsupervised one. When

he sold Beckett without the Court's approval, he stepped outside the terms on which any consent was given, and — because consent holds only while "Article III courts retain supervisory authority," Wellness, 575 U.S. at 678-79 — it lapsed with that supervision.

Consent fails for an independent reason: even a valid waiver "cannot, without more, authorize a restitution order not authorized by the statutory source." Broughton-Jones, 71 F.3d at 1149. A defendant cannot stipulate his way into an illegal sentence, and MVRA restitution is criminal punishment. Ellingburg v.

United States, 607 U.S. 163 (2026).

Finally, the disqualifying ground the Response never confronts is not waivable at all. A judge "shall" disqualify for "a financial interest in the subject matter . . . or any other interest that could be substantially affected by the outcome," 28 U.S.C. § 455(b)(4), and "[n]o . . . judge . . . shall accept from the parties . . . a waiver of any ground . . . enumerated in subsection (b)," id. § 455(e). Those standards apply to a master through Fed. R. Civ. P. 53(a)(2), which permits

consent around a § 455 ground only "with the court's approval" and "after the master discloses any potential grounds for disqualification." The Special Master disclosed neither that he would sell estate assets without Court approval nor that he would vote to approve and decline to oppose the Beckett sale — a letter unknown outside his team until it surfaced in the Martinez Affidavit. Doc. 288 at 5 & n.25. The Court approved no waiver, so the only avenue to consent around his conflict never opened. See United States v. Rechnitz, 75 F.4th 131, 143 (2d Cir. 2023) (a financial interest "no matter how small . . . cannot even be waived by the parties"); Union Carbide Corp. v. U.S. Cutting Serv., Inc., 782 F.2d 710, 714 (7th Cir. 1986) (§ 455(b) is an "absolute prohibition").

IV. De novo review does not cure the defect.

De novo review saved the reference in Raddatz only because it was statutorily authorized, concerned a single discrete issue (a suppression motion), left the ultimate decision with the district judge, and — unlike here — involved a magistrate with no financial stake. United

States v. Raddatz, 447 U.S. 667, 683-84 (1980). None of that holds: the reference exceeds § 3664(d)(6); the Special Master liquidated an entire estate rather than deciding one issue; and he is paid from that estate. De novo review of legal conclusions cannot reverse a completed fire sale, restore conveyed assets, or reconstruct an accounting never made.

Nor can later review cure a decisionmaker who was not neutral at the outset. A party "is entitled to a neutral and detached judge in the first instance," and later review does not make a tainted proceeding acceptable. Ward v. Village of Monroeville, 409 U.S. 57, 61-62 (1972). The Special Master gathered information ex parte, "outside of the rules of evidence," taking "into account documents and information that exist outside of the formal record." Doc. 288 at 10. The Court's de novo review is only as complete as the record he curated; it cannot cure a record built off the record by an interested actor.

V. The Special Master's fee interest is disqualifying.

A decisionmaker with "a direct, personal, substantial pecuniary interest" is constitutionally disqualified. Tumey v. Ohio, 273 U.S. 510, 523 (1927). The interest need not be large or direct: an institutional stake in the flow of funds suffices, Ward v. Village of Monroeville, 409 U.S. 57, 60 (1972), and a pecuniary interest "of sufficient substance" disqualifies, Gibson v. Berryhill, 411 U.S. 564, 579 (1973). The test is objective — whether, "under a realistic appraisal of psychological tendencies and human weakness," the probability of bias is "too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47 (1975); see Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 872 (2009). The Special Master is paid from the assets he

values, liquidates, and distributes; the more he administers, the larger the fund from which he is paid. That is the structural temptation due process forbids.

The controlling authority is on point. In O'Connor, Judge Friendly held that although "in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest . . . disqualif[ies] him from performing the judicial duties" of a special master — a "general principle" enforced without any doubt about the individual. United States v. O'Connor, 291 F.2d 520, 528 (2d Cir. 1961). A receiver who doubles as the officer quantifying the claims is disqualified as a matter of law. That is this Special Master.

The receiver-and-trustee analogy cuts the other way. Konrad found no conflict only because the master "was paid the standard hourly rate, and not a percentage of the sum she calculated." United States v. Konrad, 730 F.3d 343, 353 n.12 (3d Cir. 2013).1 Here the Special Master is paid out of the fund he liquidates and values, and the arrangement is opaque: he will not disclose even where the

1 Konrad underscores the defect rather than curing it. It was not a restitution case; it arose under the Criminal Justice Act, 18 U.S.C. § 3006A(f), where the district court "appointed a Master to determine the cost of private criminal defense counsel," who "surveyed hourly rates . . . and selected the lowest estimate, $400 an hour," reaching $6,000. Konrad, 730 F.3d at 346. That discrete, ministerial computation was her entire role — no custody, liquidation, sale, title-clearing, distribution, or ex parte investigation; the Article III court, not the master, "ordered Konrad to pay." Id. The Third Circuit rejected the conflict challenge in a single footnote as "unfounded," reviewing only for abuse of discretion and applying neither a due-process test nor § 455, and citing no Tumey- line authority. Id. at 353 n.12. This Special Master is the opposite on every axis, so Konrad cuts for disqualification; the controlling analogy remains O'Connor, 291 F.2d at 528.

roughly $19 million in fees the Beckett sale generated was spent, keeping that sum "confidential." The transparency finding that resolved Konrad is impossible on this record. The bankruptcy analogy fares no better: a trustee's compensation is cabined by a comprehensive scheme that caps fees, bars any interest adverse to the estate, requires disinterestedness, and imposes independent supervision. 11 U.S.C. §§ 330, 326, 327(a); 28 U.S.C. § 586. The MVRA supplies no counterpart — its only special- master provision, § 3664(d)(6), authorizes "proposed findings," not a paid fiduciary who liquidates the estate and draws his fee from it. Bankruptcy carefully authorizes and constrains what the MVRA does not permit at all. And receivers and trustees do not author the loss figure that fixes a criminal defendant's punishment; the Special Master does — and may, on notice, even "seize and sell" other assets as Secondary Restitution Assets. Doc. 288 at 14 n.49, 15 n.51. That Defendant's former professionals were paid the same way is beside the point: the defect is not payment from the estate, but that the person who values, liquidates, and distributes the res is so paid — and present counsel have not billed that fund2.

Marshall v. Jerrico confirms the line. Its relaxed standard reaches only officials who perform "no judicial or quasi-judicial functions," "hear no witnesses

2 Neither Kenneth N. Barnes nor Vivek Ramachandran has billed or been paid from the administrative fund established under the Clanwilliam Order; the professionals the Special Master references were Defendant's former counsel.

and rule on no disputed factual or legal questions," and act "akin to . . . a prosecutor or civil plaintiff." Marshall v. Jerrico, Inc., 446 U.S. 238, 247 (1980). The Special Master is the opposite: he investigated, quantified loss, and authored the findings the Court is asked to adopt. Doc. 288 at 10. The neutrality guarantee applies in criminal cases with full force, id. at 242, and because restitution is punishment, Ellingburg, 607 U.S. 163, it applies here. The Response's fallback — that the Court ultimately adjudicates — does not save the arrangement: an unconstitutional failure to recuse is structural error, "not amenable" to harmless-error review, and not cured by an untainted decisionmaker later in the process. Williams v. Pennsylvania, 579 U.S. 1, 14 (2016). The remedy is disqualification, not a promise of de novo review.

VI. The Government has not proved the amount of loss, and the figure it

asks the Court to adopt is inflated by a debt-for-value error.

Even apart from the constitutional defects, the loss figure fails on the merits. The MVRA places "[t]he burden of demonstrating the amount of the loss . . . on the attorney for the Government," with disputes "resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e); see United States v. Wilkinson, 590 F.3d 259, 269 (4th Cir. 2010). The Court must fix "the full amount of each victim's losses as determined by the court." Id. § 3664(f)(1)(A). The burden does not

shift to Defendant unless and until the Government carries its own; where the proponent offers no competent support, it "never shift[s]." Steele, 897 F.3d at 613-14; see United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017).

The two sides' evidence is chalk and cheese. Defendant's values are market- tested and independent: Beckett Collectibles was appraised at $1,003,924,000 by the independent Cabrillo Advisors appraisal — corroborated by Blackstone's $1.05 billion indication of interest — yet sold for $134 million; Clanwilliam followed the same pattern; and Damovo is the subject of a contemporaneous, arm's-length indication of interest at a $400 million enterprise value, corroborated by a Q1-2024 transaction valuing it near $371 million —

against the roughly $100 million "for the debt" figure the Special Master intends to accept. Lindberg Decl. at 2; Damovo Letter of Interest at 2; Def.'s Second Mot. to Set Aside at 2. The Special Master's numbers are the opposite. His loss figures rest on "the principal amounts owed on these 'Loans' or 'Affiliate Investments'" — the debt, not the value. Doc. 288 at 4 n.16. And his valuation defense to the Beckett gap rests entirely on "information and belief" about a price that "remains confidential," in a report he admits he assembled only "[a]s part of preparing this Response." Doc. 288 at 16, 18. Unsworn, confidential, belief-based assertions cannot carry a preponderance burden. Steele, 897 F.3d at 613-14.

"Confidential" is not an accounting. The statute requires the Court to determine "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on the Government's preponderance showing, id. § 3664(e) — and a number never disclosed can be neither tested by the defendant nor found by the Court. A court officer who liquidated the asset, controls the records, and still marks the dispositive figure "confidential," Doc. 288 at 16, 18, is not supplying the MVRA's accounting; he is withholding it in the very filing that asks the Court to adopt his number. That confidentiality cannot be asserted against the defendant whose liability turns on the figure or against the Court determining loss de novo. It is also why Defendant's pending subpoenas are necessary: compelling the records is the only way to test a number the Special Master refuses to disclose.

Debt is not value. A company's enterprise value turns on the earning power of its assets and their cash flows; its capital structure divides that value among claimants but does not set it — a foundational proposition of corporate finance. See Franco Modigliani & Merton H. Miller, The Cost of Capital, Corporation Finance and the Theory of Investment, 48 Am. Econ. Rev. 261, 268 (1958); Michael C.

Jensen, Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers, 76 Am. Econ. Rev. 323 (1986); Def.'s Second Mot. to Set Aside at 3; Def.'s Objections at 3. Treating a company as worth only its debt inverts the relationship, understating value and overstating loss. Damovo makes it concrete: selling "for the debt" at roughly $100 million against a $400–450 million arm's-length value is a roughly $300 million loss the Special Master's own conduct would cause. Lindberg Decl. at 2; Damovo Letter of Interest at 2.

The "apples to apples" rejoinder is wrong on the facts. The assertion that Defendant's valuations swept in excluded subsidiaries is unsworn "information and belief," Doc. 288 at 16 — and incorrect. The Cabrillo appraisal values each entity separately, fixing Beckett Collectibles, LLC — the business actually sold — at $1,003,924,000, with the other portfolio companies on their own lines (Arcane Tinmen ApS, $107,749,000; CBCS Operations, LLC, $14,125,000; Southern Hobby Distribution, LLC, $538,010,000). Doc. 256-1 at 3 (Ex. A to Doc. 256). The roughly $1 billion figure is Beckett standing alone — an apples-to-apples measure of what sold for $134 million — corroborated by Blackstone's $1.05 billion enterprise-value indication. Doc. 256-2 (Ex. B). The burden to prove the correct value is the Government's; a gap between a market price and an independent appraisal is resolved against the proponent who has not proved its number, Steele, 897 F.3d at 613-14 — and the Special Master withholds the very records that would resolve it.

No windfall. Restitution may not require a defendant to "pay back more money than he stole." United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017) (quoting United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017)). A figure pegged to gross debt and inflated by

fire-sale dispositions the Special Master engineered without approval produces exactly that over-recovery.

These deficiencies are not academic. At the May 26, 2026 sentencing the same loss figure drove the fraud Guidelines to "about 540 months," Sentencing Tr. 55; see id. at 44 — yet the Court found "the loss was overstated . . . the real loss there was risk. It all could have been lost, but it wasn't all lost," id. at 47, and defense counsel observed without contradiction that the Government's recommendation "includes the assumption that the loss figure is an accurate loss figure" when "the empirical analysis of the guidelines is not accurate," id. at 52. The restitution the Special Master seeks — approximately $1.655 billion (Colorado Bankers Life $821 million; Universal Life $416 million; North Star $179 million; Southland National $131 million; and the remaining insurers) — is the same figure entered provisionally at sentencing (Doc. 161) over reservation, on the

Government's representation that "within the next 90 days, people are going to want to be heard," the Court's acknowledgment "that there may be some dispute," and defense counsel's on-the-spot objection that the order was "subject to the objections of numerous parties and further hearings." Sentencing Tr. 66-67; see 18 U.S.C. § 3664(d)(5). A preliminary figure entered subject to objection is not a proven one; restitution may be ordered only in "the full amount of each victim's losses as determined by the court," id. § 3664(f)(1)(A), on preponderance proof, id. § 3664(e), and a complete accounting — not on a debt proxy, an admittedly overstated estimate, or an undisclosed "confidential" number. Steele, 897 F.3d at 613-14.

The stakes are concrete. Having committed on the record not to "stack" the Financial and Political Contribution cases — "all . . . part of the same parcel," May 15, 2024 Trial Tr. 1032:19-24 (No. 5:19-CR-22, Doc. 450); the 87-month term "already included the interrelated conduct in the Financial case," Def.'s Sentencing Mem. 2 (Doc. 507) — the Court, armed with the Special Master's loss magnitude, ran the two cases concurrently but stacked within the fraud case, imposing 60 months on one count and "84 months to run consecutive to the 60 months, to produce a sentence of 144 months," then running that concurrent with the 87- month term. Sentencing Tr. 61-62. The concurrency was a formality; the loss

magnitude drove the two fraud counts back-to-back to twelve years — roughly five years past the seven-year sentence the Court said it would not stack. The Special Master, to whom the Government "deferred wholesale," Doc. 279 at 2, thus operated as a second prosecutor whose unproven numbers drove the punishment. Those numbers cannot now be converted into a fixed restitution judgment without the proof the MVRA requires. 18 U.S.C. § 3664(e), (f)(1)(A); Steele, 897 F.3d at 613-14.

VII. The Special Master disregards mandatory offsets and credits.

The MVRA requires restitution to be reduced by amounts already recovered by, or returned to, victims. 18 U.S.C. § 3663A(b)(1)(B); id. § 3664(j)(2). The Response confirms recoveries it then ignores: the CWG compromise "result[ed] in the Special Master paying more than $157,000,000 to individual policyholders harmed by Defendant's activities," Doc. 288 at 7 — a mandatory credit the report omits. Def.'s Objections at 3; Lindberg Decl. at 1. The ULICO settlement and its amendment reflect further consideration and preferred-equity transfers that partially satisfied the underlying judgment, which must also be credited. The Special Master cannot invoke the $157 million to prove cooperation while ignoring it when fixing what Defendant owes. The report compounds the error by allowing those credits only "if

and when" value is later "realized," Def.'s Objections at 10 — a condition § 3664(j)(2) does not contain, and one that produces the double recovery the statute forbids.

VIII. The belated, still-undisclosed accounting confirms the burden is unmet.

The Special Master "obtained an accounting of the economics of the Beckett Sale" only "[a]s part of preparing this Response." Doc. 288 at 18. The report thus did not rest on a complete accounting — and even the belated one is not disclosed, the sale price kept "confidential" and the figures offered only "[o]n information and belief." Doc. 288 at 16, 18. The determination is de novo, 18 U.S.C. § 3664(d)(6); the burden is the Government's, id. § 3664(e); and restitution may enter only on the complete accounting § 3664(f)(1)(A) requires. The refrain that the sale "generated no money for victims," Doc. 288 at 19, inverts the burden and misstates the test — and is undercut by the Special Master's own nondisclosure: Defendant is informed the transaction generated approximately $19 million in fees, yet where that sum went has never been disclosed3. Money plainly moved; the Special Master will not say to whom. A court cannot find "the full amount of each victim's losses" on a record whose key figures the proponent refuses to produce.

IX. Judicial estoppel does not apply, and the objection is timely.

Judicial estoppel requires a later position "clearly inconsistent" with an earlier one, adoption of the earlier position by the court, and an "unfair advantage"

3 Defendant is so informed by former counsel, who advise that the Beckett sale resulted in approximately $19 million in legal fees; no accounting of that amount has been provided, and it remains unaccounted for.

absent estoppel. New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001). None is present. Objecting that a reference exceeded its statutory and constitutional bounds is not "clearly inconsistent" with having sought a lawful § 3664(d)(6) reference; no final restitution order has adopted the Special Master's figures; and there is no "unfair advantage" in insisting a criminal sentence conform to its authorizing statute. Structural defects and illegal sentences are not subject to ordinary waiver or estoppel in any event. Cohen, 459 F.3d at 498; Broughton-Jones, 71 F.3d at 1149. The praise the Response invokes is illusory. The emphasis in the sentencing quotations was, by the Special Master's own footnote, "added by the undersigned." Doc. 288 at 8 n.33. And the surrounding record is the opposite of praise. Defendant sought repeatedly to confer with the Special Master, yet "despite [his] repeated requests and numerous letters, the Special Master has never once spoke with [him] or granted any of [his] requests for a meeting." Lindberg Decl. ¶ 5. Defendant's Response and his Objections contest the report root and branch, Def.'s Objections at 3, 10, and Defendant has maintained on this record that the Government has proved no recoverable loss and that no restitution is due. A party that has moved to set aside the reference, disputed the report in its entirety, and denied that any restitution is owed has not endorsed the process; his filings are a damning indictment of a report that lacks the merit to support any restitution.

The timing objection fails on its own terms. Defendant could not have contested valuation numbers the Special Master never committed to or disclosed until now — the Beckett "accounting" was assembled only while preparing the Response, and the price is still "confidential." Doc. 288 at 16, 18. A party cannot be faulted for failing to rebut figures that did not exist in the record and remain undisclosed. Nor is Defendant relitigating a motion already answered. The Response's suggestion that his Emergency Motion to Stay and for a

De Novo Article III Determination (Doc. 190) was "explained in" the Special Master's response (Doc. 268) is inaccurate: Doc. 268 is, by its terms, a "Limited Response . . . limited to addressing Defendant's argument that the Special Master be disqualified," which deferred the "substantive restitution issues" to a "future report." Doc. 268 at 2, 4,

11. The Government has never answered Doc. 190 on the merits and still declines

to. Doc. 279 at 2. What has gone unanswered is the substance — the amount of loss and the completeness of the accounting — which the party bearing the burden, 18 U.S.C. § 3664(e), has never met.

Defendant has not abandoned the Court-approval and Article III questions; he has pressed them in every forum. As early as June 2026 he reserved his response, stating he "will address [the Special Master's response] after the Government and the Special Master have filed their answers," and objecting to a "sequence designed to force Defendant to commit his position before the opposing parties commit theirs." Doc. 220 at 4 (June 22, 2026). He petitioned the Fourth Circuit for mandamus seeking the same stay-and-Article-III relief and served the Special Master's counsel. In re Lindberg, No. 26-1967 (4th Cir. filed July 27, 2026). He appealed the Preliminary Order of Restitution. Doc. 192. And he moved to treat every pending motion, including Doc. 190, as refiled after the final report and to hold the report in abeyance. Doc. 282. A defendant pressing the same question in this Court, on appeal, and by mandamus has not dropped it.

Conclusion

The Response confirms the defects the Motion identifies. It does not defend the reference on the merits; it rests on a consent that cannot cure a structural Article III defect or authorize an unlawful sentence; it relies on a de novo review that cannot undo a completed liquidation or cure an interested record; it does not dispel the disqualifying fee interest; and its factual clarifications concede an unauthorized sale, an unproven and inflated loss figure, disregarded mandatory

credits, and an accounting that is incomplete and, as to the dispositive numbers, still withheld as "confidential." Defendant respectfully requests that the Court declare the reference unconstitutional as applied, disqualify and remove the Special Master, set aside his report and recommendations and any proposed restitution order, and determine restitution through an Article III process, on a complete record, with the Government held to its § 3664(e) burden.

Dated: August 9, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes4 Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

4 Pursuant to LCrR 44.1 and LCvR 83.1(c)(4), attorney Vivek Ramachandran has not signed while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case, including counsel for the United States and counsel for the Special Master.

Dated: August 9, 2026.

/s/ Kenneth N. Barnes Kenneth N. Barnes Counsel for Greg E. Lindberg

**Doc. 293 — Motion for Leave to File Supplemental Response and to Continue to Supplement (filed 08/10/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL

RESPONSE AND TO CONTINUE TO SUPPLEMENT AS RECORDS

BECOME AVAILABLE

Defendant Greg E. Lindberg respectfully moves for leave to file the accompanying Supplemental Response to the Special Master's Report, and to continue to supplement his Response and Objections as additional records become available. In support, Defendant states:

1. Mr. Lindberg's prior counsel, Katten Muchin Rosenman LLP — which

was replaced as his counsel — has been transferring the complete case files in tranches. The first tranche since Katten was replaced was transmitted to Mr. Lindberg on, August 7, 2026, at approximately 1:00 p.m.[1]; he has not yet been able to review the full record, and the transfer remains in progress.

2. Mr. Lindberg submits the accompanying Supplemental Response

based on the information available to him, and respectfully requests leave to

1 As of the date of this filing, Mr. Lindberg has still been unable to access the materials in this first tranche. The files transmitted by his former counsel are password-protected, and the credentials necessary to open them have not yet been provided. Counsel will supplement promptly upon gaining access.

continue to supplement his Response and Objections as he obtains access to additional records from his former counsel and is able to provide that access to current counsel. He does not seek to delay; he seeks only to be heard on the complete record as it becomes available, and granting leave will prejudice no party.

3. WHEREFORE, Defendant respectfully requests that the Court grant leave to

file the accompanying Supplemental Response and to continue to supplement his Response and Objections as additional records become available.

Dated: August 10, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes[2] Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

2 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master. Defendant advised them that he would continue to file supplements as and when he obtains documents from his former counsel and is able to access them. Neither the Government nor the Special Master has responded on supplementation.

Dated: August 10, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes3 Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

3 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 10, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 294 — Notice of Supplemental Authority re Doc. 248 (filed 08/10/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF

DEFENDANT'S MOTION FOR ISSUANCE OF SUBPOENAS DUCES

TECUM (DOC. 248)

Defendant Greg E. Lindberg respectfully submits this Notice of Supplemental Authority in support of his Motion for Issuance of Subpoenas Duces Tecum (Doc. 248) and his Replies in support of that Motion (Docs. 283, 285). The following decisions confirm that Federal Rule of Criminal Procedure 17(c) is available to compel the pre- hearing production of documents for a post-sentencing restitution determination under 18 U.S.C. § 3664(d)(5) and (d)(6) — the precise posture of this case. They supplement, and do not repeat, the authorities cited in the Motion and Replies.

I. United States v. Winner, 641 F.2d 825 (10th Cir. 1981).

The Tenth Circuit held squarely that Rule 17(c) reaches beyond trial: "[a]lthough Rule 17 subpoenas are generally employed in advance of trial, we see no reason why their use should not be available for post-trial motions and sentencing." Id. at 833. The court then restated the Nixon factors for that posture, requiring the party seeking production to show that the materials are evidentiary and relevant, not otherwise procurable in advance through the exercise of due diligence, necessary to prepare for the post-trial or sentencing proceeding, and sought in good faith and not

as a general fishing expedition. Id. (citing Nixon, 418 U.S. at 699–700). Winner is the source of the rule the Ninth Circuit adopted in United States v. Krane, 625 F.3d 568, 574 (9th Cir. 2010) (already cited, Doc. 248 at 6), and it forecloses any suggestion that Rule 17(c) is confined to the pretrial phase.

II. United States v. Ruth, 495 F. Supp. 3d 161 (W.D.N.Y. 2020).

The court enforced a defendant's Rule 17(c) subpoena for use at a sentencing hearing, recognizing that the strict evidentiary limitations that govern a criminal trial do not apply at sentencing, where the court may consider any information bearing sufficient indicia of reliability. Ruth confirms that the Nixon admissibility inquiry is calibrated to the proceeding: a party seeking production for a sentencing or restitution hearing need not establish trial admissibility, but only relevance and reliability. That standard is readily met here, where the subpoenaed records go directly to the causation and offset questions the Court must resolve under 18 U.S.C.

§ 3664(e).

III. United States v. Vandeberg, 201 F.3d 805 (6th Cir. 2000).

The Sixth Circuit held that the ninety-day provision of 18 U.S.C. § 3664(d)(5) is not jurisdictional and does not terminate the district court's authority to determine restitution after that period. The deferred restitution determination is thus a continuing phase of the criminal sentencing itself — the posture of this case — to which the Federal Rules of Criminal Procedure apply, 18 U.S.C. § 3664(c), and in which restitution is imposed as criminal punishment, Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026). Vandeberg reinforces Dolan v. United States, 560

U.S. 605, 611–13 (2010) (already cited, Doc. 285), that the ninety-day date exists to protect victims and does not curtail the court's power — or the defendant's right to develop the record on which that determination must rest.

IV. Authority Within the Fourth Circuit.

Although no published Fourth Circuit decision addresses Rule 17(c) in a post- sentencing MVRA restitution proceeding, the Circuit construes Rule 17(c)'s reach expansively. See In re Grand Jury Subpoena, 829 F.2d 1291 (4th Cir. 1987) (the Nixon construction of Rule 17(c) applies beyond the trial setting). District courts within the Circuit have applied the Nixon factors to Rule 17(c) subpoenas and recognized the Rule's availability outside trial. See United States v. Beckford, 964 F. Supp. 1010 (E.D. Va. 1997); United States v. King, 194 F.R.D. 569 (E.D. Va. 2000).

CONCLUSION

These authorities confirm that Rule 17(c) is available for the post-sentencing restitution determination before the Court, and that the Nixon factors — calibrated, as Winner and Ruth require, to the nature of that proceeding — are satisfied for the reasons set forth in Documents 248, 283, and 285. Defendant respectfully requests that the Court consider these decisions in ruling on the Motion.

[Signature page follows.]

Dated: August 10, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 1

1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order In Re: Use of Artificial Intelligence entered by this Court on June 18, 2024, the undersigned certifies that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg. The undersigned further certifies that every statement and every citation to an authority contained in this document has been checked for accuracy by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: August 10, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 10, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 295 — Supplemental Response re the Zero-Coupon Bonds (filed 08/10/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S SUPPLEMENTAL RESPONSE IN SUPPORT OF HIS OBJECTIONS TO THE SPECIAL MASTER'S REPORT REGARDING THE ZERO-COUPON PRINCIPAL-PROTECTED BONDS

Defendant Greg E. Lindberg respectfully submits this supplemental response to address the zero-coupon principal-protected bonds, in further support of his Objections to the Special Master's Report and his Response to the Second Supplement, and supported by the accompanying Declaration of Greg E. Lindberg. Two points frame the issue. The bonds were extremely high-quality, principal- protected instruments that the court-supervised Rehabilitator — not Mr. Lindberg — chose to sell before maturity, in a decision Mr. Lindberg could not have anticipated and did not cause. And the Report neither credits the proceeds those sales actually generated nor rests on any information the Special Master has obtained about them.

I. The bonds were high-quality, principal-protected notes issued through major banks.

1. Beginning in 2018, with the express permission of the North Carolina Department of Insurance, the North Carolina insurance companies acquired a portfolio of principal-protected notes (PPNs) issued through nationally recognized financial institutions — including Barclays, RBC, UBS, and Natixis. The closing memoranda document the transactions: the RBC note (closed March 21, 2018); the Barclays note (closed April 5, 2018, a roughly $102 million trade); the Franklin Street & Marseille 2018-I closing (May 3, 2018); the UBS note (closed June 7, 2018, a $100 million trade); and the Pierre Mendes/Natixis note (closed July 23, 2018, a $75 million trade), among others. In the aggregate the notes were contractually scheduled to pay approximately $1,006,239,867 at maturity.

2. A principal-protected note is exactly what its name says. Each note was structured with two components: a zero-coupon bond that guaranteed repayment of the principal if the note was held to maturity, and an affiliate-loan component. Because the issuers were major, highly rated banks and the principal was guaranteed at maturity, it is customary for insurance companies to hold such notes to maturity; held to maturity, they return the full guaranteed principal. Sold early, they return only a fraction of that amount — the equivalent of surrendering a life-insurance policy for a fraction of its face value.

3. The closing memoranda in evidence confirm this structure transaction

by transaction. Exhibits A through F — the closing memoranda for the RBC, Barclays, Franklin Street & Marseille, UBS, Pierre Mendes/Natixis, and NOM GB notes — each document a specific, identified zero-coupon bond issued by a major bank and purchased for a single purpose: to protect the principal of the affiliate investments the note backed. The bonds served no independent investment purpose.

Their approximately $1.006 billion in aggregate par value existed solely to insure the affiliate-loan principal, dollar-for-dollar, at maturity. The disposition summary (Exhibit G) reflects that same one-to-one design: it accounts for the outcome issuer by issuer and CUSIP by CUSIP, because each zero was a discrete instrument, tied to an identified position and sold and accounted for individually.

4. That these notes were affiliate investments is confirmed by the companies' own contemporaneous records. An August 6, 2018 internal schedule itemizes the principal-protected notes held by Academy Financial Assets, the affiliate holding entity: $7.2 million (BMO), $48.2 million (Barclays), $37.2 million (Franklin Street), $39.3 million (Marseille), $35 million (UBS), $40.6 million (Whitehorse), and $45.6 million (NOM GB) — $253,135,036 in all. Ex. H. The affiliate's own underlying-investment schedule reflects the same notes as affiliate line items. Ex. I. And the executed prefunding documentation for the Franklin Street and Marseille notes memorializes the structure at inception. Ex. J. These are the companies' own books, made and kept years before this dispute, and they establish that the zero-coupon bonds existed to fund and protect the affiliate investments — not as free-standing assets.

II. The subcomponents: the zero-coupon component guaranteed — and, when sold, actually returned — the principal.

5. The mechanics matter, because they show real cash was recovered that the Report does not credit. Each PPN could be "unwound": when it was, the zero- coupon bond was sold, and its proceeds paid down the principal owed to the insurance companies; what remained was the affiliate-loan component. The Rehabilitator's own September 30, 2019 balance sheets for the North Carolina insurance companies — including that of Colorado Bankers Life Insurance Company (CBL Life), attached hereto — illustrate the point. For CBL Life, the Franklin Street PPN was unwound and its zero-coupon bond sold, taking the book- adjusted carrying value from $47.9 million to $29.5 million — a reduction of $18.4 million, meaning the zero-coupon component was approximately 38.4% of the carrying value, and it was sold for par or higher. Applied across the roughly $293 million of such notes reflected on that company's schedule, approximately 38.4% — on the order of $112.5 million — was recovered in cash from the zero-coupon sales for that company alone. Critically, all of the zero-coupon bonds were sold for par or higher; the principal-protection component performed exactly as designed. Colorado Bankers Life remains an active company, now in court-ordered liquidation under the North Carolina Insurance Commissioner; the Rehabilitator's and Receiver's quarterly reports and the September 30, 2019 balance sheets on which this analysis relies are publicly available at cblife.com/quarterly-rehabilitation-reports.

6. Contemporaneous records already of record confirm that the zero-coupon disposals returned their value and more. In an October 28, 2019 email — Exhibit H to Mr. Lindberg's prior filing, Doc. 234-38 — the insurers' own investment professional reported the "final outcome" on the principal-protected notes. The notes that remained, he

explained, "were the ones that were priced most out of the money" — the least favorably positioned in the portfolio. Yet even those were disposed of at a gain: "Earlier in the year we talked about a best case loss on

the zeros in the -50mm to -60mm range but we ended up making +6mm on the disposals." Doc. 234-38 (Ex. H) (Oct. 28, 2019). The worst-positioned zero-coupon components thus produced a net gain of approximately $6 million on disposal — not the $50-to-$60 million loss that had been projected. That is contemporaneous, documentary confirmation that the principal-protection components performed as designed and generated proceeds that the Report nowhere credits.

7. The spreadsheet attached to that email — Book1.xlsx, appended hereto

as Exhibit G — proves the point issuer by issuer. It records the "Cash Gain/Loss" realized on each zero, netting to a "Total Gain" of $6,036,766.05 across the portfolio, and it tabulates the "Total Cash Proceeds by Lender" actually recovered: $329,169,087.55 for Colorado Bankers Life, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Corporation, for a grand total of $394,578,906.48 in cash proceeds. Ex. G. Those are not projections or "illustrative" figures; they are the recorded, dollar-for-dollar proceeds of the dispositions, broken out by issuer (Barclays, RBC, UBS, Natixis, CIBC, Citigroup, BMO, Nomura, Wells Fargo, JPMorgan, and TVA) and by company. The Special Master's Report neither reflects these amounts nor reconciles against them. The issuer-by-issuer detail underlying that summary — the per-bond disposition worksheets for each position — is attached as Exhibit K, which maps each zero-coupon bond to its principal-protected note and to the specific underlying affiliate assets it funded — for example, the RBC zero to the GIC $29 million position, the Natixis zero (Pierre Mendes) to CAF III, the Nomura zero (NOM GB)

to the AAPC $55 million preferred, and the UBS zero to the CAF I $64 million and AFI $11.8 million positions — confirming again that every one of these bonds existed to fund an identified affiliate investment. The companies' contemporaneous treasury records tracing the paydowns and the sales are collected at Exhibit L, and their portfolio dashboard and holdings-master schedules are attached as Exhibits M and N.

III. The Rehabilitator, not Mr. Lindberg, sold the bonds — and the sale

could not have been anticipated.

8. Mr. Lindberg surrendered control of the companies and their books

and records beginning in October 2018. In 2019 — after control had passed to the court-supervised Rehabilitator, Mr. Dinius — the Rehabilitator made the unilateral decision to sell the notes before maturity, in a fire sale, for approximately $394 million. That was less than forty cents on the dollar of the approximately $1.006 billion guaranteed at maturity, and it crystallized a loss of approximately $611.6 million. That decision was the discretionary act of the court-supervised fiduciary then in control; it was not Mr. Lindberg's conduct, and — having surrendered control the year before — he could neither have anticipated nor prevented it. The stated plan when the notes were purchased was to hold them to maturity, at which point the full guaranteed principal would have been repaid. Selling early defeated the entire purpose of the instrument.

9. Nor was the sale forced by any genuine need for cash — and the

exhibits prove it. The Rehabilitator's own reports and the North Carolina insurance companies' June 30 and September 30, 2019 balance sheets — including that of

Colorado Bankers Life (CBL Life), attached hereto — reflect that, for years after the 2019 sale, the companies held more than $1 billion in cash and marketable securities in the form of third-party bonds. There was no liquidity need that required selling the principal-protected notes before maturity. The early liquidation was therefore not a necessity but a discretionary choice by the fiduciaries who then controlled the companies — an intervening, superseding cause of whatever loss the sale produced, and one attributable to them rather than to Mr. Lindberg.

IV. The Report neither credits the sale proceeds nor rests on any information the Special Master obtained.

10. Separate from the loss the premature sale caused, Mr. Lindberg has never been credited with the proceeds the sales actually generated — proceeds that the insurers' own records fix at $394,578,906.48. Ex. G. The zero-coupon components were sold for par or higher; those proceeds paid down the principal owed to the insurance companies, returning that protected value to the victims; and for an offense against property the Mandatory Victims Restitution Act fixes restitution as the value of the property less the value of any part of it that is returned. 18 U.S.C. § 3663A(b)(1)(B). Restitution may not confer a windfall by requiring a defendant to "pay back more money than he stole." United States v. Stone, 866 F.3d 219, 226 (4th Cir. 2017). Yet the Special Master's figures do not account for these cash paydowns at all.

11. Two credits follow from the zero-coupon bonds, and Mr. Lindberg presses both. First, he is entitled to a credit for the $394,578,906.48 in cash the sales actually generated. Those proceeds returned the protected principal to the victims, and the Mandatory Victims Restitution Act commands that the restitution figure be reduced by the value of property so returned. 18 U.S.C. § 3663A(b)(1)(B); see Stone, 866 F.3d at 226; Ex. G; Ex. K. Second, he is entitled to a credit for the approximately $611.66 million in value the premature sale destroyed. Held to maturity, these notes were contractually obligated to pay $1,006,239,867; the Rehabilitator's decision to sell them early, for $394,578,906.48, forfeited the difference — approximately $611,660,961 — on instruments whose sole function was to protect principal. That loss was caused by the intervening, discretionary act of a court-supervised third party, taken after Mr. Lindberg had surrendered all control; under settled proximate-cause principles it is not a loss he caused, and it cannot be charged to him. Together the two credits account for the entire $1,006,239,867 of principal protection the notes were designed to deliver: the portion recovered in cash must be credited because the statute requires it, and the portion destroyed must be excluded because Mr. Lindberg did not cause it. On either footing, the zero-coupon bonds cannot add a dollar to restitution against Mr. Lindberg — they subtract from it.

12. The reason is the same pattern these proceedings have exposed elsewhere. Mr. Lindberg has been denied access to the books and records that would document the exact proceeds of the zero-coupon sales and how they were applied — he surrendered control of those records years ago and has had no access since. The only process that could obtain that data is the very compulsory process the Government and the Special Master have opposed: Mr. Lindberg's Motion for Issuance of Subpoenas (Doc. 248), which the Government opposed (Doc. 261) and the Special Master opposed (Doc. 266). They have thus opposed the one mechanism that could

establish the figures, and the Special Master has not otherwise obtained the cash-payoff data, while nonetheless seeking to have Mr. Lindberg pay restitution using numbers for which he has provided no supporting basis. The Rehabilitator's own balance sheets confirm that substantial proceeds were recovered and never credited. A restitution figure that ignores the money the assets actually returned, and that no one has reconciled against the records, cannot satisfy the complete accounting the MVRA requires before restitution is fixed. 18 U.S.C. § 3664(f)(1)(A).

13. What the Report proposes, in the end, is to fix billions of dollars in

restitution in undue haste, on the Special Master's own admitted guesses, and then to shift to Mr. Lindberg the burden — and the blame — for the discretionary act of a third party. The premature sale of the zero-coupon bonds was the decision of a court-supervised state regulator, taken after Mr. Lindberg had surrendered all control; yet the Report charges the resulting loss to him, refuses to credit the proceeds the sale generated, and asks the Court to do all of this before the Government answers the pending motions and before the records are produced. Section 3664(e) does not permit that inversion: the burden of proving the amount of loss is the Government's, not Mr. Lindberg's, and it cannot be discharged by haste, by guesswork, or by charging a defendant with a regulator's independent choices.

V. Conclusion.

14. The zero-coupon bonds were high-quality, principal-protected instruments

designed to be held to maturity. The court-supervised Rehabilitator sold them early, over Mr. Lindberg's lack of any control, in a decision he could not have anticipated — crystallizing a loss he did not cause and generating proceeds he has never been credited. For the reasons stated, and in support of his Objections, Mr. Lindberg respectfully requests that the Court decline to adopt any restitution figure premised on the zero-coupon bonds until (a) the $394,578,906.48 in proceeds actually recovered from their sale is credited as the MVRA requires; (b) the approximately $611,660,961 in value destroyed by the Rehabilitator's premature sale is excluded as an intervening-cause loss Mr. Lindberg did not cause; and (c) the accounting the Special Master has declined to obtain is performed. Taken together, these two credits account for the full $1,006,239,867 of principal protection the notes were designed to deliver, and they eliminate any restitution the zero-coupon bonds could otherwise support.

Dated: August 10, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes1 Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg 1 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested was raised with counsel for the United States and counsel for the Special Master, both of whom were consulted; the Government disagrees with and opposes the relief requested, as does the Special Master.

Dated: August 10, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes2 Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg

2 Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 10, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 296 — Notice of Filing Certificate of Cancellation of the Beckett Collectibles Trust (filed 08/10/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

GREG E. LINDBERG,

Defendant.

NOTICE OF FILING CERTIFICATE OF CANCELLATION FOR

THE BECKETT COLLECTIBLES TRUST

Defendant Greg E. Lindberg, by through counsel, respectfully submits this Notice of Filing Certificate of Cancellation for the Beckett Collectibles Trust. A true and correct copy is attached hereto as Exhibit A.

Dated: August 10, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com Counsel for Greg E. Lindberg1

Pursuant to LCrR 44.1 and LCvR 83.1 (c)(4), attorney Vivek Ramachandran has not signed this document while his Motion for Pro Hac Vice remains pending.

CERTIFICATE OF SERVICE

I certify that on the date set forth below, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will serve notice on all counsel of record, including counsel for the United States.

Dated: August 7, 2026

/s/ Kenneth N. Barnes Kenneth N. Barnes

**Doc. 300 — Reply re Doc. 234 (to the Omnibus) (filed 08/13/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION

REGARDING RESTITUTION (DOC. 234): PROXIMATE CAUSE,

AMOUNT, AND OFFSETS (REPLY TO THE GOVERNMENT'S

OMNIBUS RESPONSE, DOC. 279, WHICH ADOPTS THE SPECIAL

MASTER/RECEIVER'S SECOND SUPPLEMENT, DOC. 245)

Defendant Greg E. Lindberg respectfully submits this reply in response to the Government's Omnibus Response in Opposition (Doc. 279) and in support of his Motion regarding restitution (Doc. 234). Because the Government's Omnibus Response adopts the Special Master/Receiver's Second Supplement to the Report and Recommendations (Doc. 245) on each and every issue—resting its opposition entirely on the Special Master/Receiver's findings rather than proof of its own—this Reply is necessarily addressed to that Second Supplement (Doc. 245) as well. The Plea Agreement leaves the question of causation open. As Mr. Lindberg has maintained, Paragraph 10(a) reaches only "persons directly or indirectly harmed by the defendant's criminal conduct," and its phrase "regardless of the resulting loss amount" speaks to quantum alone; the plea therefore fixes no amount and does not displace the requirement that any loss be one the offense proximately caused. Doc.

40 ¶¶ 8(a), 10(a). The Factual Basis, for its part, expressly provides that "either party may present . . . additional relevant facts," and that it "does not necessarily represent all conduct relevant to sentencing." Doc. 42, at 1. The facts below are offered pursuant to that reservation—bearing both on the causation, foreseeability, and proximate cause the Government must prove and on the net amount, offsets, and credits at issue. Concurrently herewith, Mr. Lindberg files a Statement of Facts Regarding the Disaffiliation Structure ("SOF"), verified by his declaration under 28 U.S.C. § 1746; the Declaration of Greg E. Lindberg; and Exhibits DS-1 through DS-21 (the "Disaffiliation Exhibits"), which document that value.

INTRODUCTION

This Reply is necessarily limited in scope, and Defendant submits it to preserve his rights and to meet the seven-day response deadline that applies to him. The Government's Omnibus Response (Doc. 279) does not answer Defendant's motions on the merits or issue by issue; it disposes of every pending motion with a single, undifferentiated wave of the hand, purporting to "adopt" the Special Master/Receiver's recommendations without engaging the specific factual and legal contentions Defendant has raised. Consistent with the position Defendant advanced at the August 10, 2026 hearing—at which the

Government was asked to join and respond to each and every pending issue, one at a time—Defendant expressly reserves the right to respond, fully and on an issue-by-issue basis, if and when the Government responds in that manner to each and every motion on file. This Reply is therefore a placeholder that preserves Defendant's rights: all issues not addressed here, in light of the Government's undifferentiated Omnibus Response, are expressly reserved and are maintained as argued in Defendant's motions and objections of record. And to the extent the Government has not addressed each and every issue Defendant has raised, those issues should be treated as admitted, and the motions as unopposed, under this Court's Local Rules. See LCrR 47.1.

Because the Government's Omnibus Response purports to dispose of Defendant's pending motions—including Documents 172, 190, 201, 202, 225, 234, 238, and 269—without addressing any of them on the merits or issue by issue, Defendant incorporates each of those motions, together with his objections to the Special Master/Receiver's Reports (Docs. 132, 280) and their supporting factual showings, by reference as though fully set forth herein. Under this Court's Local Criminal Rule 47.1, the Government's failure to respond to those motions, and to the specific issues they raise, renders each such motion and issue unopposed; the issues should accordingly be treated as admitted.

The open questions are causation and the amount of restitution. The Plea Agreement itself draws that distinction: it preserves the requirement that any loss be one the offense proximately caused, and it leaves the amount unfixed. The parties' Guidelines stipulation that "loss" exceeded $550 million expressly provides that "loss under U.S.S.G. §2B1.1 may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). And Paragraph 10(a) ties restitution to the persons "harmed by the defendant's criminal conduct." Id. ¶ 10(a). The Special Master/Receiver, in turn, is charged with "verify[ing] and quantify[ing] the losses suffered by each victim" and the amounts "already received … to compensate for such losses." Doc. 106, at 6. That quantification—the harm actually caused, net of recoveries and credits—remains open for determination.

The Special Master/Receiver, however, measures restitution by the gross "outstanding balances of the Affiliate Investments." Doc. 106, at 19. That figure captures the size of the insurers' investments, not the net harm remaining after the collateral, capital, third-party principal protection, and recoveries documented below and in the accompanying Statement of Facts. Restitution is compensatory: it is measured by actual loss and reduced by the value a victim receives or recovers. See Robers v. United States, 572 U.S. 639, 644–46 (2014); 18 U.S.C. § 3664(f)(1), (j). The facts set forth below are offered pursuant to the Factual Basis's reservation permitting either party to present additional relevant facts; they bear on the causation the Government must prove and on the amount, and they show that the gross-balance figure substantially overstates the net restitution owed to the named victims.

ARGUMENT

I. The Plea Agreement Preserves the Proximate-Cause Limitation; It Waives Neither Causation Nor the Amount.

The Government's reliance on the plea assumes that it resolved restitution. It did not. As Mr. Lindberg has explained in his Motion (Doc. 234), the plea preserves the causation requirement rather than displacing it. In Paragraph 10(a), Mr. Lindberg agreed to pay "full

restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct." Doc.

40 ¶ 10(a). Two features of that language are dispositive. The obligation reaches only persons "harmed by the defendant's criminal conduct"—an express causal predicate—and the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss calculation. That distinction matters, because an agreement to pay "full restitution" fixes the amount a defendant will owe without discharging the Government from proving causation. A plea may waive the quantum of loss; it does not, through general language, erase the statutory predicate that the loss be one the offense directly and proximately caused. Any waiver of that threshold causal requirement must be express, and none appears here: "regardless of the resulting loss amount" addresses how much, not whether Mr. Lindberg's conduct caused it. The plea says as much: the Guidelines "loss" figure "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). Paragraph 10(a) thus fixes no amount, admits no reasonably foreseeable loss, and does not abandon the requirement—central to the MVRA and to Hughey—that the loss be caused by the conduct of conviction. See Hughey v. United States, 495 U.S. 411, 413 (1990). That requirement is not satisfied by attributing loss to the offense in gross. As Chief Judge Cardozo put it in the proximate-cause context, "Proof of negligence in the air, so to speak, will not do." Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 341, 162 N.E. 99, 99 (1928) (Cardozo, C.J.) (quoting Pollock, Torts (11th ed.) 455). 1 A restitution figure derived by equating

1Palsgraf is cited because it is the canonical statement of the common-law proximate-cause and foreseeability doctrine on which the Mandatory Victims Restitution Act's causation requirement rests. The MVRA authorizes restitution only to a victim "directly and proximately harmed as a result of the commission of" the offense, 18 U.S.C. § 3663A(a)(2), and the Supreme Court has construed that

the gross size of the insurers' investments with a victim's loss, and charged to Mr. Lindberg without proof that his conduct proximately caused it, is loss "in the air"; it will not do either. The Fourth Circuit's rule is directly on point: "[u]nless a plea agreement provides otherwise," an order of restitution under the MVRA "is to be based upon the loss directly and proximately caused by the defendant's offense conduct." United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009). Nothing in Paragraph 10(a) provides otherwise as to causation—it speaks to the loss amount, not to the causal predicate—and the burden of proving that causal loss rests with the Government. United States v. Wilkinson, 590 F.3d 259, 268 (4th Cir. 2010); 18 U.S.C. § 3664(e). Mr. Lindberg agreed to pay whatever loss his conduct is proven to have proximately caused; he did not stipulate causation, an amount, or foreseeability, and any ambiguity in the Government's own drafting is construed against it. Causation was therefore neither admitted nor waived. It remains the Government's to prove under 18 U.S.C. § 3664(e), and Mr. Lindberg expressly reserves and preserves that limitation here, as in every filing.

II. The Government Bears the Burden of Proving Which Losses Mr.

Lindberg's Conduct Directly and Proximately Caused, and That Burden Does Not Shift; A Gross-Balance Figure That Ties No Loss to Any Cause Will Not Support Restitution.

The governing causation standard is not open to debate, because the Fourth Circuit has already stated it in this very proceeding. In In re Zetteler, the Court of

requirement by reference to the traditional tort principles Palsgraf and its progeny established— foreseeability and a sufficiently close connection between the conduct and the resulting harm. See Paroline v. United States, 572 U.S. 434, 444–46 (2014); Robers v. United States, 572 U.S. 639, 645 (2014). Palsgraf is therefore invoked not as tort law for its own sake, but as the legal predicate that dictates the MVRA's proximate-cause standard.

Appeals denied a mandamus petition that sought to add a claimant to the restitution order in this case, and in doing so it fixed the test that controls who may recover: "Direct harm to a victim, giving rise to an entitlement to restitution under the CVRA, requires the harm to be 'closely related to the conduct inherent to the offense, rather than merely tangentially linked.'" In re Zetteler, No. 26-1749, 2026 WL 1724731, at *2 (4th Cir. June 13, 2026) (per curiam) (quoting In re McNulty, 597 F.3d 344, 352 (6th Cir. 2010)); see Doc. 130. The victim definition Zetteler construed, 18 U.S.C. § 3771(e)(2)(A), is materially identical to the MVRA's, 18 U.S.C. § 3663A(a)(2), and Zetteler drew its phrasing from a restitution case, so the standard governs the Court's de novo determination here. It comes from the same court, in the same case, applying the same restitution framework—so it is the standard against which the recommended figure must be measured. And the Court of Appeals applied it to reject a concrete, nine-figure claim: the petitioners asserted that Mr. Lindberg's conduct "forced the company into bankruptcy, resulting in losses . . . of more than $200 million," and they held a foreign judgment against him "for over $166 million," yet the Court held they had "fail[ed] to sufficiently connect the harm suffered . . . with Lindberg's criminal conduct," because they did "not identify facts closely tying those failures to Lindberg's criminal activities." Id. at *2. If an adjudicated, nine-figure loss was too tangentially connected to support restitution, then a gross-balance figure that ties no particular loss to any particular act of conviction cannot support an award many times larger. The Government must prove that Mr. Lindberg's offense conduct

directly and proximately caused each victim's harm—not merely that a loss occurred somewhere within his companies. See 18 U.S.C. §§ 3663A(a)(2), 3664(e).

Restitution does not follow automatically from the conviction; the causal loss must be proved, and the burden is the Government's. The statute is explicit: "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). That burden is not discharged by producing a gross dollar figure; it requires proof of actual loss "directly and proximately caused by [the defendant's] offense conduct." United States v. Wilkinson, 590 F.3d 259, 268 (4th Cir. 2010); United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009). Proximate cause is more demanding than but-for causation alone and turns on whether the harm bears a sufficiently close connection to the conduct of conviction. See Robers v. United States, 572 U.S. 639, 644–46 (2014); Paroline v. United States, 572 U.S. 434, 446 (2014). And as courts in this Circuit have framed the rule, "the mere fact that an injury is related to a crime is insufficient for restitution; there must be a direct and proximate connection between the two to support an award." United States v. Coats, 487 B.R. 648, 653 (E.D.N.C. 2013).

The Special Master/Receiver's own Final Report confirms that this causal question is both decisive and unresolved. Throughout the Report the Special Master/Receiver acknowledges that he and the Defendant "agree on the basic, objective, material facts but disagree on the legal conclusion of whether the chain of proximate cause was broken." Doc. 245, at 15–25 (repeated verbatim at, e.g., nn. 16, 20, 21, 22, 25). But those agreed facts establish only what existed while Mr. Lindberg

controlled the companies—that the transactions occurred, that the affiliated loans performed with no defaults, and that independent actors valued the assets above the loan balances. Those facts are bounded in time. They end at the moment control passed out of Mr. Lindberg's hands—first to the State Rehabilitator in 2018, and again to the Special Master/Receiver under the Appointment Order in 2025. Everything on the far side of that line is the Government's to introduce and to prove: that a loss in value actually occurred; a complete accounting of that loss, 18 U.S.C. § 3664(f)(1)(A); that the loss was directly and proximately caused by the offense of conviction, and not by supervening events; that the intervening decisions of the Rehabilitator, the Special Master/Receiver, and the other court-appointed fiduciaries—to hold assets rather than monetize them, to refuse face-value offers, and to sell at a fraction of appraised value—did not break the chain of causation; and that each independent, post-transfer act that produced a loss was a reasonably foreseeable consequence of the offense rather than a superseding cause. Section 3664(e) places every one of those propositions on the Government, not on Mr. Lindberg. That the burden runs this deep is confirmed by the very decision the Special Master/Receiver invokes against him: "The government bears the burden of proving by a preponderance of the evidence that the defendant's offense of conviction directly and proximately caused the harm to the victim." United States v. Ritchie, 858 F.3d 201, 211 (4th Cir. 2017) (citing United States v. Freeman, 741 F.3d 426, 435 (4th Cir. 2014)); see 18 U.S.C. § 3664(e). The Government's burden is therefore not merely arithmetic; it reaches causation itself. Yet the recommended figure is assembled from

the gross "outstanding balances of the Affiliate Investments," Doc. 106, at 19, without connecting any particular act of Mr. Lindberg to any particular, un-recovered loss of any particular victim. A figure built that way charges the Defendant with loss in the aggregate; it does not prove that his conduct proximately caused any victim's net harm. That is the defect Chief Judge Cardozo identified: "Proof of negligence in the air, so to speak, will not do." Palsgraf, 248 N.Y. at 341. Before any amount is imposed, the Government must tie fact to fact—identifying which conduct of conviction proximately caused which loss to which named victim, net of the value that victim received or recovered. See 18 U.S.C. §§ 3663A(a)(2), 3664(e), (f)(1)(A), (j).

Nor may the Government's causal burden be shifted to Mr. Lindberg, and it does not shift until the Government first carries it. "[O]nce the Government has satisfied its burden to offer evidence supporting its restitution calculation, the burden shifts to the defendant to dispute the amount"—but only then. United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017). Where the Government "fail[s] to meet its initial burden," "the burden of proof never shift[s]" to the defendant, and the resulting order must be vacated. United States v. Steele, 897 F.3d 606, 614 (4th Cir. 2018). The Special Master/Receiver's reliance on Ritchie, 858 F.3d at 211, to place the burden on Mr. Lindberg (Doc. 245, at 15) reads that case for the opposite of what it holds. Ritchie's defendant-side burden is a single, confined rule: the defendant must show that a victim "delayed unreasonably in selling property (or otherwise neglected it)." Id. That is a mitigation rule; it presupposes that the Government has first proved a loss "as a result of the offense," and it is a burden of production on the discrete question of a victim's unreasonable delay—nothing more. Ritchie says so expressly: expanding the defendant's burden beyond that narrow context "would … impermissibly add to the government's statutory burden under the MVRA." Id. The Special Master/Receiver has taken that narrow rule and inflated it to relieve the Government of its causation burden entirely—precisely what Ritchie forecloses. Consistent with the framework Mr. Lindberg has maintained in his objections to the Special Master/Receiver's Report (Doc.

132), burden-shifting on causation, foreseeability, and proximate cause is not appropriate. And the narrow Ritchie rule does not fit these facts: the post-2018 diminution did not result from any victim's unreasonable delay in selling its own collateral, but from the discretionary decisions of a court-appointed Rehabilitator and other third parties—decisions the Special Master/Receiver concedes he "is not situated to second guess." Doc. 245, at 24. Those are challenges to the Government's proof of causation, on which the Government bears the burden—not reductions Mr. Lindberg must justify. See infra Parts VII,

VIII.

The Special Master/Receiver nonetheless resolved the contested causation questions not by holding the Government to this burden, but by finding that the Defendant had not "convinced" him—the very inversion Steele condemns. That error is compounded because causation and foreseeability are not "proposed findings of fact" a master may resolve in the first instance; they are judicial determinations the Court must make de novo, 18 U.S.C. § 3664(d)(6), so the Special Master/Receiver's resolution of them is owed no deference. And it cannot be cured by the record he

assembled, because he describes his own valuation as "a 'current guess'" drawn from "a 'desktop exercise.'" Doc. 245, at 36–37. The Government cannot carry a burden of proof with an admitted guess; that is neither proof by a preponderance under § 3664(e) nor the "complete accounting" § 3664(f)(1)(A) commands. The one place the Special Master/Receiver does credit returned value proves the error. On the ULICO preferred-equity transfer, he agrees a reduction is due—but only "if and when ULICO recovers … in the amount actually recovered." Doc. 245, at 15. That deferral is contrary to the statute. The MVRA fixes the credit for returned property "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii)—not as of some future liquidation. ULICO already holds the AAPC preferred equity, transferred to it in partial satisfaction of a civil judgment, see Doc. 132, at 13–14; the credit is therefore fixed and presently due, and cannot wait for ULICO to choose to sell. That the transfer satisfied a civil judgment only confirms the credit is owed now: "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution amount to prevent double recovery by the victim." United States v. Malone, 747 F.3d 481, 485 (7th Cir. 2014). And the credit may not be withheld merely because the asset has not yet been reduced to cash or its ultimate recovery is uncertain: the Eighth Circuit reversed a district court that declined to reduce the loss by the value of returned shares based on the defendant's unproven "intention," holding that returned property must be credited at the value it had when returned. See United States v. Arrington, 97 F.4th 593, 597 (8th Cir. 2024). The separate rule that a victim's

recoveries from third parties are not credited to the defendant, 18 U.S.C. § 3664(f)(1)(B); see Malone, 747 F.3d at 485, does not apply here, because the AAPC preferred equity is value Mr. Lindberg himself returned, not a third-party payment; and it leaves undisturbed the distinct bar on double recovery where a guaranty association has already made a policyholder whole, 18 U.S.C. § 3664(j)(1) (supra Part III). ULICO's decision to hold the asset rather than reduce it to cash is ULICO's risk, not Mr. Lindberg's: a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time … must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers, 572 U.S. at 647 (Sotomayor, J.,

concurring). Deferring this mandatory, presently-fixed credit to ULICO's future choice overstates the debt today.

Mr. Lindberg's agreement that the principal balance of the Affiliate Investments is an appropriate methodology (Doc. 132, at 5) is not a concession that every dollar was proximately caused, that no offsets apply, or that the numbers are correct. Methodology, causation, and amount are three distinct questions, and agreement on the first waives nothing as to the other two. The bifurcation the parties agreed to expressly preserved the hearings necessary to finalize restitution. Doc. 107, at 3. An agreement about how to measure a loss is not an agreement that the offense caused it.

The Government's failure of proof is aggravated by its own litigating position, and the Special Master/Receiver's. Recognizing that the records needed to establish causation, foreseeability, and the amount of any loss are held by third parties—his former companies are "now under the control of NHC Holdings, LLC ('NHC')," and the remainder by the victim insurers and their fiduciaries—Mr. Lindberg moved under Federal Rule of Criminal Procedure 17 for subpoenas duces tecum to the Special Master/Receiver, Paladin (the Special Master/Receiver's financial advisor), the North Carolina Insurance Companies and their Special Deputy Rehabilitator, and the Bermuda Insurance Companies. Doc. 248; see Doc. 261, at 1; Doc. 266, at 3. The Government opposed the subpoenas—acknowledging that its own standing to object "is an open question in the Fourth Circuit," Doc. 261, at 2 n.1, yet urging that they be denied because, in its view, "the outstanding issues should all be resolved on legal, not factual, grounds," id. at 8. The Special Master/Receiver opposed them as well, asserting that "no factual issues whatsoever were implicated . . . only legal issues," Doc. 266, at 1–2, while conceding in the same filing that the requested records "would be critical to establishing material causation and offset contentions," id. at 3, and that the companies holding them are "none of which are under the Special Master/Receiver's control," id. The Government's Opposition, moreover, concedes the point: it acknowledges that "there might be contested factual issues regarding such things as whether and to what extent there was a diminution of value and, if so, who caused it," but urges that "the Court need not resolve those" so long as it rules against Mr. Lindberg on the law. Doc. 261, at 11. That shared premise—that the outstanding issues are "legal, not factual"—is at best a partial truth. It holds only as to the facts Mr. Lindberg himself has presented, which are not in dispute. It does not hold as to the facts on which the recommended figure depends—the valuation of the assets, the amount of each victim's loss and the accounting for those losses, and the causation, proximate-cause, and foreseeability determinations, among others—each of which is quintessentially factual and, on everything other than offsets, is the Government's to prove by a preponderance. 18 U.S.C. § 3664(e). The Government and its Special Master/Receiver cannot recast those factual questions as purely "legal" to defeat the discovery that would test them, and then ask the Court to impose a figure exceeding $1.6 billion on a causal theory those very records would probe. The Special Master/Receiver's suggestion that the defense sat on this request is wrong. Although the Special Master/Receiver asserts that counsel "never asked" for these records, Doc. 266, at 1–2, Mr. Lindberg in fact sought this data repeatedly, from both the Government and the Special Master/Receiver. Indeed, while the Special Master/Receiver communicated with every other participant in this matter—the Government, the North Carolina Insurance Companies, NHC Holdings, LLC, and their advisors—he did not communicate directly with Mr. Lindberg, who attempted to reach the Special Master/Receiver more than a dozen times to provide and to obtain the very

information at issue. See Decl. of Greg E. Lindberg ¶ 11. During the term- sheet negotiations over the scope of the Special Master/Receiver's authority (the "Mullen" term sheet), the Special Master/Receiver circulated a term sheet, but the process collapsed when the institutional holders of the records—the North Carolina Insurance Companies and NHC Holdings, LLC—refused to furnish the data and asserted that the Special Master/Receiver "has no authority to compel" them; and despite the efforts of Mr. Lindberg's counsel and of Paladin Management, the

information was never produced. Doc. 278. Far from waiving the point, the defense sought these facts and was met with resistance, not production. A party that bears the burden of proof cannot resist producing the facts—records it concedes are "critical to establishing material causation"—that the burden requires. On this record the Government has not established, and cannot establish, the causation, foreseeability, and loss the MVRA demands.

The same failure defeats any attempt to hold the offsets against Mr. Lindberg. Although a defendant ordinarily bears the burden to establish offsets and credits, as set out above, that burden presupposes access to the records. Here, the records needed to document the offsets are held by third parties to whom control passed four times over—two transfers of custody (to the State Rehabilitator in 2018 and to the Special Master/Receiver under the January 23, 2025 Appointment Order) and two transfers of ownership documented in the disqualification record (the AAPC voting-trust assignment, and the assignment making the Special Master/Receiver the record owner of the NHC equity), Doc. 269—not by Mr. Lindberg; and the Government and the Special Master/Receiver have refused him access—opposing the subpoenas, and declining to make the information available during the term-sheet negotiations, see Doc. 278—though he has requested it repeatedly. A defendant cannot be faulted for failing to prove offsets he was prevented from documenting. Any uncertainty that results from the withholding of those records must be read against the party that withheld them, not against the defendant who sought them. And where the causation and valuation questions are this tangled and the records this contested, the Court

may decline to order restitution altogether: the MVRA is "inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." United States v. Reifler, 446 F.3d 65, 136 (2d Cir. 2006); see 18 U.S.C. § 3663A(c)(3)(B).

III. The Affiliated-Loan Balance Is the Appropriate Measure and the

Ceiling; It Must Be Reduced by the Value Received or Recovered and by Losses Not Proximately Caused, Not Charged Gross.

Restitution is compensatory, is capped at the victim's actual loss, and is reduced by the value the victim receives or recovers; the Government bears the burden of proving the amount by a preponderance. 2 See 18 U.S.C. § 3664(e), (f)(1), (j); Robers v. United States, 572 U.S. 639, 644–46 (2014); Hughey v. United States, 495 U.S. 411 (1990). Consistent with that measure, Mr. Lindberg does not dispute that the outstanding principal balance of the affiliated loans—rather than policyholder losses—is the appropriate methodology for calculating restitution. Doc. 132, at 5. That balance, however, is the ceiling, not the award: it fixes the most the named victims could be owed, and it must then be reduced by the value they received or recovered before any final number is set. The Special Master/Receiver's error lies not in the methodology but in his failure to perform that netting. By charging the gross,

2Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant raises this issue for the Court's determination in this proceeding; consistent with Paragraph 18 of the Plea Agreement, nothing herein asserts any appellate or post-conviction right, and nothing in Paragraph 18 limits Defendant's right to present this argument to the Court in the first instance.

unreduced balance—treating the amount the insurers advanced as the amount they lost—the recommendation omits the collateral value, the capital contributions, the third-party principal protection, and the post-hoc recoveries that reduce the victims' net harm. The Plea Agreement forecloses that shortcut: the parties agreed that restitution "may be … lesser than" the Guidelines loss figure (Doc. 40 ¶ 8(a)), and Paragraph 10(a) reaches only the harm actually caused to the named victims. The amount must be reduced by the value documented below before a final number is set.

This measure reflects Congress's deliberate policy, and the Senate Judiciary Committee's report on the Mandatory Victims Restitution Act confirms it. Congress acted "to improve the administration of justice … by requiring Federal criminal defendants to pay full restitution to the identifiable victims of their crimes." S. Rep. No. 104-179, at 12 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 925. The Act's purpose is compensatory—to make the identifiable victims whole for the losses actually caused and to restore them to the position they occupied before the offense, and no more. Id. at 12–13; see United States v. Kaplan, 839 F.3d 795, 800 (9th Cir. 2016) (the MVRA's purpose is "to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act"). A figure keyed to the gross size of the insurers' investment program, rather than to the insurers' actual un-recovered loss net of the value they received and recovered, does not serve that make-whole policy; it yields a recovery untethered from any victim's net harm. Congress also confined the restitution inquiry to the loss the offense caused and cautioned that the restitution phase is not to "become fora for the determination of facts and issues better suited to civil proceedings." S. Rep. No. 104-179, at 18, reprinted in 1996 U.S.C.C.A.N. at 931; see United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018) (restitution "ought not to confer a windfall upon a victim"). Awarding the full civil value of a regulator-reviewed investment program as criminal restitution—without proof that the offense proximately caused that loss to the named victims—is precisely the civil-damages proxy Congress declined to authorize.

These limits are a ceiling, not a suggestion. The Fourth Circuit is emphatic that the MVRA "does not allow a court to grant a windfall to the victim, and thereby unfairly punish a defendant by requiring him to pay back more money than he stole." United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017). And an award that exceeds the statute's actual-loss measure is not a discretionary error to be reviewed for abuse; it is an illegal sentence, because "[a] restitution order that exceeds the authority of the statutory source 'is no less "illegal" than a sentence of imprisonment that exceeds the statutory maximum.'" United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting United States v. Broughton-

Jones, 71 F.3d 1143, 1147 (4th Cir. 1995)). “Zero” is therefore the arithmetic product of the statute’s own limits, not rhetoric: a defendant who has returned value meeting or exceeding the victims’ actual, proximately-caused loss owes no more.

The ceiling has a second, independent component the recommended figure ignores: the bar on double recovery. Restitution runs only to a victim’s un- compensated loss. Where a third party has already compensated the victim, § 3664(j)(1) directs that restitution for that portion be paid to the compensating party,

and only after the victim has been made whole; and § 3664(j)(2) forbids compensating a victim twice for the same loss. On the payees’ own account, the policyholders whose losses drive much of the recommended figure have already been made whole—paid in full by the state guaranty associations, which the payees concede are “providers of compensation” within the meaning of § 3664(j)(1). See Doc. 275, at 2, 4–5, 7 (ULICO). Awarding the North Carolina Insurance Companies the same policyholder losses a second time would produce exactly the double recovery § 3664(j) forbids and the windfall the MVRA does not permit. See Ritchie, 858 F.3d at 216. Whether a given entity is a “provider of compensation”—or a victim at all—is a legal question that should be resolved, in Mr. Lindberg’s favor, before any final number is fixed.

For the same reason, an accurate accounting of the offsets and the net loss cannot be made on this record. The MVRA directs the Court to base restitution on “a complete accounting of the losses to each victim,” 18 U.S.C. § 3664(a); yet the assets and value that would offset the claimed loss—now controlled by NHC Holdings, LLC and the victim insurers—cannot be traced or valued while the records the Special Master/Receiver himself concedes are “critical to establishing material . . . offset contentions,” Doc. 266, at 3, remain beyond reach, for the reasons set out above (supra Part II). As the Second Circuit has explained, Congress made the MVRA “inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims’ losses would unduly burden the sentencing process.” Reifler, 446 F.3d at 136; see 18 U.S.C. § 3663A(c)(3)(B). Mr. Lindberg has preserved this position, including in his objections to the Special Master/Receiver’s Report. See Doc.

132. To the extent the withheld records make an accurate determination of the net amount impossible, restitution should be denied; at a minimum, value that cannot be accounted for on this record may not be charged to Mr. Lindberg.

The accounting defect runs deeper than the missing third-party records. By the Special Master/Receiver’s and the Government’s own account, the report rests substantially on data provided during an earlier phase by Mr. Lindberg’s former counsel (Katten) and on confidential materials—yet the report’s own accounting, the underlying data behind its computations, and the methodology it applied have not been shared with Mr. Lindberg, who cannot access them. He has the report’s conclusions; he does not have the accounting, the data, or the methodology needed to test or contest them. There is, in short, no complete accounting, and no underlying data or methodology, provided to Mr. Lindberg at all. The MVRA does not permit a restitution order to be fixed on that footing. It requires the Court to base restitution on “a complete accounting of the losses to each victim,” 18 U.S.C. § 3664(a), and § 3664(e) requires the Government to prove the amount by a preponderance—obligations that presuppose a defendant able to see and contest the numbers. A figure fixed on a report whose accounting, underlying data, and methodology are withheld from the defendant is not the “complete accounting” the statute demands, and it leaves the Government unable to prove the amount by the preponderance of the evidence § 3664(e)

requires. To the extent any portion of the resulting award is not traceable to a loss the offense proximately caused and proven to that standard, it exceeds the statute's actual-loss measure, and "[a] restitution order that exceeds the

authority of the statutory source" is an illegal sentence. Davis, 714 F.3d at 812 (quoting Broughton-Jones, 71 F.3d at 1147).

This conclusion follows with special force from the Government's own insistence on the schedule. To the extent the Government contends that this proceeding must be brought to a close by the ninety-day date of August 24, 2026, see 18 U.S.C. § 3664(d)(5), it cannot at once demand a hard deadline and a full, accurate determination of causation and loss on a contested record that cannot be developed in the time that deadline would allow. The MVRA resolves that tension against the Government. Congress "plainly intended that sentencing courts not become embroiled in intricate issues of proof" in fixing restitution, and it made the mandatory obligation "inapplicable" where "the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process." Reifler, 446 F.3d at 135–36; see 18 U.S.C. § 3663A(c)(3)(B). Where those issues cannot be fairly resolved within the time available, the statute directs that mandatory restitution be declined rather than forced into an inaccurate figure. Nor may the Government answer with Dolan v. United States, 560 U.S. 605 (2010): Dolan holds only that a court that has made clear before the ninety-day date that it will order restitution retains power to fix the amount afterward; it neither requires a court to enter a figure it cannot verify nor displaces the independent complexity exception of § 3663A(c)(3)(B). Mr. Lindberg does not contend the deadline strips the Court of authority; he contends that, on this record, the complex factual issues bearing on cause and amount cannot be fairly resolved, which independently triggers

the statutory exception. The Government cannot invoke the deadline to deny the discovery and evidentiary hearing those issues require, and then invoke the same deadline to justify entering an unproven number; if the deadline governs, so does the complexity exception—and on this record, no restitution is due.

## IV. The Facts Below Are Offered Pursuant to the Factual Basis's Reservation Permitting Additional Relevant Facts.

The Factual Basis expressly provides that "either party may present … additional relevant facts," and that it "does not necessarily represent all conduct relevant to sentencing." Doc. 42, at 1; accord Doc. 40 ¶ 13. The facts below are offered pursuant to that reservation. The facts go to the amount of that restitution—the net harm, and the credits and offsets the Special Master/Receiver is charged with quantifying.

Nor does anything below disturb Paragraph 10(a). Mr. Lindberg agreed to pay "full restitution … to all persons directly or indirectly harmed by the defendant's criminal conduct." Doc. 40 ¶ 10(a). Full restitution to those persons is measured by their actual, un-recovered harm; crediting the value they received or recovered is not a reduction of "full" restitution but the correct computation of it. See 18 U.S.C. § 3664(f)(1), (j)(1); Robers, 572 U.S. at 645.

## V. The Investments Were Backed by Substantial, Documented Value That Must Be Credited in Fixing the Amount.

The additional facts show that the insurers' funds were backed by substantial, documented value bearing directly on the net amount of any harm. In exchange for its funds, each insurer received a rated, senior-secured debt instrument with a first-

lien position on the assets and cash flows of the borrower. The borrowers were twenty- one operating companies that KPMG valued, contemporaneously, at an aggregate enterprise value of approximately $2.45 billion, and Houlihan Lokey concluded the loans were conservatively underwritten at approximately fifty-percent loan-to- value—asset values exceeding the loan balances by more than $1 billion. SOF § V & Ex. DS-4; see Doc. 234, at 5–7 (Exs. E2, E3). In May 2018 the insurers held more than $1.006 billion in par value of investment-grade zero-coupon bonds as dollar-for-dollar principal protection that, if held to maturity, would have repaid the affiliated-loan principal in full. SOF § IV & Exs. DS-16, DS-17, DS-18; see Doc. 234, at 5. These principal-protection bonds were high-grade, independently rated paper issued and guaranteed by named third parties—not affiliate obligations. The private-placement materials filed with the Court identify the specific bonds, their issuers, and their guarantors: for example, an investment-grade zero-coupon bond (CUSIP 296353LF0) issued by the Escondido Union High School District, rated Aa2 by Moody's and AA by Standard & Poor's, and insured by Assured Guaranty Corporation and Assured Guaranty Municipal Corporation (formerly Financial Security Assurance). Ex. DS- 18; see Doc. 234, at 5. The insurers' principal protection thus rested on named, high-grade obligors and monoline guarantors carried at investment-grade ratings, confirming that this was creditworthy collateral whose value must be accounted for in fixing the amount.

Capital was also added into the structure, not withdrawn from it: an Eli Global affiliate paid in capital equal to the insurer's purchase discount and expected

expenses as an equity buffer beneath the insurer's debt, and each finance company carried an additional ten-percent equity buffer. SOF § IV & Exs. DS-2, DS-4, DS-20. Mr. Lindberg contributed roughly $1 billion of his own capital, took no dividends, and personally guaranteed the affiliates' obligations in an amount of approximately $2.39 billion. See Doc. 234, at 5 (Exs. A11, B8, D). Each of these—the collateral value, the principal-protection bonds, the capital contributions, and the guarantee—is value that must be accounted for in computing the victims' net harm and the credits due.

VI. The Assets Were Reviewed by the Regulator and Rated and Valued by

Independent Agencies, Confirming Realizable Value Relevant to the Amount.

The realizable value of these assets is confirmed by independent third parties. The affiliated-investment program and its structures were reviewed by NCDOI over a period of years, and the underlying loans were, in the Department's own words, "100% held by the Insurers"—that is, the insurers carried the loans and their collateral as assets on their books. Ex. DS-1. This is offered to establish, for purposes of the credits and offsets the Special Master/Receiver must apply, that the insurers held real, independently valued assets.

Independent private agencies confirmed that value. Egan-Jones rated the finance-company and SPV loan pools to an investment-grade profile; DBRS rated and approved the principal-protection notes; Fitch and A.M. Best rated the carrier; and every affiliated loan carried a rating from an SEC-approved NRSRO and an arm's- length pricing opinion. SOF § V & Exs. DS-4, DS-16, DS-17, DS-19, DS-20. In 2018, KPMG and Houlihan Lokey independently valued the borrowers and collateral at

amounts exceeding the loan balances. See Doc. 234, at 7 (Exs. E2, E3). These independent valuations are additional facts the Special Master/Receiver must weigh in fixing the amount of restitution.

VII. Post–October 2018 Diminution by Third Parties Was Not Caused by

Mr. Lindberg's Conduct and Falls Outside Paragraph 10(a).

Because the plea preserves the causal predicate (supra Part I), losses that Mr. Lindberg's criminal conduct did not cause fall outside Paragraph 10(a) altogether. A substantial portion of the amount the Special Master/Receiver attributes to Mr. Lindberg reflects value lost or recovered after he ceded control of the insurers to the court-supervised Rehabilitator in October 2018, through independent third-party decisions: the interference with the signed Ares sale; the Rehabilitator's rejection of the Oaktree, Quadro, and Montshire/Alban transactions that would have repaid the loans; the coerced ten-year hold; and the pre-maturity sale of the very zero-coupon bonds purchased to protect the affiliated-loan principal. See Doc. 234, at 24–31. The Special Master/Receiver concedes that he "is not situated to second guess discretionary decisions made by state court supervised fiduciaries in their business judgment," and that Mr. Lindberg bears only "some responsibility" for the diminution that occurred during rehabilitation and liquidation. Doc. 245, at 24. Robers marks the line. The Robers majority held that a mere decline in the market value of collateral does not break the causal chain; but it accepted the Government's own concession that a victim's intervening acts—a "donation of collateral or its sale to a friend for a nominal sum"—"could break the causal chain." 572 U.S. at 645–46 (accepting the Government's concession). Justice Sotomayor drew the corollary: "[i]f

a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Id. at 647 (Sotomayor, J., concurring). This case does not involve passive market decline: the Rehabilitator affirmatively refused arm's-length, face-value offers, elected a coerced ten-year hold, and sold the zero-coupon protection bonds years before maturity—when there was no need to sell them, because holding them to maturity would have repaid the affiliated-loan principal in full—for a fraction of their guaranteed value. Those are the kind of independent, volitional intervening acts— akin to the Robers Court's own example of a victim's "sale [of collateral] to a friend for a nominal sum"—that sever proximate cause. To the extent that diminution reflects those third-party decisions rather than harm Mr. Lindberg caused, it should be excluded from the amount attributable to him; and to the extent value was recovered, it must be credited. See 18 U.S.C. § 3664(f)(1), (j); Robers, 572 U.S. at 644–

46. The diminution here resulted from the discretionary, volitional decisions of a

court-appointed Rehabilitator and other third parties—independent intervening acts that break the causal chain unless they are directly related to the offense conduct. See United States v. Speakman, 594 F.3d 1165, 1172–74 (10th Cir. 2010). No published Fourth Circuit decision decides whether a court-supervised rehabilitator's business judgment severs MVRA causation; but the Special Master/Receiver's own concession that he "is not situated to second guess" those decisions, Doc. 245, at 24, confirms that they were independent of Mr. Lindberg's conduct.

The Special Master/Receiver's disposition of Beckett Collectibles, LLC is the same error in its starkest form. Beckett was among the operating companies Mr. Lindberg surrendered to the receivership, and it was appraised at approximately $1 billion, with a Cabrillo appraisal

valuing it at $1,003,924,000. See Doc. 280 ¶ 4; Doc. 269. The Special Master/Receiver nonetheless sold Beckett for approximately $134 million—roughly thirteen cents on the dollar—without this Court's approval and without any accounting of the proceeds, a sale he was able to effect because he had made himself the record owner of NHC Holdings, LLC. See Doc. 269; Doc. 280 ¶ 12. That below-value sale destroyed roughly $866 million in value, see Doc. 281, at 30 ("Loss on Beckett Sale," $866,000,000, Exs. 6(a)–6(c)), and two consequences follow, both in Mr. Lindberg's favor. First, the value Mr. Lindberg returned must be credited "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii)—that is, Beckett's roughly $1 billion value when he surrendered it, not the roughly $134 million the Special Master/Receiver elected to accept years later. See Arrington, 97 F.4th at 597; Robers, 572 U.S. at 647 (Sotomayor, J., concurring). Second, to the extent the shortfall is charged as loss at all, it is loss the fiduciary's own below-value sale caused—an independent, volitional act that severs the causal chain—not harm Mr. Lindberg's offense proximately caused. And because the proceeds have never been accounted for, the Beckett figure cannot satisfy the complete-accounting command of 18 U.S.C. § 3664(a) in any event. See infra Part XIV. Mr. Lindberg has pressed each of these points in his objections to the Special Master/Receiver's Report.

See Doc. 280 ¶¶ 4, 12.

The result is that the gross outstanding-balance figure is not the measure of the victims' net harm. Where the borrowers' enterprise value exceeded the loan balances, where more than $1 billion of principal-protection bonds and roughly $1 billion of the defendant's own capital stood behind the loans, and where documented recoveries and third-party value destruction post-date the loss of control, the net restitution owed to the named victims is materially less than the amount the Preliminary Order reflects. The Motion identifies the specific offsets and credits, and they should be applied. See Doc. 234, at 31–39.

VIII. The Transactions the Special Master/Receiver Isolates Were the

Necessary Implementation of the Regulator-Reviewed Structures, and Cannot Be Recast as the Proximate Cause Chargeable to Mr.

Lindberg.

The Special Master/Receiver isolates the affiliated-investment transactions— the insurer's rated debt investment into each vehicle, and the vehicle's loan to an affiliate—and treats those transactions themselves as the conduct that caused the loss, measuring restitution by their outstanding balances. Doc. 106, at 19. But those transactions were not free-standing acts of Mr. Lindberg's choosing; they were the required mechanics of the four disaffiliation structures—the two-class SPVs, the irrevocable trust, the finance companies, and the principal-protection notes—that the North Carolina Department of Insurance reviewed. SOF §§ I, III & Exs. DS-1 through DS-21. Each structure operated, by design, only through the very transaction the Special Master/Receiver now isolates: the insurer could not implement the reviewed structure without making the rated debt investment, and the vehicle could not

function without the corresponding affiliate loan. In a real sense, the transactions were the structures.

And the insurers made those investments within a framework the Department negotiated and confirmed. The Department set and confirmed the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, see Doc. 234, at 6 (Ex. A12); it received the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j) and

the supporting legal opinion identifying the vehicles, Exs. DS-5, DS-7; and it reviewed the successor finance-company and principal- protection-note structures before they were used, Exs. DS-16, DS-19. The insurers then carried the resulting instruments, as the reviewed structures contemplated, as loan-backed securities. That the insurers held affiliated investments through these vehicles was thus a feature of a regulator-reviewed framework, not a departure from one.

These transactions were, moreover, successive restructurings of the same assets—not new extractions of value. The structures evolved in response to a changing regulatory environment: the group moved to phase out and reduce the original SPV exposure and to migrate those holdings into the finance-company and, ultimately, the principal-protection-note structures. Exs. DS-16, DS-19, DS-20. Creating the PPNs required unwinding the earlier SPVs and finance companies and placing the same underlying affiliated credits into the PPN structure—now backed by the added third-party bond collateral. Moving the same assets into a successively better-collateralized, regulator-reviewed structure increased credit quality and added

collateral; it did not create a new loss. The outstanding balances the Special Master/Receiver counts therefore reflect the same underlying assets carried in a more protected form, not incremental harm proximately caused by Mr. Lindberg.

Nor did the reviewed structures merely permit these transactions; they required protective capital as an integral feature. The principal-protection-note structure, in particular, required the insurers to hold more than $1.006 billion in par value of third-party, investment-grade zero-coupon bonds as dollar-for-dollar protection of the affiliated-loan principal—a mandatory component of the reviewed design, not a discretionary addition. Exs. DS-16, DS-17, DS-18; see Doc. 234, at 5. The very capital and protection the Special Master/Receiver's gross-balance figure ignores were thus compelled by the regulator-reviewed structure. And the loss the Special Master/Receiver now charges to Mr. Lindberg flowed not from that protective design, but from the Rehabilitator's pre-maturity, below-value sale of those very bonds after Mr. Lindberg lost control. There was no need to sell them: held to maturity, the bonds would have paid their full par value and repaid the affiliated-loan principal in full. Instead, the early sale realized only roughly $394 million and destroyed roughly $611.6 million in otherwise-guaranteed value—a loss that materialized solely because of the Rehabilitator's unnecessary, volitional decision to liquidate the protection early. In his objections to the Special Master/Receiver's Second Supplement, Mr. Lindberg presses exactly this. He explains that the Report "makes no findings on intervening or superseding causes," which by itself requires vacatur, and that, because "the fiduciary acted affirmatively, selling a par-payable instrument

decades early," "[n]either case assigns the defendant the burden of disproving affirmative value destruction by the victim's fiduciary." Doc. 280 ¶¶ 19–20. The bonds were "contractually scheduled to pay $1,006,239,867 at maturity," and the Rehabilitator "sold them early for approximately $394 million—less than forty cents on the dollar—crystallizing a loss of approximately $611.6 million." Doc. 281, at 22. And the sale met no need: the Special Master/Receiver's asserted liquidity rationale is refuted by the North Carolina Insurance Companies' own quarterly reports, which show that "from 2019 through December 2023, the NCICs at all times held over $1 billion of cash and marketable securities in the form of third-party bonds," so "[t]he sale of the zero coupon bonds in 2019 was entirely unnecessary." Doc. 281 § XV.E; see Doc. 289, Ex. 1(a)–(e) (NCIC quarterly asset pages, including Colorado Bankers Life, 4Q2019–4Q2023). The insurers' statutory

annual statements make the point concrete: at every year-end from 2019 through 2023, the North Carolina Insurance Companies' combined cash and marketable third-party bonds ranged from roughly $1.9 billion to roughly $1.08 billion—never less than $1 billion—even as the protection bonds were sold. Doc. 281, at 54 (tabulating the companies' statutory Annual Statements as filed in the Rehabilitator's quarterly reports, Causey v. Southland National Insurance Corp., No. 19 CVS 8664 (N.C. Super. Ct., Wake Cnty.)). See supra Part VII.

That forecloses treating those transactions, standing alone, as the proximate cause of loss chargeable to Mr. Lindberg. Proximate cause asks whether the claimed loss was a reasonably foreseeable result of the defendant's conduct. Where the

transactions were the necessary implementation of structures the regulator reviewed and permitted the insurers to use, the mere existence of the resulting investment balances is not a loss the Special Master/Receiver may attribute to Mr. Lindberg without proof—least of all where, as shown above, the loss materialized only later, through the intervening rehabilitation and third parties' destruction of value. See supra Parts I, VII. The Special Master/Receiver's figure charges Mr. Lindberg with the gross size of a regulator-reviewed investment program; it does not prove that his conduct proximately caused any victim's net loss. As in Part I, that is loss "in the air."

IX. Foreseeability Independently Defeats the Attribution: The

Compliance and Disclosure the Structures Embodied Were Regulator- Required, and So Reflect the Absence of Foreseeability, Not Its Presence.

Proximate cause under the MVRA carries a foreseeability requirement: the Government must show that the victim's loss was a reasonably foreseeable result of the conduct of conviction, not merely that a loss later occurred. See 18 U.S.C. § 3663A(a)(2) (victim "directly and proximately harmed"); supra Part I (Palsgraf). The Plea Agreement admits no such foreseeability as to restitution. Paragraph 8(a)'s stipulation that loss "known to or reasonably foreseeable" exceeded $550 million is a Guidelines-loss stipulation under U.S.S.G. § 2B1.1—the same paragraph confirms that figure "may be … lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). It fixes neither the restitution amount nor the foreseeability of any actual, un- recovered loss to the named victims. And the manner in which these investments were originated forecloses the inference that a loss of the magnitude the Special Master/Receiver attributes was reasonably foreseeable: the affiliated loans were

underwritten within a defined risk framework, experienced no defaults while Mr. Lindberg controlled the insurers, were protected by more than $1.006 billion in par value of third-party investment-grade zero-coupon bonds and roughly $1 billion of Mr. Lindberg's own first-loss capital, were personally guaranteed in approximately $2.39 billion, and were independently valued by KPMG and Houlihan Lokey at amounts exceeding the loan balances—all while Mr. Lindberg took no dividends. SOF §§ IV–V; see Doc. 234, at 4–7. A defendant who layers that much protection beneath an investment does not foresee, and this record does not permit the inference that he foresaw, the wholesale loss now charged to him. Foreseeability is not an affirmative defense Mr. Lindberg must establish; it is a component of the proximate cause the Government must prove under § 3664(e), and these facts show that burden is unmet.

The Special Master/Receiver's contrary reasoning proves the point rather than answering it. He resolved foreseeability by declaring that "an inability to pay is always reasonably

foreseeable." Doc. 245, at 30. But a foreseeability that attaches to every loan is foreseeability in the air. Just as "[p]roof of negligence in the air, so to speak, will not do," Palsgraf, 248 N.Y. at 341, a foreseeability untethered from the specific offense and the specific victim does no limiting work at all. If every borrowed dollar carries an automatically foreseeable risk of non-payment, foreseeability ceases to limit anything and restitution becomes limitless—the precise result Hughey forbids. See Hughey, 495 U.S. at 413; Paroline, 572 U.S. at 445. Foreseeability is a relational, limiting element: the loss must be a reasonably foreseeable result of the specific conduct of conviction, not a generic risk attending any loan.

Mr. Lindberg's reliance on counsel bears on the same point. He does not offer that reliance to contest the offense or to relitigate the Factual Basis; he offers it only to show the absence of the foreseeability that proximate cause requires. The disaffiliation structures were designed and implemented on the advice of counsel, including formal legal opinions on the vehicles and on the disclaimers of affiliation. SOF § II & Exs. DS-5, DS-6, DS-7. A person who structures transactions on the advice of counsel, and is advised that those structures are permissible, does not thereby foresee that they will produce the loss later attributed to them.

Finally, the compliance and disclosure the structures embodied were required by the regulator—not discretionary acts of Mr. Lindberg—and for that reason they are compliance, not causation, and they confirm the absence of foreseeability. The disclaimers of affiliation were filed because N.C. Gen. Stat. § 58-19-25(j) required them; the structures were laid before the North Carolina Department of Insurance and revised in response to its comments; and the successor finance-company and principal-protection-note structures were reviewed before they were used. SOF § III & Exs. DS-1, DS-5, DS-7, DS-9, DS-15, DS-16, DS-19. Conduct that a regulator requires, and that is performed openly before that regulator, is not the concealed, wrongful act that proximately causes a loss; it is the opposite of concealment. A defendant who lays his structures before the regulator, makes the affiliation disclosures the law compels, and conforms the structures to the regulator's comments does not foresee that those very structures will later be recast as the cause of a billion- dollar loss. The regulator-required compliance and the non-concealment reflected throughout this record are therefore factors negating proximate causation and foreseeability—not evidence of either.

X. The Special Master/Receiver's Specific Attributions—Investments Originated by Others or Before Mr. Lindberg's Control, the GBIG- Driven Debt, and the Added Interest—Are Not Losses the Government Has Tied to His Offense Conduct.

Several of the Special Master/Receiver's specific attributions make the burden problem concrete. Each charges Mr. Lindberg with a loss on the strength of relatedness or supervisory status rather than proof that his offense conduct directly and proximately caused that particular loss. See supra Parts I–II.

First, the Special Master/Receiver charges Mr. Lindberg with the full amount of investments that others originated, or that predate his control. As to the Agera investments, he "does not dispute" that "most of the funds loaned to Agera were transferred before the Defendant acquired either Agera or the corresponding insurance company," yet recommends charging "the entire loss from the Agera loans" to Mr. Lindberg because Agera was "critical to" later acquisitions and "part and parcel with his scheme"—"even if Defendant was not the one to pull the trigger on originating all of the loans." Doc. 245, at

19. And he charges Mr. Lindberg for the Affiliate Investment corresponding to Eye Care Leaders even though CBL acquired those assets "using new consideration—separate from the pre-existing Affiliate Investment balance"—in a transaction "the supervising bankruptcy court approved as fair and reasonable." Doc. 245, at 20. That a loss is "related to," "critical to," or "part and parcel with" the scheme is not proximate cause. "[T]he mere fact that an injury is related to a crime is insufficient for restitution; there must be a direct and

proximate connection between the two." Coats, 487 B.R. at 653; see Squirrel, 588 F.3d at 215. Losses on investments originated by others, or before Mr. Lindberg controlled the insurer or the borrower, are not losses his offense conduct directly and proximately caused, and the Government has not carried its § 3664(e) burden to prove otherwise.

Second, the Special Master/Receiver charges Mr. Lindberg with the "Insurance-Holdco Debt"—Affiliate Investments the record attributes to "acquisitions driven by the GBIG management team"—on the theory that the team "was installed by, and ultimately accountable to, the Defendant, who, upon information and belief, approved the applicable transactions." Doc. 245, at 21–22. But accountability and approval "upon information and belief" are not proof that Mr. Lindberg's conduct of conviction proximately caused these particular losses. Restitution attaches to the loss the offense caused, not to every investment made by a management team answerable to the defendant, and the Special Master/Receiver's own hedged phrasing shows the causal tie is asserted, not established. The burden to establish it by a preponderance is the Government's. Wilkinson, 590 F.3d at 268; 18 U.S.C. § 3664(e).

Third, the Special Master/Receiver proposes to enlarge the award by roughly $263 million by applying a "time value of money interest rate to the victims' losses." Doc. 245, at 14. That premium is not a component of the victims' actual, proximately- caused loss. Restitution is capped at the victim's actual loss: "criminal restitution . . . is not concerned with a victim's disappointed expectations but only with his actual loss." United States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006). Whether

prejudgment interest may ever be awarded under the MVRA as "foregone interest" forming part of a victim's actual loss is unsettled, and the question need not be resolved here: the Special Master/Receiver does not tie the proposed $263 million to any foregone-interest loss the victims actually sustained, and he affirmatively disclaims the only rationale that could support it. The Special Master/Receiver's own account confirms the defect. He concedes that the interest is not imposed "to honor the victims' disappointed expectations or provide the victims the benefit of any bargain," Doc. 245, at 14—yet a time-value overlay does exactly that: it compensates for the lost use of money over time, which is the benefit of the bargain, not the "actual loss" the offense caused. 18 U.S.C. § 3664(f)(1)(A). The MVRA's own interest provision confirms the point: it imposes interest on the unpaid balance of restitution after sentencing, see 18 U.S.C. § 3612(f), not a prejudgment time-value premium built into the loss calculation itself. At a minimum, an interest component cannot be layered onto a base that has not itself been shown to be a loss Mr. Lindberg proximately caused; it compounds an unproven figure. And because restitution under the MVRA is criminal punishment, see supra note 2, an interest enhancement implicates the same reserved constitutional concerns. The interest question, like causation, offsets, and credits, should abide the Court's de novo determination. See Doc. 132, at 12–15.

XI. The Court's Restitution Determination May Not Be Delegated to, or

Governed by, the State Rehabilitation Court's Civil Findings;

Importing Those Findings Applies the Wrong Standard of Proof.

Section 3664(e) commits the causation-and-amount determination to this Court, to be "resolved by the court by the preponderance of the evidence," with "the

burden of demonstrating the amount of the loss … on the attorney for the Government." 18 U.S.C. § 3664(e). In making that determination the district court is the trier of fact, United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009), and it may not delegate the determination of the restitution amount to another decisionmaker. See United States v. Dawkins, 202 F.3d 711 (4th Cir. 2000); United States v. Blake, 81 F.3d 498 (4th Cir. 1996); United States v. Stuver, 845 F.2d 73 (4th Cir. 1988). Deferring to another tribunal's findings is a form of the delegation those cases forbid, and it is independently barred because § 3664(d)(6) makes a special master's proposed findings "subject to a de novo determination of the issue by the court."

The Special Master/Receiver's Report, however, resolves several disputed issues by deferring to the civil findings of the Wake County Superior Court that supervised the insurers' rehabilitation. He rejects Mr. Lindberg's contentions about the sale of the Clanwilliam (CWG) companies on the ground that the state court "concluded that TA Associates' prospective purchase of CWG was a fair and reasonable transaction" and that a price of at least $415 million was "in the best interests of policyholders," and by invoking that court's later order rejecting Mr. Lindberg's valuation. Doc. 245, at 22–23. Those findings cannot bear the weight the Special Master/Receiver places on them, for four independent reasons.

First, they are not final. The state rehabilitation court's orders are the subject of a pending appeal and remain unsettled, and a civil judgment under appellate review is not a settled adjudication that can be treated as conclusive of anything.

Second, they are civil findings, made under civil procedures for a different purpose—whether a sale served the policyholders' best interests—in a proceeding that never adjudicated, under any standard, whether Mr. Lindberg's offense conduct proximately caused a particular loss, or in what net amount. The MVRA does not permit a federal criminal restitution award to be built by importing such civil conclusions: § 3664(d)(6) requires this Court to determine causation and amount de novo, on the record before it, and § 3664(e) places the burden here on the Government. Third, issue preclusion does not apply, because "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel." One Lot Emerald Cut Stones & One Ring v. United States, 409 U.S. 232, 235 (1972); see Standefer v. United States, 447 U.S. 10 (1980). A finding made under a civil standard—or under a best-interests-of-policyholders standard that is not a measure of causation at all—cannot satisfy the Government's burden in this criminal proceeding. Fourth, the state court's own finding that the Rehabilitator controlled and executed the CWG sale confirms, rather than defeats, the intervening-actor defense: it was the fiduciary's sale, not Mr. Lindberg's.

That the state court approved a transaction as fair therefore does not answer— much less control—the questions § 3664(e) reserves to this Court. The point is constitutional as well as statutory: because restitution under the MVRA is criminal punishment, Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026), and must be imposed through the procedures that govern other criminal penalties, the facts that fix it must be found in this proceeding, under the standard the criminal law

requires—not borrowed from a civil record resolving a different question. A restitution order resting on facts established only in a civil proceeding, under a civil standard, and without the Government carrying its § 3664(e) burden here, is punishment imposed on the wrong standard of proof. The state-court record may be weighed as evidence, but it may not be treated as controlling; causation and amount must be found by this Court, on this record, under the standard the criminal law demands. See supra Parts I–II.

XII. The Special Master/Receiver's "Causation" Rulings—Issues 11

Through 17—Rest on Facts the Government Must Prove and Has Not Placed on the Record.

The Special Master/Receiver disallowed seven of Mr. Lindberg's proposed reductions—Issues 11 through 17—on the ground that the chain of proximate cause was not broken, treating each as a "legal conclusion" reached on "agreed facts." Doc. 245, at 15–25 & nn. 9, 16, 17, 20, 21, 25, 26. That label cannot carry these rulings. Whether the offense proximately caused a post-transfer loss, and whether an intervening actor's decision broke the causal chain, are questions of fact, and 18 U.S.C. § 3664(e) places them on the Government. See supra Part II. Each of these seven items must be measured against the causation standard the Fourth Circuit stated in this very case: the loss must be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," not merely a loss that happened to occur after control passed. See supra Part II (In re Zetteler). The Government has made that showing for none of them. The agreed facts establish only the state of the companies while Mr. Lindberg controlled them; for each of these seven issues, the

loss the Special Master/Receiver charges to Mr. Lindberg materialized only after control passed, through the intervening decisions of the Rehabilitator and other third parties. To sustain any of these amounts, the Government must prove additional facts—beyond those Mr. Lindberg has placed on the record—establishing that the offense, and not the intervening conduct, proximately caused each loss. Those facts are the Government's to prove: it bears the burden of proof on them, and it must come forward with and proactively produce the evidence establishing them—including affirmatively establishing why the intervening acts of the Rehabilitator and other third parties did not disturb the chain of causation—and it must carry that burden by a preponderance of the evidence. That burden does not shift to Mr. Lindberg. The Government has offered none of these facts.

The following sets out each of the seven "causation" rulings, the amount the Special Master/Receiver refused to credit, and the factual causation the Government must prove—and has not—to charge that amount to Mr. Lindberg: Issue (Doc. 245 causation Amount Fact the Government must prove—and has not ruling) No. 11 — October 2018 value $454,000,000 That the offense—not the post–October 2018 of the NCICs rehabilitation and management of the companies— caused the decline from their October 2018 value. No. 12 — Agera loss $129,000,000 That the offense proximately caused the Agera loss, where most of the funds were loaned before Mr.

Lindberg acquired Agera or the corresponding insurer and the loss crystallized after the indictment. No. 13 — Eye Care Leaders $22,288,826 That the offense—not the post-transfer (ECL) loss administration and the bankruptcy-court-approved, new-consideration transaction—caused the ECL loss. No. 14 — UKAT loss $39,000,000 That the offense proximately caused the UKAT loss, rather than post-transfer decisions of third parties. No. 15 — Insurance-Holdco $14,897,805 That the offense caused acquisitions the record debt portion attributes to the GBIG management team—beyond

Issue (Doc. 245 causation Amount Fact the Government must prove—and has not ruling) accountability and approval alleged "upon information and belief." No. 16 — CWG $474,000,000 That the offense—not the Rehabilitator's controlled (Clanwilliam) sale price sale, which the state court approved as fair and in the policyholders' best interests—caused the claimed shortfall. No. 17 — Early sale of the $611,600,000 That the offense—not the Rehabilitator's zero-coupon protection bonds unnecessary, pre-maturity sale of the very bonds purchased to protect the loan principal, which held to maturity would have repaid the principal in full— caused the loss.

The items above are exemplary, not exhaustive. The evidence and records necessary to establish—or to refute—the causation the Government must prove on each are identified, by way of example, in the exhibits to Mr. Lindberg's Motion for Issuance of Subpoenas Duces Tecum under Federal Rule of Criminal Procedure 17(c), which list the specific records sought from each custodian. Doc. 248.

On each of these issues the Government has done no more than adopt the Special Master/Receiver's characterization; it has put no facts on the record beyond those Mr. Lindberg himself presented, and it has not proved that the offense—rather than the intervening decisions of the Rehabilitator and other court-supervised fiduciaries—proximately caused any of these losses. Because the burden is the Government's and it remains unmet, each of these amounts must be excluded from any restitution award. See 18 U.S.C. § 3664(e); Ritchie, 858 F.3d at 211; Steele, 897 F.3d at 614.

The same burden principle governs a further item the Special Master/Receiver treats as settled. Issue 2—the starting balance of the Affiliate Investments (the "IALA" balances), some $141 million in dispute—is a question of accounting, and the

MVRA makes the accounting the Government's burden: the Court must base restitution on "a complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), and the Government must prove the amount by a preponderance, id. § 3664(e). Mr. Lindberg's agreement that principal balance is an appropriate methodology (Doc. 132, at 5) is not agreement that the Special Master/Receiver's numbers are correct; the figures themselves are contested and must be proved. That the Government and the Special Master/Receiver simultaneously oppose the subpoenas that would test those figures makes the failure of proof more egregious, not less: a party that bears the burden of an accounting cannot block access to the very records the accounting requires and then treat its unverified numbers as established. See supra Part II; Doc.

248.

XIII. The Offset and Credit Issues Turn on Records Held by Third Parties

That Mr. Lindberg Has Repeatedly Sought and the Special Master/Receiver Has Refused to Produce.

Separate from the causation issues, the Special Master/Receiver disallowed a series of offsets and credits for value the insurers received or recovered—Issues 3, 4, and 6 through 10—largely on the ground that Mr. Lindberg had not sufficiently documented them. But the records that would document these offsets are not in Mr. Lindberg's hands. They passed to third parties when he surrendered the companies, and they are held today by NHC Holdings, LLC, the North Carolina Insurance Companies and their Special Deputy Rehabilitator, the Bermuda insurers, and the Special Master/Receiver and his financial advisor. A defendant cannot be faulted for failing to prove offsets he has been prevented from documenting, and any uncertainty

from the withholding of those records must be read against the party that withheld them, not against Mr. Lindberg. See supra Part II.

The following sets out each disallowed offset or credit, the amount at issue, and the custodian of the records required to establish it: Offset / credit (Doc. 245) Amount Records required and their custodian No. 3 — AAPC/ULICO $352,906,240 Transfer and valuation records, and any recovery on preferred-equity credit the preferred equity — ULICO / NHC / Special Master/Receiver. No. 4 — SNIC payments $27,823,425 Payment and accounting records — the North Carolina Insurance Companies / Special Deputy Rehabilitator (Dinius). No. 6 — CBL subordination $3,000,000 Beckett sale and fee records — NHC / Special fee (Beckett) Master/Receiver / Paladin. No. 7 — CWG income-tax $20,000,000 Escrow and closing records — the North Carolina escrow Insurance Companies / Rehabilitator. No. 8 — ULICO real-estate $13,596,013 Transfer and valuation records — ULICO / NHC. transfer No. 9 — Bermuda asset $9,800,076 Sale and proceeds records — the Bermuda insurers / sales Rehabilitator. No. 10 — Zero-coupon bond $243,000,000 Bond-sale and proceeds records — the Rehabilitator sale proceeds (PPNs) / NHC.

These offsets, too, are exemplary rather than exhaustive. The records required to document each—held by the third-party custodians identified above—are the subject of, and are listed by way of example in the exhibits to, Mr. Lindberg's Rule 17(c) subpoena motion. Doc. 248.

Mr. Lindberg has sought these records at every turn. He moved under Federal Rule of Criminal Procedure 17(c) for subpoenas duces tecum to the very custodians who hold them. Doc. 248. Before sentencing, he requested that the data held by NHC Holdings, LLC and the North Carolina Insurance Companies be provided. And he asked that Michael Dinius, the Special Deputy Rehabilitator, be directed to furnish

the information necessary to document the offsets. The Special Master/Receiver has done none of these things—he has neither produced the records, nor obtained them from the custodians over which he presides, nor agreed to their production—while faulting Mr. Lindberg for not documenting the very offsets those records would establish. On this record the offsets cannot fairly be resolved against Mr. Lindberg; at a minimum, the value the withheld records would establish may not be charged to him, and where these accounting issues are this complex and the records this contested, 18 U.S.C. § 3663A(c)(3)(B) supplies an independent basis to decline restitution. See supra Parts II–III.

Taken together, the causation issues (Issues 11 through 17) and the offset issues (Issues 3, 4, and 6 through 10) show that the cause and amount of the claimed losses cannot be determined on the present record. And if, as the Government urges, the determination must be completed by the August 24, 2026 deadline without the data those issues require, the MVRA resolves the matter: where complex factual issues related to the cause or amount of the victims' losses cannot be resolved within the time available, the court is to decline mandatory restitution rather than enter an unsupported figure. 18 U.S.C. § 3663A(c)(3)(B). On this record, no restitution should be ordered.

XIV. The Report Is Not the "Complete Accounting" the MVRA Requires: By

Its Own Terms It Is a Presumption on the Loss Side and an Admitted "Current Guess" on the Asset Side.

The MVRA requires the Court to base restitution on "a complete accounting of the losses to each victim." 18 U.S.C. § 3664(a). The report is not one—and it says so

on its face. On the loss side, the entire figure is built on the "IALA" balances, which the Special Master/Receiver could not verify. He "encountered challenges tracing the Affiliate

Investments' documents and payment histories all the way back to the beginning of the relationship" between the affiliated companies and the insurers, Doc. 245, at 9–10, and so, "absent reliable information to the contrary," he simply "presumed that the balances used in the IALA were accurate," id. at 9, using the IALA as "the best available solution" and "the starting point of the analysis," id. at

10. He further concedes that he "could not trace back" certain sums "to funds

originating with the other insurance company victims." Id. at 35. A loss figure resting on presumed, untraceable balances is not a complete accounting; it is an assumption.

On the asset side—the value that would offset the loss—the report is candidly an estimate. The Special Master/Receiver's valuation is, in his own words, a "current guess on the value of the Primary Restitution Assets." Doc. 245, at 37. The figures "do not constitute formal valuations or fairness opinions; rather, they reflect a desktop exercise," and provide only "the most current available basis for estimating the realizable value" of the assets. Id. at 36 n.31. The Special Master/Receiver himself treats the basis for those values as "sensitive and confidential financial information." Id. at 36–37. Figures the Special Master/Receiver calls a guess, a desktop exercise, and confidential are not a firm accounting of returned value. And for sales the Special Master/Receiver has already executed—including the Beckett sale—a roughly $1 billion asset the Special Master/Receiver sold for approximately $134 million (see supra Part VIII)—the report provides no accounting of the proceeds at all.

The report also leaves the accounting provisional on its own terms—not because analysis remained unfinished before sentencing, but because this final report itself fixes nothing. Documents that would establish disputed items remain outstanding even now: on one item the Special Master/Receiver "requested, but not received, satisfactory documentation" and then declined the credit. Doc. 245, at 13. Two sizeable credits are neither allowed nor finally denied but deferred to abide future events. Id. at 5–6 (Issues 3 and 7). And the asset-side credits are not fixed either: they are to be granted "if and when" a future recovery occurs, id. at 15–16, and "tracked and reported to the Court by the Special Master over time," id. at 37. A figure still missing documents, still deferring credits, and still adjusting over time is not the complete, present accounting § 3664(a) commands.

Put together, the report is a presumption on the loss side and an admitted guess on the asset side, and its open issues remain unresolved. That is not the "complete accounting of the losses to each victim" the MVRA requires, 18 U.S.C. § 3664(a), and none of the underlying accounting, data, or methodology has been furnished to Mr. Lindberg to test it. See supra Part III. A restitution order fixed on such a record is not the "complete accounting of the losses to each victim" the statute demands, 18 U.S.C. § 3664(a), and cannot support a finding that the amount was proven by a preponderance, § 3664(e). To the extent the award rests on a guess rather than proof, it is not traceable to the loss the offense caused, exceeds the statute's actual-loss measure, and is an illegal sentence. Davis, 714 F.3d at 812.

CONCLUSION

Mr. Lindberg respectfully requests that, in fixing the amount of that restitution under Paragraph 10(a) and 18 U.S.C. § 3664, the Court and the Special Master/Receiver credit the value, recoveries, and offsets documented in the Motion and the accompanying Statement of Facts, and exclude the post–October 2018 diminution attributable to third-party conduct, in determining the net amount owed to the named victims.

Reduced to its essentials, the Government asks this Court to fix restitution exceeding $1.6 billion on a record it has not made and cannot make. It has not carried its § 3664(e) burden of proof, and it has not established the causation the MVRA requires. It seeks that figure, moreover, on a record that contains no data on many of the underlying transactions—because NHC Holdings, LLC and the North Carolina Insurance Companies have refused to produce that data on the asserted view that this Court lacks authority over them; because the Special Master/Receiver, though urged to obtain it by Mr. Lindberg's counsel and independently by Paladin Management, has refused to agree to do so; and because the Rule 17(c) subpoenas that would compel it are being resisted by a Government that concedes its own standing to object "is an open question." Doc. 261, at 2 n.1; see Docs. 248, 266, 278. The consequence is that neither the Special Master/Receiver, nor the Government, nor this Court has the data on which a $1.6 billion criminal punishment would rest. On such a record the Government cannot meet its burden, no reliable net figure can be determined, and the Court should decline to enter the recommended amount.

Dated: August 13, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Admitted Pro Hac Vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 13, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 301 — Response to ULICO's Brief re the Second Supplement (Doc. 275) (filed 08/13/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE TO UNIVERSAL LIFE INSURANCE

COMPANY'S BRIEF IN RESPONSE TO THE SPECIAL MASTER'S SECOND

SUPPLEMENT TO REPORT AND RECOMMENDATION (DOC. 275)

Defendant Greg E. Lindberg respectfully submits this Response to the brief filed by Universal Life Insurance Company ("ULICO") in response to the Special Master's Second Supplement to Report and Recommendation (Doc. 275). For the reasons set forth below, ULICO's request that Defendant's objections be denied should itself be denied, and Defendant's objections to the Second Supplemental Recommendation (Docs. 280, 281) should be sustained.

INTRODUCTION

The restitution loss in this case is measured by the balances of the affiliated loans — not by policyholder losses. Defendant and the Special Master agree that "the principal balance of the Affiliate Investments, rather than policyholder losses, is an appropriate methodology for calculating restitution." Doc. 132 at 5. The Special Master's own Report frames every disputed item accordingly, as a "remaining unpaid principal balance owing" on those affiliated loans, including the $339 million the

Special Master attributes to ULICO. Doc. 245 at 6. The only question ULICO's brief raises about the amount is whether the affiliated-loan balance it addresses has been satisfied by the value Defendant has already returned. It has.

ULICO's brief is directed largely to the order in which the payees are paid — a priority question under 18 U.S.C. §§ 3664(j)(1) and (i). That allocation does not change the amount Defendant owes, and Defendant takes no position on inter-payee priority. Defendant does not adopt ULICO's framing of the loss. The measure of restitution is the affiliated-loan balances the Special Master himself sets out, reduced by the mandatory offsets and credits for the value Defendant has returned. 18 U.S.C.

§§ 3663A(b)(1)(B)(ii), 3664(j)(2).

The three points ULICO presses against Defendant — the AAPC preferred- equity credit, the Agera loss, and the preferred-dividend credit — do not withstand scrutiny, and each turns on the very records the Government and the Special Master are simultaneously resisting producing (Doc. 248). Defendant addresses each below. ULICO's characterizations

of Defendant's spending and litigation conduct are irrelevant to the accounting the Court must perform, in which the Government — not Defendant — bears the burden of proving each victim's loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).1

1Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Response without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue

ARGUMENT

I. The Measure of Loss Is the Affiliated-Loan Balances, and Each

Balance ULICO Addresses Has Been Satisfied by the Value Defendant Returned.

Because Defendant and the Special Master measure restitution by the affiliated-loan balances (Doc. 132 at 5; Doc. 245 at 6), the dispositive question for the balance ULICO addresses is whether it has been satisfied by the value Defendant returned. It has: the $339 million balance the Special Master attributes to ULICO was satisfied dollar-for-dollar by the AAPC preferred equity ULICO accepted — par value $352,906,240 — as set out in Part II below.

Framed correctly, the mandatory offset and anti-double-recovery provisions decide the amount. Restitution must be reduced by "the value . . . of any part of the property that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii), and no victim may be compensated twice for the same loss, § 3664(j)(2). United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017) (the MVRA "does not allow a court to grant a windfall to the victim"). Applying the value already returned against the affiliated-loan balances the Special Master sets out, the balances ULICO addresses are satisfied, and no additional restitution is owed on them.

II. The $339 Million Balance Attributed to ULICO Is Satisfied by the

AAPC Preferred Equity — Which ULICO Holds by Its Own Choice Because It Pays ULICO More Than $35 Million a Year.

and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

The $339 million balance attributed to ULICO was satisfied when ULICO accepted the AAPC preferred equity, par value $352,906,240 as of May 26, 2026 — the same figure the Special Master lists in his own table. Doc. 245 at 6 (Issue 3); Lindberg Decl. ¶ 5. Under the Confidential Side Settlement Agreement dated December 19, 2022, and its Amendment dated December 30, 2022 — which resolved ULICO's $524 million civil judgment in Universal Life Insurance Co. v. Lindberg, No. 20-cv-681 (M.D.N.C.) — ULICO accepted $25 million in cash and the transfer of the AAPC preferred equity, and the parties agreed that the preferred equity would apply as a dollar-for-dollar credit against the amounts owed, regardless of whether ULICO sells the preferred or holds it. Doc. 132-1, Exs. A & B; Lindberg Decl. ¶ 5. That contractual credit is reinforced by the MVRA, which independently requires that restitution be reduced by "the value . . . of any part of the property that is returned," measured "as of the date the property is returned." 18 U.S.C. §

3663A(b)(1)(B)(ii). At $352,906,240 in par value, the credit exceeds the $339 million balance in full; it is fixed and presently due.

ULICO's contrary position misreads its own agreement. ULICO contends that, "consistent with the Side Settlement Agreement," Defendant "is not entitled to any restitution credit with respect to AAPC Preferred unless and until that asset is monetized," and that a present credit would be "contrary to the agreement between ULICO and Lindberg." Doc. 275 at 13. That is not what the agreement says. The agreement provides that the AAPC preferred applies as a dollar-for-dollar credit "regardless of whether ULICO sells the preferred or holds it." Lindberg Decl. ¶ 5; Doc.

132-1, Exs. A & B. ULICO's "unless and until . . . monetized" condition appears nowhere in the agreement; it is ULICO's litigating gloss, not its bargain. Having accepted the AAPC preferred in exchange for a credit that applies whether it sells or holds, ULICO cannot rewrite the same agreement to defer that credit indefinitely.

Nor does ULICO's complaint that Defendant "failed . . . to provide a valuation of this privately held company as contemplated by the terms of the Side Settlement Agreement" (Doc. 275 at 13) defeat the credit. The value is not genuinely in dispute: the Special Master's own table fixes the AAPC preferred at $352,906,240 in par as of May 26, 2026, Doc. 245 at 6, and ULICO "has not once disputed that the AAPC preferred is worth anything less than its par value." Lindberg Decl. ¶ 5. To the extent ULICO seeks a further valuation, the records that would supply it are held by the Special Master and are the subject of Defendant's pending Rule 17(c) subpoenas (Doc. 248) — access ULICO and the Special Master oppose. A party cannot withhold the valuation records and then fault Defendant for the absence of a valuation.

ULICO and the Special Master would nonetheless defer any credit until "if and when ULICO realizes this value." Doc. 275 at 14; Doc. 245 at 15–16. But ULICO has not been unable to realize the value — it has chosen not to. ULICO holds the AAPC preferred by its own election, for its own benefit: the preferred pays ULICO more than $35 million a year in payment-in-kind dividends, and its value has climbed from $218 million at the 2022 transfer to more than $352 million today, and is projected to reach approximately $400 million by the end of next year. Lindberg Decl. ¶ 5. ULICO thus retains an appreciating, income-producing asset that it accepted in full satisfaction

of its balance — and it "has not once disputed that the AAPC preferred is worth anything less than its par value." Id. A victim that has been made whole, and that elects to hold the returned asset because it yields more than $35 million a year and keeps appreciating, is not also entitled to collect the same balance a second time in restitution. That is the windfall the MVRA forbids. Ritchie, 858 F.3d at 216.

The statute fixes the credit "as of the date the property is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii) — not as of some future liquidation ULICO may postpone indefinitely. Robers confirms the point: a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time . . . must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline." Robers v. United States, 572 U.S. 639, 647 (2014) (Sotomayor, J., concurring). Here ULICO has chosen to hold — and the value has only risen — so ULICO enjoys the upside of its own election and bears any risk of it. Deferring the credit "if and when" ULICO elects to sell would let ULICO keep a $352- to-$400 million appreciating asset that pays it more than $35 million a year and collect the full $339 million a second time from Defendant — precisely the double recovery § 3664(j)(2) and Ritchie forbid.

## III. The Agera Loss Is Not Proximately Caused by the Offense of Conviction and Presents, at Minimum, a Disputed Factual Question for the Hearing.

ULICO urges the Court to charge Defendant with the approximately $129 million Agera loss (Doc. 275 at 13–15). The MVRA, however, limits restitution to losses "directly and proximately caused by" the offense of conviction, 18 U.S.C. §

3663A(a)(2); Hughey v. United States, 495 U.S. 411, 413 (1990) — not to every investment that later declined. And by ULICO's own account, the Agera loss did not flow from the offense: Agera "only became troubled after" a change in management and was "forced into bankruptcy on October 4, 2019" — after Defendant's April 1, 2019 indictment, and after Defendant "chose not to continue funding the restructuring of Agera." Doc. 275 at 14. A loss that crystallized months after the charged conduct, upon intervening decisions concerning a company then outside Defendant's operational control, is not the proximate result of the offense. Paroline v. United States, 572 U.S. 434, 445–46 (2014); Robers v. United States, 572 U.S. 639, 646 (2014) (intervening events — such as a donation of collateral or its "sale to a friend for a nominal sum" — "could break the causal chain").

That the Agera exposure was, moreover, a pre-existing risk Defendant took on through the ULICO reinsurance structure only underscores the point. Defendant's own filing records that he "bargained for and received from ULICO [a] 100% Preferred Debt allowance because it was clear . . . that the Agera Energy asset was a material risk to the Reinsurance Trust Account" at the time the parties' agreements were signed in 2017. Doc. 136-3 ¶ 42 (reproduced at Doc. 275 at 16). ULICO invokes that same statement to contend that Defendant "actively pursued" Agera (Doc. 275 at 14–15) — but whether Defendant acquired the exposure or inherited it, ULICO's argument at most raises a disputed question of fact; it does not establish that the offense of conviction proximately caused a loss that materialized years later on others' intervening decisions. United States v. Blake, 81 F.3d 498, 506 (4th Cir. 1996).

At the very least, whether the Agera loss was proximately caused by the offense of conviction — or by a pre-existing exposure and intervening third-party events — is a contested question of fact for this Court to resolve de novo, on the evidentiary record, 18 U.S.C. § 3664(d)(6), not imported wholesale from the civil testimony ULICO obtained in Universal Life Insurance Co. v. Lindberg, No. 20-cv- 681 (M.D.N.C.). That is one more reason the Court should permit the Rule 17(c) production Defendant has requested. Doc. 248.

## IV. ULICO Provides No Basis to Deny the Preferred-Dividend Credit; Its Own Complaint That It Lacks the Documents Confirms Why Production Is Required.

ULICO asks the Court to reject the Special Master's proposed $3 million reduction to PBLA/ULICO — a reduction that partially credits Defendant's documented preferred dividends paid to PBLA (Doc. 132 at 16–19) — "unless and until Lindberg provides . . . detailed information with respect to the date and amount of each payment, the payor and recipient . . . , and documents sufficient to identify the specific reason for the transfer." Doc. 275 at 13. Defendant is entitled to a credit for value actually returned. 18 U.S.C. §§ 3663A(b)(1)(B)(ii), 3664(j)(2).

ULICO's objection is self-defeating. It complains that it "has not been given an opportunity to examine the documents in the possession of the Special Master and PBLA related to the preferred dividends at issue." Doc. 275 at 13. Those documents are precisely what Defendant's Rule 17(c) subpoenas would produce — records that left Defendant's hands

when he transferred control of these assets to the Rehabilitator and later to the Special Master, and to which he has no access. Doc.

248; Lindberg Decl. ¶ 6 (Defendant has had no access to AAPC's financial records since control transferred, and his motions for access remain pending and opposed; see Docs. 202, 248). The remedy for a documentary dispute is production and a hearing, not denial of a credit the statute makes mandatory.

V. ULICO's Characterizations Are Irrelevant to the Accounting, and

"Zero" Is the Product of the Statute, Not Rhetoric.

ULICO's characterizations of Defendant's personal spending and litigation conduct (Doc. 275 at 4–5) have no bearing on the questions the Court must decide: the affiliated-loan balances that measure each victim's loss, less the mandatory offsets and credits for value returned, proved by the Government by a preponderance of the evidence. 18 U.S.C. §§ 3664(e), 3663A(b)(1)(B)(ii); Hughey, 495 U.S. at 413.

ULICO's demand that the Court "reject Lindberg's position that his restitution obligations should be zero" (Doc. 275 at 3) mistakes a legal conclusion for hyperbole. Zero is the arithmetic result of applying the mandatory credits — including the AAPC preferred equity ULICO holds — together with the proximate-cause limitation on disputed items such as Agera, against the affiliated-loan balances the Special Master sets out. Docs. 172, 234; Lindberg Decl. ¶ 5. A defendant who has returned value meeting or exceeding the balances that measure the loss owes no more. Ritchie, 858 F.3d at 216.

CONCLUSION

For the foregoing reasons, ULICO's request that Defendant's objections be denied should itself be denied. Defendant's objections to the Second Supplemental

Recommendation (Docs. 280, 281) should be sustained; the AAPC preferred-equity credit and the documented offsets should be applied as of the dates the property was returned; the Agera loss should be excluded or, at a minimum, set for determination at the evidentiary hearing; and no final order of restitution should enter until the Court has resolved the disputed issues de novo, on a complete record, under 18 U.S.C.

§§ 3664(d)(6) and (e).

Dated: August 13, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Admitted Pro Hac Vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 13, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 302 — Reply Supporting the Vista Recoup Motion (filed 08/13/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

GREG E. LINDBERG,

Judge Max O. Cogburn,Jr.

Defendant.

DEFENDANT GREG E. LINDBERG'S REPLY IN SUPPORT OF HIS

MOTION TO RECOUP THE DISTRIBUTION TO VISTA

Defendant Greg E. Lindberg respectfully submits this Reply in support of his Motion to Recoup the Distribution to Vista (Doc. No. 238) and in response to the Opposition filed by the Rehabilitator of Vista Life & Casualty Reinsurance Company's Protected Cell 1.16 ("Cell 1.16") (Doc. No. 274).

II. INTRODUCTION

Cell 1.16's Opposition does not dispute the fact that drives this Motion. The Special Master/Receiver, whom this Court appointed under 18 U.S.C. § 3664(d)(6), has concluded that Vista is not a victim. In his Second Supplement, the Special Master/Receiver states that he "does not recommend that the Court treat Vista as a Person Due Restitution in this Case," explaining that the Defendant "does not appear to have misrepresented the true nature of the Affiliated Investments to Vista" as he did to the actual victims. Doc. No. 245, at 33–34. Cell 1.16 does not squarely contest that conclusion. It argues principally that Vista's victim status is irrelevant to the distribution, and defends Vista's reliance on the ratings only in the alternative—on a theory its own concessions defeat. See infra Parts II, IV. Its

position reduces to this: that it may keep $23,520,710 in proceeds from the sale of a Primary Restitution Asset even though it is not a victim, because (i) the Defendant consented to the distribution and (ii) the distribution was "not restitution." Neither answer defeats recoupment.

The relief bears restating. The Defendant does not ask the Court to "credit" the Vista payment against his restitution obligation. He asks the Court to do the opposite—to recoup those estate proceeds from a conceded non-victim and apply them to the actual victims, where they will properly reduce the amounts owed. That request lies squarely within the Court's continuing authority over its own restitution process. 18 U.S.C. § 3664(o); Doc. No. 161.[FN1]

III. ARGUMENT

A. I. The Special Master/Receiver's Conclusion That Vista Is Not a

Victim Is Uncontested, and a Non-Victim's Retention of Estate Proceeds Is a Recoupable Windfall.

The Special Master/Receiver has determined that Vista is not a Person Due Restitution. Doc. No. 245, at 33–34. He has taken that position consistently: he recommended that "the Court not award restitution to Cell 1.16," Doc. No. 206, at 2, explaining that Cell 1.16's principals "were well apprised of the defendant's affiliated loan investing strategy, such that there was nothing for the defendant to hide," id. ¶ 3, and his fuller victim analysis appears in his initial Report, see Doc. No. 106-3, at 22–24. Cell 1.16 does not squarely defend Vista's victim status against that finding. Its principal submission is that victim status is irrelevant to the distribution. Doc. No. 274, at 5–9. It defends Vista's reliance on the ratings only in

the alternative, Doc. No. 274 § II.B, and that alternative fails for the reasons set out in Part IV. On the dispositive question, then, that conclusion stands unrebutted:

Vista is not a victim.

The Clanwilliam proceeds are proceeds of a Primary Restitution Asset—the Order so finds, Doc. No. 68 ¶ 2 ("Clanwilliam is among the 'Primary Restitution Assets'")–that the Special Master/Receiver marshaled for the benefit of victims. Diverting $23,520,710 of those proceeds to a party the Special Master/Receiver has now concluded is not a victim confers a windfall on a non-victim at the expense of the actual victims. Restitution law does not tolerate that result. Restitution is measured by, and limited to, a victim's actual loss, United States v. Steele, 897 F.3d 606, 611 (4th Cir. 2018); Hughey v. United States, 495 U.S. 411, 413 (1990), and a non-victim has no loss to compensate. The Court's continuing authority over restitution permits it to correct the distribution and direct the funds to those actually entitled. 18 U.S.C. § 3664(o); Doc. No. 161.

B. II. Consent to an Interim Compromise Did Not Waive the

Victim Determination; the Consent Order Expressly Reserved It.

Cell 1.16's lead argument is that the Defendant consented to the distribution and cannot now challenge it. Doc. No. 274, at 5–8. But the Consent Motion and the Order expressly reserved the victim question rather than resolving it. The Order directs that "[a]ll amounts distributed under this Order to the North Carolina Insurance Companies, the Bermuda Insurance Companies, and Vista (to the extent Vista is determined to be a victim entitled to restitution) shall be credited toward

Defendant's ultimate restitution obligations as determined by a future order of restitution entered by this Court." Doc. No. 68 ¶ E; accord Doc. No. 66 ¶ 21. The Special Master/Receiver made the same reservation in the motion itself, acknowledging that he was "unsure whether [he] will recommend that the Court treat Vista as a victim in this proceeding" and describing Vista's "potentially 'out of order' distribution." Doc. No. 66 ¶ 26 n.8. An interim distribution made to consummate a sale, on the express understanding that victim status remained open, is not an adjudication that Vista is a victim entitled to retain the funds.

Cell 1.16's own authority confirms the point. Under Consumer Fin. Prot. Bureau v. Klopp, the scope of a consent order is discerned "within its four corners." 957 F.3d 454, 463 (4th Cir. 2020) (quoting United States v. Armour & Co., 402 U.S. 673, 682 (1971)). Here, the four corners of the Order contain the reservation. And Klopp holds that the four-corners rule "does not make improper the use of certain aids to construction," including "[t]he circumstances surrounding the formation of the consent order." Id. at 463 n.4. Those circumstances—an admittedly "out of order" distribution made to secure Vista's

"cooperation" so that the sale could close, Doc. No. 66 ¶ 26 n.8—confirm that the payment resolved nothing about whether Vista is a victim.

Consent to a mechanism designed to move value to victims is not consent to a non-victim's permanent retention of estate proceeds once the reserved condition fails. The Defendant's consent to the Clanwilliam transaction was itself qualified: he agreed to the sale "although reserving his right to argue that, for restitution

purposes, [the Clanwilliam Group's] value was greater than the purchase price of the sale transaction." Doc. No. 245, at 3. And in opposing Cell 1.16's claim, the Defendant expressly reserved the still-open restitution determination–including "causation, offsets, and credits"—which, he noted, "will further change the restitution determination." Doc. No. 227, at 4 n.1. A defendant who consents to an interim distribution while reserving these very questions has not waived them; and in any event, the Court's statutory authority over restitution is not waived by a defendant's consent to an interim distribution. 18 U.S.C. § 3664(o). Nor does the Defendant's prior reliance on the Clanwilliam compromise estop this Motion: his consistent position has been that estate value should reach victims, and recouping funds paid to a non-victim so that they reach the actual victims advances that very position.

Consent cannot supply authority the restitution statutes withhold. Because "a court's power to order restitution is statutory in origin," "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory source." United States v. Broughton-Jones, 71 F.3d 1143, 1149 (4th Cir. 1995). A restitution order that exceeds its statutory authority "is no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum," United States v. Davis, 714 F.3d 809, 812 (4th Cir. 2013) (quoting Broughton-Jones, 71 F.3d at 1147), and such an illegal order falls "outside the scope of a defendant's otherwise valid appeal waiver," Broughton-Jones, 71 F.3d at 1147. Restitution reaches only victims of the offense of conviction. Hughey, 495 U.S. at

413. The narrow exception recognized in Broughton-Jones is a formal restitution term embodied in a plea agreement, see id. at 1149; the Defendant's informal consent to an interim distribution order is not that. It follows that, to the extent the $23,520,710 is defended as restitution credited toward the Defendant's obligations, see Doc. No. 68 ¶ E, the Special Master/Receiver's determination that Vista is not a victim renders that award unauthorized—and the Defendant's consent to the distribution can neither authorize it nor shield it from the Court's correction.

C. III. Equitable Mootness Is a Bankruptcy-Appeal Doctrine With

No Application Here.

Cell 1.16 argues that recoupment is barred by "equitable mootness." Doc. No. 274, at 12. That doctrine is confined to appellate review of consummated bankruptcy reorganization plans. As the Fourth Circuit has explained, it is "[a]pplied principally in bankruptcy proceedings because of the equitable nature of bankruptcy judgments," and is invoked when it becomes impractical "to upset the plan of reorganization." Mac Panel Co. v. Va. Panel Corp., 283 F.3d 622, 625 (4th Cir. 2002). Every authority Cell 1.16 cites is a bankruptcy appeal. See In re Castaic Partners II, LLC, 823 F.3d 966 (9th Cir. 2016). None applies the doctrine to limit a district court's continuing statutory authority over criminal restitution, and Cell 1.16 identifies no case doing so.

The doctrine's own premise—that relief has become impractical—fails on Cell 1.16's own facts. It concedes that $20 million remains identifiable in a USAP reserve account. Doc. No. 274, at 12. Recoupment may be ordered as an obligation of Vista, and credited to the actual victims' restitution, without any need to trace or

"unscramble" particular dollars. The eggs are not scrambled; the funds are known and located.

United States Dep't of Treasury v. Fabe is inapposite. It addresses whether a state insurer-priority statute is reverse-preempted under the McCarran-Ferguson Act—a question of how an insolvent insurer's estate is ranked among competing claimants. 508 U.S. 491 (1993). It says nothing about whether a federal court may recoup the proceeds of a federal restitution asset that were paid to a non-victim. The Vermont priority statute Cell 1.16 invokes, 8 Vt. Stat. Ann. § 7081, governs the internal distribution of an insolvent insurer's estate; it does not immunize restitution-asset proceeds from this Court's authority under Section 3664.

D. IV. Cell 1.16's Opposition Concedes the Double Recovery and

the Overstatement.

Cell 1.16 contends that any challenge to the amount of its claim is "premature." Doc. No. 274, at 13. But its Opposition concedes the very defects the Motion identifies. Cell 1.16 states that it "seeks restitution on the same basis as the North Carolina Insurers based on the same loans." Id. That is the double recovery restitution forbids: the same loans cannot be awarded twice. Steele, 897 F.3d at 611. The prematurity Cell 1.16 describes, moreover, exists only because the Special Master/Receiver already treats it as a non-victim, Doc. No. 245, at 33–34—a reason to deny the claim, not to defer it.

Finally, Cell 1.16's alternative reliance theory collapses on its own concessions. Cell 1.16 admits that it relied on the ratings in its financial statements through December 31, 2018. Doc. No. 274, at 9. The 2017–2018 correspondence

therefore falls within the very period of claimed reliance, and it shows that Cell 1.16's own principal knew, contemporaneously, both the affiliated character of the investments and their sub-investment-grade impairment. Cell 1.16 has also conceded that its principal was no passive recipient of ratings but actively worked to procure them: in its Reply, it acknowledged that its principal sought "to obtain ratings for loans then in the USAP trust – so that USAP could take reserve credit," and that he wrote it was "imperative to obtain ratings." Doc. No. 233, at 3. A principal for whom obtaining favorable ratings was "imperative" to his affiliate's regulatory capital did not innocently rely on those ratings as a neutral measure of value; he procured them.

IV. CONCLUSION

For these reasons and those stated in the Motion, the Court should recoup the amount distributed to Vista, direct that it be applied to the restitution owed to the actual victims, deny Cell 1.16's request to be treated as a restitution victim, reject its $131,207,799 1 claim as overstated and duplicative, and set the matter for an evidentiary hearing.

[Signature page follows.]

1The Order directed a distribution of $23,520,710 to Vista. Doc. No. 66 ¶ 20(d)(iii). Cell 1.16 represents that the amount actually received was $22,859,993.97. Doc. No. 274, at 12. The Defendant seeks recoupment of the amount the Court finds was in fact distributed.

Dated: August 13, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Admitted Pro Hac Vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 13, 2026

Respectfully submitted, /s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 303 — Notice of Errata re Doc. 290 (filed 08/13/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Case No. 5:19-CR-22-MOC Plaintiff,

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S NOTICE OF ERRATA TO HIS MOTION TO STRIKE

THE GOVERNMENT'S OMNIBUS RESPONSE (DOC. 290)

Defendant Greg E. Lindberg respectfully submits this notice of errata to correct a single quotation in his Motion to Strike the Government's Omnibus Response in Opposition (Doc. 290). The correction is to the quotation of Paragraph 8(a) of the Plea Agreement (Doc. 40) that appears in Paragraph 9, on page 6, of Doc. 290. It does not alter the substance of the Motion or any argument in it.

As filed, the sentence reads:

The plea agreement confirms the point expressly: it provides that restitution "may be different from, greater, or lesser than" the loss found under U.S.S.G. § 2B1.1. Plea Agreement ¶ 8(a) (Doc. 40).

Corrected to conform to the Plea Agreement, the sentence should read:

The plea agreement confirms the point expressly: it provides that "loss" under U.S.S.G. § 2B1.1 "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Plea Agreement ¶ 8(a) (Doc. 40).

The point for which the sentence was offered is unchanged. Paragraph 8(a) confirms that the Guidelines loss figure and restitution are distinct and may differ, so that Mr. Lindberg's agreement in Paragraph 10(a) to pay "full restitution, regardless of the resulting loss amount" fixes no amount and does not displace the requirement that any loss be caused by the conduct of conviction. Defendant respectfully requests that the Court and the parties treat Paragraph 9 of Doc. 290 as so corrected.

Dated: August 13, 2026 Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 (202) 860-4084 vramachandran@dhammalaw.com Admitted Pro Hac Vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 13, 2026

Respectfully submitted, /s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 309 — Motion for Reconsideration of the Order Denying Subpoenas (filed 08/18/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER

DENYING HIS MOTION FOR ISSUANCE OF SUBPOENAS (DOC. 304)

Defendant Greg E. Lindberg respectfully moves for reconsideration of the Court's August 14, 2026 Order (Doc. 304) denying his Motion for Issuance of Subpoenas Duces Tecum under Federal Rule of Criminal Procedure 17(c) (Doc. 248). Mr. Lindberg has already been sentenced; the custodial portion of his sentence has been imposed, and the only matter remaining is the determination of restitution, which is itself part of the criminal sentence. See Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026) (restitution under the MVRA is criminal punishment). The subpoenas are therefore sought in the sentencing phase of this criminal case, where Rule 17(c) is available and the Nixon factors apply with less rigor than at trial. Reconsideration is warranted because, three days after the Order, the very premises on which it rested were overtaken by events: in conferral on August 17, 2026, the Special Master conceded that the underlying valuation documents exist and could be produced, but refused to place them on the Court's record — offering only private production under a confidentiality agreement — even though he had offered to place that same material on the record under seal in his April 3, 2026 Report and Recommendations Regarding Restitution (Doc. 106 at 29), and the defendant has asked for it repeatedly. The defendant pressed for the data through conferral precisely to avoid filing this motion — proposing that it simply be placed on the docket under the protective order already in place — and files now only because the Special Master refused to do so. The Government, for its part, does not object to the defense obtaining that data from the Special Master, but opposes the issuance of the subpoenas to the recipients other than the Special Master. The Order denied the subpoenas as overbroad, duplicative of what the defense already has, unnecessary, untimely, and available by other means. Each of those rationales is now either answered by the parties' own positions or is incorrect as to the narrow, dispositive category the defense actually needs — the methodology and data underlying the Special Master's valuation of the Primary Restitution Assets and the Specified Affiliated Companies — the valuation detail the Special Master offered to provide the Court in camera (Doc. 106 at 29), the method by which he calculated each offset, and the companies' financial reports, board reports, letters of intent, and offers to purchase — on which a $1.655 billion restitution and the forfeiture keyed to it depend. For the reasons below, the Court should reconsider and either issue narrowed subpoenas or order the Special Master to place that methodology and data on the record under the protective order already governing this case.

ARGUMENT

I. Reconsideration is warranted because the Court ruled on the

subpoena motion after the defendant asked that it be held pending issue - by-issue resolution of the pending motions.

Reconsideration is warranted at the outset because the Order resolved the subpoena motion out of the sequence the defendant had requested. At the August 10, 2026 hearing on the pending restitution matters, the defendant asked the Court not to rule on the Motion for Issuance of Subpoenas (Doc. 248) at that time, but to hold it pending the Court's resolution, on an issue-by-issue basis, of the several dispositive and evidentiary motions then pending. The subpoena motion is not freestanding: it is the discovery mechanism that supplies the record for the causation, loss, offset, and accounting disputes raised in the defendant's pending motions (Docs. 234, 278, 280), and both the need for and the proper scope of the subpoenaed valuation material turn on how those issues are decided. Entering a denial (Doc. 304) before those motions were addressed — and contrary to the defendant's request to defer — warrants reconsideration so that the subpoena question is decided in its proper sequence, on a complete understanding of what each pending issue requires, and so that the record on those issues is complete for review in the Fourth Circuit. A district court has the recognized authority to reconsider and promptly correct its own rulings in a criminal case. United States v. Dieter, 429 U.S. 6, 8 (1976) (per curiam) (recognizing "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors").

II. Reconsideration is warranted by a material change in circumstances

since the Order.

A district court has the recognized authority to reconsider and correct its own rulings in a criminal case. See United States v. Dieter, 429 U.S. 6, 8 (1976) (per curiam) (recognizing "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors"). Reconsideration is appropriate to account for a material change in circumstances or evidence not previously before the Court, and to prevent manifest injustice. Both are present. The Order (Doc. 304) rested on the reasons in the Government's opposition (Doc. 261) — that the subpoenas were overbroad, that the defense already possessed much of the information, that the material was not necessary, was untimely, and was "likely available by other means." On August 17, 2026 — after the Order — the Special Master's counsel confirmed that the underlying valuation documents exist and could be produced, but refused to place them on the Court's docket, offering only private production "under a confidentiality agreement" limiting their use. Meet-and-Confer Correspondence (Aug. 17, 2026) (attached as Exhibit 1). The defendant has repeatedly asked that this material be placed on the record under the Court's own sealing procedures — as the Special Master himself offered to do in his April 3, 2026 Report and Recommendations (Doc. 106 at 29) — and has been refused. Id. The Government, meanwhile, represented that it has "no objection to [the defense] getting relevant data from the Special Master." Id. Those developments confirm that the data exists, that it can be produced under the protective order already in place, and that the only remaining dispute is

whether it will enter the record — and they undercut the "available by other means," "overbroad," and "already possess" premises of the Order.

III. The premise that the defense "already possess[es]" the information is

incorrect as to the valuation methodology and data.

Whatever categories of communications and filings the defense may already hold, it does not possess the one category that matters: the methodology and underlying data by which the Special Master valued the Primary Restitution Assets and Specified Affiliated

Companies. The Special Master has withheld those particulars — reporting only a single lumped "range" — and the defense has repeatedly and unsuccessfully sought them, including through prior counsel. See Ex. 1 ("Katten has asked for this in the past. We do not have this information."). The Special Master's own counsel confirmed both that the data exists and that it has not been produced, offering to produce it only under a confidentiality agreement. Id. A denial premised on the defense's supposed possession of this material cannot stand where the record now shows the material is held by the Special Master and was never produced.

IV. The valuation methodology and data are necessary, because the

Government must prove loss and the figure triggers forfeiture.

The Order concluded that the material is "not necessary to the Court's determination." But the Government bears the burden of proving "the amount of the loss sustained by a victim as a result of the offense," 18 U.S.C. § 3664(e), and the Court must determine restitution in "the full amount of each victim's losses," id. § 3664(f)(1)(A), on "a complete accounting," id. § 3664(a). Those commands require the

valuation and its supporting data to be in the record: a loss the Court must determine itself, de novo, id. § 3664(d)(6), on a complete accounting, id. § 3664(a), and by a preponderance of the evidence, id. § 3664(e), cannot be fixed on a valuation that the Court — and the defendant — are not permitted to see. For a property offense the value of the property is the measure, § 3663A(b)(1)(B), and it is the Government's to prove and establish on the record; where the Government puts no record proof of that value before the court, the order must be vacated. United States v. Steele, 897 F.3d 606, 613–15 (4th Cir. 2018) (vacating a property-loss restitution order because "the record contains no proof of the victim's actual loss"). The Special Master's valuation of the companies is the measure of the assets available to satisfy restitution and the basis for the credits and offsets the defendant is owed; it cannot be both the foundation of the recommended award and "not necessary" to test it. The necessity is heightened here because the restitution figure triggers a forfeiture to the extent the value of the companies falls short of the amount ordered, so an award built on an undisclosed valuation inflicts immediate and irreparable harm on the defendant — the forfeiture of property keyed to any shortfall between the companies' value and the amount ordered — and the requested data is necessary to prevent that irreparable harm. A defendant cannot adversarially test — and the Court cannot reliably determine — a billion-dollar loss figure whose basis is concealed. Due process requires a meaningful opportunity to be heard on the amount of the punishment, which is empty if the underlying data is withheld. The Government may urge that due process at a restitution hearing requires only an adequate opportunity to be

heard, not live testimony or cross-examination. See United States v. Gushlak, 728 F.3d 184, 195 (2d Cir. 2013); United States v. Castillo, 93 F. App'x 273 (2d Cir. 2004).

But those decisions turned on defendants who had access to the materials underlying the loss figure and could rebut them on the merits; here the Special Master's methodology and data have never been placed on the record at all, so there is no opportunity — adequate or otherwise — to rebut what cannot be seen. A criminal defendant cannot be sentenced — and cannot be made to forfeit property — on the basis of evidence he is forbidden to see, or without any ability to examine the data on which his sentence and the resulting forfeiture rest. Neither the open administration of justice nor the Due Process Clause permits a sentence, or the forfeiture keyed to it, to rest on secret data withheld from the defendant and kept out of the record the reviewing court must examine. The defendant has, moreover,

pursued every other means to obtain this information short of compulsion — requesting it directly, through prior counsel, and during the term-sheet negotiations with the Special Master, see Doc. 278 — and even the limited categories to which he has narrowed his request, sought only to preserve his opportunity to be heard and to perfect the record for appeal, have been refused.

V. The material is not "available by other means"; the Special Master

alone holds it, and he has now agreed to produce it under a protective order.

The Order's alternative rationale — that the material is "likely available by other means" — is incorrect and, in any event, overtaken. The institutional holders of the books, records, and valuations (the NCICs and NHC) disputed the Special Master's authority to compel the information and declined to furnish it, and the

defense's own efforts and those of Paladin were unavailing. There is no "other means": compulsory process is the only route. The conferral confirms as much — the Special Master conceded the documents exist and could be produced, but refused to place them on the record, offering only private production under a confidentiality agreement. Ex. 1. The parties' positions have narrowed the dispute to a single, easily resolved point. The Government does not oppose placing the requested records on the docket subject to a protective order. It represented that it has "no objection to [the defense] getting relevant data from the Special Master" and that "a protective order, not just filing it under seal, is appropriate here at least with respect to the most sensitive types of business data." Ex. 1.

The Government thus contemplates docketing the records with a protective order layered over the most sensitive business data — precisely the relief the defendant seeks. The defendant, in turn, agreed to proceed on a protective-order basis — stating that he would not contest confidential treatment of genuinely sensitive business information — and offered to use the Government's own standing protective order, the order that already governs all of the Government's discovery in this criminal case, so that no new agreement is needed. Ex. 1. With the Government's consent and an existing protective order available, there is no basis to keep the data off the record: on-the-record production under that order protects any genuinely sensitive business information while giving the defendant the opportunity to review and adversarially test the valuation, and preserving a complete record for review in the Fourth Circuit. The sole remaining obstacle is the Special Master's insistence on

producing the data only under a private confidentiality agreement — instead of under the Court's existing protective order and on the docket — which would keep the data off the record entirely, a condition the MVRA does not permit. Private production on terms that keep the data off the docket does not satisfy the MVRA, which requires the loss to be "determined by the court" on "a complete accounting," 18 U.S.C. § 3664(f)(1)(A), (a), and, in this criminal proceeding, keeping the records off the docket forecloses any review by the Fourth Circuit, depriving the defendant of the complete record he needs to preserve and litigate his objections on appeal.

The defendant has asked repeatedly that the material be placed on the record under the Court's own sealing procedures — as the Special Master himself proposed in his Report and Recommendations Regarding Restitution (Doc. 106 at 29), in which he represented that, "[u]pon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an in camera setting" — and has been refused. Id. The Special Master's present refusal to place the same valuation on the record

cannot be reconciled with his own prior representation that it could be submitted to the Court in camera. Where the sole holder of the data will neither let it enter the record nor identify any other source, the defendant's remedy is compulsory process, or an order directing on-the-record production under the existing protective order — not a denial premised on phantom alternatives.

VI. Any overbreadth is readily cured, and the defense proposes a

narrowed request.

To the extent the Court found the six subpoenas overbroad, Defendant does not press the full breadth of Doc. 248 on reconsideration. The dispositive need is narrow and specific, and tracks the categories the defendant identified in conferral: (1) the methodology of valuation of the Primary Restitution Assets and the Specified Affiliated Companies, together with any updated valuation methodology and the underlying valuation data — including the additional detail concerning his low/mid/high estimates that he represented, in his Report and Recommendations Regarding Restitution, he could provide "under seal or in an in camera setting," Doc. 106 at 29, and the updated figures filed in July 2026; (2) the method of calculation of the offsets and credits the Special Master applied or disallowed; and (3) for all Primary Restitution Assets and Specified Affiliated Companies, and covering the last four years, all financial reports, board reports, letters of intent, and offers to purchase received. Ex. 1.

These materials are necessary to evaluate the value of the companies. These are going concerns generating millions of dollars in annual revenue — not bankrupt entities whose worth is measured by their outstanding debt. Unlike a bankruptcy liquidation, where debt may stand in for value, the enterprise value of an operating, revenue-generating business can be assessed only from its financial reports, board reports, letters of intent, and offers to purchase; those records fix the enterprise value of these companies rather than the debt-based liquidation figure the Special Master's valuation reflects. That the defendant is prepared to accept this narrowed category

does not abandon the remainder of Doc. 248: the Government's Consolidated Position (Doc. 308) once again disallows the defendant's credits and offsets across the board, and the financial data underlying each disallowed offset is necessary to prove the very offsets the Government continues to deny. To the extent those offsets remain contested, the balance of the subpoenas is required, and the defendant presses them. Each disallowed offset turns on records the defendant does not hold — records in the hands of the third-party custodians to whom control of the companies passed — and the subpoenas are the only means to obtain them. The following, drawn from Defendant's Reply (Doc. 300), identifies representative disallowed offsets, the amount at issue, and the custodian of the records required to establish each: Offset / credit (Doc. Amount How the amount is Records required and 245) calculated their custodian No. 3 — AAPC/ULICO $352,906,2 Par value of the AAPC Transfer and valuation preferred-equity credit 40 preferred equity records, and any recovery transferred to ULICO in on the preferred equity — partial satisfaction of the ULICO / NHC / Special civil judgment. Master. No. 4 — SNIC $27,823,42 Aggregate of the payments Payment and accounting payments 5 made by or for SNIC. records — the North Carolina Insurance Companies / Special Deputy Rehabilitator (Dinius). No. 6 — CBL $3,000,000 The subordination fee CBL Beckett sale and fee subordination fee paid in connection with the records — NHC / Special (Beckett) Beckett transaction. Master / Paladin. No. 7 — CWG income- $20,000,00 The income-tax escrow Escrow and closing tax escrow 0 funded at the CWG records — the North (Clanwilliam) closing. Carolina Insurance

Companies / Rehabilitator. No. 8 — ULICO real- $13,596,01 The value of the ULICO Transfer and valuation estate transfer 3 real estate transferred. records — ULICO / NHC. No. 9 — Bermuda $9,800,076 Net proceeds of the Sale and proceeds records asset sales Bermuda insurers' asset — the Bermuda insurers sales. / Rehabilitator.

No. 10 — Zero-coupon $243,000,0 Proceeds received on the Bond-sale and proceeds bond sale proceeds 00 pre-maturity sale of the records — the (PPNs) zero-coupon principal-Rehabilitator / NHC. protection notes.

These offsets are exemplary, not exhaustive; the records required to document each are held by the third-party custodians identified above and are sought by the subpoenas duces tecum in Doc. 248 — directed to Michael Dinius and the Rehabilitator as custodian of the North Carolina Insurance Companies' records (Exs. A, D), the Special Master and NHC Holdings, LLC (Ex. B), Paladin Management Group (Ex. C), and the Bermuda joint provisional liquidators (Ex. E). Because the Government's Consolidated Position again disallows each of them, the subpoenas that would establish them remain necessary, and the defendant cannot be faulted for failing to document offsets he was prevented from obtaining. That even this narrowed, plainly relevant category has been refused confirms that the dispute was never about the breadth of the original subpoenas: a request this confined cannot be resisted as overbroad.

Simply put, if even the narrow requests the defendant made to preserve his appeal have been denied, the broader production he actually needs has obviously been denied as well. The refusal instead reveals the object of the resistance — to keep the valuation methodology and data off the docket and beyond the reach of the Fourth Circuit's review, and to secure a final restitution order, and the forfeiture keyed to it, on the same incomplete record on which the custodial sentence was already imposed. Reconsideration is warranted to prevent that result. That request satisfies the specificity and relevancy requirements of United States v. Nixon, 418 U.S. 683, 699– 700 (1974), which in this post-conviction, sentencing posture are applied with less

rigor than at trial, because the documents go directly to the amount of loss the Court must find. See United States v. Winner, 641 F.2d 825, 833 (10th Cir. 1981) (Rule 17(c) reaches "post-trial motions and sentencing"). The Court may also grant the same relief in a form that raises no overbreadth or third-party concern at all: by ordering the Special Master to place his valuation methodology and supporting data on the record, under the existing protective order and under seal if necessary. That relief rests on the Court's inherent supervisory authority over its own appointee and on Federal Rule of Civil Procedure 53, and so does not depend on Rule 17(c) at all — avoiding any question whether production is "returnable before trial," because the Special Master serves at the Court's direction and may be ordered to produce his work product directly.

VII. The statutory deadline is not a basis to deny the material or to enter

an inaccurate restitution order.

Finally, the Order noted that the subpoenas were "untimely and likely to delay the current proceedings beyond the statutory deadline." The ninety-day period of 18 U.S.C. § 3664(d)(5) is directory, not jurisdictional; a court that passes it retains authority to order restitution — and here the Court has already entered a Preliminary Order of Restitution (Doc. 161), making clear that it will order restitution and leaving open only the amount — because the deadline protects victims from delay and does not license a rushed or inaccurate award or the denial of a defendant's right to be heard. Dolan v. United States, 560 U.S. 605 (2010)

(missing the deadline does not deprive the court of the power to order restitution, at least where the court made clear before the deadline that it would order restitution and left open only the amount); see United States v. Vandeberg, 201 F.3d 805 (6th Cir. 2000). Where the loss cannot be accurately determined on the present record, the statute's remedy is to develop the record — or, if the issues are too complex, to decline restitution — not to enter an award on undisclosed data to meet a directory date. 18 U.S.C. § 3663A(c)(3)(B). Producing the narrow valuation data the defense seeks, on the expedited basis the parties discussed and under the existing protective order, serves accuracy and need not delay the proceedings. In no event does a directory deadline justify either denying the defendant the material he needs or entering a restitution order — and the forfeiture keyed to it — that the record cannot support.

VIII. The Government lacks standing to oppose subpoenas directed to third parties, and its opposition cannot support the denial.

Reconsideration is warranted for the further reason that the Order rested in part on an opposition the Government had no standing to make. The subpoenas are directed to third parties — the Special Master and the entities that hold the companies' books, records, and valuations — not to the Government. In conferral, the Government confirmed that it does not object to production from the Special Master but is opposed to the subpoenas directed to the other recipients; yet it asserts no privilege in, and no proprietary or other cognizable interest in, those third parties' records, and so lacks standing to oppose them. Ex. 1. The Fourth Circuit follows the settled rule that "[o]rdinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the documents sought." In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009) (quoting 9A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 2459 (3d ed. 1998)); accord Brown v. Braddick, 595 F.2d 961, 967 (5th Cir. 1979). The rule applies in the criminal Rule 17(c) context and to the Government as a party-opponent: "[i]n many instances, the opposing party in a criminal case will lack standing to challenge a subpoena issued to a third party because of the absence of a claim of privilege, or the absence of a proprietary interest in the subpoenaed material or of some other interest in the subpoenaed documents." United States v. Beckford, 964 F. Supp. 1010, 1023 (E.D. Va. 1997); see United States v. Nachamie, 91 F. Supp. 2d 552, 558–59 (S.D.N.Y. 2000) (Government lacked standing to quash Rule 17(c) subpoenas served on non-parties absent a legitimate independent interest); see also United States v. Gordon, 247 F.R.D. 509, 510 (E.D.N.C. 2007) (a party lacked standing to challenge subpoenas issued to nonparties absent a personal right to, or privilege in, the information sought). The Government asserts no privilege in, and no proprietary or other cognizable interest in, the companies' financial reports, board reports, valuation data, and offers — records belonging to the Special Master and the asset- holding entities — and the narrow exception for a genuine independent interest, such as protecting a vulnerable Government witness, has no application here. Its opposition (Doc. 261) was therefore not a proper basis on which to deny the subpoenas, and reconsideration is warranted so that the Rule 17(c) question is decided on the recipients' own responses and the Nixon factors, not on the objection of a party-opponent without standing to raise it.

CONCLUSION

The Court should grant reconsideration of Doc. 304 and (1) order the Special Master to place on the record — under the protective order already governing this case, and under seal if necessary — the valuation methodology and underlying data for the Primary Restitution Assets and the Specified Affiliated Companies (the supporting detail he offered to provide in camera, Doc. 106 at 29), the method by which he calculated each offset, and the underlying financial reports, board reports, letters of intent, and offers to purchase on which his recommended restitution and the associated forfeiture depend; or, in the alternative, (2) order issuance of subpoenas duces tecum for that narrowed category; and in either case afford the defendant a reasonable opportunity to review and respond to that material before any final order of restitution is entered. If the Court declines to order production of this material in any form, the alternative is not to enter restitution on an incomplete and inaccurate record but to decline to order restitution, as 18 U.S.C. § 3663A(c)(3)(B) permits where the complex factual issues of cause and amount cannot be fairly resolved on the record before the Court.

Dated: August 18, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com

/s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CONSULTATION STATEMENT

Pursuant to the Local Rules, counsel states that the relief requested has been raised with counsel for the United States and counsel for the Special Master, including in conferral on and before August 17, 2026. The Special Master opposes placing the requested valuation methodology and data for the Primary Restitution Assets and the Specified Affiliated Companies — including the valuation detail he offered to provide in camera or underseal, the method of calculating each offset, and the companies' financial reports, board reports, letters of intent, and offers to purchase — on the Court's record, and has offered only private production under a confidentiality agreement which is not practical for refrencing these documents in an appeal. The United States has advised that it does not object to the defendant obtaining relevant data from the Special Master under a protective order, but that it is opposed to the issuance of the subpoenas duces tecum to the recipients other than the Special Master.

/s/ Kenneth N. Barnes Kenneth N. Barnes

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 18, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 316 — Response to the Government's Consolidated Position (filed 08/23/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE IN OPPOSITION TO THE UNITED STATES'

CONSOLIDATED POSITION REGARDING RESTITUTION (DOC. 308)

INTRODUCTION

Defendant Greg E. Lindberg respectfully submits this Response in opposition to the United States' Consolidated Position Regarding Restitution Issues Remaining Before the Court (Doc. 308). The Government asks the Court to "conduct a de novo review" and then to enter a final order "substantially similar to that proposed by the Special Master." Doc. 308 at 1. Those two requests are in tension. A de novo determination requires the Court to find the facts itself, on the Government's own evidence, under the standard 18 U.S.C. § 3664(e) prescribes — not to adopt the recommendations of the officer who liquidated the estate and is paid from it. The Government offers no independent proof of loss or causation. It supplies a chart of conclusions, a plea-agreement waiver theory, an affidavit from the Special Master/Receiver's own controlled entity, and a request that the Court ratify a $1.655 billion figure it declines to defend on the merits. For the reasons below, the Court should decline to adopt the Report, set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc.

245-1), and resolve the disputed issues itself after the accounting and hearing the statute requires. This Response is supported by the accompanying Affidavit of Greg

E. Lindberg (Def. Ex. 1, Tab A).

The Government's demand fails at the threshold, for a reason that controls the rest: it has not proven — and its plea agreement does not excuse it from proving — that Mr. Lindberg's offense caused the losses it seeks to impose. The Government treats his agreement to pay restitution to persons "directly or indirectly harmed" as a waiver of causation itself. The Fourth Circuit has squarely rejected that use of this very language. In United States v. Squirrel, 588 F.3d 207 (4th Cir. 2009), the defendants' pleas promised "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct'" — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still — and the court held that those paragraphs "do not provide a valid basis" for restitution absent proximate cause, vacating the award. Id. at 216, 218. "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain, and it does not convert every diminution in a court-controlled estate — including the losses caused by the Government's, the Rehabilitator's, and the Special Master/Receiver's own intervening, post-indictment decisions — into the defendant's to bear. Because the Government has proved no causal link between the offense of conviction and those losses, and the plea supplies none, the $1.655 billion figure cannot stand.

ARGUMENT

I. Adoption of the Special Master/Receiver's Report is not the de novo determination § 3664(e) and § 3664(d)(6) require, and does not carry the Government's burden.

Section 3664(d)(6) permits a reference only for "proposed findings of fact and recommendations … subject to a de novo determination of the issue by the court." The de novo determination is the Court's to make, and § 3664(e) places the burden of proving "the amount of the loss sustained by a victim as a result of the offense" on "the attorney for the Government." The Government does not carry that burden by asking the Court to adopt the Special Master/Receiver's numbers. Adoption is not proof. Restitution is limited to the loss caused by the offense of conviction, Hughey v. United States, 495 U.S. 411 (1990), and a restitution order may not grant a victim a windfall, United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017). Where, as here, the Government offers the report of a conflicted officer in place of its own evidence, it has not met § 3664(e), and the Court cannot make the independent determination the statute commands on that record. A report produced by an officer who should be disqualified "may not be submitted to the district court or otherwise disseminated in any manner," In re Brooks, 383 F.3d 1036, 1046 (D.C. Cir. 2004); it certainly cannot be the substance of the Court's de novo determination. Nor do the Special Master/Receiver's own reports supply that determination: they treat causation and foreseeability as legal conclusions rather than proving them as facts, and describe the valuation as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, drawn from a "desktop exercise" that does "not constitute formal valuations or fairness opinions," id. at 36 n.31. On the loss side, the Report "presumed that the balances used in the IALA were accurate," id. at 9. A recommendation resting on presumed balances and an admitted "guess" is not the loss determination § 3664(e) requires the Court to make on the Government's proof.

The Government must still prove any restitution amount by a preponderance of the evidence, § 3664(e); it cannot simply assert one. Yet it has leapt to $1.655 billion on the Special Master/Receiver's numbers — figures resting on guesswork and conjecture, derived by a secret method that neither the Court, the defendant, nor the prosecution has been permitted to see — and on evidence of policyholder statements that was stale when presented — a showing Defendant has developed in his Motion for Reconsideration (Doc. 309). A demand resting on a computation the Court and counsel are not permitted to see is the opposite of the independent, record-based determination § 3664(e) requires.

Defendant's objection to restitution has been continuous and timely at every stage — before, during, and after the sentencing hearing. He objected to the Special Master/Receiver's loss figure when the first Report and Recommendations issued; he objected to the restitution determination at the sentencing hearing itself, where — when the Government asked the Court to enter the preliminary order of restitution — counsel preserved the objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court," Sentencing Tr. 66:18–22 (May 26, 2026); within fourteen days of the May 29, 2026 judgment he moved to stay the asset sales and filed his Consolidated Objections to the Preliminary Order of Restitution (Doc. 190); and after the Fourth Circuit's decision in In re Zetteler he filed a further motion for reconsideration under the MVRA. Counsel recounted that same sequence on the record at the August 10, 2026 hearing. Aug. 10, 2026

Hr'g Tr. 27. No part of the restitution determination has gone unchallenged, and Defendant has waived none of these objections.

The manner of the Government's participation is independently prejudicial. Having declined to answer the defendant's dispositive motions on the merits — representing that it "concurs with … the Special Master's filings" and "sees no reason to duplicate them," Doc. 279 at 2, and that it would be a waste of time for the Special Master/Receiver to address causation and the other disputed issues — the Government has nonetheless declined to file an independent response of its own, joining the Special Master/Receiver instead in a fourth successive response in this restitution phase — successive because, rather than state the Government's own independent position, it merely appends yet another affidavit to the Special Master/Receiver's position, this one from the Special Master/Receiver's own controlled entity, sworn by the acting CEO of the entity the Special Master/Receiver owns and controls. Doc. 308 (Ex. C). The Government thus refuses to carry its § 3664(e) burden or to engage the defense's arguments, and still does, while it and the conflicted officer together continue to enlarge the record against the defendant — who has meanwhile been denied the subpoenas and the underlying valuation data he needs to respond. A process in which the prosecutor and the fee-interested adjudicator file in tandem, supplement the record with new evidence at will, and decline to prove

their case, while the defendant is refused the means to test it, is patently prejudicial and cannot support entry of a final restitution order.

The Government's refusal to answer the defendant's motions issue by issue is not a matter of style; it is a failure to carry the burden the statute assigns it. Section 3664(e) places on the Government the burden of proving the amount of each victim's loss, and that burden is not met by a submission that declines to engage, on the merits and one issue at a time, the specific, evidence-backed challenges the defendant has raised. This cannot continue. The Government's posture here is, moreover, irreconcilable with the position it took in resisting the defendant's petition in the Court of Appeals, where it urged that appellate intervention was premature and that the restitution record should be developed in the district court; here, it refuses to develop or defend that record issue by issue. And the appellate proceedings resolved nothing on the merits: the Court of Appeals denied only the extraordinary, interlocutory relief the defendant sought — a stay and an expedited writ of mandamus — Doc. 308 at 9 n.9, and did not pass on any issue preserved here. To the extent the Government's bare notation of that denial is offered to suggest otherwise, a discretionary denial of a stay and of the extraordinary writ of mandamus is not a ruling on the merits. Advancing one position in one forum to defeat review and the opposite position in another to avoid its burden of proof is not permissible advocacy; Defendant submits that it crosses into prosecutorial misconduct, and it is one more reason the Government's non-responsive submission cannot support a final restitution order.

A response that selectively addresses only the issues the Government prefers — cherry-picking among the defendant's motions and the disputed restitution issues while leaving the rest unanswered — is no response at all. A party may not carry a burden of proof by choosing which of its opponent's arguments to engage; answering some issues and ignoring others is a non-response in substance, however it is styled. For the same reasons set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290) — the grounds of which Defendant places on the record here as applying, mutatis mutandis, to the Government's Consolidated Position — Doc. 308 is non-responsive and should be struck.

The Government's silence in the face of the defendant's dispositive motion confirms that failure of proof. The defendant's Motion for Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction (Doc. 234) placed squarely in issue whether the Government could carry its burden of proving that the claimed losses were caused by the offense of conviction, and it supported that challenge with documentary evidence; a response was due July 21, 2026. The Government never answered it on the merits. Because § 3664(e) assigns to the Government the burden of proving the amount of each victim's loss, that silence is not a neutral litigation choice — a burden is not carried by declining to engage the motion that contests it. The defendant's specific, evidence-backed challenges to loss and causation thus stand unrebutted, and no final order may rest on a loss figure the Government has refused to defend against the very motion that puts it in issue. This Court's Local Rules

reinforce the consequence. Under LCrR 47.1(d)(1), the Government "must file a response to any dispositive motion within fourteen (14) days of service of the motion," and under LCrR 47.1(d)(3), "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." The Government did not timely respond to Doc. 234, and to the extent it has not addressed each issue the defendant has raised, those issues may be treated as unopposed and the motion granted on that ground alone. The failure is not confined to that motion. The Government's single omnibus submission (Doc. 279) declined to answer, on the merits and issue by issue, any of the dispositive and substantive motions the defendant has filed since sentencing: his Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172); his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190); his Motion to Enforce the Plea Agreement, Preserve Counsel Access, and Require Conflict-Free Government Counsel (Docs. 201, 202); his Emergency Motion Directing the Bureau of Prisons to Permit Daily Access to Counsel, a Computer, and the Case Records (Doc. 225); his Motion for a Determination That No Restitution Is Owed (Docs. 234, 235); his Motion to Recoup the Distribution to Vista (Doc. 238); his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Orders (Doc. 269); his Second Motion to Set Aside the Special Master's Report and the Restitution Orders (Doc. 278); and his Motion to Adopt Prior Motions and Hold the Second Supplement in Abeyance (Doc. 282). To each, the Government offered only that it "concurs with the

arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." Doc. 279 at 2. Under Local Criminal Rule 47.1(d), each of those dispositive motions may be treated as unopposed and granted on that basis. Defendant likewise preserves, without waiver, his Motion to Strike the Government's Omnibus Response (Doc. 290), his Motion for Leave to File a Supplemental Response (Doc. 293), and his Motion for Reconsideration (Doc. 309), to none of which the Government has responded. Defendant is entitled to the Government's response to each of these motions, and he does not waive that right. Even if the Court were to treat any of them as moot, Defendant expressly preserves for appeal every issue raised in them; each such issue — including any the Government has left unanswered — will be raised on appeal to the United States Court of Appeals for the Fourth Circuit, and the Government, having been afforded and having declined the opportunity to respond, cannot then be heard to claim that it had no opportunity to do so.

Causation under the Mandatory Victims Restitution Act resolves into the discrete elements set out below, each of which 18 U.S.C. § 3664(e) places on the Government to prove by a

preponderance. On this record none has been proved — not by the Government, which declines to offer independent evidence, and not by the Special Master/Receiver, whose reports supply conclusions rather than proof. Causation Governing law Fact that must be Not established by element proved the Government or (Government's § the Special 3664(e) burden) Master/Receiver Proximate cause 18 U.S.C. § Each victim's loss is The Report aggregates 3663A(a)(2); In re "closely related to the a $1.655 billion figure Zetteler, No. 26-1749 conduct inherent to without tying any

(4th Cir. June 13, the offense, rather dollar to the offense 2026); Paroline v. than merely conduct; the United States, 572 tangentially linked," Government offers no U.S. 434 (2014) not a loss that merely proximate-cause proof. occurred somewhere within the companies. Foreseeability 18 U.S.C. § Each victim's loss was The record contains 3663A(a)(2); Paroline a reasonably only the Special v. United States, 572 foreseeable result of Master/Receiver's U.S. 434 (2014); the specific offense of assertion that "an United States v. conviction. inability to pay is Squirrel, 588 F.3d 207 always reasonably (4th Cir. 2009) foreseeable," Doc. 245 at 30 — foreseeability in the air. Absence of a 18 U.S.C. § 3664(e); The intervening The Government superseding cause Robers v. United decisions of the concedes losses that States, 572 U.S. 639 Rehabilitator and the resulted from (2014); United States Special decisions made "after v. Speakman, 594 F.3d Master/Receiver LINDBERG defrauded 1165 (10th Cir. 2010) (forced and premature them," Doc. 308 at 5– sales, the refusal to 6; neither it nor the refinance, the Beckett Special fire-sale) did not break Master/Receiver the causal chain. rebutted those intervening causes.

Defendant objects to the "defrauded" characterization: no evidence has been produced by the Government to support it, and the label cannot substitute for proof that the offense proximately caused these intervening losses. Actual, net loss 18 U.S.C. § A loss remained after A conclusory chart and complete 3664(f)(1)(A); 18 the collateral, the resting on a "current accounting U.S.C. § 3664(a) roughly $1 billion guess" and "presumed" first-loss capital, the balances, Doc. 245 at principal-protection 37, 9; the valuation bonds, and the methodology and recoveries, supported underlying data are by a complete withheld. accounting. Claimant-by- 18 U.S.C. § 3664(e); Which act of No victim-by-victim claimant, dollar- Hughey v. United conviction proximately showing; the by-dollar States, 495 U.S. 411 caused which un- Government itself attribution (1990); In re Zetteler, declines restitution for

No. 26-1749 (4th Cir. recovered loss to Conservatrix and June 13, 2026) which named victim. Vista/Cell 1.16 for lack of sufficient evidence, Doc. 308 at 7–8.

On every element the burden is the Government's, and on every element the record contains no competent proof — from the Government or from the officer whose report it asks the Court to adopt. A final restitution order cannot rest on causation elements that neither the Government nor the Special Master/Receiver has established.

II. The Meghji affidavit establishes, on its own terms, that the Special

Master/Receiver approved the termination of the Beckett Trust and the sale of Beckett.

The Government's affiant, Mr. Meghji — the acting CEO of NHC, the entity the Special Master/Receiver owns and controls — admits the facts that resolve this issue. He swears that the Beckett Trust "terminated in accordance with the terms of the Beckett Trust Agreement" (Ex. C ¶ 9); that "NHC provided its consent to the transaction as the Manager of … Entrust Global" (id. ¶ 19); and that the Special Master/Receiver's own board designee voted to approve the transaction and that the Special Master/Receiver furnished a letter,

reviewed by the Board before it voted, stating that he would not object (id. ¶¶ 20–21). Termination "in accordance with the[] terms" was not automatic: the trust could terminate only "at such time as the Grantor provides written approval of the termination," § 9.1(e), and a sale of substantially all Beckett assets was a "Fundamental BKX Matter" approvable only "in accordance with the Grantor's instructions," § 7.2(a)(vi). Entrust Global is the Grantor; NHC is its Manager; and the Special Master/Receiver holds the NHC equity in his exclusive,

court-ordered possession and control. The appointing order directed that "all of Defendant's … rights and interests, whether held directly or indirectly, in … the Primary Restitution Assets" be secured "in the exclusive possession and control of the special master," Doc. 56 ¶ 9, and the Special Master/Receiver accordingly became the record owner of the NHC equity, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. He is paid from "the assets administered by the Special Master," subject to "the Court's approval," Doc. 56 ¶ 14, and his authority is that "vested in the Special Master by the Court," id. ¶ 16. By admitting that NHC gave the Grantor's consent, the Government admits that the Special Master/Receiver gave it: he owns NHC, NHC manages the Grantor, and the Grantor's approval is what both the termination and the sale required. There is no version of these facts in which NHC supplied the Grantor's consent but the Special Master/Receiver, who owns NHC, did not. The affidavit's own sequence confirms the point: the Special Master/Receiver's entity supplied the Grantor approval that dissolved the trust; his board designee then voted to approve the sale of Beckett; and the designee did so after reviewing the Special Master/Receiver's own letter stating that he would not object. Ex. C ¶¶ 9, 19–21. An officer who dissolves the trust, whose designee approves the sale, and whose letter of non-objection clears it did not have "no direct involvement in the transaction," id. ¶ 21 — he caused it. The Government cannot have it both ways. It offers the letter to show that the Special Master/Receiver stood apart from the sale, but providing a letter is not standing apart — it is an affirmative act. A decisionmaker who furnishes the very approval a transaction requires has acted on

that transaction, and the Government's own proof that the Special Master/Receiver supplied the letter the board relied upon is proof that he acted. The letter the Government invokes to minimize his role is the record evidence that establishes it, and it therefore cuts against the very point for which the Government offers it. And that averment is, in any event, one of several load-bearing statements the affiant makes only on information and belief, as set out below.

A. Each of the affidavit's five load-bearing averments is offered

only on information and belief, and none is competent to carry the Government's burden.

The affidavit's decisive assertions are not sworn on personal knowledge; Mr. Meghji qualifies each "to the best of [his] knowledge, information and belief," and each is the sole support for a proposition the Government needs. First, that the Specified Affiliated Companies were placed in trust "to address concerns raised by one or more regulatory bodies, lenders and customers and [to] remove GGH and Lindberg from … management," Ex. C ¶ 5 — the premise of the Government's contention that Mr. Lindberg had already lost control. Second, that "Entrust Global owned 100% of Collectivus at the time the Beckett Trust was formed in 2021," id. ¶ 8 — the ownership foundation of the entire control analysis, as to a period years before Mr. Meghji had any role at NHC or on the Collectivus board. Third, that Beckett's 2025 revenue and EBITDA "were a small portion" of the Collectivus Group's, id. ¶ 13 — the Government's only basis for attacking the near-$1

billion valuation, offered without a single supporting figure or financial statement. Fourth, that "the Special Master has provided a letter to his Board appointee," id. ¶ 21 — the very fact offered

to minimize the Special Master/Receiver's role, and one whose existence and content the affiant does not claim to know first-hand, and which is not produced. Fifth, that the "Surviving Collectivus Group … remains a valuable restitution asset," id. ¶ 22 — the assertion that value was preserved rather than destroyed, again without figures. Mr. Meghji claims "personal knowledge" in paragraph 1, then expressly disclaims it for precisely these five averments — the ones on which the Government's position depends. Statements made on information and belief are not competent to establish a disputed fact and cannot satisfy the preponderance standard § 3664(e) requires. Causey v. Balog, 162 F.3d 795, ___ n.4 (4th Cir. 1998) (an oath that averments are "true to the best of [the affiant's] knowledge, information and belief" precludes a court from considering them, because the court "cannot assess whether [the affiant] had first hand knowledge of these facts or whether he is competent to testify to them");

Fed. R. Evid. 602.

B. The Trust Agreement and the Assignment are legal instruments,

and any disputed issue requires an evidentiary hearing.

The Trust Agreement and the Assignment are legal instruments. Their terms created the rights and powers at issue — the Grantor's approval right over the trust's termination (§ 9.1(e)) and over a Fundamental BKX Matter (§ 7.2(a)(vi)), and the Special Master/Receiver's acquisition of the NHC equity and all of its voting rights (Doc. 260 at 2) — and those terms establish that the Special Master/Receiver held the levers the disposition required. Defendant preserves that position. Should the Court regard any part of the question as a disputed issue of fact, § 3664(e) requires that it be resolved by a preponderance of the evidence, with the burden on the Government,

and Defendant is entitled to — and requests — an evidentiary hearing at which the affiant's basis may be tested. A $1.655 billion restitution cannot be fixed by adopting, on the papers and without a hearing, the untested affidavit of an officer of the very entity the Special Master/Receiver owns and controls.

III. The Government's own account confirms, rather than refutes, the

Special Master/Receiver's control of the disposition.

The Government argues that Mr. Lindberg "had already lost control" of NHC and the Specified Affiliated Companies through the 2019 MOU and the Wake County litigation, so the Special Master/Receiver "only took control over whatever remaining interest, if any," Mr. Lindberg had. Doc. 308 at 14. The premise is contradicted by the Government's own affidavit. The 2019 MOU did not itself move the Specified Affiliated Companies out of Mr. Lindberg's hands; the contribution of those companies to NHC — the step by which any transfer was to occur — "did not occur until October 2024." Ex. C ¶ 4. On the affiant's own account, the SACs had not been contributed to NHC as of the 2019 events the Government says stripped Mr. Lindberg of control, and the transfer awaited a later contribution transaction. The Government cannot date the loss of control to 2019 while its own witness dates the operative contribution to 2024. That argument defeats itself. If Mr. Lindberg had lost control to NHC, then control lay with NHC — and the Special Master/Receiver became the record owner of the NHC equity, holding all voting rights. Doc. 260 at 2. The Government cannot simultaneously say that control resided in NHC and that the officer

who owns NHC controlled nothing. Its own affiant resolves the point: NHC "provided its consent to the transaction as the Manager of … Entrust Global." Ex. C

¶ 19. The Special Master/Receiver's own conduct refutes the "inherited nothing" premise. An officer who controlled nothing could not remove the company's directors — yet two weeks after taking the NHC equity, the Special Master/Receiver, signing "solely as Special Master," removed both AAI-appointed directors of NHC, Kathy Million and Lonna Carter, effective immediately. Million Decl. ¶¶ 25–26. Nor could an officer who controlled nothing have supplied the approvals the disposition required: the Beckett Trust could be terminated only with the Grantor's written approval, § 9.1(e), and a sale of substantially all Beckett assets required the Grantor's instruction, § 7.2(a)(vi) — and the Grantor, Entrust Global, acts through NHC, which the Special Master/Receiver owns. He thus held both the two AAI-director seats he cleared and the Grantor-side approval right over the trust's dissolution and the Beckett sale. That is decisive control over the very transaction — not the empty "remaining interest, if any" the Government describes.

The MOU, moreover, did not strip Mr. Lindberg — or the officer who succeeded to his company's rights — of control over any sale. Under Article II of the MOU, the AAI-appointed director held a veto over any sale of the assets or stock of NHC or any NHC subsidiary: "provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Def. Ex. 1, Tab A ¶ 5 (Affidavit of Greg E. Lindberg) (quoting MOU Art. II, § 3.i). That veto could be defeated only by a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and Article III was never implemented. The Interim Loan

Amendment executed the same day waived "any and all claims for any Events of Default" predating it, Def. Ex. 1, Tab A ¶ 9; the Wake County court held Article III to be an unenforceable "agreement to agree," so "the default provisions that would trigger a loss of the … veto right were never implemented," Def. Ex. 1, Tab A ¶¶ 8, 14 (and Ex. B thereto); and no default under Article III has ever been asserted, Def. Ex. 1, Tab A ¶¶ 15–18. The veto therefore passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC — and he exercised it: on Mr. Lindberg's account, no buyer would have closed the Beckett sale without the affirmative consent of the Special Master/Receiver's NHC-board designee, and the Special Master/Receiver furnished that consent, including by providing the buyer his letter of non-objection. Def. Ex. 1, Tab A ¶¶ 19–20. The approval the Government attempts to recast as Mr. Lindberg's lost 2019 control was, on this record, an affirmative act of the Special Master/Receiver.

The Government's contrary reading of the MOU (Doc. 308 at 15 n.11) fails on Mr. Lindberg's sworn account of that instrument. The Government invokes the proviso that, "[p]rovided there is no default under any Loan," the NHC Board may approve a sale without an AAI Director's consent, and argues that a loan default freed the board to act alone. Doc. 55-1 at 5. But the veto falls away only upon a default under the "Loans" as they were to be amended and restructured under Article III of the MOU — and, as Mr. Lindberg attests, no such default ever existed. The Interim Loan Amendment executed the same day as the MOU "waive[d] any and all claims for any Events of Default" predating it, wiping the slate clean of every pre-existing

default. Def. Ex. 1, Tab A ¶ 9. The Article III default terms that alone could give rise to a qualifying default were never implemented: the Wake County court held Article III an unenforceable "agreement to agree," and its order records that the plaintiffs "have not

asserted a claim based on breach of Article III." Def. Ex. 1, Tab A ¶¶ 14, 16 (and Ex. B thereto). Nor has Mr. Dinius ever asserted any default under Article III. Def. Ex. 1, Tab A ¶ 17. NHC's attempt to invoke defaults under the superseded, pre- MOU loan covenants cannot supply what the MOU requires: as Mr. Lindberg attests, "the veto provision would be rendered meaningless" if the NCICs could "simply declare defaults under the old, pre-MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11. The Government thus has not shown a declared, operative Event of Default "under any Loan" as the governing documents define one; a civil finding that interest was underpaid is not, without more, such a default, and the point cannot be resolved against Defendant without the evidentiary hearing he has requested. And even if this Court, reviewing the question de novo, were to reinterpret the Loan and Article III of the MOU differently than the Wake County court did — treating what that court held to be an unenforceable "agreement to agree" as though it created an operative default — that reinterpretation could operate only after the fact. It would be ex post facto as to every res already sold, supplying retroactively an authority that did not exist when the assets were liquidated; and it still could not furnish a default basis under Article III of the MOU that existed at the time of the Beckett sale. The authority to consent to, and to effect, that sale had to exist when the sale occurred; it cannot be conjured

afterward by re-reading the Loan, and no such reinterpretation can retroactively validate a disposition made without it. Because no qualifying default ever stripped the AAI veto, the Special Master/Receiver's affirmative consent remained necessary to the Beckett sale — and, as shown above, he supplied it.

The disposition was, moreover, unauthorized on the face of the appointing order. The Order permitted liquidation of a Primary Restitution Asset only on the express condition that the Special Master/Receiver "seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56 at 6–

7. The Special Master/Receiver never sought that approval: the Beckett sale closed

with no motion, no notice, and no order of this Court, and he disclosed the completed transaction only after the fact. His position that "no approval was required" is therefore not a defense of the disposition but a concession that it exceeded the authority the Court conferred. Neither the sequence nor the form of his participation rescues it. That the Special Master/Receiver dissolved the Beckett Trust first, to clear the path for the sale, does not change the analysis: dissolving the asset's holding structure in order to enable its sale is itself an act facilitating the disposition, taken — like the sale it enabled — without ever seeking this Court's approval. And writing the letter of non-opposition on which the NHC board relied was not abstention from the sale; it was an act that helped accomplish it. The sale required the affirmative consent of an AAI Director; his designee supplied that consent, and his letter cleared it. Furnishing the approval a sale requires is participating in the sale, not standing apart from it. A letter of non-opposition, without which the board would not have

approved, is not a non-action — it is the action that accomplished the sale. Whether the dissolution preceded the sale or was a term of it, and whether his hand appears as a vote or a letter, the Special Master/Receiver acted on the estate to accomplish the disposition — without the Court approval the Order required. A restitution order built upon an unauthorized disposition of the estate cannot stand. United States v. Cohen, 459 F.3d 490, 498 (4th Cir. 2006); United States v. Broughton-Jones, 71 F.3d 1143, 1149 (4th Cir. 1995).

That the Government defends the Beckett disposition with an affidavit from the Special Master/Receiver's own controlled entity confirms, rather than answers, the constitutional problem. The affidavit is sworn by the acting CEO of NHC — the entity the Special Master/Receiver owns and controls — and it admits that the transaction was approved through the vote of the Special Master/Receiver's own board appointee and cleared by the Special Master/Receiver's letter of non-objection. Ex. C ¶¶ 20–21. The officer appointed to preserve the estate and neutrally quantify the loss now has the entity he controls — NHC — supplying sworn testimony to the prosecution to defend his conduct and sustain the loss figure. The Special Master/Receiver has thereby become a witness in these proceedings as well: his own conduct — what he did and did not do in dissolving the trust and clearing the Beckett sale — is now the very fact in dispute, and the evidence offered to resolve it comes from him and the entity he controls. That is the Special Master/Receiver operating as a second prosecutor, funded by and now speaking through the very res he administers, and as a witness in his own cause. See Doc. 269 ¶¶ 12–14. The NHC affidavit does not dispel the conflict; it reiterates it in writing — accuser, adjudicator, seller, and now witness, concentrated in a single office. The Constitution has never permitted that concentration. In re Murchison, 349 U.S. 133 (1955).

IV. Consent and waiver cannot cure the structural Article III and due-process defects.

The Government's recurring theme — that Mr. Lindberg agreed to the reference, proposed an initial draft, and did not object to the fee petitions — is a non- answer as a matter of law. It is also false on the facts. The change that transformed a neutral special master into a receiver was not Mr. Lindberg's doing; it was added by Assistant United States Attorney Daniel Ryan and imposed as the Government's insistence over the defense's objection — as the attached e-mails and redlines show, Def. Ex. 2, Tab E — and it was extracted under threat that Mr. Lindberg would forfeit the benefit of his plea and that the Government would file competing briefs. The record is developed below; it suffices here that the very feature the Government recasts as the product of the defendant's "agreement" was the Government's own. Article III's structural component and a § 455(b) financial-interest disqualification are not waivable. "To the extent that this structural principle is implicated … the parties cannot by consent cure the constitutional difficulty," Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 850–51 (1986); accord Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015). That principle applies with full force to the due- process guarantee of a neutral adjudicator, which safeguards the integrity of the tribunal and public confidence in it, not merely the interests of the parties; a proceeding before a financially interested decisionmaker is structural error, Williams v. Pennsylvania, 579 U.S. 1, 14 (2016); Tumey v. Ohio, 273 U.S. 510, 523 (1927), and courts "do not presume acquiescence in the loss of fundamental rights," Johnson v. Zerbst, 304 U.S. 458, 464 (1938). "A fair trial in a fair tribunal is a basic requirement of due process," and "no man can be a judge in his own case." In re Murchison, 349 U.S. 133, 136 (1955). Consent to a neutral master is not consent to a conflicted one. Section 455(e) forbids acceptance of "a waiver of any ground for disqualification enumerated in subsection (b)," and § 455(b)(4) reaches a "financial interest" held "as a fiduciary." Fed. R. Civ. P. 53(a)(2) permits consent only "with the court's approval" and only after disclosure — neither of which occurred. Because MVRA restitution is now criminal punishment, Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), the right to have that punishment fixed by a neutral Article III court is a criminal defendant's right that cannot be traded away to

install a fee-interested, non- Article III officer as the effective sentencer. Nor does the plea reach the illegal- sentence defect: "a defendant's consent cannot … authorize a restitution order not authorized by the statutory source." United States v. Broughton-Jones, 71 F.3d 1143, 1147–49 (4th Cir. 1995).

Even if consent could cure a structural defect — and it cannot — no valid consent exists here, for three independent reasons. First, any agreement to the reference was not the free, knowing, and voluntary waiver the law demands. It was a term embedded in a negotiated plea, and acquiescence extracted as a condition of a plea is not the intentional relinquishment of a known right required to give up the right to a neutral sentencing tribunal. See Johnson v. Zerbst, 304 U.S. 458, 464

(1938). And because the reference was a term of the Government's plea bargain, any ambiguity about what the defendant agreed to is construed against the Government, which bears the greater responsibility for the terms of a plea agreement — not converted into the defendant's consent to an unauthorized process. United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986); United States v. Jordan, 509 F.3d 191, 200 (4th Cir. 2007). Second, whatever the Government characterizes as Mr. Lindberg's agreement reached, at most, a special master under 18 U.S.C. § 3664(d)(6) — an officer limited to proposed findings of fact and recommendations subject to the Court's de novo determination — not an officer's taking exclusive possession of the estate, his undisclosed disposition of one of its largest assets, or his subsequent adjudication of the very loss that disposition produced. The version of the appointment the defense proposed — which the Government itself attaches — framed the role as that of "an independent, third-party neutral in accordance with 18 U.S.C. § 3664(d)(6)," acting "solely in [his] capacity as Special Master." Doc. 308-1 ¶¶ 1, 11 (draft). That draft conferred none of the custody, liquidation, or title-clearing powers the entered order later added, and it nowhere designated the Special Master/Receiver a receiver. Even arguendo if there was, consent to that neutral special master was not consent to an officer who would take exclusive possession of the estate, liquidate it, and dispose of one of its largest assets. The Special Master/Receiver's undisclosed approval and disposition of Beckett exceeded the scope of, and vitiated, any consent: a party who agrees to a neutral does not thereby agree to an interested actor, and consent to a fiduciary does not survive the fiduciary's undisclosed adverse conduct. The defendant

could not have consented to a conflict that had not yet occurred and was not disclosed when it did. Third, the process the Government now recasts as consensual was, in the end, unilateral. The Government — through Assistant United States Attorney Daniel Ryan — took control of the draft restitution order, rejected nearly all of the changes proposed on the defendant's behalf (including his request that the order impose a fiduciary duty to all stakeholders), and caused the final order to be filed with or without the defendant's participation. See Decl. of Greg E. Lindberg (Plea & Appointment) (Def. Ex. 1, Tab B) ¶¶ 8–10. The Government's reliance on the defendant's having "proposed an initial draft" cannot be squared with that fact: the prosecution took control of the draft and produced the operative order itself, so the final order is the Government's work product, not an artifact of the defendant's assent. An order the prosecution drafted and filed is not a product of the defendant's consent; it is the opposite. That the Government both shaped the Special Master/Receiver's work and then assumed control of the drafting and filing of the order underscores, rather than answers, the structural objection.

The contemporaneous record of the appointment negotiations — the parties' own e-mails, filed herewith as Def. Ex. 2, Tabs D and E — confirms what the "consent" theory omits.

What Mr. Lindberg agreed to was a special master under 18 U.S.C. § 3664(d)(6): under the plea agreement, he consented "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution." Plea Agreement ¶ 9 (Def. Ex. 2, Tab B). He did not agree to a receiver. Yet the reference that emerged was the Government's design, pressed over the defense's objection.

Before any motion was filed, the Government itself recruited the officer, asking the defense to "consider this Charlotte-based firm for the role as special master." Def. Ex. 2, Tab D. That firm is Grier Wright Martinez PA, which the Government's joint motion recommended as Special Master; the same motion recommended Scott Avila of Paladin Management as the Special Master's financial advisor — not as the Special Master. Doc. 54 ¶ 8. Paladin Management is the Special Master's financial advisor; it is not the Special Master, and any suggestion to the contrary is mistaken. When the defense proposed order language that would have preserved a measure of control for Mr. Lindberg or cabined the officer's authority, Assistant United States Attorney Daniel Ryan refused, insisting that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets to the government's satisfaction in order to get the benefit of the plea agreement," and that the Government "will not agree to any such efforts," and that "[t]he Special Master does not owe a duty to Mr. Lindberg or to the assets, but rather to the Court and to victims." Def. Ex. 2, Tab E. The Government rejected nearly all of the changes proposed on Mr. Lindberg's behalf — including his request that the order impose a fiduciary duty to all stakeholders — took control of the draft, and produced the operative order itself. Def. Ex. 2, Tab E. And it made clear that it would file its memorandum and proposed order by the end of the week, with "competing memos and proposed orders" if the defense did not agree — that is, with or without Mr. Lindberg's participation. Def. Ex. 2, Tab E. The order the Court entered vested precisely what the Government demanded: the estate in the "exclusive possession and control" of the Special Master/Receiver, Doc. 56 ¶ 9, with

authority to liquidate the Primary Restitution Assets, id. at 6–7. Those are the powers of a receiver, and the Government sought them deliberately. A structure the Government recruited, drafted, and imposed over the defendant's express request that he retain control — and threatened to file without him — is not a consensual reference. It is the Government's installation of a receiver in all but name; it cannot supply the "consent" the Government now invokes or cure the Article III and due- process defects, and it confirms that the transfer of control the Government attributes to Mr. Lindberg was the Government's doing, not his. Coercion is not consent: a reference the Government designed and imposed under threat of proceeding without the defendant — while he remained bound by a plea whose benefit the Government held over him and was itself prepared to disregard — cannot be recast as his agreement. The Government made the Special Master a receiver, and it owns the constitutional crisis that choice created; it cannot attribute that crisis to Mr. Lindberg, nor cure it by invoking a "consent" it coerced. Nor did the defense ever treat the resulting restitution determination as settled or agreed. At the sentencing hearing, when the preliminary order of restitution was entered, counsel placed the defense's objection on the record, stating that the order was "obviously subject to the objections of numerous parties and further hearings with the Court." Sentencing Tr. 66:18–22 (May 26, 2026). A determination that the defense expressly reserved on the record — as subject to the objections of numerous parties and to further hearings — is not one to which Mr. Lindberg consented. The same demand also inverted the sequence the Mandatory Victims Restitution Act prescribes. The statute directs the

court to determine each victim's loss and enter a restitution order, 18 U.S.C. § 3664; it nowhere authorizes the Government to take exclusive possession of — and to begin liquidating — the defendant's property before the amount of any loss has been determined. Yet that is precisely what the Government did: it demanded surrender of "exclusive possession and control" and installed an officer armed to liquidate the estate before the § 3664(e) determination the statute requires had ever been made. Putting seizure and sale before adjudication is not how the MVRA works, and the Government's disregard of that sequence — taking control of the property before the numbers were determined — is one more reason its "consent" theory cannot bear the weight it places on it. These acts — recruiting the officer, drafting the receiver powers, adding the authority to appoint the trusts' trustees and the companies' directors, and imposing the whole structure under threat of proceeding without the defendant — are the Government's own, and they are impossible for it to disclaim. The constitutional crisis they created is the Government's own. And it is a crisis no procedure can launder: a structural defect of this kind is not cured by the Court's review, for "even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 618 (1993) (citing Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972)). The Government cannot install a receiver as the officer who adjudicates the loss, over the defendant's objection, and then invoke § 3664(d)(6) de novo review to

sanitize the result; as set out below, the defect is structural and cannot be cured even by de novo review. 1 The Government's narrower waiver theory fails on its own premise. The Government contends that the defendant forfeited any non-constitutional objection "other than those specifically reserved in the [Preliminary Restitution] Order." Doc. 308 at 2 n.2. But the defendant preserved these very issues by raising them in his Response to the Special Master/Receiver's Report and in his Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). The credits, offsets, causation, and valuation questions the Government now labels waived were presented there — indeed, the Government's own chart takes its issue numbers directly from the defendant's response. Doc. 308 at 2 n.3 (citing Doc. 132-3). Objections are preserved by making them, and the defendant made them. This is, moreover, a deferred, non- final determination under 18 U.S.C. § 3664(d)(5), (d)(6), in which those preserved issues are to be resolved now. In any event, the mandatory credits and offsets — the value of returned property credited as of the date returned, § 3663A(b)(1)(B)(ii); the

1 The December 18, 2024 e-mail also sets out the Government's assertions concerning Mr. Lindberg's conduct at that time; those assertions are addressed and refuted in the accompanying Declaration of Greg E. Lindberg in Response to the December 18, 2024 Allegations (Def. Ex. 1, Tab B). For example, the Government asserted that Mr. Lindberg was "actively trying to reach deals regarding the sale of AAPC" and to "dissipate assets," and invoked those assertions to justify placing the estate in the officer's exclusive control. The record is to the contrary. The proposal to approach Blackstone about an AAPC transaction came from AAPC's own Chairman, not from Mr. Lindberg; and Mr. Lindberg's letters to the AAPC board urged that any such sale be structured as a stock transaction precisely to preserve value — to avoid a tax of $750 million or more that an asset sale would have imposed and that would have come directly out of the funds available for restitution — while he separately objected, in writing, to a proposed HPS credit-facility amendment he believed would force an unfavorable, value- destroying sale. Def. Ex. 1, Tab B ¶¶ 117, 119 & Attachment 2 thereto. Recasting the defendant's efforts to protect an asset's value — against a sale others were independently contemplating, and against a

structure that would strip $750 million from the restitution fund — as an attempt to "sell" or "dissipate" that asset, and then invoking that mischaracterization to justify a receivership, is prosecutorial overreach, not a ground for seizing the estate.

full amount of each victim's losses, § 3664(f)(1)(A); and reduction for amounts recovered, § 3664(j)(2) — are statutory commands the Court must apply; they are not "objections" a defendant forfeits by failing to reserve them line-by-line. And Defendant did not stay silent: he pressed these credits, offsets, and causation issues expressly, and repeatedly, at every stage of this proceeding. He raised them before sentencing, in his Response and Objection to the Special Master/Receiver's Report — the submission from which the Government's own chart takes its issue numbers (Doc. 132 & Ex. 2). He renewed them immediately after the judgment, in the two emergency motions to stay he filed within fourteen days of it: his Motion to Stay Asset Sales and Enforcement of the Preliminary Order of Restitution (Doc. 172), and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190). He pressed them again in his Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281), and in his Motion for a Determination That No Restitution Is Owed, or in the Alternative for Exclusion and Offset of Losses Not Proximately Caused by the Offense of Conviction (Doc. 234). And he moved to protect these very offsets and credits from irreversible loss by seeking a complete accounting and a stay of all asset sales until the offsets and that Motion are adjudicated. The issues the Government now brands forfeited were thus reserved, and re-reserved, on the record at every juncture the statute and this Court's schedule allowed. Silence on interim fee petitions is not consent to a conflicted adjudicator or to an unlawful sentence, and the full extent of the Beckett breach — that the Special

Master/Receiver alone could and did approve the sale — became apparent only when counsel obtained the trust and assignment instruments. Docs. 269, 292.

V. The Government's authorities do not reach the constitutional

question, which O'Connor and Tumey answer.

None of the Government's authorities addresses the constitutional question presented here — whether an officer who is paid from, and who liquidates, the estate may also adjudicate the loss. They are appointment orders in which no party raised, and no court decided, that question. That the same question was not raised in those cases does not mean the defect did not exist. An unraised question is not a resolved one, and an order of appointment that no court subjected to Article III or due-process scrutiny is not a holding that the combination it created is constitutional. The controlling principle is the one O'Connor and Tumey state, and O'Connor states it as a holding, not dictum. Confronting the very arrangement at issue here — a receiver appointed also to serve as special master — the Second Circuit held: "Although in theory the receiver may have no interest in whether any claims are established, in fact he certainly does; such an interest, as well as his duties to the claimants and the taxpayer, disqualify him from performing the judicial duties" of a special master. United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961) (Friendly, J.). And the court did not merely say so; it acted on it, vacating the reference: "Order affirmed insofar as it appoints a receiver, vacated insofar as it appoints a special master." Id. The Government's characterization of that holding as dictum is wrong: a court does not vacate an appointment on the strength of a dictum. That is precisely this case. Whatever his title, the Special Master/Receiver was clothed by the appointing order

with the defining powers of a receiver — exclusive possession and control of the estate, Doc. 56 ¶ 9; the authority to liquidate the Primary Restitution Assets, id. at 6–7; and record ownership of the entities, holding "all associated economic, legal, voting, and" other rights, Doc. 260 at 2. A court-appointed officer who takes custody of the res, holds its title, and liquidates it is a receiver in function, whatever the caption of the order calls him — and the entered order gave the Special Master/Receiver each of those powers even as the defense's proposed draft had designated him none of them and nowhere named him a receiver. Doc. 308-1 ¶¶ 1,

11. The reference itself was the Government's drafting. The special-master provision

of the plea agreement — paragraph 9, by which "[t]he defendant agrees to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court" — was inserted into the plea by the Government's own prosecutor; the plea's tracked changes attribute that insertion to Assistant United States Attorney Daniel Ryan. See Def. Ex. 2, Tab B, ¶ 9. Nor did the Government merely draft the clause; it proposed and recruited the special master. In the weeks before the plea, the Government asked defense counsel to "consider this Charlotte-based firm for the role as special master," and the firm it named corresponded directly with the Government about "this potential assignment" before the Government forwarded the firm's materials to defense counsel. Def. Ex. 2, Tab D (Special Master email correspondence, Nov. 25, 2024). The defense, for its part, could not meaningfully shape the terms: its "ability to get [the Government] a revised draft of the Motion and Order" was "severely

hampered by [its] inability to effectively or reliably communicate with [its] client," who obtained regular communication access only in early December 2024. Id. That clause conveyed a restitution-distribution role — it says nothing of exclusive possession and control, of liquidation, or of the appointment of directors — and only when it is read together with Mr. Ryan's December 18, 2024 email and his redline of the proposed appointment order does it become clear who converted that limited role into a receivership. That the officer emerged as a receiver was the Government's deliberate design, and the record shows the change was made by the Government's own hand: transmitting the Government's redline of the proposed order, Mr. Ryan struck the defense's provisions that would have preserved a measure of control for Mr. Lindberg, on the stated ground that Mr. Lindberg was "supposed to be giving up 'exclusive possession and control' of these assets" and that the Government "will not agree to any such efforts, and … will not give Mr. Lindberg credit for doing anything less than giving up 'exclusive possession and control.'" Dec. 18, 2024 e-mail of AUSA Daniel Ryan (Def. Ex. 2, Tab E). The tracked-changes record confirms the point on the face of the documents, and it does so through the Government's own red edits alone. In the supporting memorandum's redline, the edit that converted the office into a receivership — shown in red and thus attributable to Mr. Ryan, not to the defense — directed that the officer "assume Defendant's and/or Global Growth's authority whether held directly or indirectly, if any, to: (1) appoint trustees for all trusts related to the Primary Restitution Assets; and (2) appoint directors to all boards of directors of all companies related to the Primary Restitution Assets; and"

— arrogating to the officer the defendant's own governance powers. Def. Ex. 2, Tab

C. That single insertion is what transformed a special master who would merely

"identify, receive, apportion, and distribute funds for restitution" into a receiver vested with the defendant's own control of the estate. And the order the Court ultimately entered embodies that design: it secures the Primary Restitution Assets in the officer's control and

empowers him to determine their value, to liquidate them, to clear title for transfer to buyers, and to coordinate with other receivers. Doc. 56. Possession and control, liquidation, clearing title, and coordination with "other receivers" are the powers of a receiver, and the Government's own grouping of the Special Master/Receiver with "any other receivers" names him as one. Taking custody and exclusive control of the estate is the office of a receiver; the Government wrote that office into the order and rejected every term that would have made the officer anything less. The Special Master/Receiver is thus both the receiver who possesses and liquidates the estate and the officer who quantifies the loss and recommends the award against it, and O'Connor holds that the same person cannot lawfully be both. The rule O'Connor applied is Tumey's: a decisionmaker with "a direct, personal, substantial pecuniary interest" in the outcome is constitutionally disqualified. Tumey v. Ohio, 273 U.S. 510, 523 (1927). That interest is not incidental here; it scales with the estate. The Special Master/Receiver is paid from the very assets he administers and liquidates, so the larger the estate he sells, the greater his compensation — the temptation runs the wrong way, and it runs harder the more he sells. The Government's own authority confirms the point by contrast. In Konrad, the master

had no conflict for one reason only: she "was paid the standard hourly rate, and not a percentage of the sum she calculated." United States v. Konrad, 730 F.3d 343, 353 n.12 (3d Cir. 2013). 2 Here the opposite is true — the Special Master/Receiver is paid out of the very fund whose value he sets and whose assets he sells, so his interest rises with the size of the disposition. That is the precise structural interest O'Connor and Tumey forbid, and no appointment order the Government cites has ever sanctioned it.

VI. The compensation structure is a disqualifying interest under the

objective test.

The Government says the Special Master/Receiver's fees are hourly rather than contingent and that he received nothing from the Beckett sale. Doc. 308 at 18. Neither point dispels the interest. Due process forbids entrusting a party's property to a decisionmaker with "a direct, personal, substantial pecuniary interest," and the test is objective and requires no proof of actual bias. Tumey, 273 U.S. at 523; Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009). The Special Master/Receiver is paid from "the assets administered by the Special Master," Doc. 56 ¶ 14 — the very res whose value he quantifies and whose liquidation he directs — and he supplies both the loss figure the Government adopts and the proposed order that fixes it. That an

2 In Konrad, a criminal defendant found able to pay for his own counsel challenged, as a conflict of interest, the appointment of a master to fix the cost of the private defense counsel he was ordered to reimburse under the Criminal Justice Act. The master surveyed prevailing hourly rates, took the lowest ($400 per hour), and set the reimbursable cost of the defense at $6,000. The Third Circuit rejected the conflict claim for a single reason: the master "was paid the standard hourly rate, and not a percentage of the sum she calculated," so her fee neither rose nor fell with the figure she produced. 730 F.3d at 353 & n.12. The arrangement here is the opposite: the Special Master/Receiver's compensation is drawn from the very estate whose value he fixes and whose assets he liquidates, so the more of the estate he administers and sells, the greater his fee — the interest Konrad found absent is the interest present here.

hourly fee is drawn from the estate does not make the interest less "direct" or "substantial"; it makes the officer's solvency depend on the estate he administers and adjudicates. The Constitution does not permit the same person to serve as accuser and adjudicator. In re

Murchison, 349 U.S. 133, 136–37 (1955). And a disqualifying interest is structural error that neither de novo review nor a later order can cure, Williams v. Pennsylvania, 579 U.S. 1, 14 (2016); Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 618 (1993).

Nor can the promise of de novo review rescue the reference. The Government's answer to the conflict is that the Special Master/Receiver only proposes findings while the Court decides de novo, § 3664(d)(6); indeed it asks this Court to "conduct a de novo review" and then adopt his numbers. Doc. 308 at 1. But de novo review does not cure a structurally disqualified adjudicator; it presupposes a neutral one. "Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 618 (1993) (citing Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972)). Concrete Pipe proves the point by contrast: the trustees there survived challenge only because they acted "in an enforcement capacity," with a neutral adjudicator standing between them and the decision to "conduct a de novo review of all factual and legal issues." Id. at 618–19. Here the opposite is true. The Special Master/Receiver is not an enforcer whose work a neutral officer reviews; he is himself the adjudicator — he takes custody of the estate, values it, liquidates it, and quantifies the very loss he asks the Court to adopt — and no neutral officer stands between him and this Court. A court reviewing

his Report sees only what the conflicted officer chose to place in it, so de novo review of a record curated by the disqualified officer is not the independent determination § 3664(e) requires. Nor is the defect academic: because the Special Master/Receiver sold the Primary Restitution Assets before any determination — Beckett among them, at roughly thirteen cents on the dollar — no later de novo review can recover the value his conduct destroyed or unwind the dispositions to third parties. The advisory label describes what a special master ordinarily does; it does not describe what this officer has already done, and it cannot save a reference in which execution has preceded adjudication. Defendant has developed this conflict, and the principle that de novo review cannot cure it, fully in his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver, and to Set Aside the Restitution Orders (Doc. 269) — to which the Special Master/Receiver has already responded — and in his Second Motion to Set Aside the Special Master/Receiver's Report and the Restitution Orders (Doc. 278), which likewise establishes that the Report "is not cured by a later de novo determination under 18 U.S.C. § 3664(d)(6)," and Defendant incorporates and preserves that showing here. The Special Master/Receiver's own positions, moreover, cannot be reconciled. To defend against disqualification he casts himself as a mere advisor whose proposed findings are subject to the Court's de novo review; yet to act upon the estate he has assumed and exercised the possessory and liquidating powers of a receiver — taking custody of the assets, holding their title, and selling them, Beckett among them at roughly thirteen cents on the dollar, before any determination was made. He cannot

be an advisor for purposes of the conflict and a receiver for purposes of the estate. His own valuation carries the same double posture: he disclaims it as a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, and a "desktop exercise" that does "not constitute formal valuations or fairness opinions," id. at 36 n.31, even as the Government asks the Court to adopt that very figure as the loss. These positions are irreconcilable, and the inconsistency is itself telling: an officer who were truly the neutral advisor he claims to be would have had no occasion to seize and liquidate the estate before the Court determined what, if anything, is owed.

VII. The Government has not proven causation, and the plea's "indirect harm" language does not convert intervening losses into restitution.

A. An admission of "hardship" is not proof of the amount of each victim's loss caused by the offense.

The Government first says Mr. Lindberg admitted causing "substantial financial hardship," so causation is established. Doc. 308 at 19–20. But an admission that the offense caused hardship is not proof of the amount of each victim's loss caused by the offense, which the Government must still establish by a preponderance. § 3664(e); Hughey v. United States, 495 U.S. 411 (1990). Causation and foreseeability are, moreover, legal determinations for the Court, not facts the Special Master/Receiver may find; and a restitution order may not grant a victim a windfall. United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017). The burden of proving that causal loss is the Government's, and it does not shift until the Government carries it: the defendant's burden to dispute an amount arises only "once the Government has satisfied its burden," United States v. Stone, 866 F.3d 219, 227 (4th Cir. 2017), and

where the Government "fail[s] to meet its initial burden," the burden "never shift[s]" and the resulting order must be vacated, United States v. Steele, 897 F.3d 606, 614 (4th Cir. 2018). An order that fixes restitution without that proximate-cause determination does not merely fail for want of proof — it exceeds the statutory maximum. Restitution ordered "for losses not proximately caused by the defendant" is "a sentence expressly foreclosed by statute," United States v. Leal, 933 F.3d 426, 431 (5th Cir. 2019), so that "if a court orders a defendant to pay restitution . . . without determining that the defendant's conduct proximately caused the victim's claimed losses, the amount of restitution necessarily exceeds the statutory maximum," United States v. Winchel, 896 F.3d 387, 389 (5th Cir. 2018); see United States v. Kim, 988 F.3d 803, 810–811 (5th Cir. 2021) (reaffirming both principles and vacating a restitution order the Government had failed to tie to proximately caused loss). The Fourth Circuit's rule is the same: a restitution order exceeding its statutory source is "no less 'illegal' than a sentence of imprisonment that exceeds the statutory maximum." United States v. Broughton-Jones, 71 F.3d 1143, 1147 (4th Cir. 1995); accord United States v. Davis, 714 F.3d 809 (4th Cir. 2013). And because that limit is statutory, no agreement can lift it: "even when a defendant, prosecutor, and court agree on a sentence, the court cannot give the sentence effect if it is not authorized by law," Leal, 933 F.3d at 430–31, and "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory source," Broughton-Jones, 71 F.3d at 1149. That burden reaches causation, not merely arithmetic: restitution attaches only to loss "directly and

proximately caused by [the defendant's] offense conduct," United States v. Wilkinson, 590 F.3d 259, 268 (4th Cir. 2010); United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009), and a mere connection between an injury and the crime does not suffice — the connection must be direct and proximate. See Paroline v. United States, 572 U.S. 434, 445–46 (2014). The Fourth Circuit's own disposition in this case fixes the standard: direct harm requires the harm to be "closely related to the conduct inherent to the offense, rather than merely tangentially linked," and the court applied it to reject a nine-figure claim, holding the claimant had "fail[ed] to sufficiently connect the harm suffered … with Lindberg's criminal conduct." In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026) (per curiam) (quoted at Doc. 308 at 8). If an adjudicated, nine- figure loss was too tangentially connected to support

restitution, a gross-balance figure that ties no particular loss to any particular act of conviction cannot support an award many times larger.

On the record it filed, the Government has neither proven nor even engaged the elements causation requires. It has not established: (1) proximate cause — that any victim's loss is "closely related to the conduct inherent to the offense, rather than merely tangentially linked," In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026), rather than a loss that merely occurred somewhere within the companies; (2) foreseeability — that each victim's loss was a reasonably foreseeable result of the specific offense, the record containing only the Special Master/Receiver's assertion that "an inability to pay is always reasonably foreseeable," Doc. 245 at 30, which is foreseeability in the air; (3) the absence of a superseding cause — that the intervening

decisions of the Rehabilitator and the Special Master/Receiver (the refusal of face- value offers, the coerced hold, the premature sale of the zero-coupon protection bonds, and the below-value sale of Beckett) did not break the causal chain; (4) actual, net loss and a complete accounting — that a loss remained after the collateral, the roughly $1 billion first-loss capital, the principal-protection bonds, and the recoveries, § 3664(f)(1)(A); and (5) claimant-by-claimant, dollar-by-dollar attribution — which act of conviction proximately caused which un-recovered loss to which named victim. Section 3664(e) places each of these on the Government, and it has engaged none of them, resting instead on the plea's "indirect harm" language and its adoption of the Special Master/Receiver's conclusions. Issues the Government has not addressed stand unopposed. LCrR 47.1(d)(3).

B. The losses were driven by intervening, post-indictment

decisions — as the Government's own chart concedes.

The Government's chart proves the causation problem it seeks to avoid. It disallows credit for the diminution in the North Carolina Insurance Companies' 2018 value (Issue 11, $454,000,000), the Eye Care Lenders loss (Issue 13, $22,288,826), the UKAT refinance failure (Issue 14, $39,000,000), the Clanwilliam sale loss (Issue 16, $474,000,000), and the losses from selling the zero-coupon bonds before maturity (Issue 17, $611,600,000) — each on the express ground that the loss resulted from a decision made by the rehabilitators or the Special Master/Receiver "after LINDBERG defrauded them." Doc. 308 at 5–6. 3 That is a concession that these later decisions —

3 Defendant objects to the Government's repeated characterization that Mr. Lindberg "defrauded" the rehabilitators and the Special Master/Receiver. See, e.g., Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement. The word is a conclusion, not proof: the

made after control of the companies had passed to the rehabilitators — produced those losses. The Government cannot treat those later decisions as irrelevant when they would reduce the defendant's exposure and decisive when they increase it. The same intervening decisions — premature and forced sales, the refusal to refinance, the liquidation of long-dated instruments, and the Special Master/Receiver's own fire- sale of Beckett — are superseding causes that break the causal chain, Robers v. United States, 572 U.S. 639, 646 (2014); United States v. Speakman, 594 F.3d 1165, 1172–74 (10th Cir. 2010), and the resulting losses cannot be laid at the defendant's door. The Government concedes the same for whole categories of claimants: it declines to seek restitution for Conservatrix and for Vista/Cell 1.16 precisely because it "does not have sufficient evidence" to connect their losses to Mr. Lindberg's criminal conduct. Doc. 308 at 7–8. That confirms the causal

connection In re Zetteler requires must be proven claimant-by-claimant and dollar-by-dollar — and has not been. The Government's premise that the "swap" of assets itself fixed the loss also fails on the record: Mr. Lindberg added roughly $1 billion of his own capital to the businesses as a net, first-loss cushion that would be exhausted before any protected policyholder or creditor bore a dollar, and when control passed the affiliated loans were independently valued and found well secured. Docs. 234, 235, 278. Defendant's full causation, offset, and accounting showing — issue by issue — is set out in his Reply

Government has offered no record evidence that any fraud proximately caused the particular losses its own chart attributes to the post-indictment decisions of those third parties. Section 3664(e) places on the Government the burden of proving, by a preponderance, that the offense proximately caused each victim's loss, and a pejorative label cannot substitute for that proof. Deploying "defrauded" as a rhetorical bridge—to sweep losses caused by later, third-party decisions into the restitution figure without proving causation as to any of them—is prosecutorial overreach, not evidence. Defendant objects to the use of that characterization for any purpose in fixing restitution or forfeiture.

regarding restitution (Doc. 300) and the motions and objections incorporated there (Docs. 132, 234, 280), which he incorporates by reference.

The Government's issue-specific grounds for two of the charged losses fail on the same principle. As to Agera (Issue 12, $129,398,324), that Mr. Lindberg "agreed to include these loans in the IALA," Doc. 308 at 7, fixes their place on a schedule; it does not prove that the offense of conviction proximately caused the loss, which arose from later market and management developments, and the controlling-stake and timing assertions the Government adds are disputed. And as to the Eli Global insurance-holding-company debt (Issue 15, $14,897,805), the Government's submission that "given Defendant's admitted fraudulent conspiracy, the losses are properly included," mistakes attribution for causation: relevant conduct is not a substitute for the proximate-cause determination 18 U.S.C. § 3663A(a)(2) requires, and the Government must still prove that these specific loans were proximately caused by the offense of conviction. The record is to the contrary: the approximately $14.84 million in losses tied to the Insurance HoldCo Debt resulted from decisions made by the GBIG management team, not by Mr. Lindberg. That team selected the acquisitions, negotiated them, and structured the purchases of the companies; and the associated transactions were ordinary-course steps taken to allocate capital promptly across the different international jurisdictions in which GBIG operated — capital invested through a holding-company loan into the various international holding companies, with a promissory note issued back to the HoldCo that made the investment, the usual structuring of a multinational insurance enterprise. In

substance the transaction is double-ledger account-keeping between international subsidiaries, not a loss at all. A loss produced by the management team's ordinary- course capital allocation is not a loss the offense of conviction proximately caused. United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009); In re Zetteler, No. 26- 1749 (4th Cir. June 13, 2026). On causation the burden is the Government's, § 3664(e), and it is not carried by a generic label: that a transaction can be swept under an "admitted fraudulent conspiracy" does not prove that the offense proximately caused this particular loss, where the transaction reflects standard industry practice or was required by an insurance regulator in a changing regulatory environment — a generality that fits ordinary-course conduct equally well proves nothing about causation. Nor may the Government carry the day with mere attorney argument. It opposed — though it had no standing to do so — the Rule 17(c)

subpoenas that would have produced the very company records documenting the management team's decisions, and those subpoenas were denied; a party has no standing to oppose subpoenas directed to third-party custodians in which it claims no privilege or proprietary interest, In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009), and having blocked production of the records, the Government cannot fault the defendant for proving the point by proffer rather than by the documents it kept from him. Neither item can be resolved against Mr. Lindberg without the § 3664(e) hearing he has requested.

On the largest charged loss, the intervening cause is established directly, on personal knowledge, by Mr. Lindberg's sworn affidavit. Def. Ex. 1, Tab A (Affidavit of Greg E. Lindberg). The affidavit establishes that the consent right over any sale of NHC's assets or stock — the AAI Director's veto under Article II, Section 3.i of the June 27, 2019 Memorandum of Understanding — passed to the Special Master/Receiver and never lapsed: the only defaults that could extinguish it were those to be agreed and implemented under Article III of the MOU, and the Wake County court held Article III an unenforceable "agreement to agree" that was therefore never implemented, while every pre-MOU default was waived on the day the MOU was signed. Id. ¶¶ 5–18 & Exs. A–B. The consequence for causation is decisive. The Beckett sale did not simply befall Mr. Lindberg; it was affirmatively approved by the Special Master/Receiver, through his own NHC board designee. Aware of the veto right, the buyer required the affirmative vote of the Special Master/Receiver's designee and was furnished the Special Master/Receiver's letter of non-objection; and in Mr. Lindberg's sworn assessment, drawn from decades of mergers-and-acquisitions experience, no buyer would have closed the Beckett purchase without the Special Master/Receiver's affirmative signature — a signature the Special Master/Receiver gave knowing he could not lawfully approve the sale without this Court's approval. Id. ¶¶ 19–20. The approximately $866 million Beckett loss is thus the product of the Special Master/Receiver's own affirmative act, taken through the governance rights he holds over the estate, not of Mr. Lindberg's offense of conviction — the paradigm of a superseding cause that breaks the causal chain. Robers v. United States, 572 U.S. 639, 646 (2014).

C. The Fourth Circuit has construed this same "directly or indirectly harmed" plea language and held it does not dispense with causation — the plea fixes no amount and waives no causal predicate.

The Government also argues that Mr. Lindberg agreed in his plea to pay "full restitution, regardless of the resulting loss amount, to all persons directly or indirectly harmed by the defendant's criminal conduct," Doc. 40 ¶ 10(a), and that § 3663A(a)(3) permits agreed restitution. Two features of that language are dispositive. First, read in its entirety, the promise runs to persons "directly or indirectly harmed by the defendant's criminal conduct," and its controlling words are the closing ones — "by the defendant's criminal conduct" (emphasis added). The modifier "directly or indirectly" does not delete the requirement, stated in the same breath, that the harm be one caused by the defendant's criminal conduct. Read in total, Paragraph 10(a) fixes a causation floor — it reaches harm caused by the offense conduct, and nothing less — and cannot be inverted into a promise to pay for harm the defendant's conduct did not cause without reading the words "by the defendant's criminal conduct" out of the very sentence the Government quotes. The obligation thus reaches only persons "harmed by the defendant's criminal conduct" — an express causal predicate. Second, the phrase "regardless of the resulting loss amount" speaks to quantum alone, confirming only that the figure is not tied to the Guidelines loss calculation. An

agreement to pay "full restitution" fixes the amount a defendant will owe without discharging the Government from proving causation. A plea may waive the quantum of loss; it does not, through general language, erase the statutory predicate that the loss be one the offense directly and proximately caused. Any waiver of that threshold causal requirement must be express, and none appears here: "regardless of the resulting loss amount" addresses how much, not whether Mr. Lindberg's conduct caused it. The plea confirms the distinction — the Guidelines "loss" figure "may be different from, greater, or lesser than restitution under 18 U.S.C. § 3556." Doc. 40 ¶ 8(a). The Fourth Circuit's rule is directly on point: "[u]nless a plea agreement provides otherwise," an MVRA restitution order "is to be based upon the loss directly and proximately caused by the defendant's offense conduct." United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009). Nothing in Paragraph 10(a) provides otherwise as to causation — it speaks to the loss amount, not to the causal predicate. Squirrel is not merely the source of that rule; it is a holding on this very language. The defendants there agreed in their pleas to pay "full restitution, regardless of the resulting loss amount," to "all victims directly or indirectly harmed by the defendant's 'relevant conduct' … regardless of whether such conduct constitutes an 'offense' under 18 U.S.C. § 3663 or 3663A." Id. at 216 — the same "directly or indirectly harmed" formulation the Government invokes here, and broader still. The Fourth Circuit held that that language did not supply a valid basis for restitution absent proximate cause. Applying the causation analysis regardless, it held "the distinction is without a difference, because … the conduct of Squirrel and Slee did not directly and proximately cause any financial loss," and it vacated the award. Id. at 218. And because the power to order restitution is statutory in origin, the plea cannot supply what the statute withholds: "a defendant's consent to a particular restitution order cannot, without more, authorize a restitution order not authorized by the statutory source," and the only avenue to vary the statutory limits is a specific agreement formally embodied in the plea agreement, not a general reference to "indirect" harm. United States v. Broughton-Jones, 71 F.3d 1143, 1148–49 (4th Cir. 1995). The Fourth Circuit has applied that principle to the MVRA: where a restitution order "is not based on [the defendant's] plea agreement or his criminal conduct, it exceeds the statutory maximum under the MVRA," because even a defendant who agrees to pay a sum certain "did not agree … to relieve the government of its burden of proving that [his] restitution obligation included only those losses caused by [his] criminal conduct." United States v. Zakrzewski, 462 F. App'x 421, 426 (4th Cir. 2012) (unpublished); accord United States v. Patty, 992 F.2d 1045, 1051 (10th Cir. 1993). "Indirectly harmed" does not remove the causal chain to the defendant's criminal conduct; it does not sever that chain. That is the uniform rule: an agreement to expand restitution beyond proximately caused loss must be express and will not be implied from general language, United States v. Randle, 324 F.3d 550 (7th Cir. 2003); even an express § 3663(a)(3) plea agreement does not authorize restitution absent some causal connection between the defendant's conduct and the victim's loss, United States v. Woods, 689 F. Supp. 2d 1102 (N.D. Iowa 2010); and "directly and proximately" requires both but-for and proximate causation, United States v. Goodrich, 12 F.4th 219 (2d Cir. 2021). "Indirect" does not waive causation, and it does not elevate restitution into liability in the air. Cf. Palsgraf v. Long Island R.R. Co., 248 N.Y. 339, 341 (1928) (Cardozo, Ch. J.) ("Proof of negligence in the air, so to speak, will not do"). Paragraph 10(a) thus fixes no amount and does not abandon the requirement — central to the MVRA and to Hughey — that the loss be caused by the conduct of conviction. Hughey v. United States, 495 U.S. 411, 413 (1990). An agreement to

pay restitution for indirect harm is not an agreement that every diminution in the estate is the defendant's to bear regardless of what caused it — least of all losses attributable not to his offense but to intervening, post-indictment decisions and to value that a court-appointed officer himself extinguished. Because the plea neither sets a figure nor supplies causation, the Government must still prove, and the Court must still determine, that each dollar of claimed loss was harm caused by the criminal conduct. Nor can a plea term supply the constitutional authority the reference lacks or waive the structural defect. Defendant expressly reserves the de novo determination of causation, offsets, and credits, and reserves and preserves the Sixth Amendment challenge to fact-finding by a preponderance following Ellingburg. See Apprendi v. New Jersey, 530 U.S. 466 (2000); Southern Union Co. v. United States,

567 U.S. 343 (2012).

D. The "circular" character of the disaffiliation transfers reflects

regulator-mandated restructuring, not additional offense-caused loss.

The Government's reliance on the plea's reference to "circular, non-economic transactions among … entities using insurance company funds," Doc. 308 (quoting Doc. 42 ¶ 5), cannot be stretched to recast the disaffiliation transfers as a separate, loss-causing wrong. The Special Master/Receiver isolates the affiliated-investment transactions — the insurer's rated debt investment into each vehicle, and the vehicle's loan to an affiliate — and treats those transactions as the conduct that caused the loss, measuring restitution by their outstanding balances. Doc. 106, at 19.

But those transactions were not free-standing acts of Mr. Lindberg's choosing; they were the required mechanics of the four disaffiliation structures the North Carolina Department of Insurance reviewed — the two-class special-purpose vehicles, the irrevocable trust, the finance companies, and the principal-protection notes. Each structure operated, by design, only through the very transaction the Special Master/Receiver now isolates: the insurer could not implement the reviewed structure without making the rated debt investment, and the vehicle could not function without the corresponding affiliate loan. In a real sense, the transactions were the structures. The Department negotiated and confirmed that framework — setting the approximately forty-percent ceiling on affiliated investments in its April 11, 2016 review letter, receiving the eleven disclaimers of affiliation filed under N.C. Gen. Stat. § 58-19-25(j), and reviewing the successor finance-company and principal-protection-note structures before they were used. Doc. 234, at 6; Doc. 300, at 29–31. The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate: the transfers were successive restructurings of the same assets, as the group phased out the original special-purpose-vehicle exposure and migrated those holdings into the finance-company and, ultimately, the principal- protection-note structures. Creating the principal-protection notes required unwinding the earlier special-purpose vehicles and finance companies and placing the same underlying affiliated credits into the note structure — now backed by added third-party bond collateral. Moving the same assets into a successively better- collateralized, regulator-reviewed structure increased credit quality and added

collateral; it did not create a new loss. The outstanding balances the Special Master/Receiver counts therefore reflect the same underlying assets carried in a more protected form, not incremental harm proximately caused by Mr. Lindberg. § 3664(e); In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026). The full account, with the supporting

regulatory record, is set out in Defendant's Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (DS-1 through DS-21). Doc. 300.

E. Independently, the restructuring the Government now charges

as loss arose only because of the Government's own interference — a superseding cause.

Even if the disaffiliation transfers could be recast as loss-causing conduct, the sequence the Special Master/Receiver isolates would never have arisen but for the Government's own interference. The original disaffiliation plan required no sale of any operating company: the affiliated credits were to be contributed to a securitization and financed, retiring the affiliated loans on the insurers' balance sheets in full — a structure the group's principal lender was prepared to underwrite and that an independent third party proposed on the same terms, neither of which contemplated selling any operating company. It was only after the Government intervened — its communications causing the lender to refuse to do business with Mr. Lindberg and to refuse to hold the affiliated assets in the securitization — that the plan was forced to pivot to demanding "clean" insurance companies, and it was that Government-forced pivot that first required the asset sales and transfers the Special Master/Receiver now recasts as Mr. Lindberg's loss-causing conduct. See

Sealed Addendum (Department of Justice interview memoranda). The losses the Government charges to Mr. Lindberg are thus the product of the Government's own conduct: but for the Government's interference, the affiliated loans would have been retired through the original vehicle — with no sale, no forced disposition, and no loss. A loss the Government itself set in motion cannot be the loss "directly and proximately caused by [Mr. Lindberg's] offense conduct," United States v. Wilkinson, 590 F.3d 259, 268 (4th Cir. 2010); it is the paradigm of a superseding cause. Robers v. United States, 572 U.S. 639, 646 (2014); United States v. Speakman, 594 F.3d 1165, 1172–74 (10th Cir. 2010). That interference, moreover, rested on a false premise: the Government treated the affiliated transactions as illicit and directed the lender to treat them the same way, foreclosing the diligence that would have confirmed — from the same regulator-reviewed record set out above and in Defendant's Reply — that the transactions were mandated by the statutory disaffiliation framework rather than evidence of wrongdoing. Doc. 300, at 29–31 & Exs. DS-1 through DS-21; see Sealed Addendum.

The Government's refusal to answer issue by issue is nowhere more consequential than here, because an issue-by-issue response would have had to confront the Government's own intervening acts. Defendant's evidence includes the contemporaneous e-mail of the companies' Chief Financial Officer, Christa Miller, memorializing that when Ares — then in exclusivity to purchase the U.S. insurance companies and willing to retain the affiliated loans through a proposed SPV — reversed course, Ares "said that they had been told by a third party constituent that

they should avoid any ongoing connection to Eli Global after the close," having earlier "been advised to not have any ongoing ties." Christa Miller e-mail (Jan. 6, 2019) (Sealed Addendum). The e-mail's express words are "a third party constituent"; Defendant contends, and is prepared to establish, that the third party was the Government. The Government has never engaged that evidence or accounted for its own role, and the Ares records from the period surrounding that e-mail remain unavailable to the defense — the materials the Government did produce are attached to the sealed affidavit accompanying this Response. Because the Government will not answer, Defendant is compelled to place these matters on the record himself, without the Prosecution ever having met the burden of proof § 3664(e) assigns it. That the defendant must prove the Government's own

intervening conduct while the Government declines even to respond is, in itself, an extraordinary posture for a proceeding in which the burden is the Government's alone.

For the same reasons, Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234) cannot be turned aside on this record. It rests on new and controlling authority — In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026), the Fourth Circuit's own disposition in this case — which fixes the governing proximate- cause standard and applies directly here. This Court cannot reject Doc. 234 consistent with that authority; and because the Government has not responded to it on the merits, the motion should be granted. LCrR 47.1(d)(3). The Government has not answered any of the causation issues raised in Defendant's Motion for a Determination That No Restitution Is Owed and its accompanying Statement of

Facts (Docs. 234, 235) — the specific, evidence-backed showings that the losses the Special Master/Receiver charges were produced by intervening, post-indictment decisions of third parties and not proximately caused by the offense of conviction. Those causation issues, and the facts and evidence supporting each, are expressly reserved and are incorporated in this Response as if reproduced in full; they stand unopposed, LCrR 47.1(d)(3), and are not waived.

VIII. The mandatory credits and offsets cannot be "disallowed" on the

Government's "unless and until monetized" theory.

The Government's chart disallows nearly every credit on the theory that the defendant should be credited only "if and when" an asset is monetized and only in "the actual dollar amount of value once realized." Doc. 308 at 3. That inverts the statute. For a property offense the measure is the value on the date of loss or of sentencing, less the value of any part returned "as of the date … returned," § 3663A(b)(1)(B) — a present determination, not a future contingency — and the Court must order restitution in "the full amount of each victim's losses," crediting amounts recovered so that no order overstates the loss, § 3664(f)(1)(A), (j)(2). The AAPC preferred equity given to ULICO (Issue 3, $352,906,240) illustrates the error: the record establishes that ULICO holds AAPC preferred equity with a par value matching the obligation, and the credit is fixed as of transfer, not deferred until ULICO chooses to monetize. Doc. 278 ¶ 6. Because that equity was transferred in partial satisfaction of a civil judgment, the credit is presently due: "[a]ny amount the victim has received from the defendant in a civil suit as of the time of sentencing qualifies as 'property that is returned' and must be used to reduce the restitution

amount to prevent double recovery." United States v. Malone, 747 F.3d 481, 485 (7th Cir. 2014). A restitution order that fails to offset the loss by the value of property the defendant returned is error requiring vacatur. United States v. Arrington, 97 F.4th 593 (8th Cir. 2024) (vacating restitution for failure to reduce it by the value of returned shares). And returned property is credited at the value it had when returned — not at a future liquidation the victim may never pursue. Robers, 572 U.S. at 647 (Sotomayor, J., concurring) (a victim who "chooses to hold collateral rather than to reduce it to cash within a reasonable time … must bear the risk of any subsequent decline").

For the reasons developed in Argument VII.B, the Government's disallowance of the largest disputed items — the Clanwilliam sale loss (Issue 16, $474,000,000), the early zero-coupon-bond sales (Issue 17, $611,600,000), and the diminution in the North Carolina Insurance Companies' value (Issue 11, $454,000,000) — on the express ground that they resulted from decisions made "after LINDBERG defrauded them," Doc. 308 at 5–6, 4 proves the defense's

causation point: these are losses of later, intervening decisions, and the value those same decisions destroyed cannot be disregarded while the losses themselves are charged to Mr. Lindberg. That the North Carolina insurance companies were worth what the schedule reflects is not Mr. Lindberg's say-so; it is established by the Government's own evidence, for the lender

4 Defendant renews his objection, stated above, to the Government's characterization that Mr. Lindberg "defrauded" the rehabilitators. Doc. 308 at 5–6. No evidence has been produced by the Government to support that statement, and the label cannot substitute for the proximate-cause proof 18 U.S.C. § 3664(e) requires; its use to charge Mr. Lindberg with losses produced by later, intervening third-party decisions is prosecutorial overreach, not evidence.

the Government dealt with agreed in its letter of intent to acquire those companies for approximately $450 million — an arm's-length price the Government cannot disclaim, and one that corroborates the value charged as lost. The $450 million is thus not a separate credit but independent proof of the very value the Government's interference destroyed. The remaining issue-specific objections are set out in Defendant's prior filings (Docs. 132, 234, 235, and Defendant's response to Doc. 275) and are not waived.

The reductions the Special Master/Receiver disallowed or omitted are set out, item by item, in the revised schedule of offsets, credits, and reductions in Defendant's Preliminary Response and Objection to the Special Master/Receiver's Second Supplement to Report and Recommendations (Doc. 281, at 30), reproduced below. They fall into three groups: improper additions to the affiliate-investment balances; mandatory credits and offsets for value the insurers received or recovered, § 3664(j)(2); § 3663A(b)(1)(B); and losses that the intervening decisions of third parties produced and that the offense did not proximately cause, § 3664(e) — including the roughly $866 million destroyed when the Special Master/Receiver sold Beckett — a company valued of record at approximately $1 billion, see Argument IX — for approximately $134 million, some thirteen cents on the dollar. Applied against the Special Master/Receiver's $1,625,000,000 figure, these reductions total $3,765,418,383 and yield net restitution of zero — and that is before the roughly $1 billion of Mr. Lindberg's own first-loss capital that stands ahead of any protected party's loss:

Description Amount Special Master/Receiver's Proposed Restitution Figure $1,625,000,000

I. Improper Additions to the Affiliate-Investment Balances

Prejudgment Interest ($263,000,000) Corrected Starting Balance of Affiliate Investments ($141,000,000)

II. Additional Credits and Offsets

AAPC Preferred Equity Par Value (as of May 26, 2026) ($352,906,240) SNIC Payments ($27,823,425) Cash Payments to Pre-Designated Restitution Parties Not Captured ($79,655,289) by the Special Master/Receiver CBL Subordination Fee (Beckett refinancing) ($3,000,000) Additional Clanwilliam Sale Proceeds ($20,000,000) ULICO Sale of Contributed Real Estate ($13,596,013) Sale Proceeds of Zero-Coupon Bonds in PPNs ($243,452,385) Value of the NCICs as of October 2018 ($454,000,000) Bermuda ICs' Proceeds from Sales of Affiliated Assets ($9,800,076)

III. Losses Not Proximately Caused by Mr. Lindberg

Loss on Agera ($129,398,324) ECL Losses ($22,288,826) Loss on UKAT ($39,000,000) Insurance-Holdco Debt Portion ($14,897,805) Loss on Clanwilliam Below-Market Sale

($474,000,000) Loss on Early Zero-Coupon Bond Sales ($611,600,000) Loss on Beckett Sale ($866,000,000)

TOTAL MINIMUM OFFSETS AND REDUCTIONS ($3,765,418,383)

NET RESTITUTION OWED $0

To the extent the Government suggests that Mr. Lindberg did not prove these offsets, the records that would document them passed to third parties when Mr. Lindberg surrendered the companies — they are held by NHC Holdings, LLC, the North Carolina Insurance Companies and their Special Deputy Rehabilitator, the Bermuda insurers, and the Special Master/Receiver and his advisor — and any uncertainty from the withholding of those records must be read against the party that withheld them, not against Mr. Lindberg. The items are exemplary, not exhaustive; the records that would establish each are the subject of Defendant's Rule 17(c) subpoena motion (Doc. 248). Mr. Lindberg has, moreover, shown through valuation the factual basis for the value of everything he held until control of the companies

passed from him: those values rest on independent, professional valuations — KPMG's and Houlihan Lokey's — and, for offsets arising from events after control passed, on the Rehabilitator Mr. Dinius's own valuation of the same assets, so that each offset is supported, depending on the offset at issue, by a valuation that must be read in Mr. Lindberg's favor. Because the Government bears the burden of a complete accounting, § 3664(a), (e), and it and the Special Master/Receiver have simultaneously withheld and opposed production of the very records that would establish these offsets and disprove these charged losses, the amounts cannot be resolved against Mr. Lindberg — at a minimum, the value those records would establish may not be charged to him. And the Government, which had no standing to oppose the subpoenas directed to those third-party custodians yet stepped in to defeat them, cannot now be heard to claim that Mr. Lindberg failed to prove these offsets. In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009).

The factual bases for each of these reductions are established in Defendant's statements of facts already before the Court, which Defendant incorporates here as if fully set forth herein: his Statement of Facts in support of his Response and Objection to the Special Master/Receiver's Report and Recommendations (Doc. 132, Ex. 1); the Statements of Facts filed with his post-judgment Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172) and his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190), both filed within fourteen days of the May 29, 2026 judgment; his Consolidated Statement of Facts (Doc. 235); and his

Statement of Facts Regarding the Disaffiliation Structure and the accompanying Disaffiliation Exhibits (Doc. 300). The facts, evidence, and arguments set out in those statements of fact are incorporated in this Response as though reproduced in full.

The two improper additions at the head of the schedule require separate mention, because the Government defends the larger one affirmatively. The $263,000,000 the Special Master/Receiver added as prejudgment or "time value" interest has no basis in the MVRA. Restitution under the Act compensates a victim's actual loss caused by the offense, Hughey v. United States, 495 U.S. 411 (1990), and may neither exceed that loss nor grant a windfall, United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017). The Court must order "the full amount of each victim's losses" as § 3663A(b) defines it, and for an offense against property that amount is the value of the property lost, less the value of any part returned, §

3663A(b)(1)(B) — a measure that contains no interest component. The Government's own policy confirms as much: the Department of Justice's published guidance on the restitution process expressly excludes interest, recognizing that interest is a financial loss that is "not eligible for restitution." The Restitution Process (Fraud and/or Financial Crimes), U.S. Dep't of Justice, Criminal Division, https://www.justice.gov/criminal/criminal-vns/restitution-process (last updated Oct. 10, 2023). Where, as here, the property lost was cash the defendant can return, the measure is the amount taken under § 3663A(b)(1)(A), which includes no interest; and the pre-MVRA decision the Special Master/Receiver invokes, United States v. Hoyle, 33 F.3d 415 (4th Cir. 1994), predates the Act and does not authorize interest under

it. Adding $263 million of interest charges the defendant a sum the victims did not lose to the offense; and an amount not authorized by the statutory source is not a lawful term of a restitution order. United States v. Broughton-Jones, 71 F.3d 1143, 1147–49 (4th Cir. 1995). The out-of-circuit decision the Government invokes cannot bind this Court or enlarge the measure of loss that § 3664 and the Fourth Circuit prescribe.

The Government's disallowance of four further credits on a "new consideration" theory fails on the statute. It declines to credit the SNIC payments (Issue 4, $27,823,425), the CBL subordination fee ($3,000,000), the ULICO real-estate transfer ($13,596,013), and the Bermuda insurers' asset-sale proceeds ($9,800,076) on the ground that the payments were "made for new consideration" and were "not related to affiliate loan balances." Doc. 308 at 4–5. Neither rationale defeats a credit the MVRA makes mandatory. The statute reduces restitution by the value of property returned, § 3663A(b)(1)(B), and by amounts the victims recover, § 3664(j)(2), without regard to the payer's motive or whether a given payment matched a particular schedule line; what governs is that the payment in fact reduced the victim's net loss, which is all the statute measures. Ritchie, 858 F.3d at 216. And to the extent the Special Master/Receiver has already credited a portion of the cash payments not captured in his figures (line item, $79,655,289), that portion is not claimed twice: the credit sought is the net amount his accounting still omits. The Special Master/Receiver's contrary "criteria" — disallowing payments he deems "made for [Mr. Lindberg's] own strategic, business, or self-preservation purposes or for other

independent consideration" — has no basis in the statute and no supporting authority. What the MVRA measures is whether the victim was in fact repaid, not the defendant's motive; once the defendant shows a payment that reduced the victim's loss, the offset is mandatory, and the defendant bears only the burden of showing it. United States v. Karam, 201 F.3d 320 (4th Cir. 2000); § 3664(j)(2). Two further recoveries generated no credit at all and must also reduce the figure. Of the Clanwilliam proceeds, the Special Master/Receiver withheld a $14,112,426 administrative reserve, and $23,520,710 was paid to Vista — an entity the Special Master/Receiver "is unsure" is even due restitution — yet neither amount was credited to Mr. Lindberg. Doc. 66 ¶¶ 20(d), 26 n.8; Doc. 190. Every amount the victims received, and every amount diverted from the estate, must be brought to account before any net loss can be fixed, and these too reduce it. § 3664(f)(1)(A), (j)(2).

Nor does the Government's footnote defending restitution paid "directly to failed insurance companies," Doc. 308 at 8 n.8, answer § 3664(j). To the extent the guaranty associations have paid policyholder claims, the amounts the victims have already recovered must reduce the restitution figure so that no victim recovers twice and no order overstates the loss. § 3664(j)(1)–(2); Ritchie, 858 F.3d at 216. The allocation and "provider of compensation"

questions the Government raises under § 3664(j)(1) are addressed in Defendant's response to Doc. 275, which he incorporates by reference.

The zero-coupon principal-protected notes illustrate the same error and independently subtract from the loss; the record supporting the credit is set out in

full in Defendant's Supplemental Response Regarding the Zero-Coupon Principal- Protected Bonds and the accompanying Declaration of Greg E. Lindberg. Doc. 295 (and Exs. A–N thereto). Beginning in 2018, with the express permission of the North Carolina Department of Insurance, the North Carolina insurance companies acquired a portfolio of principal-protected notes issued through nationally recognized banks — including Barclays, RBC, UBS, and Natixis — contractually scheduled to repay approximately $1,006,239,867 at maturity. Doc. 295 ¶ 1 & Exs. A–F. Each note paired a zero-coupon bond that guaranteed repayment of principal if the note was held to maturity with an affiliate-loan component; because the issuers were major, highly rated banks and the principal was guaranteed at maturity, the notes were designed and expected to be held to maturity, at which point they would return the full guaranteed principal, while sold early they returned only a fraction — the equivalent of surrendering a life-insurance policy for a fraction of its face value. Id. ¶ 2. The companies' own contemporaneous books confirm that the zero-coupon bonds existed solely to fund and protect the affiliate investments, dollar-for-dollar, and served no independent investment purpose. Id. ¶¶ 3–4 & Exs. H–J.

When the notes were unwound, the zero-coupon components performed exactly as designed: every one was sold for par or higher, and the proceeds paid down the principal owed to the insurers — albeit at a loss of approximately $611 million to their full payoff, the result of an early sale that was never contemplated by any party and that was unnecessary given cash reserves sufficient to pay any obligations. Doc. 295 ¶¶ 5–7 & Ex. G. The insurers' own investment professional confirmed the

outcome contemporaneously — although the worst-positioned notes had been projected to lose $50 to $60 million, they were in fact disposed of at a net gain, the disposition summary recording a total realized gain of $6,036,766.05 across the portfolio. Doc. 295 ¶¶ 6–7 & Ex. G; see Doc. 234-38 (Oct. 28, 2019 email). The same records fix the cash actually recovered company by company: $329,169,087.55 for Colorado Bankers Life, $21,842,490.43 for Bankers Life Insurance Company, and $43,567,328.50 for Southland National Insurance Corporation — $394,578,906.48 in all. Doc. 295 ¶ 7 & Ex. G. These are recorded, dollar-for-dollar proceeds, not projections or "illustrative" figures, and the Special Master/Receiver's Report neither reflects them nor reconciles against them. Id. ¶¶ 7, 10.

Issue 17 (approximately $611.66 million) is not a loss chargeable to Mr. Lindberg but a credit the Government refuses to give: it is the value that same early sale destroyed, not any value Mr. Lindberg took. Mr. Lindberg surrendered control of the companies and their records in October 2018; the decision to sell the notes before maturity — for approximately $394,578,906.48, less than forty cents on the roughly $1.006 billion guaranteed at maturity — was made in 2019 by the court-supervised Rehabilitator, Mr. Dinius, after control had passed to him. Doc. 295 ¶¶ 8–9. Nor was the sale compelled by any liquidity need: the companies held more than $1 billion in cash and marketable securities for years after the 2019 sale, so the early liquidation was a discretionary choice by the fiduciaries then in control, not a necessity. Id. ¶ 9. It is therefore an intervening, superseding cause of whatever loss the sale produced,

attributable to the Rehabilitator and not to Mr. Lindberg. Robers v. United States,

572 U.S. 639, 646 (2014).

Two credits follow, and the MVRA requires both. First, the approximately $394,578,906.48 in cash the sales generated returned the protected principal to the victims and must reduce the restitution figure as the value of property "returned." 18 U.S.C. § 3663A(b)(1)(B); see United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017) (restitution may not require a defendant to "pay back more money than he stole"); Doc. 295 ¶¶ 10–11 & Exs. G, K. Second, the approximately $611,660,961 in value the premature sale destroyed must be excluded because it was caused by the intervening, discretionary act of a court-supervised third party, not by Mr. Lindberg. Doc. 295 ¶

11. Taken together, the two credits account for the full $1,006,239,867 of principal

protection the notes were designed to deliver: the portion recovered in cash must be credited because the statute requires it, and the portion destroyed must be excluded because Mr. Lindberg did not cause it. And because the Special Master/Receiver's figures nowhere account for these cash paydowns, they cannot satisfy the complete accounting the MVRA requires before restitution is fixed. § 3664(f)(1)(A). On either footing, the zero-coupon bonds cannot add a dollar to restitution against Mr. Lindberg — they subtract from it.

IX. The valuation objections are not merely "informational," and the

accounting is a statutory predicate to any final order.

The Government urges that the Court need not resolve Defendant's objections to the Special Master/Receiver's asset valuations because they were "provided for informational purposes." Doc. 308 at 21 n.15. But the Court cannot determine "the

full amount of each victim's losses," § 3664(f)(1)(A), or resolve the disputed credits, without knowing what the Special Master/Receiver sold, for how much, and where the proceeds went. The Beckett disposition — the sale of Beckett Collectibles, a business independently valued at approximately $1 billion by the Cabrillo Advisors appraisal and by Blackstone's own arm's-length acquisition proposal, for approximately $134 million, with the price withheld as "confidential" — evaded every statutory checkpoint. The Government's suggestion that Beckett was "a small portion" of the Collectivus Group (Ex. C ¶ 13), and that the "Surviving Collectivus Group … remains a valuable restitution asset" (id. ¶ 22), confirms nothing. Enterprise value is not revenue share, and the independent appraisal already in this record values each company separately. The Cabrillo Advisors appraisal fixed Beckett Collectibles, LLC — the business actually sold — at $1,003,924,000, corroborated by Blackstone's $1.05 billion enterprise-value indication of interest, while placing the other portfolio companies on their own lines (Arcane Tinmen ApS, $107,749,000; CBCS Operations, LLC, $14,125,000; Southern Hobby Distribution, LLC, $538,010,000). Doc. 256-1 at 3; Doc. 256-2. The roughly $1 billion figure is thus Beckett standing alone — an apples-to-apples measure of the business sold for approximately $134 million — not, as the Government implies, a number swollen by other entities. That a larger group retained value says nothing about whether the roughly $1 billion Beckett business was sold for a fraction of its worth, and the survival of other assets does not offset the loss of the one disposed of. If anything, that Collectivus remains valuable confirms that the estate held ample value to

protect and that the disposition was not compelled by any shortfall. A full and verified accounting is the necessary predicate to the Court's § 3664 determination, not an optional add-on, and the Special Master/Receiver cannot offer an affidavit about the Beckett

documents while withholding the documents themselves. Compounding the problem, the Special Master/Receiver has refused to place his valuation methodology on the record at all — the basis on which he derived the $1.655 billion figure, wrote down or valued the estate's assets, and accounted for the Beckett proceeds. A de novo determination under § 3664(e) cannot be made on a computation the Court cannot see, the Government cannot expose to scrutiny, and the defendant cannot rebut. A loss figure whose derivation is kept off the record is not proof of loss but an unsupported assertion; and a party cannot withhold the books, records, and valuations that would establish loss — while resisting the very subpoenas that would produce them — and simultaneously demand adoption of a report built without them.

§ 3664(a), (f)(1)(A).

The Government's suggestion that Mr. Lindberg's valuations are themselves suspect because "artificially inflating the financial condition of companies was a central part of [his] scheme," Doc. 308 at 6 n.5, does not reach the valuations on which this Response relies. Those figures are not Mr. Lindberg's own representations; they are independent, third-party determinations — the Cabrillo Advisors appraisal and Blackstone's own arm's-length indication of interest addressed in Argument IX — together with the arm's-length offers sophisticated buyers actually made. The valuations of the other assets are likewise the work of independent, nationally

recognized firms, and none of them is in dispute: KPMG prepared a valuation of the Eli Global insurance entities, and Houlihan Lokey prepared an independent portfolio valuation of the same assets, both filed with Defendant's Motion for Determination That No Restitution Is Owed (Doc. 234) as Exhibits E and HL. A premise about the defendant's historical representations says nothing about the reliability of an independent appraiser's valuation or a third party's binding offer. And the independence of the KPMG and Houlihan Lokey valuations is established by Mr. Lindberg's sworn testimony: he never communicated with KPMG or Houlihan Lokey, did not know who staffed their engagement teams, and supplied none of their inputs — the bank-account records and financial statements for the underlying operating companies were furnished by those companies' management, not by him — and his only role was to approve the more than $1.8 million in fees for their work. Def. Ex. 1, Tab A ¶ 22. Those valuations were therefore neither Mr. Lindberg's representations nor influenced by him, and the Government's "artificially inflating" premise, Doc. 308 at 6 n.5, does not reach them. Nor does attorney argument change the facts these independent valuations establish: the Government's counsel may characterize the defendant's past representations however it wishes, but the characterizations of counsel are not evidence and do not alter what KPMG, Houlihan Lokey, Cabrillo Advisors, and the buyers' own offers actually found. Indeed, the Rehabilitator's own valuation of these same assets — the valuation Mr. Dinius prepared after he took control of the companies, filed as Exhibit J to Defendant's Statement of Facts, Doc. 132, Ex. 1 — confirms rather than contradicts the values on which this Response

relies, and squarely rebuts the Special Master/Receiver's debt-based numbers. The Government's attorney argument therefore cannot discredit the record evidence that the estate held far more value than the Special Master/Receiver's debt-based figures reflect.

The accounting the Government would skip is a predicate not only to entering a restitution order but to enforcing one, and the MVRA's enforcement scheme confirms why the Special Master/Receiver's ongoing sales are unauthorized. The statute does not empower a court-appointed officer to liquidate the estate to satisfy restitution; it vests enforcement in the

United States, and only after a final order fixes the amount. A restitution order is enforced "by the United States in the manner provided for" in the fine-collection subchapters "or by all other available and reasonable means," 18 U.S.C. § 3664(m)(1)(A), through the civil-judgment machinery of § 3613 — under which restitution becomes "a lien in favor of the United States on all property and rights to property" that "arises on the entry of judgment," § 3613(c), and which incorporates the Federal Debt Collection Procedures Act and its writs of execution, 28 U.S.C. §§ 3001 et seq.; id. § 3203. See United States v. Abdelhadi, 327 F. Supp. 2d 587, 590 (E.D. Va. 2004) (the United States may pursue "any civil remedies available under the [MVRA] … such as a lien attached to defendant's property," and "any civil enforcement methods available under the [FDCPA], such as a writ of garnishment or execution on defendant's property"); United States v. Scarboro, 352 F. Supp. 2d 714, 716 (E.D. Va. 2005). That machinery presupposes an existing, valid order: the enforcement authority flows from the restitution order, not the other way around. And the order it enforces must fix "the full amount of each victim's losses," § 3664(f)(1)(A), determined by the Court de novo, § 3664(d)(6), by a preponderance, § 3664(e), on the complete accounting § 3664(a) requires — none of which can be accomplished on the data the Special Master/Receiver has withheld. That accounting reaches both sides of the ledger: it must fix not only each victim's loss but the value of the very property being liquidated to satisfy it. For an offense against property, restitution is measured by the value of the property less the value of any part returned, § 3663A(b)(1)(B), and the enforcement lien attaches to "all property and rights to property of the person," § 3613(c) — a worth the Court must establish before that property is sold, not after. Here it never was: the Special Master/Receiver disposed of the Primary Restitution Assets without ever fixing, on the record, what they were worth, so the accounting reaches neither the victims' losses nor the value of the property applied against them. What is happening here inverts that scheme. There is no final order of restitution, no complete accounting, and no judicial lien or writ; yet the Primary Restitution Assets are being disposed of one after another without any order of this Court: Beckett was sold for a fraction of its appraised value, cleared by the Special Master/Receiver's own NHC-board designee and without the Court approval his appointing order required, Doc. 56 at 6– 7; and the Damovo Group — a going concern independently worth between $400 million and $500 million — is now the subject of a pending state-court motion to approve its sale for no more than the debt against it. That disposition is one no order of this Court has authorized, and NHC's consent to it cannot lawfully be given without this Court's approval. Selling a several-hundred-million-dollar enterprise for its debt, without the approval of this Court and before any loss has been determined, does not shrink the estate on paper alone; it destroys hundreds of millions of dollars of real value and manufactures, in a single transaction, one of the largest losses the Government would then charge to Mr. Lindberg — the same below-value, no-approval pattern already seen in the Beckett sale. Liquidating the res to satisfy a restitution obligation that has never been lawfully fixed, outside the only enforcement mechanism the MVRA authorizes and before the judgment that alone could trigger it, is not enforcement of a restitution order; it is a disposition the statute does not permit. As shown above, a restitution order built upon such unauthorized dispositions of the estate cannot stand. United States v. Cohen, 459 F.3d 490, 498 (4th Cir. 2006); United States v. Broughton-Jones, 71 F.3d 1143, 1149 (4th Cir. 1995).

The methodology defect is systemic, not confined to Beckett. In the Report and across the successive dispositions, the Special Master/Receiver has repeatedly valued and sold the

companies at little more than their debt — the measure appropriate to the bankruptcy liquidation of an insolvent estate, not to the sale of a going concern. The order appointing him charged him with that very task: it directed the Special Master/Receiver to "identify all assets available for liquidation … and to the extent those assets are not readily convertible to cash, determine a reasonable estimated value for those assets." Doc. 56 at 6. A reasonable estimated value of a revenue- producing enterprise is its enterprise value, not the debt carried against it. But these are not balance-sheet shells; they are operating businesses generating hundreds of

millions of dollars in annual revenue, whose enterprise value is a function of that revenue and cash flow, not merely the debt carried against them. Valuing a revenue- producing company at its debt systematically understates what the business is worth, understates the credits and offsets the defendant is owed, and inflates the net loss charged to him. The Court cannot determine "the full amount of each victim's losses," § 3664(f)(1)(A), or the value of any property returned, § 3663A(b)(1)(B), without the companies' financial reports, board reports, revenue and cash-flow data, and the offers and letters of intent they received — the very materials that establish enterprise value and that the Special Master/Receiver has declined to place on the record. That data is not a formality; it is the difference between a debt-based liquidation number and the true value of the businesses, and it is required to determine the exact value of the companies on which the restitution figure, and the forfeiture keyed to it, depend. For a property offense, § 3663A(b)(1)(B) fixes restitution as the value of the property lost, less the value of any part of that property returned — and each figure must be established on the record. The victim's loss is the Government's to prove by a preponderance, § 3664(e); where it fails to put record proof of that loss before the Court, the order cannot stand. The Fourth Circuit vacated a property-loss restitution order on exactly that ground, holding that "the record contains no proof of the victim's actual loss" and that, because "the Government failed to meet its initial burden of demonstrating the amount of loss, the burden of proof never shifted" to the defendant. United States v. Steele, 897 F.3d 606, 613–15 (4th Cir. 2018). The other half of the same statutory measure — the value of the property

returned, § 3663A(b)(1)(B)(ii) — is the credit the defendant is owed, and it too must be established on the record before any net loss can be fixed. That is where the Special Master/Receiver's debt-based figures fail: valuing the returned operating companies at little more than their debt understates the offset the statute commands and inflates the net loss charged to Mr. Lindberg. A valuation the Special Master/Receiver keeps off the record — whether of the victim's loss or of the property applied against it — cannot satisfy the statute, and a restitution order resting on it cannot survive review. And the defect is not confined to the offset side of the ledger. Even as to the loss itself, the Court cannot order restitution on a figure whose derivation it is not permitted to see. The full methodology underlying the Special Master/Receiver's $1.655 billion figure — the basis on which he valued each asset, applied or disallowed each offset, and accounted for the proceeds of the assets he sold — has never been placed before this Court, nor shared with the defendant, despite the defendant's repeated requests that it be produced or simply placed on the docket under the protective order already in place. The defendant has pressed for that methodology and data at every turn, including in his Motion for Reconsideration of the Order Denying His Rule 17(c) Subpoenas (Doc. 309), which asks the Court either to issue narrowed subpoenas or to order the Special Master/Receiver to place his valuation methodology and supporting data on the record under the existing protective order — the very material the Special Master/Receiver himself once offered to provide the Court under

seal or in camera, Doc. 106 at 29, and has since refused to produce. A loss figure the Court cannot examine, the defendant cannot test, and the Government

has never proved is not a lawful basis for restitution; § 3664(e) requires a de novo determination on a methodology in the record, not deference to an undisclosed computation.

The AAPC valuation presents this defect in its starkest form. Because the Special Master/Receiver's write-down of AAPC rests on, and can be answered only by reference to, material he filed under seal — Appendix 1 to the Second Supplement, Doc. 245 — Defendant does not restate that material in this public Response. He addresses the AAPC valuation in full, and demonstrates that the reduced valuation cannot be reconciled with the independent professional valuations already of record, in the sealed addendum submitted with this Response — Part Two of Defendant's Sealed Addendum, which addresses the AAPC valuation and requests the unsealing of Appendix 1 to the Special Master's Second Supplement (Doc. 245) — which he incorporates here by reference. The AAPC write-down is a sentencing- and forfeiture- determinative input that has never been proved on the record, and it cannot support the restitution figure or the forfeiture keyed to it.

Once again, Defendant objects that he is forced to prove, and to place on the record, his position on the AAPC valuation before the Government has met its burden of proving that value at all. The burden under § 3664(e) is the Government's; yet the defendant is made to litigate a sentence- and forfeiture-determinative valuation the Government will not defend, on a sealed record he cannot fully answer and the Court cannot independently verify. That inversion is one more constitutional irregularity in a process already beset with them — a fee-interested officer who both liquidates and

values the estate, a forfeiture keyed to a contested and unproven valuation, and a valuation kept from scrutiny under seal — and, as shown throughout, these are structural defects that no de novo review can cure. Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 618 (1993).

X. The § 3664(d)(5) deadline is directory, not jurisdictional, and cannot

be used to force an inaccurate award.

The Government has invoked the ninety-day deadline of 18 U.S.C. § 3664(d)(5) as a reason to fix restitution now. The deadline does not bear that weight. It is directory, not jurisdictional: a sentencing court that passes it retains authority to order restitution, because the provision exists to protect victims from delay, not to compel a deadline-driven result. Dolan v. United States, 560 U.S. 605 (2010). The deadline therefore cannot be wielded as a sword to force a rushed, inaccurate award. Where a victim's losses are not ascertainable by the date set, the statute's own remedies are to set or extend the determination date and develop the record, § 3664(d)(5), or — where determining causation or the amount of loss would unduly complicate or prolong the sentencing process — to decline restitution, § 3663A(c)(3)(B); see United States v. Reifler, 446 F.3d 65, 135–36 (2d Cir. 2006) (Congress "plainly intended that sentencing courts not become embroiled in intricate issues of proof" and made mandatory restitution "inapplicable" where the complex factual issues of cause or amount "would unduly burden the sentencing process"). What the statute nowhere authorizes is the adoption of an admitted estimate to beat a date. The lawful path is a complete accounting and a determination on the merits, not a number entered under deadline pressure.

XI. The Government bargained for a process to develop the restitution

record and cannot now truncate it.

The bifurcated procedure the Government invokes to accelerate a final order is one the Government itself bargained for: the plea contemplated the development of the restitution record through the Special Master/Receiver before any final determination. Having secured that bargain, the Government cannot now compress the very process it obtained in order to fix a $1.655 billion figure before the accounting is complete and the defendant has been heard. A defendant is entitled to the benefit of the process for which the Government bargained, and the Government is held to the promises that induced the plea. Santobello v. New York, 404 U.S. 257 (1971). The defendant preserves this objection, which remains pending, including before the Fourth Circuit.

The Government notes only that the Circuit denied Defendant's petitions for a stay and for an expedited writ of mandamus. Doc. 308 at 9 n.9. To the extent that bare notation is offered to suggest that the appellate disposition supports entering a final order now, it does not. A denial of a stay and of the extraordinary writ of mandamus is a discretionary denial of interlocutory and extraordinary relief; it resolves nothing on the merits, and the Fourth Circuit did not pass on any of the issues preserved here. See Will v. United States, 389 U.S. 90 (1967); In re United States, 333 F.3d 509 (4th Cir. 2003) (mandamus is a drastic and extraordinary remedy reserved for exceptional circumstances). Two circumstances confirm as much. First, the Government itself urged the Fourth Circuit that the petitions were premature and that the restitution record should be developed in this Court before any appellate review — a position irreconcilable with its present demand to fix a $1.655 billion figure before that record and the § 3664(a) accounting are complete. Second, the timing and form of the Circuit's disposition confirm that it expressed no view on the merits, and the Government's flat description of both petitions as "denied" overstates what occurred. The petition for mandamus — which sought to compel this Court to act — was denied only after this Court set the August 10, 2026 hearing on the restitution issues, not before: once this Court took the matter up by setting it for hearing, the Circuit declined to exercise its extraordinary jurisdiction. The requested stay, in turn, was never ruled on at all on the merits: the stay was sought on the premise that this Court had not acted, and once this Court set and held the August 10, 2026 hearing on the motions for stay pending with this Court, that premise no longer existed — so the stay was left, without comment, as an interim posture rather than decided. The Circuit thus passed on nothing — a disposition reflecting deference to the ongoing proceedings in this Court, not any assessment of the merits. Because the stay was left unresolved rather than decided, it remains open for decision: this Court has not ruled on it, and the Government has not addressed it.

Defendant reasserts that application for a stay, which this Court must still decide, and the ruling on it will provide the basis for a further appeal, including an application for a stay pending appeal to the Fourth Circuit. The Government cannot recast the Circuit's disposition as an appellate ruling in its favor; and having resisted appellate review on the ground that the process in this Court should run its course, it cannot now truncate that same process. The contradiction is concrete: having told the Fourth Circuit that the restitution record should be developed in this Court, the Government has refused to participate in developing it — it declined to respond to Defendant's dispositive motions and, even now, has not answered many of them. A party cannot represent to the court of appeals that the process below should run its course and then refuse to engage that process when this Court affords it the opportunity. The appeal of the judgment and preliminary restitution order itself remains pending.

XII. The Court's restitution determination may not be delegated to, or governed by, the state rehabilitation court's civil findings.

Section 3664(e) commits the causation-and-amount determination to this Court, on the Government's preponderance proof; the district court is the trier of fact, United States v. Squirrel, 588 F.3d 207, 215 (4th Cir. 2009), and it may not delegate the determination of the restitution amount to another decisionmaker, United States v. Dawkins, 202 F.3d 711 (4th Cir. 2000); United States v. Blake, 81 F.3d 498 (4th Cir. 1996); United States v. Stuver, 845 F.2d 73 (4th Cir. 1988). Deferring to another tribunal's findings is a form of that forbidden delegation, and it is independently barred because § 3664(d)(6) makes a special master's proposed findings "subject to a de novo determination of the issue by the court." The Special Master/Receiver's Report nonetheless resolves several disputed issues — the Clanwilliam sale among them — by deferring to the civil findings of the Wake County Superior Court that supervised the insurers' rehabilitation. Doc. 245 at 22–23. Those findings cannot bear that weight. They are not final (they are on appeal); they are civil findings, made under civil procedures for a different purpose — whether a sale served the policyholders' best interests — and never adjudicated whether the offense proximately caused any particular loss, or in what amount; and issue preclusion does not apply, because "the difference in the burden of proof in criminal and civil cases precludes application of the doctrine of collateral estoppel." One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 235 (1972); see Standefer v. United States, 447 U.S. 10 (1980). A finding made under a civil best-interests standard cannot satisfy the Government's burden in this criminal proceeding. Because restitution is criminal punishment, Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), the facts that fix it must be found here, under the standard the criminal law requires — not borrowed from a civil record resolving a different question. The state-court record may be weighed as evidence; it may not be treated as controlling.

XIII. The Government's use of the undisclosed $1.6 billion loss figure to enhance the sentence, while disclaiming that figure as "separate" from restitution, is prosecutorial misconduct preserved for the sentencing appeal.

The Government cannot have the loss figure both ways. When the plea was being negotiated, footnote 3 of the draft plea agreement — dated the same day — addressed whether Mr. Lindberg's Sentencing Guidelines "loss amount" would be reduced by payments he made after indictment. The Government refused. In a December 18, 2024 e-mail responding to that footnote, the prosecutor wrote that "'loss amount' is a USSG issue, not a restitution issue," and that the Government would "not . . . agree . . . that his USSG 'loss amount' should be reduced by payments he makes post indictment," adding that "nothing in 18 USC 3664(j)(2) suggests otherwise." Def. Ex. 2, Tab E (Dec. 18, 2024 e-mail of AUSA Daniel Ryan). The Government thus drew a sharp line: the Guidelines loss that drives the sentence is a USSG matter, separate from restitution, and it would not be reduced by a dollar of post-indictment payments.

Having fixed the loss that way, the Government used it to drive the sentence upward. It urged, and obtained, an offense-level enhancement built on a loss of approximately $1.6 billion — even though many of the amounts making up that figure were not losses proximately caused by Mr. Lindberg's offense, but the product of the intervening, post-indictment decisions of third parties detailed throughout this Response. A loss the

Government would not reduce by any post-indictment payment, and that swept in amounts the offense did not cause, became the engine of the sentence.

And now the Government presses that same figure as the final restitution number. The $1.655 billion it asks this Court to enter is the sentencing loss repackaged — the same inaccurate analysis, untied to causation, now advanced as a restitution award and untethered from reality. The Government cannot in one breath insist that post-indictment payments will not reduce the Guidelines "loss amount" that drove the sentence, and in the next deploy that same unreduced, causation- untethered figure to demand a boxcar restitution award and the forfeiture keyed to it.

The infirmity is compounded because the methodology behind that $1.6 billion figure has never been disclosed to the defense. The Government enhanced Defendant's sentence on a loss calculation whose derivation — how the figure was

built, what was counted, and what offsets were ignored — it has withheld, and it now asks this Court to enter restitution and forfeiture on the same undisclosed computation. A defendant cannot test, and a court cannot review de novo under § 3664(e), a loss figure whose basis is kept off the record; the enhancement and the restitution demand rest on the identical unexamined number.

That the Government's use of this figure crosses from advocacy into misconduct is confirmed by evidence that has surfaced only now. In its Consolidated Position the Government represents that the reference to a Special Master, and the Special Master's conversion into a receiver with control of the estate, originated with Mr. Lindberg — that he "agreed to the reference." The contemporaneous record refutes that representation: as the attached exhibits show, the Special Master provision and the receiver conversion were authored and insisted upon by the Government's own counsel — including the December 18, 2018 e-mail and redlines in which the Government's attorney added the very language assuming Defendant's and Global Growth's authority to appoint trustees and directors — under threat of a plea violation and competing briefs, not at Mr. Lindberg's instance. See Def. Ex. 1, Tabs C–D. That the Government would attribute its own structural demand to the defendant, on a record that shows the opposite, reflects the same pattern as its use of an undisclosed loss figure it disclaims when convenient. This evidence has come to light only now and will be used in Defendant's appeal of the sentence.

The prosecutor "may strike hard blows," but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Advancing a $1.6 billion loss

to enhance a sentence while disclaiming that same figure to defeat restitution offsets, on a methodology withheld from the defense, and attributing to the defendant a structural demand the Government itself authored, are foul blows, not hard ones. Defendant preserved this issue as prosecutorial misconduct within fourteen days of the May 29, 2026 judgment, in his post-judgment stay motions (Docs. 172, 190), and again in his Motion to Enforce the Plea Agreement and for Conflict-Free Government Counsel (Docs. 201/202). He does not waive it, and he expressly preserves it for review in the Fourth Circuit, including in his appeal of the sentence.

Finally, Defendant incorporates by reference and preserves all of his pending motions, objections, and arguments, including his Objections to the Special Master/Receiver's Report and the Restitution Orders (Doc. 280), his Reply in support of his restitution motions (Doc. 300), his Motion to Strike the Government's Omnibus Response (Doc. 290), and his Response to the Government's prior Omnibus Response. Defendant is compelled to preserve

his issues in this manner because the Government has once again responded not issue by issue but with a single omnibus submission — the very non-responsiveness Defendant moved to strike. That the Government cannot meet the issues one at a time reflects the root of the problem: it has no facts to offer, having assembled its restitution demand without the examination of the facts that 18 U.S.C. § 3664(e) requires it to prove, and it now asks the Court to adopt a figure it declines to establish. The Government's position is non-responsive. Despite the multiple opportunities it has been afforded to answer, Defendant's request for a writ of mandamus, and Defendant's explicit request at the August 10, 2026 hearing that

the Court require the Government to respond to each pending motion issue by issue, neither the Government nor the Special Master/Receiver has answered Defendant's arguments on the merits, issue by issue. To the extent the Government and the Special Master/Receiver have not responded to any of Defendant's motions or arguments, those arguments stand unopposed, LCrR 47.1(d)(3), and Defendant does not waive any of them. The Government's silence is not a neutral litigation choice; the issues it has left unanswered — including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state- court sale, which the Government has chosen to ignore, treating engagement as counterproductive rather than addressing it — stand unopposed and will be read against the Government on review. Defendant expressly preserves every such argument for review, and each is and shall remain available to him on appeal to the United States Court of Appeals for the Fourth Circuit as if fully placed on the record.

Beyond its statutory consequences, the Government's practice of picking and choosing which issues to answer is, in and of itself, a violation of Defendant's constitutional rights. Due process entitles a defendant facing a criminal sanction — here, a $1.655 billion restitution and the forfeiture keyed to it — to notice and a meaningful opportunity to be heard on each disputed issue, and to hold the Government to its burden of proof; a prosecutor who selects which of the defendant's dispositive challenges to engage, and leaves the rest unanswered across multiple dispositive motions, denies that opportunity and shifts onto the defendant a burden the Constitution and § 3664(e) place on the Government. That denial is aggravated

by the Government's inconsistent representations across courts. Having urged the Court of Appeals that appellate intervention was premature because the restitution record should be developed in the district court, the Government here refuses to develop or defend that record issue by issue. And the Court of Appeals' denial of the defendant's stay and mandamus petitions, Doc. 308 at 9 n.9, was a discretionary refusal of extraordinary, interlocutory relief that resolved nothing on the merits; it cannot be treated as an appellate ruling against the defendant on any issue preserved here. A prosecutor cannot urge one court that its case should be proved below and then decline to prove it, issue by issue, when this Court affords the opportunity; Defendant submits that this inconsistency, in a matter carrying a $1.655 billion sanction, cannot be the foundation of a final restitution order.

Defendant further, and specifically, does not waive his responses to the Government's and the Special Master/Receiver's positions on his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver (Doc. 269), or his request for conflict-free counsel, and he preserves those issues for appeal — including his showing that the policyholder statements offered against him were stale, presented as though recent. Nor does Defendant waive his responses to any other motion

the Government has not answered. And because the Court took up these matters at the August 10, 2026 hearing, Defendant states that, upon receipt of the transcript, he will file a notice of objections and corrections to that hearing; he has not waived, and does not waive, any right with respect to anything that transpired during it.

Finally, and for the reasons developed throughout, the Government's Consolidated Position (Doc. 308) should be stricken as non-responsive. At the August 10, 2026 hearing, Defendant asked specifically that the Government be required to answer his pending motions and the disputed restitution issues one at a time, issue by issue and on the merits. It has not done so. Doc. 308 instead recasts the Special Master/Receiver's conclusions, appends a new affidavit from the entity the Special Master/Receiver owns and controls, and declines to engage — issue by issue — the defendant's specific, evidence-backed showings on causation, offsets, credits, and valuation. A single omnibus brief that does not join those issues does not carry the Government's burden under § 3664(e) and does not supply the record the Court needs for a de novo determination. Consistent with the grounds set out in Defendant's Motion to Strike the Government's Omnibus Response (Doc. 290), the Court should strike Doc. 308 as non-responsive and, if the Government intends to seek any restitution, require it to respond to each motion and each disputed issue separately and on the evidence, as Defendant requested and as § 3664(e) requires.

CONCLUSION

The Court should decline to adopt the Special Master/Receiver's Report; set aside the Preliminary Order of Restitution (Doc. 161), the Second Supplement (Doc. 245), and the proposed Final Order (Doc. 245-1); order the Special Master/Receiver to produce a full and verified accounting, including the Beckett purchase agreement, board consents, closing statement, sale price, and the referenced J.P. Morgan fairness opinion; and make the § 3664(e) loss and causation determination itself, on the

Government's own proof and after an evidentiary hearing, with a right of reply for Defendant. The Court should further stay the pending state-court sale of the Damovo Group — a Primary Restitution Asset now the subject of a pending state-court motion to approve its sale for no more than the debt against it — and enjoin any further disposition of the Primary Restitution Assets, until it has made the § 3664 determination; no such sale has been authorized by any order of this Court, and allowing the estate to be liquidated piecemeal, below value and before any loss is determined, would inflict exactly the irreparable, unrecoverable harm the Beckett disposition already caused. Where the loss cannot be determined accurately or the issues are too complex, the Court's course is to decline restitution, not to enter an inaccurate award. 18 U.S.C. § 3663A(c)(3)(B).

Dated: August 18, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 18, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 319 — Objections and Reservations Regarding the August 10, 2026 Motion Hearing (filed 08/23/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC Plaintiff, Judge Max O. Cogburn, Jr. v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S OBJECTIONS AND RESERVATIONS REGARDING THE

AUGUST 10, 2026 MOTION HEARING

INTRODUCTION

Defendant Greg E. Lindberg respectfully submits these Objections and Reservations concerning the motion hearing held before this Court on August 10, 2026, and the Court's oral rulings, statements, and directions at that hearing. The official transcript was reported by the Court's reporter and certified on August 21, 2026, and Defendant files these objections and corrections promptly upon its availability, as counsel advised the Court he would do. Defendant files this document out of an abundance of caution and to make the record complete; nothing in it waives, and it is intended to preserve, every objection, argument, and issue Defendant has raised or is entitled to raise, whether or not it was reached at the hearing. Where the Court ruled from the bench, Defendant states his objection; where the Court did not reach or did not permit argument on a matter, Defendant reserves and preserves it. Citations to the transcript are given as "Tr. __:__" (page and line).

Defendant files these Objections and Reservations for a further and specific reason. At the August 10 hearing the Court denied, from the bench and without

argument, Defendant's Motion to Enforce the Plea Agreement, Preserve Counsel Access, and Require Conflict-Free Government Counsel (Docs. 201, 202). Tr. 11:6–11. Because that motion was decided without the argument or the record it required, Defendant sets out below, and expressly preserves, the issues that should have been heard and argued on it — including the disqualification of Government counsel who are necessary witnesses on the very causation questions now before the Court, the enforcement of the plea and bifurcation agreements, and Defendant's access to his own counsel and to the case record. None of those issues was resolved on the merits, and Defendant does not waive any of them.

OBJECTIONS AND RESERVATIONS

I. Defendant objects to the summary denial of the Motion to Enforce the

Plea Agreement and to Require Conflict-Free Government Counsel (Docs. 201, 202), which was denied without argument, and preserves the issues that should have been heard on it.

The Court denied Docs. 201 and 202 from the bench at the outset of the hearing, before any argument. When Government counsel raised "the motion to disqualify me and Ms. Freeman," the Court responded, "That's going to be denied," Tr. 11:6–10, and later characterized the motion as "dead on arrival on disqualifying these folks," stating that Government counsel had "done nothing to be disqualified in this case," Tr. 12:9–13. No

argument was heard, no evidence was taken, and no findings were made. Defendant respectfully objects. The motion raised disqualification, plea-enforcement, and counsel-access questions that turn on a factual record, and it could not be resolved on the papers, still less denied before argument. Defendant preserves each of the following grounds for review.

A. Government counsel are necessary witnesses on the dispositive causation issue now before the Court, and the advocate-witness conflict cannot be resolved without a record.

The central disputed question in this restitution phase is causation — whether the offense of conviction, rather than intervening events, caused the losses the Government seeks to impose. On that question, Government counsel are themselves fact witnesses. Defendant's causation showing includes evidence that a third party, Ares, agreed to acquire the relevant entities in a transaction that would have made policyholders whole, and that the transaction was blocked by the Government: as counsel explained at the hearing, a contemporaneous e-mail from the companies' chief financial officer, Christa Miller, states that "somebody with power — the government, apparently — called up Ares and blocked that transaction." Tr. 19:23–20:2. That intervening act is now squarely at issue in Defendant's Motion for a Determination That No Restitution Is Owed (Doc. 234). At the hearing, Government counsel did not stand apart from that factual record; he vouched for it, representing to the Court from personal knowledge what the Ares discovery contained — that "[i]n discovery Ares produced documents to the government … something like 800 of them," and that there are "302s from the FBI agents about various communications and meetings with Ares." Tr. 44:7–10. A prosecutor who is a necessary witness to the very intervening-cause events that determine the amount of restitution ought not also be the advocate opposing that defense. See N.C. R. Prof'l Conduct 3.7 (advocate-witness rule); 28 U.S.C. § 530B (subjecting Government attorneys to state rules of professional conduct). And a prosecutor's duty in a criminal case "is not that it shall win a case, but that justice shall be done"; while he "may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Whether the prosecutors' dual role as advocates and witnesses on causation requires their disqualification is a question that could not be answered "dead on arrival," and Defendant preserves it.

B. The plea agreement and the parties' bifurcation agreement are enforceable, and their enforcement was not adjudicated.

Docs. 201 and 202 also sought enforcement of the plea agreement and of the parties' agreement to bifurcate the restitution proceedings. Those agreements are binding: "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 262 (1971). As counsel represented at the hearing, the restitution proceeding "was actually part of a bifurcation process where … [d]efense and the government … got together and said this restitution process is going to go on longer," so that "the hearing came first and then the restitution came after that," and "this was never meant to be a 90-day process." Tr. 35:16–24. Enforcement of the plea and of that bifurcation agreement was not adjudicated on the merits at the hearing, and Defendant preserves it.

C. Defendant's access to his own counsel and to the case record remains unresolved and is preserved.

The motion further sought to preserve Defendant's access to his counsel and the case record. That relief overlaps with Defendant's Emergency Motion Directing the Bureau of Prisons to Permit Daily Access to Counsel, a Computer, and the Case Records (Doc. 225), which remains pending. As the hearing reflected, much of the delay in this matter was attributed to unresolved questions about who Defendant's counsel were and the conditions of Defendant's access to them, Tr. 11:23–12:8 — the very conditions Docs. 201, 202, and 225 sought to fix. A defendant confronting a $1.655 billion restitution demand while incarcerated is entitled to a meaningful opportunity to consult with his counsel and review the record. Defendant preserves that right.

D. Defendant preserves any claim of prosecutorial overreach or vindictiveness arising from the manner of the Government's participation.

To the extent the Government's conduct in this restitution phase — including its refusal to answer Defendant's dispositive motions issue by issue while continuing to enlarge the record against him, and its role in the intervening events described above — gives rise to a claim of prosecutorial overreach, Defendant reserves it. See United States v. Goodwin, 457 U.S. 368 (1982); Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987) (a prosecution must be conducted by a disinterested prosecutor). Defendant does not presently move on this ground, but preserves it against waiver.

E. The change in counsel was compelled by the Special Master/Receiver's own conduct and does not excuse the Government's failure to respond.

The Court attributed the Government's failure to respond to Defendant's motions to the unresolved question of who Defendant's counsel were, explaining that once "we get who the real lawyers are … then they can respond to motions that you all have filed." Tr. 12:3–8; see Tr. 47:13–48:2. Defendant respectfully objects to that rationale and preserves the following. First, the change in counsel was not a litigation tactic; it was compelled by the Special Master/Receiver's own conduct. The Special Master/Receiver told Defendant's then-counsel at Katten that counsel would not be paid until August, and then only if funds were available; and he told Defendant's counsel at Litson the same thing, twice, during weekly calls. Confronted with the prospect that the very officer whose report he was contesting would leave his lawyers unpaid, Mr. Lindberg had to act to preserve his rights, and that necessity — not any desire for delay — was the principal reason for the change in counsel. Second, the transition does not excuse the Government's failure to respond. Undersigned counsel, Mr. Barnes, had already asked the Government to respond to Defendant's pending motions. And as soon as the inquiry into Defendant's representation was raised, a written notice from Mr. Lindberg was filed with the Court confirming his counsel. Third, the Government itself did not treat the representation question as an obstacle to responding. During two separate calls with Litson counsel, the Government raised no concern about who represented Mr. Lindberg; it observed only that the Court might be awaiting a note from Mr. Lindberg — not that the Government regarded the representation as a barrier to answering the motions. Fourth, Defendant's representation was never genuinely in doubt: in every instance, the withdrawing counsel and the incoming counsel coordinated the transition with one another, which could not have occurred unless each knew who represented Mr. Lindberg. Fifth, counsel have actively represented Mr. Lindberg throughout this period, including by petitioning the United States Court of Appeals for the Fourth Circuit for a writ of

mandamus — conduct incompatible with any suggestion that it was unclear who represented him. Sixth, the substance of the filings confirms the same point: counsel placed before the Court extensive documentary evidence of causation and filed numerous other motions, none of which could have been prepared without Mr. Lindberg's active participation — indeed, only Mr. Lindberg could have explained the documents on which those filings rest. That degree of client involvement is irreconcilable with the premise that it was unclear who represented him. The counsel- transition explanation therefore cannot bear the weight placed on it, and Defendant preserves his objection to the Government's non-response and to any suggestion that the counsel transition excused it.

II. Defendant objects to the Court's stated intention to enter restitution

on the Special Master/Receiver's numbers and to hold credits open, and reserves causation, offsets, credits, and valuation.

At the hearing, the Court described the course the Government proposed: "the Court can order the restitution based on what the special master is saying and then hold open the possibility of credits being given to Mr. Lindberg to reduce that restitution." Tr. 20:17–21. The Court later observed that it was "relying a lot on the special master in this matter … assuming he's constitutional." Tr. 47:5–8. Defendant respectfully objects. Adopting the Special Master/Receiver's recommended numbers and deferring credits to a later day is not the de novo determination that 18 U.S.C. § 3664(d)(6) and § 3664(e) require the Court to make on the Government's own proof. Section 3664(e) places on "the attorney for the Government" the burden of proving "the amount of the loss sustained by a victim as a result of the offense," and the

Special Master/Receiver's report does not carry that burden — it rests, by its own terms, on a "current guess on the value of the Primary Restitution Assets," Doc. 245 at 37, and on balances the Report "presumed … were accurate," id. at 9. Entry of a final restitution figure before the accounting, the causation determination, and the § 3664(e) hearing would fix the amount on a record the statute does not permit. Defendant objects and expressly reserves causation, foreseeability, the absence of superseding cause, offsets, credits, and valuation, none of which has been determined. 1

III. Defendant objects to the denial of the Rule 17(c) subpoenas (Doc. 248)

and of the request that the Government disclose its Ares communications (Doc. 234), and preserves his compulsory-process and disclosure rights.

Defendant objects to the denial of his Motion for Issuance of Rule 17(c) Subpoenas Duces Tecum (Doc. 248) and of his request, made as part of Doc. 234, that the Government be ordered to disclose its communications with Ares. The subpoenas and the requested disclosure go to the heart of the intervening-cause defense: whether, and by whom, the Ares transaction that would have made policyholders whole was blocked. The Government's own statements at the hearing confirm that responsive material exists and is material — that Ares "produced … something like 800" documents "to the government" in discovery, and that "302s from the FBI agents about various communications and meetings with Ares" exist. Tr. 44:7–10. What the Defendant requested was information relating to a call that Ms. Miller alleges in an

1 The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

email which was already produced in Doc. 234. The government has not produced that specific document if it exists or stated that it does not exist. Instead, the government talked about the documents produced. This specific document is not available with Katten or current counsel. The produced documents do not address this issue. Denying Defendant the process to obtain and test that evidence, while the Government simultaneously relies on its own characterization of it, deprives Defendant of the means to contest causation on the very record the Government invokes. Defendant objects and preserves his rights under Federal Rule of Criminal Procedure 17(c), the Due Process Clause, and Brady v. Maryland and its progeny, and reserves the right to renew these requests.

IV. Defendant objects to the Court's declining to require the Government

to respond issue by issue and to the denial of the Motion to Strike the Government's Omnibus Response (Doc. 290).

Defendant asked, repeatedly and specifically, that the Government be required to respond to his pending motions "issue by issue and not ignore issues." Tr. 48:16– 19; see Tr. 45:15–20. The Court declined to compel that course, stating that Government counsel would "respond the way he's going to respond," Tr. 48:20–21, and declined to strike the Government's omnibus response, Tr. 48:6. The Court also denied Defendant's request that the unanswered dispositive motions be treated as unopposed for the Government's failure to respond within the time the Local Rules prescribe, ruling that it would not "dismiss because they missed some seven-day deadline or whatever" and that the request was "going to be denied right now offhand." Tr. 45:10–12. Defendant respectfully objects. Under this Court's Local

Criminal Rule 47.1(d), the Government must respond to a dispositive motion, and a motion to which it fails to respond "may be granted without further notice." A single omnibus submission that declines to engage Defendant's specific, evidence-backed showings on causation, offsets, credits, and valuation does not carry the Government's § 3664(e) burden and does not supply the record required for a de novo determination. Defendant preserves his Motion to Strike (Doc. 290) and his position that the Government's non-responsiveness leaves his showings unrebutted.

V. Defendant objects, for the record, to the Court's characterizations of

the defense and to the exclusion of Defendant's causation evidence as untimely, and preserves his objections to the adjudicator and his right to be heard on causation.

At the hearing the Court made a number of statements about the merits before the causation record had been received, including that "this entire defense case was a shell game, money moved around," Tr. 32:21–22; that a defendant does not "get to gamble with other people's money … take other people's money and go to the casino," Tr. 33:4–7; that "we know … fraud when we see it," Tr. 34:15; and, to defense counsel, "I know you're getting paid a lot of money to say these things," Tr. 34:7–8. When counsel sought to place the intervening-cause evidence on the record, the Court declined to consider counsel's account of what prior attorneys had said as "hearsay, unsworn testimony," Tr. 24:1–4, and analogized Defendant's causation motion to a belated "new trial" request that came only after "six years" and "all these brilliant lawyers," Tr. 35:1–15. Defendant respectfully objects, and does so solely to preserve the record. Defendant further objects, specifically, to the characterization of defense counsel's compensation; how much an attorney is paid is not a proper consideration

in the restitution determination, forms no part of the § 3664(e) analysis, and should play no role in the resolution of the disputed issues. The premise of the remark is, in any event, mistaken: Mr. Ramachandran receives no compensation for this representation. On criminal matters, Mr. Ramachandran works on a Dana, or generosity, basis. The jury's finding of fraud, and Defendant's plea, establish the offense; they do not establish the amount of each victim's loss or that the offense proximately caused it, which the Government must still prove by a preponderance of the evidence, 18 U.S.C. § 3664(e), and which the Report itself rests on a "current guess" and "presumed" balances, Doc. 245 at 37, 9. Defendant's causation showing (Docs. 234, 235) is timely because it is directed to the restitution determination now before the Court — the very stage the parties agreed would follow the merits — and it is supported by documentary evidence of intervening events, not by unsworn narrative. Defendant further preserves his objection, developed in his pending motions (Docs. 190, 269, 278), that the officer whose recommendations the Court proposes to adopt is not a neutral adjudicator, because he both liquidates the estate and quantifies the loss against it, and that "[e]ven appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator." Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 618 (1993) (citing Ward v. Village of Monroeville, 409 U.S. 57, 61–62 (1972)). Defendant reserves his objections under the Due Process Clause, 28 U.S.C. § 455, and Article III. Separately, Defendant observes that the Court has, to this point, adopted the Government's positions over Defendant's objections, including on the ninety-day timetable and the proposal to

enter restitution on the Special Master/Receiver's figures; and, in light of that and of the statements set out above, Defendant respectfully reserves and preserves — without presently moving on the ground — any challenge to the impartiality of the proceeding under 28 U.S.C. § 455 and the Due Process Clause.

VI. Defendant objects to any truncation of the causation and accounting

determination to meet the August 24, 2026 deadline, and reserves that the statutory deadline is directory.

The Court stated that it would "rule on all motions that need to be decided by August 24th" and would "get it done by August the 24th." Tr. 45:24–25; Tr. 45:21–22. Defendant objects to the extent the ninety-day date is treated as a jurisdictional bar that compels entry of a final restitution amount before the accounting, the causation determination, and the § 3664(e) hearing. The deadline in 18 U.S.C. § 3664(d)(5) is directory, not jurisdictional; a sentencing court retains the power to determine the victims' losses after ninety days, as the Government itself acknowledged in invoking Dolan v. United States. Tr. 18:15–23. The record forecloses the ninety-day-cram-down premise in any event. The parties jointly moved to bifurcate the sentencing hearing — separating the restitution determination from the balance of sentencing — and the Court granted that motion. Joint Motion to Bifurcate Sentencing Hearing (Doc. 107); Order Granting Motion to Bifurcate (Doc. 108). That relief is fundamentally inconsistent with treating restitution as a rigid ninety-day process: had the ninety- day deadline been understood to control, there would have been no need for a motion to bifurcate sentencing at all. The bifurcation the parties sought and the Court granted necessarily presupposed that the restitution determination would follow, and would take longer than, the remainder of sentencing — which is precisely why counsel explained that this "was never meant to be a 90-day process." Tr. 35:16–24. The Government, having joined that motion, has since reversed course: it now presses the very ninety-day cram-down the bifurcation was designed to avoid, urging that the Court

"complete it within 90 days." Tr. 18:11–14. Defendant objects to the Government's attempt to disavow the bifurcation it agreed to and the Court granted, and preserves the point. Defendant reserves his position that the Court may, and where the loss cannot yet be determined accurately should, keep the amount open rather than enter an inaccurate award. 18 U.S.C. § 3663A(c)(3)(B).

VII. Defendant reserves all constitutional challenges to the restitution determination.

Defendant reserves and preserves all constitutional challenges to any restitution award, including that the facts necessary to support such an award must be found by a jury beyond a reasonable doubt; that any award is subject to the Excessive Fines Clause of the Eighth Amendment; that the retrospective application of the Mandatory Victims Restitution Act as criminal punishment implicates the Ex Post Facto Clause; and that the reference to the Special Master/Receiver and the adoption of his recommendations implicate Article III and the nondelegation principle. Defendant does not waive any of these challenges by addressing the restitution issues on the terms the Court has set. 2

2 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this filing without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. ___, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond

VIII. Defendant incorporates by reference and preserves all of his pending motions, and preserves every issue for appeal without waiver.

Defendant incorporates by reference, and preserves without waiver, each of his pending motions and the issues raised in them, including: his Motion to Stay Asset Sales and Enforcement of the Preliminary Restitution Order (Doc. 172); his Emergency Motion to Stay All Asset Sales and Consolidated Objections to the Preliminary Order of Restitution (Doc. 190); his Motion to Enforce the Plea Agreement, Preserve Counsel Access, and Require Conflict-Free Government Counsel (Docs. 201, 202); his Emergency Motion Directing the Bureau of Prisons to Permit Daily Access to Counsel, a Computer, and the Case Records (Doc. 225); his Motion for a Determination That No Restitution Is Owed (Docs. 234, 235); his Motion for Issuance of Rule 17(c) Subpoenas Duces Tecum (Doc. 248); his Motion to Recoup the Distribution to Vista (Doc. 238); his Motion to Declare the Special-Master Reference Unconstitutional, to Disqualify and Remove the Special Master/Receiver, and to Set Aside the Restitution Orders (Doc. 269); his Second Motion to Set Aside the Special Master/Receiver's Report and the Restitution Orders (Doc. 278); his Motion to Adopt Prior Motions and Hold the Second Supplement in Abeyance (Doc. 282); his Motion to Strike the Government's Omnibus Response (Doc. 290); his Motion for Leave to File a Supplemental Response (Doc. 293); and his Motion for Reconsideration (Doc. 309). To the extent any of these motions has been denied,

a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

Defendant objects and preserves the ruling for appeal; to the extent any remains pending, Defendant preserves it. Even if the Court should treat any issue as moot, Defendant expressly preserves it for appeal to the United States Court of Appeals for the Fourth Circuit, and the Government, having been afforded and having declined the opportunity to respond issue by issue, cannot then be heard to claim that it had no opportunity to do so.

CONCLUSION

For the reasons stated, Defendant respectfully submits these Objections and Reservations, objects to the rulings and statements identified above, and preserves — without waiver and for all purposes, including appeal to the United States Court of Appeals for the Fourth Circuit — every issue raised or reserved herein, together with all issues that should have been heard and argued on his Motion to Enforce the Plea Agreement and to Require Conflict-Free Government Counsel (Docs. 201, 202). Defendant respectfully requests that the Court note these objections and reservations on the record.

Dated: August 21, 2026.

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran

Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 21, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 320 — Notice re Damovo + Motion to Stay Its Disposition (filed 08/23/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Case No. 5:19-CR-22-MOC

v.

Judge Max O. Cogburn, Jr.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S NOTICE CONCERNING THE DAMOVO PRIMARY

RESTITUTION

ASSET AND MOTION TO STAY ITS DISPOSITION

Defendant Greg E. Lindberg respectfully submits this notice, and moves to stay any disposition of the Damovo Primary Restitution Asset pending this Court's review, and states as follows:

1. Damovo is a Primary Restitution Asset committed to the exclusive

possession and control of the Special Master by this Court's appointing order. Doc. 56 ¶ 9. The Order permits liquidation of a Primary Restitution Asset only on the express condition that the Special Master "seek Court approval to liquidate" and "oversee and help accomplish the liquidation with Court approval." Doc. 56, at 6–7.

2. The Damovo asset is now being sold for debt in proceedings in the

General Court of Justice, Wake County, North Carolina. A copy of the operative Wake County filing is attached as Exhibit 1. The Special Master has not informed this Court of that disposition, has not sought this Court's approval of it, and has not disclosed its terms to this Court — notwithstanding his duty, as this Court's

appointed officer, to keep the Court informed of the disposition of the restitution estate.

3. The disposition sacrifices restitution value. A valid, standing offer of

$400 million for the asset is on the record — Defendant placed that offer before the Court. Six months ago, the same group offered $500 million for the same asset, and the Special Master was given that information at that time. The intervening delay, and the present sale of the asset for debt, have thus already cost the restitution estate approximately $100 million in value.

4. To sell a Primary Restitution Asset for debt — without informing this

Court, and without the Court approval the appointing order requires — exceeds the authority the Court conferred, dissipates a restitution asset to the detriment of the victims and the Defendant, and deprives this Court of its role in the restitution process. See 18 U.S.C. § 3664; Doc. 56, at 6–7.

5. Defendant informed the Special Master on March 6, 2026 of this better

offer of $500 million at that time and received no response from the Special Master. See Exhibit 2. Therefore, this is a deliberate attempt to sell a $500 million asset for debt, which serves no one. The government and the Special Master did not respond to the prior Damovo Motion as well.

6. For these reasons, Defendant respectfully requests that the Court: (a)

direct the Special Master to inform the Court, forthwith, of the status and terms of any pending or completed disposition of the Damovo asset; and (b) stay any sale,

transfer, or other disposition of the Damovo asset pending this Court's review and approval under its appointing order (Doc. 56) and 18 U.S.C. § 3664.

Dated: August 21, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 18, 2026.

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 324 — Notice of Correction to Doc. 316 (filed 08/24/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S NOTICE OF CORRECTION TO HIS RESPONSE TO THE

UNITED STATES' CONSOLIDATED POSITION REGARDING

RESTITUTION (DOC. 308)

Defendant Greg E. Lindberg respectfully submits this Notice of Correction to his Response (Doc. 316) in opposition to the United States' Consolidated Position Regarding Restitution (Doc. 308):

1. The signed Declaration of Greg E. Lindberg in Response to the

Government's December 18, 2024 Allegations — referenced in the Response as Defendant's Exhibit 1, Tab B — was inadvertently omitted from the Response as filed: the signature on this second affidavit was not obtained before the Response was filed yesterday. Mr. Lindberg has since signed the Declaration, executed August 24, 2026. Defendant now files the signed Declaration to complete Defendant's Exhibit 1, Tab B, together with its Attachment 2 (Mr. Lindberg's letters concerning AAPC).

2. Defendant also corrects the citation to that Declaration: the Response's

reference to "Def. Ex. 1, Tab B ¶¶ 117, 119" should read "Def. Ex. 1, Tab B ¶¶ 4, 6, and Attachment 2 thereto." This Notice and the signed Declaration (Def. Ex. 1, Tab

B) are filed on both above-captioned dockets.

[Signature page follows.]

Dated: August 24, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 24, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 329 — Notice of Objections to Entry of Any Final Order of Restitution and Forfeiture (filed 08/26/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S OBJECTIONS TO ENTRY OF ANY FINAL ORDER OF RESTITUTION AND FORFEITURE, AND RESERVATION OF CONSTITUTIONAL AND STATUTORY ISSUES

Defendant Greg E. Lindberg respectfully submits these objections to the entry of any final order of restitution and forfeiture and reserves the constitutional and statutory issues set forth below. Because the Court may act imminently, Defendant files these objections now to preserve each issue on the record for the Court's de novo determination and for appellate review. Defendant does not waive, and expressly reserves, every issue previously raised, including those in his Response (Doc. No. 316), in every motion he has filed in these cases—whether pending, denied, withdrawn, or deemed moot—and in his objections to the Special Master's reports.

The restitution and forfeiture the Government seeks rest on the valuations, loss findings, and recommendations of the Court-appointed Special Master and Receiver. For the reasons stated in Defendant's prior filings and summarized below, that officer's appointment, his combined role, his unauthorized dispositions of Defendant's property, and the figures he produced cannot support the order the Government asks the Court to enter. Defendant objects and preserves the following.

Defendant states each objection below separately and specifically so that each is preserved. An objection made before the Court's ruling preserves the issue for review and need not be renewed after the ruling. United States v. Lynn, 592 F.3d 572 (4th Cir. 2010).

I. The reference exceeded 18 U.S.C. § 3664(d)(6), and no rule of criminal procedure authorizes a master.

Section 3664(d)(6) permits reference to a special master only "for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by the court." It does not authorize vesting custodial and dispositive power over the defendant's property in the same officer; the grant of a recommending function forecloses, by negative implication, a custodial and dispositive one. Enforcement of restitution runs through a different, procedurally protective channel—18 U.S.C. § 3664(m) and the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 et seq.—which the appointment

bypassed. Section 3664(c) confirms the limit: it makes "the provisions of this chapter, chapter 227, and Rule 32(c)" the "only rules applicable" to these proceedings, and no rule of criminal procedure authorizes a master. The appointment of a receiver to secure restitution is, moreover, an abuse of discretion where ordinary process and the FDCPA supply an adequate remedy. United States v. Bradley, 644 F.3d 1213 (11th Cir. 2011). Defendant did not consent to a receiver; he agreed only to a neutral special master. Cf. La Buy v. Howes Leather Co., 352 U.S. 249 (1957) (reference is the exception, not the rule).

II. The combined Special Master, Receiver, and prosecutorial role violates due process.

An officer who investigates the estate, sells the property, values it, becomes a witness to his own transactions, and then adjudicates or recommends on the facts his own conduct created is not the neutral and detached decisionmaker the Fifth Amendment requires. In re Murchison, 349 U.S. 133 (1955); Williams v. Pennsylvania, 579 U.S. 1 (2016) (structural error). Where the officer is compensated from the estate he administers and values, the defect is established without any inquiry into actual bias. Tumey v. Ohio, 273 U.S. 510 (1927); Ward v. Village of Monroeville, 409 U.S. 57 (1972); Connally v. Georgia, 429 U.S. 245 (1977). A receiver has a financial interest in the very claims and values he is asked to determine, which disqualifies him from serving as a special master. United States v. O'Connor, 291 F.2d 520 (2d Cir. 1961) (citing Tumey). The test is whether the officer's interest "would offer a possible temptation to the average … judge." Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis., 922 F.3d 568 (4th Cir. 2019). See also Young v. United States ex rel. Vuitton et Fils, 481 U.S. 787 (1987) (interested officer; no harmless-error review).

The defect is not limited to the officer's financial stake. The Special Master also assumed an accusatory, prosecutorial role adverse to Defendant while simultaneously serving as the officer whose findings the Court was asked to adopt. He investigated, generated, and advanced the loss and valuation figures that the Government then adopted against Defendant—both at sentencing, where they drove the guideline enhancement, and for restitution; he conditioned a favorable assessment of Defendant's cooperation on a release running to his own benefit; and, four days before sentencing—while his demand for that self-benefiting waiver was still pending—he filed a Statement Concerning Defendant's Cooperation (Doc. No. 159) advancing a position adverse to Defendant on a contested sentencing matter. His accusatory posture was thus driven by his own personal interest in the release he sought: the adverse cooperation assessment served as leverage for, and was the product of, that demand. One who performs an accusatory or prosecutorial function may not also sit in judgment or recommend the judgment on the same matter. In re Murchison, 349 U.S. 133 (1955); Williams v. Pennsylvania, 579 U.S. 1 (2016). And due process forbids injecting the decisionmaker's own personal interest into the prosecutorial or enforcement function in precisely this way; those who exercise such functions must themselves be disinterested and neutral. Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); Young v. United States ex rel. Vuitton et Fils, 481 U.S. 787 (1987). By fusing the roles of investigator, adverse advocate, and asset-liquidator with the role of the officer recommending the Court's findings, the Special Master functioned as a second prosecutor, and that combination independently violated due process.

III. De novo review by the Article III judge does not cure the defect.

The right is to a neutral officer at the moment the proceeding occurs, not to eventual review by a neutral officer. Ward, 409 U.S. at 61–62 (defendant "is entitled to a neutral and detached judge in the first instance"); Williams, 579 U.S. at 15–16. Adoption of a disqualified officer's findings is not the independent fact-finding the law requires. It follows that none of the tainted officer's work product survives: his

reports, valuations, and recommendations are the product of the disqualification, and they may not be adopted, relied upon, or placed on the record in any form. The Court must determine restitution and forfeiture, if at all, on its own findings drawn from tested evidence, and not from the tainted officer's reports.

IV. The Special Master's loss and valuation findings drove the Guidelines

calculation and the custodial sentence, and that fact-finding could not be delegated.

The Special Master's loss and valuation figures supplied or materially determined the loss amount under U.S.S.G. § 2B1.1(b)(1), and therefore the offense level, the guideline range, and the consecutive custodial term imposed. Sentencing is committed to the court. 18 U.S.C. § 3553(a); Fed. R. Crim. P. 32(i)(3)(B) (the court "must … rule on" any disputed portion of the presentence report or other controverted matter); U.S.S.G. § 6A1.3. No statute or rule authorizes reference of guideline fact- finding to a master. The calculation was doubly infirm. First, the enhancement was sought and imposed on a gross loss figure of approximately $1.655 billion (Doc. No. 162)—the Special Master's own estimate, which he characterizes as a "prediction," a "best guess," and "inherently unreliable" (Doc. No. 323 at 3–4)—without any offset for the value returned to or recovered for the victims, as U.S.S.G. § 2B1.1 cmt. n.3(E) requires. Loss under the Guidelines "shall be reduced" by the money and the fair market value of the property returned and recovered; here no such credit was applied to the guideline computation, so the offense level was driven by a gross number rather than by the net loss the Guidelines measure. Second, that same gross figure is itself the product of the Special Master's own dispositions—he sold, and continues to sell

and to propose to sell, the Primary Restitution Assets below value, including the completed Becket sale and the proposed disposition of Damovo for the amount of the debt against it, notwithstanding a pending offer of $400 to $500 million for Damovo— dispositions that suppress the value credited against loss even as the resulting shortfall is counted as loss. The defendant would thus be charged twice for the same conduct: the officer's below-value liquidations depress the credit, and the depressed recovery inflates the loss that stacked the custodial term. A sentence enhanced on an unreduced, self-generated valuation of that character cannot stand. Moreover, the figure on which both the guideline enhancement and the restitution award rest is one the Government adopted as its own without itself knowing or disclosing the methodology or data behind it. The Government took the Special Master's loss and valuation numbers and placed them before the Court at sentencing, where they drove the guideline enhancement, and again as the basis for restitution—yet it has never produced, and does not appear itself to possess, the analysis underlying them. A proponent that cannot explain the basis for its own numbers has not carried its burden of proof, 18 U.S.C. § 3664(e); and figures the Government adopted but cannot support cannot sustain either the guideline enhancement or the restitution award. The doubt about the very basis of the $1.6 billion calculation used at sentencing comes from the Special Master's own filings made after the sentence was imposed: it is in those later submissions that he characterizes his valuations as a "best guess" and a "prediction" and describes them as "inherently unreliable," while disclaiming reliance on any independently commissioned business valuations. Doc. No. 323 at 3–4; see

Doc. No. 246, Appendix 1. The number the Court used to enhance the sentence therefore rests on the same methodology the Special Master has since disavowed, and his post-sentencing disclaimers cast doubt backward on the figure he supplied for sentencing. Compounding the defect, the Special Master did not confine himself to his reports: four days before the May 26, 2026 sentencing he filed a Statement Concerning Defendant's Cooperation (Doc. No. 159, filed May 22, 2026), a sentencing- eve submission that operated to drive the guideline loss determination informally— outside any adversarial testing, cross-examination, or Rule 32 fact-finding by the Court. An unsworn, last-minute filing by the very officer whose valuations set the loss is not a permissible substitute for the Court's own findings, and Defendant objects to any reliance on it in the guideline computation. Defendant objects that the Court has not made its own findings on loss—net of all value returned and recovered—and demands that it do so under Rule 32(i)(3)(B). To the extent the loss found by the Special Master increased a statutory maximum or mandatory minimum, those facts were required to be found by a jury. Apprendi v. New Jersey, 530 U.S. 466 (2000); Alleyne v. United States, 570 U.S. 99 (2013). Defendant timely objected to this delegation within fourteen days of the sentencing and of the Judgment (Doc. No. 162, entered May 29, 2026)—see Defendant's Emergency Motion to Stay (Doc. No. 172, filed June 9, 2026, with supporting Memorandum, Doc. No. 173) and Defendant's Emergency Motion to Stay and Consolidated Objections to the Preliminary Order of Restitution (Doc. No. 190, filed June 11, 2026), each of which expressly asserted every ground stated therein as an objection to the Preliminary Order of Restitution (Doc.

No. 161)—and renews and incorporates that objection here. The specific grounds set forth above were likewise placed before the Court in those filings and are incorporated as objections to the guideline loss determination: Defendant's Emergency Motion to Stay and supporting Memorandum (Doc. Nos. 172, 173) demand that cash and property already returned be credited dollar-for-dollar and identify the mandatory offsets and reductions the proposed figure omits; and Defendant's Emergency Motion to Stay and Consolidated Objections (Doc. No. 190) objects to the Special Master's May 22 Statement (Doc. No. 159) as having compromised the May 26 sentencing. Defendant renews and incorporates each of those grounds here and objects to and preserves each of them. The objection to the loss-driven guideline enhancement and to the stacking of the custodial terms was raised at sentencing: Defendant's Sentencing Memorandum (Doc. No. 145) argued that "the Sentencing Guidelines substantially overstate the impact of the loss amount," and it invoked this Court's own statement that "[i]t's not one where the Court is going to go and try to be stacking stuff." The loss used for the guideline calculation must be reduced by all applicable credits: under U.S.S.G. § 2B1.1 cmt. n.3(E), loss "shall be reduced" by the money returned and the fair market value of the property returned to and recovered for the victims, so that the offense level is set by the net loss and not by a gross figure. Defendant's counsel, James Wyatt, argued this point on the record at the May 26, 2026 sentencing hearing, in support of a lower sentence. He argued that "the guideline figure for loss overstates the loss," and that this Court has recognized that overstatement factor in prior cases, including United States v. Kipp. Sentencing Tr.

19 (May 26, 2026) (Doc. No. 164). He further argued that, on the Special Master's own calculations, restitution payments already "made or credited … exceed a billion dollars," including a preferred-equity credit of two to three hundred million dollars that "the Special Master has indicated should be credited" but that, as a matter of timing, "hasn't been credited yet." Id. at 13. That argument, made before the Court's ruling, expressly preserved the credit-reduction issue. See United States v. Lynn, 592 F.3d 572 (4th Cir. 2010). That

objection was preserved for appellate review by Defendant's Notice of Appeal from the Judgment and the Order of Restitution (Doc. No. 192), and Defendant renews and expressly reserves it here so that it is not treated as waived in any further restitution or forfeiture proceeding before this Court.

V. The unauthorized dispositions of Defendant's property are ultra vires and void.

The Special Master/Receiver sold Defendant's property without the appraisal, publication, and judicial confirmation required by the appointing Order (Doc. No. 56) and 28 U.S.C. §§ 2001–2004. A receiver has "no powers except such as are conferred upon him by the order of his appointment." Booth v. Clark, 58 U.S. (17 How.) 322 (1855). An act beyond the order is a nullity: the Fourth Circuit has held an unauthorized receiver sale void and the confirming decree of no legal force, Cumberland Lumber Co. v. Tunis Lumber Co., 171 F. 352 (4th Cir. 1909); accord Acadia Land Co. v. Horuff, 110 F.2d 354 (5th Cir. 1940) (private sale not complying with the statute is void). These requirements reach the sale of the companies themselves. Sections 2001 and 2002 govern the sale of any realty the companies hold; and 28 U.S.C. § 2004 provides that any personalty—including the equity interests in, and the business assets of, a going concern—"sold under any order or decree of any court of the United States shall be sold in accordance with section 2001 … unless the court orders otherwise." The only exclusions from this regime are sales under Title 11 and sales by receivers or conservators of banks appointed by the Comptroller of the Currency, 28 U.S.C. §§ 2001(c), 2004; neither describes this proceeding, which is a criminal restitution matter, not a bankruptcy, administered by a special master appointed under 18 U.S.C. § 3664(d)(6), not a bank receiver. Federal courts have applied § 2004 to a receiver's sale of the controlling stock of a company, holding that it incorporates § 2001's protections and that the statute expresses a "preferential course" from which a court "should not order otherwise except under extraordinary circumstances." Tanzer v. Huffines, 412 F.2d 221 (3d Cir. 1969). That these protections are most often applied in civil receiverships is immaterial: §§ 2001–2004 govern any sale made "under any order or decree of any court of the United States," and they apply with equal force to a disposition made in this criminal proceeding— where, moreover, the officer was a special master appointed under 18 U.S.C. § 3664(d)(6) to propose findings, not a civil equity receiver clothed with liquidation authority. The default appraisal, publication, and confirmation requirements therefore applied to the disposition of these companies, and § 2004's "unless the court orders otherwise" escape was never invoked by any order authorizing a different method—indeed, the Becket sale was made with no order at all. Operating companies of this kind were required to be appraised and sold with confirmation and the statute's upset-bid protection, not dumped at the value of the debt against them.

Defendant previously objected to the Special Master's disposition of Primary Restitution Assets—including the completed Becket sale and the proposed disposition of Damovo for debt (which remains on the block, notwithstanding a pending offer of $400 to $500 million)—without the Court's approval, including in his Emergency Motions to Stay and Consolidated Objections (Doc. Nos. 172 and 190), and renews and incorporates those objections here. The Becket sale in particular was conducted with no motion, no notice, and no order of this Court, in violation of the appointing Order (Doc. No. 56) and § 3664(d)(6), as set forth in Doc. No. 190. Defendant objects to any reliance on the prices obtained in those unconfirmed sales, and reserves his claims for an accounting, disgorgement, a constructive trust over traceable proceeds, and surcharge.

VI. To the extent restitution was deferred, the Special Master/Receiver executed a sanction before it was imposed.

Where restitution was deferred under 18 U.S.C. § 3664(d)(5), there was no liquidated obligation, lien, or writ until the amended judgment issued. Section 3664(m) authorizes enforcement of an order of restitution; there was none to enforce. Seizing and liquidating Defendant's property during that window bypassed every protection the Federal Debt Collection Procedures Act attaches to prejudgment remedies, 28 U.S.C. §§ 3101–3105. Defendant preserves this objection.

VII. The Government has not carried its burden under 18 U.S.C. § 3664(e).

The loss and valuation on which the proposed order rests are unsubstantiated and derive from an officer who has disclaimed them as a "best guess" and "inherently unreliable." The Government's adoption of those figures does not satisfy its non-delegable burden. 18 U.S.C. § 3664(e); United States v. Steele, 897 F.3d 606 (4th Cir. 2018); United States v. Dove, 585 F. Supp. 2d 865 (W.D. Va. 2008) (Government failed its burden where it adopted unsubstantiated third-party loss figures); United States v. Church, 701 F. Supp. 2d 814 (W.D. Va. 2010). The failure is more fundamental than adoption of a disclaimed figure: the Government has neither produced nor shown that it possesses the methodology and underlying data for the Special Master's numbers. It has placed those numbers before the Court—at sentencing and for restitution—without demonstrating that it can supply the basis for them, and on the present record it appears not to hold that basis itself. A party that cannot produce the methodology and data supporting the loss it proposes has not proved that loss by a preponderance of the evidence, and it may not rely on the Special Master's possession of the material to excuse its own non-production. 18 U.S.C. § 3664(e). The approximately $1.6 billion loss figure, and the forfeiture measured by the Special Master's "Mid" estimate, are therefore unreliable and unsupported on the present record. Nor does Defendant's agreement to use the "Mid" estimate in the forfeiture formula cure the defect or foreclose examination of the underlying data: that agreement was made against, and premised on, the valuation of the AAPC assets as it then stood, and it does not survive a material change to that valuation. An agreement to accept an estimate built on a superseded valuation cannot bind Defendant to a figure recalculated on materially different assumptions, and it does not immunize the inputs of the forfeiture computation from testing before the judgment enters. Defendant's pending motions to compel seek precisely that methodology and data; until it is produced and tested, the Government cannot carry its burden, and Defendant objects to entry of any order on this record. Defendant's demand for that production—in his motions to compel and herein—is not a concession that the Special Master's tainted report may be cured, adopted, or placed on the record; for the reasons stated above, it may not. The demand is made to prevent a premature forfeiture and restitution order from entering on an unsupported record— the forfeiture money judgment being measured by the very "Mid" estimate the Special Master disclaims—and to ensure that any determination the Court makes rests on tested evidence found by the Court, not on the disqualified officer's work product.

VIII. Sixth Amendment — the receivership deprived Defendant of his counsel of choice for the restitution, forfeiture, and sentencing proceedings.

Through sentencing, Defendant was represented by his counsel of choice. The Special Master/Receiver's restraint and liquidation of Defendant's assets—including untainted

assets not traceable to any offense—has since deprived Defendant of the ability to retain his counsel of choice for the restitution and forfeiture proceeding, requiring him to proceed with substitute counsel. Deprivation of counsel of choice is structural error requiring no showing of prejudice, United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), and the restraint of untainted assets needed to retain counsel violates the Sixth Amendment, Luis v. United States, 578 U.S. 5 (2016). That the deprivation arises after conviction does not defeat the claim: Defendant does not seek to use substitute forfeited assets, cf. United States v. Marshall, 872 F.3d 213 (4th Cir. 2017), but untainted assets not traceable to any offense—including funds the Wake

County court ruled were not constrained—that he needs to retain counsel of choice for the restitution and forfeiture proceeding. The deprivation was not abstract: because Defendant was required to proceed after sentencing with substitute counsel newly retained for the restitution and forfeiture stage, the change in representation itself restricted what could be investigated, briefed, and placed on the record within the fourteen-day period following sentencing and the entry of the Judgment (Doc. No. 162) in which objections were due, and thereby constrained Defendant's ability to preserve and present objections during that critical window. That practical restriction on Defendant's access to the docket is a further consequence of the Sixth Amendment violation and an independent reason the issues reserved herein must be preserved now. The deprivation of resources is concrete and predates sentencing. The receivership deprived Defendant of the funds he would otherwise have used to retain and pay counsel of his choosing—including loans from AAPC and other instruments, as reflected in Defendant's Declaration. Def. Ex. 1, Tab B. Those sources were placed beyond his reach, and were unavailable even before sentencing, so the deprivation began before the sentencing stage and not merely after it. As a consequence, Defendant's legal counsel has had to be paid instead from the proceeds of the very assets the Special Master has sold—placing the officer whose figures and conduct Defendant contests in control of the funds from which Defendant's defense must be paid. What followed confirms the entanglement of the officer's control over Defendant's funds with the defense's ability to be heard: when Defendant, through prior counsel (Katten Muchin Rosenman LLP), pressed his objections to the Special

Master's restitution report on the record, the Special Master responded with an adverse Statement Concerning Defendant's Cooperation (Doc. No. 159), filed four days before sentencing. The exercise of the right to object through counsel thus drew an adverse assessment from the very officer who controlled Defendant's assets. The deprivation is not confined to the restitution and forfeiture stages; it reaches the sentencing itself. Because restitution is part of the criminal sentence and sentencing is not complete until the final order of restitution is entered, Dolan v. United States, 560 U.S. 605 (2010); 18 U.S.C. § 3664(d)(5), the sentencing proceeding remains open, and Defendant may still, following the restitution hearing, place objections to and seek corrections of the sentence—including the loss-driven guideline calculation and the restitution and forfeiture components. Defendant is entitled to the assistance of his counsel of choice for that continuing sentencing process, and the receivership's liquidation of the untainted assets he needs to retain that counsel deprives him of it. Deprived of the funds the receivership controls—including the AAPC loans and the other untainted resources he would otherwise use to retain and pay counsel of his choosing—Defendant is now reduced to relying on counsel willing to represent him on a generosity basis, rather than the counsel of choice he could retain and pay but for the receivership's restraint of his resources. This objection is directed to the restitution, forfeiture, and sentencing proceedings, and Defendant preserves it.

IX. Restitution is criminal punishment, which triggers the full constitutional architecture.

Restitution under the Mandatory Victims Restitution Act is criminal punishment. Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026).

Defendant accordingly preserves: (a) the Sixth Amendment jury guarantee— Defendant contends that the facts necessary to support restitution and forfeiture, including the identification of any victim and the amount of loss, must be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence and not by a master; Defendant acknowledges that United States v. Day, 700 F.3d 713 (4th Cir. 2012), holds Apprendi inapplicable to restitution, and preserves this issue for further review in light of Ellingburg, see Apprendi, 530 U.S. 466; Southern Union Co. v. United States, 567 U.S. 343 (2012); (b) the Excessive Fines Clause and its proportionality limit, United States v. Bajakajian, 524 U.S. 321 (1998); Timbs v. Indiana, 586 U.S. 146 (2019); (c) the Ex Post Facto Clause; and (d) the Double Jeopardy Clause—Defendant is entitled to full credit, at fair market value, for value already exacted, and objects to any increase in the amount, North Carolina v. Pearce, 395 U.S. 711 (1969); Ex parte Lange, 85 U.S. (18 Wall.) 163 (1873). Defendant applies the § 3664(e) preponderance standard for purposes of these objections without conceding its constitutionality.

X. Appointments Clause.

The Special Master exercised significant authority pursuant to the laws of the United States and, if an officer, was not appointed in conformity with Article II. Freytag v. Commissioner, 501 U.S. 868 (1991); Lucia v. SEC, 585 U.S. 237 (2018). The Appointments Clause turns on whether an officer exercises significant federal authority, not on whether the proceeding is civil or criminal, and it governs here

regardless of that distinction. Having timely objected, Defendant is entitled to relief.

Ryder v. United States, 515 U.S. 177 (1995).

XI. Reservation; no waiver; second appeal.

Defendant reserves all issues previously raised, including those in his Response (Doc. No. 316), in every motion he has filed in these cases—whether pending, denied, withdrawn, or deemed moot—including his motions to compel and his Emergency Motions to Stay and Consolidated Objections (Doc. Nos. 172 and 190, filed June 9 and June 11, 2026—within fourteen days of the Judgment (Doc. No. 162)—each asserting every ground therein as an objection to the Preliminary Order of Restitution (Doc. No. 161)), his objection to the delegation of the loss determination made within fourteen days of the sentencing, and his objections to the Special Master's reports and recommendations, and does not waive any issue by the Court's entry of an order over his objection. The denial of any such motion, or its disposition as moot or withdrawn, does not waive the issues it raised, which Defendant expressly preserves. Defendant preserves his right to appeal from any amended judgment imposing restitution, which is a separate, independently appealable judgment. Manrique v. United States, 581 U.S. 116 (2017). To the extent any appeal waiver is asserted, these objections fall outside it. See United States v. Broughton-Jones, 71 F.3d 1143 (4th Cir. 1995) (restitution not authorized by statute is outside an appeal waiver); United States v. Attar, 38 F.3d 727 (4th Cir. 1994) (a proceeding conducted in violation of the right to counsel is outside an appeal waiver).

CONCLUSION

For the foregoing reasons, Defendant objects to the entry of any final order of restitution and forfeiture on the present record and respectfully requests that the Court decline to enter such an order until these issues are resolved. In all events, Defendant preserves each objection and reservation above for the Court's de novo determination and for appellate review.

Dated: August 26, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 26, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 331 — Motion to Compel the Government / Set Aside the Report and Final Supplement (with Doc. 331-1 Affidavit) (filed 08/31/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION TO COMPEL THE GOVERNMENT TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE IT ADOPTED AND ITS EX PARTE COMMUNICATIONS WITH THE SPECIAL MASTER, AND TO SET ASIDE THE SPECIAL MASTER'S REPORT AND FINAL SUPPLEMENT

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, Brady v. Maryland and its progeny, and the Due Process Clause, for an order (1) compelling the Government to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and- confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of

restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete

record of the defense's demands and the refusals that met them. Counsel would be remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

I. The Government adopted each and every position of the Special

Master, made his figures its own, and—as the prosecutor bearing the burden of proof—must produce the data that supports them.

The Government did not merely receive the Special Master's work; it adopted it wholesale and made it the basis of the punishment it seeks. In its Omnibus Response, the Government asks the Court to "adopt the reasoning and recommendations set forth in the Special Master's" Final Report and to enter a final order of restitution "similar to that proposed by the Special Master." Doc. 279. In its Consolidated Position, the Government states that it "concurs with the arguments and conclusions contained in the Special Master's filings" and asks the Court to enter a restitution order "substantially similar to that proposed by the Special Master." Doc. 308. The Government has embraced each and every one of the Special Master's positions—the loss build, the valuations, and the disallowed offsets and credits—as its own. Having done so, the Government owns those figures, and with them the obligation to produce and support the data beneath them.

Even in the proceeding before the Special Master, the Government remained the prosecutor. A special master under 18 U.S.C. § 3664(d)(6) is an adjunct who makes proposed findings and recommendations, subject to the Court's de novo determination; he does not carry the Government's burden, and his involvement did not relieve the Government of the prosecutor's obligations. The burden of proving

each victim's loss by a preponderance is, and throughout has been, the Government's, 18 U.S.C. § 3664(e); so is the duty to render "a complete accounting of the losses to each victim," id. § 3664(a); and so are the prosecutor's disclosure duties under Brady and Giglio. A prosecutor's interest "is not that it shall win a case, but that justice shall be done"; he "may strike hard blows," but "is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). The Government could not shed its burden, or its disclosure obligations, by routing the development of the loss and valuation figures through the Special Master; those obligations followed it into that forum and bind it now. Having adopted the figures the master produced, the Government must produce and support the data on which they rest, or those figures fail for want of proof.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden

of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. United States v. Steele, 897 F.3d 606 (4th Cir. 2018); United States v. Dove, 585 F. Supp. 2d 865 (W.D. Va. 2008); United States v. Church, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served a written, itemized demand for the data. The Government first said the Defendant

already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

Nor was any of this waived by the passage of time. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026—and learned it as a direct result of the Government's own emails. When the Government represented that the data had all been provided to former counsel, current counsel investigated that representation; asking former counsel and searching the files revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master— from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others—on which the loss and

valuation figures were built. The Government's representation, offered to deflect the demand, is what exposed the unconstitutional, one-sided character of the proceeding to current counsel. A challenge raised within days of learning the facts that give rise to it is timely and is preserved.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August

15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality agreement," the Government's "reserving [its] position," and the Special Master's one- word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. United States v. Steele, 897 F.3d 606 (4th Cir. 2018); United States v. Dove, 585 F. Supp. 2d 865 (W.D. Va. 2008); United States v. Church, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party— including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies— told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that— information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever being disclosed to the Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself

impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

III. In a criminal proceeding no ex parte communication with the

adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. Goldberg v. Kelly, 397 U.S. 254 (1970); Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996); cf. In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir. 2004); In re Brooks, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," Edgar, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected

with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. § 3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the decisionmaker saw and that the defendant was never permitted to examine, test, or

rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures,

constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

IV. It makes no difference whether the Special Master is treated as a

neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, Kyles v. Whitley, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment. Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

V. The ex parte communications are Brady and Giglio material the

Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. Brady v. Maryland, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, Cone v. Bell, 556 U.S. 449 (2009); restitution is punishment,

Ellingburg. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, Giglio v. United States, 405 U.S. 150 (1972); United States v. Bagley, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, Kyles, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. See Ex. A; Affidavit of Greg E. Lindberg.

VI. The manner of the liquidations was hidden, and the new report's

lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for

approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity— were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18

U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why— whether the decline is attributable to the offense or to the Special Master's own post- transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post- transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The Government, having adopted the figures, must introduce those facts or the figures fail for want of proof; the data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's

property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, Honeycutt v. United States, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

VII. The forty-seven categories of data underlying the figures the

Government adopted, which it must produce or support.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and

valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.

2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.

3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.

4. The low/middle/high figures filed under seal in July 2026, and all data behind them.

5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.

6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.

7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.

9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.

10. The repayment data and loan-balance base data used as the starting point.

11. All LoanIQ screenshots, exports, and outputs.

12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.

13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.

14. The ULICO reconciliation.

15. The iteration history of the loss memoranda (approximately $2.9 billion to approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.

17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.

18. The terms of the agreed Clanwilliam offset and the valuation data applying it.

19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.

20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero-coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC

concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians

concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; Timbs v. Indiana, 586 U.S. 146 (2019); United States v. Bajakajian, 524 U.S. 321 (1998). The Court cannot gauge either danger, and the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Government (1) to produce to the Defendant, and to support with the underlying data, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty- seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009); United States v. Beckford, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications,

and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603

919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

supplied and those he disallowed-as well as the data from NHC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, and Paladin. I have never been given access to any of it.

9. My counsel reported to me that, on the weekly calls, the Government

represented that I would be permitted to argue the ClanWilliam offset at a value of approximately $800 million, and that the investments in the North Carolina insurance companies would be treated as offsets against restituti on. The valuations against which those offsets would run, however, were developed in communications I never saw.

10. I seek the Government's ex parte communications because I understand they

are Brady and Giglio material to which I am entitled, and because I should not be subjected to a criminal punishment-restitution and forfeiture-fixed on the basis of communications and data I was never permitted to see, and which, as I understand it, the Government has now stated in writing that it does not possess.

11. The two tables set out below show why the information the defense has

requested is relevant and where each item rests within the restitution figure.

The first is the schedule of offsets, credits, and reducti ons that, applied against the Special Master's figure, reduces restitution to zero (totaling $3,765,418,383). The second identifies each of the 47 categories of information the defense has requested and shows, for each, both where it fits and why it matters-whether it fixes the baseline loss, supports an offset or credi t, establishes an intervening cause, or consists of the ex parte communications themselves. Every category reflected in these tables is ex parte information, or the data underlying it, that was never provided to my former counsel (Katten Muchin Rosenman) or to me. The list is deliberately

Case 3:23-cr-00048-MOC-DCK 6 331-1

Document Filed 08/31/26 Page 6 of 9

**Doc. 332 — Motion to Compel the Special Master / Set Aside the Report and Final Supplement (filed 08/31/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S MOTION TO COMPEL THE SPECIAL MASTER TO PRODUCE THE DATA UNDERLYING THE RESTITUTION FIGURE AND HIS EX PARTECOMMUNICATIONS, AND TO SET ASIDE HIS REPORT AND FINAL SUPPLEMENT

Defendant Greg E. Lindberg respectfully moves the Court, under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664, including § 3664(d)(6), the Court's inherent supervisory authority over its own appointee, Brady v. Maryland and its progeny, and the Due Process Clause, for an order (1) compelling the Special Master to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories of data, spreadsheets, methodology, valuations, and communications set out in Part VII below—including the underlying spreadsheets and the methodology by which the loss and valuation figures were built, and all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) directing that those communications be logged and preserved immediately; and (3) setting aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding to which the Defendant had no access. In support, Defendant states as follows, and relies on the Affidavit of Greg E. Lindberg and Exhibit A (the meet-and- confer correspondence of August 15–29, 2026, including the Government's and the Special Master's responses), filed herewith.

Counsel for the Defendant file this Motion in discharge of their professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues for review by the United States Court of Appeals for the Fourth Circuit. The Government and the Special Master have taken the position of running out the clock—pressing toward a final order of restitution and forfeiture under the deadline of 18 U.S.C. § 3664(d)(5) while producing none

of the data, valuations, methodology, loss values, or ex parte communications on which the figures rest. A defendant cannot be made to contest, or to appeal, a multibillion-dollar restitution and forfeiture, and a custodial sentence already imposed, on a record he has never been permitted to see. Counsel therefore raise and preserve, now and expressly, the ex parte, due process, Brady and Giglio, Fifth Amendment Takings, and multiple-punishments (Double Jeopardy and Excessive Fines) challenges, together with the failure-of-proof and gross-loss challenges, so that none is waived, and so that the Fourth Circuit will have a complete record of the defense's demands and the refusals that met them. Counsel would be

remiss in their duty to the Defendant were they to allow a final order to enter on this record without raising and preserving these issues.

At the outset, the Defendant recognizes that a motion to compel a special master to disclose the information before him is unusual—because, in the ordinary course, it should never be necessary. When data is placed before a master, it is shared with the parties: the Government and the Defendant alike. The master's record is the parties' record; that is a basic incident of the reference authorized by the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and of due process, and it is why a party rarely has to move to compel the very officer deciding its case to reveal what he relied upon. In this proceeding, that never happened. The data underlying the loss and valuation figures was placed before the Special Master ex parte and was never shared with the Defendant—not at the time, and not since.

The Government sought to obscure this by trading on a change in defense counsel. When the Defendant's current counsel demanded the data, the Government represented that it had all been provided to the Defendant's former counsel, Katten Muchin Rosenman. Current counsel then did exactly what that representation invited: they asked former counsel. Former counsel searched and—far from confirming the Government's account—helped current counsel identify, item by item, the materials that had never been turned over to the Defendant at all. The Government's premise thus collapsed: the records confirm that the data current counsel seeks was never produced to former counsel either. Confronted with that, the Government did not produce the data. It shifted ground, asserting instead that it had

met its discovery obligations—an assertion it advanced knowing that its effort to blame former counsel had backfired, and that former counsel had helped current counsel pinpoint the very data the Special Master and the Government never produced.

The timing confirms that nothing has been waived. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026. It was the Government's own emails, representing that the data had all been provided to former counsel, that prompted current counsel to run the point to ground; and it was that inquiry—asking former counsel and searching the files—that revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master: from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen, among others, on which the loss and valuation figures were built. The unconstitutional, one-sided character of the proceeding thus became known to current counsel only days ago, as a direct consequence of the Government's own representation. A challenge asserted within days of learning the facts that give rise to it is timely; the ex parte and due process issues are preserved, not forfeited.

I. The Special Master and the custodians subject to his authority hold

the data; as the Court's own appointee he must produce it, and the Court has full supervisory authority to compel him.

The loss and valuation figures rest on data the Special Master and his financial advisor, Paladin Management Group, developed and hold, together with the

interested custodians subject to his authority—NHC Holdings, LLC, the North Carolina insurance companies, M3, and Michael Dinius. The Defendant does not have that data; the Court has only figures filed under seal, with no underlying data; and the Government has disclaimed possession of it. The Special Master and those custodians are the sole remaining source. The Special Master is the Court's own appointee under the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the Court retains inherent supervisory authority over its own officer to direct him to produce the data, methodology, valuations, offsets, credits, and communications underlying the figures he recommended, and to place them on the Court's record. He has stated that he would produce "documents in [his] possession" only "under a confidentiality agreement," or upon "a court order compelling" production. Ex. A (Martinez email, Aug. 17, 2026). The Court should now enter that order.

The restitution the Government seeks, and the forfeiture measured against the Special Master's "Mid" estimate, rest entirely on the Special Master's loss and valuation figures, which the Government adopted as its own and placed before the Court—at sentencing, where the approximately $1.655 billion loss drove the guideline enhancement and the twelve-year term, and again as the basis for restitution. The Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e); a proponent that adopts a third party's figure must be able to produce the basis for it. United States v. Steele, 897 F.3d 606 (4th Cir. 2018); United States v. Dove, 585 F. Supp. 2d 865 (W.D. Va. 2008); United States v. Church, 701 F. Supp. 2d 814 (W.D. Va. 2010). On August 26, 2026 the defense served

a written, itemized demand for the data. The Government first said the Defendant already had it in former counsel's files; former counsel and current counsel each searched and found none of it. Confronted with the itemized list, the Government reserved its position and directed the defense to file this motion, see Ex. A (Ryan email, Aug. 17, 2026), while the Special Master offered to produce only "documents in [his] possession," and then only under a confidentiality agreement and protective order, or a court order compelling production, id. (Martinez email, Aug. 17, 2026). Pressed for the data, the Government disclaimed possession of the underlying numbers, its correspondence reflecting that many of the requested items were exchanged ex parte and so did not come to the Government. Id. The result is dispositive: the data is in no one's hands within this proceeding—the Defendant does not have it; the Court has only figures filed under seal with no underlying data; and the Government has disclaimed possession of it. The Special Master and the custodians subject to his authority are the sole remaining source.

The Defendant has been diligent. From the moment the Special Master was appointed, the defense sought the underlying loss and valuation data, and it renewed those requests, in writing, again and again for eighteen months; each was deferred, conditioned, or refused. The full sequence is set out in the Affidavit of Greg E. Lindberg ¶ 5, and includes: requests beginning at the Special Master's appointment on January 23, 2025 (Doc. 56); requests for the M3 "desktop" valuations in the spring of 2025; a June 16–17, 2025 request for the North Carolina insurance companies' loan data, which the Special Master agreed on June 17 to share and never did; the

defense's own analysis supplied on July 29–30, 2025 while it received nothing in return; written requests on the Clanwilliam valuation and offsets on August 13, 2025; the September 16, 2025 Restitution Calculation letter to the Special Master and the Financial Advisor; further written requests on causation and offsets on November 22–23, 2025; formal written information requests in December 2025, deferred by the Special Master on December 18, 2025; the March and April 2026 reports' offer only to show conclusions under seal or in camera, without the data (Doc. 106 at 29); the July 2026 filing of low, middle, and high figures under seal with no underlying data; and the August 15–17, 2026 written demand that the data be placed on the record, met by the Special Master's willingness to produce only "under a confidentiality agreement," the Government's "reserving [its] position," and the Special Master's one- word "No." The defense then served a written, itemized demand on August 26, 2026, and renewed it on August 28–29, 2026. See Ex. A. This is not a defendant who slept on his rights; it is a defendant who asked, in writing, at every stage of the proceeding and was refused at every stage. Any suggestion that these materials are "available by other means," or that the Defendant failed to pursue them, is refuted by this record; the fault for their absence lies with those who withheld them, and any uncertainty must be resolved against the party that withheld the records, not against the Defendant. 18 U.S.C. § 3664(a), (e).

The Government's two answers do not defeat this motion; they confirm it. To the extent the Government contends that producing the underlying data is not its burden, the burden of producing the data follows the burden of proving the loss. The

Government bears the burden of proving each victim's loss by a preponderance, 18 U.S.C. § 3664(e), and the statute requires a complete accounting, id. § 3664(a); a proponent that adopts a third party's figure as its own—as the Government adopted the Special Master's loss and valuation figures, at sentencing and again for restitution—must be able to produce and support the basis for it. United States v. Steele, 897 F.3d 606 (4th Cir. 2018); United States v. Dove, 585 F. Supp. 2d 865 (W.D. Va. 2008); United States v. Church, 701 F. Supp. 2d 814 (W.D. Va. 2010). The Government cannot keep the figure while disclaiming the data beneath it. If it will not or cannot produce the foundation for the loss it asks the Court to impose, the figure fails for want of proof, and the remedy is that no restitution or forfeiture may be entered upon it—not that the Defendant must accept, as a criminal punishment, a number whose basis its proponent refuses to supply.

To the extent the Government contends that, because many of the requested items were exchanged ex parte, it does not possess them, that is not a defense; it is an admission, and it cuts against the Government twice over. It concedes that the loss and valuation figures were developed through ex parte channels from which the Defendant was excluded—the precise defect addressed in Parts II and III below. And it confirms that the data underlying the figure is in no party's hands within this proceeding: the Defendant does not have it, the Court has only figures filed under seal, and the Government has disclaimed possession of the data, its correspondence reflecting that many of the items were exchanged ex parte and did not come to it. A proponent that cannot produce the foundation for the loss it adopted cannot carry its

burden to prove it; and a loss figure whose foundation neither party to the appointing order possesses cannot support restitution or forfeiture. The order, moreover, required the Special Master to "regularly update the Parties throughout the diligence and/or sales process," Order ¶ 5, and to advise the Defendant, through counsel, in writing, id. ¶ 8. The Defendant, a Party, was entitled to be kept informed and was not; and to the extent the Government

does not possess the data underlying the figure, that data was developed and exchanged wholly outside the order's structure for keeping the Parties informed—a further reason it cannot support punishment. Because the Special Master (and his advisors), and the custodians subject to his authority, are the only remaining source, the Court should compel production from them under 18 U.S.C. § 3664 and the Court's supervisory authority over its own appointee; and because the figure was built ex parte, on data the parties never saw, the report and its Final Supplement must be set aside.

II. The proceeding operated as an ex parte forum to which the Defendant had no access; the order authorized no ex parte contact; and nothing conveyed ex parte was ever "before" the Special Master.

The figures were not developed in an adversarial process open to the Defendant. The Special Master (and his advisors) received and exchanged communications, ex parte, with the Government and with any other third party— including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the data. The Defendant was not a party to those communications, was not copied on them, and has not seen them. The order appointing the Special Master has only two parties—the United States and Greg E. Lindberg—and it authorized no ex parte communication at all: it requires the Special Master to "regularly update the Parties throughout the diligence," Order ¶ 5, and to advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. Cf. Fed. R. Civ. P. 53(b)(2)(B) (the civil analogue requires the appointing order to state the circumstances, if any, in which a master may communicate ex parte with a party; here the order states none). Rule 53 does not itself govern this criminal proceeding; the authority for the reference is the Mandatory Victims Restitution Act, 18 U.S.C. § 3664(d)(6), and the limits on the Special Master's conduct are fixed by the appointing order and by due process. The interested custodians are not parties and had no license to feed the Court's neutral off the record. On information and belief, at least some of them—including Mr. Dinius, NHC, and the North Carolina insurance companies— told the Government that if it wanted certain information it should obtain an order from the Court. The proper course was therefore an application to the Court, on notice and hearing—the mechanism paragraph 15 supplies—not ex parte data-gathering that excluded the Defendant. The reduction of AAPC, a Primary Restitution Asset, to near zero is precisely what paragraph 15 governs, yet it was accomplished with no motion, notice, or hearing, on data the Defendant never saw.

It follows that whatever was conveyed to the Special Master ex parte was never, in any cognizable sense, "before" him. A submission is "before the Special Master" only when two conditions are satisfied: first, it was disclosed to the proceeding—placed on the record, together with the underlying data supporting it, so that the Defendant, through counsel, could examine, test, and contest it; and second, it was then adopted by the Special Master on that record. Anything short of that— information passed to the Special Master, to his financial advisor, or to the Government outside that process, without the underlying data, and without disclosure to the Defendant—never entered the proceeding at all. It cannot support a finding, and any value drawn from it was adopted as a final number, not established on a record the Defendant could meet. The loss and valuation figures that drive the restitution and the forfeiture were fixed in precisely that way: taken as final numbers from ex parte sources, without the data beneath them ever

being disclosed to the Defendant or made part of the record on which he could be heard. For that independent reason, those figures were never properly before the Special Master, cannot be treated as though they were, and cannot stand unless and until the underlying data and communications are produced, placed on the Court's record, and—only then—adopted through a process in which the Defendant can participate.

These distinctions define the relief. The Government is a party, and any ex parte communication between the prosecuting authority and the adjudicating neutral is itself impermissible in a criminal proceeding; the vice is the communication itself, not merely its subject. For that reason the Defendant seeks all ex parte communications between the Government and the Special Master (and his advisors), without limitation as to subject—their existence and content are a constitutional question the Court and the Defendant are entitled to see in full. As to the interested

third parties, who are not parties to the order, the Defendant limits his request to their communications with the Special Master (and his advisors) concerning the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

III. In a criminal proceeding no ex parte communication with the

adjudicating neutral is permissible; the defect is incurable, and the report must be set aside.

A neutral that decides on ex parte submissions is not a neutral. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, and forbids the resolution of adjudicative facts on communications one party cannot see, test, or rebut. Goldberg v. Kelly, 397 U.S. 254 (1970); Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996); cf. In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir. 2004); In re Brooks, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts). Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here: this is a criminal case, the order authorized no such contact, restitution under the MVRA is criminal punishment, Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), and the same figures drove the § 2B1.1 enhancement and the sentence. Belated production

cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," Edgar, 93 F.3d 256. Because many of the participants refused to recognize the authority of the Special Master, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it. Production is therefore necessary but not sufficient; the report and its Final Supplement, being the product of that process, cannot be adopted, relied upon, or placed on the record, and must be set aside.

The Government's proposed course underscores the defect rather than curing it. Pressed to produce the data, the Government directs the Defendant to obtain it through the very officer to whom the loss and valuation questions were referred under 18 U.S.C. §

3664(d)(6)—a magistrate judge or special master—before whom the figures were placed and who made his recommendation upon them. That instruction is circular and constitutionally untenable. The data was placed before that officer ex parte; it has not been produced to the Defendant except on conditions the Special Master would set or a court order he demands; and the Defendant has never had access to the very materials the officer used to reach the figures the Court adopted. A criminal defendant cannot be sentenced, cannot be ordered to pay restitution, and cannot be made to forfeit property on the strength of evidence that only the

decisionmaker saw and that the defendant was never permitted to examine, test, or rebut. The approximately $1.655 billion loss figure drove the § 2B1.1 enhancement and the twelve-year sentence already imposed, and it drives the restitution and forfeiture now sought—yet it rests on data the Defendant has never seen. That is not a curable discovery dispute; it is punishment imposed on a record from which the Defendant was excluded, in violation of due process, and it renders the resulting sentence, and any restitution and forfeiture built on the same figures, constitutionally infirm. The de novo determination the statute requires, id. § 3664(d)(6), is itself impossible on a record whose foundation is withheld from the party who must contest it and from the Court that must review it.

IV. It makes no difference whether the Special Master is treated as a

neutral or as an arm of the prosecution.

It does not matter which characterization the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach directly and fully, Kyles v. Whitley, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment.

Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

V. The ex parte communications are Brady and Giglio material the

Defendant is entitled to receive.

Independent of the structural defect, the ex parte communications are favorable, material evidence the Government must disclose. Brady v. Maryland, 373 U.S. 83, 87 (1963), reaches evidence "material either to guilt or to punishment" and applies at sentencing, Cone v. Bell, 556 U.S. 449 (2009); restitution is punishment, Ellingburg. The communications are exculpatory as to the amount of loss—the offsets, credits, and true values—and impeaching, Giglio v. United States, 405 U.S. 150 (1972); United States v. Bagley, 473 U.S. 667 (1985), of figures the officer who produced them calls a "best guess" and "inherently unreliable"; and the duty reaches favorable evidence known to those acting on the Government's behalf, Kyles, 514 U.S. 419. Because restitution is criminal punishment, the disclosure duty extends to this proceeding; and even if the Court does not formally extend Brady to restitution, the same materials must be disclosed as a matter of due process—the Defendant's right to see and to rebut the evidence used to punish him. The Defendant has

demanded these communications repeatedly and in writing, on August 28 and 29, 2026, and they have not been produced. See Ex. A; Affidavit of Greg E. Lindberg.

VI. The manner of the liquidations was hidden, and the new report's

lower values cannot be tested without the originals.

The M3 "desktop" valuations valued all of the Primary Restitution Assets and the Specified Affiliated Companies and were used to fix the value of the assets

available for restitution; yet the nature, manner, terms, and proceeds of the liquidations—Beckett, sold for approximately $134 million against an approximately $1 billion appraisal; Clanwilliam; and the zero-coupon notes sold before maturity— were never disclosed to the Defendant, who could not contest how the dispositions were carried out, was not informed when the companies were being sold, and had no opportunity to test their value independently before sale. That is not the manner of disposition the MVRA prescribes: the Act vests enforcement in the United States, and only after a final order fixes the amount, through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to liquidate the estate ex parte, before any final order, and to withhold the valuations and terms. The point is sharpened by the Special Master's further report, which now claims the companies are worth less than his earlier valuations reflected. Without the original valuations and the underlying data, there is no way to assess why— whether the decline is attributable to the offense or to the Special Master's own post- transfer management and below-value dispositions, an intervening cause the Government must disprove under 18 U.S.C. § 3664(e). The original valuations and every revaluation are therefore essential to any determination. The Special Master's report does not address the facts of this intervening cause at all; it charges the post- transfer decline to the Defendant without accounting for the losses caused by the intervening actors—Michael Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself. It is the Government's burden to introduce facts showing why that intervening cause does not reduce or

eliminate the Defendant's liability, 18 U.S.C. § 3664(e), and the United States Court of Appeals for the Fourth Circuit cannot make that determination on a record that does not include the losses those intervening actors caused. The data must therefore be produced and placed on the record now.

The ex parte liquidations also worked an unconstitutional taking. Before any final order of restitution fixed what, if anything, the Defendant owes, the Special Master—an officer appointed at the Government's instance—took the Defendant's property into his exclusive control and liquidated it, in ex parte dealings the Defendant could neither see nor contest, and disposed of it below value, selling Beckett for approximately $134 million against an approximately $1 billion appraisal. The MVRA authorizes enforcement against a defendant's property only after a final order fixes the amount, and then only by the United States through the civil-judgment machinery of 18 U.S.C. §§ 3664(m)(1)(A) and 3613; it does not authorize a court-appointed officer to seize and sell the estate ex parte, before any final order, on values the Defendant never saw. A pre-order, ex parte liquidation of the Defendant's property—without notice, without hearing, and without the process the appointing order itself required—is a taking of property without due process of law and without just compensation, in violation of the Fifth Amendment; and forfeiture and restitution reach only property properly subject to them, Honeycutt v. United States, 581 U.S. 443 (2017). Had the Defendant retained control, any disposition would have been at fair market value; the ex parte, below-value

dispositions are the injury the Takings and Due Process Clauses forbid. Defendant expressly raises and preserves this challenge.

VII. The forty-seven categories of data the Special Master must produce.

The materials necessary to test the figures, and the ex parte communications that produced them, are the following forty-seven categories. Each is necessary to test the loss and valuation figures, to establish an offset, credit, or intervening cause, or consists of the ex parte communications themselves; the Affidavit of Greg E. Lindberg (Exhibits 1 and 2 thereto), incorporated herein, shows where each category rests within the restitution figure and why it matters. This list seeks only materials within the possession, custody, or control of the Government, the Special Master and his advisors, or the third-party custodians; it does not seek, and this Motion does not concern, any of the Defendant's own materials, which in any event are not the Government's or the Special Master's to withhold.

A. Company valuations.

1. The M3 "desktop" low/middle/high valuations of the Specified Affiliated Companies and AAPC, 2025, and every draft, with any M3 recommendation on disclosure.

2. All data, inputs, assumptions, models, workpapers, and methodology underlying the M3 valuations, with M3's transmittal correspondence.

3. Every valuation and revaluation of the companies from January 2025 to the present, and the reason for each change, including the reduction of AAPC.

4. The low/middle/high figures filed under seal in July 2026, and all data behind them.

5. The March 2026 data the Special Master offered under seal, and all documents he intends to rely on for valuations.

6. The basis for reducing AAPC to near zero, and how that reduction triggers the forfeiture money judgment.

7. All communications with M3 (or any other valuation professional) concerning the valuations.

B. The loss build.

8. The complete data, spreadsheets, workpapers, and methodology underlying the approximately $1.655 billion figure.

9. The Paladin/Mr. Dinius spreadsheets reflecting the starting loan balances.

10. The repayment data and loan-balance base data used as the starting point.

11. All LoanIQ screenshots, exports, and outputs.

12. The affiliated-loan base data for each insurer (NC and Bermuda) as of (a) October 18, 2018, (b) the MOU date, and (c) the Bermuda transfer to the JPLs.

13. The ILA/MOU reconciliations, including the ECL debt and the April 2022 AAPC refinance.

14. The ULICO reconciliation.

15. The iteration history of the loss memoranda (approximately $2.9 billion to

approximately $1.6 billion).

C. Offsets and credits.

16. The method of calculation for every offset and credit applied or disallowed, with the repayment data behind each disputed offset.

17. The NCIC-investment offset the Government conceded—on-record confirmation and the data and methodology applying it.

18. The terms of the agreed Clanwilliam offset and the valuation data applying it.

19. The source and itemization of the additional approximately $100 million in offsets and additions from Mr. Dinius.

20. Data for the disallowed offsets (the SNIC payments; the CBL subordination fee; the ULICO real-estate transfer; the Bermuda asset-sale proceeds; the zero- coupon note proceeds; the preferred-equity payments; the Finanzen sale; the CBL redemption fee).

21. Mr. Dinius's own approximately $641 million November 2018 valuation of the North Carolina insurers, and all communications concerning that valuation and its exclusion.

22. Intervening-cause data—what happened to each company after transfer (Issues 11–17).

D. Board and financial records (last four years).

23. All AAPC board books and packs.

24. All NHC board books.

25. All board minutes, financial reports, and financial presentations for the companies.

26. All letters of intent received.

27. All offers to purchase received.

E. Sale and marketing process.

28. All documents and communications on the marketing and sale of Becket, Clanwilliam, Damovo, and the SACs, including bids, offers, and valuations generated.

29. The terms, proceeds, and closing documents of every completed sale (Becket; Clanwilliam and the Triton escrow; and others).

30. For any sale or offer that did not close, all documents explaining why.

31. All Damovo figures and terms.

F. Communications.

32. All communications between the Special Master or Paladin and New Holding Company concerning valuation or the restitution figure.

33. All communications between the Special Master or Paladin and AAPC or its board concerning valuation or the restitution figure.

34. All communications between the Special Master or Paladin and the bankers concerning valuation, marketing, or sale.

35. All communications between the Special Master or Paladin and North Carolina counsel, Wes Camden, and Williams Mullen concerning valuation or the restitution figure.

36. All communications between the Special Master or Paladin and NHC concerning valuation or the restitution figure.

37. All communications between the Special Master or Paladin and the Bermuda joint provisional liquidators concerning valuation or the restitution figure.

38. All communications of Joseph Grier and Michael Martinez with any party concerning the restitution figure or the valuations.

39. All communications instructing or reflecting that information be withheld from the Defendant (e.g., "do not tell Greg Lindberg").

G. The Government's adoption trail.

40. All ex parte communications between the Government and the Special Master and his advisors, without limitation as to subject; and all communications between the Government or the Special Master and M3 or the custodians concerning the valuation or any revaluation of the assets; the marketing, sale, or other disposition of the assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in value; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures.

41. All data and methodology in the Government's possession supporting the figure and the low/middle/high valuations.

42. All materials the Government relied upon at sentencing to support the loss figure.

H. Identified files (produce in native format).

43. All M3 desktop valuation files.

44. The Special Master's Appendix 1 to the Final Supplement (July 2026) and all data underlying it.

I. Additional items.

45. The Wes Camden letters to the Special Master disputing his authority, and any similar authority-dispute letters from the NCICs, NHC, or other custodians.

46. The Special Master's AAPC-waiver requests and all communications concerning those waivers.

47. All communications with the trustee of the trusts (Steve Wilson) concerning the trusts, their assets, and any disposition or valuation of those assets.

VIII. A continued hearing cannot cure the defect where the data does not exist for anyone.

The Court should not enter restitution or forfeiture on the present record. A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government; until it is produced, no such determination can be made, and production is

therefore the necessary predicate to any hearing. To the extent the cause and amount cannot be determined because that data is unavailable, the Court may decline restitution under 18 U.S.C. § 3663A(c)(3)(B).

IX. Relief.

Immediate logging and preservation are essential and independently warranted. The ex parte communications are the only record of how the figures were built; they sit in the hands of interested custodians and of an officer whose own

conduct they concern, and they will be dissipated if they are not preserved now. Preservation also guards against a graver injury. The Defendant is exposed to multiple punishments for the same conduct—restitution of approximately $1.655 billion, a forfeiture measured against the same unverified ex parte valuations, and pre-judgment "time value" interest layered on top—each derived from figures no party can produce and none of which the Defendant has been permitted to test. The Double Jeopardy Clause forbids multiple punishments for the same offense, and the Excessive Fines Clause forbids monetary sanctions grossly disproportional to the offense. U.S. Const. amends. V, VIII; Timbs v. Indiana, 586 U.S. 146 (2019); United States v. Bajakajian, 524 U.S. 321 (1998). The Court cannot gauge either danger, and the Defendant cannot guard against successive and duplicative punishment, without the underlying data and the ex parte record—which must be preserved before it is lost.

Defendant requests that the Court order the Special Master (1) to produce to the Defendant, and to place on the Court's record under the existing protective order (under seal where appropriate), the forty-seven categories set out in Part VII, including all ex parte communications between the Government and the Special Master (and his advisors), and the ex parte communications between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that concern the valuation or any revaluation of the Primary Restitution Assets; the marketing, sale, or other disposition of those

assets, including the terms, timing, and proceeds; the causation of the victims' losses or of any decline in the value of those assets; the offsets and credits; the loss values; the methodology for computing any of the foregoing; or the restitution or forfeiture figures; (2) to log and preserve those communications immediately, to prevent their dissipation and to forestall the imposition of multiple punishments; (3) set aside the Special Master's report and its Final Supplement as the product of an ex parte proceeding, and decline to adopt, rely upon, or place them on the record; (4) treat nothing conveyed to the Special Master ex parte as having been "before" him, and give it no weight, unless it was disclosed to the proceeding with its underlying data and adopted by the Special Master on the record in a process in which the Defendant could participate; and (5) not enter restitution or forfeiture on the present record. Neither the Government nor the Special Master has a privilege or proprietary interest in the third-party custodians' records, and a generalized interest in the outcome does not confer standing to resist their production. In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009); United States v. Beckford, 964 F. Supp. 1010, 1023 (E.D. Va. 1997). Defendant expressly raises and preserves the ex parte, due process, Brady, Fifth Amendment Takings, and multiple- punishments (Double Jeopardy and Excessive Fines) issues, and the gross-loss issue, for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical

duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant this Motion, compel production of the forty-seven categories and the ex parte communications, and set aside the Special Master's report and Final Supplement before any final order of restitution and forfeiture is entered.

Dated: August 31, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

[Doc. 332-1 — Affidavit of Greg E. Lindberg]

supplied and those he disallowed-as well as the data from NHC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, and Paladin. I have never been given access to any of it.

9. My counsel reported to me that, on the weekly calls, the Government

represented that I would be permitted to argue the ClanWilliam offset at a value of approximately $800 million, and that the investments in the North Carolina insurance companies would be treated as offsets against restituti on. The valuations against which those offsets would run, however, were developed in communications I never saw.

10. I seek the Government's ex parte communications because I understand they

are Brady and Giglio material to which I am entitled, and because I should not be subjected to a criminal punishment-restitution and forfeiture-fixed on the basis of communications and data I was never permitted to see, and which, as I understand it, the Government has now stated in writing that it does not possess.

11. The two tables set out below show why the information the defense has

requested is relevant and where each item rests within the restitution figure.

The first is the schedule of offsets, credits, and reducti ons that, applied against the Special Master's figure, reduces restitution to zero (totaling $3,765,418,383). The second identifies each of the 47 categories of information the defense has requested and shows, for each, both where it fits and why it matters-whether it fixes the baseline loss, supports an offset or credi t, establishes an intervening cause, or consists of the ex parte communications themselves. Every category reflected in these tables is ex parte information, or the data

underlying it, that was never provided to my former counsel (Katten Muchin Rosenman) or to me. The list is deliberately



[Doc. 332-2 — Exhibit A — Meet-and-Confer Correspondence (omitted here; identical to Doc. 331-2)]

**Doc. 333 — Reply re Reconsideration of the Order Denying Subpoenas (filed 08/31/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S REPLY TO THE SPECIAL MASTER'S RESPONSE (DOC. 323) OPPOSING DEFENDANT'S MOTION FOR RECONSIDERATION OF THE ORDER DENYING HIS SUBPOENA REQUEST

Defendant Greg E. Lindberg respectfully submits this Reply to the Special Master's Response (Doc. No. 323) opposing Defendant's Motion for Reconsideration of the Order Denying his Subpoena Request (Doc. No. 309). For the reasons set forth below, the Motion should be granted, and the data and methodology on which the restitution determination rests should be produced.

Defendant's position has not changed, and it does not change here: the tainted Special Master's report should be thrown out in its entirety, and none of it may be adopted, relied upon, or placed on the record. Defendant's objections to the appointment, the combined and conflicted role, and the reliability of every figure the Special Master produced are set out in Defendant's contemporaneous objections and are incorporated by reference. Defendant seeks the underlying data and methodology for one purpose: because the Special Master's report is being used to fix restitution and to trigger a forfeiture money judgment of up to $230 million against Defendant, Defendant is entitled to examine the data on which those figures rest before the order enters. The request for production is not a concession that the report can be salvaged—it cannot. It is a protective measure to prevent a premature and effectively irreversible forfeiture and restitution order from entering on a record the Special Master refuses to complete.

The Response casts the Special Master as willing to produce the data voluntarily. The record is otherwise. When Defendant asked the Special Master, in writing, to place the requested data on the court record under seal—the same course the Special Master himself had represented, in his Report and Recommendations, that he could take, Doc. No. 106 at 29—the Special Master's entire answer was a single word: "No." Ex. 1 (email of M. Martinez, counsel for the Special Master, Aug. 17, 2026; also filed as Doc. No. 309-1). That flat refusal to put the data on the record, not any dispute over the "manner of disclosure," is what necessitated the Motion and this Reply.

One threshold point bears emphasis. The Order denying the subpoenas (Doc. No. 304) issued out of the sequence Defendant had requested. At the August 10, 2026 hearing, Defendant asked the Court not to rule on the subpoena motion (Doc. No. 248) then, but to

hold it pending the Court's issue-by-issue resolution of the several dispositive and evidentiary motions then pending. The subpoena motion is not freestanding: it is the discovery mechanism that supplies the record for the causation, loss, offset, and accounting disputes raised in Defendant's pending motions (Doc. Nos. 234, 278, 280), and both the need for and the proper scope of the subpoenaed valuation material turn on how those issues are resolved. Entering the denial before those motions were addressed—and contrary to Defendant's request to defer—is itself a reason to reconsider, so that the subpoena question is decided in its proper sequence

and the record on those issues is complete for review in the Fourth Circuit. The Supreme Court has recognized as much. United States v. Dieter, 429 U.S. 6, 8 (1976) (per curiam) (recognizing "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors").

I. The Special Master answers a request Defendant did not make:

Defendant seeks all data and methodology on which restitution rests—not merely the valuation estimates for the Primary Restitution Assets.

At the threshold, the Special Master recasts the request. His Response treats Defendant as seeking only documentation "backing up the Special Master's estimates of the value that may be extracted from the 'Primary Restitution Assets'" (Doc. No. 323 at 2), and then declares those estimates "not a critical component of restitution" that "neither affect Defendant's base restitution responsibility nor the restitution offsets" (id.). That was not the ask, and the recast is the Response's central error.

Defendant's Motion sought the data and methodology on which the restitution determination rests as a whole, beginning with the accounting the MVRA commands. The Court must determine restitution in "the full amount of each victim's losses," 18 U.S.C. § 3664(f)(1)(A), on "a complete accounting of the losses to each victim," id. § 3664(a)—that is, a victim-by-victim accounting of the losses—and Defendant's Motion demanded precisely that this complete accounting be placed in the record. Doc. No. 309, § IV. The Motion also sought, as a distinct category, "the method of calculation of the offsets and credits the Special Master applied or disallowed," along with the methodology and data underlying the valuation of the Primary Restitution Assets and Specified Affiliated Companies. Doc. No. 309, § VI. These are the two sides of the

restitution equation—the loss the complete accounting must establish, and the credits and offsets that net against it. In short, Defendant seeks the data behind the entire restitution calculation—the accounting of the loss the statute commands, the valuations, and the credits and offsets—not merely the Special Master's asset-value estimates (the "Mid"-range figure of $998 million, Doc. No. 246 at 36). The methodology and valuations Defendant requests thus include the primary restitution data itself—the data underlying the approximately $1.655 billion restitution figure and each victim's loss, including the underlying spreadsheets from which those numbers were built—which has never been placed before this Court in any form other than the Special Master's report: a narrative that states his conclusions without the underlying detail necessary to test them. A report is not the data. The primary restitution data of approximately $1.655 billion, and the spreadsheets behind it, have never been put before the Court at all.

That the request reaches the whole of the calculation is not an overreach; it is the direct consequence of the accounting the MVRA commands. A "complete accounting of the losses to each victim," 18 U.S.C. § 3664(a), is by its terms the entire body of data and methodology

underlying the restitution figure—the loss claimed, the derivation of each victim's share, the valuations, and the credits and offsets that net against the loss. An accounting that omits the data behind its numbers is no accounting at all; it is a bare bottom line. Nor is the Special Master's report itself the accounting: a narrative document reciting the conclusions the Special Master reached is not a complete accounting of anything. The accounting is the underlying data—the

financial records, valuations, and computations—and the methodology from which those numbers were derived, not a document setting out the numbers the Special Master wrote down. If § 3664(a) did not compel that underlying data and methodology, the provision would have no work to do. Defendant made precisely this demand in conferral, asking the Special Master to place on the record "all of the data" underlying the valuations and explaining that "a single lumped range, with its particulars withheld, cannot satisfy those provisions or permit the de novo determination the Court is required to make." Ex. 1; see 18 U.S.C. § 3664(d)(6). The Government must prove each victim's loss by a preponderance, id. § 3664(e), and cannot satisfy a statute commanding a complete accounting by reporting a lumped range while withholding the accounting itself.

The recast is refuted by the four corners of the Motion the Special Master answers—and by arithmetic. The Motion requests, as a distinct category, "the method of calculation of the offsets and credits the Special Master applied or disallowed," Doc. No. 309, § VI, so the assertion that the request "neither affect[s] . . . the restitution offsets" (Doc. No. 323 at 2) cannot stand. And a credit or offset is, by definition, a reduction applied against a restitution obligation; it cannot be evaluated apart from the loss calculation it is netted against. It is therefore impossible to test the credits and offsets the Special Master concedes are in play without the underlying restitution calculation against which each offset is applied. The Special Master cannot litigate the offsets while withholding the calculation the offsets reduce.

The recast also defeats itself. If, as the Special Master insists, the valuation estimates "do not impact the restitution analyses in any manner" (Doc. No. 323 at 7), then the base restitution figure and the per-victim loss must rest on some other data and methodology—precisely the data Defendant seeks and the Special Master has never produced. Either the estimates drive restitution, in which case they must be produced and tested, or they do not, in which case the Special Master must produce the data that does; he cannot place a $1.655 billion figure and a per-victim allocation on the record and refuse the basis for both. Nor is the premise correct: restitution is the amount owed less the credits and offsets to which Defendant is entitled, 18 U.S.C. § 3664(f), (j), and those offsets turn on what the assets actually yielded on disposition, including the Becket sale, the ClanWilliams sale, and any other sales or dispositions of the Primary Restitution Assets and Specified Affiliated Companies. The data and methodology Defendant seeks therefore include the documents, terms, and proceeds of the ClanWilliams sale and of every other completed sale, which show what each asset in fact produced. The Special Master himself measures Defendant's offsets by the "actual payments ultimately received by victims" (Doc. No. 323 at 4); he cannot measure the offsets by what the assets produced while withholding the data showing what they produced. That measure is not the one the MVRA prescribes. Under the Act, the credit against a property loss is the value of the property returned or recovered, measured as of the date of its return, 18 U.S.C. § 3663A(b)(1)(B), and the statute directs that the fact a victim "has received or is entitled to receive compensation with respect to a loss from insurance or any other source" shall not be

considered in fixing restitution at all, id. § 3664(f)(1)(B). The only reduction keyed to what a victim actually receives is for compensatory damages later recovered in a civil proceeding for the same loss, id. § 3664(j)(2). The offset is therefore a function of the value of the assets returned to and recovered for the victims—a valuation the Special Master refuses to show—not of the payments a victim happens to have received. Whether the Special Master applied the measure the statute requires, and whether his valuations are sound, cannot be tested without the underlying disposition and valuation data. Offset, moreover, is not confined to affirmative credits for value returned or recovered. Any portion of the claimed loss that the data shows was caused not by Defendant's offense but by an intervening actor—the Rehabilitator, the Special Master/Receiver, or another third party—is not Defendant's loss at all, and its subtraction operates as an offset against the amount attributable to him. Restitution reaches only the harm the offense "directly and proximately" caused, 18 U.S.C. § 3663A(a)(2), and the Government bears the burden of proving that causal link, id. § 3664(e). A loss attributable to someone else must therefore come out of the figure just as a credit does—and, like a credit, it cannot be identified, tested, or subtracted without the loss data and the methodology showing how each component of the claimed loss was derived and to whom it was attributed.

This is also why the request reaches the companies' financial records and not merely a valuation summary. The Primary Restitution Assets and Specified Affiliated Companies are going concerns generating millions of dollars in annual revenue—not bankrupt entities whose worth is measured by the debt against them. Unlike a

bankruptcy liquidation, where outstanding debt may stand in for value, the enterprise value of an operating, revenue-generating business can be assessed only from its financial reports, board reports, letters of intent, and offers to purchase; those records fix the enterprise value that the Special Master's debt-based liquidation figure does not capture. Doc. No. 309, § VI. Testing whether the Special Master undervalued these companies—and thereby overstated both the restitution shortfall and the forfeiture measured against it—requires those underlying financial records, which only compulsory process or on-the-record production can supply.

To the extent this Reply broadens the scope of what Defendant seeks beyond the Motion, that broadening is warranted—indeed compelled—by the Special Master's own Response. Having now characterized his figures as "guesses," "predictions," and "inherently unreliable" (Doc. No. 323 at 3–4), the Special Master has made the case for full disclosure clearer still: the more the restitution rests on admitted guesswork, the more essential it is that the entire restitution—the complete accounting, the underlying data, and the methodology—be placed on the record where the Court and Defendant can test it. A number the proponent himself concedes is a guess cannot be entered as a restitution judgment of approximately $1.655 billion, and a forfeiture of up to $230 million measured against it, without the data behind it. The Special Master's disclaimers do not narrow the request; they compel its full breadth.

II. The forfeiture exposure of up to $230 million requires the data now,

and Defendant's agreement to a formula is not a waiver of his right to test the number in it.

The Special Master concedes that his estimate drives Defendant's forfeiture exposure. The Forfeiture Order fixes a money judgment equal to "the lesser of either (1) $230,000,000 or (2) the difference between the amount of restitution that this Court orders and the Special Master's estimate, as of the date restitution is ordered, of the 'Mid' point value of the 'Primary Restitution Assets.'" Doc. No. 160 at 1; see Doc. No. 323 at 3. A number the

Special Master himself calls a "best guess" therefore determines a forfeiture measured in the hundreds of millions of dollars. That is not a reason to deny the data; it is the reason the data must be produced.

Because the forfeiture money judgment is defined as the difference between two numbers—the restitution the Court orders and the Special Master's Mid estimate of the value of the Primary Restitution Assets—testing the forfeiture requires the data behind both. Doc. No. 160 at 1. The judgment is the gap between what Defendant is said to owe and what his assets are said to be worth, and each side of that subtraction drives its size: an overstated restitution obligation and an understated asset valuation each enlarge the forfeiture, dollar for dollar, up to the $230 million cap. Defendant therefore cannot test the forfeiture exposure the Special Master concedes his figures create without both the full methodology for calculating the restitution obligation and the methodology and data for valuing the assets available to satisfy it. Producing one half of the subtraction while withholding the other leaves the number that fixes a judgment of up to $230 million half-tested and half-hidden.

The Special Master's contrary argument (Doc. No. 323 at 3 n.7)—that because Defendant executed the Forfeiture Order and agreed to use the estimate "good, bad, or ugly," any defect in methodology "would not change the forfeiture amount"—does not withstand scrutiny. Agreeing to a formula that incorporates the Special Master's Mid estimate is not an agreement that the estimate is accurate, and it is not a waiver of the right to examine the data that fixes the size of the judgment. The judgment moves with the estimate: the lower the Special Master's Mid figure, the larger the difference between restitution and that figure, and the larger the resulting forfeiture, up to the $230 million cap. A defendant does not surrender the right to test a number simply because he agreed to a formula in which it appears—least of all a number the proponent himself disclaims as a guess. Moreover, Defendant's agreement to use the Mid estimate was made against, and premised on, the valuation of the AAPC assets as it then stood. That premise no longer holds: the AAPC valuation has materially changed, and an agreement to accept an estimate built on a superseded valuation does not survive a material change to the very input on which it rested. Defendant did not agree to be bound to a Mid figure recalculated on materially different assumptions, still less to forgo examining how that figure was derived. The agreement fixes the formula; it does not immunize the inputs from examination before the judgment is entered.

III. The pending appeal is protective; it does not cure the need for the data

before the final restitution order enters.

The Special Master argues that because Defendant "already appealed the Forfeiture Order" (Doc. No. 323 at 3–4, citing Doc. No. 192), "any need for additional

discovery on the Special Master's estimation methodology is not immediate." The appeal is protective. It preserves Defendant's rights against the judgment already entered; it neither supplies, nor excuses the absence of, the data the restitution determination requires, and it does not make the need for that data any less immediate. The immediacy argument is, in any event, a red herring. An appeal does not stop the forfeiture, and it does not relieve the proponent of building the record on which the forfeiture must rest. Nor is the preliminary order the operative one: by its own terms the money judgment is measured by the Special Master's estimate "as of the date restitution is ordered," Doc. No. 160 at 1, so the forfeiture amount is fixed only when the final restitution order enters—a date that has not arrived. Because the number that fixes the forfeiture is set at that final order, and not by the

preliminary order Defendant appealed, the time to examine the data underlying it is now, before the final order enters, not later on appeal from a preliminary order the final determination will supersede.

First, the restitution determination remains open. Restitution may be fixed up to ninety days after sentencing, 18 U.S.C. § 3664(d)(5), and the order is not final until entered, id. § 3664(o); Dolan v. United States, 560 U.S. 605 (2010). No final order of restitution has entered. The Forfeiture Order itself measures the money judgment by the Special Master's estimate "as of the date restitution is ordered," Doc. No. 160 at

1—a date that has not arrived. The data is therefore needed now, before that order, not after it. 1 Second, an appeal cannot reconstruct a record that was never made. If the final order enters on a record from which the Special Master's methodology and data were withheld, the appellate court will have nothing on the point to review. A protective appeal secures Defendant's right to challenge the judgment; it does not manufacture the evidentiary record that 18 U.S.C. § 3664(e) requires the proponent to build in the first instance. The remedy for a record that lacks the basis for its central figures is to complete the record before the order enters—not to enter the order and then appeal the absence of proof. The appeal thus protects Defendant's position; it does not resolve, and cannot substitute for, the present need to examine the data before the restitution and forfeiture order is fixed.

IV. The Special Master's own disclaimers are the reason the data must be

produced and tested, and his handling of Damovo confirms the concern.

The Special Master describes his own work in terms that compel production. He states that he "did not commission formal business valuations," that his advisors relied instead on "documents, information, and judgments prepared by those persons charged with managing the 'Primary Restitution Assets,'" that "all business valuations are inherently unreliable," that his estimation "merely reflects the Special Master's best guess at what might happen in the future," and that there is a

1 The Court has yet to determine, de novo, causation, offsets, and credits—whether on motions practice or at the hearing—which will further change the restitution determination. Defendant expressly reserves this determination.

"necessary inaccuracy in such forecasting." Doc. No. 323 at 3–4; see Doc. No. 246. When the proponent of a number brands it a "best guess" and a forecast of "necessary inaccuracy," the party against whom it is used is entitled to the documents beneath it—to test how far the disclaimer runs, whether the guess is even a reasonable one, and what the persons "managing the 'Primary Restitution Assets'" actually told the Special Master. That is the very point of the request: to test how far the Special Master's own account of guesses, predictions, and estimates goes.

The Special Master's handling of the Damovo asset confirms the need. Damovo has not been sold; it remains on the block. Yet, notwithstanding a pending offer of $400 to $500 million, the Special Master proposes to dispose of Damovo for debt—a fraction of that offer—despite his duty to maximize value for the benefit of persons due restitution. That an officer who purports to value these assets would propose to sell one for the amount of the debt against it in the face of a $400-to-$500-million offer undermines confidence in his figures and consolidates Defendant's position that every report the Special Master has touched is unreliable. It also illustrates precisely why the underlying data is needed: the same data that would show what Damovo is worth, and what the market has offered for it,

is the data the Special Master refuses to place on the record. Defendant doubts the veracity of the Special Master's submissions, and he is entitled to examine the data underlying each of them rather than accept the Special Master's characterization that the numbers, though admittedly guesswork, need not be shown.

V. The proponent bears the burden; the argument that the offsets present only legal disputes does not answer the request for the data behind the loss.

The Special Master argues that the offsets Defendant identifies present legal rather than factual disputes, that he "is not disputing Defendant's figures for ANY of the offsets identified in the chart," and that the Fourth Circuit "can assume all of Defendant's numbers are correct" and still adopt his legal reasoning. Doc. No. 323 at 7; see id. at 7 & nn.14–15. That answers only the offsets. It does not answer—because it cannot—the request for the data and methodology behind the base restitution figure and the victim-by-victim loss. Those are factual determinations, and the Government, as the proponent of restitution, bears the burden of proving the amount of each victim's loss by a preponderance of the evidence. 18 U.S.C. § 3664(e). A proponent that places a $1.655 billion figure and a per-victim allocation on the record must produce the data that supports them; it may not withhold that basis and rest on the assertion that Defendant's separate offset requests fail "as a matter of law." 2 The Special Master's recharacterization of these disputes as purely "legal" mistakes both their nature and his role. Causation, foreseeability, and the offsets are questions of law and fact: they turn on what actually happened to the assets and the money—what was recovered, what was returned, and what each asset yielded—as well as on the legal standards that govern them. On each, the Government bears the burden of proof. 18 U.S.C. § 3664(e). The factual half of those mixed questions cannot be resolved without the underlying data, and establishing it is the Government's obligation, not Defendant's. Asking the Special Master to produce the facts is not asking him to do anything the statute does not already require of him: a special master under 18 U.S.C. § 3664(d)(6) is appointed "for proposed findings of fact and recommendations," subject to de novo determination by the Court. Developing and disclosing the facts is his assigned task; rendering legal conclusions is not, and the legal questions are for the Court to decide de novo. The request therefore keeps the Special Master squarely within the four corners of the MVRA—and asks no more of him than the statute already contemplates—while permitting Defendant to test whether the Government has met its burden of proof. The Special Master cannot decline the factual half of a mixed question by relabeling the whole of it "legal," and the tainted Special Master, of all officers, should stay within what the statute provides.

Each of these determinations carries a factual predicate that only the data can supply. Causation asks whether each claimed loss was in fact proximately caused by the offense

2 Defendant applies the preponderance standard of 18 U.S.C. § 3664(e) for purposes of this Reply without conceding its constitutionality. Because restitution under the Mandatory Victims Restitution Act is criminal punishment, see Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), Defendant contends that the Sixth Amendment requires the facts necessary to support a restitution award—including the identification of any victim and the amount of loss—to be found by a jury beyond a reasonable doubt, not by the Court by a preponderance of the evidence. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Southern Union Co. v. United States, 567 U.S. 343, 360 (2012) (applying Apprendi to criminal fines). Defendant expressly reserves and preserves this issue and does not waive any Sixth Amendment, Ex Post Facto, or related challenge to the restitution determination.

conduct rather than by intervening market forces, third-party decisions, or the Special Master's own dispositions; foreseeability asks what harm was in fact reasonably foreseeable; and the credits and offsets ask what value was in fact returned to and recovered for the victims, asset by asset, including what each

Primary Restitution Asset actually yielded or has been offered. Those are factual questions bound up with legal standards—questions of law and fact—and on each the Government bears the burden of proof by a preponderance of the evidence. 18 U.S.C. § 3664(e). Labeling the resulting disputes "legal" neither dissolves their factual core nor shifts to Defendant a burden the statute places on the Government. Defendant sets out this law-and-fact framework in full in his Reply Regarding Restitution— Proximate Cause, Amount, and Offsets (Doc. No. 300), responding to the Government's Omnibus Response (Doc. No. 279), which he incorporates herein by reference. As Defendant there explains, causation and foreseeability are elements the Government must prove, not "proposed findings" the Special Master may supply by fiat, and the factual materials bearing on them are what Defendant seeks here. The point for present purposes is narrow: the data Defendant seeks is the factual foundation on which the Government's burden must be tested, and the Special Master's development and disclosure of that factual foundation is precisely what 18 U.S.C. § 3664(d)(6) contemplates—no more, and no less.

Chief among the facts the Government must prove—and among the data the Special Master refuses to place on the record—is what happened to the companies after Defendant transferred them out of his control. Control of the insurers passed first to the State Rehabilitator in 2018 and then to the Special Master/Receiver, and much of the loss the Special Master attributes to Defendant materialized only after those transfers, through the intervening decisions of the Rehabilitator, the Special Master/Receiver, and other third parties—including below-value dispositions and the

rejection of arm's-length, face-value offers. Whether Defendant's offense conduct proximately caused a post-transfer loss, or whether an intervening actor's decision broke the causal chain, is a question of fact on which the Government bears the burden. 18 U.S.C. § 3664(e). Defendant briefed these intervening, post-transfer facts at length in his Reply Regarding Restitution (Doc. No. 300, Parts VII–X, XII), which he incorporates herein. The seven principal post-transfer "causation" rulings—Issues 11 through 17—each charge Defendant with a loss that materialized only after control passed, and together they total approximately $1.745 billion—more than the entire restitution figure. They are summarized, with the amount attributed to Defendant and the intervening fact the Government must prove as to each, in the first table of Exhibit 2. The offsets and credits the Special Master disallowed—each amount, how it is calculated, and the third-party custodian holding the records needed to prove it—are set out in the second table of Exhibit 2; those records are held by NHC, the insurance companies, Paladin, and the Rehabilitator, not by Defendant, which is why compulsory process or on-the-record production is the only route to them. The data showing what became of each company after it left Defendant's hands is thus not collateral to restitution; it is the evidence by which the Government's proximate-cause burden must be tested—and it is precisely the data the Special Master will not produce.

The Special Master's report does not address the facts of this intervening cause at all. It attributes the post-transfer declines to Defendant without identifying, quantifying, or accounting for the losses caused by the intervening actors—Michael

Dinius, the Rehabilitator, and the third-party custodians, including the Special Master/Receiver himself, whose below-value dispositions and post-transfer management produced much of the shortfall now charged to Defendant. That silence is not a neutral omission. Under 18 U.S.C. § 3664(e), the Government bears the burden of proving that the offense conduct proximately caused each loss; where the loss materialized through an intervening actor's conduct, it is the Government's burden to introduce facts showing why that intervening cause does not break the causal chain and does not reduce or eliminate Defendant's liability. The Government cannot carry a burden it never addresses, and it cannot address it by adopting a report that is itself silent on the point. A conclusion that Defendant is liable for a post-transfer loss, unaccompanied by any facts disaggregating the losses the intervening actors caused, is an assertion, not proof.

Nor can the United States Court of Appeals for the Fourth Circuit supply what the record omits. Proximate cause, and the effect of an intervening cause, are questions of fact; an appellate court does not find facts in the first instance, and it cannot do so on a record that does not include the losses caused by the intervening actors—Michael Dinius and the third parties, including the Special Master. If the figures are finalized on the present record, and the data showing what each intervening actor did and what loss each caused is never placed before this Court, there will be nothing on the decisive causation question for the Fourth Circuit to review. That is why the data must be produced and placed on the record now: so that

the Government's proximate-cause burden can be tested here, and so that a complete record of the intervening-cause facts is preserved for review in the Fourth Circuit.

For the same reason, the Subpoena Denial Order's statement that "Defendant has not shown that the information is necessary to finalize restitution" (Doc. No. 304 at 1) cannot stand alongside the Special Master's simultaneous insistence on using his figures to finalize restitution and to fix forfeiture. Information that determines the amount of the restitution judgment and the size of the forfeiture money judgment is necessary by definition. That the Special Master would prefer to supply "further background—on the record—regarding the Special Master's methodology" in the form of argument in his Response (Doc. No. 323 at 6) is no substitute for the underlying data; argument about a methodology is not the methodology, and it is not the data.

VI. Confidentiality is resolved by the Court's own Standard Criminal

Discovery Order; the manner-of-disclosure dispute is not a ground to deny production.

The Special Master states that he will produce the materials voluntarily, without a subpoena, subject to a confidentiality agreement and a protective order, and he attaches this Court's Standard Criminal Discovery Order to his Response. Doc. No. 323 at 4–5; see Doc. No. 309-1 at 10. Defendant agrees to receive and handle these materials under that Standard Criminal Discovery Order—the Court's own standing order—which provides that sensitive financial materials "shall be reviewed with the defendant in the presence of the defense team," that "the defense team shall maintain custody and control of such materials," and that they are not to be further disclosed. Standard Criminal Discovery Order (attached to Doc. No. 323). That order

fully answers the confidentiality concern. Defendant does not require, and does not seek, a separate confidentiality agreement as a precondition to production; the Court's existing order suffices.

The Special Master's professed willingness to produce is difficult to reconcile with his conduct. In his Report and Recommendations, the Special Master represented that, "[u]pon request by the Court, the Special Master could provide additional detail concerning the Special Master's estimates under seal or in an in camera setting." Doc. No. 106 at 29. In August 2026, asked in writing to do the very same thing, he answered in a single word: "No." Ex. 1. A party genuinely willing to produce does not refuse, in one word, to place the data where the Court and the defendant can actually use it. What the Special Master frames as a dispute over the "manner of disclosure" is, in substance, a refusal to put the data on the record at all— which is why the distinction between placing material on the record under seal and disclosing it to the public matters here.

Nor is there any doubt about the vehicle. The Special Master professes to be "unaware of any such protective order" (Doc. No. 323 at 8 & n.19), but Defendant identified it in conferral: the Government's own standing protective order, which already governs all of the Government's discovery in this criminal case, so that no new agreement is needed. Doc. No. 309 at 8; Ex. 1. The Government agreed that "a protective order . . . is appropriate here" and represented that it does "not object to [the defense] getting relevant data from the Special Master." Ex. 1. With the Government's consent and an existing protective order available, the only holdout is

the Special Master, who will produce the data privately but will not let it enter the record— the one condition the MVRA does not permit, because private production that keeps the data off the docket forecloses the Court's de novo determination on a complete accounting, 18 U.S.C. § 3664(a), (d)(6), and forecloses review in the Fourth Circuit.

The Special Master mischaracterizes Defendant's position as a demand that sensitive information be broadcast to "the general public." Doc. No. 323 at 5–6 & nn.11–13, 20 (quoting Doc. No. 309-1). That is not the ask. Defendant's position is that where the Special Master's data drives the restitution and forfeiture the Court is asked to order, that data must be before the Court and part of the record on which the order rests—under seal where appropriate—so that the determination is not made on figures the Court and Defendant cannot see. There is a difference between placing material "on the record" before the Court, under seal, and disclosing it to the public; the Special Master conflates the two. Defendant does not seek to injure victims. He seeks to prevent an unexamined number—one the Special Master calls a guess—from injuring him through a restitution judgment and a forfeiture of up to $230 million. The interests of third-party professionals and asset managers can be protected by the same sealing and Standard-Discovery-Order procedures; those interests are a reason to produce under safeguards, not a reason to withhold the data from the person against whom it is being used.

There is a further, independent reason the data must be placed on the Court's record now, and not produced privately or deferred. Defendant has requested that the

Government open a criminal investigation into the Special Master's disposition of approximately $1 billion in assets. Lodging the complete underlying data and methodology with the Court now—rather than leaving it in the sole possession of the officer whose own dispositions are the subject of that request—preserves it against any risk of loss, alteration, or spoliation and ensures that a complete and accurate record is fixed while the events are fresh. Because the Special Master's conduct is itself the subject of the requested inquiry, the integrity of the data is best protected by placing it on the record now, under seal where appropriate, where it is preserved for the Court, for Defendant, and for review by an authority within the Executive Branch other than the prosecutor and personnel involved in

this case. Deferring production, or leaving the data in the Special Master's hands, would leave the only records of a billion-dollar disposition in the custody of the very officer whose handling of it is in question.

VII. The request is neither vague nor made in bad faith.

The Special Master's remaining objections—that the request is "vague," shifting between a "narrower subset" and "all of the documents," and that the subpoenas are sought in "bad faith" to "delay, distract, and hinder" (Doc. No. 323 at 8–9 & nn.17–18)—do not withstand the precise statement of the request set out above. Any narrowing reflects Defendant's willingness to confer and to limit scope, not vagueness; the core of the request has been constant: all data and methodology on which restitution rests, including the data behind the $1.655 billion figure, the victim-by-victim loss calculation, and the credits and offsets. And the purpose is the

opposite of bad faith. Defendant seeks to test figures the Special Master himself disclaims as guesses, before an effectively irreversible forfeiture and restitution order enters. It is the entry of a multi-hundred-million-dollar forfeiture and a $1.655 billion restitution judgment on an admittedly "inherently unreliable" estimate, without the data, that would work the injustice—not Defendant's effort to see the numbers first.

The mechanism is proper as well. Rule 17(c) is available for post-trial motions and sentencing. United States v. Winner, 641 F.2d 825, 833 (10th Cir. 1981). Its relevancy and specificity requirements, see United States v. Nixon, 418 U.S. 683, 699– 700 (1974), apply with less rigor after conviction than at trial. As to the custodians other than the Special Master—NHC Holdings, LLC, the insurance companies, Paladin, and the Bermuda liquidators, who hold the records—neither the Special Master nor the Government has standing to resist subpoenas for documents in which it claims no privilege or proprietary interest. In re Grand Jury Subpoena John Doe, 584 F.3d 175, 184 n.14 (4th Cir. 2009); accord Brown v. Braddick, 595 F.2d 961, 967 (5th Cir. 1979); United States v. Beckford, 964 F. Supp. 1010, 1023 (E.D. Va. 1997); United States v. Nachamie, 91 F. Supp. 2d 552, 558 (S.D.N.Y. 2000) (Government lacked standing to quash Rule 17(c) subpoenas served on non-parties absent a legitimate independent interest); United States v. Gordon, 247 F.R.D. 509, 510 (E.D.N.C. 2007). And the Court may grant the same relief in a form that raises no third-party or overbreadth concern at all—by directing its own appointee to place his valuation methodology and supporting data on the record under the existing protective order, on the authority of the Mandatory Victims Restitution Act, 18 U.S.C.

§ 3664(d)(6), and the Court's inherent supervisory authority over its own appointee. Federal Rule of Civil Procedure 53 does not itself govern this criminal proceeding; the authority for the reference is the MVRA. Defendant set out these grounds in full in his Motion for Reconsideration (Doc. No. 309, Parts VI, VIII), which he incorporates herein.

The premises of the original Order fare no better. That Order rested in part on the contentions that the defense "already possess[es]" the information and that the material is "likely available by other means." Neither survives the record. Whatever communications and filings the defense holds, it does not possess the one category that matters—the methodology and underlying data by which the Special Master valued the assets—which the Special Master has withheld, reporting only a single lumped range; prior counsel sought these very particulars and were told they would not be provided. Ex. 1 ("Katten has asked for this in the past. We do not have this information."). Nor is the material "available by other means": the institutional holders of the books, records, and valuations—the North Carolina insurance companies and NHC—disputed the Special Master's authority to

compel the information and declined to furnish it, and the efforts of Defendant and of Paladin were unavailing. The Special Master alone holds the data and will not place it on the record; compulsory process, or an order directing on-the-record production under the existing protective order, is the only route.

VIII. The premise that the data lies elsewhere has now collapsed: after a diligent search it is in no one's hands—including, by the Government's own admission, the Government's.

Since this matter was briefed, the factual premise on which the Special Master resisted production has come apart. On August 26, 2026, the defense served a written, itemized demand identifying with specificity every category of data, valuation, and communication that had been promised in the parties' conferrals and never produced. The Government first responded that Defendant already possessed the materials in the files of former counsel. That is not so: former counsel and current counsel have each conducted a diligent search of their files, and none of the identified materials was produced to either by the Special Master or by the Government. When former counsel was copied on the correspondence and the defense supplied the specific list of everything promised and never received, the Government reversed course and represented that it does not have the information. That sequence is dispositive of the Order's "already possess[es]" and "available by other means" rationales alike. The data is in no one's hands within this proceeding: the Defendant does not have it; the Court has only the figures filed under seal, with no underlying data; and, by its own admission, the Government does not have it. The Special Master and the custodians subject to his authority are the sole remaining repository—which is precisely why compulsory process, or an order directing on-the-record production, is required. These issues, and the demand for this data and for the ex parte communications, have been raised by both former counsel and current counsel.

Current counsel could not have raised this sooner, and did not sleep on it. Current counsel first learned of the ex parte character of this proceeding only within the past several days—on or about August 27, 2026—and learned it as a direct consequence of the Government's own emails representing that the data had all been provided to former counsel. Running that representation to ground—by asking former counsel and searching the files—revealed both that the data had never been produced and the extent of the ex parte communications to the Special Master from M3, the North Carolina insurance companies, NHC Holdings, LLC, Michael Dinius, Wes Camden, and Williams Mullen. That is how the unconstitutional, one-sided character of the proceeding came to light. The issue is therefore timely and preserved, not waived.

IX. The proceeding is infected with ex parte communications to which the Defendant has no access, contrary to the appointing order and due process; the issue is preserved for the Fourth Circuit.

There is a further reason the communications must be produced and placed on the record. The restitution proceeding is infected with ex parte communications to which the Defendant has been given no access: communications between the Special Master (and his advisors) and the Government, and between the Special Master (and his advisors) and any other third party—including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—the interested persons who hold, generated, or supplied the assets, the valuations, and the

data. Mr. Dinius valued the North Carolina insurers at approximately $641 million in November 2018 and, with the

Rehabilitator, holds the insurers' records. As the Court's neutral, the Special Master may not confer with one party, or with the interested custodians, about the merits off the record and outside the Defendant's presence. Due process guarantees the Defendant notice and a meaningful opportunity to be heard before a neutral decisionmaker, Goldberg v. Kelly, 397 U.S. 254 (1970); Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); ex parte contact between a court's own neutral and one side is impermissible and must occur on the record, where the parties can participate, Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996); cf. In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir. 2004); In re Brooks, 383 F.3d 1036 (D.C. Cir. 2004) (de novo review of a master's findings does not cure impermissible ex parte adjudicative contacts); and the order appointing a master must state the circumstances, if any, in which the master may communicate ex parte with a party, Fed. R. Civ. P. 53(b)(2)(B).

The appointing order underscores the impropriety. It has two parties, and only two—the United States and Greg E. Lindberg—and it authorizes no ex parte communication at all: the Special Master must "regularly update the Parties throughout the diligence," Order ¶ 5, and advise the Defendant "through Defendant's counsel," in writing, id. ¶ 8, with matters "heard upon notice and hearing," id. ¶ 15. See Fed. R. Civ. P. 53(b)(2)(B) (the appointing order must state the circumstances, if any, in which the master may communicate ex parte with a party). The order thus required the Special Master to keep the Defendant, a Party, informed, and authorized no ex parte contact whatever. The order appointing the Special Master contains no ex parte communication procedures whatever. And in a criminal proceeding the

process must comport with constitutional due process: no ex parte communication with the adjudicating neutral is permissible. Even where Federal Rule of Civil Procedure 53 permits a master to communicate ex parte when the appointing order so provides, that civil allowance has no application here—this is a criminal case, the order authorized no such contact, and the Constitution forbids fixing a criminal punishment on facts developed through communications the Defendant cannot see or rebut. Instead the Defendant was shut out of the very communications—between the Special Master (and his advisors) and the Government, and between the Special Master (and his advisors) and any other third party, including but not limited to M3, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius—that produced the restitution figure and the valuations. Those communications must be produced and placed on the Court's record: if the contact was proper, production costs nothing; if it was ex parte contact about the merits, the Defendant is entitled to know it. Defendant raises, and expressly preserves, this ex parte and due process issue for review by the United States Court of Appeals for the Fourth Circuit. Counsel for Defendant have a professional and ethical duty to their client, Greg E. Lindberg, to preserve these issues, and expressly do so here so that none is waived.

The scope of what was withheld cannot be minimized. Any effort to recast these ex parte contacts as a handful of discrete, benign exchanges understates a proceeding that, for the most part, was conducted off the record and outside the Defendant's presence. In light of that attempted minimization, and to preserve a complete record

of it, Defendant is contemporaneously filing a motion to compel the production of the entire list—both the data underlying the challenged figures, including the underlying spreadsheets and the methodology by which those figures were built, and the ex parte

communications between the Special Master (and his advisors) and each participant identified above, including M3, the Government, NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, and Michael Dinius. Because most of the data and communications on which the restitution and forfeiture figures rest were developed ex parte, that production is necessary to fix, now, the full extent of what was withheld and from whom, so that the issue is preserved in its entirety for review by the United States Court of Appeals for the Fourth Circuit. A minimized subset would leave the Fourth Circuit to review a record that does not reflect the true scope of the ex parte process; counsel's duty to their client requires that the whole of it—the entire list—be placed before the Court and preserved, and Defendant expressly does so here.

The order's only mechanism for action affecting these assets is a motion to the Court: paragraph 15 provides that a motion "to expand or narrow the scope of Primary Restitution Assets … shall be heard upon notice and hearing." Order ¶ 15; see id. ¶ 10 (motion or application to the Court for instruction or clarification). None of that occurred. The reduction of AAPC—a Primary Restitution Asset—to near zero does precisely what paragraph 15 governs: it narrows the value of the restitution assets and triggers the forfeiture money judgment; yet it was accomplished with no motion, no notice, and no hearing, on valuation data the Defendant never saw. The

same is true of the low, middle, and high valuations and the approximately $1.655 billion loss figure, which were developed on data drawn ex parte from NHC Holdings, LLC, the North Carolina insurance companies, Wes Camden, Williams Mullen, M3, Paladin, and Mr. Dinius—including the $641 million Dinius valuation and the Rehabilitator's records, the NCIC loan and repayment data, the ILA/MOU and ULICO reconciliations, and the bankers' marketing and sale figures—without any motion, notice to the Defendant, or hearing at which the Defendant could test the data or be heard. The order specified motion, notice, and hearing; the process delivered ex parte data-gathering and a sealed result. All of Mr. Dinius's data— including the credits and the offsets he supplied and those he disallowed—is data to which the Defendant has never been given access. Belated production cannot cure the defect: the ex parte communications—many of them oral and occurring outside the weekly calls the defense attended—cannot be perfectly retraced, and what passed between the Special Master and the Government and the custodians "leave[s] no trace in the record" and is "now unknowable," Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996). Production is therefore necessary but not sufficient; the report must be set aside. Because many of the participants refused to recognize the Special Master's authority, the restitution flows in one direction only, without accountability to the Defendant for how or why he is charged these values; the entire process is infected with ex parte data that cannot be separated from it, and the report cannot be salvaged, only set aside.

Defendant recognizes that the Court seeks to enter a final order of restitution and forfeiture. A final order entered on this record, however, would be fatally flawed. The tribunal that produced the figures operated without the ordinary rules of a judicial proceeding: for the most part it functioned ex parte, with the Government, NHC Holdings, LLC, the North Carolina insurance companies, Michael Dinius, Wes Camden, and Williams Mullen participating in, and benefiting from, an arrangement to which the Defendant had no access—while those same interested parties refused to recognize this Court's authority and refused to place any of the underlying data on the record. In a criminal case, that defect is fatal. Restitution under the MVRA is criminal punishment, and neither restitution nor a sentence may rest on figures generated in an ex parte process the Defendant could never see or test—least of all a sentence the Government urged by representing that "there is

more evidence now." Because the defect goes to the integrity of the process and not merely to the completeness of the record, it cannot be cured by belated production alone. Defendant documents it and places it on the record now, and expressly preserves it, in discharge of counsel's duty to their client, for review by the United States Court of Appeals for the Fourth Circuit.

It does not matter which characterization of the Special Master the Government embraces. If the Special Master is an adjudicative neutral whose findings the Court is asked to adopt, his ex parte contacts and off-the-record development of the loss and valuation facts are impermissible and require that his report be set aside. If instead the Government contends that the Special Master

functioned in a prosecutorial or plaintiff-like capacity—recovering for the victims and building the loss figure—then his figures and the data behind them are the Government's own; the prosecutor's Brady and Giglio disclosure duties attach to them directly and fully, Kyles v. Whitley, 514 U.S. 419 (1995); and the ex parte communications are the prosecution developing, in secret and outside the Defendant's presence, the very facts that fix a criminal punishment. Either characterization is fatal to using the report as the basis for restitution or forfeiture, and the Defendant need not win the neutrality question to prevail.

X. In essence, the process the Special Master defends outsources Article

III adjudication to an officer who alone holds the data—a private judge.

Reduced to its essence, the Special Master's position is this. Neither this Court nor the Defendant has access to the data underlying the restitution and forfeiture figures; that data is held by NHC Holdings, LLC, the insurance companies, and the Special Master's professionals. Yet the Court is asked to enter a restitution judgment of approximately $1.655 billion and a forfeiture of up to $230 million, and the Defendant is already serving a twelve-year sentence built in part on the same figures. Only the Special Master has the data, and he will not give it to the Defendant. That is not adjudication; it is adjudication outsourced to an officer who alone holds the facts and keeps them from both the tribunal that must decide and the person who must serve the sentence and pay the judgment. A determination in which the decisionmaker cannot see the evidence, and the person to be punished is forbidden to see it, is the very definition of a private judge—the antithesis of the Article III

adjudication the Constitution requires, and of the de novo, on-the-record determination the MVRA commands. 18 U.S.C. § 3664(d)(6), (e). Because restitution under the MVRA is criminal punishment, Ellingburg v. United States, 607 U.S. 163, 146 S. Ct. 564 (2026), it must be fixed by the Court, on a record the Court and the Defendant can examine—not by an officer who keeps the data to himself. The answer is not to proceed on a record only the Special Master can see; it is to require the data to be produced, so that the Court's determination is the Court's own.

Even completing the record, however, will not by itself cure the defect here, because the figures are structurally tainted at their source. They are not merely undisclosed; they are the product of a disqualified officer who combined the roles of investigator, adverse advocate, valuer, and asset-liquidator, and who generated through his own below-value dispositions the very shortfalls he now counts as loss. Data can test a figure produced by a neutral process; it cannot rehabilitate a figure produced by a tainted one. Disclosure is therefore necessary but not sufficient: the data must be produced so that no order enters on numbers the Court and the Defendant cannot see, but the Court's own findings must be

drawn from untainted evidence, not from the Special Master's figures—which, for the reasons set out in Defendant's objections, cannot be adopted, relied upon, or placed on the record as, or as the basis for, a restitution order regardless of what data is later supplied. The production Defendant seeks is thus a floor, not a cure: it is the minimum necessary to prevent a premature and irreversible order from entering on an unexamined

record, not a validation of figures the officer's disqualification has already fatally compromised.

Until the Fourth Circuit or this Court throws out the tainted Special Master's report in its entirety, that ultimate relief has not yet arrived—and in the interim a restitution and forfeiture order may enter that inflicts irreversible harm. Defendant is therefore entitled, at a minimum, to all of the data and methodology on which the challenged figures rest, so that he may test them and at least prevent an irreversible order from entering while his challenge to the report itself remains pending. Access to the data is the protective measure that holds the line until the report is set aside; it is the least the process requires, not the most, and it cannot be denied on the theory that the report will speak for itself.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant the Motion for Reconsideration and order the production—under the Court's Standard Criminal Discovery Order, and under seal to the extent appropriate—of all data and methodology on which the restitution determination rests, including (1) the data and methodology underlying the approximately $1.655 billion restitution figure before credits and offsets, (2) the calculation of the amount due to each victim, as the Special Master defines victims, victim by victim, and (3) the data and methodology underlying each credit and offset. Absent that production, the Court should decline to enter restitution and forfeiture on the present record, and, if the cause and amount of the victims' losses cannot be fairly resolved on the record before it, should decline

to order restitution rather than enter it on an incomplete and inaccurate one. See 18 U.S.C. § 3663A(c)(3)(B). A continued hearing under 18 U.S.C. § 3664(d)(5) cannot cure the defect, because the data required for any de novo determination or review does not exist for the Defendant, the Court, or the Government, and until it is produced no such determination can be made. In all events, the tainted Special Master's report should be thrown out, and none of it should be adopted, relied upon, or placed on the record.

Dated: August 31, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: August 31, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 339 — Reply to the Special Master's Opposition to the Motion to Stay (Doc. 334) (filed 09/07/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE TO THE SPECIAL MASTER'S OPPOSITION

TO

DEFENDANT'S MOTION TO STAY DISPOSITION OF THE DAMOVO

ASSET

Defendant Greg E. Lindberg respectfully submits this Response to the Special Master's Opposition (Doc. No. 334) to his Motion to Stay Disposition of the Damovo Asset (Doc. No. 320). For the reasons set forth below, the Special Master's opposition should be rejected and the Motion granted.

INTRODUCTION

The Special Master's opposition rests on the same premise as the Government's. He says that "the Special Master does not control the liquidation of the SACs," that "NHC controls the SACs as set forth in the MOU," and that "because one or more 'Loans' (including, but not limited to, Affiliate Investments) are in default, Defendant (and now the Special Master standing in Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC." Doc. No. 334 at 3–4. From there he reasons that NHC's board "can approve … any and all dispositions of SACs" by "simple majority vote," id. at 4, and that the Court cannot reach the transaction because the entities involved are "not before the Court," id. at 4.

Every step of that reasoning depends on the same clause the Government invokes—Article II, Section 3.i's proviso that the Defendant-appointed director's consent to any sale falls away only upon a "default under any Loan." Doc. No. 55-1 at

5. And that premise is wrong for the reasons set out below: the "Loan" and the

"default" the proviso requires are creatures of Article III of the MOU, which was adjudicated an unenforceable "agreement to agree," severed, and never implemented. The "Article III Loans" and their "Default and Remedy Terms" never came into existence, so no "default under any Loan" can exist, and the consent right was never stripped. It passed intact to the Special Master when he acquired AAI's rights in NHC. Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17.

That last point exposes the central contradiction in the Special Master's position. He cannot at once hold the very consent right the MOU makes a precondition to any sale and disclaim any "control" over whether the sale proceeds. And his remaining submissions—an unsworn

account, offered "on information and belief," that NHC does not really own Damovo, and that third-party lenders are foreclosing—do not defeat the Motion. They are reasons to require the transaction and its true structure to be placed on the record before a Primary Restitution Asset is irreversibly disposed of, which is what the Motion asks.

ARGUMENT

I. The Special Master's opposition, like the Government's, depends on the MOU proviso conditioning the loss of the consent right on a "default under any Loan."

Under Article II, Section 3.i, although the NHC Board otherwise acts by majority vote, "[n]otwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5 (MOU Art. II, § 3.i). The AAI directors' consent is thus the rule for any sale of a Specified Affiliated Company; the single exception is a "default under any Loan." The Special Master's entire theory—that "by simple majority vote, NHC's board can approve … any and all dispositions of SACs," Doc. No. 334 at 4—holds only if that exception is satisfied. It is not.

II. The "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated unenforceable, severed, and never implemented.

A. "Loans" is a defined term, and the MOU reserved the operative default regime to Article III.

The MOU's recitals frame the transaction as including "the immediate partial amendment of … the interest rate and repayment terms of the Loans (the 'Interim Loan Amendment')" and "the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the 'Global Loan Amendments')." Doc. No. 55-1 (MOU Recital O). The affiliated "Loans" were to be carried in two stages—a stopgap Interim Loan Amendment at signing (Article I) and a permanent Global Loan Amendments restructuring (Article III), under which "all Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended." Doc. No. 55-1 (MOU Art. III, § 1). And Article III alone was to define a "default": "all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the 'Default and Remedy Terms')." Id. (MOU Art. III, § 1(g)). The restructured Loans and the events that could ever constitute a "default under any Loan" were both to be created by Article III.

B. In the litigation over this MOU, the courts held Article III an unenforceable "agreement to agree," severed it, and confirmed it was never implemented.

In Southland National Insurance Corp. v. Lindberg, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), the North Carolina insurance companies—whose policyholders are the restitution victims and whose designees control the NHC Board on which the Special Master now sits—sued Defendant over this MOU. The court held: "Article III of the MOU is an unenforceable agreement to agree." Amended Judgment and Order (May 26, 2022) ¶ 129 (Ex. A). "The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced." Id. ¶ 131. It found that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed," id. ¶ 98(ix), then severed Article III and enforced the remainder against Defendant, id. ¶¶ 132–

36. The North Carolina Court of Appeals affirmed, agreeing that "the other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete [Article III]," and that "the amendments and restructuring outlined in Article III were

to take place after the SACs were transferred to the NHC"—"in the future." Southland Nat'l Ins. Corp. v. Lindberg, 289 N.C. App. 378 (2023) (Opinion of the Court), disc. rev. improvidently allowed, No. 173PA23 (N.C. Oct. 17, 2025).

C. It follows that the "Article III Loans" and their "Default and

Remedy Terms" never came into existence.

The restructured "Loans" the proviso speaks of—those "as they were to be amended and restructured under Article III," Doc. No. 316 at 17, and assumed by NHC as borrower—were never brought into being; the Global Loan Amendments were never implemented. And the "Default and Remedy Terms" that alone define what an "event of default" is were never adopted, so there is no agreed measure by which any "default under any Loan" could be declared. As Defendant's sworn account states, "the default provisions that would trigger a loss of the … veto right were never implemented," and "no default under Article III has ever been asserted." Def. Ex. 1, Tab A ¶¶ 8, 14–18 (Affidavit of Greg E. Lindberg); Doc. No. 316 at 16–18.

III. Step by step, the veto-stripping condition never applied and cannot

apply.

The Special Master's theory can be tested against the MOU's own logic, and it fails at every step:

1. The consent right is the rule: no NHC subsidiary may be sold without the

affirmative consent of at least one AAI (Defendant-appointed) director. Doc.

No. 55-1 at 5.

2. The single exception is a "default under any Loan," which alone lets the board

sell by simple majority. Id.

3. The "Loan" and the "default" that exception requires are defined by Article

III—the restructured Loans assumed by NHC and the "events of default … set forth on Attachment B … (the 'Default and Remedy Terms')." Doc. No. 55-1 (MOU Art. III, § 1(g); Recital O).

4. Article III was adjudicated unenforceable, severed, and never implemented.

Southland, No. 19-CVS-013093, Amended Judgment and Order ¶¶ 129–36 (Ex. A); aff'd, 289 N.C. App. 378 (2023), disc. rev. improvidently allowed, No.

173PA23 (N.C. Oct. 17, 2025).

5. Therefore the restructured Loans and the Default and Remedy Terms never

came into existence. Def. Ex. 1, Tab A ¶¶ 8, 14–18; Doc. No. 316 at 16–18.

6. Therefore no "default under any Loan" can exist, the exception is never

satisfied, and the consent right never falls away. On this instrument the veto is incapable of being stripped, because the only mechanism the parties provided for stripping it was never created.

IV. The "Affiliate Investments" and pre-MOU defaults the Special Master

invokes cannot supply a "default under any Loan."

The Special Master says that "Loans (including, but not limited to, Affiliate Investments)" are in default. Doc. No. 334 at 3. That does not supply the default the proviso requires, for three independent reasons. First, the MOU wiped the slate clean of pre-existing defaults at its inception: the Interim Loan Amendment, executed the same day, "waive[d] any and all claims for any Events of Default" predating it. Def. Ex. 1, Tab A ¶ 9; Doc. No. 316 at 17. Second, the only post-Effective-Date "events of default" the MOU recognizes are those Article III's Default and Remedy Terms were

to establish, and those were never adopted; a default under the old, superseded, pre- MOU covenants or the affiliate investments is not a "default under any Loan" as the governing documents define one. Third, to read "any Loan" to reach those superseded covenants would, as Defendant attests, render "the veto provision … meaningless," because the insurance companies could "simply declare defaults under the old, pre- MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11; Doc. No. 316 at 17. The Special Master, who holds his position by virtue of the MOU structure the insurance companies enforced, is bound by the terms of the instrument as adjudicated, not as reimagined; he cannot claim the benefit of a severed, never-implemented Article III to manufacture the default his "no veto right" argument requires. Cf. New Hampshire v. Maine, 532 U.S. 742, 749–51 (2001).

V. The Special Master cannot disclaim "control" of a disposition his own

inherited consent gates—and, as the Court's officer, may not furnish that consent outside the Court's review.

The Special Master's disclaimer of control cannot be reconciled with the consent right he holds. When no qualifying default exists, Article II, Section 3.i forbids the NHC Board to approve the sale of any NHC subsidiary "without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5. That AAI consent right "passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC." Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17. The Special Master is therefore not a bystander to dispositions of the SACs; he holds the one consent the MOU makes a precondition to any sale. He exercised exactly that power once before, on

Defendant's account, when he furnished his consent—including a letter of non- objection to the buyer—for the Beckett disposition. Id.

Against that backdrop, the Special Master's representation that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. No. 334 at 4, is not neutrality; from the holder of the gating consent right, non-opposition operates as the very consent that lets the sale proceed. And the reason he gives—that "persons due restitution … are currently slated to (i) receive funds in exchange for releases that would reduce Defendant's outstanding restitution obligations and (ii) consent to the transaction before it closes," id. at 3—confirms that the Court's own officer is prepared to facilitate an irreversible disposition of a restitution asset, on terms he has evaluated, without submitting those terms to the Court. That is precisely what the appointing order and 18 U.S.C. § 3664 commit to the Court, not to the officer acting alone. Whether the surviving consent right should be exercised for or against this transaction is a decision for the Court to review; it is not one the Special Master may make unilaterally and then characterize as no control at all.

VI. The Special Master's account of Damovo's ownership does not remove

it from the MOU's consent structure or this Court's control, and the narrow relief the Motion seeks runs to the Court's own officer, not to strangers.

The Special Master represents—"on information and belief," and without a supporting declaration—that NHC "does not own or control Damovo," that Damovo was moved in 2021 "to a trust governed by English law," and that NHC owns only "a SAC that is owed money by Damovo's owner-trust." Doc. No. 334 at 2–3. Even taken at face value, that does not remove Damovo from the MOU's consent structure or

from this Court's restitution process. Damovo is a Specified Affiliated Company and, as Defendant has explained to the Wake County Superior Court, "an NHC subsidiary under the MOU." Doc. No. 320-1 at 9. The June 17, 2021 trust does not cut Damovo loose: by its own terms, no sale (a "Disposition") may be made "without the prior written consent of the Settlor," the Trustee and the Damovo Group must cooperate with the Settlor on any sale of the Damovo equity, and the trust "exists only for the federal case." Doc. No. 320-1 at 4–5. And the Special Master holds Defendant's rights and interests in the Primary Restitution Assets under this Court's order. The disposition of Damovo therefore cannot proceed except consistent with the federal restitution process and subject to this Court's control—which is what the Motion seeks. To the extent the Special Master's account is offered to suggest the Court is powerless here, it is beside the point: whoever holds the pen on the transaction's mechanics, a Primary Restitution Asset may not be disposed of below value and without this Court's review.

The Special Master's own submission, moreover, shows that NHC and the victims are participants in, not strangers to, the transaction: the prospective acquiror "has sought consents … and/or releases" from the North Carolina and Bermuda insurance companies and from NHC, and "has proposed to pay certain sums to those parties" in exchange. Doc. No. 334 at 2–3. A disposition structured around purchased releases from the restitution victims and from NHC, and gated by the consent right the Special Master now holds, is not a private matter among strangers; it directly reduces the value available to satisfy restitution and to size the forfeiture keyed to it.

Finally, the Special Master's objection that "the parties [Defendant] seeks to enjoin … are not before the Court," Doc. No. 334 at 4, misstates the relief. The Motion's relief runs to the Special Master—this Court's own appointee—and his NHC-board designee, and to preservation of an asset and its proceeds; it need not enjoin Damovo, its purchaser, or its lenders to be effective. Directing the Court's own officer to refrain from consenting to, or facilitating, the disposition, and to bring its terms before the Court, is squarely within the Court's authority over its appointee and the res of its restitution proceeding. To the extent any broader relief implicates non-parties, the Court can tailor its order to the Special Master and his designee without reaching strangers at all.

VII. The Special Master and the Government are circumventing the

appointing order to sell a Primary Restitution Asset for a fraction of its value—forgoing restitution the order commands the Special Master to maximize.

The order that appointed the Special Master prescribes how a Primary Restitution Asset may be liquidated, and it binds the Special Master directly. It directs him to "identify all assets available for liquidation … and … determine a reasonable estimated value for those assets"; to "select an appropriate method and timetable and seek Court approval to liquidate … any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation with Court approval." Doc. No. 56 ¶ 3(b)–(d). It rests on the

Court's finding that "it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid," id. ¶ 6, and directs the Special Master to "attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets," id. Any

change to the scope of the Primary Restitution Assets "shall be heard upon notice and hearing." Id. ¶ 15.

The contemplated Damovo disposition satisfies none of these requirements. There is no reasonable estimated value on the record; there is no Court-approved method or timetable; there is no Court approval of the liquidation; and there has been no notice and hearing. The Special Master's own account is that the asset is to be sold through a third-party lender foreclosure, with the acquiror paying only "certain sums" to NHC and the insurance companies for releases, Doc. No. 334 at 2–3—a sale at a fraction of the asset's worth, the bulk of whose proceeds, on the Government's account, "would be used to pay off Damovo's debt owed to other non-insurance company lenders," Doc. No. 335 at 2.

The value forgone is substantial and concrete. Damovo is a going concern "independently worth between $400 million and $500 million," Doc. No. 316 at 68, and a credible, financed alternative is already on the table: on July 31, 2026, Twelve Seas Investment Company III delivered a written indication of interest to acquire Damovo at a $400 million enterprise value, backed by approximately $175 million held in trust by a NASDAQ-listed acquirer. Doc. No. 320-1 at 2–3 & Ex. 1; Declaration of Greg E. Lindberg ¶ 12 (filed herewith). The contemplated transaction, by contrast, yields no sale proceeds at all—only about $17.5 million in "consent fees," of which the North Carolina insurance estates would receive ten dollars. Doc. No. 320-1 at 2, 5. The Special Master cannot simultaneously be the officer the Court charged with maximizing restitution recovery and a bystander to the disposal of the estate's most

valuable asset for a sliver of consent fees while a financed $400 million offer sits unanswered. Defendant's position in both courts is the same: he has asked the Wake County Superior Court to instruct NHC to engage the Twelve Seas offer, to place all proceeds of any Damovo transaction in this Court's escrow, and to bar any closing until this Court approves the transaction and all of its terms. Doc. No. 320-1 at 9–12.

That is the circumvention the Motion is aimed at. Accomplishing the sale through the secured lenders' foreclosure—rather than the Special Master's selecting a method and timetable and seeking this Court's approval of the price, as Doc. No. 56 ¶ 3(c)–(d) requires—is an attempt to do off the Court's docket, and without the Court's approval or the Defendant's participation, exactly what the appointing order permits only "with Court approval" and only in service of maximizing restitution. The Special Master's posture that he is a mere bystander, Doc. No. 334 at 3–4, and the Government's that the matter belongs in Wake County, Doc. No. 335 at 4, are two routes to the same end: disposing of a Primary Restitution Asset for a fraction of its value without the Court review the order requires. The Court should not permit its own appointing order to be bypassed in that way.

VIII. The constitutional and statutory challenge to disposing of Damovo

before any restitution order is preserved for appeal, and the Court's prior ruling does not authorize this sale.

The stay the Motion seeks is not a new request. Defendant has already asked the Court to stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and

to set aside the special-master reference, on constitutional and statutory grounds—principally that the estate is being liquidated before any

restitution order exists, so that, in the words of his motion, "execution has preceded adjudication" in violation of the Mandatory Victims Restitution Act's mandatory sequence and of due process. Doc. No. 269 §§ VII–VIII & Prayer ¶ 3; see Doc. No. 316 at 67–68, 83. He identified the Damovo disposition as a live example: a Primary Restitution Asset being sold, through a pending state-court motion, "for no more than the debt against it," before any restitution order and without this Court's approval. Doc. No. 316 at 68, 83. The Special Master is the officer effecting that out-of-sequence liquidation.

The Government never answered that Damovo-based challenge. As Defendant has shown, "the issues [the Government] has left unanswered—including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale … stand unopposed." Doc. No. 316 at 68. This District's rules make that omission consequential: the Government "must file a response to any dispositive motion within fourteen (14) days of service," and "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." LCrR 47.1(d)(1), (3); see Doc. No. 316 at 7.

The Special Master's Opposition does not cure that omission either. It answers only the MOU-consent mechanics of the present Motion; it does not answer the constitutional and MVRA-sequencing challenge to disposing of a Primary Restitution Asset before any restitution order.

The Court, however, has ruled otherwise on the broader challenge: it denied Defendant's motion to declare the special-master reference unconstitutional as

applied and to set aside the reference, and stated its intent to adopt the Special Master's report, with a few modifications, while reserving a separate final order on the amount of restitution. Doc. No. 330. Because the Court ruled otherwise, Defendant respectfully disagrees and expressly preserves the constitutional and MVRA-sequencing challenge—including as applied to the Damovo disposition, and including the failure of the Government and the Special Master to answer it—for review by the United States Court of Appeals for the Fourth Circuit, and does not waive any part of it. Nothing in that ruling authorizes the specific disposition now contemplated: Doc. No. 330 did not approve the sale of Damovo, make the findings 18 U.S.C. § 3664 requires, or authorize an out-of-sequence, below-value liquidation of a Primary Restitution Asset without Court review, and the Special Master should not be permitted to complete that liquidation while the challenge is pending on appeal.

IX. The equities require a stay.

The Damovo asset is a designated Primary Restitution Asset, and its disposition would be irreversible and would reduce, dollar for dollar, the value available to satisfy the restitution the Court is about to fix and to size the forfeiture keyed to it. A brief stay preserving the status quo until the transaction is presented to the Court imposes no cognizable harm on anyone with a legitimate claim to the asset, while its absence risks the permanent, uncompensable loss of restitution value—on a premise the parties' own prior litigation has already rejected, and on an ownership account that, in any event, does not remove Damovo from this Court's control. At a minimum, the Court should direct the Special Master and his NHC-

board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

X. The Court should hold an evidentiary hearing to resolve the disputed

factual issues before any disposition of the Damovo asset.

The Motion turns on disputed questions of fact that should be resolved on an evidentiary record, not on the competing papers alone. Defendant respectfully requests that, before any disposition of the Damovo asset, the Court hold an evidentiary hearing and resolve through that hearing the factual issues material to the Motion—including whether any "default under any Loan" exists within the meaning of the MOU, and the value and terms of the contemplated disposition. Those facts are contested and material to the relief the Motion seeks, and they should be resolved before any irreversible sale of a Primary Restitution Asset.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court reject the Special Master's opposition and grant the Motion, staying any sale, transfer, or other disposition of the Damovo asset until its terms are presented to and reviewed by the Court under its appointing order and 18 U.S.C. § 3664, and preserving any proceeds of a disposition pending that review. In the alternative, the Court should direct the Special Master and his NHC-board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

Dated: September 7, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 7, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

**Doc. 340 — Reply to the Government's Opposition to the Motion to Stay (Doc. 335) (filed 09/07/2026)**

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA,

Case No. 3:23-CR-48-MOC

Plaintiff,

Judge Max O. Cogburn, Jr.

v.

GREG E. LINDBERG,

Defendant.

DEFENDANT'S RESPONSE TO THE SPECIAL MASTER'S OPPOSITION

TO

DEFENDANT'S MOTION TO STAY DISPOSITION OF THE DAMOVO

ASSET

Defendant Greg E. Lindberg respectfully submits this Response to the Special Master's Opposition (Doc. No. 334) to his Motion to Stay Disposition of the Damovo Asset (Doc. No. 320). For the reasons set forth below, the Special Master's opposition should be rejected and the Motion granted.

INTRODUCTION

The Special Master's opposition rests on the same premise as the Government's. He says that "the Special Master does not control the liquidation of the SACs," that "NHC controls the SACs as set forth in the MOU," and that "because one or more 'Loans' (including, but not limited to, Affiliate Investments) are in default, Defendant (and now the Special Master standing in Defendant's shoes) has no veto right to prevent dispositions of SACs by NHC." Doc. No. 334 at 3–4. From there he reasons that NHC's board "can approve … any and all dispositions of SACs" by "simple majority vote," id. at 4, and that the Court cannot reach the transaction because the entities involved are "not before the Court," id. at 4.

Every step of that reasoning depends on the same clause the Government invokes—Article II, Section 3.i's proviso that the Defendant-appointed director's consent to any sale falls away only upon a "default under any Loan." Doc. No. 55-1 at

5. And that premise is wrong for the reasons set out below: the "Loan" and the "default" the proviso requires are creatures of Article III of the MOU, which was adjudicated an unenforceable "agreement to agree," severed, and never implemented. The "Article III Loans" and their "Default and Remedy Terms" never came into existence, so no "default under any Loan" can exist, and the consent right was never stripped. It passed intact to the Special Master when he acquired AAI's rights in NHC. Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17.

That last point exposes the central contradiction in the Special Master's position. He cannot at once hold the very consent right the MOU makes a precondition to any sale and disclaim any "control" over whether the sale proceeds. And his remaining submissions—an unsworn

account, offered "on information and belief," that NHC does not really own Damovo, and that third-party lenders are foreclosing—do not defeat the Motion. They are reasons to require the transaction and its true structure to be placed on the record before a Primary Restitution Asset is irreversibly disposed of, which is what the Motion asks.

ARGUMENT

I. The Special Master's opposition, like the Government's, depends on

the MOU proviso conditioning the loss of the consent right on a "default under any Loan."

Under Article II, Section 3.i, although the NHC Board otherwise acts by majority vote, "[n]otwithstanding the foregoing, provided that there is no default under any Loan, the NHC Board may not approve the sale of the assets or stock of NHC or any NHC subsidiary without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5 (MOU Art. II, § 3.i). The AAI directors' consent is thus the rule for any sale of a Specified Affiliated Company; the single exception is a "default under any Loan." The Special Master's entire theory—that "by simple majority vote, NHC's board can approve … any and all dispositions of SACs," Doc. No. 334 at 4—holds only if that exception is satisfied. It is not.

II. The "Loan" and the "default" the proviso requires are creatures of

Article III of the MOU, which was adjudicated unenforceable, severed, and never implemented.

A. "Loans" is a defined term, and the MOU reserved the operative

default regime to Article III.

The MOU's recitals frame the transaction as including "the immediate partial amendment of … the interest rate and repayment terms of the Loans (the 'Interim Loan Amendment')" and "the global restructuring and modification of all Loans, including assignment of the Loans to such new holding company (the 'Global Loan Amendments')." Doc. No. 55-1 (MOU Recital O). The affiliated "Loans" were to be carried in two stages—a stopgap Interim Loan Amendment at signing (Article I) and a permanent Global Loan Amendments restructuring (Article III), under which "all

Loans, as amended by the Interim Loan Amendment, shall be assumed by and assigned to NHC as borrower and further amended." Doc. No. 55-1 (MOU Art. III, § 1). And Article III alone was to define a "default": "all Loans will be subject to events of default and remedies for events of default set forth on Attachment B attached hereto (the 'Default and Remedy Terms')." Id. (MOU Art. III, § 1(g)). The restructured Loans and the events that could ever constitute a "default under any Loan" were both to be created by Article III.

B. In the litigation over this MOU, the courts held Article III an

unenforceable "agreement to agree," severed it, and confirmed it was never implemented.

In Southland National Insurance Corp. v. Lindberg, No. 19-CVS-013093 (Wake Cnty. Super. Ct.), the North Carolina insurance companies—whose policyholders are the restitution victims and whose designees control the NHC Board on which the Special Master now sits—sued Defendant over this MOU. The court held: "Article III of the MOU is an unenforceable agreement to agree." Amended Judgment and Order (May 26, 2022) ¶ 129 (Ex. A). "The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article III may be enforced." Id. ¶ 131. It found that "[t]he loan amendment process set forth in Article III of the MOU had not yet been completed," id. ¶ 98(ix), then severed Article III and enforced the remainder against Defendant, id. ¶¶ 132–

36. The North Carolina Court of Appeals affirmed, agreeing that "the other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete [Article III]," and that "the amendments and restructuring outlined in Article III were

to take place after the SACs were transferred to the NHC"—"in the future." Southland Nat'l Ins. Corp. v. Lindberg, 289 N.C. App. 378 (2023) (Opinion of the Court), disc. rev. improvidently allowed, No. 173PA23 (N.C. Oct. 17, 2025).

C. It follows that the "Article III Loans" and their "Default and

Remedy Terms" never came into existence.

The restructured "Loans" the proviso speaks of—those "as they were to be amended and restructured under Article III," Doc. No. 316 at 17, and assumed by NHC as borrower—were never brought into being; the Global Loan Amendments were never implemented. And the "Default and Remedy Terms" that alone define what an "event of default" is were never adopted, so there is no agreed measure by which any "default under any Loan" could be declared. As Defendant's sworn account states, "the default provisions that would trigger a loss of the … veto right were never implemented," and "no default under Article III has ever been asserted." Def. Ex. 1, Tab A ¶¶ 8, 14–18 (Affidavit of Greg E. Lindberg); Doc. No. 316 at 16–18.

III. Step by step, the veto-stripping condition never applied and cannot

apply.

The Special Master's theory can be tested against the MOU's own logic, and it fails at every step:

1. The consent right is the rule: no NHC subsidiary may be sold without the

affirmative consent of at least one AAI (Defendant-appointed) director. Doc.

No. 55-1 at 5.

2. The single exception is a "default under any Loan," which alone lets the board

sell by simple majority. Id.

3. The "Loan" and the "default" that exception requires are defined by Article

III—the restructured Loans assumed by NHC and the "events of default … set forth on Attachment B … (the 'Default and Remedy Terms')." Doc. No. 55-1 (MOU Art. III, § 1(g); Recital O).

4. Article III was adjudicated unenforceable, severed, and never implemented.

Southland, No. 19-CVS-013093, Amended Judgment and Order ¶¶ 129–36 (Ex. A); aff'd, 289 N.C. App. 378 (2023), disc. rev. improvidently allowed, No.

173PA23 (N.C. Oct. 17, 2025).

5. Therefore the restructured Loans and the Default and Remedy Terms never

came into existence. Def. Ex. 1, Tab A ¶¶ 8, 14–18; Doc. No. 316 at 16–18.

6. Therefore no "default under any Loan" can exist, the exception is never

satisfied, and the consent right never falls away. On this instrument the veto is incapable of being stripped, because the only mechanism the parties provided for stripping it was never created.

IV. The "Affiliate Investments" and pre-MOU defaults the Special Master

invokes cannot supply a "default under any Loan."

The Special Master says that "Loans (including, but not limited to, Affiliate Investments)" are in default. Doc. No. 334 at 3. That does not supply the default the proviso requires, for three independent reasons. First, the MOU wiped the slate clean of pre-existing defaults at its inception: the Interim Loan Amendment, executed the same day, "waive[d] any and all claims for any Events of Default" predating it. Def. Ex. 1, Tab A ¶ 9; Doc. No. 316 at 17. Second, the only post-Effective-Date "events of default" the MOU recognizes are those Article III's Default and Remedy Terms were

to establish, and those were never adopted; a default under the old, superseded, pre- MOU covenants or the affiliate investments is not a "default under any Loan" as the governing documents define one. Third, to read "any Loan" to reach those superseded covenants would, as Defendant attests, render "the veto provision … meaningless," because the insurance companies could "simply declare defaults under the old, pre- MOU loan agreements in order to deprive [him] of [his] bargained-for veto right." Def. Ex. 1, Tab A ¶ 11; Doc. No. 316 at 17. The Special Master, who holds his position by virtue of the MOU structure the insurance companies enforced, is bound by the terms of the instrument as adjudicated, not as reimagined; he cannot claim the benefit of a severed, never-implemented Article III to manufacture the default his "no veto right" argument requires. Cf. New Hampshire v. Maine, 532 U.S. 742, 749–51 (2001).

V. The Special Master cannot disclaim "control" of a disposition his own

inherited consent gates—and, as the Court's officer, may not furnish that consent outside the Court's review.

The Special Master's disclaimer of control cannot be reconciled with the consent right he holds. When no qualifying default exists, Article II, Section 3.i forbids the NHC Board to approve the sale of any NHC subsidiary "without the affirmative consent of at least one AAI Director." Doc. No. 55-1 at 5. That AAI consent right "passed intact to the Special Master/Receiver when he acquired AAI's rights in NHC." Def. Ex. 1, Tab A ¶¶ 19–20; Doc. No. 316 at 17. The Special Master is therefore not a bystander to dispositions of the SACs; he holds the one consent the MOU makes a precondition to any sale. He exercised exactly that power once before, on

Defendant's account, when he furnished his consent—including a letter of non- objection to the buyer—for the Beckett disposition. Id.

Against that backdrop, the Special Master's representation that he "does not intend to interfere with, or otherwise oppose, the transaction," Doc. No. 334 at 4, is not neutrality; from the holder of the gating consent right, non-opposition operates as the very consent that lets the sale proceed. And the reason he gives—that "persons due restitution … are currently slated to (i) receive funds in exchange for releases that would reduce Defendant's outstanding restitution obligations and (ii) consent to the transaction before it closes," id. at 3—confirms that the Court's own officer is prepared to facilitate an irreversible disposition of a restitution asset, on terms he has evaluated, without submitting those terms to the Court. That is precisely what the appointing order and 18 U.S.C. § 3664 commit to the Court, not to the officer acting alone. Whether the surviving consent right should be exercised for or against this transaction is a decision for the Court to review; it is not one the Special Master may make unilaterally and then characterize as no control at all.

VI. The Special Master's account of Damovo's ownership does not remove

it from the MOU's consent structure or this Court's control, and the narrow relief the Motion seeks runs to the Court's own officer, not to strangers.

The Special Master represents—"on information and belief," and without a supporting declaration—that NHC "does not own or control Damovo," that Damovo was moved in 2021 "to a trust governed by English law," and that NHC owns only "a SAC that is owed money by Damovo's owner-trust." Doc. No. 334 at 2–3. Even taken at face value, that does not remove Damovo from the MOU's consent structure or

from this Court's restitution process. Damovo is a Specified Affiliated Company and, as Defendant has explained to the Wake County Superior Court, "an NHC subsidiary under the MOU." Doc. No. 320-1 at 9. The June 17, 2021 trust does not cut Damovo loose: by its own terms, no sale (a "Disposition") may be made "without the prior written consent of the Settlor," the Trustee and the Damovo Group must cooperate with the Settlor on any sale of the Damovo equity, and the trust "exists only for the federal case." Doc. No. 320-1 at 4–5. And the Special Master holds Defendant's rights and interests in the Primary Restitution Assets under this Court's order. The disposition of Damovo therefore cannot proceed except consistent with the federal restitution process and subject to this Court's control—which is what the Motion seeks. To the extent the Special Master's account is offered to suggest the Court is powerless here, it is beside the point: whoever holds the pen on the transaction's mechanics, a Primary Restitution Asset may not be disposed of below value and without this Court's review.

The Special Master's own submission, moreover, shows that NHC and the victims are participants in, not strangers to, the transaction: the prospective acquiror "has sought consents … and/or releases" from the North Carolina and Bermuda insurance companies and from NHC, and "has proposed to pay certain sums to those parties" in exchange. Doc. No. 334 at 2–3. A disposition structured around purchased releases from the restitution victims and from NHC, and gated by the consent right the Special Master now holds, is not a private matter among strangers; it directly reduces the value available to satisfy restitution and to size the forfeiture keyed to it.

Finally, the Special Master's objection that "the parties [Defendant] seeks to enjoin … are not before the Court," Doc. No. 334 at 4, misstates the relief. The Motion's relief runs to the Special Master—this Court's own appointee—and his NHC-board designee, and to preservation of an asset and its proceeds; it need not enjoin Damovo, its purchaser, or its lenders to be effective. Directing the Court's own officer to refrain from consenting to, or facilitating, the disposition, and to bring its terms before the Court, is squarely within the Court's authority over its appointee and the res of its restitution proceeding. To the extent any broader relief implicates non-parties, the Court can tailor its order to the Special Master and his designee without reaching strangers at all.

VII. The Special Master and the Government are circumventing the

appointing order to sell a Primary Restitution Asset for a fraction of its value—forgoing restitution the order commands the Special Master to maximize.

The order that appointed the Special Master prescribes how a Primary Restitution Asset may be liquidated, and it binds the Special Master directly. It directs him to "identify all assets available for liquidation … and … determine a reasonable estimated value for those assets"; to "select an appropriate method and timetable and seek Court approval to liquidate … any available assets for the benefit of the victims"; and to "oversee and help accomplish the liquidation with Court approval." Doc. No. 56 ¶ 3(b)–(d). It rests on the

Court's finding that "it is imperative that the parties take steps to maximize the amount of restitution that is recovered and paid," id. ¶ 6, and directs the Special Master to "attempt to meet Defendant's restitution obligations using all or part of the Primary Restitution Assets," id. Any

change to the scope of the Primary Restitution Assets "shall be heard upon notice and hearing." Id. ¶ 15.

The contemplated Damovo disposition satisfies none of these requirements. There is no reasonable estimated value on the record; there is no Court-approved method or timetable; there is no Court approval of the liquidation; and there has been no notice and hearing. The Special Master's own account is that the asset is to be sold through a third-party lender foreclosure, with the acquiror paying only "certain sums" to NHC and the insurance companies for releases, Doc. No. 334 at 2–3—a sale at a fraction of the asset's worth, the bulk of whose proceeds, on the Government's account, "would be used to pay off Damovo's debt owed to other non-insurance company lenders," Doc. No. 335 at 2.

The value forgone is substantial and concrete. Damovo is a going concern "independently worth between $400 million and $500 million," Doc. No. 316 at 68, and a credible, financed alternative is already on the table: on July 31, 2026, Twelve Seas Investment Company III delivered a written indication of interest to acquire Damovo at a $400 million enterprise value, backed by approximately $175 million held in trust by a NASDAQ-listed acquirer. Doc. No. 320-1 at 2–3 & Ex. 1; Declaration of Greg E. Lindberg ¶ 12 (filed herewith). The contemplated transaction, by contrast, yields no sale proceeds at all—only about $17.5 million in "consent fees," of which the North Carolina insurance estates would receive ten dollars. Doc. No. 320-1 at 2, 5. The Special Master cannot simultaneously be the officer the Court charged with maximizing restitution recovery and a bystander to the disposal of the estate's most

valuable asset for a sliver of consent fees while a financed $400 million offer sits unanswered. Defendant's position in both courts is the same: he has asked the Wake County Superior Court to instruct NHC to engage the Twelve Seas offer, to place all proceeds of any Damovo transaction in this Court's escrow, and to bar any closing until this Court approves the transaction and all of its terms. Doc. No. 320-1 at 9–12.

That is the circumvention the Motion is aimed at. Accomplishing the sale through the secured lenders' foreclosure—rather than the Special Master's selecting a method and timetable and seeking this Court's approval of the price, as Doc. No. 56 ¶ 3(c)–(d) requires—is an attempt to do off the Court's docket, and without the Court's approval or the Defendant's participation, exactly what the appointing order permits only "with Court approval" and only in service of maximizing restitution. The Special Master's posture that he is a mere bystander, Doc. No. 334 at 3–4, and the Government's that the matter belongs in Wake County, Doc. No. 335 at 4, are two routes to the same end: disposing of a Primary Restitution Asset for a fraction of its value without the Court review the order requires. The Court should not permit its own appointing order to be bypassed in that way.

VIII. The constitutional and statutory challenge to disposing of Damovo

before any restitution order is preserved for appeal, and the Court's prior ruling does not authorize this sale.

The stay the Motion seeks is not a new request. Defendant has already asked the Court to stay all further sales, liquidations, and dispositions of the Primary Restitution Assets, and

to set aside the special-master reference, on constitutional and statutory grounds—principally that the estate is being liquidated before any

restitution order exists, so that, in the words of his motion, "execution has preceded adjudication" in violation of the Mandatory Victims Restitution Act's mandatory sequence and of due process. Doc. No. 269 §§ VII–VIII & Prayer ¶ 3; see Doc. No. 316 at 67–68, 83. He identified the Damovo disposition as a live example: a Primary Restitution Asset being sold, through a pending state-court motion, "for no more than the debt against it," before any restitution order and without this Court's approval. Doc. No. 316 at 68, 83. The Special Master is the officer effecting that out-of-sequence liquidation.

The Government never answered that Damovo-based challenge. As Defendant has shown, "the issues [the Government] has left unanswered—including the live and continuing disposition of the Damovo Group, a Primary Restitution Asset now the subject of a pending state-court sale … stand unopposed." Doc. No. 316 at 68. This District's rules make that omission consequential: the Government "must file a response to any dispositive motion within fourteen (14) days of service," and "[i]f the Government fails to file a timely response to a motion, the motion may be granted without further notice." LCrR 47.1(d)(1), (3); see Doc. No. 316 at 7.

The Special Master's Opposition does not cure that omission either. It answers only the MOU-consent mechanics of the present Motion; it does not answer the constitutional and MVRA-sequencing challenge to disposing of a Primary Restitution Asset before any restitution order.

The Court, however, has ruled otherwise on the broader challenge: it denied Defendant's motion to declare the special-master reference unconstitutional as

applied and to set aside the reference, and stated its intent to adopt the Special Master's report, with a few modifications, while reserving a separate final order on the amount of restitution. Doc. No. 330. Because the Court ruled otherwise, Defendant respectfully disagrees and expressly preserves the constitutional and MVRA-sequencing challenge—including as applied to the Damovo disposition, and including the failure of the Government and the Special Master to answer it—for review by the United States Court of Appeals for the Fourth Circuit, and does not waive any part of it. Nothing in that ruling authorizes the specific disposition now contemplated: Doc. No. 330 did not approve the sale of Damovo, make the findings 18 U.S.C. § 3664 requires, or authorize an out-of-sequence, below-value liquidation of a Primary Restitution Asset without Court review, and the Special Master should not be permitted to complete that liquidation while the challenge is pending on appeal.

IX. The equities require a stay.

The Damovo asset is a designated Primary Restitution Asset, and its disposition would be irreversible and would reduce, dollar for dollar, the value available to satisfy the restitution the Court is about to fix and to size the forfeiture keyed to it. A brief stay preserving the status quo until the transaction is presented to the Court imposes no cognizable harm on anyone with a legitimate claim to the asset, while its absence risks the permanent, uncompensable loss of restitution value—on a premise the parties' own prior litigation has already rejected, and on an ownership account that, in any event, does not remove Damovo from this Court's control. At a minimum, the Court should direct the Special Master and his NHC-

board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

X. The Court should hold an evidentiary hearing to resolve the disputed

factual issues before any disposition of the Damovo asset.

The Motion turns on disputed questions of fact that should be resolved on an evidentiary record, not on the competing papers alone. Defendant respectfully requests that, before any disposition of the Damovo asset, the Court hold an evidentiary hearing and resolve through that hearing the factual issues material to the Motion—including whether any "default under any Loan" exists within the meaning of the MOU, and the value and terms of the contemplated disposition. Those facts are contested and material to the relief the Motion seeks, and they should be resolved before any irreversible sale of a Primary Restitution Asset.

CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court reject the Special Master's opposition and grant the Motion, staying any sale, transfer, or other disposition of the Damovo asset until its terms are presented to and reviewed by the Court under its appointing order and 18 U.S.C. § 3664, and preserving any proceeds of a disposition pending that review. In the alternative, the Court should direct the Special Master and his NHC-board designee to refrain from consenting to, or otherwise facilitating, any disposition of the Damovo asset absent further order of the Court.

Dated: September 7, 2026

Respectfully submitted, /s/ Kenneth N. Barnes Kenneth N. Barnes Barnes Legal, PLLC 356 Travel Lite Dr.

Raleigh, NC 27603 919-524-1977 Email: barnesatty@aol.com /s/ Vivek Ramachandran Vivek Ramachandran Dhamma Law PLLC 418 Broadway, Suite N Albany, NY 12207 Email: vramachandran@dhammalaw.com Admitted pro hac vice Counsel for Greg E. Lindberg

CERTIFICATE OF SERVICE

I hereby certify that, on the date set forth below, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record and all parties registered to receive such notices in this case.

Dated: September 7, 2026

/s/ Kenneth Barnes Kenneth Barnes Counsel for Greg E. Lindberg

[Doc. 340-1 — Exhibit (51 pp.)]

EXHIBIT A

Southland National Insurance Corporation, et al. v. Greg E. Lindberg, et al.

No. 19-CVS-013093 (Wake County Superior Court) Amended Judgment and Order (May 26, 2022)

NORTH CAROLINA IN THE GENERAL COURT OF JUSTICE

: SUPERIOR COURT DIVISION

WAKE COUNTY 19 CVS 013093

A:

SOUTHLAND NATIONAL INSURANCE 9
CORPORATION in Rehabilitation, )
BANKERS LIFE INSURANCE )
:
COMPANY in Rehabilitation, ) :
COLORADO BANKERS LIFE ) : :
INSURANCE COMPANY in + Rehabilitation, and SOUTHLAND :
NATIONAL REINSURANCE AMENDED). :
CORPORATION in Rehabilitation, JUDGMENT AND ORDER Plaintiffs, ) Vv.
)
GREG E. LINDBERG, ACADEMY )
ASSOCIATION, INC., EDWARDS MILL
ASSET MANAGEMENT, LLC, NEW )
ENGLAND CAPITAL, LLC, and
PRIVATE BANKERS LIFE AND
ANNUITY CO., LTD.,
) Defendants.

THIS MATTER came on for trial at the June 21, 2021 session of Wake County Civil Superior Court before the Honorable A. Graham Shirley, I, Superior Court Judge Presiding without a jury and it appearing that:

INTRODUCTION

l. Wes Camden, Esq., Caitlin Poe, Esq., John Holton, Esq., and Lauren Fussell, Esq. appeared as counsel for Plaintiffs Southland National Insurance Corporation, Bankers Life Insurance Company, Colorado Bankers Life Insurance Company, and Southland National Reinsurance Corporation, all in rehabilitation (collectively, "Plaintiffs"). Aaron Tobin, Esq., Brian Kilpatrick, Esq., Leah Lanier, Esq, and Matthew Leerberg, Esq. appeared as counsel for Defendants Greg Lindberg ("Lindberg"), Academy Association, Inc., also known as Global

Growth Holdings, Inc ("AAI"), and New England Capital, LLC ("NEC") (collectively, "Defendants").

2. The Court previously severed the Plaintiffs' claims against Defendant Private

Bankers Life and Annuity Co., Ltd. ¢¢'PBLA") pursuant to an automatic stay issued on December 17, 2020 in Cause No. 20-12791-sce, In re: PB Life and Annuity Co., Ltd. et al., in the United States Bankruptcy Court for the Southern District of New York.

3. Plaintiffs' claim against Defendant Edwards Mill Asset Management, LLC

("EMAM") was resolved by a Consent Judgment this Court entered on May 4, 2021.

4, The Court was informed that the Parties stipulated and agreed that the issues presented by the pleadings should be heard and decided by a Superior Court Judge, rather than by ajury.

5. This Court has jurisdiction over the Parties and the subject matter of this action.

6. The Parties stipulated to certain facts at issue in this matter, as set forth in Exhibit A to this Order. Such stipulated facts are treated as true and incorporated herein.

PROCEDURAL HISTORY

7. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Lindberg.

8. Lindberg likewise solely owns all shares of stock of Defendant AAI.

9, Lindberg and AAI own, control, or have a financial interest in a large number of entities affiliated with Plaintiffs and Lindberg, all operating under a brand or portfolio name of "Eli Global" or, later, "Global Growth" (the "Affiliated Entities"). As such, AAI and the Eli Global portfolio are affiliated with Plaintiffs.

'

Since the filing of this lawsuit, AAI converted to Global Growth Holdings, Inc., a Delaware corporation.

10. On October 1, 2019, Plaintiffs filed a Verified Complaint against Defendants seeking to enforce an agreement, the Memorandum of Understanding ("MOU"), that was introduced into evidence as Plaintiffs' Exhibit 1.

11. On October 28, 2019, Plaintiffs filed a Verified Amended Complaint against Defendants seeking, among other things, to enforce the MOU through specific performance. Plaintiffs alleged that all Defendants breached the MOU by failing to restructure the Specified Affiliated Companies ("SACs") by September 30, 2019 and brought claims of fraud and negligent musrepresentation against Defendants. The SACs are a subset of the Affiliated Entities.

12. Defendants filed Rule 12 motions seeking to dismiss the Verified Amended Complaint on various grounds. The Court denied all of Defendants' motions to dismiss on January 21, 2020.

13. The Parties filed cross Motions for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. The parties waived oral argument on the motions. The Court orally denied the motions on June 21, 2021.

14. The Parties, through their counsel, presented evidence to the Court at trial in the form of 16 in-person witnesses, three witnesses by remote video, and various exhibits.

15. All evidence is before the Court and all issues and claims are now ripe for resolution.

FINDINGS OF FACT

16. The Court, in making the findings and reaching the conclusions herein, has done so after viewing the manner and demeanor of each witness and having determined the credibility of the testimony of each witness, as well as the weight to be afforded to the evidence received at trial. The Court, as fact finder, has resolved any conflicts of the evidence presented and makes these

Findings of Fact based on competent, credible evidence presented. In making these Findings of Fact and reaching the following Conclusions of Law, the Court has disregarded

any incompetent evidence and did not draw inferences from testimony otherwise competent which would render such testimony incompetent. See In re Paul, 84 N.C. App. 491, 497, 353 S.E.2d 254, 258 (1987).

17. The Court, having heard all of the evidence, and by at least a preponderance of the evidence, makes the following Findings of Fact. Any determination later stated as a conclusion of law that should have been stated as a finding of fact is incorporated into these Findings of Fact.

18. In 2014, Lindberg was engaged in the business practice of acquiring complete ownership interest and control of insurance companies and then using the liquid assets of those insurance companies to invest in his other non-insurance company businesses of the Eli Global portfolio ("Affiliated Investments"), Trial Tr. 63: 21-25, 273:21-274: 6, 952:1-17. These investments consist of participation loans to and preferred equity investments in operating companies, special purpose vehicles, and financial or other types of investment holding companies.

Trial Tr. 64:65-66: 8, 273:21-274:6.

19, The Plaintiffs sold products such as prepaid death benefits, life insurance policies and annuities. Trial Tr. 17:22-18:1, 229:15-230:6.

20. Plaintiffs' policyholder premiums paid to the insurance companies constitute liquid assets that normally would be invested in a prudent manner to ensure that future obligations to

policyholders can be timely paid. Trial Tr. 17:15-18:11. Plaintiffs' policyholder premiums were used to fund the Affiliated Investments. Pls.' Exs. 115, 139; Trial Tr. 263:16-266: 18, 273:8-276:4.

21. North Carolina law and the North Carolina Department of Insurance ("NCDOI') provide restrictions and oversight for the investment of these funds by Plaintiffs. See, e.g., N.C. Gen. Stat. § 58-7-160 et seq; Pls.' Exs. 7, 14; Trial Tr. 296: 10-22.

22. Atall relevant times, common industry practice was to limit loans or investments made by insurance companies into affiliated companies to no more than 10% of their admitted assets.2 Trial Tr. 40:11-41: 14, 375:14-17. However, until 2019 North Carolina law had not codified this limit. Trial Tr. 40:11-41: 14, 1217:20-1218:6.

23. In 2015, Lindberg obtained a special agreement under former Insurance Commissioner Wayne Goodwin to invest up to 40% of admitted assets into Affiliated Entities.

Trial Tr. 46:23-47: 4, 374:8-21, 960:6-22.

24, Among other things, Lindberg used the Plaintiff insurance companies' money to fund his purchase of companies that did business in non-insurance fields. Trial Tr. 360:5-361: 8, 960:6-14. Through layers of holding companies, Lindberg ultimately owned the controlling interests, as well as economic interests, in these non-insurance operating companies. /d; Trial Tr. 353:4-354:8, The Plaintiff insurance companies owned the loans made to the operating companies or intermediary companies, which in turn loaned to or invested in operating companies or other tiers of holding companies. The Plaintiff insurance companies, however, had no equity interest, control, or visibility in the non-insurance operating companies or the tiers of holding companies above them.? Id Trial Tr. 41:18-42: 8.

25. Under Lindberg's direction, the Plaintiff insurance companies invested even more than 40% of their assets into Affiliated Entities. Pls.' Ex. 7; Trial Tr. 1143:1-1144: 2.

26. Since the time when the Plaintiffs were domesticated in North Carolina, Lindberg, directly or indirectly, has caused more than $1.2 billion of the Insurance Companies' funds held

"Admitted assets" are defined by N.C. Gen. Stat. § 58-7-162 to provide guidance on how to classify an insurance company's assets when calculating the financial condition of the insurer. "Admitted" or "allowed" assets include, among other things, cash in the insurer's possession, investments and securities, properties and loans acquired in accordance with statute.

Some the financing was structured as "preferred equity," but it functioned like debt: it granted no governance rights and had no mandatory payments except for required dividends to Lindberg as the common shareholder. Trial Tr. 275: 18-25.

for policyholders to be invested into other companies that he owned or controlled. Pls.' Ex. 23;

Trial Tr. 46: 9-14, 143: 11-16.

27. During the pendency of this lawsuit, Lindberg was convicted by a jury of attempting to bribe the current North Carolina Commissioner of Insurance and currently is serving his sentence in federal custody. Trial Tr. 1199:17-1200: 7.

28. At the time of filing this lawsuit in October 2019, Plaintiffs were owed over $1 billion through the Affiliated Investments. Trial Tr. 46: 9-14, 143: 11-16.

29. The level of affiliated investment was and remains of concern to management of Plaintiffs and insurance regulators because the level of concentration of investments can expose the investments, and therefore the insurance companies and policyholders, to systemic risks. Pls." Ex. 17; Trial Tr. 288: 4-21, 292:23-293: 24, 562:11-18. Additionally, affiliated investments generally are illiquid and are difficult to turn into cash quickly and efficiently in order to meet the necessary policyholder obligations. Trial Tr. 294: 7-21. In fact, in 2018 it was determined that when Plaintiffs' annuity products would come due in five years there would not be enough cash flow from the Affiliated Investments to cover those annuity obligations to policyholders. Trial Tr.

56:19-25.

30. During a routine financial examination, NCDOI under Commissioner Mike Causey, became concerned about whether Plaintiffs would be able to meet their obligations to policyholders and others as they came due. Trial Tr. 293: 3-13, 563: 4-12.

31. On October 18,2018, the Commissioner entered a Consent Order placing Plaintiffs into Administrative Supervision by the NCDOI pursuant to N.C. Gen. Stat. § 58-30-60 due to concerns regarding Plaintiffs' concentration of Affiliated Investments and associated liquidity

concerns. Pls.' Ex. 14; Trial Tr. 295: 15-22. Plaintiffs and Lindberg consented to Plaintiffs being placed into Administrative Supervision. Pls.' Ex. 14; Trial Tr. 1214: 21-25.

32. Administrative Supervision was extended, with Plaintiffs' and Lindberg's consent, on February 5, 2019 and April 3, 2019. Pls.' Ex. 19; Trial Tr. 563: 13-25, 1216:23-1217:4.

33. Mike Dinius ("Dinius") of Noble Consulting, Inc. ("Noble"), was appointed as Supervisor of Plaintiffs. Pls.' Ex. 14; Trial Tr. 563: 13-25. Dinius, as Supervisor, was required to review and approve certain transactions or actions by the Plaintiffs, including any transactions above a certain dollar threshold or that involved the Plaintiffs incurring any debt, obligation or liability. Pls." Ex. 14; Trial Tr. 576: 1-22. Dinius' role was limited to his duties and responsibilities as Supervisor of Plaintiffs and he did not manage Plaintiffs' operations while in Supervision. Trial Tr. 576: 1-22.

34. The Second Amended Consent Order for Administrative Supervision ("Second Consent Order') established requirements to limit the Plaintiffs' Affiliated Investments, with the ultimate goal of reducing the total Affiliated Investments to approximately 10% of the Plaintiffs' admitted assets. Pls.' Exs. 19, 5; Trial Tr. 564: 1-9.

35. These requirements could have been met by sale of the underlying entities, or through the refinancing or repayment of Plaintiffs' loans. Ex. 23; Trial Tr. 300: 1-5, 565: 23-566: 11.

36. Pursuant to the Second Consent Order, Plaintiffs were required to reduce their Affiliated Investments by $250 million by July 31, 2019. Pls.' Ex. 19; Trial Tr. 564: 7-12. Plaintiffs, and Lindberg, agreed to the debt reduction deadlines and amounts in the Second Consent Order. Pls.' Ex. 19; Trial Tr. 299: 17-21, 1218:23-1219: 6.

37. During the Administrative Supervision, Lindberg and his team at Eli Global attempted to sell or refinance certain entities to reduce the amount of Affiliated Investments. Trial Tr. 300:1-301: 1, 565:23-566:11.

38. In April 2019, Dinius, serving as Supervisor of Plaintiffs, conducted an analysis of the Plaintiffs' Affiliated Investments based on Eli Global's efforts to sell or refinance the Affiliated Investments to meet the requirements of the Second Consent Order. Pls.' Ex. 23; Trial Tr. 565: 11- 25,

39. At this point, Dinius concluded that it would be virtually impossible for Eli Global to meet its next milestone for the reduction of Affiliated Investments. Trial Tr. 302: 17-21, 567: 25-569:4, 723:6-14. Eli Global's management agreed. /d.

40. It had become clear that Lindberg was unable to raise sufficient funds, either through sales, refinances, or payment of the Affiliated Investments, to achieve the July 31, 2019 $250 million debt reduction. Jd.

41. Dinius' analysis also indicated that Eli Global's plan to liquidate the Eli Global portfolio of companies would result in a substantial shortfall of funds compared to the companies' obligations to Plaintiffs and other lenders. Pls." Ex. 23; Trial Tr. 568: 7-11. This shortfall was estimated at over $1.2 billion at the time. /d.

42. Eli Global's management did not dispute Dinius' conclusion regarding the shortfall. Trial Tr. 302: 17-21, 568: 14-24.

43, A liquidation due to this shortfall would have been to the material detriment of vulnerable policyholders of Plaintiffs, who faced potential individual losses that could be financially devastating. Trial Tr. 306: 10-19, 723:18-724: 3.

44. During this same time period, the parties were informed that AM Best was planning to downgrade the credit rating of at least some of the North Carolina insurance companies. Trial

Tr. 536: 11-25, 828: 14-24.

45. In an effort to avoid potentially staggering policyholder losses and to resolve this serious business crisis, in early May 2019 Plaintiffs agreed to negotiate a restructuring of the Affiliated Entities' obligations, including a temporary suspension of principal and interest debt repayments, Pls.' Ex. 26; Trial Tr. 393: 9-20, 570: 5-14.

46. These negotiations ultimately produced the June 27, 2019 MOU, which the parties agreed was a legally binding agreement. Pls.' Ex. 1; Trial Tr. 112:24-113: 1, 310:18-20, 424:21- 24, 570:15-17.

47. The core of the agreement is that the affiliated debt would be adjusted and restructured to facilitate repayment and that Lindberg would relinquish control of the SACs by making them subsidiaries of a new company, New Holding Company ("NHC"), which would be managed by an independent board, comprised of sophisticated and qualified individuals charged with a duty to protect the best interest of Plaintiffs' policyholders. Pls.' Exs. 1, 26; Trial Tr. 92: 8- 25, 389:12-390:2, 552:13-553:9. The MOU and NHC structure also provided needed transparency into the underlying SACs. Trial Tr. 92: 8-25, 308:2-17.

48. Paragraph 47 above is a brief and simplified summary of the essence of the agreement embodied in the MOU. The words of the MOU constitute the precise language and terms of the agreement. All paragraphs hereinafter in this Judgment make detailed reference to specific material terms of this agreement embodied in that document.

49. Inor around May 2019, the parties began discussions and negotiations of what would become the MOU and other related agreements. Pls.' Exs. 30, 34, 35, 37, 38, 39, 42; Trial Tr. 318: 16-19, 723:9-724: 3,

50. Between May 9, 2019 and June 26, 2019, the parties negotiated at arms-length the structure and terms of the MOU. Id; Pls.' Exs. 43, 44, 45, 46, 47, 48, 49, 51, 52, 56, 57, 59, 60, 65, 66, 67, 68; Trial Tr. 529: 12-24, 723:9-724: 3, 1218:10-19. The Defendants were represented by legal counsel during the negotiations of the MOU and related agreements. Trial Tr. 548: 23- 550:20, 1218:10-19. To the extent any disadvantage in bargaining power existed, that disadvantage was due, at least in part, to Lindberg's criminal indictment and Eli Global's cash needs at the time. Trial Tr. 551: 5-25; 725: 14-22; 736: 9-20, 1219:25-1220:2.

51. During the negotiations, the MOU was subject to a number of revisions proposed by all Parties, and mutually agreed upon by the Parties. Pls.' Exs. 43, 48, 57, 60, 67; Trial Tr.

$74:24-575:25.

52. Defendants, including Lindberg, were involved in the negotiation and drafting of the MOU and the Interim Amendment to Loan Agreement. (""IALA"). Jd; Trial Tr. 1218: 10-19.

Lindberg, or his counsel, created the first draft of the MOU provided to Plaintiffs. Pls." Ex. 43;

Trial Tr. 572: 10-13.

53. The MOU, as executed, contains certain representations and warranties. Defendants

Lindberg, AAI, and NEC specifically represented and warranted that: a. Each of the Recitals', Schedules, and Exhibits attached to the MOU are true and accurate in all respects;

The Recitals included, among other things, that Lindberg has the authority to execute the agreement on behalf of certain Parties to the MOU, that the Agents on the underlying loan agreements have the authority to bind the lenders of those agreements, and that EMAM and/or Lindberg directly or indirectly control all SACs. Pls.' Ex. 1.

b. Schedules 1 through 7 of the MOU set forth all loan, financing, and investment arrangements of any nature by Plaintiffs with any party; c. Every Lindberg- or AAI-affiliate is disclosed in Exhibits A, B, or C to the MOU; d. The execution, performance of obligations, and consummation of the transactions contemplated in the MOU have been duly authorized; e. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any law; f. The execution of the MOU and the consummation of the transactions set forth in the MOU do not violate any provision of their organizational documents;

g. The execution of the MOU and the consummation of the transactions set forth in the MOU do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject; h. The execution of the MOU and the consummation of the transactions set forth in the MOU do not create in any party the right to accelerate, terminate, modify,

cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject; and

i. The MOU isa a valid, legal, and binding obligation on each of them, enforceable in accordance with its terms.

Pls.' Ex. 1; Trial Tr. 317:23-318: 15.

54. Dinius and some of Plaintiffs' management team were aware that at least some of the SACs had obtained third-party financing or had other obligations to third parties but properly

I}

and reasonably relied on the representations and warranties provided by Defendants. Trial Tr.

276:21-277:12, 589:15-590:23.

55. Defendants maintained total access and control over the underlying loan

agreements and seller notes, equity equivalence agreements (""EEAs"), and third-party financing agreements during the due diligence process. Defs.' Ex. 58; Trial Tr. 590: 5-23 ("Since Lindberg controlled all of these entities, we were relying on him to tell us if he could effectuate this or not."), 685:24-686:3 ("I would not [have] had enough time for diligence on - to review everything prior

to the execution."),702:1-703: 17.

56. Plaintiffs did not possess the majority of the underlying loan agreements between

and among the second- and third-tier operating and holding companies and seller notes, EEAs, and other third-party financing agreements. /d. Plaintiffs did not request to, and did not, review every document regarding the SACs' third-party financing and other obligations to third parties and instead relied on the representations and warranties provided by Defendants. Jd.

57. The SACs consist of hundreds of entities and the documents potentially pertaining to third-party financing are voluminous. See Pls.' Exs. 115, 131; Trial Tr. 285: 6-12, 1339:10- 1341:8. Defendants, who negotiated and executed these documents pertaining to third-party financing, and who should have been meeting their obligations under these documents on an ongoing basis, knew the contents of these documents. Pls.' Ex. 58; Trial Tr. 609: 1-23.

58. Defendants were in the best position to know whether any agreements between the SACs and any third-parties require any type of consent or waiver to the MOU or the transactions contemplated in the MOU, or whether the MOU or transactions contemplated by the MOU would trigger default or accelerations of those agreements. Trial Tr. 609: 1-23, 831:22-832: 1 ("... the

folks at Eli Global who were in a better position to know what consents were needed than the plaintiffs.")

59. On June 27, 2019, the parties executed the MOU, which required, among other things, for the SACs, a subset of the Affiliated Entities, to be restructured as subsidiaries of NHC.

Pls.' Ex. 1; Trial Tr. 552:22-553: 15.

60. Lindberg and AAI either directly or indirectly control almost all of the SACs and had the authority to contribute those entities to NHC. Jd; Trial Tr. 1240:2-1241: 3. The Plaintiffs had no role or authority in transferring the SACs to NHC. Pls.' Ex. 102; Trial Tr. $52:22-553: 15, 1240:2-1241:3.

61. NEC is an affiliate of AAI and Lindberg. Trial Tr. 605: 6-16. NEC serves as administrative agent for some of the underlying loan and equity financing arrangements involving the SACs. Pls.' Ex. 1, 2; Trial Tr. 605: 6-16.

62. Pursuant to the underlying loan agreements, the Agents have the unilateral authority

to bind the lenders on the loans made to the Affiliated Entities, including to the terms of the MOU

and IALA, discussed below. Trial Tr. 546: 1-4, 605: 21-23.

63. On June 27, 2019, the parties also executed two related agreements as part of the same transaction: the IALA and Revolving Credit Agreements ("Revolver"). Pls.' Exs. 2, 3; Trial Tr. 582: 4-25.

64. The IALA provided debt relief to Defendants and the Affiliated Entities of more than $100 million. Pls.' Exs. 2, 130; Trial Tr. 327:19-328: 6. The IALA deferred interest payments for a period of six months and modified the underlying loans' interest rates and maturity dates.

Pls.' Ex. 2; Trial Tr. 321: 3-13, 326: 5-20.

65. The Revolver provided a $40 million revolving line of credit to one of the SACs, Academy Financial Assets, LLC. Pls.' Ex. 3; Trial Tr. 582: 7-16. The Revolver was essentially exhausted in early September 2019 and the principal balance has not been repaid. Pls.' Exs. 95, 108; Trial Tr. 329: 14-25, 442:16-443: 5.

66. Defendants, and entities affiliated with Defendants, have accepted the material benefits to which they were entitled under the JALA and Revolver of more than $100 million.

Trial Tr. 1213:7-1214: 1.

67. Plaintiffs would not have executed the IALA or the Revolver if the MOU had not also been executed. Trial Tr. 203:15-204: 16. Dinius, as Supervisor, would not have approved the Plaintiffs' execution of the [ALA or Revolver if the MOU had not also been executed. Trial Tr.

581:13-583:16, 589:24-590:18.

68. On June 27, 2019, also as part of the overall agreement between the parties, this Court ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief ("Rehabilitation Order"), pursuant to N.C. Gen. Stat. § 58-30-75. Pls.' Ex. 4; Trial Tr. 582:23-583: 16. Plaintiffs and Lindberg, as Plaintiffs' ultimate controlling shareholder, consented to the entry of the Rehabilitation Order. d Trial Tr. 116: 13-

17:12,1148:11-15, 1213:3-6.

69. The MOU, IALA, Revolver, and Rehabilitation Order were all executed on June 27, 2019 as part of the same transaction. Pls.' Exs. 1,2,3,4; Trial Tr. 582:23-583: 16. The MOU specifically notes that the agreement is being executed to set forth the Parties' agreements regarding, among other things, the IALA debt reduction, the restructuring of the SACs under a new, independently controlled company, and the global restructuring. Pls.' Ex. 1.

70. Lou Hensley, president and CEO of Plaintiffs, executed the MOU, IALA, and Revolver on behalf of all Plaintiff companies. Pls.' Exs. 1, 2, 3.

71. Defendant Lindberg executed the MOU on behalf of himself, individually, and the other Defendants. Pls." Ex. 1. Lindberg also executed the MOU on behalf of the "Agents" as defined in the MOU. la Lindberg executed the JALA on behalf of himself, individually, AAJ, the Borrowers, NHC Excluded Borrowers, Preferred Equity Owners, and Preferred Equity Issuers, as those terms are defined in the IALA. Pls.' Ex. 2.

72. Because Plaintiffs were in Administrative Supervision at the time of execution, Dinius, as Plaintiffs' Supervisor, approved Plaintiffs' execution of the MOU, IALA, and Revolver.

Pls.' Exs. 1, 2, 3; Trial Tr. 583: 6-9.

73. Christa Miller ("Miller"), CFO of Eli Global, and other Eli Global personnel celebrated the execution of the MOU. Pls.' Ex. 70; Trial Tr. 426:12-427: 11. According to Miller, the MOU restructuring plan meant all of the Eli Global companies would not have to be sold. Trial Tr. 426:12-427: 11, 478:5-479:1.

74. On the evening of July 3, 2019, some Eli Global employees held a "MOU/July 4"

Celebration" at a nearby restaurant to celebrate the execution of the MOU and the holiday. Pls.' Ex. 70; Trial Tr. 426:12-427: 11.

75. The MOU contains multiple references to the Parties' intention to be legally bound by the agreement. Pls.' Ex. 1.

76. The MOU provides that the proper remedy for a breach is specific performance, in addition to other remedies. Jd.

77. The MOU, which Lindberg and Defendants all agreed to and executed, includes the following clauses consistent with a valid, binding agreement:

a. merger or integration clause; b. choice of law; c. choice of venue; d. non-assignment; e. third-party beneficiary; and f. severability.

Id.

78. Article I of the MOU requires the parties to contemporaneously execute the IALA, which was attached as an exhibit to the MOU. Id. The parties agree the JALA was executed and that it is a valid and enforceable agreement. Trial Tr. 990: 21-25.

79. The debt reduction provided by the I[ALA, and negotiated for by Lindberg, created a taxable event for Lindberg and AAI. Trial Tr. 1213:7-1213: 13. No evidence was presented to suggest that Lindberg or AAI paid, or was required to pay, any additional taxes as a result of that taxable event. No evidence was presented that Lindberg or AAI used some other loss, credit, or other event to offset the taxable event.

80. Article II of the MOU requires the parties to restructure the SACs "to become subsidiaries, either directly or indirectly," of NHC "on or before September 30, 2019." Pls.' Ex.

1.

81. Article UI of the MOU allows for additional amendments to the loan agreements that were modified by the IALA. Id Plaintiffs have not asserted a claim based on a breach of Article HI. See Am. Compl.

82. The MOU does not require that Article IJ and Article II1 be implemented contemporaneously. Pls.' Ex. 1; Trial Tr. 832: 2-16. After the SACs and loans are contributed and

assigned to NHC, NHC can undertake restructuring, negotiating, amending, or modifying the loans to accomplish the goals of the MOU. Trial Tr. 736:9-737: 12.

83. NHC was formed after the MOU was executed and before September 30, 2019.

Trial Tr. 552: 13-21; 613: 25-614-3. However, NHC had no board, officers, or directors. Trial Tr. 642:21-643:11. AAT was the sole member of NHC. Trial Tr. 552:13-21;613: 25-614-3. Lindberg, as sole shareholder of AAI, authorized work to be done on NHC's behalf to implement the MOU.

Trial Tr. 552:13-553: 9, 834:4-10.

84. The MOU further provides various procedures for how NHC shall be governed, including establishing a board of managers fashioned as a "Board of Directors" (the "NHC Board") that has exclusive control of the management of NHC and the SACs. Pls.' Ex. 1.

85. The NHC Board would comprise three members appointed by the Plaintiffs, two

members appointed by AAJ, and two independent members elected by the other five members, and therefore be independent and not controlled by Lindberg. Pls.' Ex. 1; Trial Tr. 736: 11-20. The NHC Board is further charged with managing the SACs in a manner that protects the best interests of Plaintiffs' policyholders. Pls." Ex. 1; Trial Tr. 720: 2-7, 842: 12-21.

86. Article I, section 6 provides that "NHC will promptly procure and maintain usual and customary D&O insurance for the members of the NHC Board and NHC's officers. Pls.' Ex.

1.

87. The SACs were not contributed to NHC by September 30, 2019 as required by the MOU. Trial Tr. 1240:21-1241: 15.

88. The seven-member NHC board was selected before September 30, 2019 in accordance with the terms of the MOU, which also served as the operating agreement of the NHC,

but the board members have yet to take action on behalf of NHC because D&O insurance was not

yet in place. Pls.' Ex. 1; Trial Tr. 783:10-786: 3.

89. Mo Meghji ("Meghji"), Eli Global's restructuring consultant, obtained a proposed D&O insurance policy for the NHC Board on or about September21,2019. Defs.' Ex. 250; Trial Tr. 758: 2-24. However, the policy was not bound. Trial Tr. 849:25-850:5.

90. A D&O insurance policy could have been procured or obtained prior to September 21,2019. Trial Tr. 837: 5-11.

91. Defendants proffered the testimony of John A. Dore, an insurance professional, related to the adequacy of the D&O policy obtained by Meghji. Trial Tr. 1244-1268. The Court does not find Mr. Dore's testimony helpful to the trier of fact. Trial Tr. 267:13-1268: 13.

92. AAI's selected NHC Board members, Lindberg and George Vandeman,° declined the proposed policy. Trial Tr. 849:25-850: 5, 1180:2-14.

93. In September 2019, Vandeman announced that Lindberg, as owner of AAI, is the only person who could bind the D&O policy. Pls.' Ex. 107; Trial Tr. 616: 6-24. Neither Lindberg, AAI's owner, nor Vandeman, AAI's chairman, nor any other individual bound the proposed policy Meghji obtained. Id.

94. Nothing in the MOU specifically requires Lindberg or AAI to approve the D&O policy. Pls.' Ex. 1. Therefore, the NHC Board should propose an appropriate D&O policy and direct AAI to bind the policy. Jd.

95. The remaining proposed NHC Board members, Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each had been duly appointed or elected, and each was ready, willing, and able to assume his duties as an NHC Board member once D&O

>

Vandeman is the current chairman of AAI.

insurance was in place as of September 30, 2019. Trial Tr. 848: 2-17, 863: 15-20, 876: 6-11, 891: 3- 8.

96. Mike Dinius, David Resnick, James Atterholt, Thomas Biaggi, and Frederick Heese each remains ready, willing, and able to serve on the NHC Board. /d.

97. On June 28, 2019, Lindberg cited to the terms of the MOU to claim an absolute right to control and extract distributions from non-SAC Affiliated Entities. Pls. 69; Trial Tr. 431:14-433:10. Lindberg's invocation of the MOU to obtain a benefit is inconsistent with his later positions in this litigation-namely that the MOU is not a binding agreement. Trial Tr. 998: 7-21.

98. Vandeman sent a communication to Plaintiffs on September 17, 2019 contending that the restructuring plan set forth in Article II could not be accomplished for various reasons,

including: i. Seller notes and EEAs are subject to breach and acceleration upon reorganization; ii. The debt reduction from the JALA and the reorganization may result in adverse tax consequences to Lindberg; iii. The reorganization will trigger certain change in control provisions in contracts with third-parties; iv. The reorganization was prohibited by certain other affiliate contracts; v. That various "consents" are necessary for performance of the MOU; vi. D&O insurance must be obtained by Plaintiffs; vil. The D&O insurance obtained by Plaintiffs was not acceptable; vill. Lindberg, as owner of AAI, is the only person that can bind D&O insurance for the NHC Board; and

ix. The loan amendment process set forth in Article III of the MOU had not yet been completed.

Pls,' Ex. 98.

99. The representations and warranties made in the MOU by the Defendants directly contradict Defendants' proffered explanations of the reasons preventing the MOU's implementation. Pls.' Exs. 1, 98 100. At the time the Defendants executed the MOU they knew that the execution and delivery of the MOU, or the consummation of the transactions contemplated therein resulted in a breach of, constituted a default under, would result in the acceleration of, create in any party the right to accelerate, terminate, modify cancel, or require notice or consent under contracts between the SACs and third-parties in contravention of the representations and warranties in the MOU.

101. Meghji, a restructuring specialist, and his company M-III Partners were hired by Eli Global prior to the negotiations of the MOU. Trial Tr. 734: 6-25. The MOU provides that Meghji would become the Chief Restructuring Officer of NHC. Pls." Ex. 1; Trial Tr. 735: 13-15.

102. Part ofMeghji's role after execution of the MOU was to obtain consents or waivers from third-parties or counterparties that Defendants, post-execution of the MOU, contended were necessary to the MOU restructuring. Trial Tr. 771:18-772: 23. However, neither Lindberg nor his agents gave Meghji permission to contact the third parties to seek the relevant consents or waivers. Trial Tr. 774: 5-14, 778:15-779: 1. These consents and waivers had not been obtained as of the time of trial. See Trial Tr. 743: 4-10, 1192:13-22.

103. Meghji testified he believed those consents and waivers could have been obtained in 2019 and could still be obtained today. Trial Tr. 774:8-779: 25.

104. The NHC structure as contemplated in the MOU would likely be attractive to third-party lenders or counterparties.

105. Meghji testified that any potential issues to implementation of the MOU he was aware of could be resolved. Trial Tr. 737:20-738: 18. Specifically, based on Meghji's restructuring experience and knowledge of the companies at issue, he believes the NHC Board could be seated within 14 days, D&O coverage obtained within 14 days, the SACs contributed within 45 days, and the underlying loans assigned to and assumed by NHC within 60 days of an order by this Court if the Parties work together to implement the agreement. Trial Tr. 786:13-787: 21. The Court finds this testimony to be persuasive.

106. As of the time of trial, Plaintiffs are owed over $1,275,000,000 from Affiliated Entities pursuant to the Affiliated Investments. Pls.' Ex. 23; Trial Tr. 46: 9-14, 143: 11-16. During the pendency of this lawsuit, the Affiliated Entities have paid some, but not all, of the amounts owed to Plaintiffs pursuant to the underlying loan agreements, as modified by the IALA. Trial Tr.

715:7-24.

107. Plaintiffs have suffered damages from Defendants' breach of the MOU and fraud.

108. If SACs are transferred to NHC, NHC will be able to take various actions with respect to the SACs under its control, including selling the SAC or borrowing against the SAC, in order to repay the debts owed to Plaintiffs. Trial Tr. 1396:9-1397: 3, 1397:10-12.

109. Ifthe SACs are not under NHC's control, Plaintiffs lose the benefit of the non-transferred SACs' value. Jd.

110. The SACs' values were established by William Epstein of BRG. Pls.' Ex. 115.

2]

111. Plaintiffs' damages for breach of the MOU can be determined by calculating the value of the non-transferred SACs minus the existing debt of those entities. Trial Tr. 1397: 13-15, 1402:13-23, 1403:17-1404:9, 112. At the time of trial, plaintiff CBL extended $39,905,524.37 under the Revolver to the Defendants. Pls.' Ex. 108. This amount has not been paid back. See id.; Trial Tr. 329: 8-25. Plaintiffs also have deferred and forgiven otherwise payable interest under the IALA in an amount in excess of $77 million. Trial Tr. 328: 2-6.

113. Based on the forgoing Findings of Fact, the Court reaches the following:

## CONCLUSIONS OF LAW

114. This Court has jurisdiction over the parties and the subject matter of this action.

115. The Parties waived their right to a jury trial on this action.

116. All issues pending in these actions are properly before the Court. The parties had notice of the trial date.

117. To the extent that any of the foregoing Findings of Fact constitute Conclusions of Law or vice versa, each is incorporated into the other as if set forth fully therein.

## BREACH OF CONTRACT

118. The MOU constitutes a legally enforceable contract between the parties. Defendants' conduct constituted a material breach of contract with regard to the MOU.

119. Under North Carolina law, a claim for breach of contract requires (1) the existence of a valid contract; and (2) breach of the terms thereof. Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000).

120. Plaintiffs allege the MOU is a valid and binding contract and that Defendants breached the MOU by failing to restructure the SACs on or before September 30, 2019.

121. Defendants argue that the MOU is not a binding contract but instead a non-binding term sheet.

122. To be enforceable, the terms of acontract must be sufficiently definite and certain. Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991).

123. The elements of a valid contract are: (1) offer; (2) acceptance; (3) consideration; and (4) mutuality of assent to the contract's essential terms. See Se. Caissons, LLC v. Choate Constr. Co., 784 S.E.2d 650, 654 (N.C. Ct. App. 2016). Mutual assent and the effectuation of the parties' intent is normally accomplished through offer and acceptance. Snyder v. Freeman, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980).

124. Despite its title, the MOU is a legally binding contract. It contains multiple references to the parties' agreement to be legally bound by the terms of the agreement.

125. Defendants presented testimony that a "memorandum of understanding" typically refers to a non-binding pre-agreement. The title of the MOU has no bearing on its enforceability.

126. When a party affixes his signature to a contract, he is manifesting his assent to the contract. Branch Banking & Trust Co. v. Creasy, 301 N.C. 44, 53, 269 S.E.2d 117, 123 (1980).

127. Defendants each executed the MOU. No party has challenged the authenticity of the signatures on the MOU.

128. The MOU requires, at a minimum, that the parties restructure the SACs by September 30, 2019. The purpose of the agreement was to facilitate debt relief and restructure the SACs to allow an independent board to manage and control the entities. The terms of the agreement regarding both of those requirements, Articles I and II respectively, are sufficiently clear, definite, and enforceable. The Joan restructuring and amendment contemplated by Article

III does not have to be completed contemporaneously with the contribution and transfer of the SACs to NHC.

129. Article HI of the MOU is an unenforceable agreement to agree. A requirement of a future agreement on the material terms renders a clause void for indefiniteness as a matter of law. MCB, Ltd. v. McGowan, 86, N.C. App. 607, 359 S.E.2d 50 (1987). "A contract to enter into a future contract must specify all its material and essential terms." Boyce v. McMaham, 285 N.C.

730, 734, 208 S.E.2d 692, 695 (1974).

130. Specifically, Article [II begins by stating the terms of the Global Loan Agreement will be determined "'as negotiated in good faith by the parties." Further, Section 1(i)(a) expressly calls for "[t]he Parties agree to execute any agreement . . reasonably necessary to effectuate the restructuring and modifications contemplated herein."

131. The terms of the loan agreement are not settled and leaves Article III open to the possibility of future negotiations. Without a foundation of definite terms to create the loan, none of the terms in Article II1 may be enforced.

132. The Parties agreed to include a severability clause in the MOU. Pls.' Ex. 1 at Art.

Iv, 548.

Any term or provision of this MOU that is invalid or unenforceable in any situation .. . shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the invalid or unenforceable term or provision in any other situation or in any other jurisdiction. Ifa final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, then the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision [and] to delete specific words or phrases...

Pls." Ex. 1 at Art. IV ¥ 8.

133. Where contract provisions are severable and are not dependent on the enforcement of illegal provisions for their validity, the legal provisions of said contract may be enforced. Rose v. Vulcan Materials Co., 282 N.C. 643, 658, 194 S.E.2d 521, 531-32 (1973) (citations omitted). Articles IT and III do not have to be implemented contemporaneously and are not dependent on one another, or any other term in the MOU. The validity of Article I1 is not dependent upon Article Ill or the Global Loan Amendments. The amendments and restructuring contemplated by the Global Loan Amendments should take place after the SACs are transferred to NHC.

134. The Global Loan Amendments are not an essential feature of the MOU such that severing the Global Loan Amendment language would defeat the purpose of the agreement. See Robinson, Bradshaw, & Hinson, P.A. v. Smith, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998). The other Articles of the MOU can and have been implemented and enforced notwithstanding the failure of the Parties to complete the Global Loan Amendments.

135. The Court can sever the unenforceable clause, Article III. See Vecellio & Grogan, Inc. v. Piedmont Drilling & Blasting, Inc., 183 N.C. App. 66, 73, 644 S.E.2d 16, 20-21 (2007); Int'l Paper Co. v. Corporex Constructors, Inc., 96 N.C. App. 312, 316, 385 S.E.2d 553, 555 (1989).

136. The MOU, as modified herein, is a valid and enforceable agreement between Plaintiffs and Defendants. As a result of this agreement, the parties were required to restructure the SACs to be subsidiaries ofNNHC by September 30, 2019.

ESTOPPEL

137. Even if the MOU were not a valid or binding contract, the Court finds, in the alternative, that Defendants are estopped from denying the validity of the MOU as a whole or the effect of certain terms of the MOU.

138. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration ofjustice when without its intervention injustice would result." Brooks v. Hackney, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing Thompson v. Soles, 299 N.C.

484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.'" /d. (citing Advertising, Inc. v. Harper, N.C. App. 501, 505, 172

S.E.2d 793, 795 (1970)).

139. Defendants have accepted material benefits of the MOU.

140. Defendants are estopped from denying the validity of the binding portions of the MOU or the effects of its terms.

BREACH

141. Having found that the MOU is a binding contract, the Court must determine whether Defendants breached the terms thereof.

142. The Court concludes that Defendants breached their obligation to restructure the SACs to become subsidiaries, either directly or indirectly, of NHC on or before September 30, 2019 and continue to be in breach. The Defendants admit that the restructuring contemplated by the MOU did not occur by the September 30, 2019 deadline. As of the date of trial, the restructuring still had not occurred. Defendants' conduct is a material breach of their obligations under the terms of the MOU.

143. Defendants contend that they are excused from performing the MOU, including effecting the restructuring plan, for the following reasons: (1) certain third-parties must consent to the contribution of certain SACs to NHC and those consents were not obtained; (2) certain

agreements with third-parties contain change of control provisions which would trigger default

and/or acceleration if certain SACs were contributed to NHC; (3) certain agreements prohibit the

reorganization; (4) Lindberg would face adverse tax consequences if the MOU were performed as written and executed; (5) satisfactory D&O insurance could not be obtained for the NHC Board; (6) the Global Loan Amendments contemplated by Article III of the MOU were not completed contemporaneously with the reorganization.

PRIOR MATERIAL BREACH AND REPUDIATION

144. Plaintiffs committed no prior material breach or repudiation of the MOU to excuse Defendants' nonperformance.

145. Defendants contend they are excused from performance because Plaintiffs breached and/or repudiated the contract without just cause by filing suit on October 1, 2019 and that the September 30, 2019 deadline was not material.

146. "[I]f either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." McClure Lumber Co. v. Helmsman Const., Inc., 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). "In bilateral contracts there are reciprocal promises, so that there is something to be done or forborne on both sides...." Winders v. Kenan, 161 N.C. 628, 628, 77 S.E. 687, 689 (1913). "Whether a breach is material or immaterial is ordinarily a question of fact." McClure Lumber Co., 160 N.C. App. at 198. "If [a] breach is material, the aggrieved party may cancel the contract and sue for total breach if he can show that he was ready, willing and able to perform but for the breach." Millis Const. Co. v. Fairfield Sapphire Valley, Inc., 86 N.C. App. 506, 512, 358 S.E.2d 566, 570 (1987).

147. "When a party repudiates his obligations under the contract before the time for performance under the terms of the contract, the issue of anticipatory breach or breach by anticipatory repudiation arises." Millis Const. Co. v. Fairfield Sapphire Valley, Inc., 86 N.C. App.

506, 510, 358 S.E.2d 566, 569 (1987). One effect of the anticipatory breach is to discharge the non-repudiating party from his remaining duties to render performance under the contract. Jd. (citing Restatement (Second) of Contracts § 253(2)).

148. To constitute anticipatory repudiation to excuse Defendants' nonperformance, the Plaintiffs' words or conduct must have been positive, distinct, unequivocal and absolute refusal or inability to perform when the time for performance under the terms of the contract arise. See id.; Gordon v. Howard, 94 N.C. App. 149, 153, 379 S.E.2d 674, 676 (1989).

149. Plaintiffs filed this lawsuit after the time for performance, September 30, 2019, had passed. Plaintiffs' lawsuit does not show words or conduct that is positive, distinct, unequivocal and absolute refusal to perform the MOU; nor does it constitute a breach of the MOU. To the

contrary, Plaintiffs' requested relief of specific performance indicates their desire to see the contract performed.

150. Defendants have presented no credible facts to support their theory that Plaintiffs breached or repudiated the contract to excuse Defendants' nonperformance.

DURESS

151. Defendants were not subject to any duress or unlawful coercion.

152. Defendants contend that the MOU was procured by duress where liquidation of the Plaintiff insurance companies was threatened if Defendants did not agree to restructure the SACs. At the time the alleged threat of liquidation was made, Lindberg did not believe grounds for liquidation of Plaintiffs existed. Furthermore, the Court, not the special deputy rehabilitator, has the authority to order an insurance company into liquidation if a petition is filed. See N.C. Gen.

Stat. § 58-30-100.

153. "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." Smithwick v. Whitley, 152 N.C. 369, 371, 67 S.E. 913, 914 (1910).

154. A contract procured by duress means that the contract was the result of coercion. See Link v. Link, 278 N.C. 181, 191, 179 S.E.2d 697. 703 (1971). "Duress exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will.'" Jd. at 194. However, "'it is not duress to threaten or make good faith use of legal processes available or the remedies

prescribed under a contract . .

[bJut where a threat of civil action or use of an available remedy [] made only for the purposes of extortion[,] duress may be found." /d. at 195.

155. The act threatened is wrongful "if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings." Radford v. Keith, 160 N.C. App. 41, 44, 584 S.E.2d 815, 817 (2003), affid, 358 N.C. 136, 591 S.E.2d 519 (2004).

156. Defendants were represented by counsel during the negotiation and execution of the MOU. Negotiation of the MOU, IALA, and Revolver was an arms-length transaction. Defendants were able to request and obtain, and did request and obtain, terms of the MOU, JALA, and Revolver which benefitted them. Furthermore, Defendant Lindberg, on behalf of the Plaintiffs, had already consented to the rehabilitation of Plaintiffs if certain Affiliated Investment milestones were not met in the Second Consent Order.

157. To the extent that Defendants were at a bargaining disadvantage, it was the result of their own actions and not improper actions by Plaintiffs.

158. Even if Defendants' characterization of the negotiations were true, the events do not rise to the level of necessary coercion to constitute duress.

159. Defendants have presented no credible facts to support an affirmative defense of duress.

VOID AS AGAINST PUBLIC POLICY

160. The MOU is not void as against public policy.

161. Defendants contend the MOU is void as against public policy because Plaintiffs have used the MOU to stifle growth of the SACs to the peril of Plaintiffs' policyholders.

162. Contracts and agreements are deemed void as against public policy where "the enforcement of them by the courts would have a direct tendency to injure the public good," Electrova Co. v. Spring Garden Ins. Co., 156 N.C. 232, 232, 72 S.E. 306, 307 (1911), or where the agreement violates a statute. Glover v. Rowan Mut. Fire Ins. Co., 228 N.C. 195, 198, 45 S.E.2d

45, 47 (1947).

163. The MOU does not have a direct tendency to injure the public good or violate a statute. The Defendants presented no credible facts showing that the MOU is void as against public policy. The stated purpose of the MOU is to benefit policyholders.

UNILATERAL OR MUTUAL MISTAKE

164. There was no unilateral or mutual mistake to render the MOU unenforceable.

165. Defendants contend the MOU resulted from unilateral or mutual mistake and should not be enforced. Defendants argue that the parties did not understand or appreciate the obstacles to implementing the restructuring plan, such as the adverse tax consequences and possible acceleration or breach of agreements due to change-of-control provisions.

166. "A mutual mistake is one common to both parties to a contract wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the

provisions of the written instrument designed to embody such agreement." Branch Banking & Trust Co. v. Chicago Title Ins. Co.,214N.C. App. 459, 463, 714S.E.2d514,518(2011). A mutual mistake of fact is a mistake "common to both parties and by reason of it each has done what neither intended." Marriott Financial Services v. Capitol Funds, 288 N.C. 122, 135, 217 S.E.2d 551, 560 (1975). There is "a strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety." Branch Banking & Trust Co.,214.N.C.

App. at 464 (citing Hice v. Hi-Mil, Inc., 301 N.C. 647, 651, 273 S.E.2d 268, 270-71 (1981)).

167. A mistake of law ordinarily "does not affect the validity of a contract." Greene v. Spivey, 236 N.C. 435, 444, 73 S.E.2d 488, 495 (1952).

168. Equity will not relieve a party from an agreement "entered into by reason of a mistake resulting from negligence where the means of knowledge were easily accessible." Swain v. C & N Evans Trucking Co., 126 N.C. App. 332, 484 S.E.2d 845, 848 (1997).

169. Defendants had total access and control over the seller notes, EEAs, and third -party agreements they now cite as the basis of the mutual or unilateral mistake. Defendants and their companies, not Plaintiffs, are the counterparties on these agreements.

170. Furthermore, Defendants represented and warranted that the MOU and the transactions contemplated therein, including the restructuring, would not result in a breach of or cause default or acceleration of any such agreement. Defendants cannot now, after the fact, claim mutual mistake related to these agreements.

171. The mistake must concern facts as they exist at the time of making the contract; mistaken belief as to a future performance or predicted future event does not qualify to obtain relief for a mutual mistake. Opsahl v. Pinehurst, Inc., 81 N.C. App. 56, 62, 344 S.E.2d 68, 72 (1986). Lindberg's potential future tax consequences from debt reduction he bargained for and received do not form the basis of a mutual or unilateral mistake defense.

172. A "unilateral mistake by a party to a contract, unaccompanied by fraud, imposition, undue influence or like circumstances of oppression is insufficient to avoid a contract." Smith v. First Choice Servs., 158 N.C. App. 244, 249, 580 S.E.2d 743, 748 (2003). Defendants presented no credible facts supporting their affirmative defenses of unilateral or mutual mistake.

IMPOSSIBILITY/FRUSTRATION OF PURPOSE

173. Performance of the MOU is not rendered impossible nor are Defendants excused from performance based on any frustration of purpose.

174. Defendants contend that performance of the MOU has been rendered impossible or that their nonperformance is excused under the doctrine of frustration of purpose because of unforeseen issues related to the breach and/or acceleration of the seller notes, EEAs, and third- party agreements, potential adverse tax consequences, alleged difficulty obtaining D&O insurance, and failure to complete the Global Loan Amendments of Article III of the MOU.

175. "Impossibility of performance is recognized . . as excusing a party from performing under an executory contract if the subject matter of the contract is destroyed without fault of the party seeking to be excused from performance." Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 210, 274 S.E.2d 206, 209 (1981).

176. "For nonperformance of an executory contract to be excused under the doctrine of impossibility, a party must show that his 'performance is rendered impossible by the law, provided the promisor is not at fault and has not assumed the risk of performing whether impossible or not.... Moreover, in most cases it must be shown that the event was not reasonably foreseeable.'" UNCC Properties, Inc. v. Greene, 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993) (quoting Messer v. Laurel Hill Associates, 102 N.C. App. 307,311-12,401 S.E.2d 843, 846 (1991)).

177. Under the doctrine of frustration of purpose, performance remains possible, but it is excused "whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance. The doctrine of commercial frustration is based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." Brenner v. Little Red Sch. House, Ld., 302 N.C. 207, 211, 274 S.E.2d 206, 209 (1981).

178. The subject matter of the MOU-the repayment of Plaintiffs' debt and the restructuring of the SACs-has not been destroyed or rendered valueless. The purpose of the MOU has not been frustrated.

179. Defendants also have not shown that their performance is rendered impossible. Multiple witnesses testified that performance of the MOU was possible and would have occurred if the Parties made good faith efforts to complete the underlying restructuring tasks.

180. Defendants presented no credible facts to show their nonperformance is excused by impossibility or frustration of purpose.

CONDITIONS PRECEDENT

181. There are no unmet conditions precedent to excuse Defendants' nonperformance under the MOU agreement.

182. Defendants contend that certain conditions precedent in the MOU have not been satisfied so as to trigger their performance. They note that D&O insurance was not in place on or before the September 30, 2019 deadline and that the Global Loan Amendments had not occurred.

183. "A condition precedent is an event which must occur before a contractual right arises Jn re Foreclosure of Goforth Prop., Inc., 334 N.C. 369, 375, 432 S.E.2d 855, 859 (1993). Stated another way, "[a] condition precedent is an act or event, other than a lapse of time, which [unless excused] must exist or occur before a duty to performa

promised performance arises." First Union Nat. Bank v. Naylor, 102 N.C. App. 719, 723, 404 S.E.2d 161, 163 (1991) (quoting J. Calamari & J. Perillo, The Law of Contracts § 11-5 (3d ed.1987)). However, for a contract provision to be construed as a condition precedent, the provision must contain language which plainly requires such construction. Goforth Prop., 334 N.C. at 375-376, 432 S.E.2d at 859. North Carolina courts have held that "the use of such words as 'when,' 'after,' 'as soon as,' and the like, gives clear indication that a promise is not to be performed except upon the happening of a stated event." Jones v. Realty Co., 226 N.C. 303,

306, 37 S.E.2d 906, 908 (1946).

184. The MOU does not contain any language indicating that either the Global Loan Amendments or D&O coverage is a condition precedent to the restructuring plan. As such, these events are not conditions precedent which must occur before the Defendants have a duty to restructure the SACs. Defendants presented no credible evidence of an unmet condition precedent.

UNCLEAN HANDS

185. Plaintiffs are not barred from recovery under the doctrine of unclean hands.

186. Defendants contend Plaintiffs are barred from recovery due to their unclean hands. Defendants argue that Plaintiffs acted inequitably by refusing to renegotiate the terms of the MOU

with Defendants following September 30, 2019 and by filing this and other lawsuits to put financial pressure on the Defendants.

187. "The doctrine of clean hands is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands." Ray v. Norris, 78 N.C. App. 379, 384, 337 S.E.2d 137, 141 (1985). "[T]he clean hands doctrine denies equitable relief

only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy." Brissett v. First Mount Vernon Indus. Loan Ass'n, 233 N.C. App. 241, 255, 756 S.E.2d 798, 809 (2014). "The doctrine of unclean hands is only available to a party who was injured by the alleged wrongful conduct." Jd. at 385. The doctrine "is not one of absolutes that applies to every unconscionable act of a party." Ferguson v. Ferguson, 55 N.C. App. 341, 346, 285 S.E.2d 288, 292 (1982). "Whether plaintiff committed an unconscionable act and whether her actions were more egregious than those of defendants, are questions of material fact... ." Jd.

188. Based on the evidence presented, the Court finds that Plaintiffs did not act in bad faith and were not dishonest, deceitful, fraudulent, unfair or overreaching regarding the transaction at issue. Defendants presented no credible evidence of Plaintiffs' unclean hands related to the

MOU.

WAIVER AND ESTOPPEL

189. Plaintiffs have not waived their right to enforce the MOU agreement nor are they estopped from doing so.

190. Defendants have asserted affirmative defenses of waiver and estoppel and argue that the filing of Plaintiffs' lawsuit constituted each.

191. To show that plaintiffs are barred from recovery based on waiver, a defendant must prove four elements. First, that the "waiving party is the innocent, or nonbreaching party." Wachovia Bank & Trust Co., N.A. v. Rubish, 306 N.C. 417, 425-26, 293 S.E. 749, 755 (1982) (citing Wheeler v. Wheeler, 299 N.C. 633, 639, 263 S.E.2d 763, 766-67 (1980)). Second, that the defendant's breach of contract was not a total one, and, notwithstanding the defendant's breach, the plaintiff continued to receive some of the consideration for which he bargained. Jd. Third, that the plaintiff was aware of the breach by the defendant. Id Fourth, that the plaintiff intentionally and voluntarily waived his right to suspend his own performance and declare a breach of contract

by the defendant. /d.; see Altman v. Munns, 82 N.C. App. 102, 106, 345 S.E.2d 419, 422-23 (1986). No facts were presented to support a defense of waiver.

192. "The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration ofjustice when without its intervention injustice would result." Brooks v. Hackney, 329 N.C. 166, 173, 404 S.E.2d 854, 859 (1991) (citing Thompson v. Soles, 299 N.C. 484, 486, 263 S.E.2d 599, 602 (1980)). "It is well settled that 'a party will not be allowed to accept benefits which arise from certain terms of a contract and at the same time deny the effect of other terms of the same agreement.

" Jd. (citing Advertising, Inc. v. Harper, 7 N.C. App. 501, 505, 172 S.E.2d 793, 795 (1970)).

193. No facts were presented to support a defense of estoppel as to excuse Defendants' performance. Plaintiffs, to date, have received no benefits under the MOU and furthermore have not denied the effect of any of its terms.

FRAUD

194. Defendants intentionally made material misrepresentations in the text of the MOU.

195. Fraud requires: (1) false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with the intent to deceive; (4) which does in fact deceive; and (5) causing damage to the injured party. Ragsdale v. Kennedy, 286 N.C. 130,

138, 209 S.E.2d 494, 500 (1974), 196. In the MOU, Defendants represented and warranted, among other things, that the execution and performance of obligations, and consummation of the transactions contemplated in the MOU: (1) have been duly authorized; (2) do not violate any law: (3) do not result in a breach of, constitute a default under, or result in the acceleration of any contract to which any of them is a party or is bound or to which any of their assets are subject; and (4) do not create in any party

the right to accelerate, terminate, modify, cancel, or require any notice or consent under any contract to which any of them is a party or is bound or to which any of their assets are subject.

197. These representations were false at the time Defendants made them and Defendants knew the representations were false.

198. These representations are of material facts related to the validity, execution, and implementation of the MOU.

199. Defendants reasonably calculated and intended to deceive Plaintiffs by making these false representations.

200. Plaintiffs reasonably relied on these representations in executing the MOU, IALA, and Revolver and were in fact deceived by the representations.

201. Plaintiffs were damaged by the representations because Plaintiffs entered into the [ALA and Revolver agreements based upon such representations.

202. Although Greg Lindberg may have initially intended to honor the terms of the MOU as drafted when he signed it on behalf of the Defendants on June 27, 2019, he intentionally caused

the aforesaid false warranties to be included knowing they were false, which he knew would create material potential obstacles and obstructions to specific performance of the MOU as written. Lindberg did so in order to that Defendants would receive the financial benefits of the IALA and Revolver loan. After receiving the benefits of the Revolver loan and the [ALA debt reduction, Lindberg used these false warranties as the basis for his refusal to perform as required by the MOU and for his demand that the MOU terms be re-negotiated. Lindberg acted with deceit and with the intent to defraud the Plaintiffs of the benefit of their original bargain.

203. The Court specifically finds that without the fraud committed by Defendants, Plaintiffs would not have signed the MOU, JALA and the Revolver loan and have thus suffered a loss by signing the [ALA in the amount of $77,000,000.00 in debt reduction and in the amount of $39,905,524.37 provided to Defendants by the Revolver.® 204. Inshort, the Court finds that: (a) Defendants knowingly made false representations and warranties to Plaintiffs; (b) the representations and warranties were of material facts; (c) the

representations and warranties were made with the intent to deceive Plaintiffs; (d) the Plaintiffs reasonably relied upon the false representation and warranties and were in fact deceived by them thereby causing damages to Plaintiffs.

205. Because the Court concluded Defendants are liable for fraud, Plaintiffs' alternative claim for negligent misrepresentation is not addressed.

PUNITIVE DAMAGES

206. Plaintiffs' are entitled to recover punitive damages from Defendants.

207. Punitive damages are recoverable as a matter of law where fraud is found because proof of fraud requires proof of aggravation or intentional wrongdoing. Newton v. Standard Fire

®

As the Court is ordering specific performance it is not necessary for the Court to make any additional findings as to compensatory damages.

Ins. Co., 291 N.C. 105, 229 S.E.2d 297 (1976). Punitive damages punish the intentional wrongdoing and serve as a deterrent for future behavior. Oestreicher v. Am. Nat. Stores, Inc., 290 N.C. 118, 225 S.E.2d 797 (1976).

208. The credible evidence presented in this matter supports an award of punitive damages.

209. The Court finds by clear and convincing evidence that the conduct of the Defendant's described herein was willful, wanton and fraudulent.

210. Greg Lindberg, as an officer, director or manager of entity AAI and NEC participated in the willful, wanton and fraudulent conduct, and AAI and NEC condoned such conduct.

211. Defendants should be deterred from similar conduct in the future especially where Defendants or their affiliates remain the ultimate owner of the Plaintiff insurance companies and entities which owe Plaintiffs more than $1 billion.

212. Therefore, after considering the purposes of punitive damages as set forth in N.C. Gen. Stat. § 1D-1 and evidence relating to those factors set forth N.C. Gen. Stat. § 1D-35(2)(a-c, e, h and i) the Court determines that if an appellate Court should determine that specific performance is not an available remedy this Court would enter an award of punitive damages in the amount of three times compensatory damages.

REMEDIES

213. Plaintiffs' request for specific performance of the MOU is allowed.

214. Plaintiffs have elected to pursue specific performance of the MOU as their primary remedy. The Court makes no determination at this time whether, by pursuing specific performance,

Plaintiffs have waived their claim to seek monetary damages arising from Defendants' breach of the MOU.

215. Specific performance is the only adequate remedy to protect Plaintiffs' and their policyholders' interests. Damages for breach of contract are not an adequate remedy at law.

216. Plaintiffs seek an award of specific performance. Plaintiffs seek specific performance of the restructuring plan set forth in the MOU.

217. The MOU, as agreed by the parties, provides as follows, "The Parties agree that irreparable damage would occur if any provision of this MOU were not performed in accordance with the terms hereof, and that the Parties shall be entitled to Specific Performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity."

218. Specific performance is an equitable remedy that is decreed only when it is equitable to do so. See Hutchins v. Honeycutt, 286 N.C. 314, 210 S.E.2d 254 (1974). "In order to claim a right to specific performance, that party must show the 'existence of a valid contract, its

terms, and either full performance on his part or that he is ready, willing and able to perform.'" Hong v. George Goodyear Co., 63 N.C. App. 741, 743, 306 S.E.2d 157, 159 (1983) (citing Munchak Corp. v. Caldwell, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981)).

219. Rule 70 of the North Carolina Rules of Civil Procedure provides that if a judgment directs a party to execute certain documents or to perform any other specified act and the party fails to comply within the time specified, the j udge may direct the act to be done at the cost of the disobedient party by some other person appointed by the judge and the act when so done has like effect as if done by the party.

220. Ifone or more SACs are not transferred to NHC as ordered by this Court, the Court will the address that failure and the remedy therefore at that time. As the Court has awarded

specific performance, it is inappropriate at this time to enter a money judgment for Plaintiffs' damages on the breach of contract claim. Based upon the foregoing, IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

I. The agreement between the parties set forth in the MOU is legally binding and enforceable.

The Defendants are in material breach. The Court orders Defendants to specifically perform the agreement in good faith in accordance with the terms and in the manner set forth in the MOU and hereinafter.

2. Within five (5) days of the entry of this Order, AAI shall take all necessary action to ensure

that NHC Holdings, LLC, a North Carolina limited liability company, is a manager-

managed LLC and is in good standing under the laws of North Carolina so that it may serve as NHC for performance of the MOU. The responsibilities, duties, obligations, and prohibitions of the Parties and NHC Board set forth in the MOU shall be valid and effective unless otherwise ordered herein, and the NHC Board shall have the exclusive authority to manage the business and affairs of NHC subject to and as set forth in the MOU.

3. The individuals constituting the NHC Board (as previously appointed or elected in

accordance with the terms and conditions of the MOU), shall each assume their position and duties on the NHC Board within twenty-one (21) days of the entry of this Order and in

conjunction with the D&O insurance being bound; provided, however, that AAI, in accordance with the requirements and restrictions set forth in the MOU, shall within five (5) days of the entry of this Order remove Lindberg as an appointee to the NHC Board and immediately appoint a replacement director to serve as an AAI Director (as such term is defined in the MOU) due to Lindberg's ineligibility to serve on the NHC Board following his conviction of a felony.

4}

4. AAI, as sole member of NHC, shall fund and bind the D&O insurance policy that M-II

Partners has obtained for NHC's use and benefit, if acceptable to the majority of the NHC Board members, within twenty-one (21) days of the entry of this Order.

5. Defendants shall execute and deliver or cause to be executed and delivered complete, valid

and duly authorized and executed agreements, instruments, assignments and other documentation in a form and substance acceptable to the majority of the NHC Board

members to fully effectuate the transfer, assignment, and contribution to NHC of the Defendants' equity and ownership interests in the SACs, such that the SACs become subsidiaries, either directly or indirectly, of NHC within forty-five (45) days of the entry of this Order.

6. If any SAC identified in the MOU is not contributed to NHC within the time provided in this Order, the Court will conduct a hearing where the Parties are required to show cause as to why the SAC has not been transferred or contributed to NHC. Such hearing shall be held within seventy-five (75) days of the entry of this order unless otherwise ordered by this Court.

7. The restrictions set forth in the TRO, as amended, shall remain in effect until such time as

either: (1) all SACs identified in the MOU are transferred and contributed to NHC; or (2) as otherwise ordered by this Court.

8. By separate order, the Court shall appoint a special master ("Special Master") related to the implementation of this Order and the various transactions contemplated herein. This appointment is made within the inherent authority provided to this Court to monitor and make recommendations in the interest of efficiency, practicality, and justice.

9. The Parties shall, within ten (10) days of service this Judgment and Order provide the Court

with their recommendations as to an appropriate Special Master.

10. The Special Master shall have the authority to request information from the Parties, their

employees, agents, or attorneys related to the implementation of this Order at any time.

The Parties, their employees, agents, or attorneys shall promptly, fully, and adequately respond to any inquiry or request for information from the Special Master and provide the requested information if such information is available.

11. The Special Master shall have access, upon request and under reasonable terms, to the

books and records and other information belonging to the Defendants, the SACs, and affiliated companies to assist with the Special Master's analysis. The Defendants shall provide the Special Master with copies of all financial reports otherwise filed with this Court.

12. The Special Master shall be permitted to request, schedule, attend and participate in

conferences with this Court to discuss the status of the Special Master's work pursuant to this Order.

13. The Special Master shall provide information, observations, and/or recommendations to

the Court, upon request, on matters pertaining to the implementation of this Order and the transactions contemplated herein. Such information, observations, and/or recommendations may be made orally or in writing within the discretion of the Court.

Every recommendation of the Special Master is subject to further review by this Court.

14. If the Special Master determines that any of the Defendants, or any person on behalf of the

Defendants, are taking actions that interfere with, hinder, or are inconsistent with the implementation of this Judgment, the Special Master shall promptly notify the Court.

15. The Special Master shall provide monthly invoices to the Court and the Parties. The Parties

shall have seven days to object to any portion of each invoice. Following the resolution of any objections, the Parties shall bear all reasonable costs and expenses that the Special Master incurs. The costs and expenses shall be allocated 50% to the Plaintiffs and 50% to the Defendants.

16. In the event the Special Master requires any specialized or industry specific expertise to

carry out its duties, the Special Master may make a request to this Court for authority to retain such additional expertise.

17. The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of

this Judgment.

18. Any Party that fails to comply with this Judgment shall have the opportunity to show good

cause for such failure. If that Party fails to show good cause, the Court may adjudge such Party in contempt, direct another party to take action at the non-complying Party's expense, or order another remedy as is just and proper.

19. Nothing in this Order shall be construed to require Defendants to perform any act that

violates the automatic stay arising from the Order (I) Recognizing the Bermuda Proceeding of PB Investment Holdings, Ltd. as a Foreign Main Proceeding and (II) Granting Related Relief entered by the United States Bankruptcy Court for the Southern District of New York in In re PB Life and Annuity Co. Ld., et al, Case No. 20-12791 (LBG)(May 4, 2021) (doc 50).

19 CVS 013093

SO ORDERED and Adjudged this the Qleday of May, 2022.

Honorable A. Graham Shirley Superior Court Judge Presiding

Exhibit A

STIPULATED FACTS

l. Plaintiffs are North Carolina domesticated insurance companies ultimately owned by Defendant Greg Lindberg and regulated by the North Carolina Department of Insurance

("NCDOT").

2. Defendant Greg Lindberg, directly or indirectly, owns 100% of the shares of stock

of all classes of the Plaintiffs.

3. Defendant Greg Lindberg is the sole and exclusive owner of 100% of the shares of

stock of all classes of Defendant Academy Association, Inc. ("AAI"), now known as Global Growth Holdings, Inc.

4, As of June 27, 2019, Defendants Greg Lindberg and/or AAI owned - directly, indirectly, or beneficially - a number of entities that operated under the trade name of "Eli Global," and later "Global Growth."

5. These entities are referred to as "affiliated entities."

6. Some affiliated entities have combined debt totals of approximately $1.25 billion to Plaintiffs pursuant to the terms of various direct and indirect loans and financing arrangements.

7. The NCDOI approved and agreed that Plaintiffs could invest up to 40% of their total admitted assets in affiliated entities.

8. In November2016, the NCDOI engaged Noble Consulting Services, Inc. ("Noble") to, inter alia, review Plaintiffs' investments in affiliated entities.

9. Mike Dinius owns and is the Chief Executive Officer of Noble.

10. In 2018, following Noble's review of Plaintiffs' investments in affiliated entities, the NCDOI required Plaintiffs' affiliated investments to be reduced to no more than 10% of all investments by the end of 2018.

11. On October 18, 2018, the North Carolina Commissioner of Insurance ("Commissioner") entered a Consent Order for Administrative Supervision, under which Plaintiffs consented to confidential administrative supervision.

12. On February 5, 2019, the Commissioner entered an Amended Consent Order for Administrative Supervision extending the term of the administrative supervision by an additional 120 days, or until June 15, 2019.

13. On April 3, 2019, the Commissioner entered a Second Amended Consent Order for Administrative Supervision.

14. During the administrative supervision, Lindberg and his team at Global Growth, made efforts to sell certain insurance companies, refinance loans from the Plaintiffs, and sell certain affiliated entities.

15. At that time, Mike Dinius and Noble Consulting believed selling affiliated entities or refinancing their loans would not achieve the highest return on Plaintiffs' investments.

16. Noble ultimately decided that Plaintiffs' best opportunity to achieve their highest return meant not immediately selling certain affiliated entities.

17. On June 27, 2019, the Superior Court of Wake County, North Carolina ordered Plaintiffs into rehabilitation pursuant to an Order of Rehabilitation, an Order Appointing Receiver, and Injunctive Relief.

18. Dinius and John Murphy of Noble were appointed as Special Deputy Rehabilitators of the Plaintiffs.

19. From June 27, 2019, to the present, the Special Deputy Rehabilitators have controlled the Plaintiffs, including their operations, management, and finances.

20. Plaintiffs Southland National Insurance Corporation, Colorado Bankers Life Insurance Company, and Bankers Life Insurance Company were engaged in the business of selling annuities, life, accident and critical condition insurance policies to consumers in North Carolina and elsewhere.

21. Plaintiffs generally satisfy obligations to policyholders cash payments. through

22. Part of Plaintiffs' revenue came from the sale of annuities and insurance policies and the collection of premiums.

23. Plaintiffs invested some of their revenue for the purpose of realizing a return on the investment.

24. Some of Plaintiffs' revenue was invested, directly and indirectly, in affiliated entity operating companies within the Global Growth portfolio.

25. Inaround August 2019, M3 Partners, an unaffiliated consulting firm, projected that some of the affiliated entities within the Global Growth portfolio would generate more than $1 billion in revenue in 2020.

26. M3 Partners projected those certain affiliated entities the Global Growth within portfolio would generate EBITDA between $129-154 million in 2020.

27. On May 9, 2019, Special Deputy Rehabilitator Mike Dinius sent a "Rehab Proposal" ("Proposal") to Christa Miller and Chris Herwig, Global Growth's CFO and CIO, respectively.

28. On May 16, 2019, Mike Dinius met with Greg Lindberg and others to discuss the Proposal.

29. Greg Lindberg in conjunction with his team prepared the first draft of the Memorandum of Understanding ("MOU") that was sent to Mike Dinius on June 3, 2019.

30. Between June 3 and June 27, 2019, the parties directly or through counsel exchanged drafts of the MOU, the Interim Amendment to Loan Agreements ("ILA"), Revolving Credit Agreement ("Revolver"), and the Consent Rehabilitation Order. During this time Plaintiffs also requested and received all information and disclosures from Global Growth that Plaintiffs

requested.

31. On June 25 and 26, 2019, Dinius, Lindberg, and others met in person accompanied by counsel regarding the MOU and other items.

32. On June 27, 2019, the parties signed the MOU, ILA, Revolver, and Consent Rehabilitation Order. Each document was in fact signed by the person whose name appears on the signature line.

33. Defendant Lindberg executed the MOU on behalf of himself, NEC, and AAI.

34. William Wofford executed the MOU on behalf of EMAM.

35. Lou Hensley executed the MOU on behalf of Plaintiffs.

36. Dinius signed a letter authorizing Plaintiffs to enter into the MOU.

37. The parties agree the ILA was executed and is a valid and enforceable agreement.

38. Defendant Lindberg or AAI remain the ultimate owners, directly, indirectly, or beneficially of the affiliated entities.

CERTIFICATE OF SERVICE

| hereby certify that a copy of the foregoing document was served on the persons indicated below via electronic transmission by e-mail, addressed as follows:

Wes J. Camden Caitlin M. Poe Lauren E. Fussell

WILLIAMS MULLEN

wcamden@williamsmullen.com cpoe@williamsmullen.com lfussell@williamsmullen.com Counsel for Plaintiffs Matthew Nis Leerberg

FOX ROTHSCHILD LLP

mleerberg@foxrothschild.com Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC Aaron Z. Tobin Jared T.S. Pace

CONDON TOBIN SLADEK THORNTON PLLC

atobin@condontobin.com jpace@condontobin.com Counsel for Defendants Greg E. Lindberg; Academy Association, Inc., New England Capital, LLC

This the Z day of May 2022.

Kellié Z. Myers Court Administra tor 10° Judicial District kellie.z.myers@nccourts.org

[Doc. 340-2 — Affidavit (5 pp.)]

## PART FOUR — OBJECTIONS TO THE ORDER OF AUGUST 31, 2026 (DOC. 330); RESPONSES THE GOVERNMENT AND THE SPECIAL MASTER DID NOT MAKE; AND INDEX OF EVERY POST-SENTENCING FILING

## SUPPLEMENT TO ADDENDUM — ISSUES ARISING FROM THE ORDER OF AUGUST 31, 2026 (DOC. 330)

United States v. Lindberg, No. 3:23-CR-48-MOC (W.D.N.C.) — Supplement v1 to Addendum to Defendant's Motion for Reconsideration: Comprehensive Statement of Facts and of All Issues Raised and Not Addressed (Comprehensive v2 / Full-Text v3 / House-Style v1).

This Supplement adds to the Addendum (a) the record facts and issues developed in the Motion for Reconsideration of Doc. 330 that are not already indexed there, and (b) the arguments in Defendant's Reply (Doc. 292) and Response to the Government's Consolidated Position (Doc. 316) that the Order of August 31, 2026 did not address. Each item is raised again and preserved as unanswered. Numbering continues the Comprehensive Addendum's scheme with the prefix "S" to avoid renumbering.

### PART S-1 — ADDITIONAL FACTUAL BASIS (record-verified this session)

**S-F1. The Factual Basis (Doc. 42) is the outer limit of Defendant's admissions.** The Factual Basis, filed November 11, 2024, states that the parties "expressly agree that there is a factual basis for the guilty plea(s)" and "agree not to object to or otherwise contradict the facts set forth in this Factual Basis," and — in the same paragraph — that "[t]he parties agree that they have the right to object to facts set forth in the presentence report that are not contained in this Factual Basis." It further provides that the Government "will submit to the Probation Office a 'Statement of Relevant Conduct'" and that "[t]he defendant may submit . . . a response." Doc. 42, at 1 (RECAP id 419584690). Defendant's certification states only that he does "not dispute any of the facts contained in it." Id. at 4.

**S-F2. The Factual Basis contains no admission of a "fraudulent swap" of investments.** The only conduct paragraph reads: "To carry out the conspiracies, LINDBERG and others engaged in circular, non-economic transactions among LINDBERG's web of entities using insurance company funds, and made, and/or caused to be made, various materially false and misleading statements, representations, and half-truths to, and omitted material information from, the North Carolina Department of Insurance, various ratings agencies, ULICO, insurance policyholders, and others regarding these transactions." Doc. 42 ¶ 5. The words "swap," "swapped," "fraudulently," and any admission of loss causation are absent. The fraud characterization in Doc. 330 at 10 is unsupported by the admissions.

**S-F3. The disaffiliation transfers were regulator-reviewed restructurings that post-dated loan origination.** Doc. 316, at 48–50 (§ III.D); Doc. 300, at 29–31 & Exs. DS-1 through DS-21; Doc. 234, at 6. NCDOI set the ~40% affiliated-

investment ceiling in its April 11, 2016 review letter, received eleven disclaimers of affiliation under N.C. Gen. Stat. § 58-19-25(j), and reviewed the finance-company and principal-protection-note structures before use. "The apparent circularity is the signature of that mandated sequence, not evidence that value left the estate." Doc. 316, at 49. Independently, the restructuring arose only because of the Government's own interference with the Ares transaction (superseding cause). Doc. 316, at 50–52 (§ III.E); Sealed Addendum (Doc. 318/322).

**S-F4. Plea Agreement ¶ 9 — the only special-master consent.** Defendant consented "to the appointment of a special master to identify, receive, apportion, and distribute funds for restitution, and perform any other related tasks as ordered by the Court." Doc. 40 ¶ 9 (restricted), as quoted in Doc. 107 ¶ 3, Doc. 108 ¶ 3, Doc. 145, at 5, and Doc. 316, at 24. The clause was inserted by AUSA Daniel Ryan (tracked changes, Def. Ex. 2, Tab B). Doc. 316, at 31. No stipulation to any loss or restitution figure exists.

**S-F5. Docketed PSR-objection record.** Draft PSR filed 3/6/2025, objections due 3/20/2025 (Doc. 57); unopposed extension motions granted (Docs. 58–61, extending into May 2025); **Objection to Presentence Investigation Report filed 5/21/2025 (Doc. 62, sealed—attorney, Wyatt)**; final PSR 6/17/2025 (Doc. 63); PSR Supplement with victim statements 4/22/2026 (Doc. 109); PSR 2nd Supplement 5/20/2026 (Doc. 157). Per client (2026-09-13): the "competing version" of the PSR he refers to is Defendant's Sentencing Memorandum (Doc. 145, May 14, 2026), filed five days before the Government's (Doc. 152, May 19, 2026). Doc. 62 (May 21, 2025) is the separately docketed written Objection to the PSR (sealed; Wyatt). Both are cited; note Doc. 145 at 29 withdrew all PSR objections other than loss, disparity, and history.

**S-F6. Substantive objections to the numbers before sentencing.** Doc. 132 (5/4/2026), 32 pp. + Exs. 1–3: figure "overinflated" (§ I); interest must be excluded (§ I.A); principal reduced (§ I.B); ≥ $740 million additional credits (§ II.A–G: $352.9M AAPC preferred equity to ULICO; $27.8M SNIC capital contributions; $79.6M cash to Pre-Designated Restitution Parties; $3M CBL/Beckett refinance; $20M Clanwilliam; $13.6M real estate to ULICO; $243.4M zero-coupon bonds); proximate-cause limit (§ III); jury right (§ IV). "[I]f the Court were to sustain all of Mr. Lindberg's objections, the restitution owed is zero." Doc. 132, at 3. Also Doc. 151 (5/18/2026) response to third-party objections; Doc. 113 (Solow Decl.).

**S-F7. Sentencing Memorandum preserved objections; no waiver.** Doc. 145, at 28–29: preserved (1) loss amount overstates seriousness; (2) § 3553(a)(6) disparity; (3) history and characteristics; incorporated Doc. 132 ("full restitution has already been paid," id. at 12, 28). The withdrawal sentence — "Mr. Lindberg specifically withdraws any other objections to the PSR other than those mentioned above and briefed in this Memorandum," id. at 29 — is itself proof that objections were filed and carves out the loss and restitution objections.

**S-F8. Bifurcation: the parties and the Court contemplated evidentiary hearing(s) on restitution.** Joint Motion to Bifurcate (Doc. 107, 4/3/2026) ¶ 8: "The

restitution issues involved in this case are complex and involve hundreds of millions of dollars and multiple classes of potential victims. It is anticipated that the restitution issues in this case may require a lengthy hearing or hearings." ¶ 12: sentencing "after it enters a preliminary restitution order but before any necessary hearings to finalize restitution." Order (Doc. 108, signed 4/6/2026) ¶¶ 8, 12, 15 (adopting verbatim); decretal: "Following the sentencing hearing, the Court will schedule one or more hearings (if necessary) to finalize restitution." No such hearing has been held. Full text: fulltext/Doc-107_Joint-Motion-to-Bifurcate.txt.

**S-F9. Sentencing-hearing record (May 26, 2026), as quoted in Defendant's filings.** Tr. 44 (Government agreed to 15-year stat max "with the understanding that . . . Mr. Lindberg would cooperate with the Special Master"); Tr. 47 ("the loss was overstated . . . the real loss there was risk. It all could have been lost, but it wasn't all lost"; the Court "always viewed this once, with the two cases together, because they were really part of the same thing"); Tr. 52 (Government's recommendation "includes the assumption that the loss figure is an accurate loss figure"); Tr. 55 ("about 540 months"); Tr. 61–62 (60 months + "84 months to run consecutive . . . to produce a sentence of 144 months"); Tr. 66:18–22 (order "obviously subject to the objections of numerous parties and further hearings with the Court"); Tr. 66–67 (Government: "within the next 90 days, people are going to want to be heard"; Court: "that there may be some dispute"). Sources: Doc. 292, at 16, 27–28; Doc. 234, at __ (Ex. ST); Doc. 316, at 4, 26. Transcript is Doc. 164 (not in RECAP) — conform before filing.

**S-F10. Origin of the Appointment Order.** Lindberg Plea & Appointment Decl. ¶¶ 3–4, 8–10 (Doc. 316-1, Tab B; cited Doc. 292, at 15–16); Def. Ex. 2, Tabs B, D, E (Doc. 316-2): Government recruited Grier Wright Martinez ("consider this Charlotte-based firm for the role as special master"); Dec. 18, 2024 Ryan e-mail ("supposed to be giving up 'exclusive possession and control' . . . will not agree to any such efforts . . . The Special Master does not owe a duty to Mr. Lindberg or to the assets"); Government's redline inserted the trustee/director-appointment authority; Government would file "competing memos and proposed orders" if the defense did not agree; defense's ability to revise "severely hampered by [its] inability to effectively or reliably communicate with [its] client." Doc. 316, at 23–25, 31–32; Doc. 291, at 3–4.

**S-F11. Procedural history of Docs. 269/278/288/292/316/330.** Motion 7/31/2026 (Doc. 269, with Exs. A–C and proposed order); Second Motion 8/6/2026 (Doc. 278, with affidavit and exhibits); Special Master's Response 8/7/2026 (Doc. 288); Government's omnibus 8/6/2026 deferring to the Special Master (Doc. 279, at 2); Reply 8/9/2026 (Doc. 292, 35 pp., Exs. 1–6 incl. Million Decl. and Del. Sec'y of State record); Government's Consolidated Position 8/17/2026 (Doc. 308); Defendant's Response 8/23/2026 (Doc. 316, 85 pp.); Order signed 8/28/2026, entered 8/31/2026 (Doc. 330, 13 pp.; RECAP id 491892067 — text not retrievable this session).

**PART S-2 — ISSUES RAISED IN THE MOTION FOR RECONSIDERATION OF DOC. 330 (preserved)**

**S-1.** The Order (at 2) misstates the scope of the plea stipulation: Defendant stipulated to the Factual Basis (Doc. 42), which reserves the right to object to the PSR; he did not agree that the PSR offense conduct could be adopted. Manifest injustice / Rule 32(i)(3)(B) / § 3664(e).

**S-2.** The Order (at 2, 10) states Defendant lodged no PSR objections; Docs. 57–63, 109, 157, 62, 132, 145, and Sentencing Tr. 66:18–22 refute it. There was never any waiver; the Doc. 145 withdrawal sentence preserved the loss, disparity, history, and restitution objections.

**S-3.** The Order (at 2) treats the Government's PSR litigating positions — including the ~$2 billion opening restitution figure — as facts, without the ruling Rule 32(i)(3)(B) requires or the § 3664(e) finding; the Court itself found the loss "overstated" (Tr. 47). The same figure drove the 30-level enhancement (PSR ¶ 178; Doc. 152, at 8, 10–11) and the stacked 144-month sentence (Tr. 61–62; Doc. 162).

**S-4.** The numbers were never agreed: the parties' joint bifurcation motion and the Court's order contemplated "a lengthy hearing or hearings" and "one or more hearings (if necessary) to finalize restitution" (Docs. 107 ¶¶ 8, 12; 108 ¶¶ 8, 12, 15 & at 4); none has been held.

**S-5.** The Order (at 3) mischaracterizes the Special-Master reference as Defendant's design; the sworn, unrebutted record shows AUSA Ryan drafted the plea clause and the operative order, rejected nearly all defense changes (including a fiduciary duty to all stakeholders), and filed without Defendant's review of the final draft (S-F10).

**S-6.** The Order (at 10) states Defendant admitted "fraudulently" swapping investments. No such admission exists in the Factual Basis (S-F2); the fraud issue was never addressed in the admissions; the transfers were regulator-reviewed restructurings post-dating origination (S-F3). The Order supplies by characterization what the Government never proved.

**S-7.** The Order's Special-Master/receiver section adopts the Special Master's unsworn "information and belief" account over three § 1746 declarations and contemporaneous documents (Beckett sale approval and no-oppose letter, Doc. 288, at 5, 15 & n.50; trust cancellation 9/30/2025, Doc. 292 Ex. 5; removal of AAI directors 2/27/2025, Million Decl. ¶¶ 25–27; fee opacity and the ~$19 million, Doc. 292, at 22, 30 n.3; ex parte gathering "outside of the rules of evidence," Doc. 288, at 10; emphasis "added by the undersigned," Doc. 288, at 8 n.33).

**S-8.** The Order did not consider the Reply (Doc. 292) [confirm against Doc. 330] and decided Docs. 269/278 on the Special Master's Response alone, although the Government — the party LCrR 47.1(d)–(e) obligates to respond to dispositive motions — never responded (Doc. 279, at 2) and the Special Master disclaimed the legal defense (Doc. 288, at 2). The Motion stood unopposed.

**S-9.** Sentence founded on "misinformation of constitutional magnitude," United States v. Tucker, 404 U.S. 443, 447 (1972); "assumptions . . . which were materially

untrue," Townsend v. Burke, 334 U.S. 736, 741 (1948); applies to MVRA restitution as criminal punishment, Ellingburg, 607 U.S. ___, 146 S. Ct. 564 (2026).

**S-10.** Three declined opportunities (Doc. 279 at 2; Doc. 288 at 2; Doc. 308 at 7–8 and refusal to answer issue by issue, Doc. 316 at 51; Docs. 341 at 13, 16 & n.4 and 344 at 3, 8, 12 — data "not relevant"/"not critical," offset facts rejected only "as a matter of law"). The Government and Special Master may not be afforded a fourth; the Addendum facts stand unrebutted for de novo determination and on appeal.

**PART S-3 — ARGUMENTS IN DOC. 292 (REPLY) NOT ADDRESSED BY DOC. 330 (preserved)**

**S-11.** Unequal evidentiary showings — three § 1746 declarations vs. none; information-and-belief assertions cannot carry the § 3664(e) burden (Steele, 897 F.3d at 613–14). Doc. 292, at 3–4.

**S-12.** Beckett Trust existed until 9/30/2025 (Del. Sec'y of State, File No. 5879107); Special Master alone could terminate it; either sequence (dissolve-then-sell or sell-then-dissolve) makes the disposition his act. Doc. 292, at 3–4, 7–13.

**S-13.** Reference exceeds § 3664(d)(6) — receiver functions (identify, liquidate, clear title, distribute, retain counsel, be paid from estate) are not "proposed findings"; jurisdictional consequence (Cohen, 459 F.3d at 498; Broughton-Jones, 71 F.3d at 1147, 1149); Special Master could not identify an authorizing statute. Doc. 292, at 4–5.

**S-14.** "No approval required" concedes an unauthorized disposition: Order conditioned every liquidation on Court approval (Doc. 56, at 6–7); Assignment gave him "all . . . rights . . . to transfer or otherwise dispose" and bound him "in accordance with the Order" (Doc. 260, at 2). Doc. 292, at 6–7.

**S-15.** MOU art. II required affirmative consent of an AAI Director for any sale; Special Master removed both AAI Directors (2/27/2025) and supplied the consent through his own designee; abstention "5-0" answer fails. Doc. 292, at 11–13.

**S-16.** "Not involved" cannot survive Doc. 288's own account (designee voted "after reviewing . . . a letter from the Special Master"); Special Master concedes Court approval would be required for Secondary Restitution Assets (Doc. 288, at 14 n.49) — cannot owe approval when selling directly but none when selling through NHC equity he owns. Doc. 292, at 14–15.

**S-17.** Appointment Order was the Government's plea-bargain term; ambiguities construed against the Government (Harvey, 791 F.2d at 300; Jordan, 509 F.3d at 200); Government's silence confirms the Special Master functions as its advocate. Doc. 292, at 15–17.

**S-18.** Structural Article III component non-waivable (Schor, 478 U.S. at 850–51; Stern, 564 U.S. at 483; Wellness, 575 U.S. at 678–79); consent lapsed with supervision when Beckett was sold without approval; waiver cannot authorize a restitution order outside the statute (Broughton-Jones, 71 F.3d at 1149; Ellingburg). Doc. 292, at 17–18.

**S-19.** § 455(b)(4)/(e) financial-interest ground non-waivable; Rule 53(a)(2) consent requires disclosure and Court approval — neither occurred (Rechnitz, 75 F.4th at 143; Union Carbide, 782 F.2d at 714). Doc. 292, at 18–19.

**S-20.** De novo review does not cure (Raddatz distinguished; Ward, 409 U.S. at 61–62); record curated ex parte "outside of the rules of evidence" (Doc. 288, at 10). Doc. 292, at 19–20.

**S-21.** Fee interest disqualifying (Tumey; Ward; Gibson; Withrow; Caperton; O'Connor, 291 F.2d at 528); Konrad distinguished (hourly CJA computation, no custody/liquidation); bankruptcy-trustee analogy fails (11 U.S.C. §§ 326, 327(a), 330; 28 U.S.C. § 586); Marshall v. Jerrico inapplicable; structural error not harmless (Williams v. Pennsylvania, 579 U.S. at 14). Doc. 292, at 20–23 & nn.1–2.

**S-22.** Government has not proved loss: debt-for-value error (Modigliani–Miller; Jensen); Beckett $1,003,924,000 (Cabrillo) / $1.05B (Blackstone) vs. $134M sale; Damovo $400M IOI vs. ~$100M "for the debt"; "apples to apples" rejoinder wrong (Doc. 256-1, at 3); "confidential" is not an accounting; no windfall (Stone, 866 F.3d at 226). Doc. 292, at 23–27.

**S-23.** Loss figure drove the Guidelines (~540 months) and the stacked 144-month sentence despite the Court's no-stacking commitment (Trial Tr. 1032:19–24, No. 5:19-CR-22, Doc. 450; Def.'s Sentencing Mem. 2 (Doc. 507)); preliminary figure "entered subject to objection is not a proven one." Doc. 292, at 27–29.

**S-24.** Mandatory offsets ignored: $157M CWG compromise (Doc. 288, at 7); ULICO settlement/amendment consideration; "if and when realized" condition absent from § 3664(j)(2). Doc. 292, at 29.

**S-25.** Belated, undisclosed Beckett accounting (obtained only "[a]s part of preparing this Response"); ~$19M in fees unaccounted for. Doc. 292, at 30 & n.3.

**S-26.** Judicial estoppel inapplicable (New Hampshire v. Maine); praise quotations carried emphasis "added by the undersigned" (Doc. 288, at 8 n.33); Special Master never met with Defendant (Lindberg Decl. ¶ 5); timing objection fails because figures were undisclosed; Doc. 268 was a "Limited Response" that never answered Doc. 190 on the merits; issue pressed in this Court, on appeal (Doc. 192), and by mandamus (No. 26-1967); Doc. 282 abeyance motion. Doc. 292, at 30–33.

### PART S-4 — ARGUMENTS IN DOC. 316 (RESPONSE TO CONSOLIDATED POSITION) BEARING ON DOC. 269/278 AND NOT ADDRESSED BY DOC. 330 (preserved)

**S-27.** Consent/waiver cannot cure structural defects; the receiver conversion was the Government's edit (Doc. 316, at 23–25, 31–32).

**S-28.** Coercion is not consent — reference imposed under threat of proceeding without the defendant while the Government held the plea benefit over him (Doc. 316, at 26).

**S-29.** Defense never treated the restitution determination as settled or agreed (Tr. 66:18–22) (Doc. 316, at 4, 26).

**S-30.** Paladin is the financial advisor, not the Special Master (Doc. 316, at 25; Doc. 54 ¶ 8).

**S-31.** Government's Dec. 18, 2024 position that "'loss amount' is a USSG issue, not a restitution issue" and would not be reduced by post-indictment payments (Doc. 316, at 77) — inconsistent with its later "completely different" position (Doc. 341, at 13 n.4) and with using a single figure for both.

**S-32.** Government concedes insufficient evidence to connect Conservatrix and Vista/Cell 1.16 losses to the offense (Doc. 308, at 7–8) — confirming claimant-by-claimant proof required (In re Zetteler) and never made (Doc. 316, at 41).

**S-33.** Superseding causes: forced/premature sales, refusal to refinance, liquidation of long-dated instruments, Beckett fire sale; ~$1B first-loss cushion; affiliated loans independently valued and well secured when control passed (Doc. 316, at 40–41; Docs. 234, 235, 278).

**S-34.** Circular transfers = regulator-mandated restructuring, not additional loss (Doc. 316, at 48–50); Government interference with Ares as superseding cause (Doc. 316, at 50–52; Sealed Addendum).

All items above are raised again in the Motion for Reconsideration of Doc. 330 and preserved as unanswered. Record cites to Docs. 42, 57–63, 107, 108, 132, 145, 292, 316 were verified this session against RECAP text; Sentencing Tr. cites are as reproduced in Docs. 292/234/316 and must be conformed to Doc. 164; Doc. 330 page cites are from Defendant's page-by-page review (Order text not retrievable) and must be conformed to the Order before filing.

### PART S-5 — ADDITIONS FROM THE GOVERNMENT'S OMNIBUS RESPONSE (DOC. 279) AND THE JULY 2026 MEETINGS (added 2026-09-13)

**S-F12. Doc. 279 (Government's Omnibus Response, 8/6/2026, 4 pp.; RECAP id 489047541) — verbatim.** "The United States concurs with the arguments and conclusions contained in the Special Master's filings and sees no reason to duplicate them here." (at 2). n.2: "although many of the filings are duplicative and redundant, some of these filings have taken inconsistent positions on the same issues, making substantive reply at a more minute level unproductive in light of the Special Master's comprehensive responses." "If the Court would like the United States to respond to any particular argument by the Defendant, a victim, or any other third party, the United States stands ready to do so." (at 2–3). n.1: requests to disqualify Government attorneys "frivolous and unsupported"; "Any remaining motions by the Defendant beyond these issues should also be denied as moot." Also: asks the Court to deny Docs. 172, 190, 201, 202, 225, 234, 238, 269 and to set a final restitution hearing for August 17, 2026 (at 1, 3).

**S-F13. July 2, 2026 DOJ intro call and July 16, 2026 SM/DOJ weekly meeting (Canter Decl. ¶¶ 3–9, from Ted Canter's contemporaneous notes of 7/5/2026 and 7/16/2026).** Government's "only concern was timing" (proposed last week of July, then August 17); AUSA Bain-Creed argued the filing "would take money from victims because the Special Master had to respond"; Government did

not indicate any intent to respond on the merits; SM/Martinez: mostly disagree "for conceptual reasons"; ~$50M potential offset agreement; no response filed on Vista/Cell 1.16 because "relying on information Greg provided"; zero-coupon bonds — Katten meeting never happened, "too late to change the report," will "not push back hard at the final hearing," inviting proof-up; AAPC value revised down (to be filed under seal). NOTE: the phrase "waste of time" does not appear in the notes; the closest record language is Doc. 279 n.2 ("unproductive") and Doc. 316, at 4–5 (characterizing the Government's position). PRIVILEGE: the notes are marked attorney-client/work product; filing the Canter Declaration or the e-mails waives privilege as to their contents.

**S-F14. August 10, 2026 hearing.** Defendant "explicit[ly] request[ed] . . . that the Court require the Government to respond to each pending motion issue by issue"; neither the Government nor the Special Master did so. Doc. 316, at 80–81; Aug. 10, 2026 Hr'g Tr. 27 (Doc. 312 — not in RECAP). The Government's Consolidated Position (Doc. 308, 8/17/2026) selected issues, did not address causation, and declined to answer issue by issue (Doc. 316, at 41, 51).

**S-35.** The Government's announced position — that it would not respond to Defendant's motions on the merits because doing so was "unproductive" and would "take money from victims" — was stated in the July 16, 2026 meeting, repeated in Doc. 279, maintained after the Court was asked on August 10, 2026 to require issue-by-issue responses, and maintained in Doc. 308 and Doc. 341. The Government elected not to carry its § 3664(e) burden; the Addendum facts stand unrebutted.

## PART S-6 — ENUMERATED OBJECTIONS TO DOC. 330 AND THE OFFSET SCHEDULE, CARRIED FROM THE SEPTEMBER 7, 2026 DRAFT "RESPONSE AND OBJECTIONS TO THE ORDER OF AUGUST 28, 2026" (v4) — INCORPORATED AS PRESERVED, NOT RE-ARGUED (added 2026-09-13)

Source: RestitutionReport\Lindberg-Greg_-_Motion-for-Reconsideration-Restitution-Order_5.19-and-3.23_v4_20260901.docx (never filed). The merits sections of that draft (offsets, Squirrel/Zetteler causation, superseding cause, constitutional standard) are folded here so that the Motion for Reconsideration (v2) does not re-open them for a Government merits response. Order page cites below were taken from that draft and have now been conformed to the Order (fulltext/Doc-330_Order-2026-08-31.txt). NOTE: item 10 of the draft conceded "Defendant's acceptance of the PSR's offense-conduct narrative for Guidelines purposes at sentencing (Doc. 234-52 at 6–8)"; the transcript confirms the stipulation was "to form the factual basis" (Tr. 6:2–5) and that the PSR was adopted "for the purpose of applying the guidelines" (Tr. 7:10–12), with counsel stating "None at this time" (Tr. 7:6) and reserving restitution objections at Tr. 66:20–22 — the Motion (v2, § I.A) is drafted on that accurate footing; do not assert that the Order's p. 2 statements are "false."

**S-6.1 — Offset and reduction schedule (Doc. 281, at 30; Doc. 316, at 53–55; Doc. 300)**

III. The Order Ignores $3,765,418,383 in Documented Offsets, Credits, and Non-Attributable Losses — More Than Twice the Claimed Restitution — Which the Statute Makes Mandatory.

Section 3664(j)(2) requires that any restitution amount "shall be reduced by any amount later recovered as compensatory damages for the same loss," and § 3663A(b)(1)(B) requires credit for the value of property returned. A restitution order that fails to offset the loss by value the victim received is error requiring vacatur. United States v. Arrington, 97 F.4th 593 (8th Cir. 2024); United States v. Malone, 747 F.3d 481, 485 (7th Cir. 2014); United States v. Ritchie, 858 F.3d 201, 216 (4th Cir. 2017) (no windfall). Defendant has placed in the record, item by item and with documentary support, the following schedule of reductions. Doc. 281 at 30; Doc. 564 at 38–39; Def. Resp. to Doc. 308 at 50–51:

| | |
|---|---|
| Special Master/Receiver's Proposed Restitution Figure | $1,625,000,000 |
| I. Improper Additions to the Affiliate-Investment Balances | |
| Prejudgment Interest | ($263,000,000) |
| Corrected Starting Balance of Affiliate Investments | ($141,000,000) |
| II. Mandatory Credits and Offsets (§ 3664(j)(2); § 3663A(b)(1)(B)) | |
| AAPC Preferred Equity Par Value (as of May 26, 2026) | ($352,906,240) |
| SNIC Payments | ($27,823,425) |
| Cash Payments to Pre-Designated Restitution Parties Not Captured | ($79,655,289) |
| CBL Subordination Fee (Beckett refinancing) | ($3,000,000) |
| Additional Clanwilliam Sale Proceeds | ($20,000,000) |
| ULICO Sale of Contributed Real Estate | ($13,596,013) |
| Sale Proceeds of Zero-Coupon Bonds in PPNs | ($243,452,385) |
| Value of the NCICs as of October 2018 | ($454,000,000) |
| Bermuda ICs' Proceeds from Sales of Affiliated Assets | ($9,800,076) |
| III. Losses Not Proximately Caused by Mr. Lindberg (§ 3664(e)) | |
| Loss on Agera | ($129,398,324) |
| ECL Losses | ($22,288,826) |
| Loss on UKAT | ($39,000,000) |
| Insurance-Holdco Debt Portion | ($14,897,805) |
| Loss on Clanwilliam Below-Market Sale | ($474,000,000) |
| Loss on Early Zero-Coupon Bond Sales | ($611,600,000) |
| Loss on Beckett Sale | ($866,000,000) |

TOTAL MINIMUM OFFSETS AND REDUCTIONS ($3,765,418,383)

NET RESTITUTION OWED $0

---------------------------------------------------------------- ------------------

Applied against the Special Master/Receiver's $1,625,000,000 figure, these reductions total $3,765,418,383 and yield net restitution of zero — before the roughly $1 billion of Mr. Lindberg's own first-loss capital that stands ahead of any protected party's loss, and before the $2.39 billion personal backstop guarantee. Several of the largest items are established by the Government's own evidence: the $454 million value of the NCICs in October 2018 is corroborated by Ares's arm's-length letter of intent to acquire them for approximately $450 million; the $474 million Clanwilliam loss is the difference between the $880 million Quadro valuation and the $450 million forced sale; the $611.6 million bond loss is the difference between guaranteed par and the Rehabilitator's pre-maturity sale price; and the $866 million Beckett loss is the difference between the $1,003,924,000 Cabrillo Advisors appraisal (corroborated by Blackstone's $1.05 billion enterprise-value proposal) and the approximately $134 million the Special Master/Receiver accepted. Def. Resp. to Doc. 308 at 50, 58–59.

These reductions are not discretionary. The MVRA requires that any restitution amount be reduced by compensatory damages a victim recovers in a civil proceeding, 18 U.S.C. § 3664(j)(2), and by the value of any property returned, § 3663A(b)(1)(B); a court has no authority to award more than a victim's actual loss. United States v. Alalade, 204 F.3d 536 (4th Cir. 2000); United States v. Ritchie, 858 F.3d 201 (4th Cir. 2017). Where the assets securing the affiliated loans have been sold and their proceeds received, the credit is measured by the amounts actually realized. Robers v. United States, 572 U.S. 639 (2014). The Order applies not one of these mandatory offsets.

The Order does not mention a single one of these items. It does not rule on them, defer them, or reject them. It says only that Defendant's objections to the Special Master/Receiver's asset valuations need not be resolved because those valuations were "provided for informational purposes." Order at 11. That conflates two different things. Defendant's objections to the estimated value of the remaining Primary Restitution Assets are one matter; the mandatory statutory credits for value the victims have already received or recovered, and the exclusion of losses the offense did not cause, are another, and the statute does not permit a final order to be entered without resolving them. To the extent the Order announces an intention to adopt the Special Master/Receiver's report "with a few modifications" without first adjudicating each of these reductions on the Government's proof, Defendant objects.

**S-6.2 — Enumerated objections (60), each raised again and preserved**

VII. Enumerated Objections Preserved for the Record.

Without waiving any argument in his prior filings, all of which are incorporated by reference (Docs. 132, 172, 174, 190, 201, 202, 225, 234, 235, 238, 248, 269, 278, 280, 281, 282, 290, 292, 293, 300, 309, and Defendant's Response to Doc. 308; No. 5:19-cr-22, Docs. 564, 584, 588), Defendant objects to the Order on each of the following grounds, and requests that each be preserved for appellate review:

1. Misstatement of the record ("admission"). The Order's finding that "Defendant admitted … that Defendant proximately caused the insurance companies, and their policyholders, to incur losses when he fraudulently caused them to swap cash and high-quality, liquid investments with his own illiquid affiliated investments" (Order at 10) has no basis in the Factual Basis (Doc. 42 ¶¶ 5–6), the Plea Agreement (Doc. 40), the PSR, or any statement by Defendant. Defendant admitted "circular, non-economic transactions" and "substantial financial hardship," nothing more.
2. Misstatement of the record ("evidence shows"). The Order's finding that "the evidence shows" fraudulent swapping (Order at 10) cites no evidence. The Government has offered no evidence in this proceeding that the affiliated loans were fraudulently originated or underwritten, or that any loss was reasonably foreseeable to Defendant when they were made.
3. Misstatement of the record ("no objection to fee petitions"). The Order's statement that Defendant "has not objected to any" fee petitions (Order at 9) disregards Doc. 269 and its proposed order (Doc. 269-5 ¶¶ 1, 5) seeking vacatur of paragraph 14 and an accounting of all fees, and disregards that Defendant's subpoenas for the underlying records were opposed and denied (Doc. 248).
4. Misstatement of the record ("never asked this Court to find otherwise"). The Order's statement that Defendant never asked the Court to reject the Term Sheet's characterization of the Special Master's role (Order at 7) is contradicted by Docs. 172, 190, 238, 269, and 278.
5. Misstatement of the record (Term Sheet). The Order treats a Government-circulated "Term Sheet" as if it defined the Special Master's authority (Order at 7). The Term Sheet was never entered by the Court, never signed by Defendant, and cannot amend Doc. 56, the Assignment Agreement, or the Beckett Trust Agreement.
6. Misstatement of the record (Beckett approval). The Order's statement that the Beckett purchaser "did not require or otherwise request that the Special Master approve the sale" (Order at 9 n.4) omits that the Trust Agreement required Grantor approval (§§ 7.2(a)(vi), 9.1(e)), that NHC — owned by the Special Master — gave it, that his designee voted for the sale, and that his non-objection letter preceded the vote (Doc. 308, Ex. C ¶¶ 9, 19–21).
7. Misstatement of the record ("remaining interest, if any"). The Order's conclusion that the Special Master took only a residual interest (Order at 6 & n.2) is contradicted by the Assignment Agreement §§ 1, 16 (all economic, legal, voting, and beneficial rights; discretion notwithstanding the Operating

and Voting Trust Agreements), Doc. 260 at 2, and the Special Master's removal of directors Million and Carter (Million Decl. ¶¶ 25–26).

8. Misstatement of the record (loss of control in 2019). The Government's own affiant dates the contribution of the SACs to NHC to October 2024 (Doc. 308, Ex. C ¶ 4); the Order's finding that control was lost through the 2019 MOU (Order at 6) is contrary to the Government's evidence.
9. Misstatement of the record (MOU default). The Order's reliance on the MOU's "no default" proviso and the E.D.N.C. IALA ruling (Order at 6–7 n.2) disregards that the loans were restructured under Article III of the MOU, that the Wake County court held Article III unenforceable and recorded that no Article III claim was asserted, and that no Article III default was ever declared.
10. Misstatement of the record (PSR acceptance). Defendant's acceptance of the PSR's offense-conduct narrative for Guidelines purposes (Doc. 234-52 at 6–8) is not an admission of proximately caused, foreseeable restitution loss; the PSR itself states the restitution amount is "unknown" (¶ 110), and the Plea Agreement decouples the ">$550M" Guidelines stipulation from restitution. The PSR was, moreover, a preliminary and contested report: Defendant filed his Sentencing Memorandum (Doc. 145) before the Government filed its own (Doc. 152), and moved for a determination that no restitution is owed (Doc. 234), preserving every objection—including causation—through his objections to the preliminary report; under Fed. R. Crim. P. 32(i)(3)(B) the disputed narrative could not be relied upon without a ruling that was never made, and no report was final or exempt from the required hearing.
11. Misstatement of the record ("substantial"). The Joint Motion's representation that restitution is "substantial" (Doc. 54 ¶ 5(b)) is not an admission of $1.655 billion, and is satisfied by the restitution already paid through the Clanwilliam proceeds.
12. Constitutional mislabeling. The Order analyzes Defendant's due-process claim under the Fourteenth Amendment (Order at 4). The claim arises under the Fifth Amendment and Article III. Defendant preserves both.
13. Omission — offsets and credits. The Order does not address any of the $3,765,418,383 in offsets, credits, and non-attributable losses documented in Doc. 281 at 30, Doc. 564 at 38–39, and Defendant's Response to Doc. 308 at 50–51, which reduce net restitution to zero. Each item is individually objected to and preserved.
14. Omission — Clanwilliam and policyholder payment in full. The Order does not address that the Clanwilliam sale proceeds paid every U.S. policyholder in full (Ex. D7; Doc. 100), satisfying paragraph 10(a) of the Plea Agreement.
15. Omission — Ares. The Order does not address the Government's interference with the signed $450 million Ares transaction (Doc. 564 at 10, 26; Exs. G, A15).

16. Omission — Oaktree. The Order does not address the Rehabilitator's refusal of the $1.0 billion Oaktree transaction that would have repaid all affiliated loans at face value by June 2019 (Doc. 564 at 11, 27; Exs. C, C2).
17. Omission — Montshire/Alban. The Order does not address the Rehabilitator's refusal of, and litigation against, the 2023 Montshire/Alban offer (Doc. 564 at 30; Exs. O, O2).
18. Omission — Quadro. The Order does not address the Rehabilitator's blocking of the $3.4 billion Quadro transaction (Clanwilliam at $880 million) followed by the $450 million forced sale (Doc. 564 at 30; Exs. G2, I3, I4).
19. Omission — coerced ten-year hold. The Order does not address that the June 27, 2019 MOU was imposed under express written threat of liquidation (Ex. D5; Trial Tr. Vol. 5 at 1012:11–12) and foreclosed the face-value exits.
20. Omission — zero-coupon bond fire-sale. The Order does not address the Rehabilitator's pre-maturity sale of $1,006,239,867 par of principal-protection bonds for approximately $394 million, without required court approval, crystallizing a $611.6 million loss (Doc. 564 at 28–29).
21. Omission — disaffiliation structures. The Order does not address the regulator-reviewed disaffiliation record (NCDOI April 11, 2016 review letter; § 58-19-25(j) disclaimers; Doc. 300 at 29–31; DS-1 through DS-21) that explains the "circular" character of the transfers.
22. Omission — first-loss capital and guarantee. The Order does not address Mr. Lindberg's roughly $1 billion of first-loss capital, his $2.39 billion personal backstop guarantee, or the absence of any dividend (Doc. 564 at 5; Exs. A11, B8, D).
23. Omission — contemporaneous valuations. The Order does not address the 2018 KPMG and Houlihan Lokey valuations confirming the loans were supported by more than $1 billion of equity at approximately fifty-percent loan-to-value (Doc. 564 at 7–8; Exs. E, E2, E3, HL).
24. Omission — Beckett valuation. The Order does not address the Cabrillo Advisors appraisal of Beckett Collectibles at $1,003,924,000, corroborated by Blackstone's $1.05 billion enterprise-value proposal, against the approximately $134 million sale price (Def. Resp. to Doc. 308 at 58–59).
25. Omission — Government's concession of intervening cause. The Order does not address the Government's own disallowance of five loss categories on the ground that each resulted from decisions made "after LINDBERG defrauded them" (Doc. 308 at 5–6), a concession that those losses were caused by intervening decisions.
26. Omission — Government's concession as to Conservatrix and Vista/Cell 1.16. The Order does not address the Government's concession that it lacks sufficient evidence to connect those claimants' losses to the offense (Doc. 308 at 7–8), which confirms that causation must be proved claimant by claimant.
27. Omission — Meghji affidavit. The Order does not address that the Government's only new evidence is an affidavit from the acting CEO of the

Special Master's controlled entity whose five decisive averments are sworn only on information and belief (Doc. 308, Ex. C ¶¶ 5, 8, 13, 21, 22; Causey v. Balog, 162 F.3d at 803 n.4).

28. Omission — removal of NHC directors. The Order does not address the Special Master's removal of the AAI-appointed NHC directors two weeks after taking the NHC equity (Million Decl. ¶¶ 25–26).
29. Omission — withheld methodology. The Order does not address that the Special Master's valuation methodology and underlying data have been withheld from the Court and defense counsel (Doc. 309).
30. Omission — denial of subpoenas. The Order does not address the Government's and Special Master's opposition to Defendant's Rule 17(c) subpoenas for the books and records of the surrendered companies (Doc. 248).
31. Omission — Special Master's own disclaimers. The Order does not address that the Special Master "presumed that the balances used in the IALA were accurate" (Doc. 245 at 9) and described his valuation as a "current guess" from a "desktop exercise" that is not a formal valuation (id. at 36 n.31, 37).
32. Omission — Government's coercion of the reference. The Order does not address that the Government drafted and imposed the receivership structure over Defendant's objection and under threat of proceeding without him (Def. Ex. 1, Tab D).
33. Legal error — Squirrel. The Order does not cite or distinguish United States v. Squirrel, 588 F.3d 207 (4th Cir. 2009), which holds that the identical "directly or indirectly harmed" plea language does not supply a basis for restitution absent proximate cause.
34. Legal error — In re Zetteler. The Order does not cite or apply In re Zetteler, No. 26-1749 (4th Cir. June 13, 2026), the law of this case, requiring that each loss be "closely related to the conduct inherent to the offense."
35. Legal error — Ellingburg. The Order does not cite Ellingburg v. United States, 607 U.S. 163 (2026), and does not apply the heightened procedural protections that attend a criminal penalty.
36. Legal error — Hughey/Steele/Ritchie. The Order does not apply the rule that restitution is capped at actual loss caused by the offense of conviction and may not produce a windfall. See also United States v. Elbaz, 52 F.4th 593 (4th Cir. 2022).
37. Legal error — burden of proof. The Order inverts § 3664(e) by faulting Defendant for attempting to "undo" admissions rather than requiring the Government to prove loss and causation. Stone, 866 F.3d at 227; Steele, 897 F.3d at 614.
38. Legal error — § 3663A(a)(3). The Order reads § 3663A(a)(3) as eliminating causation. That provision expands the class of payees under an agreement; it does not authorize restitution for losses the criminal conduct did not cause, and the Plea Agreement itself limits restitution to harm "by the defendant's criminal conduct."

39. Legal error — statutory maximum. Restitution for losses not proximately caused by the offense exceeds the statutory maximum and is an illegal sentence regardless of consent. Leal; Winchel; Kim; Broughton-Jones; Davis.
40. Legal error — superseding cause. The Order does not apply Robers, Speakman, Tyler, or Gibbens to the intervening decisions of the Government, the Rehabilitator, and the Special Master.
41. Legal error — mandatory credits. The Order does not apply § 3664(j)(2) or § 3663A(b)(1)(B), or Arrington and Malone, requiring reduction for value recovered or returned. See United States v. Alalade, 204 F.3d 536 (4th Cir. 2000).
42. Legal error — "risk" is not loss. To the extent the Order or any final order rests on the premise that the "real loss" was "risk," Defendant objects: the MVRA compensates actual loss only, and the affiliated investments were lawful, regulator-approved, and within industry practice when made.
43. Legal error — Tumey standard. The Order applies a subjective actual-bias standard and disregards the objective "possible temptation" test of Tumey, Ward, Concrete Pipe, and Williams v. Pennsylvania. See Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009); Harper v. Prof'l Probation Servs., Inc., 976 F.3d 1236 (11th Cir. 2020).
44. Legal error — O'Connor. The Order dismisses O'Connor's holding that one person may not serve as both receiver and special master as "dicta" and disregards its reasoning, which the Government has never answered.
45. Legal error — Konrad, Richardson, Withrow. Each is distinguishable: none involves an adjudicator compensated from the res he administers and liquidates.
46. Legal error — Burks, Adams, Hitt. Unpublished consent appointment orders in which no constitutional challenge was raised or decided are not authority that the arrangement is constitutional.
47. Legal error — Article III. The reference assigns to a non-Article III, fee-interested officer the adjudicative functions of quantifying loss and fashioning a restitution order, which is criminal punishment. Defendant preserves the structural Article III objection, which personal consent cannot waive.
48. Legal error — § 455(b). Defendant preserves the objection that the Special Master, as an officer exercising adjudicative functions, is disqualified under 28 U.S.C. § 455(b)(4) by reason of a financial interest in the subject matter.
49. Legal error — In re Brooks. A report produced by a disqualified officer may not be submitted to or relied upon by the Court; the Order's announced intention to adopt the Special Master's report is therefore error.
50. Legal error — Doc. 56 ¶ 16. The Special Master's authority does not extend to violating other court orders or governing instruments; the Beckett disposition proceeded in violation of the Trust Agreement's approval requirements and without notice to the Court.

51. Legal error — waiver. Neither the Plea Agreement, the Joint Motion, nor the absence of an objection to Doc. 56 waives a structural constitutional defect, a statutory-maximum objection, or the Government's § 3664(e) burden. Coerced acquiescence is not consent.
52. Legal error — Apprendi/Southern Union. Defendant preserves the objection that facts increasing a criminal restitution penalty must be found by a jury beyond a reasonable doubt.
53. Procedural error — de novo determination. Announcing adoption of the report "with a few modifications" before ruling on Defendant's objections is not the de novo determination § 3664(d)(6) requires.
54. Procedural error — no evidentiary hearing. The Order resolves disputed facts (control, approval of the Beckett sale, the fee arrangement, causation) on the papers, on an information-and-belief affidavit, without cross-examination.
55. Procedural error — Government default. The Order resolves Docs. 269 and 278 on the merits notwithstanding the Government's failure to respond to Defendant's dispositive motions on the merits and issue by issue, contrary to LCrR 47.1(d).
56. Procedural error — unresolved motions. The Order does not rule on Docs. 172, 190, 201, 202, 225, 234, 235, 238, 248, 282, 290, 293, or 309, each of which bears on the relief denied.
57. Procedural error — access to counsel and records. Defendant was required to litigate these motions from custody, with limited access to counsel, a computer, and the case record (Doc. 225), and while the records necessary to his showing were withheld.
58. Procedural error — accounting. No final order may be entered before the full and verified accounting of every disposition of Primary Restitution Assets and every fee paid from the estate (Doc. 269-5 ¶ 5) has been rendered and tested.
59. Procedural error — stay. Defendant renews his request that all further sales, liquidations, and dispositions of Primary Restitution Assets be stayed pending final determination and appeal (Docs. 172, 190; Doc. 269-5 ¶ 3), and objects to any disposition in the interim.
60. Preservation. Every argument, fact, exhibit, and authority in the filings incorporated above is preserved, whether or not restated here, and Defendant does not waive any of them by this Response.

## PART S-7 — EVERY DEFENSE FILING AFTER SENTENCING (May 26, 2026), INCORPORATED AND PRESERVED

Each filing below was made by Defendant in No. 3:23-CR-48 after the sentencing hearing of May 26, 2026 (the parallel entries in No. 5:19-CR-22 are incorporated by the same reference). Every fact, exhibit, argument, and authority in each is incorporated by reference into the Addendum and into the Motion for Reconsideration, and is preserved for de novo determination and for review. Where

the Government or the Special Master did not answer a filing on the merits, the opportunity to do so has passed. Docket numbers and dates are from the CourtListener/RECAP docket for 3:23-CR-48 (docket id 66858068), pulled September 14, 2026; administrative entries (pro hac vice, transcript requests, withdrawal and substitution of counsel, appearance, remote-appearance) are listed at the end for completeness only.

**A. Substantive motions, responses, replies, notices, and declarations**

| Doc. | Date | Filing | Responds to / relates to |
|---|---|---|---|
| 168 | 06/04/2026 | Motion to Delay Federal Prison Reporting Date | (Wyatt) — terminated as moot 08/21/2026 |
| 172, 173 | 06/09/2026 | Motion to Stay, with Memorandum in Support | Preliminary Restitution Order (Doc. 161) / Special-Master process |
| 174 | 06/09/2026 | Response (with Exhibits, Docs. 175–188) | Answered only by the Omnibus Response (Doc. 279) |
| 190 | 06/11/2026 | Motion to Stay (Exs. B, W, S2, Statement of Facts, Proposed Order) | Seeking disqualification of Special Master |
| 192 | 06/11/2026 | Notice of Appeal (Judgment, Doc. 162; Order, Doc. 161) | 4th Cir. No. 26-4309 |
| 198 | 06/12/2026 | Notice of Filing / Response in Opposition | Docs. 189, 193 (van Faassen/Zetteler mandamus) |
| 201, 202 | 06/15/2026 | Motions (each with Affidavit and Proposed Order) | Denied 08/14/2026 (Doc. 305) |
| 211 | 06/17/2026 | Response in Opposition | Doc. 205 (Government extension motion) |
| 212 | 06/17/2026 | Response in Opposition | Doc. 171 (Samson motion for reconsideration/objection to restitution) |
| 213 | 06/17/2026 | Motion for Extension of Time | re Doc. 171 |
| 219 | 06/22/2026 | Response in Opposition | Doc. 205 |
| 220 | 06/22/2026 | Response in Opposition (with Exhibit) | Doc. 218 (Special Master extension motion) / Doc. 217 |
| 224 | 06/23/2026 | Motion to Dismiss as Moot Motions to Withdraw as Counsel | (Wyatt) |
| 225 | 06/24/2026 | Motion for Order Directing BOP to Permit Daily Access to Counsel | — |
| 227 | 06/29/2026 | Response in Opposition (4 Exhibits) | Docs. 221–222 (Samson CVRA restitution motion) |
| 228 | 06/30/2026 | Response in Opposition | Doc. 223 (Pennsylvania Commissioner amicus letter) |
| 234 | 07/14/2026 | Motion for Determination That No Restitution Is Owed, or | Pending; never ruled on |

| | | | |
|---|---|---|---|
| | | for Exclusion and Offset of Losses Not Proximately Caused | |
| 235 | 07/15/2026 | Declaration of Greg E. Lindberg — Consolidated Statement of Facts (Exhibits A1–A15 et seq.) | In support of Doc. 234 |
| 236 | 07/17/2026 | Motion for Leave to File Sur-Reply | Doc. 233 (Samson reply) |
| 237 | 07/17/2026 | Response in Opposition (Exhibits 1–5+) | Docs. 221–222 |
| 238 | 07/17/2026 | Motion to Recoup the Distribution to Vista (Cell 1.16) (Ex. A Tabs) | Pending |
| 248 | 07/23/2026 | Motion for Issuance of Rule 17 Subpoenas Duces Tecum (Exs. A–...) | Denied 08/14/2026 (Doc. 304) |
| 251 | 07/24/2026 | Notice of Filing of Petition for Writ of Mandamus (Ex. A) | 4th Cir. No. 26-1965 (denied 08/04/2026, Doc. 272) |
| 252 | 07/25/2026 | Response in Opposition to Motion for Inquiry into Status of Counsel / Motion to Modify Transport Order (4 Exhibits) | Doc. 247 |
| 253 | 07/26/2026 | Supplemental Response of Undersigned Counsel (2 Exhibits) | Doc. 247 |
| 254 | 07/27/2026 | Notice of Filing of Statement of Counsel Representation and Emergency Request for Furlough (Ex. A) | Doc. 247 / hearing |
| 256 | 07/27/2026 | Notice of Correction Regarding Valuation of Beckett Collectibles | Doc. 234 |
| 257 | 07/27/2026 | Notice of Petition for Writ of Mandamus (Exhibit) | 4th Cir. No. 26-1965 |
| 259 | 07/28/2026 | Notice of Errata (Docs. 172, 173, 174, 190, 202, 211, 212, 213, 220, 225, 234, 236, 238) | — |
| 260 | 07/28/2026 | Notice of Filing of Exhibits (3 Exhibits) | — |
| 264, 265 | 07/30/2026 | Wyatt & Blake Fifth Motion for Payment of Fees and Expenses; Wyatt Declaration | Granted 08/26/2026 (Doc. 328) |
| 267 | 07/30/2026 | Motion for Extension of Time (Ex. A: unsigned draft Response and Objection to Special Master's Second Supplement) | Doc. 245 |
| 269 | 07/31/2026 | Motion to Declare the Special-Master Reference Unconstitutional as | Denied 08/31/2026 (Doc. 330) |

| | | | |
|---|---|---|---|
| | | Applied, to Disqualify and Remove the Special Master, and to Set Aside the Restitution Order (with Exhibits, incl. 269-5 Proposed Order) | |
| 270 | 08/03/2026 | Reply (Exhibits 1–…) | Doc. 221 (Samson) |
| 271 | 08/03/2026 | Response in Opposition (Ex. A: Affidavit of Greg E. Lindberg) | Doc. 247 |
| 277 | 08/06/2026 | Notice of Errata | Doc. 269 |
| 278 | 08/06/2026 | Motion re Doc. 269 | Denied 08/31/2026 (Doc. 330) |
| 280 | 08/06/2026 | Response in Opposition | Doc. 245 (Special Master's Second Supplement) |
| 281 | 08/06/2026 | Response in Opposition (3 Affidavits, 3 Exhibits) | Doc. 245 |
| 282 | 08/06/2026 | Motion for Abeyance (Exhibit) | Terminated as moot 08/20/2026 |
| 283 | 08/06/2026 | Response in Opposition (Affidavit, 2 Exhibits) | Doc. 266 (Special Master's opposition to subpoenas) |
| 285 | 08/06/2026 | Response in Opposition (Affidavit, 2 Exhibits) | Doc. 261 (Government's opposition to subpoenas) |
| 289 | 08/07/2026 | Notice of Errata (Docs. 280, 281, 283, 285) (Exhibits incl. 4Q2019 Quarterly …) | — |
| 290 | 08/07/2026 | Motion to Strike the Government's Omnibus Response (2 Exhibits) | Doc. 279; denied 08/20/2026 (open court 08/10/2026) |
| 291 | 08/09/2026 | Response in Opposition (Exhibit) | Doc. 279 (Government Omnibus Response) |
| 292 | 08/09/2026 | Response in Opposition — Reply in support of Docs. 269/278 (6 Exhibits) | Doc. 288 (Special Master's response) |
| 293 | 08/10/2026 | Motion for Leave to File Supplemental Response and to Continue to Supplement | Granted 08/13/2026 |
| 294 | 08/10/2026 | Notice of Supplemental Authority | Doc. 248 |
| 295 | 08/10/2026 | Supplemental Response — Objections to Special Master's Report re Zero-Coupon Principal-Protected Bonds (Lindberg Declaration) | Doc. 106 / Doc. 245 |
| 296 | 08/10/2026 | Notice of Filing Certificate of Cancellation of the Beckett Collectibles Trust (Ex. A) | — |
| 300 | 08/13/2026 | Reply in Support of Doc. 234 — Proximate Cause, Amount, and Offsets | Doc. 279 / Doc. 245 |

| | | | |
|---|---|---|---|
| | | (with Statement of Facts re Disaffiliation and Exs. DS-1–DS-21) | |
| 301 | 08/13/2026 | Response in Opposition | Doc. 275 (ULICO) |
| 302 | 08/13/2026 | Response in Support | Doc. 238 (Vista/Cell 1.16) |
| 303 | 08/13/2026 | Notice of Errata | Doc. 290 |
| 309 | 08/18/2026 | Motion for Reconsideration of Order Denying Subpoenas (Exhibit) | Doc. 304; Special Master opposed (Doc. 323) |
| 316 | 08/23/2026 | Response in Opposition to the Government's Consolidated Position (2 Exhibits) | Doc. 308 — never cited in Doc. 330 |
| 317, 318 | 08/23/2026 | Motion to Seal; Sealed Addendum | re Doc. 316 (denied as moot, Doc. 326) |
| 319 | 08/23/2026 | Response | Doc. 247 |
| 320 | 08/23/2026 | Motion to Stay (2 Exhibits) | Opposed: Docs. 334 (SM), 335 (Gov't) |
| 321, 322 | 08/23/2026 | Corrected Motion to Seal; Sealed Addendum | re Doc. 316 (granted, Doc. 325) |
| 324 | 08/24/2026 | Notice of Correction to Doc. 316 (Ex. 1, Tab B — Declaration of Greg E. Lindberg) | Doc. 316 |
| 329 | 08/26/2026 | Notice of Objections to Entry of Any Final Order of Restitution and Forfeiture, and Reservation of Constitutional and Statutory Issues | — |
| 331 | 08/31/2026 | Motion to Compel the Government to Produce the Data Underlying the Restitution Figure and Its Ex Parte Communications, and to Set Aside the Report and Final Supplement (331-1 Affidavit; 331-2 Ex. A) | Opposed: Doc. 341 |
| 332 | 08/31/2026 | Motion to Compel the Special Master to Produce the Data and His Ex Parte Communications, and to Set Aside His Report and Final Supplement | Opposed: Docs. 343 (affidavit), 344 |
| 333 | 08/31/2026 | Reply to the Special Master's Response (Doc. 323) re Motion for Reconsideration of Subpoena Order | Doc. 323 |
| 336, 337 | 09/01/2026 | Katten Fifth Motion for Payment of Fees and Expenses; Memorandum (McCarthy Declaration) | Opposed: Doc. 338; Reply Doc. 342 (09/09/2026) |
| 339 | 09/07/2026 | Reply (Exhibit; Affidavit) | Doc. 334 (Special Master's opposition to |

| | | | |
|---|---|---|---|
| | | | stay) |
| 340 | 09/07/2026 | Reply (Exhibit; Affidavit) | Doc. 335 (Government's opposition to stay) |

**B. Administrative entries (listed for completeness)**

Docs. 170 (Barnes appearance, 06/09); 195–197 (Katten and Wyatt & Blake motions to withdraw, 06/12); 207–209 (Litson pro hac vice motions, 06/17); 210 (motion to substitute, 06/17); 226, 229 (transcript requests, 06/25, 07/01); 244 (Ramachandran pro hac vice, 07/22); 249 (substitution of counsel; Litson terminated, 07/23); 284 (unopposed motion to appear remotely, 08/06).

**C. Responses the Government and the Special Master did not make**

Of the filings above, the Government filed no merits response to Docs. 172, 190, 201, 202, 225, 234, 235, 238, 269, 278, 280–281, 283, 285, 291–292, 295, 300, 302, 309, 316, 324, 329, or 333 other than the four-page Omnibus Response (Doc. 279) that "concurs" with the Special Master and "stands ready" to respond "[i]f the Court would like," and the Consolidated Position (Doc. 308) that declined to address the issues one by one. The Special Master responded to Docs. 172/190/201/202 (Doc. 217), 190 (Doc. 268), 248 (Doc. 266), 269 (Doc. 288), 309 (Doc. 323), 320 (Doc. 334), and 332 (Docs. 343–344), and disclaimed any legal defense of the reference as "within the Government's purview" (Doc. 288, at 2). [Counsel: confirm against the docket before filing; this list is compiled from docket descriptions, not from reading each response.]